UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

DIRECT ACTION FOR RIGHTS AND
EQUALITY,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES,

*Respondents*.

No._____

**Received Electronically**
**September 5, 2024**
**United States Court of Appeals**
**For the First Circuit**

**PETITION FOR REVIEW**

Pursuant to 5 U.S.C. § 702, 42 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, and Federal Rule of Appellate Procedure 15(a), Direct Action for Rights and Equality ("DARE") hereby petitions this Court to review the Report and Order, Order on Reconsideration, Clarification, and Waiver of Respondent Federal Communications Commission ("FCC") captioned *In the Matter of Incarcerated People's Communication Services; Implementation of the Martha-Wright Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 & 12-375, FCC 24-75 (released July 22, 2024) ("Order") (Ex. A).

The complete Order has yet to be published in the Federal Register. However, on August 26, 2024, a small portion of the Order was published in the Federal Register. *See* 89 Fed. Reg. 68,369 (Aug. 26, 2024) (Ex. B). The published portion of the Order addresses petitions for reconsideration, clarification, and waiver. The remainder of the Order—including its key substantive provisions—has yet to be published in the Federal Register.

Given the limited publication at this date, DARE believes that the Order is not yet reviewable. However, to safeguard its rights in pursuing litigation, DARE is filing a protective

petition at this time to ensure that it is entitled to review, in the event that the Order is deemed now reviewable.

Venue is proper in this Court pursuant to 28 U.S.C. § 2342(1) because DARE's principal place of business is 340 Lockwood Street, Providence, Rhode Island 02907.  DARE submitted comments in the underlying proceeding before the FCC and is aggrieved by the Order itself not the published excerpts) within the meaning of 28 U.S.C. § 2344, although DARE does not claim to be separately aggrieved by the limited portion of the Order published on August 26, 2024.

The Order implements the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) (codified at 47 U.S.C. §§ 152–153, 276), which required the FCC to establish a compensation plan for incarcerated people's communication service ("IPCS") providers and to adopt rate caps for incarcerated people's audio and video communication services.

The Act amended the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, by mandating that all rates and charges fir incarcerated people's communication services be just and reasonable; by expanding the FCC's authority over IPCS beyond traditional payphone service in correctional institutions to also encompass advanced communication services, such as video; by eliminating the requirement that individuals utilizing incarcerated people's communications services—both incarcerated individuals and their families—pay providers on a per-call basis; and by directing the FCC to complete a rulemaking to implement the Act's requirements.  But the Order adopted by the FCC maintains some of the very barriers to keeping families connected that Congress passed the Act to eliminate.  In particular, the FCC declined to adopt certain consumer protection measures and permitted the recovery of safety and security costs that are not used and useful in the provision of IPCS through its regulated rate caps.

Accordingly, DARE seeks review of the Order on the grounds that it is arbitrary, capricious, an abuse of discretion, and/or otherwise contrary to law within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*  DARE respectfully requests that the Court hold aspects of the Order unlawful and remand the matter to the FCC for further proceedings.

Dated: September 5, 2024                    Respectfully submitted,

                                            */s/ Jessica Ring Amunson*
                                            Jessica Ring Amunson
                                            Jenner & Block LLP
                                            1099 New York Ave, N.W. Suite 900
                                            Washington, D.C. 20001
                                            (202) 639-6000
                                            jamunson@jenner.com

                                            *Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Petition for Review was served on

September 5, 2024, by e-mail on the following:

> P. Michelle Ellison
> General Counsel
> Federal Communications Commission
> 45 L Street NE
> Washington, DC 20554
> LitigationNotice@fcc.gov

I hereby certify that a copy of the foregoing Petition for Review was served on

September 5, 2024, by first-class mail on the following:

> Merrick Garland
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Ave., NW
> Washington, DC 20530

*/s/ Jessica Ring Amunson*
Jessica Ring Amunson

# Exhibit A

Federal Communications Commission    FCC 24-75

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |

**REPORT AND ORDER, ORDER ON RECONSIDERATION,**
**CLARIFICATION AND WAIVER, AND FURTHER**
**NOTICE OF PROPOSED RULEMAKING**

**Adopted: July 18, 2024**                    **Released: July 22, 2024**

**Comment Date: [[30]] days after publication in the Federal Register**
**Reply Comment Date: [[60]] days after publication in the Federal Register**

By the Commission: Chairwoman Rosenworcel and Commissioners Starks and Gomez issuing separate statements; Commissioner Carr concurring in part and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                                                    Paragraph #

I. INTRODUCTION ........................................................................................................................ 1
   A. Executive Summary ............................................................................................................. 3
II. BACKGROUND ......................................................................................................................... 5
   A. The Martha Wright-Reed Just and Reasonable Communications Act of 2022 ................... 5
   B. Early Reform Efforts ........................................................................................................... 9
   C. The *GTL v. FCC* Decision .................................................................................................. 12
   D. More Recent Reform Efforts .............................................................................................. 15
   E. Implementation of Martha Wright-Reed Act ..................................................................... 21
III. DISCUSSION ............................................................................................................................ 23
   A. Unique Marketplace for Incarcerated People's Communications Services ........................ 23
   B. Impact on Consumers and Society ..................................................................................... 26
   C. Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder ............ 31
      1. Purpose and Scope of the Martha Wright-Reed Act ................................................... 31
      2. Addition of "Other Calling Device[s]" ....................................................................... 33
      3. The Requirement to Establish a Compensation Plan ................................................... 37
      4. Amendment to Section 2(b) of the Communications Act ............................................ 89
      5. Inclusion of Advanced Communications Services Within the Definition of Payphone
         Service ......................................................................................................................... 90
      6. Onsite Video Visitation .............................................................................................. 109
   D. Rate Caps .......................................................................................................................... 117
      1. Rate Cap Structure ..................................................................................................... 120
      2. Preliminary Costing Issues ........................................................................................ 159
      3. Accounting for Correctional Facility Costs ............................................................... 163
      4. Adopting Audio and Video Incarcerated People's Communications Services Rate
         Caps ........................................................................................................................... 183

**Federal Communications Commission**                    **FCC 24-75**

5. Preemption .................................................................................................................. 223
6. Site Commissions ......................................................................................................... 242
7. Safety and Security Costs ............................................................................................ 339
8. Ancillary Service Charges ........................................................................................... 408
9. Alternate Pricing Plans ............................................................................................... 427
10. International Rate Caps ............................................................................................... 472
E. Waivers ............................................................................................................................... 475
F. Communications Services for Incarcerated People with Disabilities ................................ 482
1. Part 14 Changes ........................................................................................................... 483
2. Enterprise Registration for IP CTS and IP Relay ....................................................... 489
3. Other Issues ................................................................................................................. 495
G. Reform of Consumer Protection Rules .............................................................................. 499
1. Consumer Disclosure Rules ......................................................................................... 502
2. Treatment of Unused Balances in IPCS Accounts ...................................................... 530
H. Other Matters ..................................................................................................................... 557
1. Rule Revisions ............................................................................................................. 557
2. Definitions of Prison and Jail ...................................................................................... 560
3. Annual Reporting and Certification Requirement ....................................................... 565
4. Reporting and Recordkeeping ...................................................................................... 573
5. Payphones Outside the Incarceration Context ............................................................. 578
6. Cost Benefit Analysis of Revised Interstate and Intrastate Rate Caps ........................ 579
7. Effective Dates and Compliance Dates ....................................................................... 587
8. Enforcement ................................................................................................................. 597
I. Severability ......................................................................................................................... 598
IV. ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER .............................. 599
A. Hamilton Petition for Reconsideration .............................................................................. 600
B. Securus Petition for Clarification ....................................................................................... 604
C. Securus Waiver Petition ..................................................................................................... 606
V. FURTHER NOTICE OF PROPOSED RULEMAKING ........................................................... 608
A. Establishing Permanent Rate Caps for Video Services ..................................................... 608
B. Further Disaggregating the Very Small Jail Tier ............................................................... 612
C. Quality of Service .............................................................................................................. 613
D. Expanding the Definitions of Prisons and Jails ................................................................. 617
E. Treatment of Unused Balances in IPCS Accounts ............................................................. 620
F. Uniform Additive to Account for Correctional Facility Costs .......................................... 621
G. Effect on Small Entities ..................................................................................................... 623
H. Digital Equity and Inclusion .............................................................................................. 624
I. OPEN Government Data Act .............................................................................................. 625
VI. PROCEDURAL MATTERS ...................................................................................................... 626
VII. ORDERING CLAUSES ............................................................................................................. 640
APPENDIX A – FINAL RULES
APPENDIX B – FINAL REGULATORY FLEXIBILITY ACT ANALYSIS
APPENDIX C – INITIAL REGULATORY FLEXIBILITY ACT ANALYSIS
APPENDIX D – DATA COLLECTION
APPENDIX E – RATE CAP METHODOLOGY
APPENDIX F – SUMMARY STATISTICS
APPENDIX G – LASSO ANALYSIS
APPENDIX H – UPPER BOUND ANALYSIS
APPENDIX I – LOWER BOUND ANALYSIS
APPENDIX J – RATE CAP VALIDATION

## I.    INTRODUCTION

1.    Today we take the most significant steps thus far to fulfill the dream of Martha Wright-Reed, who advocated tirelessly to ensure that incarcerated people would be able to communicate with family and loved ones at just and reasonable rates.  While this Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking implements the requirements of the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or Act), this proceeding began over twenty years ago when a determined grandmother petitioned the Federal Communications Commission to take action against the egregiously high telephone rates and charges that were impeding incarcerated people's ability to stay connected with their families and friends.  Martha Wright-Reed championed the idea of easing the financial burdens imposed on incarcerated people and their families simply to make a phone call.  As a blind elderly woman, who could neither write letters nor travel such long distances for in-person visits, she often spent hundreds of dollars a month in long distance phone calls to stay in touch with her incarcerated grandson.[1]  In her honor, and in the face of years of litigation frustrating the Commission's reform efforts in this area, Congress passed the Martha Wright-Reed Act, significantly expanding the Commission's jurisdiction over incarcerated people's communications services (IPCS) and directing the Commission to "establish a compensation plan to . . . ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities."[2]

2.    In this item, we exercise the authority granted the Commission by Congress and adopt comprehensive reforms that will significantly reduce the financial burdens incarcerated people face to communicate with their loved ones.  We first reduce existing rate caps for all incarcerated people's audio communication services, by implementing a methodology specifically permitted by Congress in the Act, and establish, for the first time, interim rate caps for incarcerated people's video communications services.  We also materially reduce the prices consumers pay for IPCS by limiting the costs that can be recovered through IPCS rates to only costs that the Commission finds are used and useful in the provision of IPCS.  We also permit states to maintain rates lower than the Commission's rate caps.  We next end IPCS providers' long-standing practice of making site commission payments to carceral facilities, the costs of which were passed through to consumers via higher IPCS rates.  We further strengthen the requirements for access to IPCS by incarcerated people with disabilities, and adopt stronger consumer protection rules.  We also permit providers, for the first time, to offer optional alternate pricing plans, subject to conditions to protect and benefit IPCS consumers.  We issue an Order resolving various petitions pending in this proceeding from our prior orders.  Finally, we adopt a Further Notice of Proposed Rulemaking to obtain evidence necessary to make further progress toward accomplishing the critical work that remains.

### A.    Executive Summary

3.    The Report and Order implements the expanded authority granted to the Commission by the Martha Wright-Reed Act to establish a compensation plan that ensures both just and reasonable rates and charges for incarcerated people's audio and video communications services and fair compensation for incarcerated people's communications service providers.  The Report and Order fundamentally reforms the regulation of IPCS in all correctional facilities, regardless of the technology used to deliver these services, and significantly lowers the IPCS rates that incarcerated people and their loved ones will pay.  These comprehensive reforms:

---

[1] *See* Myaisha Hayes, *Prison Phone Justice is a Gender Justice Issue: The Legacy of Mrs. Martha Wright-Reed*, Media Justice, Mar. 8, 2019 (https://mediajustice.org/news/prison-phone-justice-is-a-gender-justice-issue-the-legacy-of-mrs-martha-wright-reed/).

[2] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156, pmbl. (Martha Wright-Reed Act or the Act); 168 Cong. Rec. H10027-28 (daily ed. Dec. 22, 2022) (statements of Reps. Pallone and Rush) (referencing the *Global Tel* Link v. FCC*, 866 F.3d 397, 403 (D.C. Cir. 2017) (*GTL v. FCC*) decision that the Commission lacked authority over intrastate rates).

Federal Communications Commission                                                    FCC 24-75

- Utilize the expanded authority Congress granted the Commission, in conjunction with the FCC's preexisting statutory authority, to adopt just and reasonable IPCS rates and charges for all intrastate, interstate, and international audio and video IPCS, including video visitation services;

- Lower existing per-minute rate caps for audio IPCS and establish initial interim per-minute rate caps for video IPCS, based on industry-wide cost data submitted by IPCS providers, while permitting states to maintain IPCS rates lower than the Commission's rate caps;

- Lower the overall prices consumers pay for IPCS and simplify the pricing structure by incorporating the costs of ancillary services in the rate caps and prohibiting providers from imposing any separate ancillary service charges on IPCS consumers;

- Prohibit IPCS providers from making site commission payments for IPCS and preempt state and local laws and regulations requiring such commissions;

- Limit the costs associated with safety and security measures that can be recovered in the per-minute rates to only those costs that the Commission finds are used and useful in the provision of IPCS;

- Allow, subject to conditions, IPCS providers to offer alternate pricing plans for IPCS that comply with the rate caps we establish;

- Revise and strengthen accessibility requirements for IPCS for incarcerated people with disabilities;

- Revise and strengthen existing consumer disclosure and inactive account requirements; and

- Revise the existing annual reporting and certification requirements.

4.     We adopt the following rate caps:

### Table One: New Rate Caps by Tier

| Tier (ADP) | Audio (Permanent) (Per minute) | | Video (Interim) (Per minute) | |
|---|---|---|---|---|
| | Current Caps | New Caps | Current Caps | New Caps |
| **Prisons** (any ADP) | $0.14* | *$0.06* | N/A | *$0.16* |
| **Large Jails** (1,000+) | $0.16* | *$0.06* | N/A | *$0.11* |
| **Med. Jails** (350-999) | $0.21 | *$0.07* | N/A | *$0.12* |
| **Small Jails** (100-349) | $0.21 | *$0.09* | N/A | *$0.14* |
| **Very Small Jails** (0-99) | $0.21 | *$0.12* | N/A | *$0.25* |

*\* Current cap figures that include a $0.02 additive for facility costs, which equates to the allowance made for facility-incurred IPCS costs reflected in contractually-prescribed site commissions, the closest available comparison.*

## II.     BACKGROUND

### A.     The Martha Wright-Reed Just and Reasonable Communications Act of 2022

5.     The Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act or Act),[3] was enacted on January 5, 2023.  It represents the culmination of a years-long effort to comprehensively address unreasonably high rates and charges that incarcerated people and their families pay for communications services.  The Act expands and clarifies the scope of the Commission's authority over IPCS under section 276 of the Communications Act of 1934, as amended

---

[3] Martha Wright-Reed Act.

(Communications Act)[4] by modifying section 276 to require the Commission to ensure that the rates and charges for incarcerated people's intrastate communications services be just and reasonable.[5]  It also modifies the requirement in section 276(b)(1)(A) that providers be fairly compensated by eliminating the requirement that compensation occur on a "per call" basis and for "each and every [call]."[6]  Thus, with the new amendments, section 276(b)(1)(A) directs the Commission to establish a compensation plan to "ensure that all payphone service providers are fairly compensated and all rates and charges are just and reasonable for completed intrastate and interstate communications using their payphone or other calling device."[7]  The Act further augments the Commission's jurisdiction by modifying the Communications Act to expand the definition of payphone service in correctional institutions to encompass advanced communications services, including "any audio or video communications service used by inmates . . . regardless of technology used."[8]

6.      The Martha Wright-Reed Act also amends section 2(b) of the Communications Act to reinforce that the Commission's jurisdiction extends to intrastate, as well as interstate and international, communications services used by incarcerated people.[9]  The Communications Act generally allocates regulatory authority over intrastate, interstate, and international communications services between the Commission and the states.[10]  It grants authority to the Commission to ensure that "[a]ll charges, practices, classifications, and regulations for and in connection with" interstate or international common carrier communications services are "just and reasonable," and directs the Commission to "prescribe such rules and regulations as may be necessary in the public interest to carry out" this mandate.[11]

7.      Section 2(b) of the Communications Act generally preserves states' jurisdiction over "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service."[12]  The Commission is thus "generally forbidden" from regulating "intrastate communication service, which remains the province of the states."[13]  Stated differently, section 2(b) "erects a presumption against the Commission's assertion of regulatory authority over intrastate communications."[14]  But Congress can enact statutory provisions that overcome this presumption, including by expressly excluding provisions of the Communications Act from section 2(b).[15]  Section 276 of the Communications Act always has been clear that the Commission has authority to establish

---

[4] 47 U.S.C. § 151 *et seq.*

[5] Martha Wright-Reed Act § 2(a)(1)(B).

[6] *Id.* § 2(a)(1)(A), (C).  Prior to the Martha Wright-Reed Act, section 276 of the Communications Act directed the Commission to prescribe regulations establishing a "per call" compensation plan ensuring that payphone service providers, including ICS providers, "are fairly compensated for each and every completed intrastate and interstate call using their payphone."  47 U.S.C. § 276(b)(1)(A) (1996).

[7] 47 U.S.C. § 276(b)(1)(A).  The Communications Act explicitly exempts emergency calls and telecommunications relay service calls for hearing disabled individuals from the fair compensation requirement.  *Id.*

[8] Martha Wright-Reed Act § 2(a)(2), (b); 47 U.S.C. §§ 153(1)(E), 276(d).

[9] Martha Wright-Reed Act § 2(c); 47 U.S.C. § 152(b).

[10] 47 U.S.C. § 152.

[11] *Id.* § 201(b).

[12] *Id.* § 152(b).

[13] *GTL v. FCC*, 866 F.3d at 403 (quoting *New England Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 75 (D.C. Cir. 2003) (citing 47 U.S.C. § 152(b)).

[14] *GTL v. FCC*, 866 F.3d at 409 ("This is 'not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction' in interpreting the [Communications] Act's provisions." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 373 (1986) (*La. Pub. Serv. Comm'n*)).

[15] *See, e.g.*, 47 U.S.C. § 152(b) (providing a list of sections of the Communications Act that are excepted from section 152(b)).

compensation plans for "intrastate and interstate" payphone calls,[16] and the Martha Wright-Reed Act also specifically modified section 2(b) to include section 276, as amended, in an explicit exception.[17] This amendment makes abundantly clear that the Commission's authority under section 276 encompasses intrastate IPCS.

8.        In direct response to the D.C. Circuit's decision in *GTL v. FCC*, the Act expressly allows the Commission to "use industry-wide average costs," as well as the "average costs of service of a communications service provider" in setting just and reasonable rates and charges.[18] In implementing the Act, the Commission is required to consider the "costs associated with any safety and security measures necessary to provide" telephone service and advanced communications services.[19] Finally, the statute directs the Commission to promulgate regulations necessary to implement the statutory provisions not earlier than 18 months and not later than 24 months after its January 5, 2023 enactment date.[20]

### B.        Early Reform Efforts

9.        Prior to the enactment of the Martha Wright-Reed Act, the Commission had previously taken a number of steps to reform communications services for incarcerated people. In the *2012 ICS Notice*,[21] the Commission initiated its inmate calling services (ICS) rulemaking principally in response to petitions filed by Martha Wright and her fellow petitioners seeking relief from "excessive" inmate calling services rates.[22] In the *2013 ICS Order*, the Commission found that rates for calling services for incarcerated people greatly exceeded the reasonable costs of providing those services and adopted interim interstate rate caps of $0.21 per minute for debit and prepaid calls, and $0.25 per minute for collect calls.[23] The Commission also launched its First Mandatory Data Collection to obtain industry cost data to

---

[16] *Id.* § 276(b)(1)(A) (1996).

[17] Martha Wright-Reed Act § 2(c); 47 U.S.C. § 152(b).

[18] Martha Wright-Reed Act § 3(b)(1); *GTL v. FCC*, 866 F.3d at 414-15.

[19] Martha Wright-Reed Act § 3(b)(2).

[20] *Id.* § 3(a).

[21] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Notice of Proposed Rulemaking, 27 FCC Rcd 16629 (2012) (*2012 ICS Notice*).

[22] Petition for Rulemaking or, in the Alternative, Petition to Address Referral Issues in Pending Rulemaking by Martha Wright et al., CC Docket No. 96-128, at 1 (filed Nov. 3, 2003), https://www.fcc.gov/ecfs/document/5510934978/11 (requesting that the Commission reduce inmate calling services rates, prohibit exclusive inmate calling services contracts, and bar providers from requiring that all calls from correctional facilities be collect calls); Petitioners' Alternative Rulemaking Proposal by Martha Wright et al., CC Docket No. 96-128, at 2 (filed Feb. 28, 2007), https://www.fcc.gov/ecfs/document/5514061266/3 (emphasizing the urgent need for Commission action addressing exorbitant inmate calling services rates, proposing benchmark rates for interstate long distance inmate calling services calls, and reiterating their request that providers offer debit calling as an alternative option to collect calling); *see also Comment Sought on Alternative Rulemaking Proposal Regarding Issues Related to Inmate Calling Services*, CC Docket No. 96-128, Public Notice, 22 FCC Rcd 4229 (WCB 2007); *Petition for Rulemaking Filed Regarding Issues Related to Inmate Calling Services*; *Pleading Cycle Established*, CC Docket No. 96-128, Public Notice, DA 03-4027, 2003 FCC LEXIS 7261 (WCB Dec. 31, 2003) (requesting comment on both petitions).

[23] *Rates for Inmate Calling Services*, WC Docket No. 12-375, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 14107, 14111, para. 5 (2013) (*2013 ICS Order*). Under the Commission's rules, "Debit Calling" means "a presubscription or comparable service which allows an Inmate, or someone acting on an Inmate's behalf, to fund an account set up [through] a Provider that can be used to pay for Inmate Calling Services calls originated by the Inmate." 47 CFR § 64.6000(g). "Prepaid Calling" means "a presubscription or comparable service in which a Consumer, other than an Inmate, funds an account set up through a Provider of Inmate Calling Services. Funds from the account can then be used to pay for Inmate Calling Services, including calls that originate with an Inmate." *Id.* § 64.6000(p). "Collect Calling" means "an arrangement whereby the called party takes

(continued….)

**Federal Communications Commission**                                    **FCC 24-75**

help develop permanent rate caps.[24]  In the *2014 ICS Notice*, the Commission sought comment on establishing permanent rate caps for both interstate and intrastate calls and on reforming charges for services ancillary to the provision of inmate calling services.[25]

10.     In 2015, the Commission adopted a comprehensive regulatory framework for interstate and intrastate inmate calling services that included permanent rate caps for interstate and intrastate inmate calling services calls,[26] and imposed limits on ancillary service charges.[27]  Specifically, the *2015 ICS Order* set tiered rate caps for interstate calls based on the type and size of correctional facilities[28] and calculated these caps using industry-wide average costs as reported in the First Mandatory Data Collection.[29]  The Commission excluded all site commission payments from industry costs, having found such payments were not reasonably related to the provision of inmate calling services.[30]  The Commission

---

affirmative action clearly indicating that it will pay the charges associated with a call originating from an Inmate Telephone."  *Id.* § 64.6000(d).

[24] *2013 ICS Order*, 28 FCC Rcd at 14111-12, paras. 5, 7 (adopting the First Mandatory Data Collection).  While the D.C. Circuit stayed the application of portions of the *2013 ICS Order* in January 2014 in response to certain providers' petitions for review, it allowed the Commission's interim rate caps to remain in effect.  *Securus Techs., Inc. v. FCC*, No. 13-1280, 2014 U.S. App. LEXIS 13669, at *3 (D.C. Cir. Jan. 13, 2014) (order granting motions for stay in part).  Later that year, the court placed the petitions for review in abeyance pending Commission action on permanent rates.  *GTL v. FCC*, 866 F.3d at 405 (citing *Securus Techs., Inc. v. FCC*, No. 13-1280, 2014 U.S. App. LEXIS 25157, at *3 (D.C. Cir. Dec. 16, 2014) (order holding cases in abeyance)).

[25] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Second Further Notice of Proposed Rulemaking, 29 FCC Rcd 13170, 13179, para. 19 (2014) (*2014 ICS Notice*).  Ancillary service charges are fees that providers assess on calling services used by incarcerated people that are not included in the per-minute rates assessed for individual calls.  47 CFR § 64.6000(a).

[26] The Commission relied on sections 201(b) and 276 of the Communications Act to adopt rate caps for both interstate and intrastate inmate calling services.  *Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763, 12768, 12813-18, paras. 7, 106-16 (2015) (*2015 ICS Order* or *2015 ICS Notice*).

[27] *2015 ICS Order*, 30 FCC Rcd at 12838-39, paras. 144-45.  Because of continued growth in the number and dollar amount of ancillary service charges that had inflated the effective price paid for inmate calling services, the Commission limited permissible ancillary service charges to only five types and capped the charges for each: (1) Automated Payment Fees—credit card payment, debit card payment, and bill processing fees, including fees for payments made by interactive voice response, web, or kiosk; (2) Fees for Single-Call and Related Services—billing arrangements whereby an incarcerated person's collect calls are billed through a third party on a per-call basis, where the called party does not have an account with the inmate calling services provider or does not want to establish an account; (3) Live Agent Fees—fees associated with the optional use of a live operator to complete inmate calling services transactions; (4) Paper Bill/Statement Fees—fees associated with providing customers of inmate calling services an optional paper billing statement; and (5) Third-Party Financial Transaction Fees—the exact fees, with no markup, that providers of calling services used by incarcerated people are charged by third parties to transfer money or process financial transactions to facilitate a consumer's ability to make account payments via a third party.  47 CFR §§ 64.6000(a), 64.6020.

[28] *2015 ICS Order*, 30 FCC Rcd at 12775, para. 22.

[29] *Id.* at 12790, para. 52 & n.170 (stating that this industry-average approach would allow providers to "recover average costs at each and every tier").  The Commission set caps of $0.11 per minute for prisons; $0.14 per minute for jails with average daily populations of 1,000 or more; $0.16 per minute for jails with average daily populations of 350 to 999; and $0.22 per minute for jails with average daily populations of less than 350.  *Id.* at 12776, Tbl. 3.

[30] *Id.* at 12821-22, para. 123; *see also 2013 ICS Order*, 28 FCC Rcd at 14124-25, paras. 33-34 (describing site commissions as "payments made from [inmate calling services] providers to correctional facilities and related state authorities" and recognizing that such payments "can take the form of a percentage of gross revenue, a signing bonus, a monthly fixed amount, yearly fixed amount, or in-kind contributions"); *Implementation of Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Order

(continued....)

also extended the interim interstate rate caps it had adopted in 2013 to intrastate calls, pending the effectiveness of the new rate caps, and sought comment on rate regulation of international inmate calling services calls.[31]  Finally, the *2015 ICS Order* established a Second Mandatory Data Collection to guide further reforms, and began an annual filing obligation to collect information on providers' interstate, intrastate, and international rates, as well as their ancillary service charges, among other information.[32]

11.     While an appeal of the *2015 ICS Order* was still pending, the Commission reconsidered the full exclusion of site commission payments from its permanent rate cap calculations.[33]  The Commission's *2016 ICS Reconsideration Order* increased the permanent rate caps adopted in the *2015 ICS Order* to account for claims that certain correctional facility costs reflected in site commission payments are directly and reasonably related to the provision of inmate calling services.[34]

### C.     The *GTL v. FCC* Decision

12.     The permanent rate caps adopted in the *2015 ICS Order* were vacated by the D.C. Circuit in *GTL v. FCC* in 2017 on three principal grounds.[35]  First, the panel majority held that the Commission lacked the statutory authority to cap intrastate calling services rates because the Commission's authority over intrastate calls under section 276 of the Communications Act did not authorize it to impose intrastate rate caps, and the Commission's authority under section 201(b) of the Communications Act did not extend to intrastate rates.[36]  Second, the D.C. Circuit concluded that the Commission had erred by categorically excluding site commissions from inmate calling services providers' costs used to set rate caps.[37]  Because some site commissions were "mandated by state statute," while others were "required by state correctional institutions," the court concluded that some portion of site commissions might be

---

on Remand and Notice of Proposed Rulemaking, 17 FCC Rcd 3248, 3262, para. 38 (2002) (*2002 Pay Telephone Order*) (describing site commissions as "location rents that are negotiable by contract with the facility owners and represent an apportionment of profits between the facility owners and the providers of the inmate payphone service").

[31] 2015 ICS Order, 30 FCC Rcd at 12769, 12771, paras. 9, 11; see also *Wireline Competition Bureau Addresses Applicable Rates for Inmate Calling Services and Effective Dates for Provisions of the Inmate Calling Services Second Report and Order*, WC Docket No. 12-375, Public Notice, 31 FCC Rcd 2026 (WCB 2016).

[32] *2015 ICS Order*, 30 FCC Rcd at 12862, 12891-92, paras. 198, 266-67 (adopting the Second Mandatory Data Collection).  The annual filing obligation became known as the "Annual Report."  *See* 47 CFR § 64.6060.

[33] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order on Reconsideration, 31 FCC Rcd 9300, 9305, para. 10 (2016) (*2016 ICS Reconsideration Order*).

[34] *Id.*, 31 FCC Rcd at 9307, para. 12.  In March 2016, in response to providers' petitions for review of the *2015 ICS Order*, the D.C. Circuit stayed the application of the *2015 ICS Order*'s permanent rate caps and ancillary service charge cap for single-call services.  *GTL v. FCC*, 866 F.3d at 405 (citing *GTL v. FCC*, No. 15-1461 (D.C. Cir. Mar. 7, 2016) (order granting partial stay)).  "Single-call services" means "billing arrangements whereby an Inmate's collect calls are billed through a third party on a per-call basis, where the called party does not have an account with the Provider of Inmate Calling Services or does not want to establish an account."  47 CFR § 64.6000(a)(2).  Later that month, the D.C. Circuit stayed the application of the Commission's interim rate caps to intrastate inmate calling services.  *GTL v. FCC*, 866 F.3d at 405-06 (citing *GTL v. FCC*, No. 15-1461 (D.C. Cir. Mar. 23, 2016) (order granting partial stay)).  In November 2016, the D.C. Circuit also stayed the *2016 ICS Reconsideration Order*, pending the outcome of the challenge to the *2015 ICS Order*.  *GTL v. FCC*, 866 F.3d at 406 (citing *Securus Techs., Inc. v. FCC*, No. 16-1321, 2016 U.S. App. LEXIS 24370, at \*4 (D.C. Cir. Nov. 2, 2016) (order granting partial stay)).

[35] *GTL v. FCC*, 866 F.3d at 402, 415.

[36] *Id.* at 408-12 (observing that section 276 of the Communications Act "merely directs the Commission to 'ensure that all providers [of calling services for incarcerated people] are fairly compensated' for their inter- and intrastate calls," and section 276 "is not a 'general grant of jurisdiction' over intrastate ratemaking") (internal citation omitted).

[37] *Id.* at 412-13.

legitimately included in provider costs, and remanded to the Commission to determine what portion of site commissions were directly related to the provision of inmate calling services.[38]  Third, the court found that the Commission's use of a weighted average per-minute cost in setting rate caps, on the existing record as analyzed in the *2015 ICS Order*, was arbitrary and capricious,[39] in part because this approach, as the Commission had applied it, rendered calls with above-average costs unprofitable and thus did "not fulfill the mandate of [section] 276 that 'each and every'" call be fairly compensated.[40]

13.    The D.C. Circuit also remanded the Commission's ancillary service charge caps, finding that—on the available record—the Commission "had no authority to impose ancillary fee caps with respect to intrastate calls."[41]  Although the court found ancillary service charge caps on interstate calls "justified," it could not "discern from the record whether ancillary fees [could] be segregated between interstate and intrastate calls," and remanded the issue for the Commission to determine whether it could segregate ancillary service fee caps between interstate and intrastate calls.[42]  The court also vacated the video visitation annual reporting requirements adopted in the *2015 ICS Order* as "beyond the statutory authority of the Commission."[43]

14.    In a related case decided later that year, the D.C. Circuit "summarily vacated" the *2016 ICS Reconsideration Order* "insofar as it purports to set rate caps on inmate calling service" because the revised rate caps in that order were "premised on the same legal framework and mathematical methodology" rejected by the court in *GTL v. FCC*.[44]  As a result of the D.C. Circuit's decisions in *GTL* and *Securus Techs. v. FCC*, the interim rate caps that the Commission adopted in 2013 ($0.21 per minute for debit/prepaid calls and $0.25 per minute for collect calls) remained in effect for interstate inmate calling services calls.

D.    **More Recent Reform Efforts**

15.    Following the D.C. Circuit's remand in *GTL v.* FCC,[45] the Commission took additional actions to address unreasonable rates and charges for communications services for incarcerated people. In February 2020, the Wireline Competition Bureau (Bureau or WCB) issued a public notice seeking to refresh the record on issues related to ancillary service charges to respond to the D.C. Circuit's remand.[46] The Bureau sought comment on whether ancillary service charges may be "segregated between interstate

---

[38] *Id.* at 413.  The court directed the Commission to "assess on remand which portions of site commissions might be directly related to the provision of [inmate calling services] and therefore legitimate, and which are not."  *Id.* at 414.

[39] *Id.* at 402, 414-15.  Judge Pillard dissented on this point, noting that the Commission has "wide discretion" under section 201 of the Communications Act to decide "which costs to take into account and to use industry-wide averages that do not necessarily compensate 'each and every' call."  *Id.* at 424-25 (Pillard, J., dissenting).

[40] *Id.* at 414 (internal citation omitted).  Although the court acknowledged that the *2015 ICS Order* "advance[d] an efficiency argument—that the larger providers [could] become profitable under the rate caps if they operate[d] more efficiently"—that theory was "based on data from the two smallest firms," which "represent[ed] less than one percent of the industry," and the court found that the *Order* did not account for conflicting record data.  *Id.* at 415 (internal citation omitted); *see also id.* at 402 (vacating the *2015 ICS Order* in part).

[41] *Id.* at 402, 415.

[42] *Id.* at 415.

[43] *Id.* at 402; *2015 ICS Order*, 30 FCC Rcd at 12891-92, para. 267.

[44] *Securus Techs., Inc. v. FCC*, No. 16-1321, 2017 U.S. App. LEXIS 26360, at *4-5 (D.C. Cir. Dec. 21, 2017) (*Securus Techs. v. FCC*).  The court remanded "the remaining provisions" of the *2016 Reconsideration Order* to the Commission "for further consideration . . . in light of the disposition of this case and other related cases."  *Id.* at *5.

[45] *GTL v. FCC*, 866 F.3d at 416.

[46] *Wireline Competition Bureau Seeks to Refresh the Record on Ancillary Service Charges Related to Inmate Calling Services*, WC Docket No. 12-375, Public Notice, 35 FCC Rcd 189 (WCB 2020) (*Ancillary Services Refresh Public Notice*).

and intrastate calls and, if so, how."[47]  It also sought comment on the definition of jurisdictionally mixed services and how the Commission should proceed if any permitted ancillary service is deemed jurisdictionally mixed.[48]

16.    In August 2020, the Commission adopted the *2020 ICS Order on Remand*,[49] in which it found that ancillary service charges generally are jurisdictionally mixed[50] and cannot be practicably segregated between the interstate and intrastate jurisdictions, except in a limited number of cases.[51]  The Commission therefore concluded that inmate calling services providers are generally prohibited from imposing ancillary service charges other than those permitted by the Commission's rules, and from imposing charges in excess of the Commission's ancillary service fee caps.[52]  In the accompanying *2020 ICS Notice*, the Commission proposed reform of the inmate calling services rates then within its jurisdiction based on its analysis of industry data collected in the Second Mandatory Data Collection, as well as information collected in the 2020 Annual Reports.[53]

17.    In May 2021, the Commission adopted the *2021 ICS Order*,[54] which, among other actions, set new interim interstate rate caps for prisons and larger jails, reformed the treatment of site commissions, and capped international calling rates.[55]  The Commission first eliminated separate rate caps for all collect calls and retained the existing $0.21 per minute interstate rate cap for debit and prepaid calls for correctional facilities with average daily populations below 1,000.[56]  The Commission then lowered the interstate interim rate caps from $0.21 per minute for debit and prepaid calls to $0.12 per minute for prisons and $0.14 per minute for jails with average daily populations of 1,000 or more incarcerated people.[57]  It allowed site commission payments mandated by federal, state, or local law, to be passed through to consumers, without any markup, and capped other site commission payments that result from contractual obligations or negotiations with providers to no more than $0.02 per minute for prisons and jails with average daily populations of 1,000 or more.[58]  The Commission adopted a modified waiver process that permits providers to seek waivers of the rate and ancillary services fee caps on a facility-by-

---

[47] *Ancillary Services Refresh Public Notice*, 35 FCC Rcd at 189-90.

[48] *Id.* at 190 (proposing to define jurisdictionally mixed services as "[s]ervices that are capable of communications both between intrastate end points and between interstate end points").

[49] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8486, para. 2 (2020) (*2020 ICS Order on Remand* or *2020 ICS Notice*).

[50] *Id*. at 8495, para. 28; *Ancillary Services Refresh Public Notice*, 35 FCC Rcd at 190 (quoting *Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, WC Docket No. 03-211, Memorandum Opinion and Order, 19 FCC Rcd 22404, 22413, para. 17 (2004) (*Vonage Order*)).

[51] *2020 ICS Order on Remand*, 35 FCC Rcd at 8495, para. 28 (noting that in certain cases, when a charge is imposed and the consumer accepts the charge, the call may be clearly intrastate).

[52] *Id.*; 47 CFR § 64.6020.

[53] *2020 ICS Order on Remand*, 35 FCC Rcd at 8486, para. 3.  The Commission proposed to lower the interstate rate caps for inmate calling services to $0.14 per minute for debit, prepaid, and collect calls from prisons and $0.16 per minute for debit, prepaid, and collect calls from jails.  *Id.* at 8509, para. 67.

[54] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9521, para. 5 (2021) (*2021 ICS Order* or *2021 ICS Notice*).

[55] *Id.* at 9530, para. 28.

[56] *Id.* at 9536, para. 40.

[57] *Id.* at 9520-21, para. 3.

[58] *Id.*

facility or contract-by-contract basis.[59]  The Commission also delegated authority to WCB and the Office of Economics and Analytics (OEA) to conduct a Third Mandatory Data Collection to collect uniform cost data to use in setting permanent rate and ancillary services fee caps that more closely reflect inmate service providers' costs of providing service.[60]

18.　　In the *2021 ICS Notice*, the Commission sought comment on, among other matters, the provision of communications services to incarcerated people with disabilities, and the methodology to be employed in setting permanent interstate and international rate caps.[61]  It also sought comment on general reform of the treatment of site commission payments in connection with interstate and international calls, and additional reforms to the Commission's ancillary service charges rules.[62]

19.　　In September 2022, the Commission issued the *2022 ICS Order*, which adopted requirements to improve access to communications services for incarcerated people with disabilities and to reduce certain charges and curtail abusive practices related to ICS.[63]  The Commission required inmate calling services providers to provide access to substantially all relay services eligible for Telecommunications Relay Services (TRS) Fund support in any correctional facility where broadband is available and where the average daily population incarcerated in that jurisdiction (i.e., in that city, county, state, or the United States) totals 50 or more persons.[64]  It also required that where inmate calling services providers are required to provide access to substantially all forms of TRS, they also must provide access to American Sign Language (ASL) direct, or point-to-point, video communication.[65]  Additionally, the Commission lowered its caps on certain provider charges and barred certain abusive practices to lessen the financial burden on incarcerated people and their loved ones when using calling services.[66]

20.　　The Commission also issued the *2022 ICS Notice* seeking stakeholder input and evidence relating to additional reforms concerning incarcerated people with disabilities.[67]  It sought further

---

[59] *Id.* at 9593-96, paras. 169-75.

[60] *Id.* at 9619-20, para. 221.  WCB and OEA sought public comment on this data collection in September 2021. *WCB and OEA Seek Comment on Upcoming Third Mandatory Data Collection for Inmate Calling Services*, WC Docket No. 12-375, Public Notice, 36 FCC Rcd 13859 (WCB/OEA 2021).  In January 2022, WCB and OEA released an Order adopting the data collection.  *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, 37 FCC Rcd 369 (WCB/OEA 2022).  The Commission incorporated the responses to this data collection into the record of this proceeding in the *2023 IPCS Notice*.  *Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669, 2673, para. 8 (2023) (*2023 IPCS Order* or *2023 IPCS Notice*).  As indicated above, the Commission conducted two prior mandatory data collections seeking this type of uniform cost data.  *Supra* Section II.B (Early Reform Efforts).

[61] *2021 ICS Order*, 36 FCC Rcd at 9521, para. 5.

[62] *Id*.

[63] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, 37 FCC Rcd 11900, 11902, paras. 3-4 (2022) (*2022 ICS Order* or *2022 ICS Notice*).

[64] *Id.* at 11902, para. 3.  The exception is that a provider need not provide access to *non-Internet Protocol* Captioned Telephone Service (CTS) in any facility where it provides access to Internet Protocol Captioned Telephone Service (IP CTS).  47 CFR § 64.6040(b)(2)(i).

[65] *2022 ICS Order*, 37 FCC Rcd at 11902, para. 3.

[66] *Id.* at 11902, para. 4.  The Commission's reforms included prohibiting providers from seizing or otherwise disposing of funds in inactive calling services accounts until at least 180 calendar days of continuous inactivity has passed in such accounts, lowering the Commission's cap on provider charges for individual calls when neither the incarcerated person nor the person being called has an account with the provider, and lowering its cap on provider charges for processing credit card, debit card, and other payments to calling services accounts.  *Id.*

[67] *Id.* at 11902, para. 5.

comment on reforms concerning providers' rates, charges, and practices in connection with interstate and international calling services,[68] including further refining the Commission's rules concerning the treatment of balances in inactive accounts, expanding the breadth and scope of the Commission's consumer disclosure requirements, using the Commission's data collections to establish just and reasonable permanent caps on interstate and international rates and associated ancillary service charges, and allowing providers to offer pilot programs for alternative pricing structures.[69]

### E.    Implementation of Martha Wright-Reed Act

21.    Following the enactment of the Martha Wright-Reed Act in January 2023,[70] the Commission issued the *2023 IPCS Notice* and *2023 IPCS Order* in March 2023 to begin the process of implementing that Act.[71] In the *2023 IPCS Notice*, the Commission sought comment on how it should interpret the Martha Wright-Reed Act's provisions expanding the Commission's authority over communications services for incarcerated people, including the Act's requirement that rates and charges for incarcerated people's communications services be just and reasonable, the Act's expansion of the Commission's authority to include advanced communications services, including video services, the expansion of the Commission's jurisdiction to include intrastate communications services, and other aspects of the Act.[72] It also sought comment on how the Martha Wright-Reed Act affects the Commission's ability to ensure that IPCS services and associated equipment are accessible to and usable by people with disabilities.[73] Finally, the *2023 IPCS Notice* incorporated unresolved issues previously raised in WC Docket No. 12-375 into the current dual-captioned proceeding.[74]

22.    In the *2023 IPCS Order*, the Commission reaffirmed its prior delegation of data collection authority to WCB and OEA, and directed them to update and restructure their most recent data collection as appropriate in light of the requirements of the new statute.[75] In July 2023, WCB and OEA exercised this delegated authority and adopted the *2023 Mandatory Data Collection Order*[76] to collect information on the additional services and providers subject to the Commission's newly expanded authority and address the Act's other provisions where necessary.[77]

## III.    DISCUSSION

### A.    Unique Marketplace for Incarcerated People's Communications Services

23.    The history of this proceeding makes crystal clear that the IPCS marketplace "is not a

---

[68] *Id.* at 11902, para. 6.

[69] *Id*.

[70] Martha Wright-Reed Act; 47 U.S.C. §§ 152(b), 153(1)(E), 276(b)(1)(A), (d).

[71] *2023 IPCS Order,* 38 FCC Rcd 2669; *2023 IPCS Notice,* 38 FCC Rcd 2669.

[72] *2023 IPCS Notice*, 38 FCC Rcd at 2681-82, para. 28.

[73] *Id.* at 2685, para. 36.

[74] *Id.* at 2674-75, para. 12.

[75] *Id.* at 2701-02, para. 84.

[76] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 23-638 (WCB/OEA July 26, 2023) (*2023 Mandatory Data Collection Order*); *Wireline Competition Bureau Announces the Due Date for Responses to the Commission's Incarcerated People's Communications Services 2023 Mandatory Data Collection*, WC Docket Nos. 23-62 and 12-375, Public Notice, DA 23-839 (WCB/OEA Sept. 13, 2023) (announcing the Office of Management and Budget's (OMB) approval of the Commission's 2023 Mandatory Data Collection); Notice of Office of Management and Budget Action for New Collection, OMB Control No. 3060-1314 (approved Sept. 11, 2023).

[77] *2023 Mandatory Data Collection Order* at 3, paras. 7-8.

**Federal Communications Commission** FCC 24-75

well functioning market with competitive forces that would drive prices towards costs."[78] Once a provider successfully competes for a contract to serve a facility, it has a monopoly over the provision of IPCS at that facility.[79] Incarcerated people play no role in the process of selecting IPCS providers or the services they offer and have no choice but to pay the rates and charges imposed if they wish to call their family or other loved ones.[80] Consumers have no means of switching to another provider and no means of redress even if the IPCS provider "raises rates, imposes additional fees, adopts unreasonable terms and conditions for use of the service, or offers inferior service."[81] As a result, there are no competitive forces to constrain providers from imposing rates and charges that far exceed the costs required to provide the services.[82] In stating its preference for relying on competition and market forces to discipline prices, the

---

[78] Wright Petitioners et al. Comments, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Report, at 2, para. 3 (rec. May 8, 2023) (Public Interest Parties May 8, 2023 Comments) (Brattle May 8, 2023 Report); Letter from Jonathan Kanter, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, to Wireline Competition Bureau, FCC, WC Docket Nos. 23-62 and 12-375, at 3 (filed Apr. 29, 2024) (DOJ Apr. 29, 2024 *Ex Parte*) ("IPCS markets across the country suffer from a lack of competition, which harms both incarcerated people and those who purchase communications services to communicate with them."). *But see* Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 9 (filed July 11, 2024) (Securus July 11, 2024 *Ex Parte*) (arguing that "one cannot increase competition by driving competitors out of the marketplace"). Securus conflates the number of market participants with the presence of market competition, and ignores the fact that providers who operate with inefficient costs will face competitive pressure to lower those costs. *See* Appendix J.

[79] *2021 ICS Order*, 36 FCC Rcd at 9531, para. 31 (explaining that providers of communications for incarcerated people "have monopoly power" over consumers); *2015 ICS Order*, 30 FCC Rcd at 12765-66, para. 2 (describing ICS providers "as unchecked monopolists," with "no competitive pressures to reduce rates"); Color of Change Comments, WC Docket Nos. 23-62 and 12-375, at 4 (rec. May 8, 2023) (Color of Change May 8, 2023 Comments) (describing how providers offer lucrative deals to correctional facilities "in exchange for monopoly control over a facility's communications services"); Stephen Raher Comments, WC Docket Nos. 23-62 and 12-375, at 5 (rec. May 8, 2023) (Raher May 8, 2023 Comments) (describing how "monopoly contracts prevent any semblance of market competition" in the IPCS marketplace); 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) ("It is no coincidence that incarcerated persons are subjected to these exorbitant rates. In most if not all cases, one company has a monopoly in the facilities it serves."); DOJ Apr. 29, 2024 *Ex Parte* at 3 ("[I]ncarcerated people and their loved ones face an effective monopoly after the correctional facility selects a provider for its communications services.").

[80] *See, e.g.*, United Church of Christ Media Justice Ministry and Public Knowledge Comments, WC Docket Nos. 23-62 and 12-375, at 4 (rec. May 9, 2023) (UCC and Public Knowledge May 9, 2023 Comments) ("[F]amily members and incarcerated people . . . have no choices of the companies they use, but also for the entities that contract for services."); California Public Utilities Commission Comments, WC Docket Nos. 23-62 and 12-375, at 2 (rec. May 8, 2023) (California PUC May 8, 2023 Comments) ("Families of the incarcerated have no other choice when they need to connect and communicate with the incarcerated."); Worth Rises Reply, WC Docket Nos. 23-62 and 12-375, at 2 (rec. July 12, 2023) (Worth Rises July 12, 2023 Reply) ("The ratepayers are those who use the services, incarcerated people and their loved ones, who do not have any say in what provider is chosen to provide IPCS."); *2021 ICS Order*, 36 FCC Rcd at 9532, para. 32.

[81] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9532, para. 32; *see* Worth Rises July 12, 2023 Reply at 2 (recognizing that while "corrections agencies do procure IPCS from providers and decide who will be awarded the contract for their facilities, they do not pay for the services they are procuring"); UCC and Public Knowledge May 9, 2023 Comments at 4.

[82] *2021 ICS Order*, 36 FCC Rcd at 9532, para. 32; Color of Change May 8, 2023 Comments at 3 (asserting that "the carceral telecommunications sector is plagued by a lack of competition, kickbacks and commissions to facilities, predatory fees and coercive practices; all inflating the true cost of business for telecommunications providers and consumers"); *2020 ICS Notice*, 35 FCC Rcd at 8520-21, para. 100; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (explaining that direct evidence of monopoly power is evidence that a firm "can profitably raise prices substantially above the competitive level"); *cf. AT&T Corp. v. FCC*, 292 F.3d 808, 809-10 (D.C. Cir. 2002) (describing "bottleneck monopolies over access to each individual end user" in telecommunication markets). This absence of competitive alternatives to discipline IPCS rates justifies rate regulation independent of

(continued....)

Commission has acknowledged "there is little dispute that the [IPCS] market is a prime example of market failure."[83] This market failure persists today.[84] Indeed, one provider aptly summarizes the IPCS market dynamics today as follows:

> Fundamentally, due to the inherent structure of the [IPCS] marketplace, [IPCS] providers' rational economic incentive is to entice confinement facilities to award the provider a service contract as the facility, and confinement facilities' rational economic incentive is to award contracts to [IPCS] providers who provide the greatest payments (monetary or otherwise) to the facility. Notably absent from the foregoing calculus are the [IPCS] consumers themselves, despite the fact that they are the ones who ultimately pay for [IPCS] service.[85]

24.    Despite Commission actions over the years to constrain rates and charges in the audio IPCS marketplace, the monopolistic nature of the marketplace has not changed, and remains "characterized by increasing rates, with no competitive pressures to reduce rates."[86] The "unusual market dynamics" of the IPCS marketplace and the "inability of market forces to constrain IPCS rates" are also evident in a still nascent portion of the marketplace—video IPCS, making clear that "some form of regulatory constraint . . . is needed to ensure that end user rates are just and reasonable."[87] The bipartisan Martha Wright-Reed Act is a directive that the Commission provide such regulatory constraint on the IPCS marketplace through ensuring "just and reasonable charges for telephone and advanced communications services in correctional and detention facilities."[88]

25.    Some commenters argue that the IPCS marketplace is competitive because contracts are awarded based on a bidding process, an argument that appears challenging to square with Congress's

---

the problematic role that site commissions historically have played. We thus reject arguments that the elimination of site commission payments calls into question the need for rate regulations. *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 23-24.

[83] *2015 ICS Order*, 30 FCC Rcd at 12763, para. 2.

[84] Public Interest Parties May 8, 2023 Comments at 3 (stating that "[t]he MWRA closes any perceived loopholes in the Commission's authority, and empowers the agency to address market failures that for too long have resulted in unjust and unreasonable rates and charges for all audio and video IPCS"); DOJ Apr. 29, 2024 *Ex Parte* at 4 (arguing that the lack of competition in the industry has led to "unreasonably high rates, ancillary service fees, and abusive provider practices such as the seizure of unused funds in incarcerated people's accounts without notice or refund" and "disincentivizes product improvements, service, and innovation").

[85] Pay Tel Communications Inc. Comments, WC Docket Nos. 23-62 and 12-375, at 6-7 & n.18 (rec. May 8, 2023) (Pay Tel May 8, 2023 Comments); *see also* DOJ Apr. 29, 2024 *Ex Parte* at 3-4 (detailing the "significant barriers to entry and expansion in this market," including significant upfront capital costs, a tendency of correctional facilities to reject bids from providers that lack significant experience, and the fact that IPCS contracts generally last for several years and renew automatically, limiting opportunities for rebidding).

[86] *2015 ICS Order*, 30 FCC Rcd at 12765, para. 2; UCC and Public Knowledge May 9, 2023 Comments at 4 (explaining that "[t]he companies and carceral institutions have no incentive to bring down prices or improve service—in fact they have the opposite incentive"); Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach., Report of Don J. Wood, at 6 (filed Aug. 21, 2023) (Wood Aug. 23, 2023 Report); *id.* at 8 (affirming that "[t]here is little dispute that the current market structure creates incentives for higher rates"); UCC and Public Knowledge May 9, 2023 Comments at 4 ("As so often has been said in the FCC's carceral communications dockets, the market is completely dysfunctional.").

[87] Wood Aug. 23, 2023 Report at 6-7; *see also* Brattle May 8, 2023 Report at 2, para. 5 (stating that "the FCC needs to correct for this market failure by setting a regulated rate").

[88] Martha Wright-Reed Act, pbml.

enactment of the Martha Wright-Reed Act.[89]  Independently, the Commission has not been persuaded by such arguments in the past, and we find no further evidence in the record that might warrant a departure from this conclusion.[90]  Instead, we continue to find that "because correctional officials typically allow only one provider to serve any given facility. . . there are no competitive constraints on a provider's rates once it has entered into a contract to serve a particular facility."[91]  Indeed, the Commission has found that providers' cost data reflect this lack of competition in the industry.[92]  And the Commission has explained how factors such as site commissions '"distort[] the [IPCS] marketplace' by creating incentives for the facilities to select providers that pay the highest site commissions, even if those providers do not offer the best service or lowest rates."[93]  Thus, even if there is "competition" in the bidding market as some providers assert, it is not the type of competition the Commission recognizes as having an ability to "exert downward pressure on rates for consumers."[94]

### B.    Impact on Consumers and Society

26.    The Commission has long recognized—and worked to combat—the negative consequences that unreasonable communications rates and charges have on incarcerated people, their

---

[89] Global Tel*Link Corp. d/b/a ViaPath Comments, WC Docket Nos. 23-62 and 12-375, at 4 (rec. May 8, 2023) (ViaPath May 8, 2023 Comments); *see* Pay Tel May 8, 2023 Comments at 17-18 (discussing the competitive bidding process); Securus Technologies, LLC Comments, WC Docket No. 23-62 and 12-375, at 3 (rec. May 8, 2023) (Securus May 8, 2023 Comments) (describing the IPCS marketplace as competitive); *compare* Letter from Chérie R. Kiser, Cahill Gordon & Reindel LLP, Counsel to Global Tel*Link Corporation d/b/a ViaPath Technologies, to Marlene H. Dortch, Secretary, FCC, WC Dockets Nos. 23-61 and 12-375, at 13 (filed June 13, 2024) (ViaPath June 13, 2024 *Ex Parte*) ("IPCS providers cannot, and do not, exercise market power in the competitive bidding process.") *with id.*, Paul Godek, Secretariat Economists, Report in Support of *Ex Parte* Presentation of Global Tel*Link Corp., at 7 (Secretariat Economists June 13, 2024 Report) ("[W]hether the IPCS industry is concentrated or not should have no bearing on the FCC's regulatory stance.").

[90] *2021 ICS Order*, 36 FCC Rcd at 9533, para. 33; *2015 ICS Order*, 30 FCC Rcd at 12794, para. 62 (describing how "a lack of robust competition would explain why the reported cost data does not seem reflective of underlying costs (a result that is inconsistent with effective competition)"); Raher May 8, 2023 Comments at 5-6 ("While IPCS providers have spent years arguing that contract bidding is an adequate competitive substitute for consumer choice, the Commission has repeatedly rejected this unpersuasive argument."); 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) (explaining that "kickbacks, not competition, are often the deciding factor in which company is selected").

[91] *2021 ICS Order*, 36 FCC Rcd at 9533, para. 33.

[92] *See 2015 ICS Order*, 30 FCC Rcd at 12794, para. 62 (finding that "roughly similarly situated providers have substantially different costs," which indicated "a lack of robust competition"); *see also* Global Tel*Link Corp. d/b/a ViaPath Technologies Comments, WC Docket No. 12-375, Attach. Secretariat Economists Report, at 7, para. 16 (rec. Dec. 15, 2022) (Secretariat Economists Dec. 15, 2022 Report) ("The individual facility cost data displays substantially greater dispersion.  But even these annual averages indicate either that the providers have widely varying costs, have used widely varying methodologies for reporting their costs, or both."); Securus Technologies, LLC Comments, Docket No. 12-375, Attach. FTI Report, at 24 (rec. Dec. 15, 2022) (Securus Dec. 15, 2022 Comments) ("Although there are certainly differences in the costs reported between providers, the data does not suggest any particular bias as the distributions tend to have similar skewedness.").

[93] *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12820-21, para. 122; *2021 ICS Order*, 36 FCC Rcd at 9533, para. 33; *2002 Pay Telephone Order*, 17 FCC Rcd at 3253, para. 12; Electronic Privacy Information Center Comments, WC Docket Nos. 23-62 and 12-375, at 4 (rec. May 8, 2023) (EPIC May 8, 2023 Comments) ("Site commissions additionally exacerbate already-questionable anti-competitive behavior amongst ICS vendors.").

[94] *2021 ICS Order*, 36 FCC Rcd 9533, para. 33; *2015 ICS Order*, 30 FCC Rcd at 12765, para. 2 ("Market forces often lead to more competition, lower prices, and better services.  Unfortunately, the ICS market, by contrast, is characterized by increasing rates, with no competitive pressures to reduce rates."); *2002 Pay Telephone Order*, 17 FCC Rcd at 3253, para. 12; *2013 ICS Order*, 28 FCC Rcd at 14129, para. 41.

**Federal Communications Commission**                    **FCC 24-75**

families and loved ones, and society at large.[95]  The record in this proceeding provides overwhelming evidence of the substantial burden excessive communications rates have on the ability of incarcerated people to stay connected and maintain the vital, human bonds that sustain families and friends when a loved one is incarcerated.[96]  In fact, "[t]he high costs of keeping in contact drive more than 1 in 3 families, who are already financially burdened, into debt for phone calls and visits with their loved ones."[97]  As the Prison Policy Initiative explains, "[t]he cost of everyday communication is arguably the worst price-gouging that people behind bars and their loved ones face."[98]  Color of Change highlights these burdens through the story of Maria Marshall, who, "after spending $120 in just two weeks to maintain contact with both her teenage son and her ex-husband behind bars, was forced to make the difficult choice between the two, as she struggled to pay exorbitant phone rates and could only afford one of their accounts."[99]  Brian Howard, a formerly incarcerated person, speaks for all too many in stating, "though we have committed a crime and became incarcerated, we incarcerate our family as well."[100]

  27. The Commission held several public listening sessions to learn firsthand from individuals

---

[95] *E.g.*, *2021 ICS Order*, 36 FCC Rcd at 9534, para. 34; *2013 ICS Order*, 28 FCC Rcd at 14130, para. 42 (finding excessive rates "impose an unreasonable burden" on families of incarcerated people and discourage communication between incarcerated people and their support network); *2014 ICS Notice*, 29 FCC Rcd at 13181, para. 23 (acknowledging that the level of site commission payments "has potentially life-altering impacts on prisoners and their families").

[96] Worth Rises Comments, WC Docket Nos. 23-62 and 12-375, at 1 (rec. May 8, 2023) (Worth Rises May 8, 2023 Comments); Color of Change May 8, 2023 Comments at 1; *see, e.g.*, 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) ("It is my hope that this bill will help reduce financial burdens that prevent people from being able to communicate with loved ones and friends."); *id.* (statement of Rep. Lee) ("What is the basis of the issue?  It is family.  It is family connectedness.  We have heard over and over again how exorbitant the cost is for grandmothers, mothers and fathers, and sisters and brothers to keep connections to individuals who, yes, have committed a crime, have been convicted, and are incarcerated, but they should not have been left out of the circle of humanity and family and the ability to stay connected."); Letter from Leadership Conference, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed June 17, 2024) (Leadership Conference June 17, 2024 *Ex Parte*) (explaining that "[e]xorbitant costs and fees heighten depression, isolation, and loneliness among incarcerated individuals"); Letter from Ahuva Battams, Attorney Advisor, WCB, FCC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-62 and 12-375, Transcript, 31:9-32:18 (filed June 20, 2024) (Phoenix Listening Session) (Rosalind Akins describing communication as "a human right" and how vital it was for her grandson "to feel close.  He just needed to feel human and that someone familiar and someone that loved him was close, accessible, familiar, and cared."); Letter from Wade Askew, Policy Director, Georgia Justice Project, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed July 8, 2024) (Georgia Justice Project July 8, 2024 *Ex Parte*) (noting that "high communication services rates not only compromise[] these connections, but also extracts wealth from individuals and communities already suffering from significant financial hardship").

[97] California State Senator Josh Becker Comments, WC Docket Nos. 23-62 and 12-375, at 1 (rec. May 8, 2023) (Sen. Becker May 8, 2023 Comments).

[98] Letter from Peter Wagner, Executive Director, Prison Policy Initiative, to Marlene Dortch, Secretary, FCC, WC Docket No. 12-375, Attach., Peter Wagner and Wanda Bertram, *State of Phone Justice 2022: The problem, the progress, and what's next* (Dec. 2022) (filed Dec. 15, 2022) (State of Phone Justice Dec. 2022 Report).

[99] Color of Change May 8, 2023 Comments at 3.

[100] Letter from Ahuva Battams, Attorney Advisor, WCB, FCC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Transcript, 26:10-20, 33:7-13 (filed Mar. 5, 2024) (Charleston Listening Session) (Deon Nowell, formerly incarcerated, describing how critical communications are to maintaining support systems and how without that support "it's a burden on us, it's a burden on our families. . . .  It becomes a burden on the community."); Phoenix Listening Session at 18:23-19:1 (Kim Thomas explaining that "[t]his is the ripple effect of lives, and we have got to take that into account.  It's not just the person who's incarcerated that gets affected by this.  It is the entire family, which is the community").

directly impacted by unreasonable IPCS rates and charges.[101]  In these sessions, witnesses testified to the high cost of communications as being the primary barrier to keeping families connected—despite the well documented benefits of "maintaining communication with loved ones during incarceration."[102] Universally, testimony from formerly incarcerated individuals stresses the burden that unreasonable communications rates and charges have had on their ability to communicate with their families.[103]  For example, Colette Payne, both formerly incarcerated and having an incarcerated son, relates how, because of the cost of phone calls, "I wasn't always able to speak with my own children during my incarceration."[104]  Kim Thomas, a formerly incarcerated person, explains the anguish of mothers "who gave birth while incarcerated and did not get to see their child for 18 months, physically or in any other way."[105]  Other formerly incarcerated people emphasize how the high cost of communications prevents mothers from regularly speaking to their children.[106]  One grandmother, whose daughter is incarcerated, details how her four young grandchildren are only able to speak to their mother every "week and a half

---

[101] Letter from Ahuva Battams, Attorney Advisor, Pricing Policy Division, Wireline Competition Bureau, FCC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Incarcerated People's Communications Services Oct. 27, 2023 Chicago Listening Session Video Subtitles (filed Feb. 6, 2024) (Chicago Listening Session); Charleston Listening Session; Phoenix Listening Session.

[102] Color of Change May 8, 2023 Comments at 2 (citing Leah Wang, *Research Roundup: The Positive Impacts of Family Contact for Incarcerated People and Their Families*, PPI (Dec. 21, 2021), https://www. prisonpolicy.org/blog/2021/12/21/family_contact/); Sen. Becker May 8, 2023 Comments at 1; 168 Cong. Rec. H10028 (daily ed. Dec. 22, 2022) (statement of Rep. Rush) ("[I]ncarcerated loved ones can be charged inhumane costs for a simple phone call.").

[103] *See, e.g.*, Chicago Listening Session at 468-89 (Monse Arreola, formerly incarcerated, explaining how her mother had to borrow money to afford phone calls with her and how communications are "just not affordable and it's not feasible and it's not fair"); Charleston Listening Session at 14:2-5 (Eric Mitchell, formerly incarcerated, explaining that "one of the things [incarcerated people] always talk about . . . that the pricing of the phones calls are just too high."); *id.* at 23:10-11 (Brian Howard, formerly incarcerated, explaining the burden on families); *id.* at 31:17-19 (Deon Nowell explaining that calls in the federal system are "expensive, super expensive"); Sen. Becker May 8, 2023 Comments at 1 (citing studies showing that one in three families incur debt for phone calls and visits with their loved ones); Civil Rights Corps Comments, WC Docket Nos. 23-62 and 12-375, at 2 (rec. May 8, 2023) (Civil Rights Corps May 8, 2023 Comments) ("Throughout our work, our clients and partners consistently describe the costs associated with communicating from behind bars as crippling.").

[104] Chicago Listening Session at 30-31; *see also id.* at 591-97 (Sandra Brown, formerly incarcerated, describing how "my family just couldn't afford to pay for those calls" and that the cost of video communication made staying [connected to] my son or other family members or any source of support for that matter, just impossible"); Charleston Listening Session at 18:2-8 (Eric Mitchell urging that "something to be done about this because it's just - everybody deserves . . . to be able to communicate with your lawyer, your loved ones, family, however people want to keep in touch, you want to be in the know," because "you care about your loved ones out there."); *id.* at 42:7-13 (Brian Howard suggesting: "[T]he thought about rehabilitating somebody who has committed a crime is out the window.  And so that's why we have high prices of phone calls, that's why we have high prices of goods that come in, because we're not looking at people who are incarcerated as human."); *see id.* at 36:10-13 (Deon Nowell asking "why can't we just make it affordable and make it a better place for a man to communicate, because at the end of the day, we're human"); Chicago Listening Session at 400, 448 (Monse Arreola explaining that "being in contact with family members while you're incarcerated is very, very hard" because of the high cost of phone calls).

[105] Phoenix Listening Session at 17:25-18:2.

[106] Chicago Listening Session at 804-811 (Desiree Lumpkins emphasizing the importance of communications in keeping her incarcerated daughter connected with her children); Charleston Listening Session at 15:19-20 (Eric Mitchell stating that "when you can't use the phone, you can't keep in contact with your loved ones, with your kids"); *id.* at 59:13-16 (Jada Cochran, formerly incarcerated, describing the importance of being able to hear "I love you mommy" and respond "I love you too, baby"); 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Lee).

**Federal Communications Commission**    **FCC 24-75**

and two weeks if that" because communications are so expensive.[107]  Jada Cochran, who gave birth in prison and whose mother raised her four young children while she was incarcerated, cried as she lamented that her mother could not afford many calls, despite the fact they were her "lifeline to my family, to my children."[108]  Brione Smith, a teenager whose father is incarcerated, describes being devastated when she could not reach her father after her best friend and grandfather died within a few weeks of each other.[109]

28.    Participants at the Commission's listening session explain how the unreasonably high communications rates at times force incarcerated people and their families to choose between basic necessities, such as between food, and communications.[110]  For example, Deon Nowell reports at the Chicago listening session how some incarcerated people had to beg for food to reserve enough money to call their families.[111]  Ana Navarro describes how families must choose between communication or rent, food, or school supplies.[112]  Kim Thomas, a formerly incarcerated person, explains how incarcerated people earn "about 15 cents an hour…. So if you calculate that out, it's not very much money, and you choose to make a phone call or buy soap."[113]  Incarcerated people with disabilities that impact their ability to communicate continually experience barriers to access because "prison administrators fail to understand their communication needs."[114]

29.    The benefits of communications between incarcerated people and their families are wide-

---

[107] Chicago Listening Session at 782-808; *see also id.* at 25-41 (Colette Payne, formerly incarcerated, describing how, because there was not enough money to call home, she "wasn't always able to speak with my own children during my incarceration"); Charleston Listening Session at 32:12-33:2 (Deon Nowell describing how when he became ill, he was unable to call his mother because of lack of funds, causing her to panic and call the prison authorities to arrange for him to be admitted to a hospital, and only at the hospital, he "was able to use a phone like a normal person, so I could assure her of my safety."); Phoenix Listening Session at 56:24-57:11 (Brione Smith explaining how because the mother of her half siblings cannot afford regular communications with their father, her three-year old sister probably does not "know what my dad looks like")

[108] Charleston Listening Session 55:8-13; Phoenix Listening Session at 33:15-16 (Rosalind Akins describing how "it's not just a phone call. It's not that. It is a lifeline. It is life support."); *id.* at 44:21-45:20 (Dominique Jones-Johnson highlighting how important communications are between children and their incarcerated parents).

[109] Phoenix Listening Session 56:2-11.

[110] Chicago Listening Session at 431-432 (Monse Arreola describing how "I was experiencing making choices by having to choose good, nutritious food or call my family"); *id.* at 735-36 (Sandra Brown explaining that incarcerated people should be able to "reach out to their families and friends and loved ones and not have to worry about whether or not they have to choose between buying soap for their body or talking to their children"); *id.* at 1014-1018 (Ana Navarro, formerly incarcerated, explaining:  "[Y]ou have to choose, can we communicate with this person that's inside or do we pay rent?  Do we buy food?  Do we get the kids school supplies that they need?  It's hard."); Charleston Listening Session at 14:5-10 (Eric Mitchell describing how:  "Some people have to choose between, you know, commissary, food on the table at home, or, you know, having money on the phone.  So if you have kids at the house to feed, the smartest thing would be to scratch the phone."); *id.* at 23:12-15 (Brian Howard describing the choice between phone calls with your family or having money for the commissary or canteen); *id.* at 31:25-32:3 (Deon Nowell explaining how:  "[Y]ou're debating whether you're going to buy soap to wash with, shoes to have on your feet, a soup to eat.  You have just so many different choices over communication."); Civil Rights Corps May 8, 2023 Comments at 2; *2021 ICS Order*, 36 FCC Rcd at 9535, para. 36.

[111] Charleston Listening Session at 39:14-18.

[112] Chicago Listening Session at 1014-17.

[113] Phoenix Listening Session at 11:14-17; *id.* at 25:1-7 (Omar Thomas explaining how the cost of communications keeps increasing, but there are no corresponding wage increases for incarcerated people).

[114] ClearCaptions, LLC Comments, WC Docket Nos. 23-62 and 12-375, at 3 (rec. May 8, 2023) (ClearCaptions May 8, 2023 Comments); California Public Utilities Commission Reply, WC Docket Nos. 23-62 and 12-375, at 5 (rec. June 6, 2023) (California PUC June 6, 2023 Reply) ("incarcerated people with disabilities experience severe access problems"); Accessibility Advocacy et al. Comments, WC Docket Nos. 23-62 and 12-375, at 4 (rec. May 8, 2023) (Accessibility Coalition May 8, 2023 Comments).

ranging and well-documented.[115]  For decades, studies have linked regular contact with family with lowering rates of recidivism and increasing likelihood of successful reentry into society after release.[116] During the listening sessions, the formerly incarcerated emphasized how communication with family decreases recidivism and sustains hope.[117]  Children who have regular communications with an incarcerated parent have "better relationships with that parent."[118]  Without these connections, incarcerated people tend to lose contact with the outside world and can lose hope of reengaging with

---

[115] Color of Change May 8, 2023 Comments at 1 ("maintaining communication with loved ones during incarceration has measurable positive impacts on public safety and benefits the families of those incarcerated"); UCC and Public Knowledge May 9, 2023 Comments at 5 ("The Commission correctly concludes that regulation of rates is important for, and promotes, public safety."); Leadership Conference June 17, 2024 *Ex Parte* at 1 (explaining that communication "throughout incarceration is not only humane, it is essential for improving people's ability to successfully re-enter their communities").

[116] Civil Rights Corps May 8, 2023 Comments at 3 ("This family separation also inflicts broader societal harms, as family contact is linked to reducing recidivism, improving health, and strengthening parent-child relationships." (citing Leah Wang, *Research Roundup: The Positive Impacts of Family Contact for Incarcerated People and Their Families*, PPI (Dec. 21, 2021), https://www.prisonpolicy.org/blog/2021/12/21/family_contact/)); Sen. Becker May 8, 2023 Comments at 1 ("Research also shows that incarcerated people who are able to keep in frequent contact with their loved ones are more successful re-entering society than those who have limited or no contact." (citing Ryan Shanahan and Sandra Villalobos Agudelo, *The Family and Recidivism*, American Jails (Sept.-Oct. 2012) at 17-24, https://www.prisonpolicy.org/scans/vera/the-family-and-recidivism.pdf)); Barrick, K., Lattimore, P. M., & Visher, C.A., *Reentering Women: The Impact of Social Ties on Long-Term Recidivism*, The Prison Journal (2014) & Haverkate, D. L. & Wright, K. A., *The differential effects of prison contact on parent-child relationship quality and child behavioral changes,* Corrections: Policy, Practice, & Research, 5, 222-244 (2020)) (consistent phone calls reduce the likelihood of recidivism and improve relationships); ClearCaptions May 8, 2023 Comments at 2; Color of Change May 8, 2023 Comments at 1 ("Research has shown that more consistent and frequent phone calls are linked to the lowest odds of recidivism."); UCC and Public Knowledge May 9, 2023 Comments at 5-6 ("Studies consistently show that incarcerated people who have regular contact with family members are more likely to succeed after release and have lower recidivism rates."); Public Interest Parties, May 8, 2023 Comments at 33 ("Studies have 'consistently found that prisoners who maintain close contact with their family members while incarcerated have better post-release outcomes and [a] lower recidivism rate,' and a better reintegration rate after incarceration could be critical to addressing the inequities in the American justice and carceral systems.") (internal citations omitted); Letter from Daniel A. Johnson, General Counsel, Florida Department of Corrections, to the Commission, WC Docket Nos. 23-62 and 12-375, at 2 (filed July 11, 2024) (FDC July 11, 2024 *Ex Parte*) ("FDC recognizes the rehabilitative value of providing telephone and advanced communication services to incarcerated people."); *see also 2021 ICS Order*, 36 FCC Rcd at 9534-35, paras. 34-37; *2015 ICS Order*, 30 FCC Rcd at 12766-67, para. 3 & n.13 (citing research and explaining that "family contact during incarceration reduces recidivism and allows inmates to be more present parents for the 2.7 million children who suffer when an incarcerated parent cannot afford to keep in touch").

[117] Charleston Listening Session at 22:22-25 (Brian Howard explaining how "communications is key, vital, to our rehabilitation because it extends our family support, friend support, and having that support when you come home."); *id.* at 35:7-11 (Deon Nowell asserting that "[i]f we could lower the rates, if we could make an impact from the inside out, the men would have the help they need, calling their lawyers, right, calling their parents, calling their children."); *see id.* at 34:19-23 (Deon Nowell expounding on how this proceeding will "lessen the burden on men, help men to keep the communication between them, possibly someone who could put a helpful quote, a helpful saying, something to help them get through the day"); *id.* at 59:2-16 (Jada Cochran explaining how vital communication on rehabilitation, warning that without it, incarcerated people become "bitter, resentful, full of hate because they haven't had, you know, that softness that you get from your children"); *see also* Sen. Becker May 8, 2023 Comments at 1.

[118] Color of Change May 8, 2023 Comments at 1-2; *see also* Phoenix Listening Session at 18:9-22 (Kim Thomas describing the damage a missed call can cause between a child and their incarcerated parent); *id.* at 43:23-44:2 (Dominique Jones-Johnson explaining the negative impact of missed calls on children, "When a dad tells you I'm gonna call you in the morning and that call doesn't happen, oh, my daddy lied to me.  So I go to school and I become belligerent because I don't know why he didn't call.  I'm just a kid.").

**Federal Communications Commission** **FCC 24-75**

society and their loved ones.[119]  Others suggest that unlawful activities within correctional facilities would likely decrease if communications services were affordable and accessible.[120]  Rosalind Akins, whose grandson was formerly incarcerated, describes how "[p]eople become induced mentally ill because they can't communicate."[121]  Deon Nowell explains that lower communications rates will "help [the incarcerated people] make the right decision.  That's why it's called rehabilitation.  Help [the incarcerated people] to make the right decision, especially when it deals with the costs of communication."[122]

30.     The Martha Wright-Reed Act charges us with evaluating and breaking down the financial barriers to communications between incarcerated people and their families, consequently lessening the burden of having to choose between buying food and communicating with their family members, and helping facilitate a successful transition to a life outside of correctional facilities.  The Act gives us the tools we need to meet these objectives.  We anticipate that by lessening the financial burdens of staying connected, the reforms we adopt today will promote increased communication—allowing the preservation of essential family ties, keeping vital family connections alive by enabling incarcerated people to parent their children and connect with their spouses, and helping families stay intact.

**C.     Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder**

**1.     Purpose and Scope of the Martha Wright-Reed Act**

31.     In the Martha Wright-Reed Act, Congress gave the Commission a clear mandate to fix a "broken system," one in which the rates and charges that incarcerated people pay to communicate with those they love far exceed the amounts other Americans pay.[123]  The *2023 IPCS Notice* sought comment on the proper interpretation of the scope and purpose of the Martha Wright-Reed Act's amendments.  We conclude that the Martha Wright-Reed Act, taken as whole, fundamentally validates the Commission's broad exercise of authority over IPCS.[124]  The record reflects widespread agreement that the Martha

---

[119] Charleston Listening Session at 15:14-16:3 (Eric Mitchell explaining that the cost of communications means "you can't keep in contact with your loved ones, with your kids . . . most people just give up. . . . People just give up and . . . once you give up, it's pretty much a dead end from there."); *id.* at 33:14-17 (Deon Nowell describing how "we don't realize the cost of not lowering the rates, it's really going to really, really have a major impact on us as a society with men coming home from prison"); *id.* at 59:17-21 (Jada Cochran explaining how "if you lose that connection [with your family], you really don't care about anything else"); Phoenix Listening Session at 57:16-22 (Brione Smith explaining how talking about her volleyball games gives her father hope that he might see one himself one day); *see* Charleston Listening Session at 26:22-27:2 (Brian Howard explaining his concerns that without communication, the men and women released from the Department of Corrections will not be better than when they were incarcerated).

[120] Charleston Listening Session at 19:2-10 (Eric Mitchell explaining how lower prices and more phones would decrease "frustration and anger" felt by incarcerated people that sometimes leads to "bad things"); *id.* at 25:18-24 (Brian Howard explaining how "more than half" of incarcerated people using contraband cell phones would not do so if it "was affordable and easy for a resident to be able to call his family."); Phoenix Listening Session at 21:10-13 (Omar Thomas estimating that "65 percent of the population in the prison system turn to drugs secondary to not being able to communicate because the penal system is designed so that you don't communicate").

[121] Phoenix Listening Session at 33:9-10; *see also id.* at 21:8-9 (Omar Thomas, a formerly incarcerated person, explains how access to communications has "the biggest impact [on] mental health").

[122] Charleston Listening Session at 40:22-25.

[123] 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone); Public Interest Parties May 8, 2023 Comments at i (asserting that Congress directed the Commission to "wholistically reform the incarcerated people's communications services . . . marketplace and eliminate the excessive, unjust, and unreasonable rates and charges faced by IPCS consumers").

[124] *2023 IPCS Notice*, 38 FCC Rcd at 2674, para. 11 (interpreting the Martha Wright-Reed Act "as removing any limitations on the Commission's authority over incarcerated peoples' audio and video communications services and empowering [the Commission] to prohibit unreasonably high rates and charges for, and in connection with, all such

(continued….)

Wright-Reed Act "confers plenary authority on the Commission" to regulate a wide range of communications services, including telephone and certain advanced communications services, provided to incarcerated people regardless of the technology or device used or a communication's status as interstate or intrastate.[125]  More specifically, as certain commenters observe, the Martha Wright-Reed Act's amendments to section 276 of the Communications Act provide the Commission with authority over all IPCS rates and charges,[126] complemented by the Commission's section 201(b) of the Communications Act authority over interstate and international IPCS.[127]  Congress's directives guide our implementation of the Commission's responsibilities as described in further detail below.

32.      IPCS providers, state and local officials, and public interest advocates broadly agree that this expanded authority over communications services provided to incarcerated people includes not just audio services, but also certain advanced communications services that were previously outside the

---

services, including intrastate services"); Securus May 8, 2023 Comments at i; Wright Petitioners et al. Reply, WC Docket Nos. 23-62 and 12-375, at 3 (rec. July 12, 2023) (Public Interest Parties July 12, 2023 Reply) (arguing that the record supports an "expansive view of the Commission's authority under the Martha Wright-Reed Act").

[125] Securus Technologies, LLC Reply, WC Docket Nos. 23-62 and 12-375, at ii (rec. July 12, 2023) (Securus July 12, 2023 Reply); Martha Wright-Reed Act § 2(c); 47 U.S.C. §§ 152(b), 276(b)(1)(A).

[126] *E.g.*, Public Interest Parties May 8, 2023 Comments at 2; *see also* Public Interest Parties May 8, 2023 Comments at 4 (explaining that "Congress has . . . decisively mooted the concerns that the D.C. Circuit raised about the Commission's intrastate jurisdiction"); Pay Tel May 8, 2023 Comments at 5 (noting that the Martha Wright-Reed Act "fills the jurisdictional gap identified by the D.C. Circuit's decision" by providing the Commission with authority over intrastate IPCS); NCIC Inmate Communications Comments, WC Docket Nos. 23-62 and 12-375, at 4 (rec. May 8, 2023) (NCIC May 8, 2023 Comments) (arguing that the Martha Wright-Reed Act "moots any jurisdictional concerns raised in *GTL v. FCC*"); ViaPath May 8, 2023 Comments at 2 (noting that the Martha Wright-Reed Act "permits the FCC for the first time, to assert jurisdiction over all interstate and intrastate IPCS"). We view Congress's actions in the Martha Wright-Reed Act as directly responding to the D.C. Circuit's holdings in *GTL v. FCC* that the Commission had exceeded its statutory authority in capping the rates for intrastate inmate calling services and in requiring providers to report information regarding their video visitation services. *GTL v. FCC*, 866 F.3d at 402.  The Commission has previously interpreted "interstate," as used in section 276 of the Communications Act, to include international calling services.  *E.g.*, *2021 ICS Notice*, 36 FCC Rcd at 9600, para. 185 (evaluating the compensation for "each interstate and international call" in determining whether the Commission's interim rate caps met the section 276(b)(1)(A) of the Communications Act mandate to ensure fair compensation for completed interstate calls); *2020 ICS Notice*, 35 FCC Rcd at 8532, para. 130 (proposing to find that the Commission's international rate cap proposals are consistent with section 276's fair compensation provision); *2015 ICS Order*, 30 FCC Rcd at 12861-62, para. 196 ("[W]e believe it is clear that Congress provided the Commission with authority over ICS-related 'ancillary services.'  Based upon the plain language of these statutory provisions and the common definition of the term 'ancillary,' we find that the term 'ancillary services,' as used in section 276(d), is reasonably interpreted to mean services that *provide necessary support for the completion of international, interstate and intrastate calls* provided via ICS." (emphasis in original, footnote omitted)); *APCC Services, Inc., v. CCI Communications, LLC*, 28 FCC Rcd 564, 570, para. 17 (2013) (affirming the grant of a complaint based on "the defendant's willful failure to comply with rules that, when followed by Completing Carriers, ensure that the mandates of Section 276 are achieved'" in the case of predominantly international call traffic).  Consistent with that prior interpretation, the *2023 IPCS Notice* proposed to interpret "interstate," as used in section 276(b)(1)(A), as amended by the Martha Wright-Reed Act, to include international communications services.  *2023 IPCS Notice*, 38 FCC Rcd at 2671, para. 5 n.17 (stating that "references . . . to 'interstate'" in the *2023 IPCS Notice* and *2023 IPCS Order* "include both interstate and international communications" except where otherwise noted); *id.* at 2674, para. 11 & n.35 ("our authority over international services remains intact and will now include all incarcerated people's international communications services covered by the statute").  Consistent with our historical understanding of our statutory authority—including in the IPCS context in the near-term lead-up to the enactment of the Martha Wright-Reed Act—we adopt that interpretation today, a step that no commenter opposes. Independently, insofar as our rules treat international IPCS calls the same as domestic IPCS calls, the record does not persuade us that it would be practicable to make the sort of real-time jurisdictional determinations that would enable our rules to distinguish international calls from domestic calls in those scenarios, in any event.

[127] 47 U.S.C. § 201(b).

Commission's ratemaking authority.[128]  No commenter challenges this overall interpretation of the purpose and scope of the Martha Wright-Reed Act or suggests a more limited view of the Commission's authority.[129]  We find no basis for disagreeing with this consensus view, and thus, we exercise the full degree of our authority in this regard to adopt a compensation plan ensuring just and reasonable rates and charges, as well as fair compensation for providers of incarcerated people's audio and video communications services.  We analyze below the specific amendments to section 276 of the Communications Act included in the Martha Wright-Reed Act that collectively expand our jurisdiction over IPCS and interpret each amendment, consistent with the overarching goal of the Act—just and reasonable rates for IPCS consumers and fair compensation for IPCS providers.

## 2.    Addition of "Other Calling Device[s]"

33.    At the outset of our analysis, we address the fact that the Martha Wright-Reed Act extends the Commission's authority over IPCS to include not just communications using traditional payphones, but also communications using "other calling device[s]."[130]  As amended, section 276(b)(1)(A) of the Communications Act directs the Commission to establish a compensation plan so all payphone service providers are fairly compensated for communications "using their payphone or other calling device."[131]  Based on the record and consistent with the Commission's proposal in the *2023 IPCS Notice*, we interpret the term "other calling device[s]" in the Martha Wright-Reed Act broadly to encompass all devices that incarcerated people either use presently or may use in the future to engage in covered communications with individuals not confined within their correctional institutions.[132]  Our interpretation is further confirmed by Congress's expansion of our authority over advanced communications services in section 3(1)(E) of the Communications Act, to include "any audio or video communications service used by inmates . . . *regardless of technology used.*"[133]

34.    There is support in the record for this expansive interpretation.  As the Public Interest Parties explain, "Congress chose to use expansive language covering 'any technology used' to grant the Commission authority as broadly as possible, intending to cover any and all technologies that an incarcerated person may use to communicate [by audio or video] today or in the future."[134]  The breadth of Congress's language and the "absence of additional qualifying language" limiting the scope of the term

[128] Public Interest Parties July 12, 2023 Reply at 3; Pay Tel May 8, 2023 Comments at 5; Securus May 8, 2023 Comments at 1; NCIC May 8, 2023 Comments at 4;  California PUC May 8, 2023 Comments at 1-2; Sen. Becker May 8, 2023 Comments at 1-2; Public Interest Parties May 8, 2023 Comments at 1-2; EPIC May 8, 2023 Comments at 2; Raher May 8, 2023 Comments at 1; Stephen Raher Reply, WC Docket Nos. 23-62 and 12-375, at 1-2 (rec. July 12, 2023) (Raher July 12, 2023 Reply); Civil Rights Corps May 8, 2023 Comments at 4.

[129] Some commenters do argue that the Commission lacks authority in certain specific areas.  *E.g.*, Securus May 8, 2023 Comments at 4-5 (explaining that the Martha Wright-Reed Act's expansion of authority is "limited to the specific advanced services identified in the statute" and does not include e-messaging services), 9 (arguing that the Commission is without authority to regulate streaming services); Securus July 12, 2023 Reply at 2 (asserting that the Martha Wright-Reed Act does not confer authority to regulate practices in connection with advanced communications services); National Sheriffs' Association Reply, WC Docket Nos. 23-62 and 12-375, at 2 (rec. July 12, 2023) (National Sheriffs' Association July 12, 2023 Reply) (arguing that the Commission does not have authority over onsite communications), 4 (contending that the Commission does not have authority over practices, classifications, and regulations).  We address these arguments below.

[130] Martha Wright-Reed Act § 2(a)(1); 47 U.S.C. § 276(b)(1)(A); *see 2023 IPCS Notice*, 38 FCC Rcd at 2677-78, para. 17.

[131] 47 U.S.C. § 276(b)(1)(A).  The statute explicitly exempts emergency calls and telecommunications relay service calls for hearing disabled individuals from this requirement.

[132] *2023 IPCS Notice*, 38 FCC Rcd at 2677-78, para. 17.

[133] 47 U.S.C. § 153(1)(E) (emphasis added).

[134] Public Interest Parties May 8, 2023 Comments at 5; *see also* California PUC June 6, 2023 Reply at 3 (expressing agreement with the position of the Public Interest Parties).

"other calling device[s]" persuades us that a broad reading of this term is intended.[135]  Under this reading, the Commission's authority extends to "all types of calling devices" that incarcerated people may now or in the future use to communicate by audio or video with those not confined in the incarcerated person's correctional institution.[136]  Furthermore, the Commission has long understood section 276(b)(1)(A) of the Communications Act to set requirements governing TRS communications using TRS devices in correctional facilities.[137]  Given that backdrop, coupled with the fact that TRS is designed to ensure service functionally equivalent to telephone service,[138] we conclude that "payphone[s]" and "other calling devices" under section 276(b)(1)(A) include devices that people with disabilities use for purposes of "communications" regardless of whether the devices convey those communications using audio and/or video, or also (or instead) text, braille, or another communications medium.[139]

35.    To be clear, as proposed in the *2023 IPCS Notice*, the interpretation of "other calling device[s]" we adopt today encompasses all wireline and wireless phones, computers, tablets, and other communications equipment capable of sending or receiving audio or video communications described in section 276(d) of the Communications Act, regardless of transmission format.[140]  And, "[c]onsistent with the Commission's mandate to provide Telecommunications Relay Service ('TRS') for incarcerated people with disabilities," this statutory phrase also includes all wireline and wireless equipment, whether audio, video, text, other communications medium, or some combination thereof that incarcerated people with disabilities presently use to communicate, through any payphone service, with the non-incarcerated, including but not limited to videophones, captioned telephones, and peripheral devices for accessibility, such as braille display readers, screen readers, and TTYs.[141]

36.    Finally, as proposed in the *2023 IPCS Notice*, our interpretation of "other calling device[s]" includes other potential devices, not yet in use, to the extent incarcerated people, including those with disabilities, use them for covered communications in the future.[142]  Such a future-oriented interpretation is necessary to ensure that IPCS rates and charges remain just and reasonable, and that providers continue to be fairly compensated, as IPCS technology evolves.  It also will, to the extent possible, keep IPCS providers from shifting "exploitative practices to spaces left unregulated" by our actions today.[143]

### 3.    The Requirement to Establish a Compensation Plan

37.    The Martha Wright-Reed Act preserved the requirement in section 276(b) of the

---

[135] *2023 IPCS Notice*, 38 FCC Rcd at 2677, para. 17.

[136] California PUC May 8, 2023 Comments at 3 (arguing that "[c]ommunication in carceral settings should be accessible regardless of the technology used to allow incarcerated people to communicate with their family, loved ones, clergy, counsel, and other critical support systems").

[137] *E.g.*, *2015 ICS Order*, 30 FCC Rcd at 12923, Appx. A at para. 5 (revising 47 CFR § 64.6040 to prohibit inmate calling services providers from levying or collecting any charge at all for a TRS call placed by an incarcerated individual using a text telephone (TTY) device).

[138] 47 U.S.C. § 225(a)(3).

[139] *Id.* § 276(b)(1)(A) (covering a "payphone or other calling device").

[140] *2023 IPCS Notice*, 38 FCC Rcd at 2677-78, para. 17.

[141] Public Interest Parties May 8, 2023 Comments at 5-6 (identifying "devices that enable text-to-speech, speech-to-text, relay services for deaf, deafblind, and individuals with other disabilities, assisted video conferencing and any extant or future technology that assists incarcerated people with disabilities to communicate with others outside of their facility").

[142] *2023 IPCS Notice*, 38 FCC Rcd at 2677-78, para. 17.

[143] Civil Rights Corps May 8, 2023 Comments at 1; Color of Change May 8, 2023 Comments at 7 (asserting that "[i]n order to sustainably impact the longstanding exploitation in prison telecommunications, the FCC's regulations should encompass current and future communications services").

Communications Act that the Commission "establish a compensation plan" as a principal means of achieving the statutory goals with regard to IPCS. As amended, section 276(b)(1)(A) requires that this compensation plan ensure that "all payphone service providers are fairly compensated" for completed communications and that "all rates and charges [for those communications] are just and reasonable."[144] The statute further requires the Commission to implement this statutory directive by rule.[145] We now turn to the legal framework envisioned by the statute for establishing a compensation plan that will realize these statutory goals.

> a.    **Addition of the "Just and Reasonable" Requirement to Section 276(b)(1)(A)**

38.    We adopt the Commission's proposal that the term "just and reasonable," added to section 276(b)(1)(A) of the Communications Act by the Martha Wright-Reed Act, be interpreted as having the same meaning as the term "just and reasonable" in section 201(b) of the Communications Act.[146] Prior to the Martha Wright-Reed Act, section 276(b)(1)(A) contained no "just and reasonable" requirement. Instead, that section required the Commission to evaluate payphone rates on a per-call basis and to ensure that providers were fairly compensated for each and every completed call. Congress, however, modified this approach in the Act by removing the "per call" and "each and every" completed call language from section 276(b)(1)(A), which instead now requires that all payphone service providers be fairly compensated, and that all rates and charges imposed by those providers be "just and reasonable." Not only is there strong support in the record for the conclusion that "just and reasonable" for the purposes of revised section 276(b)(1)(A) has the same meaning as "just and reasonable" in section 201(b),[147] but the rules of statutory construction and judicial precedent buttress this finding.[148]

39.    By way of example, the Public Interest Parties explain, and we agree, that "[t]racking the Section 201(b) meaning is the most sound reading of the statute and of congressional intent," consistent with the understanding "that Congress was aware of the Section 201(b) standard—and the Commission's decades of relevant precedent interpreting it—when it chose to add the identical term to Section 276."[149]

---

[144] 47 U.S.C. § 276(b)(1)(A).

[145] Martha Wright-Reed Act § 3(a) (directing the Commission to promulgate regulations necessary to implement the Martha Wright-Reed Act not earlier than 18 months and not later than 24 months after the date of its enactment); *see also* 47 U.S.C. §§ 4(i), 201(b), 303(r) (establishing general rulemaking authority to implement the Act); *cf.* 47 U.S.C. § 276(b)(1) (directing that "within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations" implementing section 276(b)(1)).

[146] *2023 IPCS Notice*, 38 FCC Rcd at 2678, paras. 18-19; *see, e.g., 2021 ICS Order*, 36 FCC Rcd at 9575-76, 9587, paras. 126, 128-29, 153 (citing precedent supporting the Commission's implementation, in the context of audio calling services for incarcerated people, of the "just and reasonable" standard in section 201(b)). We address how we apply this standard below. *See infra* Section III.C.3.e (Authority to Regulate IPCS Providers' Practices).

[147] Raher May 8, 2023 Comments at 7; Public Interest Parties May 8, 2023 Comments at 9 & n.32; Leadership Conference on Civil and Human Rights Comments, WC Docket Nos. 23-62 and 12-375, at 2 (rec. July 12, 2023) (Leadership Conference July 12, 2023 Reply).

[148] Raher May 8, 2023 Comments at 7; Public Interest Parties May 8, 2023 Comments at 9; Leadership Conference July 12, 2023 Reply at 2. Citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts § 25*, at 171-73 (2011), the Public Interest Parties also explain that there is a legal presumption of consistent usage that supports the Commission's interpretation that Congress's addition of "just and reasonable" to section 276 has the same meaning as when the term is used elsewhere in the Communications Act. Public Interest Parties May 8, 2023 Comments at 9 & n.32.

[149] Public Interest Parties May 8, 2023 Comments at 9; Raher May 8, 2023 Comments at 7; *see e.g., Ratzlaf v. U.S.*, 510 U.S. 135, 140-43 (1994) (holding that under the rules of statutory construction, "a term appearing in several places in a statutory text is generally read the same way each time it appears."); *Sea-Land Serv. v. Fed. Maritime Comm'n*, 404 F.2d 824, 828 (D.C. Cir. 1968) (when interpreting amendment to common carriage provisions of the

(continued….)

The Supreme Court likewise explained in *FCC v. AT&T* that "identical words and phrases within the same statute should normally be given the same meaning."[150]  Both of these tenets have particular force here.  The identical terms "just and reasonable" appear in section 201(b) and have now been added to section 276(b)(1)(A), both sections of Title II of the Communications Act, to describe the required end result of our ratemaking.  The Martha Wright-Reed Act also was enacted against the regulatory backdrop of—and in response to—the *GTL v. FCC* decision, where the D.C. Circuit found that the Commission unreasonably relied on the "just and reasonable" standard of section 201(b) when implementing the differently-worded language of section 276.[151]  Further, in the wake of *GTL v. FCC*, the Commission continued to regulate rates and practices for interstate and international IPCS services under its section 201(b) "just and reasonable" authority, informed by the obligation to ensure "fair" compensation under section 276(b)(1)(B).[152]

40.     Nothing in the text of the Martha Wright-Reed Act leads us to believe that Congress intended to alter that general regulatory approach in our implementation of section 276(b)(1)(A) in the case of services we previously have regulated under section 201(b).  Instead, that regulatory backdrop reinforces our conclusion that "just and reasonable" is best interpreted in a manner that harmonizes the application of that standard in sections 201(b) and 276(b)(1)(A).  The record also provides no reason to interpret "just and reasonable" differently in the two sections of the Communications Act.  We thus find that "just and reasonable" has the same meaning in both statutory provisions and regardless of the services to which the phrase is applied.

41.     *The Used and Useful Framework*.  As Congress has imported section 201(b)'s "just and reasonable" standard into section 276(b)(1)(A), we next find that the standard the Commission has used to determine just and reasonable rates under 201(b) should also apply to our ratemaking under section 276(b)(1)(A).  Historically, the "used and useful" framework has "both informed the Commission's regulatory cost accounting and ratemaking rules and operated to protect the interests of ratepayers and carriers."[153]  The record supports our conclusion that this framework provides the most appropriate mechanism for ensuring just and reasonable rates and charges for IPCS, and therefore applies to all IPCS over which we now have authority.[154]

42.     Accordingly, we rely on "the 'used and useful' doctrine and its associated prudent expenditure standard" to assess the costs that should either be included or excluded from our rate cap calculations to ensure just and reasonable rates and charges for IPCS.[155]  Under this framework, the determination of just and reasonable rates focuses on affording regulated entities an opportunity to

---

Interstate Commerce Act, the court "must assume that Congress intended to use [certain maritime terms of art] as they have historically been understood for the past half century").

[150] *FCC v. AT&T*, 562 U.S. 397, 408 (2011); Public Interest Parties May 8, 2023 Comments at 9; Leadership Conference July 12, 2023 Reply at 2.

[151] *GTL v. FCC*, 866 F.3d at 409-12.

[152] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9575-76, 9587, paras. 126, 128-29, 153.

[153] *Sandwich Isles Communications, Inc.*, WC Docket No. 10-90, Order on Reconsideration, 34 FCC Rcd 577, 580, para. 7 (2019) (*Sandwich Isles Reconsideration Order*).

[154] Worth Rises May 8, 2023 Comments at 5; Public Interest Parties May 8, 2023 Comments at 10; UCC and Public Knowledge May 9, 2023 Comments at 8; Public Interest Parties July 12, 2023 Reply at 9; Electronic Privacy Information Center Reply, WC Docket Nos. 23-62 and 12-375, at 3 (rec. June 6, 2023) (EPIC June 6, 2023 Reply) ("The Commission has for decades applied a "used and useful" standard in its general telecommunications dockets to identify which costs to service providers can fairly be passed on to consumers, and which costs are excessive or unfair to consumers.  EPIC urges the Commission to apply this standard in this docket to properly allocate costs between ratepayers, prison telecommunications providers, and jails and prisons themselves.").

[155] *Establishing Just and Reasonable Rates for Local Exchange Carriers*, WC Docket No. 07-135, Notice of Proposed Rulemaking, 22 FCC Rcd 17989, 17997, para. 20 & n.49 (2007).

recover their "prudently incurred investments and expenses that are 'used and useful' in the provision of the regulated service for which rates are being set."[156]  This "used and useful" framework, which "is rooted in American legal theory and particularly in the constitutional limitations on the taking of private property for public use,"[157] balances the "equitable principle that public utilities must be compensated for the use of their property in providing service to the public" with the "[e]qually central . . . equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them."[158]  In applying these principles, "the Commission considers whether the investment or expense 'promotes customer benefits, or is primarily for the benefit of the carrier.'"[159]  As the Commission has explained, "[t]he used and useful and prudent investment standards allow into the rate base portions of plant that directly benefit the ratepayer, and exclude any imprudent, fraudulent, or extravagant outlays."[160]

43.    As one commenter suggests, the used and useful framework allows us to recognize all IPCS costs that benefit IPCS users, including any such costs incurred by correctional facilities, as costs

---

[156] *See 2021 ICS Order*, 36 FCC Rcd at 9575, para. 126.  The used and useful framework permits regulated entities to earn a reasonable return on their resources dedicated to public use but it does not allow them to include a markup for profit beyond that.  *See, e.g.*, *Smyth v. Ames*, 169 U.S. 466, 546-47 (1898) ("What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience."); *Jersey Cent. Power & Light Co. v. FERC*, 810 F.3d 1168, 1175 (D.C. Cir. 1984) (*Jersey Central*) (recognizing that regulated rates are "calculated to generate a reasonable return" on property dedicated to public use); *American Telephone and Telegraph Company The Associated Bell System Companies*, Docket No. 19129, Phase II Final Decision and Order, 64 F.C.C.2d 1, 39-40, paras. 116-20 (1977) (*AT&T Phase II Order*) (rejecting AT&T's attempt to earn a return on "the amount of investment capital" its investors had provided to AT&T, rather than on AT&T's prudent investment in property used and useful in the provision of service to the public"); *2021 ICS Order*, 36 FCC Rcd at 9576, para. 129 & n.395 (allowing a pass-through of portions of providers' site commission payments that the Commission determined to be used and useful on an interim basis but declining to "go further and provide for providers to make a profit on those site commission payments").

[157] *AT&T Phase II Order*, 64 F.C.C.2d 1, 38, para. 111.  In this Order, we use the term "used and useful framework" to refer collectively to the "used and useful" standard and the "prudent expenditure" standard.

[158] *Id.* at 38, paras. 111-12.

[159] *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126 (quoting *Establishing Just and Reasonable Rates for Local Exchange Carriers*, 22 FCC Rcd at 17997, para. 19 & n.47); Public Interest Parties July 12, 2023 Reply at 9.  There are several elements of the Commission's used and useful analysis.  First, the Commission considers the need to compensate providers "for the use of their property and expenses incurred in providing the regulated service." *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 111).  Second, the Commission looks to the "equitable principle that ratepayers should not be forced to pay a return except on investments that can be shown to benefit them."  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 112).  In this regard, the Commission considers "whether the expense was necessary to the provision of" the services subject to the "just and reasonable" standard.  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7.  And third, the Commission considers "whether a carrier's investments and expenses were prudent (rather than excessive)."  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Communications Revisions to Tariff F.C.C. Nos. 1, 2, 11, 13, and 14 Applications for Review*, CC Docket No. 87-611, Memorandum Opinion and Order, 5 FCC Rcd 5693, 5695, para. 17 (1990) (*1990 AT&T Tariff Investigation Order*)).

[160] *Implementation of Sections of The Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation and Adoption of a Uniform Accounting System For Provision of Regulated Cable Service*, MM Docket No. 93–215 and CS Docket No. 94–289, Report and Order and Further Notice of Proposed Rulemaking, 9 FCC Rcd 4527, 4546-67, para. 39 (1994) (*1994 Cable Rate Regulation Order*); *see also id.* at para. 40 & n.67 (explaining that the Commission was employing the used and useful and prudent investment standards it long had applied in the common carrier context).

that should be recovered though IPCS rates and charges.[161]  Conversely, that framework allows us to exclude from that recovery any costs that do not benefit IPCS users, either because they were imprudent or because they were for non-IPCS products or services, regardless of whether the provider or the facility incurred them.  In short, the used and useful framework functions as an "equitable principle" that prevents ratepayers from having to pay for costs that are "primarily for the benefit of the carrier," while allowing regulated entities to be compensated for providing service.[162]

44.    Some commenters express concerns over our reliance on the used and useful framework in the IPCS context,[163] describing the framework as being "a vestige of rate-of-return regulation."[164]  To the contrary, we find that the framework remains the most practical and effective method for determining the costs providers and facilities reasonably incur in providing IPCS.  As historically applied by the Commission, the used and useful framework limits the costs recoverable through regulated rates and charges to "prudently incurred investments and expenses that are 'used and useful' in the provision of the regulated service."[165]  We disagree with those commenters who argue that competition in the IPCS market

---

[161] Worth Rises May 8, 2023 Comments at 8 (explaining that "IPCS rates may include all costs directly related to the provision of IPCS that are also used and useful to IPCS consumers" and that "correctional facilities may incur used and useful costs which the Commission could include within rates").  Worth Rises also reminds us that the Commission has rarely departed from the used and useful standard and has "always ensured that ratepayers benefitted from this departure."  *Id.* at 5.

[162] Public Interest Parties May 8, 2023 Comments at 10-11 (In the IPCS context, the consideration of what is necessary for the provision of interstate telecommunications services "is dependent on whether the cost 'benefits ratepayers'" and also "requires that investments be 'prudent' even if otherwise 'used and useful.'"); UCC and Public Knowledge May 9, 2023 Comments at 8; Public Interest Parties July 12, 2023 Reply at 9-10; *see also id.* at 9 (taking the position that "providers should not be allowed to recover costs that primarily benefit themselves rather than the end users").  We explain below how our overall approach to implementing section 276(b)(1)(A) adheres to both the "just and reasonable" and the "fairly compensated" standards.  *See infra* Section III.C.3.c (Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)).

[163] National Sheriffs' Association Comments, WC Docket No. 23-62 and 12-375, at 3 (rec. May 8, 2023) (National Sheriffs' Association May 8, 2023 Comments); Securus May 8, 2023 Comments at 30; ViaPath May 8, 2023 Comments at 6; National Sheriffs' Association July 12, 2023 Reply at 13; Pay Tel Communications, Inc. Reply, WC Docket Nos. 23-62 and 12-375, at 6 (rec. July 12, 2023) (Pay Tel July 12, 2023 Reply); Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, FCC, WC Docket Nos. 23-62 and 12-375, at 11-12 (filed July 9, 2024) (Pay Tel July 9, 2024 *Ex Parte*) (arguing that the used and useful standard "has little application" in this context); Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, FCC, WC Docket Nos. 23-62 and 12-375, at 2-3 (filed July 11, 2024) (Pay Tel July 11, 2024 *Ex Parte*).

[164] ViaPath May 8, 2023 Comments at 6; Pay Tel July 12, 2023 Reply at 6; Global Tel*Link Corp. d/b/a ViaPath Reply, WC Docket Nos. 23-62 and 12-375, at n.19 (rec. July 12, 2023) (ViaPath July 12, 2023 Reply); *see also* Securus July 11, 2024 *Ex Parte* at 17 (arguing that the used and useful framework "is ill suited to the structure of the IPCS industry where the direct customer of the provider, the correctional authorities, determine what is required to provide IPCS in their facilities, and the rate payers are the incarcerated individuals and their friends and family that pay for the costs of the service").

[165] *See 2021 ICS Order*, 36 FCC Rcd at 9575, para. 126.  Contrary to Pay Tel's and Securus's representations, our application of the used and useful standard is not "novel" or otherwise inappropriate as applied in this Report and Order.  Pay Tel July 9, 2024 *Ex Parte* at 11; Securus July 11, 2024 *Ex Parte* at 16-18.  The used and useful standard is "a standard regulatory agencies have been using for decades" to "determine whether a regulated company's expenses are justified."  *Sandwich Isles Commc'ns, Inc. v. FCC*, 741 F. App'x 808, 810 (D.C. Cir. 2018).  Nothing about the Commission's approach here is novel.  Instead, it reflects the familiar ratemaking exercise the Commission routinely undertakes to determine those capital costs and expenses that may be recovered through regulated rates.  To the extent Pay Tel's argument is premised on the notion that the used and useful standard "is nowhere specified in the Martha Wright-Reed Act or in Section 276," we explain above that as Congress has imported section 201(b)'s "just and reasonable" standard into section 276(b)(1)(A), the used and useful framework

(continued….)

makes application of the used and useful standard unnecessary. That argument conflates the bidding market (i.e., the market in which IPCS providers compete against each other to win contracts with correctional facilities) with the retail market (i.e., the market in which IPCS consumers pay rates and charges for the communications services that we must ensure are just and reasonable).[166] Indeed, the Commission has previously determined that "even if there is competition in the bidding market . . . it is not the type of competition the Commission recognizes as having an ability to exert downward pressure on rates for consumers."[167] Pay Tel and ViaPath contend that "IPCS providers [should be] free to best determine how to manage their investments and expenses."[168] Allowing providers such complete flexibility would run contrary to the plain text in the Martha Wright-Reed Act and congressional directive to the Commission. Moreover, this type of behavior has thus far resulted in unreasonable IPCS rates and charges for consumers, underscoring the need for us to apply the used and useful (or a similar) framework to prevent the inclusion of imprudent and non-IPCS costs in IPCS rates and charges.

45.     We also find unpersuasive arguments that we should allow all prudently incurred "operating expenses" to be recovered through IPCS rates and charges even if those expenses are not used and useful in the provision of IPCS and related ancillary services.[169] The National Sheriffs' Association, in particular, expresses concern that the costs of some expenditures that correctional officials find prudent, including expenditures for certain safety and security measures, will be excluded from our ratemaking calculus.[170] It claims that relying on the used and useful standard is inconsistent with section 4 of Martha Wright-Reed Act, which specifies that "[n]othing in the Act shall be construed to . . . prohibit the implementation of any safety and security measures" related to IPCS "at a State or local prison, jail, or detention facility."[171]

46.     The National Sheriffs' Association's reasoning, however, does not fully comport with the language of the Martha Wright-Reed Act addressing safety and security measures. Section 3(b)(2) of that Act requires that we "consider costs associated with any safety and security measures necessary to provide" IPCS in promulgating implementing rules and in "determining just and reasonable rates" for IPCS.[172] But neither section 3(b)(2) nor any other provision of the Martha Wright-Reed Act concludes or

that the Commission's has used to determine just and reasonable rates under section 201(b) provides the most appropriate mechanism for determining just and reasonable rates under section 276(b)(1)(A). Pay Tel July 9, 2024 *Ex Parte* at 11. And, in any event, section 201(b) is similarly silent on the applicability of the used and useful standard. Further, we do not, as Pay Tel suggests, rely on the used and useful framework "to the exclusion of 'fair compensation.'" *Id.* As we explain below, the text of section 276(b)(1)(A), as amended by the Martha Wright-Reed Act, requires the Commission to implement both provisions in tandem, which we do in setting rate caps using a zone of reasonableness approach. *Infra* Section III.D (Rate Caps).

[166] ViaPath May 8, 2023 Comments at 6; Pay Tel July 12, 2023 Reply at 6.

[167] *2021 ICS Order*, 36 FCC Rcd at 9533, para. 33 (quoting *2002 Pay Telephone Order*, 17 FCC Rcd at 3252-54, paras. 12; 2013 ICS Order, 28 FCC Rcd at 14129, para. 41; *see also AT&T v. FCC*, 292 F.3d 808, 809 (D.C. Cir. 2002) (recognizing that competitive local exchange carriers (LECs) "possess a 'series of bottleneck monopolies over access to each individual end user'" even though each competitive LEC has a "small market share"); Raher May 8, 2023 Comments at 5; UCC and Public Knowledge May 9, 2023 Comments at 9; DOJ Apr. 29, 2024 *Ex Parte* at 3 (noting the "structural barriers to competition" that "deprive[] consumers [of] the benefits of a robust, competitive IPCS market").

[168] ViaPath May 8, 2023 Comments at 6; Pay Tel July 12, 2023 Reply at 6.

[169] Securus May 8, 2023 Comments at 27; National Sheriffs' Association July 12, 2023 Reply at 14; Securus July 11, 2024 *Ex Parte* at 17 (suggesting that the used and useful framework does not apply to operating expenses).

[170] National Sheriffs' Association May 8, 2023 Comments at 3.

[171] *Id.* at 3; Martha Wright-Reed Act § 4.

[172] Martha Wright-Reed Act § 3(b)(2). We address Securus's arguments that the used and useful framework "is wholly unsuited" for the purpose of determine cost recovery for site commission payments in Section III.D.6.c.ii (Site Commissions Are Not Used and Useful In the Provision of IPCS). *See* Securus May 8, 2023 Comments at 25.

requires that *every* safety and security measure that a correctional institution chooses to implement in connection with IPCS is "necessary to provide" IPCS, or mandate that we require consumers to pay for *all* those measures through IPCS rates.[173]

47.     Rather, when read in conjunction with section 3(b)(2) and the other provisions of the Martha Wright-Reed Act, section 4 simply makes clear that, in directing the Commission to develop a compensation plan to ensure just and reasonable IPCS rates and charges, Congress did not intend to intrude on the ability of correctional institutions to "adopt policies that, in their judgment, are needed to preserve safety and security."[174]  Our actions in this Order make no such intrusion.  We do not prohibit any correctional institution from implementing any safety and security measure that it deems appropriate or desirable.[175]  We do, however, ensure that IPCS consumers do not bear the costs of those safety and security measures that are not necessary to provide IPCS regardless of how desirable these measures may be to correctional institutions.  Section 4 does not preclude such an outcome.[176]

48.     The Commission has relied on the used and useful framework to ensure just and reasonable rates for decades.[177]  Our decision to apply that framework in determining which costs should be recoverable from consumers through IPCS rates and charges is fully consistent with the Communications Act, as amended by the Martha Wright-Reed Act, as well as with Commission precedent, including Commission regulation of IPCS rates that formed the regulatory backdrop to the enactment of the Martha Wright-Reed Act.  The used and useful framework, including its prudent expenditure component, embodies core ratemaking principles that the Commission has long used to separate the costs that captive ratepayers should pay for regulated services from those that are either properly attributable to other products or services or excessive.  In applying that framework, along with the "necessary" standard that section 3(b)(2) of the Martha Wright-Reed Act specifies for the costs of safety and security measures and the other standards set forth in that Act, we discharge our statutory duties, consistent with record support, without intruding into matters outside our authority.[178]

### b.      Effect on Other Laws

49.     Section 4 of the Martha Wright-Reed Act provides additional direction regarding the effect of the Act on existing laws.  Section 4 consists of two clauses that are meant to guide the interpretation of the remainder of the Act.  The first clause of section 4 of the Act specifies that "[n]othing in this Act shall be construed to modify or affect any Federal, State or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility."[179]  In

---

[173] National Sheriffs' Association May 8, 2023 Comments at 9 (contending that "if a safety or security measure is implemented in connection with IPCS . . . the costs should be recoverable"); National Sheriffs' Association July 12, 2023 Reply at 12.

[174] National Sheriffs' Association July 12, 2023 Reply at 7; *see* ViaPath May 8, 2023 Comments at 13; FDC July 11, 2024 *Ex Parte* at 3.

[175] *Infra* Section III.C.3.b (Effect on Other Laws).

[176] We interpret section 4 of the Martha Wright-Reed Act below.  *See infra* Section III.D.7.b.iv (Consideration of Safety and Security Costs Under the Used and Useful Framework).

[177] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9575-79, paras. 126-33 (applying the used and useful framework to evaluate cost recovery for site commission payments).

[178] *See, e.g.*, Worth Rises May 8, 2023 Comments at 5 (explaining that the used and useful framework is best suited to evaluating just and reasonable rates); Worth Rises July 12, 2023 Reply at 3 (noting that the used and useful standard is the best framework for considering safety and security expenses); Public Interest Parties July 12, 2023 Reply at 9 (explaining that "[n]othing prevents the application of the used and useful standard, which is part of the process to determine whether rates are just and reasonable, to IPCS").

[179] Martha Wright-Reed Act § 4.  We interpret "this Act," as used in section 4 of the Martha Wright-Reed Act, as referring the Martha Wright-Reed Act, rather than the Communications Act.  *See 2023 IPCS Notice*, 38 FCC Rcd at

(continued….)

the *2023 IPCS Notice*, the Commission sought comment on the meaning of this statutory language.[180] The Commission asked whether "the language of this clause simply mean[s] that the Martha Wright-Reed Act does not create any new obligation for state or local facilities to provide any form of incarcerated people's calling services."[181]  The National Sheriffs' Association supports this interpretation, adding that the language of the Martha Wright-Reed Act would not support "any new requirement to make IPCS available."[182]  The United Church of Christ and Public Knowledge likewise agree that "this provision demonstrates that the Act does not affirmatively require any additional service offerings" at correctional institutions.[183]  No commenter disputes this interpretation of the first clause of section 4.  We conclude that this clause means that the Martha Wright-Reed Act neither expressly nor by implication modifies any federal, state or local law in a manner that would require the provision of any new or additional incarcerated people's communications services at any state or local correctional institution.

50.    The second clause of section 4 specifies that nothing in the Martha Wright-Reed Act "shall be construed to . . . prohibit the implementation of any safety and security measures related to" telephone service or advanced communications services at a State or local prison, jail, or detention facility.[184]  In the *2023 IPCS Notice*, the Commission sought comment on how to interpret this clause and asked, in particular, whether the clause means that the Martha Wright-Reed Act, with its focus on "just and reasonable ratemaking" was "not intended to interfere with any correctional official's decision on whether to implement any type of safety or security measure that the official desires in conjunction with audio or video communications services."[185]  Two commenters support this interpretation of the second clause of section 4.[186]  In contrast, the United Church of Christ and Public Knowledge contend more narrowly that "this provision demonstrates that the Act does not . . . prohibit safety and security measures."[187]

51.    While the Commission's initial request for comment seems to suggest the more expansive reading of the second clause of section 4 that the National Sheriffs' Association supports, we now conclude that a narrower reading of that clause will more closely reflect the limited scope of the statutory language.  We find that the National Sheriffs' Association's interpretation is overbroad and would expand the reach of the second clause beyond its intended scope.  When read in conjunction with the other provisions of the Martha Wright-Reed Act, the second clause of section 4 of that Act simply makes clear that, in directing the Commission to develop a compensation plan to ensure just and reasonable IPCS rates and charges, Congress did not intend to prohibit correctional institutions from implementing policies that, in their judgment, are needed to preserve safety and security.  Consistent with that interpretation and the specific language of section 4, we interpret the second clause of section 4 as precluding us from construing any provision of that Act as making such a prohibition regarding the implementation of any safety and security measures at any federal, state, or local correctional

---

2695, para. 67.  All parties commenting on the meaning of section 4 accept this interpretation.  *See, e.g.*, National Sheriffs' Association May 8, 2023 Comments at 14; UCC and Public Knowledge May 9, 2023 Comments at 18.

[180] *2023 IPCS Notice*, 38 FCC Rcd at 2695, para. 67.

[181] *Id*.

[182] National Sheriffs' Association May 8, 2023 Comments at 14.

[183] UCC and Public Knowledge May 9, 2023 Comments at 18; *id*. at 20 (stating that section 4 "merely indicates [the Act imposes] no additional obligations on the part of state and local authorities to provide communications service").

[184] Martha Wright-Reed Act § 4.

[185] *2023 IPCS Notice* 38 FCC Rcd at 2695, para. 68.

[186] National Sheriffs' Association May 8, 2023 Comments at 14; FDC July 11, 2024 *Ex Parte* at 3-4.

[187] UCC and Public Knowledge May 9, 2023 Comments at 18.

institution.[188]

52.     The National Sheriffs' Association expresses concern that the costs of some expenditures for certain safety and security measures will be excluded from our ratemaking calculus.[189]  The National Sheriffs' Association relies on its broader interpretation of section 4 to assert that the Commission must not "interfere with the operation of jails by eliminating their ability to recover [safety and security] costs" through IPCS rates.[190]  Although the National Sheriffs' Association admits that excluding certain safety and security costs from IPCS rates "is not a prohibition per se," it claims that, in practice, disallowing any costs associated with safety and security measures that law enforcement officials have approved effectively prohibits the measures from being implemented.[191]

53.     The National Sheriffs' Association's reasoning, however, does not comport with the broader statutory context of the Martha Wright-Reed Act addressing safety and security measures.  In particular, section 3(b)(2) of that Act requires that we "consider costs associated with any safety and security measures necessary to provide" IPCS in promulgating implementing rules and in "determining just and reasonable rates" for IPCS.[192]  The best interpretation of the Martha Wright-Reed Act will ensure a meaningful role for both section 3(b)(2) and section 4.[193]

54.     If section 3(b)(2), of its own force, required the Commission to allow recovery of all costs identified by providers or correctional facilities as safety and security costs in regulated rates, as some commenters suggest,[194] then there would seem to be little to no possible risk that such safety and security measures could be "prohibited" because they would, instead, be affirmatively funded by IPCS ratepayers.  That would leave section 4 with little or no risk to address in that regard, and thus the relevant language of section 4 would be of substantially diminished significance.[195]

---

[188] *See* Securus July 11, 2024 *Ex Parte* at 13 (noting that section 4 states "the Commission may not bar the '*implementation*' of [safety and security] measures") (emphasis in original).

[189] National Sheriffs' Association May 8, 2023 Comments at 3.

[190] *Id*.

[191] *Id*. ("Although not a prohibition per se, disallowing a cost associated with a security or safety mechanism produces the same effect."); National Sheriffs' Association July 12, 2023 Reply at 7 ("Prohibiting facilities from recovering these costs has the same effect as prohibiting them outright."); FDC July 11, 2024 *Ex Parte* at 4 ("While not expressly prohibiting the implementation of safety and security measures, establishing rates that do not allow for the recovery of costs associated with those measures would have the effect of hindering or preventing their implementation and potentially limiting the availability of telephone and advanced communication services in correctional institutions and facilities.").

[192] Martha Wright-Reed Act § 3(b)(2).  We address Securus's arguments that the used and useful framework "is unsuited for the purpose of determine cost recovery for site commission payments in Section III.D.6.c.ii (Site Commissions Are Not Used and Useful In the Provision of IPCS).  Securus May 8, 2023 Comments at 25.

[193] *See, e.g.*, *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) (rejecting an interpretation of a statutory provision that would render another provision "largely superfluous" and quoting precedent that "'[t]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme'") (citations omitted).

[194] *See, e.g.*, National Sheriffs' Association May 8, 2023 Comments at iv, 4, 8-9; Pay Tel May 8, 2023 Comments at 13-14; Securus May 8, 2023 Comments at 34-35, 38; Securus July 12, 2023 Reply at 28.  We reject Securus' suggestion that failure to find all safety and security measures "necessary" and recoverable would violate the Administrative Procedure Act (APA).  Securus July 12, 2023 Reply at 29.  As revealed by our consideration of the relevant issues and the record before us on safety and security issues below, we fully ensure that we have "acted within a zone of reasonableness and, in particular, ha[ve] reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (*Prometheus*).

[195] We recognize that section 3(b)(2) is focused on "costs associated with any safety and security measures *necessary* to provide" IPCS, Martha Wright-Reed Act § 3(b)(2) (emphasis added), while section 4 is focused on

(continued….)

55.     Conversely, if section 4 were read to require recovery of the full array of safety and security costs—deferring to the correctional facilities' decision to approve the use of particular measures when doing so—there would seem to be little meaningful left for the Commission to "consider" in that regard under section 3(b)(2).  Matters such as identifying the magnitude of such costs and how they should be allocated already would be necessitated by the "just and reasonable" requirement in section 276(b)(1)(A) of the Communications Act, as amended by the Martha Wright-Reed Act, if section 4 were interpreted to require such recovery.  That, in turn, would leave section 3(b)(2) of substantially diminished significance.

56.     Our interpretation of those provisions, by contrast, preserves a meaningful role for each, particularly when understood in light of the relevant regulatory backdrop.  In the years leading up to the enactment of the Martha Wright-Reed Act, one of the most-debated issues was the recovery through IPCS rates of payments providers made to correctional facilities, ostensibly—at least in some instances—associated with safety and security measures.[196]  Some parties argued for a categorical prohibition on any such recovery,[197] while other parties advocated for full recovery through IPCS rates of virtually any such asserted costs or payments.[198]  For its part, the Commission sought to navigate these competing claims by seeking to use the best available evidence to assess whether there were costs—such as safety and security costs—with a sufficient nexus to IPCS to potentially warrant recovery of those costs in IPCS rates; using the best available data to seek to quantify those costs; and continuing to evaluate additional tools it might use to address the continued concerns about such cost recovery, including possible preemption.[199]  Our reading of section 3(b)(2) reflects an approach to safety and security costs analogous to the middle path the Commission historically has sought to take.  By requiring that such costs be "considered"—but *only* that they be "considered"—the Martha Wright-Reed Act makes clear that it is not putting a thumb on the scale of either extreme position by categorically precluding or categorically allowing recovery of claimed safety and security costs through regulated IPCS rates.  At the same time, section 4 of the Martha Wright-Reed Act makes clear that the Commission cannot use that Act as a basis to go so far as outright "prohibit[ing] the implementation of any safety and security measures related to" IPCS—such as by preempting even the implementation of such measures—while not foreclosing the possibility that correctional facilities ultimately must look elsewhere besides IPCS provider payments passed through in IPCS rates to fund some (or many) of those measures.

57.     Our actions in this Order do not prohibit any correctional institution from implementing any safety and security measure that it deems appropriate or desirable.[200]  We do, however, ensure that IPCS consumers do not bear the costs of those safety and security measures that are not used and useful or necessary to provide IPCS regardless of how desirable these measures may be to correctional

---

"safety and security measures *related to*" IPCS.  Martha Wright-Reed Act § 4 (emphasis added).  Despite the potential that "necessary" in section 3(b)(2) is a narrower standard than "related to" in section 4, it is not clear how much practical significance that would have if, as some commenters contend, the Commission is required to simply defer to providers' and/or correctional facilities' on what safety and security costs must be recoverable in IPCS rates.  *See, e.g.*, National Sheriffs' Association May 8, 2023 Comments at 8; Securus May 8, 2023 Comments at 35.  But even under a stricter standard, we are persuaded that mandatory recovery through IPCS rates of all "costs associated with any safety and security measures necessary to provide" IPCS would leave the relevant proviso of section 4 of substantially diminished significance.

[196] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9524-25, 9526, 9565-86, paras. 14-15, 18, 107-50 (discussing various legal and policy debates related to these issues); *2021 ICS Notice*, 36 FCC Rcd at 9660-61, paras. 313-15 (seeking comment on various regulatory approaches to address these issues).

[197] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9569-70, para. 115 (noting such arguments).

[198] *See, e.g.*, *id.* at 9567, para. 110 (noting such arguments).

[199] *See, e.g.*, *id.* at 9524-25, 9528-29, 9565-86, paras. 14-15, 24, 107-50; *2021 ICS Notice*, 36 FCC Rcd at 9660-61, paras. 313-15.

[200] *See infra* Section III.D.7 (Safety and Security Costs).

institutions.  Section 4 does not preclude such an outcome.

58.        In addition, without conceding the factual merits of the National Sheriffs' Association's claim regarding our ability to exclude costs of safety and security measures that are neither used and useful nor necessary from our ratemaking analysis, as a statutory matter we observe that in other contexts where Congress wanted to prevent not only the prohibition of certain conduct, but even things that effectively prohibit such conduct, it has done so explicitly.[201]  Particularly because our interpretation best reconciles sections 3(b)(2) and 4 of the Martha Wright-Reed Act, we are not persuaded to infer a *de facto* prohibition—a prohibition in fact—from the language of section 4 as the National Sheriffs' Association suggests.  With respect to the factual merits of the National Sheriffs' Association claims, we have provided for the recovery generally of used and useful costs, including costs for necessary safety and security measures, through the rate caps we adopt today.  We find our actions adequately address concerns about a *de facto* prohibition of safety and security measures in this context.[202]

         **c.**      **Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)**

59.        We now turn to the requirement that we establish a compensation plan to ensure IPCS providers are fairly compensated.[203]  We conclude that, in addition to ensuring "just and reasonable" rates and charges, our compensation plan for IPCS must accord meaning to the "fairly compensated" clause in section 276(b)(1)(A) and its relationship to the "just and reasonable" rates and charges mandate.[204]

60.        *Meaning of the Fair Compensation Standard.*  We conclude that our compensation plan for IPCS must give full effect to both the "just and reasonable" and the "fairly compensated" clauses in section 276(b)(1)(A).[205]  In the *2023 IPCS Notice*, the Commission sought comment on how it should balance the interests of both consumers and industry in giving effect to both clauses.[206]  As proposed in the *2023 IPCS Notice*, we determine that giving effect to both standards requires a balanced approach that "emphas[izes] consumers' (particularly incarcerated people's) and providers' right to just and reasonable rates and charges for each audio and video communications service now encompassed within the statutory definition of 'payphone service,'" as well as ensuring that such rates ensure that "all payphone providers are fairly compensated."[207]

61.        We view these clauses as imposing two interdependent statutory mandates, each of which

---

[201] *See, e.g.*, 47 U.S.C. § 253(a) (specifying that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit *or have the effect of prohibiting* the ability of any entity to provide any interstate or intrastate telecommunications service" (emphasis added)); *id.*, § 332(c)(7)(B)(i)(II) (restricting certain regulation of personal wireless service facilities that "shall not prohibit *or have the effect of prohibiting* the provision of personal wireless services").

[202] *Infra* Section III.D.7.b.iv (Consideration of Safety and Security Costs Under the Used and Useful Framework).

[203] 47 U.S.C. § 276(b)(1)(A).

[204] *2023 IPCS Notice*, 38 FCC Rcd at 2675-76, para. 14.

[205] Martha Wright-Reed Act pmbl.; 47 U.S.C. §§ 201(b), 276(b)(1)(A); Public Interest Parties July 12, 2023 Reply at 10; Pay Tel May 8, 2023 Comments at 8; NCIC May 8, 2023 Comments at 4.

[206] *2023 IPCS Notice*, 38 FCC Rcd at 2675-76, para. 14.

[207] *Id.* at 2675-76, 2697-98, 29, paras. 14, 73; Securus May 8, 2023 Comments at 10; Pay Tel May 8, 2023 Comments at 9; Pay Tel July 12, 2023 Reply at 9; California PUC May 8, 2023 Comments at 4-5 (explaining that establishing a just and reasonable rate requires balancing the cost of providing the service with the "affordability" of the rates to incarcerated people and their families); Pay Tel May 8, 2023 Comments at 7-8; Securus May 8, 2023 Comments at 15; Raher July 12, 2023 Reply at 5-6.  We thus reject Securus's claim that the Order "simply collapses the fair compensation standard into the just and reasonable standard."  Securus July 11, 2024 *Ex Parte* at 17.  As we explain, our rate-making methodology and statutory interpretation of the Martha Wright-Reed Act ensure that both standards are given full effect.  *See infra* Section III.D.4.c (Consistency with Statutory Requirements).

we must seek to fully implement.[208]  As discussed below, as a general matter a range of possible outcomes potentially can be found "just and reasonable" and a range of possible outcomes potentially can be found to "fairly compensate" IPCS providers.  Because of that, we anticipate being able to find areas of overlap in those two ranges that will satisfy both statutory mandates.[209]

62.     With respect to the "just and reasonable" mandate, as discussed above, that directive leads us to balance the "equitable principle that public utilities must be compensated for the use of their property in providing service to the public" with the "[e]qually central . . . equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them," drawing on Commission precedent under section 201(b).[210]  In determining rates that are "just and reasonable" we look to whether costs to be recovered were prudently incurred and used and useful in the provision of the services at issue.  That framework does not inevitably lead to a single "just and reasonable" rate, however, but allows for a range of rates with the agency potentially able to find any rate with that zone to be "just and reasonable."[211]

63.     There also is a body of precedent regarding the interpretation of the "fairly compensated" mandate historically present in section 276(b)(1)(A)—but our approach here must account for certain ways in which the Martha Wright-Reed Act altered the operative statutory approach, necessitating related departures from that historical precedent.  Under that precedent, regulated rate levels historically were viewed as in accordance with the "fairly compensated" standard if they "allow providers to generate sufficient revenue from each interstate and international call—including any ancillary service fees attributable to that call—(1) to recover the direct costs of that call; and (2) to make a reasonable contribution to the provider's indirect costs related to inmate calling services."[212]  As the Commission

---

[208] *2023 IPCS Notice*, 38 FCC Rcd at 2677, para. 16; Securus May 8, 2023 Comments at ii (arguing that "just and reasonable" and "fair compensation" are "not coterminous and seek to achieve different goals"); Securus July 11, 2024 *Ex Parte* at 17; Pay Tel May 8, 2023 Comments at 9; Pay Tel July 12, 2023 Reply at 9.  *Contra* Raher July 12, 2023 Reply at 5-6 ("IPCS carriers, most notably Securus, argue that fair compensation provides an independent basis (separate and apart from the just-and-reasonable standard) for inflating IPCS rates.  This argument is meritless.").

[209] We find this expectation particularly reasonable given that the "just and reasonable" precedent under section 201(b)—which we carry into our application of section 276(b)(1)(A)—already involves a balancing that accounts for the service provider's interests.  47 U.S.C. § 201(b).

[210] *AT&T Phase II Order*, 64 F.C.C.2d at 38, paras. 111-12.

[211] *See, e.g., Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1502 (D.C. Cir. 1984) (*Farmers Union*) (pointing out that historically, rates had been seen as just and reasonable when they fell "within a 'zone of reasonableness,' where rates are neither 'less than compensatory' [for providers] nor 'excessive' [for consumers]").

[212] *2021 ICS Order*, 36 FCC Rcd at 9600, para. 185; *see also, e.g., 2002 Pay Telephone Order*, 17 FCC Rcd at 3257-58, para. 23 ("Unless an ICS provider can show that (i) revenue from its interstate or intrastate calls fails to recover, for *each* of these services, both its direct costs and some contribution to common costs, or (ii) the *overall* profitability of its payphone operations is deficient because the provider fails to recover its total costs from its aggregate revenues (including both revenues from interstate and intrastate calls), then we would see no reason to conclude that the provider has not been 'fairly compensated.'").  In addition to the evaluation of regulated rate levels, the "fairly compensated" mandate applies to details of the compensation plan that bear on the mechanics of obtaining payment.  *See, e.g., Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Report and Order, 18 FCC Rcd 19975, 19977-78, para. 5 (2003) (*2003 Payphone Report and Order*) ("In devising a compensation plan to ensure that PSPs are fairly compensated, the Commission has examined various methods of: (1) identifying the party responsible for compensation; and (2) ensuring that PSPs are paid based on accurate data for every completed call.").  Advocacy in this respect historically was focused more on traditional payphones, where payphone providers faced challenges in identifying the party that was supposed to pay for a call, and in obtaining reliable data for use in billing.  *See, e.g., id.* at 19978-83, paras. 6-17 (recounting these problems, and the Commission's efforts to address them, in the traditional payphone context); *see also, e.g., 2023 IPCS Notice*, 38 FCC Rcd at 2676-77, para. 15 (explaining that as

(continued....)

recognized in the *2002 Pay Telephone Order*—and recognized again in the *2021 ICS Order*—the "lion's share of payphone costs are those that are 'shared' or 'common' to all services," and there are "no logical or economic rules that assign these common costs to 'each and every call.'"[213]  As a result, "a wide range of compensation amounts may be considered 'fair.'"[214]

64.    *The Continued Role of the Fair Compensation Standard.*  Prior to the enactment of the Martha Wright-Reed Act, section 276(b)(1)(A) of the Communications Act required that the Commission "establish a per call compensation plan" ensuring that service providers be "fairly compensated for each and every completed" call.[215]  The Martha Wright-Reed Act eliminated the "per call" and "each and every" call requirements and added a new dimension to section 276 by requiring that our compensation plan for IPCS "ensure that . . . all rates and charges" for incarcerated people's communications services "are just and reasonable."[216]  In the *2023 IPCS Notice*, the Commission sought comment on how the Martha Wright-Reed Act's amendments to section 276(b)(1)(A) affect the "fairly compensated" requirement in that section.[217]  In particular, the Commission sought comment on Congress's intent in striking the "per call" and "each and every [call]" language from section 276(b)(1)(A) and the effect of its removal on the "fairly compensated" requirement, particularly in light of the Martha Wright-Reed Act's new requirement that all IPCS rates and charges be just and reasonable.[218]

65.    The record persuades us that in striking the "per call" and "each and every [call]" language, Congress modified but did not eliminate the requirement that providers be fairly compensated for completed intrastate and interstate communications.  Instead, as Pay Tel explains, the fair compensation requirement "was left as an independent requirement by the Martha Wright-Reed Act, reflecting a purposeful decision by Congress to retain the requirement as an essential component of [IPCS] reform."[219]  We agree that we should not "effectively read the requirement out of the statute or

---

originally enacted in 1996, the "fair compensation" requirement was "designed to fix the specific problem of uncompensated payphone calls at that time" and noted that "the situation is quite different" in the context of IPCS because providers "generally receive compensation for the calls they carry").  Securus argues that we have departed from the *2002 Pay Telephone Order's* fair compensation determination based on overall profitability to determine fair compensation evaluating "profitability on a call-by-call basis."  *See* Securus July 11, 2024 *Ex Parte* at 5-6, n.10 (citing *2002 Pay Telephone Order*, 17 FCC Rcd at 3257-58, para. 7).  We disagree.  Further, Securus has not explained the difference between these two views of profitability, and has not articulated why a provider would not be profitable overall if it were profitable on a call-by-call basis.

[213] *2002 Pay Telephone Order*, 17 FCC Rcd at 3255-56, paras. 16, 18; *see also 2021 ICS Order*, 36 FCC Rcd at 9602, para. 190.

[214] *2002 Pay Telephone Order*, 17 FCC Rcd at 3255, para. 16; *see also 2021 ICS Order*, 36 FCC Rcd at 9602, para. 190.

[215] 47 U.S.C. § 276(b)(1)(A) (2021); *see, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9600, para. 185 (discussing the requirements of section 276(b)(1)(A)); *see also GTL v. FCC*, 866 F.3d at 409 (finding "unfounded" the Commission's assertion that "'the interests of both the payphone service providers and the parties paying the compensation must be taken into account'" in determining whether payphone providers are fairly compensated) (quoting *2015 ICS Order*, 30 FCC Rcd at 12814, para. 107 & n.335).

[216] 47 U.S.C. § 276(b)(1)(A); Pay Tel May 8, 2023 Comments at 7 (explaining under the Act, fair compensation to providers is still required); Securus May 8, 2023 Comments at 10.  We disagree with UCC's argument that it would be "arbitrary and capricious" to require fair compensation for providers.  UCC and Public Knowledge May 9, 2023 Comments at 18.  This is contrary to the explicit statutory text of section 276(b)(1)(A) that requires fair compensation.

[217] *See 2023 IPCS Notice*, 38 FCC Rcd at 2676-77, paras. 15-16.

[218] *See id.* at 2675-2677, paras. 14-15.

[219] Pay Tel May 8, 2023 Comments at 9; *see also* Securus May 8, 2023 Comments at 10 (explaining that the Martha Wright-Reed Act "expressly retained the requirement that providers be fairly compensated").

diminish its importance."[220]  Instead, we address the fair compensation and just and reasonable standards as interdependent standards as we implement the requirements of section 276(b)(1)(A).[221]

66.    At the same time, we reject suggestions that the "just and reasonable" mandate could be treated as subsidiary to the "fairly compensated" mandate.[222]  The text of section 276(b)(1)(A) as amended by the Martha Wright-Reed Act requires the Commission to implement both provisions in tandem.  And because the two mandates potentially can be satisfied through a range of outcomes, the record here does not persuade us that we will be forced into a situation where one mandate must yield for the other mandate to be met.

67.    *Interpreting the Fair Compensation Standard in Light of the Martha Wright-Reed Act.*  While we conclude that our compensation plan for IPCS must accord meaning to the "fairly compensated" clause in section 276(b)(1)(A), we also conclude that the Martha Wright-Reed Act alters our interpretation and application of that clause in certain key ways.  For one, deletion of the "per call" and "each and every [call]" language from section 276(b)(1)(A) fundamentally changes the requirements of that clause.  Consistent with the Commission's preliminary interpretation in the *2023 IPCS Notice*, we find that these statutory amendments signal "Congress's intent to restrict the application of the 'fairly compensated' requirement with respect to [IPCS] by no longer requiring the Commission to ensure that its compensation plan allows for 'fair' compensation for 'each and every' completed call."[223]  Thus, while we must ensure that providers receive fair compensation for completed intrastate and interstate communications,[224] we are not obliged to establish a per-call based compensation plan, as section 276(b)(1)(A) previously required.[225]

68.    The Martha Wright-Reed Act also affects how we implement section 276(b)(1)(A)'s directive that our compensation plan for IPCS "ensure that all payphone service providers are fairly compensated" for completed communications, consistent with the Act's amendments to section 276(b)(1)(A).[226]  Section 3(b)(1) of the Martha Wright-Reed Act grants us explicit authority to use "industry-wide average costs."  Use of industry-wide average costs, of necessity, evaluates provider

---

[220] Pay Tel May 8, 2023 Comments at 9.

[221] Securus May 8, 2023 Comments at 10; Raher May 8, 2023 Comments at 3 Tbl. 1 (explaining that fair compensation "must be balance[d] against consumers' right to just and reasonable rates"); Public Interest Parties May 8, 2023 Comments at 11 (acknowledging the Commission's obligation to ensure fair compensation and just and reasonable rates).

[222] We therefore reject any argument that IPCS rates or ancillary services charges "must be *higher* than they otherwise would be under a 'just and reasonable'" analysis in order "to achieve 'fairness.'"  Public Interest Parties May 8, 2023 Comments at 12 (emphasis in original); *see also, e.g.*, UCC May 9, 2023 Comments at 3.

[223] *2023 IPCS Notice*, 38 FCC Rcd at 2677, para. 16; Public Interest Parties May 8, 2023 Comments at 12-13; California PUC May 8, 2023 Comments at 4; EPIC May 8, 2023 Comments, at 3 (explaining that the "Commission is empowered to reconsider its rate caps with the touchstone of 'just and reasonable' pricing instead of the 'fairly compensated for each and every call' standard that existed previously"); Securus July 12, 2023 Reply at 11 (maintaining that fair compensation "may no longer be required for each and every call"); Raher May 8, 2023 Comments at 3 Tbl. 1 (noting that "fair compensation no longer applies on a per-call basis").

[224] *See, e.g.*, Public Interest Parties May 8, 2023 Comments at 11 (recognizing that the Commission is obligated to ensure fair compensation and just and reasonable rates and charges); Securus May 8, 2023 Comments at 10 (arguing that the "fairly compensated" and "just and reasonable" requirements "are not coterminous"); Pay Tel May 8, 2023 Comments at 9 (arguing that the Commission may not "disregard the 'fair compensation' requirement in determining just and reasonable rates").

[225] Raher May 8, 2023 Comments at 11; California PUC May 8, 2023 Comments at 4; *see* Securus May 8, 2023 Comments at 10.

[226] 47 U.S.C. § 276(b)(1)(A); Securus May 8, 2023 Comments at 11.

compensation on a more aggregated—rather than provider-by-provider—basis.[227]  Section 3(b)(1) expressly permits the use of such data in "determining just and reasonable rates" as one permissible example, alongside more general authority to use industry-wide average costs "[i]n implementing this Act and the amendments made by this Act," and "promulgating regulations under" the Martha Wright-Reed Act's amendments to the Communications Act.[228]  Based on that language we interpret Congress as authorizing us to rely on industry-wide average costs in implementing the "fairly compensated" mandate—and its interplay with the "just and reasonable" mandate—as amended and codified in section 276(b)(1)(A) by the Martha Wright-Reed Act.  We consequently interpret Congress' permission to use industry-wide average costs to mean that rate caps based on costs evaluated on an aggregated basis generally will satisfy the requirement that all payphone service providers be fairly compensated.  The record supports this interpretation.[229]  Consistent with the Martha Wright-Reed Act, and its amendments to section 276(b)(1)(A), we therefore adopt rate caps based on industry-wide average cost data submitted by IPCS providers in response to the Commission's 2023 Mandatory Data Collection, as described below.

69.     We also observe that these provisions of the Martha Wright-Reed Act respond directly to the D.C. Circuit's holding in *GTL v. FCC* that setting rate caps based on industry-wide average costs was "patently unreasonable" because "calls with above-average costs" would not be fairly compensated on a per call basis.[230]  The elimination by Congress of the "per call" and "each and every [call]" language from section 276(b)(1)(A) leads to the interpretation that compensation need not be evaluated on a per-call basis.  In addition, our reading of section 3(b)(1) of the Martha Wright-Reed Act persuades us that fair compensation need not be evaluated on a provider-by-provider basis—still subject, of course, to Constitutional limits on rate regulation as applied to individual providers.[231]

70.     At the same time, the flexibility in evaluating costs described in section 3(b)(1) of the Martha Wright-Reed Act is tempered by certain requirements to consider particular costs or cost characteristics under section 3(b)(2) of that Act.  Section 3(b)(2) provides that the Commission "shall consider costs associated with any safety and security measures necessary to provide a service."[232]  Under that provision, the Commission also must consider cost differences associated with "small, medium, or

---

[227] *2023 IPCS Notice*, 38 FCC Rcd at 2688, para. 47; Martha Wright-Reed Act § 3(b)(1) (providing that the Commission "may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider").

[228] Martha Wright-Reed Act § 3(b)(1).  Nothing in the Martha Wright-Reed Act compels the Commission to use "the average costs of service of a communications service provider" in determining just and reasonable rates.  Martha Wright-Reed Act § 3(b)(1).  We thus reject Securus's argument that the Commission somehow "ignored" the possibility of using such costs in setting its rate caps.  Securus July 11, 2024 *Ex Parte* at 5.

[229] *See* Public Interest Parties May 8, 2023 Comments at 11, 18 (explaining that the Commission's obligation to ensure fair compensation is satisfied in setting just and reasonable rates that account for costs specific to the provision of IPCS and noting that the statute empowers the Commission "to use industry-wide weighted averages to determine rate caps"); Pay Tel May 8, 2023 Comments at 9 (arguing that the Martha Wright-Reed Act "does not imply that industry average rates would satisfy the 'fair compensation' standard . . . but rather it makes clear that the Commission may utilize average costs . . . as one of the tools to establish rates which are just and reasonable and which ensure fair compensation to the provider").

[230] *GTL v. FCC*, 866 F.3d at 414.

[231] *See, e.g.*, *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307-08 (1989) (*Duquesne Light*) ("The guiding principle [in the ratemaking context] has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory. . . .  If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments."); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 605 (1944) (*Hope Natural Gas*) ("Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called 'fair value' rate base").

[232] Martha Wright-Reed Act § 3(b)(2).

large facilities or other characteristics."[233]  Consistent with that provision, we therefore also evaluate such costs considerations in the rate caps we adopt, as described below.

71.    Consistent with the Commission's analysis in the *2021 ICS Order*, we find that a provider will be fairly compensated within the meaning of section 276(b)(1)(A), as amended by the Martha Wright-Reed Act, if the rates and charges we find just and reasonable afford it an opportunity to be fairly compensated at the level of the contract, regardless of the contributions that any particular communication or service makes toward the provider's shared and common costs, ensuring efficient providers have an opportunity to obtain fair compensation when bidding on contracts.[234]  Under this approach, a provider will be fairly compensated if the rates and fees it is permitted to charge will afford it an opportunity to recover industry-average costs associated with prudent investments used and useful in providing IPCS and associated ancillary services at the facilities the provider serves.[235]

### d.    Rates and Charges

72.    We interpret the statutory language "rates and charges" to encompass the amounts imposed on consumers by IPCS providers as the Commission proposed in the *2023 IPCS Notice*.[236]  Section 276(b)(1)(A), as amended by the Act, requires that "all rates and charges" imposed by providers for the eligible communications are just and reasonable.[237]  The *2023 IPCS Notice* proposed to interpret "rates" to include "the amounts paid by consumers of incarcerated people's communications services for calls or other audio or video communications covered by the statute or [the Commission's] rules."[238]  And the *2023 IPCS Notice* proposed to interpret "charges" to include "all other amounts assessed on consumers of incarcerated people's communications services" including "ancillary service charges, authorized fees, mandatory taxes and fees, and any other charges a provider may seek to impose on consumers."[239]  The record supports these interpretations.[240]  We are persuaded that the statutory language "rates and charges" encompasses the amounts imposed on IPCS consumers, as we proposed in the *2023 IPCS Notice*, whether "rates" and "charges" are interpreted individually or if "rates and charges" is understood as an all-encompassing category.

73.    The regulation of "rates and charges" lies at the core of the Martha Wright-Reed Act, and the amendments to section 276.  Prior to the enactment of the Martha Wright-Reed Act, the Commission's rules commonly used the term "rates" when referring to the amounts consumers paid for

---

[233] *Id*.

[234] We decline to set rate caps that ensure cost recovery for providers with unusually high costs because to let unusual cases determine rates generally would result in unjust and unreasonable rates.  Instead, if such providers exist, they can seek a waiver.  *See infra* Section III.E (Waivers); *2021 ICS Order*, 36 FCC Rcd at 9602, para. 189.  In that *Order*, the Commission found that compensation could be fair, when measured on a per-call basis, even if "each and every completed call" did not "make the same contribution to a provider's indirect costs" (i.e., costs shared among, or common to, groups of calls) and even if the provider did not "recover the total 'cost' it claims in connection with each and every separate inmate calling services call."  *Id*.; NCIC May 8, 2023 Comments at 4-5.  Instead, the Commission recognized that "the lion's share" of inmate calling services costs were shared or common costs and that there were a range of economically sound methods of assigning these costs to individual calls.  *2021 ICS Order*, 36 FCC Rcd at 9602, para. 190.

[235] *2021 ICS Order*, 36 FCC Rcd at 9603-04, paras. 192-93; *see id.* at 9602, para. 189 (quoting *2002 Pay Telephone Order*, 17 FCC Rcd at 3255-56, para. 18).

[236] *2023 IPCS Notice*, 38 FCC Rcd at 2680, para. 24.

[237] 47 U.S.C. § 276(b)(1)(A).

[238] *2023 IPCS Notice*, 38 FCC Rcd at 2680, para. 24.

[239] *Id.*

[240] *See, e.g.*, NCIC May 8, 2023 Comments at 6; California PUC June 6, 2023 Reply at 4.

inmate calling services calls,[241] while at other times referring to such amounts as "charges."[242]  The Commission's rules also at times use the term "rates" in connection with ancillary service charges.[243]  Nonetheless, on balance we conclude that under our rules in place at the time of the enactment of the Martha Wright-Reed Act, the term "rates" should be understood as referring to the amounts paid by consumers of incarcerated people's communications services for calls, supporting our adoption of the interpretation of that term proposed in the *2023 IPCS Notice*.  Our interpretation also comports with the broad ordinary meaning of the term "rate."[244]

74.    We also conclude that "charge[s]" properly are interpreted as including ancillary services charges, mandatory taxes, mandatory fees, and authorized fees.[245]  The Commission's rules at the time of the Martha Wright-Reed Act's enactment defined "Ancillary Service Charge" as "any charge Consumers may be assessed for, or in connection with, the interstate or international use of Inmate Calling Services that are not included in the per-minute charges assessed for such individual calls."[246]  Although the ancillary service charges that were permitted to be assessed under the Commission's rules were limited to five discrete categories,[247] Congress notably did not use the term "ancillary service charges" in the Martha Wright-Reed Act, instead using the more generic term "charges."[248]  Consequently, we do not find it appropriate to focus narrowly on the scope of ancillary service charges specifically permitted to be assessed under the Commission's rules.  Rather, consistent with Congress's use of the broader term "charges," we look to the distinction drawn between per-minute rates and any other "charge[s] Consumers may be assessed for, or in connection with, the interstate or international use of Inmate

---

[241] *See, e.g.*, 47 CFR §§ 64.6000(h) (defining "Flat Rate Calling" as "a calling plan under which a Provider charges a single fee for an Inmate Calling Services call, regardless of the duration of the call"), 64.6000(v) (defining "Provider-Related Rate Component" as an "interim per-minute rate" that may be charged in certain circumstances), 64.6000(w) (defining "Facility-Related Rate Component" as "either the Legally Mandated Facility Rate Component or the Contractually Prescribed Facility Rate Component identified in § 64.6030(d)"), 64.6030 (setting forth the Commission's "Inmate Calling Services interim rate caps," specified on a per-minute basis for different categories of calls), 64.6060(a)(1) (require annual reporting of "[c]urrent interstate, intrastate, and international rates for Inmate Calling Services").

[242] *See, e.g., id.* §§ 64.6000(a) (distinguishing ancillary service charges from "the per-minute charges assessed for . . . individual calls"), 64.6000(d) (defining collect calling as "an arrangement whereby the called party takes affirmative action clearly indicating that it will pay the charges associated with a call originating from an Inmate Telephone"), 64.6000(u) (defining jurisdictionally mixed charges as "any charge Consumers may be assessed for use of Inmate Calling Services that are not included in the per-minute charges assessed for individual calls and that are assessed for, or in connection with, uses of Inmate Calling Service to make such calls that have interstate or international components and intrastate components that are unable to be segregated at the time the charge is incurred"), 64.6110(c) (requiring clear labeling of "all charges for International Calls").

[243] *See, e.g., id.* §§ 64.6020(b) (prohibiting IPCS providers from charging "a rate for a permitted Ancillary Service Charge" above certain specified levels), 64.6110(a) (under the heading "Consumer Disclosure of Inmate Calling Service rates," addressing the disclosure of "Ancillary Service Charges").

[244] *See, e.g.*, Merriam-Webster, https://www.merriam-webster.com/dictionary/rate (last visited Feb. 6, 2024) (defining "rate" as, among other things, "an amount of payment or charge based on another amount" or "a charge, payment, or price fixed according to a ratio, scale, or standard"); Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/rate (last visited Feb. 6, 2024) (defining "rate" as, among other things, "an amount or level of payment"); Dictionary.com, https://www.dictionary.com/browse/rate (last visited Feb. 6, 2024) (defining "rate" as, among other things, "the amount of a charge or payment with reference to some basis of calculation").

[245] *E.g.*, 47 CFR §§ 64.6030, 64.6070.

[246] *Id.* § 64.6000(a).

[247] *Id.* § 64.6000(a)(1)-(5).

[248] Martha Wright-Reed Act § 2(a)(1)(B).

Calling Services."[249]  That encompasses not only ancillary service charges permitted under the Commission's rules, but the other amounts identified in the *2023 IPCS Notice* such as mandatory taxes, mandatory fees, and authorized fees.  This interpretation likewise comports with the broad ordinary meaning of the term "charge."[250]

75.    As an alternative basis for our decision, we conclude that "rates and charges" can be interpreted collectively as reflecting a "belt and suspenders" approach to the Commission's regulatory authority under section 276(b)(1)(A) that encompasses the full array of amounts assessed on IPCS customers discussed above.[251]  The statutory context and regulatory history are consistent with that understanding.  For example, leading up to the enactment of the Martha Wright-Reed Act, the Commission relied on authority under section 201(b)—which refers to "charges" but includes no express reference to "rates"[252]—to adopt rules governing "rates and charges" for IPCS.[253]  Treating "rates and charges" as a doublet that emphasizes that meaning of these overlapping terms also harmonizes section 3(b) of the Martha Wright-Reed Act—which addresses the Commission's consideration of certain cost information when, among other things, "determining just and reasonable *rates*"[254]—with the fact that the Act amended section 276(b)(1)(A) to include a mandate that the Commission ensure that "*rates and charges* are just and reasonable" for IPCS.[255]  This understanding of "rates and charges" also is understandable given the Commission's own sometimes inconsistent usage of "rates" and "charges" in its IPCS rules in effect at the time of enactment of the Martha Wright-Reed Act.  Given that statutory context and regulatory history, "rates and charges" need not necessarily be understood as embodying two distinct concepts, but rather as ensuring that Congress collectively encompassed the full range of amounts assessed on IPCS customers over which it wanted the Commission to have authority.  Further, this interpretation of "rates and charges" reflects the substantial overlap in the ordinary meaning of those

---

[249] 47 CFR § 64.6000(a).

[250] *See, e.g.*, Merriam-Webster, https://www.merriam-webster.com/dictionary/charge (last visited Feb. 6, 2024) (defining "charge" as, among other things, "the price demanded for something"); Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/charge (last visited Feb. 6, 2024) (defining "charge" as, among other things, "the amount of money that you have to pay for something, especially for an activity or service"); Dictionary.com, https://www.dictionary.com/browse/charge (last visited Feb. 6, 2024) (defining "charge" as, among other things, "expense or cost," "a fee or price charged," or "a pecuniary burden, encumbrance, tax, or lien; cost; expense; liability to pay").

[251] *See, e.g.*, *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017) ("'[s]ometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012) (*Reading Law*) (emphasis in original)); *Doe v. Boland*, 698 F.3d 877, 881 (6th Cir. 2012) ("the presumption against surplusage does not apply to doublets—two ways of saying the same thing that reinforce its meaning," such as "null and void," "arbitrary and capricious," "cease and desist," and "free and clear" (internal quotation marks omitted)); *Reading Law* at 178 (explaining that "[d]oublets and triplets abound in legalese" such as "*[e]xecute and perform*," "*[r]est, residue, and remainder*," and "*[p]eace and quiet*").

[252] 47 U.S.C. § 201(b).

[253] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9520, para. 2 ("Today, we move forward as proposed, lowering interstate rates and charges for the vast majority of incarcerated people, limiting international rates for the first time, and making other reforms to our rules."); *2020 ICS Order on Remand*, 35 FCC Rcd at 8486, para. 4 ("We believe that our actions today will ensure that rates and charges for interstate and international inmate calling services are just and reasonable as required by section 201(b) of the Act and thereby enable incarcerated individuals and their loved ones to maintain critical connections.").

[254] Martha Wright-Reed Act § 3(b).

[255] *Id.* § 2(a)(1)(B) (amending section 276(b)(1)(A) of the Communications Act).

terms.[256]

76.    Notably, section 276(b)(1)(A) also specifies that "*all* rates and charges" be just and reasonable.[257]  By specifying that "all," as opposed to some smaller subset of "rates and charges," are to be just and reasonable, Congress obviously intended to grant us broad regulatory oversight of "rates and charges."  We find that the requirement that "all" rates and charges be just and reasonable applies both to the rates providers impose and the rates consumers ultimately pay.  Thus, the totality of the rates and charges a provider assesses on or collects from consumers must be just and reasonable.  We find support for this in the record and judicial precedent.[258]

77.    Thus, we disagree with ViaPath that we should interpret "rates and charges" as excluding mandatory taxes, mandatory fees, and authorized fees.[259]  ViaPath contends that our "current IPCS rules acknowledge" that "authorized fees and mandatory taxes and fees are separate and apart from ancillary service charges."[260]  As we explain above, the Martha Wright-Reed Act uses a broader term than "ancillary service charges," and we conclude it best effectuates Congress' choice for our interpretation to sweep more broadly than the specific categories of ancillary service charges permitted under our existing rules.  Nor are we persuaded by ViaPath's efforts to rely on rules and precedent from the operator services context.[261]  We find the statutory and regulatory considerations that we have described here to be much more pertinent to understanding Congress's actions against that precise legal backdrop than precedent and rules cited by ViaPath that were adopted in a context that we find at most tangentially related to our regulation of IPCS as relevant here.

78.    To exclude any tax or fee that a provider might impose on IPCS consumers from the term "all rates and charges" would risk opening the door to assessments that could undercut the requirement of section 26(b)(1)(A) that amounts IPCS providers impose—and that IPCS customers pay—be just and reasonable.  Indeed, the Commission recognized as much in the *2015 ICS Order* when it repeatedly referred to mandatory taxes, mandatory fees, and authorized fees as charges and banned all inmate calling services "fees or charges beyond mandatory taxes and fees, and authorized fees that the carrier has the discretion to pass through to consumers without any mark up."[262]  The Commission concluded that this ban would help ensure just and reasonable rates for inmate calling services.[263]  The record at that time demonstrated that providers had been marking up taxes and regulatory fees before passing them on to consumers and that those inflated fees had contributed to unreasonable inmate calling services rates and

---

[256] *See, e.g.*, Merriam-Webster, https://www.merriam-webster.com/thesaurus/charge (last visited Feb. 6, 2024) (listing "rate" as a synonym for the relevant meaning of "charge"); Cambridge Dictionary, https://dictionary.cambridge.org/us/thesaurus/charge (last visited Feb. 6, 2024) (listing "rate" as a synonym for the relevant meaning of "charge"); Thesaurus.com, https://www.thesaurus.com/browse/charge (last visited Feb. 6, 2024) (listing "rate" as one of the strongest matches for the relevant meaning of "charge").

[257] 47 U.S.C. § 276(b)(1)(A).

[258] *See* Public Interest Parties May 8, 2023 Comments at 2 (noting that "[w]ith the passage of the MWRA, Congress unambiguously has made clear that the Commission has broad authority to adopt reforms to ensure that *all* rates and charges . . . are just and reasonable") (emphasis in original), 14 (explaining that the Commission "should ensure that providers *implement* any just and reasonable rates justly and reasonably") (emphasis in original); *Hope Natural Gas*, 320 U.S. at 602 (explaining that "[i]t is not the theory but the impact of the rate order which counts" and that "[i]f the *total effect* of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end") (emphasis added).

[259] ViaPath May 8, 2023 Comments at 9 n.40.

[260] *Id.*

[261] *Id.*

[262] *2015 ICS Order*, 30 FCC Rcd at 12859, para. 192 (referring to taxes and regulatory fees as "charge[s]"; *see id.* at 12859, para. 191 (referring to "mandated charge[s]" and to "non-mandated charges").

[263] *Id.* at 12859, para. 192.

charges.[264]  Given the history of inflated ICS charges, there can be no assurance of a just and reasonable end result for IPCS if the definition of rates and charges were limited in the manner ViaPath proposes, which would allow providers to impose additional charges on consumers or to mark up their authorized fees, mandatory taxes, or mandatory fees before recovering them from consumers.[265]  We therefore conclude that the statute requires us to consider the totality of the rates and charges a provider assesses or collects from consumers to ensure that all IPCS rates and charges are just and reasonable.[266]

### e.    Authority to Regulate IPCS Providers' Practices

79.    In the *2023 IPCS Notice*, the Commission sought comment on whether section 276(b)(1)(A)'s mandate that we "establish a compensation plan to ensure that . . . all rates and charges" for incarcerated people's communications services be "just and reasonable" extends to ensuring that the providers' practices, classifications, and regulations for or in connection with those services are just and reasonable.[267]  The Commission also asked for comment on the extent of its section 276(b)(1)(A) authority, if any, to address providers' practices, classifications, and regulations, as well as any limitations on that authority.[268]  Based on the record, we conclude that the Martha Wright-Reed Act provides us with limited authority to regulate IPCS providers' practices, classifications, and regulations (collectively, "practices") as a necessary part of our obligation to establish a compensation plan to ensure fair IPCS compensation to providers and just and reasonable rates and charges for IPCS consumers and providers under section 276(b)(1)(A).[269]  In addition, section 201(b)'s grant of authority over practices for or in connection with interstate and international common carrier incarcerated people's communications

---

[264] *Id.* at 12858-59, para. 190 (explaining that "[t]he record in this proceeding indicates that ICS providers charge ICS end users 'fees under the guise of taxes'"), 12859, para. 192 ("we do not permit fees or charges beyond mandatory taxes and fees, and authorized fees that the carrier has the discretion to pass through to consumers without any mark up" in order to ensure that "ICS end user's rates" are just and reasonable "because they are paying the cost of the service they have chosen and any applicable taxes or fees, and nothing more"); *see also, e.g.*, Pay Tel July 11, 2013 Comments at 5; Letter from Brian D. Oliver, Chief Executive Officer, GTL, Richard A. Smith, Chief Executive Officer, Securus, and Kevin O'Neil, President, Telmate, to Chairman Tom Wheeler, Chairman, FCC, WC Docket No. 12-375, at 4-5 n.13 (filed Sept. 15, 2014) (Joint Provider Proposal). That Proposal states that "[u]nder the parties' proposal, ICS providers would still be permitted to charge applicable federal, state, and local taxes as well as fees associated with federal, state and local governmental action, including federal and state universal service fund fees, numbering fees, federal and state regulatory fees, and any other federal, state, or local fee permitted to be imposed on end user customers. ICS providers would impose such taxes and fees consistent with existing federal and state requirements regarding calculation and disclosure of such taxes and fees." Joint Provider Proposal at 4-5 n.13.

[265] *2015 ICS Order*, 30 FCC Rcd at 12859, para. 192 (citing *Truth-In-Billing and Billing Format*, CC Docket No. 98-170, Second Report and Order, Declaratory Ruling, and Second Further Notice of Proposed Rulemaking, 20 FCC Rcd 6448, 6461, para. 28 (2005)) (internal quotations marks omitted); 47 CFR § 64.6000(b) (noting that providers are "permitted, but not required, to pass through" authorized fees to consumers), 64.6000(n) (referring to a "Mandatory Tax or Fee that is passed through to a consumer"). Indeed, a recent class action lawsuit alleges that an IPCS provider charges consumers inflated fees under the guise of taxes.  *See* Class Action Complaint at 3, *Israelson et al. v. Inmate Calling Solutions LLC (dba ICS Solutions)*, No. 2:24-cv-02027 (D. Kan. Jan. 19, 2024), ECF No. 1. The rules we adopt today do not alter the circumstances in which providers may pass authorized fees, mandatory taxes, and mandatory fees through to consumers.  Appendix A, §§ 64.6000, 64.6070; *see* Letter from Chérie R. Kiser and Angela F. Collins, Cahill Gordon & Reindel LLP, Counsel to Global Tel*Link Corporation d/b/a ViaPath Technologies, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 6 (filed July 11, 2024) (ViaPath July 11, 2024 *Ex Parte*).

[266] California PUC June 6, 2023 Reply at 4 (arguing that "[c]apping IPCS rates and all related charges should go hand in hand such that these separate fees cannot be used to circumvent the Commission's rate caps").

[267] *2023 IPCS Notice*, 38 FCC Rcd at 2681, para. 27.

[268] *Id.*

[269] Raher May 8, 2023 Comments at 7-8; Public Interest Parties May 8, 2023 Comments at 14, 25; California PUC June 6, 2023 Reply at 4.

services enables us to act in certain circumstances, as well.[270]  We address these two sources of authority below.

80.    *Section 276(b)(1)(A) Compensation Plan Requirement*.  We conclude that the section 276 requirement that the Commission "establish a compensation plan" to achieve the goals of fair compensation for providers and just and reasonable rates and charges for consumers and providers, requires more of the Commission than the simple act of setting rates and charges.[271]  When implementing section 276(b)(1)(A) historically, the Commission has not limited itself just to the regulation of rate levels when seeking to effectuate the "fairly compensated" requirement that preceded the Martha Wright-Reed Act.  By adding the "just and reasonable" mandate, while leaving the directive to establish a "compensation plan" unaltered, we understand Congress to intend that the Commission undertake an integrated set of actions designed to work in concert to achieve the statute's central goals of fair compensation and just and reasonable rates and charges.

81.    Long prior to the enactment of the Martha Wright-Reed Act, the Commission implemented section 276(b)(1)(A)'s mandate to establish a compensation plan to ensure payphone providers are fairly compensated by addressing the practical details associated with charging for, and receiving payment for, payphone services.[272]  In its implementation of section 276(b)(1)(A) over time, the Commission adopted various requirements in particular payphone contexts apart from simply rate setting.  Such requirements have included, among other things: (1) requiring the transmission of information to enable tracking of calls from payphones;[273] (2) allocating responsibility for paying compensation for payphone calls;[274] and (3) defining the permissible arrangements between payphone providers and the carriers paying them compensation for payphone calls.[275]  A unifying premise of these requirements is that their inclusion in a compensation plan enabled the Commission to advance the fair compensation

---

[270] 47 U.S.C. §§ 152(b), 276(b)(1)(A); *La. Pub. Serv. Comm'n*, 476 U.S. at 373 (holding that section 2(b)(1) of the Communications Act provides "not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction" in interpreting the Act's provisions).

[271] *2023 IPCS Notice*, 38 FCC Rcd at 2681, para. 27.

[272] *See, e.g.*, *Metrophones Telecommunications, Inc. v. Glob. Crossing Telecommunications, Inc.*, 423 F.3d 1056, 1078 (9th Cir. 2005), *aff'd*, 550 U.S. 45 (2007) (recognizing that in adopting rules implementing the compensation plan requirement in section 276(b)(1)(A), "the Commission's primary purpose was to create a system for compensation"); *id.* at 1062 (describing the Commission's rules implementing the fairly compensated requirement as setting forth "detailed compensation procedures and reporting requirements"); 47 CFR § 64.1310 (setting forth detailed call tracking, information disclosure, and record keeping requirements).

[273] *See, e.g., Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Report and Order, 11 FCC Rcd 20541, 20590-91, paras. 96-97 (1996) (*Payphone First Report and Order*); *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Order on Reconsideration, 11 FCC Rcd 21233, 21265-66, para. 64 (1996); *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Memorandum Opinion and Order, 13 FCC Rcd 4998, 5010, 5012, 5017-18, 5020, paras. 20, 24, 33, 37 (CCB 1998).

[274] *See, e.g., Payphone First Report and Order*, 11 FCC Rcd at 20584, para. 83; *Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, Second Order on Reconsideration, 16 FCC Rcd 8098, 8105, para. 15 (2001) (*Payphone Second Order on Reconsideration*); *2003 Payphone Report and Order*, 18 FCC Rcd at 19976, para. 1.

[275] *See, e.g., 2003 Payphone Report and Order*, 18 FCC Rcd at 19987, 19992-94, 19998, 20003, paras. 26, 36-38, 44, 52; *Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, Order on Reconsideration, 19 FCC Rcd 21457, 21461, para. 7 (2004) (*2004 Payphone Order on Reconsideration*).

mandate in section 276(b)(1)(A).[276]

82.     In light of the Martha Wright-Reed Act's addition of the "just and reasonable" mandate in section 276(b)(1)(A), we find that the statute's direction to establish a compensation plan likewise necessarily carries with it the authority to prescribe regulations to govern providers' practices to the extent that those practices implicate the Commission's ability to ensure that rates and charges are just and reasonable.  In this way, the "compensation plan" requirement—which the Martha Wright-Reed Act left unaltered—gives the Commission authority in the case of the "just and reasonable" mandate that is comparable to what it historically has possessed when crafting compensation plans to account for the "fairly compensated" mandate.[277]  As the Public Interest Parties indicate, the responsibility to establish a comprehensive plan ensuring just and reasonable rates and charges "necessarily encompasses a corresponding responsibility to ensure that IPCS providers do not evade [the Commission's rate and fee] caps through their other practices, classifications, and regulations."[278]  Given the mandate of the Martha Wright-Reed Act and its revisions to section 276(b)(1)(A), we find that the Commission's authority over rates and charges necessarily extends to practices that affect our ability to ensure that rates and charges are just and reasonable, as well as that providers are fairly compensated.[279]

83.     If section 276(b)(1)(A) instead were read only to allow us to regulate IPCS rate levels, providers' practices could thwart Congress's direction to ensure just and reasonable rates and charges for consumers and fair compensation for IPCS providers.  The risk that providers' practices could subvert the goals of the statute is not speculative.  For example, in light of evidence that inmate calling services providers were "engaging in unjust and unreasonable practices and imposing unfair rates by instituting minimum or maximum amounts that may be deposited for prepaid calling accounts," the Commission prohibited providers from instituting prepaid account minimums and required that any provider that limits deposits set the maximum purchase amount at no less than $50 per transaction.[280]  And, more recently, the Commission concluded that all funds deposited into a debit-calling or prepaid calling account and not spent on products or services are generally the property of the account holder and that any action inconsistent with this finding is an unjust and unreasonable practice.[281]  The Commission also has found affirmative requirements, such as consumer disclosure rules, necessary to ensure that rates and charges as implemented are just and reasonable as applied to consumers.[282]  In sum, we find that section 276, as amended by the Martha Wright-Reed Act, gives us authority over providers' practices to the extent they

---

[276] *See, e.g., Payphone First Report and Order*, 11 FCC Rcd at 20702, para. 335; *Payphone Second Order on Reconsideration*, 16 FCC Rcd at 8098, para. 1; *2003 Payphone Report and Order*, 18 FCC Rcd at 19976, 19977-78, paras. 2, 5; *2004 Payphone Order on Reconsideration*, 19 FCC Rcd at 21458, para. 1.

[277] *2023 IPCS Notice*, 38 FCC Rcd at 2681, para. 27; 47 U.S.C. § 276(b)(1)(A); Public Interest Parties May 8, 2023 Comments at 14 (arguing that the Commission should "ensure that providers *implement* any just and reasonable rates justly and reasonably, including with respect to any other 'practice, classification, or regulation' connected to offering IPCS") (emphasis in original); Raher May 8, 2023 Comments at 7 (recognizing that "rates and charges are not the only problems confronting IPCS consumers"); Color of Change May 8, 2023 Comments at 4-7 (discussing a range of "damaging practices"); California PUC June 6, 2023 Reply at 4 (explaining that "[c]apping IPCS rates and all related charges should go hand in hand such that these separate fees cannot be used to circumvent the Commission's rate caps").

[278] Public Interest Parties May 8, 2023 Comments at 14.

[279] *2023 IPCS Notice*, 38 FCC Rcd at 2681, para. 27.

[280] *2015 ICS Order*, 30 FCC Rcd at 12852, paras. 175, 178; 47 CFR § 64.6100.  Securus asks that we "set minimum funding amounts to allow [IPCS providers] to better manage costs.  Securus July 11, 2024 *Ex Parte*, Attach. A at 2.  We decline on the record before us to adopt its proposal, but will continue to monitor its concerns.

[281] *2022 ICS Order*, 37 FCC Rcd at 11929, para. 71 (prohibiting providers from seizing or otherwise disposing of unused funds except through a full refund to the account holder, until at least 180 calendar days of continuous account inactivity has passed).

[282] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9589-90, paras. 160-62.

may affect the Commission's ability to ensure just and reasonable IPCS rates and charges and fair compensation for all incarcerated people's communications services.[283]

84.     We agree with commenters insofar as they note that Congress did not incorporate the entirety of the section 201(b) legal framework to ensure just and reasonable practices, classification, and regulations into section 276(b)(1)(A).[284]  At the same time, we reject claims that we lack any authority at all over IPCS provider practices under section 276(b)(1)(A).  In particular, we reject arguments that our interpretation fails to properly credit Congress's decision to use different language in section 201(b) and section 276(b)(1)(A).[285]  To the contrary, we honor Congress's choice because we do not interpret our section 276(b)(1)(A) authority over IPCS practices to be as extensive as the Commission's authority over common carrier practices under section 201(b).  At the same time, we also must honor Congress's choice to leave intact the requirement that the Commission "establish a compensation plan" in the regulation mandated by section 276(b)(1)(A).  As indicated by our analysis above, the compensation plan provision goes beyond the establishment of individual rates and necessarily entails a harmonized set of requirements that act as a coordinated whole to achieve the new statutory mandate of just and reasonable rates and charges.

85.     *Section 201(b) Authority Over Interstate and International Practices.*  Apart from the statutory directives in section 276 taken as a whole that support our finding of jurisdiction over certain IPCS practices to the extent they bear on just and reasonable rates and charges, we conclude that section 201(b) provides an independent statutory basis for regulating providers' practices with regard to IPCS.[286] This authority explicitly extends to IPCS-related practices for or in connection to the interstate and international telecommunications services that are within our section 201(b) authority, as well as to practices for or in connection with other IPCS services within our section 276 authority to the extent those practices cannot practicably be separated from practices applicable to services within our section 201(b) authority.[287]

86.     Section 201(b) grants the Commission jurisdiction over "practices, classifications, and regulations" of carriers "for or in connection with" interstate and international communications services, including those services used to provide IPCS.[288]  That authority has been interpreted by the Commission to extend "to the intrastate portion of jurisdictionally mixed services 'where it is impossible or impractical to separate the service's intrastate from interstate components' and state regulation of the intrastate

---

[283] Those services include the full range of services now subject to Commission authority as a result of the Martha Wright-Reed Act, including intrastate IPCS and the advanced communications services now included in the statutory definition of "payphone service." 47 U.S.C. §§ 152(b), 153(1)(A)-(E), 276(d).

[284] Securus July 12, 2023 Reply at 2 ("Congress could have incorporated all of section 201(b) into the MWR Act amendments but it chose not to do so."); National Sheriffs' Association July 12, 2023 Reply at 3-5 (noting that the Martha Wright-Reed Act "amends section 276 only to require IPCS 'rates and charges' to be just and reasonable" and does not include "practices, classifications, and regulations" as referenced in section 201(b)).

[285] National Sheriffs' Association July 12, 2023 Reply at 3-5 ("The suggestion that Congress chose to specify rates and charges in the [Martha Wright-Reed Act], on the one hand, and to include practices, classifications, and regulations by implication through 201(b), on the other hand, contradicts" the rule of statutory construction that when Congress includes specific language in one section of a statute but excludes it from another, it is generally presumed that Congress acts intentionally in doing so as articulated in *Russello v. United States*, 464 U.S. 16, 23 (1983)); Securus July 12, 2023 Reply at 3 n.5 (citing *Hamden v. Rumsfeld*, 548 U.S. 557, 578 (2006) and *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[286] *2023 IPCS Notice*, 38 FCC Rcd at 2681-82, para. 28.

[287] *Id*.

[288] 47 U.S.C. § 201(b).

component would interfere with valid federal rules applicable to the interstate component."[289]  In the *2023 IPCS Notice*, the Commission sought comment on whether it could use this "impossibility exception" to regulate practices for or in connection with incarcerated people's intrastate communications services and to audio and video services that were unregulated prior to the enactment of the Martha Wright-Reed Act.[290]  The record is mixed on this issue.[291]

87.    The Commission has previously applied section 201(b) and the impossibility exception to regulate providers' practices that affect both interstate and intrastate inmate calling services.  In the *2020 ICS Remand Order*, the Commission relied on section 201(b) in adopting rules applicable to both interstate and intrastate ancillary service charges, finding that "ancillary service charges generally cannot be practically segregated between the interstate and intrastate jurisdiction except in the limited number of cases where, at the time a charge is imposed and the consumer accepts the charge, the call to which the service is ancillary is a clearly intrastate-only call."[292]  In the *2022 ICS Order*, the Commission exercised its 201(b) authority to prohibit provider seizure of outstanding balances in inactive accounts that could be used to pay for interstate, intrastate, and nonregulated services,[293] and to set limitations on ancillary service fees in order to curtail the incentives for providers to engage in revenue-sharing schemes that drive up prices charged to inmate calling services consumers.[294]

88.    Consistent with this precedent, we conclude that our section 201(b) authority over providers' practices extends to the full range of "payphone service[s]," as defined in section 276(d), to the extent the practices for or in connection with the payphone services outside of our separate section 201(b) authority cannot practicably be separated from the practices for or in connection with the payphone services within that authority.  Consistent with the Commission's finding in the *2020 ICS Remand Order¸* we find that this inseverability generally extends to providers' rate and ancillary services charge practices in connection with interstate and intrastate IPCS to the extent that IPCS-related practices cannot practicably be separated into interstate, intrastate or non-section 201(b) regulated services components.[295]

### 4.    Amendment to Section 2(b) of the Communications Act

89.    In the next step of our analysis, we address the Martha Wright-Reed Act's confirmation of our jurisdiction to regulate the rates of all forms of intrastate IPCS to ensure they are not unreasonably high.  Section 276(b)(1)(A) always has been clear that the Commission has authority to establish compensation plans for "intrastate and interstate" payphone calls,[296] and as explained above, the Martha Wright-Reed Act amended that provision to clearly establish the Commission's authority to ensure just and reasonable rates for both intrastate and interstate communications, as newly encompassed by section

---

[289] *2020 ICS Order on Remand*, 35 FCC Rcd at 8496, paras. 31, 32; *Vonage Order*, 19 FCC Rcd at 22413, para. 17); *Minn. Pub. Util. Comm'n v. FCC*, 483 F.3d 570, 574 (8th Cir. 2007); *see also La. Pub. Serv. Comm'n*, 476 U.S. at 373; *Pub. Serv. Comm'n of Md. v. FCC*, 909 F.2d 1510, 1515 (D.C. Cir. 1990); *Illinois Bell Tel. Co. v. FCC*, 883 F.2d 104, 113 (D.C. Cir. 1989).

[290] *2023 IPCS Notice*, 38 FCC Rcd at 2681-82, para. 28.

[291] Public Interest Parties May 8, 2023 Comments at 14-15 ("Since the intrastate and interstate components of IPCS providers' practices, classifications, and regulations are not readily separable, the Commission can also rely on the impossibility exception to ensure that it may appropriately regulate them using its ancillary authority.").  *Contra* Securus May 8, 2023 Comments at 44 ("The jurisdictional analysis adopted by the Commission to invoke the impossibility exception and regulate rates for jurisdictionally indeterminate services is no longer needed in light of the MWR Act's express grant of authority over intrastate rates and charges and should be jettisoned.").

[292] *2020 ICS Order on Remand*, 35 FCC Rcd at 8495, para. 28.

[293] *2022 ICS Order*, 37 FCC Rcd at 11931-32, para. 75 & n.209.

[294] *Id*. at 11939, para. 87.

[295] *2020 ICS Order on Remand*, 35 FCC Rcd at 8495, para. 28.

[296] 47 U.S.C. § 276(b)(1)(A) (1996).

276(d).[297]  Above and beyond that, the Martha Wright-Reed Act added section 276 to the express exceptions to the general preservation of state authority in section 2(b) of the Act.[298]  Consistent with the Commission's proposal in the *2023 IPCS Notice*, we conclude that the collective effect of the amendments to section 276 as to intrastate communications, when coupled with the Martha Wright-Reed Act's amendment to section 2(b) of the Communications Act, is to remove any doubt that our authority over IPCS includes both interstate and intrastate jurisdiction.[299]

### 5.    Inclusion of Advanced Communications Services Within the Definition of Payphone Service

90.    In the *2023 IPCS Notice*, the Commission recognized that the Martha Wright-Reed Act had expanded its section 276 authority over "payphone service" in correctional institutions to include "advanced communications services," as defined in sections 3(1)(A), 3(1)(B), 3(1)(D), and new (3)(1)(E) of the Communications Act.[300]  The Commission asked how this expansion of statutory authority applies to each type of enumerated advanced communications service for incarcerated people.[301]  We conclude that the Martha Wright-Reed Act not only retains the Commission's preexisting authority over audio communications in the carceral setting, but extends that authority to include four categories of advanced communications services—"interconnected VoIP service," "non-interconnected VoIP service," "interoperable video conferencing service," and "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used"[302]—within the definition of "payphone service.[303]  We also conclude, as proposed in the *2023 IPCS Notice*, that the language in the new statute confers on the Commission broad jurisdiction to develop a compensation plan for the categories of audio and video communications included in the definition of "payphone service" in order to ensure that IPCS providers are fairly compensated and all IPCS rates and charges are just and reasonable.[304]  We likewise find that the expansion of the types of services and devices over which we have authority correspondingly includes entities that may not have previously been subject to our rules and that now fall under our regulatory oversight.[305]  Below, we discuss, in turn, the four types of advanced communications services now included in the definition of "payphone service."

---

[297] *Id*. §§ 276(b)(1)(A), 276(d).

[298] Martha Wright-Reed Act § 2(c).

[299] *2023 IPCS Notice*, 38 FCC Rcd at 2685-86, paras. 37-38.

[300] *Id.* at 2682-83, para. 29; Martha Wright-Reed Act § 2(a)(2) (codified in 47 U.S.C. § 153(1)(A)-(B), (D)-(E)).

[301] *2023 IPCS Notice*, 38 FCC Rcd at 2682-83, para. 29.

[302] 47 U.S.C. §§ 153(1)(A)-(B), (D)-(E), 276(d).  The Communications Act's definitions of "interconnected VoIP service," "interoperable video conferencing service," and "non-interconnected VoIP service" are set forth in 47 U.S.C. §§ 153(25), 153(27), and 153(36), respectively.

[303] *Id*. § 153(1)(A)-(B), (D)-(E), 276(d).

[304] Martha Wright-Reed Act § 2(a) (emphasis added); 47 U.S.C. § 276(b)(1)(A).

[305] ViaPath July 12, 2023 Reply at 11; Pay Tel May 8, 2023 Comments at 22 ("Pay Tel supports the equal application of regulation to all providers of the service, regardless of the technology used, as authorized in the Act."); Securus July 12, 2023 Reply at 18 ("Providers that fall within the statutory definition and provide the service to carceral facilities will now be subject to the Commission's regulation and should be required to submit cost data if the service is deemed to be IPCS."); *see* NCIC May 8, 2023 Comments at 8 ("NCIC believes that the inclusion of audio chat through a comprehensive communications application could be the hook the Commission needs to address non-interconnected VoIP providers providing services to incarcerated persons that have largely escaped federal and state regulatory compliance.").

### a.    Interconnected and Non-Interconnected VoIP Services (47 U.S.C. § 153(1)(A)-(B))

91.    The Martha Wright-Reed Act expressly confirms the Commission's authority over interconnected and non-interconnected VoIP services, adding interconnected and non-interconnected VoIP services, as referenced in sections 3(1)(A) and 3(1)(B) of the Communications Act,[306] to section 276(d)'s definition of "payphone service."[307] Based on universal support in the record,[308] we find that this authority includes audio services using interconnected or non-interconnected VoIP,[309] and extends to each entity that provides IPCS via interconnected or non-interconnected VoIP, including entities that provide those services via non-traditional equipment such as tablets or kiosks.[310] To the extent an entity provides any of these services in "correctional institutions,"[311] it will be subject to the rules we adopt in this Report and Order.[312]

### b.    Interoperable Video Conferencing Service (47 U.S.C. § 153(1)(D))

92.    The Martha Wright-Reed Act extends our section 276 authority to "interoperable video conferencing service" by adding a reference to sub-paragraph 3(1)(D) of the Communications Act to the definition of "payphone service" in section 276(d).[313] The Communications Act defines "interoperable video conferencing service" as "a service that provides real-time video communications, including audio, to enable users to share information of the user's choosing."[314] This definition encompasses video conferencing applications commonly in use outside the incarceration context, including applications that rely on transmission over the Internet;[315] and the rules we adopt in this Report and Order extend to such

---

[306] 47 U.S.C. §§ 153(1)(A-B), 276(d); NCIC May 8, 2023 Comments at 7-8; Securus May 8, 2023 Comments at 5-6; ViaPath July 12, 2023 Reply at 11.

[307] Martha Wright-Reed Act § 2(a)(2) (codified in 47 U.S.C. § 153(1)(A)-(B)).

[308] HEARD et al. Comments, WC Docket Nos. 23-62 and 12-375, at 3 (rec. May 8, 2023) (HEARD May 8, 2023 Comments); NCIC May 8, 2023 Comments at 7; Pay Tel May 8, 2023 Comments at 5-6; Public Interest Groups May 8, 2023 Comments at 4-5; Securus May 8, 2023 Comments at 4-6; ViaPath July 12, 2023 Reply at 11.

[309] Securus May 8, 2023 Comments at 5-6.

[310] *See 2023 IPCS Notice*, 38 FCC Rcd at 2697-98, para. 73; ViaPath July 12, 2023 Reply at 11. As the Commission has observed, "[s]ection 276 makes no mention of the technology used to provide payphone service. . . . Thus, the use of VoIP or any other technology for any or all of an ICS provider's service does not affect our authority under section 276." *2013 ICS Order*, 28 FCC Rcd at 14115, para. 14; *2015 ICS Order*, 30 FCC Rcd at 12884, para. 250 (confirming that "section 276, by its terms, is technology neutral with respect to inmate calling services"). Our authority over inmate calling services is therefore unaffected by the application of VoIP technology; rather, the expansion of our inmate calling services authority to include VoIP technology reflects the Commission's long-held understanding of inmate calling services as inherently technology neutral. If a particular service meets the relevant definition in the Commission's rules, it is a form of inmate calling services and subject to the Commission's inmate calling services rules.

[311] 47 U.S.C. § 276(d) (defining "payphone service" as including "the provision" of interconnected VoIP service and non-interconnected VoIP service "in correctional institutions").

[312] *See 2023 IPCS Notice*, 38 FCC Rcd at 2682-83, para. 29.

[313] Martha Wright-Reed Act § 2(a)(2); *2023 IPCS Notice*, 38 FCC Rcd at 14-15, para. 30.

[314] 47 U.S.C. § 153(27).

[315] *See* Worth Rises May 8, 2023 Comments at 13 ("Many states and local jurisdictions have turned to off-the-shelf advanced communication providers for the provision of IPCS, specifically video calls. For example, in Maryland, incarcerated people use Microsoft Teams to make video calls. In Wisconsin and Pennsylvania, incarcerated people use Zoom. In California and New York City, incarcerated people use Cisco Webex. In Iowa, incarcerated people used Google Meets before the agency transitioned to Ameelio."); *see also* Cidnet, *Secure Visits from Anywhere*, https://cidnet.net/cidnet-video/ (last visited Jan. 18, 2024) (describing a video application that allows incarcerated

(continued….)

**Federal Communications Commission**                    **FCC 24-75**

applications and similar applications should they be used in the incarceration context.

93.    One commenter suggests that "[i]n the absence of a Commission adopted definition of 'interoperable,' it is difficult to identify which video services made available to incarcerated persons qualify for potential rate regulation."[316] That argument is outdated. In the *Access to Video Conferencing Order*, the Commission revisited its previous views regarding the interpretation of the statutory term "interoperable video conferencing service" and concluded that there was "no persuasive reason to modify or limit the scope of the statutory definition of this term."[317] There, the Commission explained that the statutory definition of "interoperable video conferencing service" encompasses a variety of video communication services that are commonly used today, or that may be used in the future, to enable two or more users to share information with one another.[318] It rejected arguments that the term "interoperable" had meaning independent of the statutory definition or in some way limited the scope of the statutory definition of the service.[319] It concluded that the term interoperable "may simply reflect the fact that any video service satisfying [the statutory] definition . . . necessarily involves some level of interoperability among the particular devices and software employed by users of that service."[320] We find arguments to the contrary to have been fully addressed by the Commission's actions in the *Access to Video Conferencing* proceeding.[321]

94.    As the Commission has explained, the definition of interoperable video conferencing services does not reflect an intention to exclude any service based on whether it is used primarily for

---

people to participate in video conversations over the Internet). The Arizona State Prison Complex also utilizes Google Meets as a limited, free alternative to Securus's video communications services. The Arizona State Prison Complex also utilizes Google Meets as a limited use, free alternative to Securus's video communications services. https://corrections.az.gov/sites/default/files/2024-02/2024%20Perryville%20Visitation%20Schedule.pdf (last visited June 21, 2024).

[316] Securus May 8, 2023 Comments at 8. Securus acknowledges that the Commission's *Access to Video Conferencing Order* settled this question. Securus July 12, 2023 Reply at 18 & n.52 (citing *Access to Video Conferencing*; *Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010*; *Telecommunications Related Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*; *Petition of Sorenson Communications, LLC for a Limited Waiver of the Privacy Screen Rule*, CG Docket Nos. 23-161, 10-213, 03-213., Report and Order, Notice of Proposed Rulemaking, and Order, 38 FCC Rcd 6300 (2023) (*Access to Video Conferencing Order*)).

[317] *Access to Video Conferencing Order*, 38 FCC Rcd at 6313, para. 28; *see Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020) (holding that "'[w]hen a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning") (internal citations omitted).

[318] *Access to Video Conferencing Order*, 38 FCC Rcd at 6313-14, para. 29. In 2011, the Commission interpreted a qualifying phrase in the definition—"to enable users to share information of the user's choosing"—to mean that services "provid[ing] real-time video communications, including audio, *between two or more users*" would be included, "even if they can also be used for video broadcasting purposes (*only from one user*)." *Implementation of Sections 716 and 717 of the Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010; Amendments to the Commission's Rules Implementing Sections 255 and 251(a)(2) of the Communications Act of 1934, as Enacted by the Telecommunications Act of 1996; Accessible Mobile Phone Options for People who are Blind, Deaf-Blind, or Have Low Vision*, CG Docket No. 10-213, WT Docket No. 96-198, CG Docket No. 10-145, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 14557, 14578, para. 50 (2011) (emphasis in original) (*2011 ACS Order*). However, a service that provides real-time video and audio communications "*only from one user*" (i.e., "video broadcasting") would *not* meet the definition of "interoperable video conferencing service." *Id*. (emphasis in original).

[319] *Access to Video Conferencing Order*, 38 FCC Rcd at 6316, para. 37.

[320] *Id*. at 6315-18, paras. 34-38.

[321] Securus May 8, 2023 Comments at 9.

point-to-point or multi-point conversations, or based on the type of device used to access the service.[322] Likewise, the definition does not depend on the options offered to users for connecting to a video conference (e.g., through a dial-up telephone connection or by broadband, through a downloadable app or a web browser), what operating systems or browsers users' devices may employ, whether the service works with more than one operating system, or whether the service may be classified as offered to the public or to a private group of users (such as a telehealth platform).[323]  The Commission concluded that the important characteristic is that two or more people can use the service to share information with one another in real-time, via video.[324]

95.    Our section 276 authority over interoperable video conferencing services in the IPCS context therefore includes all options offered to users for connecting to a video conference,[325] regardless of what operating systems or browsers their devices may use, whether the service works with more than one operating system, or whether the service may be classified as offered to the public or to a private group of users.[326]  Where two or more people can use a video conferencing service to share information with one another in real-time, that service is subject to our section 276 authority in the incarceration context.[327]  This authority also extends to educational, vocational, or other video programming in which incarcerated people participate in real-time in the incarceration context.[328]

96.    We disagree that this interpretation somehow constitutes an assertion of authority over Internet content.[329]  Notwithstanding certain parties' comments suggesting otherwise,[330] we have not proposed to regulate Internet content, nor do we do so in this Report and Order.  The rules we adopt today are content-neutral, and our authority over interoperable video conferencing services, like our authority over traditional payphone services, is independent of the information communicated though those services.  Neither the Communications Act nor the Martha Wright-Reed Act includes any language limiting the content or information that may be offered through interoperable video conferencing, and we do not impose any such limitations in our rules.

97.    *Interoperable Video Conferencing Service for People with Disabilities*.  Under section 716 of the Communications Act, as amended by the Twenty-First Century Communications and Video

---

[322] *Access to Video Conferencing Order*, 38 FCC Rcd at 6313-14, para. 29.

[323] *Id*.; *see 2023 IPCS Notice*, 38 FCC Rcd at 2683, para. 30.

[324] *Access to Video Conferencing Order*, 38 FCC Rcd at 6313-14, para. 29.

[325] *Id*. at 6313-14, para. 29 & n.103 (citing *What Is Video Conferencing* (explaining that certain "services require all participants to download software if they want to send audio or video," while others permit users to "start a meeting without creating an account or downloading software")).

[326] *2023 IPCS Notice*, 38 FCC Rcd at 2682-83, para. 29.

[327] *Access to Video Conferencing Order*, 38 FCC Rcd at 6313-14, para. 29; 47 U.S.C. § 153(1)(D); Raher July 12, 2023 Reply at 2-3; *see 2023 IPCS Notice*, 38 FCC Rcd at 2683, para. 30.

[328] To be clear, entertainment and other forms of content that are not real-time communications services are not included in our authority over interoperable video conferencing.  *See* Securus May 8, 2023 Comments at 9; NCIC Inmate Communications Reply, WC Docket Nos. 23-62 and 12-375, at 8 (rec. July 12, 2023) (NCIC July 12, 2023 Reply).  They may, however, be subject to our authority under section 3(1)(E), which is not limited to real-time communications services.  47 U.S.C. § 153(1)(E).

[329] Securus May 8, 2023 Comments at 9 ("The Commission has never asserted authority to regulate internet content and the MWR Act does not confer such authority in relation to IPCS.  Services that enable incarcerated persons to access movies, educational content, vocational content or other forms of streaming content fall outside the definition of the advanced services added to section 276, including interoperable video conferencing services.").

[330] Raher July 12, 2023 Reply at 2-3 (supporting Commission regulation of video streaming services); National Sheriffs' Association May 8, 2023 Comments at 5-6 (opposing Commission regulation of video entertainment and instructional programming); ViaPath July 12, 2023 Reply at 10-11 (opposing Commission regulation of video streaming content and radio broadcast services).

Accessibility Act of 2010 (CVAA),[331] interoperable video conferencing service and equipment used for interoperable video conferencing service must be accessible to and usable by people with disabilities, unless those requirements are not achievable.[332]  Consistent with the Commission's analysis in the *Access to Video Conferencing Order*,[333] we find no persuasive reason to modify or limit the scope of these accessibility requirements as they apply in the IPCS context.  Instead, we conclude that the accessibility requirements in section 716 of the Communications Act and part 14 of our rules apply, without limitation, to all interoperable video conferencing services provided in correctional institutions and to all equipment that people with disabilities use to access those services.[334]

### c.    Any Audio or Video Communications Service (47 U.S.C. § 153(1)(E))

98.    The Martha Wright-Reed Act added new subsection (E) to section 3(1) of the Communications Act to expand the definition of "advanced communications services" to include "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[335]  It also included these same services in the definition of payphone service in section 276(d), expanding the scope of the Commission's authority over incarcerated people's communications services.  As proposed in the *2023 IPCS Notice*, we interpret the phrase "any audio or video communications service" in subsection 3(1)(E) as encompassing every method that incarcerated people may presently, or in the future, use to communicate, by wire or radio, by voice, sign language," or other audio or video media, without

---

[331] 47 U.S.C. § 617; *see* Pub. L. No. 111-260, 124 Stat. 2751 (2010); *Access to Video Conferencing Order*, 38 FCC Rcd at 6302, para. 3.

[332] *Access to Video Conferencing Order*, 38 FCC Rcd at 6302, para. 3; 47 U.S.C. §§ 153(1), 617(a)(1), (b)(1).

[333] *Access to Video Conferencing Order*, 38 FCC Rcd at 6302, para. 3; *see 2011 ACS Order*.  As explained in more detail below, in the *2011 ACS Order* the Commission assumed that the word "interoperable" needed to be defined independently of the term "interoperable video conferencing service."  *Id.* at 14576, para. 47.  In the *Access to Video Conferencing Order*, the Commission revisited this issue and rejected arguments that the term "interoperable" had meaning independent of the statutory definition or in some way limited the scope of the statutory definition of the service.  *Access to Video Conferencing Order*, 38 FCC Rcd at 6316, para. 37. The Commission explained that the statutory definition of "interoperable video conferencing service" encompasses a variety of video communication services that are commonly used today, or that may be used in the future, to enable two or more users to share information with one another.  *Id.* at 6313-14, para. 29.

[334] *Access to Video Conferencing Order*, 38 FCC Rcd at 6302, para. 3; *see* 47 CFR Pt. 14.

[335] 47 U.S.C. § 153(1)(E).

**Federal Communications Commission**                    **FCC 24-75**

qualification.[336]  The record strongly supports this interpretation.[337]  In doing so, we fulfill Congress's intent that a broad range of communications services and technologies be available to incarcerated persons and their loved ones at just and reasonable rates.

99.    Our interpretation encompasses technology used by people with disabilities.  We find that, consistent with our mandate to provide TRS to incarcerated persons with disabilities, "any audio or video communications services," as used in section 3(1)(E) includes all services currently provided in correctional institutions that an incarcerated person who is deaf, hard of hearing, deafblind, or has speech or other disabilities may use to communicate with individuals outside the correctional institution where the incarcerated person is held, and incorporates all future services and technologies that will assist incarcerated people with disabilities to communicate with the non-incarcerated—or incarcerated people to communicate with non-incarcerated people with disabilities—so long as it involves audio or video communications services.[338]

100.    We interpret "audio or video communications services" to encompass not only services that are audio and/or video at both ends of the communication, but also services that are audio and/or video at only one end of the communication or otherwise involve audio and/or video for only a segment or portion of the communication.  The focus of section 3(1)(E) is not on whether a particular party to a communication is communicating in audio and/or video form, but rather on whether the *service* is an "audio or video communications service."[339]  So long as the communications service involves audio and/or video in at least some respect, we conclude the "audio or video communications service" criterion is satisfied.  The breadth of this interpretation, which may be of particular relevance where communications involving people with disabilities are concerned, is further supported by the fact that Congress chose to include that service within the category of "advanced communications services" that

---

[336] *2023 IPCS Notice*, 38 FCC Rcd at 2683, para. 32; Public Interest Parties May 8, 2023 Comments at 5; *see* Color of Change May 8, 2023 Comments at 8; Pay Tel May 8, 2023 Comments at 5-6.  Congress included all aspects of the section 3(1) definition of advanced communications services in the section 276(d) definition of payphone services with the exception of electronic messaging services defined in section 3(1)(C).  Certain commenters address the exclusion of electronic messaging services from the Commission's regulatory jurisdiction in the record, particularly to the extent audio or video communications may be sent via electronic messaging service.  *See, e.g.*, Worth Rises May 8, 2023 Comments at 12 (proposing that voice and video messages that "may be watched and listened to asynchronously by IPCS ratepayers" be included in our section 3(1)(E) authority); Raher May 8, 2023 Comments at 11.  *Contra* Securus July 12, 2023 Reply at 5 (arguing that "one-way, non-real-time services" like Videograms are "a form of electronic messaging" excluded from the Commission's jurisdiction); ViaPath July 12, 2023 Reply at 10 (arguing that "all types of messaging services are outside the purview of the [Martha Wright-Reed] Act"); NCIC Inmate Communications *Ex Parte* Presentation, WC Docket Nos. 23-62 and 12-375, Attach., Letter from Lee G. Petro and Adam J. Sandler, Pillsbury Winthrop Shaw Pittman, LLP, Counsel to NCIC Inmate Communications, to April J. Tabor, Office of Secretary, FTC, Comments in Response to Unfair or Deceptive Fees NPRM, R207011 (Feb. 7, 2024), at 3 (filed Feb. 14, 2024) (NCIC Feb. 14, 2024 *Ex Parte*).  On the limited record before us, we decline at this time to determine what is or is not an electronic messaging service for purposes of excluding such services from the scope of the Act's implementation mandate.  While we decline to make a determination, we reiterate that under section 716 of the Communications Act, electronic messaging service is required to be accessible to and usable by people with disabilities, including those in carceral facilities.  *See, e.g.*, 47 U.S.C. §§ 610, 617.  Separately, some commenters argue that the Commission should assert authority over voicemail.  Raher May 8, 2023 Comments at 11; Worth Rises May 8, 2023 Comments at 12.  Other commenters argue that the Commission may not regulate voicemail because the Commission treats voicemail as an information service.  Securus July 12, 2023 Reply at 5-6; ViaPath July 12, 2023 Reply at 11.  The record in this regard is underdeveloped.  Thus, at this time, we decline to address the Commission's regulatory jurisdiction over voicemail in the IPCS context.

[337] Public Interest Parties May 8, 2023 Comments at 5; *see* Color of Change May 8, 2023 Comments at 8; Pay Tel May 8, 2023 Comments at 5-6.

[338] Public Interest Parties May 8, 2023 Comments at 5-6.

[339] 47 U.S.C. § 153(1)(E).

**Federal Communications Commission**    **FCC 24-75**

are subject to various disability access requirements,[340] along with the recognition in section 276(b)(1)(A) that the communications services covered by that provision would include TRS.[341]

101.    Unlike some other services included within the section 3(1) definition of advanced communications services, the services included in section 3(1)(E) are not expressly restricted to real-time or near real-time communications services.[342]  We interpret Congress' omission of such limiting language for the comprehensive set of IPCS services covered by section 3(1)(E) as bringing non-real-time communications services generally within the ambit of our IPCS jurisdiction, to the extent an incarcerated person may use them to communicate with the non-incarcerated.[343]

102.    While Congress included no limitations to the range of audio and video communications services encompassed in section 3(1)(E), it addressed the parties involved by limiting the definition to audio or video services used for communications between two classes of users, i.e., "inmates" and "individuals outside the correctional institution where the inmate is held."  While there is no dispute in the record regarding the meaning of the statute's reference to inmates, parties do dispute the meaning of the latter phrase.

103.    Consistent with one of the alternatives raised in the Commission's discussion in the *2023 IPCS Notice*, we interpret the phrase "individuals outside the correctional institution where the inmate is held" to mean, not the precise physical location of the individual with whom the incarcerated person is communicating, but instead the status of that individual as someone who is "neither confined in nor employed by the institution, even if [they are] temporarily located on the premises of the institution for purposes of communicating with incarcerated individuals through some form of audio or video communications service."[344]  The record supports this interpretation.[345]  As the Public Interest Parties recognize, "although the term 'outside the correctional institution' can mean 'not physically within the structure,' it can equally mean 'not held within the institution.'"[346]  The relevant statutory language appears very similar to part of the Commission's longstanding definition of "inmate calling service," which likewise refers to "individuals outside the Correctional Facility where the Inmate is being held."[347]  Although the Commission did not definitively interpret the meaning of the "outside" language in its IPCS rules prior to the enactment of the Martha Wright-Reed Act,[348] in the inmate calling context it regularly used the term "outside" of a correctional facility when referring to the status—rather than the physical

---

[340] *See, e.g.*, *id*. §§ 610, 617.

[341] *Id*. § 276(b)(1)(A).

[342] *Id*. § 153(1)(E).

[343] *See 2023 IPCS Notice*, 38 FCC Rcd at 2683, para. 30; California PUC June 6, 2023 Reply at 3; Worth Rises May 8, 2023 Comments at 12; Raher May 8, 2023 Comments at 11; Raher July 12, 2023 Reply at 2-3.

[344] *2023 IPCS Notice*, 38 FCC Rcd at 2684, para. 33.

[345] Public Interest Parties May 8, 2023 Comments at 7-8 ("To interpret this language as suggesting that the Commission's authority over an incarcerated person's communications with their family member might cease the moment the family member steps foot on the grounds of a correctional institution would contravene the goals of the MWRA, and create an arbitrary distinction in light of the overarching purpose of the Act."); Civil Rights Corps May 8, 2023 Comments at 6 ("Why, for example, would the Commission be able to regulate a phone call made from the street next to a jail but not a video call made only a few yards away in the jail's lobby?").

[346] Public Interest Parties May 8, 2023 Comments at 8.

[347] 47 CFR § 64.6000(j).

[348] *See, e.g.*, *2015 ICS Notice*, 30 FCC Rcd at 12903-12904, para. 298 (seeking comment, for example, on whether "certain forms of video visitation are in fact distinct from ICS" or if instead "intra-institution video visitation facilities that require the friend or family member to come to the institution in order to have a video visit [might] fall inherently outside the definition of ICS as compared to video visitation between the inmate in the institution and a friend or family member in a remote location"); *GTL v. FCC*, 866 F.3d at 415 (noting that the Commission had not resolved "whether or not video visitation services are a form of ICS").

location—of the party with whom the inmate was communicating.[349]  Because our interpretation is both consistent with the ordinary meaning of "outside" and accords with the trend we discern in the regulatory backdrop relevant here, we find that the best reading of "outside the correctional institution" in section 3(1)(E) refers to a party's status rather than its physical location.  Consistent with the arguments of a number of commenters, we thus conclude that communications with "individuals outside the correctional institution where the inmate is held" is best understood to mean communications with individuals who are neither incarcerated in, nor employed by, the incarcerated person's correctional institution, i.e., "outside" of the institution's framework, regardless of the physical location where they can use the communication service.[350]

104.    Our interpretation also is supported by our view of congressional intent and associated policy considerations.  We agree with Worth Rises that "[t]here is no evidence that Congress intended for a miniscule regulatory cut-out that leaves IPCS ratepayers unprotected from rate regulation when they are physically located within a building that is property of the correctional authority.  Whether the outside called party is on their mobile phone in the lobby of a correctional facility or sitting at a video kiosk booth in the on-site video calling room, they should be protected by the Commission's ratemaking authority."[351] This reinforces our conclusion that the best reading of the statutory language is that it refers to the non-incarcerated status of the individual with whom the incarcerated person is communicating, rather than the physical location of individuals with whom an inmate can communicate using a given service.

105.    The ordinary tools of statutory interpretation strongly support the view that the qualifier,

---

[349] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9532-33, para. 32 (discussing "how incarcerated people are able to communicate with the outside world"); *id*. at 9534, para. 34 (explaining that "excessive telephone rates continue to impose an unreasonable burden on the ability of incarcerated people . . . to maintain vital connections with the outside world" thus "exacerbating the urgent need for inmate calling rate reform"); *id*. at 9604, para. 194 (evaluating the benefits of rule revisions by considering, among other things, the importance of "increased communication and ties to the outside world"); *2015 ICS Order*, 30 FCC Rcd at 12883, para. 246 (anticipating that certain regulatory reforms "will help drive the adoption of more modern forms of TRS by correctional facilities, which helps further the deployment of ICS as well as helps maintain or increase contact between more incarcerated persons and the outside world"); *2013 ICS Order*, 28 FCC Rcd at 14166, para. 110 (finding that "debit or prepaid calling yield significant public interest benefits and facilitate communication between inmates and the outside world"); *cf. 2013 ICS Order*, 28 FCC Rcd at 14119-20, para. 23 (noting that "[a]n inmate's [debit] account can be funded by the inmate (with earned funds, for example) or by outside parties").  We recognize that the FCC Form established for purposes of a proposed collection of data on video visitation services described "Off-Site Video Visitation" as "a call that allows an Inmate to communicate via video with another party (or parties) located outside the Facility where the Inmate is being detained."  *FCC Notice Required By The Paperwork Reduction Act*, OMB Control Number 3060-1222, 2017 WL 823589, 4 (Mar. 1, 2017).  That limited example does not overcome our understanding of the broader usage of "outside" in Commission decisions in this context, particularly where it referred to communications to another party "located" outside the relevant correctional facility – a qualifier signaling physical location that is not present in either the Commission's definition of ICS or the text of section 3(1)(E) of the Communications Act.

[350] Civil Rights Corps May 8, 2023 Comments at 3-4, 6; Worth Rises May 8, 2023 Comments at 12; Public Interest Parties May 8, 2023 Comments at 7.  By the same token, our analysis leads us to reject claims that we must interpret "outside the correctional institution" to refer to the physical location of the party with whom the inmate is communicating.  *See, e.g.*, National Sheriffs' Association May 8, 2023 Comments at 6 (arguing that "[i]f Congress had meant to base the Commission's authority on whether a person is incarcerated or not, it could have easily done so,"); Securus May 8, 2023 Comments at 7-8 (opposing the Commission's proposed interpretation, explaining that "[s]uch an interpretation would appear inconsistent with the intent of section 3(1)(E) to regulate as necessary the rates for *remote* video calling (*i.e.,* a communication with someone that is outside of the correctional institution.)").  These commenters do not persuade us that anything in the statutory text itself counsels against our interpretation, and insofar as they otherwise have a narrow view of congressional intent underlying the language it adopted, we are not persuaded by that either, as discussed more below.

[351] Worth Rises May 8, 2023 Comments at 12; *see* Public Interest Parties May 8, 2023 Comments at 7-8; Civil Rights Corps May 8, 2023 Comments at 6.

"individuals outside the correctional institution where the inmate is held," in section 3(1)(E) should be limited to services that only meet the definition of advanced communications services under that specific provision. Section 3(1) consistently has been understood as a disjunctive list of services such that meeting any one of those categories is sufficient to render a service an advanced communications service.[352] While several commenters agree with this interpretation,[353] one commenter contends that "the limiting phrase of new subsection 3(1)(E)" applies to all of the services included in section 3(1) "in the context of IPCS."[354] While the scope of section 3(1)(E) outside of the phrase in question is sufficiently expansive to encompass virtually all communications services, the National Sheriffs' Association points to nothing in the Martha Wright-Reed Act or the amended text of section 3(1) that would suggest that Congress intended to override the preexisting operative structure of that provision or subsume the definitions of interconnected VoIP service, non-interconnected VoIP service, and interoperable video conferencing service within section 3(1)(E).[355] Had Congress intended the "outside the correctional institution" language in section 3(1)(E) to apply to other advanced communications services, it could have included that language in section 3(1) as a whole, appended it to other subsections of section 3(1) as it deemed appropriate, or incorporated that language into section 276(d).[356] It did none of these things.

106.    Nor can the National Sheriffs' Association's interpretation be reconciled with the broader statutory context. The definition of "advanced communications service" in section 3(1) does not owe its existence solely to IPCS regulation under section 276 of the Communications Act.[357] Rather, a range of statutory provisions rely on that definition. Interpreting section 3(1) to mean that each of the individual audio and video services listed in sections 3(1)(A), (B), and (D) are subject to the limitation in (E) would result in a substantial narrowing of preexisting statutory requirements dealing with matters such as disability access.[358]

107.    Likewise, the National Sheriffs' Association's interpretation cannot readily be squared with section 276(d) as amended by the Martha Wright-Reed Act. In pertinent part, that provision as originally enacted defined "payphone service" subject to Commission authority under section 276 as encompassing "the provision of inmate telephone service in correctional institutions."[359] When Congress amended that definition in the Martha Wright-Reed Act to include certain advanced communications services, it made those services subject to the "in correctional institutions" limitation, as well.[360] Yet if the relevant terms in section 3(1) all already were subject to the limitation in 3(1)(E), it is not clear how much work would be left for the section 276(d) qualifier "in correctional institutions" to perform. At a

---

[352] 47 U.S.C. § 153(1) (2011); *2011 ACS Order*, 26 FCC Rcd at 14569, para. 31.

[353] Public Interest Parties July 12, 2023 Reply at 5-6; Securus May 8, 2023 Comments at 9.

[354] National Sheriffs' Association May 8, 2023 Comments at 5.

[355] Indeed, if the relevant qualifier in section 3(1)(E) either were interpreted to apply to sections 3(1)(A), (B), and (D) or if section 3(1)(E) were read as subsuming sections 3(1)(A), (B), and (D), it is not clear what remaining practical significances sections 3(1)(A), (B), and (D) would have given the existence of section 3(1)(E). Under ordinary canons of statutory interpretation, such an outcome cuts against that reading. *See, e.g.*, Public Interest Parties May 8, 2023 Comments at 6-7 (citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); Public Interest Parties July 12, 2023 Reply at 5-6.

[356] Public Interest Parties May 8, 2023 Comments at 6-7; Public Interest Parties July 12, 2023 Reply at 5-6.

[357] Indeed, section 3(1) includes "electronic messaging service," 47 U.S.C. § 153(1)(C), which was not included as a specified category of service covered by amended section 276(d) of the Communications Act. *Id.* § 276(d).

[358] *See, e.g.*, *id.* §§ 610, 617 (establishing disability access requirements for manufacturers of equipment for advanced communications service and for providers of advanced communications services).

[359] *Id.* § 276(d) (1996).

[360] *Id.* (payphone service includes "the provision of inmate telephone service and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 153(1) of this title in correctional institutions").

minimum, Congress's deliberate choice to subject the advanced communications services covered by section 276(d) to the "in correctional institutions" qualifier provides good reason to pause before inferring arguably similar limitations in section 3(1) in a manner that appears contrary to that statutory text.

108.    Consequently, we adopt the proposal in the *2023 IPCS Notice* that the language requiring that communications involve "individuals outside the correctional institution where the inmate is held" applies only with regard to subparagraph 3(1)(E).  We therefore agree with other commenters that the phrase "outside the correctional institution where the inmate is held" does not apply outside the context of section 3(1)(E).[361]

### 6.    Onsite Video Visitation

109.    In the *2023 IPCS Notice*, the Commission sought comment on whether its expanded authority over IPCS extends to onsite video visitation services.[362]  The widespread use of onsite video visitation is a relatively recent phenomenon, initially driven by significant health risks posed by the COVID-19 pandemic.  During the pandemic, "nearly every jail and prison" shifted from in-person visitation to onsite video services to prevent exposure to and the spread of coronavirus.[363]  In many instances, correctional institutions continue to restrict onsite visits to video communications in lieu of in-person visits.[364]

110.    Consistent with the description in the *2023 IPCS Notice*, we define onsite video visitation services as services that enable video communications between a person incarcerated in a correctional institution and a non-incarcerated person visiting that institution.[365]  We find that our authority over incarcerated peoples' advanced communications services extends to onsite video visitation on two independent grounds: (a) onsite video visitation's status as an "interoperable video conferencing service" within the meaning of section 3(1)(D); and (b) its status as an "audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used" within the meaning of section 3(1)(E).[366]

111.    *Onsite Video Visitation as an Interoperable Video Conferencing Service under Section § 3(1)(D).*  We conclude that onsite video visitation includes each of the elements of the definition of interoperable video conferencing service in section 3(27) of the Communications Act and that it is therefore a "payphone service" within the meaning of section 276(d) when provided in correctional

[361] National Sheriffs' Association May 8, 2023 Comments at 5-6; Civil Rights Corps May 8, 2023 Comments at 1; Public Interest Parties May 8, 2023 Comment at 6; Public Interest Parties July 12, 2023 Reply at 5 ("Reading Section 153(1)(E)'s limiting phrase to restrict the communications services subject to the Commission's ratemaking authority would, therefore, not only distort the statute's plain language, but also contravene clear congressional intent."); *see* Securus May 8, 2023 Comments at 9.

[362] *2023 IPCS Notice*, 38 FCC Rcd at 2684, para. 34.

[363] EPIC June 6, 2023 Reply at 7; National Sheriffs' Association July 12, 2023 Reply at 10-11; NCIC May 8, 2023 Comments at 16, 9 ("Correctional facilities sometimes discourage face-to-face visitation to limit facility staff comingling with the public to prevent exposure to COVID and other sicknesses, to eliminate passing of contraband from the public to the staff and incarcerated people, and to minimize the need to escort potentially violent incarcerated persons to a visiting area."); NCIC Inmate Communications Comments, WC Docket No. 12-375, at 2 (rec. Sept. 27, 2021) (NCIC Sept 27, 2021 Comments); *see* Civil Rights Corps May 8, 2023 Comments at 1-2; Pay Tel May 8, 2023 Comments at 22.

[364] EPIC June 6, 2023 Reply at 7; Civil Rights Corps May 8, 2023 Comments at 5; NCIC Sept. 27, 2021 Comments at 3.

[365] *2023 IPCS Notice*, 38 FCC Rcd at 2684, para. 34.

[366] 47 U.S.C. § 153(1)(D)-(E); Civil Rights Corps May 8, 2023 Comments at 6 ("[T]he Commission's authority to regulate the rates of video calls, regardless of technology used, is clearly inclusive of on-premises video calls."); NCIC May 8, 2023 Comments at 8; Securus May 8, 2023 Comments at 6-8; Worth Rises May 8, 2023 Comments at 12; Public Interest Parties May 8, 2023 Comments at 8.

institutions.  Section 3(27) defines "interoperable video conferencing service" as "a service that provides real-time video communications, including audio, to enable users to share information of the user's choosing."[367]  Onsite video visitation meets those criteria:  it is a real-time service that involves video communications, including audio, and that enables the incarcerated and the non-incarcerated to share information of their choosing.[368]  Onsite video visitation uses the same or functionally similar technology and equipment as is used generally for video IPCS.[369]

112.     We also find that Congress intended our authority under section 276 to extend to the full range of interoperable video conferencing services, including onsite video visitation services, given the inclusion of section 3(1)(D) in section 276(d).  By this inclusion, Congress eliminated doubt that video visitation was subject to the Commission's authority in response to the D.C. Circuit's *GTL v. FCC* decision casting doubt on whether video visitation reporting requirements were within the Commission's authority.[370]  As amended by the Martha Wright-Reed Act, the definition of "payphone service" in section 276(d) of the Communications Act now includes all interoperable video conferencing services, without qualification, to the extent they are provided in correctional institutions.  Given this statutory language, we conclude that our authority under section 276(b)(1)(A) extends to all onsite video visitation services.

113.     Our conclusion does not change regardless of whether onsite video visitation is offered free of charge.[371]  Though one commenter argues that we should limit our oversight because "the industry

---

[367] 47 U.S.C. § 153(27).

[368] Public Interest Parties May 8, 2023 Comments at 8 ("The Commission should interpret the MWRA as extending the Commission's authority over on-site video visitation services as either 'any audio or video service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held' or 'interoperable video conferencing services.'"); Securus May 8, 2023 Comments at 9 (recognizing that "on site visitation services may qualify as video conferencing services because on-site video visitation services enable real-time communication of information of the user's choosing").  *Contra* NCIC Feb. 14, 2024 *Ex Parte*, Attach. at 3-4. Notwithstanding the National Sheriffs' Association's advocacy to the contrary, we find above that the limitation to "individuals outside the correctional institution" included in section 3(1)(E) is specific to the grant of authority in that section and is not generally applicable to section 3(1) as a whole.  *See supra*, Section III.C.6 (Onsite Video Visitation).  Thus, to the extent it were relevant in a given scenario, we observe that the definition of interoperable video conferencing service does not include any limitation or requirement that the communications be with individuals outside the correctional institution.  Instead, we find the statute best interpreted to mean that any interoperable video conferencing service, a service that includes onsite video visitation, is a payphone service, and therefore subject to our authority under section 276(b)(1)(A), to the extent it is provided in correctional institutions.  *See* 47 U.S.C. § 276 (defining "payphone service" as including "the provision of" interoperable video conferencing service "in correctional institutions").

[369] *2023 IPCS Notice*, 38 FCC Rcd at 2684, para. 34; Civil Rights Corps May 8, 2023 Comments at 5 (listing several provider services using the same equipment, including "GTL/ViaPath and Securus/Aventiv–the two largest IPCS providers–each use a singular system to schedule and manage on-site and remote calls.  GTL describes its 'VisitMe' system for remote and on-site video calls as one 'highly scalable solution.'  Similarly, Securus's 'Securus Video Connect' system encompasses both remote and on-site video calls and allows non-incarcerated persons to use one phone application to schedule both types of video calls."); Public Interest Parties May 8, 2023 Comments at 8; *see 2021 ICS Notice*, 36 FCC Rcd at 9648-49, para. 281 ("[T]he record indicates that remote video visitation, where available, is often provided by an inmate calling service provider.").

[370] *GTL v. FCC*, 866 F.3d at 415-16.  The video reporting requirements before the D.C. Circuit applied to both onsite and remote video visitation.  *See Inmate Calling Service Provider Annual Reporting, Certification, and Consumer Disclosure Requirements*, WC Docket No. 12-375, ICS Annual Reporting Instructions (Oct. 25, 2016) https://omb.report/icr/201609-3060-008/doc/69266001 (ICS Annual Report Instructions) (requiring each inmate calling services provider to report rate and other information regarding their "video calling services" and defining "video calling" as "any service that allows inmates to communicate with other parties via video, whether the other party is physically present at the correctional facility or is calling from another location" and specifying that "[v]ideo calling" includes, but is not limited to, video visitation").

[371] Securus May 8, 2023 Comments at 7; *see* NCIC May 8, 2023 Comments at 8-9.

has no history of charging for such services,[372] we find that because such services meet the definition of "payphone service" in section 276(d), they fall within the Commission's jurisdiction.[373]  We affirm that onsite video visitation services are interoperable video conferencing services, and as such, are subject to our section 276 jurisdiction and the rules we adopt herein.

114.    *Onsite Video Visitation as a Video Communications Service under Section 3(1)(E).*  In the *2023 IPCS Notice*, the Commission sought comment on whether onsite video visitation services constitute "video communications service[s]" within the meaning of section 3(1)(E).[374]  As an initial matter, we find that, based on the record in response to the *2023 IPCS Notice*, onsite video visitation is a video communications service under section 3(1)(E), giving us an alternative basis for exercising section 276 authority over those services independent of section 3(1)(D).  We are persuaded by commenters' explanations that "[o]n-site video visitation service used by an incarcerated person for the purpose of communicating with those neither confined nor employed by the correctional facility fits plainly within the statutory language in section 3(1)(E), as the service is used by incarcerated persons to communicate with . . . persons not held within the institution."[375]

115.    Nor do we find any "reasonable justification to interpret the Act to allow the Commission to regulate [remote video services] but [not onsite video services]."[376]  We are not persuaded by suggestions that Congress intended to include a limitation based on the physical location of the non-incarcerated person involved in the communication such that we have no authority over onsite video visitation under section 3(1)(E).[377]  As discussed above, the language of the statute is best read as focused on the status of the individuals involved in an audio or video communication—not on the physical location of the called party at the time of the communication.[378]

116.    Policy considerations likewise support our interpretation.  We find it compelling that "[b]oth remote and on-premises video calls are typically operated by the same IPCS providers, involve the same technological systems, and have the same functions and equipment for the incarcerated user,

---

[372] Securus May 8, 2023 Comments at 8.

[373] Public Interest Parties May 8, 2023 Comments at 8-9 ("If on-site video visitation is not subject to the Commission's oversight, IPCS providers will be able to charge unjust and unreasonable rates for the service and be motivated to shift IPCS consumers toward the more profitable service and away from those over which the Commission has authority."); Civil Rights Corps May 8, 2023 Comments at 6 ("[T]o the extent an IPCS provider exploits families by charging for these on-premises calls now or in the future, the video calls would certainly be subject to the ratemaking authority of the Commission.").  *Contra* Securus May 8, 2023 Comments at 7-8 (arguing that it is not clear "that onsite video visitation services require Commission oversight as the industry has no history of charging for such services").

[374] *2023 IPCS Notice*, 38 FCC Rcd at 2684-85, paras. 34-36.

[375] Public Interest Parties May 8, 2023 Comments at 8.

[376] Civil Rights Corps May 8, 2023 Comments at 5; Securus May 8, 2023 Comments at 9.

[377] National Sheriffs' Association May 8, 2023 Comments at 5-6 ("[T]he Commission should give these phrases their plain meaning, as is required by the basic rules of statutory construction.  Accordingly, the Commission has no jurisdiction over video visitation.").

[378] *See* Worth Rises May 8, 2023 Comments at 12.  Indeed, even assuming *arguendo* that the qualifier in section 3(1)(E) were interpreted to apply to the physical location rather than status of the individuals with whom an inmate is communicating, the relevant statutory question would be where the *service* can be used, and not where a given *communication* occurs.  *See* 47 U.S.C. § 153(1)(E) (covering "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used").  If an audio or video communications service can be used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, the details associated with a given individual communication using that service would be irrelevant.

regardless of the location of the person with whom they are communicating."[379]  While some providers offer such service for free today,[380] it does not follow that consumers never would or could need the protection of the "just and reasonable" standard provided by the Martha Wright-Reed Act for these video communications.[381]  Absent Commission oversight of onsite video visitation, both facilities and IPCS providers could, for example, have "a perverse incentive . . . to reduce the availability of other forms of IPCS as well as in-person visitation."[382]  We are persuaded that, because these services share providers, equipment, and other technology systems, the only difference between onsite and remote video communications is the location of the non-incarcerated party with whom the incarcerated individual is communicating.  We therefore agree that "[t]here is no reasonable justification to interpret the Act to allow the Commission to regulate one but not the other."[383]

### D.    Rate Caps

117.    After carefully considering our expanded statutory authority, the data received in response to the 2023 Mandatory Data Collection, and the record developed from the *2023 IPCS Notice* and the precursor notices,[384] we take a series of actions to establish just and reasonable rates for IPCS while also ensuring fair compensation for providers.  Specifically, we adopt the Commission's proposals to set separate rate caps for audio IPCS and video IPCS, and to treat interstate and intrastate communications uniformly, as supported by both the record and provider responses to the 2023 Mandatory Data Collection.[385]  We also revise our rate cap tiers, and adopt separate per-minute rate caps within each of those tiers for audio IPCS and video IPCS.  Collectively, these steps will achieve the dual directives of the statute to ensure just and reasonable rates for consumers and providers and fair compensation for providers.

118.    These actions reflect our application of the "used and useful" framework in evaluating the costs of providing IPCS, consistent with the Commission's proposal in the *2023 IPCS Notice*.[386]

---

[379] Civil Rights Corps May 8, 2023 Comments at 5 (listing several provider services using the same equipment, including "GTL/ViaPath and Securus/Aventiv–the two largest IPCS providers–each use a singular system to schedule and manage on-site and remote calls.  GTL describes its 'VisitMe' system for remote and on-site video calls as one 'highly scalable solution.'  Similarly, Securus's 'Securus Video Connect' system encompasses both remote and on-site video calls and allows non-incarcerated persons to use one phone application to schedule both types of video calls."); Public Interest Parties May 8, 2023 Comments at 8; *see 2021 ICS Notice*, 36 FCC Rcd at 9648-49, para. 281.

[380] NCIC May 8, 2023 Comments at 8-9; Securus May 8, 2023 Comments at 7.

[381] Public Interest Parties May 8, 2023 Comments at 8-9; Civil Rights Corps May 8, 2023 Comments at 6.  *Contra* Securus May 8, 2023 Comments at 7-8.

[382] Public Interest Parties May 8, 2023 Comments at 8; Civil Rights Corps May 8, 2023 Comments at 5-6 ("The Commission's authority over on-premises video calls is key to preventing further harm to incarcerated people and their loved ones.").

[383] Civil Rights Corps May 8, 2023 Comments at 5.

[384] *See e.g. 2023 IPCS Notice*, 38 FCC Rcd at 2679 and 2686-93, paras. 20-21, 41-43, and 46-57 (seeking comment on several proposals related to ratemaking for IPCS including those mentioned); *2022 ICS Notice*, 37 FCC Rcd at 11951, para. 125 (seeking comment on how to permanently cap rates and ancillary service charges); *2021 ICS Notice*, 36 FCC Rcd at 9656-57, paras. 302-305 (seeking comment on the overall methodology used to set rate caps).

[385] *See* NCIC May 8, 2023 Comments at 9-10 (identifying various ways that video IPCS costs more to provide than audio IPCS, including the minimum data rates required for each service and the greater amounts of storage capacity needed for video communications); Securus May 8, 2023 Comments at 18 (asserting that there are no material cost differences between interstate and intrastate audio IPCS); *see also* NCIC May 8, 2023 Comments at 11 (same); Appendix D (Data Collection).

[386] *2023 IPCS Notice*, 38 FCC Rcd at 2679-80, paras. 20-22 (seeking comment on applying the "used and useful" framework in capping IPCS rates).

**Federal Communications Commission**                    **FCC 24-75**

Under this framework, the determination of just and reasonable rates focuses on affording regulated entities an opportunity to recover their "prudently incurred investments and expenses that are 'used and useful' in the provision" of the regulated service.[387]  In applying this framework, we use provider-submitted data and other information from the record to estimate the costs incurred in providing IPCS, including any safety and security measures used and useful in the provision of these services.[388]  Our rate cap calculations incorporate the costs providers reported as their costs of providing ancillary services, consistent with our decision to eliminate separate charges for ancillary services.[389]  Finally, our rate caps reflect our best estimate of the costs incurred in implementing the TRS reforms adopted in the *2022 ICS Order* and our best estimate of the costs facilities incur in the provision of IPCS.

119.     Accordingly, we adopt the following permanent rate caps for audio IPCS, and interim rate caps for video IPCS:

- For all prisons, $0.06 per minute for audio communications, and $0.16 per minute for video communications;

- For jails with an average daily population (ADP) greater than or equal to 1,000 incarcerated people, $0.06 per minute for audio communications and $0.11 per minute for video communications;

- For jails with an ADP between and including 350 and 999 incarcerated people, $0.07 per minute for audio communications and $0.12 per minute for video communications; and

- For jails with an ADP between and including 100 and 349 incarcerated people, $0.09 per minute for audio communications and $0.14 per minute for video communications.

- For jails with an ADP with 99 or fewer incarcerated people, $0.12 per minute for audio communications and $0.25 per minute for video communications.

We establish these rate caps using a zone of reasonableness approach.  This approach allows us to respond to the limitations of the cost-of-service data before us in a manner that appropriately balances fair compensation for IPCS providers with just and reasonable rates and charges for consumers and providers.  Through this approach, we afford providers an opportunity to recover the used and useful costs incurred to provide IPCS and also keep IPCS rates affordable for incarcerated people and their loved ones.[390]

### 1.     Rate Cap Structure

120.     *Adopting Rate Caps as the Regulatory Mechanism*.  We conclude that rate caps are the appropriate mechanism for ensuring that all rates for IPCS are just and reasonable.[391]  Consistent with the Commission's prior ratemaking with regard to inmate calling services, we find that rate caps provide the best overall rate structure for IPCS because of the flexibility that rate caps afford providers while still ensuring that the incarcerated individual and their loved ones are protected from unreasonably high rates

---

[387] *See id.*, 38 FCC Rcd at 2679, para. 21; *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126.

[388] *See infra* Section III.D.7 (Safety and Security Costs).

[389] *See infra* Section III.D.8 (Ancillary Service Charges).

[390] *See 2023 IPCS Notice*, 38 FCC Rcd at 2675-76, para. 14 n.47 (citing *Farmers Union*, 734 F.2d at 1502 as "pointing out that historically, rates had been seen as just and reasonable when they fell within a zone of reasonableness" (internal quotations omitted)); *see 2021 ICS Order*, 36 FCC Rcd at 9553-54, paras. 81-83 (establishing the "zone of reasonableness" framework to evaluate cost data submitted in response to the Second Mandatory Data Collection); *see also* Global Tel*Link Corp. d/b/a ViaPath Technologies Comments, WC Docket No. 12-375, at 17-18 (rec. Dec. 15, 2022) (ViaPath Dec. 15, 2022 Comments) (describing the Commission's use of the "zone of reasonableness" approach as "a sensible way to identify a range of rates that would be just and reasonable to investors and ratepayers" (quoting *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 487-88 (2002) (*Verizon v. FCC*))).

[391] Martha Wright-Reed Act § 2(a)(1).

and charges.[392]  We also find that rate caps are preferable to prescriptive rate setting for IPCS because a rate cap approach does not preclude or prevent providers and parties representing facilities from negotiating and entering into agreements to provide IPCS at lower or no cost to incarcerated people and their friends and family, as is shown in the record.[393]  The record strongly supports the use of rate caps rather than prescriptive rate setting.  Rate caps also allow providers to be responsive to the differing needs of each facility, and "protect ratepayers as a group from high prices and provide carriers with an incentive to increase productivity."[394]  As the IPCS industry continues to develop and offer advanced communications services including video communications, we find that flexibility in pricing and in service offerings will be important to ensure that providers and incarcerated people and their friends, families, and loved ones benefit from the rate caps we adopt today.

121.    *Separate Rate Caps for Audio IPCS and Video IPCS.*  With the Martha Wright-Reed Act's expansion of the Commission's authority to regulate advanced communications services, and in keeping with the Commission's obligation to ensure just and reasonable rates, we adopt separate rate caps for audio IPCS and video IPCS.[395]  We find the record, including the 2023 Mandatory Data Collection data, overwhelmingly support this approach.  Record comments support separate rate caps because of the

---

[392] *2021 ICS Order*, 36 FCC Rcd at 9530, para. 28 (adopting interim interstate and international rate caps); *see 2013 ICS Order*, 28 FCC Rcd at 1411, para. 5 (adopting interim interstate rate caps for calls in carceral environments); *see also 2015 ICS Order*, 30 FCC Rcd at 12770, para. 9 (readopting the *2013 ICS Order*'s interim interstate rate caps).

[393] *2021 ICS Order*, 36 FCC Rcd at 9573, para. 121 n.373 (identifying a contract between the City and County of San Francisco and GTL that allows incarcerated people to place calls free of charge to them as a result funding from the local government); *see Policy and Rules Concerning Rates for Dominant Carriers*, CC Docket No. 87-313, 5 FCC Rcd 6786, 6791, para. 35 (1990) ("[P]ermitting flexibility in price-setting generates economic efficiencies that benefit ratepayers through lower rates."); *see also* New York City, N.Y., Code § 9-154 (requiring the city to "provide telephone service to individuals within the custody of the department in city correctional facilities at no cost to the individuals or the receiving parties for domestic telephone calls"); ViaPath Dec. 15, 2022 Comments at 16 (quoting Commission orders as supporting the use of rate caps to protect ratepayers and encourage innovation).

[394] ViaPath Dec. 15, 2022 Comments at 15, 20.

[395] In adopting these rate caps, we do not intend any modification of the requirements of section 64.6040(d) of our rules, which addresses TRS and certain related services (TTY-to-TTY communications and point-to-point video communication in American Sign Language).  *See* 47 CFR § 64.6040(d).  Section 64.6040(d) prohibits an IPCS provider from levying or collecting any charges for TRS calls (or for the use of a device or transmission service for such calls), except for Internet Protocol Captioned Telephone Service (IP CTS) and its analog counterpart, Captioned Telephone Service (CTS).  *Id.* § 64.6040(d)(1), (2).  For IP CTS, CTS, and point-to-point video communication in ASL, an IPCS provider may assess charges that do not exceed its charges for an equivalent voice telephone call.  *Id.* § 64.6040(d)(2), (3).  Thus, charges for these services will be effectively capped at the applicable rate cap for audio communications.  For TTY-to-TTY communication, an IPCS provider may assess a charge that does not exceed 25 percent of the applicable per-minute rate for a voice call.  *Id.* § 64.6040(d)(4).  Thus, such charges are effectively capped at 25 percent of the applicable per-minute rate for a voice call.  *See also infra* Section III.D.9.d.ii (Disability Access via Alternate Pricing Plans).

materially different cost structures of offering audio and video IPCS,[396] and we agree.[397] The data show that video communications typically require more expensive equipment, and even when comparing audio and video communications made using the same equipment, the data suggest that video communications are more expensive to provide.[398] This difference in costs justifies the need to adopt separate rate caps for these services to satisfy our obligations for both providers and consumers of IPCS. Accordingly, we separately analyze audio and video IPCS costs and develop separate rate caps at each tier for both services.

122. As proposed in the *2021 ICS Notice* and the *2023 IPCS Notice*, we adopt permanent rate caps for audio IPCS.[399] The Commission has previously been constrained to adopt only interim rates for these services given persistent limitations of the industry data available to it.[400] We now find that the audio cost data received in response to our most recent data collection provide a sufficient basis for setting permanent audio IPCS rate caps.[401]

---

[396] NCIC May 8, 2023 Comments at 10 (arguing that "[s]eparate caps for audio and video services are necessary" and proposing that those caps "should be dictated by the resources required to provide the service"); Pay Tel May 8, 2023 Comments at 22 (noting that "the cost of video storage is typically higher than that of call data storage given the substantially greater sizes of video files," and that "the cost of video equipment is greater than the cost of traditional phone equipment"); Securus May 8, 2023 Comments at 20 (identifying that, on top of different cost structures and the different technologies used to offer video IPCS and audio IPCS, Securus also offers video IPCS differently than it does its audio IPCS); ViaPath July 12, 2023 Reply at 6-7 (noting that, based on the record, the costs associated with video IPCS differ from audio IPCS costs); *see also* ViaPath June 13, 2024 *Ex Parte* at 4 (arguing that audio and video IPCS should have different rate caps because "[t]he record demonstrates the provision of video IPCS is different from [audio] IPCS"); *see also* Secretariat Economists June 13, 2024 Report at 7 (arguing that video IPCS is more costly to provide than audio IPCS "due to higher costs for equipment, broadband access, and security").

[397] *See* Appendix F (discussing differences between the audio and video markets).

[398] *See id.* (comparing reported costs between audio and video services); *see also* Pay Tel May 8, 2023 Comments at 22 (highlighting that the equipment used for video IPCS is more expensive than "traditional phone equipment"); NCIC May 8, 2023 Comments at 10 (noting that video communications require more transmission bandwidth than audio calls); Securus May 8, 2023 Comments at 23 (asserting that for its proprietary video IPCS offerings, Securus incurs additional costs "including the development costs of the application software downloaded on loved ones' devices").

[399] *See 2023 IPCS Notice*, 38 FCC Rcd at 2673, paras. 8-9 (discussing the Commission's efforts in setting "reasonable permanent rate caps" for audio IPCS); *see also 2023 IPCS Order*, 38 FCC Rcd at 2701-02, paras. 83-84 (recognizing that the Martha Wright-Reed Act "contemplate and require the collection and analysis" of cost data and delegating authority to staff to collect such data "as appropriate to implement the Martha Wright-Reed Act"); *2022 ICS Notice*, 37 FCC Rcd at 11951, para. 125 (seeking comment on how to use provider responses to the Third Mandatory Data Collection to set "reasonable, permanent caps" for audio IPCS); *2021 ICS Notice*, 36 FCC Rcd at 9521, para. 5 (seeking comment on setting permanent rates for what is now audio IPCS).

[400] *2021 ICS Order*, 36 FCC Rcd at 9530, para. 28; *see 2013 ICS Order*, 28 FCC Rcd at 1411, para. 5 (adopting interim interstate rates caps for calls in carceral environments); *2015 ICS Order*, 30 FCC Rcd at 12770, para. 9 (readopting the *2013 ICS Order*'s interim interstate rate caps).

[401] *See* Securus Dec. 15, 2022 Comments at 15-16 (finding that the Third Mandatory Data Collection, which collected cost data for calendar years 2019 through 2021, used a "cost-causative methodology" which resulted in cost data that "as a whole is sufficiently robust and credible to underpin the development of permanent rates"); Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, and Marcus W. Trathen and Christopher B. Dodd, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. B, Joint Report by FTI Consultants and Wood and Wood, at 8, 11 (filed June 10, 2024) (FTI and Wood June 10, 2024 Report) (concluding that the 2023 Mandatory Data Collection's "audio IPCS cost data are suitable for setting rate-caps"); *see also* Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-

(continued….)

123.    By contrast, video IPCS involves relatively new services in an emerging market for the correctional industry, and one which the Commission has not previously had the authority to regulate.[402] The reported costs show a marked differential between audio and video costs per minute, which may be attributable, in part, to the respective difference in maturity of the two types of service offerings.[403]  As a result of the relative nascency of the video IPCS market generally, the wide variations among facilities in the per-minute costs of providing IPCS, and the likely need to revise any video rate caps in the future to account for growth and evolution of the video IPCS marketplace, we find that the reported costs and demand for video IPCS are best suited for interim rate caps.[404]

124.    *Per-Minute Rate Caps for Audio IPCS and Video IPCS.*  We adopt the Commission's proposal to set rate caps for audio and video IPCS on a per-minute basis as the foundation of our efforts to ensure just and reasonable IPCS rates and charges.[405]  The record provides no basis to abandon the long-standing per-minute rate caps for audio IPCS, and we find no reason to deviate from this approach.[406] This decision is further supported by our adoption today of rules to permit alternate pricing plans subject

---

375, at 2-3 (filed June 24, 2024) (Pay Tel June 24, 2024 *Ex Parte*); Appendix D (Data Collection) (discussing the sufficiency of the audio IPCS cost data from the 2023 Mandatory Data Collection).

[402] *See* Appendices F, H (discussing video as an emerging marketplace); Letter from Marcus W. Trathen and Christopher Dodd, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed June 18, 2024) (Pay Tel June 18, 2024 *Ex Parte*); *2023 IPCS Notice*, 38 FCC Rcd at 2670-71, para. 3 (noting that the Martha Wright-Reed Act was enacted on January 5, 2023); FTI and Wood June 10, 2024 Report at 26 (observing that "video IPCS reported costs are reflective of a nascent service offering in which providers are in various states of development and implementation"); *see also* Pay Tel June 18, 2024 *Ex Parte* at 1 (same).

[403] *See generally* Appendix F (comparing the reported audio and video costs); *see also* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1-2 (filed May 23, 2024) (Wright Petitioners May 23, 2024 *Ex Parte*) (recognizing anomalies that distinguish video from audio cost data).

[404] *See* Appendices F, H (discussing the nascent attributes of the IPCS video marketplace); *see also* Letter from Andrew Lama, Government Affairs Specialist, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed May 17, 2024) (Worth Rises May 17, 2024 *Ex Parte*) (citing examples of video call rates ranging from $0.05/minute to $0.65/minute).  We find that the video data present similarities to the data that the Commission reviewed in 2021, when the Commission was faced with data that it determined was unreliable, resulting in the adoption of interim rate caps.  *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9545, para. 63 (explaining that issues with the accuracy and reliability of the data resulted in a change from the Commission's proposed approach of setting permanent rate caps to setting interim rate caps); FTI and Wood June 10, 2024 Report at 29 (finding that the Brattle Group's analysis for video IPCS shows "the need to allow the market to develop").  NCIC argues that the Commission should "delay the adoption of interim rates until it receives comprehensive data from all video visitation providers, and deliver immediate relief by simply prohibiting flat-rate billing, which is currently being offered at up to $12.99 per session").  Letter from Lee G. Petro and Glenn S. Richards, Dickinson Wright PLLC, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 4 (filed July 10, 2024) (NCIC July 10, 2024 *Ex Parte*).  We decline to do so.  While we recognize that the video marketplace is in its nascent stages, we find that the available data sufficiently support the interim rate caps we adopt today.  In addition, as we note below, interim rate caps for video are necessary to curb abuses identified in the record concerning other existing rate structures in the video market.

[405] *2023 IPCS Notice*, 38 FCC Rcd at 2688, para. 46 (proposing that the Commission require providers to offer "video communications services at per-minute rates").

[406] *See, e.g.*, Worth Rises May 17, 2024 *Ex Parte* at 4 (advocating support for a per-minute call structure); Letter from Glenn S. Richards, Dickinson Wright PLLC, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed May 24, 2024) (NCIC May 24, 2024 *Ex Parte*) (same).  The Commission has historically set per-minute rate caps for audio IPCS.  *See 2015 ICS Order*, 30 FCC Rcd at 12775-76, para. 22 (setting the Commission's interim rate caps on a per-minute of use basis); *see also 2021 ICS Order*, 36 FCC Rcd at 9536, para. 40 (adopting lower per-minute rate caps for interstate ICS calling).

to specified conditions.[407]  Similarly, given the per-minute rate structure we adopt for audio calls, we find that taking a consistent approach for video communications would offer several benefits for IPCS consumers.  First, per-minute rates are simple to understand and reflect the actual duration of the call or communication.  As a matter of policy, the Commission has stated that transparency regarding the charges for IPCS "is critical because it ensures that incarcerated persons and their families understand the prices they are, or will be, charged for the services they use, enabling them to make informed decisions when purchasing those services."[408]  We find that consistent use of per-minute rates for audio and video IPCS will result in an easier to understand and more transparent regulatory framework.[409]  We therefore reject proposals to use other rate metrics, such as per-session charges, in the rate caps that serve as the foundation for ensuring just and reasonable IPCS rates.[410]  Per-minute rates also provide greater transparency and offer greater familiarity and flexibility for both industry and consumers.[411]

125.    Establishing interim per-minute rate caps for video IPCS is also responsive to concerns voiced in the record about the need to curb abusive practices associated with other existing rate structures for video IPCS.[412]  At the same time, however, our new rules permitting providers to deploy alternate pricing plans for both audio and video IPCS, subject to certain conditions, including, in particular, compliance with the overall rate caps adopted here, will permit providers to experiment with optional rate structures that may be beneficial and desirable for IPCS consumers.[413]  Taken together, we find these actions satisfy two goals:  our default per-minute rates will ensure just and reasonable rates for IPCS consumers and providers and fair compensation for providers;[414] and our optional alternate pricing plan rules will provide some measure of flexibility for the industry, allowing providers and customers to voluntarily opt-in to other pricing arrangements that may be mutually beneficial.

---

[407] *See infra* Section III.D.9 (Alternate Pricing Plans).

[408] *2022 ICS Notice*, 37 FCC Rcd at 11947, para. 111 (citing *2015 ICS Order*, 30 FCC Rcd at 12895-96, para. 278).

[409] NCIC May 8, 2023 Comments at 7, 12 (urging that the Commission adopt "per-minute billing" for video IPCS as a "consumer-friendly practice[]" and arguing that "per-minute billing would be the most cost-effective solution for short-term and county jails that may house incarcerated persons for an evening or weekend").

[410] *See* Securus May 8, 2023 Comments at 23-24 (proposing the Commission "permit flexibility in pricing models" by allowing both per-minute and per-session charges for video IPCS).

[411] *See 2015 ICS Order*, 30 FCC Rcd at 12812-13, para. 104 (noting that "[s]everal commenters suggest that . . . providers will benefit from a ban on flat-rate calls because it will lower their costs related to consumer complaints and bill adjustments").

[412] NCIC May 8, 2023 Comments at 7-8, 12 (identifying examples of abusive practices—like charging for calls that do not take place or requiring flat-rate charges or bulk minute purchases to use video IPCS—that require incarcerated individuals and their loved ones to pay for services that they do not use, and urging the adoption of a per-minute rate basis for video IPCS and other prohibitions to curb these practices); Raher May 8, 2023 Comments at 19 (finding that no provider "has come forward with a reasonable or compelling justification" for per-session billing); Worth Rises May 8, 2023 Comments at 11 (requesting that the Commission prohibit per-call pricing for video calls because that "pricing structure may even incentivize IPCS providers to artificially cause calls to drop, which [would] allow[] them to collect the full" price of video calls  without incurring the costs of completing the calls); *see also 2015 ICS Order*, 30 FCC Rcd at 12810-13, paras. 98-105 (prohibiting per-call and per-connection fees and prohibiting flat rate calling because those types of abusive charging practices have "no place in a framework" for just and reasonable rates").

[413] *See infra* Section III.D.9 (Alternate Pricing Plans).

[414] The Commission has previously found that when providers used flat-rate charges for audio calls, if the duration of the audio call was less than the maximum time allowable, "the price for that call is disproportionately high." *2015 ICS Order*, 30 FCC Rcd at 12813, para. 105 (citing the *2013 ICS Order*, 28 FCC Rcd at 14154-55, para. 85). Receiving no record evidence to the contrary, we find that a similar result is likely in the case of per-call or per-session charges for video IPCS.

126.    We decline to adopt a model carrier approach to establish the rates for either audio or video IPCS.  As proposed in the record, a model carrier approach would set rates by reference to general telecommunications industry-average costs for non-IPCS calls, including a predetermined return, "and then potentially adjust for costs that may be particular to the provision of service in incarceration facilities."[415]  Although the Commission has employed a similar approach in other circumstances,[416] we find that our tiered approach based on the currently available IPCS-provider data provides a more accurate estimate of just and reasonable IPCS rates and will better reflect the size variance and the economies of scale in the IPCS market rather than relying on a uniform general telecommunications industry rate setting approach.[417]  At the same time, a model carrier based approach is useful for comparative analysis, and as explained further in Appendix I, can be used to confirm our understanding of certain aspects of providers' cost data.[418]

127.    *Adopting Rate Caps Derived from Industry Average Costs*.  As permitted by the Martha Wright-Reed Act, we use industry average costs reported by IPCS providers at the company-wide and facility levels in response to the 2023 Mandatory Data Collection as the basis for developing the IPCS rate caps we adopt today.[419]  The Commission previously used industry average costs to set inmate calling

---

[415] Brattle May 8, 2023 Report at 2-4, paras. 5-7.  *But see* Secretariat Economists June 13, 2024 Report at 24 (arguing that the model carrier analysis is flawed because it "assumes inappropriate values for operating costs," an "inappropriate percentage for overhead," and that "10 percent . . . is an adequate return on capital to sustain the industry"); *see also* FTI and Wood June 10, 2024 Report at 20.

[416] *See, e.g.*, *Connect America Fund*; *ETC Annual Reports and Certifications*; *Developing a Unified Intercarrier Compensation Regime*, WC Docket Nos. 10-90, 14-58, CC Docket No. 01-92, Report and Order, Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 31 FCC Rcd 3087, 3090, para. 3 (2016) (*ETC Annual Reports Order*) (setting a "forward looking, efficient" cost model for rate of return carriers).

[417] *See* Letter from Salvatore Taillefer, Jr. and Mary J. Sisak, Blooston, Mordofsky, Dickens & Prendergast, LLP, Counsel to National Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 4 (filed June 20, 2024) (National Sheriffs' Association June 20, 2024 *Ex Parte*) (arguing that general telecommunications industry costs are inappropriate); Securus July 12, 2023 Reply at 9 (asserting that "[l]arger providers [of traditional communications services] enjoy massive economies of scale, scope, and density well beyond anything provided by IPCS providers"); Appendix I (discussing the Brattle Model Carrier study); *see also supra* Section III.A (Unique Marketplace for Incarcerated People's Communications Services) (describing lack of competitive forces in the IPCS market).  We find further that the marketplace is still adapting to the requirements of IPCS video communications, which counsels in favor of allowing more time before adopting a model carrier approach.  *See* Appendices F, H (discussing the IPCS market); *see also supra* Section III.A (Unique Marketplace for Incarcerated People's Communications Services) (discussing same).  Because we do not base our analysis on the model carrier approach, we find it unnecessary to address arguments concerning the Commission's authority in this respect.  *See, e.g.*, Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-373 at 2-6 (filed Apr. 30, 2024) (Securus Apr. 30, 2024 *Ex Parte*); *see also* ViaPath June 13, 2024 *Ex Parte* at 7-11 ("The Commission should give no weight to the Brattle Group's Model Carrier Approach for setting rate caps.").

[418] *See infra* Appendix I (discussing model carrier approach).

[419] *See* Appendix D.  In the *2021 ICS Notice*, the Commission sought comment on whether to "calculate industry-wide mean contract costs per paid minute of use," or to "analyze costs at the facility level."  *2021 ICS Notice*, 36 FCC Rcd at 9656, para. 303.  We resolve this question by confirming that we analyze costs at the facility level, in the interest of evaluating providers' costs as accurately as possible, consistent with the facility-level cost data staff sought and obtained through the 2023 Mandatory Data Collection.  *See 2021 ICS Notice*, 36 FCC Rcd at 9656, para. 303 (observing it would be necessary to analyze facility-level cost data "to capture potential differences in costs associated with smaller facilities"); Pay Tel Communications, Inc. Reply, WC Docket No. 12-375, at 6 (rec. Dec. 17, 2021) (Pay Tel Dec. 17, 2021 Reply) ("[I]t is imperative for the Commission to review and use facility-level cost data when engaging in its ratemaking analysis going forward."); Incarcerated People's Communications Services 2023 Mandatory Data Collection Instructions, WC Docket Nos. 23-62 and 12-375, at 45-63, https://www.fcc.gov/files/2023-ipcs-mandatory-data-collection-instructions (2023 Mandatory Data Collection Instructions); Appendix D.

services rate caps,[420] but the D.C. Circuit rejected that approach as not providing fair compensation for providers on a "per call" basis for "each and every call," as was then required by the language of section 276(b)(1)(a) of the Communications Act.[421]  The Martha Wright-Reed Act removed the "each and every call" language from section 276(b)(1)(a) and authorized the Commission to use "industry-wide average costs" in determining just and reasonable rates.[422]  We can only conclude, and commenters concur, that the Act thereby removed the limitations set forth in the D.C. Circuit's decision.[423]  We also believe that using industry average costs to set rates will best ensure rates that are just and reasonable for consumers and providers and provide fair compensation for providers.

128.    We further find that the Act's elimination of the requirement that "each and every" completed communication be fairly compensated means that we are no longer required to establish a per-call based compensation plan.[424]  Commenters agree.[425]  Rate caps based on costs evaluated on an

---

[420] *2023 IPCS Notice*, 38 FCC Rcd at 2671-72, 2688-89, paras. 5, 47-49.  In the *2015 ICS Order*, the Commission set rate caps based on "[c]osts per minute . . . calculated using a weighted average per minute cost," in order to "prevent[] small outliers from having a disproportionate impact." *2015 ICS Order*, 30 FCC Rcd at 12790, para. 52.  The Commission found that basing the rate caps on average per-minute costs meant that providers "will be able to set rates at levels that allow them to recover average costs at each and every tier." *Id.* at 12790, para. 52 n.170.  Accordingly, the Commission concluded that the rate caps it adopted were "more than sufficient to allow providers to recover efficiently-incurred ICS costs." *Id.* at 12790, para. 54.

[421] *GTL v. FCC*, 866 F.3d at 414 (finding the "averaging calculus is patently unreasonable," because setting rate caps at average costs for each tier "makes calls with above-average costs in each tier unprofitable," and holding that this "d[id] not fulfill the mandate of § 276 that 'each and every' inter- and intrastate call be fairly compensated").

[422] Martha Wright-Reed Act § 3(b)(1).

[423] *See* Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (filed Feb. 17, 2023) (Securus Feb. 17, 2023 *Ex Parte*) ("[T]he MWR Act largely sought to address limitations on the Commission's authority set forth in the D.C. Circuit's *Global Tel*Link v. FCC* ('*GTL*') decision," including by "allow[ing] the Commission to utilize industry-wide and company-specific average costs"); Public Interest Parties May 8, 2023 Comments at 4, 16-17 ("The *GTL* court had determined that the Commission could not use industry-wide averages because doing so would not be consistent with its statutory mandate that 'each and every' call be fairly compensated.  Congress clearly intended to alter this outcome of *GTL* by adding 'industry-wide average costs' to Section 3(b)(1) of the Act and deleting the fair compensation requirement for 'each and every call,' thereby authorizing the Commission to do exactly what the *GTL* court had held it could not: consider industry-wide costs when setting just and reasonable rates."); Leadership Conference July 12, 2023 Reply at 2 ("The Leadership Conference and undersigned organizations . . . [e]ndorse the view in the record for the proceeding, and in the legislative record for the Martha Wright-Reed Act, that Congress' passage of the legislation should be viewed by the FCC as a wholesale rejection of the D.C. Circuit's *Global Tel*Link v. FCC* ruling."); Raher May 8, 2023 Comments at 2 (same); UCC and Public Knowledge May 8, 2023 Comments at 7 (same); Securus July 12, 2023 Reply at 1 ("The initial comments in this proceeding reflect substantial agreement that the Act confers upon the Commission plenary authority to regulate the rates and charges for intrastate services and video communications and was intended to reverse certain of the findings in the D.C. Circuit's *Global Tel*Link v. FCC* decision."); ViaPath July 12, 2023 Reply at 8-9 ("[T]he legislative and Commission expressed understandings [are] that the [Martha Wright Reed Act] was intended to address previous rulings in *GTL v. FCC*."); Pay Tel May 8, 2023 Comments at 10 n.24 (same).

[424] Martha Wright-Reed Act § 2(a)(1); *see supra* Section III.C.3.c (Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)).

[425] Public Interest Parties May 8, 2023 Comments at 12-13 (noting that "Congress eliminated that term from the statute, decisively addressing the GTL decision's contrary interpretation.  To the extent there is an independent obligation to ensure fair compensation, it would apply generally, and not to individual calls."); *see also* Securus Feb. 17, 2023 *Ex Parte* at 4 ("The D.C. Circuit overturned the Commission's use of industry average costs to set rates because 'calls' with above-average costs would be unprofitable and thus violate Section 276's then-existing standard of fair compensation for each and every' call.  The MWR Act contains several provisions relevant to the D.C. Circuit's conclusion.  It removes the 'per call' compensation requirement and deletes the language that providers be

(continued….)

aggregated basis generally will satisfy the requirement that all payphone service providers be fairly compensated.[426]  Based on our interpretation of the Act in light of the D.C. Circuit's holding in *GTL v. FCC*, as well as the Act's explicit terms, we further find that setting the upper and lower bounds of our zone of reasonableness based on industry-wide average costs at each tier of facilities—without the need to consider one standard deviation or any other measure of deviance from the average—will satisfy this requirement.  We find that Congress's express permission to use industry average costs in setting rate caps encompasses the specific approach to using industry average costs that the Commission adopted in the *2015 ICS Order*:  setting rate caps at the level of the weighted average of providers' reported costs at each tier.  The regulatory history—particularly our understanding of the ways that the Martha Wright-Reed Act sought to respond to the D.C. Circuit's decision in *GTL*, including with specific respect to the use of industry average costs—reinforces the reasonableness of our interpretation.

### a.    Rate Caps Based on Total Costs

129.    Consistent with the changes to our authority, we adopt the proposal to set rate caps that incorporate total IPCS costs by including *all* relevant costs incurred in the provision of IPCS in our calculations of average provider costs.[427]  In implementing that approach, we depart from the Commission's previous approach to allowing and capping separate charges for certain ancillary services and instead include the costs related to the provision of those ancillary services in our IPCS rate caps.  We also depart from the Commission's use of separate rate additives for facility-incurred costs in the *2021 ICS Order,* in favor of including those costs, to the extent recoverable, in our per-minute rate caps.[428]  This will substantially simplify our cap structure.[429]  After analyzing providers' cost data, we find that the data for calendar year 2022 collected in response to the 2023 Mandatory Data Collection, together with other record evidence, provide a sufficient and reasoned basis on which to take these steps in establishing our rate caps.[430]  Taken together, reforming our ancillary services charge rules, and including costs incurred by facilities to provide IPCS and TRS-related costs into our rate caps, result in a total cost approach to setting IPCS rate caps which is more straightforward, results in rates which are easier to understand, and will empower incarcerated persons and their loved ones to make better informed choices.  We address each of these steps below.  Lastly, we disagree with commenters that suggest that we

---

'fairly compensated' for 'each and every call.'"); Leadership Conference July 12, 2023 Reply at 2; UCC and Public Knowledge May 9, 2023 Comments at 7; Public Interest Parties May 8, 2023 Comments at 16-17.

[426] *See supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder).

[427] *2023 IPCS Notice*, 38 FCC Rcd at 2687, paras. 43-44 (proposing a total cost approach separately for audio IPCS and video IPCS); s*ee 2021 ICS Order*, 36 FCC Rcd at 9542, 9544-46, paras. 54, 60-65; *see also id*. at 9709, 9712, 9720-21, Appx. E, paras. 9, 17, 34, 36 (referencing total costs).

[428] *See 2021 ICS Order*, 36 FCC Rcd at 9561-92, paras. 100-68 (addressing the application of the facility rate additive).

[429] *See infra* Sections III.D.7 (Safety and Security Costs), III.D.8 (Ancillary Service Charges); *see also 2021 ICS Order*, 36 FCC Rcd at 9536, paras. 39-40 (setting interim interstate rates which included separate rate components for provider-related and facility-related caps).  Pay Tel proposes that we account for facility costs "through an explicit additive to IPCS rate caps," as this will "incentivize facilities to compare service-based, competitive market factors when awarding contracts."  Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach., at 5-6 (filed June 7, 2024) (Wood June 7, 2024 Report).  We find that the approach we adopt here will obtain a fundamentally similar result.

[430] *See* Appendix D.  One commenter notes that we should consider "free video calls through off-the-shelf video platforms," such as Microsoft Teams, Zoom, and Ameelio, as part of the industry-wide definition of IPCS providers.  *See* Worth Rises May 17, 2024 *Ex Parte* at 3; *see also* Pay Tel June 18, 2024 *Ex Parte* at 3-6 (arguing that these platforms "may result in less access to communications services"); ViaPath June 13, 2024 *Ex Parte* at 4-5 ("encourag[ing] the Commission to reject comparisons to off-the-shelf video platforms" like Zoom when setting video IPCS rate caps).  We find that these video platform business models are substantially different from those of most IPCS providers, and we decline at this time to do so.

incorporate an inflation factor into our methodology for setting rate caps.[431]  Those commenters generally fail to acknowledge the role that productivity increases play in offsetting inflation.[432]  We find that they fail to establish that productivity increases did not offset the inflation that has incurred since 2022, much less that inflation will outpace productivity gains in the future.[433]

130.    *Incorporating Costs Associated with Ancillary Services*.  We find that the five types of ancillary services addressed by our rules are intrinsic to the provision of IPCS, and we incorporate the costs of providing these services into our per-minute rate caps for a number of reasons.[434]  For one, incorporating the costs of these services into a single rate cap—rather than allowing providers to assess a separate ancillary service charge for each ancillary service—will result in rates and charges that are easier for consumers to understand and easier for providers to administer, while still allowing providers to recover the average costs associated with these ancillary services through our per-minute rates.

131.    In addition, in the *2021 ICS Order*, the Commission found that, based on record data, there was "no reliable way to exclude ancillary service costs" from the calculations for the provider-

---

[431] NCIC May 8, 2023 Comments at 14 (proposing the Commission adopt the interim rates and "adjust them upward according to increases in the Consumer Price Index"); Securus May 8, 2023 Comments at 3-4 (finding that the "inflationary environment is nevertheless having an impact on calling volumes" and arguing "[t]he Commission should take effects of inflation into account as a factor in the methodology of developing rates"); *see also* Securus May 8, 2023 Comments at 20 (arguing that "[s]etting permanent price caps in an inflationary environment is not sustainable" and that the Commission should adopt "some mechanism to adjust for increasing costs due to inflation"); ViaPath May 8, 2023 Comments at 11 (recognizing that inflation has increased since the adoption of the interim rate caps in 2021); ViaPath May 8, 2023 Comments, Attach., Paul Godek, Supplemental Report in Support of Comments of Global Tel*Link Corp. d/b/a ViaPath Technologies Regarding the FCC's Notice of Proposed Rulemaking and Order to Implement the Martha Wright-Reed Act at 2-4 (identifying increasing inflation and arguing that the Commission should index its rate caps to account for inflation) (Secretariat Economists May 8, 2023 Report); National Sheriffs' Association July 12, 2023 Reply at 16 (joining Securus in calling for an inflation factor); Securus July 11, 2024 *Ex Parte* at 3; Secretariat Economists June 13, 2024 Report at 26-28; Pay Tel June 24, 2024 *Ex Parte* at 2-3.  Secretariat Economists' data show that, historically, growth in the Telecommunications PPI has been lower, on average, than general measures of inflation.  Over the last decade, the average annual change of the Telecommunications PPI was 0.7%, as compared to the average annual change of the broader GDP Deflator over the same time period of 2.6%.

[432] *See, e.g.*, Secretariat Economists June 13, 2024 Report at 26-28; *see also* Secretariat Economists May 8, 2023 Report at 2-3 (comparing a broader measure of inflation to a measure of inflation in the telecommunications industry).  Neither study includes data on the rates of increase in productivity in the telecommunications industry.  We also note that the data in the Secretariat Economists May 8, 2023 Report shows that inflation in the telecommunications industry has generally been lower than the broader measure of inflation.

[433] *See Business Data Services in an Internet Protocol Environment, et al.*, WC Docket No. 16-143 et al., Report and Order, 32 FCC Rcd 3459, 3559, para. 244 (2017), remanded in part sub nom., *Citizens Telecomms. Co. of Minn, LLC v. FCC*, 901 F.3d 991 (2018) (*BDS Order*) (finding, in a price cap setting, that productivity gains over a period of 12 years "were almost exactly offset by inflation").  NCIC misconstrues this Report and Order as suggesting that "it will take 12 years for the productivity costs to offset inflationary effects."  NCIC July 10, 2024 *Ex Parte*.  To the contrary, in this Report and Order, the Commission found that "the *annual* difference" between the broadcasting and telecommunications industry "price index and productivity [was] only -0.11 percent *annually*."  *BDS Order*, 32 FCC Rcd at 3559, para. 244 (emphasis added).

[434] *See 2015 ICS Order*, 30 FCC Rcd at 12839, para. 146.  In the *2015 ICS Order*, the Commission evaluated which ancillary service charges should be permitted by distinguishing between "what is an intrinsic part of providing ICS, and what is not."  *Id.* (citing comments arguing that "ancillary service charges should be allowed only for services that are offered "as a convenience, and that therefore are not reasonably required to be incurred for an inmate to place a call").  Under this framework, the Commission permitted ancillary service charges only for automated payment service, live agent service, paper bill/statements, single-call and related services, and third-party financial transactions.  *Id.* at 12839, para. 147.

related rate cap component,[435] resulting in interim rate caps that included the costs that consumers already paid for through separate ancillary services fees.[436]  To address this issue, in the *2022 ICS Notice* the Commission asked whether "some or all of [the ancillary] services" for which separate charges were permitted are "an inherent part of providing inmate calling services," such that the Commission should continue to "include these costs in [the] per-minute rate cap calculations and eliminate some or all charges for ancillary services."[437]  As the record shows, all of these fees "relate to payment and billing,"[438] and other than the paper bill fee, all of these fees address consumers' means of paying for the service they rely upon.[439]  Although these ancillary services may have qualified as a "convenience" in 2015 when the Commission first identified them in its rules, the record indicates that they are now the predominant means by which consumers gain access to IPCS.[440]  While alternative methods of funding an account remain available (e.g., by check or money order), we find that automated payment or money transmitter services are "an intrinsic part" of accessing the service, like most other services in the 21st-century economy.[441]  In short, "incarcerated people and their families must either incur [these charges] when making a call or forego contact with their loved ones."[442]

132.    Our decision to incorporate the costs of ancillary service functions in our rate caps also reflects the limitations in the cost data providers submitted for their ancillary services.  Like the Commission found in the *2021 ICS Order*, we still cannot reliably isolate the costs of providing each type of ancillary service from other IPCS costs.[443]  We therefore find that incorporating ancillary service costs

---

[435] *2021 ICS Order*, 36 FCC Rcd at 9552, para. 79.  The Commission was unable to "isolate with any degree of accuracy" the costs of providing ancillary services because "[t]he instructions for the Second Mandatory Data Collection required certain ancillary service revenues to be reported separately, but providers were not required to report their ancillary service costs separately from other inmate calling services costs.  Further, providers were not required to separately report costs relating to any specific ancillary service, and no commenter ha[d] suggested a way of identifying the providers' ancillary service costs."  *Id.*

[436] *Id.* at 9553, para. 80.

[437] *2022 ICS Notice*, 37 FCC Rcd at 11955, para. 139.

[438] Raher May 8, 2023 Comments at 13; *see also* Securus May 8, 2023 Comments at 21 ("Ancillary service fees are largely designed to recover the costs involved in funding accounts[.]"); Letter from Stephen Raher, General Counsel, Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2-3 (filed July 15, 2022) (PPI July 15, 2022 *Ex Parte*) ("[T]here are really only two categories of payment-related costs imposed directly on carriers: (1) general overhead costs of conducting business, and (2) payment-card processing fees.").

[439] Put otherwise, consumers may pay for IPCS via a payment card or a third-party money transmitter, with the assistance of a live agent, and/or may pay to complete a communication without setting up an account.

[440] PPI July 15, 2022 *Ex Parte* at 1-2 ("Most non-incarcerated ICS customers choose between two methods of paying for ICS calls:  they use a payment card (either to pay for a specific call on a one-off basis or to fund a prepaid account) or they fund a prepaid account by giving cash to a money transmitter who then remits the funds electronically to the ICS provider for credit to the customer's account."); *see also 2021 ICS Order*, 36 FCC Rcd at 9613, para. 209 n. 646 (citing comments explaining that "since 'many [IPCS] customers do not have bank accounts, they often use money transmitters . . . to remit funds to prepay'" for IPCS accounts).

[441] Indeed, one provider has pointed to the decline in one alternative payment mechanism—collect calls—in support of its proposal that the Commission eliminate the fee for paper statements.  *See* Letter from Lee G. Petro, Counsel to NCIC Inmate Communications, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2-3 (filed June 17, 2022) (NCIC June 17, 2022 *Ex Parte*).

[442] *2021 ICS Notice*, 36 FCC Rcd at 9666, para. 326 (citing the *2015 ICS Order*, 30 FCC Rcd at 12838, para. 144).  Although the paper billing fee does not necessarily address the means by which consumers access IPCS, commenters have raised other rationales for eliminating this fee, as addressed further below.

[443] *See* Appendix H; *2021 ICS Order*, 36 FCC Rcd at 9552, para. 79.  In contrast to the Second Mandatory Data Collection, the instructions for the 2023 Mandatory Data Collection required providers to report their costs of each ancillary service separately.  Nevertheless, we find that providers failed to reliably or consistently allocate their costs

(continued….)

into our rate caps is the best means of recovering the aggregated ancillary services costs reported by providers and ensuring just and reasonable IPCS rates.[444]

133.    Incorporating the costs of providing ancillary services into our rate caps will provide several benefits to IPCS consumers and respond to concerns raised in the record.  First, this rate cap structure will eliminate the incentive and ability for providers to charge multiple fees for the same transaction,[445] as a way of exacting revenue from consumers that far exceeds their actual costs of completing the transaction, a problem that is well-documented in the record.[446]  By folding the costs of all

---

among the various ancillary services, or even between ancillary services and other IPCS costs.  Incorporating all of these reported costs into the rate cap avoids the risk of setting individual fee caps for each ancillary service that misestimate providers' actual costs.  *See* Appendix H.

[444] *See, e.g.*, United Church of Christ Media Justice Comments, WC Docket No. 23-62, at 6 (rec. Dec. 15, 2022) (UCC and Public Knowledge Dec. 15, 2022 Comments) ("Since the Commission has already incorporated all the costs of ancillary services into the per minute rates of all the services offered by ICS providers, and if the problem of isolating those costs is so difficult, the Commission should consider whether it is just and reasonable to abolish ancillary services entirely.").  We find that this approach is preferable to allowing double recovery of the same costs by adopting separate rates and charges.  *See id.* at 5 ("[M]ost important is to ensure that whatever the disposition of individual services or ancillary services as a group, consumers do not continue to be double charged for the service.").  *But see* NCIC July 10, 2024 *Ex Parte* at 3 (arguing that the inclusion of ancillary services costs is a "contributing factor[] for rate caps below NCIC's cost to provide IPCS service").

[445] *See* Color of Change May 8, 2023 Comments at 6 ("A number of providers charge both an automated payment fee and a fee for the card processor costs for the same transactions.  This results in charging incarcerated individuals or their loved ones 21% more on average than the intended $3 cap."); NCIC Sept. 27, 2021 Comments at 10 ("Moreover, NCIC renews its request for the FCC to prohibit third-party transaction fees which lead to double billing of ICS customers."); Prison Policy Initiative Comments, WC Docket No, 12-375, at 11 (rec. Sept. 27, 2021) (PPI Sept. 21, 2021 Comments) ("The fundamental problem of double dipping is that carriers are recouping payment-card processing costs twice over. . . .  When carriers impose the $3 fee allowed under 47 CFR § 64.6020(b)(1) while also making customers pay the carrier's card-processing costs under § 64.6020(b)(5), this constitutes an unreasonable charge, unjust enrichment, and circumvention of the Commission's stated purpose in promulgating ICS rules."); Pay Tel Communications, Inc. Comments, WC Docket No. 12-375, at 6 (rec. Dec. 15, 2022) (Pay Tel Dec. 15, 2022 Comments); Securus Technologies, LLC Comments, WC Docket No. 12-375, at 19 (rec. Sept. 27, 2021) (Securus Sept. 27, 2021 Comments) ("Securus concurs that such double recovery, if it is occurring, would be inappropriate."); Stephen Raher Comments, WC Docket No. 12-375, at 6 (rec. Dec. 15, 2022) (Raher Dec. 15, 2022 Comments) ("The number of carriers charging multiple transaction fees on the same payment has escalated in recent years and the cumulative financial harm caused to consumers is substantial."); Letter from Cheryl A. Leanza, Policy Advisor, UCC Media Justice *et al.*, to Chairwoman Rosenworcel and Commissioners Simington, Carr, and Starks, FCC, WC Docket No. 12-375, at 3 (filed Sept. 21, 2022) (UCC Media Justice Sept. 21, 2022 *Ex Parte*) (recommending that the Commission "immediately prohibit ICS providers from imposing two duplicative fees on one transaction rather than seeking comment on this practice").

[446] The comment record reflects substantial debate (even confusion) as to whether—and if so, under what circumstances—multiple fees can be charged for a single transaction, and more generally, what activity the payment-related fees were intended to encompass.  *See, e.g.*, *2021 ICS Notice*, 36 FCC Rcd at 9667, para. 327 ("There appears to be some confusion among industry stakeholders regarding the relationship between the automated payment fee and third-party transaction fees as they relate to credit card processing fees."); California PUC Comments, WC Docket No. 12-375, at 5 (rec. Sept. 27, 2021) (California PUC Sept. 27, 2021 Comments) (asking the Commission to clarify the rules on ancillary charges to ensure they are not "assessed multiple times" in a single call); Pay Tel Dec. 15, 2022 Comments at 6 (same); Securus Dec. 15, 2022 Reply at 33 (arguing that "there is no basis to categorically preclude" assessing multiple types of fees on the same transaction); *see also 2021 ICS Notice*, 36 FCC Rcd at 9667-69, paras. 327, 329 (asking for comment on the distinctions between various ancillary fees and suggesting that "permitting providers to charge both an automated payment fee and a credit card processing fee when consumers use a credit or debit card to make an automated payment would, indeed, seem to allow for double recovery"); NCIC Sept. 27, 2021 Comments at 10 (arguing that the automated payment fee was intended to encompass all costs of processing payments, including those passed through by third-party processors); Prison Policy Initiative Reply, WC Docket No. 12-375, at 3 (rec. Dec. 17, 2021) (PPI Dec. 17, 2021 Reply) (same);

(continued....)

ancillary services into our rate caps and eliminating providers' ability to charge for them separately, we also remove the incentive for providers to "double dip" in this manner, effectively mooting related concerns under our new rules,[447] and mitigate consumer confusion arising from these practices. We similarly eliminate the ability of providers to engage in other rent-seeking activity described in the record,[448] including concerns that providers may "steer" consumers to a more expensive single-call option for an incarcerated person's initial call after incarceration in an effort to artificially inflate revenues through single-call fees.[449] These practices undermine the intent of our rules, and inflate providers'

---

Securus Technologies, LLC Reply, WC Docket No. 12-375, at 26 (rec. Mar. 5, 2023) (Securus Mar. 5, 2023 Reply) (arguing that internal and third-party payment processing costs are covered by separate ancillary fees); Global Tel*Link Corp. d/b/a ViaPath Reply, WC Docket No. 12-375, at 12 (rec. Dec. 17, 2021) (GTL Dec. 17, 2021 Reply) (same).

[447] Certain providers contend that any circumstances in which they have charged multiple fees are legitimate. *See, e.g.*, Securus Sept. 27, 2021 Comments at 19-20 (describing how Securus "may impose an automated payment fee" or "a live agent fee" to cover its internal costs in managing accounts or providing live agent service, "and may also impose a third-party credit processing fee to cover the costs imposed by" a third-party payment processor); GTL Dec. 17, 2021 Reply at 11 ("The Commission, however, should not assume that when more than one transaction fee is applied to a call that it equates to double recovery. As GTL has explained, each Ancillary Service Charge serves a distinctly different transactional purpose in the provision of ICS to consumers."). Because the rate cap structure we adopt enables providers to recover their average costs of providing ancillary services, as permitted by the Martha Wright-Reed Act, we find it unnecessary to resolve this dispute in this rulemaking. The record also shows that such practices have engendered consumer confusion. *See* Raher Dec. 15, 2022 Comments at 6 ("Continued allowance of [charging multiple transaction fees on the same payment] not only unjustly enriches carriers, but it makes rate and fee disclosure more complex for consumers."); UCC Media Justice Dec.15, 2022 Comments at 6 ("As the amount of space given to asking questions about particular services, multiple processing charges on a single call, etc. make clear, the existence of extra charges confronts incarcerated persons and their loved ones with a confusing and confused array that is rife with opportunities for multiple charges, some of which are not permitted and perhaps some of which may be inadvertent.").

[448] Commenters describe circumstances where providers charged multiple single-call fees when calls were disconnected and reconnected, where a provider "charge[d] a billing statement fee as a matter of course without offering an option of providing a free electronic copy," and several other rent-seeking practices. *See* California PUC June 6, 2023 Reply at 3-4 (observing that "IPCS providers charg[e] fees separate from the [IPCS] rates which can be as much as $3.00 for single-call fees, and when the call was disconnected, the consumer was charged $3.00 for each time they reconnected, totaling $9.00 or more."); Letter from Lee G. Petro, Pillsbury Winthrop Shaw Pittman, LLP, Counsel to NCIC Inmate Communications, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 8 (filed July 15, 2022) (NCIC July 15, 2022 *Ex Parte*); Letter from Glenn S. Richards, Pillsbury Winthrop Shaw Pittman LLP, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Dockets Nos. 23-62 and 12-375, at 4, 9-19 (filed Apr. 19, 2024) (NCIC Apr. 19, 2024 *Ex Parte*) (describing practices including overcharging via extra fees, or capping maximum deposits); *see also* State of Phone Justice Dec. 2022 Report at 5 (describing single-call practices as "particularly exploitative"); *2021 ICS Order*, 36 FCC Rcd at 9615, para. 213; *2022 ICS Order*, 37 FCC Rcd at 11937, para. 83.

[449] *See, e.g.*, Color of Change May 8, 2023 Comments at 5-6 (arguing that IPCS providers like Securus "steer" consumers to calling options that incur single call transaction fees as opposed to directing consumers to fund accounts); PPI Dec.17, 2021 Reply at 5-6 (pointing out that Securus's menu for first-time call recipients prompts the single-call service first, while setting up an account is mentioned last and, unlike the other menu options, requires hanging up and calling a different number); NCIC July 15, 2022 *Ex Parte* at 2 (describing a similar IPCS call menu); NCIC Sept. 27, 2021 Comments at 10 (addressing providers' practice of steering consumers to using single-call services (and so paying the associated fee)); Prison Policy Initiative Comments, WC Docket No. 12-375, at 11-12 (rec. Sept. 27, 2021) (PPI Sept. 27, 2021 Comments) (same); Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ OC, Inc., on behalf of Joint Advocates, to Marlene H. Dortch, Secretary, FCC, at 3 & Attach., Peter Wagner and Alexi Jones, *State of Phone Justice: Local jails, state prisons and private phone providers* (Feb. 2019), at 9 (filed July 29, 2020) (Joint Advocates July 29, 2020 *Ex Parte*) (same); *2015 ICS Order*, 30 FCC Rcd at 12896, para. 279 n. 974 (noting concerns in the record "that providers may be using consumer disclosures as an opportunity to funnel end users into more expensive service options, such as those that may require

(continued….)

revenues well beyond costs, at the expense of consumers, all while providing no additional consumer value.[450]

134.    We likewise find that incorporating ancillary service costs into our rate caps will align rates and charges more fairly with actual user activity.  Several commenters point out the seeming unreasonableness and disproportionality of charging a $3.00 fee for a call that may only last one minute,[451] or passing through similar fees for small deposits, causing consumers to "lose a significant amount" of their account deposits paying such fees.[452]  By incorporating ancillary service costs into our rate caps, we ensure that the cost of any particular communication for any IPCS consumer is more proportionate to its duration.  We also eliminate certain distortions that our current fee structure may perpetuate, such as avoiding a live agent, or transferring funds to relatives less frequently in an effort to avoid such charges.[453]  Our actions today reduce these barriers to communication.

135.    Incorporating ancillary service costs into our rate caps will also simplify the billing process, easing the administrative burden on providers and clarifying the bills and general operational process for consumers.[454]  We agree that these changes will "simplify matters for consumers."[455]  Similarly, with respect to paper billing fees, by incorporating the costs of these bills into our rate caps we align IPCS billing practices more closely with consumers' experiences for other forms of telecommunications service outside of the carceral context, where separate charges are not assessed for

---

consumers to pay fees to third parties").  *But see* Securus Mar. 5, 2023 Reply at 22-23 (arguing that it does not steer consumers to more expensive single-call products which are "only available if primary, alternative billing arrangements are not available" and that the called party can terminate the call and fund a prepaid account if desired).

[450] Indeed, by removing such incentives, we find that the rate cap structure we adopt in this Order may, for example, motivate providers to make it easier to set up an account when consumers receive an IPCS communication for the first time.  *See* NCIC Sept. 27, 2021 Comments at 10 (contending that the Commission "should prohibit transaction fees on single calls, as this only leads some providers to make this the first and easiest option to place a call"); PPI Dec. 17, 2021 Reply at 5 (same).

[451] NCIC Sept. 27, 2021 Comments at 10 (asserting that there is "no cost basis" for the single-call fee); *see also* National Association of State Utility Consumer Advocates Comments, WC Docket No. 12-375, at 2 (rec. Sept. 27, 2021) (NASUCA Sept. 27, 2021 Comments) (questioning the appropriateness of a $3.00 fee on every single call); Letter from Stephen Raher, General Counsel, PPI, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (filed June 14, 2022) (PPI June 14, 2022 *Ex Parte*) (pointing out that the $3.00 single-call fee is "far less economically efficient than funding a prepaid account").

[452] NCIC July 15, 2022 *Ex Parte* at 8; *see also* NCIC Inmate Communications Reply, WC Docket No. 12-375, at 8 (rec. Dec. 17, 2021) (NCIC Dec. 17, 2021 Reply) (raising concerns that Securus's "imposition of a flat-fee pass-through [financial service] charge disproportionally impacts smaller deposits").

[453] *See, e.g.*, NCIC Apr. 19, 2024 *Ex Parte* at 4, 9-19 (describing "common industry abuses" that serve merely to extract fees from consumers and interfere with their ability to access the service they are paying for, including "capping deposits at $50," which bars consumers from exercising the potentially more economical option of making larger, one-time deposits (and so incurring the payment processing fee less frequently)).  *But see* ViaPath June 13, 2024 *Ex Parte* at 19 (arguing "there is no need to modify the Commission's existing rules on deposit amounts").

[454] *See* PPI Sept. 27, 2021 Comments at 7 ("PPI has focused our recent ICS-related research on addressing third-party fees, but collecting definitive and comprehensive information is difficult.  Given the level of difficulty encountered by experienced researchers, it should be obvious that consumers face even steeper challenges in understanding alternative fee structures and making informed decisions."); UCC and Public Knowledge Dec. 15, 2022 Comments at 6 (arguing that incorporating ancillary service charges into the rate caps "would simplify matters for consumers" because [c]onsumer charges would include a clear per-minute rate and the consumer would not be forced to sort through a variety of additional 'ancillary' charges, or sort through 'processing charges', etc. on any call").

[455] UCC and Public Knowledge Dec. 15, 2022 Comments at 6-7.

paper bills.[456]

136.    Finally, we find that incorporating ancillary service costs into our rate caps aligns our rate and fee structure more effectively with broader patterns in the industry and the diminishing utility of certain ancillary services.[457]  The record affirms that several of these services are declining in use.  For example, several providers assert they rarely charge a paper bill fee as few consumers require paper bills, even proposing outright that this fee be eliminated.[458]  At least one provider no longer charges a live agent fee, having switched to an automated system during the pandemic.[459]  Meanwhile, providers have shifted from offering single-call services through third parties (as defined in our rules) to instead provide these services themselves.[460]  The record further suggests that the single-call service, which ostensibly offers the convenience of completing initial contact without setting up an account, may in practice—like paper billing—offer little benefit to consumers, as they still have to enter their payment card information to accept the call.[461]

---

[456] *See* California PUC Sept. 27, 2021 Comments at 5 ("If similar charges are not levied by competitive telecommunications providers, there seems little justification for ICS providers to charge such fees to those who are incarcerated.  Fees such as single call fees, carrier access fees, account set up fees, and transfer fees [for being moved between facilities] are not being charged by telecommunications corporations operating in the open market today."); *id.* at Attach. A, California PUC Aug. 19, 2021 Decision Adopting Interim Rate Relief, at 67 (noting that "telecommunications and other utilities provide customer service outside of IPCS facilities for free" and that "customers outside of IPCS facilities receive paper bills or statements, such as utility bills or bank statements, without paying additional fees").

[457] As the Commission has previously observed, several jurisdictions have already banned ancillary service charges, either piecemeal or outright.  *See 2015 ICS Order*, 30 FCC Rcd at 12845, 12847, paras. 162, 165; *2021 ICS Notice*, 36 FCC Rcd at 9669, para. 331.

[458] *See* NCIC June 17, 2022 *Ex Parte* at 2-3 (noting that only six of its customers "still require paper bills," and arguing that "it is time for the FCC to eliminate the Billing Statement Fee"); Securus Mar. 5, 2023 Reply at 19, 24 ("[Securus] no longer assesses a paper bill statement fee except in limited circumstances. . . .  The number of consumers requesting Direct Bill arrangements has dwindled over the years and continues to shrink.  The number of times Securus charged a paper bill/statement fee has correspondingly fallen off."); *see also* PPI July 15, 2022 *Ex Parte* at 6 ("The record suggests that [the paper billing fee] is unnecessary and should be eliminated.").

[459] Securus Mar. 5, 2023 Reply at 23 ("During the COVID-19 lockdowns . . . Securus changed its system so that the customer service representative transfers the consumer to an IVR to enter their payment card information. . . .  Securus no longer charges a live agent fee in connection with automated payment services.").

[460] *See, e.g.*, Securus Mar. 5, 2023 Reply at 21 ("Securus still provides a single call service . . . but not as defined by the Commission. . . .  Securus' single-call product does not utilize a third party to bill the call."); PPI June 14, 2022 *Ex Parte* at 1 (asserting that single call services "are becoming uncommon in the industry," as "billing is now typically done directly by the carrier without the involvement of a third party").  Other commenters propose eliminating the single-call fee entirely.  *See, e.g.*, NCIC Sept. 27, 2021 Comments at 10 ("There is no cost-basis to charge a $3.00 transaction fee for a single call that may last for only 1 minute.  The FCC should prohibit transaction fees on single calls, as this only leads some providers to make this the first and easiest option to place a call."); PPI Dec. 17,  2021 Reply at 6-7 (arguing that the Commission should "remove carriers' economic incentives through elimination or sharp curtailment of single-call transaction fees").  *But see* NCIC Inmate Communications Comments, WC Docket No. 12-375, at 7-8 (rec. Dec. 15, 2022) (NCIC Dec. 15, 2022 Comments) (arguing against "[f]urther changes to, or eliminating, ancillary fees now that the FCC has eliminated the single-call loophole").

[461] *See* NCIC Sept. 27, 2021 Comments at 13 ("The idea behind single-call products is to provide a convenience for family member by allowing them to accept a single call without having to go through the process of setting up an account, but yet, in most cases, they still have to enter in a major credit card or a debit card to accept these calls.").  *But see* ViaPath June 13, 2024 *Ex Parte* at 18 (arguing in opposition that "[i]n the correctional environment, a consumer may not want to take the time to set up an account knowing the account will not be used again in the foreseeable future").  The record does not establish the marginal difference between single-call payment and account creation, and we are not convinced that the margin would be great enough to significantly deter interested consumers.

137.    Some commenters object to the approach of incorporating ancillary service costs into the rate caps.[462] Those commenters argue that this methodology "does not reflect the manner in which costs are caused by users of the service," and "would impose costs for payment processing on all consumers, rather than just those consumers directly responsible for the cost."[463] We are unpersuaded. We find that most of these functions have become "an intrinsic part of providing" IPCS because they provide IPCS consumers the means to obtain IPCS, such that consumers typically "must either incur [these charges] when making a call or forego contact with their loved ones."[464] It is not necessary that these services be used by "*all* consumers"; the fact that these services operate as a threshold to most IPCS communications, coupled with the many factors identified above in support of ancillary service cost recovery through our per-minute IPCS rate caps, establishes that our regulatory approach provides for just and reasonable rates for consumers and providers, while also providing appropriate cost recovery for providers.[465] We also find unpersuasive the argument that we should abstain from "[f]urther changes to, or eliminating, ancillary fees" because this "likely will cause new efforts to subvert the FCC's ancillary fee caps."[466] The history of this proceeding demonstrates that "efforts to subvert [our] ancillary fee caps" or otherwise abuse ancillary fees is merely an endemic feature of the market.[467] The record contains no evidence that

---

[462] *See* Pay Tel Dec. 15, 2022 Comments at 5-6; Securus Mar. 5, 2023 Reply at 32-33; Global Tel*Link Corp. d/b/a ViaPath Reply, WC Docket No. 12-375, at 7-8 (rec. Mar. 5, 2023) (ViaPath Mar. 5, 2023 Reply).

[463] Pay Tel Dec. 15, 2022 Comments at 6.

[464] *2021 ICS Notice*, 36 FCC Rcd at 9666, para. 326 (citing the *2015 ICS Order*, 30 FCC Rcd at 12838, para. 144). For the same reason, we are not persuaded by Securus's implicit argument that the current ancillary fees are offered "as a convenience to incarcerated persons or their friends and family and are not intrinsic to the provision of ICS." Securus Mar. 5, 2023 Reply at 32-33. The sole fee unrelated to paying for IPCS, the paper bill fee, is sufficiently rarely used that it has a negligible impact on the per-minute rate caps. *See* Appendix F.

[465] In the *2015 ICS Order*, the Commission found that single-call services were not "reasonably and directly related to the provision of ICS" because they "inflate the effective price end users pay for ICS and result in excessive compensation to providers." *2015 ICS Order*, 30 FCC Rcd at 12857, para. 187. We find that this pattern has been ameliorated, in part, by the changes to single-call fees adopted in the *2021 ICS Order* and *2022 ICS Order*; we also recognize that providers incur some amount of legitimate costs for providing this service, which for at least some consumers may offer a crucial means of completing an IPCS communication. At the same time, we find that the continuing abuse of this fee described in the record supports elimination of the single-call fee as an independent charge—and suggests that our analysis of ancillary service costs may actually overestimate providers' actual costs.

[466] NCIC Dec. 15, 2022 Comments at 7-8. NCIC also argues that changes to, or elimination of, ancillary fees would "require ICS providers to spend thousands of hours renegotiating contracts to comply with a new fee structure." NCIC Dec. 15, 2022 Comments at 8. *But see* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2-3 (filed Apr. 15, 2024) (Public Interest Parties Apr. 15, 2024 *Ex Parte*) (suggesting the Commission adopt a 30-day transition period because "there is evidence that providers can amend their contracts very quick[l]y, or even immediately, following a new statute or regulation"). The rate caps we adopt today will require contract amendments or renegotiations regardless, and NCIC does not provide evidence or elaboration to support its conclusory assertions regarding the implications of the particular change associated with ancillary fees, so we find this argument unpersuasive.

[467] *See, e.g.*, PPI Sept. 27, 2021 Comments at 6 ("Although the Commission has subsequently restricted the type and amount of ancillary charges, carriers are no less motivated to exploit every available opportunity to continue deriving unreasonable profits from such fees."); NCIC June 17, 2022 *Ex Parte* at 2 ("The result of this imprecise language [in the Commission's rules] has led to certain ICS providers imposing additional ancillary fees on ICS consumers that most certainly contravene the FCC's efforts to reign in ancillary fees."); Raher May 8, 2023 Comments at 17 ("Despite the progress the Commission has made in lowering IPCS voice-calling rates, there are still numerous documented problems that require regulatory intervention."); *2015 ICS Order*, 30 FCC Rcd at 12842, para. 151 ("One commenter explains that ancillary fees have 'no actual relation to actual costs borne by ICS providers and have become a mechanism by which providers sustain or increase their overall revenues.' Indeed, even ICS providers have recognized the need for reform and have submitted various proposals to that end."); *2021 ICS Order*, 36 FCC Rcd at 9616, paras. 215-16 ("[T]he record in this proceeding continues to suggest that the same types of revenue-sharing agreements that lead to indirect markups of third-party transaction fees for single-call

(continued….)

eliminating separate ancillary service fees would amplify this pattern; indeed, the record suggests, and logic supports the fact, that eliminating separate fees would eliminate entirely the incentive and ability to subvert them.[468]

138.    *Incorporating Facility Costs in IPCS Rate Caps*.  We also include in our rate caps an estimate of the costs that correctional facilities incur that are used and useful in the provision of IPCS. Previously, the Commission found that correctional facilities incur certain costs that are "reasonably and directly related" to the provision of IPCS.[469]  However, despite repeated efforts to collect data from which to reliably measure such costs, we find that neither the collected data nor the record before us allow us to identify those costs with reasonable certainty.[470]  Further, requiring accurate cost accounting of facilities' costs would unreasonably burden facilities, and facilities have declined to provide such data voluntarily.[471]  Consequently, as proposed in the *2023 IPCS Notice*,[472] we make generalized findings based on the available record information before us.[473]  Our rate caps, therefore, include our best estimate of the used and useful facility costs incurred in the provision of IPCS.[474]

139.    *Incorporating TRS Costs in IPCS Rate Caps*.  We also include in our IPCS rate caps an estimate of the costs associated with providing TRS in correctional facilities as required by the *2022 ICS*

---

services similarly lead to mark-ups of third-party financial transaction fees.  Such practices serve to circumvent, either directly or indirectly, the limits placed by the Commission on ancillary service charges and lead to unjust and unreasonable charges."); *2022 ICS Order*, 37 FCC Rcd at 11939, para. 87 ("Commenters now highlight that the $6.95 cap we adopted in the *2021 ICS Order* . . . may have actually incentivized providers to increase charges for consumers.").

[468] For example, the *2015 ICS Order* banned several types of ancillary service charges, e.g., "account set-up, maintenance, closure, and refund fees." *2015 ICS Order*, 30 FCC Rcd at 12839, para. 146.  The record is bereft of any evidence that the elimination of these fees has encouraged providers to attempt to subvert the Commission's rules.

[469] *See 2021 ICS Order*, 36 FCC Rcd at 9579-80, para. 135 (adopting the $0.02 per-minute rate component for facility incurred costs to provide calling services on two separate bases); *see also 2016 Order on Reconsideration*, 31 FCC Rcd at 9308, para. 15; *2023 IPCS Notice*, 38 FCC Rcd at 2672, para. 4 n. 20.

[470] *See* Appendix I.  At best, the record discussion concerning IPCS costs which facilities may bear falls short of the sort of quantitative evidence which would ordinarily support the Commission's ratemaking efforts.  *See* Pay Tel May 8, 2023 Comments at 17-18 (arguing that "by permitting express recovery for the costs of ensuring the safety and security of ICS, the Commission provides facilities with service-based, competitive market factors to compare when awarding contracts"); *see also* Pay Tel Dec. 17, 2021 Reply at 11-13 (arguing that the labor of officers are "animating drivers of site commissions" and identifying several tasks purported to be related which bear questionable connection to IPCS).  *But see* UCC and Public Knowledge May 9, 2023 Comments at 11 (arguing that the "Commission must reject its incorrect and isolated conclusion" in the *2016 ICS Order on Reconsideration*, and further arguing that the costs facilities incur are a result of carceral operations, distinct from IPCS).

[471] UCC and Public Knowledge May 9, 2023 Comments at 12-13 (arguing that the Commission's proposal to allow cost recovery for facility incurred costs to provide IPCS would require additional cost reporting and allocations that would be "highly burdensome").

[472] *2023 IPCS Notice*, 38 FCC Rcd at 2680, para. 22 (proposing to make generalized findings).

[473] *See Am. Pub. Gas Ass'n v. Federal Power Comm'n*, 567 F.2d 1016, 1046 (D.C. Cir. 1977) (*American Public Gas v. FPC*) (concluding the Federal Power Commission's reliance on "the best available data," with "whatever adjustments appeared necessary and feasible" in a ratemaking proceeding was not unreasonable); *see also* Appendix D.

[474] *See* Appendices D, H, and I (explaining facility costs).  Further, as explained below, we also permit IPCS providers to reimburse facilities for any specified used and useful costs that facilities actually incur in the provision of IPCS that would otherwise be incurred by the IPCS provider.

*Order* to the extent that they are not recoverable through TRS support mechanisms.[475]  Industry and stakeholders overwhelmingly support the provision of communications services to incarcerated people with hearing or speech disabilities, but the record indicates that, in the carceral environment, enabling these services imposes certain costs upon IPCS providers.[476]  We find, as the record demonstrates, that these costs to provide TRS are particularly challenging to recover at the smallest facilities.[477]  In light of that record and informed by responses to the 2023 Mandatory Data Collection, we now include cost recovery for the additional infrastructure and hardware costs to deliver TRS in the carceral environment in our rate caps, estimated based on the best available data.[478]

### b.    Additional Components of Rate Cap Structure

140.    *Single Rate Cap for Audio IPCS.*  Consistent with the proposal in the *2023 IPCS Notice* and the record, we find that the costs to provide interstate and intrastate audio IPCS are not materially different from each other and therefore adopt a single rate cap that applies to both interstate and intrastate audio IPCS communications at each tier.[479]  The Martha Wright-Reed Act's directive to set rates and charges that are "just and reasonable" for interstate and intrastate IPCS establishes the framework for our analysis.  Examining the record through this lens, we find support for treating the costs of providing interstate and intrastate audio IPCS as functionally identical.[480]  The record indicates that providers do not distinguish between the costs of providing interstate and intrastate audio IPCS communications, and we

---

[475] *See 2022 ICS Order*, 37 FCC Rcd at 11907-08, para. 19 (requiring providers to provide "TRS-eligible users the ability to access any relay service eligible for TRS Fund Support").

[476] Public Interest Parties May 8, 2023 Comments at 32 (urging "the Commission to take further action here to expand accessible services to people experiencing incarceration to the greatest extent possible"); Hamilton Relay, Inc. Reply, WC Docket No. 12-375, at 3 (rec. Mar. 3, 2023) (Hamilton Relay Mar. 3, 2023 Reply) (recognizing that as "Hamilton Relay is not a specialized ICS provider that is in a position to deploy and maintain corrections-grade hardware and networks"); NCIC Dec. 15, 2022 Comments at 3 (stating that it "believes all incarcerated persons should, if they require it, have access to accessible communications" and noting the costs to deploy "corrections-grade" hardware are substantial especially at smaller facilities and arguing that providers of VRS, Video Relay Interpretation, and IP CTS are in a better position to face those costs); Pay Tel Dec. 15, 2022 Comments at 10 (arguing that "the disparate costs of deploying equipment and hiring and training personnel to deploy and operate devices in smaller facilities . . . cannot be ignored" and "must be recovered"); Securus Dec. 15, 2022 Comments at 5-6 (asserting "[t]here is no apparent principled reason for precluding access to advanced forms of TRS in these smaller jurisdictions," but arguing that "[t]he Commission should also ensure that providers are able to recover the additional costs of deploying necessary equipment and facilities for those additional services, such as kiosks, installation and wiring, which can easily amount to thousands of dollars").  *But see* ViaPath Dec. 15, 2022 Comments at 8-9 (arguing that deploying TRS as required by the *2022 ICS Order* "may impose significant costs . . . while providing little benefit to the 'relatively small' number of incarcerated persons" at the smallest facilities).  We find that our inclusion of a TRS cost estimate into our zones of reasonableness accounts for providers' concerns about the imposition of costs at smaller facilities; and further, we disagree that ensuring the availability of functionally equivalent communication services provides "little" benefit to those who rely on such services to communicate with their friends, families, and loved ones.

[477] *See* Securus Dec. 15, 2022 Comments at 6 (noting the costs to deploy TRS as required at very small facilities are "not insubstantial" and "may not be recoverable in light of the revenue opportunity at the facility"); Pay Tel Dec. 15, 2022 Comments at 10 (highlighting the costs "in smaller facilities as opposed to larger jails" are "disparate"); NCIC Dec. 15, 2022 Comments at 3-4 (stating the costs to deploy at small to medium sized facilities is in the thousands and arguing that cost recovery issues for deploying TRS at smaller facilities are compounded because providers "do not receive consistent monthly revenue from facilities with ADPs of fewer than 50 persons").

[478] *See* Appendices H, I.

[479] *2023 IPCS Notice*, 38 FCC Rcd at 2687, para. 43.

[480] *See, e.g.*, California PUC May 8, 2023 Comments at 7 ("The mobile wireless industry does not differentiate between intrastate and interstate calls."); NCIC May 8, 2023 Comments at 11 ("[T]here is no practical difference between terminating an interstate voice call and an intrastate voice call.").

find no reason to do otherwise.[481]  We thus set a single rate cap for these communications, and find that this simplified approach will benefit consumers and providers alike.[482]

141.    Our action today is consistent with the Commission's previous findings that provider cost data failed to identify meaningful differences between interstate and intrastate audio IPCS costs.[483]  In the Third Mandatory Data Collection, the Bureau offered providers the option to allocate their expenses so as to reflect any cost differences between providing interstate and intrastate ICS,[484] and no providers exercised this option.  This fact suggests either that no providers had differences to report, or that any such differences were *de minimis*.[485]

142.    More recently, the *2023 IPCS Notice* sought comment on whether to "treat costs for interstate voice services and intrastate voice services as having identical per-unit costs."[486]  All

---

[481] *See, e.g.*, California PUC May 8, 2023 Comments at 7; NCIC May 8, 2023 Comments at 11; Pay Tel May 8, 2023 Comments at 5 ("Providers have not endeavored to separate costs as between intrastate and interstate jurisdictions in their prior mandatory data collection cost filings[.]"); Securus May 8, 2023 Comments at 18 ("[T]here are no material differences in providing interstate and intrastate voice-only services[.]"); Raher May 8, 2023 Comments at 12 ("The record contains absolutely no evidence suggesting that operational costs differ between inter- and intrastate IPCS[.]").

[482] The record supports our conclusion that the adoption of identical rate caps for interstate and intrastate audio IPCS communications will benefit the public interest.  For example, one commenter suggests that adopting a single rate cap for interstate and intrastate audio IPCS communications will benefit providers by "ensur[ing] a consistent regulatory approach," and benefit consumers "by simplifying and unifying rate structures in a manner more consistent with today's consumer expectations and experiences with other telecommunications services."  Pay Tel May 8, 2023 Comments at 5; ViaPath Mar. 5, 2023 Reply at 3 ("The Commission's actions since 2012 have had an influence on state ICS rates, but greater intrastate uniformity and regulatory certainty is needed, which will benefit all ICS stakeholders – end users, correctional facilities, providers, and the public interest.").  Indeed, at least one provider has already independently set a unitary rate for interstate and intrastate IPCS communications, reflecting that providers are likely to benefit from the implementation of a single rate cap.  Securus May 8, 2023 Comments at 41.  We agree that a simple unified rate cap will benefit both providers and consumers, and this finding further supports our action today.

[483] For example, in the *2020 ICS NPRM*, the Commission observed that "the available data do not suggest that there are any differences between the costs of providing interstate and intrastate inmate calling services" and so proposed to rely on total industry costs in setting rates.  *2020 ICS Notice*, 35 FCC Rcd at 8513-15, paras. 83-89.  The Commission then adopted this same approach in the *2021 ICS Order*.  *2021 ICS Order*, 36 FCC Rcd at 9542, 9544-46, paras. 54, 60-65; *see also id.* at 9709, 9712, 9720-21, Appx. E, paras. 9, 17, 34, 36 (referencing total costs).

[484] Calling Services for Incarcerated People Third Mandatory Data Collection Instructions, WC Docket Nos. 23-62 and 12-375, at § IV.C.2.f, http://www.fcc.gov/sites/default/files/2022_mdc_-_instructions_to_third_mandatory_data_collection_1.18.2022.docx.

[485] Commenters have subsequently recognized the same, and emphasized that providers declined to distinguish between costs for interstate and intrastate audio IPCS in responding to prior mandatory data collections.  *See* Pay Tel May 8, 2023 Comments at 5 ("Providers have not endeavored to separate costs as between intrastate and interstate jurisdictions in their prior mandatory data collection cost filings, so any rate caps set on the basis of unseparated costs assume that providers will be able to recover costs through both intrastate and interstate rates.  Adopting a unified approach to ratemaking will ensure a consistent regulatory approach to cost recovery based on the most accurate cost information"); Raher May 8, 2023 Comments at 5 ("The record contains absolutely no evidence suggesting that operational costs differ between inter- and intrastate IPCS, and therefore the Commission should impose uniform rate caps on services regardless of their jurisdictional nature[.]"); ViaPath May 8, 2023 Comments at 14 ("Such a differentiation [between interstate and intrastate costs] is not necessary. . . . [P]roviders [did not] separate their interstate and intrastate voice costs in responding to the Third Mandatory Data Collection.").

[486] *2023 IPCS Notice*, 38 FCC Rcd at 2687, para. 43.

commenters to address the subject support this approach.[487]  Several commenters state that there is no material cost difference between providing interstate and intrastate audio IPCS.[488]  Subsequently, in the 2023 Mandatory Data Collection, the Bureau again offered providers the option to allocate their costs between intrastate and interstate audio IPCS.[489]  Once more, providers declined to exercise this option.  In short, nothing in the record suggests any material differences between interstate and intrastate audio IPCS costs, and we therefore adopt a single unified rate cap for each facility tier.[490]

143.     *Single Rate Cap for Video IPCS*.  We also find that interstate and intrastate video IPCS communications have costs that are not materially different, and adopt a single rate cap for interstate and intrastate video IPCS communications at each tier.[491]  As with audio IPCS, the adoption of a unified rate cap for interstate and intrastate video IPCS communications is uniformly supported by the record and fully consistent with the treatment of interstate and intrastate video services by providers.[492]

144.     In the *2023 IPCS Notice*, the Commission sought comment on whether to assume that the average costs for intrastate and interstate video communications services are identical.[493]  All commenters to address the subject support taking this approach.[494]  Several commenters observe that there are no material cost differences between interstate and intrastate video IPCS,[495] while others note that providers do not separate costs between interstate and intrastate video IPCS internally and will likely face challenges in separating such costs.[496]

---

[487] *See* California PUC May 8, 2023 Comments at 7; NCIC May 8, 2023 Comments at 11; Pay Tel May 8, 2023 Comments at 5, 18-19; Securus May 8, 2023 Comments at 18, 41-42; Raher May 8, 2023 Comments at 12; ViaPath May 8, 2023 Comments at 14; Securus July 12, 2023 Reply at 18; Raher July 12, 2023 Reply at 4.

[488] California PUC May 8, 2023 Comments at 7; NCIC May 8, 2023 Comments at 11; Securus May 8, 2023 Comments at 18; Raher May 8, 2023 Comments at 12.

[489] 2023 Mandatory Data Collection Instructions at Appx. A, Word Template.

[490] Independently, our adoption of identical rates based on an analysis of the collective (i.e., aggregate of both interstate and intrastate) average costs of providing IPCS is further underpinned by the Martha Wright-Reed Act's authorization to "use industry-wide average costs" in setting rates.  *See* Martha Wright-Reed Act § 3(b).

[491] *See 2023 IPCS Notice*, 38 FCC Rcd at 2687, para. 44.

[492] *See, e.g.*, NCIC May 8, 2023 Comments at 11 ("[T]he same rates and charges should apply to voice calls irrespective of the jurisdiction of the call.  Relatedly, the Commission should follow the same ratemaking approach for video calls.  There is no jurisdictional cost difference for video services[.]"); Securus May 8, 2023 Comments at 18 ("[T]he costs of providing video communications services does not vary between interstate and intrastate services to a degree that warrants setting different intrastate and interstate video communications rate caps.  Any rate caps the Commission adopts should apply equally to interstate and intrastate services thus creating a unitary rate."); ViaPath May 8, 2023 Comments at 15 ("It is unlikely providers will be able to readily separate their video communications costs into 'intrastate' and 'interstate' components because video-based services generally are not segregated or priced based on the interstate/intrastate dichotomy.").

[493] *2023 IPCS Notice*, 38 FCC Rcd at 2687, para. 44.  The Commission also sought comment on whether the jurisdictional nature of video communications services could even be determined.  *Id.*

[494] *See* NCIC May 8, 2023 Comments at 11; Securus May 8, 2023 Comments at 18; Raher May 8, 2023 Comments at 12 ("The record contains absolutely no evidence suggesting that operational costs differ between inter- and intrastate IPCS, and therefore the Commission should impose uniform rate caps on services regardless of their jurisdictional nature (to the extent that such jurisdictional classification is even possible)."); ViaPath May 8, 2023 Comments at 15; Securus July 12, 2023 Reply at 18; Raher July 12, 2023 Reply at 4.

[495] NCIC May 8, 2023 Comments at 11; Securus May 8, 2023 Comments at 18; Raher May 8, 2023 Comments at 12.

[496] ViaPath May 8, 2023 Comments at 15; Securus Technologies, LLC Initial Comments to 2023 Proposed Mandatory Data Collection, WC Dockets Nos. 23-62 and 12-375, at 2 (rec. June 2, 2023)  ("The Commission should refrain from requiring providers to go back and isolate video calling data from 2020 and 2021.  The burden of this

(continued….)

145.    In the 2023 Mandatory Data Collection, the Bureau offered providers the option to allocate their video IPCS expenses to reflect any cost differences between providing interstate and intrastate video IPCS.  No providers exercised this option, supporting our view that such costs are materially indistinguishable between the two jurisdictions.  In the absence of any demonstrated material differences between interstate and intrastate video IPCS costs or record data supporting such a distinction, we adopt a single unified rate cap for video IPCS communications for each tier as well.  Similar to audio IPCS, setting a single rate cap for video IPCS will benefit both providers and consumers by establishing an efficient and simplified mechanism for video IPCS rate regulation.[497]

### c.    Rate Cap Tiers

146.    In light of the directives established by the Martha Wright-Reed Act and record support, we adopt a rate cap structure that first distinguishes between two types of facilities (jails and prisons) and then four tiers of jails based on size.  We agree with commenters[498] that continuing to "distinguish[ ] between the type of facility (jails vs. prisons), as well as, for jails, between different size facilities" is a reasonable approach.[499]  The record and the data also support rate cap distinctions based on the "differences in the costs" of providing IPCS that relate to facility size and "other characteristics."[500]  We adopt the following rate cap tiers to reflect the cost characteristics attributable to differences in facility type and size:

(1)  Jails with an average daily population of 0 to 99;

(2)  Jails with an average daily population between and including 100 to 349;

(3)  Jails with an average daily population between and including 350 to 999;

(4)  Jails with an average daily population of 1,000 or more; and

(5)  A separate tier for all prisons regardless of average daily population.

We also revise the definition for average daily population in our rules by establishing a date certain each

---

approach outweighs any material benefit.  Moreover . . . intrastate and interstate costs are not materially different, and no provider had sought to isolate intrastate costs[.]").

[497] *See* Pay Tel May 8, 2023 Comments at 5; ViaPath Mar. 5, 2023 Reply at 3 (arguing that greater uniformity and more certainty will benefit all ICS stakeholders).

[498] *See, e.g.*, Pay Tel May 8, 2023 Comments at 3-4 ("[T]he Commission currently regulates ICS rates disaggregated by facility type and size and the Act confirms this approach by mandating consideration of differences in costs incurred by 'small, medium, or large facilities' or other similar characteristics."); National Sheriffs' Association May 8, 2023 Comments at 7 ("The record clearly demonstrates it is more costly to serve jails.  And, as NSA's cost survey demonstrates, even among jails costs vary significantly once a jail has an average daily population (ADP) of 1000 or more, or with an ADP of less than 350."); Securus May 8, 2023 Comments at 19 ("Securus continues to believe it is appropriate to set different caps for prisons and jails and that Average Daily Population at the facility level is a useful proxy for differentiating among jails."); *see also* Appendix D.

[499] *2015 ICS Order*, 30 FCC Rcd at 12776, para. 24.  While one commenter supports differentiation between prisons and jails, it also suggests that myriad factors may be "glossed over" by our reliance upon industry averages.  *See* National Sheriffs' Association June 20, 2024 *Ex Parte* at 5.  As set out in the Appendix and explained below, we believe this tiering structure best captures the costs across the various types and sizes of facilities, and the record does not establish that such other factors are more cost-causative.  *See* Appendix G (Lasso Analysis).

[500] *See* Pay Tel July 12, 2023 Reply at 4 (noting "extensive documentation of these cost differences, and the reasons for the IPCS provider cost differences between jails and prisons, as well as between small, medium, and large jails"); National Sheriffs' Association May 8, 2023 Comments at 7; Securus Mar. 5, 2023 Reply at 13-14 ("The analysis of the cost data prepared by FTI attached to Securus' comments also showed a sharp delineation of costs for the smallest facilities, those with an ADP of less than 100 compared with larger facilities."); Appendix G (examining the differences in costs attributable to a wide range of variables and concluding that facility type is predictive).

year by which the jail population during the preceding calendar year must be determined.  Specifically, we set April 30 as the date on which the annual recalculation of average daily population becomes effective, in order to promote greater uniformity in its application.[501]  We find that the combination of size and type rate tiers that we adopt reflect the most critical factors driving providers' costs, and will result in both just and reasonable rates for consumers and providers and fair compensation for providers.

147.     *Facility Size.*  The Martha Wright-Reed Act directs the Commission to "consider . . . differences in the costs" incurred to provide IPCS "by small, medium, or large facilities" in setting rates for IPCS.[502]  In the *2023 IPCS Notice*, the Commission sought comment on how to interpret the requirement imposed by the Martha Wright-Reed Act to "consider . . . differences in the costs . . . by small, medium, or large facilities or other characteristics" in determining rates.[503]  The Commission asked for comment on what size categories to adopt and where to set the size thresholds for each category.[504]  The Commission proposed that the rate structure adopted in the *2021 ICS Order*, which "establish[ed] separate caps for prisons and jails, as well as separate rate tiers for different-sized jails," seemed consistent with this provision of the Act.[505]  However, the Commission sought comment on whether the Act required any change to the approach of analyzing providers' costs "based on the type and size of correctional institution being served," such as by implementing more or fewer rate tiers based on facility type or size.[506]

148.     The record nearly uniformly supports maintaining a rate cap structure that distinguishes among jails based on facility size.[507]  All commenters addressing the issue agree that the Act permits us to

---

[501] *See* Securus June 11, 2024 *Ex Parte*, Attach. at 1; Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ, OC Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 (filed May 14, 2021) (UCC May 14, 2021 *Ex Parte*) ("Further, we requested the FCC provide more clarity as to the point in time when a jail is over the 1,000 ADP threshold. . . .  The FCC should pick a clear date and a clear standard by which the ADP is measured so that consumers and advocates will know whether a particular jail must comply with the new lower rate caps."); *2021 ICS Notice*, 36 FCC Rcd at 9659, para. 310 (seeking comment on "whether the current definition of the average daily population sufficiently addresses fluctuations in jail populations and variations in how correctional facilities determine average daily populations"); *see also infra* paras. 156-157.

[502] Martha Wright-Reed Act § 3(b)(2).  We note that, by requiring only that we "consider" cost differences "by small, medium, or large facilities or other characteristics," the statute does not require the Commission to set rate tiers based on facility size or other applicable factors where, after appropriate consideration, we determine that there are not meaningful cost differences attributable to these factors.  *See* Martha Wright-Reed Act § 3(b)(2); *cf.* Securus May 8, 2023 Comments at 19 ("To the extent cost data reflects differing per unit costs at different types or sizes of facilities, faithful adherence to the MWR Act requires adoption of rate tiers."); ViaPath May 8, 2023 Comments at 9 ("If the record continues to support that costs vary based on size of the facility, ADP tracked by correctional authorities is a practical approach for differentiating between facilities.").  For example, as discussed below, we do not find support in the record or the data for establishing different size tiers for prisons, and so decline to adopt such tiers.

[503] *2023 IPCS Notice,* 38 FCC Rcd at 2694, para. 62.

[504] *Id.*

[505] *Id.* at 2694, para. 63.

[506] *Id.*  The Commission also sought comment on what "other characteristics" to consider in setting rate caps, such as facility type (e.g., prison, jail, or other kind of institution), the geographic location of the facility served, or the technology used to provide IPCS, in addition to how any relevant "other characteristics" impact costs, and how much weight to give to these other characteristics, including in relation to facility size.  *Id.* at 2694, para. 65.

[507] *See, e.g.*, Pay Tel May 8, 2023 Comments at 3-4; National Sheriffs' Association May 8, 2023 Comments at 7; Securus May 8, 2023 Comments at 12 ("To avoid the possibility that high volume carceral settings might be overcompensated, notwithstanding the existence of a competitive bidding process, the Commission should adopt a tiering mechanism as it has in previous orders.")  For administrative simplicity, we decline to apply size tiering to prisons for several reasons.  First, as the Commission has previously observed, "prisons are almost uniformly large," allowing them to enjoy greater economies of scale than jails.  *2015 ICS Order*, 30 FCC Rcd at 12780, para. 34

(continued….)

maintain this general tiering structure.[508]  Several commenters contend that the available data do, in fact, indicate significant variations in costs due to facility size,[509] and that we should therefore set rate tiers accounting for these variations.[510]  Indeed, the record in this proceeding "contains extensive documentation of [the] cost differences, and the reasons for those differences,"[511] in providing audio and video IPCS among different sizes of jails.[512]  As set forth in Appendices D and G, our data analysis

---

n.107.  Second, the data filed in response to the 2023 Mandatory Data Collection do not indicate significant differences in the costs of serving different prison facilities.  *See* Appendix D.  Finally, only one commenter raised the prospect of tiered rates for prisons.  *See* National Sheriffs' Association July 12, 2023 Reply at 15 ("NSA supports Securus' recommendation . . . that rates should further be tiered based on the size of the prison or jail.").  *But see* Securus May 8, 2023 Comments at 18-19 ("Securus continues to believe it is appropriate to set different caps for prisons and jails and that Average Daily Population at the facility level is a useful proxy for differentiating among jails.").

[508] *See, e.g.*, Pay Tel May 8, 2023 Comments at 3-4; Securus May 8, 2023 Comments at 19; ViaPath May 8, 2023 Comments at 9 ("The MWR Act allows the Commission to continue on the same regulatory path taken in 2021.").

[509] *See* National Sheriffs' Association May 8, 2023 Comments at 7; Pay Tel May 8, 2023 Comments at 10-11 ("The record in the ICS reform proceeding contains extensive documentation of these cost differences, and the reasons for those differences, between jails and prisons and between small, medium, and large jails."); Securus July 12, 2023 Reply at 15 ("[L]arge facilities show lower costs per minute; exactly what you would expect in an industry that offers some economies of scale.  FTI's previous detailed analysis of the 3rd MDC cost data showed strong correlations between cost drivers such as facility type and size. . . .  These strong relationships between overall costs with ADP, provider, facility size, and facility type also translate to [cost per minute] as well, with these factors being significantly predictive of CPM.").  *But see* PPI 2022 Comments at 18 (arguing, based on its 2019 study of rates in Michigan facilities, that "facility size does not actually correlate with rates"—or, implicitly, with costs); Center for Advanced Communications Policy Comments, WC Docket No. 12-375, at 8-9 (rec. Oct. 27, 2021) (Center for Advanced Communications Policy Oct. 27, 2021 Comments) (same); Leadership Conference 2021 Reply at 4 (same).

[510] National Sheriffs' Association July 12, 2023 Reply at 15 ("NSA supports Securus' recommendation that the Commission set different caps for prisons and jails, and that rates should further be tiered based on the size of the prison or jail."); Pay Tel May 8, 2023 Comments at 12 ("[T]o ensure access in smaller facilities, smaller facilities must be treated differently from larger facilities."); Securus May 8, 2023 Comments at 19 ("These cost differences . . . are best addressed through appropriate tiering of rates to reflect differences in average costs of providing services to different types or sizes of facilities.  Securus continues to believe . . . that Average Daily Population at the facility level is a useful proxy for differentiating among jails.").

[511] Pay Tel May 8, 2023 Comments at 10-11; *see also* National Sheriffs' Association May 8, 2023 Comments at 7; Securus July 12, 2023 Reply at 15; *see, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12777-83, paras. 26-37; *2021 ICS Order*, 36 FCC Rcd at 9538-40, paras. 46-48.

[512] Several factors contribute to these cost disparities, particularly the economies of scale associated with serving larger facilities and the fact that smaller facilities are often located in more rural areas.  *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12780-81, para. 34 (finding that economies of scale "support the tiering approach" and citing comments arguing that prisons and other larger facilities "benefit from . . . economies of scale" by spreading fixed costs among larger populations); NCIC May 8, 2023 Comments at 9-10 (stating that it needs to charge more for video visitation "at rural facilities with smaller populations where the costs of delivering services are higher"); Pay Tel July 12, 2023 Reply at 4 ("Primary drivers of the cost differences include . . . the rural nature of many smaller facilities[.]"); Securus May 8, 2023 Comments at 19 ("A provider that exclusively or primarily serves smaller jails particularly in more rural areas is likely to have higher average per unit costs . . . ."); Pay Tel Communications, Inc. Reply, WC Docket No. 12-375, Attach., at 12-13 (rec. Mar. 3, 2023) (Pay Tel Mar. 3, 2023 Wood Report) ("Over the long course of this investigation, available information has consistently demonstrated that smaller facilities are more costly, on a per unit basis, to serve than larger facilities. . . .  Multiple factors contribute to this differential. Most equipment used to provide ICS is scalable downward only to a point; it is simply more efficient to deploy equipment at a larger location than a smaller location. . . .  [Additionally,] the resources devoted [for on-site services] are often similar or the same for both smaller and larger facilities, even though the smaller facility will generate fewer revenue-producing [minutes of use] (and the geographically remote nature of many small jails may cause required

(continued....)

indicates that there remain statistically significant differences in the costs of providing audio and video IPCS among jails of different sizes.[513]  The record supports adopting four size tiers of jails, expanding the categories contemplated by the Martha Wright-Reed Act.[514]  Specifically, we find evidence that providers incur progressively greater costs in serving jails at the lower tiers of ADP than at the highest tier that we adopt.[515]  Consequently, we adopt average daily population cutoffs of 100, 350, and 1,000 incarcerated persons in order to distinguish among different sizes of jails.[516]

149.    While the Martha Wright-Reed Act specifies that we consider cost differences among three sizes of facilities ("small, medium, and large"),[517] we do not interpret that specification as a directive that limits our actions to only three size tiers that correspond to the terms referenced in the statute.  Instead, we interpret Congress' intent as mandating that the Commission analyze the relevant data to assess the cost characteristics of different-sized facilities, including those referenced in the statute, and then to reflect that analysis in the rate cap structure the Commission ultimately adopts.[518]

150.    We find that the record supports adopting a more granular tiering structure than that referenced in the Act or established by our current rules to better capture cost differences among "small, medium, and large facilities," in addition to creating a separate tier for very small jails.  The record supports adopting this tiering arrangement to better reflect the "differences in the costs" of serving various sizes of jails, particularly where the record distinguishes jails of the smallest sizes as subject to

---

person-hours to be higher for these tasks)."); NCIC Inmate Communications Comments, WC Docket No. 12-375, at 5-6 (rec. Nov. 4, 2021) (NCIC Nov. 4, 2021 Comments).

[513] *See* Appendices D, G.  The data submitted in response to the Third Mandatory Data Collection further support this conclusion.  *See, e.g.*, Securus July 12, 2023 Reply at 15 (noting that its consultant identified "strong linear associations between ADP and total cost" for data reported in response to the Commission's third data collection in these proceedings); Pay Tel July 12, 2023 Reply at 4.

[514] *See* Martha Wright-Reed Act § 3(b)(2); *see, e.g.*, National Sheriffs' Association May 8, 2023 Comments at 7; Pay Tel May 8, 2023 Comments at 10-11.  Although we find that the present record and data support establishing rate caps that vary with size tiers for jails, we reiterate that the statute does not require us to set rate tiers as described.  After appropriate consideration, however, we determine that the record and data do support a tiering structure for prisons.

[515] We found in the *2021 ICS Order* that the available data suggested that "providers incur higher costs per minute for jails with [ADPs] below 1,000 than for larger jails."  *2021 ICS Order*, 36 FCC Rcd at 9538-39, paras. 46-47.  The data submitted for the 2023 Mandatory Data Collection continues to reflect this pattern.  However, at that time we deferred on further rate cap setting with respect to jails with ADPs below 1,000 "because the available data [did] not allow us to quantify the extent to which providers' costs of serving [such] jails . . . exceed the industry average."  *2021 ICS Order*, 36 FCC Rcd at 9539-40, para. 48.  With the data submitted for the 2023 Mandatory Data Collection, we are now able to determine with greater accuracy the cost differential of providing service to jails with ADPs below 1,000.

[516] Although certain commenters suggest other size thresholds, we find that the size tiers we adopt here best fit the data submitted for the 2023 Mandatory Data Collection.  *See* Appendix E; Wood Aug. 23, 2023 Report at 11-12 (identifying thresholds at ADPs of 500 and 1,000); National Sheriffs' Association May 8, 2023 Comments at 13 (identifying thresholds at ADPs of 350 and 2,500).  *But see* FTI and Wood June 10, 2024 Report at 1 (recommending setting rate caps at the same tiers we adopt today).

[517] *See* Martha Wright-Reed Act § 3(b)(2) (directing the Commission to "consider costs associated with . . . differences in the costs" incurred to provide IPCS "by small, medium, or large facilities").

[518] Pursuant to their delegated authority, WCB and OEA structured the 2023 Mandatory Data Collection to ensure it included the requisite facility-level data needed to support this analysis.  After "consider[ing] . . . differences in the costs" incurred to provide IPCS "by small, medium, or large facilities" as directed by the Act, we find that the data do reflect size differences among jails—and that the data further support distinguishing a further, fourth size tier of jails to best ensure just and reasonable rates for consumers and providers and fair compensation for providers.  *See, e.g.*, Appendix D.

special per-unit cost differences.[519]  Our adoption of an additional tier for very small jails is consistent with the statutory directive to consider cost differences for "small, medium, and large" facilities as well as an "other characteristic" for which to account.[520]  We also seek comment in the Further Notice on whether obtaining more granular data from providers serving very small jails would allow us to further disaggregate this size tier to better reflect the variability of provider costs and other characteristics in our rate tiers.[521]

151.    *Other Characteristics*.  In addition to the three specified sizes of facilities, the Martha Wright-Reed Act also directs the Commission to "consider . . . differences in the costs" incurred to provide IPCS due to "other characteristics."[522]  The Commission sought comment on whether it should continue to use the type of facility as another characteristic in determining its IPCS rate cap structure.[523]  Several commenters propose that we maintain a rate cap structure that incorporates facility type as one of these "other characteristics," by distinguishing between prisons and jails.[524]  One commenter also proposes that we consider several other factors that impact providers' costs, including the variations in facilities' costs associated with providing IPCS, the different IPCS systems employed by different facilities, and the fact that facilities in rural areas may be more costly to serve.[525]

152.    All commenters that address the "other characteristics" language agree that the Act permits the Commission to maintain a distinction between prisons and jails.[526]  Several commenters contend that the available data indicate significant variations in costs due to facility type,[527] and that the

[519] *See, e.g.*, National Sheriffs' Association May 8, 2023 Comments at 7; Pay Tel May 8, 2023 Comments at 10-11; *compare* Securus Mar. 5, 2023 Reply at 13-14 ("The record indicates that this current level of differentiation [in the Commission's rate caps] inadequately accounts for cost differences between very small facilities, medium-sized facilities, and larger facilities as measured by average daily population."); *see also* Appendix D.  While one commenter alleges, "use of average data is simply not granular enough to produce just and reasonable rates," it fails to address the increase in granularity afforded by our tiered approach.  *See* National Sheriffs' Association June 20, 2024 *Ex Parte* at 5.

[520] This rate cap structure finds further support in the rate cap tiers previously adopted by the Commission, which also distinguished among facilities based on facility type and size based on average daily population.  In the *2015 ICS Order*, the Commission found that there was "substantial record support" from commenters for "rate tiering based on differences between jails and prisons as well as population size" given the differences in provider costs arising from these factors, a conclusion supported by the Commission's analysis of the First Mandatory Data Collection.  *2015 ICS Order*, 30 FCC Rcd at 12776-80, paras. 24-29, 33.  The Commission therefore adopted rate cap tiers based on facility type and size, to "account[] for the differences in costs to ICS providers" and to avoid "over-compensating ICS providers serving larger, lower-cost facilities."  *Id.* at 12779-83, paras. 30-37.  In the *2021 ICS Order*, following similar reasoning, the Commission again adopted a rate cap structure distinguishing between prisons and jails and among jails based on size.  *2021 ICS Order*, 36 FCC Rcd at 9536, para. 40; *see id.* at 9539-40, paras. 47, 50 (finding that the record, including the data submitted for the Second Mandatory Data Collection, indicated "that providers incur higher costs per minute for jails with average daily populations below 1,000 than for larger jails," and "that it costs service providers . . . more to provide calling services in jails than in prisons").

[521] *See* Section V.B (Further Disaggregating the Very Small Jail Tier).

[522] Martha Wright-Reed Act § 3(b)(2).

[523] *2023 IPCS Notice*, 38 FCC Rcd at 2694, paras. 63, 65.

[524] *See* National Sheriffs' Association July 12, 2023 Reply at 15; Pay Tel May 8, 2023 Comments at 3-4; Securus May 8, 2023 Comments at 19; ViaPath May 8, 2023 Comments at 9.

[525] *See* National Sheriffs' Association May 8, 2023 Comments at 13.

[526] *See, e.g.*, Pay Tel May 8, 2023 Comments at 3-4; Securus May 8, 2023 Comments at 19; ViaPath May 8, 2023 Comments at 9.

[527] *See* National Sheriffs' Association May 8, 2023 Comments at 7; Pay Tel May 8, 2023 Comments at 10-11; Securus July 12, 2023 Reply at 15.

Commission should therefore set rate tiers to account for these variations.[528]  We agree that the record "contains extensive documentation of [the] cost differences, and the reasons for those differences,"[529] of providing audio IPCS between prisons and jails.[530]  Many of these cost differences stem from the fact that prisons, in contrast to jails, are "used primarily to confine individuals . . . sentenced to terms in excess of one year."[531]  The consequent differences in average durations of stay and turnover rates between prisons and jails account for much of the disparities in costs between the two types of facilities.[532]  As set forth in Appendix G, our data analysis indicates that there remain statistically significant differences in the costs of providing audio IPCS in prisons versus jails, as well as greater variations from mean costs for jails than for prisons.[533]  The same pattern applies to the costs of providing video IPCS.[534]  We find this evidence credible and sufficient to support incorporating facility type, by adopting separate rate cap tiers for prisons and jails, as an "other characteristic" contemplated by the Martha Wright-Reed Act.

---

[528] *See* National Sheriffs' Association July 12, 2023 Reply at 15; Pay Tel May 8, 2023 Comments at 3; Securus May 8, 2023 Comments at 19 ("These cost differences . . . are best addressed through appropriate tiering of rates to reflect differences in average costs of providing services to different types or sizes of facilities.  Securus continues to believe it is appropriate to set different caps for prisons and jails.").

[529] Pay Tel May 8, 2023 Comments at 10-11, 13; *see, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12777-83, paras. 26-37; *2021 ICS Order*, 36 FCC Rcd at 9540-41, paras. 49-51; *see also* National Sheriffs' Association May 8, 2023 Comments at 7; Securus May 8, 2023 Comments at 19.

[530] Several factors contribute to these cost disparities, particularly the higher turnover in jails than in prisons, economies of scale associated with serving larger facilities (as prisons tend to be larger than jails), and the fact that jails are often located in more rural areas.  *See 2015 ICS Order*, 30 FCC Rcd at 12780, para. 33 ("Prisons typically have more stable, long-term inmate populations. . . .  The record suggests that higher churn rates increase costs . . . .  The record also indicates that prison inmates make fewer but longer calls and providers appear to incur fewer bad debt costs when serving prisons."); *Id.* at 12780-81, para. 34 (finding that economies of scale "support the tiering approach" and citing comments arguing that prisons and other larger facilities "benefit from . . . economies of scale" by spreading fixed costs among larger populations); Pay Tel May 8, 2023 Comments at 11 ("As previously explained, a primary driver of the differences between jails and prisons is the heavy turnover of the inmate population in jails. . . .  Additionally, the rural nature of many smaller facilities tends to increase costs due to higher telecommunications expenses and customization requirements."); Securus May 8, 2023 Comments at 19 ("A provider that exclusively or primarily serves smaller jails particularly in more rural areas is likely to have higher average per unit costs."); National Sheriffs' Association  Mar. 3, 2023 Reply at 3-4; *see also* Pay Tel May 8, 2023 Comments at 11 (citing several other contributing factors, such as "a greater reliance on prepaid accounts and collect calling in jails" and the requirement for IPCS providers to provide "a significant amount of . . . free calls" to those incarcerated in jails).

[531] 47 CFR § 64.6000(r).

[532] *See* Pay Tel May 8, 2023 Comments at 11-12 ("[A] primary driver of the differences between jails and prisons is the heavy turnover of the inmate population in jails.  This turnover increases costs by creating additional work in account set-up (i.e., working with inmates and staff in accessing calling services, setting up accounts, establishing blocked number lists, and other similar customizations to address the needs of a particular inmate) and increases the likelihood that portions of prepaid accounts will need to be refunded. . . .  [B]ecause of the transient nature of jails the total number of individuals housed in jails over the course of a year greatly exceeds that of prisons."); National Sheriffs' Association Reply, WC Docket No. 12-375, at 3-4 (rec. Mar. 3, 2023) (National Sheriffs' Association Mar. 3, 2023 Reply) (arguing that jails incur "higher costs due to higher turnover and shorter stays"); *2015 ICS Order*, 30 FCC Rcd at 12780, para. 33 (asserting that the record indicates that "the costs to serve prisons are lower than to serve jails" because "[p]risons typically have more stable, long-term inmate populations" and the consequent "higher churn rates increase costs").

[533] *See* Appendix G.  The data submitted in response to the Third Mandatory Data Collection further support this conclusion.  *See* Securus July 12, 2023 Reply at 15.

[534] *See* Appendix G.

153.    One commenter proposed specific additional factors beyond facility size and type.[535] Another commenter claims there are no significant differences after accounting for facility size.[536] However, after controlling for provider and state, we find that the main predictors of providers' costs per minute are facility size and type.[537] By contrast, other variables provide negligible independent predictive value.[538] Consequently, we find that such factors are best accommodated through the use of rate caps based on industry-wide average costs, which enable the provision of IPCS to be commercially viable across the tiers we adopt.[539] In sum, we find that incorporating these attributes into our rate caps would provide little benefit in terms of meaningfully reflecting providers' costs, while imposing additional administrative burden on providers and potentially introducing consumer confusion.[540] After "consider[ing] . . . other characteristics" proposed by commenters as directed by the statute, we decline to

---

[535] National Sheriffs' Association May 8, 2023 Comments at 13.  The National Sheriffs' Association identifies several other factors that may impact the costs of providing IPCS: that facility staff "provide more functions in some cases tha[n] in others and that the hourly wage and benefits of jail employees varies by state and locality"; that "different facilities employ different IPCS systems," and "require different security measures," with attendant variation in costs; that "jails in rural areas are more costly to serve"; and that "jails allow different amounts of inmate calling."  *Id.*

[536] Brattle May 8, 2023 Report at 7, para. 15.

[537] *See* Appendix G; *see also* Securus July 12, 2023 Reply at 15-16 (observing that grouping facilities by "facility type, size and associative provider" reduces variation in costs "dramatically"); Securus May 8, 2023 Comments at 19 (arguing that rate tiers should be set "to reflect differences in average costs of providing services to different types or sizes of facilities"); Pay Tel July 12, 2023 Reply at 3-4 ("These industry-wide 'subsets' should be defined by facility size and type.  Pay Tel agrees with GTL and the National Sheriffs' Association that the use of average daily population ('ADP') is the 'best practical approach' for differentiating between facilities for the purposes of setting rates or rate caps."); National Sheriffs' Association May 8, 2023 Comments at iii-iv ("[C]osts vary depending on a number of variables, most importantly type of facility (prison vs. jail) and size of facility (by average daily population (ADP)).").

[538] *See* Appendix G; *see, e.g.*, Securus June 6, 2023 Comments at 2 ("Securus concurs that providers should endeavor to allocate costs among traditional voice service or ICS, and video calling services.  There is no need to further segregate costs into subcategories of voice and video service."); Global Tel*Link Corp. d/b/a ViaPath Comments to Proposed 2023 Mandatory Data Collection, WC Docket No. 12-375, at 4 (rec. June 2, 2023) (ViaPath June 2, 2023 Mandatory Data Collection Comments) ("In ViaPath's experience, the costs for voice do not significantly vary based on service type.").  Pursuant to the Martha Wright-Reed Act's requirement that we "consider costs associated with any safety and security measures necessary to provide" IPCS, we address the impact of implementing safety and security measures on providers' costs in more detail separately.  *See infra* Section III.D.7 (Safety and Security Costs).

[539] *See* ViaPath Dec. 15, 2022 Comments at 17-18 ("The zone of reasonableness approach continues to be the appropriate method for establishing permanent rates based on the data submitted. . . . The data shows the existing rate caps allow a variety of competitors to operate in the market while using different cost structures and serving different types of facilities.  This is precisely the reasoning underlying the zone of reasonableness: to 'equitably reconcil[e] diverse and conflicting interests.'"); Securus July 12, 2023 Reply at 16 (arguing that factors such as "extent of site commissions, specific requirements of the facility, and scope of services" can be "accommodated through industry-wide cost averaging, particularly when appropriately tiered").

[540] We also find that, in the absence of any data indicating otherwise, many of the factors identified by the National Sheriffs' Association are simply not well suited for direct incorporation into a rate cap structure.  Because these factors vary in a nonlinear manner, they are ill-suited to a tiered rate cap structure, and incorporating them into our rate caps would necessitate an exceedingly granular and therefore intractable system.  The National Sheriffs' Association does not point to any concrete data that might reflect the impact of any of these factors on providers' costs.  *Cf. 2015 ICS Order*, 30 FCC Rcd at 12786, para. 46 ("We also believe that adopting fewer tiers than those requested in response to the Mandatory Data Collection responds to comments in the record expressing concern over potential confusion and burden of multiple rates.").

**Federal Communications Commission**                    **FCC 24-75**

incorporate any other additional characteristics in our IPCS rate cap structure.[541]

154.    *Alternative Proposals.*  Not all commenters agree with the tiering structure we adopt in this Report and Order.  The National Sheriffs' Association supports adopting three size tiers of jails, proposing that the thresholds be set at ADPs of 350 and 2,500.[542]  Conversely, ViaPath argues that the rate caps adopted in the *2021 ICS Order* do not require any modification other than "necessary adjustments for market changes."[543]  We disagree, and find that neither proposal takes into account the wider record; nor do they incorporate the data provided in response to the 2023 Mandatory Data Collection.[544]  Consequently, we find that both of these proposals fail to accurately account for the current differences in the costs that we observe.

155.    For similar reasons, we decline to adopt the proposals from NCIC and ViaPath that we adopt a single rate cap, either for all jails (with a separate rate cap for prisons)[545] or for all facilities.[546]  As several commenters observe, setting a single rate cap for all facilities, or even all jails, would almost

---

[541] We have insufficient data to evaluate the cost-causative impact of variations in the services provided or staffing costs incurred by facilities.  In the 2023 Mandatory Data Collection, we asked providers to submit "any verifiable, reliable, and accurate information" they have regarding any expenses incurred by facilities to provide IPCS.  *See* 2023 Mandatory Data Collection Instructions at 59, § IV.D.2.d.  However, no provider submitted any information on facilities' costs in response to this request.  Given this limitation, we address the role of costs incurred by facilities in providing IPCS separately.  *See infra* Section III.D.1.c.3 (Accounting for Correctional Facility Costs).

[542] National Sheriffs' Association May 8, 2023 Comments at 13.

[543] ViaPath May 8, 2023 Comments at 8; *see also* ViaPath June 13, 2024 *Ex Parte* at 3; Letter from Michelle Lewis, Superintendent, Northern Neck Regional Jail, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 23-62, Attach. at 2 (filed May, 29, 2024) (Virginia Association of Regional Jails May 29, 2024 *Ex Parte*)  (same); Letter from Derek Almarode, President, Virginia Association of Regional Jails, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 at 3 (filed July 11, 2024) (VARJ July 11, 2024 *Ex Parte*) (same); *cf.* Public Interest Parties July 12, 2023 Reply, Appx. A at 6, para. 14 & n.10 ("As the results of our model carrier calibration suggest, it might be reasonable to collapse the medium and large categories into one and only have two ADP-based classes of facilities.").

[544] The National Sheriffs' Association relies on data from its 2015 cost survey, which we have previously distinguished.  *See* National Sheriffs' Association May 8, 2023 Comments at 13; *2021 ICS Order*, 36 FCC Rcd at 9583, 9662, paras. 143 ("We are concerned, however, that some of the facilities included in the National Sheriffs' Association survey report an exceedingly high number of hours of correctional facility officials' time compared to most other reporting facilities."), 317 ("[T]he survey data for jails with fewer [than 1,000] incarcerated people varied far too widely to comfortably estimate any values that would withstand scrutiny today."); *see also* National Sheriffs' Association May 8, 2023 Comments at 7 (claiming that the same cost survey demonstrates that costs vary for jails at ADP thresholds of 350 and 1,000).  Meanwhile, the rate structure adopted in the *2021 ICS Order* was based on data from the Second Mandatory Data Collection.  *See 2021 ICS Order*, 36 FCC Rcd at 9536, para. 40; *see also* Securus Mar. 5, 2023 Reply at 13 ("The record indicates that this current level of differentiation [in the Commission's rate caps] inadequately accounts for cost differences between very small facilities, medium-sized facilities. and larger facilities as measured by average daily population."); FTI and Wood June 10, 2024 Report at 16-17 (demonstrating that the variability of average per-minute costs at jails below 1,000 ADP supports adding additional tiers and setting tiers at the same tiers we adopt today).  Furthermore, in the *2021 ICS Order*, the Commission explicitly deferred on setting rate caps for jails with ADPs below 1,000 because the available data did not enable accurate calculation of the relative costs of such facilities—a gap that, as noted above, has been rectified with the data submitted for the 2023 Mandatory Data Collection.  *See 2021 ICS Order*, 36 FCC Rcd at 9540, para. 48.

[545] *See* NCIC May 8, 2023 Comments at 9-10 ("Setting industry-wide rate caps is the fairest and most efficient way to regulate ICS, as incarcerated people may be transferred to several different facilities during their incarceration and different rates would be confusing for the consumers and their loved ones.").

[546] *See* ViaPath May 8, 2023 Comments at 9 & n.41 (suggesting that a "simpler approach" would be to have "two rate caps – one for prisons and one for jails – which would eliminate the need for the Commission to rely on ADP to establish rate caps," and which could also "make IPCS charges more transparent for the incarcerated and their friends and family, as well as more straightforward for IPCS providers and correctional facilities to administer").

certainly result in either unreasonably low rates in smaller facilities, such that providers may be unable to recover the costs of providing service to these higher-cost facilities, or else a windfall for those serving prisons and larger jails at the cost of those incarcerated in such facilities.[547]  We find that these consequences would outweigh any benefits from adopting a single rate cap.  We agree with commenters that, given our analysis of the data, adopting a single rate cap "will run counter to" the goals of section 276 as well as the Martha Wright-Reed Act,[548] and would less effectively address the implications of our consideration of the "differences in the costs . . . by small, medium, or large facilities or other characteristics."[549]

156.    *Definition and Use of Average Daily Population*.  In the *2023 IPCS Notice*, the Commission sought comment on the "use of average daily population as the primary metric" for the size of correctional institutions, including whether there were "compelling reasons to adopt a different metric for determining size."[550]  The record confirms that ADP continues to be the most practical metric for determining the size of correctional facilities for the purposes of applying our rate caps.[551]  However, the record reflects a need for "a clear date and a clear standard by which the ADP is measured," so that all parties can uniformly determine "whether a particular jail must comply with" different rate caps than in the prior year.[552]  Accordingly, we revise the definition for average daily population in our rules by

---

[547] *See* National Sheriffs' Association May 8, 2023 Comments at 7-8 ("The Commission should address these differences by creating separate caps or rates for jails to ensure the continued availability and possible expansion of IPCS in jails. . . .  A rate structure which sets a low rate cap based on average costs that apply to all facilities means that the costs at some facilities are higher than the cap – and that jails operated by Sheriffs are most likely to be impacted by this type of rate structure.  The Commission can and should address this issue by setting higher rates for jails based on ADP."); Pay Tel May 8, 2023 Comments at 12 ("If the Commission were to use flat industry average costs (driven by large, dominant providers of ICS such as Securus and GTL), then service will likely be curtailed in smaller facilities as providers will not be able to recover their costs of providing service."); Securus May 8, 2023 Comments at 12.

[548] Pay Tel May 8, 2023 Comments at 12; *see also* Securus May 8, 2023 Comments at 19 ("To the extent cost data reflects differing per unit costs at different types or sizes of facilities, faithful adherence to the MWR Act requires adoption of rate tiers.").

[549] Indeed, in the *2015 ICS Order*, the Commission thoroughly examined the negative consequences of establishing a single rate cap in the context of data indicating that costs of providing IPCS vary by facility size and type.  *See 2015 ICS Order*, 30 FCC Rcd at 12777-83, paras. 26-37; *see also 2021 ICS Order*, 36 FCC Rcd at 9541, para. 51 (declining to adopt a unitary rate structure because "the evidence suggests higher provider costs at jails than prisons").  Once again, we find that the commenters proposing a single rate cap "provide no real evidence or support for why rate tiers would be any more difficult or challenging than" the current approach.  *See 2015 ICS Order*, 30 FCC Rcd at 12782, para. 36.

[550] *2023 IPCS Notice*, 38 FCC Rcd at 2694, para. 64.  The Commission also incorporated prior calls for comments on how ADP should factor into our rate caps, including on whether the definition for ADP in the Commission's rules "sufficiently addresses fluctuations in jail populations and variations in how correctional facilities determine average daily populations."  *2023 IPCS Notice*, 38 FCC Rcd at 26, para. 64; *see 2022 ICS Notice*, 37 FCC Rcd at 11952-53, para. 132; *2021 ICS Notice*, 36 FCC Rcd at 9659, para. 310.

[551] *See* National Sheriffs' Association May 8, 2023 Comments at 13 ("[A]t this time, ADP is the best variable known to NSA for use to divide jails into cost and rate tiers."); Pay Tel July 12, 2023 Reply at 3-4 ("Pay Tel agrees with GTL and NSA that the use of average daily population ('ADP') is the 'best practical approach' for differentiating between facilities for the purposes of setting rates or rate caps."); Securus May 8, 2023 Comments at 19 ("Securus continues to believe it is appropriate to set different caps for prisons and jails and that Average Daily Population at the facility level is a useful proxy for differentiating among jails."); ViaPath May 8, 2023 Comments at 9 ("If the record continues to support that costs vary based on size of the facility, ADP tracked by correctional authorities is a practical approach for differentiating between facilities.").

[552] UCC May 14, 2021 *Ex Parte*.  Additionally, we find that the definition for average daily population under our rules, which requires the measurement of all incarcerated persons "*in* a facility" (rather than those merely within that

(continued….)

establishing April 30 as the date on which the annual recalculation of ADP reflecting data from the prior calendar year (and, as applicable, the new corresponding rate cap) becomes effective.[553]

157.    Adopting a specific date on which the annual ADP recalculation must be performed[554]—and by which providers must implement new rates to comply with the appropriate rate cap, where applicable—will yield greater uniformity and accountability in the application of this metric, and address related concerns raised in the record.[555]  A uniform effective date for implementing each year's newly recalculated ADP (and corresponding rate caps) will help consumers "to determine which jails must comply with [each of] the FCC's new rate caps,"[556] and will help providers by establishing a more predictable and consistent calculation process.  We select April 30 as the effective date for the annual ADP recalculation because, as Securus points out, providers need to obtain data from correctional officials in order to determine each jail's average daily population during the preceding calendar year.[557]  Our rules already require providers to report that information in their annual reports, which are due each year on April 1.[558]  An April 30 date for determining each jail's rate cap tier going forward avoids the imposition of any additional burden on providers, while providing a "realistic timeframe" for providers to collect and process data on average daily populations as part of the mandated annual review and updating of rate cap tiers.[559]

158.    ViaPath cites the "concerns [raised] about consistency and variations in population" and suggests that the current requirement for annual calculation of ADP "could require negotiated per-minute IPCS rates to increase or decrease each year due to changes in facility population year-to-year."[560]  To address this concern, and aid consistency, ViaPath proposes that we redefine ADP to permit it to be "calculated and applied for the initial term of an IPCS contract, and thereafter recalculated and applied for each renewal term of a contract."[561]  We decline to adopt ViaPath's proposal.  We are concerned that this approach would incentivize providers to commence or renew contract terms at times of unusually low populations to "lock in" the consequently higher rates for the full contract term.[562]  Although we recognize that requiring ADP to be recalculated annually may entail a near-term administrative burden,

---

facility's jurisdiction), over a "calendar year," effectively addresses related concerns that states and localities may track population figures differently.  *See* 47 CFR § 64.6000(c).

[553] *See* Appendix A (Final Rules).

[554] The definition currently lacks a precise date upon which the calculation of ADP shall be performed.  47 CFR § 64.6000(c) (defining average daily population as "the sum of all Inmates in a facility for each day of the preceding calendar year, divided by the number of days in the year").

[555] *See* UCC May 14, 2021 *Ex Parte*.

[556] *Id*.

[557] Securus June 11, 2024 *Ex Parte*, Attach. at 1.  To the extent they have not already done so, providers should ensure that their contracts with correctional facilities provide for the providers' timely receipt of all information they need to recalculate average daily populations in accordance with our rules.

[558] 47 CFR § 64.6060; *see* Annual Reporting and Certifications Instructions, https://www.fcc.gov/sites/default/files/annual_report_instructions_final.docx (link provided in *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, 37 FCC Rcd 7558, Appx. A (WCB 2022)) (*2022 ICS Annual Report Order*).

[559] Securus June 11, 2024 *Ex Parte*, Attach. at 1.

[560] ViaPath May 8, 2023 Comments at 10.

[561] *Id*.

[562] ViaPath's proposal may not even meaningfully improve consistency in the calculation of ADP, given the substantial variation in IPCS contract terms.  *See, e.g.*, Prisoners' Legal Services et al. Reply, WC Docket No. 12-375, at 5 (rec. Dec. 17, 2021) (setting out the lengths of IPCS contracts "for Massachusetts counties that run correctional facilities and the state DOC," which vary between 3 years and 10 years).

the record fails to suggest that this burden outweighs the benefit of IPCS rates that correspond to the costs associated with different size jails.[563]  And over the longer term, contracting will occur against the backdrop of our rule providing certainty regarding the timing of ADP calculations and from the outset such contracts can be tailored accordingly as needed.

## 2.    Preliminary Costing Issues

159.    To assess the costs that should be included in or excluded from our rate cap calculations to ensure just and reasonable rates for IPCS, we rely on the "used and useful" framework and its associated prudent expenditure standard.[564]  Under the used and useful framework the Commission first considers the need to compensate providers "for the use of their property and expenses incurred in providing the regulated service."[565]  Second, the Commission looks to the "equitable principle that ratepayers should not be forced to pay a return except on investments that can be shown to benefit them."[566]  In this regard, the Commission considers "whether the expense was necessary to the provision of" the regulated service.[567]  And third, the Commission considers "whether a carrier's investments and expenses were prudent (rather than excessive),"[568] and has found that "imprudent or excess investment . . . is the responsibility and coincident burden of the investor, not the ratepayer."[569]  Although the Commission has identified these "general principles regarding what constitutes 'used and useful' investment," it "has recognized 'that these guidelines are general and subject to modification, addition, or deletion'" and that "'[t]he particular facts of each case must be ascertained in order to determine what part of a utility's investment is used and useful.'"[570]  The Commission "may, in its reasonable discretion,

---

[563] No other commenter addresses the issue of the yearly recalculation requirement for ADP, suggesting that this requirement does not impose a disproportionate burden.  We also find that the revision we adopt today, which grants providers a full month to calculate and (where necessary) implement the newly-applicable ADP figures each year, will help to ameliorate this burden.

For similar reasons, we decline to adopt Talton Communications' proposal that ADP be calculated quarterly "by taking an average of the population of detainees across all facilities serviced by a single ICS provider."  Talton Communications, Inc. Reply, WC 12-375, at 8 (rec. Dec. 16, 2021).  First, we find that this proposal risks generating either insufficient returns or excessive returns for a given provider, depending on the nature of the facilities it serves.  Second, we find that it would also make the rates imposed on any given consumer relatively arbitrary, based purely on the portfolio of the IPCS provider serving their respective facility rather than the actual costs of providing service.  Finally, this proposal would ultimately require updating the applicable rates even more frequently than under our current rules, imposing greater administrative burdens on providers and greater inconsistency on consumers.

[564] *See supra* Section III.C.3.a (Addition of "Just and Reasonable" Requirement to Section 276(b)(1)(A)) (describing, generally, the used and useful framework and our decision to apply it to our ratemaking).

[565] *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Phase II Order*).

[566] *Id.*; *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 111 (explaining that "[e]qually central to the used and useful concept, however, is the equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown to benefit them").

[567] *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7.

[568] *Id.* (citing *1990 AT&T Tariff Investigation Order*, 5 FCC Rcd at 5695, para. 17).

[569] *AT&T Phase II Order*, 64 F.C.C.2d at 47, para. 112; *see also Policy to be Followed in the Allowance of Litigation Expenses of Common Carriers in Ratemaking Proceedings in the Matter of Revisions to the Uniform System of Accounts*, Memorandum Opinion and Order, 92 F.C.C.2d 140, 144, para. 9 (1982) (explaining that an expense may be disallowed if it is "found to be exorbitant, unnecessary, wasteful, extravagant, or incurred in the abuse of discretion or in bad faith, or of a non-recurring nature").

[570] *Sandwich Isles Communications, Inc.*, WC Docket No. 09-133, Petition for Declaratory Ruling, 25 FCC Rcd 13647, 13652, para. 12 (WCB 2010) (*Sandwich Isles Petition for Declaratory Ruling*) (quoting *AT&T Phase II Order*, 64 F.C.C.2d at 39, para. 114).

fashion an appropriate resolution that is tailored to the specific circumstances before it."[571]

160.    We apply this framework in evaluating the costs and expenses to be included in our IPCS rate cap calculations.  As described below, we rely on a zone of reasonableness approach to adopt separate rate caps for audio and video IPCS by facility size and type.[572]  As applied here, our approach begins by looking to the record to identify an upper limit for each rate category that corresponds to a rate level above which rates would clearly be unjustly and unreasonably high.  We then make adjustments to that upper limit based on the record to remove costs that are not used and useful for the provision of IPCS in order to identify the lower limit of our zone of reasonableness.  Between the upper and lower limits of that zone, we then seek to identify a particular rate level that will best reflect the proper balancing of the equitable interests that ratepayers only bear costs or expenses that reasonably benefit them and that providers earn a reasonable return when their property is used in the provision of regulated services.  The particular rate level we identify within that zone of reasonableness is then adopted as the relevant rate cap for that rate category.

161.    The upper bounds we adopt include all reported provider costs, including those categories that we generally find are not "used and useful" in the provision of IPCS.[573]  We are confident based on this record that rate caps set above the upper bound clearly would be unjustly and unreasonably high.  In turn, we rely on the used and useful framework to make reasonable adjustments to those upper bound costs to establish the lower bounds of the zones of reasonableness.  By deriving our rate caps from the "used and useful" framework, our approach reflects the Commission's longstanding methodology for ensuring that providers are able to obtain recovery for the costs and expenses that demonstrably benefit ratepayers.  At the same time, including all reported provider costs to establish the upper bound reflects a conservative approach.  As a result, we are confident that setting rates within that zone of reasonableness will yield rate caps designed to afford fair compensation to IPCS providers.

162.    Next, our interpretation of section 3(b)(2) of the Martha Wright-Reed Act requires us to examine available evidence of "costs associated with any safety and security measures necessary to provide" IPCS which, along with the other costs, we review and use to arrive at a reasoned conclusion regarding the recoverability of those costs.[574]  To conduct that examination—including with respect to safety and security costs—we employ the "used and useful" framework.[575]  In doing so, we consider all relevant cost evidence in the record before us that could conceivably fall within the scope of costs of safety and security measures required to be considered as "necessary" under section 3(b)(2) of the Martha Wright-Reed Act.[576]

### 3.    Accounting for Correctional Facility Costs

163.    To account for the possibility that some correctional facilities may incur—and IPCS providers may reimburse—used and useful costs in allowing access to IPCS, we incorporate into our

---

[571] *Id.*; *American Telephone and Telegraph Co., et al., for authority under section 214 of the Communications Act of 1934, as amended, to supplement existing facilities by construction, acquisition and operation of a lightguide cable between cities on a main route between Cambridge, Mass. and Washington, DC, with extension lightguide cables to Various cities along this route*, File No. W-P-C-3071, Memorandum Opinion, Order and Authorization, 84 F.C.C.2d 303, para. 32 (1981) (*AT&T LightGuide Cable 214 Order*) (acknowledging that rate matters "involve a great deal of judgment," and concluding that the expenditures in question were "justifiable in the long run and will serve the public convenience and necessity").

[572] *Infra* Section III.D.1.c.4 (Establishing the Zones of Reasonableness).

[573] *See infra id.*

[574] *See infra* Section III.D.7 (Safety and Security Costs).

[575] *Id.*

[576] *Id.*  As we discuss below, we therefore have no need to more precisely define the ultimate scope and contours of the term "necessary" under section 3(b)(2) at this time.  *Id.*

zones of reasonableness the Commission's best estimate of IPCS costs that correctional facilities may incur. To facilitate recovery of any used and useful costs—but only such costs[577]—that correctional facilities incur, we permit IPCS providers to reimburse correctional facilities for the used and useful costs they may incur as those costs have been identified in this Report and Order. Together, these measures ensure that we account for used and useful correctional facility costs in our ratemaking calculations to the extent the record allows. Finally, our actions also ensure that rates and charges for IPCS will be just and reasonable as required by the Martha Wright-Reed Act, while also ensuring fair compensation for providers to the extent justified by the record here.[578]

164.     Our treatment of correctional facility costs reflects a careful balancing of two competing factors. First, certain commenters generally assert—though largely without support or current data—that correctional facilities may incur some used and useful costs in providing access to IPCS.[579] While the nature and extent of such costs is unclear on the current record, Worth Rises explains that "[w]hile exceedingly rare in the provision of IPCS, correctional facilities may incur used and useful costs which the Commission could include within rates."[580] These assertions and the Commission's prior recognition that correctional facilities may incur some costs in allowing access to IPCS persuade us to recognize a measure of these costs in our ratemaking calculus to the extent the record permits.[581]

165.     Second, despite some commenters' assertions that correctional facilities incur costs in their administration of IPCS, the available cost data (i.e., the 2015 survey data submitted by the National Sheriffs' Association) do not allow us to quantify what those costs are with any level of exactitude. This issue is not new. In the *2020 ICS Notice*, the Commission asked "correctional facilities to provide detailed information concerning the specific costs they incur in connection with the provision of interstate inmate calling services."[582] In the *2021 ICS Order*, the Commission observed that despite this request, "nothing more current was submitted" into the record regarding correctional facility costs.[583] Again the Commission, in the *2021 ICS Notice,* sought broad comment on correctional facility costs, including methodologies to estimate such costs and how to obtain reliable data.[584] And, in an effort to understand potential cost differentials between prisons and jails of differing sizes, the Commission also sought specific comment on facility costs for each type of correctional facility.[585] Finally, in the 2023 Mandatory

---

[577] *Infra* Section III.D.6.c.ii (Site Commissions Are Not Used and Useful in the Provision of IPCS).

[578] Martha Wright-Reed Act § 2(a); 47 U.S.C. § 276(b)(1)(A).

[579] National Sheriffs' Association May 8, 2023 Comments at 9 (arguing that if jails are not permitted to recover their IPCS costs, access to IPCS may be limited or eliminated); National Sheriffs' Association Reply, WC Docket No. 12-375, at 4 (rec. Dec. 17, 2021) (National Sheriffs' Association Dec. 17, 2021 Reply) (noting that "facilities incur costs to allow ICS in jails"); Pay Tel July 12, 2023 Reply at 11 (explaining that "confinement facilities themselves incur costs in making IPCS available"); Worth Rises May 8, 2023 Comments at 8 (noting that "facilities may incur used and useful costs on behalf of IPCS ratepayers, but generally do not"); Wood June 7, 2024 Report at 6 (asserting that "confinement facilities do incur actual and quantifiable costs related to safety and security"); *see also* Letter from Peter Wagner, Executive Director, Brian Nam-Sonenstein, Senior Editor and Researcher, and Stephen Raher, Former General Counsel, Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 7 (filed June 25, 2024) (PPI June 25, 2024 *Ex Parte*); Securus July 11, 2024 *Ex Parte* at 22.

[580] Worth Rises May 8, 2023 Comments at 8.

[581] *See, e.g.*, *2016 ICS Reconsideration Order*, 31 FCC Rcd at 9307, para. (explaining that "some facilities likely incur costs that are directly related to the provision of ICS"); *2021 ICS Order*, 36 FCC Rcd at 9561, para. 100 (adopting interim facility related rate components designed to account for costs that correctional facilities incur that are used and useful in the provision of calling services).

[582] *2020 ICS Order*, 35 FCC Rcd at 8522, para. 103.

[583] *Id.* at 9583, para. 142.

[584] *See, e.g.*, *id.* at 9660, 9665-66, paras. 313, 324.

[585] *See id.* at 9661-64, paras. 316-22.

Data Collection, WCB and OEA directed IPCS providers to report "any verifiable, reliable, and accurate information" in their possession showing the costs incurred by correctional facilities.[586]

166.     Despite these numerous and repeated public attempts to obtain relevant data, commenters have neither provided updated facility cost data nor proposed a methodology that would allow the Commission to accurately estimate used and useful correctional facility costs.  Instead, the National Sheriffs' Association continues to rely on its 2015 cost survey as a "reasonable proxy" for facility costs,[587] while a single provider simply lists various tasks for which correctional facilities allegedly incur costs but provides no supporting data as to what those costs are.[588]  Given the state of the record, it is reasonable for us to conclude that no allowance for correctional facility costs is warranted in our lower bounds.[589]  In particular, the failure of providers and facilities—which would have the relevant data—to provide such data to the Commission despite repeated calls for them to do so warrants an adverse inference that actual information would not support the case for recovery.[590]  However, out of an abundance of caution, and in recognition of those commenters that continue to assert that correctional facilities may incur used and useful costs in allowing access to IPCS, we conclude that we should incorporate some allowance for such costs into the upper bounds of the zones of reasonableness.[591]  Specifically, based on data from a 2015 cost survey provided by the National Sheriffs' Association we incorporate $0.02 into the upper bounds of our zones of reasonableness for all facilities.  We do not include an estimate of correctional facility costs in the lower bounds of our zones of reasonableness as neither the record nor providers' cost data reported in the 2023 Mandatory Data Collection adequately or consistently support the inclusion of any specific level of cost.

167.     To that end, there are two sources of data we can look to in determining whether and how to incorporate a measure of correctional facility costs into our ratemaking calculus.  The first is the 2015 cost survey from the National Sheriffs' Association,[592] upon which the National Sheriffs' Association and Pay Tel ask us to rely.[593]  The Commission relied, in part, on data from that survey in the *2021 ICS Order* when it adopted a $0.02 interim cap for recovery of IPCS providers' contractually prescribed site

---

[586] 2023 Mandatory Data Collection Instructions at 59.

[587] National Sheriffs' Association Comments, WC Docket No. 12-375, at 8 (filed Sept. 27, 2021) (National Sheriffs' Association Sept. 27, 2021 Comments); National Sheriffs' Association Dec. 17, 2021 Reply at 2.

[588] *See* Pay Tel July 12, 2023 Reply, at 11-16 (listing various tasks for which correctional facilities purportedly incur costs but providing no data as to those costs); Virginia Association of Regional Jails May 29, 2024 *Ex Parte* at 7 (same); Letter from Kieran Donahue, Sheriff, Canyon County, Idaho, to Marlene H. Dortch, Secretary FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed July 11, 2024) (Canyon County Sheriff July 11, 2024 *Ex Parte*) (same).

[589] *See 2021 ICS Notice*, 36 FCC Rcd at 9666, para. 324 (asking whether the Commission should "condition any rate element for correctional facility costs on the provision of reliable correctional facility cost data provided to us by the facilities themselves").

[590] *See, e.g.*, *Int'l Union v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him").

[591] We also consider facility costs in choosing rate caps from within the zones of reasonableness.  *Infra* Section III.D.4.b (Determining Permanent Rate Caps for Audio IPCS and Interim Rate Caps for Video IPCS).

[592] National Sheriffs' Association Comments, WC Docket No. 12-375, Exh. A (rec. Jan. 12, 2015) (National Sheriff's Association Jan. 12, 2015 Comments).

[593] *See, e.g.*, National Sheriffs' Association Dec. 17, 2021 Reply at 9 (arguing that the Commission should "re-affirm the facility compensation amounts approved in the [2016] Reconsideration Order," which were based, in part, on the National Sheriffs' Association cost survey); Pay Tel Communications, Inc. Comments, WC Docket No. 12-375, at 11 (rec. Sept. 27, 2021) (Pay Tel Sept. 27, 2021 Comments) ("Pay Tel supports the proposal and data submission by NSA.").

commission payments.[594]  Although the Commission expressed concerns about the National Sheriffs' Association survey data at that time, it explained that "they are the best data available from correctional facility representatives regarding their estimated costs."[595]  That remains true today.  As the Prison Policy Initiative observes, the National Sheriffs' Association survey relies "entirely on self-reported data from correctional facilities" and involves "inappropriately expansive descriptions" of IPCS-related tasks.[596]  Such infirmities make it very likely that the National Sheriffs' Association data overstated correctional facility costs at the time of the survey, and severely limit the data's value as a proxy for current facility costs.[597]  But, as the Commission has explained, "an agency may reasonably rely on the best data available where perfect information is unavailable."[598]  The National Sheriffs' Association survey data are the best data available from correctional facility representatives which we may, and do, reasonably consider in determining how to account for used and useful correctional facility costs in our ratemaking calculations.

168.     The second source of data we consider in determining whether and to what extent correctional facility costs may incur used and useful costs is the data providers reported regarding their site commission payments in response to the 2023 Mandatory Data Collection.  Appendix I compares the costs per minute that providers reported for contracts requiring the payment of monetary site commissions with the costs per minute that providers reported for contracts not requiring the payment of monetary site commissions.[599]  Previously, the Commission relied in part on a similar analysis of earlier provider data—in conjunction with the National Sheriffs' Association data—as grounds for a $0.02 per minute interim allowance for reasonable correctional facility costs.[600]  However, even the 2021 data analysis suggested that the $0.02 per minute interim allowance might have been too high.[601]  And our analysis of the data from the 2023 Mandatory Data Collection ultimately provides no basis to identify an amount of correctional facility costs that should be recoverable through regulated IPCS rates.  In particular, performing the same comparison used in 2021, but updated to reflect the latest data, discloses that providers actually incur *greater* costs per minute to serve facilities for which they pay monetary site commissions, providing no substantiation of certain commenters' suggestion that site commissions operate to compensate for the transfer of some costs of service from providers to facilities.[602]  We conclude that because providers report greater costs per minute for contracts requiring the payment of

---

[594] *2021 ICS Order*, 36 FCC Rcd at 9581, para. 141 (concluding that the National Sheriffs' Association data "independently support[] a $0.02 allowance for correctional facility costs" at prisons and larger jails).

[595] *Id.* at 9582, para. 142.

[596] PPI Sept. 27, 2021 Comments at 14.

[597] Indeed, neither correctional facilities nor IPCS providers have an incentive "to understate their costs in the context of a rate proceeding, lest the Commission adopts rates that are below cost."  *2021 ICS Order*, 36 FCC Rcd at 9587, para. 154.

[598] 2021 ICS Order, 36 FCC Rcd at 9544, para. 62 (citing *American Public Gas v. FPC*, 567 F.2d at 1016; *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322 (D.C. Cir. 1980) (*MCI v. FCC*)).

[599] *See infra* Appendix I.  We find this comparison potentially helpful because both facilities and providers have explained that some portions of some site commission payments may compensate facilities for costs they incur in permitting access to IPCS.  If we saw *lower* per-minute costs for providers at facilities with site monetary commission payments than for facilities without monetary site commission payments, we might reasonably infer (or at least hypothesize, subject to further analysis) that facilities may be incurring such significant levels of used and useful costs as to require an approach materially different from our approach in this Order.  Our comparison, however, shows *higher* per-minute costs for providers at facilities with monetary site commission payments than for facilities without monetary site commission payments.

[600] *2021 ICS Order*, 36 FCC Rcd at 9579-80, 9755-56, paras. 135-36 & Appx. H.

[601] *See 2021 ICS Order*, 36 FCC Rcd at 9579-80, 9755-56, paras. 135-36 & Appx. H.

[602] *See, e.g.*, Pay Tel July 12, 2023 Reply at 11 (stating that facilities' costs associated with providing access to IPCS may be reflected "indirectly" in providers' costs "through site commission payments").

monetary site commissions versus those that do not, our approach of including a $0.02 per-minute additive for facility costs in the upper bounds of our zones of reasonableness, but no additive for facility costs in the lower bounds of those zones, is the best approach given the record before us.  This balancing reflects our recognition, on the one hand, that correctional facilities may well incur used and useful costs in allowing access to IPCS, with the absence of any basis in the record that would enable us to estimate those costs with any degree of precision.

169.    In accounting for correctional facility costs in this manner, we decline requests that we instead account for those costs by adding a specific amount per-minute to our rate caps based on data from the National Sheriffs' Association cost survey.[603]  These data do not enable us to quantify such costs with anything near the level of specificity that would be required to adopt a specific "just and reasonable" additive reflecting used and useful correctional facility costs.  Commenters supporting a rate additive have failed to explain a connection between their proposed additives and the National Sheriffs' Association 2015 cost survey data.  Nor have they explained the methodology used to derive the additives they propose or, indeed, any alternative additives.[604]  We therefore cannot accept at face value the proposed rate additives, or adopt any alternative additive, based on these data and simultaneously ensure that the rate caps we adopt are just and reasonable and fairly compensatory.  Given the state of the record, we conclude that our approach, as described below, strikes the best balance.

170.    *Incorporating A Measure of Correctional Facility Costs Into the Upper Bounds of the Zones of Reasonableness*.  In establishing the upper bounds of our zones of reasonableness, we use providers' unadjusted reported IPCS costs.[605]  Ordinarily, we would undertake the same exercise to incorporate correctional facility costs into our upper bounds.  But as detailed above, we have no reliable reported correctional facility cost data, which requires us to find a reasonable substitute.  Because the National Sheriffs' Association 2015 cost survey is the only available correctional facility cost data reported by correctional facility representatives in the record, we rely on those data to incorporate $0.02 into the upper bounds of our zones of reasonableness for all facilities.  The $0.02 figure derives from the Commission's prior analysis of the amount of used and useful correctional facility costs the National Sheriffs' Association's cost survey reasonably supported.  In the *2021 ICS Order*, the Commission relied, in part, on these data to conclude that $0.02 was a reasonable estimate of the used and useful correctional facility costs recovered through IPCS providers' contractually prescribed site commission payments for prisons and for jails with average daily populations of 1,000 or more.[606]  The Commission explained that the majority of prisons and large jails that responded to the National Sheriffs' Association survey reported "average total costs per minute of less than $0.02" but declined to adopt a lower figure, reflecting the Commission's "conservative approach" to estimating correctional facility costs in setting interim rate caps

---

[603] *See* Pay Tel May 8, 2023 Comments, at 18; Pay Tel July 12, 2023 Reply, at 15; National Sheriffs' Association Sept. 27, 2021 Comments at 8; Pay Tel Sept. 27, 2021 Comments at 13; *see also* Wood June 7, 2024 Report at 2 (suggesting that the Commission include an "explicit additive to the rate caps for audio and video IPCS" for the costs of safety and security measures incurred by correctional facilities); Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2-3 (filed June 7, 2024) (Pay Tel June 7, 2024 *Ex Parte*).

[604] Pay Tel supports the National Sheriffs' Association's "prior proposal and data submission," which Pay Tel claims supports per-call additives ranging from $0.02 for facilities with average daily populations of 2,500 or greater to $0.08 for facilities with average daily populations ranging from one to 349.  Pay Tel Sept. 27, 2021 Comments at 11 (citing National Sheriffs' Association Comments, WC Docket No. 12-375, at 8 (filed Nov. 23, 2020)).

[605] *Infra* Section III.D.4.a (Establishing the Zones of Reasonableness).

[606] *See 2021 ICS Order*, 36 FCC Rcd at 9581, para. 141.

based on these data.[607]  The Commission, nevertheless, continued to express concerns about the data.[608]

171.    The record has not developed in any meaningful way since the Commission determined that the National Sheriffs' Association data supported, at most, a $0.02 allowance for correctional facility cost at prisons and jails with average daily populations of 1,000 or more.[609]  We thus see no principled or reasonable basis on which to depart from that determination so as to find a higher cost justified now.  As one commenter explains, instead of "refreshing the record or seriously engaging on the merits of the Commission's inquiry," the National Sheriffs' Association "simply continues its years-long practice of rote repetition of the cost categories identified in its 2015 survey findings."[610]  The National Sheriffs' Association contends that because the Commission found its cost survey "credible" in the *2016 ICS Reconsideration Order*, there is "no basis" to change that conclusion now.[611]  This argument is unpersuasive.  The Commission made a credibility determination in the *2016 ICS Reconsideration Order* in the context of a record on facility costs that the Commission acknowledged was lacking.[612]  The National Sheriffs' Association's arguments do not acknowledge the very specific circumstances under which the Commission relied on the 2015 survey data, and do not provide sufficient basis for the Commission to deviate from its subsequent findings in the *2021 ICS Order*.

172.    The National Sheriffs' Association acknowledges the imprecision of the data it provided but argues that the "wide unexplained variations" in costs that the Commission observed in the data are attributable to the fact that "there are different hourly rates for Sheriffs' and jail employees" and that different facilities use different IPCS systems and require different administrative and security measures.[613]  These arguments do not provide us with a methodology that would let us verify or isolate costs used and useful in the provision of IPCS from the other costs that correctional facilities incur and that are reflected in the survey data.[614]  Rather, the National Sheriffs' Association's statements concede that correctional facilities do not incur costs uniformly, making it even more likely these data overstate correctional facility costs.

173.    The National Sheriffs' Association also continues to maintain that the costs reported in its cost survey should be fully recoverable.[615]  These include costs related to various safety, security,

---

[607] *Id.* at 9582, paras. 143-44.

[608] *See, e.g.*, *id.* at 9583, para. 143 (noting that "some of the facilities included in the National Sheriffs' Association survey report an exceedingly high number of hours of correctional facility officials' time compared to most other reporting facilities").

[609] We sought to identify in using data from the 2023 Mandatory Data Collection the extent to which correctional facilities bear costs by seeking to determine how much providers' reported expenses decline when they pay monetary site commissions, but found providers' reported expenses increase in a statistically significant manner when they pay such commissions.  *See* Appendix G.

[610] PPI Dec. 17, 2021 Reply at 24.

[611] National Sheriffs' Association Dec. 17, 2021 Reply at 9.

[612] *See 2016 ICS Reconsideration Order*, 31 FCC Rcd at 9314, para. 27 (acknowledging that "the record on what the costs facilities actually incur in relation to ICS is still imperfect" even with the National Sheriffs' Association survey); *see also* Letter from Al Kramer, Senior Policy Adviser, Public Knowledge, and Cheryl A. Leanza, Policy Advisor, United Church of Christ, OC Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2-3 (filed Mar. 28, 2021) (recognizing that the *2016 ICS Reconsideration Order* was based on a "very limited record" and that the rate cap increases were undertaken "out of an abundance of caution").

[613] National Sheriffs' Association Sept. 27, 2021 Comments at 6; National Sheriffs' Association Dec. 17, 2021 Reply at 5.

[614] *2021 ICS Order*, 36 FCC Rcd at 9586, para. 149.

[615] *See, e.g.*, National Sheriffs' Association Sept. 27, 2021 Comments at 3; National Sheriffs' Association Dec. 17, 2021 Reply at 2-3.

surveillance, and administrative tasks.[616]  The National Sheriffs' Association explains that without these functions no IPCS would be provided in certain correctional facilities and, conversely, without IPCS, correctional facilities would not incur costs associated with the administrative and security tasks it lists.[617]  In effect, then, the National Sheriffs' Association's argues that because IPCS is made available to incarcerated people, the costs that it has put into record are necessarily used and useful and therefore recoverable in full.  This argument misses the mark.  Simply because some tasks "are sometimes performed does not end the Commission's inquiry."[618]  For example, the fact that a correctional facility might elect to undertake certain activities given the existence of IPCS in that facility does not automatically mean that the activities are of sufficient benefit to IPCS ratepayers to warrant their bearing the activities' costs through IPCS rates.  We instead must undertake a more nuanced analysis to determine the types of costs that are allowable in IPCS rates.[619]  And we do so by applying the used and useful framework the Commission has relied on for decades.[620]  Employing that approach, we incorporate, to the extent the record provides meaningful data, the used and useful costs incurred in the provision of IPCS into our rate cap calculations, regardless of whether those costs are incurred directly by IPCS providers or instead incurred directly by correctional facilities and subject to IPCS provider reimbursement.  As to costs that we do not find used and useful in the provision of IPCS, IPCS ratepayers should not be forced to bear them—nor should IPCS providers be compelled to do so themselves.  Thus, while correctional facilities remain free to engage in (or employ) activities or functions that are not used and useful in the provision of IPCS, they must look elsewhere besides regulated IPCS rates to fund them.

174.    Fundamentally, the costs reflected in the National Sheriffs' Association survey are, for the most part, "cost[s] of operating prisons and jails, not providing communication service" and, as such, do not benefit IPCS consumers sufficiently to render them used and useful in the provision of IPCS.[621]

---

[616] *See, e.g.*, National Sheriffs' Association Sept. 27, 2021 Comments at 3  (listing various "security duties" and "administrative functions"); Pay Tel Sept. 27, 2021 Comments at 9 (discussing call monitoring and blocking and unblocking numbers); *see also* PPI Sept. 27, 2021 Comments at 18 Tbl. 3 (questioning whether categories of alleged facility-related ICS costs including call monitoring, call recording analysis, enrolling users in voice biometrics, and blocking and unblocking numbers are actually related to the provision of IPCS).

[617] *See* National Sheriffs' Association Dec. 17, 2021 Reply at 4; FDC July 11, 2024 *Ex Parte* at 4.  We find the argument that IPCS would not be provided in certain facilities as the National Sheriffs' Association and FDC claim to be unsubstantiated.  *See infra* Section III.D.6.c.ii (Site Commissions Are Not Used and Useful In the Provision of IPCS).

[618] PPI Dec. 17, 2021 Reply at 24, 26.  The National Sheriffs' Association makes much of the fact that sheriffs and facilities rather than calling services providers often perform many of the tasks they identify.  National Sheriffs' Association Sept. 27, 2021 Comments at 4; National Sheriffs' Association Dec. 17, 2021 Reply at 3.  But simply because certain tasks are performed by facilities or sheriffs does not automatically mean that such tasks are related to communications services.  If anything, the fact that certain tasks may be performed by the correctional facilities suggests that these are costs of incarceration, not of IPCS.  *See, e.g.*, Public Interest Parties May 8, 2023 Comments at 22-23 (arguing that "safety and security services is a core function of operating a *facility*, but unrelated to the provision of communications services") (emphasis in original); Worth Rises Comments, WC Docket No. 12-375, at 4 (rec. Sept. 27, 2021) (Worth Rises Sept. 27, 2021 Comments) (explaining that "[s]ecurity is a core function of correctional agencies and is related to the standard operation of correctional facilities"); National Sheriffs' Association Dec. 17, 2021 Reply at 7 (explaining that "the primary duty of Sheriffs and jails is to ensure security in the facility and in the community").

[619] *See* PPI Dec. 17, 2021 Reply at 26-27 (explaining that under traditional ratemaking principles, regulators make judgements about the types of expenses ratepayers cover).

[620] *See, e.g.*, *id.* at 26  (explaining that the used and useful and prudent expenditure principles have historically allowed "regulators to exclude expenses from a utility's rate base even if the costs would not have been incurred but for the utility's regulated operations").

[621] Letter from Bianca Tylek, Founder and Executive Director, Worth Rises, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (filed Mar. 24, 2021) (Worth Rises Mar. 24, 2021 *Ex Parte*); *see also* Worth Rises May

(continued….)

**Federal Communications Commission**                                    **FCC 24-75**

Stated differently, "[t]he presence or absence" of these tasks "does not actually prevent or enable communication."[622] Subject to those costs we conclude are used and useful in the provision of IPCS as reflected in our ratemaking calculus, we agree.[623] But outside of the costs we do allow, the National Sheriffs' Association cost survey fails to support the inclusion of any amount greater than $0.02 to account for used and useful correctional facility costs.

175.     We decline to give any weight to the survey provided by Pay Tel's outside consultant, which purports to quantify "an estimate of the [s]afety and [s]ecurity costs incurred by confinement facilities that are specifically caused by making IPCS available at that facility."[624] We find this survey to be unreliable. First, the survey is unrepresentative. As the consultant concedes, the "sample size of [the] data collection effort is limited."[625] It encompasses 30 correctional facilities, which is less than 1% of all facilities included in the 2023 Mandatory Data Collection, and covers only "small county jails and large regional facilities" thereby excluding prisons and large jails.[626] Second, the survey does not attempt to account for the nuances of how safety and security measures are administered and, in particular, the division of labor between correctional facilities and IPCS providers. The record is clear that these and other functions and activities for which correctional facilities allegedly incur costs are sometimes performed by the IPCS provider and sometimes performed by the correctional facility.[627] What is more, certain IPCS providers have stated that they offer comprehensive services, that include safety and security services, as part of a unified platform they sell to correctional facilities.[628] Thus, we find it unlikely that the information provided in the Pay Tel consultant's survey is representative of the costs incurred by correctional facilities in connection with safety and security measures across the IPCS industry. As such, we decline to rely on it to estimate used and useful correctional facility costs.[629]

---

8, 2023 Comments at 4 (arguing that safety and security measures are "not necessary for the provision of IPCS, but instead elective features sought after by corrections administrators law enforcement and prosecutors with no basis"); Worth Rises Sept. 27, 2021 Comments at 4 (explaining that security and surveillance services are "similar to the security and surveillance conducted on other forms of communication between incarcerated people and their loved ones"). As explained below, we determine that costs associated with certain safety and security measures are recoverable. *Infra* Section III.D.7 (Safety and Security Costs).

[622] *See, e.g.*, Worth Rises Mar. 24, 2021 *Ex Parte* at 2.

[623] *See infra* Section III.D.1.c.4.a (Establishing the Zones of Reasonableness).

[624] Wood June 7, 2024 Report at 1.

[625] *Id.* at 7.

[626] *Id.* at 5; *infra.* Appendix D.

[627] *See, e.g.*, Pay Tel July 12, 2023 Reply at 11-13, Exh. 3 (setting forth various tasks that may sometimes be performed by correctional officials or the IPCS provider).

[628] *See, e.g.*, Securus Technologies, LLC, Response to Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 8 (filed Oct. 31, 2023) (Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template) ({[

                                                                    ]}); Pay Tel Communications, Inc., Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 19 (filed Oct. 31, 2023) (Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template) (indicating that communications recording is an {[

                                ]}). Material that is set off by double brackets {[   ]} is subject to a request for confidential treatment and is redacted from the public version of this document.

[629] Even if we were to find the data reliable enough to be decisional, it would support the $0.02 that we incorporate into the upper bounds of our zones of reasonableness based on the National Sheriffs' Association survey. The June 7, 2024 Wood Report, which is based on information self-reported by correctional facilities across seven categories of safety and security measures, suggests that the "average reported cost for these 30 facilities in $0.08 per MOU." Wood June 7, 2024 Report at 6. However, this estimate includes three categories of safety and security measures

(continued….)

176.　　Therefore, we adopt the $0.02 allowance for correctional facility costs in the upper bounds of our zones of reasonableness for all facilities. In the *2021 ICS Order*, the Commission limited the applicability of the $0.02 cap for recovery of contractually prescribed site commissions to prisons and jails with average daily populations of 1,000 or more individuals "in response to criticism that this value would not be sufficient to recover the alleged higher facility-related costs" of smaller facilities.[630] Because commenters "did not provide sufficient evidence to enable [the Commission] to quantify" the allegedly higher costs incurred by smaller correctional facilities, the Commission sought comment on that issue in the *2021 ICS Notice*.[631] The Commission further explained that the National Sheriffs' Association data varied too widely to determine whether correctional facility costs were indeed higher for smaller facilities.[632]

177.　　Here, too, commenters have not substantiated their claims that correctional facility costs are higher in smaller facilities. The National Sheriffs' Association argues that the Commission's concerns about its data concerning smaller facilities "contradict the Commission's finding in the *2016 ICS Reconsideration Order*."[633] They also argue that "a wide variation in data is not disqualifying when there is an explanation for the variation," which they claim the survey data provide.[634] Prior statements from the National Sheriffs' Association potentially account for the variation in costs for smaller facilities, including differences in employee time spent on certain tasks, compensation rates, and differences in minutes of use.[635] And the Commission noted that "there are many potential variables that impact facilities' costs" and sought "detailed comment on those variables" in an attempt to obtain a clearer record on costs for smaller facilities.[636] Yet commenters have not provided any such details to explain the wide variation in facility costs for smaller facilities reflected in the National Sheriffs' Association survey.[637] In short, the record does not support the inclusion of an amount greater than $0.02 into the upper bounds of the zones of reasonableness for all facilities.

178.　　*Correctional Facility Costs in the Lower Bounds of the Zones of Reasonableness.* The lower bounds of our zones of reasonableness reflect only those costs that the record affirmatively establishes as generally being used and useful in the provision of IPCS.[638] Due to the lack of any reliable

---

that we conclude today are not used and useful in the provision of IPCS, including "Routine Preventative Call Monitoring," "Call Recording Review" and "Enrolling Inmates for Voice Biometrics." *Id. See generally infra* Section III.D.7 (Safety and Security Costs). These three categories account for a total of 74% of the average reported costs of safety and security measures in the Wood June 7, 2024 Report (38% for routine preventative call monitoring, 28% for call recording review, and 8% for enrolling inmates for voice biometrics). Wood June 7, 2024 Report at 6. Removing costs associated with those measures reduces the $0.08 per minute figure that the report argues represents facilities' safety and security costs by 74%, yielding an average cost of approximately $0.0208 per minute. Thus, in excluding categories of safety and security costs that we conclude are generally not used and useful from the amount in the Wood June 7, 2024 Report, we arrive at essentially the same $0.02 that we incorporate into the upper bounds of our zones of reasonableness.

[630] *2021 ICS Order*, 36 FCC Rcd at 9581, para. 140.

[631] *Id.* at 9662, paras. 316-18.

[632] *Id.* at 9662, para. 317.

[633] National Sheriffs' Association Sept. 27, 2021 Comments at 9.

[634] *Id*.

[635] *2021 ICS Notice*, 36 FCC Rcd at 9662, para. 317 (citing National Sheriffs' Association Comments, WC Docket No. 12-375, at 9 (filed Nov. 23, 2020)).

[636] *2021 ICS Notice*, 36 FCC Rcd at 9662, para. 371.

[637] National Sheriffs' Association Sept. 27, 2021 Comments at 9; National Sheriffs' Association May 8, 2023 Comments at 11 (stating that the "cost study provides specific information on costs based on ADP for jails around the country").

[638] *Infra* Section III.D.1.c.4.a (Establishing the Zones of Reasonableness).

data concerning correctional facility costs in connection with IPCS, we rely on data reported by IPCS providers in the 2023 Mandatory Data Collection in connection with providers' site commission payments.  While we recognize that correctional facilities do incur used and useful costs in allowing access to IPCS, the record provides no data that would allow us to estimate those costs with any degree of precision.  Accordingly, we include no estimate for such costs in the lower bounds of our zones of reasonableness.  We decline to rely on the National Sheriffs' Association cost survey in connection with our evaluation of whether and how to incorporate correctional facility costs into the lower bounds of our zones of reasonableness.  As discussed above, we find that the National Sheriffs' Association survey data that we use to incorporate correctional facility costs into the upper bounds of the zones of reasonableness do not enable us to quantify such costs with any level of specificity.[639]  We therefore conclude that we cannot meaningfully adjust the data providers reported for purposes of establishing the lower bounds.

179.    We reach our decision regarding correctional facility costs in the lower bounds based on the absence of a record quantifying such costs, and supported by the analysis described in Appendix I.[640]  This analysis, which is based on the Commission's analysis in the *2021 ICS Order*,[641] takes providers' cost and site commission data reported in response to the 2023 Mandatory Data Collection and compares providers' relative costs per minute for contracts with and without site commissions.[642]  That analysis indicates that contracts with site commissions exhibit *greater* costs per minute than those without site commissions, which provides no support for the assertion that site commissions operate to transfer some costs of service from providers to facilities.[643]  Because providers' responses to the 2023 Mandatory Data Collection "incorporate[] no correctional facility-provided cost data," we find that our approach of including a $0.02 per-minute additive for facility costs in the upper bounds of our zones of reasonableness, but no additive for facility costs in the lower bounds of those zones, properly balances our recognition that correctional facilities may well incur used and useful costs in allowing access to IPCS with the absence of any basis in the record that would enable us to estimate those costs with any degree of precision.[644]  And because the available provider data do not enable us to quantify the extent to which

[639] The same applies to the Wood June 7, 2024 Report.  As discussed above, that "limited" report covers only 30 correctional facilities and only includes "small county jails and large regional facilities," rendering the survey far too unrepresentative as a measure of correctional facility costs across the industry.  Wood June 7, 2024 Report at 5.

[640] *Infra* Appendix I.

[641] *See generally 2021 ICS Order*, 36 FCC Rcd at 9755-56, Appx. H.

[642] *Infra* Appendix I.

[643] If the opposite were true, and site commissions did recover facility costs used and useful in the provision of IPCS, we would expect to see higher costs to the provider for contracts without site commissions.  *See 2021 ICS Order*, 36 FCC Rcd at 9755, Appx. H (explaining that higher cost per minute for contracts without site commissions reflect "at least in part, give-and-take negotiations in which providers agree to incur additional costs related to the provision of [IPCS] in exchange for not having to pay site commissions"); *see also* Appendix I.

[644] *2021 ICS Order*, 36 FCC Rcd at 9579-80, para. 135; Pay Tel July 12, 2023 Reply at 11 (explaining that the costs that correctional facilities incur in making IPCS available "are not currently reflected in mandatory data collection submissions (except indirectly through site commission payments)"); Wood June 7, 2024 Report at 4 (explaining that IPCS providers have "little or no information in their possession" regarding safety and security costs incurred by correctional facilities, based on a review of responses to the 2023 Mandatory Data Collection).  Pay Tel argues that not including a measure of facility costs in the lower bound "reflects a misunderstanding of the evidence in the record and in no way justifies withholding cost recovery from facilities."  Pay Tel July 9, 2024 *Ex Parte* at 14.  Yet Pay Tel does not contend with the inadequacies of the record data we have identified in any meaningful way beyond asserting that they show that correctional facilities incur costs associated with making IPCS available.  *Id.*  As we explain above, the available correctional facility cost data are unreliable for purposes of including a measure of correctional facility costs in the lower bounds of our zones of reasonableness.  Furthermore, we do not withhold cost recovery from facilities by declining to include a measure of correctional facility costs in the lower bounds.  As explained below, we take the fact that our lower bounds may not reflect all used and useful costs into account in

(continued….)

providers' site commission payments compensate facilities for any costs that they incur that are used and useful in the provision of IPCS, we do not incorporate correctional facility costs into the lower bounds of our zones of reasonableness.

180.    We acknowledge that because we do not incorporate a measure of correctional facility costs in the lower bounds of our zones of reasonableness, those bounds may understate the used and useful costs of providing IPCS. As discussed above, none of the data in the record concerning correctional facility costs allow the Commission to quantify these costs with any level of precision and, as such, preclude any adjustment to the lower bounds. We account for that fact in choosing rate caps at levels that exceed the lower bounds, as discussed below.[645]

181.    *Reimbursement for Used and Useful Correctional Facility Costs.* Despite the limitations in our data reflecting facilities' costs, we nevertheless take measures to ensure that correctional facilities have a mechanism to recover their used and useful costs, if any, in the provision of IPCS. To that end, we permit IPCS providers to reimburse correctional facilities for such used and useful costs, if it is apparent that such costs are, indeed, incurred by a facility. The IPCS rate caps we adopt today reflect, based on the record before us, all of the used and useful costs incurred in the provision of IPCS regardless of whether such costs are incurred by IPCS providers or correctional facilities. Thus, the rate caps recognize, consistent with the record, that correctional facilities may incur some used and useful costs in allowing access to IPCS.[646] Because we eliminate site commissions below, which have historically been the primary means by which correctional facilities may have, to some extent, recovered used and useful costs they may incur in allowing access to IPCS, correctional facilities would have no means to recover those costs absent that further action to allow a level of provider reimbursements.[647]

182.    The reimbursement we allow extends only to those costs that are used and useful in the

---

setting rate caps, and we allow IPCS providers to reimburse correctional facilities for the used and useful costs they may incur, if any.

[645] *Infra* Section III.D.4.b (Determining Permanent Rate Caps for Audio IPCS and Interim Rate Caps for Video IPCS).

[646] *See, e.g.*, Pay Tel July 12, 2023 Reply at 11 (discussing various activities that may be performed by correctional authorities and arguing that these activities are costs to the facilities); Worth Rises May 8, 2023 Comments at 4; National Sheriffs' Association Dec. 17, 2021 Reply at 4; Pay Tel June 7, 2024 *Ex Parte* at 4 (arguing that "any approach to balanced regulation must include meaningful facility cost recovery"); Pay Tel July 9, 2024 *Ex Parte* at 14 (noting that "facilities incur costs associated with making IPCS available"); Pay Tel July 11, 2024 *Ex Parte* at 2-3. Pay Tel's contention that the Commission "fail[s] to allow for a mechanism by which facilities may recover their costs associated with making IPCS available" is contradicted by our explicit allowance for such a mechanism here. Pay Tel July 9, 2024 *Ex Parte* at 13; *see also* Letter from Salvatore Taillefer, Jr., Blooston, Mordofsky, Dickens & Prendergast, LLP, Counsel to National Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed July 11, 2024) (National Sheriffs' Association July 11, 2024 *Ex Parte*) (arguing that the Order "regulat[es] the IPCS market as if it only had" a consumer and a provider, without taking into account carceral facilities). Pay Tel's argument appears to be grounded in its preference for an "express additive to IPCS rate caps" rather than the reimbursement mechanism permitted by this Report and Order. Pay Tel July 9, 2024 *Ex Parte.* at 15. As we explain above, the available data do not enable us to quantify correctional facility costs in a way that would allow us to disaggregate our rate caps into just and reasonable provider components and facility components, and Pay Tel has not supplied more robust data or otherwise attempted to cure the defects in the available data. As a result, we rely on our rate caps, which reflect all of the used and useful costs incurred in the provision of IPCS, and therefore "allow IPCS providers to recover facility costs," despite Pay Tel's argument to the contrary.

[647] However, in today's Further Notice we seek comment on whether to adopt a uniform facility cost recovery additive to our IPCS audio and video rate caps in lieu of the reimbursement we permit here. *See* Section V.F (Uniform Additive to Account for Correctional Facility Costs).

provision of IPCS as reflected in this Report and Order.[648]  For example, "[i]f a correctional facility were to pay for internet installation and maintenance to enable the provision of IPCS," that payment would be considered used and useful in the provision of IPCS.[649]  In that case, the IPCS provider could reimburse the correctional facility for its costs from the revenue collected by the IPCS provider since the cost of Internet installation is included in our rate caps.  In contrast, IPCS providers may not reimburse correctional facilities for costs that we find not to be used and useful in the provision of IPCS, such as costs for certain safety and security measures that we conclude are not used and useful in the provision of IPCS.[650]  Finally, under no circumstances may reimbursement result in IPCS consumers being charged more than the rate caps we adopt today.

### 4.    Adopting Audio and Video Incarcerated People's Communications Services Rate Caps

183.    We adopt permanent audio IPCS and interim video IPCS rate caps by employing a zone of reasonableness approach, similar to the Commission's previous efforts.[651]  We find that adopting zones of reasonableness, updated from the Commission's approach in the *2021 ICS Order*, is the best means of establishing rate caps in which IPCS rates are "just and reasonable" and, in conjunction with our ban on

---

[648] Given the over-arching problems associated with site commission payments, if a correctional facility seeks reimbursement from an IPCS provider for an allegedly used and useful cost, the IPCS provider should determine whether the cost for which the correctional facility seeks reimbursement is a cost that the Commission has determined to be used and useful and thus properly reimbursable under the standard set forth in this Report and Order.  We otherwise leave the details of any reimbursement transaction to the parties to resolve.  IPCS providers and their correctional facility customers are well aware of the types of costs that are used and useful in the provision of IPCS and are in the best position to negotiate reimbursement as they see fit.  *See* ViaPath July 11, 2024 *Ex Parte* at 4-5 ("The Commission must clearly delineate . . . the costs considered to be in the 'used and useful' category"); Securus July 11, 2024 *Ex Parte*, Attach. A at 2 (expressing concern about how to "validate or otherwise justify" reimbursement); Letter from Tim McAteer, President, Inmate Calling Solutions, LLC, d/b/a ICSolutions, to Marlene H. Dortch, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed July 12, 2024) (questioning whether CALEA covers all monitoring, recording, and storage) (ICSolutions July 12, 2024 *Ex Parte*); Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ Media Justice Ministry, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed July 12, 2024) (UCC Media Justice July 12, 2024 *Ex Parte*) (arguing that the Commission should "make clear, and also provide a more defined, but not fully inclusive, sense of prohibited site commissions which would not be classified as used and useful").  We also clarify that while we *permit* IPCS providers to reimburse correctional facilities for their used and useful costs in allowing access to IPCS, nothing in today's Report and Order should be interpreted to *require* IPCS providers to do so.  To the extent a correctional facility incurs used and useful costs in allowing access to IPCS, the correctional facility and the IPCS provider are free to negotiate such reimbursement in accordance with this Report and Order.  ICSolutions asks whether, within the rate caps, IPCS providers can "pay correctional facilities up to the $0.02/minute for reasonable corrections facilities' costs" and, if so, whether the $0.02 per minute is a safe harbor.  ICSolutions July 12, 2024 *Ex Parte* at 1.  We do not establish a safe harbor.  The $0.02 figure to which ICSolutions presumably refers reflects the Commission's best estimate of used and useful correctional facility costs for the purpose of calculating the upper bounds of our zones of reasonableness.  That figure is not meant to suggest that $0.02 per minute would be an appropriate reimbursement amount and does not establish a safe harbor for purposes of the reimbursement we permit.

[649] Worth Rises May 8, 2023 Comments at 8 (noting that this example is an "extreme rarity in the IPCS industry, as very few facilities invest capital to directly provide IPCS").

[650] *See infra* Section III.D.7 (Safety and Security Costs).

[651] *2021 ICS Order*, 36 FCC Rcd at 9544-45, paras. 61-62 (adopting a zone of reasonableness approach and identifying how this approach may help the Commission reduce its reliance on inaccurate or unreliable data); *see 2022 ICS Notice*, 37 FCC Rcd at 11953-54, paras. 134-35 (seeking comment on the Commission's use of the zone of reasonableness approach to setting permanent rate caps for audio IPCS using the Third Mandatory Data Collection's cost data).

site commissions, providers are "fairly compensated."[652]  We further find that the data collected in the 2023 Mandatory Data Collection offers a sufficient basis from which to derive the zones and rate caps, despite the limitations of the reported cost data.[653]  We derive the upper bounds and lower bounds of the zones for each facility tier by evaluating and analyzing the data and other information received in response to the 2023 Mandatory Data Collection.

184.    *Reliance on Data from the 2023 Mandatory Data Collection*.  The 2023 Mandatory Data Collection, which updated and supplemented the Third Mandatory Data Collection,[654] is the most comprehensive data collection in the IPCS proceeding to date, building upon the lessons learned from each previous effort.  As instructed by the Commission,[655] WCB and OEA structured this data collection to strike a balance between meeting the statutory timeline directed by the Martha Wright-Reed Act and simultaneously reducing the burdens on providers to respond to an expanded collection, such as by limiting the information requested, lowering reporting requirements, and making other changes associated with reducing burdens through the notice and comment process.[656]  We agree with commenters who assert that the currently available data are of substantially greater quality than that available in 2021 when we established interim rates,[657] and we find the most recent reported data continued to improve in the same

---

[652] *See* 47 U.S.C. § 276(b)(1)(A) (requiring the Commission to "establish a compensation plan to ensure that all payphone service providers are fairly compensated and all rates and charges are just and reasonable for completed intrastate and interstate communications"); Martha Wright-Reed Act § 2.

[653] We reject cursory claims that our rate caps will be unreasonable because our rules "impose[] significant and new operational obligations and changes on all providers" but "fails to account for the costs of these new obligations." Securus July 11, 2024 *Ex Parte* at 3.  Securus does not quantify or otherwise substantiate this claim, nor does it demonstrate that the waiver process would be inadequate to address any unusual implementation costs that theoretically might arise for a given provider.

[654] *See 2023 IPCS Order*, 38 FCC Rcd at 2701-2702, paras. 84-85 (delegating authority to the Wireline Competition Bureau and Office of Economics and Analytics to update the previous data collection and concluding that the Commission "must immediately begin" in order to meet our obligations under the statute); *see also 2023 Mandatory Data Collection Order*, at 3, para. 8  (concluding that the modifications to update the Third Mandatory Data Collection to meet the Commission's obligations under the Martha Wright-Reed Act "appropriately balance" the need for specific data and "avoid unduly burdening providers") (citing *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, 37 FCC Rcd 368, 370, para. 7 (WCB/OEA 2022)).

[655] *2023 IPCS Order*, 38 FCC Rcd at 2701-2702, paras. 83-85.

[656] *See, e.g.*, *2023 Mandatory Data Collection Order* at 5, 19, paras. 14, 50 (requiring providers to explain how they performed cost reporting rather than requiring additional cost reporting and cost allocation requirements which are more burdensome, and separately making optional the reporting of facility specific metrics which providers demonstrated difficulty in reporting).  To reduce the time required and the burdens associated with responding to the 2023 Mandatory Data Collection, it was decided to only require parties to report data collected in the ordinary course of their business, to require at least GAAP consistency for financial reporting, and to allow providers to develop cost allocations based on their knowledge of their businesses and accounts, rather than imposing a regulatory set of accounts on providers.  These decisions traded minimizing burdens off against obtaining useful data.  Staff experience acknowledged that different providers would take different approaches, would have different business models, and would differ in other important ways, and accordingly, questions designed to provide necessary context to understanding these differences were updated and included as well.  *See generally* 2023 Mandatory Data Collection Instructions.

[657] *See* Securus Dec. 15, 2022 Comments at 14 (concluding that "the information reaped in the [Third Mandatory Data Collection] is sufficiently robust and credible to underpin the development of permanent rates"); Securus Dec. 15, 2022 Comments, Attach., Declaration of Charlie J. Choe, Robert O. Fisher, Brian F. Pitkin, and Steven E. Turner, at 6 ("FTI concludes that the majority of providers' responses to the Third MDC are sufficiently complete, accurate, and credible" to develop rate caps) (emphasis omitted); Pay Tel Dec. 15, 2022 Comments at 13 (finding that "[i]n the wake of the Third Mandatory Data Collection, the Commission is in an improved position to make additional reforms"); Pay Tel Communications, Inc. Reply, WC Docket No. 12-375, at 2 (rec. Mar. 3, 2023) (Pay Tel Mar. 3, 2023 Reply) (finding that its expert observed that the data received initially in response to the Third

(continued….)

fashion. Even so, the data from the 2023 Mandatory Data Collection are imperfect.[658] While we afforded providers the leeway to report data collected in the ordinary course of business rather than imposing a regulatory set of accounts upon them, the absence of a uniform system of accounting rules engenders variance in the reported data.[659] We likewise acknowledge that providers are incentivized to report their data in ways that produce higher IPCS costs, that providers are differently situated and may interpret our data requests differently, and that cost allocation, as a general matter, can be difficult.[660]

185.    Nevertheless, we find the data from the 2023 Mandatory Data Collection sufficient to support our actions today.[661] As stated previously, agencies may reasonably rely on the best available data where perfect information is unavailable.[662] The Supreme Court has recognized that "[i]t is not infrequent that the available data does not settle a regulatory issue," and in such cases, "the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy

Mandatory Data Collection "represent a significant increase in quality and reliability when compared with the data collected via the Second Mandatory Data Collection"). These data are derivative of the cost allocation instructions for this data collection, which have been improved and refined themselves. *See* 2023 Mandatory Data Collection Instructions; Securus 2023 Mandatory Data Collection Comments at 1 ("Securus supports the overall approach of largely paralleling the Third Mandatory Data Collection and its detailed allocations of cost and demand data.").

[658] *See* Appendices D, E; *see, e.g.*, Secretariat Economists Dec. 15, 2022 Report at 7, para. 16 ("[T]he cost data do not appear to be reported on a sufficiently consistent basis so as to form a suitable foundation for cost-based rate regulation."); Wood Aug. 23, 2023 Report at 15-16  (agreeing with other analysis that "providers have not reported data consistently"); Brattle May 8, 2023 Report at 2-3, para. 5 (finding "[c]omparisons to other publicly reported data . . . suggest IPCS providers may be inflating their response to the FCC's collection"); Stephen Raher Reply, WC Docket No. 12-375, at 10 (rec. Mar. 3, 2023) (Raher Mar. 3, 2023 Reply) (agreeing with other commenters that there are some issues with provider responses to the Third Mandatory Data Collection); Wright Petitioners et al. Comments, WC Docket No. 12-375, at 13 & n.39 (rec. Dec. 15, 2022) (Public Interest Parties Dec. 15, 2022 Comments) (identifying that some provider responses provide insufficient data "to do a facility-specific cost per-minute analysis" and some provider responses manipulate the "template in ways that make standardizing the information more difficult"). *But see* Securus Dec. 15, 2022 Comments at 14 ("[W]hile there are some deficiencies in the responses, and providers continued to take different approaches to allocating costs and reporting on those methodologies, the information reaped in the [Third Mandatory Data Collection] is sufficiently robust and credible to underpin the development of permanent rates.").

[659] *See* Appendix E; *see also* Wood Aug. 23, 2023 Report at 16 ("[T]he reality is that this kind of iterative process is inevitable (particularly with no [Uniform System of Accounts] or detailed accounting rules). While imperfect, the existing process is demonstrably moving in the direction of higher quality and greater reliability.").

[660] While the record raises some questions as to whether these data accurately capture IPCS expenses, we have sought to account for that risk as best we can, including by using a range of other record sources or publicly available information beyond our data collection. *See generally* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A., Coleman Bazelon et al., Brattle Group, Brattle Report: Updated IPCS Cost Model (filed Feb. 9, 2024); Appendices I, J.

[661] *See, e.g.*, Wood Aug. 23, 2023 Report at 9-10 (noting "general agreement among the commenting parties that the data from the Third Mandatory Data Collection can and should be relied upon as the basis for rate caps"); Securus Dec. 15, 2022 Comments at ii-iii (concluding that "the dataset overall is sufficiently complete and credible to underpin the development of permanent rate caps" and adding that "the data appears to reflect costs that are prudently incurred and that are used and useful to the provision of ICS").

[662] *American Public Gas v. FPC*, 567 F.2d at 1046 (holding that the Federal Power Commission's reliance on unverified data supplied by the American Gas Association was not unreasonable and articulating the "best available data" rule:  "The [Federal Power] Commission's choice to use the best available data, and to make whatever adjustments appeared necessary and feasible, is within its competence.  'Courts cannot fairly demand the perfect at the expense of the achievable.'") (citation omitted); *see also Prometheus*, 141 S. Ct. at 1159-60; *MCI v. FCC*, 627 F.2d at 340-42 (explaining that "[t]he best must not become the enemy of the good, as it does when the FCC delays making any determination").

**Federal Communications Commission**                    **FCC 24-75**

conclusion."[663]  Having "explain[ed] the evidence which is available," we apply our judgment to the record and reach results that provide a "rational connection between the facts found and the choice made."[664]  In doing so, we minimize our reliance on data that we find inaccurate or unreliable by setting lower bounds that adjust for anomalies in the reported data.[665]  Under the circumstances, we choose "to use the best available data, and to make whatever adjustments appear[] necessary and feasible"[666] to ensure that audio and video IPCS rates are just and reasonable.  We have undertaken a comprehensive analysis of the available data, explained our concerns with the imperfections that we have identified, and fully explicated the basis for the rate methodology that we adopt in light of the relative merits of the data.  We also provide our reasoning for excluding certain data from our analysis, based on both flaws in the data and the directives of the Martha Wright-Reed Act.[667]

186.    *Implementing the Zone of Reasonableness Approach*.  In the *2023 IPCS Notice*, the Commission sought comment on the approach to ratemaking and the statutory directive that we may use industry-wide average costs.[668]  The zone of reasonableness approach is well-suited to reconcile competing concerns, such as those reflected by the Martha Wright-Reed Act's respective obligations to set "just and reasonable" rates that "fairly compensate[]" providers.[669]  This approach helps avoid "giving undue weight to the assumptions that would lead to either unduly high or unduly low per-minute rate

---

[663] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

[664] *Id.* at 43 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

[665] *See 2021 ICS Order*, 36 FCC Rcd at 9545, para. 62-63 (observing that "reliance on imperfect data is not ideal, but a lack of perfect data is not fatal to agency action"); *American Public Gas v. FPC*, 567 F.2d at 1046 (holding that the Commission is not required to pursue "the perfect at the expense of the achievable" (internal quotation marks and citation omitted)); *MCI v. FCC*, 627 F.2d at 340-42 (explaining that years-long ratemaking delays resulting from a desire to obtain better or perfect data undermine the Commission's credibility and the requirement of just and reasonable rates under the [Communications] Act).  The D.C. Circuit has held that an agency's decision should be upheld when from "among alternatives all of which are to some extent infirm because of a lack of concrete data, [the agency] has gone to great lengths to assemble the available facts, reveal its own doubts, refine its approach, and reach a temporary conclusion."  *Nat'l Ass'n of Regulatory Utility Commissioners v. FCC*, 737 F.2d 1095, 1140-42 (D.C Cir. 1984) (*NARUC*) (holding that the FCC's "rel[iance] upon its historical experience and expertise" to establish an interim charge when "no reliable data was available" was "within the agency's broad discretion"); *see also Prometheus*, 592 U.S. at 425 (highlighting that the Commission had "acknowledged the gaps in the data" it relied on in evaluating the continuing need for certain media ownership rules).

[666] *American Public Gas v. FPC*, 567 F.2d at 1044-46 (upholding an agency's decision to rely on the best available data in setting rates for new natural gas); *see also Am. Pub. Commc'ns Council v. FCC*, 215 F.3d 51, 56 (D.C. Cir. 2000) (*American Public Communications*) (upholding Commission action which relied on disputed cost data, stating that "we cannot require an agency to enter precise predictive judgments on all questions as to which neither its staff nor interested commenters have been able to supply certainty").  NCIC argues that "nearly half of the current video visitation service providers" did not respond to the 2023 Mandatory Data Collection, and so urges the Commission to "delay the adoption of interim rates until it receives comprehensive data from all video visitation providers, and deliver immediate relief by simply prohibiting flat-rate billing."  In effect, NCIC asks that we pursue "the perfect at the expense of the achievable."  *American Public Gas v. FPC*, 567 F.2d at 1046.  For the reasons set forth herein, we find it appropriate to address the limitations in providers' video IPCS data by making appropriate adjustments to our upper and lower bounds and in setting interim rate caps, rather than abandoning the effort to set rate caps altogether in contravention of Congress's mandate.

[667] *See* Appendix E; *infra* Section III.D.7 (Safety and Security Costs); *2021 ICS Order*, 36 FCC Rcd at 9553, para. 81 (finding that where "limitations in the available data make it impossible for [the Commission] to estimate true mean contract costs per paid minute with any degree of precision," a zone of reasonableness approach is suitable as a ratemaking approach).

[668] *See 2023 IPCS Notice*, 38 FCC Rcd at 2686, 2689, paras. 40-41, 49 (seeking comment on the structure of rate caps and the use of industry-wide average data to set rate caps).

[669] *See* 47 USC § 276(b)(1)(A); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968) (*Permian Basin*).

caps," and helps us balance the respective competing interests of providers and consumers.[670]  It also gives us the flexibility to effectively address imperfections in the data and ultimately select rate caps that satisfy both statutory standards.[671]  We reiterate, "[i]t is well-established that rates are lawful if they fall within a zone of reasonableness."[672]

187.    The record supports this approach.  As certain commenters observe, the zone of reasonableness approach "allowed the Commission to take into account the different approaches to cost reflected in the Second Mandatory Data Collection," and it "continues to be the appropriate method for establishing permanent rates based on the data submitted in response to the Third Mandatory Data Collection."[673]  Commenters add that the zone of reasonableness remains appropriate under the Martha Wright-Reed Act, which "embraces the use of industry-wide average costs to set rate caps for IPCS" and "adjust[ing] those costs as necessary."[674]

188.    Not all commenters agree, however.  A few argue that the zone of reasonableness

---

[670] *2021 ICS Order*, 36 FCC Rcd at 9553, para. 82.  Precedent establishes that we are "free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and competing interests."  *Permian Basin*, 390 U.S. at 767; *see FPC v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 586 (1942) (*Natural Gas Pipeline*) (explaining that ratemaking involves the making of "pragmatic adjustments"); *Hope Natural Gas*, 320 U.S. at 602-603 (describing the ratemaking process and the balancing of interests).

[671] *See, e.g.*, ViaPath Dec. 15, 2022 Comments at 17-18 ("The data shows the existing rate caps allow a variety of competitors to operate in the market while using different cost structures and serving different types of facilities," which "is precisely the reasoning underlying the zone of reasonableness: to 'equitably reconcil[e] diverse and conflicting interests.'" (quoting *Permian Basin*, 390 U.S. at 767 (1968)).  Indeed, the D.C. Circuit has emphasized the "basic principle" that "rate orders that fall within a 'zone of reasonableness,' where rates are neither 'less than compensatory' nor 'excessive,'" are "just and reasonable."  *Farmers Union*, 734 F.2d at 1502 (further observing that "[t]he 'zone of reasonableness' is delineated by striking a fair balance between the financial interests of the regulated company and 'the relevant public interests, both existing and foreseeable'" (quoting *Permian Basin*, 390 U.S. at 792)); *see also* Securus May 8, 2023 Comments at 17 ("The courts have generally upheld a rate as just and reasonable if it falls within a zone of reasonableness, the lower bound of which identifies the rate necessary to avoid confiscation and the upper bound identifies the point at which rates become excessive." (citing *Jersey Central*, 810 F.2d at 1177)).

[672] *2021 ICS Order*, 36 FCC Rcd at 9553, para. 82; *see, e.g.*, *Permian Basin*, 390 U.S. at 767 ("[T]his Court has often acknowledged that the [Federal Power] Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the [Federal Power] Commission which is within a 'zone of reasonableness.'"); *NARUC*, 737 F.2d at 1141 (explaining that when "a figure selected by the agency reflects its informed discretion, and is neither patently unreasonable nor 'a dictate of unbridled whim,' then the agency's decision adequately satisfies the standard of review"); *Natural Gas Pipeline*, 315 U.S. at 585 (describing a "zone of reasonableness" within which the agency is free to fix a rate); *cf. Verizon v. FCC*, 535 U.S. at 524-25 ("'The fact that the method employed to reach [just and reasonable rates] may contain infirmities is not . . . important'[;] . . . the general rule is that any question about the constitutionality of rate setting is raised by rates, not methods[.]" (citation omitted)).

[673] ViaPath Dec. 15, 2022 Comments at 17-18 (favorably describing the zone of reasonableness approach as "a sensible way to identify a range of rates that would be just and reasonable to investors and ratepayers" (quoting *Verizon v. FCC*, 535 U.S. at 487-88)).

[674] ViaPath May 8, 2023 Comments at 8; *see also* Pay Tel May 8, 2023 Comments at 3-4 ("In many ways, the Act simply confirms the Commission's current regulatory approach.  For example . . . the Act now expressly permits the 'use' of industry average costs as a data point in setting rates.  Again, the Commission has been exploring various methodologies for analyzing the cost data it has collected, including the use of a 'zone of reasonableness' approach which makes various statistical adjustments to industry average costs. . . . Directionally these new Congressional directives seem aligned with the Commission's current regulatory analysis."); Securus May 8, 2023 Comments at 17 ("The courts have generally upheld a rate as just and reasonable if it falls within a zone of reasonableness, the lower bound of which identifies the rate necessary to avoid confiscation and the upper bound identifies the point at which rates become excessive." (citing *Jersey Central*, 810 F.2d at 1177)).

**Federal Communications Commission**                    **FCC 24-75**

approach is unnecessary with higher quality data and advocate for us to employ a statistical method paradigm.[675] While the data collected in the 2023 Mandatory Data Collection are more comprehensive and reliable than the data from prior data collections, we disagree that the improvement in the collected data requires us to change our approach.[676] Nor have those commenters persuaded us that their alternative approaches to rate regulation would be an improvement.[677] The alternative statistical methods advanced by providers, including using a mean plus standard deviation or an interquartile range,[678] ignore the limitations of the data and the likelihood that providers have overstated their costs, problems which the zone of reasonableness approach helps us address. We also find that the zone of reasonableness approach remains particularly apt for balancing the directives established by the Martha Wright-Reed Act on the basis of the data before us.[679]

### a.    Establishing the Zones of Reasonableness

189.    Our zone of reasonableness approach involves three distinct steps which echo the approach the Commission took in the *2021 ICS Order*.[680] First, we establish ceilings, or upper bounds, for our zones for each audio and video tier by using the data that providers submitted in response to the

---

[675] *See, e.g.*, Securus Dec. 15, 2022 Comments at 19 ("FTI concludes that utilizing a zone of reasonableness is not necessary in light of the overall quality of the data submitted in response to the [Third Mandatory Data Collection]. The Commission utilized a zone of reasonableness approach in the 2021 ICS Order due to data limitations."); Pay Tel Mar. 3, 2023 Wood Report at 10 ("When setting interim rate caps based on the imperfect data from the Second Mandatory Data Collection, the Commission applied a zone of reasonableness approach that is not necessary with higher quality data."); *see also* FTI and Wood June 10, 2024 Report at 11 (finding the data to be sufficient for the Commission's rate-setting efforts because "[e]ach method of data inspection yields results that are consistent and reasonable for a sample set submitted by providers of varying size and scale").

[676] *See supra* Section III.D.1.c.4 (Adopting Audio and Video IPCS Rate Caps). As we discuss below and in Appendix F, the market for video IPCS is still developing, which strengthens the case for applying the zone of reasonableness to the data before us. *See infra* Section III.D.4.a (Establishing the Zones of Reasonableness); Section III.D.4.b (Determining Permanent Rate Caps for Audio IPCS and Interim Rate Caps for Video IPCS).

[677] *See supra* Section III.D.1 (Rate Cap Structure) (finding that a zone of reasonableness approach better fits the present data than the Brattle model carrier approach, particularly because the market is still adjusting to the requirements of video IPCS communications); *see also* Appendix F.

[678] *See* Securus Feb. 17, 2023 *Ex Parte*, at 4-5 (suggesting the Commission use "industry averages and mechanisms such as a standard deviation, or interquartile range approach, that ensure the vast majority of a provider's contract and facility costs can be recovered"); *see also* Securus Mar. 5, 2023 Reply at 15 (arguing that setting a rate cap using averages without applying a standard deviation or interquartile range "would leave too many contracts or facility costs unrecoverable and preclude the ability of providers to recover their average costs"); Pay Tel Mar. 3, 2023 Wood Report at 10 (finding the interquartile range approach "represents a reasonable and well-tested methodology" to satisfy the Commission's ratemaking objectives). For providers that can demonstrate that their costs exceed our rate caps, we direct those providers to the waiver process. *Infra* Section III.E (Waivers).

[679] NCIC separately criticizes the zone of reasonableness as "overly complicated," and suggests that it "may well be impossible to monitor at small- and medium-sized facilities that have frequently fluctuating populations with varying lengths of incarceration." NCIC Dec. 15, 2022 Comments at 7. We are unpersuaded. The resultant caps are straightforward, and NCIC fails to explain how monitoring rates at individual facilities (regardless of size) is problematic. Indeed, providers are required to track and report the rates they charge, and neither providers nor facilities have any role (much less any responsibility) in the "zone of reasonableness" calculation process. *See* 47 CFR § 64.6060 (requiring providers to "submit a report to the Commission, by April 1st of each year, regarding interstate, intrastate, and international Inmate Calling Services for the prior calendar year," including the "[c]urrent interstate, intrastate, and international rates"). Nor has NCIC explained how population turnover impacts the zone of reasonableness calculation process. As we explain in Appendix E, by distinguishing between prisons and jails, our rate-setting methodology helps account for turnover to the extent relevant, and NCIC's comments do not demonstrate what, if anything, more is justified in that regard.

[680] *See 2021 ICS Order*, 36 FCC Rcd at 9545, paras. 61-62.

106

2023 Mandatory Data Collection.[681]  To reach these ceilings, we also add all reported safety and security costs to the industry averages reflected by the reported data relative to whether those costs are used and useful, and include estimates of facility costs and TRS costs.[682]  Second, we make reasonable, conservative adjustments to the reported data, including by reducing the types of safety and security costs and amount of facility costs we incorporate into our industry average cost calculation, among other steps. We use those adjusted data to establish reasonable floors, which become the lower bounds of our zones of reasonableness.[683]  In determining the upper and lower bounds, we calculate industry average costs across the sum of both billed and unbilled minutes, as we find that this sum (rather than billed minutes alone) more accurately reflects providers' average costs.[684]  Finally, we rely on record evidence and on our agency expertise to pick reasonable rate caps for each tier from within those zones for both audio and video IPCS communications.

190.    *Determining Upper Bounds for the Zones of Reasonableness.*  We begin our determination of the upper bounds for our permanent audio rate caps and our interim video rate caps by identifying the weighted average of providers' reported IPCS costs at each tier.  To do this, we exclude those submissions we find incomplete or otherwise unusable,[685] and we otherwise accept providers' costs as reported.[686]  Because reported costs include costs which we find are not used and useful in the provision of IPCS, our upper bounds mark the upper limits of what might be considered "industry-wide average costs" within the meaning of section 3(b)(1) of the Martha Wright-Reed Act.

191.    In keeping with our acceptance of providers' IPCS costs as reported, we also include all reported safety and security costs in our upper bounds of the zones of reasonableness.  We do so for several reasons.  First, we recognize that while questions were pending surrounding the inclusion of such costs in our IPCS rates,[687] providers continued to develop and offer safety and security measures for the benefit of and use by authorized personnel in the carceral environment.[688]  This suggests that historically,

---

[681] Unlike the *2021 ICS Order*, no outliers were dropped.  *See id.* at 9556, n.256.

[682] *See generally* Appendix H.

[683] We describe these adjustments more fully in Appendix I.

[684] *See* Appendix E.

[685] *See* Appendix E (describing the submissions we find unfit to include in the provider database).

[686] *See id.* (describing the need to drop observations with missing or incomplete data).

[687] *See, e.g.*, *2020 ICS Notice*, 35 FCC Rcd at 8583, para. 107; *2021 ICS Notice*, 36 FCC Rcd at 9585-86, 9664-65, paras. 148-50, 323; *2022 ICS Notice*, 37 FCC Rcd at 11952, para. 131; Securus July 12, 2023 Reply at 27-28 (arguing that "[s]ecurity features have driven down costs and enabled the expansion of IPCS over time" and "[t]oday's advanced communications present significantly more complex security challenges for carceral institutions"); National Sheriffs' Association Comments, WC Docket No. 12-375, at 2-8 (rec. Jan. 15, 2021) (National Sheriffs' Association Jan. 15, 2021 Comments); Worth Rises Reply, WC Docket No. 12-375, at 2-6 (rec. Dec. 17, 2021) (Worth Rises Dec. 17, 2021 Reply); *see e.g.*, *infra* Section III.D.7 (Safety and Security Costs) (addressing the comment record regarding accounting for safety and security costs in IPCS rate caps).

[688] *See, e.g.*, Securus July 12, 2023 Reply at 27-28 (discussing the evolution of safety and security measures, wherein facilities "have sought centralized management of communications through sophisticated software that allows real-time oversight, more robust call recording and data management tools, more advanced security controls for access to data and systems, and secure dedicated networks"); United Church of Christ Media Justice Ministry and Public Knowledge Comments, WC Docket No. 12-375, at 12 (rec. Sept 27, 2021) (UCC and Public Knowledge Sept. 27, 2021 Comments) ("ICS providers have routinely introduced new security and surveillance services mid-contract that therefore are not associated with any increase in rates. Instead, it is a scheme to normalize the use of such technologies and then to later use these new services to justify higher rates."); Worth Rises Sept. 27, 2021 Comments at 3; Worth Rises Dec. 17, 2021 Reply at 3 (discussing one county's consideration of "a pilot to adopt" speech-to-text software, and its decision against adoption as "the technology was too expensive"); *infra* Section III.D.7 (Safety and Security Costs) (discussing the Commission's prior treatment of the increasing array of security features being offered by IPCS providers).

IPCS providers were able to provide service without certain safety and security services which have been more recently developed.[689]  In developing our upper bounds, however, we decline to weigh the various categories of safety and security measures, and instead give providers the benefit of the doubt by treating all such measures as used and useful IPCS costs, regardless of whether such measures are of the type that were historically used and useful in the provision of IPCS.[690]  Second, because of limitations in the reported data, we cannot further disaggregate or distinguish costs for individual safety and security measures with precision.[691]  Rather than attempt to remove costs for specific constituent safety and security measures which are not used and useful in the provision of IPCS, we take a conservative approach and include all reported safety and security measures costs within the upper bounds.

192.    Next, we incorporate an estimate of the separate IPCS costs which facilities may incur in allowing access to IPCS.  First, as we explain above, we adopt an estimate of $0.02 per minute for the proposed caps at each tier for our upper bounds to reflect any used and useful costs facilities may incur.[692]  As we have explained, the record does not sufficiently quantify the amount of such costs, particularly at smaller facilities.[693]  We derive an estimate of these costs from the facility cost additive the Commission used in its *2021 ICS Order*, which previously applied to prisons and large jails, depending on the existence of contractually prescribed site commissions related to a given facility.[694]  This $0.02 estimate continues to reflect the best data available concerning facility costs despite outstanding questions.[695]  Without better data from which to determine how facilities' IPCS costs may differ, if at all, between facilities of different sizes and types, we apply this same estimate uniformly across all tiers.

193.    Finally, we also include an estimate of the costs incurred by providers to implement the changes to TRS services required under the *2022 ICS Order*.[696]  We understand that the costs to provide TRS in the carceral environment may frequently exceed the support available to TRS providers because of the specialized equipment and networks often required to deploy these services inside of prisons or

---

[689] *See* Worth Rises Sept. 27, 2021 Comments at 2-3 (discussing the historical distinction between communications services and security services in the IPCS market).  *But see* Securus Technologies, LLC Reply, WC Docket No. 12-375, at 29-31 (rec. Dec. 17, 2021) (Securus Dec. 17, 2021 Reply) (rebutting Worth Rises's comments and citing a study finding that IPCS "would not exist if it did not possess" security features like the use of PINs or limits on the telephone numbers that can be called); *infra* Section III.D.7 (Safety and Security).

[690] *See id.*; *see also* Appendix H.

[691] *See* Appendix I.

[692] *See supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[693] Although the Commission has repeatedly sought more recent and more accurate data, the record before us is lacking.  *See id.*; Appendix I; *2021 ICS Notice*, 36 FCC Rcd at 9666, para. 324; *see also* National Sheriffs' Association May 8, 2023 Comments at 9; Pay Tel July 12, 2023 Reply at 11-16.

[694] *See 2021 ICS Order*, 36 FCC Rcd at 9579-80, paras. 134-36 (adopting a permissive allowance of $0.02 per minute for providers of prisons and larger jails, based on an estimate of site commission payments that are legitimately related to providing audio IPCS, as the prescribed facility rate component); *supra* Section III.D.3 (Accounting for Correctional Facility Costs) (referencing the $0.02 additive for correctional facilities' costs that the Commission adopted in in the *2021 ICS Order*).

[695] *See id.* (recognizing the concerns regarding the reliability of the data from the National Sheriffs' Association's cost survey).  The use of this additive did not generate any waiver requests in the interim, suggesting that the estimate was not unduly low.

[696] *See 2022 ICS Order*, 37 FCC Rcd at 11907-29, paras. 19-70.  These changes did not take effect until January 9, 2023, and the costs of implementing them therefore were not reflected in the data filed in response to the 2023 Mandatory Data Collection, which are for calendar year 2022.  *See Rates for Interstate Inmate Calling Services*, 87 Fed. Reg. 75496 (2022).

**Federal Communications Commission** FCC 24-75

jails.[697]  We include this estimate so that our rate caps will cover these excesses and fully compensate providers for the costs of providing these services.  However, the record quantifying these costs is once again scant.[698]  The only available data in the 2023 Mandatory Data Collection stems from the response of a single provider, which suggest that these costs may be $0.002 per minute.[699]  Without more data on which to rely, we incorporate that estimate into both our upper and lower bounds.

194.    As we explain in Appendix I, we find that the upper bounds overstate providers' actual costs of providing both audio IPCS and video IPCS, likely by a significant margin.[700]  In addition to the overinclusion of safety and security costs and facility costs which we discuss above, all providers have reasons to overstate their general IPCS costs in response to our data collection, as higher costs could lead to higher cost-based rate caps, and thus higher profits.[701]

195.    Additionally, our upper bounds also incorporate the weighted average cost of capital (WACC) as reported by providers, another factor which heightens the likelihood that they are overstated. The instructions to the 2023 Mandatory Data Collection included the caveat that the Commission would apply a WACC figure of 9.75% for any provider that failed to justify the application of an alternative figure.[702]  Of all providers, only Securus and ViaPath reported higher costs of capital than the standard 9.75% rate of return.[703]  We find Securus and ViaPath failed to justify the higher costs of capital they reported and therefore use 9.75% in determining our lower bounds.  Particularly because the weighted average cost of capital has a cascading effect upon reported costs, accepting these figures as reported tends to overstate the upper bounds.

196.    There are also distinct attributes of the video IPCS market which reinforce our conclusion that the upper bounds likely overstate providers' used and useful costs.  One overarching attribute is that video IPCS remains a developing marketplace—in fact, providers report offering video IPCS at less than half of all facilities where they offer audio IPCS.[704]  There are significant indicia that the reported data reflect high upfront costs to develop and deploy video IPCS across the nation's carceral facilities, which

---

[697] *See* Hamilton Relay Mar. 3, 2023 Reply at 3 ("Hamilton Relay is not a specialized ICS provider that is in a position to deploy and maintain corrections-grade hardware and networks."); NCIC Dec. 15, 2022 Comments at 3 (noting the costs to deploy "corrections-grade" hardware are substantial especially at smaller facilities); Securus Dec. 15, 2022 Comments at 6 (arguing that "[t]he Commission should . . . ensure that providers are able to recover the additional costs of deploying necessary equipment and facilities" for [the] additional services, such as kiosks, installation and wiring, which can easily amount to thousands of dollars").

[698] *See* Appendix H (discussing the data supplied concerning TRS costs).

[699] *See id.*

[700] This conclusion echoes the reasoning in the Commission's *2021 ICS Order*. *2021 ICS Order*, 36 FCC Rcd at 9555-56, paras. 86-87 (identifying that the upper bounds overstated costs because of how providers reported certain data and because the upper bounds incorporated costs as reported without necessary adjustments).

[701] *See id.* at 9554, para. 83.

[702] Generally, 9.75% is the Commission's currently authorized rate of return for incumbent local exchange carriers regulated on a rate-of-return basis.  2023 Mandatory Data Collection Instructions, § IV.C.2.d; *see also Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, 37 FCC Rcd 368, 377, para. 28 (implementing the proposal to allow providers an option to calculate their WACC or accept the Commission's default rate of 9.75%).

[703] *See* Appendix I (detailing how 9.75% is a standard rate of return for incumbent local exchange carriers that are regulated on a rate-of-return basis).

[704] Appendix F; *see also* Securus May 8, 2023 Comments at 23 ("Unlike voice service, which is a mature technology, video services are still relatively new and evolving.  Securus has and continues to improve the quality and functionality of its video services and is exploring additional features.").  Currently, video IPCS is being deployed at 49.24% of facilities in the dataset.  *See also* Appendix F.

costs should decrease over time.[705]  For example, many facilities represented in the dataset have extraordinarily high costs per minute for video IPCS, yet very low relative demand, which is consistent with newly deployed services.[706]  Further, the variation in providers' reported data for almost every aspect of video communication is substantially higher than for audio, suggesting that video supply in 2022 was in an early developmental stage, and that providers will likely become more efficient over time, resulting in lower unit costs.[707]  Keeping in mind the rate caps that we adopt today reflect data from 2022, we expect providers have become more efficient in supplying video services and will continue to do so.  We also expect usage of video IPCS to increase and hence, as providers reap economies of scale, for costs relative to demand to decrease over time.

197.    In light of the above, we calculate the upper bounds for audio and video IPCS rate caps for each tier as follows:

- Prisons: $0.107 per minute for audio communications and $0.326 per minute for video communications;

- Large Jails: $0.098 per minute for audio communications and $0.223 per minute for video communications;

- Medium Jails: $0.110 per minute for audio communications and $0.216 per minute for video communications;

- Small Jails: $0.121 per minute for audio communications and $0.208 per minute for video communications; and

- Very Small Jails: $0.151 per minute for audio communications and $0.288 per minute for video communications.

Taken together, these upper bounds form a reasonable, yet cautiously overstated, edifice from which to continue our calculation of the zones of reasonableness.

198.    *Determining Lower Bounds of the Zone of Reasonableness*.  Our lower bound calculations begin by incorporating the results of our upper bound analysis, which "provides an appropriate starting point for determining the lower bounds of the zones."[708]  We then make reasonable

---

[705] *See* Appendix F; *see also* Wright Petitioners May 23, 2024 *Ex Parte*, Attach. at 2 ({[

]}); Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Group, Response to the FCC's Implementation of the Martha Wright-Reed Act, at 9 (filed July 12, 2024) (Brattle July 12, 2024 Report) (arguing that there are {[

]}).

[706] Appendix F; *see also* Wright Petitioners May 23, 2024 *Ex Parte*, Attach. at 2-3 (pointing to "excessive reported cost per-minute figures for video IPCS of "several dollars . . . [to] tens of thousands of dollars per minute"), 8-10 (discussing how "almost half" of all facilities "report[] [video IPCS costs] in excess of revenues," such that their data "are most likely unreliable for rate-setting purposes as it is not sustainable in the long term to lose money on each call").

[707] Appendix E; *see also* Brattle July 12, 2024 Report at 9 ( {[

}).

[708] *2021 ICS Order*, 36 FCC Rcd at 9556, para. 88.

**Federal Communications Commission**     **FCC 24-75**

adjustments to the upper bound figures to "minimize our reliance on data that we find inaccurate or unreliable."[709]  We also adjust the upper bound figures to remove the costs of those categories of safety and security measures that we find generally are not used and useful in the provision of IPCS.[710]

199.     Our lower bound adjustments to providers' reported costs entail several modifications beyond those applied to reach our upper bound figures.  Nevertheless, we find that several significant anomalies in providers' reported data justify these modifications.  Most critically, providers' total reported costs across the industry for 2022 exceed their total reported revenues by approximately $219 million.[711]  The existence of such a disparity, let alone its magnitude, strongly suggests that reported costs are inflated, given that rational firms are profit seeking.  Nor have any providers offered an explanation of why costs might reasonably exceed revenues at such a magnitude, either in their responses to the 2023 Mandatory Data Collection or otherwise in the record.  Consequently, we find that even the more impactful modifications that we adopt to establish our lower bounds represent reasonable, conservative adjustments,[712] which help account for this deficit, in addition to addressing the other anomalies in the reported data we detail further below.[713]

200.     The construction of the lower bounds is driven by removing the costs of those categories of safety and security measures that we find generally are not used and useful in the provision of IPCS.[714]  As discussed above, we find that only two of the seven categories of safety and security measures identified in the 2023 Mandatory Data Collection are generally used and useful in the provision of IPCS: the Communications Assistance for Law Enforcement Act (CALEA)[715] compliance measures and communication security services.[716]  By incorporating the costs reported for these service categories into our lower bounds, we retain a significant portion of providers' reported safety and security costs, i.e., $180 million.[717]  Conversely, incorporating the costs of the five remaining categories would run counter

---

[709] *See id.* at 9545, para. 62.  The related assumptions and adjustments are described at greater length below, and in Appendix I.

[710] *See infra* Section III.D.7 (Safety and Security Costs).  We discuss the assumptions and adjustments taken to derive these numbers below, which are themselves described in greater detail in Appendix I.

[711] This represents a deficit amounting to over 16% of the total size of the IPCS market.  *See* Appendix F.  This pattern applies individually as well as in the aggregate, with half of the providers making up our database reporting cost-revenue deficits for 2022, including four of the top five providers by market share, a result "inconsistent with the record evidence establishing that providers are able to achieve significant economies of scale."  *2021 ICS Order*, 36 FCC Rcd at 9550, para. 75; *see* Appendix F.

[712] *Infra* Section III.D.5 (Preemption).

[713] *See American Public Communications*, 215 F.3d at 56 (upholding Commission action that relied on disputed cost data, stating that "we cannot require an agency to enter precise predictive judgments on all questions as to which neither its staff nor interested commenters have been able to supply certainty").  The adjustments set forth below help resolve this apparent discrepancy between providers' reported costs and revenues.

[714] *See* Martha Wright-Reed Act § 3(b)(2) (directing that the Commission "shall consider costs associated with any safety and security measures necessary to provide" IPCS).

[715] 47 U.S.C. § 1001 *et seq.*; 47 CFR § 1.20000 *et seq.*

[716] *See infra* Section III.D.7 (Safety and Security) (finding that the excluded services serve more general law enforcement functions); *see also* 2023 Mandatory Data Collection Instructions, § IV.C.3.b.

[717] This sum is equivalent to nearly half of providers' reported costs of providing audio and video IPCS (even before applying the additional adjustments addressed below).  *See* Appendix F, Tab. 30 (collecting industry-reported safety and security costs, before adjustment).  Additionally, as discussed above, several commenters contend that *none* of the costs of providing safety and security measures should be incorporated into our rate caps, arguing that these measures are not "used and useful" to IPCS consumers but instead merely "elective features," and that incorporating these costs into our caps effectively requires consumers to finance the conditions of their own confinement as a condition of communicating with loved ones.  *See infra* Section III.D.7 (Safety and Security).  We disagree, and find that allowing a portion of such costs results in just and reasonable rate caps.

**Federal Communications Commission**                    **FCC 24-75**

to the purposes and language of the Martha Wright-Reed Act and would fail to yield just and reasonable rates.  Excluding these costs reduces industry-wide total costs by approximately $326 million.[718]  By excluding these costs from our lower bound figures, we "ensure that IPCS consumers do not bear the costs of those safety and security measures that are not necessary to provide IPCS."[719]

201.      Next, we revisit our per-minute estimate of the IPCS related costs that facilities incur, and set the estimate of such costs at zero for the lower bounds.  Again, the lower bounds of our zones of reasonableness include only those costs we find are used and useful; with respect to the costs facilities may incur to provide IPCS, the limited record and the lack of quantifying data persuade us to estimate that there are no facility costs that we should consider used and useful in IPCS.[720]  Given the likelihood that the estimate we accepted for the upper bounds is overstated, we find that using a lower estimate of these costs at the lower bounds minimizes reliance on flawed data while we still provide for the opportunity to recover costs for providing IPCS through our process for determining rate caps.  In sum, we conclude from both the record and the reported cost data that it is reasonable to estimate facility costs to be zero in our lower bounds.[721]  And because we do not permit—let alone require—IPCS providers to reimburse correctional facilities for costs those facilities incur that are not used and useful in the provision of IPCS and not allowed in regulated IPCS rates, or to otherwise provide in-kind site commissions to correctional facilities, providers will not face the prospect of paying unrecoverable site commissions to correctional facilities that might deny the providers fair compensation.[722]

202.      We do, however, continue to incorporate the same estimate for TRS costs in our lower bounds as we did in our calculation of the upper bounds.  There is nothing in the record that suggests a range for these costs.

203.      We also revise the weighted average cost of capital (WACC) for ViaPath and Securus, the only two companies which elected to estimate an alternative WACC figure.[723]  We find that neither provider offered sufficient justification to support their proposed alternatives to the Commission's 9.75% WACC.[724]  Both providers rely on several assumptions which we find lacking and which consistently favor material overestimation of the ultimate WACC figure.[725]  Furthermore, ViaPath failed to document its underlying calculations and processes with the requisite detail, rendering its approach nonreplicable—a flaw that not only undermines the reliability of such calculations, but also makes them impossible to validate.[726]  Given these concerns, we find that Securus and ViaPath failed to meet their burden of

---

[718] See Appendix F.

[719] Supra Section III.C (Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder).

[720] See supra Section III.D.3 (Accounting for Correctional Facility Costs) (discussing persistent and unaddressed concerns with the data from the National Sheriffs' Association's cost survey).

[721] Id.

[722] 47 U.S.C. § 276(b)(1)(A) (in pertinent part, requiring the Commission to "establish a compensation plan to ensure that all payphone service providers are fairly compensated ").

[723] ViaPath and Securus adopted a weighted average cost of capital of 14.86% and 11.43%, respectively, well above the 9.75% rate which every other reporting provider adopted.  See Appendix I.  As we explain above, in the 2023 Mandatory Data Collection Instructions, the Commission explained that it may apply a WACC of 9.75% for any provider that failed to justify the application of an alternative figure.  2023 Mandatory Data Collection Instructions at 23.

[724] See Appendix I.

[725] For example, certain components of the WACC calculation are supposed to rely on data assimilated from a "demonstrably comparable group of firms."  2023 Mandatory Data Collection Instructions at 28-29.  Both providers assembled groups of firms that we find, on balance, are not "demonstrably comparable."  See Appendix I (detailing this and other questionable assumptions underlying Securus's and ViaPath's WACC calculations).

[726] See Appendix I (detailing efforts to replicate ViaPath's WACC calculations).

justifying the alternative WACCs they propose and that the most reasonable approach for factoring the WACC into our lower bounds is to apply the default WACC figure of 9.75% for both providers.  This default 9.75% WACC is equal to the Commission's authorized rate of return for local exchange carrier services subject to rate-of-return on rate base regulation, which reflects comprehensive analyses of capital structures and the costs of debt and equity, and is designed to compensate these carriers for their cost of capital.

204.    Finally, we adjust Securus's reported video cost data downward in order to address significant and unresolvable, on the record before us, issues with those data.[727]  Unadjusted, Securus's reported video cost data stand apart from those reported by the rest of the industry.  For example, Securus reports average video IPCS costs per minute that exceed the average of the rest of the industry by anywhere from 100% to over 250%, depending on the facility tier.[728]  Across all facilities, Securus's reported per-minute video IPCS costs are over four times the average of all other providers:  an anomalous result, given that we would expect Securus—as one of the two largest providers in the IPCS market—to benefit from economies of scale and scope.[729]  This situation is analogous to the situation the Commission confronted in 2021; as the Commission then concluded with respect to ViaPath, Securus "should be better enabled to spread its fixed costs over a relatively large portfolio of contracts relative to other providers," but "[i]nstead, taking [its] reported costs at face value would imply that it does not achieve economies of scale."[730]  Instead, we find that Securus's reported video IPCS data likely reflect substantial initial investment in fixed assets that, while presumably proportionate to the number of video IPCS minutes over which this investment may eventually be spread, is disproportionate to the number of video IPCS minutes Securus provided in 2022, the year covered by the 2023 Mandatory Data Collection.[731]  Incorporating Securus's video cost data as reported would therefore inaccurately skew the

---

[727] *See 2021 ICS Order*, 36 FCC Rcd at 9557, para. 90 (adopting a similar substitution method for GTL's reported cost data).

[728] *See* Appendix I.  Securus's specific cost figures, and how they compare to others in the industry at each tier, are addressed in further detail in Appendix I.

[729] *See 2021 ICS Order,* 36 FCC Rcd at 9550, para. 75 (finding that similarly—but less dramatically—disproportionate cost data reported by ViaPath was "inconsistent with the record evidence establishing that providers are able to achieve significant economies of scale").  Indeed, Securus's reported cost data for audio IPCS reflect such economies of scale—with substantially lower costs per minute at each tier than the industry average—which only raises further concerns with the reliability of its reported video IPCS costs.  *See* Appendix I.

[730] *2021 ICS Order,* 36 FCC Rcd at 9550, para. 75; *see also 2020 ICS Notice,* 35 FCC Rcd at 8518, para. 94.  Indeed, Securus's reported video IPCS costs are even more out of proportion than ViaPath's reported costs examined in the *2021 ICS Order.  Compare* Appendix I (determining that Securus's per-minute video IPCS costs are higher than every other provider at each tier, and over three times the average of all other providers) *with 2021 ICS Order,* 36 FCC Rcd at 9550, para. 75 (observing that ViaPath's reported costs "are higher than those of all but one (much smaller) provider, and are nearly {[           ]} the average of all the other providers").  This conclusion is strengthened by comparing Securus's and ViaPath's reported costs to their respective minutes of use.  *Compare* Appendix I (determining that Securus's share of reported total video IPCS costs are over {[                    ]} than its reported share of total video minutes of use) *with 2020 ICS Notice*, 35 FCC Rcd at 8518, para. 94 (concluding that ViaPath's reported share of total audio IPCS costs "is roughly 1.5 times greater than its reported share" of industry minutes of use).

[731] *See* Appendix I; Wright Petitioners May 23, 2024 *Ex Parte*, Attach. at 11-15 (discussing the anomalous nature of Securus's reported video IPCS cost data, which {[

                              ]}); Letter from Henry Dixon, Vice President & Head of Government Relations, Aventiv Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed Feb. 26, 2024) (Securus Feb. 26, 2024 *Ex Parte*) (discussing Securus's expanding investments in communications technology, including video IPCS).

industry's mean above what it is likely to be as demand grows significantly over time.[732]  At base, we find that Securus's per-minute video IPCS costs are simply non-representative for the industry at large.[733]

205.    We conclude that the best way to address this anomaly is to follow an approach similar to that adopted in the *2021 ICS Order*, and adjust Securus's video expenses to align more closely with their competitors.  Specifically, we set Securus's video IPCS cost per minute equal to the weighted average for all other providers and estimate Securus's new annual total expense for video.  We then calculate the percentage reduction in Securus's annual total expenses as a result of this adjustment, and reduce the cost per-minute data reported for each facility at which Securus provides video IPCS by the same percentage, in order to retain Securus's relative allocations of video expenses.[734]  This approach reasonably preserves the non-cost information that Securus reported for the facilities it serves (e.g., average daily population, facility type, and total video IPCS minutes of use), while reducing its anomalous reported cost data to fit the industry norm.[735]  However, we recognize that this adjustment may still overestimate Securus's costs per minute, particularly given certain attributes of the nascent market for video IPCS.[736]  These flaws in providers' video IPCS cost data (both industry-wide and for Securus in particular), as well as evidence suggesting that this market has significant room for future growth, confirm that it is appropriate to adopt interim video rate caps to effectively account for these conditions.[737]

---

[732] *See 2021 ICS Order*, 36 FCC Rcd at 9556, para. 89 (concluding that the use of ViaPath's reported costs would "skew the data and . . . otherwise render the mean . . . to be [a] less precise measure[] of the data's central tendency"); *see also* Secretariat Economists June 13, 2024 Report at 13 (noting that video costs exceed revenues "due to the high costs reported by a single IPCS provider") (citing FTI and Wood June 10, 2024 Report).

[733] *See* Appendix I (reviewing reasons why Securus's reported video IPCS costs are not representative); *see also 2021 ICS Order*, 36 FCC Rcd at 9550, para. 75.  *But see* Securus July 11, 2024 *Ex Parte* at 20 (arguing that its large upfront investment in video technology, which it believes reflects the nascent state of the video service market, should be included in our rate cap calculations, and that the Commission's interim rates "should reflect *current* costs" (emphasis in original)).  We disagree that it is appropriate to set rates for the IPCS industry based on per-minute cost data so heavily skewed by one provider's outsized investment in upfront costs for a nascent service offering; to do so would lead to recovery in excess of long run average costs, failing to meet our obligations for just and reasonable rates.

[734] We describe this method in greater detail and show its application to Securus's data in Appendix I.  In the *2021 ICS Order*, the Commission applied the *k*-nearest neighbor method to determine appropriate substitutes for ViaPath's reported cost data.  *2021 ICS Order*, 36 FCC Rcd at 9557, para. 90.

[735] *See id.* at 9557, para. 90.  We also considered removing all of Securus's data from our lower bound calculations; however, we find this approach too sweeping because it would exclude all of Securus's video cost data from our analysis.  *See, e.g., id.* at 9558, para. 92 (reaching the same conclusion regarding removing ViaPath's data).  Given the developing nature of the video IPCS market, and the role which Securus plays within it, excluding its data would create an incomplete picture of the video IPCS industry.  *See, e.g., id.*; *see* Appendix F (detailing Securus's share of the video IPCS market, e.g., average daily population and paid minutes of use).

[736] *See supra* Section III.D.1 (Rate Cap Structure) (recognizing, as factors in setting the upper bounds for video IPCS, the nascency of the video IPCS marketplace, its room for future growth, the providers' large initial deployment costs, and the likelihood that a disproportionate share of providers' platform and application costs were video IPCS, rather than nonregulated services).

[737] *See supra id.* (addressing the adoption of permanent and interim rate caps); Appendix F; FTI and Wood June 10, 2024 Report at 29 (finding that "it is premature to use this data to set permanent rates for video IPCS, and that future data collection may be necessary as the markets for video IPCS mature"); Securus Feb. 17, 2024 *Ex Parte* (discussing Securus's expanding investments in communications technology, including video IPCS).  Conversely, the fact that we do not implement any adjustments specific to any provider's reported audio IPCS costs further reflects our confidence in our approach to audio IPCS and our incrementally greater confidence in the underlying data, such that we do not apply the "interim" descriptor to the rate caps that we adopt for audio IPCS.  In particular, the more established marketplace for audio IPCS, coupled with our experience with audio IPCS data analysis in the past, gives us sufficient confidence that our overall rate-setting approach will appropriately account for the

(continued….)

206.    Following the aforementioned steps, we calculate the lower bounds for audio and video IPCS rate caps for each tier as follows:

- Prisons: $0.049 per minute for audio communications and $0.122 per minute for video communications;

- Large Jails: $0.047 per minute for audio communications and $0.087 per minute for video communications;

- Medium Jails: $0.061 per minute for audio communications and $0.102 per minute for video communications;

- Small Jails: $0.080 per minute for audio communications and $0.126 per minute for video communications; and

- Very Small Jails: $0.109 per minute for audio communications and $0.214 per minute for video communications.

### b.    Determining Permanent Rate Caps for Audio IPCS and Interim Rate Caps for Video IPCS

207.    Based on our analysis of the available information, we find that the following rate caps within the zones of reasonableness for each tier of facilities will provide just and reasonable rates while ensuring fair compensation:

| Tier (ADP) | Audio (Per minute) | | | Video (Per minute) | | |
|---|---|---|---|---|---|---|
| | Lower Bound | Audio Rate Caps | Upper Bound | Lower Bound | Interim Video Rate Caps | Upper Bound |
| **Prisons**    (any ADP) | $0.049 | **$0.06** | $0.107 | $0.122 | **$0.16** | $0.326 |
| **Large Jails**  (1,000+) | $0.047 | **$0.06** | $0.098 | $0.087 | **$0.11** | $0.223 |
| **Med. Jails**  (350-999) | $0.061 | **$0.07** | $0.110 | $0.102 | **$0.12** | $0.216 |
| **Small Jails** (100-349) | $0.080 | **$0.09** | $0.121 | $0.126 | **$0.14** | $0.208 |
| **Very Small Jails**  (0-99) | $0.109 | **$0.12** | $0.151 | $0.214 | **$0.25** | $0.288 |

208.    We settle on these rate caps through our examination of the record, our analyses of the available data, and on the basis of our extensive regulatory experience in this market.[738]

209.    *Lower Bounds as an Accurate Metric for Used and Useful Costs*.  We begin by considering the midpoint in each of the zones of reasonableness, and whether the record and evidence suggest the appropriate cap lies above or below those midpoints.  On balance, we find that just and

---

remaining limitations in those data sufficient to justify rate caps that will apply indefinitely.  Although our audio IPCS rate caps are in that sense "permanent" rate caps, they naturally remain subject to reevaluation if warranted in the future based on new developments or new information.

[738] As discussed above, the Commission has been engaged in an ongoing process of examining and regulating various aspects of the IPCS market for over a decade, in the course of which the Commission has conducted several notice and comment cycles and supporting data collections (and analyses of the data produced therefor).  *See, e.g.*, *2012 ICS Notice*, 27 FCC Rcd 16629; *2013 ICS Order*, 28 FCC Rcd 14107; *2015 ICS Order*, 30 FCC Rcd 12763; *2016 ICS Order on Reconsideration*, 31 FCC Rcd 9300; *2020 ICS Order*, 35 FCC Rcd 9495; *2021 ICS Order*, 36 FCC Rcd 9519; *2022 ICS Order*, 37 FCC Rcd 11900; *2023 IPCS Order*, 38 FCC Rcd 2669; *see* Inmate Calling Services Mandatory Data Collection, WC Docket No. 12-375, General Instructions, https://docs.fcc.gov/public/attachments/DOC-343708A3.docx (Second Mandatory Data Collection Instructions); Calling Services for Incarcerated People Third Mandatory Data Collection, WC Docket No. 12-375, Instructions, http://www.fcc.gov/sites/default/files/2022_mdc_-_instructions_to_third_mandatory_data_collection_1.18.2022.docx (Third Mandatory Data Collection Instructions); 2023 Mandatory Data Collection Instructions.

reasonable rates are likely below the midpoint of each tier for both audio and video IPCS. As discussed above, we find that only those categories of safety and security costs included in the lower bounds generally are truly used and useful in the provision of IPCS.[739] Setting rate caps at the midpoint, which would give equal weight to both upper and lower bounds would risk incorporating costs that we find are ultimately highly unlikely to benefit the ratepayer and, therefore, produce rates that are not "just and reasonable." This risk is nontrivial: the adjustment made for safety and security costs accounts for 84% of the overall reduction in audio costs and 50% of the overall reduction in video costs between the upper and lower bounds, such that even a minor increase above our midpoint is likely to incorporate a significant portion of costs we find are properly excluded from the rate caps.[740] Consequently, we find that the lower bounds operate as a more accurate reference point for providers' used and useful costs.[741] The substantive evidence in support of the other adjustments we make in setting our lower bounds[742] warrants a similar conclusion: that we must set rate caps well below the midpoint if we are to obtain an accurate estimate of those costs that are used and useful in providing IPCS.

210. *Unaccounted Factors Which Support Choosing Lower Rate Caps*. Our calculation of the lower bound left several other factors unaccounted for, which collectively reinforce our decision to set caps below the midpoints. While we were unable to precisely quantify the effect of these factors upon reported industry costs, the factors nevertheless indicate that providers' reported costs are likely inflated. At the outset, we reiterate that total industry reported costs exceeded total industry revenues by $219 million.[743] Without context, this might indicate that the IPCS industry at large is unprofitable, and suggests that rational firms might exit the market, results inconsistent with the fact that there is no evidence that any provider is not an ongoing viable operation.[744] This is also inconsistent with the lack of competition and competitive pressures that we have documented above.[745] While some of the observed cost-revenue gap for the industry can be explained by the nascent state of the video IPCS marketplace as providers continue to develop and deploy video IPCS, investing heavily in fixed assets needed to provide

---

[739] *See infra* Section III.D.7 (Safety and Security Costs).

[740] The record suggests that some providers may have had difficulty isolating and properly allocating their safety and security expenses, a difficulty which would increase reported IPCS costs where providers were unable to report these costs separately. *See* Securus Apr. 30, 2024 *Ex Parte*, Attach. at 8, para. 19 (arguing that "[o]ther providers [than Securus], particularly those with fewer resources or less sophisticated accounting procedures, may not have been able to isolate security costs"). *But see* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A at 21-22 (filed May 7, 2024) (Public Interest Parties May 7, 2024 *Ex Parte*) (arguing that, if providers did have difficulty isolating security costs as Securus implies, "[t]his is all the more reason to place greater weight on Securus' and GTL's reported non-security costs" for audio IPCS, which are much lower by comparison); Appendix I.

[741] As discussed further below, we recognize that, given the limitations inherent in the 2023 Mandatory Data Collection and providers' responses to the data collection, our estimate of providers' safety and security costs may not incorporate all costs that are used and useful in providing IPCS. While we find that this warrants setting rate caps marginally above the lower bounds, it does not fundamentally change our conclusion here.

[742] *See supra* Section III.D.4.a (Establishing the Zones of Reasonableness) (detailing several adjustments to account for aspects of providers' cost data that we find make the data inaccurate or otherwise unreliable); Appendix I.

[743] *See* Appendix F.

[744] *See* Appendix I.

[745] *See supra* Section III.A (Unique Marketplace for Incarcerated People's Communications Services) (discussing market dynamics); Appendix D (same); *see also* DOJ Apr. 29, 2024 *Ex Parte* at 3 (observing the lack of competition in the IPCS market); *2015 ICS Order*, 30 FCC Rcd at 12765, 12793-94, paras. 2, 59, 62 ("[T]he ICS market . . . is characterized by increasing rates, with no competitive pressures to reduce rates."). *But see* ViaPath June 13, 2024 *Ex Parte* at 12-13 (arguing the DOJ's evaluation of the IPCS industry does not reflect the realities of the market because of the competitive bidding process); Secretariat Economists June 13, 2024 Report at 24-26.

those services, this does not explain the gulf, which strongly suggests that costs are overstated.[746]

211.    There are also several factors that we find are likely to decrease providers' costs per minute going forward, suggesting that their reported costs tend to overestimate future costs.  As the Commission has previously observed, "[w]hen prices fall, quantity demanded increases."[747]  We find that the increase in communications generated by the reductions in price which our rate caps will achieve should reduce providers' average costs, other things being equal.[748]  And incorporation of ancillary service charges into our rate caps (which, as noted above, should reduce overall prices) will only amplify this effect.[749]  Similarly, video IPCS, as a service, is still in its nascent stages, and it may be that the reported figures overstate costs (as providers, in addition to Securus, make large capital investments that will be depreciated over time) and understate demand compared to what could be expected in a more mature market.[750]  We expect that, as the video IPCS market approaches a more stable equilibrium, cost per minute will decline.[751]

212.    Several elements of providers' responses to the 2023 Mandatory Data Collection also indicate that providers accounted for costs in a way that likely overestimated the costs attributable to IPCS and ancillary services.  For example, several providers recognize substantial amounts of goodwill.[752]  The size of these amounts, whether these amounts are amortized or written down upon being tested for impairment, and how these amounts are allocated can significantly impact reported IPCS costs.[753]  These

---

[746] As discussed elsewhere, the high per-minute video costs attributable to nascency do not reflect the efficient costs of the industry in a steady-state.

[747] *See 2021 ICS Order*, 36 FCC Rcd at 9607, para. 199; *see also 2015 ICS Order*, 30 FCC Rcd at 12797, para. 67 ("[T]here is substantial record evidence showing that, to the extent that our caps lower existing rates, they will increase minutes of use and raise provider revenues."); National Sheriffs' Association July 11, 2024 *Ex Parte* at 2 ("There is no question that reduced rates will drive increases in incarcerated persons' calling.").  NSA points out that the increase in minutes of use will also result in an increase in "associated safety and security costs."  *Id.*  Our rate cap structure accounts for this demand-driven basis of safety and security costs by basing the recovery of those costs that we find used and useful in the provision of IPCS on relative demand, i.e., via the incorporation of such costs into the per-minute rate caps.

[748] *See* Appendix F.

[749] *See infra* Section III.D.8 (Ancillary Service Charges).  This effect should be further augmented to the extent that the growth in market-wide minutes of use from 2021 to 2022 reflects an independent trend of increased demand, unrelated to the impact of the decrease in rates resulting from the *2021 ICS Order*.  *See* Appendix I.

[750] *See* Appendix I; Securus Feb. 17, 2024 *Ex Parte*.

[751] The record suggests that the hardware used by providers in deploying video IPCS (including both tablets and network infrastructure) may also be used to provide, or improve the service for, audio IPCS.  *See* Securus May 8, 2023 Comments at 2 (observing that "multifunctional devices [that] . . . enable voice calling [and] video calling . . . are proliferating," which "fosters efficiencies and cost savings, as well as the opportunity in the future to further reduce costs by offering bundled discounts," and "reduces infrastructure costs by avoiding multiple providers each deploying potentially duplicative network facilities"); NCIC May 8, 2023 Comments at 4 (noting that audio and video calling use "the same communications device (i.e., tablet)"); Worth Rises July 12, 2023 Reply at 5 (observing that "correctional tablets, and the broadband they depend on," are used "to make [both] voice and video calls," among other services).  Thus, as providers continue to invest in capital as part of the expansion of their video IPCS offerings, these investments will cross-subsidize costs for audio IPCS, reducing the net costs of providing IPCS.

[752] *See, e.g.*, Appendix I (recognizing $1.24 billion of goodwill net investment reported by providers, and noting that the providers who reported goodwill allocate 94% of this figure, i.e., $1.16 billion, to IPCS).

[753] Goodwill represents the difference between the purchase price of a company and the company's fair market value at the time of purchase.  Under the Generally Accepted Accounting Principles (GAAP), until 2021, private companies were required to elect either to amortize goodwill on a straight-line basis over a period of up to ten years, or to conduct annual impairment testing.  The threshold step of the impairment testing process is a qualitative assessment of whether the goodwill carried on a company's balance sheet likely exceeds its fair market value, which

(continued….)

providers left their allocations of goodwill largely unexplained, which makes it difficult to assess to what extent it is properly attributable to IPCS.[754] A similar principle applies to providers' incentives to over-allocate costs that support both video IPCS and nonregulated services to IPCS, particularly where the Commission has no effective means of auditing these allocations. Providers often offer IPCS using the same platform as nonregulated services (and thus the platform costs are shared between these services).[755] The instructions to the 2023 Mandatory Data Collection, despite a high level of specificity left providers with substantial leeway in choosing precisely how to allocate costs that support both video IPCS and nonregulated services (e.g., tablet and app development expenses) between video IPCS (and ancillary services) and nonregulated services.[756] Such expenses can be significant, and misallocating them could readily skew costs toward IPCS. Each of these factors tend to inflate reported costs—and therefore suggests our rate caps should be lowered—for reasons entirely unrelated to the costs of service.

213.    *Factors Supporting Rates Above the Lower Bounds*. We also recognize a series of factors which support setting the rate caps above our lower bound. As a general matter, we find it appropriate to set rates somewhat above the lower bounds to minimize reliance on the imperfect data on which we base our rate caps, which will better ensure that providers will have the opportunity to recover the costs of providing IPCS, consistent with both the equitable considerations underlying just and reasonable rates and the fair compensation mandate of section 276(b)(1)(A). Setting rate caps above the lower bounds will help to account for the possibility that the adjustments we applied to providers' reported costs to

---

takes into account several factors including macroeconomic developments and regulatory changes. *See, e.g.*, Financial Accounting Standards Board, *Accounting Standards Update: Intangibles—Goodwill and Other (Topic 350)* (March 2021), https://www.fasb.org/page/ShowPdf?path=ASU%202021-03.pdf&title=ACCOUNTING U%20STANDARDS%20UPDATE%202021-03%E2%80%94INTANGIBLES%E2%80%94GOODWILL %20ANDU%20OTHER%20(TOPIC%20350):%20ACCOUNTING%20ALTERNATI (last visited June 25, 2024); Pricewaterhouse Coopers LLP, *9.1 Overview: accounting for goodwill post acquisition* (May 31, 2024), https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/business_combination/business_combination__28_US/chapter_9_accounting_US/91_overviewaccounting-for-goodwill-postacquisitionUS.html; *see also* Financial Accounting Standards Board, Accounting Standards Update: Intangibles—*Goodwill and Other (Topic 350)* (January 2014), https://www.fasb.org/Page/ShowPdf?path=ASU+2014-02_2.pdf&title=Update+No.+2014-02%E2%80%94 Intangibles%E2%80%94Goodwill+and+Other+%28Topic+350%29%3A+Accounting+for+Goodwill+ %28a+consensus+of+the+Private+Company+Council%29&acceptedDisclaimer=true&Submit=. Since the goodwill reported by these providers was first recorded on their balance sheets, several events have transpired that would seem likely to have triggered the impairment testing process, potentially leading to a significant write down of these amounts: most notably, the Covid-19 pandemic, several orders issued in this proceeding and by certain state Commissions, and the passage of the Martha Wright-Reed Act. *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd 9519; *2022 ICS Order*, 37 FCC Rcd 11900. We question whether providers' goodwill figures are overstated as none recorded any significant write down of the goodwill on its balance sheet notwithstanding these events, and thus we find their reported goodwill figures unreliable.

[754] *See* Appendix I. The instructions for the 2023 Mandatory Data Collection require providers to comply with GAAP in calculating their goodwill figures attributable to IPCS. *See* 2023 Mandatory Data Collection Instructions, § IV.C.1. However, GAAP does not necessarily entail distinguishing between goodwill attributable to IPCS and IPCS-related services versus nonregulated services.

[755] *See* Raher July 12, 2023 Reply at 8; Worth Rises July 12, 2023 Reply at 5.

[756] For example, providers' Word template responses illustrate that they may have failed to disaggregate platform development costs, reporting the full costs of development as a video IPCS expense even where the platform provides non-IPCS services. *See* Appendix I; *cf.* Raher July 12, 2023 Reply at 8 ("[I]f a carrier incurs costs of $100 to provide service on a tablet that can be used for voice calling, video calling, electronic messaging, and streaming, then that $100 expense must be allocated across all four of those services, and not recovered entirely from voice-and video-calling rate."); Worth Rises July 12, 2023 Reply at 5 ("While some of these investments in broadband and hardware is necessary for the provision of IPCS, and is used and useful to IPCS ratepayers, much, if not all, of the providers' same infrastructure investments is also used to support the sale of non-regulated services to IPCS ratepayers and correctional agencies. . . . [I]t would be inappropriate for the Commission to allow providers to recover the full cost of such investments through IPCS rates.").

obtain the lower bound estimates were too aggressive, to account for the possibility that aspects of our evaluation of used and useful costs to provide IPCS may be inaccurate to some degree, to account for any inflation not offset by productivity growth, and to ensure that providers will be better able to recover their costs of providing TRS.

214.    We also recognize several specific factors that guide us to select rate caps above our lower bounds.  In particular, we find that the data submitted for the costs of providing safety and security measures are imperfect and imprecise;[757] we recognize these flaws are likely attributable, at least in part, to the inevitable imprecision of the allocations required to comply with the 2023 Mandatory Data Collection.[758]  Due to the aggregation of the submitted data within each category, we are unable to meaningfully identify the specific costs for the various functions within each safety and security category enumerated in the data collection.  Consequently, we recognize the possibility that providers may have misallocated the costs of providing certain component functions, causing those costs to be improperly excluded from the calculation of the lower bounds.[759]  Similarly, we recognize that facilities may incur certain costs that are used and useful in the provision of IPCS[760] but the lack of reliable data in the record makes it impossible to quantify those costs with any degree of precision.  Finally, although we exclude one-time implementation costs which are inappropriate for inclusion in permanent rate caps, providers' ongoing costs of implementing this Report and Order may, on balance, exceed their ongoing savings from, for example, not having to process site commission payments.  We thus take the conservative approach of setting our rates somewhat above the lower bounds to account for facilities' used and useful costs.  Additionally, as noted above, the record and the data make clear that video IPCS is still a developing market.[761]  Given this context, we find it appropriate to set interim rates above the lower bounds for video IPCS in particular, to afford providers flexibility in responding to the cost and demand uncertainties inherent to such markets.[762]

---

[757] For example, providers generally declined to provide further detail on the costs attributable to each individual function.  *See* Appendix I.

[758] The questions regarding safety and security costs in the 2023 Mandatory Data Collection necessarily reflected some imprecision for at least two reasons.  First, the Commission was operating with limited information on this subject, given the limited detail obtained on this subject in prior data collections.  Second, the Commission took efforts to avoid imposing an outsize burden on providers in reporting specific details of their safety and security costs, particularly in light of the comment record suggesting that providers have not historically accounted for the costs of their safety and security measures in particularly discrete detail.  *See, e.g.*, Pay Tel Communications, Inc. Comments, WC Docket Nos. 23-62 and 12-375, at 2 (rec. June 2, 2023) (Pay Tel June 2, 2023 Mandatory Data Collection Comments) ("[P]roviders' accounting systems are not designed to track 'safety and security' costs (as opposed to specific security-related service offerings) as functional components separate from other aspects of the service."); ViaPath June 2, 2023 Mandatory Data Collection Comments at 5 ("It may be difficult for providers to separate their safety and security costs, and then allocate and report those costs in each of the Commission-established categories.").

[759] For example, NCIC {[                                        ]}.  NCIC Inmate Communications, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 35-37 (filed Dec. 4, 2023) (NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template).  Given the limitations in the data provided, we are unable to ascertain costs for any of these individual services.  The costs of any such services, to the extent they exist, would have been improperly excluded from the calculation of the lower bounds.

[760] *See supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[761] *See* Securus May 8, 2023 Comments at 2, 23; Securus February 26, 2024 *Ex Parte* at 1, Ex. A; Appendix F (noting that the data indicates that providers are in the midst of a process of deploying tablets to the facilities they serve).

[762] As discussed above, we recognize that the developing nature of the video IPCS market also suggests that providers' reported costs per minute may be higher than similar figures would be in a more mature market.  We account for both of these implications of the nascent market in selecting our rate caps.

215.    Collectively, these reasons counsel in favor of setting our rate caps higher than the lower bounds.  But we find that these factors are generally outweighed by countervailing factors, including the providers' incentive to overstate their costs and the lack of evidence that the upper bounds accurately capture providers' actual costs of providing IPCS.  Accordingly, we find it appropriate to set our rate caps at levels nearer to, but still above, the lower bounds, to more accurately account for all of these factors.  We reiterate, however, that even these lower bounds largely reflect providers' costs as reported.[763]  The rate caps we set reflect our reasonable balancing of these considerations.

216.    *Commercial Viability and Cost Recovery*.  Applying these rate caps to each provider's reported minutes of use allows us to calculate their potential revenues under these caps.[764]  Potential revenues for eight out of 12 IPCS providers exceed their total reported costs when excluding site commissions and safety and security categories that generally are not used and useful in the provision of IPCS.[765]  These eight firms represent over 90 percent of revenue, 96 percent of ADP, and 96 percent of billed and unbilled minutes in the dataset.[766]

217.    We reiterate that our rate caps likely overestimate providers' actual costs of providing IPCS, for the reasons set forth above.  Additionally, our rate caps, by lowering prices, will likely increase

---

[763] *See supra* Section III.D.4.a (Establishing Zones of Reasonableness) (setting the lower bounds based largely on providers' reported costs).

[764] In making this determination, we refer to providers' reported costs, net of those categories of costs that we identify in this Order as unrelated to the provision of IPCS: i.e., site commissions, and the five excluded categories of safety and security costs discussed above.  *See supra* Section III.D.3 (Accounting for Correctional Facility Costs); *infra* Section III.D.7 (Safety and Security).  The fact that several states and smaller jurisdictions have adopted rate caps equal to or lower than those we adopt today—with no evidence in the record indicating that these rates have made the provision of IPCS unprofitable—lends further support to our findings as to providers' commercial viability.  *See* Appendix I; *see also* Worth Rises May 17, 2024 *Ex Parte* at 2 (citing examples of IPCS contracts with video IPCS rates as low as $0.05 per minute, or $0.010 per minute net of site commissions); Letter from Karina Wilkinson, Coalition for Social Justice Action, New Bedford Chapter, and Prisoners' Legal Services of Massachusetts, to FCC, WC Docket Nos. 23-62 and 12-375, Attach., Comments on Notice of Proposed Rulemaking, at 1-2 (filed Apr. 4, 2024) (PLS of Massachusetts Apr. 4, 2024 *Ex Parte*) (discussing rates in place under Massachusetts' "No-Cost Calls" law, including audio IPCS rates of $0.0016, $0.0045, and $0.0825 per minute for facilities falling into our medium, small, and very small jail tiers, respectively; and rates for combined audio, video, and e-messaging service of less than $0.011 per minute for facilities falling into our small and medium jail tiers); Public Interest Parties Apr. 15, 2024 *Ex Parte* at 3 n.12 (citing California PUC's August 23, 2021 decision adopting rate caps of $0.07 per minute for all incarceration facilities in California).  *But see* NCIC May 24, 2024 *Ex Parte* at 3 n.3 (arguing that the $0.05 rate referenced by Worth Rises is an unreliable reference point, as it was renegotiated as part of a settlement of bribery allegations).

[765] *See* Appendix J.  Because our estimates of providers' average costs are likely overstated, we find it unlikely that any provider will be unable to recover its individual average costs of providing audio and video IPCS.  In the event providers are unable to recover their used and useful IPCS costs, providers remain free to seek a waiver of our rules, a process we revise herein.  *See 2021 ICS Order*, 36 FCC Rcd at 9558-59, para. 93; Securus 2022 Reply at 15 ("[O]utliers with exceptionally high costs should continue to be provided an opportunity through a waiver process to avoid the rate cap."); *see also infra* Section III.E (Waivers)(amending our waiver procedures).

[766] An alternate method to estimate potential revenue under the rate caps sums reported IPCS and ancillary services for audio and video by facility, reducing these values, if applicable to match potential revenues under the rate caps.  Under this method, the projected revenues of the same 8 of 12 providers exceed their costs.  In the *2021 ICS Order*, the Commission conducted a similar analysis at the facility-specific level.  *See 2021 ICS Order*, 36 FCC Rcd at 9559-60, para. 97.  However, in light of the Martha Wright-Reed Act's amendments to Section 276, and its authorization to use both "industry-wide average costs" and the "average costs of service of a communications service provider" in setting rates, we find it more appropriate to conduct this analysis across each provider's full portfolio of facilities served and, more generally, across the full IPCS industry.  *See supra* Section III.C.3.c (Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)).

**Federal Communications Commission**　　　　　　　　　　　　**FCC 24-75**

communications volumes (and so decrease average costs per minute),[767] as will providers' continuing expansion of and investment into their video IPCS services.[768] Taken together, we find that these reasons demonstrate that this number is conservative, and that we likely underestimate the extent to which providers will be able to recover their costs under our rate caps.[769] We anticipate that, over time, revenues for additional providers will exceed their total actual costs even beyond those already identified in our analysis above. Our analysis of the underlying facility-level data corroborates this conclusion.[770]

218. Finally, we find that our rate caps do not threaten providers' financial integrity such that they could be considered confiscatory, even in those anomalous circumstances where a provider cannot recover its costs under our rate caps.[771] The rate caps are based on data supplied by providers and correctional facilities. As the Commission has previously observed, neither of these parties "have incentives to understate their costs in the context of a rate proceeding, lest the Commission adopts rates that are below cost."[772] Rather, providers had "every incentive to represent their [IPCS] costs fully, and possibly, in some instances, even to overstate these costs."[773] Further, our rate caps explicitly account for all costs of providing IPCS identified in the record, including costs incurred by correctional facilities, costs of necessary safety and security measures, and cost variations attributable to facility size and type.[774]

---

[767] *See supra* Section III.D.4 (Adopting Audio and Video IPCS Rate Caps) (discussing the impact on demand of reduced IPCS rates); Appendix F.

[768] *See infra* Appendix F (addressing future expansion of video IPCS).

[769] *See* Appendix J; *see also* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 3-4 (filed July 12, 2024) (Wright Petitioners July 12, 2024 *Ex Parte*) (discussing how our rate caps "are conservative [*sic*] and reasonable"). *But see* Securus July 11, 2024 *Ex Parte* at 4 (arguing that rates set below provider costs may drive some providers out of the industry and curtail spending to develop and deploy "new consumer friendly technology, including tablets, the deployment of which has been shown to significantly increase calling volumes").

[770] *See* Appendix J. {[　　　]} of facilities report per-minute revenues net of site commissions under our rate caps, meaning that providers will be able to recover the same per-minute revenues at these facilities under our rate caps. Assuming that these facilities are generally profitable (as profit-maximizing firms are unlikely to bid for unprofitable contracts), our rate caps will therefore not undermine providers' profitability for these facilities. However, this does not mean that the remaining facilities would not recover their costs under our rate caps, as detailed further in Appendix J (for example, per-minute revenues net of site commissions likely exceed providers' per-minute costs net of site commissions).

[771] *See supra* Section III.C.3.a (Addition of the "Just and Reasonable" Requirement to Section 276(b)(1)(A)) (discussion of the Constitutional limits on rate regulation); *2021 ICS Order*, 36 FCC Rcd at 9587-88, paras. 153-54 ("As the Supreme Court has recognized, the 'guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory.' As a general matter, '[r]ates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called "fair value" rate base.'" (quoting *Duquesne Light Co.*, 488 U.S. at 307; *Hope Natural Gas*, 320 U.S. at 605)). Further, we find the fact that providers negotiate for per-minute rates lower than our choice of caps to support our conclusion that these rate caps do not threaten providers' financial integrity. *See* PLS of Massachusetts Apr. 4, 2024 *Ex Parte*, Attach. at 2.

[772] *2021 ICS Order*, 36 FCC Rcd at 9587, para. 154.

[773] *Id.* (quoting the *2015 ICS Order*, 30 FCC Rcd at 12799, para. 73).

[774] Additionally, as the Commission has repeatedly observed, the offering of IPCS "is voluntary on the part of the [IPCS] providers, who are in the best position to decide whether to bid to offer service subject to the contours of the request for proposal"; IPCS providers have no obligation "to submit bids or to do so at rates that would be insufficient to meet the costs of serving the facility or that result in unfair compensation." *See 2021 ICS Order*, 36 FCC Rcd at 9588, para. 155 (quoting the *2015 ICS Order*, 30 FCC Rcd at 12836, para. 142).

### c.    Consistency with Statutory Requirements

219.    Section 276(b)(1)(A) of the Communications Act, as amended by the Martha Wright-Reed Act, requires the Commission to "establish a compensation plan to ensure that all payphone service providers are fairly compensated and all rates and charges are just and reasonable for completed intrastate and interstate communications."[775]  We conclude that the rate caps and waiver process we adopt in this Report and Order fully satisfy this mandate.  We find that rates will be just and reasonable if they afford providers an opportunity to recover their "prudently incurred investments and expenses that are 'used and useful' in the provision of the regulated service for which rates are being set,"[776] and upon reflection of the amendments to section 276, we find that a provider will be fairly compensated if it is afforded an opportunity to recover the industry average of those costs on a company-wide basis.[777]  And as the Public Interest Parties explain, "for a service provider to be 'fairly compensated' for its services would signify that it is paid an amount that reasonably reflects the value of the services that it provides. . . .  The standard does not require every carrier to be profitable, but rather for rates to be set at a level where carriers receive compensation that would allow a well-run and prudent IPCS carrier to realize a fair rate of return."[778]

220.    Across the industry, these rate caps will allow providers to generate sufficient revenue from the audio and video communications they provide (1) to recover the actual, direct costs of each communication, and (2) to make a reasonable contribution to their indirect costs related to IPCS.  Because they reflect what we have determined are the industry average costs incurred to provide IPCS, falling "squarely within the zones of reasonableness,"[779] the rate caps we adopt today meet this standard.  Indeed, by setting our rate caps above our lower bounds, "[o]ur approach incorporates assumptions and actions

---

[775] 47 U.S.C. § 276(b)(1)(A).

[776] *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126.

[777] *Supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission Authority Thereunder).  Securus argues that the Martha Wright-Reed Act requires the Commission to ensure that *each provider* be able to recover its average costs.  *See* Securus Mar. 5, 2023 Reply at 14 (arguing that the Martha Wright-Reed Act requires the Commission to "ensure[] that each provider's average communications costs can be recovered"); Securus Feb. 17, 2023 *Ex Parte* at 4 ("Setting rates below a provider's average costs would not fairly compensate a provider for completed communications.").  We conclude the Act does not require such particularized analysis and reiterate that rate caps based on costs evaluated on an aggregated basis generally will satisfy the requirement that all payphone service providers be fairly compensated.  *See supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission Authority Thereunder) (determining that, in light of the Martha Wright-Reed Act, fair compensation need not be evaluated on a provider-by-provider basis); *see also* Wright Petitioners July 12, 2024 *Ex Parte* at 5-6 (arguing that "Congress's shift from a per-call approach to average industry costs approach underscores Congress's intent to reduce rates and not ensure that the rate caps cover the cost of each and every call").

[778] Public Interest Parties May 8, 2023 Comments at 11-12; *see also* Wright Petitioners July 12, 2024 *Ex Parte* at 6 n.25 ("To the extent certain providers are inefficient, the Commission is not obligated to set rates to cover an inefficient business model—as the Commission correctly notes, it has no burden 'to set rate caps that support inefficient business models, even if a provider is inefficient due to its scale.'" (quoting Appendix H)); UCC Media Justice July 12, 2024 *Ex Parte* at 2 (observing that "the waiver process is always available for any provider that can demonstrate its costs are higher than the caps because of legitimate costs not covered by, for example, current subsidies available to providers serving rural areas").  Securus argues that our rate caps fail to ensure that "all" providers are fairly compensated, threatening the competitiveness of the IPCS marketplace, because our industry average-based rate caps do not account for costs on a provider-by-provider basis.  Securus July 11, 2024 *Ex Parte* at 4-9.  We disagree.  Securus interprets the term "all payphone service providers" in section 276(b)(1)(A) to mean "each payphone service provider," and ignores the fact that fair compensation does not require the Commission to adopt rate caps which allow for the recovery of inefficiently incurred costs.

[779] *2021 ICS Order*, 36 FCC Rcd at 9602-03, para. 190.

that lean toward over-recovery of costs."[780]  At the same time, these rate caps reflect our best estimate of providers' actual costs of providing IPCS, therefore limiting the recoverable costs to those costs "that directly benefit the ratepayer" and excluding "any imprudent, fraudulent, or extravagant outlays."[781]

221.     The rate caps we adopt in this Report and Order also meet the separate rate-making evaluation requirements set out by the Martha Wright-Reed Act.  The Act requires that we "shall consider costs associated with any safety and security measures necessary to provide" IPCS, as well as the "differences in costs" of providing IPCS "by small, medium, or large facilities or other characteristics."[782]  WCB and OEA directed providers to explain the nature of their safety and security costs in their responses to the 2023 Mandatory Data Collection, and we sought comment on these issues in the *2023 IPCS Notice*.[783]  Having examined the data and the record on these issues, we have incorporated into our rate caps the costs of those safety and security measures we find are, in fact, used and useful in the provision of IPCS, as well as the most critical factors driving the differences in providers' costs, including facility size.[784]  Accordingly, our rate caps meet these requirements imposed by section 3 of the Act.[785]

222.     Our regulatory approach also includes measures to ensure that providers are not forced to bear unrecoverable costs, through our actions to prohibit all monetary and in-kind site commissions at all facilities.  Thus, outside the context of reimbursements paid to correctional facilities for costs or expenses that we find used and useful in the provision of IPCS—and for which we allow recovery in IPCS rates— providers will not be permitted or required to make monetary payments or in-kind contributions to correctional facilities that arguably could represent unrecoverable costs at odds with section

---

[780] *Id.* at 9601, para. 188; *see infra* Section III.D.4 (Adopting Audio and Video IPCS Rate Caps) (addressing factors that counsel in favor of setting our rate caps above the lower bounds); Wright Petitioners July 12, 2024 *Ex Parte* at 4 (arguing that our rate caps "more than ensure fair compensation to IPCS providers," as they are "more conservative" than the rates produced by the Brattle Group's model carrier approach); Brattle July 12, 2024 Report at 5-6 (demonstrating that even the lowest of the rate caps we adopt today exceeds the rates produced by the model carrier approach for each facility tier).

[781] *Supra* Section III.D.3 (Accounting For Correctional Facility Costs).  Direct Action for Rights and Equality, et al., argue that our caps "remain far from 'just and reasonable' for indigent individuals and communities," and so "encourage the Commission to propose even lower caps—the lowest possible caps for voice and video communications."  Letter from Melonie Perez, et al., Direct Action for Rights and Equality (DARE) to Marlene H. Dortch, FCC, at 2 (filed July 10, 2024) (DARE July 10, 2024 *Ex Parte*).  However, these commenters fail to identify what rate caps would be more appropriate, or how such rate caps would both be "just and reasonable" and ensure that providers are "fairly compensated."

[782] Martha Wright-Reed Act § 3(b)(2).  We disagree that "small facility cost[s]" are not adequately captured by our use of industry averages.  *See* National Sheriffs' Association June 20, 2024 *Ex Parte* at 4.  Because we set our caps on the basis of several tiers, costs for facilities of various sizes are captured at the respective tier.

[783] *See* 2023 Mandatory Data Collection Instructions, §§ IV.C.3.b, IV.C.3.c, IV.D.2.c; *2023 IPCS Notice*, 38 FCC Rcd at 2689-93, paras. 52-57.

[784] *See infra* Section III.D.7 (Safety and Security).  Our analysis therefore takes into account all of the factors identified in the record and the data that "account[] for cost discrepancies among providers," *GTL v. FCC*, 866 F.3d at 415, and addresses certain commenters' concerns that our use of average costs "must take into account size and type differences."  National Sheriffs' Association July 12, 2023 Reply at 15-16; *see also* Pay Tel July 12, 2023 Reply at 3 ("[R]atemaking based on industry-wide average costs cannot disregard differences in the size and type of facility.").  We find that any cost variation that is not accounted for by the tiers we adopt (and not reflective of "imprudent, fraudulent, or extravagant outlays" by individual providers) is accommodated by our use of a rate cap structure.  *See supra* Section III.D.2 (Rate Cap Structure) (discussing how rate caps accommodate various cost structures).

[785] The Act also requires that we "promulgate any regulations necessary" to implement the Act "[n]ot earlier than 18 months and not later than 24 months after the date of [its] enactment."  Martha Wright-Reed Act § 3(a).  The Act was enacted on January 5, 2023, requiring the adoption of implementing regulations between July 5, 2024 and January 5, 2025.

276(b)(1)(A)'s fair compensation mandate.[786]  In the event that a provider is not afforded the opportunity to recover its costs for providing IPCS under our caps, that provider may seek a waiver of those caps in accordance with our revised waiver procedures adopted in this Report and Order.  The combination of our regulatory actions here, including our rate caps and our revised waiver process, consequently will afford all providers the opportunity to be fairly compensated at just and reasonable rates for providing IPCS consistent with section 276(b)(1)(A).[787]

## 5.    Preemption

223.    Consistent with section 2(b) of the Communications Act, as amended by the Martha Wright-Reed Act, and section 276(c) of the Communications Act, we preempt state and local laws and regulations that require IPCS rates that exceed the rate caps we adopt today.  We similarly preempt state and local laws and regulations requiring separate ancillary service fees.  We decline, however, to preempt state and local laws and regulations requiring IPCS rates below the rate caps we adopt today.[788]

224.    It is well established that "a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority."[789]  Section 276(b)(1)(A) always has been clear that the Commission has authority to establish compensation plans for "intrastate and interstate" payphone calls,[790] and as explained above, the Martha Wright-Reed Act amended that provision to clearly establish the Commission's authority to ensure just and reasonable rates for both intrastate and interstate communications, as newly expanded under section 276(d).[791]  Above and beyond that, the Martha Wright-Reed Act added section 276 to the express exceptions to the general preservation of state authority in section 2(b) of the Act.[792]  Commenters uniformly agree that this demonstrates Congress's intent to grant the Commission authority to ensure just and reasonable rates for all intrastate IPCS,[793] firmly anchoring the Commission's authority over such services.  Furthermore, while the Martha Wright-Reed Act decisively expanded the scope of the Commission's authority over IPCS, it retained the express preemption provision in section 276(c), which provides that "[t]o the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such

---

[786] *Infra* Section III.D.6 (Site Commissions).  To the extent that providers voluntarily elect to incur other costs or expenses that are not used and useful in the provision of IPCS and subject to recovery under the rate caps we adopt (or the associated waiver process), that voluntary assumption of costs or expenses does not give rise to a burden on the Commission to provide for recovery under the fair compensation mandate of section 276(b)(1)(A).  *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9568-69, 9573-74, 9577-78, paras. 114, 122, 130 (in the site commission context, discussing why there is no obligation to allow recovery of voluntarily-incurred costs or expenses).

[787] Our approach of setting rate caps that we find reasonable based on general conclusions from the industry as a whole, while leaving providers the opportunity to make provider-specific showing that additional recovery should be permitted, thus does not "preclude[] a[] 'provider-by-provider' assessment" as some contend.  Securus July 11, 2024 *Ex Parte* at 5.  The regulatory approach we employ also is consistent with regulatory approaches the Commission has employed in setting just and reasonable rates in other contexts in the past.  *See, e.g.*, 47 CFR § 32.7300(h) (identifying categories of costs that "are presumed to be excluded from the costs of service in setting rates" absent "specific justification to the contrary" that will be "given special regulatory scrutiny").

[788] *See 2023 IPCS Notice*, 38 FCC Rcd at 2696-97, paras. 71-72 (proposing, pursuant to section 276(c), to preempt state regulations that exceed the rates or rate caps the Commission adopts pursuant to the Martha Wright-Reed Act while seeking comment on the Commission's preemption authority in connection with state laws that mandate lower rates and charges); *see also* 47 U.S.C. §§ 152(b), 276(c).

[789] *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

[790] 47 U.S.C. § 276(b)(1)(A) (1996).

[791] *See supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder); 47 U.S.C. §§ 276(b)(1)(A), 276(d).

[792] Martha Wright-Reed Act § 2(c).

[793] *See supra* Section III.C.1 (Purpose and Scope of the Martha Wright-Reed Act).

matters shall preempt such State requirements."[794]

225.    We find that state and local laws and regulations that require IPCS rates that exceed the rate caps we adopt today or that require separate ancillary service charges conflict with the Commission's regulations adopted in this Report and Order to ensure just and reasonable rates and charges for intrastate and interstate IPCS and fair compensation for IPCS providers under section 276(b)(1)(A). Pursuant to section 276(b)(1)(A), as amended by the Martha Wright-Reed Act, the compensation plan the Commission adopts today includes IPCS rate caps carefully calibrated to ensure that all payphone service providers are fairly compensated and all rates and charges are just and reasonable for all IPCS, including intrastate.[795] These rate caps are ceilings limiting what IPCS providers may charge for intrastate and interstate audio and video communications.[796] To the extent state and local laws or regulations require IPCS rates that exceed those ceilings, such state and local laws or regulations would, by definition, lead to unjust and unreasonable IPCS rates and charges. In connection with ancillary service charges, as noted above, our rate caps incorporate the costs of providing these services.[797] Thus, to the extent state or local laws and regulations require separate ancillary service charges, such charges would also be unjust and unreasonable as they would exceed the Commission's IPCS rate caps.

226.    Commenters broadly agree that state and local requirements mandating IPCS rates and charges that are higher than the rate caps we adopt today are subject to preemption.[798] No commenter argues that the Commission lacks authority to preempt such state and local requirements or should not do so. As noted above, the Communications Act provides the Commission the necessary authority to adopt regulations ensuring just and reasonable rates and charges for intrastate and interstate IPCS, which requires preemption of state and local laws and regulations requiring IPCS rates that exceed the Commission's adopted rate caps or that require separate ancillary service charges.

227.    *Preemption of State Requirements.* When a federal law contains an express preemption clause, the courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent."[799] The Supreme Court has explained that where a "statute 'contains an express pre-emption clause,' we do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive

---

[794] 47 U.S.C. § 276(d).

[795] *See id.* § 276(b)(1)(A).

[796] *See* Public Interest Parties May 8, 2023 Comments at 13 (suggesting the Commission clarify that its rate methodology acts as a ceiling but not a floor); California Public Utilities Commission Reply, WC Docket Nos. 23-62 and 12-375, at 2 (rec. July 12, 2023) (California PUC July 12, 2023 Reply) (same); *see also* ViaPath June 13, 2024 *Ex Parte* at 15-16 (proposing "the Commission should allow any state that seeks to make IPCS free to the incarcerated and their friends/family to continue that practice").

[797] *See supra* Section III.D.2 (Preliminary Costing Issues).

[798] *See* Public Interest Parties May 8, 2023 Comments at 13 (explaining that the Commission must preempt state and local intrastate rates that are higher than its rate caps); Leadership Conference July 12, 2023 Reply at 3 (supporting the view of those commenters arguing for preempting of "those state-imposed rates that are higher than the rate the [C]ommission establishes"); UCC Media Justice May 8, 2023 Comments at 17 (noting that Congress "expressly provided for preemption of state and local law extremely clearly" in section 276(c)); Securus May 8, 2023 Comments at 44 (arguing that "the Commission should expressly preempt state regulation" based on the Martha Wright-Reed Act's "directive to establish a compensation plan for intrastate communications services, the exemption of section 276 from section 2(b) of the Communications Act, and the requirements of section 276(c)"); California PUC May 8, 2023 Comments at 1 (explaining that the "[California] PUC supports national rate caps for IPCS").

[799] *E.g., CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (*CSX*).

**Federal Communications Commission**  **FCC 24-75**

intent.'"[800] Independently, even assuming *arguendo* that any preemption analysis should begin "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress"[801]—particularly where "Congress has 'legislated . . . in a field which the States have traditionally occupied'"[802]—it nonetheless remains the case that "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it."[803]

228.    Here, the express preemption clause in section 276(c) applies to "State requirements" to the extent they are "inconsistent with the Commission's regulations."[804] The term "state requirements" in express preemption provisions has been interpreted by the Supreme Court more broadly than terms like "laws or regulations." For example, the Court has concluded that "[a]bsent other indication, reference to a State's 'requirements' in an express preemption provision includes its common-law duties."[805] By contrast, the Court has found that references to state "laws or regulations" preempt only "positive enactments."[806] Consistent with this precedent, we find that the reference to "state requirements" in section 276(c) is broad enough to reach state laws and regulations requiring IPCS rates that exceed the rate caps we adopt today.

229.    The surrounding statutory framework also demonstrates that preemption of laws and regulations requiring IPCS rates that exceed the rate caps we adopt today is authorized by section 276(c). As noted above, section 276(b)(1)(A) always has been clear that the Commission has authority to

---

[800] *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (*Franklin*); *see also, e.g., Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico, Inc. v. Hernández*, 58 F.4th 5, 12 n.5 (1st Cir. 2023) (*Hernández*) (explaining that "[i]n applying *Franklin*'s broad language outside that case's specific context of the Bankruptcy Code's preemption clause, we join other circuit courts that have applied Franklin to other statutes"—referencing the *en banc* Eighth Circuit and the Fifth and Ninth Circuits).

[801] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (declining to apply *Franklin* because "that case did not address preemption of claims invoking 'historic . . . state regulation of matters of health and safety,' such as the products liability claims at issue here"). The term "police power" refers to the "general power of governing, possessed by the States but not by the Federal Government." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

[802] *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 230).

[803] *Medtronic v. Lohr*, 518 U.S. at 486.

[804] 47 U.S.C. § 276(c); Public Interest Parties July 12, 2023 Reply at 16 (explaining the contours of section 276(c)). This is consistent with how the Commission has applied section 276(c) in the past. *See, e.g., First Payphone Order*, 11 FCC Rcd at 20670, para. 261 (concluding that because the Commission found "state requirements that mandate the routing of any or all" calls within the same local access transport area (intraLATA calls) "to an incumbent LEC to be inconsistent with the requirements of Section 276(b)(1)(E) [that] . . . all such state requirements are preempted by the Commission's regulations"). ViaPath argues the Commission should "preempt any existing state rates that are higher than the Commission's rates as well as all future state regulation of voice IPCS." ViaPath June 13, 2024 *Ex Parte* at 16. As stated herein, today's Report and Order preempts state regulations which mandate prices above the caps we set today. As also discussed, we see no rationale for disturbing state regulations which require pricing below our caps, nor has ViaPath offered any, and we decline to preempt such regulations at this time. ViaPath also suggests that the Commission should preempt state regulation of all video IPCS because it has "historically been treated under the law as inherently interstate." *Id.*; ViaPath May 8, 2023 Comments at 14-15; *see also* NCIC Comments at 8 (suggesting that, "because it is impossible to determine jurisdiction" for video calls, "all video visitation services should be considered to be interstate and all rates and charges should follow what is allowable for interstate video visits"). We are unpersuaded. Our exercise of our preemption authority does not require such a categorical approach.

[805] *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) (concluding that a clause prohibiting state "requirements" associated with medical devices that were "in addition to or different from" the federal requirements preempted state common law claims against the device manufacturer).

[806] *See Spriestma v. Mercury Marine*, 537 U.S. 51, 63 (2002).

establish compensation plans for "intrastate and interstate" payphone calls, and as explained above, the Martha Wright-Reed Act amended that provision to clearly establish the Commission's authority to ensure just and reasonable rates for all communications now encompassed by section 276(d).[807]  In amending section 276, Congress left the express preemption provision in section 276(c) unaltered, revealing Congress' understanding that Commission regulations implementing the full scope of amended section 276(b)(1)(A) would be subject to that express preemption provision.

230.    This point was further emphasized by the amendment of section 2(b) of the Communications Act to expressly exempt section 276 from the preservation of state authority over intrastate communications under that provision.[808]  In the Martha Wright-Reed Act, Congress expressly considered the potential effect of that statute on other laws, and only disclaimed the intent to "modify or affect any" state or local law "to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities."[809]  That narrow express preservation of existing law is not implicated by our preemption here.  The statutory context provided by section 276 as a whole, coupled with the Martha Wright-Reed Act, thus reinforces our understanding of the scope of preemption encompassed by section 276(c).

231.    Relatedly, we conclude that preemption is consistent with section 4 of the Martha Wright-Reed Act, which states that nothing in that Act "shall be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities."[810]  We preempt only those state laws and regulations that require IPCS rates that exceed the rate caps we adopt today or that require separate ancillary service charges.  To the extent federal, state, or local laws or regulations require IPCS to be provided to incarcerated people at state or local correctional facilities, such laws and regulations are not preempted by our actions here.  Similarly, we do not prohibit the implementation of any safety and security measures related to IPCS at any state or local correctional facility.  As we explain above, section 4 of the Martha Wright-Reed Act is "not intended to interfere with any correctional official's decision on whether to implement any type of safety and security measure that the official desires in conjunction with audio or video communications services."[811]  Consistent with that interpretation, here we preempt state laws and regulations requiring IPCS rate caps that exceed the Commission's adopted caps or that require separate ancillary service charges, a pre-emption that we conclude is necessary to achieve the statutory requirements of section 276(b)(1)(A) to ensure just and reasonable rates and charges for IPCS consumers and fair compensation for providers.  Correctional officials remain free to implement desired safety and security measures.

232.    *Preemption of Local Requirements*.  Our analysis of our preemptive authority is somewhat different when it comes to local requirements that may require IPCS rates and charges that exceed the Commission's rate caps because section 276(c) does not expressly reference "local" laws or regulations.  Nonetheless, we conclude that principles of conflict preemption allow us to also preempt

---

[807] *See supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder).

[808] 47 U.S.C. § 152(b).

[809] Martha Wright-Reed Act § 4.

[810] *Id*.

[811] *See supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder); *2023 IPCS Notice*, 38 FCC Rcd at 2695, para. 68; National Sheriffs' Association May 8, 2023 Comments at iv (supporting "the interpretation of the second phrase in Section 4, regarding safety and security measures, that 'the just and reasonable ratemaking focus of the Martha Wright-Reed Act is not intended to interfere with any correctional official's decision on whether to implement any type of safety or security measure that the official desires in conjunction with audio or video communications services'" (quoting *2023 IPCS Notice*, 38 FCC Rcd at 2695, para. 68)).

such local laws and regulations. As an initial matter, we note that "for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws."[812] Thus, relevant precedent concerning state law is equally applicable to local law.

233.    As a threshold matter, we find that local laws and regulations that require IPCS rates and charges that exceed the Commission's IPCS rate caps or that require separate ancillary service charges stand as an obstacle to our regulation of IPCS. We explained above the conflict that occurs as a result of state requirements, and that conclusion is not altered if the requirements originate instead at the local level. Consequently, under section 276(b)(1)(A) coupled with standard conflict preemption principles we preempt local laws and regulations that require IPCS rates and charges exceeding the Commission's caps or that require separate ancillary service charges.

234.    Our conflict preemption determination is bolstered by the enactment of the Martha Wright-Reed Act, which modified the Communications Act in a manner that we see as intended to establish a uniform system of federal regulation for all IPCS under section 276(b)(1)(A). As explained above,[813] the Martha Wright-Reed Act was enacted against the regulatory backdrop of—and in response to—the *GTL v. FCC* decision, where the D.C. Circuit found that the Commission had unreasonably relied on the "just and reasonable" standard of section 201(b) when implementing the differently-worded language of section 276.[814] Insofar as that left the Commission to rely on section 201(b) to ensure IPCS rates and charges were not too high, it generally precluded the Commission from addressing excessive intrastate IPCS rates. The Martha Wright-Reed Act's amendment of section 276(b)(1)(A) gave the Commission clear authority to ensure just and reasonable rates under that provision, which always has encompassed both intrastate and interstate services.[815] Given the legal and regulatory backdrop, that persuades us that Congress envisioned a uniform system of federal regulation as far as IPCS rates and charges are concerned.

235.    *Scope of Preemption.* At this time, our preemption extends only to those state and local laws and regulations that require IPCS rates and charges exceeding the Commission's rate caps or that require separate ancillary service charges. The record is mixed as to whether the Commission should or must also preempt state and local laws or regulations that set IPCS rates and charges that are below the Commission's caps.[816] For example, Pay Tel and Securus assert that the Commission must preempt these lower rates.[817] They argue that the Commission must adopt rates for intrastate and interstate IPCS that

---

[812] *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985) (*Hillsborough County*) (citing *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973) (*City of Burbank*)).

[813] *See supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder).

[814] *GTL v. FCC*, 866 F.3d at 409-12.

[815] *See, e.g.*, Public Interest Parties May 8, 2023 Comments at 4 (explaining that the amendment to section 2(b) of the Communications Act "was a direct response to *GTL*, in which the D.C. Circuit had found the Commission's pre-MWRA authority was limited to only interstate and international IPCS").

[816] Securus May 8, 2023 Comments at 42 (noting that section 276(c) compels preemption of inconsistent state requirements through the use of the mandatory "shall" in the statutory text); Pay Tel May 8, 2023 Comments at 20 (emphasizing section 276(c)'s use of "shall preempt" in connection with inconsistent state requirements).

[817] *See* Pay Tel May 8, 2023 Comments at 20 (asserting that "[a] state-imposed intrastate rate cap that is either *below or above* an intrastate cap established by the Commission is, by definition, 'inconsistent' therewith—and Section 276(c) requires preemption") (emphasis in original); Securus May 8, 2023 Comments at 42 (arguing that the Commission "should expressly preempt state action that attempts to set lower rates or charges, including for ancillary services, than those set in the compensation plan"); Pay Tel July 12, 2023 Reply at 16 (agreeing with Securus that the Commission should preempt state requirements that attempt to set rates and charges that are lower than the Commission's caps).

ensure fair compensation for IPCS providers,[818] and state rate caps that are below the Commission's caps are necessarily "inconsistent" with the Commission's regulation of IPCS since such caps would be below cost and thus not afford fair compensation.[819] These commenters assert that below-cost intrastate rate caps are problematic insofar as they may require "increases in federal rates to defray costs which are not being recovered at the state level"[820] and lead to cross-subsidization between states because "[i]f consumers in one state pay less than the rate the Commission has determined is necessary to fairly compensate providers . . . consumers in other states may end up making a larger contribution to the company's costs."[821] They add that below-cost intrastate rates "may lessen the willingness of providers to bid for facilities, depress market participation (particularly by smaller, regional providers), and reduce investment in new technologies" while also raising the "very real possibility of confiscatory rates," particularly if rates are set using a zone of reasonableness approach.[822]

236.    On the other hand, state commenters and public interest advocates argue that the Commission is not required to preempt state rates that are lower than the Commission's caps.[823] The California Public Utilities Commission explains that "states and local governments are in a better position to assess what a reasonable rate would be for the provision of services in their geographic locations."[824] The Public Interest Parties assert that state and local laws that require intrastate rates to be lower than the Commission's rate caps are not inconsistent with the Commission's regulations "because any intrastate rates lower than the Commission's rate cap would not violate any specific provision of the Communications Act and lower rates are consistent with the underlying purpose of the MWRA."[825] Both the California Public Utilities Commission and the Public Interest Parties explain that to the extent the Commission's rate caps act as ceilings and not floors, the Commission should not preempt lower state

---

[818] Pay Tel May 8, 2023 Comments at 20 (explaining that providers "will be able to recover their costs and receive fair compensation pursuant to whatever interstate and intrastate rate regime the Commission ultimately adopts"); Securus May 8, 2023 Comments at 42 (explaining that the Commission's adopted compensation plan will "establish[] unitary rate structures that the Commission will, by definition have found to have satisfied the statutory standard of fair compensation and that are just and reasonable").

[819] Securus May 8, 2023 Comments at 42 ("State imposed rates that differ from what the Commission has determined to be fair, just and reasonable will necessarily impinge on the effective implementation of the Commission's compensation plan and run afoul of Section 276(c)."); Pay Tel May 8, 2023 Comments at 19 (arguing that failure to preempt "below-cost intrastate rates would rob providers of ICS in jails of their ability to recover costs on a holding company level"). Securus also asserts that "states that adopt industry-wide rate caps for intrastate services, including ancillary service charges, below the level established by the Commission raise the very real possibility of confiscatory rates." Securus May 8, 2023 Comments at 43.

[820] Pay Tel July 12, 2023 Reply at 17.

[821] Securus May 8, 2023 Comments at 43; Pay Tel July 12, 2023 Reply at 17 (identifying "potential issues of cross-subsidization").

[822] Securus May 8, 2023 Comments at 43; Pay Tel July 12, 2023 Reply at 18 (alleging that state-level decisions setting below-cost rates "will undoubtedly result in fewer vendors offering services"). We address concerns about confiscatory rates in connection with our zone of reasonableness analysis above. *Supra* Section III.D.4 (Adopting Audio and Video IPCS Rate Caps).

[823] *See* California PUC May 8, 2023 Comments at 8; Raher May 8, 2023 Comments at 13; Leadership Conference July 12, 2023 Reply at 3.

[824] California PUC May 8, 2023 Comments at 8; California PUC July 12, 2023 Reply at 8.

[825] Public Interest Parties May 8, 2023 Comments at 13; *see also* California PUC July 12, 2023 Reply at 2 (explaining that the "ultimate goal of this proceeding is to ensure that IPCS rates are reasonable and affordable" and that "[s]tates and local governments should be given the flexibility to achieve the most affordable rates for incarcerated persons within their facilities"); Leadership Conference July 12, 2023 Reply at 3 (arguing that "a lower rate is consistent with the Commission's regulations").

**Federal Communications Commission**                    **FCC 24-75**

rates.[826]  We agree.  State IPCS rate proceedings are designed to look at cost data and market conditions unique to that particular state, a much smaller geographic area and a much more disaggregated basis than the ratemaking analysis the Commission was required to undertake on a national level which covered the entire country.  It is entirely possible that cost data reflecting a smaller subset of the national footprint of facilities targeted to only certain state specific facilities could yield fair compensation for providers operating in that state at those facilities at lower rates than reflected by the Commission's rate caps adopted today.

237.    We decline to preempt state or local laws and regulations requiring rates lower than the caps we adopt today.  As the California Public Utilities Commission explains, the argument from Securus and Pay Tel that lower intrastate rates is necessarily inconsistent with the Commission's regulation of IPCS is "question-begging" as it "assumes that the FCC's regulations do *not* allow rates below the federal cap."[827]  The rate caps we adopt today establish ceilings, rather than floors that inherently would limit potential state action.[828]  These rate caps, which are based on provider-supplied data, appropriately balance the need to ensure just and reasonable rates and charges for IPCS consumers based on industry averages and fair compensation for IPCS providers.  More generally, it is well established that rates can be lawful if they fall within a zone of reasonableness.[829]  Thus, a state's intrastate rate cap might fall within that zone even if it is lower than the Commission's specified rate caps.

238.    We also find that state or local requirements that mandate intrastate IPCS rates or charges below the Commission's caps are consistent with the "underlying purpose of the [Martha Wright-Reed Act]" to fundamentally reform the IPCS marketplace and eliminate, to the greatest extent possible, decades of exorbitant rates for communications services used and paid for by incarcerated people and their loved ones.[830]  Finally, this approach is also consistent with the policy the Commission established when it considered this issue in the *2021 ICS Order*.  In light of considerable state-level reform efforts, the Commission decided that the "federal requirements will operate as ceilings" for jurisdictionally mixed calling services.[831]

239.    Should an IPCS provider claim that a state or local requirement leads to unfair compensation, that provider may seek appropriate relief in the relevant state or locality or from the Commission by submitting a petition for preemption.[832]

240.    Our approach to state or local requirements mandating lower IPCS rates is consistent

---

[826] Public Interest Parties May 8, 2023 Comments at 13 ("The Commission should clarify that any rate methodology will act as a ceiling, not a floor, and, consistent with precedent, preempt intrastate rates that are higher than a rate cap but not lower."); California PUC July 12, 2023 Reply at 2 ("If the FCC rules that its caps are a ceiling but not a floor, then any state or local rate[s] that are lower than the FCC's rates cannot, by definition, be inconsistent with the FCC's regulations.").

[827] California PUC July 12, 2023 Reply at 2 (emphasis in original).

[828] *See supra* Section III.D.1 (Rate Cap Structure).

[829] *See, e.g.*, *NARUC*, 737 F.2d 1095.

[830] Public Interest Parties May 8, 2023 Comments at 13; California PUC July 12, 2023 at 2.

[831] *See 2021 ICS Order*, 36 FCC Rcd at 9617, para. 217 & n.683 (concluding that "[t]o the extent state law allows or requires providers to impose rates or fees lower than those in our rules, that state law or requirement is specifically not preempted by our actions here"); *see also* Raher May 8, 2023 Comments at 13 (noting the "reasoned policy of cooperative federalism" in the *2021 ICS Order* and arguing that the Commission "should continue this policy out of comity to state lawmakers and regulators who may be able to identify ways in which IPCS can be profitably delivered in certain jurisdictions under lower price caps than those prescribed by the Commission"); California PUC July 12, 2023 Reply at 2 (agreeing with Raher that the Commission should continue this policy).

[832] *See, e.g.*, 47 CFR § 1.1206; *see 2023 IPCS Notice*, 38 FCC Rcd at 2697, para. 72 (seeking comment on "what steps, if any, the Commission should consider following a state mandate where a provider is able to claim, and clearly substantiate its claim, that an unreasonably low rate lead to unfair compensation to providers").

with the legal and regulatory backdrop here.  When the Commission undertook regulation of intrastate inmate calling services rates in the *2015 ICS Order*, the Commission adopted an analogous approach to preemption—it declined requests to treat state or local requirements mandating rates below the FCC's caps as inherently in conflict with the Communications Act or Commission rules, instead leaving providers to seek relief on a case-by-case basis should they be able to demonstrate in a particular scenario that they were not being fairly compensated.[833]  Although the D.C. Circuit in *GTL* subsequently rejected the Commission's claim of statutory authority to cap intrastate calling services rates under section 276,[834] the Martha Wright-Reed Act made clear the Commission's authority to ensure just and reasonable rates for intrastate IPCS under section 276(b)(1)(A).[835]  Yet Congress left section 276(c)'s express preemption of conflicting state laws unchanged relative to the provision in place when the Commission acted in 2015.  Nor does the amended text of section 276(b)(1)(A) expressly mandate the exclusivity of the Commission's implementing rules.  Thus, in acting consistent with the general approach to preemption adopted in 2015, we are acting consistent with the Commission's historical regulatory approach, which we see no intent by Congress to displace through the Martha Wright-Reed Act.

241.    Finally, we decline to adopt Securus's proposal that the Commission preempt lower state rates unless a state can "make a showing to the Commission that IPCS costs in the state justify a lower rate and that the lower rate satisfies the statutory standard that providers are fairly compensated and that rates and charges are just and reasonable."[836]  Under this proposal, "a lower state rate cap would not take effect until the Commission first finds that the state had met its burden of demonstrating that the lower rate complies with the statutory standard."[837]  Securus's proposal would have us begin from the premise that lower state rates and charges are necessarily inconsistent with the Commission's regulations and preempt them.  In order to reverse this preemption decision, the onus would then be on the state or locality to justify why its lower rates or charges are consistent with the statutory standard in that they provide fair compensation for providers and just and reasonable rates for consumers.  We decline to make a determination *ex ante* that state and local rates and charges below our caps are inconsistent with a fair compensation plan.  As we explain above, we do not find lower state rates to be inconsistent with the Commission's IPCS regulations.

6.    **Site Commissions**

a.    **Introduction**

242.    We next comprehensively reform the Commission's treatment of site commission payments associated with IPCS to implement the requirements of the Martha Wright-Reed Act.  Our actions today continue to allow IPCS provider reimbursement of correctional facilities for costs used and useful in providing IPCS while decoupling other IPCS provider payments to correctional facilities, which constitutes what we henceforth refer to as "site commissions."  We then end the practice of paying site

---

[833] *2015 ICS Order*, 30 FCC Rcd at 12864-72, paras. 203-20.

[834] *GTL v. FCC*, 866 F.3d at 408-12 (observing that section 276 "merely directs the Commission to 'ensure that all providers [of calling services to incarcerated people] are fairly compensated' for their inter- and intrastate calls," and it "is not a 'general grant of jurisdiction' over intrastate ratemaking" (internal citation omitted)).

[835] 47 U.S.C. § 276(b)(1)(A); *see also id.* § 152(b).

[836] Securus July 12, 2023 Reply at 20  (noting that its proposal is similar to the mechanism the Commission adopted in the *1996 Pay Telephone Order* in which the Commission allowed states to demonstrate to the Commission that "there are market failures within the state that would not allow market-based rates" for local coin calls such that the state could regulate the local calling rates).  *See Payphone First Report and Order*, 11 FCC Rcd at 20572, para. 61.  We also decline to pursue Securus's recommendation that "states should be required to adopt a waiver process."  Securus July 12, 2023 Reply at 20.  We see no basis on which we could mandate that states or localities adopt such a process and Securus offers none.

[837] Securus July 12, 2023 Reply at 20.

commissions associated with IPCS.[838]

243.     In the *2021 ICS Notice*, the Commission highlighted the difficulties in accounting for and isolating the portion of site commission payments, if any, that may be used and useful in the provision of audio calling services for incarcerated people.[839]  The Commission sought comment on whether it should prohibit providers from entering into contracts requiring the payment of site commissions and whether it should preempt state or local laws and regulations that require such payments.[840]  The Commission also questioned the propriety of allowing providers to recover the costs of their site commission payments from consumers.[841]

244.     After carefully considering the record in these proceedings and the Martha Wright-Reed Act, we find that site commission payments—payments from IPCS providers to correctional facilities that are not used and useful in the provision of IPCS—are fundamentally incompatible with our mandate under section 276(b)(1)(A), as amended, to ensure both just and reasonable IPCS rates and charges for IPCS consumers and providers as well as fair compensation for IPCS providers.[842]  Considering the requirements of the Martha Wright-Reed Act and the demonstrated negative effects of site commission payments, particularly with regard to consumer affordability, we conclude that we must eliminate site commissions associated with IPCS.

245.     Accordingly, we prohibit all IPCS providers from paying site commissions of any kind associated with intrastate, interstate, international, jurisdictionally mixed, and jurisdictionally indeterminate audio and video IPCS, including all monetary and in-kind site commissions, at all facilities.  To implement this prohibition, and consistent with the record and the Commission's proposals in the *2021 ICS Notice*, we preempt all state and local laws and regulations requiring or allowing IPCS providers to pay site commissions associated with IPCS and prohibit IPCS providers from entering into contracts requiring or allowing them to pay site commissions associated with IPCS.  Compliance with our reforms associated with site commission payments will be required by the dates specified in Section III.H below.[843]

246.     Although we eliminate site commissions associated with IPCS, we do not deny correctional facilities the opportunity to be reimbursed by IPCS providers for any costs the correctional facilities incur that are used and useful in the provision of IPCS.  The IPCS rate caps we adopt today reflect, based on the record before us, all of the used and useful costs incurred in the provision of IPCS regardless of whether such costs are incurred by IPCS providers or correctional facilities.[844]  Consistent with that record, the rate caps account for used and useful costs associated with IPCS providers' provision of IPCS incurred by correctional facilities.[845]  Therefore, we permit IPCS providers to reimburse

---

[838] *See* 47 CFR § 64.6000(t).  As discussed below, site commission payments are payments made by IPCS providers to correctional facilities and broadly encompass any form of monetary payment, in-kind payment requirement, gift, exchange of services or goods, fee, technology allowance, or product.  *See infra* Section III.D.6.b.i (Site Commissions and IPCS).

[839] *See 2021 ICS Notice*, 36 FCC Rcd at 9661, para. 314.

[840] *Id.* at 9661, paras. 314-15.

[841] *Id.* at 9661, para. 313.

[842] 47 U.S.C. § 276(b)(1)(A).

[843] *See infra* Section III.H.7 (Effective Dates and Compliance Dates).

[844] *See supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[845] *See, e.g.*, National Sheriffs' Association May 8, 2023 Comments at 9 (arguing that if jails are not permitted to recover their IPCS costs, access to IPCS may be limited or eliminated); Pay Tel July 12, 2023 Reply at 11 (explaining that "confinement facilities themselves incur costs in making IPCS available"); Worth Rises May 8, 2023 Comments at 8 (noting that "facilities may incur used and useful costs on behalf of IPCS ratepayers, but

(continued….)

correctional facilities for the used and useful costs the facilities incur to enable the provision of IPCS.[846] To the extent a correctional facility performs a function that is used and useful in the provision of IPCS under the standards set forth in this Report and Order, the IPCS provider may reimburse the correctional facility for that function's cost.[847]  We emphasize, however, that the cost recovery we permit extends only to costs that the Commission has classified as used and useful in this Report and Order.[848]  Costs that the Commission has not found to be used and useful in the provision of IPCS may not be recovered from IPCS providers through revenues under the rate caps we establish.  And under no circumstances may reimbursement result in IPCS consumers being charged more than the rate caps we adopt today.

### b.    Background

#### (i)    Site Commissions and IPCS

247.    IPCS connect incarcerated people to their families, loved ones, clergy, and counsel.[849] But unlike communications services offered to the general public outside of the correctional environment, IPCS providers have monopoly power in the facilities they serve.[850]  As the Commission has explained:

> [I]ncarcerated people have no choice in the selection of their calling services
> provider.  The authorities responsible for prisons or jails typically negotiate with the
> providers of [IPCS].  Once the facility makes its choice—often resulting in contracts
> with providers lasting several years into the future—incarcerated people in such

---

generally do not"); National Sheriffs' Association Dec. 17, 2021 Reply at 4 (noting that "facilities incur costs to allow ICS in jails").

[846] We therefore find without merit the National Sheriffs' Association's argument that "[t]he proposals to arbitrarily disallow legitimate costs and preclude their recovery is contrary to the Communications Act requirement to set reasonable rates, the Commission's statutory mandate to promote access to ICS, and court precedent."  *See* National Sheriffs' Association Dec. 17, 2021 Reply at 4.  The Commission has identified the used and useful costs, including a measure of facility costs for safety and security measures, in the rate caps it adopts today.  The Commission is thus fully in accordance with "rate-making principles that require the allowance of legitimate costs in rates."  *See* National Sheriffs' Association Dec. 17, 2021 Reply at 4.  We also find the National Sheriffs' Association's argument that "[f]acility compensation through rates also is consistent with the Commission's precedent that costs should be recovered from the cost causer" to be moot given our allowance for facility-related cost recovery in our rate caps.  *See* National Sheriffs' Association Dec. 17, 2021 Reply at 4.  We are unpersuaded by the National Sheriffs' Association's assertion that the Commission has "found that the calling and called party are the cost causer and the beneficiary of calls" such that the costs of calls should be recovered from the ratepayers.  *See* National Sheriffs' Association Dec. 17, 2021 Reply at 4; *see also* Pay Tel July 12, 2023 Reply at 14 (arguing that IPCS users "are the parties causing the costs to be incurred").  The Commission made that cost-causation determination in the context of certain intercarrier compensation reforms, not with respect to IPCS, which occurs in a fundamentally different context where the users of the service have no choice in the provider they use—and the choice of provider can significantly affect the cost of service.  *See Connect America Fund et al.,* WC Docket No. 10-90 et al., Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 17907-17908, paras. 744-45 (2011) (*USF/ICC Transformation Order*), aff'd, *In re FCC 11-161,* 753 F.3d 1015 (10th Cir. 2014), cert. denied, 135 S. Ct. 2050, and 135 S. Ct. 2072 (2015).  In any case, costs that are not used and useful in the provision of IPCS are not caused by IPCS communications, and thus neither party to such communications reasonably can be seen as causing those costs through the use of IPCS.

[847] As we explain above, *see supra* Section III.D.7 (Safety and Security Costs), any costs that facilities incur to provide "safety and security measures necessary" for the provision of IPCS are also used and useful in the provision of IPCS.  This reimbursement therefore encompasses any costs a correctional facility incurs in performing safety and security measure functions that are necessary for the provision of IPCS.

[848] *See supra* Section III.D (Rate Caps).

[849] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9520, para. 1; DOJ Apr. 29, 2024 *Ex Parte* at 2 (recognizing that "communications services for incarcerated people provide an important lifeline between incarcerated people and their loved ones").

[850] *2021 ICS Order*, 36 FCC Rcd at 9531, para. 31.

facilities have no means to switch to another provider, even if the chosen provider raises rates, imposes additional fees, adopts unreasonable terms and conditions for use of the service or offers inferior service.[851]

248.    In many cases, correctional authorities award contracts for IPCS "based in part on what portion of [IPCS] revenues a provider has offered to share with the facility."[852]  These payments, historically referred to as "site commissions," are salient components of the exclusive contracts between correctional authorities and IPCS providers.[853]  Site commissions broadly include "any form of monetary payment, in-kind payment requirement, gift, exchange of services or goods, fee, technology allowance, product or the like."[854]  They can be expressed "in a variety of ways, including as per-call or per-minute charges, a percentage of revenue or a flat fee."[855]

---

[851] *Id.* at 9532, para. 32; *see also* UCC and Public Knowledge May 9, 2023 Comments at 1 (highlighting that "[u]nlike any other consumer for whom the Commission acts today, people who communicate to and from carceral institutions have *no choices* in the companies they use to communicate: *no choices at all*") (emphasis in original)).

[852] *2021 ICS Order*, 36 FCC Rcd at 9567, para. 100; *2015 ICS Order*, 30 FCC Rcd at 12818, para. 117 (noting that "in many cases, ICS bids are predicated on the winning providers' willingness to share part of its ICS revenues with the correctional facility"); DOJ Apr. 29, 2024 *Ex Parte* at 3 (noting that "[s]ome correctional facilities may prefer vendors who pay higher site commissions"); Letter from Nathan Miller, Professor of Economics, Georgetown University, to the FCC, WC Docket No. 23-62, Attach., Nathan H. Miller, Marleen Marra, & Gretchen Sileo, *The Price That Inmates Pay*, at 1-2 (filed May 4, 2023) (Miller May 4, 2023 *Ex Parte*) ("Often the selected [IPCS] provider agrees to share some of the revenue obtained from inmates with the correctional authority."); Color of Change May 8, 2023 Comments at 4 (explaining that IPCS providers "typically offer carceral facilities a portion of the revenue generated from phone calls, or kickbacks, in exchange for monopoly control over a facility's communication services"); State of Phone Justice Dec. 2022 Report at 3 (highlighting that "jails and prisons often choose their telecom providers on the basis of which company will pay the facility the most money in kickbacks"); Pay Tel Sept. 27, 2021 Comments, Exh. 3 at 6 (providing a proposal evaluation form covering eight bids and showing the scores attached to each aspect of the respective proposals, including a category for "Proposed Rates and Commission/Agency Cost"); Contract between the State of New Hampshire, Department of Administrative Services, and Global Tel*Link Corp. at 3 (executed Oct. 3, 2017), https://www.prisonphonejustice.org/media/phonejustice/NH_DOC_GTL_Contract_thru_Oct_2022.pdf (providing a proposal evaluation form for a contract with the State of New Hampshire showing a category for "Fee Structure (Costs/Rebates/Commissions)"); Brattle May 8, 2023 Report at 24, para. 43 (noting that "[m]ore often than not . . . bid evaluation forms include site commissions or revenue sharing percentages").

[853] *See, e.g.*, *2012 ICS Notice*, 27 FCC Rcd at 16632, para. 5 (explaining that contracts "often include a site commission or location fee paid to the correctional facility"); *2002 Pay Telephone Order*, 17 FCC Rcd at 3252-53, para. 10 (explaining that "[t]o have a realistic chance of winning a contract, the bidder must include an amount to cover commissions paid to the inmate facility").  While the record does not definitively pinpoint when the practice of paying site commissions began, one commenter in the past suggested the practice originated with the provider Evercom.  *Rates For Interstate Inmate Calling Services*, WC Docket No. 12-375, Order Denying Stay Petitions, 31 FCC Rcd 10936, 10943-44, para. 17 & n.68 (WCB 2016) (citing Letter from Paul Wright, Executive Director, Human Rights Defense Center (HRDC), to Honorable Tom Wheeler, Chairman, FCC, WC Docket No. 12-375, at 10 (filed July 29, 2015) (explaining that "[u]ntil the late 1980s when Evercom invented the kickback model of giving money to corrections officials in exchange for monopoly contracts, telephone services for prisoners and their families were cheap, high quality and affordable").

[854] *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12818, para. 117; *see also* 47 CFR § 64.6000 (defining site commissions).

[855] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9561, para. 100 & n.300; Pay Tel Sept. 27, 2021 Comments Exh. 3 at 1 (noting a site commission offer of 90% on all calls as well as an upfront guarantee of $150,000 per year); Contract between the State of New Hampshire, Department of Administrative Services, and Global Tel*Link Corp. at 49 (executed Oct. 3, 2017), https://www.prisonphonejustice.org/media/phonejustice/NH_DOC_GTL_Contract_thru_Oct_2022.pdf (requiring a "fixed 20% commission paid to the state based upon gross charges").

249.    Site commissions can arise in several different scenarios.[856]  First, a state or local statute or regulation "that operate[s] independently of the [IPCS] contract process" may mandate "site commission payments at a specified level."[857]  Second, "there can be situations where the correctional institution's request for proposal, or the like, asks bidders to agree to pay site commissions at a specified level."[858]  And third, there may be circumstances where no state or local law or regulation "compels site commission payments and the correctional institution soliciting bids does not request any specific payment (even if it indicates that offers to pay site commissions will influence bid selection)."[859]  Some state laws permit—but do not require—correctional institutions to collect site commissions while others may require site commissions but do not specify any particular level.[860]  In these circumstances, IPCS providers and correctional institutions may negotiate the amount of the site commission.[861]

250.    In general, site commissions provide benefits to correctional authorities and the IPCS providers bidding on IPCS contracts.  By providing a mechanism for correctional authorities to share in some portion of IPCS revenues, site commission payments allow correctional authorities to "benefit financially from the contract that they sign with their [IPCS] provider."[862]  And "by proposing higher prices" during the bidding process, IPCS providers "can pay more in commissions to the state, thereby increasing the probability with which they win the contract."[863]  It is due to these market dynamics that

---

[856] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9561, para. 100; *GTL v. FCC*, 866 F.3d at 413  ("In some instances, commissions are mandated by state statute, and in other instances commissions are required by state correctional institutions as a condition of doing business with ICS providers.") (internal citations omitted); 47 CFR § 64.6000 (defining the "Facility-Related Rate Component" as either the "Legally Mandated Facility Rate Component" or the "Contractually Prescribed Facility Rate Component").

[857] *2021 ICS Order*, 36 FCC Rcd at 9571, para. 119 & n.361 (providing examples of such site commissions).

[858] *Id.* at 9571, para. 120.

[859] *Id.* at 9572, para. 121.

[860] *Id.* at 9571, para. 119 & n.361; Cal. Pen. Code § 4025(d)-(e) (providing that money from site commissions that is attributable to the use of pay telephones by incarcerated individuals must be deposited into an "inmate welfare fund"); California PUC May 8, 2023 Comments at 5 (noting that section 4025 of the California Penal Code does not mandate that site commissions be collected); *Securus Techs., LLC v. Pub. Utils. Comm'n*, 305 Cal.Rptr.3d 153, 175 (Cal. Ct. App. 2023) (explaining that section 4025 of the California Penal Code "impliedly authorizes county sheriffs to collect site commissions" but does not "require sheriffs to do so, or mandate the collection of a certain amount").

[861] *See 2021 ICS Order*, 36 FCC Rcd at 9571, para. 119 & n.361 (suggesting that site commissions arising under such state laws are subject to contractual negotiations during the bidding process).

[862] Miller May 4, 2023 *Ex Parte*, Attach. at 2.

[863] *See id.*; Brattle May 8, 2023 Report at 24, para. 45 (explaining that if a provider "places a high value on commissions, they may be able to win contracts for audio and video services even if their infrastructure is more expensive than their competitors"); *see also* Pay Tel Sept. 27, 2021 Comments at 6 (providing a proposal evaluation form covering eight bids and showing the scores attached to each aspect of the respective proposals, including a category for "Proposed Rates and Commission/Agency Cost"); Contract between the State of New Hampshire, Department of Administrative Services, and Global Tel*Link Corp. at 3 (executed Oct. 3, 2017), https://www.prisonphonejustice.org/media/phonejustice/NH_DOC_GTL_Contract_thru_Oct_2022.pdf (providing a proposal evaluation form for a contract with the State of New Hampshire showing a category for "Fee Structure (Costs/Rebates/Commissions)").

site commissions have sometimes been described as "kickbacks"[864] or "legal bribes."[865]

251.    Regardless of how they arise, site commissions, as historically understood, "fund a wide and disparate range of activities."[866]  In some cases, site commission revenues may be used to fund programs related to "education and reintegration into society."[867]  "In certain jurisdictions, state law requires that revenue from site commission payments, or a portion thereof, be deposited into welfare funds or the state's general treasury.[868]  In other cases, site commission payments may be used to "defray costs of maintaining carceral facilities."[869]  Because site commission revenues can include many different types of payments, they may also be offered for the benefit of correctional officials, through, for example,

---

[864] *See, e.g.*, Miller May 4, 2023 *Ex Parte*, Attach. at 2 (explaining that site commission payments "are reasonably characterized as kickbacks but, in industry parlance, they are known as 'commissions'"); Public Interest Parties Jan. 12, 2015 Comments at 7 (discussing the "existing ICS kickback regime"); 168 Cong. Rec. H10027 (daily ed. Dec. 22, 2022) (statement of Rep. Pallone) ("Unfortunately, kickbacks, not competition, are often the deciding factor in which company is selected."); Civil Rights Corps May 8, 2023 Comments at 4 (referring to "lucrative kickbacks"); Color of Change May 8, 2023 Comments at 3-4; Letter from Peter Wagner, Executive Director, Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach., Brian Nam-Sonenstein, *Shadow Budgets: How mass incarceration steals from the poor to give to the prison* (May 6, 2024), at 6 (filed May 7, 2024) (*Shadow Budgets* May 6, 2024 Report) (explaining that the IPCS market operates "by charging fees to service users (incarcerated people and their communities), which enriches both the telecom company (in the form of profit) and the prison system (in the form of kickbacks)).

[865] *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12821-22, para. 123 (noting that "HRDC, for example, describes site commissions as 'legal bribes to induce correctional agencies to provide ICS providers with lucrative monopoly contracts'") (citation omitted).

[866] *Id.* at 12824-25, para. 127; *2013 ICS Order*, 28 FCC Rcd at 14135, para. 54 (noting that site commissions are made "for a wide range of purposes"); Securus Dec. 17, 2021 Reply at 20 (explaining that "many facilities continue to use site commissions as a predominate source of funding to recoup their costs of providing ICS, maintaining security, and supporting critical programs to help support successful reentry and reduce recidivism").

[867] *2013 ICS Order*, 28 FCC Rcd at 14137-38, para. 57; Securus Sept. 27, 2021 Comments at 13 ("Many states and local governments have made policy choices to fund important, welfare-enhancing programs for incarcerated persons [through site commission payments].").

[868] *See, e.g.*, Wis. Stat. Ann. § 301.105 (requiring the department of corrections to "collect moneys for commissions from telephone companies for contracts to provide telephone services to inmates" and transmit those sums to the secretary of administration, who is then required to deposit two-thirds into the general fund "as general purpose revenue-earned" and "credit one-third" to an "appropriation account"); Cal. Pen. Code 4025 (d)-(e) (mandating that site commission revenue be deposited into an "inmate welfare fund" when the site commission is "attributable to the use of pay telephones which are primarily used by inmates while incarcerated"); Utah Code Ann. § 64-13-42 (creating a "Prison Telephone Surcharge Account" consisting of "revenue generated by the state from pay telephone services located at any correctional facility" that "[u]pon appropriation by the Legislature . . . shall be used by the department for education and training programs for offenders and inmates"); Fla. Stat. § 945.215 (specifying that "[a]ll proceeds from contracted telephone commissions must be deposited into the State-Operated Institutions Inmate Welfare Trust Fund or . . . into the General Revenue Fund"); *Shadow Budgets* May 6, 2024 Report at 1 (explaining that "corrections officials have wide discretion to use welfare funds as shadow budgets for subsidizing essential facility operations, staff salaries, vehicles, weapons, and more, instead of paying for such things out of their department's more transparent and accountable general budget.").

[869] *See, e.g.*, Securus Sept. 27, 2021 Comments at 13; *see also 2015 ICS Order*, 30 FCC Rcd at 12825, para. 127 (noting that site commissions may fund "general governmental or correctional activities unrelated to the costs of providing ICS by either the provider or facility"); Letter from Michal J. Nowicki, Marashlian & Donahue, PLLC, Counsel to HomeWAV, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed July 12, 2024) (noting that correctional facilities use site commission revenue for "upgrades to the facilities' heating, cooling, and plumbing systems" among other things).

campaign contributions or "payments to influential sheriff-led associations"[870] or through in-kind payments.[871] Finally, site commissions—as that term historically was understood—may also serve, in part, to "compensate correctional facilities for the costs they reasonably incur in the provision of [IPCS]."[872] Those facility-related costs may encompass various safety, security, surveillance, and administrative tasks.[873] These functions and activities may be performed by correctional authorities or IPCS providers, depending on their mutually agreed arrangements.[874]

252.    Regardless of the purposes for which site commissions may be used, they historically have been "a significant driver of rates" that incarcerated people and their loved ones pay.[875] Specifically, site commissions have exerted and continue to exert "upward pressure" on rates.[876] By imposing higher rates, IPCS providers historically could afford to pay more in commissions to correctional authorities.[877] Thus, providers ultimately recovered the costs of their site commission payments through the rates they

---

[870] *2021 ICS Order*, 36 FCC Rcd at 9568 n.344 (citing Peter Wagner & Alexi Jones, PPI, *On Kickbacks and Commissions in the Prison and Jail Phone Market* (Feb. 11, 2019), https://www.prisonpolicy.org/blog/2019/02/11/kickbacks-and-commissions/).

[871] In one instance, correctional officials were offered cruises as part of IPCS contracts. Fairfax County Sheriff's Office Inmate Communication Services Agreement with Smart Communications Holding, Inc., Attach. 2 – Vendor Proposal, at 6 (signed Feb. 26, 2021) (Fairfax County Sheriff's Office Inmate Communication Services Agreement), https://www.fairfaxcounty.gov/sheriff/sites/sheriff/files/assets/fairfax%20county%20inmate%20communications%20agreement.pdf; Hayden Betts, The Appeal, *Sheriffs Offered Caribbean Cruises and Florida Retreats as Part of Jail Telecom Contracts* (Oct. 17, 2022), https://theappeal.org/smart-communications-cruises-trips-florida/.

[872] *See, e.g.*, *2020 ICS Notice*, 35 FCC Rcd at 8520, para. 100.

[873] *See, e.g.*, National Sheriffs' Association July 12, 2023 Reply at iv  (asserting that "site commissions in some instances go toward safety and security measures"); Pay Tel July 12, 2023 Reply at 11-13 (listing various tasks relating to administration of IPCS communications systems, managing call traffic, and call monitoring); Wood June 7, 2024 Report at 2 (explaining that safety and security costs "have historically been recovered through an implicit subsidy generated by site commissions paid to confinement facilities by IPCS providers"); *see also* National Sheriffs' Association Sept. 27, 2021 Comments at 3; Pay Tel Dec. 17, 2021 Reply at 11.

[874] Pay Tel July 12, 2023 Reply at Exh. 3 (providing a chart detailing facility administrative and security-related IPCS tasks, including whether such tasks are typically performed by the IPCS provider or the correctional facility); Pay Tel June 7, 2024 *Ex Parte* at 2 (explaining that many "safety and security related tasks are performed *exclusively* by facility personnel" (emphasis in original)).

[875] *See 2015 ICS Order*, 30 FCC Rcd at 12819, para. 118; *see also 2014 ICS Notice*, 29 FCC Rcd at 13180, para. 21 (noting that "[t]he record is clear that site commissions are the primary reason ICS rates are unjust and unreasonable and ICS compensation is unfair"); Wright Petitioners et al. Reply, WC Docket No. 12-375, at 3 (rec. Dec. 17, 2023) (Public Interest Parties Dec. 17, 2021 Reply) (highlighting that site commissions "continue to be a major driver of the unconscionably high rates many incarcerated individuals must pay for ICS"); Wood June 7, 2024 Report at 2 (noting that there is "general agreement that the existing mechanism of indirect cost recovery through site commissions is substandard at best, and may result in over-recovery of costs and higher-than-necessary end user rates"). *But see* Virginia Association of Regional Jails May 29, 2024 *Ex Parte* at 4 (explaining that the Virginia Association of Regional Jails "does not consider the payment of site commissions or the consideration of revenue in contract award as contributing to" unjust and unreasonable rates).

[876] *See, e.g.*, Public Interest Parties July 12, 2023 Reply at 13 ("In fact, as the Commission has noted and many commenters agreed, site commission payments tend to result in higher rates for IPCS consumers."); Miller May 4, 2023 *Ex Parte* at 1 (explaining that site commissions put "upward pressure" on prices); *2002 Pay Telephone* Order, 17 FCC Rcd at 3260, para. 29 (noting the "upward pressure" that site commissions "impose on inmate calling rates").

[877] *See, e.g.*, Miller May 4, 2023 *Ex Parte* at 1; Brattle May 8, 2023 Report at 24, para. 45.

charged consumers.[878]  This means that incarcerated people and their loved ones, who cannot choose their own IPCS providers, were forced to bear the financial burden imposed by site commissions in the rates they pay, thereby subsidizing the tasks or activities that correctional officials or, in some cases, state law, dictate associated with the use of site commission revenue.  As explained above, this subsidization could have extended to tasks and activities that have nothing to with enabling communication between incarcerated people and their loved ones, including funding "inmate welfare programs . . . salaries and benefits of correctional facilities, states' general revenue funds, and personnel training."[879]

253.    These historical consumer costs could be substantial.  Site commissions historically could account for "33 percent of the out-of-pocket consumer call charges on average" and rising "to more than 70 percent in some jurisdictions."[880]  Collectively, as set forth in Appendix F, providers reported total industry site commissions of over $446 million.  Relatedly, in jurisdictions that have eliminated site commissions, IPCS rates have "decreased significantly."[881]  In short, there is "no question" that the site commissions result in higher consumer prices.[882]

254.    At the same time, site commissions have distorted the IPCS marketplace.[883]  Each correctional facility has "a single provider of [IPCS] that operates as a monopolist within that facility," and very often "correctional authorities award the monopoly franchise for [IPCS] based in part on what portion of inmate calling services revenues a provider has offered to share with the facility."[884]  Such scenarios can create "reverse competition" in which "the financial interests of the entity making the buying decision (the correctional institution) are aligned with the seller (the ICS provider) and not the

---

[878] *See, e.g.*, Brattle May 8, 2023 Report at 24-25, para. 45 (explaining how site commissions result "in the provider getting away with charging higher rates for their services, even if there are other providers who offer better infrastructure at a lower cost").

[879] *2014 ICS Notice*, 29 FCC Rcd at 13172, para. 3.

[880] Securus Sept. 21, 2021 Comments at 14 (quoting Securus Technologies Supports Interim Rate Caps on Inmate Calling Services and Proposes Sweeping Collaborative Effort to Modernize Correctional Communications, https://securustechnologies.tech/wp-content/uploads/2021/07/Final_Ad_TheHill2.pdf).

[881] *See, e.g.*, *2014 ICS Notice*, 29 FCC Rcd at 13183, para. 27; *2015 ICS Order*, 30 FCC Rcd at 12819, para. 119 (highlighting that "ICS rates have dropped dramatically in states that have eliminated site commissions"); Securus Dec. 17, 2021 Reply at 20 ("Systems that do not permit site commissions tend to have lower consumer rates."); Worth Rises Comments, WC Docket No. 12-375, at 11 (rec. Nov. 23, 2020) (Worth Rises Nov. 23, 2020 Comments) (explaining that in 2018 after New York City passed legislation making jail calls free to incarcerated people, the "city could no longer collect site commissions and renegotiated the price of its calls with Securus from $0.50 for the first minute and $0.05 for every additional minute to $0.03 per minute across the board," saving families "nearly $10 million annually").

[882] Securus Sept. 21, 2021 Comments at 13, 24 (highlighting that "Securus has . . . publicly called for the elimination of site commissions, noting their impact on consumer costs"); Miller May 4, 2023 *Ex Parte* at 2 (explaining that site commissions have "significant implications for outcomes, including on the price of phone calls" that consumers must pay); Worth Rises Nov. 23, 2020 Comments at 9 (identifying site commissions as one of the "leading costs providers point to justify their egregious call rates").

[883] Wood June 7, 2024 Report at 3, 7 (noting that site commissions are a "well-documented source of market distortions in the industry"); Wright Petitioners July 12, 2024 *Ex Parte* at 3 (explaining that "[t]he record makes clear that site commissions fundamentally distort the market for IPCS").

[884] *2021 ICS Order*, 36 FCC Rcd at 9567, para. 112; Pay Tel Sept. 27, 2021 Comments at 12 (noting that site commissions create an "incentive for facilities to award contracts based primarily (or at times, exclusively), on site commission offerings"); Brattle May 8, 2023 Report at 24-25, para. 45 (suggesting that "decision makers may prioritize the financial benefits they will receive from a provider rather than the cost and quality of the infrastructure they offer").

**Federal Communications Commission**                    **FCC 24-75**

consumer (the incarcerated person or a member of his or her family)."[885]  Thus, as a matter of historical practice, "providers bidding for a facility's monopoly franchise compete to offer the highest site commission payments,"[886] instead of competing on "service-based, competitive market factors" such as price or quality of service that would ultimately benefit incarcerated people and their loved ones.[887] While reverse competition occurs in other contexts, it has been "at its most pernicious in the inmate phone service context because buyers not only do not have a choice of service providers, they also have strong reasons not to forego using the service entirely."[888]  What is more, once a contract is signed, "the terms of the contract are set in stone" in that they need not be renegotiated by the IPCS provider absent a change in law and, because the provider then has monopoly power, it "[does] not have to worry about" lowering its prices "in order to stay competitive."[889]  As a result in such scenarios, "at any given time, the end-users are not necessarily benefitting from the lowest possible" IPCS prices.[890]

> **(ii)    The Commission's Regulation of Recovery For Site Commission Payments**

255.    The Commission has historically viewed site commission payments as "a division of locational monopoly profit" and not a cost of providing payphone service.[891]  This characterization led the Commission to exclude site commission costs from the costs it used to set interim calling services rate

---

[885] *2014 ICS Notice*, 29 FCC Rcd at 13181, para. 22; Brattle May 8, 2023 Report at 24, para. 43 (explaining that "[i]f correctional agencies put a larger emphasis on revenue sharing percentages and site commissions in the scoring criteria, then they may not always pick the best possible outcome that maximizes consumer surplus").

[886] *2021 ICS Order*, 36 FCC Rcd at 9567, para. 112; Brattle May 8, 2023 Report at 24, para. 45 (noting that "[i]f a provider places a high value on commissions, they may be able to win contracts" because "they can offer higher site commissions to decision makers who have the power to award contracts").

[887] *See, e.g.*, Pay Tel Sept. 27, 2021 Comments at 12-13; *2014 ICS Notice*, 28 FCC Rcd at 13173, para. 4 (explaining that site commissions force "providers to compete not on price or service quality but on the site of site commissions payments—a dynamic that drives rates even higher to cover greater and greater site commission payments"); Brattle May 8, 2023 Report at 24, para. 45 (noting that "providing lower rates for voice calling services is unfortunately not always the optimal strategy for winning the contract").  *But see Virginia Association of Regional Jails May 29, 2024 Ex Parte*, Attach., Letter from Michelle Lewis, VARJ Legislative Committee Member, to Marlene H. Dortch, Secretary, FCC, FCC Proceeding: 23-62 In the Matter of Incarcerated People's Communications Services, at 6 (asserting that "there is no distortion of competition").

[888] *2013 ICS Order*, 28 FCC Rcd at 14129-30, para. 41 (internal quotation marks omitted) (citing Letter from Jason Marks, Esq., to Mignon Clyburn, Acting Chair, FCC, WC Docket No. 12-375 at 1 (filed July 12, 2013)).

[889] Brattle May 8, 2023 Report at 25, para. 46.

[890] *Id*.

[891] *See, e.g., Implementation of the Pay Telephone Reclassification and Compensation Provision of the Telecommunications Act of 1996*, CC Docket No. 96-128, Third Report and Order and Order on Reconsideration of the Second Report and Order, 14 FCC Rcd 2545, 2562, para. 37 n.72 (1999) (concluding that "locational rents should be treated as a form of profit rather than a cost"); *2002 Pay Telephone Order*, 17 FCC Rcd at 3255, para. 38 (finding that site commissions "represent an apportionment of profits between the facility owners and the providers of the inmate payphone service"); *2012 ICS Notice*, 27 FCC Rcd at 16642-43, para. 37 (seeking comment on the Commission's view that site commissions are not a cost but should be treated as profit); *2013 ICS Order*, 28 FCC Rcd at 14135, para. 54 (concluding that site commissions "are not costs that are reasonably and directly related to the provision of ICS because they are payments made to correctional facilities or department of corrections for a wide range of purposes, most or all of which have no reasonable and direct relation to the provision of ICS"); *2015 ICS Order*, 30 FCC Rcd at 12822, para. 124 ("While we continue to view such payments as an apportionment of profit, and therefore irrelevant to the costs we consider in setting rate caps for ICS, we do not prohibit ICS providers from paying site commissions."); *see also* Wright Petitioners et al. Comments, WC Docket No. 12-375, at 7 n.36 (rec. Nov. 23, 2020) (Public Interest Parties Nov. 23, 2020 Comments).

caps in the *2013 ICS Order* and permanent rate caps in the *2015 ICS Order*.[892]  Over time, however, the Commission recognized that "some portion of [site commission payments] may be attributable to legitimate facility costs."[893]  Thus, in the *2016 ICS Reconsideration Order*, the Commission explained that "some facilities likely incur costs that are directly related to the provision of ICS," and determined that "it is reasonable for those facilities to expect ICS providers to compensate them for those costs . . . [as] a legitimate cost of ICS that should be accounted for in [the] rate cap calculations."[894]  As a result, the Commission reconsidered its decision to entirely exclude site commission payments from its 2015 rate caps and adopted additives to those caps "to account for claims that certain correctional facility costs reflected in site commission payments are directly and reasonably related to the provision of inmate calling services."[895]

256.    In the 2017 *GTL v. FCC* opinion, the D.C. Circuit held that the "wholesale exclusion of site commission payments from the FCC's cost calculus" in the *2015 ICS Order* was "devoid of reasoned decision-making and thus arbitrary and capricious."[896]  The court was unpersuaded by the Commission's assertion that site commissions have nothing to do with the provision of calling services, reasoning that "[i]n some instances, commissions are mandated by state statute" while in others "commissions [are] required by state correctional institutions as a condition of doing business with ICS providers."[897]  The court also explained that because the Commission acknowledged that some portion of some providers' site commission payments might represent "legitimate" costs of providing inmate calling services, the Commission could not "categorically exclude[] site commissions and then set rate caps at below cost."[898]  "Ignoring costs that the Commission acknowledges to be legitimate," the court explained, "is implausible."[899]  But the court left it to the Commission on remand to determine "*which portions* of site commissions *might be directly related to the provision of ICS and therefore legitimate*, and which are not."[900]

257.    In 2020, the Commission proposed rate reform of the inmate calling services then within its jurisdiction with the *2020 ICS Notice*.[901]  Based on extensive analysis of the data the Commission collected in the Second Mandatory Data Collection, the Commission proposed to lower the interstate rate caps to $0.14 per minute for debit, prepaid, and collect calls from prisons and $0.16 per minute for debit,

---

[892] *See, e.g.*, *2013 ICS Order*, 28 FCC Rcd at 14111-12, para. 7 (concluding that "site commission payments and other provider expenditures that are not reasonably related to the provision of ICS are not recoverable through ICS rates"); *2015 ICS Order*, 30 FCC Rcd at 12819, para. 118 ("Accordingly, we do not include site commission payments in the cost data we use in setting the rate caps established in this Order.").

[893] *2020 ICS Order*, 35 FCC Rcd at 8521, para. 101; *2014 ICS Notice*, 29 FCC Rcd at 13180, para. 21 (seeking comment on prohibiting site commissions and on "whether correctional institutions incur any costs in the provision of ICS and, if so, how to enable the facilities to recover such costs").

[894] *2016 ICS Reconsideration Order*, 31 FCC Rcd at 9307, para. 12.

[895] *2021 ICS Order*, 36 FCC Rcd at 9525, para. 15; *2016 ICS Reconsideration Order*, 31 FCC Rcd at 9307, para. 12.

[896] *GTL v. FCC*, 866 F.3d at 417.

[897] *Id.* at 413.

[898] *Id.* (internal quotation marks omitted).

[899] *Id.* (internal quotation marks omitted).

[900] *Id.* at 414 (emphasis added); Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ, Office of Communication Inc. & Al Kramer, Senior Fellow, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 5 (filed Mar. 31, 2021) (UCC and Public Knowledge Mar. 31, 2021 *Ex Parte*) (explaining that the D.C. Circuit's remand "left it open to the Commission, based on a reasoned analysis, to conclude that no portion of the site commissions are part of the legitimate cost of providing the service if that is what the record reveals").

[901] *See, e.g.*, *2020 ICS Notice*, 35 FCC Rcd at 8510, para. 71.

prepaid, and collect calls from jails.[902]  Consistent with the D.C. Circuit's opinion in *GTL v. FCC*, the Commission also proposed to include "an allowance for site commission payments in the interstate rate caps to the extent those payments represent legitimate correctional facility costs that are directly related to the provision of inmate calling services."[903]  The Commission proposed an allowance of $0.02 per minute, which reflected the Commission's "analysis of the costs correctional facilities incur that are directly related to providing inmate calling services and that the facilities recover from inmate calling services providers as reflected by comparing provider cost data for facilities with and without site commission requirements."[904]  Recognizing that facility costs for contracts covering only jails with low average daily populations might exceed the proposed $0.02, the Commission invited comment on adopting higher allowances for correctional facility costs for such contracts if the record supported such allowances.[905]

### (iii)    2021 Rate Structure Reforms

258.    In the *2021 ICS Order*, the Commission adopted interim inmate calling services rate caps that included an allowance for site commission payments "consistent with section 276's fair compensation provision" as interpreted by the D.C. Circuit's decision in *GTL v. FCC*.[906]  In relevant part, the Commission adopted two facility-related rate components reflecting different types of site commissions for prisons and larger jails: legally mandated site commission payments that providers are obligated to pay under laws or regulations; and contractually prescribed site commission payments that providers agree, by contract, to make.[907]  The Commission permitted providers to recover the costs of their legally mandated site commission payments, without any markup, as an additive to the interim interstate per-minute rate caps up to a total rate cap of $0.21 per minute.[908]  Where site commission payments resulted from contractual obligations or negotiations between providers and correctional officials, the Commission permitted providers to recover no more than $0.02 per minute for prisons and larger jails.[909]

259.    In evaluating cost recovery for site commissions in the *2021 ICS Order*, the Commission emphasized that full recovery of site commission payments is not required by the D.C. Circuit's decision in *GTL v. FCC*, given that the court made clear that the Commission may "assess on remand which portions of site commissions might be directly related to the provision of [inmate calling services] and therefore legitimate, and which are not."[910]  The Commission reasoned that full recovery of site commissions "cannot be reconciled with [the Commission's] statutory duty to ensure that incarcerated

---

[902] *See, e.g., id.*

[903] *2020 ICS Notice*, 35 FCC Rcd at 8521-22, para. 103.

[904] *Id.*

[905] *See id.* at 8520, para. 99.

[906] *2021 ICS Order*, 36 FCC Rcd at 9563, para. 101; *GTL v. FCC*, 866 F.3d at 412-13 (explaining that given the Commission's acknowledgement that the rate caps it adopted in the *2015 ICS Order* were below providers' costs taking site commissions into consideration, the Commission did not comply with the fair compensation mandate of section 276).

[907] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9562, para. 100.  The Commission did not adopt facility-related rate components for jails with average daily populations below 1,000, which remained subject to the existing $0.21 per-minute total rate cap.  *2021 ICS Order*, 36 FCC Rcd at 9581, para. 140.  This outcome reflected, in part, record arguments suggesting that "legitimate facility costs related to [IPCS] may indeed be higher for smaller facilities." *2021 ICS Notice*, 36 FCC Rcd at 9662, para. 316.  Because commenters "did not provide sufficient evidence to enable [the Commission] to quantify any such costs," the Commission sought comment on facility costs for smaller jails as part of the *2021 ICS Notice*.  *See id.* at 9661-64, paras. 316-22.

[908] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9521, 9564, paras. 3, 105.

[909] *See, e.g.*, *id.* at 9521, para. 3.

[910] *GTL v. FCC*, 866 F.3d at 414.

people and the people with whom they speak are charged 'just and reasonable' rates for inmate calling services."[911]  At the same time, the Commission concluded that it could not, consistent with the record before it at that time and "current law and policy" treat all site commissions solely as a division of locational monopoly profit and therefore deny any recovery of such payments.[912]

260.    The Commission relied on its section 201(b) authority over interstate and international rates and charges in the *2021 ICS Order* in analyzing cost recovery separately for legally mandated and contractually prescribed site commissions.[913]  As to legally mandated site commissions payments, the Commission recognized them "as a cost that providers must incur to provide calling services, consistent with section 276's fair compensation provision."[914]  Thus, the Commission found legally mandated site commission payments "to be used and useful in the provision of interstate and international inmate calling services at least as long as the Commission continues to permit providers of interstate and international inmate calling services to continue to make these site commission payments."[915]

261.    The Commission next found that contractually prescribed site commission payments "reflect[] not only correctional officials' discretion as to whether to request site commission payments . . . but also providers' voluntary decisions to offer payments to facilities that are mutually beneficial in the course of the bidding and subsequent contracting process."[916]  The Commission also recognized that contractually prescribed site commissions payments that "simply compensate a correctional institution for the costs (if any) an institution incurs to enable interstate and international inmate calling services" were "prudently incurred expenses used and useful in the provision of interstate and international inmate calling services."[917]  Contractually prescribed site commission payments were deemed not recoverable, however, "insofar as they exceed[ed] the level needed to compensate a correctional institution for the costs (if any) an institution incurs to enable interstate and international inmate calling services."[918]

262.    Ultimately, the Commission arrived at the $0.02 per minute allowance for prisons and larger jails on two independent bases.[919]  First, it estimated "the portion of site commissions that are legitimately related to inmate calling services" based on a comparison of per-minute costs for facilities that receive site commission payments and those that do not from cost and site commission data that providers reported in response to the Second Mandatory Data Collection.[920]  Because those data "incorporated no correctional facility-provided cost data," the Commission's methodology "reflected its reasoned judgment as to the best estimation of legitimate facility costs related to inmate calling services in

---

[911] *2021 ICS Order*, 36 FCC Rcd at 9568, para. 113.

[912] *Id.* at 9569, para. 115.

[913] *See id.* at 9575, para. 126 ("Given the focus in the *2020 ICS Notice* on applying our section 201(b) authority it makes sense to evaluate cost recovery—otherwise described as an evaluation of whether the costs are directly and reasonably related to the provision of inmate calling services—under the longstanding principles the Commission has relied upon when implementing section 201(b) in the past.").

[914] *Id.* at 9563, para. 101.

[915] *Id.* at 9578, para. 133.

[916] *Id.* at 9563, para. 103.

[917] *Id.* at 9575-76, para. 127.

[918] *Id.* at 9576, para. 128.

[919] *See, e.g.*, *id.* at 9579, para. 134.

[920] *2021 ICS Order*, 36 FCC Rcd at 9579-80, para. 135.  The Commission first used this methodology in Appendix H of the *2020 ICS Notice* but updated it with corrected cost data in Appendix E of the *2021 ICS Order*.  *See 2021 ICS Order*, 36 FCC Rcd at 9579, para. 135.

the absence of cost data from correctional facilities themselves."[921]  The Commission emphasized that its own analysis "reflect[ed] even lower estimates for legitimate facility costs" but declined to adopt an allowance lower than $0.02 at that time.[922]

263.    Second, data from a survey of facilities' inmate calling services costs that the National Sheriffs' Association had conducted in 2015 independently supported the $0.02 allowance for correctional facility costs at prisons and larger jails.[923]  Though the Commission had previously relied on these data in the absence of any other data, the Commission expressed continuing concern about their reliability because "some of the facilities included in the . . . survey [had] report[ed] an exceedingly high number of hours of correctional facility officials' time compared to most other reporting facilities."[924]  The Commission did "not find these data credible when comparing them to data of similarly sized reporting facilities *that have no incentive* to under-report their hours or costs."[925]  Notwithstanding these issues, the Commission concluded that they were "the best data available from correctional facility representatives" that allowed the Commission to balance the "objectives to ensure just and reasonable rates under section 201 of the Act with the requirement to ensure fair compensation under section 276 of the Act."[926]  The Commission therefore relied on the data from the National Sheriffs' Association survey in addressing providers' site commissions payments to prisons and larger jails.  The Commission found, however, that the survey data for jails having average daily populations of fewer than 1,000 incarcerated people "varied far too widely to comfortably estimate any values" for correctional facility costs "that would withstand scrutiny today" (i.e., in May 2021).[927]  The Commission circumscribed its interim treatment of site commissions based on the record and regulatory backdrop at that time,[928] and confirmed that nothing in the *2021 ICS Order* would limit its "ability, on a more complete record and with sufficient notice, to reconsider [its] treatment of site commission payments."[929]

264.    In the *2021 ICS Notice*, adopted at the same time as the *2021 ICS Order*, the Commission sought comment on how and where to draw the line between legitimate and illegitimate portions of site commission payments and asked for specific data concerning legitimate portions of those costs, if any.[930]  Additionally, the Commission asked commenters to provide methodologies that the Commission could use to identify legitimate site commission expenses.[931]  The Commission also sought comment on "prohibiting providers from entering into any contract requiring the payment of contractually prescribed

---

[921] *2021 ICS Order*, 36 FCC Rcd at 9580, para. 135.  The Commission agreed with commenters that it is "difficult to disentangle which part of the site commission payment goes towards reasonable facility costs and which portion is due to the transfer of market power."  *See id.* at 9565-66, para. 107 (quoting Public Interest Parties Jan. 15, 2021 Comments, Appx. A, Brattle Report, at 14).

[922] *See 2021 ICS Order*, 36 FCC Rcd at 9580, para. 136.

[923] *Id.* at 9581, para. 141 (citing National Sheriffs' Association Jan. 12, 2015 Comments at 3).

[924] *2021 ICS Order*, 36 FCC Rcd at 9583, para. 143.  The Commission flagged one facility with an average daily population of approximately 1,500, which reported approximately 694 total hours per week on inmate calling services-related activities, which was "roughly 400 hours more than the next highest facility with an equal or lower average daily population."  *Id.*

[925] *Id.* (emphasis in original).

[926] *See id.* at 9582-83, paras. 142-43.

[927] *Id.* at 9662, para. 317.

[928] *See, e.g.*, *id.* at 9569-70, para. 115 (explaining that "while we conclude that full recovery of site commissions is not required, we cannot conclude on the current record, and in light of the current legal treatment of site commissions, that no recovery of site commissions is justified").

[929] *Id.* at 9565, para. 106.

[930] *Id.* at 9660, para. 312.

[931] *See id.* at 9660, para. 313.

site commissions for interstate and international calling services" and "preempting state or local laws that impose [legally mandated site commission] payments on interstate or international calling services."[932]

### (iv)      The Martha Wright-Reed Act and the 2023 IPCS Notice

265.      On December 22, 2022, Congress passed the Martha Wright-Reed Act, which was signed into law on January 5, 2023.  Just slightly over two months later, the Commission adopted the *2023 IPCS Notice*, in which it sought comment on several aspects of the effect of the Martha Wright-Reed Act on the Commission's consideration of site commission payments.  First, as a general matter, the Commission incorporated its prior questions on site commissions from the *2021 ICS Notice* into the *2023 IPCS Notice*.[933]  In particular, the Commission asked whether its ratemaking calculations should "include providers' site commission payments only to the extent, if any, that they compensate facilities for used and useful costs that the facilities themselves incur."[934]  Second, the Commission requested comment on how the dual requirements of section 276(b)(1)(A) to ensure just and reasonable rates and charges for IPCS consumers and providers and fair compensation for IPCS providers should affect its treatment of site commission payments including any decision on whether to preempt state and local laws and regulations that impose site commissions.[935]  And third, the Commission invited comment "on the relationship, if any, between safety and security measures and site commission payments."[936]

### (v)      Other Trends in the Treatment of Site Commissions

266.      Broadly, the "structure of the market for providing communications services to incarcerated persons has changed and continues to change."[937]  This is particularly true in the case of site commissions.  Indeed, "[t]here is already a growing trend to eliminate the use of site commissions."[938]  One IPCS provider explains that it offers "commission-less options in its proposals to correctional authorities"[939] to "improve affordability for consumers."[940]  In addition to provider-led efforts, "a number of states have banned site commissions" or have made IPCS free to end users[941] driven, at least in part, by the goal of protecting incarcerated people and their loved ones "from detrimental practices by private corporations providing goods and services to people confined in carceral facilities."[942]  States that have eliminated site commissions include California, Michigan, Missouri, Nebraska, New Mexico, New York,

---

[932] *Id.* at 9661, paras. 314-15.

[933] *2023 IPCS Notice*, 38 FCC Rcd at 2680, para. 22.

[934] *Id*.

[935] *See id.* at 2679, 2680, paras. 20, 22; *see also id.* at 2697, para. 72 (seeking comment on "the scope of the Commission's preemption authority in light of the Martha Wright-Reed Act, including in particular, [the Commission's] authority over site commissions").

[936] *Id.* at 2692, para. 57.

[937] Securus May 8, 2023 Comments at 2.

[938] Securus Sept. 27, 2021 Comments at 16.

[939] *Id.* at 15; Securus May 8, 2023 Comments at 24 ("Securus offers commission-free options in response to RFPs and is working with corrections agencies to remove site commissions and has pledged to pass savings from the elimination of site commissions through to consumers.").

[940] Securus Sept. 27, 2021 Comments at 14.

[941] *Id.* at 16-17.

[942] *See* 2022 Cal. Leg. Serv., ch. 827 (S.B. 1008) (West); *see also* State of New Jersey. Senate Bill No. 2390 (introduced Jan. 29, 2024), https://pub.njleg.gov/Bills/2024/S2500/2390_I1.HTM (explaining that the purpose of the legislation is to "reduce the enormous financial burden of inmate phone calls as the high cost of prison phone calls have sapped savings from low-income families trying to communicate with their loved ones").

Rhode Island, and South Carolina.[943]  And five states—Massachusetts, Connecticut, California, Minnesota, and Colorado have now enacted legislation providing for free communications services for incarcerated people, meaning that IPCS consumers now pay nothing for IPCS site commissions.[944]  More recently, other states have introduced legislation requiring IPCS to be provided free of charge to incarcerated people and their loved ones or have eliminated site commission payments.[945]  This is also true for some municipalities, for example, San Diego and San Francisco.[946]  Together, these trends point to a decreasing reliance on site commission payments in providing IPCS.

### c.    Discussion

#### (i)    Overview of Our Approach To Site Commissions

267.    In this Report and Order, we only permit IPCS provider payments to correctional facilities for costs used and useful in the provision of IPCS.  As Pay Tel explains, facility cost recovery and site commissions are "two separate (but currently interrelated) issues."[947]  Pay Tel emphasizes that "site commission payments often ultimately provide facilities with necessary cost recovery for their role in administering ICS" but that "does not mean site commission payments are necessary for—i.e., the only means of ensuring—facility cost recovery."[948]  We agree.  Decoupling the conceptually distinct category of IPCS provider payments to correctional facilities for costs used and useful in the provision of IPCS from other payments IPCS providers have been asked—or required—to make to correctional facilities (i.e., "site commissions") illuminates how those markedly different categories of IPCS provider payments

---

[943] *See* Cal. Pen. Code § 2084.5 (West); Cal. Pub. Util. Code § 2899 (West 2023); Cal. Welf. And Inst. Code § 208.1 (West 2023); Co. Rev. Stat. §§ 17-42-103; 19-2.5-1511.5; Conn. Gen. Stat. § 18-8100; N.M. Stat. § 33-14-1; R.I. Gen. Laws § 42-56-38.1; S.C. Code § 10-1-210; Securus Sept. 27, 2021 Comments at 16-17 n.40 (citing Human Rights Defense Center, Prison Legal News, *FCC Order Heralds Hope for Reform of Prison Phone Industry* (Dec. 15, 2013), https://www.prisonlegalnews.org/news/2013/dec/15/fcc-order-heralds-hope-for-reform-of-prison-phone-industry/); Prisoners' Legal Services et al. Comments, WC Docket No. 12-375, at 5-6 (rec. Nov. 23, 2020) (Prisoners' Legal Services Nov. 23, 2020 Comments) (identifying three Massachusetts counties that eliminated site commissions); Worth Rises Nov. 23, 2020 Comments at 11 (discussing New York City, N.Y., Code § 9-154, which requires New York City to provide domestic inmate calling services at no cost to incarcerated people or the receiving parties and prevents the city from receiving revenue from inmate calling services); *2015 ICS Order*, 30 FCC Rcd at 12787-88, para. 49 (discussing actions in Ohio, West Virginia, and New Jersey).

[944] Mass. Gen. Laws ch. 127, § 87A; Conn. Gen. Stat. § 18-8100 (West 2021); Cal. Pen. Code § 2084.5  (West 2023); Cal. Pub. Util. Code § 2899 (West 2023); Cal. Welf. and Inst. Code § 208.1 (West 2023); 2023 Colo. Legis. Serv., ch. 23-1133 (H.B. 1133 (West) (precluding the receipt of "any revenue, including commissions or fees"); 2023 Minn. 93d Sess. (S.F. 2909) §§ 32.3-32.13 (prohibiting state agencies from receiving "revenue from the provision of voice communication services or any other communication service").

[945] State of New Jersey. Senate Bill No. 2390 (introduced Jan. 29, 2024), https://pub.njleg.us/Bills/2024/S2500/2390_I1.HTM (proposing to require state and private correctional facilities to allow incarcerated people to make telephone and video calls at no cost to the incarcerated person or other party and prohibiting correctional facilities from receiving a commission or imposing surcharges for telephone usage in addition to the charges imposed by the telephone service provider); State of Maryland, Senate Bill 948 (introduced Feb. 2, 2024), https://mgaleg.maryland.gov/2024RS/bills/sb/sb0948f.pdf (proposing that state correctional facilities and telephone service providers may not charge an incarcerated individual or a third party, for the incarcerated individual's use of telephone equipment or telephone services in a state correctional facility); Illinois House Bill 5257 (introduced Feb. 9, 2024) (stating that an incarcerated person is entitled to make free telephone calls from correctional institutions).

[946] Free calling has been in place in San Diego since July 1, 2021.  *See* San Diego County Sheriff's Dept., Detention Services Bureau, Telephones, https://www.sdsheriff.gov/bureaus/detention-services-bureau/telephones (last visited June 14, 2024).  For San Francisco, *see* Agreement between the City and County of San Francisco and GTL, Contract ID 1000017882 at 3, § 3.3.1 (Aug. 1, 2020).

[947] Pay Tel Sept. 27, 2021 Comments at 8.

[948] Pay Tel Dec. 17, 2021 Reply at 8.

can and should be treated under our new regulatory approach.

268.     We find that our rate caps will allow for IPCS provider reimbursements to correctional facilities for costs used and useful in the provision of regulated IPCS.[949]  In particular, we enable facilities to be reimbursed for these costs by including them in our rate caps and allowing providers to compensate facilities for them.[950]  By adopting a mechanism that enables correctional facility cost recovery extending only to used and useful costs reimbursed by IPCS providers, we ensure that correctional facilities will not be without recourse to recover their legitimate costs from providers within the bounds of the rate caps we adopt today.  We also ensure that providers' obligations to reimburse correctional facilities will be limited to the used and useful costs associated with the provision of IPCS that they actually incur.

269.     We take a different approach with respect to site commissions.  Today we conclude, based on the record and consistent with precedent, that site commission payments are not used and useful in the provision of IPCS and must therefore be excluded from the calculation of the Commission's rate caps.  We further prohibit site commission payments to all facilities to the extent those payments are associated with intrastate, interstate, international, jurisdictionally mixed, and jurisdictionally indeterminate audio and video IPCS, including all monetary and in-kind site commissions.  To effectuate this prohibition we take two actions consistent with the *2021 ICS Notice* and the *2023 IPCS Notice*.  First, we preempt state and local laws and regulations allowing or requiring site commission payments for IPCS.[951]  And second, we prohibit IPCS providers from entering into contracts allowing or requiring the payment of site commissions.[952]  We emphasize that the actions we take today in eliminating site commissions apply to all correctional institutions:  prisons, larger jails, smaller jails, and other types of correctional institutions.

### (ii)     Site Commissions Are Not Used and Useful In the Provision of IPCS

270.     Based on the record and core ratemaking precedent, we find that site commission payments are not used and useful in the provision of IPCS and must therefore be excluded from our rate and fee cap calculations.[953]  As discussed below, site commissions, whether legally mandated or contractually prescribed, do not satisfy any prong of the used and useful framework as that framework is applied by courts and the Commission.[954]

271.     Securus argues that the used and useful framework "is unsuited for the purpose of determining cost recovery for site commission payments" and is not an "appropriate basis" to restrict or eliminate site commissions.[955]  Securus explains that the used and useful framework "potentially leads to

---

[949] *Supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[950] At this time, we do not see the need to amend the Commission's definition of site commission to carve out the reimbursement we permit.  *See* Securus July 11, 2024 *Ex Parte* Attach. A at 1.

[951] *See 2021 ICS Notice*, 36 FCC Rcd at 9661, para. 315.

[952] *Id.* at 9661, para. 314.

[953] *See, e.g.*, Public Interest Parties July 12, 2023 Reply at 13 (noting that under the used and useful framework, "site commissions render little cognizable benefits to IPCS consumers"); California PUC May 8, 2023 Comments at 5 (arguing that in deciding whether to preempt state and local laws that impose site commissions, "the FCC should first determine whether those site commission payments are related to the actual costs of providing the service").  We note that the California PUC "supports capping the amount of site commissions to the extent they are proven necessary for the provision of IPCS."  California PUC June 6, 2023 Reply at 5.  As we discuss below, we conclude that site commissions, generally, are not used and useful in the provision of IPCS.

[954] *See supra* Section III.D (Rate Caps) (describing the used and useful framework).

[955] Securus May 8, 2023 Comments at 25, 32 ("The Commission's reliance on the 'used and useful' framework for limiting or eliminating site commission payments from regulated rates defies the D.C. Circuit's opinion and misapplies the 'used and useful' standard.").

unreasonable outcomes where the entity that sets the requirements for service, the correctional institution, is different from the "rate payer."[956]  In Securus's view, correctional facilities, not incarcerated people, are the "direct customer[s]" of IPCS and, as such, prescribe the "features and functions" they deem used and useful to provide the service.[957]  It is thus "untenable," Securus argues, to suggest that all features a correctional facility deems used and useful must "inure directly to the benefit of each caller."[958]

272.    While it is true that correctional authorities contract with IPCS providers for the provision of IPCS in their facilities, we are not persuaded by Securus's arguments.  IPCS are used and paid for by incarcerated people and their loved ones.[959]  In implementing section 276(b)(1)(A)'s just and reasonable and fair compensation standards, "[t]he Commission's duty is to protect IPCS ratepayers and ensure reasonable compensation for providers, not to protect the interests and demands of non-ratepaying stakeholders."[960]  And it is through the used and useful framework that the Commission balances the "equitable principle that public utilities must be compensated for the use of their property in providing service to the public" with the "[e]qually central . . . equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them."[961]  It is therefore entirely appropriate to evaluate site commission payments under the used and useful framework.

273.    To the extent Securus is concerned that applying the used and useful framework will somehow interfere with the discretion of correctional officials, we find those concerns overstated.[962]  We do not limit the ability of a correctional authority to "prescribe[] the features and functions it deems necessary to provide the service in its facilities."[963]  Correctional authorities remain free to contract for the "equipment, network facilities, operations and services" they deem appropriate.[964]  All we do here is evaluate site commission payments under long-standing principles the Commission uses in evaluating whether rates and charges are just and reasonable and conclude, based on the record developed over many years in these proceedings, that those payments are not used and useful in the provision of IPCS and must therefore be excluded from our rate cap calculations.  Doing so ensures that incarcerated people and their loved ones "bear only legitimate costs of providing service to them."[965]

274.    Securus also contends that the "used and useful" framework is "inapplicable to site commissions for the further reason that it is a feature of rate of return regulation" that is "unsuited for the purpose of determining cost recovery for site commission payments."[966]  Securus explains that the role of the "used and useful" framework under rate-of-return regulation is "to determine the rate base, defined as

---

[956] Securus May 8, 2023 Comments at 25.

[957] *Id*. at 25-26.

[958] *Id*. at 26.

[959] *See, e.g.*, 47 CFR § 64.6000(j) (defining inmate calling service to mean "a service that allows Inmates to make calls to individuals outside the Correctional Facility where the Inmate is being held, regardless of the technology used to deliver the service"); Worth Rises July 12, 2023 Reply at 2 (explaining that while correctional institutions "do procure IPCS from providers . . . they do not pay for the services they are procuring").

[960] Worth Rises July 12, 2023 Reply at 2.

[961] *See AT&T Phase II Order*, 64 F.C.C.2d at 38, paras. 111-12.

[962] *See* Securus May 8, 2023 Comments at 26 (noting that an IPCS provider is "responding to the requirements of its customer in terms of equipment, network facilities, operations and services as stated in requests for proposals").

[963] *Id.* at 25.

[964] *Id.* at 26.

[965] *Tenn. Gas Pipeline Co. v. FERC*, 606 F.2d 1094, 1109 (D.C. Cir. 1979) (*Tenn. Gas Pipeline Co.*).

[966] Securus May 8, 2023 Comments at 26, 32; *see also* ViaPath May 8, 2023 Comments at 6 (arguing that the Commission should not set IPCS rates based on the used and useful standard as it is a "vestige of rate-of-return regulation").

net investment in plant and equipment" and "plays no role in determining appropriate operating expenses, such as site commissions," which may be recovered "unless totally unrelated to the provision of service or excessive."[967]  Securus claims that because the Commission has opted to use "a form of price cap," rather than "rate of return regulation to set incarcerated communications services rate caps," the used and useful framework should be inapplicable.[968]  And even in the context of rate-of-return regulation, Securus asserts that regulators are not required to apply the used and useful framework and may instead use the prudent investment rule.[969]

275.    We find Securus's arguments in this regard unpersuasive.  First, as the Commission has explained, it has "not only . . . applied [the used and useful framework] in the context of carriers operating under rate-of-return regulation, but rates set on that basis were also used as the foundation for the price caps."[970]  Indeed, the Commission's price cap regime for incumbent local exchange carriers started with rates "generated by the conventional cost-of-service formula," an approach that has become, over time, the prevailing methodology to determine the rate base and allowable expenses under rate-of-return regulation.[971]  Setting price caps therefore involves some measure of the cost of service that is the hallmark of rate-of-return regulation.[972]  Fundamentally, setting IPCS rates is an "exercise in cost-based ratemaking" that "requires a determination of the costs providers incur in providing those services."[973]  And the used and useful framework is the standard the Commission has historically applied to "exclude[] certain impermissible costs from any rate methodology."[974]  Accordingly, we conclude that we may apply the used and useful framework to providers' site commission payments.

276.    Second, the used and useful standard, and the just and reasonable ratemaking standard more broadly, are fundamentally concerned with balancing the interests of ratepayers with the need to compensate public utilities for the use of their property.[975]  The policy of allowing only investments and expenses which are "used and useful" to be recovered from ratepayers "is intended to ensure that current

---

[967] Securus May 8, 2023 Comments at 26-27 (citing *1990 AT&T Tariff Investigation Order*, 5 FCC Rcd 5693); *see also* Securus July 11, 2024 *Ex Parte* at 17.

[968] Securus May 8, 2023 Comments at 26-27.

[969] *See id.* at 30.

[970] *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126.  ViaPath disputes this characterization, arguing that the price cap rates "were for dominant carriers moving from rate-of-return regulation to price cap regulation in the first instance, not carriers operating in a competitive market."  ViaPath May 8, 2023 Comments at 6 n.26.  As indicated above, IPCS consumers are the captive customers of the provider chosen by correctional officials.

[971] *See, e.g.*, *Verizon v. FCC*, 535 U.S. at 487.  In *Hope Natural Gas*, the Supreme Court "disavowed the position that . . . the Constitution required fair value as the sole measure of a rate base on which 'just and reasonable' rates were to be calculated."  *Verizon v. FCC*, 535 U.S. at 483-84 (citing *Hope Natural Gas*, 320 U.S. at 601-02).  "Federal and state commissions setting rates in the aftermath of *Hope Natural Gas* largely abandoned the old fair-value approach and turned to methods of calculating the rate base on the basis of 'cost.'"  *Verizon v. FCC*, 535 U.S. at 484.  And "cost" "came to mean 'cost of service,' that is, the cost of prudently invested capital used to provide the service."  *Verizon v. FCC*, 535 U.S. at 485.

[972] *See, e.g.*, *2013 ICS Order*, 28 FCC Rcd at 14134, para. 52 & n.195 ("Cost considerations may and frequently do play a role in rate cap regulatory regimes without *ipso facto* converting such regimes into rate of return regulation.").

[973] *2021 ICS Order*, 36 FCC Rcd at 9541, para. 52.

[974] Public Interest Parties May 8, 2023 Comments at 10; *see also Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (explaining that the "used and useful" concept "has both informed the Commission's regulatory cost accounting and ratemaking rules and operated to protect the interests of ratepayers and carriers").

[975] *See AT&T Phase II Order*, 64 F.C.C.2d at 38, paras. 111-12.

**Federal Communications Commission**                    **FCC 24-75**

ratepayers bear only legitimate costs of providing service to them."[976]  The concept thus is not inherently limited to physical plant owned by the provider and irrelevant to expenses.[977]  And the standard is necessarily flexible, allowing the Commission to analyze "[t]he particular facts of each case . . . in order to determine what part of a utility's investment is used and useful."[978]  We rely on this flexibility to ensure that IPCS consumers bear "only legitimate costs of providing service to them."[979]  Importantly, however, we do not rely solely on the used and useful framework to eliminate site commissions.  Instead, our actions stem principally from the requirements of section 276(b)(1)(A), as amended by the Martha Wright-Reed Act, that we ensure just and reasonable rates and charges for consumers and providers and fair compensation for providers.  In doing so, we do as Securus requests, which is to exercise "the full degree of [our] authority" to prohibit site commission payments entirely.[980]

### (a)      Used and Useful Assessment

277.    In the *2021 ICS Order*, the Commission conducted a used and useful analysis applying a prudent investment standard and ultimately permitted providers to pass through to consumers, on an interim basis, the full amount of their legally mandated site commission payments up to a total interstate rate cap of $0.21 per minute and no more than $0.02 per minute for their contractually prescribed site commission payments for prisons and larger jails.[981]  In conducting its cost recovery analysis under the used and useful framework, the Commission explained that it did not consider site commission payments of any kind to "involve[e] the use of provider property and investment in a manner analogous to the circumstances addressed in [its] provider-based rate caps."[982]  The Commission reasoned that the site commission payments, or the portions thereof, that it allowed providers to recover on an interim basis

---

[976] *See, e.g.*, *Investigation of Special Access Tariffs of Local Exchange Carriers*, CC Docket No. 85-166, Memorandum Opinion and Order, FCC 86-52, 1986 WL 291617, at *8, para. 35 (1986); *Tenn. Gas Pipeline Co.*, 606 F.2d at 1109 (interpreting the "used and useful" precept to mean that "current rate payers should bear only legitimate costs of providing service to them").

[977] *See, e.g.*, *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 ("The Commission for decades has applied the 'used and useful' standard in determining the appropriate investments and expenses to be included in a rate-of-return carrier's interstate rate base.  The used and useful standard provides the foundation for Commission decisions evaluating whether particular investments and expenses are reasonable."); *ETC Annual Reports Order* at 3214, para. 334; *AT&T Application For Review*; *Sandwich Isles Communications, Inc. Petition For Declaratory Ruling*, WC Docket No. 09-133, Memorandum Opinion and Order, 31 FCC Rcd 12977, 12995-98, paras. 52-58 (2016) (applying the "used and useful" framework to evaluate recovery of submarine cable lease expenses); *All Universal Service High-Cost Support Recipients Are Reminded That Support Must Be Used For Its Intended Purpose*, WC Docket Nos. 10-90, 14-58, Public Notice, 30 FCC Rcd 11821, 11822 (2015) ("The Commission likewise takes seriously any inclusion of inappropriate expenses for recovery by ratepayers, and will take appropriate steps to ensure that expenses are used and useful and prudently incurred.").  The Commission's previous employment of the "used and useful" framework to evaluate recovery of site commissions through just and reasonable rates as part of the regulatory backdrop to the Martha Wright-Reed Act's addition of the "just and reasonable" mandate to section 276(b)(1)(A) reinforces our conclusion that it is reasonable for us to rely on that approach again here.  *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9575-79, paras. 126-33 (employing the used and useful framework in evaluating recovery of facility-based expenses).

[978] *AT&T Phase II Order*, 64 F.C.C.2d at 38, paras. 111-12.

[979] *Investigation of Special Access Tariffs of Local Exchange Carriers* at *8, para. 35; *Tenn. Gas Pipeline Co.*, 606 F.2d at 1109 (interpreting the "used and useful" precept to mean that "current rate payers should bear only legitimate costs of providing service to them").

[980] *See* Securus May 8, 2023 Comments at 33; Securus Technologies, LLC Comments, WC Docket No. 12-375, at 17-18 (rec. Sept. 17, 2021) (Securus Sept. 17, 2021 Comments); Securus Dec. 17, 2021 Reply at 20-21.  As we explain below, this prohibition is fully consistent with *GTL v. FCC*.  *See infra* Section III.D.6.c.iii (Prohibiting Site Commissions Payments Associated with IPCS).

[981] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9562-64, paras. 101, 103.

[982] *Id.* at 9576, para. 129 & n.395.

were "akin to exogenous costs."[983]  Separately, the Commission independently justified its decision "as a matter of the flexibility provided by the 'just and reasonable' framework of section 201(b) of the [Communications] Act under the particular circumstances."[984]  The Commission concluded that allowing only a pass-through of site commission expenses it found to be prudently incurred and used and useful "adequately accounts for the use of providers' property . . . balanced with the equitable interest of customers of interstate and international inmate calling services."[985]

278.    Our approach here differs from the Commission's 2021 interim reforms in which the Commission concluded that a portion of some site commission payments was used and useful in the provision of calling services, and therefore compensable for purposes of the used and useful analysis.  For one, we separate out from our definition of "site commissions" the reimbursement IPCS providers make to correctional facilities for costs those facilities incur that we have already found to be used and useful in the provision of IPCS under our analysis above.[986]  The question then turns to whether site commissions as defined here separately are used and useful in the provision of IPCS and thus separately compensable under the just and reasonable standard.  We conclude that they are not.  Thus, in developing the IPCS rate caps we adopt today, we have identified, based on the record, all of the used and useful costs and expenses in the provision of intrastate, interstate, international, and jurisdictionally mixed audio and video IPCS, regardless of whether those costs are incurred by IPCS providers or correctional facilities.[987]  Accordingly, we have considered, consistent with this element of the used and useful framework, what is required to compensate IPCS providers for offering IPCS while safeguarding the interests of incarcerated people and their loved ones under the just and reasonable mandate.[988]

279.    On the record now before us and considering the requirements of section 276(b)(1)(A), as amended by the Martha Wright-Reed Act, we find that, to the extent they exceed the costs correctional institutions prudently incur in the provision of IPCS, site commissions, whether contractually prescribed or legally mandated, are not used and useful in the provision of IPCS because there is no indication that such payments benefit IPCS consumers.[989]  To begin with, the Commission predicated its 2021 interim reforms on the assumption that a portion of providers' site commission payments provided a benefit to IPCS consumers and was thus recoverable "at least as long as the Commission continues to permit providers . . . to make site commission payments."[990]  That is, the Commission assumed, on the record before it, that some portion of providers' site commission payments compensated correctional facilities for the costs they incurred in enabling the provision of ICS.[991]  But even in the *2021 ICS Order*, the Commission concluded that site commission payments above that level were not used and useful and/or not prudently incurred and should not be subject to recovery in order to ensure just and reasonable rates.[992]  Nothing in the record here persuades us to change our mind in that respect, and we thus again conclude that such costs are not used and useful and/or prudently incurred, and thus not recoverable

---

[983] *Id.*

[984] *Id.*

[985] *Id.*

[986] *See supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[987] *AT&T Phase II Order*, 64 F.C.C.2d at 37, para. 111; *see supra* Section III.D (Rate Caps).

[988] *See, e.g.*, *Hope Natural Gas*, 320 U.S. at 603 (highlighting that the fixing just and reasonable rates "involves a balancing of the investor and the consumer interests").

[989] *See supra* Section III.D.2 (Preliminary Costing Issues).

[990] *2021 ICS Order*, 36 FCC Rcd at 9575-76, para. 127.

[991] *See, e.g.*, *id.* (concluding that contractually prescribed site commissions that compensate a correctional institution for the costs an institution incurs to enable access to IPCS are recoverable); *id.* at 9578, para. 133 (finding that legally mandated site commissions at the level required by the relevant statute or rule to be recoverable).

[992] *See, e.g.*, *id.* at 9576-78, paras. 128-30.

through just and reasonable rates.  And, as discussed below, absent any viable data that demonstrate any portion of a site commission in this context provides compensable costs, we find that site commissions are in their entirety not recoverable.

280.     As to those site commission payments the Commission did allow to be recovered under its used and useful and prudent investment analysis in the *2021 ICS Order*, the Commission relied, in part, on the National Sheriffs' Association 2015 survey as the best available proxy for those costs and limited recovery for contractually prescribed site commission payments to no more than $0.02 per minute at prisons and larger jails, even though the Commission's independent estimates of the portion of site commissions that were legitimately related to inmate calling services supported "even lower potential estimates for legitimate facility costs."[993]  The Commission chose to rely on the National Sheriffs' Association data—despite significant reservations about their accuracy—in large part due to "the absence of any other facility-provided data" in the record.[994]  Rather than delay much-needed relief, the Commission chose to rely on the "best data available" to estimate facility costs used and useful in the provision of communications services "until more updated facility-related data are submitted into the record."[995]  As discussed above, however, no commenter or other stakeholder has provided updated facility-related cost data sufficient to enable the Commission to isolate the portions of providers' site commission payments, if any, that actually compensate correctional facilities for the costs they incur in the provision of IPCS.[996]  Accordingly, we decline to rely on those data here to allow additional recovery for providers' site commission payments.

281.     Putting aside the lack of reliable data, the record persuades us that site commission payments primarily compensate correctional facilities for the transfer of their market power over IPCS at a given facility[997] or are used by providers to "overcome . . . competitors to become the exclusive provider of multiple services, including nonregulated services at a correctional facility" while providing no clear benefit to IPCS consumers.[998]  In the *2021 ICS Order*, the Commission identified a collective action problem "that makes providers, as a group, reluctant to limit or omit site commission payments in their bids for fear that competitors fail to do so, and that correctional institutions will select competitors that do offer site commissions (or offer higher site commissions) instead."[999]  Securus confirms that "[t]he problem identified by the Commission is real," suggesting that providers cannot "unilaterally end the

---

[993] *See id.* at 9580-81, paras. 136, 141.  With respect to legally mandated site commission payments, the Commission assumed, on the record before it at that time, that legally mandated site commission payments at the level required by the relevant statute or regulation were used and useful.  *Id.* at 9578, para. 133.  We address certain particularities with respect to legally mandated site commissions below.

[994] *2021 ICS Order*, 36 FCC Rcd at 9583, para. 143.

[995] *Id.* at 9582-83, paras. 142-43; *see also id.* at 9565, para. 106 (explaining that the Commission's decision to allow for limited recovery of providers' site commission costs was an interim step taken "in light of the history of this proceeding [and] the available record").

[996] *See, e.g.*, Katherine Clad Reply, WC Docket No. 12-375, at 3 (rec. Dec. 17, 2021) (Clad Dec. 17, 2021 Reply) (highlighting that "in the 18 years that ICS reform has been attempted, proponents of commissions have been unable to precisely articulate these costs to the FCC"); Letter from Andrew D. Lipman, Morgan, Lewis & Bockius LLP, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 7 (filed Apr. 8, 2015) (Lipman Apr. 8, 2015 *Ex Parte*) (explaining that the cost data provided by correctional facilities and associations "lack the kind of detail that would be required in a rate proceeding to justify their accuracy"); *see also supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[997] DOJ Apr. 29, 2024 *Ex Parte* at 3 (asserting that "commissions operate as a transfer of funds from the IPCS vendors to the correctional facilities").

[998] *2021 ICS Order*, 36 FCC Rcd at 9577, para. 129; Public Interest Parties July 12, 2023 Reply at 13 ("Instead of benefiting consumers, providers use these payments as leverage to help secure contracts with correctional authorities.").

[999] *2021 ICS Order*, 36 FCC Rcd at 9573-74, para. 122.

established practice of many local governments in seeking site commission payments in their negotiations with providers."[1000] Thus, it appears that "when providers offer site commission payments as part of their bids, they do so to gain a benefit for themselves, rather than to satisfy a formal precondition of access to a correctional facility."[1001]

282.    Consider, for example, monetary site commission payments.  In certain cases, contract language requiring the payment of monetary site commissions demonstrates that such payments compensate correctional facilities "for the transfer of their market power over [IPCS] to the [IPCS] provider" and cannot be shown to directly benefit consumers of incarcerated people's communications services.[1002]  For example, the language in a contract between CenturyLink Public Communications, Inc., a former provider of incarcerated people's communications services, and Milwaukee County, Wisconsin, explains that "[i]n consideration of being granted the right and obligation to operate the Inmate Pay Telephone Concession at the Correctional Facilities, CenturyLink shall pay County a commission rate equal to 70.1% of the Gross Revenue generated from completed or accepted calls made at the CenturyLink pay phones covered by this agreement."[1003]  In another case, the contract calls for the payment of a percentage of gross revenue "in return for the exclusive right to install and operate the [p]hones in the premises."[1004]

283.    Provisions like these illustrate that the site commission payments benefit the facilities insofar as they receive compensation for allowing the provider (instead of the correctional authority) to offer communications services at the facility or facilities covered by the contract.  And, the site commission payments benefit the providers, which receive the exclusive right to offer communication services for the duration of the contract.  There is nothing in these contracts, or the record generally, suggesting that such site commission payments are conditioned on, for example, improved service quality or lower prices for consumers of calling services or compensating the correctional facility for any costs it incurs in allowing IPCS.  Thus, the benefits flow first to the facility and then to the provider, "all to the detriment of [IPCS] customers."[1005]

284.    Record evidence submitted by Pay Tel also demonstrates the way in which site commissions may be used by IPCS providers to "increase the probability with which they win [a] contract."[1006]  Pay Tel provides documentation relating to recent requests for proposals "in which Pay Tel competed but ultimately lost due to site commission payment amounts."[1007]  Pay Tel notes that, in two

---

[1000] Securus Sept. 27, 2021 Comments at 15.

[1001] *2021 ICS Order*, 36 FCC Rcd at 9573, para. 121.

[1002] *2020 ICS Notice*, 35 FCC Rcd at 8520, para. 100.

[1003] *See* Opposition of the Wright Petitioners to Petition of CenturyLink For Stay Pending Judicial Review, WC Docket No. 12-375, Exh. C at 6-7 (filed Feb. 3, 2016), https://www.fcc.gov/ecfs/document/60001391222/2.

[1004] *See* Reliance Telephone, Inc. Inmate Telephone Location Agreement with Aitkin County, Minnesota at 1 (Oct. 12, 2005), https://www.prisonpolicy.org/contracts/file.php?document_id=339&name=Aitkin%20County%20-%20Reliance%20contract.pdf; *see also* Correct Solutions, LLC Contract and Agreement with Bryan County Sheriff's Office, §§ 2.6, 2.14, Attach. D (dated June 1, 2021) (noting that in consideration for an agreement that grants the provider "exclusive rights to install and maintain inmate telephone systems within its building or on its private property" the provider is required to pay the facility a "monthly commission fee" of 60% for completed phone calls), https://www.prisonpolicy.org/contracts/file.php?document_id=623&name=1629_001%20%20281%29.pdf.

[1005] *2021 ICS Order*, 36 FCC Rcd at 9577, para. 129.  DOJ Apr. 29 2024 *Ex Parte* Submission at 4 (observing that "[s]ome correctional facilities may prefer vendors who pay higher site commissions, but when site commissions serve to increase the rates that incarcerated people and their families pay, they work directly against the FCC's mandate to ensure that such rates be just and reasonable").

[1006] Miller May 4, 2023 *Ex Parte* at 1.

[1007] Pay Tel Sept. 27, 2021 Comments at 12 & Exh. 3.

instances, it ranked higher in each scoring category except for the site commission category but still lost the bids.[1008]  Indeed, the winning bidders had proposed to pay site commissions of 90% and 88.8% on all calls.[1009]  Thus, Pay Tel at least plausibly lost those bids on the basis of its site commission offerings indicating that "providers may feel compelled to offer site commissions in order to remain competitive" rather than to compensate correctional facilities for the costs, if any, they incur in making IPCS available.[1010]  To the extent these site commissions were, in fact, related to any legitimate IPCS costs, we would have expected to see similar offers from the other bidders.  But we do not.  Instead, it appears that the winning bidder used its site commission offerings in this context "to overcome its competitors" in the bidding process.[1011]

285.    The National Sheriffs' Association offers a different explanation of Pay Tel's data.  It claims that a high site commission percentage does not "necessarily mean the commission payment exceeds the cost to the facility of allowing ICS or that the rate charged for ICS service at the facility is unreasonable."[1012]  In its view, Pay Tel's experience "may show that the cost to serve the specific facility is below the Commission's nationwide average rate and the dollar amount of the revenues is significant enough that ICS providers are willing to offer a greater percentage of their profits to capture that specific contract."[1013]  Or, it "may also reflect the fact that ICS providers are not required to bid on facility contracts or provide ICS at all facilities and . . . can boost profit by declining to provide service in higher cost facilities."[1014]  These alternative explanations are speculative and otherwise unsupported by record evidence.  In contrast, Pay Tel provides concrete evidence, including bid evaluation forms used by the correctional authorities, that portrays a compelling, first-hand account of how site commissions factored into the bid evaluation processes.  We find it highly persuasive that Pay Tel obtained higher scores across all bid scoring categories except site commissions but still lost those contracts.  We believe these outcomes clearly illustrate "the current incentive for facilities to award contracts based primarily (or, at times, exclusively) on site commission offerings" rather than on the basis of price or quality of service, to the detriment of IPCS consumers.[1015]

286.    In-kind payments also demonstrate that site commissions primarily benefit correctional authorities and IPCS providers but not IPCS consumers, as they are often wholly unrelated to the provision of IPCS.  This is because in-kind payments from the IPCS provider can take varied forms, including software packages,[1016] {[                    ]}[1017] campaign contributions, "payments to

---

[1008] *Id.*

[1009] *Id.* at 2.

[1010] Securus Sept. 27, 2021 Comments at 15.

[1011] *2021 ICS Order*, 36 FCC Rcd at 9577, para. 129; Miller May 4, 2023 *Ex Parte* at 2 (noting that "a higher commission increases the likelihood of being selected").

[1012] National Sheriffs' Association Dec. 17, 2021 Reply at 6 n.23.

[1013] *Id.* at 6.

[1014] *Id.*

[1015] Pay Tel Sept. 27, 2021 Comments at 12.

[1016] *See, e.g.*, Securus Technologies, LLC FCC Form 2302(a), Appx. A, Word Template, at 22 (filed June 30, 2022) (explaining that "Securus' Contractually Prescribed, In-Kind Site Commissions consists [sic] of a software package for public safety purposes unrelated to ICS").

[1017] Encartele, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 6 (filed Oct. 31, 2023).

**Federal Communications Commission**    **FCC 24-75**

influential sheriff-led associations,"[1018] or anything else of value to the correctional authority.[1019]  For example, Smart Communications offered, among other inducements, an "Annual Technology Training Summit Cruise" as part of its proposal to a sheriff's office.[1020]  Those cruises had a value of over $84,000 over the contract term.[1021]  Because these in-kind contributions are often offered at low or no cost to the correctional authority, they clearly benefit the correctional authority, which receives something of value from the IPCS provider.  And such inducements also benefit the IPCS provider to the extent they allow that provider to surpass its competitors in the bidding process.[1022]  In contrast, there is nothing in the record showing the extent, if any, to which these types of in-kind site commissions, whatever form they may take, are used and useful in the provision of IPCS and thus benefit incarcerated people and other ratepayers.  Indeed, no commenter has suggested as such.  Rather, such payments are more accurately understood as inducements "designed to influence a correctional authority's selection of its monopoly service provider."[1023]  This is the kind of "excess investment" that should not be recoverable from ratepayers under the used and useful framework.[1024]

287.    We acknowledge, however, that some portion of providers' site commission payments, whether contractually prescribed or legally mandated, may be used for socially beneficial purposes when viewed from a broader perspective.  These may include "inmate health and welfare programs such as rehabilitation and educational programs; programs to assist inmates once they are released; law libraries; recreation supplies; alcohol and drug treatment programs; transportation vouchers for inmates being released from custody; or other activities."[1025]  These causes, while worthy, are unrelated to the provision of IPCS and as such IPCS consumers do not bear the responsibility to bear their costs under the Communications Act.[1026]  As commenters have observed, such programs could instead "be paid for from general revenue sources" or other state or local funding, enabling state and local governments to continue to advance the objectives of "reducing recidivism and providing basic care" consistent with their existing

---

[1018] Peter Wagner & Alexi Jones, PPI, *On Kickbacks and Commissions in the Prison and Jail Phone Market* (Feb. 11, 2019), https://www.prisonpolicy.org/blog/2019/02/11/kickbacks-and-commissions/.

[1019] One provider describes the fluid nature of in-kind site commissions noting that they "{[

                                ]}."  City Tele Coin Co., Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 14 (filed Oct. 31, 2023) (City Tele Coin Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template).

[1020] *See* Fairfax County Sheriff's Office Inmate Communication Services Agreement, Attach. 2 – Vendor Proposal, at 6  (signed Feb. 26, 2021), https://www.fairfaxcounty.gov/sheriff/sites/sheriff/files/assets/fairfax%20county%20 inmate%20communications%20agreement.pdf.

[1021] *Id*.

[1022] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9577, para. 129 (discussing the way in which site commissions can be used by IPCS providers to overcome competitors).

[1023] *See, e.g.*, *GTL v. FCC*, 866 F.3d at 416.

[1024] *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 112.

[1025] *2013 ICS Order*, 28 FCC Rcd at 14125, para. 34; *see* Virgina Association of Regional Jails May 29, 2024 *Ex Parte* at 2 (noting that "commissions must be used to fund educational, recreational, and rehabilitative (to include medical costs) efforts for the direct benefit of the incarcerated population"); Letter from the American Jail Association to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 3-4 (filed July 10, 2024) (AJA July 10, 2024 *Ex Parte*) (arguing that reduced IPCS profits will result in less funding for educational, recreational, mental health, substance abuse, and other programming for incarcerated people in Virginia).

[1026] *2013 ICS Order*, 28 FCC Rcd at 14138, para. 57.

efforts in those areas.[1027]  We agree.  And as the Commission has observed, the Communications Act "does not provide a mechanism for funding social welfare programs or other costs unrelated to the provision of ICS, no matter how successful or worthy."[1028]  Were we to find such non-IPCS costs used and useful in the provision of IPCS and therefore recoverable from consumers, we would be unable to ensure just and reasonable IPCS rates and charges consistent with section 276(b)(1)(A), as amended by the Martha Wright-Reed Act.[1029]

288.    While we conclude that site commissions, whether legally mandated or contractually prescribed, are not used and useful because they do not benefit consumers, some further discussion of legally mandated site commissions in this context is necessary in light of the Commission's 2021 interim reforms.  In the *2021 ICS Order*, the Commission assumed that legally mandated site commission payments that "exceed the level that simply compensates a correctional institution for any costs the institution incurs to enable interstate and international inmate calling service" were prudent expenses because there was "no evidence that either the provider or the correctional institution could agree to a lower amount (or no site commissions at all) based on the current record and current law."[1030]  Thus, the Commission concluded, on an interim basis, that legally mandated site commissions "at the level required by the relevant statute or rule to be used and useful in the provision of interstate and international inmate calling services at least as long as the Commission continues to permit providers . . . to continue to make these site commission payments."[1031]  The Commission made no determination regarding how legally mandated site commissions may "impact [the Commission's] ability to ensure just and reasonable . . . rates."[1032]  The Commission also emphasized that "this [was] a close question" and that the record developed in response to the *2021 ICS Notice* "may persuade [the Commission] to reach a different conclusion" in addressing site commissions on a permanent basis.[1033]  The Commission's interim approach to legally mandated site commission payments in the *2021 ICS Order* thus turned in significant part on the legal backdrop that the Commission took as given at that time, namely:  (1) legally mandated site commissions could not be avoided; and (2) IPCS providers were allowed to make those payments.

289.    We no longer believe our used and useful analysis should proceed based on those assumptions.  For one, the Martha Wright-Reed Act added to section 276(b)(1)(A) the requirement that the Commission's compensation plan "ensure that . . . all rates and charges" for intrastate and interstate

---

[1027] *See, e.g.*, Lipman Apr. 8, 2015 *Ex Parte* at 11; Letter from Stephen Raher, Pro Bono Legal Analyst and Aleks Kajsturn, Legal Director, Prison Policy Initiative, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 3 (filed Jan. 27, 2015) (noting that the cost of these services is "part and parcel of running a correctional facility").

[1028] *2013 ICS Order*, 28 FCC Rcd at 14138, para. 57.  As such, we do not dispute the notion that "there are many factors that may be indicative of a legitimate penological interest" such as "crime interdiction, deterrence, inmate management and . . . revenue generation" but the costs associated with pursuing these interests are not costs used and useful in the provision of communications services for incarcerated people under the Communications Act. Virginia Association of Regional Jails May 29, 2024 *Ex Parte*, Attach. at 5.

[1029] 47 U.S.C. § 276(b)(1)(A).  We recognize that in *GTL v. FCC*, the D.C. Circuit concluded that "it does not matter that the states may use commissions for purposes unrelated to the activities of correctional facilities."  *GTL v. FCC*, 466 F.3d at 413.  But, as we explain below, the *GTL* decision was premised on IPCS providers actually paying site commissions as a condition of doing business.  *See id.* (noting that "providers who are required to pay the site commissions as a condition of doing business have no control over the funds once they are paid").  In contrast, our actions today prohibit the payment of site commissions, thus eliminating the concern expressed by the D.C. Circuit about the use of site commissions as a precondition to providing service in correctional facilities.  We therefore conclude that we may, under these circumstances, consider how site commissions are used.

[1030] *2021 ICS Order*, 36 FCC Rcd at 9578, para. 132.

[1031] *Id.* at 9578, para. 133.

[1032] *Id.* at 9578, paras. 132 & nn.399, 133.

[1033] *Id.* at 9578, para. 133.  In the *2021 ICS Notice*, the Commission sought comment on, among other things, legally mandated site commission payments.  *See id.* at 9661, para. 315.

IPCS are "just and reasonable,"[1034] putting that legal mandate on equal footing with the preexisting "fair compensation" requirement and bringing it within the purview of the express preemption provision in section 276(c).[1035]  In addition, the Commission sought comment and developed a record on whether to prohibit site commission payments and preempt contrary state and local laws and regulations in light of that updated legal authority.[1036]  Because we conclude that we are substantively and procedurally in a position to prohibit site commission payments and preempt contrary state and local laws and regulations, the better course is to approach the used and useful analysis without the presumption of inevitability that so significantly influenced the Commission's prior assessment of legally mandated site commission payments.

290.    Nothing in the record persuades us that legally mandated site commissions "reflect[] the actual costs associated with the provision of [IPCS], separate and apart from the legal compulsion for facilities to collect it."[1037]  Particularly given that we no longer find it warranted to assume the existence or continuation of such a legal requirement, we agree that "[t]here is nothing with respect to [a] statutory obligation that makes such a charge 'used and useful' under the Commission's obligation to ensure rates are just and reasonable."[1038]  We also see no evidence or support for the notion that legally mandated site commissions flow through to benefits in IPCS such that users of those services should be expected to bear those costs under a used and useful analysis.[1039]  This is particularly true where state or local law or regulation requires site commission payments as a percentage of gross (i.e., total) revenue for a group of services that is not restricted to IPCS.[1040]  It is difficult to see how a site commission based on such a formula reflects any relation to the underlying costs of providing IPCS.  But, on the record before us, it is similarly difficult to tie other types of site commissions, such as those framed as per-call charges, to any legitimate IPCS costs.[1041]  In sum, the record is devoid of any indication that legally mandated site commissions are set at levels that are designed simply to reimburse correctional facilities for the costs they incur in making IPCS available such that their payment would affect the provision of IPCS and that IPCS customers reasonably should bear those costs.

291.    If anything, the record suggests that legally mandated site commission payments support activities that quite clearly do not enable the provision of the underlying communication services that

---

[1034] Martha Wright-Reed Act § 2(a); 47 U.S.C. § 276(b)(1)(A).

[1035] *See supra* Sections III.C.3.a (Addition of the "Just and Reasonable" Requirement to Section 276(b)(1)(A)), III.C.3.c (Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)); *infra* Section III.D.6.c.iii (Prohibiting Site Commission Payments Associated With IPCS).

[1036] *See, e.g.*, *2021 ICS Notice*, 36 FCC Rcd at 9659, paras. 311-24.

[1037] *2021 ICS Order*, 36 FCC Rcd at 9578, para. 132 n.399.

[1038] Petition for Reconsideration of United Church of Christ, OC Inc. and Public Knowledge, WC Docket No. 12-375, at 9 (filed Aug. 27, 2021), https://www.fcc.gov/ecfs/document/10827182190354/1; Public Knowledge Erratum to Petition for Reconsideration, WC Docket 12-375 (filed Dec. 14, 2022) (UCC and Public Knowledge Petition); *see also GTL v. FCC*, 866 F.3d at 424 (Pillard, J., dissenting) ("Simply put, the fact that a state may demand them does not make site commissions a legitimate cost of providing calling services."); UCC and Public Knowledge Mar. 31, 2021 *Ex Parte* at 4 (highlighting language from Judge Pillard's dissent in *GTL*).

[1039] *See GTL v. FCC*, 866 F.3d at 424 (Pillard, J., dissenting) (discussing site commissions required by statute); UCC and Public Knowledge Petition at 5 (explaining that revenue from legally mandated site commissions "can be used for anything from general revenue to incarcerated persons' drug treatment programs and beyond").

[1040] *See, e.g.*, Tex. Gov't Code Ann. § 495.027(a)(2) (West 2021) (requiring "a commission of not less than 40 percent of the gross revenue received from the use of any service provided"); *see also GTL v. FCC*, 866 F.3d at 424 (Pillard, J., dissenting) (referring to the Texas law "which only illustrates the problem that site commissions are a form of monopoly rent not tied to actual costs").

[1041] *See, e.g.*, Tenn. Code Ann. § 41-7-104 (West 2013) (requiring a "fee of ten cents" to be collected for "each completed telephone call made by an inmate housed in a local jail or workhouse").

IPCS consumers pay for.[1042]  In Tennessee, for example, per-call fees are required to be remitted by the provider to the state treasurer on a quarterly basis "and credited to a special account in the state general fund designated as the local correctional officer training fund to be used exclusively to fund certification training provided through the institute for local correctional personnel within the state."[1043]  It is difficult to see how funding officer certification training enables or improves the communications services incarcerated people and their loved ones use.  Indeed, the training of correctional officials is plainly necessary to the general operation of a correctional institution separate and apart from the presence or absence of IPCS.  And yet, at least under Tennessee law, IPCS consumers are subsidizing these efforts.  To allow such costs to be recovered from those consumers would be "at odds with well-established principles of ratemaking" and directly "impact our ability to ensure just and reasonable . . . rates."[1044]  Thus, given the state of the record and the requirements of the Martha Wright-Reed Act, we conclude that because there is no indication that legally mandated site commission payments provide any benefit to incarcerated people and their loved ones who are the customers of IPCS, they are not used and useful in the provision of IPCS.

292.    In concluding that legally mandated site commissions are not used and useful in the provision of IPCS, we are mindful of the Commission's observations in the *2021 ICS Order*, that in jurisdictions that require legally mandated site commission payments, "facilities have no immediate ability to entertain offers from providers that wish to supply a facility without paying the site commission demanded" and that "absent further legislative process to amend the government statute, facilities would appear to have to forgo making [communication] services available."[1045]  Rather than taking that as a given, today we exercise our authority to preempt state and local laws and regulations that require IPCS providers to pay site commissions associated with IPCS.  Such preemption will alleviate the concerns the Commission expressed in the *2021 ICS Order* as to both IPCS providers and the correctional facilities themselves.  Thus, both providers and correctional facilities may pursue commission-free contracts without running afoul of contrary legal mandates.

### (b)    Prudent Expenditure Analysis

293.    Finally, because the forgoing analysis demonstrates that site commissions are not used and useful in the provision of IPCS, that is sufficient to exclude them from just and reasonable rates.[1046]  In other words, once we have determined that site commissions are not used and useful, any provider payment of site commissions is necessarily imprudent.

### (iii)    Prohibiting Site Commission Payments Associated with IPCS

294.    Having found that site commissions do not recover costs or expenses used and useful in the provision of IPCS, we now evaluate the interplay between that determination and the broader

---

[1042] *See, e.g.*, UCC and Public Knowledge Petition at 5 (explaining that the revenue from site commissions "can be used for anything from general revenue to incarcerated persons' drug treatment programs and beyond").

[1043] Tenn. Code Ann. § 41-7-104 (West 2013).

[1044] *2021 ICS Order*, 36 FCC Rcd at 9567-68, 9578, paras. 113, 132 n.399; *NARUC v. FERC*, 475 F.3d 1277, 1280 (D.C. Cir. 2008) ("[A] common test for the lawfulness of rates is their connection to the reasonably-incurred costs of providing the regulated service."); *NAACP v. FPC*, 425 U.S. 662, 666-69 (1976) (holding that the Federal Power Commission's statutory authority to "establish 'just and reasonable' rates" gave the agency "ample authority" to prevent a regulatee from charging consumers for "unnecessary or illegitimate costs" that the regulatee might incur through "racially discriminatory employment practices").

[1045] *2021 ICS Order*, 36 FCC Rcd at 9578, para. 133.

[1046] At times, the Commission might elect to consider the prudence of investments and expenses as an independent alternative to its decision that particular costs are not used and useful.  *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9576-77, paras. 128-29 (performing the prudent investment evaluation and the used and useful analysis as two independent alternative bases for its decision).  But the prudent investment inquiry does not provide an alternative ground for including costs in provider rates when they are not used and useful.

regulatory framework specified by the Communications Act.  We conclude that the payment of site commissions, whether legally mandated or contractually prescribed, would create a conflict between the dual statutory requirements of ensuring fair compensation for providers and just and reasonable IPCS rates and charges for consumers and providers.  Accordingly, pursuant to sections 276(b)(1)(A), 276(c), and 201(b) of the Communications Act, we reconcile these statutory objectives by prohibiting site commissions associated with intrastate, interstate, international, jurisdictionally mixed, and jurisdictionally indeterminate audio and video IPCS.

295.    *Our Approach Best Reconciles Our Statutory Duties In Light of the Harms of Site Commissions*.  The Martha Wright-Reed Act added to section 276(b)(1)(A) the requirement that the Commission's compensation plan "ensure that . . . all rates and charges" for intrastate and interstate IPCS are "just and reasonable."[1047]  Thus, section 276(b)(1)(A), as amended by the Martha Wright-Reed Act, requires the Commission to establish a compensation plan to ensure that all IPCS providers are "fairly compensated" and that "all [IPCS] rates and charges are just and reasonable."[1048]  As stated above, we view the "just and reasonable" and "fairly compensated" requirements as interdependent and complementary statutory mandates, which we must fully implement.[1049]  Section 201(b) of the Communications Act also requires just and reasonable rates and charges for interstate and international IPCS.[1050]

296.    Site commissions interfere with the Commission's ability to implement these dual requirements of determining "just and reasonable" rates and charges and "fair[] compensat[ion]" for IPCS providers.  To the extent that IPCS providers face a legal necessity to pay site commissions, the D.C. Circuit's decision in *GTL v. FCC* suggests that the fair compensation requirement in section 276(b)(1)(A) requires that IPCS providers be able to recover those payments through IPCS rates and charges.[1051]  Yet, allowing that recovery would lead to unjust and unreasonable IPCS rates and charges given our finding that providers' site commission payments are expenditures that are not used and useful in the provision of IPCS.  Even beyond that, payment of site commissions introduces competitive distortions in the bidding market for IPCS.  Thus, site commissions create conflict between the fair compensation and the just and reasonable requirements in section 276(b)(1)(A).  The policy harms arising from site commissions likewise frustrate the Commission's ability to alleviate competitive distortions and foster greater competition in the IPCS marketplace.[1052]

297.    Site commissions historically have been a major driver of excessive IPCS rates.  As discussed above, site commissions have exerted "upward pressure" on IPCS rates because by proposing higher rates, IPCS providers can afford to pay more in site commissions to correctional authorities.[1053]  Site commission payments, however, are used to fund a "wide and disparate" range of activities, including educational and welfare programs, the state or local government's general revenue fund, the costs of maintaining correctional institutions, and, in extreme cases, campaign contributions or entertainment for correctional officials.[1054]  And "most or all" of these functions "have no reasonable and

---

[1047] Martha Wright-Reed Act § 2(a); 47 U.S.C. § 276(b)(1)(A).

[1048] *Id*.

[1049] *See supra* Section III.C.3.c (Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)).

[1050] 47 U.S.C. § 201(b).

[1051] *See generally GTL v. FCC*.  We thus reject the argument that a prohibition on site commissions is beyond the scope of the Commission's authority.  VARJ July 11, 2024 *Ex Parte* at 2.  As we explain, the prohibition on site commissions best reconciles our statutory duties to ensure both just and reasonable rates and charges for IPCS consumers and providers and fair compensation for IPCS providers.

[1052] 47 U.S.C. § 276(b)(1) (providing guidance about the implementation of all of section 276(b)(1)).

[1053] *Supra* Section III.D.6.b.i (Site Commissions and IPCS).

[1054] *See id*.

direct relation to the provision of ICS[1055]—a historical assessment confirmed by our used and useful analysis above.[1056]  Because IPCS consumers "are forced to absorb . . . site commissions in the rates they pay," they "subsidize everything from inmate welfare programs, to salaries and benefits of correctional facilities, states' general revenue funds, and personnel training."[1057]  As the Commission has observed, "[p]assing the non-ICS-related costs that comprise site commission payments . . . onto inmates and their families . . . result[s] in rates . . . that are not just and reasonable."[1058]

298.    Site commissions also historically have distorted the IPCS marketplace.[1059]  Commenters and the Commission have long recognized that site commissions undermine the integrity of the bidding process for IPCS.[1060]  In a properly functioning marketplace, correctional institutions would select an IPCS provider based on the quality of service the provider offered and on the rates the provider would charge.[1061]  But the interests of correctional institutions diverge from the interests of consumers using IPCS.[1062]  While IPCS consumers are interested in lower prices for IPCS, correctional institutions have an incentive to maximize the revenues they receive from providing access to the correctional facility to an IPCS provider.[1063]  IPCS providers historically responded to this state of affairs in the marketplace by increasing IPCS rates, thereby enabling them to offer higher site commissions and increasing the likelihood they would be chosen as the monopoly provider for a facility for the term of a multi-year

---

[1055] *2013 ICS Order*, 28 FCC Rcd at 14135, para. 54; *see also, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9567-68, para. 113.

[1056] *See supra* Section III.D.6.c.ii (Site Commissions Are Not Used and Useful In the Provision of IPCS).

[1057] *2014 ICS Notice*, 29 FCC Rcd at 13172, para. 3; *see also supra* Section III.D.6.b.i (Site Commissions and IPCS).

[1058] *2015 ICS Order*, 30 FCC Rcd at 12823, para. 125; *see also* Securus Sept. 21, 2021 Comments at 14 (explaining that it is not "fair to place the economic burden of welfare-enhancing programs wholly on incarcerated people or their loved ones that utilize communications services, particularly when they are often the least able to shoulder these costs").

[1059] *See, e.g.*, *supra* Section III.D.6.b.i (Site Commissions and IPCS); Miller May 4, 2023 *Ex Parte* at 2 (identifying site commissions as one of "two main economic distortions that disadvantage incarcerated individuals" and suggesting that "[e]liminating commissions . . . would result in lower prices that nonetheless allow for [IPCS] to be provided profitably"); Wood June 7, 2024 Report at 3, 7; Wright Petitioners July 12, 2024 *Ex Parte* at 3.

[1060] *See, e.g.*, *supra* Section III.D.6.b.i (Site Commissions and IPCS); Miller May 4, 2023 *Ex Parte* at 1 (explaining that by proposing higher prices, IPCS providers "can pay more in commissions to the state, thereby increasing the probability with which they win the contract"); Public Interest Parties July 12, 2023 Reply at 13 ("Not only does including site commission payments in consumer rates contradict the statutory requirements of setting 'just and reasonable' rates, rent-seeking site commissions also distort the market."); Securus May 8, 2023 Comments at 3 (noting that the "elimination and restriction of site commissions removes or substantially lessens their distorting effect on the competitive bidding process"); Pay Tel Sept. 27, 2021 Comments at 12 (recognizing that there is a "current incentive for facilities to award contracts based primarily (or, at times exclusively) on site commission offerings"); *2014 ICS Notice*, 29 FCC Rcd at 13180, para. 22 (explaining that "[t]he payment of site commissions distorts the ICS marketplace by creating 'reverse competition' in which the financial interests of the entity making the buying decision (the correctional institution) are aligned with the seller (the ICS provider) and not the consumer (the incarcerated person or a member of his or her family)").

[1061] *See, e.g.*, Pay Tel Sept. 27, 2021 Comments at 12 (referring to "service-based, competitive market factors" in awarding IPCS contracts).

[1062] *See, e.g.*, *supra* Section III.D.6.b.i (Site Commissions and IPCS); Benj Azose Comments, WC Docket No. 12-375, at 3 (rec. Sept. 20, 2021) (Azose Sept. 20, 2021 Comments) (noting that "[t]he people making the contract and the people paying for the services provided are different people").

[1063] *See, e.g.*, *supra* Section III.D.6.b.i (Site Commissions and IPCS); *2021 ICS Order*, 36 FCC Rcd at 9567, para. 112.

contract.[1064]  This market distortion results in higher IPCS rates for consumers,[1065] providing an additional, independent basis for concluding that site commissions are unjust and unreasonable.

299.    Securus acknowledges that "[t]here is no question that site commissions continue to play a role in the bidding process" but argues that the Commission "overstates the case . . . to the extent it claims that awards always go to the provider offering the highest site commissions."[1066]  Securus provides a study based on data analyzing "the contribution of price and site commissions to the scoring criteria utilized" by facilities.[1067]  The study finds that "[c]ontrary to what we may expect based on suggestions that the entity bidding the highest site commission payment always or generally wins, the bid evaluation criteria used by most RFP issuers reflect a strong preference for bids with high levels of performance on the qualitative aspects of a bid, not necessarily based on price or site commission proposals."[1068]  Securus also argues that site commissions "may actually play some role in fostering competition by enabling smaller providers to successfully compete against larger providers, particularly for smaller facilities that may rely more on site commission revenue."[1069]

300.    At the same time, however, Securus argues that "[t]o the extent site commissions continue to distort competition in the bidding market, the solution is to further regulate site commissions."[1070]  We agree.  Even if site commissions do not always or exclusively result in problematic distortions in the IPCS marketplace, the record confirms that site commissions create incentives "for facilities to award contracts based primarily (or at times, exclusively) on site commission offerings."[1071]  Even if some correctional facilities do not fully act on those incentives at given points in time, as long as those incentives remain the risk of marketplace distortions will persist based on factors—i.e., correctional facility decision-making preferences—that are outside the control of the Commission and IPCS consumers.  And where facilities do act on those financial incentives, even assuming there was perfect competition in the IPCS bidding market, "[t]he benefit would be to . . . providers and to facilities offering the contracts, not to the people paying."[1072]  The solution, then, is to remove the incentive to award contracts "based in whole or in part on site commissions."[1073]  That is what we do today.  Doing so "leave[s] facilities with only service-based, competitive market factors [to consider] when awarding

---

[1064] *See, e.g.*, *supra* Section III.D.6.b.i (Site Commissions and IPCS); *2021 ICS Order*, 36 FCC Rcd at 9567, 9572-74, paras. 112, 121-22; *2015 ICS Order*, 30 FCC Rcd at 12820, para. 122 (noting that site commissions create "incentives for the facilities to select providers that pay the highest site commissions, even if those providers do not offer the best service or lowest rates"); Miller May 4, 2023 *Ex Parte*, Attach. at 2.

[1065] *See, e.g.*, *supra* Section III.D.6.b.i (Site Commissions and IPCS); *2021 ICS Order*, 36 FCC Rcd at 9567, para. 112; Miller May 4, 2023 *Ex Parte* at 1 (explaining that site commissions put "upward pressure" on prices); Public Interest Parties July 12, 2023 Reply at 13 (asserting that site commissions "result in higher rates for IPCS consumers").

[1066] Securus Dec. 17, 2021 Reply at 16.

[1067] *Id.* and Attach., Katja Seim, Report on the Inmate Calling Services Bidding Market, In Response to the Fifth Further Notice of Proposed Rulemaking WC Docket 12-375 (Dec. 16, 2021) (Seim Study).

[1068] Seim Study at 3, para. 41.

[1069] Securus Dec. 17, 2021 Reply at 18 (citing an example of a new entrant, SMART, offering 100% site commissions).

[1070] *Id.*; *see also* Azose Sept. 20, 2021 Comments at 3 (noting that "the public good can only be defended by regulation").

[1071] Pay Tel Sept. 27. 2021 Comments at 12.

[1072] Azose Sept. 20, 2021 Comments at 3.

[1073] Securus Dec. 17, 2021 Reply at 18-19.

**Federal Communications Commission**                    **FCC 24-75**

contracts."[1074] This, in turn, pushes providers to "compete to provide the best service for the lowest consumer cost as the only way to distinguish themselves and win bids."[1075] Our action to alleviate competitive distortions in the IPCS market through the elimination of site commission payments thus advances the purpose of section 276 to "promote competition among payphone service providers and promote widespread deployment of payphone services to the benefit of the general public."[1076]

301.    There is significant support in the record for our approach.  In the *2021 ICS Notice*, recognizing "the difficulties and complexities . . . in accounting for and isolating what portion of site commission payments may be related to legitimate facility costs," the Commission sought comment on prohibiting providers from entering contracts requiring the payment of site commissions and preempting state and local laws and regulations requiring providers to pay site commissions.[1077]  A variety of commenters support a prohibition, primarily based on their view that a rule against site commissions is needed to ensure just and reasonable IPCS rates and charges.[1078]  As Securus observes, "the use of site

---

[1074] Pay Tel Sept. 27. 2021 Comments at 12; Securus Dec. 17, 2021 Reply at 18-19 (agreeing with Pay Tel's arguments in this regard).

[1075] Pay Tel Sept. 27, 2021 Comments at 12; Securus Dec. 17, 2021 Reply at 18-19; Securus May 8, 2023 Comments at 3 (noting that "[t]he elimination or restriction on site commissions . . . can be presumed to discipline prices as providers compete fiercely to win contracts").

[1076] 47 U.S.C. § 276(b)(1); *Payphone First Report and Order*, 11 FCC Rcd at 20543-44, para. 2 (explaining that in implementing section 276 the Commission sought to "eliminate those regulatory constraints that inhibit the ability both to enter and exit the payphone marketplace, and to compete for the right to provide services to customers through payphones").  Securus argues that the Commission has not accounted for the market effects of eliminating site commissions.  Securus July 11, 2024 *Ex Parte* at 23.  Securus explains that "the Commission has pointed to the existence of site commissions and their alleged impact on the IPCS market as creating the conditions that require additional regulation."  *Id.*  In eliminating site commissions, Securus contends that the Commission "removes the condition purportedly justifying regulation over the IPCS market and then proceeds to continue and expand upon the regulation that is allegedly justified by the existence of site commissions that are now removed."  *Id.* at 2-3.  Securus argues that the Commission "should at least proffer some justification why permanent, highly prescriptive rate regulation must continue even though it believes it has created the conditions for a properly functioning, competitive marketplace."  *Id.* at 3.  While the Commission has identified site commissions as "the primary reason" IPCS rates can be unjust and unreasonable, *2014 ICS Order*, 29 FCC Rcd at 13180, para. 21, the Commission has never stated that they are the *only* reason that IPCS rates can be unjust and unreasonable.  Indeed, the Commission has specifically recognized that rate regulation is needed because "no competitive forces within the [correctional] facility constrain providers from charging rates that far exceed the costs . . . providers incur in offering service." *2021 ICS Order*, 36 FCC Rcd at 9533, para. 32; *see id.*, para. 33.  Rate regulation is thus clearly necessary to, for example, prevent IPCS providers from overcharging consumers even in the absence of site commission payments.  To suggest that the elimination of site commissions should be the basis for reduced rate regulation also ignores abusive ancillary service charging practices that have historically plagued the industry.  *See, e.g.*, NCIC July 10, 2024 *Ex Parte* at 2 (noting various exploitative practices by IPCS providers in relation to ancillary service charges).

[1077] *2021 ICS Notice*, 36 FCC Rcd at 9661, paras. 314-15.

[1078] *See, e.g.*, Securus May 8, 2023 Comments at 24 ("Securus has thus publicly called for the elimination of site commissions, noting their impact on consumer costs."); Securus Sept. 27, 2021 Comments at 14 (supporting "the elimination of site commissions to improve affordability for consumers"); Securus Dec. 17, 2021 Reply at 20 (explaining that the "pass through of site commission costs directly affects affordability, which in turn affects accessibility"); Pay Tel Sept. 27, 2021 Comments at 13 (explaining that "for any additional meaningful ICS relief to occur the Commission must prohibit site commissions and all other payments to facilities that are in excess of those necessary for facilities to recover[] their costs in administering ICS"); PPI Sept. 27, 2021 Comments at 16 (supporting "any lawful action that the Commission can take to address exorbitant site commissions"); Azose Sept. 20, 2021 Comments at 2-5; Pay Tel Sept. 27, 2021 Comments 13 (explaining that "for any additional meaningful ICS relief to occur the Commission must prohibit site commissions and all other payments to facilities that are in excess of those necessary for facilities to recover[] their costs in administering ICS"); UCC and Public Knowledge Sept. 27, 2021 Comments at 10 (proposing that the Commission "preempt any commission payment or other practice which results in unjust and unreasonable rates"); Public Interest Parties May 8, 2023 Comments at 24

(continued….)

commissions is inimical to the shared goals of all stakeholders of improving access to, and affordability of, communications services for incarcerated persons and their families."[1079]  Many of these same commenters support the Commission's identification of options in the *2021 ICS Notice* to prohibit IPCS providers from entering into contracts requiring the payment of site commissions and preempting state and local laws and regulations requiring site commissions.[1080]

302.     Consistent with the record and the Martha Wright-Reed Act, we prohibit all site commission payments associated with IPCS.[1081]  To effectuate this prohibition we take two actions consistent with the *2023 IPCS Notice* and the *2021 ICS Notice*.  First, we preempt state and local laws and regulations allowing or requiring site commission payments for IPCS.[1082]  And second, we prohibit IPCS providers from entering into contracts allowing or requiring the payment of site commissions.[1083]  The scope of site commissions subject to the prohibition and preemption include all monetary payments, including lump-sum or upfront payments, payments based on percentage of revenue, and per-call payments associated with IPCS or associated ancillary services.  It also includes all in-kind payments and contributions providers may offer associated with IPCS or associated ancillary services, including technology grants, equipment, training programs, or any other payment, gift, or donation offered by an IPCS provider to a correctional institution or a representative of a correctional institution.

---

(recognizing that "[t]he treatment of site commission[s] has been a long-standing issue in this proceeding"); Public Interest Parties July 12, 2023 Reply at 15 (noting that "the record is replete with the negative and unjust effects of site commission payments"); Public Interest Parties Dec. 17, 2021 Reply at 4 (noting that "the record has long been clear that the Commission must take action to address exorbitant site commissions (and the intractable market failures that have enabled them) in order to achieve just and reasonable rates"); Azose Sept. 20, 2021 Comments at 2-3 (arguing that site commissions should be removed from IPCS rates "because they are inconsistent with lower rates for incarcerated people and their families"); Clad Dec. 17, 2021 Reply at 1 (recognizing that site commissions are a "major driver" of inflated costs and that they are "indefensible and should be abolished completely"); Wood June 7, 2024 Report at 3 (explaining that prohibiting site commissions would eliminate a source of IPCS market distortions); *see also* Pay Tel June 24, 2024 *Ex Parte* at 2-3; PPI June 25, 2024 *Ex Parte* at 7; Wright Petitioners July 12, 2024 *Ex Parte* at 3 (explaining that the "Commission's decision to prohibit recovery of [site commission] payments is well supported by both the record and law").

[1079] Securus Sept. 27, 2021 Comments at 14.

[1080] *See, e.g.*, Securus Sept. 17, 2021 Comments at 17 (urging the Commission to "seriously consider" both approaches to eliminating site commission payments "as long as it provides state and local governments sufficient time to adopt alternative funding sources"); Securus May 8, 2023 Comments at 25 ("Securus reiterates its recommendation for the Commission to either uniformly bar providers from entering into contracts requiring site commissions or to preempt site commissions provided that the Commission include a transition period that provides state and local governments time to identify alternative funding sources."); Clad Dec. 17, 2021 Reply at 2  (arguing that the Commission should "simply forbid ICS providers . . . from entering into contracts requiring commissions"); Public Interest Parties Dec. 17, 2021 Reply at 4 ("Fortunately, as multiple commenters recognize, the Commission has ample authority to address unreasonable site commissions, including by prohibiting ICS providers from performing or executing agreements to pay site commissions and preempting state or local laws mandating site commission payments."); UCC and Public Knowledge Sept. 27, 2021 Comments at 10 (proposing that the Commission "preempt any commission payment or other practice which results in unjust and unreasonable rates"); PPI Sept. 17, 2021 Comments at 16 (explaining that a prohibition on contractual payments would help address site commissions); Leadership Conference on Civil and Human Rights Comments, WC Docket No. 12-375, at 4 (filed Dec. 17, 2021) (arguing that "the Commission "must do more to alleviate high costs, including . . . preempting commissions or unjust rate elements").

[1081] *See* Wright Petitioners July 12, 2024 *Ex Parte* at 2 (noting that "the elimination of site commissions is long overdue and necessary to bring competition to this failed market").

[1082] *See 2021 ICS Notice*, 36 FCC Rcd at 9661, para. 315.

[1083] *See id.* at 9661, para. 314.

303.    In contrast, a minority of commenters oppose further site commission reforms.[1084] Praeses and NCIC argue that rate caps sufficiently protect consumers against unjust and unreasonable rates while also allowing facilities to recover the costs they incur in providing IPCS.[1085]  Praeses contends that the Commission should continue to adhere to its historically "permissive position" towards site commissions in which it concluded that it did not need to prohibit or otherwise regulate site commissions.[1086]  NCIC and Praeses further assert that the continued use of rate caps "will necessarily lead to fair and reasonable site commissions" and will protect consumers from unjust and unreasonable rates and charges.[1087]  And the National Sheriffs' Association asserts that preempting laws requiring site commissions and prohibiting providers from entering into contracts requiring the payment of site commissions is not "appropriate" because "facilities incur costs to allow ICS in jails and . . . jails require commission payments in connection with allowing ICS in jails."[1088]

304.    Restricting the recovery of IPCS provider payments to correctional facilities through regulated rates is at best a highly imperfect tool so long as site commissions are allowed to be paid.  For one, as discussed above, if IPCS providers face a legal obligation to pay site commissions, the D.C. Circuit's decision in *GTL v. FCC* suggests that the fair compensation requirement in section 276(b)(1)(A) requires that IPCS providers be able to recover those payments through IPCS rates and charges.[1089]  That scenario leaves the door open to the full panoply of excessive rates and charges along with the marketplace distortions that historically have plagued IPCS.

305.    Marketplace distortions also are likely to remain so long as site commissions are permissible.  Rate caps set based on industry-wide average costs are likely to leave headroom for additional profit by providers with below-average costs.  As long as site commissions remain permissible, such providers can use that headroom to, in effect, pay higher site commissions by using excess revenues earned from regulated rates.  This is likely to result in marketplace distortions similar to those historically experienced in the IPCS marketplace, as discussed above—i.e., correctional facilities choosing providers for paying higher site commissions, and the benefits of efficiency improvements and cost savings thus

---

[1084] *See* NCIC July 12, 2023 Reply at 2 (stating that "[i]t would be premature and harmful to local and state governments for the Commission to regulate or eliminate site commissions"); National Sheriffs' Association Sept. 27, 2021 Comments at 7-8 (arguing that banning contractual site commission provisions or preempting laws requiring site commissions is not appropriate); National Sheriffs' Association Dec. 17, 2021 Reply at 5-6; NCIC Dec. 17, 2021 Reply at 5 (same); Praeses LLC Comments, WC Docket No. 12-375, at 7 (filed Sept. 27, 2021) (Praeses Sept. 27, 2021 Comments) (arguing that the Commission "should not alter its longstanding understanding of site commissions as a private contractual negotiation between ICS providers and Facilities regarding the apportionment of ICS revenue"); Virginia Association of Regional Jails May 29, 2024 *Ex Parte*, Attach. at 6 ("It is the position of the Virginia Association of Regional Jails that the abolition of site commissions or revenue share would be counterproductive to the provision of criminal justice, detrimental to inmate management and inappropriately interfere with the establishment of public policy.").

[1085] Praeses Sept. 27, 2021 Comments at 7 (explaining that so long as "ICS rates are capped, the public interest is protected"); NCIC Dec. 17, 2021 Reply at 6 ("NCIC continues to believe that just and reasonable caps on ICS rates and ancillary fees will necessarily lead to fair and reasonable site commissions and will be sufficient to cover the costs incurred by facilities to provide inmate communications.").

[1086] Praeses Sept. 27, 2021 Comments at 8.

[1087] NCIC Dec. 17, 2021 Reply at 6; Praeses Sept. 27, 2021 Comments at 13-14 (arguing that allowing providers "to offset a limited portion of their site commission costs thorough a capped, per-minute addition to the Providers' ICS rates" is reasonable); NCIC Sept. 27. 2021 Comments at 7 ("NCIC believes that if the FCC adopts just and reasonable caps on ICS rates and ancillary fees, the side-effect will be that site commissions would also be fair and reasonable.").

[1088] *See* National Sheriffs' Association Sept. 27, 2021 Comments at 7.

[1089] *See generally GTL v. FCC*, 866 F.3d 397.

**Federal Communications Commission**                    **FCC 24-75**

flowing to correctional facilities and winning bidders but not IPCS consumers.[1090]  These effects could be mitigated to some degree by the use of more granular categories of providers when averaging costs and setting rates if that resulted in less disparity in the range between the highest- and lowest-cost providers included in the category.  But to go further in mitigating those concerns would require a shift to provider-by-provider, ongoing rate-of-return rate regulation.  However, the Commission has previously disavowed any willingness to conduct full-blown rate regulation for individual IPCS providers,[1091] nor is it clear how viable provider-by-provider rate-of-return regulation even would be in a context where rates typically are specified in multi-year RFPs rather than biennial (or more frequent) tariff filings.[1092]  Thus, we think it is all too likely that, despite our best efforts, distortions in the IPCS marketplace would remain as long as the traditional array of site commission payments are allowed.

306.    We also disagree with Praeses that the Commission should continue to decline to prohibit site commissions as it has in the past.[1093]  Praeses contends that the Commission has "repeatedly and expressly declined to interfere with the often complex and multi-faceted private contractual negotiations between Providers and Facilities."[1094]  It relies on statements in the *2013 ICS Order*, *2015 ICS Order*, and the *2016 ICS Reconsideration Order*, in which the Commission concluded that it did not need to prohibit or otherwise directly regulate site commissions.[1095]  But those decisions were a function of the circumstances and limited record before the Commission during that period.  The Commission's previous decisions not to prohibit site commissions do not foreclose it from doing so on the basis of the circumstances and the record before it now, particularly in light of the requirements of the Martha Wright-Reed Act to ensure that IPCS providers are fairly compensated and that all rates and charges are just and reasonable.[1096]  As our analysis above indicates, we now are persuaded that simply regulating recovery of site commission payments through regulated rates to the extent permitted by the "fair compensation" standard—while leaving IPCS providers free to pay site commission as a general matter—would not be "just and reasonable."  Nor are we persuaded that it would be workable to address such

---

[1090] *See 2015 ICS Order*, 30 FCC Rcd at 12820-21, para. 122; *2021 ICS Order*, 36 FCC Rcd at 9533, para. 33; *2002 Pay Telephone Order*, 17 FCC Rcd at 3253, para. 12.  These harmful effects would be even more extreme if, rather than relying on industry-wide average costs, the Commission relied on costs just from higher-cost or highest-cost providers.

[1091] *See, e.g.*, *2013 ICS Order*, 28 FCC Rcd at 14134 n.195 ("Contrary to the Dissent's suggestion, we are not imposing rate-of-return regulation on ICS providers. . . .  [A]s the Dissent notes, rate of return regulation is complex; it requires ex ante review, tariff filings, detailed cost support in compliance with various accounting rules, and a prescribed rate of return, among other things."); *Rates For Interstate Inmate Calling Services*, WC Docket No. 12-375, Order Denying Stay Petitions and Petition to Hold in Abeyance, 28 FCC Rcd 15927, 15932, para. 10 (WCB 2013) ("Traditional rate of return regulation involves rates established in a complex tariff filing process.  At the Commission, the process is governed by Part 61 of the Commission's rules which require the use of the Commission's Uniform System of Accounts in Part 32, the allocation of costs between regulated and non-regulated categories pursuant to Part 64 of the Commission's rules, the separation of costs between interstate and intrastate jurisdictions under the Part 36 rules, and the apportionment of interstate costs to the appropriate services using the Part 69 rules.  Nothing of the sort is required by the *Order*." (footnote omitted)).

[1092] *See, e.g.*, 47 CFR § 69.3 (requiring access tariff filings every two years); 47 U.S.C. § 204(a)(3) (requiring tariff filings in the event of rate changes).

[1093] *See* Praeses Sept. 27, 2021 Comments at 7-10.

[1094] *Id.* at 8.

[1095] *Id.* at 8-9.

[1096] *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that in departing from previous regulatory policies the agency "must provide a reasoned explanation for its action" and provide "good reasons for the new policy" but need not "demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one"); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."); 47 U.S.C. § 276(b)(1)(A); Martha Wright-Reed Act § 2(a).

concerns through case-by-case evaluations. Our analysis indicates that legally-mandated site commissions lead to the full array of harms historically experienced in this context. And even in the case of contractually-prescribed site commissions, case-by-case evaluations would be burdensome for everyone involved—including the Commission and private parties. Further, it is not clear how such case-by-case evaluations could be sufficiently timely to avoid delaying the typical RFP process yet still guard against the risk of marketplace distortions before they occur. Thus, we conclude that our bright-line prohibition on site commissions reflects the best way of dealing with these problems.

307.    *Our Approach Is Consistent with* GTL v. FCC. Some commenters argue that the Commission's actions today conflict with *GTL v. FCC*.[1097] These commenters contend that the D.C. Circuit "expressly recognized that site commissions are legitimate costs of ICS providers" and thus the Commission could not categorically exclude them from its rate methodology.[1098] This has led some to argue that "[t]he Commission must . . . ensure its rate caps allow ICS providers to recover all of their costs associated with the payment of site commissions."[1099] But, as the Wright Petitioners explain, the decision in *GTL v. FCC* "was made against background conditions in which ICS providers were *actually* paying those site commissions pursuant to negotiated agreements to provide ICS at facilities or in compliance with legal mandates" and not in a regulatory environment in which site commissions were prohibited.[1100] The court had "no occasion to consider the Commission's authority to prohibit negotiated agreements . . . or its authority to preempt state and local requirements."[1101] And the court "never suggested that the Commission lacked authority to take such actions to fulfill its statutory mandate."[1102] By precluding providers from paying site commissions altogether, we eliminate the factual predicate—the payment of site commissions as a condition precedent to providing IPCS—which led the court in *GTL* to hold that site commissions could not be wholly excluded from the Commission's ratemaking calculus. Thus, we conclude that *GTL v. FCC* is no bar to our actions today, particularly since our rate cap calculations incorporate, to the extent the record permits, the costs facilities incur that are used and useful and/or necessary in providing IPCS. And, in any event, the Martha Wright-Reed Act is an intervening development that reinforces the Commission's mandate to ensure just and reasonable rates and charges for IPCS that also afford fair compensation.

308.    *Our Approach Accounts For Legitimate Interests of Correctional Facilities Associated with IPCS.* Separate from the issue of site commission payments, the rate caps we adopt today recognize, consistent with the record, that correctional facilities may incur some used and useful costs in their provision of IPCS.[1103] Because we allow providers to reimburse correctional facilities for the used and useful costs, if any, they incur, we have thus afforded correctional facilities an avenue to facilitate recovery of their used and useful costs associated with allowing access to IPCS in their facilities.

309.    We emphasize that the actions we take today in eliminating site commissions apply to all

---

[1097] *See* National Sheriffs' Association Sept. 27, 2021 Comments at 7 (arguing that the Commission's proposals "are precluded by court precedent"); Praeses Sept. 27, 2021 Comments at 10 (contending that *GTL v. FCC* weighs "against Commission efforts to regulate site commissions").

[1098] Praeses Sept. 27, 2021 Comments at 10; National Sheriffs' Association Sept. 27, 2021 Comments at 7.

[1099] Global Tel*Link Corp. d/b/a ViaPath Comments, WC Docket No. 12-375, at 30 (rec. Nov. 23, 2020).

[1100] Public Interest Parties Dec. 17, 2021 Reply at 5 (emphasis in original).

[1101] *Id.* at 6.

[1102] *Id*.

[1103] *See, e.g.*, National Sheriffs' Association May 8, 2023 Comments at 9 (arguing that if jails are not permitted to recover their IPCS costs, access to IPCS may be limited or eliminated); Pay Tel July 12, 2023 Reply at 11 (explaining that "confinement facilities themselves incur costs in making IPCS available"); Worth Rises May 8, 2023 Comments at 4 (noting that "facilities may incur used and useful costs on behalf of IPCS ratepayers, but generally do not"); National Sheriffs' Association Dec. 17, 2021 Reply at 4 (observing that "facilities incur costs to allow ICS in jails"); *see also supra* Section III.D.3 (Accounting for Correctional Facility Costs).

correctional institutions: prisons, larger and smaller jails, and other correctional institutions.  The facility-related rate components that the Commission adopted in the *2021 ICS Order* apply only to prisons and jails with average daily populations of 1,000 or more incarcerated people.[1104]  Because of the "concern raised in the record about facility size variations in facility-related costs for [smaller] jails" the Commission left the existing $0.21 per-minute rate cap in effect for facilities whose average daily populations were below 1,000 incarcerated people.[1105]  Thus, providers serving these relatively small jails could continue to recover site commissions as long as they did not exceed the $0.21 cap applicable to those jails.  The Commission, however, sought comment in the *2021 ICS Notice* on facility costs for jails with average daily populations below 1,000, and asked commenters to "provide detailed descriptions and analyses of the cost drivers" for these facilities.[1106]  The National Sheriffs' Association and Pay Tel assert that facility costs per incarcerated person are higher for smaller jails than for larger jails.[1107]  They urge continued reliance on the National Sheriffs' Association 2015 survey to justify higher facility-related cost recovery for smaller jails, but otherwise provide no responsive data.[1108]  For the reasons discussed above, we reject continued reliance on the National Sheriffs' Association 2015 survey.[1109]  Because we now can accommodate smaller jails in the same overall regulatory approach as prisons and larger jails, it best advances our statutory mandates of ensuring just and reasonable rates and charges consistent with fair compensation for IPCS providers for us to do so.

310.    To the extent commenters' arguments against the elimination of site commissions are premised on the loss or depletion of state programs currently funded by site commission payments, the "just and reasonable" standard of the Communications Act does not contemplate such funding such programs that are unrelated to the provision of IPCS through regulated rates, regardless of how worthy those programs may be.[1110]  And, in any event, we expect that the implementation period applicable to the reforms we adopt today will be sufficient to allow state and local governments time to adjust to an environment without site commissions.[1111]

311.    Given the availability of reimbursement from IPCS providers for costs that are used and useful in the provision of IPCS, consistent with our statutory duties, we see no reason to believe that correctional institutions will decrease or limit access to IPCS as some commenters assert.  Some commenters allege that "if compensation for . . . providers and Sheriffs is not adequate, access to ICS is likely to decrease" or be disallowed.[1112]  In NCIC's view, "there is almost no scenario in which a

---

[1104] *See 2021 ICS Order*, 36 FCC Rcd at 9581, para. 140.

[1105] *Id*.

[1106] *See id.* at 9662, para. 318.

[1107] *See* National Sheriffs' Association Sept. 27, 2021 Comments at 8; Pay Tel Sept. 27, 2021 Comments at 11.

[1108] *See* National Sheriffs' Association Sept. 27, 2021 Comments at 8 (alleging that the "average per minute cost of security and administrative functions . . . is higher for smaller jails than for larger jails"); Pay Tel Sept. 27, 2021 Comments at 11 ("Pay Tel supports the proposal and data submission by NSA.").

[1109] *See supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[1110] *See, e.g.*, Virginia Association of Regional Jails May 29, 2024 *Ex Parte* at 2; *see supra* Section III.D.6.c.ii.a (Used and Useful Assessment).  In support of site commissions, ViaPath contends that "IPCS 'providers who are required to pay site commissions as a condition of doing business have no control over the funds once they are paid,' which does not change the record evidence that site commissions are a cost of providing IPCS."  ViaPath June 13, 2024 *Ex Parte* at 6.  ViaPath has not articulated why provider-control over such funds after payment has been made has any bearing on why the practice is beneficial, nor why the practice should continue.  We find this argument unpersuasive.

[1111] *See infra* Section III.H.7 (Effective Dates and Compliance Dates).

[1112] National Sheriffs' Association Sept. 27, 2021 Comments at 2 & n.8; Pay Tel July 12, 2023 Reply at 14; NCIC July 12, 2023 Reply at 3 (alleging that elimination of site commission payments will "trickle down to incarcerated

(continued….)

**Federal Communications Commission**　　　　　　　　　　　　　**FCC 24-75**

correctional agency could lose site commission revenue and continue to provide the critical services and programs funded by that revenue."[1113]

312.　　We find it highly unlikely that correctional facilities would limit or deny access to IPCS as a result of the elimination of site commission payments.  As the Commission has observed, there are "well-documented benefits, for communities and correctional institutions alike, in allowing incarcerated people access to" IPCS.[1114]  Further, the record contains no indication that IPCS deployment has decreased or been eliminated in states that have eliminated site commissions.[1115]  And, as the Commission has previously noted, arguments premised on a denial or reduction of access to IPCS are likely to elicit an "intensely negative backlash."[1116]  Thus, we see no reason to believe that correctional institutions will curtail or eliminate access to IPCS simply because they no longer receive site commission payments.  In fact, given the generally lower rates we adopt in this Report and Order, it is reasonable for us to anticipate increased usage of IPCS once the Report and Order takes effect.[1117]

(a)　　**Preempting State and Local Laws and Regulations Requiring or Allowing Site Commissions Associated with IPCS**

313.　　As part of the overall prohibition on site commissions we adopt today, we preempt state and local laws and regulations allowing or requiring the payment of monetary site commissions or the provision of in-kind site commissions associated with the provision of IPCS regulated pursuant to sections 201(b) and 276(c) of the Communications Act and consistent with the *2023 IPCS Notice* and the *2021 ICS Notice*.[1118]  It is well established that "a federal agency may pre-empt state law only when and if

---

people who will see services and programs eliminated if correctional agencies no longer have site commission revenue available as a funding mechanism"); Pay Tel June 7, 2024 *Ex Parte* at 4; *see also* Pay Tel July 11, 2024 *Ex Parte* at 3 (arguing that without sufficient cost recovery for safety and security costs, "facilities will have no choice but to restrict calling").

[1113] NCIC July 12, 2023 Reply at 4.  Largely on this basis, NCIC concludes that it "would be premature and harmful to local and state governments for the Commission to . . . eliminate site commissions."  *Id.* at 2.

[1114] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9572, para. 120; *2015 ICS Order*, 30 FCC Rcd at 12835-36, para. 140 (explaining that IPCS "provides valuable non-monetary benefits to correctional facilities, such as correctional management and incentives to inmates who exhibit good behavior").

[1115] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9573, para. 121 & n.373 (observing that incarcerated people and their loved ones still have access to communications services in San Francisco, which has made communications services free to end users).

[1116] *2015 ICS Order*, 30 FCC Rcd at 12835-36, para. 140.

[1117] *See 2021 ICS Order*, 36 FCC Rcd at 9607-08, paras. 199-200; *see also* Worth Rises Nov. 23, 2020 Comments at 11 (noting increased calling following the reduction of charges for inmate calling services); San Fransisco Financial Justice Project Comments, WC Docket No. 12-375, at 1 (rec. Nov. 23, 2020) (Financial Justice Project Nov. 23, 2020 Comments) (noting a more significant increase in calling with the elimination of charges for inmate calling services).

[1118] *See 2023 IPCS Notice*, 38 FCC Rcd at 2680, para. 22 (incorporating the Commission's prior questions on site commissions into the *2023 IPCS Notice* and requesting that commenters address each of them in relation to each incarcerated people's communications services now subject to the Commission's ratemaking authority); *2021 ICS Notice*, 36 FCC Rcd at 9661, para. 315 (asking whether the Commission should preempt state and local laws that impose site commission payments on the incarcerated people's communications services then subject to the Commission's ratemaking authority).  As explained above, our actions preempting state and local laws and regulations allowing or requiring the payment of monetary site commissions or the provision of in-kind site commissions associated with the provision of IPCS and prohibiting IPCS providers from entering into contracts requiring or allowing them to pay site commissions are necessary because they best ensure the harmonization of both the "just and reasonable" and "fair compensation" mandates of section 276(b)(1)(A).  *Supra* Section III.D.6.iii (Prohibiting Site Commission Payments Associated with IPCS); NCIC July 10, 2024 *Ex Parte* at 4.  Our actions not

(continued….)

it is acting within the scope of its congressionally delegated authority."[1119]  Section 201(b) of the Communications Act gives the Commission authority over interstate and international IPCS.[1120]  And as explained above, the Martha Wright-Reed Act amended section 276(b)(1)(A) to clearly establish the Commission's authority to ensure just and reasonable rates for intrastate as well as other jurisdictional inmate communications.[1121]  The Martha Wright-Reed Act also expanded the Commission's section 276 authority over "payphone service" in correctional institutions to include "advanced communications services," as defined in sections 3(1)(A), 3(1)(B), 3(1)(D), and new (3)(1)(E) of the Communications Act.[1122]  Furthermore, while the Martha Wright-Reed Act decisively expands the scope of the Commission's authority over IPCS, it retained section 276(c), which provides that "[t]o the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements."[1123]  Further, the record also reflects that a variety of stakeholders believe the Commission should preempt state and local laws that require or allow site commissions.[1124]

314.    We find that state and local laws and regulations authorizing or requiring site commissions conflict with the Commission's regulations adopted in this Report and Order to ensure just and reasonable rates and charges for IPCS and fair compensation for IPCS providers under section 276(b)(1)(A) and to ensure just and reasonable rates and charges for interstate and international IPCS under section 201(b) of the Communications Act.  In particular, state and local laws and regulations requiring or allowing providers to pay site commissions associated with IPCS lead to unjust and unreasonable rates and charges insofar as consumers are being charged for non-IPCS costs where providers pay site commissions.[1125]  Those laws and regulations also lead to unjust and unreasonable rates

---

only benefit individual ratepayers, but also the public and the IPCS marketplace more generally.  As an additional matter, we note that our actions also give timely effect to our findings under section 276(b)(1)(A), consistent with Congress' objective as revealed by its establishment of a statutory deadline for the Commission to "promulgate any regulations necessary to implement this Act and any amendments made by this Act."  Martha Wright-Reed Act § 3(a).

[1119] *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

[1120] 47 U.S.C. § 201(b).

[1121] *See supra* Section III.C.4 (Amendment to Section (2)(b) of the Communications Act).

[1122] *See supra* Section III.C.5 (Inclusion of Advanced Communications Services Within the Definition of Payphone Service).

[1123] 47 U.S.C. § 276(d).

[1124] *See, e.g.*, Public Interest Parties July 12, 2023 Reply at 16; Securus May 8, 2023 Comments at 24 (asking the Commission to "tackle the issue head on through preemption of site commissions rather than indirectly through caps on revenues from regulated services that can be used to fund them"); Securus Sept. 27, 2021 Comments at 17-18; Raher May 8, 2023 Comments at 17 ("The Commission should invoke its [preemption] powers to the extent necessary to override local law that seeks to recover extraneous non-communications costs through a system of site commission payments."); Raher July 12, 2023 Reply at 10 (observing that "[l]imited or wholesale federal preemption of state and local IPCS site commissions has garnered notable support from parties to this proceeding"); UCC and Public Knowledge May 9, 2023 Comments at 20-21 (arguing that "[e]ven if the Communications Act . . . did not expressly preempt state and local authority, FCC action to adopt just and reasonable rates would impliedly preempt state and local authority"); UCC and Public Knowledge Sept. 27, 2021 Comments at 10 ("The Commission should preempt any commission payment or other practice which results in unjust and unreasonable rates.").

[1125] *See, e.g.*, *supra* Section III.D.6.c.iii (Prohibiting Site Commission Payments Associated With IPCS); Securus Dec. 17, 2021 Reply at 20 (explaining that while "many facilities continue to use site commissions as a predominate source of funding to recoup their costs of providing ICS, maintaining security, and supporting critical programs to help support successful reentry and reduce recidivism," the "cost of these activities should not be borne solely by incarcerated persons and their families using vital communications services to maintain contact").

and charges through the resulting marketplace distortions.[1126]  Such laws and regulations are therefore in conflict with the "just and reasonable" requirement in section 276(b)(1)(A) of the Communications Act and our implementation of those mandates through regulations adopted in this Report and Order.[1127]  Precluding providers from paying site commissions pursuant to state and local law will enable us to address one of the "primary reason[s] [IPCS] rates are unjust and unreasonable."[1128]  We therefore agree with those commenters arguing that the Commission should exercise its authority to preempt laws and regulations that require providers to pay site commissions associated with IPCS.

315.     At the same time, commenters point out that preemption is relevant to ensuring that IPCS providers are fairly compensated as required by section 276(b)(1)(A), as interpreted by the D.C. Circuit in *GTL v. FCC*.[1129]  Commenters explain that "[a]s long as local governments are allowed to require site commissions as a condition of providing service . . . *GTL* teaches that section 276 and section 201 require that they be recoverable."[1130]  Separately, experience has shown that when recovery of site commissions associated with IPCS is constrained by regulation, correctional facilities can attempt to maintain those revenue streams by shifting the nature of site commission arrangements.[1131]  Absent a prohibition on site commissions, we anticipate correctional facilities seeking increasingly creative ways to maintain monetary or in-kind payments, with the Commission (and IPCS providers) playing an endless game of 'whack-a-mole' in an effort to enforce section 276(b)(1)(A)'s fair compensation mandate.  Thus, preemption is "preferable to the Commission's efforts to regulate . . . site commissions through regulation of provider rates" alone.[1132]  Indeed, according to Securus "[d]irectly addressing site commissions through preemption is . . . consistent with *GTL*."[1133]  We agree.

316.     Commenters have extensively reviewed the Commission's authority to preempt site commissions in these proceedings.  Prior to the enactment of the Martha Wright-Reed Act, arguments regarding the Commission's preemption authority focused on the Commission's jurisdiction over interstate and international communications under section 2(a) of the Communications Act.[1134]  Other commenters have argued that section 276(c) gives the Commission "express authority" to preempt inconsistent state requirements.[1135]  The Wright Petitioners explain that "[s]ection 276 of the Communications Act gives the Commission the authority to preempt state requirements that are

---

[1126] *See, e.g.*, *supra* Section III.D.6.c.iii (Prohibiting Site Commission Payments Associated With IPCS).

[1127] 47 U.S.C. § 276(b)(1)(A).

[1128] *See, e.g.*, *2014 ICS Notice*, 29 FCC Rcd at 13180, para. 21.

[1129] *See, e.g.*, Securus May 8, 2023 Comments at 33; Pay Tel July 12, 2023 Reply at 16.

[1130] Securus May 8, 2023 Comments at 33; Pay Tel July 12, 2023 Reply at 16.

[1131] *See, e.g.*, *2014 ICS Notice*, 29 FCC Rcd at 13182-83, para. 26 & n.96 (explaining that the record "indicates that when a state acts to prohibit or reduce monetary site commission payments, the ICS contract may instead require other valuable inducements such as wireless telephone blocking systems"); *2013 ICS Order*, 28 FCC Rcd at 14124-25, para. 33 (explaining that site commission payments can take a variety of forms, including "the form of a percentage of gross revenue, a signing bonus, a monthly fixed amount, yearly fixed amount, or in-kind contributions"); *id*. at 14137, para. 56 & n.212 (citing arguments in the record "noting that 'an overly narrow concept of commissions leaves some glaring loopholes' that have made some state reform initiatives 'far less effective than originally expected,' including some 'rebranding' of commissions as 'administrative fees, with no actual change;' and urging the Commission to 'take an expansive view of the commission system' so that companies do not continue to exert a 'wild west attitude' toward reform attempts").

[1132] Securus May 8, 2023 Comments at 33.

[1133] *Id*.

[1134] *See, e.g.*, UCC and Public Knowledge Sept. 27, 2021 Comments at 10-11.

[1135] *See, e.g.*, Public Interest Parties July 12, 2023 Reply at 16.

'inconsistent with the Commission's regulations.'"[1136]  As explained below, we are persuaded that the Communications Act provides the Commission the necessary authority to adopt regulations addressing the problems caused by site commissions in the IPCS marketplace, which requires preemption of state and local laws and regulations requiring or authorizing the site commission payments.

317.    *Preemption of State Requirements*.  Section 276(c) contains an express preemption provision upon which we rely to preempt state laws and regulations that allow or require the payment of site commissions associated with IPCS.[1137]  Section 276(c) states that "[t]o the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements."[1138]  When a federal law contains an express preemption clause, the courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent."[1139]  The Supreme Court has explained that where a "statute 'contains an express pre-emption clause,' we do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'"[1140]  Independently, even assuming *arguendo* that any preemption analysis should begin "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress"[1141]—particularly where "Congress has 'legislated . . . in a field which the States have traditionally occupied'"[1142]—it nonetheless remains the case that "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it."[1143]

318.    Here, the express preemption clause in section 276(c) applies to "State requirements" to the extent they are "inconsistent with the Commission's regulations."[1144]  The term "state requirements" in express preemption provisions has been interpreted by the Supreme Court more broadly than terms like "laws or regulations."  For example, the Court has concluded that "[a]bsent other indication, reference to

---

[1136] *Id.*

[1137] Because we conclude that section 276(c) provides the Commission the necessary preemption authority, we decline to invoke the Commission's authority under section 253, including the preemption provision of section 253(d).  *See* Public Interest Parties May 8, 2023 Comments at 25-28.

[1138] 47 U.S.C. § 276(c).  As part of the reforms we adopt today, we adopt a rule prohibiting the payment of site commissions as set forth in this Report and Order.  The Commission's IPCS regulations are in Part 64, subpart FF of Title 47 of the Code of Federal Regulations.  47 CFR § 64.6000 *et seq.*

[1139] *See, e.g., CSX*, 507 U.S. at 664.

[1140] *Franklin*, 579 U.S. at 125; *see also, e.g., Hernández*, 58 F.4th at 12 & n.5 (1st Cir. 2023) (explaining that "[i]n applying *Franklin*'s broad language outside that case's specific context of the Bankruptcy Code's preemption clause, we join other circuit courts that have applied *Franklin* to other statutes"—referencing the *en banc* Eighth Circuit and the Fifth and Ninth Circuits).

[1141] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 230; *see also Shuker v. Smith & Nephew, PLC*, 885 F.3d at 771 n.9 (declining to apply *Franklin* because "that case did not address preemption of claims invoking 'historic . . . state regulation of matters of health and safety,' such as the products liability claims at issue here").  The term "police power" refers to the "general power of governing, possessed by the States but not by the Federal Government."  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. at 536.

[1142] *Medtronic v. Lohr*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 230).

[1143] *Medtronic v. Lohr*, 518 U.S. at 486.

[1144] 47 U.S.C. § 276(c); Public Interest Parties July 12, 2023 Reply at 16 (explaining the contours of section 276(c)).  This is consistent with how the Commission has applied section 276(c) in the past.  *See, e.g., First Payphone Order*, 11 FCC Rcd at 20670, para. 261 (concluding that because the Commission found "state requirements that mandate the routing of any or all intraLATA calls to an incumbent LEC to be inconsistent with the requirements of Section 276(b)(1)(E) [that] . . . all such state requirements are preempted by the Commission's regulations").

**Federal Communications Commission**                    **FCC 24-75**

a State's 'requirements' in an express preemption provision includes its common-law duties."[1145]  By contrast, the Court has found that references to state "laws or regulations" preempt only "positive enactments."[1146]  Consistent with this precedent, we find that the reference to "state requirements" in section 276(c) is broad enough to reach state laws and regulations requiring or allowing the payment of site commissions associated with IPCS.

319.      The surrounding statutory framework also demonstrates that preemption of laws and regulations requiring or allowing site commissions is authorized by section 276(c).  Section 276(b)(1)(A) always has been clear that the Commission has authority to establish compensation plans for "intrastate and interstate" payphone calls, and as explained above, the Martha Wright-Reed Act amended that provision to clearly establish the Commission's authority to ensure just and reasonable rates for all communications now encompassed by section 276(d).[1147]  And as we have found, the regulations authorized under section 276(b)(1)(A) to "establish a compensation plan" to achieve the goals of fair compensation for providers and just and reasonable rates and charges for consumers and providers requires more of the Commission than the simple act of capping rates and charges.[1148]  In amending section 276, Congress left the express preemption provision in section 276(c) unaltered, revealing Congress' understanding that Commission regulations implementing the full scope of amended section 276(b)(1)(A) would be subject to that express preemption provision.

320.      This point was further emphasized by the amendment of section 2(b) of the Communications Act to expressly exempt section 276 from the preservation of state authority over intrastate communications under that provision.[1149]  In the Martha Wright-Reed Act, Congress expressly considered the potential effect of that statute on other laws, and only disclaimed the intent to "modify or affect any" state or local law "to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities."[1150]  That narrow express preservation of existing law—which is not implicated by our preemption here—came against the backdrop of Commission and judicial grappling with the interplay between site commission payments and IPCS rates and charges,[1151] as

---

[1145] *Riegel v. Medtronic, Inc.*, 552 U.S. at 324 (concluding that a clause prohibiting state "requirements" associated with medical devices that were "in addition to or different from" the federal requirements preempted state common law claims against the device manufacturer).

[1146] *See Sprietsma v. Mercury Marine*, 537 U.S. at 63.

[1147] *See supra* Section III.C.3 (The Requirement to Establish a Compensation Plan).

[1148] *Id*.

[1149] 47 U.S.C. § 152(b).

[1150] Martha Wright-Reed Act § 4.

[1151] *See, e.g.*, *2013 ICS Order*, 28 FCC Rcd at 14111, para. 7 (concluding that "site commission payments and other provider expenditures that are not reasonably related to the provision of ICS are not recoverable through ICS rates"); *2015 ICS Order*, 30 FCC Rcd at 12819, para. 118 ("Accordingly, we do not include site commission payments in the cost data we use in setting the rate caps established in this Order."); *2016 ICS Reconsideration Order*, 31 FCC Rcd at 9307, para. 12 (explaining that "some facilities likely incur costs that are directly related to the provision of ICS," and that "it is reasonable for those facilities to expect ICS providers to compensate them for those costs . . . [as] a legitimate cost of ICS that should be accounted for in [the] rate cap calculations"); *2021 ICS Order*, 36 FCC Rcd at 9562-78, paras. 101-33 (discussing and analyzing various site commissions and adopting an approach to recovery that differed between legally-mandated and contractually-prescribed site commissions); *GTL v. FCC*, 866 F.3d at 412-14, 416-17 (rejecting as unreasonable the Commission's "wholesale exclusion of site commission payments from the FCC's cost calculus" in the *2015 ICS Order*, citing the petitioners' argument that "[i]f agreeing to pay site commissions is a condition precedent to ICS providers offering their services, those commissions are 'related to the provision of ICS,'" and leaving it to the Commission on remand to determine "which portions of site commissions might be directly related to the provision of ICS and therefore legitimate, and which are not" (internal quotation marks omitted)).

well as longstanding Commission consideration of whether and when to prohibit and preempt site commissions.  The statutory context provided by section 276 as a whole, coupled with the Martha Wright-Reed Act, thus reinforces our understanding of the scope of preemption encompassed by section 276(c).

321.    Relatedly, we conclude that preemption is consistent with section 4 of the Martha Wright-Reed Act, which states that nothing in that Act "shall be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities."[1152]  We preempt only those state laws and regulations that require or permit the payment of monetary site commissions or the provision of in-kind site commissions associated with IPCS.  To the extent federal, state, or local laws or regulations require IPCS to be provided to incarcerated people at state or local correctional facilities, such laws and regulations are not preempted by our actions here.  Similarly, we do not prohibit the implementation of any safety and security measures related to IPCS at any state or local correctional facility.  As we explain above, section 4 of the Martha Wright-Reed Act is "not intended to interfere with any correctional official's decision on whether to implement any type of safety and security measure that the official desires in conjunction with audio or video communications services."[1153]  Consistent with that interpretation, here we preempt state laws and regulations requiring or allowing the payment of site commissions associated with IPCS, a preemption that we conclude is necessary to achieve the statutory requirements of section 276(b)(1)(A) to ensure just and reasonable rates and charges for IPCS consumers and fair compensation for providers.  Correctional officials remain free to implement desired safety and security measures.

322.    The conflict between IPCS providers' payment of site commissions and the "just and reasonable" mandate implicates the Commission's oversight of interstate and international IPCS under section 201(b), as well.  The Supreme Court has explained that "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law."[1154]  Such a conflict can arise when a law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[1155]  While there are no "precise guidelines" governing when state law creates such an obstacle, the Supreme Court has acknowledged that federal agencies "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose" such an obstacle.[1156]  Additionally, the Supreme Court has found that the inquiry into whether state law poses an obstacle sufficient to allow preemption requires consideration of "the relationship between state and federal laws as they are interpreted and applied, not merely as they are written."[1157]  One situation in which

---

[1152] Martha Wright-Reed Act § 4.

[1153] *See supra* Section III.C.3.b (Effect on Other Laws); *2023 IPCS Notice*, 38 FCC Rcd at 2695, para. 68; National Sheriffs' Association May 8, 2023 Comments at iv (supporting "the interpretation of the second phrase in Section 4, regarding safety and security measures, that 'the just and reasonable ratemaking focus of the Martha Wright-Reed Act is not intended to interfere with any correctional official's decision on whether to implement any type of safety or security measure that the official desires in conjunction with audio or video communications services'" (quoting *2023 IPCS Notice*, 38 FCC Rcd at 2695, para. 68)).

[1154] *See, e.g.*, *Hillsborough County*, 471 U.S. at 713.

[1155] *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (*Hines*); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2001) ("This Court, when describing conflict pre-emption, has spoken of pre-empting state law that 'under the circumstances of th[e] particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'—whether that 'obstacle goes by the name of 'conflicting; contrary to . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment . . . interference,' or the like." (quoting *Hines*, 312 U.S. at 67)).

[1156] *City of Burbank*, 411 U.S. at 638; *Wyeth v. Levine*, 555 U.S. 555, 577 (2009).

[1157] *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).

**Federal Communications Commission**  FCC 24-75

the Supreme Court has determined that state law can interfere with federal goals is when such a law is at odds with Congress's intent to create a uniform system of federal regulation.[1158]

323.    Furthermore, a federal agency acting within the scope of its authority may preempt state law.[1159]  "[I]n a situation where state law is claimed to be pre-empted by federal regulation, a 'narrow focus on Congress' intent to supersede state law [is] misdirected,' for '[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law.'"[1160]  Instead, the question is whether Congress has delegated the authority to act in a sphere, and whether the agency has exercised that authority in a manner that preempts state law.  The Supreme Court also has explained that "an 'assumption' of nonpre-emption [sic] is not triggered when the State regulates in an area where there has been a history of significant federal presence."[1161]

324.    The Commission undoubtedly has authority under section 201(b) to ensure that rates and practices for and in connection with certain interstate and international incarcerated people's communications services are just and reasonable.[1162]  The Commission's actions in this regard also involve an area that has long been subject to extensive federal regulation.  Since the original enactment of the Communications Act, section 2(a) has made clear that the Communications Act applies to "all interstate and foreign communication by wire or radio," and section 201(b) has directed the Commission to ensure that rates and practices for and in connection with interstate and foreign communication services are just and reasonable.[1163]  We thus find that section 201(b) provides us with independent authority, alternative to section 276, to preempt laws and regulations allowing or requiring site commissions associated with interstate and international telecommunications for incarcerated people.

325.    *Preemption of Local Requirements.*  Our analysis of our preemptive authority is somewhat different when it comes to local requirements that may permit or require the payment of site commissions because section 276(c) does not expressly reference "local" laws or regulations.  Nonetheless, we conclude that principles of conflict preemption allow us to also preempt local laws and regulations requiring or authorizing IPCS providers to pay site commissions associated with IPCS.  As an initial matter, we note that "for purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws."[1164]  Thus, relevant precedent concerning state law is equally applicable to local law.

326.    As a threshold matter, we find that local laws and regulations requiring or authorizing site commissions stand as an obstacle to our regulation of IPCS.  We explained above the conflict that occurs as a result of state requirements, and that conclusion is not altered if the requirements originate instead at the local level.  Consequently, under sections 276(b)(1)(A) and 201(b)—coupled with standard conflict preemption principles—we preempt local laws and regulations that permit or require site commissions.

327.    Our conflict preemption determination is bolstered by the enactment of the Martha Wright-Reed Act, which modified the Communications Act in a manner that we see as intended to establish a uniform system of federal regulation for all IPCS under section 276(b)(1)(A).  As explained

---

[1158] *See, e.g.*, *Hines*, 312 U.S. at 69 (concluding that because Congress had created a "broad and comprehensive plan" regarding the terms and conditions upon which non-citizens may enter the country and because the federal government has control over foreign relations, the government's plan preempted a more stringent plan adopted by Pennsylvania).

[1159] *La. Pub. Serv. Comm'n*, 476 U.S. at 369.

[1160] *City of New York v. FCC*, 486 U.S. 57, 64 (1988) (quoting *Fidelity Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 154 (1982)).

[1161] *United States v. Locke*, 529 U.S. 89, 107-108 (2000).

[1162] 47 U.S.C. § 152(a).

[1163] *Id.* § 201(b).

[1164] *Hillsborough County*, 471 U.S. at 713 (citing *City of Burbank*, 411 U.S. at 624).

above,[1165] the Martha Wright-Reed Act was enacted against the regulatory backdrop of—and in response to—the *GTL v. FCC* decision, where the D.C. Circuit found that the Commission had unreasonably relied on the "just and reasonable" standard of section 201(b) when implementing the differently-worded language of section 276.[1166]  Insofar as that left the Commission to rely on section 201(b) to ensure IPCS rates and charges were not too high, it generally precluded the Commission from addressing excessive intrastate IPCS rates.  The Martha Wright-Reed Act's amendment of section 276(b)(1)(A) gave the Commission clear authority to ensure just and reasonable rates under that provision, which always has encompassed both intrastate and interstate services.[1167]  Given the legal and regulatory backdrop, that persuades us that Congress envisioned a uniform system of federal regulation as far as IPCS rates and charges are concerned.

328.     *Scope of Preemption.*  At this time, our preemption extends only to those state and local laws and regulations that permit or require IPCS providers to pay site commissions associated with IPCS, and does not extend to site commissions associated with other services or activities insofar as the effect of those site commissions can be segregated from the IPCS subject to Commission regulation.  To the extent there are laws and regulations that permit or require the payment of site commissions associated with non-IPCS services, including nonregulated services, we do not preempt those laws or regulations, provided that neither the costs of such services nor any site commissions associated with them are passed on to IPCS consumers through IPCS rates or charges, and that the offering of non-IPCS services is not a precondition to offering IPCS at a correctional institution.[1168]  At this time, we are not persuaded that site commissions in those scenarios are likely to directly affect the reasonableness of rates and charges and fairness of compensation for the IPCS we regulate, either directly (through inflated IPCS rates and charges) or indirectly (through competitive distortions in the IPCS marketplace).  Our approach flows from the conditions we adopt to ensure that such site commissions do not implicate IPCS.  And it also flows in part from the broad scope of IPCS subject to our regulation, which, at this time, leaves a much smaller universe of services or activity potentially subject to site commissions, which we currently expect to have minimal potential to distort the IPCS marketplace, particularly given the segregation from IPCS that we adopt.  Should circumstances warrant, we can revisit this issue in the future.

329.     Additionally, as explained above, today we adopt IPCS rate caps that account for all used and useful IPCS costs, whether they are incurred by providers or correctional facilities.  To facilitate the ability of correctional facilities to recover used and useful IPCS costs they may incur, we permit IPCS providers to reimburse correctional facilities for the used and useful costs they prudently incur in the provision of IPCS, as calculated in accordance with the standards set forth in this Report and Order.  Such reimbursements fall outside the scope of what we describe as "site commissions" under the regulatory framework of this Report and Order.  To the extent state laws or regulations allow or require correctional facilities to obtain reimbursement from providers for those costs that fall outside the scope of our understanding of "site commissions" (whatever terminology the state law or regulation might use), we do not preempt such laws or regulations.

(b)     **Prohibiting IPCS Providers from Entering Into Contracts Allowing or Requiring Them to Pay Site Commissions Associated with IPCS**

330.     As part of the prohibition against paying site commissions we adopt today, we also

---

[1165] *See supra* Section III.C.3.c (Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)).

[1166] *GTL v. FCC*, 866 F.3d at 409-12.

[1167] *See, e.g.*, Public Interest Parties May 8, 2023 Comments at 4 (explaining that the amendment to section 2(b) of the Communications Act "was a direct response to *GTL*, in which the D.C. Circuit had found the Commission's pre-MWRA authority was limited to only interstate and international IPCS").

[1168] Consistent with this policy, if there are state requirements that encompass both IPCS and non-IPCS services, our preemption actions extend only to the part of such requirements implicating IPCS.

prohibit providers from entering into contracts allowing or requiring them to pay site commissions associated with IPCS, consistent with the *2021 ICS Notice*.[1169]  We agree with the Wright Petitioners that doing so is "the simplest and most-wide ranging method to ensure IPCS rates are just and reasonable and fairly compensate providers."[1170]  As discussed above, we have concluded that the Martha Wright-Reed Act provides us with limited authority to regulate IPCS providers' practices, classifications, and regulations (collectively, "practices") associated with IPCS as a necessary part of our obligation to establish a compensation plan to ensure fair compensation to providers and just and reasonable rates and charges for consumers.[1171]  This authority derives from section 276(b)(1)(A)'s mandate that we establish a compensation plan addressing IPCS and, in certain circumstances, we also exercise section 201(b)'s grant of authority over practices associated with interstate and international IPCS.  We address these two sources of authority below.

331.    In defining the contours of the prohibition on paying site commissions, we mirror the carve-outs specified in the case of our preemption of laws and regulations permitting or requiring site commissions.  In particular, IPCS providers remain free to contract for the provision of non-IPCS services with correctional institutions following our actions today.  However, under no circumstances may providers enter into a contract with a correctional facility for the provision of IPCS where, as a condition precedent to providing IPCS, the provider must agree to pay a site commission of any kind.  To the extent IPCS providers contract with correctional institutions for the provision of non-IPCS services, neither the costs of those services nor any site commissions associated with them may be passed on to consumers through IPCS rates or charges.  Such limitations are necessary to protect IPCS consumers from unjust and unreasonable IPCS rates and to ensure that providers receive fair compensation, consistent with section 276(b)(1)(A) as amended by the Martha Wright-Reed Act, as well as our obligation to ensure just and reasonable rates under section 201(b).[1172]  Finally, consistent with our policy of allowing IPCS providers to reimburse correctional facilities for their used and useful costs consistent with the standards in this Report and Order, we do not bar contractual provisions that require such reimbursement.

### (i)     Section 276(b)(1)(A)

332.    We conclude that the practice of paying site commissions undermines the Commission's ability to establish just and reasonable rates for IPCS consumers and providers and ensure fair compensation for providers.[1173]  To best ensure fair compensation and just and reasonable rates and charges for IPCS, we thus adopt a compensation plan under section 276(b)(1)(A) that precludes IPCS providers from paying site commissions associated with IPCS subject to that provision.  As we explain above, the section 276 requirement that the Commission establish a compensation plan to ensure fair compensation for IPCS providers and just and reasonable rates and charges for consumers necessarily carries with it the authority to prescribe regulations governing providers' practices to the extent those practices relate to the rates and charges applied to consumers.  This authority not only allows us to preclude practices that work to undermine the rate and fee caps we set but also allows us to adopt affirmative requirements that help ensure that rates and charges as implemented are just and reasonable as applied to consumers.[1174]  Accordingly, in specifying a compensation plan to implement section

---

[1169] *2021 ICS Notice*, 36 FCC Rcd at 9661, para. 314.

[1170] Public Interest Parties July 12, 2023 Reply at 15.

[1171] *Supra* Section III.C.3.e (Authority to Regulate IPCS Providers' Practices).

[1172] *See, e.g.*, Securus May 8, 2023 Comments at 33-34 (noting that "[i]f a provider cannot offer service with paying a demanded site commission then a site commission is 'related to the provision of ICS'") (citing *GTL v. FCC*, 866 F.3d at 413); Pay Tel July 12, 2023 Reply at 16 (explaining that "so long as the Commission permits site commissions, those commissions are costs ICS providers generally must incur in order to provide ICS service, and therefore must be fully considered in any proposed rate caps").

[1173] *See supra* Section III.D.6.c.iii (Prohibiting Site Commission Payments Associated With IPCS).

[1174] *See supra* Section III.C.3.c (Implementation of the "Fairly Compensated" Standard in Section 276(b)(1)(A)).

276(b)(1)(A), as amended by the Martha Wright-Reed Act, we find it necessary to preclude providers from entering into contracts that require or allow them to pay site commissions associated with IPCS.

333.    Commenters highlight that the Commission "has exercised similar authority over telecommunications service providers by barring their entry into contracts, or enforcing existing contracts, with entities over whom the Commission has no direct jurisdiction in order to promote the Commission's regulatory objectives."[1175]  In the context of multiple tenant environments,[1176] the Commission has long prohibited providers of certain communications services from entering or enforcing agreements with property owners that grant the provider exclusive access and rights to provide service to the multiple tenant environment.[1177]  The Commission has also adopted rules prohibiting telecommunications carriers and multichannel video programming distributors from entering into or enforcing certain types of revenue sharing agreements with the owners or multiple tenant environments.[1178]  And, in the international settlements context, the Commission has limited the settlement rates that U.S. carriers may pay foreign carriers to terminate international traffic originating in the United States.[1179]  In each of these cases, the Commission's regulation of the entities subject to its jurisdiction has affected entities over which the Commission has no direct jurisdiction.  More importantly, where challenged by parties claiming that the Commission was impermissibly regulating parties over which it has no jurisdiction, the D.C. Circuit has upheld the Commission's actions.[1180]

---

[1175] Securus Sept. 27, 2021 Comments at 17-18; Public Interest Parties Dec. 17, 2021 Reply at 5 (agreeing with Securus); Letter from Andrew A. Lipman, Morgan, Lewis & Bockius LLP, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (filed Oct. 15, 2015) (Lipman Oct. 15, 2015 *Ex Parte*); Letter from Andrew D. Lipman, Morgan, Lewis & Bockius LLP, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375 at 9 (filed July 21, 2015) (Lipman July 21, 2015 *Ex Parte*); Wright Petitioners July 12, 2024 *Ex Parte* at 3 (noting that the Commission's actions in this regard are "consistent with precedent where the Commission has prohibited certain types of agreements to promote competition when it has jurisdiction over only one party").

[1176] Multiple tenant environments are "commercial or residential premises such as apartment buildings, condominium buildings, shopping malls, or cooperatives that are occupied by multiple entities." *Improving Competitive Broadband Access to Multiple Tenant Environments*, GN Docket No. 17-142, Notice of Inquiry, 32 FCC Rcd 5383, 5383-84, para. 2 (2017).

[1177] *Promotion of Competitive Networks in Local Telecommunications Markets et al.*, WT Docket No. 99-217, CC Docket Nos. 96-98, 88-57, First Report and Order and Further Notice of Proposed Rulemaking in WT Docket No. 99-217, Fifth Report and Order and Memorandum Opinion and Order in CC Docket No. 96-98, and Fourth Report and Order and Memorandum Opinion and Order in CC Docket No. 88-57, 15 FCC Rcd 22983, 22985, para. 1 (2000) (prohibiting carriers from entering into contracts that restrict owners and managers of commercial multiple tenant environments from permitting access by competing carriers); *Promotion of Competitive Networks in Local Telecommunications Markets*, WT Docket No. 99-217, Report and Order, 23 FCC Rcd 5385, 5386, para. 5 (2008) (prohibiting carriers from entering into contracts with residential multiple tenant environments owners that grant carriers exclusive access for the provision of telecommunications services to residents of those multiple tenant environments); *see Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units & Other Real Estate Developments*, MB Docket No. 07-51, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 20235, 20236, para. 1 (2007), *affirmed*, *Nat'l Cable & Telecomm. Ass'n v. FCC*, 567 F.3d 659 (D.C. Cir. 2009) (prohibiting certain multichannel video programming distributors from entering into or enforcing exclusivity contracts with residential multiple tenant environment owners).

[1178] *See Improving Competitive Broadband Access to Multiple Tenant Environments*, GN Docket No. 17-142, Report and Order and Declaratory Ruling, 37 FCC Rcd 2448, 2456-57, para. 16 (2022).

[1179] *See International Settlement Rates*, IB Docket No. 96-261, Report and Order, 12 FCC Rcd 19806, 19807, para. 1 (1997), *affirmed Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224 (D.C. Cir. 1999); *see also* Public Interest Parties Dec. 17, 2021 Reply at 5 & n.17.

[1180] *Cable & Wireless P.L.C. v. FCC*, 166 F.3d at 1230 (explaining that "no canon of administrative law requires [a court] to view the regulatory scope of agency actions in terms of their practical or even foreseeable effects"); *Nat'l Cable & Telecomm. Ass'n v. FCC*, 567 F.3d at 666 (noting that "most every agency action has relatively immediate effects for parties beyond those directly subject to regulation").

334.    While we prohibit IPCS providers from entering into contracts requiring or allowing them to pay site commissions associated with IPCS, we recognize that there are likely enforceable contracts that currently require the payment of site commissions.  In such circumstances, we rely on contractual change of law provisions.  Commenters and the Commission have noted that IPCS contracts "typically include change of law provisions."[1181]  We expect that our site commission reforms adopted in this Report and Order "constitute regulatory changes sufficient to trigger contractual change-in-law provisions that will allow [IPCS] providers to void, modify or renegotiate aspects of their existing contract to the extent necessary to comply" with our reforms today.[1182]  To the extent, however, that providers "have entered into contracts without change-of-law provisions," those providers "did so with full knowledge" that the Commission might act to prohibit site commissions, and have been on notice that the Commission could act in this regard, particularly in light of the *2021 ICS Notice*.[1183]  Thus, we believe that relevant change-of-law provisions will enable parties to amend their contracts to the extent necessary and we strongly encourage parties to work cooperatively to resolve any issues.  To the extent contractual disputes arise, including in circumstances where contracts do not have change-of-law provisions, parties may seek resolution of those disputes in court.[1184]

335.    Praeses contends that section 276(b)(1)(A) does not give the Commission authority over "private contractual payments" by IPCS providers and correctional institutions.[1185]  Praeses focuses on statements from *GTL v. FCC* in which the D.C. Circuit explained that section 276 "merely" directs the

---

[1181] *2015 ICS* Order, 30 FCC Rcd at 12868, para. 213 (quoting GTL Mar. 23, 2013 Comments at 29); HRDC Jan. 13, 2014 Reply at 7 (explaining that "ICS contracts typically include provision that accommodate renegotiations or amendments upon agreement of the parties"); Letter from Lee G. Petro, Drinker Biddle & Reath LLC, Counsel for Martha Wright, et al., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 (filed Aug. 2, 2013) (explaining that "existing contracts between ICS providers and correctional facilities regularly include provisions that permit the amendment or renegotiation of the terms in the event of state or federal regulatory changes"); *2013 ICS Order*, 28 FCC Rcd at 14162-63, para. 102; *Rates for Interstate Inmate Calling Services*; *Pay Tel Communications, Inc.'s Petition for Waiver of Interim Interstate ICS Rates*, WC Docket No. 12-375, Order, 29 FCC Rcd 1302, 1311-12, para. 19 (WCB 2014) (explaining that providers "like most commercial entities, generally can renegotiate contract terms with the facilities they serve, particularly where such contracts contain change of law provisions").

[1182] *2015 ICS Order*, 30 FCC Rcd at 12868, para. 213.  NCIC estimates that the Commission's decision "to prohibit site commissions will likely lead to the renegotiation of approximately 3,000 contracts."  NCIC July 10, 2024 *Ex Parte* at 4.  As we explain, however, providers and correctional authorities have long been on notice that the Commission might act to prohibit site commissions.

[1183] *See, e.g.*, *id.* at 12869, para. 215 & n.764; *2021 ICS Notice*, 36 FCC Rcd at 9661, paras. 314-15 (seeking comment on prohibiting site commissions); *see also* Letter from Tim McAteer, President, ICSolutions, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Attach. 1, Further Comment on the FCC's Fact Sheet, Facts in the Record, and Applicable Law, at 2-3 (filed Oct. 15, 2015) (explaining that providers "either knew or should have known that they would have to bear the regulatory risk of changes to the rates and the impact on commissions when considering whether to enter into [an] agreement, especially if those agreements were entered into after the FCC first began this rulemaking proceeding on December 24, 2012 in WC Docket No 12-375").

[1184] We reject NCIC's suggestion that our actions "abrogate" contracts.  NCIC July 10, 2024 *Ex Parte* at 4.  To the contrary, even for contracts that lack change-of-law provisions, the failure to pay a site commission required by a still-valid contract term is an issue to be resolved through a breach of contract action in court if the parties cannot negotiate a resolution on their own.  In addition, since 2013, the Commission has proceeded with IPCS reforms notwithstanding the potential interplay with existing IPCS agreements.  Continuing to do so here is consistent with Commission precedent, including our decision to defer to change-of-law provisions or otherwise-applicable legal frameworks governing the enforcement of existing contracts.  *See, e.g.*, *2013 ICS Order*, 28 FCC Rcd at 14162, para. 100 & n.365; *2015 ICS Order*, 30 FCC Rcd at 12869, para. 215; *2016 ICS Reconsideration Order*, 31 FCC Rcd at 9317, para. 30 n.126; *2021 ICS Order*, 36 FCC Rcd at 9568, para. 113.

[1185] Praeses Sept. 27, 2021 Comments at 11.

Commission ensure that providers are fairly compensated.[1186]  Praeses' comments, however, do not account for the amendments to section 276(b)(1)(A) made by the Martha Wright-Reed Act.  Rather than focusing solely on fair compensation, the Martha Wright-Reed Act added the requirement that the Commission ensure that all rates and charges are just and reasonable.[1187]  We find that the best way to reconcile both requirements is to prohibit site commission payments as part of our compensation plan implementing section 276(b)(1)(A).  This persuades us that we have authority to prohibit providers from entering into contracts requiring or permitting the payment of site commissions.  Separately, however, we are unpersuaded by Praeses' argument given the Commission's history, detailed above, of exercising similar authority over providers in the past.

### (ii)    Section 201(b)

336.    Separately, we conclude that paying site commissions is an unjust and unreasonable practice pursuant to our authority under section 201(b) and the impossibility exception.  Section 201(b) of the Communications Act provides an independent statutory basis for regulating providers' practices for or in connection with the interstate and international telecommunications services that are within our section 201(b) authority.  Acting pursuant to section 201(b) of the Communications Act, the Commission has generally found carrier practices unjust and unreasonable where necessary to protect competition and consumers against carrier practices for which there was either no cognizable justification or where the public interest in banning the practice outweighed any countervailing policy concerns.[1188]  As explained above, allowing recovery of site commissions would lead to unjust and unreasonable IPCS rates and charges given our finding that the providers' site commission payments are expenditures that are not used and useful in the provision of IPCS.[1189]  Even beyond that, payment of site commissions introduces competitive distortions in the bidding market for IPCS.[1190]  Although some commenters argue that site commissions may enable correctional facilities to recover the costs they incur in making IPCS available,[1191] as we have discussed above, these commenters have not been able to precisely articulate these costs to the Commission.[1192]  Over the course of the many years that the Commission has been examining this issue, commenters have failed to come forward with meaningful data regarding the portions of providers' site commission payments that may be used and useful.[1193]  Under these

---

[1186] *Id*.; *GTL v. FCC*, 866 F.3d at 409.

[1187] 47 U.S.C. § 276(b)(1)(A).

[1188] *See, e.g.*, *Truth-In-Billing and Billing Format*, CC Docket No. 98-170, First Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 7492, 7506, para. 24 (1999) (emphasizing that "a carrier's provision of misleading or deceptive billing information is an unjust and unreasonable practice in violation of section 201(b) of the Act"); *Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges ("Cramming") et al.*, CG Docket Nos. 11-116 et al., Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 4436, 4438, para. 4 (2012) (explaining that the Commission has found the practice of placing charges on consumer telephone bills for unauthorized services (i.e., "cramming") is an unjust and unreasonable practice prohibited by section 201(b)); *Protecting Consumers from Unauthorized Carrier Changes and Related Unauthorized Charges*, CG Docket No. 17-169, Report and Order, 33 FCC Rcd 5773, 5779-80, para. 19 (2018) (explaining that the Commission "has found that misrepresentations made by interstate common carriers constitute unjust and unreasonable practices" under section 201(b) of the Act); *Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage*, WC Docket No. 18-155, Report and Order and Modification of Section 214 Authorizations, 34 FCC Rcd 9035, 9073-74, para. 92 (2019) (concluding that the "practice of imposing tandem switching and tandem switched transport access charges on [interexchange carriers] for terminating access-stimulation traffic" is an unjust and unreasonable practice under section 201(b)).

[1189] *See supra* Section III.D.6.c.ii (Site Commissions Are Not Used and Useful In the Provision of IPCS).

[1190] *See supra id.*

[1191] *See, e.g.*, Pay Tel July 12, 2023 Reply at 11; National Sheriffs' Association Sept. 27, 2021 Comments at 7-8.

[1192] *See supra* Section III.D.6.c.ii.a (Used and Useful Assessment).

[1193] *See, e.g.*, *2021 ICS Notice*, 36 FCC Rcd at 9660-64, paras. 312-322.

**Federal Communications Commission** FCC 24-75

circumstances, we find no countervailing policy concerns or cognizable justification for the practice of paying site commissions given their detrimental effects on consumers and on the IPCS market in general. For these reasons, we conclude that the practice of paying site commissions associated with interstate and international telecommunications services is an unjust and unreasonable practice and prohibit it.

337.     Our section 201(b) authority also enables us to regulate practices associated with other IPCS services within our section 276 authority to the extent those practices cannot be practicably separated from practices applicable to services within our section 201(b) authority, pursuant to the impossibility exception.[1194]  For example, when the Commission exercised its section 201(b) authority to prohibit carriers from entering or enforcing exclusivity provisions in contracts with residential building owners, the Commission applied that ban even where agreements affected the viability of competitors offering bundles of services—of which telecommunications services were only one part—in order to fully address practices for or in connection with the telecommunications services directly subject to section 201(b).[1195]  Thus, the Commission's section 201(b) authority extends to the full range of "payphone service[s]," as defined in section 276(d), to the extent the practices for or in connection with the payphone services outside of our separate section 201(b) authority cannot be separated from practices for or in connection with the payphone services within this authority.

338.     The record contains no evidence that IPCS providers can practicably separate the practice of paying site commissions in connection with the interstate and international payphone services within our section 201(b) authority from the practice of paying site commissions for or in connection with the other payphone services within the Commission's section 276(d) authority, including advanced communications services, in order to isolate the harms of such practices.[1196]  As explained above,[1197] payment of site commissions undermines just and reasonable rates not only when providers directly increase IPCS rates to pass through site commission payments, but also through the marketplace distortions that result.  There is no evidence that the marketplace distortions arising from the practice of paying site commissions can practicably be separated into interstate, intrastate, international or non-section 201(b) regulated services components.  Indeed, as the Wright Petitioners explain, "IPCS providers cannot practicably separate the general practices that may apply broadly to IPCS providers, which all offer both interstate and intrastate services, themselves into interstate and intrastate components."[1198]  Further, we anticipate that enough aggregate revenues are potentially at stake for those services outside of our direct authority under section 201(b) that even allowing carriers' continued payments of site commissions only associated with those services is likely to lead to marketplace distortions that undermine our ability to ensure just and reasonable interstate and international IPCS rates.  Thus, consistent with the precedent discussed above, we conclude that this inseverability allows us to prohibit the practice of paying site commissions in connection with intrastate, interstate, international, jurisdictionally mixed, or jurisdictionally indeterminate audio or video IPCS under section 201(b).[1199]

### 7.     Safety and Security Costs

339.     Historically, the Commission has recognized that communications services for incarcerated people are different than communications services offered to the general public due, in part, to certain safety and security measures needed to adapt communications services to the carceral

---

[1194] *See supra* Section III.C.3.e (Authority to Regulate IPCS Providers' Practices).

[1195] *See, e.g.*, *2008 Competitive Networks Order*, 23 FCC Rcd at 5387-89, 5391, paras. 8-12, 14-15.

[1196] 47 U.S.C. § 276(d).

[1197] *See supra* Section III.D.6.c.2 (Site Commissions Are Not Used and Useful In the Provision of IPCS).

[1198] Public Interest Parties May 8, 2023 Comments at 16.

[1199] *See supra* Section III.C.3.e (Authority to Regulate IPCS Providers' Practices).

context.[1200]  The Martha Wright-Reed Act not only requires that the Commission adopt a compensation plan ensuring that IPCS rates and charges are just and reasonable, but also mandates that in determining those rates the Commission "shall consider costs associated with any safety and security measures necessary to provide" IPCS.[1201]  We find that, in order to give effect to the requirements of the Martha Wright-Reed Act, we must apply the Commission's traditional ratemaking standard, the used and useful standard, to determine whether any costs of safety and security measures are properly recoverable through regulated rates.  Based on the record and data submitted in response to the 2023 Mandatory Data Collection,[1202] we determine that safety and security costs related to compliance with CALEA,[1203] as well as those incurred for communications security services, are generally appropriate for recovery through regulated IPCS rates, consistent with the Martha Wright-Reed Act.[1204]  We also find that other types of safety and security measures, including law enforcement support services, communications recording services, communications monitoring services, and voice biometrics services, are generally not appropriate for recovery through regulated IPCS rates.  Finally, learning from the 2023 Mandatory Data Collection, we make modest adjustments in our rate-setting process to ensure that the costs of all safety and security measures that are properly included in regulated IPCS rates are, in fact, recoverable.

### a.     Background

340.     Prior to the 1984 breakup of AT&T, pricing for communications for incarcerated people largely mirrored that of the broader market.[1205]  After the breakup, however, former safety and security service providers began providing communications services, using "their security and surveillance services to carve out this niche micro-market for themselves."[1206]  As Worth Rises explains, since that time, "the corrections landscape [has seen] the widespread adoption of an increasing array of security and surveillance services, with IPCS consumers bearing the costs."[1207]  As the 2023 Mandatory Data Collection amply demonstrates, costs broadly understood as reflecting safety and security measures now represent the largest single component of reported costs in the IPCS industry.[1208]

### (i)     The Commission's Historical Consideration of Safety and Security Measures

341.     The Commission first began to assess the role safety and security measures play in the provision of inmate calling services in the 1990s.  In a 1996 declaratory ruling, it determined the proper regulatory treatment of certain safety and security measures such as call blocking, restricting called

---

[1200] *2002 Pay Telephone Order*, 17 FCC Rcd at 3252, para. 9 ("Although section 276 classifies inmate calling service as a payphone service, inmate calling services, largely for security reasons, are quite different from the public payphone services that non-incarcerated individuals use.").

[1201] Martha Wright-Reed Act § 3(b)(2).

[1202] *2023 Mandatory Data Collection Order*.

[1203] 47 U.S.C. § 1001 *et seq.*; 47 CFR § 1.20000 *et seq.*

[1204] In the instructions to the 2023 Mandatory Data Collection, WCB and OEA divided potential safety and security measures into seven categories and requested that providers submit data allocating their safety and security costs among the categories.  2023 Mandatory Data Collection Instructions at 35, https://www.fcc.gov/files/2023-ipcs-mandatory-data-collection-instructions.

[1205] Worth Rises Sept. 27, 2021 Comments at 2-3.

[1206] *Id*. at 3.

[1207] *Id*. at 2-3; Charleston Listening Session at 22:18-21, 54:19-24 (explaining that prior to the late 1990s, "local phone calls were a dime and you could talk as long as you wanted.  Phones were abundance.  Out on the yard, it was phones.  In the dormitory there was phones, able to communicate").

[1208] *See* Appendix F at Table 5 (reflecting that 2022 industry safety and security costs totaled {[                                                                                             ]}.

parties, and call tracking under the then-relevant regulatory framework.[1209]  In analyzing these functionalities, the Commission framed such measures as services that "essentially help[] corrections officials to determine whether a transmission path may be established."[1210]  The Commission viewed these services as contributing to the provision of the underlying communications service.[1211]  In that same timeframe, however, the Commission began to raise concerns about the costs of safety and security measures when it sought comment on whether it should implement "rate caps, to remedy high charges to the billed party for collect calls initiated by prison inmates."[1212]  The Commission described possible security measures as including call blocking, approved number lists, call length limitations, and total calls permitted to specific individuals.[1213]  It contemplated that "[p]risons may also need to be able to monitor calls and even tape them."[1214]

342.    A few years later, in the *2002 Pay Telephone Order*, the Commission began to address the increasing number and type of safety and security measures available to correctional facilities and their associated costs.[1215]  While the Commission considered traditional security measures, such as call blocking, restrictions on three-way calling, and approved number lists, the Commission addressed, for the first time, security services that primarily served basic law enforcement functions such as providing "detailed, customized reports for correctional facility officials."[1216]  The record then before the Commission showed a shift from selective, targeted surveillance services to requirements for "listening and recording capabilities for all calls."[1217]  The Commission also addressed the issue of the costs of these measures.  While recognizing that "the provision of inmate calling services implicates important security concerns and, therefore, involves costs unique to the prison environment," the Commission nonetheless declined to raise rates relating to inmate calling services based on safety and security costs, expressing the hope that lower rates might lead to "more cost-effective security protections."[1218]  Raising concerns about the imposition of "expensive security costs," the Commission sought comment on "inmate calling service

---

[1209] *Petition for Declaratory Ruling by the Inmate Calling Services Providers Task Force*, RM-8181, Declaratory Ruling, 11 FCC Rcd 7362 (1996) (*1996 Declaratory Ruling*).  The then-relevant regulatory framework, commonly known as the *Computer II* framework, distinguished between two types of computer processing applications offered over common carrier transmission facilities: "basic services," which were defined "as the provision of 'pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information"; and "enhanced services," which were defined as services that "employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information."  *North American Telecommunications Association Petition for Declaratory Ruling Under Section 64.702 of the Commission's Rules Regarding the Integration of Centrex, Enhanced Services, and Customer Premises Equipment*, ENF 84-2, Memorandum Opinion and Order, 3 FCC Rcd 4385, 4385, para. 5 (1988) (quoting 47 CFR § 64.702(a)); *Second Computer Inquiry, Final Decision*, 77 F.C.C.2d 384, 420, para. 96 (1980).

[1210] *1996 Declaratory Ruling*, 11 FCC Rcd at 7376, para. 31.  The Commission compared "screening and blocking features employed by correctional officials to monitor inmate telephone usage" to "services offered in the network that help customers screen or pre-select callers for acceptance or rejection do not go beyond providing a basic transmission channel and facilitating the customer's use of that transmission channel."  *Id.*

[1211] *Id.*

[1212] *Billed Party Preference for InterLATA 0+ Calls*, CC Docket No. 92-77, Second Further Notice of Proposed Rulemaking, 11 FCC Rcd 7274, 7300-01, paras. 48-49 (1996).

[1213] *Id.* at 7301, para. 48 n.125.

[1214] *Id.*

[1215] *2002 Pay Telephone Order*, 17 FCC Rcd at 3252, para. 9.

[1216] *Id.*

[1217] *Id.*

[1218] *Id.* at 3263, 3276, paras. 40, 72.

practices that may serve legitimate security needs but have the unintended, and perhaps *unnecessary*, effect of increasing the costs incurred by inmates and their families."[1219]

343.    In the *2013 ICS Order*, the Commission again acknowledged the importance of security features in the provision of inmate calling services, while emphasizing that "ICS rate reform has not compromised the security requirements of correctional facilities."[1220]  In establishing "conservative" interim ICS rates, the Commission, on the record before it, took into account "security needs as part of the ICS rates as well as the statutory commitment to fair compensation."[1221]  These interim rates were based on the requirement of fair compensation in the language of section 276 at the time.[1222]  Based on data in the record, the interim rates "demonstrate[d] the feasibility of providing ICS on an on-going basis to hundreds of thousands of inmates without compromising the levels of security."[1223]  The record led the Commission to include in the rates the costs of "sophisticated security features—including biometric caller verification based on voice analysis, and sophisticated tracking tools for law enforcement."[1224]  While traditional security measures were still deployed virtually universally, the record indicated that additional security features had become available and were primarily designed to assist law enforcement in discharging its core functions, including investigative work, gathering evidence, storing call recordings for use in court proceedings, and preparing reports for facilities.[1225]  The Commission was cognizant of the "critical security needs of correctional facilities," particularly used to aid law enforcement in the successful prosecution of "hundreds" of crimes.[1226]  The Commission nevertheless added the limiting principle that security costs must have an appropriate nexus to the provision of ICS to be recoverable through ICS rates.[1227]  Such costs likely included the costs of security features inherent in the network, including "the costs of recording and screening calls, as well as the blocking mechanisms the ICS provider must employ to ensure that inmates cannot call prohibited parties."[1228]  The Commission also referenced "more sophisticated security features" such as "biometric caller verification based on voice analysis and sophisticated tracking tools for law enforcement."[1229]

---

[1219] *Id*. at 3278, para. 78 (emphasis in original).  The Commission likewise sought comment on "alternatives to collect calling in the inmate environment that might result in lower rates for inmate calls while continuing to satisfy security concerns."  *Id.* at 3277, para. 76.

[1220] *2013 ICS Order*, 28 FCC Rcd at 14109, 14111, paras. 2, 4.

[1221] *Id*. at 14138, 14140-41, paras. 58, 61.

[1222] *Id*. at 14141, para. 61.

[1223] *Id*. at 14138-39, para. 58.

[1224] *Id*. at 14134, para. 53 n.196.

[1225] *Id*..

[1226] *Id*. at 14138, para. 58.

[1227] *Id*. at 14134, para. 53.

[1228] *Id*. at 14134, para. 53 n.196.

[1229] *Id*. While the Commission ultimately included the costs of advanced security features such as continuous voice biometric identification in the interim rates it adopted, it did so on the basis of limited data on industry costs since the Commission had not yet conducted a data collection to obtain comprehensive industry data.  *Id.* at 14138, para. 58; *see id*. at 58 n.221 (citing a cost study submitted by a provider).  Contrary to what Securus claims, we do not improperly reverse findings in the *2013 ICS Order* regarding safety and security costs with our actions today. Securus July 11, 2024 *Ex Parte* at 14 (arguing that because the Commission included services such as call monitoring, call recording, and voice biometrics in the rate caps it adopted in the *2013 ICS Order*, "it is reasonable to assume Congress intended that the Commission *at a minimum* include in the rates the costs of measures it has previously found necessary").  Given the nature of the highly circumscribed record at the time of the *2013 ICS Order*, it does not follow—and the Martha Wright-Reed Act does not say—that the Commission must include safety and security costs it has previously included in the rates in the rate caps it adopts today pursuant to the Martha

(continued….)

344.    By 2020, the Commission had begun to give increased scrutiny to the role safety and security measures played in the provision of IPCS and the extent to which cost recovery for the increasing array of security and surveillance measures was appropriate through inmate calling services rates.[1230]  In the *2020 ICS Notice*, the Commission sought comment on whether "safety and surveillance costs in connection with inmate calling services should be recovered through inmate calling service rates."[1231]  It noted that "[a]s public interest groups [had] pointed out, correctional facilities did not pass on the costs of other security measures, such as scrutinizing physical mail, to incarcerated people and their families."[1232]

345.    In the *2021 ICS Order*, the Commission observed that the record provided in response to the *2020 ICS Notice* did not allow it to determine "whether security and surveillance costs that correctional facilities claim to incur in providing inmate calling services are 'legitimate' inmate calling services costs that should be recoverable."[1233]  Some commenters encouraged the Commission to exclude all such costs, arguing that security services were "not related to the provision of communication service and provide[d] no benefit to consumers" and "not related to [the] 'communications functions'" of ICS.[1234]  Certain providers and the National Sheriffs' Association called for the opposite, arguing that "correctional facilities incur administrative and security costs to provide incarcerated people with access to [inmate calling services]" and that these costs should be recovered through calling rates.[1235]  The Commission found, however, that the data provided in support of this position did not allow it to "isolate legitimate telephone calling-related" costs from "general security and surveillance costs in correctional facilities that would exist regardless of inmate calling services."[1236]  Based on the unreliability of the data provided, the Commission found that it had no "plausible method" for determining recoverable security and surveillance costs.[1237]

346.    At the same time, in the *2021 ICS Notice*, the Commission sought comment on security and surveillance costs and specifically whether some security-related costs should "more appropriately be deemed to be general security services that are added on to inmate calling services but not actually necessary to the provision of the calling service itself."[1238]  The Commission asked whether providers are in fact providing "two different services," including "a communication service that enables incarcerated people to make telephone calls" and "a separate security service that aids the facility's general security efforts but would more appropriately be paid for directly by the facility rather than by the users of the communications service who receive no benefit from these security features that are unnecessary to enable them to use the calling service."[1239]  The Commission also referenced a representation made by one provider listing the basic security measures required to provide service and acknowledging that "anything more than this is not required for secure calling and that additional products are 'gold-plated

---

Wright-Reed Act. In any event, as set forth in the analysis that follows, the record now before us, which is far more robust than the record that existed at the time of the *2013 ICS Order*, persuades us to reach a different conclusion regarding certain safety and security measures than the Commission may have reached previously. *Infra* Section III.D.7.b.iv (Consideration of Safety and Security Costs Under the Used and Useful Framework).

[1230] *2020 ICS Notice*, 35 FCC Rcd at 8523, para. 107.

[1231] *Id*.

[1232] *Id*.

[1233] *2021 ICS Order*, 36 FCC Rcd at 9585, para. 148.

[1234] *Id*. at 9585, para. 148 nn.452-54 (citing multiple public interest groups' comments).

[1235] *Id*. at 9585, para. 148 nn.455-58 (citing ViaPath's and the National Sheriffs' Association's comments).

[1236] *Id*. at 9586, para. 149.

[1237] *Id*. at 9586, paras. 149-50 ("We are skeptical of these data given the wide unexplained variations that appear across some of the facilities.").

[1238] *Id*. at 9665, para. 323.

[1239] *Id.*

offerings."[1240]  The provider suggested that "a basic phone system requires security related to identifying the incarcerated individual placing a call, restricting who that individual can and cannot call, providing the called party with the ability to accept, reject, or block the caller, and providing the facility with the ability to monitor and record calls."[1241]  As a result, the Commission sought comment on "legitimate" security features, how to distinguish such features from security relating to the facility as a whole, and how to isolate and quantify such costs.[1242]  In the *2022 ICS Notice*, the Commission reiterated these requests for comment and asked about the extent to which "the security and surveillance costs that providers [had] included" in their responses to the Third Mandatory Data Collection "relate[d] to functions that meet the used and useful standard."[1243]

### (ii)    The Martha Wright-Reed Act and Safety and Security

347.    Section 3(b)(2) of the Martha Wright-Reed Act requires that the Commission, in implementing the Act including promulgating regulations and determining just and reasonable rates, "consider costs associated with any safety and security measures necessary to provide" IPCS.[1244]  As a result, in the *2023 IPCS Notice*, the Commission sought comment on this directive.[1245]  It requested comment on how the term "necessary" should be interpreted, particularly asking whether it should follow D.C. Circuit precedent finding that "necessary" "must be construed in a fashion that is consistent with the ordinary and fair meaning of the word, *i.e.,* so as to limit 'necessary' to that which is required to achieve a desired goal."[1246]  The Commission also asked for detailed, specific comment on which safety and security measures are "necessary," as contemplated by the Act, to the provision of IPCS and why those measures are "necessary."[1247]  Finally, it sought comment on whether it "should interpret the Martha Wright-Reed Act's use of the term 'safety and security' as having the same or different meaning as the term 'security and surveillance' previously used in this proceeding."[1248]

### (iii)    2023 Mandatory Data Collection

348.    Pursuant to a delegation of authority from the Commission,[1249] WCB and OEA gathered data to attempt to understand what safety and security measures were offered by IPCS providers, as well as their functions and costs, among other purposes.[1250]  The data collection required that the providers isolate the costs they incur in providing safety and security measures from their other costs, and then allocate their safety and security measure costs into seven categories on a company-wide level, with an accompanying narrative description of the services included in each category.[1251]  Providers were required "to allocate the annual total expenses they incurred in providing safety and security measures among

---

[1240] *Id*. (quoting Letter from Tim McAteer, President, ICSolutions, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1-2 (filed May 12, 2021) (ICSolutions May 12, 2021 *Ex Parte*)).

[1241] *Id*. at 9665, para. 323 (quoting ICSolutions May 12, 2021 *Ex Parte* at 1-2); *see* ICSolutions May 12, 2021 *Ex Parte* at 2 (asserting that "[d]espite being marketed as 'necessary,' any additional security-related "technologies or services are not required for secure inmate calling, or the actual service consumers are paying for").

[1242] *2021 ICS Notice*, 36 FCC Rcd at 9665, para. 323.

[1243] *2022 ICS Notice*, 37 FCC Rcd at 11952, para. 131.

[1244] Martha Wright-Reed Act § 3(b)(2).

[1245] *2023 IPCS Notice*, 38 FCC Rcd at 2689, para. 53.

[1246] *Id*. at 2690, para. 53; *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000) (*GTE Serv. Corp.*).

[1247] *2023 IPCS Notice*, 38 FCC Rcd at 2690, para. 54.

[1248] *Id*. at 2691, para. 55.

[1249] *Id*. at 2700-01, paras. 84-85.

[1250] *2023 Mandatory Data Collection Order*.

[1251] *Id*. at 7, para. 20.

**Federal Communications Commission**    **FCC 24-75**

seven categories using the provider's best estimate of the percentage of those expenses attributable to each category."[1252]  The providers were then required to allocate all reported safety and security costs at the facility level.  Additionally, they were required to allocate the expenses in each category to four types of services—audio IPCS, video IPCS, ancillary services, and other products and services.[1253]

349.    These seven categories were designed to "provide a comprehensive and workable framework for dividing safety and security measure costs into reasonably homogenous groupings that 'should capture all [safety and] security costs,' particularly with the addition of multiple examples of costs for each category."[1254]  A catch-all category for any costs that did not fit within the other categories was also added to ensure completeness.[1255]  The categories are: (1) CALEA compliance measures, (2) law enforcement support services, (3) communications security services, (4) communication recording services, (5) communication monitoring services, (6) voice biometrics services, and (7) other safety and security measures.[1256]

350.    Providers were required to submit information regarding safety and security measures in both cost data format and narrative responses to an excel and word template.[1257]  For purposes of the collection, "safety and security measures" were defined as:

> [A]ny safety or security surveillance system, product, or service, including any such system, product, or service that helps the Facility ensure that Incarcerated People do not communicate with persons they are not allowed to communicate with; helps monitor and record on-going communications; or inspects and analyzes recorded communications.  Safety and Security Measures also include other related systems, products, and services, such as a voice biometrics system, a personal identification number system, or a system concerning the administration of subpoenas concerning communications.  The classification of a system, product, or service as a Safety and Security Measure does not mean that it is part of a Provider's IPCS-Related Operations.[1258]

351.    Providers were then instructed to provide a variety of information, including whether safety and security measures differed among facilities, contracts, audio/video services, or other factors.[1259]  Total annual expenses, billed revenues, company-wide financial information, and service-specific financial information were requested, as well as allocations of such data among the seven safety and security categories.[1260]  Providers were instructed "to report in the Excel template, for each category, the Company's best estimate of the percentage of its total Annual Total Expenses for Safety and Security Measures that is attributable to the measures within that category."[1261]  Safety and security measures were to be identified and described based on these categories.[1262]

352.    Providers' responses give for the first time a comprehensive picture of the dominant role

---

[1252] *Id.*

[1253] 2023 Mandatory Data Collection Instructions at 37.

[1254] *2023 Mandatory Data Collection Order* at 8, para. 21.

[1255] *Id.*

[1256] *Id.* at 7, para. 20 & n.44.

[1257] *Id.* at 11, para. 28.

[1258] 2023 Mandatory Data Collection Instructions at 13.

[1259] *Id.* at 15.

[1260] *Id.* at 20, 22, 35, 37-38.

[1261] *Id.* at 35.

[1262] *Id.* at 35, 58-60.

that the costs of safety and security measures now play in the IPCS industry's cost structure.  Reported safety and security measure costs now represent the single largest category of reported costs.[1263]  The providers' data show that those costs now represent approximately {[       ]} of all reported IPCS costs and that reported safety and security measure costs significantly exceed the total costs of providing both audio and video IPCS combined.[1264]  On a total industry cost per-minute basis, reported safety and security costs are {[                                                ]}, while reported costs of providing IPCS are {[                                ]}.

353.     The reported data also indicate that different-sized providers incur markedly different safety and security measure costs on a per-minute basis.  For example, the two largest providers reported incurring {[

]} per minute in costs for safety and security measures, whereas the range for the rest of the industry is between $0.001 and $0.006 per minute for audio IPCS and between $0.0001 and $0.024 per minute for video IPCS.[1265]

### b.     Our Approach to Considering Safety and Security Costs under Section 3(b)(2) of the Martha Wright-Reed Act

354.     Before reaching our assessment of providers' separately reported costs of safety and security measures, we address the statutory interpretation underlying our consideration of these matters under the Martha Wright-Reed Act and the Communications Act.

### (i)     The Directive To "Consider" Safety and Security Costs under Section 3(b)(2) of the Martha Wright-Reed Act

355.     Pursuant to section 3(b)(2) of the Martha Wright-Reed Act, we will evaluate as part of our ratemaking exercise under section 276(b)(1)(A) of the Communications Act "costs associated with any safety and security measures necessary to provide" IPCS.[1266]  This is a familiar task of the sort the Commission has long undertaken when seeking to ensure just and reasonable rates, where it has evaluated costs and expenses of various kinds for which providers sought recovery through regulated rates.  The Commission likewise has historical experience with similar assessments of safety and security measures raised in the IPCS context specifically.  Our conclusion that section 3(b)(2) of the Martha Wright-Reed Act simply informs how we approach our traditional rate-setting function—rather than establishing some kind of unique or anomalous approach specific to safety and security—flows from the statutory text and context, along with the relevant regulatory history that served as the backdrop to the Martha Wright-Reed Act.

356.     In the *2023 IPCS Notice*, the Commission sought comment on the meaning of "shall consider" as used in section 3(b)(2) of the Martha Wright-Reed Act,[1267] and on what discretion, if any, that phrase gives the Commission in its ratemaking determinations.[1268]  We conclude that the requirement that we "consider" the costs of safety and security measures means that we must "reach . . . express and reasoned conclusion[s]" regarding such costs—as relevant here, as part of the process of determining just

---

[1263] The industry reported total safety and security costs of approximately {[                    ]}.  *See infra* Appendix F.

[1264] Audio and video IPCS combined represent approximately {[        ]} of all reported IPCS costs, inclusive of site commissions.

[1265] *See supra* Appendix  F.

[1266] Martha Wright-Reed Act § 3(b)(2).

[1267] *Id*.

[1268] *2023 IPCS Notice*, 38 FCC Rcd at 2689-90, para. 52; Martha Wright-Reed Act § 3(b)(2).  We agree with Pay Tel that the word "shall," is mandatory, not permissive, such that we "*must* consider costs associated with necessary safety and security measures in setting just and reasonable rates."  Pay Tel May 8, 2023 Comments at 15.

and reasonable rates for IPCS.[1269]  Consistent with prior interpretations of similar statutory language, we do not read section 3(b)(2) of the Martha Wright-Reed Act as a directive mandating the recovery of the costs of all safety and security measures identified by providers or facilities;[1270] or as inherently requiring the Commission "to give any specific weight" to such costs as a statutory matter.[1271]  Instead, the text of that provision merely requires us to examine available evidence regarding "costs associated with any safety and security measures necessary to provide" IPCS along with the various other cost claims we review as part of our overall approach to ensuring just and reasonable rates and charges for IPCS that also yield fair compensation for providers.[1272]

357.    Commenters generally support this interpretation.[1273]  As the Public Interest Parties explain,

> Congress did not say that the Commission 'must include' or 'shall allow for the recovery of' the safety and security costs claimed by IPCS providers.  Instead, it deferred to the Commission's expertise and discretion, requiring only that it consider costs associated with safety and security measures when developing rate caps.  While the Commission must therefore consider these costs, it is plainly not obligated to pass them through in the rate caps ultimately adopted.[1274]

We agree with these views.

---

[1269] *Time Warner Ent. Co. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995) (quoting *Cent. Vt. Ry. v. ICC*, 711 F.2d 331, 336 (D.C. Cir. 1983)) (holding that a statute that "by its terms merely requires the Commission to consider" a particular factor in determining whether a rate is unreasonable "means only that [the Commission] must 'reach an express and considered conclusion' about the bearing of [the] factor," but does not mean that the Commission must "'give any specific weight'" to the factor, and that the Commission may "ultimately conclude[] that [the factor] should not be given any weight"); *see* Worth Rises May 8, 2023 Comments at 2; EPIC June 6, 2023 Reply at 8 (agreeing with "commenters who argue that the Commission must consider safety and security but is not required to include them as recoverable costs"); Leadership Conference July 12, 2023 Reply at 3.

[1270] Worth Rises May 8, 2023 Comments at 2; EPIC June 6, 2023 Reply at 8; Leadership Conference July 12, 2023 Reply at 3 (encouraging the Commission "to conclude that the Martha Wright-Reed Act's direction to 'consider the costs of safety and security measures' requires the commission to comply with the Administrative Procedure Act to consider the matter, but does not require the commission to pass those costs on to consumers").

[1271] *Time Warner Ent. Co. v. FCC*, 56 F.3d at 175 (quoting *Cent. Vt. Ry. v. ICC*, 711 F.2d at 336).

[1272] Contrary to the National Sheriffs' Association's characterization of the *2023 IPCS Notice*, nowhere in that *Notice* did we interpret "consider" to mean that we are "required to treat all safety and security costs identified by providers . . . as costs recoverable through rates for communications services for incarcerated people."  National Sheriffs' Association May 8, 2023 Comments at 9 (citing *2023 IPCS Notice*, 38 FCC Rcd at 2689-90, para. 52).  Rather, the Commission sought comment on whether such an interpretation would be appropriate, or whether another, contrary interpretation would be correct.  *See 2023 IPCS Notice*, 38 FCC Rcd at 2689-90, para. 52 (asking whether the Commission could consider the costs of safety and security measures, "but ultimately decide to exclude all of them from its rate calculations as unnecessary").

[1273] Worth Rises May 8, 2023 Comments at 2; EPIC June 6, 2023 Reply at 8; Leadership Conference July 12, 2023 Reply at 3; Public Interest Parties May 8, 2023 Comments at 2; Raher May 8, 2023 Comments at 14-15.

[1274] Public Interest Parties May 8, 2023 Comments at 23; EPIC May 8, 2023 Comments at 3 (encouraging the Commission to conclude that the Martha Wright-Reed Act's "direction to 'consider the costs of safety and security measures' does not require the Commission to pass those costs on to consumers"); EPIC June 6, 2023 Reply at 8; Raher May 8, 2023 Comments at 14-15 (suggesting that "the 'consideration' language in the Wright-Reed Act is properly understood as providing the Commission with the flexibility to consider necessary security costs, without mandating any particular outcome"); Worth Rises May 8, 2023 Comments at 2; Leadership Conference July 12, 2023 Reply at 3 (proposing that the Commission "conclude that the Martha Wright-Reed Act's direction to 'consider the costs of safety and security measures' requires the commission to comply with the Administrative Procedure Act to consider the matter, but does not require the commission to pass those costs on to consumers"); *see* Pay Tel May 8, 2023 Comments at 15.

358.    Our interpretation of section 3(b)(2) is reinforced by the broader statutory context.  In particular, section 4 of the Martha Wright-Reed Act provides that nothing in that Act "shall be construed to . . . prohibit the implementation of any safety and security measures related to [IPCS] services at [correctional] facilities."[1275]  As we explain above, when read together, section 3(b)(2) of the Martha Wright-Reed Act is best understood as merely requiring the Commission to evaluate such costs as part of its just and reasonable rate analysis, while section 4 simply makes clear that, in directing the Commission to develop a compensation plan to ensure just and reasonable IPCS rates and charges, Congress did not intend to prohibit correctional institutions from adopting policies that, in their judgment, are needed to preserve safety and security.[1276]

359.    Our understanding of section 3(b)(2) harmonizes it with the broader regulatory history here, as well.  Considering costs associated with any safety and security measures necessary to provide IPCS as part of our used and useful analysis reflects a continuation of the sort of analyses the Commission has long undertaken in the IPCS context.[1277]  For example, in the *2013 ICS Order*, the Commission explained that it would "likely" find it appropriate to include costs—including some safety and security costs—"that are closely related to the provision of interstate ICS" in setting rates.[1278]  And, in the *2021 ICS Notice*, to help it determine the extent to which certain security and surveillance costs may be recovered through calling services rates, the Commission sought comment on the "types of security and surveillance functions, if any, [that] are appropriately and directly related to inmate calling."[1279]  Thus, the focus of the Commission's inquiry has been to identify costs associated with safety and security measures that have a sufficient nexus to IPCS to justify recovery of the relevant costs or expenses through IPCS rates.[1280]

360.    The Commission's evaluation of the nexus between safety and security measures and the provision of IPCS evolved over time as the industry's use of such measures increased.[1281]  The Commission also has grappled with limited data and record comment in attempting these analyses.  For instance, in setting interim rate caps in the *2021 ICS Order*, the Commission recognized that the record then before it made it impossible to determine the extent to which security and surveillance costs should be recovered through inmate calling services rates.[1282]  The Commission therefore sought comment in the *2021 ICS Notice* on the extent to which the services that providers and facilities had identified as security-related services should "be deemed to be general security services that are added onto inmate calling services but not actually necessary to the provision of the calling service itself."[1283]  The Commission also sought comment in that *Notice* on methodologies that would help it isolate and quantify "calling-related security and surveillance costs from general security and surveillance costs" that providers and facilities

---

[1275] Martha Wright-Reed Act § 4.

[1276] *See supra* Section III.C.3.b (Effect on Other Laws).

[1277] And even apart from that particular sort of evaluation, the Commission otherwise also has long been involved in assessing the technological relationship between communications service and safety and security measures associated with IPCS.  *See, e.g.*, *1996 Declaratory Ruling*, 11 FCC Rcd at 7376, para. 31.

[1278] *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53 & n.196.

[1279] *2021 ICS Notice*, 36 FCC Rcd at 9665, para. 323.

[1280] *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53.

[1281] *See, e.g.* Worth Rises Mar. 24, 2021 *Ex Parte* at 2 (explaining that providers have "routinely introduced new security and surveillance services"); Worth Rises Sept. 27, 2021 Comments at 11 (asserting that "there is no end to the ever-expanding suite of security and surveillance services IPCS providers are introducing to sway correctional customers to contract their services"); Pay Tel June 18, 2024 *Ex Parte*, Attach., Declaration of Vincent Townsend at 2-8 (discussing the historical development of Pay Tel's safety and security measures).

[1282] *2021 ICS Order*, 36 FCC Rcd at 9585-86, para. 148.

[1283] *Id.* at 9664-65, para. 323 (asking "[w]hat functions should be disallowed as too attenuated to claim as legitimate costs").

incur.[1284]  In the *2022 ICS Notice* the Commission reiterated its requests for comment that would help it identify, and quantify, the distinction between safety and security measures directly related to the provision of communications services in correctional institutions and the general provision of safety and security in those institutions.[1285]

361.    In sum, we read section 3(b)(2) simply to direct the Commission to evaluate the evidence before it regarding the costs associated with any safety and security measures necessary to provide IPCS and make a reasoned judgment about whether and to what extent such costs should be included in just and reasonable IPCS rates, consistent with fair compensation for providers.  This flows from the statutory text and context, and represents a continuation of the ratemaking role the Commission long has played in this context (and others).

362.    In light of what we see as the best reading of section 3(b)(2) of the Martha Wright-Reed Act, we are unpersuaded by arguments that, as a statutory matter, we must allow recovery of all costs associated with safety and security measures in IPCS rates.[1286]  Some commenters misunderstand section 3(b)(2) and argue that all safety and security measures a facility identifies are automatically necessary and recoverable through regulated rates by virtue of being selected by "experts."[1287]  The National Sheriffs' Association argues that "[t]he fact that a security or safety measure is implemented in connection with IPCS service makes it a recoverable cost."[1288]  We disagree with these contentions.  Although section 3(b)(2) requires the Commission to "consider" costs associated with safety and security measures necessary in providing IPCS when determining just and reasonable rates, commenters do not persuasively demonstrate that, as a textual matter, this requires more than evaluating the available information in the record and reaching a reasoned decision.[1289]  And as discussed above, our reading of section 3(b)(2) best

---

[1284] *Id*.

[1285] *See, e.g.*, *2022 ICS Notice*, 37 FCC Rcd at 11952, para. 131 (asking "which of the security and surveillance costs that providers included in their" responses to the Commission's Third Mandatory Data Collection "relate to functions that meet the used and useful standard").

[1286] National Sheriffs' Association May 8, 2023 Comments at iii ("Regarding necessary security and safety measures, the MWRA plainly requires the Commission to ensure these costs are recoverable"); National Sheriffs' Association July 12, 2023 Reply at 6 ("The MWRA requires the Commission to consider and allow for the recovery of necessary safety and security measures through IPCS rates."); Letter from Henry Dixon, Vice President & Head of Government Relations, Aventiv Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed July 1, 2024) (addressing the role of safety and security measures "and the importance of recovering these costs in call rates").

[1287] National Sheriffs' Association May 8, 2023 Comments at iii ("When it comes to jails, Sheriffs are experts on the safe and secure operation of the facilities and should be the ultimate arbiters of what is necessary when it comes to safety and security."); Securus May 8, 2023 Comments at 38; FDC July 11, 2024 *Ex Parte* at 2 ("[T]he Commission must defer to the expertise of prison administrators on matters of institutional security.").

[1288] National Sheriffs' Association May 8, 2023 Comments at 9 ("Sheriffs are the experts on what safety and security measures are necessary in connection with IPCS.  If a safety or security measure is implemented in connection with IPCS in any correctional facility, the cost should be recoverable.  It is the duty and the right of the correctional facility to determine what safety and security measures are necessary for its facility and the Commission has no authority to second-guess this."); National Sheriffs' Association July 11, 2024 *Ex Parte* at 1-2; Securus May 8, 2023 Comments at 35 ("In making any determination as to what costs are 'necessary' to ensure the safety and security of incarcerated persons, those working in carceral settings, and the general public, the Commission should give substantial deference to correctional authorities that have expertise in this area.").

[1289] Consequently, we reject commenters' contrary interpretations insofar as they would, as a statutory matter, necessarily require recovery through regulated IPCS rates of all costs of safety and security measures "necessary" within the meaning of section 3(b)(2), irrespective of the specific basis for that "necessary" determination—whether giving preclusive weight to correctional facilities' judgements, or some other level of weight, or making the determination on other grounds.  *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 13 ("[T]he Commission certainly

(continued….)

**Federal Communications Commission**                    **FCC 24-75**

accords with the statutory context and the relevant regulatory history. Indeed, contrary arguments would require us to interpret section 3(b)(2) as establishing an anomalous approach to ratemaking under the Communications Act that would, at least with respect to the costs of safety and security measures, effectively eliminate the role Congress intended the Commission to play in determining just and reasonable rates and, instead, place that role in the hands of the providers and facilities.[1290] While correctional authorities certainly have expertise on safety and security as a general matter, Congress has not vested the authority in them to decide which safety and security costs should be recoverable in IPCS rates—and a contrary reading of section 3(b)(2) that took the issue of safety and security cost recovery through regulated IPCS rates out of the Commission's hands and placed it in the control of providers and facilities would raise private nondelegation concerns.[1291] We consequently reject arguments that section 3(b)(2) of the Martha Wright-Reed Act requires recovery of all costs associated with safety and security measures in regulated IPCS rates.

          **(ii)**       **The Scope of "Safety and Security Measures" under Section 3(b)(2) of the Martha Wright-Reed Act**

    363.    Section 3(b)(2) of the Martha Wright-Reed Act requires us to consider costs "associated with any safety and security measures necessary to provide" IPCS.[1292] In the *2023 IPCS Notice*, the Commission sought comment on whether it "should interpret the Martha Wright-Reed Act's use of the term 'safety and security' as having the same or different meaning as the term 'security and surveillance' previously used in this proceeding."[1293] The Commission has at different times variously referred to the universe of measures at issue as "security measures," "security features," "monitoring," "security monitoring," and "security and surveillance."[1294] The record before us is mixed. One commenter suggests that "safety and security" differs from "security and surveillance" such that "it relieves the Commission of considering surveillance measures at all."[1295] Others argue that "[t]he Commission should not interpret 'safety and security' to mean something different than the term 'security and surveillance'

---

should give considerable weight to correctional agency's findings regarding what is necessary. But Securus does not suggest that the Commission give preclusive weight to such findings.").

[1290] Worth Rises May 8, 2023 Comments at 7 ("The Commission must apply healthy skepticism when IPCS providers claim that a safety or security measure is used and useful to IPCS ratepayers. IPCS ratepayers are incarcerated people and their loved ones, not correctional or law enforcement authorities. The Commission must only consider the position and perspective of IPCS ratepayers when determining whether a measure is used and useful and can be included in rates.").

[1291] The Constitution limits the government's ability to empower a private entity "to regulate the affairs" of other private parties. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). The Constitution permits such an assignment of authority only if the entity "function[s] subordinately" to a federal agency and is subject to the agency's "authority and surveillance." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). Of course, correctional authorities remain free to determine and implement whatever safety and security measures they deem appropriate at the correctional facility. Contrary to assertions made by FDC, nothing in this Report and Order prevents facilities from implementing the safety and security measures of their choice. FDC July 11, 2024 *Ex Parte* at 2. But under the statutory scheme, it is for the Commission to determine any extent to which the costs of such measures are recoverable through regulated IPCS rates.

[1292] Martha Wright-Reed Act § 3(b)(2).

[1293] *2023 IPCS Notice*, 38 FCC Rcd at 2691, para. 55.

[1294] *2002 Pay Telephone Order*, 17 FCC Rcd at 3276, para. 72; *2013 ICS Order*, 28 FCC Rcd at 14109, 14134, paras. 2, 53 & n.196; *2021 ICS Order*, 36 FCC Rcd at 9585, para. 148.

[1295] Worth Rises May 8, 2023 Comments at 2-3 ("The language of the Act limits what the Commission must consider as it relates to security and surveillance costs and compares to what the Commission previously considered—it relieves the Commission of considering surveillance measures at all. The ordinary and fair meaning of neither safety nor security includes or implies surveillance.").

previously used in the Commission's IPCS proceedings."[1296]

364.    We find that the best interpretation of the two phrases is that the "security and surveillance" measures of the sort that historically have been the focus of this proceeding fall within the scope of "safety and security" measures under section 3(b)(2), and that we need not go further at this time to more precisely define whether the two phrases are coextensive.  The services previously at issue in the *Inmate Calling Services* proceeding, such as call blocking, recording, and monitoring, are now before us for consideration, and fit within the scope of "safety and security."  Although there is no express reference to "surveillance" measures in section 3(b)(2), the Commission not only has considered such costs in the proceedings that formed the backdrop for the Martha Wright-Reed Act, but at times suggested that "security and surveillance" measures collectively could be seen as involving "security."[1297]  Against that backdrop—and absent more detailed textual arguments that the language "safety and security" should not be read to encompass surveillance of the sort we historically have considered—we find such surveillance measures fall within the scope of "safety and security measures" under section 3(b)(2) of the Martha Wright-Reed Act.  Because we do, in fact, consider the relevant cost evidence in the record here that even arguably could fall within the scope of costs of "safety and security measures" under section 3(b)(2), we find it unnecessary to more precisely define the ultimate scope and contours of that statutory language at this time.

> **(iii)    Which "Safety and Security Measures" Are "Necessary To Provide" IPCS under Section 3(b)(2) of the Martha Wright-Reed Act**

365.    Section 3(b)(2) of the Martha Wright-Reed Act mandates that, in "promulgating regulations necessary to implement this Act and the amendments made by this Act" and "determining just and reasonable rates," the Commission "shall consider costs associated with any safety and security measures necessary to provide" IPCS.[1298]  In the *2023 IPCS Notice*, the Commission requested comment on how it should interpret the term "necessary."[1299]  Consistent with judicial precedent interpreting other statutory uses of the term "necessary," we interpret the term "necessary" in section 3(b)(2) to mean "that which is required to achieve a desired goal."[1300]  Commenters generally support this interpretation.[1301]

---

[1296] ViaPath May 8, 2023 Comments at 12 & n.54; *see* National Sheriffs' Association July 12, 2023 Reply at 8 ("NSA believes surveillance fits comfortably within the rubric of safety and security measures.").

[1297] *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9586, para. 150 (noting the difficulty in segregating recoverable from unrecoverable "security and surveillance costs" and going on to state that "[i]n the absence of an ability to distinguish or quantify *security* cost duplication at this time" the issue would be subject to further comment (emphasis added)); *2020 ICS Notice*, 35 FCC Rcd at 8523, para. 107 (seeking comment on recovery of "correctional facilities' security and surveillance costs" and going on to note that "correctional facilities do not pass on the costs of *other types of security measures*" (emphasis added)); *see also 2021 ICS Notice*, 36 FCC Rcd at 9664-65, para. 323 (characterizing a commenter as having identified a need for "security . . . providing the facility with the ability to monitor and record calls").

[1298] Martha Wright-Reed Act § 3(b), (b)(2).

[1299] *2023 IPCS Notice*, 38 FCC Rcd at 2690, para. 53.

[1300] *GTE Serv. Corp.*, 205 F.3d at 423 ("As is clear from the Court's judgment in *Iowa Utilities Board*, a statutory reference to 'necessary' must be construed in a fashion that is consistent with the ordinary and fair meaning of the word, *i.e.,* so as to limit 'necessary' to that which is required to achieve a desired goal.") (citing *AT&T Corp. v. Iowa Util. Board*, 525 U.S. 366, 389-90 (1999)).

[1301] Commenters rely on both judicial precedent and dictionary definitions of the term "necessary."  Worth Rises May 8, 2023 Comments at 3 (citing *GTE Serv. Corp.* and arguing that the word "necessary" is more limited than "used and useful" and "must be interpreted according to its ordinary and fair meaning"); ViaPath May 8, 2023 Comments at 12 (explaining that "[t]he 'ordinary and fair' meaning of the term 'necessary' is that which is required to achieve a desired goal, and a measure may be 'necessary' even though acceptable alternatives have not been

(continued….)

366.    Securus points out that this interpretation of "necessary" "requires identification of a desired goal."[1302]  We agree and find that the Martha Wright-Reed Act identifies the "desired goal."[1303]  In pertinent part, section 3(b) of the Martha Wright-Reed Act states that in "determining just and reasonable rates," the Commission "shall consider costs associated with any safety and security measures necessary to provide" IPCS.[1304]  Those IPCS services, in turn, are "telephone service and advanced communications services."[1305]  Based on this language, we conclude that, for a safety and security measure to be necessary, it must be required "for the provision of telephone service and advanced communications services to incarcerated people."[1306]  In other words, for a safety and security measure to be necessary, it must be required for the provision of communications services in correctional institutions.[1307]

367.    Some commenters claim that the goal of safety and security measures "is to prevent communications services from being used to commit or facilitate potential crimes, fraud, or other abuses."[1308]  We do not dispute, and indeed the Commission has long recognized, that communications

---

exhausted"); Public Interest Parties May 8, 2023 Comments at 23 (arguing, on the basis of the Black's Law Dictionary definition of "necessary," that "something is necessary if it *must exist* and *cannot be avoided*") (emphasis in original).

[1302] Securus May 8, 2023 Comments at 37; *see also* Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC and Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 8 (filed June 10, 2024) (Securus and Pay Tel June 10, 2024 *Ex Parte*) (explaining that Securus and Pay Tel "do not disagree that the term 'necessary' must be defined in the context of achieving a desired goal").

[1303] *See, e.g.*, *CTIA v. FCC*, 330 F.3d 502, 510-11 (D.C. Cir. 2003) ("We do not read *Iowa Utilities Board* or *GTE Service Corp.* to suggest that 'necessary' has precisely the same meaning in every statutory context, or that context is irrelevant to the meaning of 'necessary.'") (emphasis omitted); *Cellco P'ship v. FCC*, 357 F.3d 88, 96 (D.C. Cir. 2004) ("The term 'necessary' is a chameleon-like word whose meaning, as Verizon Wireless acknowledges, may be influenced by its context.").

[1304] Martha Wright-Reed Act § 3(b).

[1305] *Id.* § 3(b)(1).

[1306] Worth Rises May 8, 2023 Comments at 3.

[1307] *Id.* ("[F]or a security and surveillance measure to be necessary it must be required or indispensable for the provision of telephone service and advanced communications services to incarcerated people.  In other words, without the safety or security measure the provision of such services would be hindered.  Importantly, this interpretation of necessary centers largely on technology and not on policies that may interfere with the provision of such services. . . . Safety and security measures can only be determined to be necessary if they are required or indispensable to the provision of telephone services and advanced communications services."); Raher May 8, 2023 Comments at 16 ("A leading example of properly recoverable expenses is the cost of protecting networked IPCS systems from malicious online threats—such costs are necessary to the provision of IPCS because without such security, systems might fail and thus be unable to connect calls.").

[1308] Securus May 8, 2023 Comments at 37; *see also* Securus and Pay Tel June 10, 2024 *Ex Parte* at 8 (arguing that "in the context of determining necessary safety and security measures, the goal is to ensure that IPCS services are not being used to commit crimes or otherwise abuse available communications services"); ViaPath July 11, 2024 *Ex Parte* at 3; Pay Tel July 9, 2024 *Ex Parte* at 7 (explaining that "IPCS is a specialized communications service, which is specifically designed to meet the safety and security needs of confinement facilities").  Commenters focusing on the relationship between safety and security measures and the commission of crimes using IPCS fail to acknowledge the benefits that increased communications have on the incarcerated population and the resulting impact on facility safety.  *E.g.*, Charleston Listening Session at 25:15-24 (Brian Howard opining that if communication "was affordable and easy for a resident to be able to call his family. . . more than half that population that may be using illegal cell phones wouldn't have the need to do that"), 35:2-11 (Deon Nowell explaining that increased communication with families results in "much less stress that we don't take out on each other.  It will probably be less—I mean, honestly it will probably be less stabbings, less cell phones.  If we could lower the rates, if we could make an impact from the inside out, the men would have the help they would need, calling their lawyers, right,

(continued….)

services for incarcerated people occur in a unique context that "implicate[] important security concerns."[1309]  To that end, the Commission has recognized that there are certain features that ensure these communications services are available to incarcerated people and can be used safely.[1310]  The Martha Wright-Reed Act envisions such an outcome by directing the Commission to consider safety and security measures "necessary to provide" communications services "in correctional institutions."[1311]

368.    We part ways with ViaPath and other commenters who assert that *all* safety and security measures are necessary to provide IPCS.[1312]  The Act's use of the limiting term "necessary" implies that Congress did not intend all safety and security measures would be treated as necessary but rather implicitly suggests some limitation on the scope of measures the Commission is to consider.  Thus, while we do not dispute the notion that the general goal of safety and security measures is to ensure that IPCS are used safely, it does not follow that any and all safety and security measures are necessary to achieve that goal as Securus and others would suggest.[1313]

---

calling their parents, calling their children"); *see* Phoenix Listening Session at 34:9-18 (Rosalind Akins warning that when families cannot afford communications, "it forces inmates to break rules because they will say will you three-way me to someone else.  You're putting them in some precarious positions because families cannot afford [communications]."), 41:10-15 (Omar Thomas revealing that because he could not afford regular communication with his family, when "I found out that my parents were ill, and I wasn't gonna wait on the letter to find out that they died.  I needed to be in touch.  And so I did what I had to do, circumvent everything in the prison system to get an iPhone.  And I only used it to communicate with my family.").

[1309] *See, e.g., 2002 Pay Telephone Order*, 17 FCC Rcd at 3276, para. 72.

[1310] *Id*.

[1311] Martha Wright-Reed Act § 3(b)(2); 47 U.S.C. § 276(d); Worth Rises May 8, 2023 Comments at 3 (explaining that the "desired goal, as prescribed by Section 3(b)(2) of the Martha Wright-Reed Act, is 'to provide [telephone service and advanced communications services to incarcerated people]'") (quoting Martha Wright-Reed Act § 3(b)(2)); *see also* Worth Rises July 12, 2023 Reply at 1 (asserting that Securus's view of the statutory goal as "utterly unsupported and inconsistent with the Commission's basic mandate with regard to IPCS").

[1312] ViaPath July 12, 2023 Reply at 4-5 ("[T]he MWR Act requires the Commission to consider costs associated with *any* safety and security measures necessary to provide the required IPCS and advanced communications services.") (emphasis added); National Sheriffs' Association May 8, 2023 Comments at 3-4 ("The fact that a security or safety measure is implemented in connection with IPCS service makes it a recoverable cost."), 9 (alleging that the Commission is "required to treat *all* safety and security costs identified by providers . . . as costs recoverable through rates for communications services for incarcerated people") (emphasis added); Pay Tel July 9, 2024 *Ex Parte* at 18 (arguing that "[a]uthorizing full recovery of vendor safety and security costs will ensure that public safely is not compromised").

[1313] Securus May 8, 2023 Comments at 38 ("Safety and security features such as monitoring, restricting numbers that can be called, preventing call forwarding or three-way conversations, biometrics, recording and storage features are all necessary to achieve the safe use of communications services in carceral settings."); *see* National Sheriffs' Association May 8, 2023 Comments at 4, 10-11; ViaPath May 8, 2023 Comments at 12-13.  We find certain commenters' invocation of "contraband devices" in connection with its discussion of safety and security for IPCS to be inapt.  *See* National Sheriffs' Association July 12, 2023 Reply at 12 (implying that contraband devices demonstrate the need for safety and security measures in connection with IPCS); Securus and Pay Tel June 10, 2024 *Ex Parte* at 3-4 (stating that, in some cases, incarcerated people use contraband cell phones to engage in criminal activity); Pay Tel June 18, 2024 *Ex Parte* at 2.  The issue of contraband devices in correctional institutions is the subject of a separate proceeding at the Commission and is unrelated to our implementation of the Martha Wright-Reed Act or the consideration of the costs of necessary safety and security measures for inclusion in just and reasonable rates for IPCS.  *See, e.g., Promoting Technological Solutions to Combat Contraband Wireless Device Use In Correctional Facilities*, GN Docket No. 13-111, Second Report and Order and Second Further Notice of Proposed Rulemaking, 36 FCC Rcd 11813 (2021).  Nevertheless, the record suggests that one of reasons for the proliferation of contraband devices are the high IPCS rates that the families of incarcerated people cannot afford to pay.  Charleston Listening Session at 25:22-24 (explaining that "more than half" of the people using contraband cell phones would not need to do so if IPCS rates were affordable).  We similarly find inapposite the National Sheriffs'

(continued….)

369.    Although commenters that address the interplay between the "necessary" standard and "used and useful" framework contend that "necessary" is more limited than "used and useful,"[1314] we need not resolve that ultimate interplay here.[1315]  Consistent with our conclusion in the prior section regarding the interpretation of "safety and security," we have no need to more precisely define the ultimate scope and contours of the statutory language "necessary" at this time because we do, in fact, consider the relevant cost evidence in the record here that even arguably could fall within the scope of costs of safety and security measures required to be considered as "necessary" under section 3(b)(2).[1316]

---

Association's contention that because "security and safety measures protect inmates by reducing crime within the facility," such services are necessarily related to the provision of IPCS.  National Sheriffs' Association July 12, 2023 Reply at 13; *see* FDC July 11, 2024 *Ex Parte* at 4-5.  Finally, we find inapposite some providers' contentions that the Commission has rejected the protection of the public as a permissible safety and security function.  *See* Pay Tel July 9, 2024 *Ex Parte* at 7 & n.31 (citing section 1 of the Communications Act, 47 U.S.C. § 151, which establishes the Commission in part for the promotion of "safety of life and property"); Securus July 11, 2024 *Ex Parte* at 26.  While section 1 of the Communications Act makes clear that the Commission was created to promote the public safety, among other purposes, those other purposes include "mak[ing] available, so far as possible . . . communication service . . . at reasonable charges" and promoting "the national defense."  47 U.S.C. § 151.  It does not follow that in mandating that we ensure just and reasonable rates and charges for all incarcerated people's communication services and that we promote the "widespread deployment of payphone services to the benefit of the general public," 47 U.S.C. § 276(b)(1), Congress intended that IPCS consumers should finance any measure that generally promotes public safety or the national defense.  Instead, we think that Congress intended a narrower focus, one in which we determine which costs IPCS consumers can justly and reasonably be required to finance.  That type of determination is one well known to the Commission and under which we must evaluate different types of capital costs and expenses to determine which are recoverable through regulated rates.

[1314] Worth Rises May 8, 2023 Comments at 3; Raher May 8, 2023 Comments at 16 (arguing that the "necessary" standard in the Martha Wright-Reed Act is "even more restrictive than the concepts of 'used and useful,' or 'directly related to the provision of telecommunications service'").

[1315] Although we agree with commenters that *GTE Serv. Corp.* is relevant precedent regarding the interpretation of the term "necessary" in a statute, we are not persuaded that it resolves the question of the interplay between "necessary" in section 3(b)(2) of the Martha Wright-Reed Act and the "used and useful" standard we employ when setting just and reasonable rates.  *See, e.g.*, Worth Rises May 8, 2023 Comments at 3 (discussing *GTE Serv. Corp.*); Securus July 11, 2024 *Ex Parte* 10-11.  We see no indication on the face of that opinion that the Commission's use of the terminology "used or useful" in assessing whether collocation obligations should apply under section 251(c)(6) of the Communications Act was intended to draw upon, or overlap with, the "used and useful" analysis historically employed in the ratemaking context.  *See, e.g.*, *GTE Serv. Corp.*, 205 F.3d at 422.  Independently, the D.C. Circuit subsequently has read *GTE Serv. Corp.* (as well as *Iowa Util. Board*) as fully consistent with the notion that the statutory context is relevant when interpreting the term "necessary."  *CTIA*, 330 F.3d at 510-11.  And without definitively resolving the interplay of terms, we note that in a statutory context where Congress has directed the Commission to merely "consider" certain costs when setting just and reasonable rates, it would not be an absurd result for the universe of costs subject to consideration to be broader than the universe of costs ultimately allowed for recovery in regulated rates.  Thus, although we find *GTE Serv. Corp.* to be relevant to the interpretation of "necessary" in a general way, we are not currently persuaded to rely on it in the more specific manner that some commenters have advocated.  We disagree with Securus's claim that by not reaching a determination on which safety and security costs are "necessary" to the provision of IPCS, we have somehow "render[ed] the entire 'necessary' provision found at section 3(b)(2) of the MWR Act superfluous."  Securus July 11, 2024 *Ex Parte* at 11.  As we have just explained, by considering *all* safety and security costs, it necessarily follows that we have complied with the Martha Wright-Reed Act's mandate that we "consider costs associated with any safety and security measures necessary to provide" IPCS in setting just and reasonable rates.  Martha Wright-Reed Act § 3(b)(2).  Our mode of "considering" such costs via the "used and useful" framework thus is distinct from the identification of the universe costs to be considered in the first instance—and our approach therefore does not conflate the terms "necessary" and "used and useful" as Securus contends.  *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 11-12.

[1316] *See supra* Section III.D.7.b.ii (The Scope of "Safety and Security Measures" under Section 3(b)(2) of the Martha Wright-Reed Act).  Because we evaluate the costs of all safety and security measures that could arguably fall within the scope of the term "necessary," we do not opine on the necessity of safety and security measures that correctional

(continued….)

Stated differently, the cost of any safety and security measure that even arguably could be viewed as necessary to the provision of IPCS—under any understanding of "necessary"—is a cost that we evaluate, and reach a reasoned decision about, under the used and useful framework that we employ to determine just and reasonable IPCS rates in this Report and Order.

### (iv)    Consideration of Safety and Security Costs Under the Used and Useful Framework

370.    While section 3(b)(2) of the Martha Wright-Reed Act requires us to "consider" certain safety and security costs when determining just and reasonable rates,[1317] as we explain above, we employ the "used and useful" framework to determine what costs and expenses can be recovered through just and reasonable IPCS rates.[1318]  Consequently, our consideration of safety and security costs as required by section 3(b)(2)—and with respect to other safety and security costs raised in the record—occurs within the context of that "used and useful" analysis.  In particular, we rely on the "used and useful" framework and its associated prudent expenditure standard to assess which costs should be included in the rate caps we adopt to determine just and reasonable IPCS rates.[1319]  In applying the used and useful standard, we consider whether a cost "promotes customer benefits, or is primarily for the benefit of the carrier,"[1320] as well as whether that cost was prudently incurred.[1321]

371.    Since 2002, the Commission has recognized the need to "balance the laudable goal of making calling services available to inmates at reasonable rates, so that they may contact their families and attorneys, with necessary security measures and costs related to those measures."[1322]  Security measures that might have "the unintended, and perhaps unnecessary, effect of increasing the costs incurred by inmates and their families" have long concerned the Commission, as has the lack of data to

---

facilities may implement.  FDC July 11, 2024 *Ex Parte* at 4 (suggesting that the "Commission lacks authority to evaluate the necessity of safety and security measures implemented by FDC in relation to IPCS").

[1317] Martha Wright-Reed Act § 3(b)(2).

[1318] *See supra* Sections III.C.3.a (Addition of the "Just and Reasonable" Standard to Section 276(b)(1)(A)) and III.D (Rate Caps).

[1319] *See, e.g.*, Worth Rises May 8, 2023 Comments at 3, 5; Worth Rises July 12, 2023 Reply at 2; EPIC June 6, 2023 Reply at 4; Public Interest Parties July 12, 2023 Reply at 9 & n.28; *see* Leadership Conference July 12, 2023 Reply at 3; DARE July 10, 2024 *Ex Parte* at 2.

[1320] *2021 ICS Order*, 36 FCC Rcd at 9575, para. 126 (quoting *Establishing Just and Reasonable Rates for Local Exchange Carriers*, 22 FCC Rcd at 17997, para. 19 & n.47); Public Interest Parties July 12, 2023 Reply at 9.  There are several elements of the Commission's used and useful analysis.  First, the Commission considers the need to compensate providers "for the use of their property and expenses incurred in providing the regulated service." *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 111).  Second, the Commission looks to the "equitable principle that ratepayers should not be forced to pay a return except on investments that can be shown to benefit them."  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (citing *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 112).  In this regard, the Commission considers "whether the expense was necessary to the provision of" the services subject to the "just and reasonable" standard.  *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7.  And third, the Commission considers "whether a carrier's investments and expenses were prudent (rather than excessive)."  *Id.* (citing *1990 AT&T Tariff Investigation Order*, 5 FCC Rcd at 5695, para. 17).  We note that in considering whether expenses are "necessary to the provision of" the services subject to the "just and reasonable standard," the used and useful framework accords with the Commission's prior analysis of safety and security measures which sought to determine the extent to which those measures were "directly related to the provision of IPCS."

[1321] *1994 Cable Rate Regulation Order*, 9 FCC Rcd at 4546-67, para. 39; *see also id.* at para. 40 & n.67 (explaining that the Commission was employing the used and useful and prudent investment standards it long had applied in the common carrier context); Wright Petitioners May 8, 2023 Comments at 11 (explaining that "investments must be 'prudent' even if otherwise 'used and useful'").

[1322] *2002 Pay Telephone Order*, 17 FCC Rcd at 3276, para. 72.

properly analyze these costs.[1323]  For years, stakeholders have debated whether various safety and security measures are part of inmate calling services, as certain providers and the National Sheriffs' Association contend,[1324] or are "not related to the provision of communication service" and of "no benefit to consumers."[1325]  Prior deficiencies in the record, including the absence of any meaningful data on the costs incurred in providing safety and security measures, have prevented the Commission from determining the extent to which safety and security costs may be recovered through inmate calling services rates.[1326]

372.    We now have a sufficiently robust record to apply the used and useful framework for the first time to the safety and security measures that providers and the National Sheriffs' Association claim are part of IPCS and to quantify, to the extent the data permit, the costs providers and facilities incur in implementing those safety and security measures.[1327]  Though far from perfect, that record allows us to establish zones of reasonableness that capture, for each rate cap tier, the approximate range within which the providers' and facilities' used and useful safety and security fall.[1328]  The record provides discrete data on the costs providers claim to incur in providing seven categories of safety and security measures and allows us to make reasoned decisions about whether the measures in each category are generally used and useful in the provision of IPCS.[1329]  And the record allows us to compensate for the imprecisions in the data before us—regarding both providers' and facilities' costs of providing used and useful safety and security measures—in selecting "just and reasonable" rate caps from within the zones of reasonableness. The record before us now thus provides far greater detail on the nature and purposes of the safety and security measures that providers deploy, the extent of that deployment, and the measures' underlying costs than was previously available to the Commission.  Consistent with this expanded record, our analysis builds upon and, in certain instances where appropriate, departs from the Commission's prior analyses of safety and security measures in the inmate calling services context.

373.    As discussed below,[1330] application of the used and useful framework to the safety and security costs that providers and the National Sheriffs' Association claim are IPCS costs helps us balance the need to ensure reasonable recovery of providers' investments and expenses used in providing IPCS with the requirement that we provide for recovery through regulated rates when the costs incurred are used and useful to the provision of IPCS and therefore promote customer benefits.[1331]  In allowing, within the limits of the record before us, only those investments and expenses which are used and useful to be

---

[1323] *Id.* at 3278, para. 78; *2021 ICS Order*, 36 FCC Rcd at 9586, para. 148.

[1324] *2021 ICS Order*, 36 FCC Rcd at 9585, para. 148 (citing ViaPath's and the National Sheriffs' Association's comments).

[1325] *Id.* (citing multiple public interest groups' comments).

[1326] *Id.* at 9585, paras. 148-50.

[1327] 47 U.S.C. § 276(b)(1)(A).

[1328] *See infra* Section III.D.7.c.i (Application of the Used and Useful Framework).

[1329] *See id.*

[1330] *See id.*

[1331] *See AT&T Phase II Order*, 64 F.C.C.2d at 38, paras. 111-12; Worth Rises May 8, 2023 Comments at 3, 5; Worth Rises July 12, 2023 Reply at 2; EPIC June 6, 2023 Reply at 4; Public Interest Parties July 12, 2023 Reply at 9 n.28; *see also* Leadership Conference July 12, 2023 Reply at 3.  Securus criticizes the Commission's application of the used and useful framework to safety and security costs as being solely focused on whether a given cost or expense benefits IPCS consumers.  Securus July 11, 2024 *Ex Parte* at 17.  We disagree.  As previously explained, application of the used and useful framework balances the need to ensure that IPCS providers receive reasonable recovery of their investments and expenses in providing IPCS with the need to ensure that ratepayers bear only the costs of providing the regulated service to them.  This is what we do here in evaluating all of the safety and security costs IPCS providers have reported and determining the extent to which tasks associated with those costs provide a benefit to IPCS consumers such that they may be recovered through regulated rates.

recovered from ratepayers, we "ensure that current ratepayers bear only legitimate costs of providing service to them."[1332]  As one commenter explains, "[t]he Commission has applied the used and useful standard for decades when considering whether a provider can recover costs for an asset or service, or in this case, necessary safety and security measures."[1333]  This is particularly relevant with regard to the safety and security measures that providers furnish pursuant to their contracts with correctional institutions, the purposes and scope of which have evolved from simply facilitating the provision of voice communications in correctional institutions to broader measures designed to detect potential criminal activity and enforce the criminal laws, among other non-communications purposes.[1334]  For example, in responses to the 2023 Mandatory Data Collection, when asked to describe various safety and security measures, providers explain how these measures assist law enforcement in investigating potential criminal activity and building cases, create reports for facilities and law enforcement, analyze data, and store records for use in court.[1335]  Securus makes clear that its subpoena and warrant services respond to

---

[1332] *See, e.g.*, *Investigation of Special Access Tariffs of Local Exchange Carriers* at *8, para. 35; *Tenn. Gas Pipeline Co.*, 606 F.2d at 1109 (interpreting the "used and useful" standard to mean that "current rate payers should bear only legitimate costs of providing service to them").

[1333] Worth Rises May 8, 2023 Comments at 5; Worth Rises July 12, 2023 Reply at 2 (urging that the Commission "apply the used and useful standard to determine that safety and security measures are not recoverable through IPCS rates"); *see* EPIC June 6, 2023 Reply at 5 (contending that "[t]he ratepayer should not be charged for functionality that is neither used nor useful by them in the course of their call or advanced communication").

[1334] *See* Worth Rises May 8, 2023 Comments at 6 (contending that "[l]aw enforcement support services are not useful to incarcerated people and their loved ones, but instead used and useful to law enforcement").

[1335] Combined Public Communications, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 15 (filed Oct. 31, 2023) (Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template) ("Combined Public Communications processes subpoenas, records requests, and FOIA requests as a courtesy service to our customers."); NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 33-34 {[(

]}; Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 22 {[

]}; Prodigy Solutions, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 14 (filed Oct. 30, 2023) (Prodigy Oct. 30, 2023 Response to 2023 Mandatory Data Collection Word Template) {[ ("

]}; Global Tel*Link Corp. d/b/a/ ViaPath, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 33-34 (filed Oct. 31, 2023) (ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template); Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 41 {[

]}, 42 {[

]}; Smart Communications, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 16 (filed Oct. 31, 2023) (Smart Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template) {[

]}; *see* AJA July 10, 2024 *Ex Parte* at 3 (explaining AJA uses revenues from communications to "identify[] emerging gang affiliations" and detect[] patterns of radicalization," how "this information informs law enforcement strategies" including "those required by local, state and federal agencies," how this "revenue stream [from IPCS] enables jails to employ skilled analysts who sift through vast amounts of data, providing actionable insights" that "prevent[] crimes before they occur and greatly assist in solving crimes that have occurred").

requests by "prosecutors, investigators, district attorneys, police officers, [and] detectives."[1336]

374.    The record is replete with examples of costly services that are unrelated (or only marginally related) to providing IPCS and thus provide no (or only marginal) benefits to ratepayers in their capacity as consumers of IPCS.[1337]  Safety and security measures that do not facilitate the provision of underlying communications services in correctional institutions are not used and useful.  While law enforcement, correctional facilities, and the public at large may benefit from these measures, the Martha Wright-Reed Act mandates that we ensure just and reasonable IPCS rates for incarcerated people and their loved ones.  Allowing the costs of measures that are not used and useful in the provision of IPCS to be recovered through IPCS rates would be inconsistent with that mandate.  Similarly, the costs of safety and security measures that provide a dual purpose—that are both used and useful in providing IPCS and in furthering another purpose—should be borne by both ratepayers and facilities.

375.    Although the Commission has historically recognized that safety and security measures were, at least in some sense, inherent in providing communications services for incarcerated people,[1338] it has been clear from the outset that only certain safety and security costs should be recovered through regulated rates.[1339]  In the *2013 ICS Order*, for example, the Commission determined that recovery of the costs of safety and security measures should be limited to "costs that are reasonably and directly related to the provision of ICS" and indicated that such recovery "would likely include . . . costs associated with security features relating to the provision of ICS," but that "costs relating to general security features of the correctional facility unrelated to ICS" would be excluded.[1340]  The Commission did not then and has not since made a determination of which safety and security measure costs should be recoverable in IPCS rates.  We therefore reject Securus's suggestion that "Commission precedent is crystal clear that the costs of safety and security measures such as recording, monitoring, biometrics, and related services are

---

[1336] Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 41.

[1337] Worth Rises July 12, 2023 Reply at 2; EPIC June 6, 2023 Reply at 4 ("EPIC agrees that there is compelling evidence that these tools are not necessary for the provision of telephone (or advanced communications) service, and urges the Commission to employ its 'used and useful (to ratepayers)' standard when determining what should be paid by incarcerated persons and by those who wish to remain in contact with them—this will further avoid conflating what the facility deems is necessary to its safe and secure operation with what is technologically necessary to connect a phone call or other communication safely and securely."); Leadership Conference July 12, 2023 Reply at 3 ("[I]ncarcerated people and their loved ones should not be forced to subsidize services they do not want or are the responsibility of the incarcerating institution."); DARE July 10, 2024 *Ex Parte* at 2 (same); *see e.g.*, Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 22 {[

                                                                                                                            ]}; Inmate Calling Solutions, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 16 (filed Nov. 2, 2023) (ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template) {[
                                                                                                                ]}; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 36 {[

                                                                                                            ]}.

[1338] *2013 ICS Order*, 28 FCC Rcd at 14109, para. 2.

[1339] *2002 Pay Telephone Order*, 17 FCC Rcd at 3276, para. 72 (allowing recovery of only those safety and security costs that are related to the provision of inmate calling services); *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53.

[1340] *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53.  This dichotomy has remained a staple of Commission decisions attempting to "balance[e] the unique security needs related to providing telecommunications service in correctional institutions," with the statutory requirements of fair compensation for providers, and, to the extent interstate and international audio services were involved, just and reasonable rates for consumers and providers. *2015 ICS Order*, 30 FCC Rcd at 12775, para. 21; *2002 Pay Telephone Order*, 17 FCC Rcd at 3252, 3276, paras. 9, 72; *2013 ICS Order*, 28 FCC Rcd at 14109, para. 2; *2021 ICS Order*, 36 FCC Rcd 9585, para. 148.

inherent in the provision of communications services to the incarcerated."[1341]  The mandate in section 276(b)(1)(A) that we ensure just and reasonable rates for consumers, in conjunction with the Martha Wright-Reed Act's requirements that we consider safety and security costs "necessary" to the provision of IPCS, requires that we reevaluate this precedent at any rate.

376.    In arguing that all safety and security costs must be recoverable through IPCS rates, some commenters ignore the context of the Commission's prior discussion of safety and security measures.[1342] Instead, they rely on the fact that the Commission has previously recognized the relationship between safety and security measures and IPCS, but ignore that this relationship was always predicated on a direct link to the provision of the underlying communications service.[1343]  Thus, while the Commission has previously recognized that communications services for incarcerated people "implicate[] important security concerns,"[1344] and that "costs associated with security features relating to the provision of ICS" *may* constitute recoverable costs,[1345] the Commission has never concluded that the costs of all—or even a substantial portion—of the safety and security measures that providers often voluntarily choose to offer or correctional facilities may choose to require should be recovered from consumers.  On the contrary, while the precise formulation for inclusion has varied, Commission precedent establishes that only the costs of those safety and security measures with a sufficient nexus to the provision of IPCS should be recovered through inmate calling services rates.[1346]  Allowing recovery of the costs associated with all safety and security measures that providers decide to offer or that facilities choose to deploy would be inconsistent with that precedent and, more broadly, with the requirement that our compensation plan for IPCS ensure "just and reasonable" rates and charges.

377.    We similarly find overbroad Securus's suggestion that we must "include safety and security costs in IPCS rates absent a finding that those costs bear no relation to the provision of telephone or video services."[1347]  As an initial matter, nothing in the statute suggests such a presumption.  In fact, the statute implies the opposite—while it requires the Commission to consider these costs, in doing so, it gives the Commission latitude to exercise its judgment regarding the ultimate just and reasonable rate determination.[1348]  Securus's approach also incorrectly presumes that any cost that a provider or a

---

[1341] Securus May 8, 2023 Comments at iii.

[1342] *Id.* (suggesting that Commission precedent has already determined that the costs of safety and security measures such as recording, monitoring, biometrics and related services are recoverable in IPCS rates because "[n]othing has changed to overturn this precedent"); Securus and Pay Tel June 10, 2024 *Ex Parte* at 1 (arguing that the Commission "has consistently found that safety and security measures are necessary to provision incarcerated people's calling services" and that "[n]othing has changed since these determinations were made").

[1343] *See, e.g.*, Securus May 8, 2023 Comments at 35 (arguing that the Commission has found that safety and security costs are "inherent" in IPCS); Securus July 12, 2023 Reply at 20 (noting that "the Commission has consistently found safety and security measures integral to the provision of IPCS and, accordingly, that their costs must be included in IPCS rates"); Pay Tel May 8, 2023 Comments at 14 ("The Commission has explicitly recognized the relationship between security and ICS, including the need to support cost recovery for ensuring the security of the service."); ViaPath May 8, 2023 Comments at 12-13.

[1344] *See, e.g., 2002 Pay Telephone Order*, 17 FCC Rcd at 3276, para. 72.

[1345] *2013 ICS Order*, 28 FCC Rcd at 14134-35, para. 53 & n.196.

[1346] *Id.* at 14134-35, para. 53.

[1347] Securus May 8, 2023 Comments at 34 (contending that, with the Martha Wright-Reed Act, "Congress thus has sent a strong signal to the Commission that it include safety and security costs in IPCS rates absent a finding that those costs bear no relation to the provision of telephone or video services").

[1348] Thus, we agree with Securus that the Commission does not have "unfettered discretion to reject necessary costs."  Securus July 11, 2024 *Ex Parte* at 13.  And we do not reject any necessary costs that also satisfy the used and useful standard.  As we explain above, we consider all cost evidence in the record regarding any safety and security measures that could be viewed as necessary to the provision of IPCS, under any understanding of the term

(continued….)

**Federal Communications Commission**  **FCC 24-75**

correctional institution reports as having been incurred for safety and security measures must automatically be included in our rate cap calculations. We find instead that those calculations should reflect, to the extent the record permits us to make such a determination, only those costs that we affirmatively find are used and useful in the provision of IPCS. More fundamentally, Securus's test would require IPCS consumers to bear the full costs of safety and security measures that are not directly related to the provision of IPCS, but rather are more related to the costs of incarceration generally, or are used principally for broader law enforcement or investigative purposes.

378.     To the extent correctional facilities contract with IPCS providers for safety and security measures that do not facilitate the provision of communications services, the costs of those measures should not be passed on to IPCS consumers.[1349] For example, customized reports for correctional facilities, long term storage of recordings of communications, creating searchable databases of these recordings, and voice biometrics that are used for law enforcement purposes are measures that facilitate law enforcement but are not required to restrict communications to permitted individuals.[1350] If they were unavailable, incarcerated people would still be able to place telephone calls or use advanced communications because these safety and security measures serve almost exclusively law enforcement functions.[1351] As the United Church of Christ and Public Knowledge explain, "[t]he customer of carceral

---

"necessary." We evaluate those costs under our traditional used and useful ratemaking standard to determine the extent to which those costs are recoverable from IPCS consumers through regulated rates.

[1349] UCC and Public Knowledge May 9, 2023 Comments at 12 ("Just because a carceral facility contracts for security and monitoring services with the same provider that it chooses for the provision of the underlying communications service in order to perform its function as a carceral facility, does not mean that it has become a communications provider entitled to pass on those costs to telephone customers."). We find overbroad the National Sheriffs' Association's argument that because jails generally have statutory obligations that require safety and security measures, that it necessarily follows that IPCS consumers must bear the cost of such measures. National Sheriffs' Association June 20, 2024 *Ex Parte* at 2; Canyon County Sheriff July 11, 2024 *Ex Parte* at 1. For example, the National Sheriff's Association concludes that because the Death in Custody Reporting Act requires facilities to "report on the circumstances surrounding the death of an incarcerated person (such as whether the cause of death was mental health related)," and because monitoring IPCS may identify persons having mental health crises that could lead to suicide, IPCS consumers must therefore pay for all safety and security costs related to monitoring. *Id.* As discussed above, facilities' obligation to care for the safety and wellbeing of incarcerated people, as well as comply with statutes that are unrelated to the provision of communications, are the responsibility of facilities—as are the costs associated with such obligations. IPCS consumers are not required to shoulder the burden of paying for each and every facility cost whether related to the provision of communications or not. For similar reasons, we find inapposite some commenters' argument that not allowing the recovery of certain safety and security costs through IPCS rates would necessarily lead to "increased taxes or an unnecessary reallocation of general funds." AJA July 10, 2024 *Ex Parte* at 3; VARJ July 11, 2024 *Ex Parte* at 3; Securus July 11, 2024 *Ex Parte* at 24. Aside from the speculative nature of this claim, we have explained why IPCS consumers should not bear the cost of services that are unrelated to the provision of IPCS, nor should they be responsible for services whose purpose is to serve law enforcement.

[1350] EPIC June 6, 2023 Reply at 3 ("The Martha Wright-Reed Act requires that the Commission 'shall consider costs associated with any safety and security measures necessary to provide a [telephone or advanced communications] service'—which as one commenter has already noted would include tools that protect IPCS systems from malicious online threats, but not tools that facilitate law enforcement investigation (of any crime that might be discussed on any call)."); Raher May 8, 2023 Comments at 16; *see* Securus May 8, 2023 Comments at 39 (describing safety and security measures that: "Record the content of all telephone connections; store recordings for at least 2 years; transfer the recorded calls to removable media for archiving or review; enable search and access for designated contractors; deliver records upon agency or court request . . . . Provide software or other capabilities to continue to search and access recordings after the termination of the contract . . . . Analytical and query features for linkages, relationships, associations, and mapping of data points, data mining, data analytics, data visualization, and predictive modeling"); Leadership Conference July 12, 2023 Reply at 3 (arguing that "[s]ervices such as security and surveillance are the function of the carceral institution" and should not be recoverable in IPCS rates).

[1351] *See* UCC and Public Knowledge May 9, 2023 Comments at 12.

functions is the carceral institution. The customers of the communication are the two people using a service to communicate with each other."[1352] Services that serve predominately law enforcement purposes provide only marginal benefits to incarcerated people and their families in their use of IPCS, and only a small portion of the costs of those services are used and useful in the provision of IPCS. The bulk of those costs related to incarceration, generally—like feeding and housing—and, like those costs, cannot justly and reasonably be imposed on incarcerated persons and their loved ones. Correctional facilities are free to adopt any safety and security measures they deem appropriate, but may not rely on IPCS ratepayers to defray all the costs providers and facilities incur in providing those measures. Instead, only the used and useful portion of those costs should be recovered through IPCS rates.

379.    Some commenters raise concerns that the used and useful standard is inappropriate specifically when applied to safety and security measures.[1353] We disagree. We are not persuaded that the application of the used and useful standard to safety and security costs would prohibit facilities' implementation of safety and security measures in violation of section 4 of the Martha Wright-Reed Act.[1354] Rather, we find that this argument conflates our authority over what the facility and its service providers *may charge* ratepayers with the facilities' authority over what safety and security measures "the facility and its service providers may choose to employ *at their own expense*."[1355] Although section 4 of the Martha Wright-Reed Act bars the Commission from prohibiting safety and security measures related to IPCS in correctional facilities, nothing in the Martha Wright-Reed Act requires that IPCS consumers pay for such measures through IPCS rates.[1356] To the contrary, section 3(b)(2) of that Act indicates otherwise by obliging the Commission merely to "consider" such costs without requiring a particular outcome.[1357] While our rate-making process may result in changing how some of those measures are funded, our application of the used and useful framework in discharging this mandate simply does not prohibit correctional officials, law enforcement officials, or IPCS providers from implementing any safety and security measures at any correctional facility.[1358] Correctional facilities remain free to implement any safety and security measures of their choosing; they just cannot expect the IPCS consumer to bear the cost

---

[1352] *Id*.

[1353] National Sheriffs' Association May 8, 2023 Comments at 3, 14; National Sheriffs' Association July 12, 2023 Reply at 12-14; Securus May 8, 2023 Comments at 40 (arguing that the used and useful standard should not apply); Securus July 12, 2023 Reply at 25; NCIC July 10, 2024 *Ex Parte* at 3 (criticizing the Commission's application of the used and useful framework in connection with the costs of safety and security measures).

[1354] National Sheriffs' Association May 8, 2023 Comments at 3 ("Section 4 of the MWRA states that the Commission cannot prohibit any security and surveillance mechanisms in connection with the provision of IPCS in jails. The Commission must therefore take care to ensure that it does not interfere with the operation of jails by eliminating their ability to recover these types of costs through a 'used and useful' analysis. Although not a prohibition per-se, disallowing a cost associated with a security or safety mechanism produces the same effect.").

[1355] EPIC June 6, 2023 Reply at 5-6 (emphasis added).

[1356] Martha Wright-Reed Act § 4; Raher May 8, 2023 Comments at 16 (recognizing that "the Commission cannot dictate what lawful security measures correctional facilities may deploy in connection with IPCS, but it *may* define the type of security costs that are recouped through user-paid rates and fees"); Worth Rises May 8, 2023 Comments at 8 (explaining that the Commission "does not have the mandate, or authority, to fund every safety and security measure corrections agencies seek" and that "[b]y excluding the cost of safety or security measures that are not necessary and/or used and useful to IPCS ratepayers from IPCS rates, the Commission is only determining that IPCS ratepayers cannot be forced to pay for such measures"); EPIC June 6, 2023 Reply at 5-6.

[1357] Martha Wright-Reed Act § 3(b)(2).

[1358] National Sheriffs' Association May 8, 2023 Comments at 3-4 (contending that "[t]he fact that a safety or security measure is implemented in connection with IPCS makes it a recoverable cost"); National Sheriffs' Association July 12, 2023 Reply at 9-12.

of all of those choices.[1359]

380.    *The "Customer" Under the Used and Useful Framework.*  In applying the used and useful framework, "the Commission considers whether the investment or expense 'promotes customer benefits, or is primarily for the benefit of the carrier.'"[1360]  In applying that framework to IPCS, we make clear that the "customers" referred to under this analysis are the IPCS ratepayers in their status as consumers of communications services in correctional institutions.  Securus encourages a broader interpretation of "customer" that would include correctional facilities, as well as ratepayers, because correctional facilities are "necessary part[ies]" to IPCS.[1361]  It suggests that the Commission has a "general responsibility" to protect the general public and "ensure a safe environment" for accessing communications services.[1362]  These arguments do not overcome our responsibility here where incarcerated people or their loved ones are the ones paying for and using IPCS subject to Commission-specified rate regulations.  Although correctional institutions contract with providers for the provision of IPCS, such services are used, and paid for, by incarcerated people and their loved ones.[1363]  As Worth Rises explains, the "Commission's duty is to protect IPCS ratepayers and ensure reasonable

---

[1359] The National Sheriffs' Association, in its arguments against relying on the used and useful standard, suggests that instead, "the principle of cost causation, which states that those who cause costs should pay for them" should be used.  National Sheriffs' Association July 12, 2023 Reply at 9; National Sheriffs' Association June 20, 2024 *Ex Parte* at 2.  The National Sheriffs' Association argues that, for example, if a crime is committed using IPCS, the incarcerated person should pay for all related safety and security costs because without IPCS, the crime could not have been committed.  *Id*.  The Commission has previously rejected such unpersuasive "but for" arguments, most recently in the *Open Internet* proceeding.  *Safeguarding and Securing the Open Internet; Restoring Internet Freedom*, WC Docket Nos. 23-320 and 17-108, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52, at 181, para. 286 & n.1182 (Apr. 25, 2024).  The National Sheriffs' Association's logic is flawed.  Simply because a crime occurred using a phone call does not mean that the phone call was the cause of the crime, nor that IPCS consumers are responsible for the associated safety and security costs.  Law enforcement activities are the responsibility of law enforcement.  As such, the costs associated with those activities are appropriately borne by correctional facilities, not IPCS consumers.  The used and useful framework and cost causation principles both aim at ensuring that ratepayers do not bear costs that were not incurred for the ratepayers' benefit.  Since the sole purpose of many of these safety and security measures is to benefit law enforcement, we would allocate the costs of these measures to the providers' non-IPCS operations even if we were to employ a cost causation approach.  *See* Worth Rises July 12, 2023 Reply at 2 ("We do not contest that corrections agencies are an IPCS stakeholder and that they make demands of providers, but the exclusion of the costs of their demands from rates is not an unreasonable outcome.  Any stakeholder who makes demands of a provider should pay for the services it demands, not make demands that others must pay for, especially when those others are, in fact, largely harmed by the provision of those services.").

[1360] *Supra* Section III.C.3 (The Requirement to Establish a Compensation Plan).

[1361] Securus May 8, 2023 Comments at 41; *see* Pay Tel May 8, 2023 Comments at 17-18 (arguing that permitting express recovery of safety and security services "would help to align the interests of facilities with consumers by incenting facilities to enter into contracts with lower calling rates in order to stimulate increased phone usage, thereby spurring healthy competition among providers that will benefit consumers").  Under this logic, the providers themselves would also be included as beneficiaries in the used and useful test.

[1362] Securus May 8, 2023 Comments at 40-41.  Pay Tel mischaracterizes our rejection of Securus's overbroad interpretation of "customer" as a more general rejection of the need to provide appropriate safety and security measures as part of the provision of IPCS.  Pay Tel July 9, 2024 *Ex Parte* at 3 & n.11.  As discussed above, and consistent with section 1 of the Communications Act, the Commission has long embraced the inclusion of safety and security measures as an integral part of the provision of IPCS and incorporated the relevant costs in its approach to rates for these services.  *See, e.g., supra* Section III.D.7.a.i (The Commission's Historical Consideration of Safety and Security Measures); 47 U.S.C. § 151.

[1363] *See, e.g.*, 47 CFR § 64.6000(j) (defining "Inmate Calling Service" to mean "a service that allows Inmates to make calls to individuals outside the Correctional Facility where the Inmate is being held, regardless of the technology used to deliver the service"); Worth Rises July 12, 2023 Reply at 2 (explaining that while correctional institutions "do procure IPCS from providers . . . they do not pay for the services they are procuring").

compensation for providers, not to protect the interests and demands of non-ratepaying stakeholders."[1364] We rely on the used and useful framework because it balances the "equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them,"[1365] with ensuring fair compensation for providers.[1366]  It therefore would be inappropriate—and, ultimately inconsistent with our mandate to ensure just and reasonable IPCS rates—to evaluate safety and security costs under a framework that characterized correctional institutions as the customers.[1367] Although Securus is correct that the used and useful framework is flexible, it is not all encompassing, and we decline to expand that framework to include non-ratepayers.  Rather, we rely on this flexibility to ensure that IPCS consumers "bear only legitimate costs of providing service to them."[1368]

381.    Our focus on incarcerated people and their loved ones as the customers of IPCS has several cross-cutting implications for our application of the used and useful standard to safety and security measures broadly.  For one, safety and security measures that serve predominantly law enforcement functions do not yield sufficient (if any) benefit to IPCS customers to warrant more than a marginal (or any) recovery through just and reasonable IPCS rates.  In this vein, in the case of safety and security measures that are not universally or nearly universally employed by IPCS providers, we are not persuaded that they meet the used and useful standard for cost recovery through IPCS rates.[1369]  As explained by the Public Interest Parties, "safety and security features that are not universally used across facilities suggests that they cannot be 'necessary,' as some providers do offer IPCS without needing to use such features."[1370]  Safety and security measures cannot be both required to provide IPCS and elective.  The National Sheriffs' Association unwittingly makes this point by explaining that "different facilities have different security requirements."[1371]  While we agree with the National Sheriffs' Association that correctional institutions that have relatively large proportions of "violent offenders" generally impose more extensive safety and security measures that other correctional institutions,[1372] the record contains no information tying those measures specifically to the provision of IPCS.  Absent such information, we conclude that those measures are part of the correctional institutions' overall safety and

---

[1364] Worth Rises July 12, 2023 Reply at 2.

[1365] *See AT&T Phase II Order*, 64 F.C.C.2d at 38, paras. 111-12.

[1366] 47 U.S.C. § 276(b)(1)(A).

[1367] There are indeed scenarios where the facility or governmental body may be the customer in jurisdictions where free calling for incarcerated persons has been implemented.  That is not the scenario we are addressing in this Order.

[1368] *Investigation of Special Access Tariffs of Local Exchange Carriers* at *8, para. 35 (Jan. 24, 1986); *Tenn. Gas Pipeline Co.,* 606 F.2d at 1109.

[1369] EPIC June 6, 2023 Reply at 3-4 ("Other commenters document multiple instances in which these services cannot be considered necessary by virtue of the fact that they are not utilized universally."); Public Interest Parties May 8, 2023 Comments at 24; Worth Rises May 8, 2023 Comments at 4-5, Appx. B (explaining how ViaPath claimed certain safety and security services as both "necessary" and "elective").  *But see* Securus and Pay Tel June 10, 2024 *Ex Parte* at 9 ("Differences in the suite of safety and security measures facilities use do not render them unnecessary.").

[1370] Public Interest Parties May 8, 2023 Comments at 24; *see* Worth Rises May 8, 2023 Comments at 4-5 ("Global Tel Link's own IPCS contracts outline elective, optional rates for safety and security measures, such as Voice Biometrics, Word Search (call transcription), Data IQ (data analytics), and even investigative staff, that it tells the Commission are necessary."); *see also* Public Interest Parties Apr. 15, 2024 *Ex Parte* at 5 (arguing that safety and security costs are not used and useful).

[1371] National Sheriffs' Association July 12, 2023 Reply at 12; *see also* Securus and Pay Tel June 10, 2024 *Ex Parte* at 9 (noting that "a maximum security prison may have different safety and security requirements than a juvenile detention facility").

[1372] National Sheriffs' Association July 12, 2023 Reply at 12 (finding it "well established that different facilities have different security requirements, in some cases because of the type of person incarcerated (for example, violent offenders versus non-violent offenders)").

security operations, rather than an essential element of the provision of communications services in a correctional environment. Such a focus on safety and security measures shown to be deployed on a widespread basis makes most sense when setting IPCS rate caps, rather than prejudging whether and to what extent less commonly-employed measures ultimately might someday be proven of sufficient necessity—and benefit to IPCS customers—to warrant recovery in regulated IPCS rates and charges. Independently, we conclude that those atypical costs or expenses are excessive, and thus imprudent under the "used and useful" framework, and thus not appropriate for inclusion in regulated IPCS rates.

382.    We also find that safety and security features offered solely or chiefly to win contracts do not warrant recovery through regulated IPCS rates.[1373]  It is not uncommon for providers responding to requests for proposals to offer enhanced safety and security measures that are not specifically demanded by the correctional authority.  Measures that correctional institutions accept for free or in lieu of monetary site commissions payments do not become a benefit to IPCS ratepayers by virtue of that correctional facility's acceptance.[1374]  Features not included in requests for bids were clearly not considered critical to IPCS by the correctional institutions themselves.  We find persuasive Worth Rises' reasoning that "[t]he broad spectrum of elective safety and security measures that IPCS providers offer" have "no demonstrated, or at times even articulated, public benefit.  These other elective measures are nice-to-haves for corrections agencies, law enforcement, and prosecutors and vary from agency to agency."[1375]  Indeed, we find that the costs of "safety and security [that] are for the benefit of 'investigators, correctional administrators, prosecutors, and other law enforcement officers'" are not appropriately borne by IPCS ratepayers.[1376]  Our evaluation of the 2023 Mandatory Data Collection responses also supports assertions in the record that offering advanced safety and security measures has become a chief means by which the largest providers dominate the process correctional institutions use to select IPCS providers.[1377]  Indeed, while certain safety and security measures are undoubtedly both used and useful in, and necessary for, the provision of IPCS, the data raise questions whether and to what extent many of the advanced safety and security measures may be more reflective of the broken nature of competition in the dysfunctional IPCS marketplace and tools certain providers use to gain advantages in winning contracts.

---

[1373] *See* Securus July 12, 2023 Reply at 28, 38 ("In Securus' experience, demand for security features has largely been driven by facilities, as they have defined the tools they need to provide communications while ensuring the safety of their facilities and the public.  In particular, facilities often express their communications-security needs through RFPs with detailed security requirements.  Bidders that do not meet security requirements risk losing contracts or being disqualified from the bidding process.").

[1374] Worth Rises May 8, 2023 Comments at 4; Public Interest Parties May 8, 2023 Comments at 22-23; Raher May 8, 2023 Comments at 16 ("IPCS carriers advertise their surveillance add-ons as 'investigative' tools 'designed to identify potential criminal activity.'  That these tools may *utilize* data generated by communications service does not make the technology *necessary to the provision* of the communications service.").

[1375] Worth Rises May 8, 2023 Comments at 4; Public Interest Parties May 8, 2023 Comments at 22-23.

[1376] Public Interest Parties May 8, 2023 Comments at 22-23; Pay Tel May 8, 2023 Comments at 17 ("[A] 'call recording analysis' security function may *also* be performed in the investigation of prior crimes after the fact.  In such instances, the facility would incur that cost as a result of its desire to investigate prior crimes and the fact that it identified a particular call as  likely to yield evidence of criminal activity *prior to the inmate's incarceration*.  This latter use of the 'call recording analysis' security function should not be considered a legitimate cost of ICS since it is an outgrowth of a pre-existing criminal investigation . . . ."); *see* Securus May 8, 2023 Comments at 39 (describing safety and security measures that "correctional authorities expect providers to include in their offerings"); Wood June 7, 2024 Report at 4 (explaining that, as part of the survey, correctional facilities were instructed to exclude "investigative surveillance and research related to past alleged crimes" and treat such a cost "as one that should be recovered as part of the facility's general operations budget, and not through IPCS rates").  We note that such features are also not used and useful.

[1377] *See, e.g.*, Worth Rises Sept. 27, 2021 Comments at 8-9 (noting that "[f]or many agencies, the suite of security and surveillance service that an IPCS provider can offer is often the differentiating factor when choosing one provider over another").

**Federal Communications Commission**                                    **FCC 24-75**

### c.    Assessing the Costs of Safety and Security Measures

383.    Applying the standards described above, we reach reasoned conclusions regarding the safety and security measures that primarily benefit consumers and appropriately are included in regulated rates under our used and useful analysis.[1378]  Measures that serve only a law enforcement function or provide no benefit to IPCS consumers are not used and useful in the provision of IPCS.  Costs that are used and useful are used to calculate just and reasonable IPCS rate caps.[1379]

### (i)    Application of the Used and Useful Framework

384.    We evaluate whether the costs of the seven categories of safety and security measures set forth in the 2023 Mandatory Data Collection should be included in IPCS rates by applying the used and useful framework.  As an initial matter, we reiterate that the used and useful framework is flexible.  Although the Commission has identified "general principles regarding what constitutes 'used and useful' investment," it "has recognized 'that these guidelines are general and subject to modification, addition, or deletion."[1380]  The Commission emphasized that "[t]he particular facts of each case must be ascertained in order to determine what part of a utility's investment is used and useful."[1381]  The Commission "may, in its reasonable discretion, fashion an appropriate resolution that is tailored to the specific circumstances before it."[1382]

385.    Additionally, to account for the facts that the categories of safety and security costs in the 2023 Mandatory Data Collection are imprecise,[1383] and that providers' allocations of their safety and security costs are at times inexact among these categories, we evaluate categories based on the nature of the preponderance of tasks or functions within each category.  If the predominant use of tasks and

---

[1378] *See* Worth Rises May 8, 2023 Comments at 4 ("The Commission must determine what safety and security measures are necessary to the provision of IPCS, and thus that their costs may be included in IPCS rates, by determining what measures are required or indispensable to the provision of IPCS services."); EPIC June 6, 2023 Reply at 4 (urging the Commission to "avoid conflating what the facility deems is necessary to its safe and secure operation with what is technologically necessary to connect a phone call or other communication safely and securely"); Securus May 8, 2023 Comments at 34.

[1379] Thus, we do not exclude all safety and security costs from our ratemaking calculus.  *See* Securus and Pay Tel June 10, 2024 *Ex Parte* at 11 (arguing that the "exclusion of all safety and security costs would have a substantial impact on rates, and would have numerous likely unintended and harmful consequences").

[1380] *Sandwich Isles Declaratory Ruling*, 25 FCC Rcd 13467, 13652, para. 12 (*Sandwich Isles Declaratory Ruling*) (quoting *AT&T Phase II Order*, 64 F.C.C.2d at 39, para. 114).

[1381] *Sandwich Isles Declaratory Ruling*, 25 FCC Rcd at 13652, para. 12.

[1382] *Id.* at 13653, para. 16; *AT&T Lightguide Cable 214 Order*, 84 F.C.C.2d at 317, para. 32 (acknowledging that rate matters "involve a great deal of judgment," and concluding that expenditures were "justifiable in the long run and will serve the public convenience and necessity").  Moreover, courts typically defer to the Commission's discretion on rate-related determinations.  *See, e.g.*, *Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 780 (D.C. Cir. 1990) (remanding on other grounds) ("In reviewing the Commission's rules for inclusion of an item in the rate base, in a context in which we have no basis for thinking that the end result will be unjust, we inquire only into whether the agency's rules are arbitrary or unreasonable.").  Pay Tel overlooks this flexibility in arguing we have applied a "newly-minted 'user benefit' standard" in our application of the used and useful framework to safety and security measures.  Pay Tel July 9, 2024 *Ex Parte* at 8.  As we have explained, the used and useful framework, as applied for decades by the Commission in its familiar ratemaking functions, is an equitable principle that prevents ratepayers from having to pay for costs that are primarily incurred for the benefit of the provider, while allowing regulated entities to be compensated for providing service.  *Supra* Section III.C.3 (The Requirement to Establish a Compensation Plan).  We do not, as Pay Tel suggests, depart from these core ratemaking principles in evaluating safety and security measures under the used and useful framework here.

[1383] *See 2023 Mandatory Data Collection Order* at 8, para. 21 (explaining that the categories of safety and security measures "provide a comprehensive and workable framework for dividing safety and security measure costs into reasonably homogenous groupings").

functions within a category are not used and useful, the entire category will be treated as not used and useful and excluded from the lower bound of our zone of reasonableness.[1384]

386.     We find two categories of safety and security costs to be generally used and useful—Category 1: CALEA compliance measures; and Category 3: communications security services.  We conclude that the remaining five categories of safety and security measures should not be treated as used and useful in setting a lower bound on the range of reasonable rates.[1385]  In particular, in setting IPCS rate caps, we include the costs of all safety and security categories in the upper bounds of our zones of reasonableness, but include only the costs of the two categories found to be generally used and useful in the lower bounds of our zones of reasonableness.

387.     We also adjust our rate setting within the zones of reasonableness to develop overall rate caps that recognize the imprecision of both the seven defined safety and security categories in the 2023 Mandatory Data Collection, and the inconsistencies in the narrative descriptions and varied allocations made in provider responses.[1386]  For example, IPCS providers' narrative responses to our request for

---

[1384] In addition to relying on this procedure only for setting the lower bound for our range of reasonable rates, we also note that we are adopting a waiver process to accommodate providers in atypical circumstances that can demonstrate grounds for recovery beyond that provided by our rate caps.  *Infra* Section III.E (Waivers).  We acknowledge that the nature of safety and security is evolving such that some measures that we determine are not generally used and useful may be "second or third generation implementations of the same measures" the Commission has found to be used and useful.  Pay Tel July 9, 2024 *Ex Parte* at 9 & Exh. A.  As we explain below, however, our conclusions in this regard are part of the larger task of setting IPCS rate caps that are just and reasonable for consumers and providers and that afford fair compensation to providers.  This task necessarily requires us to arrive at a reasonable end result based on the record before us.  And due to the imprecise nature of the categories of safety and security measures and providers' reporting of those costs, we find that, based on the record and core ratemaking precedent, some costs of safety and security measures are not generally used and useful.  This is particularly true in situations where providers allege that additional safety and security measures are necessary to ensure that the safety and security measures we conclude are used and useful function properly.  *See* Securus July 11, 2024 *Ex Parte* at 18.  We are skeptical of such claims.  For example, while certain providers claim that voice biometrics services can be used to prevent fraud or the circumvention of calling restrictions, the record does not indicate that voice biometrics services primarily ensure the proper functioning of providers' communications security services.  *Infra* Section III.D.7.c.i (Application of the Used and Useful Framework).

[1385] Specifically, categories 2 (law enforcement support services); 4 (communication recording services); 5 (communication monitoring services); 6 (voice biometrics services); and 7 (other safety and security measures).  *See* Worth Rises May 8, 2023 Comments at 6-7 (contending that law enforcement support services, call recording and monitoring services, voice biometrics, and other services are not used and useful in the provision of IPCS); EPIC May 8, 2023 Comments at 3 (maintaining that "unnecessary surveillance practices are not properly considered services to incarcerated persons or their contacts"); DARE July 10, 2024 *Ex Parte* at 2 ("We strongly support the Commission's recognition that five of the seven enumerated safety and security categories are not 'used and useful' for the provision of IPCS and thus must be excluded from recovery through IPCS rates.").

[1386] Securus overlooks this fact in complaining that the Commission relies on the seven defined safety and security categories in the 2023 Mandatory Data Collection.  Securus July 11, 2024 *Ex Parte* at 15.  Securus argues that "[i]f a provider failed to allocate certain safety and security costs within the Commission's own 'inexact' allocation structure, those costs are not included in the . . . rate caps, despite the fact that such costs meet the . . . definition of used and useful." *Id.* at 15.  To the extent Securus's issue is with the seven categories of safety and security measures from the 2023 Mandatory Data Collection, Securus and other interested parties were free at any time, but particularly in response to the Commission's Public Notice seeking comment on the 2023 Mandatory Data Collection, to propose another method of collecting cost data regarding safety and security measures.  *See Wireline Competition Bureau and Office of Economics and Analytics Seek Comment on Proposed 2023 Mandatory Data Collection for Incarcerated People's Communications Services*, WC Docket Nos. 23-62 and 12-375, Public Notice, 38 FCC Rcd 4035, 4039 (WCB/OEA 2023) ("We invite comment on the categories of safety and security measures in the proposed instructions.  How if at all should they be changed?").  But Securus did not do so and actually conceded that the cost categories the Commission proposed were "similar to categories employed in the Third Mandatory Data Collection."  *2023 Mandatory Data Collection Order* at 8, para. 21.  To the extent IPCS providers

(continued….)

**Federal Communications Commission**　　　　　　　　　　**FCC 24-75**

CALEA compliance[1387] information revealed confusion regarding which safety and security measures were related to CALEA compliance, and few providers identified any associated costs.[1388] However, it appears that some providers have allocated certain functions, such as portions of call monitoring and recording, to other categories, i.e., Category 4 (communications recording services) and Category 5 (communications monitoring services), that likely should have been allocated to the CALEA category insofar as they facilitate the type of electronic surveillance required by CALEA.[1389] Because we are unable to disaggregate the costs reported to these other categories to identify precisely which portions of call monitoring and recording costs should have been appropriately included in the CALEA category, we account for these under-reported CALEA costs in setting our overall rate caps, which have been adjusted accordingly. The same is true for safety and security measures that providers have described as "inherent" or built into their systems such that they do not have separate costs to allocate.[1390] Because our

did not allocate costs to those seven categories (despite being instructed to perform allocations using their best estimate), they did so with full knowledge that the Commission would use the results of the data collection as a critical part of its efforts to fulfill its obligations under the Martha Wright-Reed Act. *See, e.g.*, *2023 Mandatory Data Collection Order* at 2, para. 4 ("The Martha Wright-Reed Act contemplates an additional data collection by requiring or allowing the Commission to consider certain types of other costs necessary to its implementation.").

[1387] CALEA requires that telecommunications carriers and manufacturers of telecommunications equipment design their equipment, facilities, and services to ensure that they have the necessary surveillance capabilities to comply with legal requests for information. 47 U.S.C. § 1001 *et seq.* Telecommunications carriers must "ensure that [they] are capable of accommodating simultaneously the number of interceptions, pen registers, and trap and trace devices" as requested by the Attorney General. *Id.* § 1003(b)(1). CALEA defines "telecommunications carrier" more broadly than the Communications Act. *Communications Assistance for Law Enforcement Act and Broadband Access and Services*, ET Docket No. 04-295, First Report and Order and Further Notice of Proposed Rulemaking, 20 FCC Rcd 14989, 14993, para. 10 (2005) (*CALEA Order*); 47 U.S.C. § 1001(8)(B)(ii) (defining "telecommunications carrier" as "a person or entity engaged in providing wire or electronic communication switching or transmission service to the extent that the Commission finds that such service is a replacement for a substantial portion of the local telephone exchange service and that it is in the public interest to deem such a person or entity to be a telecommunications carrier for purposes of [CALEA]"). The Commission has found that interconnected VoIP providers also must comply with CALEA requirements. *CALEA Order*, 20 FCC Rcd at 14991, para. 8.

[1388] *See, e.g.*, HomeWAV, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 38 (filed Oct. 27, 2023) (HomeWAV Oct. 27, 2023 Response to 2023 Mandatory Data Collection Word Template) {[

　　　　　　　　　　　　　　　　]}; Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 18 {[

　　　　　　　　]}; Smart Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15 {[　　　　　　　　　]}; ICSolutions July 12, 2024 *Ex Parte* at 1-2; *see also* Appendix F at Tables 20, 21 (reflecting that only two providers reported CALEA compliance expenses, while at least five providers reported expenses for the other six categories of safety and security measures). To the extent that ICSolutions seeks guidance on CALEA compliance, that is outside the scope of this IPCS rate-making proceeding. ICSolutions July 12, 2024 *Ex Parte* at 2-3.

[1389] *See, e.g.*, NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 33 {[

　　　　　　　　]}. As referenced above, CALEA was designed to ensure that law enforcement could conduct electronic surveillance by requiring telecommunications carriers and manufacturers of telecommunications equipment to ensure they have the necessary surveillance capabilities. *See* 47 U.S.C. § 1001 *et seq.*; 47 CFR § 1.20000 *et seq.*

[1390] *See, e.g.*, Prodigy Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 14 {[

　　　　　　　　]}; ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template at 15 {[

(continued….)

upper and lower bounds include the costs of safety and security measures that are inherent in IPCS providers' platforms and which serve both IPCS-related and other purposes, we make adjustments in setting our rate caps to reasonably attempt to ensure that those caps do not over-recover or under-recover the costs of safety and security measures.

388.    In sum, we find that this three-step process—including all reported safety and security measure costs in our upper bounds, including only a portion of those costs in our lower bounds, and taking the imprecision of those bounds into account in setting rate caps—reasonably applies the used and useful framework to the record before us.  The resulting rate caps—the "end result" of our ratemaking—reflect a balance that recognizes both the merits and shortcomings of the commenters' positions on whether the costs of safety and security measures should be recovered through IPCS rates.[1391]  At one end of the spectrum, some commenters urge us to set rate caps at levels that would allow providers and facilities to recover all (or virtually all) the costs they incur in providing safety and security measures.[1392]  These commenters correctly recognize that, for the most part, the safety and security measures on which we need to make a judgment contribute toward the provision of "inmate telephone services and advanced communications services" in correctional institutions.[1393]  But these commenters fail to recognize that many of these measures also contribute toward other purposes, including law enforcement and investigative purposes that are only circumstantially related to the provision of IPCS.  At the other end of the spectrum, other commenters would exclude virtually all safety and security measure costs from our ratemaking calculus.[1394]  These commenters focus on the law enforcement and investigative purposes served by the safety and security measures before us, while deemphasizing or ignoring the contributions the measures make toward the safe provision of IPCS.

389.    We do not adopt either extreme position.  Instead, we apply the used and useful standard, as articulated in core ratemaking precedent, to evaluate all of the arguably recoverable costs in the record, including costs associated with safety and security measures, to distinguish those costs that should be included in our ratemaking calculus from those that should not.  In doing so, we arrive at a middle ground that properly balances the "equitable principle that public utilities must be compensated for the use of their property in providing service to the public" with the "[e]qually central . . . equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them."[1395]

390.    Contrary to the characterizations of some commenters, our actions today, and in particular our actions regarding safety and security measures, are about fulfilling our obligation under the Martha Wright-Reed Act to adopt a compensation plan for IPCS that ensures just and reasonable rates and

---

]}; Pay Tel Oct. 31, 2023 Response to 2023

Mandatory Data Collection Word Template at 20 {[

]}.

[1391] *See Hope Natural Gas*, 320 U.S. at 603; *see also Jersey Cent. Power & Light Co. v. FERC*, 810 F.3d 1168, 1173 (D.C. Cir. 1987) (noting that "it is the 'end result' which must be just and reasonable").

[1392] *See, e.g.*, Pay Tel July 9, 2024 *Ex Parte* at 18; Pay Tel July 11, 2024 *Ex Parte* at 2-3; VARJ July 11, 2024 *Ex Parte* at 2; FDC July 11, 2024 *Ex Parte* at 5.

[1393] *See* 47 U.S.C. § 276(d).

[1394] *See, e.g.*, Brattle May 8, 2023 Report at 23 ("It is unclear if any safety and security measures are necessary components of providing IPCS, and, if so, the FCC should exclude such costs from the rate for the services."); Worth Rises May 5, 2023 Comments at 4; DARE July 10, 2024 *Ex Parte* at 3 (urging the Commission to exclude the costs of six of the seven safety and security categories); UCC Media Justice July 12, 2024 *Ex Parte* at 1 & n.2.

[1395] *AT&T Phase II Order*, 64 F.C.C.2d at 38, para. 111.

charges for IPCS consumers and providers and fair compensation for IPCS providers.[1396]  Our actions are not about questioning or overriding the judgment of correctional officials or "evaluat[ing] the credibility of [correctional officials'] decisions regarding safety and security of [their] institutions."[1397]  Nor do our actions bar correctional authorities from implementing any safety and security measures they deem necessary.[1398]  Our task is a narrow one: to determine the extent to which claimed IPCS costs can be recovered through regulated rates charged to consumers.  And that is exactly what we do in applying bedrock ratemaking precedent to evaluate all of the claimed IPCS costs and expenses in the record before us to determine the extent to which consumers should bear those costs.[1399]  We next discuss the application of the used and useful standard to each category of safety and security costs.

391.    *Category 1: CALEA Compliance Measures.*[1400]  Although we are not persuaded that the functionalities associated with CALEA compliance generally would directly benefit IPCS users, under the current regulatory *status quo* we nonetheless find that the costs related to CALEA compliance measures are used and useful in the provision of IPCS.[1401]  First, without CALEA compliance, IPCS providers could not offer their audio or certain advanced communications services.  CALEA requires that telecommunications carriers and manufacturers of telecommunications equipment design their equipment, facilities, and services to ensure that they have the necessary surveillance capabilities to comply with legal requests for information.[1402]  This includes the ability to enable the government to monitor and

---

[1396] 47 U.S.C. § 276(b)(1)(A).

[1397] Florida Department of Corrections Comments at 3.

[1398] *Supra* Section III.C.3.b (Effect on Other Laws).

[1399] We reject as unsupported and speculative suggestions that our approach to safety and security measures will result in less security of IPCS communications generally and will facilitate criminal activity using IPCS.  *See* Securus July 11, 2024 *Ex Parte* at 25-26.

[1400] The instructions for the 2023 Mandatory Data Collection directed providers to identify and describe each of the safety and security measures that they took to comply with CALEA.  2023 Mandatory Data Collection Word Template, WC Docket Nos. 23-62 and 12-375, https://www.fcc.gov/files/final-2023-ipcs-mandatory-data-collection-word-templatev2 at 12 (last visited July 9, 2024) (2023 Mandatory Data Collection Word Template).  CALEA mandates that certain communications services providers "ensure that [their] equipment, facilities, or services that provide a customer or subscriber with the ability to originate, terminate, or direct communications are capable of" intercepting communications, providing the Federal government with access call-identifying information, and delivering intercepted communications and call-identifying information to the Federal government.  47 U.S.C. § 1002(a).

[1401] Worth Rises May 8, 2023 Comments at 4; Worth Rises Reply, WC Docket No. 12-375, at 4 (rec. Mar. 3, 2023); EPIC May 8, 2023 Comments at 3; Public Interest Parties May 8, 2023 Comments at 20; *see* National Sheriffs' Association July 12, 2023 Reply at 9.  *Contra* ViaPath July 12, 2023 Reply at 5 & n.17.  Pay Tel takes issue with the Commission's determination that costs associated with CALEA compliance measures are used and useful while indicating that these measures generally may not directly benefit IPCS consumers.  Pay Tel July 9, 2024 *Ex Parte* at 8.  As we note above, however, the used and useful standard is a flexible standard, allowing the Commission to "fashion an appropriate resolution that is tailored to the specific circumstances before it."  *Sandwich Isles Declaratory Ruling*, 25 FCC Rcd at 13653, para. 16.  Here, given the legal obligations associated with CALEA, we determine that such costs are used and useful in the provision of IPCS.  Pay Tel further argues that in the same way CALEA is a legal requirement, IPCS providers "are also required by the facilities which they seek to serve to employ a range of safety and security measures."  Pay Tel July 9, 2024 *Ex Parte* at 8.  This argument is unavailing.  A requirement imposed by a law passed by Congress is quite different from a contractual "requirement" that results from the commercial negotiations between parties to a contract.

[1402] 47 U.S.C. § 1002(a)(1)-(4); *Communications Assistance for Law Enforcement Act and Broadband Access and Services*, ET Docket No. 04-295, Notice of Proposed Rulemaking and Declaratory Ruling, 19 FCC Rcd 15676, 15680, para. 9 (2004).  The Commission has found that interconnected VoIP providers also must comply with CALEA requirements.  *CALEA Order*, 20 FCC Rcd at 14989, para. 1.  The Commission has not made a specific determination as to whether video calling is subject to CALEA, however to the extent it is a telecommunications

(continued….)

record communications "pursuant to a court order or other lawful authorization."[1403]  As Worth Rises explains, "CALEA compliance is required of all telecommunications carriers and providers of interconnected voice over internet protocol services, not just providers of IPCS."[1404]

392.     Second, under the regulatory *status quo* the Commission previously has held that CALEA compliance costs appropriately can be recovered through user charges.[1405]  In particular, the Commission has previously held that telecommunications carriers and interconnected VoIP providers "may absorb the costs of CALEA compliance as a necessary cost of doing business, or, where appropriate, recover some portion of their CALEA . . . implementation costs from their subscribers" for compliance measures taken after January 1, 1995.[1406]  To the extent IPCS providers obtain transmission services from third parties, the rates they pay likely include charges for those third parties' CALEA compliance costs.[1407]

393.     IPCS providers also may be required to perform discrete tasks to comply with CALEA. Any such tasks also facilitate the provision of IPCS because IPCS providers must comply with CALEA as a precondition to offering audio services and certain advanced communications.  We, therefore, conclude, based on the record, that costs providers incur as a result of CALEA compliance are used and

---

service or interconnected VoIP service it would automatically apply.  We thus disagree that IPCS providers, to the extent they provide telecommunications services and VoIP services, are exempt from CALEA compliance, citing *Communications Assistance for Law Enforcement Act*, CC Docket No. 97-213, Second Report and Order, 15 FCC Rcd 7105, 7119, para. 25 (1999).  When the Commission considered payphone providers, generally, as exempt from CALEA, the Commission was not intending to sweep in those same payphone providers to the extent they were also telecommunications services providers or VoIP providers.  *See* Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 40; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 32; Securus July 11, 2024 *Ex Parte* at 15-16.  Contrary to Securus's claim that we have departed from Commission precedent without proper notice, we are not modifying such precedent.  Securus July 11, 2024 *Ex Parte* at 15-16.  To the extent that IPCS providers offer both payphone services and audio communications services, including telecommunications services and VoIP, they have been, and remain, subject to CALEA requirements.

[1403] 47 U.S.C. § 1002.  We note that the monitoring and recording requirements associated with CALEA are significantly more limited than those services included in Categories 4 and 5.  *See* ICSolutions July 12, 2024 *Ex Parte* at 2 (equating the monitoring and recording costs in Categories 4 and 5 with Category 1 CALEA costs).  We find the costs of those limited monitoring or recording services to be used and useful in the provision of IPCS.  This is in stark contrast to the constant and pervasive communications recording and monitoring within correctional facilities for *all* communications—services that far exceed the requirements of CALEA.  *Infra* Section III.D.7.c.i (Application of the Used and Useful Framework).

[1404] Worth Rises May 8, 2023 Comments at 4; 47 U.S.C. § 1001 *et seq.*

[1405] 47 CFR § 229(e); *Communications Assistance for Law Enforcement Act and Broadband Access and Services*, ET Docket No. 04-295, Second Report and Order and Memorandum Opinion and Order, 21 FCC Rcd 5360, 5394, para. 73 (2006) (*2006 CALEA Order*) ("Section 229(e) of the Communications Act allows rate-regulated common carriers to seek to recover their federally-allocated CALEA section 103 costs from subscribers.").

[1406] *2006 CALEA Order*, 21 FCC Rcd at 5393, para. 72.

[1407] *See* ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 33 {[

                                                          ]}.

useful in the provision of IPCS.[1408]  For the same reasons, we also conclude that costs IPCS providers incur in complying with CALEA are prudently incurred.[1409]

394.    *Category 2: Law Enforcement Support Services.*[1410]  We find that law enforcement support services are generally not used and useful in the provision of IPCS because they do not facilitate the provision of IPCS.[1411]  Rather, as the record makes clear, these services are primarily intended to serve law enforcement purposes.[1412]  Providers' own descriptions of their law enforcement support services support this conclusion.[1413]  For example, the record shows that such services include tasks such as "search warrant processing" and "Freedom of Information Act (FOIA) request processing."[1414]  Also

---

[1408] Worth Rises May 8, 2023 Comments at 4 (arguing that CALEA compliance measures are necessary to the provision of IPCS); Public Interest Parties May 8, 2023 Comments at 20.  Securus argues that the Commission's conclusion that CALEA costs are used and useful "adds nothing to the rate caps" because providers allocated relatively small amounts of such costs to CALEA in the 2023 Mandatory Data Collection.  Securus July 11, 2024 *Ex Parte* at 15-16.  Simply because providers did not allocate significant amounts to CALEA compliance is not a basis on which to conclude that such costs are irrelevant to our ratemaking.  As noted above, we evaluate all safety and security cost data in the record before us.

[1409] *See, e.g.*, *Sandwich Isles Reconsideration Order*, 34 FCC Rcd at 580, para. 7 (explaining that the Commission "considers whether a carrier's investments and expenses were prudent (rather than excessive)" as part of the used and useful framework).

[1410] The instructions for the 2023 Mandatory Data Collection directed providers to identify and describe each of their safety and security measures that they classified as a law enforcement support service.  These "services include, but are not limited to, the administration of subpoenas, the administration of crime tip lines, the administration of informant lines, and the maintenance of data repositories for use by law enforcement personnel."  2023 Mandatory Data Collection Word Template at 12.  In their responses to the 2023 Mandatory Data Collection, providers identified certain law enforcement support services. *See, e.g.*, Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 41 (listing responding to subpoenas, "forensic services for recovered cell phones, computers, and other digital devices with use of state-of-the-art analysis tools and certified forensic staff . . . . Certified forensic examiners also perform data extractions on devices that are damaged, locked, or unsupported by other forensic tools using the latest chip-off forensics technique"); Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15 ("process[ing] subpoenas, records requests, and FOIA requests"); ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 33-34 (listing {[
                                                 ]}); Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 19 {[
                                              ]}; Smart Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 16 {[                                              ]}.

[1411] Public Interest Parties May 8, 2023 Comments at 23.

[1412] Worth Rises May 8, 2023 Comments at 6; EPIC May 8, 2023 Comments at 3; Public Interest Parties May 8, 2023 Comments at 23; Raher May 8, 2023 Comments at 16.

[1413] Prodigy Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 14 {[
                                                        ]}; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 33 {[

                                                                  ]}; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 41 {[

                                                      ]}; Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 18; HomeWAV Oct. 27, 2023 Response to 2023 Mandatory Data Collection Word Template at 41; Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 20.

[1414] Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 41; Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 33; Pay Tel Dec. 15, 2023 Response to

(continued....)

**Federal Communications Commission**    **FCC 24-75**

included in this category are call transcription services, which are primarily used to create databases for law enforcement to conduct investigations and assist with case building.[1415]  Some commenters claim these services assist in minimizing crime and identifying potential violators, functions that primarily serve law enforcement purposes and do not facilitate or enable the provision of IPCS.[1416]  We recognize that some functions within this category may provide a benefit to incarcerated people, such as the administration of tiplines to anonymously report crimes and connect incarcerated people with Prison Rape

---

2023 Mandatory Data Collection Word Template at 19; Smart Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 16.

[1415] Prodigy Oct 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 14-15 {[

]}; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 41 {[

]}; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 33; *see* NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 34-35 {[

]}; Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 19-20 {[

]}.

[1416] Securus May 8, 2023 Comments at 39 ("Features to trace calls, detail call history, allow for call monitoring without detection while recording and include other call detail capabilities that can be used to aid investigations related to the detention facilities."); National Sheriffs' Association Sept. 27, 2021 Comments at 3 (explaining that "security duties include . . . forwarding alerts and recorded calls to investigators; conducting real-time monitoring of inmate conversations; analyzing call recording of inmate conversations; burning CDs of conversations for further review by investigators; and responding to law enforcement requests and subpoenas for call detail records and recordings"); Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15 {[

]}; NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 33-34 {[

]}; Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 22 {[

]}; Prodigy Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 14 {[

]}; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 33-34; Securus Nov. 1, 2023 Response to 2023 Mandatory Data Collection Word Template at 41 {[

]}, 42 {[

]}; Smart Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 16 {[

]}.

Elimination Act (PREA) report centers;[1417] however, they do not facilitate the provision of IPCS and are therefore not used and useful in the provision of IPCS. In other words, communications services for incarcerated people are able to take place without these services and we generally do not find that these functions benefit IPCS users in their use of IPCS in a way that makes it equitable for them to bear the costs of these functions in regulated IPCS rates.

395.    *Category 3: Communications Security Services.*[1418]  Based on the record, we find that the functions included in the communications security services category are generally used and useful in the provision of IPCS.[1419]  Most of the functions that providers classify as communications security services are safety and security measures that the Commission has traditionally found to be "inherent" in communications services for incarcerated people.[1420]  Such functions include the development of pre-approved "allow" lists, preventing three-way communications, and fraud management.[1421]  These basic functions are directly related to the underlying communications service and do not go beyond that required to enable or appropriately limit the customer's use of the underlying communications service in a correctional institution.[1422]  They also benefit consumers of IPCS by ensuring that communications

---

[1417] Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 19; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 41; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 34.

[1418] The instructions for the 2023 Mandatory Data Collection directed providers to identify and describe each of their safety and security measures that they classified as a communications security service.  2023 Mandatory Data Collection Word Template at 12-13.  These "services include, but are not limited to, implementing measures that allow an Incarcerated Person to call only certain individuals or numbers; implementing measures that limit the individuals or numbers an incarcerated person may call; providing personal identification numbers (PINs) to incarcerated people; providing disclaimers to called parties regarding communication origination; implementing communication-acceptance procedures; preventing three-way communications; preventing chain communications; dual-tone multifrequency detection; manual call control for the Facility; tracking frequently called numbers; implementing incoming communication restrictions; and fraud management."  *Id.*  In their 2023 Mandatory Data Collection responses, providers identified certain communications security services.  *See, e.g.*, Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15-16 {[
                                                                    ]}; Securus Oct. 31, 2023
Response to 2023 Mandatory Data Collection Word Template at 42 {[
                                    ]}; Smart Communications Oct. 31, 2023 Response to 2023 Mandatory Data
Collection Word Template at 16 {[
                                    ]}; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word
Template at 34 {[                                                        ]}.

[1419] Securus May 8, 2023 Comments at 40; *see* NCIC May 8, 2023 Comments at 15; *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53 n.196 (treating safety and security costs in a manner similar to its treatment of other costs that the Commission has found are likely recoverable such as "originating, switching, and the transport and termination of calls").  *But see* DARE July 10, 2024 *Ex Parte* at 3.

[1420] *2002 Pay Telephone Order*, 17 FCC Rcd at 3252, para. 9; *2013 ICS Order*, 28 FCC Rcd at 14138, para. 58.

[1421] Securus May 8, 2023 Comments at 40 ("The Commission, however, has recognized that security features protect incarcerated persons, their friends and family, the correctional institution, and the general public.  Safety and security features that prevent fraud, such as a person seeking to use another person's calling account, directly benefit incarcerated persons or their loved ones that are funding the account.").

[1422] *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53 n.196.  These basic safety and security functions prevent witness tampering and violations of no-contact orders, and protect consumer accounts from being used unlawfully. *See* National Sheriffs' Association May 8, 2023 Comments at 10-11; Securus May 8, 2023 Comments at 38 (noting that "restricting numbers that can be called" and "preventing call forwarding or three-way conversations" help "achieve the goal of the safe use of communications services in carceral settings").

services can be safely and securely offered in an incarceration setting.[1423]  We find that costs associated with this category of basic safety and security measures are generally used and useful.  At the same time, the record does not provide a reason to question the communications security services costs reported in the 2023 Mandatory Data Collection or otherwise determine them imprudent.

396.    The Commission has long held that there are legitimate reasons for certain safety and security measures that facilitate or enable the provision of communications services in the correctional environment.[1424]  Services in this category appear to be universally offered by IPCS providers and are a standard part of all IPCS offerings.[1425]  Based on the record before us, and consistent with the Commission's previous discussions, we find that these communications security services are inherent in the provision of IPCS and are the key factors distinguishing IPCS communications from those communications of the general public, which do not require such services.[1426]

397.    One commenter argues that communications security services are not used and useful "as they are designed and intended to restrict the access that incarcerated people and their loved ones have to communications."[1427]  While we agree that call blocking functionalities impose restrictions on who incarcerated people can communicate with, such measures are required to facilitate the provision of communications services in the carceral setting.[1428]  As the Commission explained in the *2013 ICS Order*, "a disproportionately large percentage of ICS-enabled crimes target and victimize vulnerable populations consisting of victims, witnesses, jurors, inmates, and family members of these individuals."[1429]  We find that the safety and security measures included in the communications security services category, such as blocking mechanisms and call allow lists, ensure the safety and security of IPCS by appropriately balancing the need to protect public safety against ensuring that incarcerated people can stay connected

---

[1423] Contrary to Securus's claim that we ignore the benefits of such safety and security measures to "incarcerated people and their friends and family," we recognize that the "establishment of PIN numbers, limiting calls to certain preapproved numbers, and preventing call forwarding or three-way calling" are used and useful to the provision of IPCS and are recoverable in our rate caps.  Securus July 11, 2024 *Ex Parte* at 17-18.

[1424] *See, e.g., 2002 Pay Telephone Order*, 17 FCC Rcd at 3276, para. 72.

[1425] As one provider explains, {[

                                                                                    ]}  Smart Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 16; *see also* City Tele Coin Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15-16; Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15-16; HomeWAV Oct. 27, 2023 Response to 2023 Mandatory Data Collection Word Template at 39-40; NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 35-36; Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 19-20; Prodigy Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 15; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 42; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 34.

[1426] For example, measures such as pre-approved numbers lists, blocking three-way communications, and the use of PIN numbers to help ensure that the incarcerated individual associated with the account is initiating the communication facilitate the provision of communications services in correctional institutions by preventing calls to inappropriate parties such as judges or witnesses and protecting against fraud.  *2002 Pay Telephone Order*, 17 FCC Rcd at 3252, para. 9; *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53 n.196; NCIC May 8, 2023 Comments at 15. These functions are distinguished however from other duplicative and expensive functions that go way beyond what is necessary to accomplish these objectives and that we consider not used and useful.

[1427] Worth Rises May 8, 2023 Comments at 6.

[1428] *2002 Pay Telephone Order*, 17 FCC Rcd  at 3252, para. 9; *2013 ICS Order*, 28 FCC Rcd at 14138, para. 58; Pay Tel May 8, 2023 Comment at 16-17; National Sheriffs' Association May 8, 2023 Comments at 10-11; NCIC Apr. 19, 2024 *Ex Parte* at 3 (asserting that "correctional institutions require [inmate calling services] providers to block third-party apps from being accessible by inmates on tablets provided to inmates" and that unsecured messaging capabilities "would allow the incarcerated to contact and harass victims, witnesses, minors, and judges").

[1429] *2013 ICS Order*, 28 FCC Rcd at 14138, para. 58.

with their loved ones.

398.    *Category 4: Communications Recording Services.*[1430]  We find that communications recording services included in this category generally are not used and useful in the provision of IPCS.[1431] These services are primarily used to police the contents of all communications or to gather information for law enforcement purposes.[1432]  Providers describe these services as including functions such as storing recorded communications, transcribing such recordings, and converting recordings into digital formats to support investigation and litigation activities.[1433]  None of these services actually facilitate the provision of IPCS.  Further, certain providers' communications recordings services {[

]} and

create downloadable recordings of all IPCS in a variety of digital formats.[1434]  These latter functions are wholly avoidable to the provision of communications services in correctional institutions and are therefore not used and useful.

399.    Some commenters explain that the cost of storing these recordings is ever increasing, particularly for video communications.[1435]  Although the Commission suggested in the *2013 ICS Order*

---

[1430] The instructions for the 2023 Mandatory Data Collection directed providers to identify and describe each of their safety and security measures that they classified as a communications recording service.  2023 Mandatory Data Collection Word Template at 13.  These category 4 services "include, but are not limited to, providing a disclaimer regarding recording of communications, recording of communications, and storage of recorded communications."  *Id.*  In their 2023 Mandatory Data Collection responses, providers identified a number of specific communications recording services.  *E.g.*, Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 18 (services include recording and storing Audio IPCS calls); ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 35 (ViaPath {[

]}); Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 43 {[

]}.

[1431] *See supra* Section III.D.7.c.i (Application of the Used and Useful Framework).

[1432] Worth Rises May 8, 2023 Comments at 6 (explaining how recordings aid correctional facilities and law enforcement and are then used to prosecute call participants and are not related to providing IPCS); Pay Tel May 8, 2023 Comments at 17 (explaining that call recording analysis performed for the purpose of criminal investigations "should not be considered a legitimate cost of [IPCS]"); *see* Raher May 8, 2023 Comments at 16 ("IPCS carriers advertise their surveillance add-ons as 'investigative' tools 'designed to identify potential criminal activity.'  That these tools may utilize data generated by communications service does not make the technology *necessary to the provision* of the communications service."); PPI Sept. 27, 2021 Comments at 18 (listing safety and security measures not directly related to communications, including call recording analysis).

[1433] Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 18; HomeWAV Oct. 27, 2023 Response to 2023 Mandatory Data Collection Word Template at 41; Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 20; *see* AJA July 10, 2024 *Ex Parte* at 3 (describing the "sophisticated monitoring systems that capture and retain inmate communication data" to "allow for the retrieval of specific conversations, phone numbers, contacts and when needed for inmate protection, investigations and/or court proceedings").

[1434] ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 35; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 43.

[1435] *See* Securus May 8, 2023 Comments at 23 (explaining that video communications services differ from audio calls because of "increased transport and storage costs as video communications take more bandwidth than voice-only communications"); Pay Tel May 8, 2023 Comments at 21 (explaining that "the cost of video storage is typically higher than that of call data storage given the substantially greater sizes of video files"); NCIC May 8, 2023 Comments at 10 ("The costs of storing video recordings hew closely to the amount of bandwidth used and can cost 15 times more than the costs to store voice calls."); ViaPath July 12, 2023 Reply at 6 (agreeing with Securus that "the provision of video IPCS incurs additional costs above and beyond those incurred with voice IPCS, such as software development costs, device costs, WiFi deployment costs, and increased storage costs"); Ameelio June 27,

(continued….)

**Federal Communications Commission**          **FCC 24-75**

that it would "likely find the costs of the storage of inmate call recordings" recoverable in the context of those recordings being used in court proceedings,[1436] the Commission subsequently questioned that position based on several factors reflecting the significant evolution of the industry since that time.[1437] First, the Commission could not have predicted that audio recordings would be stored for years or in perpetuity and the cost of that storage would be rolled into IPCS consumer rates.[1438] Also, video communications were not even within the scope of the Commission's inmate calling services regulations; nor was the use of video communications as prevalent as it is today. Finally, the Commission has a considerably more developed perspective on the industry given the current, more extensive record, including its recent mandatory data collections. With this more complete record and exercising our full authority over video communications services consistent with the Martha Wright-Reed Act, we are not persuaded that the costs of storing communications recordings for which we are not generally including the costs of the recordings in the first place, are generally used and useful in the provision of IPCS.[1439] Nor do we conclude that the rising costs of these features justify including them in the rates paid by the IPCS consumers.

400.    Next, some providers argue that communications recording services facilitate the provision of IPCS. For example, one provider explains that it uses "call recording analysis" to ensure that incarcerated people are not using its communications services to intimidate judges and witnesses.[1440] Other providers use call recordings to verify that the incarcerated person participating in a communication was the person whose PIN was used to originate the communication and to resolve complaints regarding the charges for specific communications.[1441] While such uses of communication recording services may be generally beneficial, the record contains no evidence to suggest that these services actually facilitate the provision of IPCS and are not just redundant features to the blocking and PIN number administration purposes that we do recognize as recoverable costs. On balance, then, we conclude that for the most part these functions suit general law enforcement needs rather than providing capabilities necessary or beneficial to IPCS ratepayers in their capacity as IPCS users. Consequently, we conclude this category generally fails to meet the used and useful test. As an independent, alternative basis for our decision, to the extent that these features are supplemental ways of addressing concerns already addressed by safety and security measures the costs of which we have found used and useful above, we conclude that incurring these additional costs to serve the same ends are excessive as far as IPCS is concerned, and thus imprudent.

2023 Comments at 2 (explaining that the "cost of storing a video call can be roughly ten times higher than that of a voice call").

[1436] *2013 ICS Order*, 28 FCC Rcd at 14134, para. 53 n.196.

[1437] *Supra* Section III.D.7.a (Background).

[1438] Securus May 8, 2023 Comments at 39; NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 34 {[                                    ]}; HomeWAV Oct. 27, 2023 Response to 2023 Mandatory Data Collection Word Template at 41.

[1439] Similarly, we share Worth Rises's concerns that the high cost of storage could incentivize providers to "artificially cause calls to drop, which allows them to collect the full cost of a video call and save on the storage that full video call recording would cost them." Worth Rises May 8, 2023 Comments at 11.

[1440] Pay Tel May 8, 2023 Comments at 16-17.

[1441] *See, e.g.*, Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 20 {[                                    ]}.

**Federal Communications Commission**    **FCC 24-75**

401.    *Category 5: Communications Monitoring Services.*[1442]  We find that communications monitoring services generally are not used and useful in the provision of IPCS because they primarily serve a law enforcement purpose, not a communications purpose, and they generally do not benefit ratepayers in their capacity as consumers of IPCS.[1443]  As the record makes clear, communications monitoring costs are "part of carceral functions, not communications functions."[1444]  Indeed, IPCS providers "advertise their surveillance add-ons as 'investigative' tools 'designed to identify potential criminal activity.'"[1445]  And, despite claiming that "surveillance fits comfortably within the rubric of safety and security measures," the National Sheriffs' Association acknowledges that "surveillance is not necessarily conducted expressly or solely for safety or security purposes."[1446]

402.    One commenter notes that the Commission has previously recognized that "'security features such as call recording and monitoring' . . . 'advance[] the safety and security of the general public.'"[1447]  The Commission has also described the monitoring of frequently called numbers to prevent incarcerated people from "evad[ing] calling restrictions via call-forwarding or three-way calling" as being part of inmate calling services.[1448]  We are not persuaded by these arguments because these statements

---

[1442] The instructions for the 2023 Mandatory Data Collection directed providers to identify and describe each of their safety and security measures that they classified as a communications monitoring service.  2023 Mandatory Data Collection Word Template at 13.  These services "include, but are not limited to, live or real-time monitoring of communications; automatic word detection; communication transcription; and analysis of recordings, which may also include keyword searches."  *Id.*  In their 2023 Mandatory Data Collection responses, providers identified a number of specific communications monitoring services.  *E.g.*, Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 43-44 (services include transcription and translations of audio calls for investigators, identification of key words or phrases, remote video monitoring); Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 18 (providing add-on voice biometrics for transcriptions and word detection).

[1443] Raher May 8, 2023 Comments at 16 (calling for the costs of law enforcement surveillance systems used to "detect and document criminal activity (both real and imagined)" to be borne by correctional facilities); Securus May 8, 2023 Comments at 39 (describing how it offers "[f]eatures to trace calls, detail call history, allow for call monitoring without detection while recording and include[s] other call detail capabilities that can be used to aid investigations related to the detention facilities"); Worth Rises May 8, 2023 Comments at 6; *see* PPI Sept. 27, 2021 Comments at 18 (listing safety and security measures that are not directly related to the provision of communications, including call monitoring and asserting that functions like call monitoring "are properly viewed as overhead in a correctional environment"); Leadership Conference June 17, 2024 *Ex Parte* at 1 (arguing that communication "monitoring services" are "not for the benefit of incarcerated people").

[1444] UCC and Public Knowledge May 9, 2023 Comments at 12.

[1445] Raher May 8, 2023 Comments at 16 (emphasis in original).

[1446] National Sheriffs' Association July 12, 2023 Reply at 8.

[1447] *Id*. (citing *2013 ICS Order*, 28 FCC Rcd at 14109, para. 2).  The National Sheriffs' Association argues that "surveillance fits comfortably within the rubric of safety and security measures."  National Sheriffs' Association July 12, 2023 Reply at 8.  In making this argument, the National Sheriffs' Association relies on another commenter's reference to a Second Circuit decision that discusses the Supreme Court's interpretation of the Fourth Amendment in the prison context.  *Id.* at 8 n.30 (citing Global Tel*Link Corporation Reply, WC Docket No. 12-375, at 14-15 n.66 (rec. Jan. 15, 2021) (citing *United States v. Amen*, 831 F.2d 373, 379-80 (2d Cir. 1987) (*Amen*))).  We find the National Sheriffs' Association's reliance on the Second Circuit's decision in *Amen* to be misplaced.  That court's finding, after considering the Fourth Amendment, that there is a legitimate security concern linked to call monitoring is distinct from whether the IPCS consumers must pay for call monitoring costs through IPCS rates.  *Amen*, 831 F.2d at 379-80.  For the same reason, we find unpersuasive FDC's reliance on other judicial precedent and Florida law for the same reason.  FDC July 11, 2024 *Ex Parte* at 2-3 & n.2.  While we accept as true that the Florida legislature has granted FDC jurisdiction over all matters related to correctional institutions in Florida, nothing in these cases or Florida law requires that IPCS consumers bear the costs of any particular safety and security measure that facilities choose to implement.  *See id.* at 3.

[1448] *2002 Pay Telephone Order*, 17 FCC Rcd at 3252, para. 9.

217

were based on the record at the time they were made and do not reflect the evolution of the industry and the proliferation of such services during the course of this proceeding.

403.    The current record, including data and information submitted by IPCS providers, reveals that call monitoring has evolved and expanded significantly and is now predominantly "used to aid investigations related to detention facilities,"[1449] "aid corrections agencies and law enforcement in 'investigation and litigation activities,'"[1450] and "provide[] for skilled investigators."[1451]  One provider describes its audio monitoring services as including an alert system "mostly configured before the incarcerated person has been prosecuted and evidence is still being gathered."[1452]  Not surprisingly, the data submitted by IPCS providers demonstrate that communications monitoring services have become a significant profit center for at least some providers.[1453]  While communications monitoring services are argued to be a tool for keeping incarcerated people from calling blocked numbers and from engaging in three-way calling,[1454] enabling the full recovery of costs for these monitoring services would amount to significant over-recovery for providers, given that we already include the recovery for the costs of providing the call blocking and limitation on three-way calling capabilities in our rate caps.  We find, on balance, that call monitoring services, for the most part, are primarily used for law enforcement or investigative purposes, and therefore are generally not used and useful in the provision of IPCS.  As an independent, alternative basis for our decision, to the extent that call monitoring services are, in part, used to supplement measures like call blocking and limitation on three-way calling capabilities for which we already allow recovery, we conclude that incurring these additional costs to serve the same ends are excessive as far as IPCS is concerned, and thus imprudent.

404.    *Category 6: Voice Biometrics Services.*[1455]  We next conclude that voice biometrics services are elective safety and security measures used predominantly for general law enforcement

---

[1449] Securus May 8, 2023 Comments at 39; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 43 {[

]}; NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 33-34 {[

]}; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 35; AJA July 10, 2024 *Ex Parte* at 2-3 (describing the purpose of monitoring services, such as automatic keyword searches and data retention, as preventing intra-facility incidents and "allow[ing] for the retrieval of specific conversations, phone numbers, contacts," as "needed for inmate protection, investigations and/or court proceedings").

[1450] Worth Rises May 8, 2023 Comments at 6.

[1451] Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 44.

[1452] City Tele Coin Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 16.

[1453] Aventiv Consolidated Financial Statements, Dec. 31, 2021 and 2022 at 21, Note 5 (reporting revenues of over {[ ]} million in "monitoring services" in 2021 and 2022).

[1454] *See, e.g.*, Securus July 12, 2023 Reply at 25 (explain that part of the purpose of monitoring is to ensure "compliance with correctional authorities' reasonable calling restrictions").

[1455] The instructions for the 2023 Mandatory Data Collection directed providers to identify and describe each of their safety and security measures that they classified as a voice biometrics service.  2023 Mandatory Data Collection Word Template at 13.  These category 6 services "include, but are not limited to, voice printing, voice identification, continuous voice verification, and voice databasing. *Id.*  In their 2023 Mandatory Data Collection responses, providers identified a number of specific voice biometrics services.  *E.g.*, ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template at 16 (providing {[

]}); NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 37 (providing "{[

]}").

purposes that do not facilitate the provision of IPCS.[1456]  As such, they generally are not used and useful in the provision of IPCS.  This treatment of voice biometrics services is also supported by several commenters that expressly oppose recovery of the costs of voice biometrics services through our rate caps.[1457]

405.     Certain providers claim that their voice biometrics services are used and useful in the provision of IPCS in that they help prevent fraud and the circumvention of calling restrictions by preventing incarcerated people from passing a call to another person, and they help validate that the "rightful owner of [a] PIN" is placing the call.[1458]  Some of those same providers, however, also describe using these services as furthering more general law enforcement purposes, including "generati[ng] targeted investigative leads,"[1459] "help[ing] investigators find correlations among calls,"[1460] and {[

]}[1461]  Voice biometrics recordings also are subject to being rolled up into voice print databases and marketed as a broader investigative tool for general law enforcement and surveillance purposes.[1462]

406.     As Securus explains, "[e]arly IPCS was typically provided by on-site operators that would handle the approval and connection of collect calls placed by incarcerated persons."[1463]  Over time, the market for safety and security measures has evolved with one of those "advances" being the development of voice biometrics.[1464]  The fact that IPCS has historically been offered without capabilities like voice biometrics undercuts the notion that these capabilities are required for the provision of IPCS.

---

[1456] Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 19-20; ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template at 16; NCIC Dec. 5, 2023 Response to 2023 Mandatory Data Collection Word Template at 37; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 44.  Inmate calling services pre-date the availability of Voice Biometrics.  *See, e.g.*, Securus History, https://securustechnologies.tech/about/history/ (Apr. 22, 2024) (explaining that it first introduced voice biometrics services in 2014); GTL, *GTL's Voice IQ™ solves issue of inmate identification on calls with biometric voiceprints*, https://www.gtl.net/gtls-voice-iq-solves-issue-of-inmate-identification-on-calls-with-biometric-voiceprints/ (Apr. 7, 2015).  Voice biometrics services are likewise not used, or even offered, universally, in many cases being an elective feature only.  Worth Rises May 8, 2023 Comments at 5; Public Interest Parties May 8, 2023 Comments at 24; EPIC June 6, 2023 Reply at 3-4; City Tele Coin Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 17; Combined Public Communications Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 17; Prodigy Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 16; TKC Telecom, Response to 2023 Mandatory Data Collection, WC Docket Nos. 23-62 and 12-375, Appx. A, at 14 (filed Nov. 2, 2023) (TKC Telecom Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template); ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 35-36.

[1457] PPI Sept. 27, 2021 Comments at 18 (listing safety and security measures that are unrelated to communications, including voice biometrics); Leadership Conference June 17, 2024 *Ex Parte* at 1 (explaining that voice biometrics "are not for the benefit of incarcerated people" and thus "do not belong in the rate").

[1458] ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template at 16; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 44; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 35-36; Securus May 8, 2023 Comments at 39 ("Voice biometrics to prevent unauthorized use and the ability to search for key words or phrases in audio recordings.").

[1459] Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 44.

[1460] *Id*.

[1461] NCIC Dec. 4, 2023 Response to 2023 Mandatory Data Collection Word Template at 37.

[1462] George Joseph, Debbie Nathan, *Prisons Across the U.S. Are Quietly Building Databases of Incarcerated People's Voice Prints*, The Intercept, https://theintercept.com/2019/01/30/prison-voice-prints-databases-securus/ (Jan. 30, 2019).

[1463] Securus July 12, 2023 Reply at 27.

[1464] *Id*.

And, as Securus notes, demand for features like voice biometrics "has largely been driven by facilities," suggesting that these measures are elective and do not actually prevent consumers from using IPCS if they are not available or used.[1465]  For these reasons, we find that voice biometrics services as a category generally are not used and useful in the provision of IPCS.  As an independent, alternative basis for our decision, to the extent that voice biometrics services are, in part, used to supplement fraud prevention and calling restriction measures for which we already allow recovery, we conclude that incurring these additional costs to serve the same ends are excessive as far as IPCS is concerned, and thus imprudent.

407.    *Category 7: Other Safety and Security Measures.*[1466]  We find that other safety and security measures as a category are generally not used and useful in the provision of IPCS.[1467]  The instructions to the 2023 Mandatory Data Collection established this category as a catch-all category for providers to allocate the costs of safety and security measures that did not fit into the other categories and to ensure that providers reported the costs of all their safety and security measures.[1468]  As a result, the tasks or functions reported in this category are varied and diverse.  However, few, if any, of the safety and security measures reported in this category serve even a nominal communications function.[1469]  For example, one provider includes access to a free law library, while another reports that it provides "a postal mail scanning service in some facilities."[1470]  These services also "help[] correctional agencies generate targeted investigative leads . . . create 'actionable intelligence' for federal law enforcement . . . [and] flag calls in which incarcerated people discussed contacting media about cover-ups of COVID-19 outbreaks."[1471]  Based on the record, we are persuaded that the safety and security measures included in this category either largely serve a law enforcement function or, to the extent they do not serve a law enforcement function, also do not facilitate the provision of IPCS.  As a result, we conclude that the safety and security measures included in this category generally are not used and useful.

### 8.    Ancillary Service Charges

408.    We eliminate all separately assessed ancillary service charges for IPCS and, instead, allow for the recovery of the costs of ancillary services as reported by providers through the rate caps we adopt today.  In the *2022 ICS Notice¸* the Commission sought comment on whether some or all ancillary services are inherently part of inmate calling services and, if so, whether it should include the costs of those services in its rate cap calculations and preclude providers from imposing separate charges in

---

[1465] *Id.* at 28.

[1466] The instructions for the 2023 Mandatory Data Collection directed providers to identify and describe each of their safety and security measures that were not included in any of the prior six categories.  These services "include, but are not limited to, reporting obligations, acquisition of patents to support safety and security technologies, and research and development of new safety and security technologies."  2023 Mandatory Data Collection Word Template at 13.  In their 2023 Mandatory Data Collection responses, providers identified a number of specific safety and security measures.  *E.g.*, ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template at 16 (providing {[                                    ]}); Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 22; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 36.

[1467] Worth Rises May 8, 2023 Comments at 7.

[1468] *Id.*; 2023 Mandatory Data Collection Instructions at 37.

[1469] Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 22; Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 44-45; ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template at 16; ViaPath Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 36 (offering services that "{[                          ]}").

[1470] Pay Tel Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 22; ICSolutions Nov. 2, 2023 Response to 2023 Mandatory Data Collection Word Template at 16 ("{[                          ]}").

[1471] Worth Rises May 8, 2023 Comments at 7.

connection with those services.[1472]  Based on the record,[1473] we conclude that the best means of discharging our mandate to establish a compensation plan that ensures both just and reasonable IPCS rates and charges, as well as fair compensation for providers is to allow recovery of the costs of ancillary services within our overall IPCS rate caps.  In doing so, we eliminate a source of consumer confusion and detrimental provider practices while ensuring that providers have the opportunity to recover their used and useful costs of providing ancillary services.

### a.    The Commission's Prior Treatment of Ancillary Service Charges

409.    The Commission has long recognized the economic burden that unreasonably high ancillary service charges impose on incarcerated people and their loved ones.[1474]  Those charges have been a continuous source of confusion and gamesmanship, significantly increasing the costs of IPCS "because incarcerated people and their families must either incur them when making a call or forego contact with their loved ones."[1475]  As one commenter explains, ancillary service charges "can increase the cost of staying in touch with loved ones by 40%."[1476]  Deposits consumers make in their accounts can be "consumed" by ancillary service charges, which can dramatically reduce the amount of call time available to consumers for a given amount of account funds.[1477]

410.    The Commission's prior reform efforts limited the ancillary services for which providers could assess separate charges and capped those "permissible" charges,[1478] in an effort to foreclose providers' "incentive and ability to continue to extract unjust and unreasonable ancillary service charges."[1479]  The Commission permitted five types of ancillary service charges—automated payment

---

[1472] *2022 ICS Notice*, 37 FCC Rcd at 11955, para. 139.

[1473] UCC and Public Knowledge Dec. 15, 2022 Comments at 6 (contending that "the Commission should consider whether [it would be] just and reasonable to abolish ancillary services entirely"); NCIC Sept. 27, 2021 Comments at 10 (suggesting that the Commission eliminate single call transaction fees); PPI Dec. 17, 2021 Reply at 5 (concurring with NCIC's suggestion that the Commission eliminate single call transaction fees); Illinois Campaign for Prison Phone Justice Comments, WC Docket. No. 12-375, at 3 (rec. Jan. 9, 2015) (arguing that the FCC should "[u]se its authority to eliminate all ancillary fees, including per-call connection fees as well as charges to open, close or deposit money in debit accounts"); National Lawyers Guild Comments, WC Docket No. 12-375, at 4 (rec. Jan. 12, 2015) (arguing that eliminating "ancillary fees entirely and accept[ing] all ancillary services as a basic operational cost will diminish that rift [between the incarcerated and their families] and promote strong family and community ties for all prisoners despite a prisoner's family's socioeconomic status"); New Jersey Institute for Social Justice Comments, WC Docket No. 12-375, at 3-4 (rec. Jan. 12, 2015) (advocating that the Commission eliminate ancillary service charges for intrastate ICS calls); PPI July 15, 2022 *Ex Parte* at 6 (suggesting the elimination of the fee for paper billing statements); Prisoners Legal Services Comments, WC Docket No. 12-375, at 9 (rec. Jan. 15, 2015) (maintaining that "[m]ost expenses covered by fees" are incidental "to the general costs of conducting business in the ICS industry and should be included in the per-minute rates"); Praeses Comments, WC Docket No. 12-375, at 44 (rec. Jan. 15, 2015) (suggesting that "all costs", including ancillary service costs, "that Providers necessarily and unavoidably incur as part of completing an inmate call should be recovered through ICS rates"); NCIC June 17, 2024 *Ex Parte*,  Exh. A at 5 (discussing transaction fees in connection with single-pay calls under the Commission's current ancillary service charge rules in the context of a Colorado PUC proceeding).

[1474] *2022 ICS Order*, 37 FCC Rcd at 11936-40, paras. 81-87; *2021 ICS Order*, 36 FCC Rcd at 9612-16, paras. 209-16; *2020 ICS Order on Remand*, 35 FCC Rcd at 8495, para. 28; *2015 ICS Order*, 30 FCC Rcd at 12838-39, paras. 144-45.

[1475] *2021 ICS Notice*, 36 FCC Rcd at 9666-67, para. 326.

[1476] Color of Change May 8, 2023 Comments at 6.

[1477] California PUC Sept. 27, 2021 Comments at 5; Dana. M. Mims Comments, WC Docket No. 12-375, at 2 (rec. Nov. 15, 2022) (explaining that "a first-time user of [City Tele Coin] can deposit $5.00, which would leave a balance of $2.00, which is an 8-minute call").

[1478] *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12838-39, paras. 144-45.

[1479] *Id.* at 12845, para. 161.

fees, third-party financial transaction fees, live agent fees, paper bill/statement fees, and single-call and related services fees.[1480] The Commission cautioned that it was "mindful of and concerned about the potential for continued abuse of ancillary service charges, and [would] monitor the implementation of these caps and determine if additional reforms are necessary in the future."[1481]

411.    In the *2021 ICS Order*, in response to allegations of inmate calling service provider abuses, the Commission responded to the need for further ancillary service charge reform specifically for the third-party fees for single-call and related services and third-party financial transactions.[1482] The Commission reasoned that fixed, interim caps of "$6.95 per transaction" were necessary to discourage providers from seeking out, as part of revenue-sharing schemes, artificially high rates for these services from third parties.[1483] In the *2021 ICS Notice*, the Commission highlighted record evidence concerning the assessment of duplicate ancillary service charges for individual transactions and sought comment on whether providers were assessing both automated payment fees and third-party transaction fees for individual credit card or debit card transactions.[1484] The Commission expressed concern that providers were exploiting ambiguities in the rules to engage in such "double dipping,"[1485] and sought comment on whether the Commission's rules were sufficiently clear in prohibiting providers from assessing multiple ancillary service charges per transaction or should be amended to implement such a prohibition.[1486]

412.    In the *2022 ICS Order*, in response to further allegations of harmful provider practices associated with third-party fees,[1487] the Commission set $3.00 as the maximum amount that providers could pass through to consumers for single-call and related services and any third-party financial transactions where the transaction involves the use of an automated payment system, and set $5.95 as the maximum pass-through amount where the transaction involves the use of a live agent.[1488] In setting these caps, the Commission sought to address concerns raised by commenters that the caps on third-party fees adopted in 2021 "simply encourage[d] some carriers to steer customers toward unnecessarily expensive calling options."[1489]

413.    In the *2022 ICS Notice*, the Commission sought comment on whether it should eliminate ancillary service charges as separate fees and instead include the costs of those services in its overall rate cap calculations.[1490] The Commission also sought comment on how it might use data from the Third Mandatory Data Collection to set reasonable ancillary service caps in the event it decided to continue to allow separate ancillary service charges.[1491] The Commission asked, in particular, whether the data providers had submitted in response to the Third Mandatory Data Collection "provide[d] a reasonable allocation of costs between inmate calling services and various ancillary services" that would allow it to

---

[1480] *Id.* at 12846, para. 163 & Tbl. 4. As examples, under the *2015 ICS Order*, the cap for single-call and related services was "the exact transaction fee charged by the third-party provider, with no markup, plus the adopted per-minute rate," and the capped third-party financial transaction fee was "the exact fees, with no markup that result from the transaction." *Id.* at 12857, para. 186.

[1481] *Id.* at 12851, para. 174.

[1482] *Id.* at 9612-16, paras. 209-16; 47 CFR § 64.6020(b)(2), (b)(5) (2022).

[1483] *2021 ICS Order*, 36 FCC Rcd at 9612-13, 9615, paras. 209, 212.

[1484] *Id.* at 9667, para. 327.

[1485] *Id.*; *2022 ICS Order*, 37 FCC Rcd at 11907, para. 17.

[1486] *2021 ICS Notice,* 36 FCC Red at 9667-69, paras. 327-29.

[1487] *2022 ICS Order*, 37 FCC Rcd at 11937-38, para. 81.

[1488] *Id.* at 11937, para. 84; *see id.* at 11938-39, para. 87.

[1489] *Id.* at 11937, para. 83 (citing PPI Sept. 27, 2021 Comments at 12).

[1490] *2022 ICS Notice*, 37 FCC Rcd at 11955, para. 139.

[1491] *Id.* at 11955, paras. 138, 140.

set reasonable cost-based ancillary service caps.[1492]  Finally, the Commission asked how it should revise its rules to prevent detrimental practices, such as "double dipping," associated with any ancillary service charges that it continued to permit.[1493]  In the *2023 IPCS Notice*, the Commission reiterated these requests for comment in light of enactment of the Martha Wright-Reed Act,[1494] and sought comment on whether ancillary service charge caps should apply uniformly to all audio and video incarcerated people's communications services.[1495]

> **b.    Eliminating All Separate Ancillary Service Charges**

414.    We conclude that our compensation plan for IPCS should allow providers to recover their costs of providing ancillary services through per-minute rate caps, rather than through separate ancillary service charges.  We therefore eliminate all separately assessed ancillary service charges for IPCS, including any ancillary service charges associated with intrastate IPCS.[1496]  To ensure that providers have an opportunity to recover their costs of providing ancillary services, we include providers' reported ancillary service costs from the 2023 Mandatory Data Collection in the used and useful IPCS costs that we use to set the rate caps we adopt in this Report and Order.

415.    *Recognizing that Ancillary Services Are Inherently Part of IPCS.*  These actions reflect four independently sufficient findings.[1497]  First, we find that all ancillary services associated with IPCS, including the five types of ancillary services for which our inmate calling services rules presently permit separate charges, are inherent in the provision of IPCS.[1498]  In the *2022 ICS Notice*, the Commission sought comment on whether "some or all" of the permissible ancillary services are "an inherent part of providing inmate calling services," such that the Commission should continue to "include those costs in [the] per-minute rate cap calculations and eliminate some or all charges for ancillary services."[1499]  To a large extent, the permissible ancillary services reflect routine internal business functions, such as internal computer processing and other back office, in-house functions inherent in providing a consumer-facing service.  For example, automated payment fees are, by definition, fees for IPCS providers' internal "credit card payment, debit card payment, and bill processing" that are basic back office functions that are a routine part of providing a communications service.[1500]  Given the historical backdrop of problems that

---

[1492] *Id.* at 11955, 11958-59, paras. 138, 147.

[1493] *Id.* at 11955-58, paras. 141-46.

[1494] *2023 IPCS Notice*, 38 FCC Rcd at 2674-75, 2686, paras. 12, 40.

[1495] *Id.* at 2686, para. 41.

[1496] To the extent that providers assess ancillary services charges for their own services or on behalf of facilities, such fees are now prohibited.  For example, in Arizona, "[a]ll adult visitors applying for in-person/phone, and video visits must pay a one time, non-refundable, $25.00 background check fee."  https://corrections.az.gov/visitation. (last visited June 21, 2024).  To process this Visitation Application, some providers charge additional ancillary service fees.  Arizona Department of Corrections Rehabilitation & Reentry, Visitation Background Fees, https://corrections.az.gov/visitation/visitation-background-fees (last visited June 24, 2024).

[1497] These findings apply equally to audio and video IPCS because, as certain commenters explain, the utility and costs of providing ancillary services do not vary between types of services.  *See* Securus May 8, 2023 Comments at 21 (asserting that ancillary service charges "are largely designed to recover the costs involed in funding accounts, which are the same for voice-only and video communications services"); Raher May 8, 2023 Comments at 13 (contending that all current ancillary service charges "authorized under the Commission's rules relate to payment and billing, and therefore there is no need for separate fee caps based on the technology of the underlying service").

[1498] *See 2015 ICS Order*, 30 FCC Rcd at 12839, para. 146 & n.524 (distinguishing between ancillary services that are "an intrinsic part of providing" inmate calling services and other ancillary services, and allowing separate charges only for services that are offered "as a convenience, and that therefore are not reasonably required . . . for an inmate to place a call").

[1499] *2022 ICS Notice*, 37 FCC Rcd at 11955, para. 139.

[1500] 47 CFR § 64.6000(a)(1).

have arisen from separately-imposed ancillary service charges in this context, we find that providers should not be allowed to treat payment for IPCS as a service—separate and apart from IPCS service itself—for which a separate charge is assessed.

416.    The other permissible ancillary services—third-party financial transaction fees, live agent fees, paper bill/statement fees, and single-call and related services fees—relate primarily to how consumers are billed for and pay for IPCS, and thus also are inherently part of IPCS.[1501]  Although these ancillary services may have qualified as a "convenience" in 2015 when the Commission first identified them in its rules, the record indicates that they are now the predominant means by which consumers gain access to IPCS.[1502]  While alternative methods of funding an account remain available (e.g., by check or money order), automated payment or money transmitter services are "an intrinsic part" of accessing and using IPCS, as is the case with most other services in the 21st-century economy.[1503]  In short, "incarcerated people and their families must either incur [these charges] when making a call or forego contact with their loved ones."[1504]

417.    We recognize, of course, that an IPCS user may contact a live agent, request a paper bill, or otherwise interact with an IPCS provider regarding matters other than routine billing and collection. For instance, an IPCS account holder may wish to speak with a live agent to complain about the service quality on video communications, to learn about the provider's alternate pricing plans, or to obtain a refund of money from an inactive account.  We find that these other non-billing and collection interactions also are inherent in the provision of IPCS, in much the same way that similar interactions are inherent in products and services provided outside the IPCS context.  As such, we conclude that the costs of these interactions should be recovered through IPCS rates, rather than ancillary service charges that have been an ongoing source of harm in the IPCS context.

418.    *Eliminating Incentives for Abuses.*  Second, we find that continuing to allow providers to impose separate ancillary service charges would create an incentive for providers to continue to engage in practices that unreasonably burden consumers and effectively raise the cost of IPCS.  Although the Commission has previously restricted the type and amount of ancillary service charges, providers are still "motivated to exploit every available opportunity to continue deriving unreasonable profits from such fees."[1505]  A rate structure that eliminates all separate ancillary service charges while still allowing

---

[1501] *See* Raher May 8, 2023 Comments at 13; *see also* PPI July 15, 2022 *Ex Parte* at 2 (asserting that "there are really only two categories of payment-related costs imposed directly on carriers: (1) general overhead costs of conducting business, and (2) payment-card processing fees").

[1502] PPI July 15, 2022 *Ex Parte* at 1-2 ("Most non-incarcerated ICS customers choose between two methods of paying for ICS calls: they use a payment card (either to pay for a specific call on a one-off basis or to fund a prepaid account) or they fund a prepaid account by giving cash to a money transmitter who then remits the funds electronically to the ICS provider for credit to the customer's account."); *see also 2021 ICS Order*, 36 FCC Rcd at 9613, para. 209 n.646 (citing comments explaining that "since 'many [IPCS] customers do not have bank accounts, they often use money transmitters . . . to remit funds to prepay'" for IPCS accounts).

[1503] Indeed, one provider has pointed to the decreased usage of collect calls, and its alternative payment mechanisms, in support of its proposal that the Commission eliminate the fee for paper statements.  *See* NCIC June 17, 2022 *Ex Parte* at 2-3.

[1504] *2021 ICS Notice*, 36 FCC Rcd at 9666, para. 326 (citing the *2015 ICS Order*, 30 FCC Rcd at 12838, para. 144).

[1505] PPI Sept. 27, 2021 Comments at 6; *see also* NCIC June 17, 2022 *Ex Parte* at 2 (contending that "imprecise language [in the Commission's rules] has led to certain [inmate calling services] providers imposing additional ancillary fees on [inmate calling services] consumers that most certainly contravene the FCC's efforts to reign in ancillary fees"); Raher May 8, 2023 Comments at 17 ("maintaining that "[d]espite the progress the Commission has made in lowering IPCS voice-calling rates, there are still numerous documented problems that require regulatory intervention"); *2015 ICS Order*, 30 FCC Rcd at 12842, para. 151 ("One commenter explains that ancillary fees have 'no actual relation to actual costs borne by ICS providers and have become a mechanism by which ICS providers sustain or increase their overall revenues.'  Indeed, even ICS providers have recognized the need for reform and have

(continued….)

providers to recover the costs of these functions will eliminate the incentive and ability for providers to charge multiple fees for the same transaction,[1506] as a way of exacting revenue from consumers that far exceeds their actual costs of completing the transaction,[1507] a problem that is well-documented in the record.[1508]  By including providers' reported costs of all ancillary services into our rate caps and eliminating providers' ability to charge for them separately, we also remove the incentive for providers to "double dip" in this manner, mooting related concerns in regard to our existing rules and eliminating

---

submitted various proposals to that end."); *2021 ICS Order*, 36 FCC Rcd at 9616, para. 216 ("[T]he record in this proceeding continues to suggest that the same types of revenue-sharing agreements that lead to indirect markups of third-party transaction fees for single-call services similarly lead to mark-ups of third-party financial transaction fees.  Such practices serve to circumvent, either directly or indirectly, the limits placed by the Commission on ancillary service charges and lead to unjust and unreasonable charges."); *2022 ICS Order*, 37 FCC Rcd at 11939, para. 87 ("Commenters now highlight that the $6.95 cap we adopted in the *2021 ICS Order . . .* may have actually incentivized providers to increase charges for consumers.").

[1506] *See* Color of Change May 8, 2023 Comments at 6 (asserting that "[a] number of providers charge both an automated payment fee and a fee for the card processor costs for the same transactions" and that this double dipping "results in charging incarcerated individuals or their loved ones 21% more on average than the intended $3 cap" for automated payments); NCIC Sept. 27, 2021 Comments at 10 (renewing NCIC's prior request that the Commission "prohibit third-party transaction fees which lead to double billing of ICS customers"); PPI Sept. 27, 2021 Comments at 11 ("The fundamental problem of double dipping is that carriers are recouping payment-card processing costs twice over. . . .  When carriers impose the $3 fee allowed under 47 CFR § 64.6020(b)(1) while also making customers pay the carrier's card-processing costs under § 64.6020(b)(5), this constitutes an unreasonable charge, unjust enrichment, and circumvention of the Commission's stated purpose in promulgating [inmate calling services] rules."); Pay Tel Dec. 15, 2022 Comments at 6; Securus Sept. 27, 2021 Comments at 19 ("Securus concurs that such double recovery, if it is occurring, would be inappropriate."); Raher Dec. 15, 2022 Comments at 6 ("The number of carriers charging multiple transaction fees on the same payment has escalated in recent years and the cumulative financial harm caused to consumers is substantial."); UCC Media Justice Sept. 21, 2022 *Ex Parte* at 3 (recommending that the Commission "immediately prohibit ICS providers from imposing two duplicative fees on one transaction rather than seeking comment on this practice").

[1507] *See, e.g.*, *2021 ICS Notice*, 36 FCC Rcd at 9667, para. 327 ("[If] the credit card processing fees encompassed in the automated payment fee are the same credit card processing fees referred to in the third-party financial transaction fee . . . then permitting providers to charge both an automated payment fee and a credit card processing fee when consumers use a credit or debit card to make an automated payment would, indeed, seem to allow for double recovery.").

[1508] The record reflects substantial debate or confusion as to whether—and if so, under what circumstances— multiple fees can be charged for a single transaction, and more generally, what activity the payment-related fees were intended to encompass.  *See, e.g.*, *2021 ICS Notice*, 36 FCC Rcd at 9667, para. 327 (recognizing apparent "confusion among industry stakeholders regarding the relationship between the automated payment fee and third-party transaction fees as they relate to credit card processing fees").  *Compare* California PUC Sept. 27, 2021 Comments at 5 (asking that the Commission clarify its rules to ensure that ancillary service charges are not "assessed multiple times" for a single call); Pay Tel Dec. 15, 2022 Comments at 6 (same); NCIC Sept. 27, 2021 Comments at 10 (arguing that the automated payment fee was intended to encompass all payment processing costs, including those passed through by third-party processors); PPI Dec. 17, 2021 Reply at 3 (same) *with* Securus Mar. 5, 2023 Reply at 26, 33 (arguing internal and third-party payment processing costs are covered by separate ancillary fees and that "there is no basis to categorically preclude" assessing multiple types of fees on the same transaction); Securus Sept. 27, 2021 Comments at 19-20 (describing how Securus "may impose an automated payment fee" or "a live agent fee" to cover its internal costs in managing accounts or providing live agent service, "and may also impose a third-party credit processing fee to cover the costs imposed by" a third-party payment processor); GTL Dec. 17, 2021 Reply at 11 ("The Commission, however, should not assume that when more than one transaction fee is applied to a call that it equates to double recovery.  As GTL has explained, each Ancillary Service Charge serves a distinctly different transactional purpose in the provision of ICS to consumers."); *see also 2021 ICS Notice*, 36 FCC Rcd at 9667-70, paras. 327, 329 (seeking comment on the distinctions among various ancillary fees).  Because we eliminate all ancillary service charges associated with IPCS, we find it unnecessary to resolve this dispute in this rulemaking.

consumer confusion arising from these practices.

419.    We similarly eliminate the ability of providers to engage in other rent-seeking activity described in the record,[1509] including concerns that providers may "steer" consumers to a more expensive single-call option for an incarcerated person's initial call after incarceration in an effort to artificially inflate revenues through single-call fees.[1510]  These practices undermine the intent of our rules and merely inflate providers' revenues well beyond costs at the expense of consumers while providing no additional consumer value.

420.    *Recognizing the Limitations of Providers' Ancillary Services Cost Data.*  Third, we find that the limitations inherent in providers' reported ancillary service charge data preclude our setting reasonable, cost-based caps on individual ancillary service charges.  In the *2021 ICS Order*, the Commission found that the data before it provided "no reliable way to exclude ancillary service costs" from the calculations for the provider-related rate cap component,[1511] resulting in interim rate caps that included the costs that consumers were also paying through ancillary service fees.[1512]  To correct for this problem, in the 2023 Mandatory Data Collection, providers were required to follow detailed instructions in allocating their costs to, and among, their permissible ancillary services.[1513]  But, as made clear in Appendix H, providers failed to reliably or consistently allocate their costs among the various ancillary services.  This makes it impossible for us to assess reliable costs for each individual ancillary service.  Incorporating all of these reported costs into our rate cap calculations avoids the risk of setting individual caps for each ancillary service charge that fail to reflect providers' actual costs, while still ensuring the

---

[1509] Commenters describe circumstances where providers charged multiple single-call fees when calls were disconnected and reconnected, or where a provider "charge[d] a billing statement fee as a matter of course without offering an option of providing a free electronic copy," and several other rent-seeking practices.  *See* California PUC June 6, 2023 Reply at 3-4 (observing that "IPCS providers charg[e] fees separate from the ICPS [*sic*] rates which can be as much as $3.00 for single-call fees, and when the call was disconnected, the consumer was charged $3.00 for each time they reconnected, totaling $9.00 or more"); NCIC July 15, 2022 *Ex Parte* at 8; NCIC Apr. 19, 2024 *Ex Parte* at 4, 9-19 (describing practices including overcharging via extra fees, or capping maximum deposits); *see also* State of Phone Justice Dec. 2022 Report at 5 (describing single-call practices as "particularly exploitative") (Dec. 2022); *2021 ICS Order*, 36 FCC Rcd at 9615, para. 213; *2022 ICS Order*, 37 FCC Rcd at 11937, para. 83.

[1510] *See, e.g.*, Color of Change May 8, 2023 Comments at 5-6 (arguing that IPCS providers like Securus "steer" consumers to calling options that trigger single call transaction fees as opposed to directing consumers to fund accounts); PPI Dec. 17, 2021 Reply at 5-6 (pointing out that Securus's menu for first-time call recipients prompts the single-call service first, while setting up an account is mentioned last and, unlike the other menu options, requires hanging up and calling a different number); NCIC July 15, 2022 *Ex Parte* at 2 (describing a similar IPCS call menu); NCIC Sept. 27, 2021 Comments at 8 (addressing certain providers' practice of steering consumers to using the single-call service (and so pay the associated fee)); PPI Sept. 27, 2021 Comments at 11-12 (same); Joint Advocates July 29, 2020 *Ex Parte* at 3 & Attach. at 9 (same); *see also 2015 ICS Order*, 30 FCC Rcd at 12896, para. 279 n.974 (noting concerns "that providers may be using consumer disclosures as an opportunity to funnel end users into more expensive service options, such as those that may require consumers to pay fees to third parties").  *But see* Securus Mar. 5, 2023 Reply at 22-23 (asserting that it does not steer consumers to more expensive single-call products, and stating that such products are "only available if primary, alternative billing arrangements are not available" and that the called party can terminate the call and fund a prepaid account).

[1511] *2021 ICS Order*, 36 FCC Rcd at 9552, para. 79.  The Commission was unable to "isolate with any degree of accuracy" the costs of providing ancillary services because the instructions for the Second Mandatory Data Collection required providers to report certain ancillary service revenues separately, but did not require providers to report their ancillary service costs separately from other inmate calling services costs.  Further, those instructions did not require providers to separately report costs relating to any specific ancillary service, and no commenter suggested a way of identifying the providers' ancillary service costs.  *Id.*

[1512] *Id.* at 9553, para. 80.

[1513] 2023 Mandatory Data Collection Instructions at 20-27, 45-49.  In contrast to the Second Mandatory Data Collection, the instructions for the 2023 Mandatory Data Collection required providers to report their costs of each ancillary service separately.  *See* Appendix D.

providers are able to recover their costs through our rates. By incorporating providers' reported ancillary service charge costs into our rate cap calculations, we ensure they have an opportunity to recover, but not double recover, their actual costs of providing ancillary services.[1514]

421.    *Additional Benefits*.  Fourth, we find that incorporating providers' ancillary service costs into our rate cap calculations will benefit both consumers and providers.  As an initial matter, that approach will result in a rate structure that will be easier for consumers to understand and for providers to administer, while still allowing them to recover any used and useful costs they incur in providing ancillary services.[1515]  It will simplify providers' record keeping and billing processes, easing the administrative burdens on providers and reducing the burdens on consumers as they seek to understand any charges to their IPCS accounts.

422.    We likewise find that incorporating ancillary service costs into our rate cap calculations will align rates and charges more fairly with actual user activity.  Commenters point out the seeming unreasonableness and disproportionality of imposing a $3.00 fee for automated single call and related services for a call that may be of short duration,[1516] or passing through similar fees for smaller deposits, causing consumers to "lose a significant amount" of their account deposits through such fees.[1517] Incorporating ancillary service costs into our rate caps spreads those costs across all calls and communications, ensuring that the cost of any particular communication for any IPCS consumer is more proportionate to its duration.

423.    Even beyond those direct effects on IPCS rates and charges, we also eliminate certain incentives for consumer behavior that our current fee structure would perpetuate, such as avoiding a live agent or transferring funds to relatives less frequently in an effort to avoid such charges.[1518]  Our actions today reduce these barriers to communication, resulting in a compensation plan ensuring just and reasonable rates and charges—and fair compensation for providers—in a way that best benefits the general public.[1519]  Our actions also better align with similar services in the non-carceral communications context.  As one commenter explains, "[m]ost telephone corporations and other utilities provide customer services for free, including services such as speaking with a live agent to set up an account, adding money to an account, or assisting with making a call."[1520]  Similarly, by incorporating the reported costs of paper

---

[1514] *See, e.g.*, UCC and Public Knowledge Dec. 15, 2022 Comments at 5-6 (stressing the importance of ensuring that "whatever the disposition of individual services or ancillary services as a group, consumers do not continue to be double charged" for ancillary services and contending that "if the problem of isolating [ancillary services costs is so difficult, the Commission should consider whether it is just and reasonable to abolish" ancillary service charges entirely).  Additionally, by including providers' costs of providing ancillary services in our rate caps, we effectively exclude from our rate cap calculations the amount by which providers' revenues from ancillary service charges unreasonably exceeded their costs.  *See* Appendix H.

[1515] UCC and Public Knowledge Dec. 15, 2022 Comments at 6 (arguing that eliminating separate charges for ancillary services would provide consumers with "a clear per-minute rate" for each call and allow them to avoid sorting through a variety of additional charges in making their calling decisions).

[1516] NCIC Sept. 27, 2021 Comments at 10 (asserting that there is "no cost basis" for the single-call fee); NASUCA Sept. 27, 2021 Comments at 2 (questioning the appropriateness of assessing a $3.00 fee to make an individual call).

[1517] NCIC July 15, 2022 *Ex Parte* at 8; *see also* NCIC Dec. 17, 2021 Reply at 8 (raising concerns that Securus's "imposition of a flat-fee pass-through [financial service] charge disproportionally impacts smaller deposits").

[1518] *See, e.g.*, NCIC Apr. 19, 2024 *Ex Parte* at 4, 9-19 (describing "common industry abuses" that serve merely to extract fees from consumers and interfere with their ability to access the service they are paying for, including "capping deposits at $50," which bars consumers from exercising the potentially more economical option of making larger, one-time deposits (and so incurring the payment processing fee less frequently)).

[1519] *See, e.g.*, 47 U.S.C. § 276(b)(1) (describing the high-level policy objectives of section 276(b)(1) as, among other things, "promot[ing] the widespread deployment of payphone services to the benefit of the general public").

[1520] California PUC Sept. 27, 2021 Comments, Attach. A, California PUC Aug. 19, 2021 Decision Adopting Interim Rate Relief, at 108.

bills into our rate cap calculations, we align IPCS billing practices more closely with telecommunications billing practices outside of the carceral context, where separate charges typically are not assessed for paper bills.[1521]

424.    Finally, we find that incorporating ancillary service costs into our rate cap calculations aligns our rate and fee structure more effectively with broader patterns in the IPCS industry while recognizing the diminishing usage of certain ancillary services.[1522]  For example, several providers assert they rarely charge a paper bill fee as few consumers require paper bills, even proposing that this fee be eliminated.[1523]  At least one provider no longer charges a live agent fee, having switched to an automated system during the pandemic.[1524]  Meanwhile, some providers have shifted from offering single-call services through third parties (as defined in our rules) to instead provide these services themselves.[1525]  The record further suggests that the single-call service, which ostensibly offers the convenience of completing initial contact without setting up an account, may in practice offer little benefit to consumers, as the called parties still have to enter their payment card information to accept the call.[1526]

425.    Some commenters object to the approach of incorporating ancillary service costs into our rate cap calculations.[1527]  Those commenters argue that this methodology "does not reflect the manner in

---

[1521] *See* California PUC Sept. 27, 2021 Comments at 5 ("If similar charges are not levied by competitive telecommunications providers, there seems little justification for ICS providers to charge such fees to those who are incarcerated.  Fees such as single call fees, carrier access fees, account set up fees, and transfer fees [for being moved between facilities] are not being charged by telecommunications corporations operating in the open market today."); *id.* at Attach. A, California PUC Aug. 19, 2021 Decision Adopting Interim Rate Relief, at 67 (noting that "telecommunications and other utilities provide customer service outside of IPCS facilities for free" and that "customers outside of IPCS facilities receive paper bills or statements, such as utility bills or bank statements, without paying additional fees").

[1522] As the Commission has previously observed, several states have already banned ancillary service charges, either piecemeal or outright.  *See 2021 ICS Notice*, 36 FCC Rcd at 9669, para. 331; *2015 ICS Order*, 30 FCC Rcd at 12845, 12847, paras. 162, 165.

[1523] *See* NCIC June 17, 2022 *Ex Parte* at 2-3 (noting that only six of its customers "still require paper bills," and arguing that "it is time for the FCC to eliminate" the paper billing fee); Securus Mar. 5, 2023 Reply at 19, 24 ("[Securus] no longer assesses a paper bill statement fee except in limited circumstances. . . .  The number of consumers requesting Direct Bill arrangements has dwindled over the years and continues to shrink.  The number of times Securus charged a paper bill/statement fee has correspondingly fallen off."); *see also* PPI July 15, 2022 *Ex Parte* at 6 ("The record suggests that [the paper billing fee] is unnecessary and should be eliminated.").

[1524] Securus Mar. 5, 2023 Reply at 23 (stating that "[d]uring the COVID-19 lockdowns[,] . . . Securus changed its system so that the customer service representative transfers the consumer to an [interactive voice response system] to enter their payment card information" and that "Securus no longer charges a live agent fee in connection with automated payment services").

[1525] *See, e.g.*, *id.* at 21 ("Securus still provides a single call service . . . but not as defined by the Commission. . . . Securus' single-call product does not utilize a third party to bill the call."); PPI June 14, 2022 *Ex Parte* at 1 (asserting that single call services "are becoming uncommon in the industry," as "billing is now typically done directly by the carrier without the involvement of a third party").  Other commenters propose eliminating the single-call fee entirely.  *See, e.g.*, PPI Dec. 17, 2021 Reply at 6-7 (arguing that the Commission should "remove carriers' economic incentives through elimination or sharp curtailment of single-call transaction fees").  *But see* NCIC Dec. 15, 2022 Comments at 7-8 (arguing against "[f]urther changes to, or eliminating, ancillary fees now that the FCC has eliminated the single-call loophole").

[1526] *See* NCIC Sept. 27, 2021 Comments at 13.  Our actions are consistent with our recent initiative requiring cable and direct broadcasting satellite operators to offer "all-in" prices to consumers so that consumers have a transparent and accurate reflection of the total cost of services, inclusive of all additional fees.  *Matter of All-In Pricing for Cable and Satellite Television Service*, MB Docket No. 23-203, Report and Order, FCC 24-29 (Mar. 14, 2024).

[1527] *See* Pay Tel Dec. 15, 2022 Comments at 5-6; Securus Mar. 5, 2023 Reply at 32-33; ViaPath Mar. 5, 2023 Reply at 7-8.

which costs are caused by users of the service," and "would impose costs for payment processing on all consumers, rather than just those consumers directly responsible for the cost."[1528]  We are unpersuaded. We find that most of these functions have become "an intrinsic part of providing" IPCS because they provide IPCS consumers the means to obtain IPCS, such that consumers typically "must either incur [these charges] when making a call or forego contact with their loved ones."[1529]  Certain ancillary service charges, for example those for automated payment services, are costs that are either universally or near universally incurred by consumers.  But it is not necessary that these services be used by "*all* consumers"; the fact that these services can operate as a threshold, coupled with the factors identified above that support ancillary service cost recovery through per-minute IPCS rate caps, will ensure that our approach provides for just and reasonable rates for consumers and providers, while also providing appropriate cost recovery for providers.[1530]

426.    Further, commenters opposing the elimination of separate ancillary service charges ignore the other factors that make it the best means of ensuring just and reasonable IPCS rates and charges.  As discussed above, each of the other factors supporting our approach—the need to eliminate incentives for providers to assess unreasonable ancillary service charges, the impossibility of setting reasonable ancillary service charge caps given the limitations on the data on ancillary service costs providers reported in response to the 2023 Mandatory Data Collection, and the additional public interest benefits our approach will produce—fully and independently support our approach both individually, and in any combination.

### 9.    Alternate Pricing Plans

#### a.    Introduction

427.    The Commission has traditionally required IPCS providers to charge for interstate and international audio IPCS on a per-minute basis principally to safeguard consumers from potentially unreasonable rates and practices.  The Commission's rules have long prohibited providers from using "flat-rate calling" that would require consumers to pay a flat rate per call regardless of the length of the call.[1531]  By comparison, in recent years many telecommunications service plans in non-carceral settings have transitioned to flat-rate pricing for a specific quantity of, or an unlimited number of, minutes.[1532]  At the same time, IPCS marketplace developments have also led to "emerging pay models" that more closely track the "modern marketplace."[1533]  In recognition of these developments and the pro-consumer benefits of allowing more flexible pricing programs, today we permit IPCS providers to offer incarcerated people

---

[1528] Pay Tel Dec. 15, 2022 Comments at 5-6.

[1529] *2021 ICS Notice*, 36 FCC Rcd at 9666, para. 326 (citing *2015 ICS Order*, 30 FCC Rcd at 12838, para. 144).  For the same reason, we are not persuaded by Securus's implicit argument that the current ancillary fees are offered "as a convenience to incarcerated persons or their friends and family and are not intrinsic to the provision of ICS." Securus Mar. 5, 2023 Reply at 32-33.

[1530] In the *2015 ICS Order*, the Commission found that single-call services were not "reasonably and directly related to the provision of ICS" because they "inflate the effective price end users pay for ICS and result in excessive compensation to providers."  *2015 ICS Order*, 30 FCC Rcd at 12857, para. 187.  We find that this pattern has been ameliorated, in part, by the changes to single-call fees adopted in the *2021 ICS Order* and *2022 ICS Order*; we also recognize that providers incur some amount of legitimate costs for providing this service, which for at least some consumers may offer a crucial means of completing an IPCS communication.  At the same time, we find that the continuing abuse of this fee described in the comment record, supports elimination of the single-call fee as an independent charge.

[1531] *Id.* at 12812-13, paras. 102-105.

[1532] *See* Color of Change May 8, 2023 Comments at 5; Public Interest Parties Dec. 15, 2022 Comments at 9; Prison Policy Initiative Comments on Securus Technologies, LLC's Petition for Waiver, WC Docket No. 12-375, at 8 (rec. Jan. 7, 2022) (PPI Jan. 7, 2022 Waiver Comments).

[1533] *2020 ICS Notice*, 35 FCC Rcd at 8533, para. 134.

and their friends and family IPCS via optional "alternate pricing plans," subject to clearly defined safeguards to ensure that IPCS consumers are protected.[1534]

428.    The record reflects that alternate pricing plans can provide meaningful benefits to IPCS consumers, including, but not limited to, increased utilization of IPCS, with all of its attendant benefits for reducing recidivism, and greater budgetary certainty for IPCS consumers.[1535]  Nevertheless, we are mindful that alternate pricing plans may not be a good fit for every consumer and therefore include guardrails to protect against potential "abuse and higher prices."[1536]  We find that, on balance, the potential advantages of these plans are significant.  We therefore permit IPCS providers to offer alternate pricing plans subject to rules and conditions to ensure that consumers that elect these plans have the information needed to make informed choices and are protected from unjust and unreasonable rates and charges.[1537]  Alternate pricing plans may include the full range of IPCS now subject to the Commission's authority, including intrastate IPCS and advanced communications services now included in the statutory definition of "payphone service" in carceral facilities.[1538]

**b.    Background**

429.    The Commission has previously invited comment on how its regulation of IPCS "should evolve in light of marketplace developments to better accommodate the needs of incarcerated people," including through the use of "alternative rate structures."[1539]  In the *2020 ICS Notice*, the Commission sought comment about "alternative rate structures" and whether it should change its rules "to recognize industry innovations" including new pay models.[1540]  At that time, some commenters voiced support for such changes.[1541]  Later, in the *2021 ICS Notice*, the Commission asked whether it should consider "alternative rate structures, such as one under which an incarcerated person would have a specified—or unlimited—number of monthly minutes of use for a predetermined monthly charge."[1542]  Some

---

[1534] The Commission previously referred to these programs as "pilot programs."  *E.g.*, *2022 ICS Notice*, 36 FCC Rcd at 11959, para. 148.  These optional programs could, for example, consist of blocks of audio calls or video communications, or an unlimited quantity of either service, at a set monthly or weekly price.

[1535] Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. at 30 (filed Dec. 21, 2023) (Securus Dec. 21, 2023 *Ex Parte*) (explaining that the alternate pricing plans that Securus piloted provided "budget predictability for consumers" and "calling times increased 58%"); ViaPath Mar. 5, 2023 Reply at 3, 14 (increased communications).

[1536] Pay Tel Mar. 3, 2023 Reply at 6; *see* Public Interest Parties Dec. 15, 2022 Comments at 9.  *But see* ViaPath Dec. 15, 2022 Comments at 4 ("Alternative pricing structures are beneficial for both the incarcerated and their friends/family."); ViaPath Mar. 5, 2023 Reply at 15 (arguing that "[t]here is no record evidence that prior alternative pricing trials have resulted in anything other than satisfied customers").

[1537] *See* Public Interest Parties Dec. 15, 2022 Comments at 29 (suggesting the use of "guardrails" to protect IPCS consumers).  As explained above, the Martha Wright-Reed Act requires just and reasonable rates and charges, and provides us with limited authority to regulate IPCS providers' practices, classifications, and regulations that relate to IPCS rates and charges.  *Supra* Section III.C.3.e (Authority to Regulate IPCS Providers' Practices).

[1538] 47 U.S.C. §§ 152(b), 153(1)(A)-(E), 276(d).

[1539] *2020 ICS Notice*, 36 FCC Rcd at 8533, para. 134.

[1540] *Id.*

[1541] *See, e.g.*, Securus Technologies, LLC Comments, WC Docket No. 12-375, at 47-48 (rec. Nov. 23, 2020) (suggesting that the Commission "permit providers to offer subscription plans, in which consumers pay for a block of minutes in advance, or unlimited calling plans . . . in conjunction with traditional per minute pricing"); Financial Justice Project Nov. 23, 2020 Comments at 1; Worth Rises Nov. 23, 2020 Comments at 11 ("The Commission's rulemaking should account for developments in the market that have allowed incarcerated people and their support networks to communicate for free or significantly less.").

[1542] *2021 ICS Notice*, 36 FCC Rcd at 9657, para. 305.

**Federal Communications Commission**                    **FCC 24-75**

commenters expressed support for "alternative rate structures" while acknowledging the need to ensure incarcerated people and their loved ones are protected from unjust and unreasonable rates and charges.[1543] At that time, the Prison Policy Initiative asserted that alternate pricing plans were premature as a matter of law and fact,[1544] and requested that the Commission ensure that the alternate pricing plans be "fair to consumers."[1545]

430.    Shortly after the release of the *2021 ICS Notice*, Securus filed a Petition for Waiver of the Commission's rules so it and "other providers" could offer flat-rate calling packages for interstate audio IPCS.[1546] Securus had been offering subscription plans for intrastate audio service since December 2020.[1547] Under its subscription plans, Securus charged a flat rate for a fixed number of calls for a period of, for example, one month.[1548] The Bureau sought comment on the Securus Waiver Petition.[1549] While commenters did not object to alternate pricing plans in general, the responses were mixed, with some urging the Commission to grant the Securus Waiver Petition,[1550] and others expressing concern and suggesting that the Commission proceed slowly and adopt consumer protection measures applicable to

---

[1543] *E.g.*, Global Tel*Link Corp. Comments, WC Docket No. 12-375, at 7 (rec. Sept. 27, 2021) (GTL Sept. 27, 2021 Comments) (arguing that such rate structures would "serve[] the public interest as it will promote increased calling while reducing costs for incarcerated people and their friends and families"); NCIC Sept. 27, 2021 Comments at 5 (asserting that "[t]o the extent that subscription plans become an established norm, the FCC must take steps to ensure that incarcerated persons and their families will be charged just and reasonable rates and fees").

[1544] PPI Sept. 27, 2021 Comments at 22-24.

[1545] *Id.* at 24.

[1546] Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement to Enable Provision of Subscription Based Calling Services, WC Docket No. 12-375, at 6-7 (filed Aug. 30, 2021), https://www.fcc.gov /ecfs/document/10830227993038/1 (Securus Waiver Petition).

[1547] *Id.* at 1.

[1548] *Id.* at 2. In addition to the flat rate, Securus charged a "site commission[] (if applicable), plus $3.00 automated payment fee." Securus Dec. 21, 2023 *Ex Parte*, Attach. at 12. The call lengths were limited by each facility. Letter from Joanna Acocella, Chief Corporate Affairs Officer, Aventiv, to Marlene Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 n.2 (filed Mar. 8, 2022) (Securus Mar. 8, 2022 *Ex Parte*). Also, the plans were "[d]esigned to be used only to call specific numbers from a specific facility." Securus Dec. 21, 2023 *Ex Parte*, Attach. at 12. Calls made to other numbers that were not using Securus's subscription plan were charged at Securus's per-minute rates. Securus Dec. 21, 2023 *Ex Parte*, Attach. at 12.

[1549] *Wireline Competition Bureau Seeks Comment on Securus Technologies, LLC's Petition for Waiver of the Inmate Calling Services Per-Minute Rate Requirement*, WC Docket No. 12-375, Public Notice, 36 FCC Rcd 15841 (WCB 2021).

[1550] *E.g.*, Global Tel*Link Corp. d/b/a ViaPath Comments on Securus Petition for Waiver, Docket No. 12-375, at 2 (rec. Jan. 7, 2022) (ViaPath Jan. 7, 2022 Waiver Comments).

such plans.[1551]  Securus terminated its subscription plans later in 2021 due to its inability to determine the jurisdictional nature of the calls included in the plans.[1552]

431.    In the *2022 ICS Notice*, and again in the *2023 IPCS Notice*, the Commission sought further comment on alternate pricing plans, conditions that may be placed on the plans, and consumer disclosures to ensure that providers accurately disclose the details of any alternate pricing plans.[1553]  The record in response generally supports the agency permitting these alternate pricing plans but many commenters focused on requirements and protective measures related to these plans.  ViaPath asks the Commission to refrain from adopting "excessive and unnecessary conditions" applicable to the plans.[1554]  Securus requests flexibility in selecting the form of the plans, and recognizes that "reasonable conditions" will be necessary.[1555]  The Public Interest Parties suggest that the Commission permit the plans subject to a number of conditions concerning, for example, rates and consumer information, to ensure that consumers are protected.[1556]  Based on the foregoing suggestions, Pay Tel observes that the plans may have benefits "in *some* settings for *some* customers."[1557]  Stephen Raher requests a robust system of consumer disclosures.[1558]  Subsequent *ex parte* filings provide additional detail on Securus's experience offering alternate pricing plans and discuss possible conditions on these plans.[1559]

---

[1551] NCIC does not object to alternate pricing plans in general but it, along with Worth Rises et al., expresses concern about Securus's programs, and asks the Commission to require specific parameters if the Commission were to permit IPCS providers to offer alternate pricing plans. NCIC Inmate Communications Comments, WC Docket No. 12-375, at 2 (rec. Jan. 7, 2022) (NCIC Jan. 7, 2022 Waiver Comments); Worth Rises et al. Comments on Securus Technologies, LLC Petition for Waiver of the Incarcerated Person Calling Services Per Minute Rate Requirement, WC Docket No. 12-375, at 1-3 (rec. Jan. 7, 2022) (Worth Rises Jan. 7, 2022 Waiver Comments); Response of Worth Rises to Securus Technologies, LLC Petition for Waiver of the Per Minute Rate Requirement to Enable Provision of Subscription Based Calling Service, WC Docket No. 12-375, at 3 (filed Oct. 27, 2021) (Worth Rises Oct. 27, 2021 Response).  PPI does not object to alternate pricing plans per se but questions the data that Securus provides, asks whether consumers actually realized cost savings, and raises questions regarding the information conveyed to customers about the programs.  Prison Policy Initiative Reply to Securus Technologies, LLC's Petition for Waiver, WC Docket No. 12-375, at 3-5 (PPI Jan. 21, 2022 Waiver Reply); PPI Jan. 7, 2022 Waiver Comments at 3.

[1552] Securus Mar. 8, 2022 *Ex Parte* at 1 ("Securus suspended the programs in light of the Federal Communications Commission's ('Commission') requirement that jurisdictionally indeterminate calls be treated as interstate calls and must be assessed on a per minute basis, even if the calls were in fact intrastate."); Securus Dec. 17, 2021 Reply at 32 & n.105 (stating that the subscription plans were already suspended) (citing Letter from Joanna Acocella, Chief Corporate Affairs Officer, Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 1 (filed Nov. 4, 2021) (Securus planning to suspend the subscription plans)).  *But see 2020 ICS Order on Remand*, 35 FCC Rcd at 8503, para. 53 (explaining that the jurisdictional nature of a call is determined by the endpoints); PPI Jan. 21, 2022 Waiver Reply at 1 (noting that the rules on jurisdictionally mixed calls were provided in the order released in August 2020).

[1553] *2022 ICS Notice*, 37 FCC Rcd at 11959-63, paras. 148-60; *2023 IPCS Notice*, 38 FCC Rcd at 2687-88, paras. 45-46.

[1554] ViaPath Mar. 5, 2023 Reply at 14-15; *see also* ViaPath Dec. 15, 2022 Comments at 7 n.28.

[1555] Securus Mar. 5, 2023 Reply at 6-8.

[1556] Public Interest Parties Dec. 15, 2022 Comments at 9.

[1557] Pay Tel Mar. 3, 2023 Reply at 6 (emphasis in original).

[1558] Raher Dec. 15, 2022 Comments at 10.

[1559] Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2-3 (filed Feb. 2, 2024) (Public Interest Parties Feb. 2, 2024 *Ex Parte*); Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed Jan. 11, 2024) (Securus Jan. 11, 2024 *Ex Parte*); Securus Dec. 21, 2023 *Ex Parte*.

### c.    Discussion

432.    We find that the record supports allowing IPCS providers to offer alternatives to per-minute pricing for IPCS subject to the rules and conditions adopted in this Report and Order. We therefore allow IPCS providers flexibility to offer pricing structures other than per-minute pricing as options for consumers in addition to offering standard per-minute pricing plans.[1560] The record indicates both provider and consumer interest in such plans, and we find that these plans offer benefits that consumers want. For example, Securus's plans were "developed as a direct result of consultations between Securus leadership and justice-involved families."[1561] After Securus terminated its subscription plans, consumers asked it to reinstate the plans, and emphasized their benefits.[1562] Former subscribers explained that Securus's subscription plans helped them be able to talk to loved ones, helped stabilize their mental health, and enabled an incarcerated person to help their children with their homework.[1563] The Director of Facility Operations at one carceral facility describes Securus's plan as "the most economical option for communication [between incarcerated people and] their wives and children."[1564] Securus remarks that a "key benefit" to the individuals enrolled in its subscription plans "was being able to better budget for calls by knowing in advance how much would be spent on calls during a given period."[1565]

433.    Additionally, data provided by Securus indicate that consumers experienced longer and less costly calls under its subscription plans. According to Securus, the average cost per call was $0.65 under its subscription plans (with an average call length of 14.51 minutes) compared to an average cost

---

[1560] In reply comments to the *2022 ICS Notice*, the Public Interest Parties request the Commission to defer consideration of alternate pricing plans due to the enactment of the Martha Wright-Reed Act in January 2023, and the circulation of the draft *2023 IPCS Notice* (which was released Mar. 17, 2023). Wright Petitioners et al. Reply, WC Docket No. 12-375, at 12 (rec. Mar. 3, 2023) (Public Interest Parties Mar. 3, 2023 Reply); *2023 IPCS Notice*, 38 FCC Rcd at 2669-70, para. 1. Parties have had more than three years and several opportunities to comment on alternate pricing plans, including in response to further questions about such plans raised in connection with the Commission's implementation of the Martha Wright-Reed Act in the *2023 IPCS Notice*. *2023 IPCS Notice*, 38 FCC Rcd 2687-88, paras. 45-46. Given the potential benefits discussed herein, we see no reason to wait any longer to allow such plans.

[1561] Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (filed May 13, 2021) (Securus May 13, 2021 *Ex Parte*).

[1562] Securus Technologies, LLC Comments on Petition for Waiver of the Inmate Calling Services Per-Minute Rate Requirement, WC Docket No. 12-375, at 5-8 (rec. Jan. 7, 2022) (Securus Jan. 7, 2022 Waiver Comments). Securus does not provide any input it may have received from dissatisfied customers.

[1563] *Id.* at 7 (quoting Veronica F., Esa R. and Glory E.).

[1564] *Id.* at 5.

[1565] Securus Sept. 27, 2021 Comments at 12. Demand for flat-rate monthly plans also was expressed in the California PUC's hearings on Regulating Telecommunications Services Used by Incarcerated People. Consumers mentioned the flat-rate monthly plans for cell phone usage, and streaming services like Disney and Netflix, and asked whether flat-rate monthly plans could be provided for telephone calls with incarcerated people. California PUC Public Participation Hearing, Vol. 2, Rulemaking 20-10-002, at 30-31, 53, 132-33 (Apr. 28, 2021), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K604/382604073.PDF (statements of Dinorah Guzman and Milania LaFaber) (California PUC Hearing Vol. 2) (cited by Securus May 13, 2021 *Ex Parte* at 2 n.2); California PUC Public Participation Hearing, Vol. 1, Rulemaking 20-10-002, at 232-33 (Apr. 29, 2021), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K478/382478114.PDF (statement of Liz Araiza, requesting a monthly subscription service with a flat fee) (California PUC Hearing Vol. 1) (cited by Securus May 13, 2021 *Ex Parte* at 2 n.2). To support its argument that fixed-rate pricing helps consumers budget for calls, Securus points to Connecticut, where the Department of Corrections (DOC) now pays for calls, thereby making the calls free to the consumers. Securus asserts that it charges the DOC for Securus's services on a per-incarcerated-person basis (rather than using per-minute rates) to enable DOC to better budget for Securus's services. Securus Dec. 21, 2023 *Ex Parte*, Attach. at 34; Securus Mar. 5, 2023 Reply at 8.

per call of $1.62 using Securus's per-minute rates (with an average call length of 9.19 minutes).[1566] Securus explains that "[c]osts decreased [an] average of 61% per call and 74% on a per-minute basis."[1567] ViaPath also predicts that alternate pricing plans "will promote increased calling while reducing costs."[1568]

434.    Nevertheless, other commenters urge caution regarding alternate pricing plans.  For example, Pay Tel expresses concern that if a consumer does not use all of the minutes in a plan, the cost they pay for a plan would be greater than they would have paid at the per-minute rates offered by that provider.[1569]  The Accessibility Advocacy and Research Organizations ask the Commission to take a "cautious approach designed to ensure [alternate pricing plans] serve incarcerated people with disabilities' interests first, and not those of ICS providers looking for ways to circumvent their pricing obligations."[1570] Although Securus points out that "[s]ubscribers saved money at low levels of utilization: 15-30%,"[1571] the data do not tell the complete story.  The Public Interest Parties point out that a "substantial number of participants" (i.e., from 10% to 34% of the consumers) in Securus's nine subscription plans had low usage and as a result, paid more using the subscription plans than they would have paid under per-minute rates.[1572]

435.    Given the apparent demand from consumers and the potential savings and increased communications that can result from alternate pricing plans, we will permit IPCS providers to offer such plans.  However, to help make sure that consumers who enroll in the plans benefit from them and that IPCS providers do not use such plans to otherwise evade the Commission's IPCS rules, we require that these plans comply with the general rules applicable to all IPCS, and adopt specific consumer protection and disclosure rules for these plans.[1573]

436.    We acknowledge that our decision today represents an evolution in the Commission's

---

[1566] Securus Dec. 21, 2023 *Ex Parte*, Attach. at 34.

[1567] *Id.* at 32.

[1568] ViaPath Jan. 7, 2022 Waiver Comments at 21; *see also* ViaPath June 13, 2024 *Ex Parte* at 16-17 (same).

[1569] Pay Tel Dec. 15, 2022 Comments at 13.

[1570] Accessibility Advocacy et al. Reply, WC Docket No. 12-375, at 9 (rec. Mar. 6, 2023) (corrected version) (Accessibility Coalition Mar. 6, 2023 Reply).  Worth Rises points out that "IPCS providers have a record of exploiting incarcerated people and their loved ones."  Worth Rises May 8, 2023 Comments at 9.

[1571] Securus Dec. 21, 2023 *Ex Parte*, Attach. at 33.

[1572] Public Interest Parties Feb. 2, 2024 *Ex Parte* at 2-3; Securus Jan. 11, 2024 *Ex Parte*, Attach. B, "Percent of Subscribers Above Break Even Point at Actual Usage."  The Public Interest Parties, and Securus's spreadsheet, reference the breakeven point for Securus's subscription plans.  The breakeven point refers to the amount of usage required for a consumer to realize a rate that equals the provider's per-minute rate.  Specifically, the "breakeven point" is the usage amount: (a) below which a consumer would pay more for the subscription plan than they would have paid under the provider's per-minute rates, and (b) at or above which the cost of the subscription plan would be less than or equal to what the consumer would pay under the provider's per-minute rates.  For example, Securus shows that 76% of its subscribers were above the breakeven point at one facility.  In other words, 76% of the subscribers had usage high enough to justify the cost of the subscription plan whereas the remaining 24% of subscribers effectively paid more for the subscription plan than they would have paid if they had paid for the service at Securus's per-minute rates.  Securus Jan. 11, 2024 *Ex Parte*, Attach. B (righthand column of the spreadsheet, Agency #2, third number).

[1573] The Public Interest Parties urge the Commission to ensure that "consumers are protected with any [alternate pricing plans]."  Public Interest Parties Mar. 3, 2023 Reply at 13; *see also* Raher Mar. 3, 2023 Reply at iii, 12-14 (requesting the Commission to not permit alternate pricing plans until "a strong system of consumer disclosures is in place"); DARE July 10, 2024 *Ex Parte* at 2 (suggesting the Commission proceed cautiously with regard to alternate pricing plans).  We expect the rules we adopt today will provide sufficient consumer protections, and in any event, the alternate pricing plans are optional for both providers and consumers.

thinking concerning permitted rate structures.[1574]  We emphasize that IPCS alternate pricing plans are optional to consumers, and IPCS providers that offer such plans are still required to offer a per-minute pricing option to the consumers they serve.  This ensures that consumers will always have the option of selecting per-minute pricing if traditional per-minute pricing offers greater value.  In facilities where alternate pricing plans are offered, consumers will now have the ability to select the pricing models that best meet their needs and their budgets, similar to the flexibility afforded to consumers outside the carceral setting.

### (i)    General Parameters of Alternate Pricing Plans

437.    We allow IPCS providers the option to offer alternate pricing plans.  We first define an "alternate pricing plan" as the offering of IPCS to consumers using a pricing structure other than per-minute pricing.[1575]  An IPCS provider may determine whether to offer such a plan, which services to include, which format (i.e., the rates (subject to the applicable rate caps) and the number of minutes, calls or communications for example, included (or an unlimited number of minutes, calls or communications)), and where to offer the plan, as discussed below.  We require IPCS providers that offer alternate pricing plans to comply with the rules specific to alternate pricing plans, as well as other rules applicable to all IPCS, to help ensure just and reasonable rates and charges.[1576]

438.    *Optional to Consumers and to IPCS Providers.*  As a threshold matter, a consumer may enroll in an alternate pricing plan at their discretion.  IPCS providers must not require a consumer to enroll in an alternate pricing plan.  In the *2022 ICS Notice* and the *2021 ICS Notice*, the Commission asked whether providers should be permitted to offer optional pricing structures as long as consumers would still have the ability to purchase service on a per-minute basis.[1577]  In response, the Public Interest Parties and ViaPath agree that participation in an alternate pricing plan should be voluntary for the consumer.[1578]  No commenter suggests that enrollment in a plan should be mandatory for a consumer.

439.    Similarly, we do not require IPCS providers to offer alternate pricing plans.  An IPCS provider's decision to offer an alternate pricing plan is voluntary.  Consistent with the record and to ensure the optional nature of alternate pricing plans particularly for consumers, we require providers offering alternate pricing plans to also continue offering per-minute pricing.[1579]  We adopt revisions to section 64.6010(a) of our rules to incorporate this requirement.[1580]  Consumers therefore will still have the option of paying for IPCS on a per-minute basis.[1581]  As Worth Rises points out, "[p]er minute pricing

---

[1574] 47 CFR §§ 64.6030 (per-minute rate caps), 64.6090 (prohibiting flat-rate calling); *e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12812, paras. 102-105 (adopting section 64.6090 of the Commission's rules); *2013 ICS Order*, 28 FCC Rcd at 14139-40, paras. 59-60 (adopting safe harbor levels for per-minute rates).

[1575] *Infra* Appendix A, 47 CFR § 64.6000.

[1576] 47 U.S.C. §§ 201(b), 276(b)(1)(A).  For example, the prohibitions and limitations on per-call, per-connection, and per-communication charges, site commissions, ancillary service charges, and taxes and fees as provided for in our rule revisions, also apply to alternate pricing plans.

[1577] *2022 ICS Notice*, 37 FCC Rcd at 11959, para. 148; *2021 ICS Notice*, 36 FCC Rcd at 9657, para. 305.

[1578] Public Interest Parties Dec. 15, 2022 Comments at 10; ViaPath Dec. 15, 2022 Comments at 21.

[1579] ViaPath May 5, 2023 Comments at 7; Public Interest Parties Dec. 15, 2022 Comments at 10; Securus Dec. 15, 2022 Comments at ii; *infra* Section III.D.9.c.ii.d (Cancellation by the Consumer).

[1580] *Infra* Appendix A, 47 CFR § 64.6010(a).

[1581] *See 2022 ICS Notice*, 37 FCC Rcd at 11916, para. 148; Public Interest Parties Dec. 15, 2022 Comments at 10 (asserting that "consumers should be able to select between a per-minute structure that exists today and any alternative [pricing] plan, if offered"); Securus Dec. 21, 2023 *Ex Parte*, Attach. at 35; Securus Dec. 15, 2022 Comments at 7; ViaPath Dec. 15, 2022 Comments at 21 (arguing that the plans "should always be an 'alternative' to traditional ICS per-minute calling, not a replacement of per-minute calling"); NCIC Jan. 7, 2022 Waiver Comments

(continued….)

structures . . . protect ratepayers who may only make a few calls and do not want to be locked into paying for extended time periods."[1582]  No commenter requested that the Commission mandate the offering of alternate pricing plans, or eliminate the per-minute option.[1583]

440.　　*Format.*  An IPCS provider may employ any format for its alternate pricing plans that complies with the Commission's generally applicable IPCS rules and the safeguards we adopt in this Report and Order, which, together, are designed to protect consumers from unjust and unreasonable rates and charges, consistent with the Martha Wright-Reed Act.[1584]  IPCS providers will have the flexibility to determine the format of their alternate pricing plans and may offer plans based on pricing by minutes of use, calls or communications made, or any other format.  In the *2022 ICS Notice* and the *2021 ICS Notice*, the Commission asked about plans that would offer a specific, or unlimited, number of minutes of use for audio services at a monthly charge, and the merits of different pricing structures and their impact on consumers and providers.[1585]  Some commenters oppose plans based on a specified number of calls due to concerns about dropped calls, which we address below.[1586]  One commenter argues that the Commission's prohibition on flat-rate calling and per-call charges prohibits alternate pricing plans.[1587]  As discussed below, we remove the rule prohibiting flat-rate calling, making this concern moot.[1588]  In addition, the prohibition on per-call charges does not prohibit the provision of alternate pricing plans based on a specific number, or unlimited number of, calls or communications; the prohibition on per-call charges just prohibits charges that are assessed in addition to the base rates for calls.[1589]  As discussed above, we retain and amend the prohibition on per-call charges.  Thus, the commenter's concern about per-call charges is misplaced.  Because we now have authority to regulate rates for certain advanced communications services, including video services, alternate pricing plans may include advanced communications services, which likewise may be offered for a fixed number of or an unlimited number of minutes or communications, for a service period of a week or a month, among other formats.

441.　　When determining the format of an alternate pricing plan, IPCS providers must consider the type and characteristics of the facilities they serve, including: (a) any limits on the number of and

---

at 4 (asserting that if Securus offers its subscription plans, the Commission should "require Securus to continue to offer a rule-compliant, per-minute rate plan").

[1582] Worth Rises May 8, 2023 Comments at 9.

[1583] Worth Rises asks the Commission to obtain more data before permitting providers to offer alternate pricing plans, but our requirements that alternate pricing plans to be optional for consumers, and that the plans comply with the other rules and conditions we adopt here generally for IPCS, should resolve Worth Rises's concerns.  *Id.*

[1584] 47 U.S.C. § 276(b)(1)(A).

[1585] *2022 ICS Notice*, 37 FCC Rcd at 11961, paras. 152-53; *2021 ICS Notice*, 36 FCC Rcd at 9657, para. 305.  Our decision to permit IPCS providers to offer alternate pricing plans based on a fixed or unlimited number of minutes, calls or communications seems to be inconsistent with the Commission's prior implication, in the *2022 ICS Order*, that per-minute rates are preferable to per-call rates.  *2022 ICS Order*, 37 FCC Rcd at 11959, para. 149 & n.373.  But in the *2022 ICS Order*, the Commission cited to a discussion in the *2021 ICS Order* concerning cost allocators, not rate setting.  *2021 ICS Order*, 36 FCC Rcd at 9547, para. 68.  Thus, because our decision here is about rate setting, not cost allocation, that passage in the *2022 ICS Order* does not apply.

[1586] Worth Rises May 8, 2023 Comments at 11; Worth Rises Oct. 27, 2021 Response at 2; *see infra* Section III.G.1.d (Alternate Pricing Plan Consumer Disclosure Requirements).

[1587] NCIC Jan. 7, 2022 Waiver Comments at 1-4.  NCIC conflates the concepts of flat-rate and per-call charges with call-based pricing plans.  *Id.* at 3 (referring to "a per-call, flat-rate fee," and citing the section of the *2015 ICS Order* that applies to flat-rate charges, not per-call charges).

[1588] *Infra* Section III.D.9.d.i (Flat-Rate Calling).

[1589] *Infra* Section III.G.1.d (Alternate Pricing Plans Consumer Disclosure Requirements).  *See 2015 ICS Order*, 30 FCC Rcd at 12810, para. 98 (explaining that "[p]er-call or per-connection charges are one-time fees often charged to ICS users at call initiation").

length of calls or communications imposed by the facility; (b) the availability of correctional staff to manage the use of the service; and (c) equipment availability for the calls or communications.[1590]  A provider's consideration of these factors will help ensure that consumers are reasonably able to make enough calls to reach the breakeven point for the specific plan as discussed below.[1591]

442.     *Service Period*.  In the *2022 ICS Notice*, the Commission asked parties to comment on the appropriate service period for alternate pricing plans.[1592]  The Public Interest Parties and Securus suggest that "consumers should not be required to sign up for long term commitments."[1593]  We agree and therefore limit the service period IPCS providers may offer an alternate pricing plan to no longer than one month.[1594]  One month is the length of a standard billing cycle used by IPCS providers in carceral facilities and telecommunications companies in non-carceral settings.[1595]  Limiting alternate pricing plans to service periods of at most one month limits consumers' potential financial liability and permits flexibility for any changed circumstances.  At the end of a service period, a consumer who is participating in the alternate pricing plan will need to renew their enrollment if they want to continue participating in the plan (unless the consumer previously has opted in to automatic renewals, if offered by the provider).[1596]

443.     *Services Included*.  An alternate pricing plan may consist of: (a) a single service that is defined as IPCS (e.g., an audio or video communications service) or (b) any bundle of services for which

---

[1590] The amount of communications equipment per facility varies but, as an example, the Public Interest Parties suggest that in 2023, the California Department of Corrections and Rehabilitation Facilities had an average of 1 telephone for every 22 incarcerated people.  Public Interest Parties July 12, 2023 Reply Appx. A, Coleman Bazelon et al., the Brattle Group, Brattle Report at III-12.  Additionally, in the Genessee County Jail, "[e]ach jail pod has only two video kiosks for roughly 60 to 70 people, and it is common for only one of the kiosks to be working at any given time."  NCIC Apr. 19, 2024 *Ex Parte*, Exh. B at 14, 19  (*S.L. v. Sheriff Christopher Swanson, Genesee County*, Class Action Complaint and Demand for Jury Trial, Case No. 2024-120601-CZ (7th Cir. Ct. Mich. Mar. 15, 2024) (ViaPath is a defendant.)).

[1591] We want to avoid IPCS providers, offering alternate pricing plans of, for example, 200 calls per month when because of equipment limitations or call length and frequency limitations the incarcerated individual could not possibly make 200 calls a month at their facility.

[1592] *2022 ICS Notice*, 37 FCC Rcd at 11970, para. 155.

[1593] Securus Mar. 5, 2023 Reply at 7 n.19; Public Interest Parties Dec. 15, 2022 Comments at 10.  PPI notes that in prisons, "residents have a longer and more predictable length of stay (as compared to jails), allowing them to more effectively budget for recurring expenses like phone calls," whereas in jails, "populations are more transient and financial planning is more difficult."  Letter from Stephen A. Raher, General Counsel, PPI, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 4 (filed Feb. 9, 2022).  NCIC suggests that bulk packages for video could be offered as an option at longer-term facilities, but that "per-minute billing would be the most cost-effective solution for short-term and county jails that may house incarcerated persons for an evening or weekend."  NCIC May 8, 2023 Comments at 12.  Although these statements appear to assume that the consumer is the incarcerated person, the concern about the length of stay likely would similarly apply to the friends and family of the incarcerated person, if they are the consumers.

[1594] *Infra* Appendix A, 47 CFR § 64.6140 (Alternate Pricing Plans).  When Securus offered its subscription plans, the services were offered for no more than one month at a time before renewal was required.  Securus Jan. 7, 2022 Waiver Comments at 3; Securus Dec. 15, 2022 Comments at 9.

[1595] *See, e.g.*, Pay Tel Mar. 3, 2023 Reply at 8 (explaining that it provides detailed account information in monthly statements); Raher Dec. 15, 2022 Comments at 8 (advocating that if the Commission were to adopt account statement rules, it should require electronic statements to be generated monthly); ViaPath Dec. 15, 2022 Comments at 14 & n.51 (explaining that although ViaPath does not generate bills for every consumer, it does provide monthly bills to bail bondsmen, attorneys, etc.); Verizon, *Frequently asked questions about understanding your bill*, https://www.verizon.com/support/residential/account/understand-bill/faqs (last visited May 6, 2024) (Billing cycles are "most often" set to repeat monthly.)  Thus, IPCS providers already conduct accounting on a monthly basis.

[1596] *Infra* Section III.D.9.c.ii.c (Automatic Renewals).

each service is defined as IPCS.[1597]  Most comments in the record focus on the provision of interstate audio IPCS, because most of the comments were filed before the enactment of the Martha Wright-Reed Act, which expanded the Commission's regulatory authority to include all audio and video communications services in carceral facilities.[1598]  In the absence of regulation, we recognize that some providers have priced video services at flat rates, and others have priced video services by the minute.[1599]  In the *2023 IPCS Notice*, the Commission asked whether it should "allow voice and video services to be offered as bundles."[1600]  In response, Securus urges the Commission to "make clear" that providers "may bundle voice, video and other services" in alternate pricing plans, and that the Commission could "exercise oversight" through reporting requirements.[1601]  Additionally, the California Public Utilities Commission states that bundles should not be allowed "unless the provider provides transparency on the cost or what the rate entails."[1602]  Our rate, reporting and other alternate pricing plan requirements should resolve these concerns.

444.　　We recognize that services offered in combination under an alternate pricing plan may not be subject to the same rate caps.  Nevertheless, services offered under an alternate pricing plan remain subject to the general IPCS rules, including the applicable rate caps for both audio and video services and the prohibition for levying separate ancillary service charges.  To the extent a consumer purchasing services under an alternate pricing plan believes that the charge assessed for the bundled services resulted in the effective rate exceeding the applicable rate caps established in this Report and Order, the consumer would first need to show that their usage of each service in the bundle meets or exceeds the usages required to meet the specified breakeven point(s),[1603] and then the IPCS provider would bear the burden of

---

[1597] *Infra* Appendix A, 47 CFR § 64.6000 (definition of Incarcerated People's Communications Service).  Our use of the word "bundle" in the context of alternate pricing plans refers only to a combination of services; it does not imply a discount.  *See* Securus Technologies, LLC Comments on the Proposed Revisions to the Annual Reporting Requirements, WC Docket No. 12-375, at 9 (rec. Sept. 8, 2023) (in the context of annual reports, asking for clarification of "bundles," and noting that the California PUC has used "bundling" to mean "simply including more than one type of service in a single contract even if each is priced separately and there is no discounting involved").  We also note that "bundling" is mentioned in the record in the context of services offered by a provider to a contracting authority.  *E.g.*, PPI Sept. 27, 2021 Comments at 20 (mentioning "bundled contracts").  By comparison, "bundling" in alternate pricing plans concerns services offered by a provider to consumers.

[1598] Martha Wright-Reed Act § 2; 47 U.S.C. § 276(d); *e.g.*, Pay Tel Dec. 15, 2022 Comments at 13 (discussing "calls"); Worth Rises Dec. 17, 2021 Reply at 7-9 (urging the Commission to look at "rate structures emerging in the [carceral] market" for phone calls).  *See* Securus Waiver Petition at 7 (subscription plans for voice service).

[1599] *E.g.*, Raher May 8, 2023 Comments at 19 (noting some providers charge per-minute rates and others bill on a per-session basis for video communications); NCIC May 8, 2023 Comments at 9 (mentioning flat fees for remote video visits); Securus May 8, 2023 Comments at 23 (billing on a flat-rate, per-session basis for its web-based video service); Rappahannock Regional Jail, *At-Home Visitation*, https://www.rrj.state.va.us/at-home-visitation (last visited May 10, 2024) (ViaPath's video service charging $15 for "up to a 25 minute visit").

[1600] *2023 IPCS Notice*, 38 FCC Rcd at 2686, para. 41.  While not advocating for alternate pricing plans that would consist of combinations of services with prices based on broadband usage, Worth Rises previously suggested that the Commission consider such approaches and determine if they would protect consumers.  Worth Rises Dec. 17, 2021 Reply at 7-9.

[1601] Securus May 8, 2023 Comments at 45; Worth Rises Supplemental Comments, WC Docket Nos. 23-62 and 12-375, at 8 (rec. June 3, 2024) ("Securus often bundles the cost of video calling and e-messaging with voice calling.").

[1602] California PUC May 8, 2023 Comments at 6.

[1603] The breakeven point refers to the amount of usage required for a consumer to realize a rate that equals the provider's applicable per-minute rate at the facility.  Specifically, the "breakeven point" is the usage amount: (a) below which a consumer would pay more for the subscription plan than they would have paid under the provider's per-minute rates, and (b) at or above which the cost of the subscription plan would be less than or equal to what the consumer would pay under the provider's per-minute rates.  *Infra* Appendix A, 47 CFR § 64.6000. *Compare* Securus Jan. 11, 2024 *Ex Parte* at 1 (providing a similar definition of the "breakeven point") *with* Securus

(continued….)

**Federal Communications Commission**                    **FCC 24-75**

demonstrating that the rate charged to that consumer under its alternate pricing plan is less than or equal to the applicable IPCS per-minute rate cap.

445.    We do not permit alternate pricing plans that combine IPCS with non-regulated services, as requested by some IPCS providers.[1604]  As the Public Interest Parties observe, alternate pricing plans should not include non-IPCS "which lack visibility and transparency in their pricing."[1605]  A key premise in our decision to allow alternate pricing plans is the ability of IPCS users to make informed decisions about whether to choose such optional plans.  Where the plans are limited to IPCS, users can make comparisons to the rate-regulated per-minute plans capped by Commission rules.  By contrast, if non-regulated services are included in alternate pricing plans, we are not confident that IPCS users consistently will have the same type of visibility and transparency in the pricing for those non-regulated services sufficient to make an informed decision whether to elect an alternate pricing plan.

446.    *Facilities*.  Alternate pricing plans may be offered at any carceral facilities served by the IPCS provider, such as jails and prisons, where the relevant correctional authorities permit.[1606]  By not specifying the types of facilities in which IPCS providers may offer alternate pricing plans, we allow providers the flexibility to determine where these plans would be most beneficial.

### (ii)    Rules and Conditions Specific to Alternate Pricing Plans

447.    Alternate pricing plans must comply with the rules generally applicable to IPCS, as well as specific rules and conditions designed to ensure that consumers that choose these pricing plans are protected.  Requiring compliance with these comprehensive rules will serve to protect consumers and ensure just and reasonable rates and charges as required by the Communications Act and the Martha Wright-Reed Act.[1607]

### (a)    Using a Consumer's Comparable Per-Minute Rate

448.    In the *2021 ICS Notice*, the Commission asked about the appropriate rate of IPCS offered

---

July 11, 2024 *Ex Parte* Attach. at 3 (implying that the "facility's per-minute rate" varies, thereby requiring the specification of that rate *at* the breakeven point).

[1604] Several providers suggest that the Commission should permit bundling of non-IPCS with IPCS.  Global Tel*Link Corp. Comments, WC Docket No. 12-375, at 7 (rec. Sept. 27, 2021) (suggesting that the ability to bundle services like "video, voice texting, email and access to content" could provide IPCS consumers with "pricing arrangements that are more akin to those offered to non-incarcerated populations"); NCIC Sept. 27, 2021 Comments at 4 (wanting to include messaging and remote visitation); *see also* Securus May 8, 2023 Comments at 2, 45 (asserting that IPCS providers' costs could be reduced by offering "bundled discounts, much as commercial providers bundle voice, video and [I]nternet access at a discounted price").  NCIC explains that its accounting system is set up to support just subscription plans or just per-minute plans.  Thus, if subscription plans include audio but not messaging, then a consumer would need to have two accounts with NCIC if they want both services—and NCIC would need to modify its accounting platform to support the two accounts.  NCIC Sept. 27, 2021 Comments at 4.  NCIC is the only commenter that expresses concern about the cost of establishing subscription plans, and NCIC does not quantify that cost.  However, NCIC does point out that other IPCS providers have separate accounts for separate services, and charge their customers varying fees for each of those accounts.  NCIC Apr. 19, 2024 *Ex Parte*, Exh. A at 3, 11-13.  NCIC is concerned that the FCC would "mandate a subscription plan."  NCIC Sept. 27, 2021 Comments at 4.  Because we are making subscription plans optional to the provider, NCIC can choose to not offer such plans.

[1605] Public Interest Parties Feb. 2, 2024 *Ex Parte* at 3.

[1606] *Infra* Appendix A, 47 CFR § 64.6000 (revised definitions of "jail" and "prison").  Securus offered its subscription plans in eight jails and one prison.  One of those facilities was a short-term detention facility where Securus offered a plan of just 25 calls per week, but that facility had low utilization.  Securus consequently posits that "[i]t may be that subscription plans are not optimal for short term facilities."  Securus Jan. 21, 2022 Reply at 3 n.6.

[1607] 47 U.S.C. §§ 201(b), 276(b)(1)(A).

via an alternate pricing plan.[1608]  In the *2022 ICS Notice*, the Commission asked how to protect consumers from "unreasonably high interstate and international rates in connection with pilot programs."[1609]  Today, we require that any IPCS alternate pricing plan be offered at a rate that has a breakeven point equal to or less than the applicable rate cap.[1610]  The rates of alternate pricing plans that satisfy this requirement will be presumed lawful.[1611]  We therefore ensure that providers cannot use alternate pricing plans to circumvent our rate caps, as commenters have cautioned.[1612]

449.    For purposes of demonstrating compliance with our rules in the event of a consumer complaint or investigation, an alternate pricing plan, whether offering bundled IPCS or a stand-alone service, must have a breakeven point that, when calculated on a per-minute basis, is less than or equal to the applicable rate caps.  The IPCS provider bears the burden of demonstrating compliance with this condition if its alternate pricing plan is the subject of a complaint or an investigation by the Commission.[1613]  A consumer complaint about the provider's alternate pricing plan rates will not be entertained under the alternate pricing plan rule in section 64.6140 unless the consumer's usage meets or exceeds the breakeven point(s) for the alternate pricing plan.[1614]

450.    In the *2022 ICS Notice*, the Commission also sought comment on whether a consumer's actual usage should be taken into account when determining whether an alternate pricing plan is consistent with the rate caps.[1615]  One commenter suggests that a plan's effective rate be calculated based on the usage data for a specific consumer.[1616]  Other commenters propose using alternative methods such as a "reasonable utilization" of the allotted minutes,[1617] "a reasonable assumption of usage," and an "average level of usage."[1618]  None of these commenters explain how these alternative methods would be

---

[1608] *2021 ICS Notice*, 36 FCC Rcd at 9657, para. 305.

[1609] *2022 ICS Notice*, 37 FCC Rcd at 11961, para. 154.

[1610] In the *2022 ICS Notice*, the Commission also asked whether it should require providers to offer consumers a discount compared to what they would pay for the same usage under the rate caps.  *2022 ICS Notice*, 37 FCC Rcd at 11962, para. 154.  Securus objects to being required to offer a discount because "there [would be] little or no incentive to price these plans at a substantial price discount."  Securus Dec. 15, 2022 Comments at 12.  We do not require that alternate pricing plans be offered at a discount from the Commission's per-minute rate caps.  Providers can determine the details of their alternate pricing plans, subject to our rules and what the market will bear.

[1611] *See supra* Section III.D.5 (Preemption).

[1612] Accessibility Advocacy et al. Comments, WC Docket No. 12-375, at 7 (rec. Dec. 15, 2022) (Accessibility Coalition Dec. 15, 2022 Comments); Accessibility Advocacy et al. Reply, WC Docket No. 12-375, at 8 (rec. Mar. 3, 2023) (Accessibility Coalition Mar. 3, 2023 Reply); Public Interest Parties Feb. 2, 2024 *Ex Parte* at 2 (citing similar remarks by Worth Rises).

[1613] *See infra* Section III.H.4 (Reporting and Recordkeeping).  Commenters agree that the providers should bear the burden of demonstrating their compliance with the Commission's rate caps and ancillary services caps, because "IPCS providers . . . are in the best position to provide this information about usage to the Commission."  Public Interest Parties May 8, 2023 Comments at 30; *see* Public Interest Parties Dec. 15, 2022 Comments at 12; Pay Tel Mar. 3, 2023 Reply at 5.

[1614] This limitation does not restrict non-rate-related complaints about providers' alternate pricing plans, for example about dropped calls or billing issues, while it does strike a balance by limiting the number of rate complaints that can be brought to the Commission to those brought by consumers whose usage met the breakeven point.

[1615] *2022 ICS Notice*, 37 FCC Rcd at 11961, para. 154.

[1616] Raher Dec. 15, 2022 Comments, Appx. 1 at 13 (suggesting that a statement of account include the consumer's effective rate, so that the consumer could "make informed decisions about what calling plan to use in the future").

[1617] ViaPath Jan. 7, 2022 Waiver Comments at 5.

[1618] Securus Sept. 27, 2021 Comments at 12; Securus Dec. 21, 2023 *Ex Parte*, Attach. at 37; Securus Dec. 15, 2022 Comments at 12.  Securus also suggests that no plan "should be offered if its effective per-minute rate at full

(continued….)

implemented in practice.[1619]  We find that comparing the amount of usage to meet the breakeven point to the consumer's actual usage of the alternate pricing plan will result in a more meaningful and accurate assessment than using the alternate methods proposed by commenters.

451.    Our rule requiring comparison of a consumer's actual usage to the alternate pricing plan's breakeven point makes the determination of whether a plan results in just and reasonable rates for a specific consumer straightforward.[1620]  In the event of a challenge, the IPCS provider would need to use only the number of minutes used by the consumer challenging the lawfulness of the alternate pricing plan, without needing to analyze other consumers' usage to determine an "average" or "reasonable" amount of usage.  Securus cautions that the Commission "be mindful . . . of not imposing excessive burdens on providers" as it considers the calculation of a consumer's effective rate, but Securus does not explain what it thinks the "burden" may be.[1621]  We find that requiring that a consumer's actual usage be used to determine the comparable per-minute rate for that consumer is less of a burden than Securus's suggestions that providers use a "reasonable" or "average" amount of usage.

(b)    <strong>Complaints of Dropped Calls or Communications</strong>

452.    When using an alternate pricing plan based on a specific number of calls or communications, an IPCS consumer may be charged for more than one call or communication if an original call is dropped and the consumer is forced to reinitiate the call or communication to finish a conversation.[1622]  We, therefore, address the issue of refunds or credits for such calls or communications when consumers are effectively charged for more than one call when a call is dropped.  In the case of plans that charge on a per-call or per-communication basis, we expect refunds or credits to be provided in particular circumstances for dropped calls, and also require specific consumer disclosures to ensure that consumers are aware of the ability to request those refunds or credits.

453.    Complaints of dropped calls, and the attendant lost funds associated with those calls, have been a constant refrain since the beginning of the Commission's regulatory efforts to reform communications services for incarcerated persons.[1623]  Unfortunately, dropped calls continue to be a problem and are not limited to audio IPCS.[1624]  In the *2021 ICS Notice*, the Commission asked about

---

utilization is not below the applicable per-minute cap."  Securus Dec. 15, 2022 Comments at 11.  Calculating a comparable per-minute rate at full utilization assumes that a "consumer will use every call and minute available," an assumption that defies the purpose of our requirement to calculate the consumer's effective rate.  *2022 ICS Notice*, 37 FCC Rcd at 11961, para. 154 (asking whether the Commission should make that assumption).

[1619] *E.g.*, Securus Dec. 15, 2022 Comments at 11.

[1620] *Infra* Appendix A, 47 CFR § 64.6140 (Alternate Pricing Plans).

[1621] Securus Dec. 15, 2022 Comments at 12.

[1622] *See*, e.g., Phoenix Listening Session at 23:8-10 (Omar Thomas explaining how during "the 15 minutes that you're allotted, you only talk for 11 and it hung up, but your loved one is paying for that 15 minutes"); *id.* at 26:19-27:9 (Omar Thomas, in response to questions about refunds for dropped calls, stating:  "We're charged all over again.  I don't think there is a procedure in place to reap benefits such as refunds.  I've never heard of it.").

[1623] *2012 ICS Notice*, 27 FCC Rcd at 16637, para. 19.  Then, in the *2015 ICS Order*, the Commission prohibited per-call (and per-connection) charges, in part, due to the "'assessment of multiple per-call charges for what was, in effect, a single conversation'" that was interrupted when the call was dropped.  *2015 ICS Order*, 30 FCC Rcd at 12811, para. 101.

[1624] California PUC May 8, 2023 Comments at 9 (dropped or interrupted calls); State of Phone Justice Dec. 2022 Report at 8 (dropped video communications or sessions); Esperanza Dillard Comments, Docket No. 12-375, at 1 (rec. Dec. 14, 2022) (Dillard Dec. 14, 2022 Comments) (arguing that "deaf/disabled people and their loved ones are often disconnected because of inaccessible telecommunications in carceral systems"); Public Interest Parties Dec. 15, 2022 Comments at 10; Worth Rises Jan. 7, 2022 Waiver Comments at 2 ("Incarcerated individuals and their families report that calls made from prisons and jails are frequently dropped.").

preventing providers from assessing duplicative ancillary service charges when a call is dropped.[1625]  In the *2022 ICS Notice*, the Commission sought comment on adopting a requirement to provide credits or other remedies for dropped calls in the context of alternate pricing plans.[1626]  At the October 27, 2023, and February 1, 2024, IPCS Listening Sessions, IPCS consumers also discussed the issue and the difficulty of having calls dropped.[1627]

454.    There are several possible reasons for an audio call or a video communication to drop.  On the one hand, there could be a technical reason such as faulty equipment in the carceral facility,[1628] a problem in the IPCS provider's network, in the transmission network between the IPCS provider and the called party, or in the called party's network, in which instances we expect providers to take steps to provide appropriate refunds or credits.[1629]  On the other hand, calls or communications can be intentionally disconnected for non-technical reasons related to security, such as stopping attempts to initiate a three-way call, for which refunds or credits would not be appropriate.[1630]  For example, when it offered its subscription plan, Securus made refunds available upon request and acknowledged that refunds may be available "for verified performance problems such as poor quality or outages caused by Securus systems."[1631]  Upon receipt of a dropped call complaint, we similarly expect IPCS providers to investigate these claims in good faith and resolve them swiftly so as not to delay giving a refund or credit to the IPCS consumer when warranted.  The record indicates that Securus monitored the incidences of dropped calls in its subscription plans, thereby suggesting that this task will not be overly burdensome for IPCS providers.[1632]  Regardless, we will vigilantly monitor complaints about inappropriately dropped communications, and, if necessary, will adopt specific rules requiring refunds or credits in the instance of dropped calls or communications.[1633]

455.    We next require IPCS providers to clearly describe their policies regarding dropped calls or communications in plain language in their consumer disclosures, including explaining the types of dropped calls and communications for which a consumer can seek a refund or credit.[1634]  The provider also must explain how the refund or credit for a dropped call or communication will be calculated.[1635]  In

---

[1625] *2021 ICS Notice*, 36 FCC Rcd at 9671-72, para. 337 (asking whether the Commission should, for example, prevent providers from assessing charges when calls are dropped after being successfully connected).

[1626] *2022 ICS Notice*, 37 FCC Rcd at 11962, para. 155.

[1627] Charleston Listening Session at 17:5-14, 18:9-12, 24:18-20, 62:10-11, 63:7-14 (statements of Eric Mitchell, Brian Howard, and Jada Cochran describing frequently dropped calls); Chicago Listening Session at 908, 968.

[1628] Securus Sept. 21, 2022 *Ex Parte* at 9.

[1629] Securus Jan. 7, 2022 Waiver Comments at 4; Securus Sept. 21, 2022 *Ex Parte* at 9.

[1630] *See* Securus Jan. 7, 2022 Waiver Comments at 4; Worth Rises May 8, 2023 Comments at 11 ("[A]n officer cuts off the call.").

[1631] Securus Dec. 21, 2023 *Ex Parte*, Attach. at 4, 24.

[1632] *See* Securus Jan. 7, 2022 Waiver Comments at 3-4 (asserting that although it received no complaints about dropped calls while offering its subscription plans, Securus's "internal data reflects that the number of calls dropped due to network performance issues within its control are . . . 0.28% of completed calls").  Even this small percentage means that{[          ]} calls were dropped due to network issues  {[
                    ]}.  *See* Securus Jan. 11, 2024 *Ex Parte*, Attach. B (total actual calls).

[1633] We seek comment on call or communication service quality and the issue of dropped calls due to service quality in the accompanying Notice.  *See infra* Section V (Further Notice of Proposed Rulemaking).

[1634] *See infra* Section III.G.1.d (Alternate Pricing Plan Consumer Disclosure Requirements); *infra* Appendix A, 47 CFR § 64.6140(d) (Dropped Calls or Communications and Related Consumer Disclosures).

[1635] For example, if an alternate pricing plan is based on the number of calls or communications, then the IPCS provider could give a credit of at least one call or communication, if there is enough time left in the service period for the consumer to use that credit; otherwise, a pro-rated refund may be appropriate.  *But see* Securus Jan. 7, 2022

(continued….)

its consumer disclosures, the IPCS provider must also clearly explain the method the consumer must use to make a complaint and request a refund or credit for a dropped call or communication, and that method must be easy for the consumer to complete.[1636]

### (c)    Automatic Renewals

456.    To protect consumers from being billed for additional service periods without their consent, we permit IPCS providers to offer automatic renewals of any alternate pricing plan but only on an opt-in basis, and subject to other requirements discussed below.  In the *2022 ICS Notice*, the Commission sought comment on whether consumers should be able to opt out of automatic renewals for alternate pricing plans, citing concerns that without such protections, alternate pricing plans may default to renewals consumers do not intend to purchase or no longer need.[1637]  In response, some commenters expressed similar concerns[1638] and even suggested prohibiting automatic renewals.[1639]  Alternatively, Securus asserts that "the consumer should have a readily accessible means to decline or cancel any renewal option."[1640]

457.    We adopt rules to ensure that consumers are informed about their renewal options.  These rules are intended to give consumers the option to select automatic renewal, and also an easy method and sufficient opportunity for consumers to cancel the service before a plan renews.[1641]  We are guided by the record, and many other situations where the Commission has required service providers to educate their consumers and allow them to opt into or out of a service.[1642]  These rules apply to all IPCS offered

---

Waiver Comments at 4 (Securus gave a refund for the fraction of the plan represented by the call that was dropped, such as 1/25 of the cost of the plan in a 25-call plan, regardless of when in the service period the dropped call occurred.).  If the alternate pricing plan consists of a fixed number of minutes, we suggest that the IPCS provider give the consumer a refund for the minutes used by the call or communication that was dropped.  Finally, if the alternate pricing plan consists of unlimited calls or communications, or unlimited minutes, then no credit or refund would be needed.

[1636] *See* Worth Rises Oct. 27, 2021 Response at 3 (asking how consumers request a refund for dropped calls and how the refund policy is communicated to consumers).  ViaPath suggests that complaints could be filed at the Commission.  ViaPath June 13, 2024 *Ex Parte* at 14.  However, clearly informing consumers of a provider's policies regarding dropped calls or communications and providing an easy-to-use method for requesting a refund or credit will be a good first step toward resolving issues with dropped calls and communications.

[1637] *2022 ICS Notice*, 37 FCC Rcd at 11962, para. 155 & n.391 (citing Worth Rises Jan. 7, 2022 Waiver Comments at 2); *see also* Worth Rises Oct. 27, 2021 Response (explaining that with automatic renewals, "consumers may default to renewals they do not intend to make").

[1638] *See, e.g.,* Public Interest Parties Dec. 15, 2022 Comments at 9  (noting concerns about the ability to cancel Securus's alternative pricing plan in a timely manner without incurring extra fees) (citing PPI Jan. 7, 2022 Waiver Comments)).

[1639] Worth Rises Oct. 27, 2021 Response at 3 (asking for automatic renewals to be prohibited, and suggesting that if they are not prohibited, the provider should be required to offer an easily accessible termination option).

[1640] Securus Dec. 15, 2022 Comments at 12.  During Securus's subscription plans, when a consumer signed up using its website, Securus gave the choice between manual renewal and automatic renewal.  Securus Dec. 21, 2023 *Ex Parte*, Attach. at 15.  PPI notes that Securus apparently did not give advance notice when a renewal occurred for its subscription plan; Securus notified customers only "*after* their renewal payments have been processed."  PPI Jan. 7, 2022 Waiver Comments at 17.  PPI also points out that although Securus stated that customers could receive a refund within 14 days of an unwanted and unused automatic renewal, Securus's contracts did not include these terms.  PPI Jan. 21, 2022 Waiver Reply at 5.

[1641] *See infra* Appendix A, 47 CFR §§ 64.6140(e) (Automatic Renewals and Related Consumer Disclosures), 64.6140(f) (Cancellation by the Consumer and Related Consumer Disclosures).

[1642] *E.g.*, 47 CFR § 64.2008 (detailed list of information that must be provided to a customer before a carrier asks the customer for opt-in approval to use the customer's customer proprietary network information (CPNI)); 47 CFR § 64.2401(b) (requiring a "brief, clear, non-misleading, plain language description of services" on telephone bills);

(continued….)

through an alternate pricing plan.

458.    We also require that IPCS providers offering automatic renewals for alternate pricing plans explain, in plain language, the terms and conditions of the automatic renewal both at the time that it initially offers the automatic renewal option to a consumer, and before any automatic renewal is about to occur by whatever method the IPCS provider has established for other consumer notifications.  The notices must explain that if a consumer who requested automatic renewals does not later want the alternate pricing plan to be renewed, the consumer may cancel their participation within a reasonable grace period identified by the provider at the time service is initiated.

459.    The IPCS provider must give notice to the consumer of an upcoming renewal with sufficient time before the renewal date to ensure the consumer can cancel their enrollment in the alternate pricing plan prior to its renewal.  The Prison Policy Initiative suggests that "[a] notification 2-3 business days prior to renewal would help customers avoid potential overdraft fees and remind them to cancel their subscription if they have been meaning to do so but forgot."[1643]  We agree that this requirement will ensure that consumers have sufficient notice.  Therefore, we require that providers give notice directly to consumers no later than three business days prior to the renewal date, and, to ensure receipt of the notice, we require providers use, at a minimum, the method of communication that consumers agreed to at the time they enrolled in the alternate pricing plan.[1644]

### (d)    Cancellation by the Consumer

460.    A consumer must be able to cancel their enrollment in an alternate pricing plan at any time and revert to per-minute pricing.  Refunds or credits must be made available to consumers in the circumstances detailed below.  Providers should process the cancellation by the next business day after the cancellation request.[1645]  In its consumer disclosures, the provider must clearly explain the process for requesting plan cancellation, which must include the ability to use the method the consumer used to enroll in the plan.[1646]  The disclosures also must include an explanation of the option to request a specific termination date if different from the date that the provider processes the cancellation.[1647]  The consumer disclosures also must include an explanation of the amount of the refund that will be provided in situations where the IPCS provider does give refunds under the circumstances surrounding

---

47 CFR § 64.5108 (specifying the information to be provided by a TRS provider before a customer would opt into permitting the TRS provider to use a customer's CPNI); *Advanced Methods to Target & Eliminate Unlawful Robocalls*, CG Docket No. 17-59 and WC Docket No. 17-97, Declaratory Ruling and Third Further Notice of Proposed Rulemaking, 34 FCC Rcd 4876, 4886-87, para. 33 (2019) (describing how voice service providers must offer sufficient information, in plain language, about call blocking so consumers can make an informed choice about whether to remain in the program, and "make the opt-out process simple and straightforward").

[1643] PPI Jan. 7, 2022 Waiver Comments at 17.  No other commenter mentions the notices to be provided before automatic renewals.

[1644] For example, Securus used email to remind consumers when they were reaching the call limit of its subscription plans.  Securus Dec. 21, 2023 *Ex Parte*, Attach. at 26.  *See* Minnesota Department of Commerce Comments, WC Docket No. 12-375, at 4 (rec. Dec. 15, 2022) (Minnesota Dept. of Commerce Dec. 15, 2022 Comments) (suggesting that providers give monthly balance statements "delivered by the customer's preferred contact method" such as email); Pay Tel Sept. 27, 2021 Comments Exh. 1 at 23 (listing email as part of a customer's contact information for prepaid accounts).  PPI commends Securus for providing an online option for cancelling enrollment (although they suggest that the related terms and conditions were confusing).  PPI Jan. 7, 2022 Waiver Comments at 17.

[1645] Pay Tel July 12, 2023 Reply at 11-12, 14 (explaining that system administrator duties, including administering debit accounts, are performed 24/7); *infra* Appendix A, 47 CFR § 64.6140(f).

[1646] *Infra* Appendix A, 47 CFR § 64.6140(f).  Securus provided an online cancellation option but, according to PPI, did not tell consumers that procedure was available.  PPI Jan. 7, 2022 Waiver Comments at 17.

[1647] For example, the consumer may want to request a cancellation because an incarcerated person is going to be transferred, and the consumer would want the plan to terminate after the date of transfer.

cancellation.[1648]  The provider must clearly explain that once the alternate pricing plan terminates, and where applicable, the provider will bill for its service(s) at the provider's per-minute rates for the service(s) by the first day after the termination date.[1649]  We do not require providers to roll over unused minutes, calls or communications.

461.    *When Cancellation Is Allowed.*  IPCS providers must allow consumers to cancel their participation in an alternate pricing plan at any time during the service period and revert to per-minute pricing.  This requirement applies regardless of whether the consumer has elected to permit the provider to automatically renew their participation in the plan.  In the *2022 ICS Notice*, the Commission sought comment on whether consumers should be permitted to cancel their enrollment in an alternate pricing plan before the end of their enrollment period.[1650]  NCIC noted that people who are incarcerated for only a short period of time or are moved to another facility may not be able to "receive the full benefit of the subscription plan."[1651]  The Public Interest Parties assert that "[c]onsumers should . . . not be bound by any long-term commitments and should be free to switch to a per-minute structure upon request."[1652]  The record also indicates that a consumer may want to cancel their enrollment if they have not used the service since the beginning of the service period or if their incarceration status has changed.  There may also be "special circumstances" such as release or transfer under which a consumer may need to cancel their participation in an alternate pricing plan.  Securus repeatedly states that consumers should be permitted to cancel at any time, and refers to easy cancellations as the "ultimate consumer protection."[1653]  We agree.  Regardless of when a consumer wants to cancel their enrollment, the IPCS provider's procedures for cancelling the service must be easy to follow and use the same method to effectuate cancellation that the consumer used to enroll in the plan.  As Securus points out, the method for cancelling service should be "readily accessible."[1654]

462.    *Refunds Upon Cancellation.*  In the *2022 ICS Further Notice*, the Commission asked whether IPCS providers should be required to offer refunds when consumers cancel an alternate pricing plan before the end of the "subscription period."[1655]  Securus explains that under its subscription plan, "refunds [were] available upon request,"[1656] and suggests that refund options should be limited to special circumstances such as the transfer or release of the incarcerated person.[1657]  Securus argues that requiring providers to otherwise give refunds to consumers who cancel during a service period "would deprive providers of the benefit of the bargain—low rates in exchange for a predictable revenue stream."[1658]  We

---

[1648] *Infra* Appendix A, 47 CFR § 64.6140(f).

[1649] For example, if the plan is cancelled due to the incarcerated person being released, then the ability for the incarcerated person to call their friends and family would no longer be needed.  By comparison, if the cancellation is not due to one of the special circumstances, then the incarcerated person may still need to use the service of the provider and would pay for that service using the provider's per-minute rates.

[1650] *2022 ICS Notice*, 37 FCC Rcd at 11962, para. 155.

[1651] NCIC Jan. 7, 2022 Waiver Comments at 2-3.

[1652] Public Interest Parties Dec. 15, 2022 Comments at 9-10 & n.26 (referring to the issue as being one of consumer protection).

[1653] Securus Dec. 17, 2021 Reply at 34; Securus Dec. 21, 2023 *Ex Parte*, Attach. at 35.

[1654] Securus Dec. 15, 2022 Comments at 12.

[1655] *2022 ICS Notice*, 37 FCC Rcd at 11962, para. 155.

[1656] Securus Dec. 21, 2023 *Ex Parte*, Attach. at 4.  However, Securus's website states:  "There are no refunds/adjustments for early termination prior to the expiration date of your subscription."  NCIC Jan. 7, 2022 Waiver Comments at 5 & n.12; *see also* PPI Jan. 7, 2022 Waiver Comments at 18 (pointing out that Securus's "'Product Terms and Conditions'" state "'Subscription payments are non-refundable'").

[1657] Securus Dec. 15, 2022 Comments at 12; *see* Securus Jan. 7, 2022 Comments at 3.

[1658] Securus Dec. 15, 2022 Comments at 13.

agree.  Therefore, although consumers may cancel their enrollment in an alternate pricing plan at any time, IPCS providers are not required to refund the balance of the subscription amount except in the case of special circumstances.  The special circumstances recognized by the IPCS provider shall include situations where the incarcerated person: (a) is released; (b) is transferred to another facility; or (c) is not permitted to make calls or communications for a substantial portion (for example 50% or more) of the subscription period of the alternate pricing plan.[1659]  Under such circumstances, the consumer would not be able to make use of the alternate pricing plan, and thus not be able to receive the benefit of the services they paid for.  The IPCS provider may also establish other special circumstances for which it will provide a refund when a consumer requests cancellation.

463.    Any refund provided due to special circumstances shall be no less than the pro-rated amount that corresponds to the unused portion of the service period remaining under the alternate pricing plan.[1660]  These limited refund requirements strike the appropriate balance between protecting consumers in the case of changed circumstances while still making the plans attractive for IPCS providers.  Although we do not require an IPCS provider to give a refund for the unused portion of the alternate pricing plan when a cancellation occurs in situations other than the special circumstances detailed here, an IPCS provider may offer a refund at the provider's option in other situations.

464.    *No Required Rollovers*.  We do not require providers to roll over unused minutes, calls, or communications from one service period under an alternate pricing plan to another service period.[1661]  One commenter observes that Securus's subscription plan did not allow for the rollover of unused minutes, thereby increasing the consumer's effective rate.[1662]  Securus opposes a requirement for consumers to be able to roll over unused minutes because rollovers would convert alternate pricing plans into "repackaged per-minute rate plans and prevent consumers from enjoying lower prices."[1663]  We agree that a rollover requirement may undermine IPCS providers' incentives to offer alternate pricing plans, and therefore refrain from requiring providers to roll over unused minutes, calls, or communications.

### d.    Other Issues

#### (i)    Flat-Rate Calling

465.    Because we permit IPCS providers to offer alternate pricing plans at flat rates (e.g., $Y per month or $Y per week), we remove section 64.6090 of the Commission's rules which prohibits the offering of IPCS via flat rates.[1664]  That prohibition on "flat-rate calling" was adopted by the Commission in the *2015 ICS Order* when some providers *required* consumers to pay for a 15-minute call even if the

---

[1659] NCIC Jan. 7, 2022 Waiver Comments at 5 (suggesting refunds when an incarcerated person is released or transferred); PPI Jan. 7, 2022 Waiver Comments at 8 ("[If] the caller loses phone privileges as a disciplinary sanction . . . the subscriber will have spent money for no or little service in any given billing period"); Securus Dec. 15, 2022 Comments at 12 (recommending refunds in the case of transfer or release); Securus Jan. 7, 2022 Waiver Comments at 3 (partial refunds in the case of transfers).

[1660] For example, if a consumer is enrolled in an alternate pricing plan and has used 200 minutes of an allotted 600 minutes when the consumer cancels due to special circumstances, the consumer would have 400 minutes (= 600 minutes − 200 minutes) unused at the time of cancellation.  The provider would give a refund of at least 2/3 (= 400 minutes / 600 minutes) of the amount the consumer paid for the plan.

[1661] *2022 ICS Notice*, 37 FCC Rcd at 11962, para. 155 & n.389 (seeking comment on whether the Commission should allow such rollovers); *see* Public Interest Parties Dec. 15, 2022 Comments at 10 n.27 (suggesting that "unused minutes could roll-over into the next billing cycle so users may avoid paying for services that have not been rendered").

[1662] Worth Rises Oct. 27, 2021 Response at 2; Securus Dec. 17, 2021 Reply at 34.

[1663] Securus Mar. 5, 2023 Reply at 8-9.  Indeed, in Securus's subscription plan, Securus did not roll over unused calls.  Securus Dec. 17, 2021 Reply at 34.

[1664] 47 CFR § 64.6090 ("No Provider shall offer Flat-Rate Calling for interstate or international Inmate Calling Services.").

call ended prior to the expiration of the 15 minutes.[1665]  The Commission concluded that flat-rate prices for such short calls were "disproportionately high" and therefore prohibited flat-rate calling.[1666]  Today, IPCS providers offer their IPCS at per-minute pricing, and we *permit* them to offer flat-rated alternate pricing plans as an *option* to the per-minute pricing.[1667]  Consequently, we no longer need to prohibit flat-rate calling to protect consumers.[1668]  If a provider offers a flat rate option for IPCS, they would be offering an alternate pricing plan, and would be subject to our general IPCS rules as well as the alternate pricing plan rules which will serve to protect consumers.[1669]

### (ii)    Disability Access via Alternate Pricing Plans

466.    IPCS providers that offer alternate pricing plans must ensure that they comply with our rules concerning TRS and related communication services.  In the *2022 ICS Notice* and the *2023 IPCS Notice*, the Commission sought comment regarding the features or attributes that should be included in alternate pricing plans, and what conditions it would need to impose to ensure just and reasonable rates for audio and video communications services relevant here.[1670]  In the *2023 IPCS Notice*, the Commission also sought comment on the extent to which the Martha Wright-Reed Act expands its ability to ensure that any audio and video communications services used by incarcerated people are accessible to and usable by people with disabilities.[1671]  The Accessibility Advocacy and Research Organizations urge the Commission to "be proactive and aggressive in preventing" providers from using alternate pricing plans to circumvent "the prohibition on charges for certain TRS calls"[1672] as well as providers' "pricing obligations."[1673]

467.    In the *2022 ICS Order*, the Commission amended section 64.6040 of its rules to improve access to TRS and related communications services, and clarified and expanded the restrictions on charges for TRS calls.[1674]  In this Report and Order, we amend section 14.10 to reflect the Martha Wright-Reed Act's expansion of the Communications Act's definition of advanced communications service, making clear the obligations of IPCS providers to ensure their video and voice communications services are accessible to and usable by incarcerated people with disabilities, and we amend section 64.611 to facilitate the provision of IP CTS to incarcerated people with disabilities.[1675]  Here, we amend section 64.6040 to clarify how calls or communications using TRS and related communications services shall be

---

[1665] *2015 ICS Order*, 30 FCC Rcd at 12812-13, paras. 102-105; Pay Tel Jan. 27, 2015 Reply at 54.

[1666] *2015 ICS Order*, 30 FCC Rcd at 12813, para. 105.

[1667] *Supra* Section III.D.9.a (Introduction); *infra* Appendix A, 47 CFR §§ 64.6010(a), 64.6140(a) (General Parameters).

[1668] *Infra* Appendix A (removal of 47 CFR § 64.6090).  One commenter opposes flat-rate charges for IPCS video calling, providing examples where the flat-rate charges are the only way to pay for video calling.  Raher May 8, 2023 Comments at 19-20.  Because today we adopt per-minute rate caps for IPCS video calling and permit flat-rate charges for video calling only within the context of an optional alternate pricing plan, these concerns are mitigated. *Supra* Section III.D.4 (Adopting Audio and Video IPCS Rate Caps).

[1669] *Infra* Appendix A, 47 CFR §§ 64.6000 (definition of Alternate Pricing Plan), 64.6140 (Alternate Pricing Plan rules).

[1670] *2023 IPCS Notice*, 38 FCC Rcd at 2688, para. 46; *2022 ICS Notice*, 37 FCC Rcd at 11916, 11919, paras. 148, 155.

[1671] *2023 IPCS Notice*, 38 FCC Rcd at 2698-99, paras. 75-77.

[1672] Accessibility Coalition Dec. 15, 2022 Comments at 7.

[1673] Accessibility Coalition Mar. 6, 2023 Reply at 9.

[1674] *2022 ICS Order*, 37 FCC Rcd at 11902, para. 3.

[1675] *Infra* Section III.F.2 (Enterprise Registration for IP CTS).

treated under an alternate pricing plan.[1676]

468.    An IPCS provider that offers an alternate pricing plan must treat the calls or communications made to use TRS and related communications services in accordance with new section 64.6040(e).  The requirements in new section 64.6040(e) mirror the restrictions on charges for IPCS in section 64.6040(d).  If an alternate pricing plan offers an unlimited number of minutes or calls, then eligible TRS users must be allowed unlimited TRS, text-telephone-to-text-telephone (TTY-to-TTY), and point-to-point American Sign Language (ASL) video calls under the same plan.  If an alternate pricing plan limits the number of calls or minutes that are allowed during a billing period, then: (1) Video Relay Service (VRS), Internet Protocol Relay Service (IP Relay), and Speech-to-Speech Relay Service (STS) calls or minutes shall not be counted for purposes of such limits; (2) each Internet Protocol Captioned Telephone Service (IP CTS) and Captioned Telephone Service (CTS) call or minute shall be counted as equal to a non-TRS audio call or minute; and (3) TTY-to-TTY calls (which under a per-minute rate plan must not be charged at more than 25% of the per-minute rate) shall be counted as single calls (under a plan that limits the number of calls) or counted at one fourth the number of minutes used (if the plan limits the number of minutes).  Also, each point-to-point video call shall be counted as equal to an audio call.  Regardless of the format of an alternate pricing plan, there shall be no charge or fee for any equipment used to access TRS and related communication services, and no charge or fee for the Internet or data portion of an IP CTS or CTS call,[1677] or for any additional Internet or other connections needed for services covered by section 64.6040.  These rules will prevent IPCS providers that offer alternate pricing plans, from circumventing the requirements adopted in the *2022 ICS Order*.  The rules also will satisfy requests in the record, and our statutory duties to ensure that communications services are accessible to and usable by persons with disabilities.[1678]

### (iii)    Consistency with the Martha Wright-Reed Act

469.    We find that allowing alternate pricing plans subject to the requirements and rules we adopt today is consistent with the Martha Wright-Reed Act.  In the *2023 IPCS Notice*, the Commission asked whether the Martha Wright-Reed Act precludes the Commission from permitting alternate pricing plans for audio or video communications.[1679]  Only one commenter addressed this issue, asserting that nothing in the Martha Wright-Reed Act "bars use of different pricing structures."[1680]  Previously, in response to the *2021 ICS Notice*, the Prison Policy Initiative argued that the effective rates of alternate pricing plans and the consumer disclosures provided at that time could violate the Commission's statutory duties under sections 201(b) and 276(b)(1)(A).Act.[1681]  We find, however, the conditions we impose today on the offering of alternate pricing plans sufficiently address the fundamental concerns raised in the record.[1682]

---

[1676] *Infra* Appendix A, 47 CFR § 64.6040(e).

[1677] For example, with CTS and IP CTS, a second telephone line or an Internet connection—separate from the voice connection—is often used to connect the user's device with the IP CTS provider to enable the provision of captions. If an alternate pricing plan offers a fixed number of minutes for voice service, for example, then in applying such a limit to a CTS or IP CTS user, only the minutes handled by the voice service line may be counted.

[1678] 47 U.S.C. §§ 225(b)-(c), 255(c), 617(b)(1), (d)-(e); Accessibility Coalition Mar. 3, 2023 Reply at 9.

[1679] *2023 IPCS Notice*, 38 FCC Rcd at 2687-88, para. 45.

[1680] Securus May 8, 2023 Comments at 23, 44.

[1681] *2021 ICS Notice*, 36 FCC Rcd at 9657, para. 305; PPI Sept. 27, 2021 Comments at 23-24.

[1682] Because we limit the rates that may be charged for IPCS when offered through alternate pricing plans to the just and reasonable rate caps we adopt today on a per-minute basis—rate caps that ensure fair compensation to providers—alternate pricing plan rates and charges will also be just and reasonable and provide fair compensation consistent with the Martha Wright-Reed Act.  *Supra* Sections III.D (Rate Caps) and III.D.9 (Alternate Pricing Plans).  While we find that the per-minute rate caps we adopt today will ensure that IPCS providers are "fairly

(continued….)

### (iv)    Start Date and End Date

470.    Consistent with the voluntary nature of any IPCS alternate pricing plan, an IPCS provider that elects to offer an alternate pricing plan may choose when to offer the plan once the rules permitting such plans are effective.  The Commission previously asked about possibly allowing alternate pricing plans on a temporary or pilot program basis only.[1683]  We decline to limit providers' ability to offer these plans given that no IPCS user must choose such a plan, and given the other protections we adopt.[1684]  We also do not limit the time frame during which an alternate pricing plan may be offered due, in part, to the potential consumer benefits of these plans and to our adoption of rules and conditions that will ensure such benefits.  However, we caution providers that if we see evidence of gamesmanship or that providers are otherwise taking advantage of consumers through these alternate pricing plans, we will not hesitate to revisit allowing IPCS providers to offer such plans.

471.    Just as we permit providers to determine when to offer an alternate pricing plan without prior approval from or notification to the Commission, we similarly permit providers to terminate a plan at their discretion, provided that sufficient notice is given to their consumers.  We permit providers to determine what is reasonable notice of termination,[1685] and require notification to consumers in accordance with applicable consumer disclosure rules.[1686]

### 10.    International Rate Caps

472.    In the *2021 ICS Order*, the Commission first adopted interim rate caps on international audio IPCS communications comprised of the applicable interstate rate cap component for that facility plus an international termination component.[1687]  The record and the data before us demonstrate that providers continue to incur termination charges for completing international audio communications.[1688]  We therefore decline to disturb the rules for international calls on the record before us, and maintain our existing international rate cap structure for audio IPCS.

---

compensated," in accordance with section 276(b)(1)(A) of the Communications Act, an IPCS provider that chooses to offer an alternate pricing plan will bear the responsibility for ensuring that the plan will adequately compensate it for its services on a companywide basis.  47 U.S.C. § 276(b)(1)(A).

[1683] *2022 ICS Notice*, 37 FCC Rcd at 11961, para. 152 (asking about amending rules to permit providers to offer "pilot programs" and whether it should authorize such plans for a limited period of time, such as two years).

[1684] Worth Rises suggests that the Commission permit a pilot program pursuant to a waiver for no longer than three months so that the Commission may collect data to ensure compliance with the rate caps before permitting the plan to continue.  Worth Rises May 8, 2023 Comments at 10-11.  Conversely, Securus asserts that the Commission should not limit the length of time the plan can be offered and argues that "[a]rtificially ending programs that may be providing substantial benefits would harm the very consumers the Commission wishes to protect."  Securus Dec. 15, 2022 Comments at 14.

[1685] For example, given that alternate pricing plans are limited to one month service periods, IPCS provider notification to affected consumers two weeks prior to it no longer offering a monthly plan exemplifies reasonable notice.

[1686] *Infra* Section III.G.1 (Consumer Disclosure Rules).

[1687] *See 2021 ICS Order*, 36 FCC Rcd at 9596, 9598-99, paras. 176, 181-82; 47 CFR § 64.6030(e) (establishing that providers may charge a rate for international calls equal to the applicable interstate cap "plus the average amount that the provider paid its underlying international service providers for calls to the International Destination of that call, on a per-minute basis," with this international termination component to be recalculated every calendar quarter).

[1688] *See* ViaPath June 2, 2023 Mandatory Data Collection Comments at 4 (noting that the only "meaningful difference in cost" of providing international IPCS is the "international termination charges paid to underlying carriers"), Appendix F (discussing the costs reported for completing international communications in the Third and 2023 Mandatory Data Collection).

**Federal Communications Commission**     **FCC 24-75**

473. In the *2021 ICS Notice*, the Commission sought comment on whether and how it should further reform international rates,[1689] a request echoed in subsequent notices.[1690] In response, certain commenters raised concerns with the formula for calculating international rates set forth in our rules, arguing that tracking multiple "floating rates" raises surveillance costs for providers and reduces predictability for consumers.[1691] We are unpersuaded. As an initial matter, we decline to establish a uniform safe harbor under which the termination component that would apply to all of a provider's international audio calls (or alternatively to all of the provider's international audio calls under a particular contract) would equal the average of the provider's international termination charges for the previous calendar year (or alternatively the average of such charges under the particular contract), as one commenter suggests.[1692] Because international termination charges vary significantly depending on the calls' destinations, any such approach would result in IPCS consumers being charged unreasonably high rates for calls to international destinations having relatively low termination charges. It is also hard to understand how predictability could decline when the international termination fees themselves change frequently, and the commenters have not substantiated their claims of compliance difficulties with cost data. No commenter raises other concerns with the current international rate cap formula. At the same time, providers' submitted data are remarkably devoid of any data on the cost of providing international IPCS, with only one provider reporting such costs.[1693] We therefore find that both the data and the record are, at present, insufficient to support revisions to our rules, or to develop alternative approaches to international rate caps.

474. We recognize that differences between audio IPCS and video IPCS may limit the applicability of these rules to video IPCS.[1694] In fact, the data from the 2023 Mandatory Data Collection do not indicate that providers routinely or ordinarily incur termination charges for completing international video communications.[1695] In the absence of any record supporting the need for international video communications rate caps, we decline to adopt an international termination component for video IPCS at this time. In the absence of such a separate component for video IPCS, international video communications will be subject to the interstate video cap in effect for the relevant facility.

### E. Waivers

475. We adopt with modifications the waiver process previously adopted by the Commission in the *2021 ICS Order*. The modifications reflect our full jurisdiction under the Martha Wright-Reed Act to include intrastate services and various advanced communications services, including video services and providers that offer them, in addition to the interstate and international services that previously were the

---

[1689] *See 2021 ICS Notice*, 36 FCC Rcd at 9672-73, paras. 340-41 (seeking comment on "what types of costs should legitimately be considered as additional costs associated with international calls," and "other ways in which we could reform international rates on a permanent basis to ensure they are just and reasonable").

[1690] *See, e.g.*, *2022 ICS Notice*, 37 FCC Rcd at 11953, para. 134 (asking commenters to "suggest methodologies we might use to set reasonable interstate and international provider-related rate caps"); *2023 IPCS Notice*, 38 FCC Rcd at 2686-88, paras. 39-46 (seeking comment on the appropriate ratemaking approach in light of the Martha Wright-Reed Act, including whether to set different caps among intrastate, interstate, and international communications).

[1691] *See* Pay Tel Sept. 27, 2021 Comments at 16-17 (noting that the quarterly-averaging requirement "involve[s] constant surveillance of a multiple of floating rates," which may not be feasible for smaller providers that experience a "miniscule amount of international calling"); Securus Dec. 15, 2022 Comments at 21 (noting that "fluctuating rates from country to country and quarterly adjustments undermine the predictability of rates and cause confusion").

[1692] Securus Dec. 15, 2022 Comments at 22; Securus June 11, 2024 *Ex Parte*, Attach. at 1.

[1693] *See* Appendix F (noting that only one provider reported incurring additional costs associated with terminating international communications).

[1694] Unlike audio IPCS, we have no record evidence that video communications services incur international termination charges.

[1695] *See* Appendix F (discussing international termination charges).

focus of our IPCS rules.[1696]  The modifications also reflect the Act's direction that the Commission may use a provider's average costs in determining just and reasonable IPCS rates.  The waiver process we adopt will ensure that providers that may face unusually high costs to serve a particular facility or set of facilities covered by a contract will have the opportunity to demonstrate that those costs are, indeed, used and useful costs in their provision of IPCS and are therefore recoverable.[1697]

476.    The Commission's previous waiver process permitted an inmate calling service provider to file a petition for a waiver of our interim inmate calling services rate caps if the provider makes certain showings that it cannot recover its allowable costs under the Commission's interim inmate calling services rate caps.[1698]  We modify that process to take into account the Commission's full authority under the Martha Wright-Reed Act to include intrastate services and advanced communications services.  In addition, the Commission will evaluate waiver petitions in light of the Act's elimination of the section 276 requirements that providers be compensated on a "per-call" basis, and compensated for "each and every call," and in light of the addition of the requirement that the Commission ensure IPCS rates are just and reasonable while ensuring that providers are fairly compensated.[1699]

477.    To be granted a waiver under the rules adopted in 2021, providers are required to show that they faced "unusually high costs in providing interstate or international inmate calling services at a particular facility or under a particular contract that are otherwise not recoverable through the per-minute charges for those services and through ancillary service fees associated with those services."[1700]  When adopted, the Commission noted that various providers argued that reductions in inmate calling services rates would threaten their financial viability, imperiling their ability to provide service, and risk degrading or lowering their quality of service.[1701]  It determined that those claims were best addressed on a case-by-case basis through a waiver process that focused on the costs the provider incurred in providing interstate and international inmate calling services, and any associated ancillary services, at an individual facility or under a specific contract.[1702]

478.    In the *2023 IPCS Notice*, the Commission sought comment on "any other matters that may be relevant to our implementation of the Martha Wright-Reed Act to adopt just and reasonable rates and charges for incarcerated people's audio and video communications services."[1703]  In the context of analyzing providers' site commission payments, it also asked for comment on the showing it should require to evaluate waivers seeking to recover the portion of those payments that compensate facilities for their used and useful costs of providing IPCS.[1704]  Based on the record, we retain our current waiver

---

[1696] 47 U.S.C. §§ 152(b), 276(b)(1)(A), (d).

[1697] As discussed above, we interpret and apply section 276(b)(1)(A) in a manner that harmonizes the "just and reasonable" and "fairly compensated" criteria.  *See supra* Section III.C.3 (The Requirement to Establish a Compensation Plan).  Consequently, the used and useful analysis we employ will involve that harmonization of the "just and reasonable" and "fairly compensated" standards.

[1698] *See 2021 ICS Order*, 36 FCC Rcd at 9593-96, para. 169-175; 47 CFR § 64.6120; *2013 ICS Order*, 28 FCC Rcd at 14153, para. 82.  *2015 ICS Order*, 30 FCC Rcd at 12871, para. 219 (reaffirming the waiver process for inmate calling services providers adopted in 2013); *see also* 47 CFR § 1.3.  The portions of the *2015 ICS Order* regarding the waiver process were unaltered by the *GTL v. FCC* court's 2017 vacatur.  *See GTL v. FCC*, 866 F.3d 397 *passim*.

[1699] 47 U.S.C. §§ 152(b), 276(b)(1)(A), (d); Securus May 8, 2023 Comments at ii.

[1700] *2021 ICS Order*, 36 FCC Rcd at 9593, para. 170; 47 CFR § 1.3.

[1701] *2021 ICS Order*, 36 FCC Rcd at 9593, para. 171 (citing various provider comments).

[1702] *Id*.

[1703] *2023 IPCS Notice*, 38 FCC Rcd at 2700, para. 81.

[1704] *Id.* at 2715-16, para. 22.

process framework with modifications to reflect the provisions of the Martha Wright-Reed Act, including our new authority thereunder.[1705]

479.    The IPCS rate cap methodology we adopt herein comprehensively accounts for providers' reported costs of providing IPCS as contemplated by the Act, and we therefore anticipate that instances where providers cannot recover their cost of service should be exceptional.  To the extent such instances occur, however, we adopt a process that allows providers to seek waivers of our rate caps to ensure recovery of the used and useful costs of providing IPCS.  We also expand the scope of our previous waiver process to allow providers to seek waivers related to the provision of advanced communications services, including video, as well as with respect to our overall IPCS rate caps which will now apply to international, interstate and intrastate services.[1706]  Additionally, we remove any reference to ancillary services in our waiver rules because, as explained above, separately-identified ancillary service fees have been prohibited, and the costs of providing ancillary services have instead been included in the overall rate caps.[1707]  As was the case with our previous IPCS waiver process, providers may seek a waiver either on a facility basis or contract basis.[1708]

480.    Consistent with the Commission's previous waiver process and with its waiver processes generally, petitioners will continue to bear the burden of proof to show that good cause exists to support waiver requests, but all waiver requests must now include a showing that the request will not result in unjust and unreasonable IPCS rates and charges.[1709]  An IPCS provider filing a petition for waiver must clearly demonstrate that good cause exists for waiving our rate caps or other rules at a given facility or group of facilities, or under a particular contract, and that strict compliance with these caps would be inconsistent with the public interest.[1710]  For any waiver request based on a particular facility or group of facilities, the provider must show that the costs of the entirety of its contract are not recoverable under the applicable rate caps, not merely the costs at an individual facility or group of facilities that are part of an otherwise profitable contract.  As the Commission explained in the *2021 ICS Order*, conclusory assertions that the reductions in rates will harm the provider or make it difficult for the provider to expand

---

[1705] Securus May 8, 2023 Comments at ii, 17 (recommending that the Commission continue a "reasonable waiver process" that would "utilize the same general methodology it applied in the *2021 ICS Order*"); Public Interest Parties July 12, 2023 Reply at 12 (supporting amendments to our waiver rules to both ensure providers fair compensation above our IPCS rates "in limited circumstances").  We decline at this time to extend our waiver process to include pilot programs or to impose requirements on state rate-setting processes. *See supra*  Section III.D.9 (Alternate Pricing Plans). Worth Rises May 8, 2023 Comments at 9; Securus July 12, 2023 Reply at 20; Public Interest Parties Dec. 15, 2022 Comments at 12 & n.33.  State rate-setting processes (in contrast to site commission payment requirements) are not governed by our current IPCS rules, to the extent they do not result in state rates or charges exceeding our rate caps, and thus cannot be addressed by waiver in any case.  And we decline to depart from our rules governing alternative pricing plans via waiver because we believe those rules already provide for appropriate flexibility, and adhering to that regulatory framework provides certainty regarding the parameters for any such experimentation that will occur, thereby facilitating appropriate Commission oversight and managing what IPCS users will be expected to understand about such plans, and the protections they will have under them. *See, e.g.*, *Mary V. Harris Found. v. FCC*, 776 F.3d 21, 28-29 (D.C. Cir. 2015) (observing that "[a]n agency does not abuse its discretion by applying a bright-line rule consistently in order both to preserve incentives for compliance and to realize the benefits of easy administration that the rule was designed to achieve," and citing similar precedent).

[1706] *Supra* Section III.D (Rate Caps).

[1707] *Id.*

[1708] 47 CFR § 64.6120(a).  We disagree with Securus that we should allow company-wide waivers given that company-wide waivers would likely be too complex and time-consuming to provide adequate and timely relief for providers.  *See* Securus May 8, 2023 Comments at 20 (proposing that the Commission allow relief on either a company-wide or contract basis).

[1709] *2021 ICS Order*, 30 FCC Rcd at 9594-95, para. 172; *see* 47 CFR § 1.3.

[1710] *2021 ICS Order*, 30 FCC Rcd at 9594, para. 172.

its service offerings will not be sufficient to obtain a waiver.[1711]  Providers requesting a waiver of our IPCS rules will continue to be required to provide a detailed explanation of their claims, including all relevant financial and operational data as referenced in our rules.[1712]  In order to evaluate waivers, we also require a provider to submit its total company IPCS costs and revenues and other financial data and information, including justification for deviating from "the average costs of service of a communications service provider" to assess the merits of a petition.[1713]  Failure to provide such information will prevent us from making a determination regarding the waiver request and will be grounds for dismissal without prejudice.  Furthermore, the petitioner must provide any additional information requested by Commission staff to evaluate the waiver request during the course of its review.[1714]

481.     We caution petitioners that we will continue to evaluate waiver petitions thoroughly and waivers will not be routinely granted.[1715]  The Commission previously delegated authority to the Bureau to review and rule on petitions for waivers,[1716] and we reaffirm that delegation of authority today.  Waiver petitions will be placed on public notice, and interested parties will be provided an opportunity for comment.

###    F.     Communications Services for Incarcerated People with Disabilities

482.     We amend our rules to improve communications services for incarcerated people with disabilities.  First, in response to comments on the *2023 IPCS Notice*, we amend our Part 14 rules as appropriate to reflect the Martha Wright-Reed Act's expansion of the Communications Act's definition of "advanced communication service."  Next, in response to comments on the *2022 ICS Notice*, we amend our Part 64 TRS rules to allow a form of enterprise registration for the use of Internet Protocol Captioned Telephone Service (IP CTS) in carceral facilities.  We also amend the Part 64 IPCS rules to require that IPCS providers provide billing and other information regarding their services in accessible formats.  We clarify that Internet-based IPCS providers may provide access to traditional (TTY-based) TRS via real-time text.  We defer action on setting a timeline to expand the scope of our IPCS rules on access to TRS and related services, pending the collection of further information on implementation of the current rules.[1717]

###    1.     Part 14 Changes

483.     *Advanced Communications Services Definition*.  We adopt the Commission's proposal, in the *2023 IPCS Notice*, to amend the definition of "advanced communications services" in our Part 14 rules to incorporate the amended statutory definition.[1718]  Prior to the Martha Wright-Reed Act, the Communications Act (and Part 14 of our rules) defined "advanced communications services" to be: (1) interconnected VoIP service; (2) non-interconnected VoIP service; (3) electronic messaging service; and (4) interoperable video conferencing service.[1719]  The Martha Wright-Reed Act amended this definition to

---

[1711] *Id*. at 9595, para. 173.

[1712] 47 CFR § 64.6120.

[1713] Martha Wright-Reed Act § 3(b)(1).

[1714] 47 CFR § 64.6120(c).

[1715] *See 2021 ICS Order*, 36 FCC Rcd at 9594, 9596, paras. 172, 175; *USF/ICC Transformation Order*, 26 FCC Rcd at 17840, para. 540.

[1716] *See 2021 ICS Order*, 36 FCC Rcd at 9596, para. 175; *2015 ICS Order*, 30 FCC Rcd at 12876, para. 212; *2013 ICS Order*, 28 FCC Rcd at 14154, para. 84.

[1717] In Section IV.A (Hamilton Petition for Reconsideration), *infra*, we resolve a petition for reconsideration of the disability-related aspects of the *2022 ICS Order*.

[1718] *2023 IPCS Notice* 38 FCC Rcd at 2699, para. 76.

[1719] 47 U.S.C. § 153(1)(A)-(D) (2022).  The Commission recently clarified the definition of "interoperable video conferencing service."  *Access to Video Conferencing*; *Implementation of Sections 716 and 717 of the*

(continued….)

add a fifth category: "any audio or video communications services used by inmates for the purposes of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used."[1720]  We now amend the definition of "advanced communications services" in our Part 14 rules to include that category as well, aligning the definition in our rules with the amended statutory definition.[1721]

484.    *Statutory Accessibility Requirements.*  Pursuant to section 716 of the Communications Act, providers of advanced communications services and manufacturers of equipment used for such services (including end user equipment, network equipment, and software) must ensure that such services, equipment, and software are accessible to and usable by individuals with disabilities, unless doing so is "not achievable."[1722]  Whenever those requirements are not achievable a manufacturer or provider must ensure that its equipment or service is compatible with existing peripheral devices or specialized customer premises equipment commonly used by individuals with disabilities to achieve access, unless such compatibility is not achievable.[1723]  The Commission has implemented section 716 by adopting performance objectives to ensure the accessibility, usability, and compatibility of advanced communications services and the associated equipment,[1724] recordkeeping requirements,[1725] and the consumer dispute assistance and informal and formal complaint processes.[1726]  Covered service providers and equipment manufacturers also must file certificates of compliance with applicable recordkeeping requirements, including contact information for persons authorized to resolve complaints regarding

---

*Communications Act of 1934, as Enacted by the Twenty-First Century Communications and Video Accessibility Act of 2010*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*; *Petition of Sorenson Communications, LLC for a Limited Waiver of the Privacy Screen Rule*, CG Docket Nos. 23-161, 10-213, 03-123, Report and Order, Notice of Proposed Rulemaking and Order, FCC 23-50 (June 12, 2023) (*2023 IVCS Order* or *2023 IVCS Notice*).  In light of the lengthy pendency of unsettled questions regarding the application of Part 14 to video conferencing, the Commission extended until September 3, 2024, the deadline for providers of such services to comply with the Part 14 accessibility rules for advanced communications services.  *2023 IVCS Order*, para. 41; Federal Communications Commission, Access to Video Conferencing, 88 Fed. Reg. 50053 (Aug. 1, 2023).

[1720] Martha Wright-Reed Act § 2(b) (amending 47 U.S.C. § 153(1)).

[1721] *See* Accessibility Coalition May 8, 2023 Comments at 4.  One commenter agrees that the Commission should simply incorporate section 3's definition of ACS, as amended by the Martha Wright-Reed Act, into Part 14.  *See* Accessibility Coalition May 8, 2023 Comments at 3-4.  No other commenters directly address the issue.

[1722] 47 U.S.C. § 617(a), (b); *see also* 47 CFR §§ 14.20, 14.21 (setting forth the accessibility obligations of covered manufacturers and service providers and defining "accessible," "usable," and "compatible").  The term "achievable" means with reasonable effort or expense, as determined by the Commission.  47 U.S.C. § 617(g).  Section 716 of the Communications Act specifies that, in determining whether the requirements of a provision are achievable, the Commission shall consider the following factors: (1) the nature and cost of the steps needed to meet the requirements of this section with respect to the specific equipment or service in question; (2) the technical and economic impact on the operation of the manufacturer or provider and on the operation of the specific equipment or service in question, including on the development and deployment of new communications technologies; (3) the type of operations of the manufacturer or provider; and (4) the extent to which the service provider or manufacturer in question offers accessible services or equipment containing varying degrees of functionality and features, and offered at differing price points.  *Id.*

[1723] *Id.* § 617(c).  Providers of advanced communications services are also prohibited from installing network features, functions, or capabilities that impede accessibility or usability.  *Id.* § 617(d).

[1724] 47 CFR § 14.21.  "Manufacturers and service providers must consider [these performance objectives] at the design stage as early as possible and must implement such performance objectives, to the extent that they are achievable."  *Id.* § 14.20(b)(1).  In addition, "[m]anufacturers and service providers must identify barriers to accessibility and usability as part of such evaluation."  *Id.* § 14.20(b)(2).

[1725] *Id.* § 14.31.

[1726] *Id.* §§ 14.32-14.38.

alleged violations of accessibility requirements.[1727]

485.    *Effect of the Martha Wright-Reed Act on the Scope of Rules.*  In the *2023 IPCS Notice*, the Commission sought comment on the extent to which the Martha Wright-Reed Act expands its ability to ensure that any audio and video communications services used by incarcerated people are accessible to and usable by people with disabilities.[1728]  As a number of commenters recognize,[1729] prior to enactment of that legislation, voice services offered by IPCS providers were already subject to the requirements of section 716 or the related requirements of section 255 of the Communications Act.[1730]  Similarly, electronic messaging services and interoperable video conferencing services offered by IPCS providers were also subject to section 716 and the Part 14 rules.  The record does not indicate to what extent, if at all, there are other audio and video communication services offered by IPCS providers that were *not* previously included in the definitions of "telecommunications service" or "advanced communications services," and that, accordingly, are newly subject to accessibility requirements under section 716 of the Communications Act and Part 14 of our rules.  However, to the extent that any IPCS provider may have been uncertain whether accessibility requirements apply to a particular voice or video communication service that it provides for the use of incarcerated persons in communicating with non-incarcerated persons, the Martha Wright-Reed Act makes clear that the accessibility requirements of the Commission's rules apply to such services.

486.    *Part 14 Performance Objectives.*  The *2023 IPCS Notice* also sought comment on whether the Commission should add or modify any performance objectives or recordkeeping requirements for application in the correctional facility context.[1731]  At this time, we do not see a need to create new or different performance objectives for IPCS providers.  As noted above, communications services offered by IPCS providers were already covered by section 255 or 716 of the Communications Act, and the record does not indicate that any audio and video communications services used by incarcerated people were not previously included in the statutory definitions of telecommunications services and advanced communications services.  Further, while the communication challenges experienced by incarcerated people with disabilities may be more acute, the record does not indicate that they are different in kind from those of non-incarcerated people with disabilities.  For example, to be accessible to a blind person, whether incarcerated or not, an advanced communications service should "[p]rovide at least one mode that does not require user vision."[1732]

487.    We decline, at this time, to impose a limitation on the use of automatic speech

---

[1727] *Id*. § 14.31(b).

[1728] *2023 IPCS Notice*, 38 FCC Rcd at 2699, para. 76.

[1729] *See, e.g.*, ViaPath Dec. 15, 2022 Comments at 7 (noting that IPCS providers are subject to the same accessibility obligations as other providers of telecommunications service).

[1730] 47 U.S.C. § 255.  Section 255 imposes similar accessibility obligations on providers of telecommunications services and manufacturers of telecommunications equipment, and the Commission's regulations implementing section 255, 47 CFR part 6, also apply to providers of interconnected VoIP service.  47 CFR § 6.1(d).  Accessibility of voicemail equipment and services are addressed in 47 CFR part 7.  Overlap between sections 255 and 716 is avoided because section 716 provides that it does not apply to "any equipment or services, including interconnected VoIP service, that [were] subject to the requirements of section 255" of the Communications Act prior to the enactment of section 716.  47 U.S.C. § 617(f).  Such services and equipment "shall remain subject to the requirements of section 255" of the Communications Act.  47 U.S.C. § 617(f).  However, the recordkeeping, certificate of compliance, consumer dispute assistance, and enforcement requirements of Part 14 apply to manufacturers and service providers covered by section 255 as well as those covered by section 716.  47 CFR §§ 14.30-14.38.

[1731] *2023 IPCS Notice*, 38 FCC Rcd at 2699, para. 77.

[1732] *See* 47 CFR § 14.21(b)(1)(i).

recognition (ASR) technology alone in the provision of IP CTS in carceral facilities.[1733]  The Commission previously found the use of ASR-only captioning in the provision of IP CTS to be comparable in accuracy to CA-assisted IP CTS.[1734]  While we continue to encourage providers to make CA-assisted IP CTS available, there is not a sufficient record in this proceeding to suggest that provision of ASR-only IP CTS would discriminate against for example, people who speak dialects, have accented speech, or speech impediments, nor a record to suggest that CA-assisted IP CTS would cure or otherwise prevent such discrimination.[1735]  The Commission will continue to collect data and information annually from IPCS providers[1736] and it has open dockets concerning advanced communications services and IP CTS where a record on the raised concerns may be developed to be addressed.[1737]  In the interim, we proceed with ensuring the Commission's current accessibility rules are appropriately applied in the correctional facilities context.

488.    We are also not persuaded that it is necessary to modify Part 14 performance objectives to address "the unique challenges of offering Internet-based IPCS and consistent with the Commission's existing IPCS accessibility rules," as recommended by Ameelio, a provider of Internet-based IPCS.[1738]  To the extent that security issues or other factors may affect the achievability of specific performance objectives,[1739] such concerns can be addressed consistently with the current Part 14 rules, as Part 14 obligations are expressly subject to the proviso "unless the requirements of this [subsection/paragraph] are not achievable."[1740]

## 2.    Enterprise Registration for IP CTS and IP Relay

489.    *Background*.  To prevent waste, fraud, and abuse and allow the collection of data on TRS usage, our rules generally condition TRS Fund support for VRS, IP CTS, and IP Relay on eligible users of these services being registered with a service provider.  Certain personal data, as well as a self-certification of eligibility to use TRS, must be collected from each TRS user and—for VRS and IP CTS

---

[1733] UCC Media Justice July 12, 2024 *Ex Parte* at 3.

[1734] *Misuse of Internet Protocol (IP) Captioned Telephone Service*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 13-24 and 03-123, Report and Order, Declaratory Ruling, Further Notice of Proposed Rulemaking, and Notice of Inquiry, 33 FCC Rcd 5800, 5828-20, paras. 51-52.

[1735] *See* UCC Media Justice July 12, 2024 *Ex Parte* at 3, which is the first time this issue has been raised to the Commission in this proceeding.

[1736] *See infra,* Section III.H.3.

[1737] *See, e.g.*, Petition of TDI for Access, Inc (TDI), National Association of the Deaf (NAD), and Hearing Loss Association of America (HLAA) for Rulemaking to Require Option for Communications Assistants by Stand-Alone Automatic Captioning Providers, CG Docket Nos. 13-24 and 03-123 (filed May 31, 2024), https://www.fcc.gov/ecfs/document/10531086287963/1.

[1738] Ameelio Inc. Reply, WC Docket No. 12-375, at 7 (rec. July 12, 2023) (Ameelio July 12, 2023 Reply).  Ameelio states that its "core offering is its video visitation service," and that it also offers text-based mail and e-messaging services.  *Id.* at 2-3.

[1739] *See id*. at 13 (asserting that "some of the Commission's proposed performance objectives for IVCS that are achievable outside of correctional institutions may not be achievable for IPCS providers").

[1740] 47 CFR § 14.20(a); *see also id*. § 14.20(b)(1) ("Manufacturers and service providers must consider performance objectives set forth in § 14.21 at the design stage as early as possible and must implement such performance objectives, *to the extent that they are achievable*.") (emphasis added).  We also note that some of the concerns raised by Ameelio appear to be based on a misunderstanding of the Commission's video conferencing proposals.  For example, the Commission has proposed to modify the TRS "privacy screen" rule (redesignated 47 CFR § 64.604(d)(5)) to *allow VRS providers* to be compensated for providing VRS in a video conference in which some participants turn off their video cameras.  *2023 IVCS Notice* at 33, paras. 87-89.  However, nothing in the Commission's proposal suggests that the proposed rule would affect the ability of a *video conferencing service provider* or host to require participants to leave their cameras on, for security or other reasons.

users—entered in the TRS User Registration Database (User Database), a central registry maintained by a Commission-designated administrator.[1741]  For VRS, however, the rules provide an alternative to individual registration for videophones maintained by businesses, organizations, government agencies, or other entities and made available to their employees or clients as "enterprise videophones."[1742]  This "enterprise registration" alternative is not currently authorized for IP CTS or IP Relay.[1743]

490.    In the *2022 ICS Order*, the Commission modified its registration rules for incarcerated people eligible to use TRS, simplifying the registration data that must be collected in that context to account for differences in the availability and source of registration information.[1744]  IPCS providers are required to assist TRS providers in collecting registration information and documentation from incarcerated users and correctional authorities.[1745]  The Commission also authorized a modified form of enterprise registration for VRS use in correctional facilities.[1746]  In lieu of registering each videophone, the amended enterprise rule allows a VRS provider to assign a pool of telephone numbers to a correctional authority.[1747]  The numbers may be used interchangeably with any videophone or other user device made available for the use of VRS within the correctional facility.[1748]  In the *2022 ICS Notice*, the Commission sought comment on whether to adopt a comparable form of enterprise registration for IP CTS in the incarceration context.[1749]  All commenters addressing the issue support such a rule change.[1750]  In addition, Securus urges that enterprise registration also be allowed for IP Relay in the carceral context, noting that "the same logistical issues at the correction facility for individual registration of IP CTS" extend to IP Relay.[1751]

491.    To further expedite access to TRS by incarcerated people, we amend our rules to allow enterprise registration for IP CTS and IP Relay in the incarceration context.[1752]  The record indicates that

---

[1741] *See* 47 CFR § 64.611.  The User Database has not yet been activated for IP CTS.  Pending its activation, however, registration data and a self-certification of eligibility must be collected and maintained by the IP CTS provider.

[1742] *Id.* § 64.611(a)(6).

[1743] The Commission has previously granted a waiver of the TRS registration rule to allow TRS providers to provide IP CTS and IP Relay to federal government employees and on-premises contractors through a registration process similar to the VRS enterprise registration process.  *See Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket No. 03-123, Order, 36 FCC Rcd 14364 (CGB 2021).

[1744] *See 2022 ICS Order*, 37 FCC Rcd at 11926-27, paras. 62-63 (adopting 47 CFR § 64.611(k)(1)(i)-(ii)).

[1745] 47 CFR § 64.6040(c)(3); *2022 ICS Order*, 37 FCC Rcd at 11912, para. 26.

[1746] *2022 ICS Order*, 37 FCC Rcd at 11927, para. 65.

[1747] 47 CFR § 64.611(k)(2).

[1748] *Id*.

[1749] *2022 ICS Notice*, 37 FCC Rcd at 11942, para. 93.

[1750] Accessibility Coalition Dec. 15, 2022 Comments at 3; ClearCaptions, LLC Comments, WC Docket No. 12-375 (rec. Dec. 13, 2022) (ClearCaptions Dec. 13, 2022 Comments); Securus Dec. 15, 2022 Comments at 3-5; Hamilton Relay Inc. Reply, WC Docket No. 12-375, at 4-5 (rec. Mar. 3, 2023); Public Interest Parties Mar. 3, 2023 Reply at 5; Letter from Katherine Barker Marshall, Potomac Law Group, PLLC, Counsel to Global Caption, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed June 27, 2024).

[1751] *See* Securus July 11, 2024 *Ex Parte*, Attach. A at 1.

[1752] Accessibility Coalition Dec. 15, 2022 Comments at 3 (maintaining that enterprise registration "would simplify the commencement of service to eligible incarcerated users"); Securus Dec. 15, 2022 Comments at 3-4 (contending that enterprise registration "will facilitate obtaining access to communications services by incarcerated persons with disabilities"); Letter from Cheryl A. Leanza, Policy Advisor, United Church of Christ Media Justice Ministry, to

(continued….)

the individual registration process can pose significant challenges for incarcerated people attempting to use IP CTS or IP Relay.[1753]  When a person is initially confined and seeks to notify a family member or attorney of their situation, the need for individual registration may delay access to IP CTS or IP Relay for hours or days, with potentially serious consequences for the newly incarcerated person.[1754]  For example, some of the required registration information and documentation may not be readily available at the time of initial incarceration, and assistance in collecting or preparing such information and documentation may not always be available from correctional authorities.[1755]  Further, incarcerated persons, particularly those newly incarcerated, are often transferred between facilities.[1756]  If a transferee must re-register (e.g., because the new facility is operated by a different correctional authority or a different TRS provider is providing a particular relay service), or if there is a delay in confirming an existing registration (e.g., because the TRS provider is not promptly informed of the transfer) access to TRS could be interrupted or even terminated.[1757]  Additional registration issues may arise in juvenile detention facilities, where a parent or guardian would need to register on behalf of a minor who has been incarcerated.

492.    The record confirms that allowing enterprise registration for IP CTS and IP Relay in the carceral setting would not significantly increase the risk of TRS waste, fraud, or abuse.  In the *2022 ICS Order*, the Commission found that the security measures routinely applied to telephone service in correctional facilities limit any risk of waste, fraud, and abuse associated with enterprise registration for VRS,[1758] and those same security measures would tend to limit such risks in the case of IP CTS and IP Relay.[1759]  Further, by allowing the assessment of charges for IP CTS that do not exceed those for an equivalent voice telephone call, we have limited the potential incentive of incarcerated people who do not need the service to seek to use it in lieu of ordinary voice service.[1760]  Conversely, the limitation of IP CTS charges to those for an equivalent voice call limits any incentive for correctional authorities to allow or promote the use of IP CTS by incarcerated people with no need for the service.

Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1 (filed June 14, 2024) (UCC Media Justice June 14, 2024 *Ex Parte*) (asking the Commission to adopt enterprise registration for IP CTS).

[1753] *See* ClearCaptions Dec. 13, 2022  Comments at 2-6; Securus Dec. 15, 2022 Comments at 3-5.

[1754] *See* ClearCaptions Dec. 13, 2022 Comments at 2-3; Securus Dec. 15, 2022 Comments at 3-4 (pointing out that "the requisite information and certifications necessary to begin utilizing the IP CTS service may not be available before the need to use the service arises, especially for newly arriving persons in short-term facilities with frequent turnover").

[1755] *See* ClearCaptions Dec. 13, 2022 Comments at 5 (asserting that if an incarcerated person is not already registered with ClearCaptions, "it is not clear if or how ClearCaptions would be able to collect that individual's self-certification without assistance from the correctional facility"); Securus Dec. 15, 2022 Comments at 4-5 (noting that registration information may not be readily available from records maintained by the IPCS provider or correctional authority).

[1756] ClearCaptions Dec. 13, 2022 Comments at 2-3 (noting the transient nature of stays at some facilities, especially in the initial days of incarceration, when an incarcerated person may spend only a short period of time at a booking facility before being moved).

[1757] *See id.* at 4 (suggesting that re-registration could be rejected if the provider is unaware of the transfer).

[1758] *See 2022 ICS Order*, 37 FCC Rcd at 11927, para. 65.

[1759] *See* Securus Dec. 15, 2022 Comments at 5 ("ICS providers and correctional facilities utilize a number of stringent security and monitoring measures of calling services that will help reduce the possibility that ineligible users will gain access to IP CTS services.").

[1760] *See 2022 ICS Order*, 37 FCC Rcd at 11927, para. 65; 47 CFR § 64.6040(d)(2).  In IP Relay, no charges are permitted.  47 CFR § 64.6040(d)(1).  However, with IP Relay, unlike IP CTS, the communications assistant mediates communication in both directions.  As a result, IP Relay conversations tend to be substantially slower than the equivalent voice conversations, and there is accordingly less incentive for incarcerated people to request use of the service if they do not need it for functionally equivalent communication.

493.    The enterprise registration rule we adopt for IP CTS and IP Relay in the carceral context parallels the VRS enterprise registration rule, as modified for the carceral context.[1761]  To make it easier to find the applicable requirements, we combine the existing requirements for carceral enterprise registration for VRS with the new requirements for such registration for IP CTS and IP Relay in a single new paragraph (l) of section 64.611.  For enterprise registration of a correctional facility or correctional authority,[1762] a TRS provider must transmit to the TRS User Registration Database administrator the following information:  the TRS provider's name, the telephone numbers or other unique identifiers assigned to the correctional authority,[1763] the name and address of the correctional facility or correctional authority,[1764] the date of initiation of service to the correctional authority, and the name of the individual responsible for the device(s) used to access VRS,  IP Relay, or IP CTS at the correctional facility or facilities involved.  This individual may be an employee of either the correctional authority or the IPCS provider.  When a TRS provider ceases providing relay service to a correctional authority via enterprise registration, the provider shall transmit the date of termination of such service.

494.    The TRS provider also must obtain a signed certification from the responsible individual attesting that he or she understands the functions of the devices used to access TRS and that the cost of TRS is financed by the federally regulated Interstate TRS Fund.  The certification also must state that the correctional authority or IPCS provider will make reasonable efforts to ensure that for VRS and IP Relay only persons with a hearing or speech disability are permitted to access the service, and that for IP CTS only persons with hearing loss that necessitates the use of IP CTS to communicate by telephone are permitted to access IP CTS.  A VRS or IP CTS provider must also obtain the responsible individual's consent to transmit this information to the TRS User Registration Database.[1765]  Before obtaining such consent, the TRS provider must describe, using clear, easily understood language, the specific information being transmitted, that the information is being transmitted to the TRS User Registration Database to ensure proper administration of the TRS program, and that failure to provide consent will require individual registration and self-certification by incarcerated persons.  A TRS provider shall maintain the confidentiality of any registration and certification information obtained by the TRS provider, and shall not disclose such registration and certification information, or the content of such registration and certification information, except as required by law or regulation.

### 3.    Other Issues

495.    *Accessible Billing Formats*.  As also proposed in the *2022 ICS Notice*, we amend our rules to require that any charges for IPCS be disclosed in accessible formats to incarcerated people with disabilities.[1766]  The record in this proceeding generally supports this proposal.[1767]  We do not agree with

---

[1761] *See* 47 CFR § 64.611(a)(6), (k)(2).

[1762] The existing rule for VRS allows enterprise registration of a single pool of telephone numbers for use by a correctional authority in all of its facilities.  47 CFR § 64.611(k)(2).  We allow the same flexibility for IP CTS.

[1763] Such numbers may be assigned either by the IPCS provider or the TRS provider.

[1764] As with the existing rule for VRS, the address may be the main or administrative address of the correctional authority.  *See* 47 CFR § 64.611(k)(2).

[1765] At this time, the TRS rules do not require that IP Relay registration data be entered in the User Registration Database.

[1766] *See 2022 ICS Notice*, 37 FCC Rcd at 11943, para. 98.

[1767] *See* Accessibility Coalition Mar. 3, 2023 Reply at 7-8; Public Interest Parties Mar. 3, 2023 Reply at 6; Securus Dec. 15, 2022 Comments at 6-7; Accessibility Coalition  Dec. 15, 2022 Comments at 6-7; UCC Media Justice June 14, 2024 *Ex Parte* at 2 (requesting that we "strengthen billing disclosure requirements to ensure incarcerated people with disabilities receive information about payment and billing practices in accessible formats"); Accessibility Coalition Sept. 21, 2022 *Ex Parte* at 7.

ViaPath that amendment of the Part 64 rules in this respect is unnecessary.[1768]  Although our Part 6, 7, and 14 rules include requirements that information and documentation provided to customers regarding covered services be accessible to individuals with disabilities, those rules are subject to an achievability condition—which is not applicable to our Part 64 IPCS rules.[1769]  Given the special importance of communication to incarcerated people with disabilities and the history of egregious telephone charges imposed on incarcerated people and their families, we decline to impose an achievability condition on access to billing information in the carceral setting.

496.    *Charges for TRS-Related Services.*  As discussed above, we amend section 64.6040 of our rules to clarify the treatment of TRS and related services under alternate pricing plans.  We do not otherwise alter the provisions of section 64.6040 regarding charges for TRS and related services.  In particular, we decline Securus's request for modification of section 64.6040(d)(3), which caps the permitted charges for point-to-point video service used by incarcerated persons with disabilities who can use ASL, limiting such charges to the equivalent rate for an equivalent voice call.  Securus recommends that, "[n]ow that the Commission has set rate caps for video IPCS charges for video IPCS," the benchmark for point-to-point ASL video charges should be the charges for equivalent non-ASL video calls.[1770]  We deny this request.  Although ASL point-to-point video service is not relay service *per se*, it serves the same statutory purpose—"to provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio in a manner that is functionally equivalent to the ability of a hearing individual . . . to communicate using *voice* communication services."[1771]  Therefore, access to this service is mandated for any facility covered by section 64.6040(b)(2)(ii), even if video communication is not otherwise made available at such facility.  Accordingly, in the *2022 ICS Notice*, the Commission appropriately benchmarked the charges for the use of point-to-point video to communicate in ASL at the charges for an equivalent *voice* call.  Permitting the assessment of a higher *video* rate for such calls, instead of the equivalent voice rate at any correctional institution, would be inconsistent with the underlying statutory purpose—to make available communication that is functionally equivalent to voice communication.

497.    *Analog TRS.*  In response to reply comments by Ameelio, an Internet-based video IPCS provider, we clarify the application to such providers of the IPCS rules mandating the availability of traditional (TTY-based) TRS and STS.  Noting that the Internet does not support analog services,[1772] Ameelio "proposes that the Commission update its IPCS accessibility rules to accommodate advanced communications services that . . . do not rely on the Public Switched Telephone Network (PSTN), by clarifying that app-based IPCS providers may comply with the IPCS accessibility rules by providing functional equivalents to the traditional accessibility services that rely on the legacy telephone network."[1773]  As the Commission explained in the *2022 ICS Order*, while TTY technology is

---

[1768] *See* ViaPath Dec. 15, 2022 Comments at 7 (stating that additional rules on billing formats are not needed because inmate calling services providers are subject to the same obligations as other providers of telecommunications services to provide information and documentation in a manner that is accessible to individuals with disabilities).

[1769] *See* 47 CFR §§ 6.11, 7.11 (requiring information and documentation about covered service to be available and accessible to individuals with disabilities, if readily achievable); *id.* § 14.20(d) (requiring that information and documentation about covered services be accessible, if achievable); *see also id.* §§ 6.3(h), 7.3(h) (defining "readily achievable"); *id.* § 14.10(b) (defining "achievable").

[1770] *See* Securus July 11, 2024 *Ex Parte*, Attach. A at 2.

[1771] 47 U.S.C. § 225(a)(3) (emphasis added); *see also 2022 ICS Order*, 37 FCC Rcd at 11917, para. 35 ("Therefore, incarcerated individuals with hearing and speech disabilities who require the use of video calling for effective communication must be afforded the same access to point-to-point video calling that incarcerated individuals without hearing and speech disabilities are given for *voice* calling.") (emphasis added).

[1772] Ameelio July 12, 2023 Reply at 7.

[1773] *Id.*

incompatible with the IP protocol, TTY-based TRS and STS continue to be essential for ensuring that all segments of the TRS-eligible population have access to functionally equivalent communications.[1774]  In addition, U.S. Department of Justice regulations implementing Title II of the American with Disabilities Act currently require correctional authorities to furnish auxiliary aids and services, which are defined to include voice, text, and video-based telecommunications products and systems, including TTYs, videophones, and captioned telephones or equally effective telecommunications devices.[1775]  However, rules the Commission adopted in 2016 allow mobile service providers to comply with TTY-related requirements by supporting real-time text, as an alternative to TTY connection.[1776]  We amend our codified IPCS rules to make clear that, similarly, IPCS providers may provide access to traditional TRS via real-time text, as an alternative to TTY transmissions, if real-time text transmission is supported by the available devices and reliable service can be provided by this method.  Additionally, for IPCS providers to meet their requirement to provide access to traditional TTY-based TRS and STS, they need only ensure that incarcerated individuals eligible to use TRS can access at least one certified provider of each form of TRS.[1777]  If an IPCS provider does not interconnect with the PSTN, it could rely on contracting or other arrangements with a correctional facility to ensure that TTY-based TRS and STS are made available.[1778]

498.     We also do not address at this time the Commission's proposal to expand the scope of coverage of the TRS Access Rule to include correctional facilities in jurisdictions with an ADP of fewer than 50 incarcerated people.[1779]  We recognize that the Communications Act directs us to ensure that TRS are available to *all* eligible persons in the United States, to the extent possible,[1780] and we reaffirm the Commission's belief that, to ensure the availability of TRS and point-to-point ASL video communication to the fullest extent possible, the TRS-related access obligations of incarcerated people's communications service providers should be at least coextensive with those of correctional authorities under federal disability rights law—which are not subject to any population size limitation.[1781]  However, given that the current rule has been effective for less than a year, we believe that our determination of an appropriate timeline for the expansion of TRS access to those facilities not covered by the current rule may benefit from experience gained regarding the first year of implementation.  Therefore, we will keep the record open for additional input on this matter.

### G.    Reform of Consumer Protection Rules

499.     In light of the expansion of our authority under the Martha Wright-Reed Act, we next revise our existing consumer protection rules to improve consumer disclosure requirements and to protect the funds of IPCS account-holders to ensure IPCS consumers fully benefit from the various reforms we adopt in this Report and Order.  The Commission's consumer disclosure rules currently require providers

---

[1774] *2022 ICS Order*, 37 FCC Rcd at 11908, para. 19.

[1775] *Id.* at 11910, para. 22 (citing 28 CFR §§ 35.104 (defining auxiliary aids and services); 35.160 (requiring public entities to furnish auxiliary aids and services)).

[1776] *See* 47 CFR § 9.10(c) (allowing commercial mobile service providers to support calls to 911 via real-time text, as an alternative to supporting TTY technology); *id.* § 14.21(d)(5) (allowing providers of wireless interconnected and non-interconnected VoIP services to support real-time text in lieu of providing TTY connectability and TTY signal compatibility); *id.* § 64.603(a)(1) (allowing commercial mobile service providers to support 711 calling to traditional TRS providers via real-time text, as an alternative to supporting TTY technology).

[1777] *Id.* § 64.6040(b)-(c).

[1778] *Id.* § 54.6040(c)(1).

[1779] *See 2022 ICS Notice*, 37 FCC Rcd at 11942-43, paras. 94-97; *see, e.g.*, UCC Media Justice June 14, 2024 *Ex Parte* at 1; Leadership Conference June 17, 2024 *Ex Parte* at 2; DARE July 10, 2024 *Ex Parte* at 2.

[1780] *See 2022 IPCS Order*, 37 FCC Rcd at 11915, para. 30, citing 47 U.S.C. § 225(b)(1) (TRS to be made available "to the extent possible").

[1781] *See 2022 IPCS Order*, 37 FCC Rcd at 11915, para. 30.

to disclose their rates, ancillary service charges, and charges for terminating international calls to account holders and specify how certain charges should be displayed on billing statements.[1782]  The existing inactive account rules bar providers, on an interim basis, from converting unused funds in inactive ICS accounts to their own use and require them to make reasonable efforts to refund those funds.[1783]  Based on the record, we expand these consumer protection rules to apply to the full scope of IPCS now subject to our ratemaking authority.[1784]

500.    We also address certain limitations in our existing rules which the record shows lack sufficient scope, clarity, and specificity to enable IPCS consumers—and the public—to make fully informed decisions regarding the rates, charges, and practices associated with providers' offerings.[1785]  Some commenters also contend that the current rules are inadequate to ensure that IPCS consumers receive the information they need to verify charges to their accounts.[1786]  Similarly, the record makes clear a need to revise and strengthen the interim inactive account rules to ensure that IPCS consumers are able to receive timely refunds of unused funds in IPCS accounts deemed to be inactive.  In light of this, we decline to simply apply our existing consumer protection rules to the expanded list of services—video IPCS and other audio and video advanced communications services, including intrastate services—over which we now have jurisdiction under section 276.  Instead, we revise and strengthen those rules and apply them to all IPCS as set forth below.[1787]

501.    Section 276(b)(1)(A) of the Communications Act, as amended by the Martha Wright-Reed Act, requires that we develop a compensation plan ensuring just and reasonable rates and charges

---

[1782] 47 CFR § 64.6110.

[1783] *Id.* § 64.6130.

[1784] *See, e.g.*, Raher May 8, 2023 Comments at 17 (arguing that the Commission should extend its consumer disclosure requirement to all forms of IPCS); ViaPath July 12, 2023 Reply at 6 n.21 (agreeing that "there is no need to adopt separate or different consumer disclosure requirements for video IPCS" and that the Commission should apply the same disclosure rules to all forms of IPCS).

[1785] *See, e.g.*, Public Interest Parties Dec. 15, 2022 Comments at 6-7 (asserting that "there is no clear guidance on how to" provide disclosures uniformly, and that "not all ICS providers appear to comply with the rule"); Public Interest Parties Mar. 3, 2023 Reply at 9-10; Leadership Conference on Civil and Human Rights Reply, WC Docket No. 12-375, at 2 (rec. Mar 3, 2023) (Leadership Conference Mar. 3, 2023 Reply) (asserting that "[m]isleading information often causes incarcerated people and their loved ones to inadvertently select high priced service"); Phoenix Listening Session at 13:6-14:20 (Kim Thomas explaining that lack of transparent policies result in incarcerated people "rarely [being] given the information" needed to make informed decisions.  For example, she states that "If I don't know that that call is going to cost $2, I might make it not having it. If I don't know that my video visit will cost my family this much – I might say no more often if I know it's going to put them in a hardship. If I know that if I use trigger words my messages are going to go out and never reach their destination, then I might not send that. But the information is not readily available."); *id.* at 30:21-31:5 (Rosalind Akins, who grandson was incarcerated, describing how confusing GTL's procedures are, such that "So I've had money placed on some of these other entities that were not accessible to [her grandson's] usage.  And so hence that money is lost and wherever it is, I don't know. But I didn't know.").  *But see* ViaPath Dec. 15, 2022 Comments at 10-14 (arguing that the Commission's existing consumer disclosure rules already provide "significant protections" to incarcerated people and their families and family, and that further changes to the Commission's disclosure requirements are not needed in light of existing Commission rules and market practices).  *See* Raher Dec. 15, 2022 Comments at 7 (maintaining that "[c]onsumer protection regulations can only go so far if consumers lack easy access to understandable information about the services they are purchasing").

[1786] Leadership Conference Mar. 3, 2023 Reply at 2 (maintaining that "without clear billing information," consumers will be unable to "monitor whether the companies they must patronize follow the FCC's new rules protecting them"); *see, e.g.*, Public Interest Parties Mar. 3, 2023 Reply at 9-10 (asserting that the record supports adopting enhanced consumer disclosures because the current requirements are insufficient, and "additional transparency and information . . . including actual activity, fee assessments, and notices are needed").

[1787] *See* ViaPath Mar. 5, 2023 Reply at 13.

for consumers and providers, while providing fair compensation to providers.[1788]  As set forth above, we interpret this requirement as giving us authority over providers' practices associated with IPCS to the extent they may affect our ability to ensure just and reasonable audio and video IPCS rates and charges and fair compensation for all IPCS.[1789]  We exercise that authority to adopt rules requiring IPCS providers to timely and effectively disclose the information that IPCS consumers will need to make informed decisions in setting up and using their IPCS accounts as well as rules to facilitate refunds of funds remaining in accounts that have been deemed inactive.

1. **Consumer Disclosure Rules**

a.      **Disclosure of Rates, Charges, and Practices**

502.    We revise and expand our consumer disclosure rules so all IPCS users and, where appropriate, the general public will have sufficient information to evaluate providers' IPCS rates, charges, terms and conditions.  Expanding these rules will offer increased transparency and protection for consumers beyond those afforded by the Commission's existing rules, facilitating the monitoring and enforcement of our rules to ensure just and reasonable IPCS rates and charges.[1790]  We expand the scope of our rules to include all IPCS providers subject to our expanded jurisdiction under the Martha Wright-Reed Act, including video IPCS and other advanced communications services.  We also expand the scope of our rules to apply to the different stages of consumers' interaction with IPCS providers, from prior to the opening of an IPCS account to the closing of an inactive account.  We conclude pursuant to our authority under section 276(b)(1)(A) of the Communications Act, as amended by the Martha Wright-Reed Act and, to the extent interstate or international telecommunications services are involved, pursuant to section 201(b) of the Communications Act, that the increased transparency we require is necessary to ensure just and reasonable IPCS rates and charges, and fair compensation as the Martha Wright-Reed Act mandates.

503.    *Background.*  In the *2015 ICS Order*, the Commission first required ICS providers to "clearly, accurately, and conspicuously" disclose their interstate, intrastate, and international rates and ancillary service charges to consumers "on their websites or in another reasonable manner readily available to consumers."[1791]  In the *2021 ICS Order*, the Commission required providers to separately disclose any charges for terminating international calls,[1792] and to "clearly label" as "separate line item[s] on [c]onsumer bills" any amounts charged consumers for site commissions and international calling.[1793]

504.    In the *2022 ICS Notice*, the Commission sought comment on expanding the "breadth and

---

[1788] 47 U.S.C. § 276(b)(1)(A); *see, e.g.*, 47 CFR §§ 42.10 (requiring the publicly availability of information about interexchange carrier rates, terms and conditions), 64.710, 64.6110.

[1789] *Supra* Section III.C.3.e (Authority to Regulate IPCS Providers' Practices).

[1790] *See, e.g.*, Public Interest Parties Dec. 15, 2022 Comments at 6-7; Leadership Conference June 17, 2024 *Ex Parte* at 1-2.  *But see* ViaPath Dec. 15, 2022 Comments at 10-14; Phoenix Listening Session at 13:6-14:20 (Kim Thomas explaining that lack of transparent policies result in incarcerated people "rarely [being] given the information" needed to make informed decisions.  For example, she states that "If I don't know that that call is going to cost $2, I might make it not having it.  If I don't know that my video visit will cost my family this much – I might say no more often if I know it's going to put them in a hardship. If I know that if I use trigger words my messages are going to go out and never reach their destination, then I might not send that.  But the information is not readily available.").

[1791] *2015 ICS Order*, 30 FCC Rcd at 12895-96, para. 278 (reasoning that "transparency in rates, terms, and fees will facilitate compliance with . . . reforms and ensure that consumers are informed of their choices" and finding that this rule "provide[s] key consumer benefits with minimal burden on [inmate calling services] providers").  This rule is now codified at 47 CFR § 64.6110(a).  The Commission also stated that ICS providers that are non-dominant interexchange carriers must make their current rates, terms, and conditions available to the public via their company websites.  *2015 ICS Order*, 30 FCC Rcd at 12893, para. 274 (citing 47 CFR §§ 1.80(a)), 42.10(b).

[1792] *2021 ICS Order*, 36 FCC Rcd at 9591, para. 166.

[1793] 47 CFR § 64.6110(b)-(c); *see 2021 ICS Order*, 36 FCC Rcd at 9564, para. 104.

scope" of the existing consumer disclosure requirements to reach more ICS consumers and increase transparency regarding the rates and charges they pay for IPCS.[1794]  In the *2023 IPCS Notice*, the Commission sought "renewed comment" on these matters and asked what additional specific rule changes would be needed to implement the Martha Wright-Reed Act.[1795]

505.    *Scope of Disclosure Requirements*.  We first expand the scope of our disclosure requirements to apply to all IPCS providers that provide any audio IPCS or video IPCS subject to our jurisdiction under the Martha Wright-Reed Act.  This essential step in our implementation of the Act will ensure that all IPCS consumers will have the same transparency into their providers' rates, charges and practices regardless of the type of IPCS they use.

506.    *Public Website Disclosure*.  Section 64.6110 of our rules requires ICS providers to disclose certain information on their websites or in another reasonable manner readily available to IPCS consumers.[1796]  The record suggests that this rule, as currently written, does not allow for adequate information for the public.[1797]  Therefore, to promote transparency regarding IPCS offerings, we revise our rules to require IPCS providers to disclose their IPCS rates, charges, and associated practices in an easily accessible manner on their publicly available websites.[1798]  This information must be available to all members of the public, including our state regulatory partners, and not just to consumers with a preexisting IPCS account with the provider at any particular facility.  Providers must not require that website visitors open an account with the provider as a precondition to obtaining website access to the provider's rates and charges.[1799]  This disclosure requirement will enable any consumer with Internet access to make informed decisions regarding the provider's IPCS offerings both prior to opening an account and on an ongoing basis once an account has been created.  It will also allow the Commission, our state counterparts, and the public to evaluate whether providers' rates, charges, and associated

---

[1794] *See 2022 ICS Notice*, 37 FCC Rcd at 11902, para. 6; *see id.* at 11946-50, paras. 110-124 (suggesting that the reforms contemplated would "help ensure that incarcerated people and those they call will receive clear and transparent information about providers' charges and fees that inmate calling services consumers need to make informed choices regarding their calling service options").

[1795] *2023 IPCS Notice*, 38 FCC Rcd at 2674-75, para. 12.

[1796] 47 CFR § 64.6110(a).

[1797] Public Interest Parties Dec. 15, 2022 Comments at 7 (requesting that the Commission "require ICS providers to make information about their rates, terms, and conditions of service, including information about site commissions and international rate components, available generally to the public in an easily accessed manner"); Public Interest Parties Mar. 3, 2023 Reply at 9 (arguing "that IPCS providers could make information about their rates, terms, and conditions of service, available generally to the public (via both a provider's website or other publicly available source) as well as in each facility in the locations where incarcerated people make outgoing calls in an easily accessed manner"); Phoenix Listening Session at 13:6-14:20.  Some providers suggest that they have already taken steps to make such information generally available.  *See, e.g.*, Pay Tel Mar. 3, 2023 Reply at 8 (explaining that it makes billing information and "additional information concerning terms and conditions of its services is available" to the "public, and particularly the incarcerated persons and related consumers that already do business with an ICS provider"); Securus Dec. 15, 2022 Comments at 34 ("Securus provides detailed disclosures to friends and family that fund accounts and discloses general information on Securus' rates and terms and conditions to the general public.").

[1798] *Infra* Appendix A, 47 CFR § 64.6110; Public Interest Parties Dec. 15, 2022 Comments at 6-7 (contending that transparency is critical for ensuring that consumers can make informed IPCS-related decisions and urging that providers be required to disclose such information in an easily accessible manner).  We note that the disclosure requirements we impose on publicly-available websites apply equally to IPCS providers that offer their IPCS services through web-based applications.

[1799] *See* Pay Tel 2022 Reply at 8 n.15; ViaPath Dec. 15, 2022 Comments at 12 (observing that only once friends or family members establish an account with ViaPath, can they determine online rates and charges applicable to the selected correctional facility).

**Federal Communications Commission**    **FCC 24-75**

practices comply with the rules we adopt in this Report and Order.[1800]  We anticipate that the additional public awareness will help consumers make informed choices and generally promote compliance with our IPCS rules.

507.    Building upon the Commission's previous efforts to ensure transparency of ICS rates and charges, providers are required to post on their public websites complete information about their IPCS offerings, including information on rates, charges, and associated practices.[1801]  One commenter expressed concern that provider websites contain "misleading information" that can cause consumers to select "high priced service[s]."[1802]  Therefore, we amend our current rules to include information that will assist consumers in making informed decisions regarding IPCS.  Specifically, we find that providers must include, on their publicly available websites, information on how to manage an account, fund accounts, close accounts, and how to obtain refunds of unused balances.[1803]  The public website disclosures must also contain sufficient information to enable IPCS users "to understand the cost of a call before picking up the phone."[1804]

508.    *Methods of Disclosure.*  To ensure consumers receive the information necessary to make informed decisions, IPCS providers must make consumer disclosures available: (a) via the provider's website in a form generally accessible to the public without needing to have an account with the provider; (b) via the provider's online and mobile application, if consumers use that application to enroll; and (c) on paper, upon request of the consumer.[1805]  In doing so, we respond to the record which suggests that

---

[1800] The Martha Wright-Reed Act makes clear our authority over intrastate IPCS, but such required public disclosure will allow us to benefit from the experience of our state regulatory partners.

[1801] Public Interest Parties Dec. 15, 2022 Comments at 7 ("Transparency regarding charges and fees is critical for ensuring that ICS users understand the full range of prices and fees for these services, allowing these users to make more informed decisions when using ICS."); Public Interest Parties Mar. 3, 2023 Reply at 10 (supporting "additional transparency and information about an account, including actual activity, fee assessments, notices, etc." and asserting that "[e]nsuring that this information is disclosed through 'regular periodic statements of account' would enable consumers to make informed decisions about their IPCS use"); Accessibility Coalition Mar. 3, 2023 Reply at 7 ("The record highlights the potential for confusion, miscommunication, and exploitation when incarcerated people are able to access tolled accessible communications services but are not provided with an accessible bill that explains the charges associated with those services.").

[1802] Leadership Conference Mar. 3, 2023 Reply at 2; *see* Public Interest Parties Mar. 3, 2023 Reply at 10-11 ("Not all providers make sufficient disclosures, and even when they do, the information is often difficult to locate or access."); Phoenix Listening Session at 14:5-20 (Kim Thomas calling for disclosures that allow the incarcerated population to "know what we're accepting, let us know what we're agreeing to prior to us blindly clicking the accept button").

[1803] Public Interest Parties Dec. 15, 2022 Comments at 7; Public Interest Parties Mar. 3, 2023 Reply at 10-11 (requesting that the Commission reject the IPCS providers' arguments that their existing disclosures are sufficient and requesting further Commission guidance "both as to the content of such disclosures and the mode of disclosure"); Public Interest parties Mar. 3, 2023 Reply at 9 (explaining that "the rules need to be revised because consumers may have difficulty understanding rates and fees.").

[1804] Public Interest Parties Dec. 15, 2022 Comments at 7; *infra* Section III.G.1.b (Effective Consumer Disclosure).

[1805] Raher Dec. 15, 2022 Comments at 8 ("As the Commission notes, not all ICS customers have internet access. Accordingly, mailed paper statements should be offered as an option.").  In the *2022 ICS Notice*, the Commission sought comment on whether it should require "written or electronic disclosure, or otherwise specify the manner in which providers must make any required disclosure."  *2022 ICS Notice*, 37 FCC Rcd at 11962-63, para. 156*; see* Raher Mar. 3, 2023 Reply at 8-9 (suggesting that consumers should be able to receive disclosures online, and that consumers preferring paper bills should be able to opt into that format "free of charge"); PPI Sept. 27, 2021 Comments at 23 (suggesting that the Commission consider how the initial disclosures are made, especially to "incarcerated people who lack internet access").

information about providers' service plans may already be provided this way.[1806]  Likewise, by requiring different methods of disclosure, we recognize that consumers access these disclosures in different ways.[1807]  For example, many incarcerated people may lack access to the Internet, and therefore may have no way of learning of a provider's rates and charges where availability of these disclosures is limited to a website or online application.  To ensure these consumers are able to access providers' disclosures, we require IPCS providers to make their disclosures available on paper if requested by a consumer, thereby "devising a framework to ensure that all IPCS carriers provide such information in a concise, portable, and easy-to-understand format."[1808]  As one commenter explains, a 2022 study found that "consumers comprehended and retained financial disclosures better when they read them on paper than on a computer screen; and study participants showed even worse retention and comprehension rates when they read the disclosures on smartphones."[1809]  We anticipate that requiring these methods of making the necessary disclosures will be minimally burdensome to providers and relatively straightforward to implement, while also being familiar to IPCS users based on their experiences to date.

509.     *Billing Statements and Statements of Accounts.*  Based on the record, we require providers to make available billing statements and statements of account[1810] to all IPCS account holders on a monthly basis, via the provider's website, or via the provider's mobile or online application, and in any event, via paper statements upon request.[1811]  Our rules do not presently require providers to make

---

[1806] Securus Dec. 21, 2023 *Ex Parte*, Attach. at 7, 23; Securus Dec. 15, 2022 Comments at 34-35 (explaining that it offered information about its subscription plans via both its website and a mobile application, and stating that it offers information via a toll-free telephone number); *see also* Pay Tel Mar. 3, 2023 Reply at 8 (explaining that account information is "made available to its customers via online accounts and its proprietary mobile app"); ViaPath Dec. 15, 2022 Comments at 14 (stating that friends or family members can review account transactions "online or via an app on their wireless device"); California PUC Sept. 27, 2021 Comments, Attach. A, California PUC Decision 21-08-037, Decision Adopting Interim Rate Relief for Incarcerated Person's Calling Services at 2 (requiring providers to inform customers of required rate changes via websites, among other methods).

[1807] Securus Dec. 15, 2022 Comments at 34 (asserting that consumers without internet access may obtain information by calling a toll-free number); *see also* ViaPath Dec. 15, 2022 Comments at 12 (noting that the correctional facilities it serves make available printed materials, posters, and brochures to incarcerated individuals that contain information on the rates, terms, and conditions for the services offered by ViaPath; on-site ViaPath personnel are available in many correctional facilities to assist incarcerated individuals); Pay Tel Dec. 15, 2022 Comments at 8 (asserting that it is Pay Tel's practice to provide rate and call instructions on posters within the facility in many locations—and required disclosure information can be added to these posters as well for added visibility).

[1808] Raher Mar. 3, 2023 Reply at 9.

[1809] *Id.* at 8 (citing "survey data from ACI Speedpay Pulse show[ing] a steady increase in the percentage of telecom customers who prefer to receive billing statements electronically").

[1810] *See infra* Appendix A, 47 CFR § 64.6110.

[1811] Pay Tel Dec. 15, 2022 Comments at 8 ("Pay Tel does provide a detailed monthly statement that is available for viewing online or via Pay Tel's proprietary mobile application for called parties that have a prepaid account with Pay Tel."); Pay Tel Mar. 3, 2023 Reply at 8 ("Consistent with comments of other providers, Pay Tel is already in the practice of providing detailed account information in the form of monthly statements made available to its customers via online accounts and its proprietary mobile app."); Securus Dec. 15, 2022 Comments at 35 ("Securus makes monthly account statements available on its website."); Securus Mar. 5, 2023 Reply at 46 ("Providers in response informed the Commission that they make detailed statements available online or through mobile apps to consumers funding prepaid accounts.  Securus' comments included a sample of the type of monthly account statements that it makes available online, or on paper if requested."); Raher Dec. 15, 2022 Comments at 8 (proposing that electronic billing statements be made available on a monthly basis); NCIC Dec. 15, 2022 Comments at 6 ("not[ing] that many ICS providers offer online access to consumers' accounts with details of call history, charges, and taxes," and asserting that "[a]ll ICS providers should be able to provide this basic information to each of its consumers at no cost").  As demonstrated by the record, however, this is not occurring.  Our new requirement will ensure that consumers receive the necessary disclosures.

**Federal Communications Commission**　　　　　　　　　**FCC 24-75**

billing statements and statements of account available to ICS users.  In the *2022 ICS Notice*, the Commission proposed to modify the consumer disclosure rules to ensure consumers receive bills or statements of account from their providers.[1812]  The record reveals a lack of consistency as to how IPCS providers disseminate information regarding their rates and charges to consumers.[1813]  Most providers offer rate and charge information online without providing periodic bills or statements of account,[1814] although a few, such as Pay Tel, issue monthly electronic statements to account holders via online accounts and mobile applications.[1815]  We conclude that a consistently applied and transparent requirement is appropriate, and that all providers must make account-related disclosures to account holders monthly, which will foster consumer education and consumer protection.

510.　　Receiving monthly billing statements or statements of account will place IPCS account holders on the same footing as consumers generally, who typically receive monthly bills or statements of account (either online or via paper statements).[1816]  Indeed, this is even more crucial for incarcerated individuals because many do not have the freedom to check their accounts at regular intervals.[1817]  We rely in particular on one commenter's assertion that information on websites or web applications "of varying detail and salience" is not a substitute for statements in concise, easy-to-read formats.[1818]  Given that IPCS providers routinely track and maintain information on consumers' accounts, they should be able to generate monthly updates to consumers without undue burden as other communications service

---

[1812] *See 2022 ICS Notice*, 37 FCC Rcd at 11948, para. 113.

[1813] *E.g.*, Securus Dec. 15, 2022 Comments at 35 (stating that its "website provides information on how to fund accounts, add other incarcerated persons to accounts, how to close accounts and how to obtain refunds of unused balances"); ViaPath Dec. 15, 2022 at 14 (contending that friends or family members using the ViaPath communications platform can easily review their account transactions online or via an application on their wireless devices); NCIC Dec. 15, 2022 Comments at 6 (asserting that many providers offer online access to consumers' accounts with details of call history, charges, and taxes).  Securus contends that consumers and the general public have access to information on funding fees and taxes and the "rates applicable to any facility that Securus serves." Securus Dec. 15, 2022 Comments at 35.

[1814] NCIC contends that online account access allows ICS providers to reduce customer service costs; consumers and family members no longer need to call customer service representatives or ask facility staff for ICS account information.  NCIC Dec. 15, 2022 Comments at 6.

[1815] *See* Pay Tel Dec. 15, 2022 Comments at 9.

[1816] Raher Dec. 15, 2022 Comments at 7 (strongly supporting a new requirement for providers to render regular periodic statements of account); Leadership Conference June 17, 2024 *Ex Parte* at 1 (asking the Commission to "improve billing transparency" such as by requiring "dynamic consumer disclosures that are sent regularly"); Georgia Justice Project July 8, 2024 *Ex Parte* at 1 (supporting adoption of consumer protection measures such as billing transparency); *see* Pay Tel Dec. 15, 2022 Comments at 8; Pay Tel Mar. 3, 2023 Reply at 8 (explaining that it provides detailed account information in monthly statements); Securus Dec. 15, 2022 Comments at 35; Securus Mar. 5, 2023 Reply at 46; Verizon, *Frequently asked questions about understanding your bill*, https://www.verizon.com/support/residential/account/understand-bill/faqs (last visited May 6, 2024) (Billing cycles are "most often" set to repeat monthly.).

[1817] *E.g.*, Phoenix Listening Session at 37:5-14 (Rosalind Akins explaining, "I will tell you is when you pay the money, which is interesting -- when you pay the money, you get an email saying we just have $50 of your money.  But it's very interesting that you can gobble that money up and in the moment of crisis and need, my grandson's calling me and it's saying you have one cent left, not enough for the call.  So they never told you when there was enough money.  And I always felt guilty if I hadn't made the regular call to check to see how much money is on that phone.").

[1818] Raher Mar. 3, 2023 Reply at 9.  Stephen Raher also proposes a model statement of account that would provide customized information based on a consumer's activity.  *Id.*  We do not require this type of statement at this time.  In addition, Mr. Raher proposes a working group for consumer disclosures and billing statements.  *Id.* at 7-8.  We do not believe this is necessary, given our updates to the consumer disclosure requirements.

providers routinely do.[1819]  Given concerns that certain consumers may not have access to the Internet or may have accessibility issues, we also require providers to issue paper bills or statements of account upon request by a consumer.[1820]

511.    Each IPCS provider is required to make available to account holders the information they will need to understand any transactions affecting their accounts.[1821]  We do not dictate the format of the bills or statements of account, but require them to include the amount of any deposits to the account, the duration of any calls and communications charged to the account on a per-minute basis, the rates and charges applied to each call and communication for which a charge is assessed, and the balance remaining in the account after the deduction of those charges.[1822]  Whether a provider issues paper statements or online statements, the disclosures must include this same vital information.

512.    *Billing Statements and Statements of Account for Alternate Pricing Plans.*  We find that additional information must be provided in billing statements and statements of account for alternate pricing plans.  The billing statement or statement of account must provide for each service period: (a) call details, including the duration of each call, and the total minutes used for that service period, and the total charge including taxes and fees, with explanations of each tax or fee;[1823] (b) the total charges that would have been assessed using the provider's per-minute rate;[1824] (c) the calculated per-minute rate for the service period, calculated as the charge for the service period divided by the total minutes used by that consumer, with an explanation of that rate;[1825] and (d) the breakeven point, with an explanation of the breakeven point.[1826]  Also, as discussed above for billing statements and statements of account for services rendered on a per-minute basis, the billing statements and statements of account for an alternate pricing plan must provide information about deposits made to the consumer's account and the account balance.

513.    *Repeal of Site Commission Disclosure Requirement.*  In light of our action today prohibiting the payment of site commissions related to IPCS,[1827] we repeal section 64.6110(b) of the rules, which requires that providers "clearly label" as "a separate line item on [c]onsumer bills" any amounts

---

[1819] *See, e.g.*, NCIC Dec. 15, 2022 Comments at 6 (asserting that many providers who offer online access to consumers' accounts with details of call history, charges, and taxes, and that all providers should be able to provide this basic information to each of its consumers at no cost).

[1820] *See* Raher Dec. 15, 2022 Comments at 8 (asserting that mailed paper statements should be offered as an option, and that, "[g]iven the evidence in the record regarding the modest number of customers who want paper bills, the cost of mailing statements should be borne by carriers without the imposition of additional customer fees).  In fact, many providers already make paper statements available upon request.  Securus Dec. 15, 2022 Comments at 34; ViaPath Dec. 15, 2022 Comments at 14.  We find inapposite Pay Tel's opposition to providing paper billing statements or disclosures based on facility imposed "restrictions or limits on paper usage, due to the cost of processing the resulting waste."  Pay Tel Dec. 15, 2022 Comments at 9.  Our billing statement and disclosure rules govern *provider* methods of dissemination; facility practices over paper use are irrelevant.

[1821] *See infra* Appendix A, 47 CFR § 64.6110; ViaPath Dec. 15, 2022 Comments at 14 (indicating that account holders can easily review account transactions online or via an app on their wireless devices).

[1822] We recognize that, in light of action we take in this Report and Order, site commission information does not have to be included.

[1823] Raher Dec. 15, 2022 Comments, Appx. 1 at 13.

[1824] *See id.* at 10 (asserting that "monthly account statements must . . . show . . . what the total cost would have been under the 'standard' per-minute rates offered at the same correctional facility").

[1825] *See id.* (asserting that "monthly account statements must . . . show . . . the calculated per minute rate (i.e., subscription fee divided by number of minutes)").

[1826] *Supra* Section III.D.9.c.ii.a (Using a Consumer's Comparable Per-Minute Rate).

[1827] *See supra* Section III.D.6 (Site Commissions).

charged consumers for facility costs included in the providers' site commission payments.[1828]  Given our prohibition against IPCS providers paying site commissions of any kind associated with intrastate, interstate, international, jurisdictionally mixed, or jurisdictionally indeterminate audio and video IPCS, including all monetary and in-kind site commissions, we find that this rule is no longer needed.[1829]

### b.    Effective Consumer Disclosures

514.    Just as we have required all prior consumer disclosures to be clear, accurate and conspicuous, we now conclude that all required IPCS provider disclosures, including those implementing our inactive account and alternate pricing plan rules, must be clear, accurate, and conspicuous—the same standard our current rules set for disclosure of audio rates and ancillary service charges.[1830]  Adherence to these standards will allow a reasonable person to readily understand IPCS audio and video rates and charges.  For example, a provider should price its products in dollars per minute, rather than in dollars per megabyte as one provider does and which would be confusing to consumers.[1831]  In this manner, incarcerated people and their loved ones will be able to understand the rates and charges they are, or will be, assessed and the terms and conditions that will apply to a provider's IPCS offerings.  This, in turn, will help them make informed decisions about which services to purchase and whether an alternate pricing plan would be beneficial.

515.    We expect that the requirement that disclosures be "clear, accurate, and conspicuous" and the other disclosure requirements we adopt in this Report and Order will ensure IPCS users and the public will timely receive clear and transparent information about providers' rates, charges, and practices.  We therefore find that our revised disclosure rules give providers "clear guidance" regarding the information providers must disclose and how it must be disclosed, as certain commenters urge.[1832]  These requirements will reduce consumer confusion when accessing provider websites which, while technically providing the information required by our rules, continue to be difficult for consumers to navigate.[1833]  For example, as one commenter explains, one provider's "terms and conditions and privacy policy collectively total almost 18,000 words," with "the sheer volume and complexity of this information . . . not reasonably accommodate[ing] the actual needs of the average consumer."[1834]  This same providers

---

[1828] *See infra* Appendix A, 47 CFR § 64.6110.

[1829] Similarly, given our elimination of ancillary service charges elsewhere in this Report and Order, we also repeal the portion of section 64.6110(a) that requires providers to disclose those charges to consumers.

[1830] *See* 47 CFR § 64.6110(a) (requiring IPCS providers to "clearly, accurately, and conspicuously" disclose their "interstate, intrastate, and international rates and ancillary service charges").  We specify that the terms "clear," "accurate," and "conspicuous" have their common meaning.  *E.g.*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/clear (last visited June 13, 2024) (clear); Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/accurately (last visited June 13, 2024) (accurately); Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/conspicuously (last visited June 13, 2024) (conspicuously).

[1831] State of Phone Justice Dec. 2022 Report at 18; Public Interest Parties May 8, 2023 Comments at 29; Public Interest Parties Feb. 2, 2024 *Ex Parte* at 2; Phoenix Listening Session at 14:14-20 (Kim Thomas describing the challenges of understanding consumer disclosures for a population that does "not have an eighth grade literacy").

[1832] *See, e.g.*, Public Interest Parties Dec. 15, 2022 Comments at 6-7 (asserting that there is no clear guidance on how to provide disclosures uniformly, and that not all providers appear to comply with the rule); Public Interest Parties Mar. 3, 2023 Reply at 9 (contending that the record supports enhanced consumer disclosure requirements because the current requirements are insufficient).  *But see* ViaPath Dec. 15, 2022 Comments at 10 (arguing that changes to the Commission's consumer disclosure rules are "not needed in light of existing Commission rules and market practices").

[1833] *See, e.g.*, *infra* Section III.G.1.b (Effective Consumer Disclosures).

[1834] Raher Mar. 3, 2023 Reply at 9 (citing Securus's General Terms and Conditions webpage, https://securustech.net/friends-and-family-terms-and-conditions/index.html (last visited June 11, 2024)); Phoenix Listening Session 14:21-

(continued….)

**Federal Communications Commission**                    **FCC 24-75**

lists its rates and charges under a page called "Tariffs."[1835]  Thus, the requested information is on its website, but we find it doubtful that consumers as a whole would understand what a tariff is and that is the place in which they should look for pricing information.  Another provider's rates and charges are included in a page labelled "Legal and Privacy,"[1836] giving no indication to consumers that this is the location of such information.  Given these practices, we find that it is necessary to amend our current rules to ensure that consumers can easily understand and access such information by requiring that providers make their rates, charges, and associated practices available on their websites in a manner in which consumers can easily find the information.  We also find that the disclosures we require with regard to alternate pricing plans "should provide sufficient information to enable consumers to assess the value to them of the [alternate pricing] plan versus using standard per-minute rate plans."[1837]  In view of these findings, we decline to adopt a specific "IPCS label" for billing statements and statements of account, as was proposed in the record.[1838]  We find such an approach overly prescriptive and unnecessary.  To minimize unnecessary burdens on providers and to allow flexibility, we decline to prescribe a particular format for disclosures.

### c.    Accessible Formats for Consumer Disclosures

516.    All disclosures concerning IPCS, including disclosures pertaining to inactive accounts and alternate pricing plans, must be accessible to people with disabilities.[1839]  In the *2022 ICS Notice*, the Commission sought comment on the effectiveness of its rules in providing information regarding rates, charges, and fees to people who are deaf, hard of hearing, deaf-blind, or have a speech disability.[1840]  The Commission proposed that all disclosures, including those regarding reporting requirements and charges, be made in an accessible format for incarcerated persons with disabilities, and invited comment on what

---

15:16 (Kim Thomas describing disclosures that are "pages long" and must be accepted before being permitted to use tablets and how many incarcerated people "would just process through it.  So they aren't reading it.  And it's not provided in any other venue for them to sit back and go, oh, yeah, I agreed to that.").

[1835] Securus's webpage for "Rates" does not, in fact, include any rate information, instead merely stating that its "rates are in compliance with applicable state and federal regulations."  Securus Technologies, Rates, https://securustech.net/rates/index.html (last visited June 11, 2024).  In order to find pricing information, consumers must navigate to a page labeled "Tariffs" which links to each individual state or federal tariff.  Securus Technologies, Tariffs, https://securustechnologies.tech/about/tariffs/ (last visited June 11, 2024).

[1836] ViaPath, Legal and Privacy, https://www.viapath.com/legal-and-privacy/ (last visited June 11, 2024).

[1837] Securus Mar. 5, 2023 Reply at 7; Public Interest Parties Dec. 15, 2022 Comments at 10-11.

[1838] The Public Interest Parties assert that the Commission should adopt a version of the consumer broadband label adopted in the *2022 Broadband Label Order* so that consumers can make informed decisions before making a call.  Public Interest Parties Dec. 15, 2022 Comments at 7-8 (citing *Empowering Broadband Consumers Through Transparency*, CG Docket No. 22-2, Report and Order and Further Notice of Proposed Rulemaking, 37 FCC Rcd 13686 (2022)).  They contend that the Commission should tailor a similar label for IPCS, "and require . . . providers to make information about their rates, terms, and conditions of service, including information about site commissions and international rate components, available generally to the public in an easily accessed manner."  Public Interest Parties Dec. 15, 2022 Comments at 7-8; DARE July 10, 2024 *Ex Parte* at 2 (advocating for a "consumer disclosure label that builds on the recently adopted broadband consumer labels"); *see also* ViaPath June 13, 2024 *Ex Parte* at 17-18 (finding that "a 'label' is not required to ensure IPCS consumers have accurate information" because "IPCS providers already are under an obligation to 'clearly, accurately, and conspicuously' disclose their rates and charges" and "provide . . . the opportunity to obtain certain oral disclosures prior to a call being connected").

[1839] *See* Public Interest Parties Apr. 15, 2024 *Ex Parte* at 3 (requesting that the Commission "strengthen billing disclosure requirements to ensure incarcerated people with disabilities receive information about payment and billing practices in accessible formats").

[1840] *2022 ICS Notice*, 37 FCC Rcd at 11949, para. 118.

**Federal Communications Commission**    **FCC 24-75**

steps it should take to implement that proposal.[1841]

517.    Based on the record, we revise our consumer disclosure rules to specify that consumer disclosures must be in accessible formats for people with disabilities.  We agree with commenters that any website disclosures, billing statements, and statements of account must be in accessible formats.[1842] We do not prescribe specific mechanisms, but afford providers flexibility to respond to specific requests and make reasonable accommodations.

### d.    Alternate Pricing Plan Consumer Disclosure Requirements

518.    We adopt consumer disclosure requirements specific to alternate pricing plans, including disclosures prior to enrollment and on billing statements and statements of account.[1843]  These rules are in addition to the disclosure requirements generally applicable to IPCS.

519.    Several commenters discuss the benefits of enhanced consumer disclosure for alternate pricing plans.[1844]  We agree that consumers need some essential information to assess whether a particular alternate pricing plan best meets their needs.  For example, IPCS consumers should know the format of and charges for the alternate pricing plan prior to enrollment.[1845]  Providers also should ensure that consumers know: (a) the terms, conditions and procedures for renewals, cancellations, and reporting dropped calls, so they will be in control of the length of time they are enrolled in the plan and know how

---

[1841] *See id.* at 11943, 11949, 11950, paras. 98, 118, 122.

[1842] Accessibility Coalition Dec. 15, 2022 Comments at 3, 7-8 (arguing that to "ensure that incarcerated people with disabilities are fully informed about calling practices and billing, disclosures must be made in formats such as Braille, large print, videos in American Sign Language that are captioned and audio described, e-mails, and printed materials."); Securus Dec. 15, 2022 Comments at 6 (concurring with the Commission's proposal to make information regarding charges accessible to people with disabilities);  Public Interest Parties Dec. 15, 2022 Comments at 8 (asserting that their proposed IPCS label "must be accessible to a wide range of users and circumstances, including in a format for incarcerated people with disabilities).

[1843] In the *2022 ICS Notice*, the Commission asked "[w]hat type of consumer outreach or education would be needed to ensure that consumers are able to choose the [alternate pricing plan] that best meets their needs."  *2022 ICS Notice*, 37 FCC Rcd at 11961, para. 153.  The Commission also asked "what information consumers would need about providers' pilot programs to help them make informed choices between a pilot program and traditional per-minute pricing," and whether it should require providers to inform consumers "how a pilot program's prices translate on a per-minute basis, to enable consumers to make an informed decision between the program and the traditional per-minute pricing model."  *Id.* at 11962, para. 156.

[1844] The Public Interest Parties assert that "[e]nsuring that all fees are disclosed should help protect consumers against junk fees, hidden-fees pricing, and negative-option subscriptions."  Public Interest Parties Feb. 2, 2024 *Ex Parte* at 3.  PPI suggests that such information would allow consumers to "consider their likely phone usage and compare subscription costs to what they would pay under per-minute pricing."  PPI Jan. 7, 2022 Waiver Comments at 9; *see* PPI Sept. 27, 2021 Comments at 23.  The Leadership Conference requests the Commission to "ensure that consumers are fully informed about alternative pricing structures so that they can make informed decisions about their choices."  Letter from Jonathan Walter, Policy Counsel, Leadership Conference on Civil and Human Rights, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 12-375 et al., at 3 (filed Feb. 21, 2024) (Leadership Conference Feb. 21, 2024 *Ex Parte*).  Securus suggests that the Commission "[r]equire baseline disclosures so [the] consumer can make an informed choice," and that the disclosures include the "offered terms, (e.g., X number of calls per month for $X)."  Securus Dec. 21, 2023 *Ex Parte*, Attach. at 35; Securus Mar. 5, 2023 Reply at 7 (citing Public Interest Parties Dec. 15, 2022 Comments at 11).

[1845] *See* Public Interest Parties Dec. 15, 2022 Comments at 10 (arguing that it is "'critical that incarcerated people and their families understand the provider's alternative pricing offerings and how they differ from per-minute usage'"); Letter from Gregory R. Capobianco, Jenner & Block, LLP, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (filed Jan. 2, 2024) ("encourag[ing] the Commission to ensure that consumers have . . . information about the total cost of the plan (including fees)"); PPI Jan. 7, 2022 Waiver Comments at 18-19 (in the context of Securus's subscription plan, observing that no legal contract between a customer and Securus could be found).

to report dropped calls;[1846] (b) the option to obtain service on a per-minute basis, so they are aware that enrollment in the plan is not the only option available to them;[1847] (c) the breakeven point for the plan, so they will know what their usage level needs to be to benefit from the plan;[1848] and (d) the availability of their usage and billing data upon request, so they can analyze their past usage and make decisions about their future enrollment in the plan.[1849] Accordingly, we find that providers offering alternate pricing plans must disclose the following information:[1850]

> (a) The rates and any added taxes or fees, a detailed explanation of the taxes and fees, total charge, quantity of minutes, calls or communications included in the plan, the service period, and the beginning and end dates of the service period;

> (b) Terms and conditions, including those concerning dropped calls and communications, automatic renewals and cancellations;

> (c) An explanation that per-minute rates are always available as an option to an alternate pricing plan and that per-minute rates apply if the consumer exceeds the calls/communications allotted in the plan;

> (d) The breakeven point, and an explanation in plain language that the breakeven point is the amount of plan usage the consumer must make to start to save money compared to the provider's applicable per-minute rate for the same type and amount of service; and

> (e) The ability to obtain usage and billing data, upon request, for each of the most recent three service periods (where feasible),[1851] including total usage and total charges including taxes and fees.[1852]

520.    ViaPath opposes the adoption of consumer disclosure rules specific to alternate pricing

---

[1846] *See* Securus Dec. 17, 2021 Reply at 35 (explaining that instructions on how to cancel were included in frequently asked questions on Securus's website); PPI Jan. 7, 2022 Waiver Comments at 17-18 (in the context of Securus's subscription plan, describing conflicting information concerning Stephen Raher's attempt to cancel a subscription, as well as Securus's practice of informing customers *after* their renewal payments were processed); *see also* Worth Rises Oct. 27, 2021 Response at 3 (in the context of Securus's subscription program, asking for information about renewals, cancellations and dropped calls).

[1847] *See* Public Interest Parties Dec. 15, 2022 Comments at 10 ("Consumers . . . should be free to switch to a per-minute structure upon request.")

[1848] *See* Public Interest Parties Feb. 2, 2024 *Ex Parte* at 2-3 (remarking that "a substantial number of participants in [Securus's] subscription pilot programs were below the 'break-even' point"). The disclosure of the breakeven point will especially be needed if a provider offers an alternate pricing plan that is designed for heavy users. *See* ViaPath June 13, 2024 *Ex Parte* at 17 (suggesting that "packages of services at a single rate" would be offered to "heavier or broader users of available communications services"). A light user of IPCS, begin told what the breakeven point is for such an alternate pricing plan, and being given an explanation of the breakeven point, would have information that could be used in deciding whether the plan makes sense for their circumstances.

[1849] *See* Raher Mar. 3, 2023 Reply at 14 (requesting that data be provided to consumers so that they can "compare their actual costs under a per-minute regime to their projected costs under a subscription plan and make an informed decision").

[1850] We are listing these items together here to give one list encompassing the details of alternate pricing plan disclosures.

[1851] If the consumer had not been a customer of the provider during one or more of the three previous service periods, the provider must give the usage and billing data for whatever service periods the consumer did use the provider's services and for which the provider has retained the information. If the consumer has never been a customer of the provider, then this requirement does not apply.

[1852] These disclosure requirements resolve Leadership Conference's concerns that consumers be informed about costs and refunds. Leadership Conference Feb. 21, 2024 *Ex Parte* at 3.

plans, arguing that the Commission's rules "already facilitate significant transparency,"[1853] and that "[c]onsumers are in the best position to determine whether alternative pricing arrangements meet their needs."[1854]  In particular, ViaPath cites to section 64.710 of the Commission's rules which requires audible information about the cost of a call prior to call connection.[1855]  However, section 64.710 applies to interstate calls made from correctional facilities and therefore does not apply to intrastate IPCS calls over which the Commission now has jurisdiction.[1856]  The other rule sections referenced by ViaPath—sections 42.10, 42.11, 64.2401 and 64.6110—fare no better.[1857]  Sections 42.10 and 42.11 of the Commission's rules do not apply to intrastate services.[1858]  Also, Section 42.10 requires rate information to be publicly available at one physical location, which at a minimum, would not be useful to incarcerated people; and section 42.11 requires the information to be available for submission to the Commission and state regulatory commissions, not the public or consumers.[1859]  Section 64.2401 applies to telephone bills, not to disclosures at other times, such as when someone is trying to determine whether to enroll in an alternate pricing plan.[1860]  Finally, ViaPath suggests that section 64.6110, the section we are amending here, is sufficient.[1861]  Section 64.6110 currently does not apply to intrastate or video service for example,

---

[1853] ViaPath Dec. 15, 2022 Comments at 10-11, 22; *see* ViaPath Jan. 7, 2022 Waiver Comments at 3.  ViaPath also asserts that audible disclosures are not needed because "[t]here is no record evidence that prior alternative pricing trials have resulted in anything other than satisfied customers."  ViaPath Mar. 5, 2023 Reply at 15.  The evidence ViaPath refers to is testimony provided by Securus from a small subset of its customers—meaning we do not have information about how satisfied the remaining customers were, including the customers whose usage did not meet the breakeven points in Securus's plans.  *See generally supra* Section III.D.9.c.ii.a (Using a Consumer's Comparable Per-Minute Rate).

[1854] ViaPath Mar. 5, 2023 Reply at 14.

[1855] 47 CFR § 64.710; ViaPath Jan. 7, 2022 Waiver Comments at 4 & n.17.

[1856] 47 CFR § 64.710.  Because section 64.710 was adopted over two decades ago, it does not require providers to give all the terms and conditions of alternate pricing plans.  *Billed Party Preference for InterLATA 0+ Calls*, CC Docket No. 92-77, Second Order on Reconsideration, 16 FCC Rcd 22314, 22330-31 (2001) (revision to section 64.710); *Billed Party Preference for InterLATA 0+ Calls*, CC Docket No. 92-77, Second Report and Order and Order on Reconsideration, 13 FCC Rcd 6122, 6171 (1998) (initial version of section 64.710).

[1857] 47 CFR §§ 42.10, 42.11, 64.2401, 64.6110; ViaPath Dec. 15, 2022 Comments at 22 n.98.

[1858] 47 CFR §§ 42.10, 42.11.

[1859] *Id.* §§ 42.10, 42.11.

[1860] *Id.* § 64.2401.

[1861] ViaPath Dec. 15, 2022 Comments at 22 n.98.  Section 64.6110 of the Commission's rules requires, among other things, that IPCS providers disclose their rates and fees on their websites or "in another reasonable manner readily available to consumers."  47 CFR § 64.6110.  Compliance with this requirement appears less than ideal.  For example, Securus has a website with an obscure URL, and which provides only rates, not taxes and fees.  Securus Dec. 15, 2022 Comments at 35 & n.42; Securus Technologies, Rate Quote, https://securustech.online/#/rate-quote (last visited June 7, 2024).  Another Securus website, accessed from a link at the bottom of *securustech.net*, apparently requires a user to have an account in order to view the rates.  Securus Technologies, https://securus tech.net/ (last visited June 7, 2024); Securus Technologies, Rates, https://securustech.net/rates/index.html (last visited June 7, 2024).  (The website Securus apparently provided specifically for its subscription plan could not be accessed.  https://securuscallsubscription.com/ (last attempted visit June 7, 2024); Securus Jan. 7, 2022 Waiver Comments at 3 & n.7).  Additionally, despite ViaPath's contention that it is focused on transparency, simplification and clarity for consumers, an Internet user would not find rates at https://www.viapath.com/ or http://gtl.com/.  ViaPath June 13, 2024 *Ex Parte* at 17 n.108.  Links to rates are given at https://www.gtl.net/.  From there, interstate rates are found via a link to a page entitled "Federal Tariffs and Price Lists," which directs the user to a tariff-like document for ViaPath—which the average consumer could readily decide is too difficult to understand.  GTL, Federal Tariffs and Price Lists, https://www.gtl.net/legal-and-privacy/federal-tariffs-and-price-lists/ (last visited June 14, 2024); ViaPath Technologies, Interstate and International Rates, Terms and Conditions, https://www.gtl.net/wp-content/uploads/2023/01/ViaPath-FCC-Interstate-International-RTC-1-9-2023.pdf (Jan. 9, 2023).

or the terms and conditions associated with alternate pricing plans which we are permitting for the first time.[1862] Taken together, the rule sections listed by ViaPath do not require the disclosure of all of the terms and conditions for alternate pricing plans for intrastate, interstate, and international audio and video IPCS, with the consumer being either an incarcerated person or a friend or family member, with the disclosure being made before, during or after enrollment in a plan, and with the disclosure being made to the public, including the Commission.[1863] Thus, even if IPCS providers perfectly comply with the rule sections listed by ViaPath, the rules are insufficient to ensure consumers receive the kind of information needed to make well-informed decisions about participation in alternate pricing plans generally, and to inform the public so they may analyze the provider's compliance with our regulations. We find that the consumer disclosure requirements specific to alternate pricing plans that we adopt here are necessary to educate and protect consumers.[1864]

521.    *Timing and Manner of Disclosures.* In the *2022 ICS Notice*, the Commission asked whether it should adopt rules "governing how providers should disclose to consumers the rates, terms, and conditions associated with any" alternate pricing plan.[1865] After reviewing the record, we adopt such requirements here, and conclude that an IPCS provider must make the alternate pricing plan disclosures identified above available: (a) before a consumer enrolls in the program (pre-enrollment); (b) upon request, at any time after enrollment; (c) with a billing statement or statement of account, and any related consumer communications; and (d) at the beginning of each call or communication.

522.    *Pre-Enrollment Disclosures.* Before a consumer first enrolls in an alternate pricing plan, the provider must ensure that the consumer is fully informed about the plan and the disclosure must provide all plan details. For example, if the plan consists of 60 calls per month for $30.00 plus permissible taxes and fees totaling $2.50, the disclosure must provide the total dollar amount of $32.50, and the amount of taxes and fees in detail.[1866] The provider also must specify and explain the plan's "breakeven point," discussed above.[1867] Prior to the consumer's enrollment, the IPCS provider also must inform the consumer that usage and billing data will be available upon request before they enroll and after they enroll in the alternate pricing plan. These disclosures will enable a consumer to consider their own IPCS needs and the likelihood that their usage would reach the breakeven point before making a decision to enroll in the alternate pricing plan and give them comfort that they will continue to have access to the information they need over time to decide whether to remain enrolled in that alternate pricing plan.

523.    *Disclosures Upon Request at Any Time.* In addition to the disclosures being crucial to a consumer's decision about whether to enroll in a plan, having access to the disclosures also is important while a consumer is enrolled in the plan, and after enrollment has ended. During enrollment in a plan, a consumer may want to check the provider's procedures for handling dropped calls, for example, or

---

[1862] 47 CFR § 64.6110.

[1863] ViaPath also cites to sections 208 and 403 of the Communications Act, and section 1.711 of the Commission's rules. ViaPath Dec. 15, 2022 Comments at 22 n.98 (citing 47 U.S.C. §§ 208, 403 and 47 CFR § 1.711). However, those sections concern the Commission's authority to address a provider's actions after the fact. They do not require disclosures to consumers.

[1864] PPI suggests that providers reveal information such as a requirement that the consumer has to pay money regardless of whether the incarcerated caller is allowed to make calls, or pointing out that subscriptions are not comparable to wireless plans which allow callers to communicate with anyone of their choosing. PPI Jan. 7, 2022 Waiver Comments at 8. We find our consumer disclosure requirements sufficiently robust to enable consumers to determine whether a provider's alternate pricing plan is the right choice for them. Of course, IPCS providers readily may add additional information that is truthful and useful to consumers to the information that they are required to provide, at any time they interact with the consumers, and on website postings that are available to the public.

[1865] *2022 ICS Notice*, 37 FCC Rcd at 11919-20, para. 156.

[1866] Securus Dec. 21, 2023 *Ex Parte*, Attach. at 24. The terms and conditions also must give the total dollar amount that will be charged, in this example $32.50. *Infra* Appendix A, 47 CFR § 64.6040.

[1867] *Supra* Section III.D.9.c.ii.a (Using a Consumer's Comparable Per-Minute Rate).

compare a billing statement to the terms of the plan.  After enrollment, a consumer may want to check their billing statements against the terms of the plan to ensure the charges were correct or use the information to determine if they want to enroll in an alternate pricing plan again.

524.    Providers must also make available the number of remaining minutes, calls or communications under the consumer's alternate pricing plan without the consumer having to initiate a call or communication that counts toward the minutes, calls or communications allotted in the plan.  This can be achieved via the consumer's account on the provider's website or via the provider's mobile or online application, for example.  For those without Internet access a provider can give this information via its customer service line, or by whatever mechanism is permitted by the facility.[1868]  This disclosure requirement will allow consumers to monitor their alternate pricing plan usage without deducting a minute, call, or communication from their plan.  The record indicates that Securus offered this information to consumers of its subscription plan, suggesting this requirement will not be burdensome to providers.[1869]  Therefore, we include this requirement in our alternate pricing plan consumer disclosure rules.

525.    *Disclosures with a Billing Statement or Statement of Account*.  Each billing statement or statement of account should explain how the consumer may access the disclosures.  The methods for obtaining the disclosures must include the ability to request a paper copy.  The other methods could include a link to a website or a toll-free telephone number, or perhaps a complete copy of the disclosures that would be included with the billing statement or statement of account.  With such access to the disclosures, consumers will be able to confirm the charges on the billing statement or statement of account, and make decisions about their continued use of the alternate pricing plan.

526.    *Disclosures at the Beginning of a Call or Communication*.  In addition to disclosing all of the terms and conditions at other times and upon request, providers must make available, upon request of the consumer, specific disclosures at the beginning of a call made via an alternate pricing plan.  For example, a provider could offer the option of this detailed information if a consumer were to "press two" at the beginning of a call.[1870]  The IPCS provider must disclose the number of minutes, calls or communications remaining for the service period (for plans that have a finite number of minutes, calls, or communications).  This will ensure that IPCS users have the information they need to determine whether to tailor their usage of IPCS in a given instance based on the details of the alternate pricing plan they are enrolled in.  The requirement to provide disclosures at the beginning of a call is currently in section 64.710 of the Commission's rules.[1871]  Section 64.710 as currently written, however, is insufficient to provide IPCS consumers with adequate information to make an educated decision prior to making a call.  For example, section 64.710 applies to interstate calls made from correctional facilities, not intrastate calls, and that section necessarily does not require the provider to offer the disclosure of all the terms and conditions of alternate pricing plans which are permitted for the first time in this Report and Order.[1872]  Therefore, we add to our rules disclosure requirements at the beginning of the call or communication

---

[1868] *See* Public Interest Parties Apr. 15, 2024 *Ex Parte* at 4-5 (asserting that "[i]ncarcerated people often are unable to use toll-free numbers . . . any many incarcerated people do not have access to the internet," and requesting the Commission to require providers to "offer a means for incarcerated people to contact . . . [the provider's] customer support . . . via whatever mechanism is permitted . . . tailored to the communications available to incarcerated people at a particular facility").

[1869] Securus Dec. 17, 2021 Reply at 35 n.111; Securus Dec. 21, 2023 *Ex Parte*, Attach. at 26.

[1870] For example, the availability of the alternate pricing plan disclosures could be announced as part of the information at the beginning of a call, and the consumer could be told they can "press 2" to hear how to obtain the disclosure information online, or "press 3" to hear the disclosures read to them.  This is similar to Pay Tel's use of voice prompts, such as by saying:  "For rate information, press 1 now."  Pay Tel July 12, 2023 Reply Exh. 2 at 44 (The Reality).

[1871] 47 CFR § 64.710.

[1872] *Id.*

which are specific to alternate pricing plans.[1873]  Securus states that, for its subscription plans, consumers were informed of the number of calls remaining at the beginning of each call.[1874]  Our rule amendments require providers to give specific information about the status of the alternate pricing plan, and are broader than Securus's practice, to ensure that consumers are fully informed about the status of their use of the plan.

527.     *Billing and Usage Data.*  The alternate pricing plan disclosures—which primarily focus on the alternate pricing plan itself—also must inform consumers that their own prior usage and billing data (whether under per-minute pricing or an alternate pricing plan) are available upon request.  This information will further assist a consumer in deciding whether to enroll in an alternate pricing plan.  The availability of that information upon request while the consumer is enrolled in a plan will, in turn, enable IPCS consumers to evaluate whether to remain enrolled in that alternate pricing plan.  It also will ensure that information is available in a manner that is timely for IPCS users—i.e., when they otherwise are in a position to make such evaluations, in the event that they have not retained such information when it otherwise is made available to them.[1875]

528.     The usage and billing data must show what the provider charged for each of the past three service periods (where feasible),[1876] including: (a) the minutes of use for each of the calls or communications made and the applicable per-minute rate that was charged (where applicable); (b) the total number of minutes; and (c) the totals charged including the details of any taxes and fees.  If a consumer had been enrolled in an alternate pricing plan, the data must include the breakeven point for the alternate pricing plan(s), an explanation of the breakeven point in plain language, and the total that would have been due for each service period if the provider's per-minute rate had been used.[1877]  The consumer's prior usage and billing data could be made available when the consumer logs into their account on the provider's website and the provider's online and mobile applications, but must also be made available on paper upon request of the consumer,[1878] and be made available at any time, whether before, during, or after a consumer's enrollment in an alternate pricing plan.

529.     These requirements respond to a record suggestion that "a monthly accounting comparing the costs under a pilot program and the applicable per-minute rate would help IPCS consumers understand whether they will benefit or are benefitting from an alternative pricing structure."[1879]  While one commenter advocates for disclosures of a consumer's historical IPCS usage and expenditures "over a

---

[1873] *Infra* Appendix A, 47 CFR § 64.6110.

[1874] Securus Dec. 21, 2023 *Ex Parte*, Attach. at 26.

[1875] Because we require disclosures of key information regarding alternate pricing plans in other circumstances, we anticipate that in many instances IPCS consumers already will have the information they need, and will not find it necessary to avail themselves of this option.  That said, because the limited experience of IPCS consumers with such plans, IPCS consumers may not know what information they will want to have in order to make an assessment of whether to remain on an alternate pricing plan, they might not automatically have retained that particular information.  As a result, we expect a consumer's ability to obtain this information upon request will provide an important backstop that will not unduly burden IPCS providers above and beyond the alternate pricing plan disclosures we otherwise require.

[1876] The requirement applies only for those service periods for which the consumer was a customer of the provider. A service period could be, for example, a month or a week.

[1877] *See* Public Interest Parties Feb. 2, 2024 *Ex Parte* at 2 (suggesting that information should include how much a consumer would have paid at certain levels of usage under the applicable per-minute rate).

[1878] As discussed above, we require disclosures to be available on paper so that they are accessible to people who do not have Internet access.  *Supra* Section III.G.1.a (Disclosure of Rates, Charges, and Practices).

[1879] Public Interest Parties Feb. 2, 2024 *Ex Parte* at 3.

long period" to "account[] for periodic variations in usage,"[1880] we limit the data IPCS providers must provide to the calling records for the most recent three service periods (where feasible) so as not to overwhelm consumers with large quantities of data,[1881] or create an overly burdensome requirement on providers.[1882]  For an alternate pricing plan with a service period of one month, the data provided would be for three months—i.e., approximately 90 days.  For an alternate pricing plan with a service period of one week, the data provided would be for three weeks—i.e., 21 days.

### 2.    Treatment of Unused Balances in IPCS Accounts

#### a.    Adoption of Permanent Rules

530.    We next adopt permanent rules addressing the treatment of unused funds in IPCS accounts that build upon the interim rules that the Commission adopted in the *2022 ICS Order*.[1883]  We now update our interim rules to reflect our expanded authority over IPCS,[1884] and adopt permanent rules to provide IPCS account holders with informational, procedural, and financial protections that help ensure that IPCS account holders are able to maintain control over the funds in their accounts and receive refunds of any unused funds in a timely manner.  Collectively, these measures, consistent with several providers' affirmative statements that refunds are always available,[1885] remove obstacles that, as a practical matter, have largely prevented account holders from receiving refunds of unused funds.[1886]

531.    We take these actions pursuant to our authority under section 276(b)(1)(A) of the Communications Act, as amended by the Martha Wright-Reed Act, and, to the extent the underlying accounts can be used for interstate or international telecommunications services, pursuant to section

---

[1880] Raher Mar. 3, 2023 Reply at 14 (asserting that consumers should be permitted to "examin[e] historical costs over a long period" but that "Securus actively prevents this type of analysis because it only allows customers to review their calling records for the previous 90 days"); *see* Raher Dec. 15, 2022 Comments at 10.

[1881] *See* PPI Jan. 7, 2022 Waiver Comments at 9 (explaining that "individuals frequently struggle with simple calculations and avoid complicated calculations entirely").

[1882] Although Securus stated that it made monthly statements of account available for 90 days for services outside of its subscription plan, we require data for at least the most recent three "service periods" so that the consumer can see their usage during three similar periods of time, and see the complete charges and taxes and fees for those service periods.  Securus Dec. 15, 2022 Comments at 36 ("monthly account statements . . . available for download for up to 90 days").  The use of "three service periods" also would be a more reasonable request for alternate pricing plans offered on a weekly basis, rather than requiring a provider deliver up to 90 days of data (equivalent to approximately 12 weeks of data) which may be overwhelming to the consumer and may be onerous for the provider.

[1883] 47 CFR § 64.6130 (Funds remain the property of the account holder unless they are spent on products or services, or disposed of in accordance with a controlling judicial or administrative mandate, or the requirements of applicable state law.); *2022 ICS Order*, 37 FCC Rcd at 11931-36, paras. 75-80; *infra* Appendix A, 47 CFR § 64.6130.

[1884] *Supra* Section III.G (Reform of Consumer Protection Rules).

[1885] NCIC Dec. 15, 2022 Comments at 5 ("NCIC makes the funds in inactive accounts available indefinitely."); Securus Dec. 15, 2022 Comments at 30 ("[R]efunds are available upon request at any time, whether an account is in active or inactive status."); *see* PPI Dec. 17, 2021 Reply at 30 ("[A]t the insistence of the Iowa Utilities Board, GTL's tariff in that state provides that customers can obtain refunds at any time, even if the account has been classified as 'inactive.'").

[1886] *E.g.*, Letter from Stephen Raher, General Counsel, PPI, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, Exh. 1 at 1, ICS Carrier Prepaid Fund Policies (filed May 6, 2022) (PPI May 6, 2022 *Ex Parte*) (quoting policies of ICSolutions, Prodigy, and Securus which imply that they seize funds after 180 days of inactivity); Pay Tel Dec. 15, 2022 Comments at 11-12 (not having mailing address of the account holder); Pay Tel Mar. 3, 2023 Reply at 7 (asserting that a prepaid card used to fund an account may be inactive or unable to be loaded with new funds when a refund would be due).

**Federal Communications Commission**          **FCC 24-75**

201(b) of the Communications Act.[1887]  We conclude that any action (whether by a provider, a provider's affiliate, or an entity acting on the provider's or the affiliate's behalf) inconsistent with our revised rules for unused IPCS account funds would unreasonably impede our ability to ensure just and reasonable IPCS rates and charges, as required by section 276(b)(1)(A),[1888] and to the extent interstate or international telecommunications services are involved, would constitute an unreasonable practice within the meaning of section 201(b) of the Communications Act.[1889]

### b.    Background

532.    In the *2022 ICS Order*, in response to allegations of abusive provider practices, the Commission adopted interim rules that prohibit providers from seizing or otherwise disposing of funds in inactive inmate calling services accounts until the accounts have been continuously inactive for at least 180 calendar days.[1890]  The record at the time showed how providers would confiscate, for their own use, funds in accounts they deemed "inactive" after a certain period of time, resulting in significant windfalls.[1891]  The Commission was concerned that by taking possession of unused funds in customers' accounts, providers were "depriv[ing] consumers of money that is rightfully theirs."[1892]  Under the interim rules, once the 180-day period has run, providers must make reasonable efforts to refund all funds in the accounts to the account holders and, if those efforts are unsuccessful, treat those funds in accordance with

---

[1887] 47 U.S.C. §§ 201(b), 276(b)(1)(A).

[1888] 47 U.S.C. § 276(b)(1)(A).  We recognize that the *2022 ICS Order* characterized the Commission's interim rules governing unused balances as guarding against "unjust and unreasonable practice[s] within the meaning of section 201(b) of the [Communications] Act."  *2022 ICS Order*, 37 FC Rcd at 11929-30, para. 71.  Because section 201(b) broadly addresses just and reasonable charges and practices for or in connection with interstate and international common carrier services, the Commission had no cause at that time to parse more closely the precise relationship between those rules and ensuring just and reasonable rates and charges for IPCS.  Examining that issue more closely now, we conclude that rules addressing the treatment of unused funds in IPCS accounts bear on the effective rates or charges that IPCS users pay to establish and maintain an account and use IPCS services.  In particular, we find that the risk that an IPCS user will lose funds they contributed to an IPCS account effectively increases the overall cost of IPCS by reducing the IPCS usage they can count on receiving for a given amount of funds in an IPCS account.  We therefore conclude that these regulations—designed to mitigate that risk—appropriately are part of a compensation plan designed to ensure just and reasonable rates and charges for IPCS within the meaning of section 276(b)(1)(A).  47 U.S.C. § 276(b)(1)(A) (directing the Commission to "establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications using their payphone or other calling device, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation").  Notably, no commenter disputes the Commission's legal authority in this regard.

[1889] 47 U.S.C. § 201(b).

[1890] 47 CFR § 64.6130; *2022 ICS Order*, 37 FCC Rcd at 11931-36, paras. 75-80.

[1891] Letter from Stephen Raher, General Counsel, Prison Policy Initiative, to Marlene Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (filed Aug. 31, 2022) (PPI Aug. 31, 2022 *Ex Parte*) (providing data showing that ViaPath's (then GTL's) annual revenues from prepaid account seizures for 2012-2018 were $14 million to $15 million per year), Exh. 1 - Declaration of Ian Ratner, Plaintiff's Notice of Filing of Revised Public Version of the Declaration of Ian Ratner, Exh. B – Declaration of Ian Ratner at 7 (estimating GTL's revenue from inactive accounts from August 2022 through July 2027, without a settlement agreement in *Githieya v. GTL*, No. 1:15-CV-00986-AT (N.D. Ga. filed Apr. 3, 2015), as being at least $84 million); PPI May 6, 2022 *Ex Parte* at 1-2 (alleging that inmate calling services "carriers hold substantial amounts of customer prepaid funds, which carriers are free to use as unrestricted working capital," and that "many carriers impose inactivity policies under which customer funds are forfeited to the carrier after a certain period of account inactivity"); PPI May 6, 2022 *Ex Parte* Exh. 1 at 1, ICS Carrier Prepaid Fund Policies (quoting policies of ICSolutions, Prodigy, and Securus, each of which states that they do not issue refunds, or in other words, that they seize funds after 180 days of inactivity); PPI Dec. 17, 2021 Reply at 29 (noting that the plaintiffs in a 2015 class action, *Githieya v. GTL*, alleged that GTL had "seize[d] customer prepaid funds after 90 days of account inactivity").

[1892] *2022 ICS Order*, 37 FCC Rcd at 11932-33, para. 75; PPI Dec. 17, 2021 Reply at 30.

any controlling judicial or administrative mandate or applicable state law requirements.[1893]  The Commission found, on an interim basis,

> that all funds deposited into any account that can be used to pay for interstate or international inmate calling services remain the property of the account holder unless or until they are either: (a) used to pay for products or services purchased by the account holder or the incarcerated person for whose benefit the account was established; or (b) disposed of in accordance with a controlling judicial or administrative mandate or applicable state law requirements, including, but not limited to, requirements governing unclaimed property.[1894]

533.    In the *2022 ICS Further Notice*, the Commission sought comment on whether the Commission should adopt additional requirements regarding inactive accounts to protect consumers as it adopts final rules.[1895]  Specifically, the Commission sought comment on the length of the time before an account could be deemed inactive, and the actions that would be sufficient to demonstrate activity.[1896]  It also sought comment on other issues, including whether to require providers to issue refunds within a specified period of time once an account has been deemed inactive, whether providers should be required to collect contact information from and provide notice to account holders, and what types of mechanisms providers should use to refund amounts to consumers.[1897]

### c.    Discussion

#### (i)    Consumers' Right to Funds

534.    The Commission's interim inactive account rules provide that "funds deposited into a debit calling or prepaid calling account . . . shall remain the property of the account holder unless or until the funds are" used or disposed of in accordance with our rules, including as required by controlling adjudicatory decisions or state law.[1898]  Building on that general foundation, the permanent rules for inactive accounts we adopt today are designed to safeguard the funds consumers deposit in IPCS accounts, thereby ensuring that the effective costs of IPCS are not unduly increased in a manner that is at odds with our mandate to ensure just and reasonable rates and charges for IPCS.  Our permanent rules also reaffirm the Commission's interim rules that bar IPCS providers from improperly "seiz[ing] or otherwise dispos[ing] of unused funds" in inactive accounts,"[1899] and require providers to undertake "reasonable efforts" to refund unused funds.[1900]

#### (ii)    Scope of the Inactive Account Rules

535.    We now extend our rules to all accounts that can be used to pay an IPCS-related rate or charge, to the extent the provider or its affiliate controls the disposition of the funds in the accounts.  The interim rules for inactive accounts apply to "all funds deposited into a debit calling or prepaid calling

---

[1893] *2022 ICS Order*, 37 FCC Rcd at 11929-30, para. 71; 47 CFR § 64.6130.

[1894] *2022 ICS Order*, 37 FCC Rcd at 11931, para. 75.  The Commission used its authority under section 201(b) of the Communications Act to prohibit unjust and unreasonable practices, explaining that its "actions extend to commingled accounts that can be used to pay for both interstate and international calling services and nonregulated services such as tablets and commissary services."  *2022 ICS Order*, 37 FCC Rcd at 11931, para. 75 & n.209; 47 U.S.C. § 201(b).

[1895] *2022 ICS Notice*, 37 FCC Rcd at 11944-46, paras. 99-109.

[1896] *Id.* at 11944, para. 100.

[1897] *Id*. at 11944-46, paras. 101-106.

[1898] 47 CFR § 64.6130(a).

[1899] *Id.* § 64.6130(b).

[1900] *Id.* § 64.6130(d).

account,"[1901] as those terms are defined in the Commission's rules.[1902]  We now conclude that our permanent rules for the treatment of balances in inactive IPCS accounts apply to any type of account, that can be used to pay for IPCS, to the extent the provider or its affiliate controls the disposition of the funds in the account.[1903]  In other words, we find that our rules are applicable to all IPCS accounts generally to the extent they are controlled by providers or their affiliates.[1904]

536.    Our definition of "IPCS account," and hence the applicability of our inactive accounts rules, extends to all accounts administered by, or directly or indirectly controlled by a provider or an affiliate, that can be used to pay IPCS rates or charges, including accounts where the incarcerated person is the account holder,[1905] regardless of whether those accounts can also be used to pay for nonregulated products or services such as tablets and commissary services.[1906]  Consistent with the Commission's analysis in the *2022 ICS Order*, we conclude that where we have authority under section 201(b) and/or section 276 of the Communications Act to regulate the rates, charges, or practices associated with communications services, our authority extends to the nonregulated portion of a mixed service where it is impossible or impractical to separate the service's regulated and nonregulated components.[1907]

537.    In the *2020 ICS Order on Remand*, the Commission found that ancillary service charges "generally cannot be practically segregated between the interstate and intrastate jurisdiction" except in a

---

[1901] *Id.* § 64.6130(a).

[1902] *Id.* §§ 64.6000(g) ("Debit Calling means a presubscription or comparable service which allows an Inmate, or someone acting on an Inmate's behalf, to fund an account set up through a Provider that can be used to pay for Inmate Calling Services calls originated by the Inmate."), 64.6000(p) ("Prepaid Calling means a presubscription or comparable service in which a Consumer, other than an Inmate, funds an account set up through a Provider of Inmate Calling Services.  Funds from the account can then be used to pay for Inmate Calling Services, including calls that originate with an Inmate.").  While for all practical purposes our rules do not distinguish between debit and prepaid calling accounts, given the prevalence of the use of these terms in the industry, our rules continue to reference these terms in our definition of "IPCS Account."  *Infra* Appendix A, 47 CFR § 64.6000 (definition of "IPCS Account").

[1903] *See* Securus Dec. 15, 2022 Comments at 25-26 (explaining that certain debit accounts "are controlled by the carceral institution"); Securus Mar. 5, 2023 Reply at 41 ("The facility, not Securus, controls the funds, and Securus cannot process refunds for those accounts or require that a facility do so."); ViaPath Mar. 5, 2023 Reply at 10 (noting that "there may be instances in which the ICS provider does not have control over an incarcerated individual's account because the account is administered by the correctional authority or a third-party commissary vendor").

[1904] Our rules do not generally extend to payment mechanisms other than accounts.  To the extent a provider offers only one payment mechanism to pay for IPCS rates and charges at a facility, that payment mechanism is subject to the inactive account requirements even if that mechanism is not an "account."  For example, NCIC asserts that "[s]ome companies sell virtual calling cards with 'no refund' policies."  NCIC Dec. 15, 2022 Comments at 6.  While we do not generally include prepaid calling cards for the payment of IPCS in our definition of an IPCS account, we nonetheless conclude that providers that do not offer consumers an alternative means of paying ongoing charges other than a prepaid calling card are nonetheless subject to the inactive account requirements we impose here.

[1905] *Infra* Appendix A, 47 CFR § 64.6000 (definition of "IPCS Account").  These accounts are used for "debit calling" under our current rules.  *See* 47 CFR § 64.6000(g).

[1906] This treatment is consistent with the Commission's decision, in the *2022 ICS Order*, to extend its interim inactive account rules to commingled accounts that could be used to pay for regulated and nonregulated charges if providers administered or controlled those accounts.  *2022 ICS Order*, 37 FCC Rcd at 11931-32, para. 75 & n.209.

[1907] 47 U.S.C. §§ 201, 276; *2022 ICS Order*, 37 FCC Rcd at 11931-33, para. 75 & n.209; *see also 2020 ICS Order*, 35 FCC Rcd at 8496, para. 31 (citing *Vonage Order*, 19 FCC Rcd at 22413, para. 17).  Because the *2022 ICS Order* was adopted before the enactment of the Martha Wright-Reed Act, the Commission's decision was based on section 201(b) of the Communications Act.  The now-revised section 276 of the Communications Act provides additional authority for our decision here.

limited number of cases where the ancillary service charge clearly applies to an intrastate-only call.[1908] Applying the impossibility exception, the Commission concluded that providers generally may not impose any ancillary service charges other than those specified in the Commission's rules and are generally prohibited from imposing charges in excess of the ancillary service fee caps.[1909]  Similarly, commingled accounts offered by providers contain funds that can be used to pay IPCS rates and charges, over which the Commission has jurisdiction, as well as charges for nonregulated products and services.[1910]  Because we cannot practically segregate the portion of the funds in providers' commingled accounts that may be used to pay IPCS-related rates and charges from the portion that may be used to pay nonregulated charges, we conclude that commingled accounts should be subject to our permanent rules regarding the treatment of unused funds in inactive accounts.[1911]

### (iii)    Inactive Period

538.    We retain the requirement that 180 consecutive calendar days must pass before a provider may initiate the process of determining that an IPCS account has become inactive, except where state law affirmatively sets a shorter alternative period, or the incarcerated person for whom the account was established is released from confinement or transferred to another correctional institution.  In the *2022 ICS Notice*, the Commission invited comment on whether the 180-day timeframe specified in our interim rules is the appropriate time frame before an IPCS provider may deem an account to be inactive and therefore begin the process of making reasonable efforts to refund the funds to the account holder.[1912] Consistent with the position of several commenters,[1913] we find that a 180-day time frame offers account holders an adequate window during which they may exert custody or control before their account is deemed inactive, without imposing unwarranted burdens on providers.  In contrast, the 364-day inactive period proposed by one commenter, or any longer alternative period set by state law, would unnecessarily delay the refund to consumers of unused funds from accounts deemed inactive while imposing increased burdens on providers.[1914]

539.    In the *2022 ICS Notice*, the Commission asked for comment on the release and transfer

---

[1908] *2020 ICS Order on Remand*, 35 FCC Rcd at 8495, para. 28.

[1909] *Id.*

[1910] *See 2022 ICS Order*, 37 FCC Rcd at 11931-33, para. 74 n.209 (citing Letter from Gregory R. Capobianco, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, CG Docket Nos. 10-51 and 03-123, at 3-4 (filed Sept. 23, 2022) (observing that "[t]he Commission has already dispensed with claims that it lacks jurisdiction over certain '[commingled]' services or accounts").

[1911] In the *2020 ICS Order on Remand*, 35 FCC Rcd at 8498, paras. 36-38, the Commission distinguished between automated payments made to fund an account *before* calls are completed and fees are incurred, from automated payments made *after* a call is made and therefore the jurisdiction has been determined.  The funds at issue here are akin to the former situation where the funds cannot be separated by jurisdiction, so the Commission applied the inactive accounts rules to the corresponding automated payment fees.

[1912] *2022 ICS Notice*, 37 FCC Rcd at 11944, para. 100.

[1913] Raher Dec. 15, 2022 Comments at 2, 5; ViaPath Dec. 15, 2022 Comments at 9 (offering to provide text notifications to friends and family when the end of the 180-day inactivity period is approaching); Pay Tel Mar. 3, 2023 Reply at 6-7; *see also* Pay Tel Dec. 15, 2022 Comments at 11 (not opposing the proposed 180-day inactivity period).  *But see* NCIC Dec. 15, 2022 Comments at 5 (proposing a 364-day inactivity period).

[1914] NCIC Dec. 15, 2022 Comments at 5; *see* Pay Tel Mar. 3, 2023 Reply at 7 (explaining that a 364-day inactivity period is too long, particularly in jails where people are incarcerated for shorter periods); Securus Mar. 5, 2023 Reply at 44 ("The Commission should also decline to impose a requirement to keep a dormant account active for up to a year before issuing refunds to customer[s].  This would impose a wasteful burden on the providers and be obviously detrimental to the customers.").

**Federal Communications Commission**                                      **FCC 24-75**

process "to better understand the need for rules addressing those areas."[1915]  Based on the record,[1916] we find that if a provider becomes aware that an incarcerated person has been released or transferred, the 180 days of inactivity will presumptively be deemed to have run, requiring a provider to begin processing a refund in accordance with the requirements we adopt in this Report and Order subject to countervailing direction from the account holder.[1917]  We agree with Securus that in situations where accounts "are not specific to any facility or incarcerated person and may be used for calls from multiple facilities," the account holder "may very reasonably wish to keep funds deposited in their . . . account to continue communicating with other individuals."[1918]  To ensure that the account holder's preference is implemented in situations where the provider becomes aware that an incarcerated person has been released or transferred, we require that the provider contact the account holder prior to closing the account and refunding the remaining balance, to determine whether the account holder wishes to continue using the account, or to close it and obtain a refund from the provider in accordance with our requirements.  If the account holder so requests, the account will be deemed inactive under our rules, and the provider must issue a refund in accordance with our requirements.[1919]

540.    Consistent with the *2022 ICS Order*, our rules do not disturb the ability of account holders to obtain a refund upon request during the 180-day period of inactivity.[1920]  Under no circumstances other than those described above, however, can a provider dispose of the funds in an IPCS account prior to 180 days of continuous inactivity without the account holder's affirmative consent.[1921]  And, once the account holder provides that consent, the provider must refund any remaining funds in accordance with the requirements set forth below.[1922]  Together, these steps will help ensure that account holders are not deprived of funds that are rightfully theirs, thereby effectively saddling account holders with unjust and unreasonable rates.[1923]

541.    The interim rules for inactive accounts required that the inactivity period be continuous and specified the actions by the account holder or the incarcerated person for whom the account had been established that would be sufficient to restart the inactivity period—for example, adding or withdrawing funds from the account, expressing an interest in retaining the account, or otherwise exerting or

---

[1915] *2022 ICS Notice*, 37 FCC Rcd at 11945, para. 103.

[1916] Securus Dec. 15, 2022 Comments at 28-29 ("[T]he Commission should recognize that providers depend on facilities to provide information about the release or transfer of incarcerated persons . . . [and] appropriately recognize the interest that facilities have in administering funds available to incarcerated persons and managing the release process.").

[1917] *See* Public Interest Parties Dec. 15, 2022 Comments at 3; ViaPath Dec. 15, 2022 Comments at 9 (providing refunds upon release of the incarcerated person); Pay Tel Mar. 3, 2023 Reply at 7; Securus Dec. 15, 2022 Comments at 24, 26; Securus Mar. 5, 2023 Reply at 45 (supporting this procedure for debit accounts, but not for friend and family accounts).

[1918] Securus Mar. 5, 2023 Reply at 45.

[1919] *Infra* Appendix A, 47 CFR § 64.6130.

[1920] *2022 ICS Order*, 37 FCC Rcd at 11934, para. 77; *infra* Appendix A, 47 CFR § 64.6130 (inactive accounts).

[1921] *2022 ICS Order*, 37 FCC Rcd at 11933, para. 76.

[1922] *Id.* at 11933, para. 78.

[1923] *See, e.g.*, Letter from Stephen Raher, General Counsel, PPI, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 4-5 (filed Sept. 12, 2022) (supporting steps taken by the Commission to address inmate service providers' treatment of refunds for prepaid accounts); *see also, e.g.*, *Generic Proceeding Considering the Promulgation of Telephone Rules Governing Inmate Phone Services*, Docket No. 15957, Further Order Adopting Revised Inmate Phone Service Rules, at 10, § 3.13 (Ala. Pub. Serv. Comm'n June 12, 2015) (*Alabama Inmate Phone Services Rules Further Order*), https://psc.alabama.gov/wp-content/uploads/2021/12/Dec-2014-Order-15957-updated-thru-6-12-2015.pdf (stating that prepaid balances "remain the property of the account holder").

Federal Communications Commission    FCC 24-75

attempting to exert control over the account.[1924]  In the *2022 ICS Notice*, the Commission invited comment on whether it should refine these rules and, in particular, on whether other actions by the account holder or the incarcerated person should restart the inactivity period.[1925]  We retain the requirement that the inactivity period be continuous, as well as the requirement that the inactivity period restart when the account holder or the incarcerated person for whom the account is maintained: (a) deposits, credits, or otherwise adds funds to the account; (b) withdraws, spends, debits, transfers, or otherwise removes funds from an account; (c) expresses an interest to the IPCS Provider in retaining, receiving, or transferring the funds in an account; or (d) otherwise attempts to exert or exerts ownership or control over the account or the funds held in the account.[1926]

542.    We also clarify that an account holder may use any reasonable means to convey to a provider its interest in retaining, receiving, or transferring funds in an account, including by calling, emailing, or writing to the provider, or by affirmatively responding to a provider inquiry asking whether the account should remain open.[1927]  A means of communication is "reasonable" for this purpose if it is a means of communication between the provider and account holder otherwise used in other situations, or if the service agreement provides for it as an additional means of communication in the specific scenario of such communications.  This will guard against the risk that mere difficulty in communicating with the provider would result in an account qualifying as inactive under our rules, triggering the need for the account holder to go back through the steps of (re)establishing an account and risking the inability to engage in IPCS communications in the meantime.  At the same time, it only holds the provider accountable for using the means of communications with the account holder that they otherwise are using already, along with any additional means specified for these purposes in their service agreement.

543.    In addition, the record makes clear that providers often lack the information they will need to complete the refund process.[1928]  To eliminate this potential roadblock, we urge providers to allow the account holder to specify an individual to which a refund should go to the extent the provider's existing systems can accommodate such a change.[1929]  In the Further Notice, we invite comment on whether we should require that all providers follow this "best practice."[1930]

### (iv)    Required Refunds

544.    We now adopt permanent rules that reaffirm the requirement that, once an IPCS account is deemed inactive, providers must take proactive steps to issue a refund to the account holder in accordance with the requirements set forth below.  The record makes clear that both a refund mandate and rules implementing that mandate are needed to keep providers from continuing to retain the funds in inactive accounts and appropriating them to their own uses, which increases the effective cost of IPCS to consumers contrary to our statutory mandate to adopt a compensation plan for IPCS that ensures just and

---

[1925] *2022 ICS Notice*, 37 FCC Rcd at 11944, para. 100.

[1926] *See infra* Appendix A, 47 CFR § 64.6130.

[1927] Securus Dec. 15, 2022 Comments at 30; Securus Mar. 5, 2023 Reply at 38.

[1928] Pay Tel Dec. 15, 2022 Comments at 11-12; Securus Dec. 15, 2022 Comments at 25 ("Securus generally does not have individual contact information for incarcerated persons that would enable . . . methods of delivering a refund" other than via the facility or a Western Union process.); ViaPath Mar. 5, 2023 Reply at 11-12 ("ViaPath may not have a valid mailing address for a friend/family member, and ViaPath does not always have cellular telephone numbers or email addresses for account holders.").

[1929] *See* Securus June 11, 2024 *Ex Parte* at 28-29 (describing the changes Securus would need to make to fully operationalize allowing account holders to designate third parties to receive refunds).

[1930] *Id.* at 29-30 (suggesting that we seek comment on this matter); *see infra* Section V.E (Treatment of Unused Balances in IPCS Accounts).

reasonable rates and charges.[1931]  The requirement to initiate a refund for inactive accounts is consistent with and in addition to the underlying obligation of providers to refund accounts generally upon request by an account holder.

545.     Both the refund mandate and our implementing rules will apply to all accounts within our definition of "IPCS account."[1932]  We find unavailing Securus's argument that we should not require refunds from accounts held by incarcerated people because the funds in them are not considered abandoned while the account holder remains incarcerated and "are routinely refunded upon transfer or release."[1933]  We commend correctional institutions and certain providers for having procedures in place to ensure that all funds in an IPCS account are refunded once an incarcerated person is released or transferred.[1934]  And, as Securus recognizes, providers typically rely on correctional institutions to advise them when an incarcerated person is released or transferred.[1935]  Since correctional institutions do not always share that information with providers,[1936] Securus's argument underscores the need for providers to take proactive steps to ensure that account holders are aware that refunds are available once their accounts are deemed inactive.[1937]  As we do in circumstances where a provider becomes aware that an incarcerated person has been transferred or released, we similarly require that when a refund otherwise becomes due under our rules at the expiration of the 180-day inactivity period, the provider must contact the account holder prior to closing the account and refunding the remaining balance, to determine whether the account holder wishes to continue using the account, or to close it and obtain a refund from the provider in accordance with our requirements.

546.     We disagree with certain commenters' assertions that we should not require refunds from accounts that "are never deemed inactive" or "never expire."[1938]  While such accounts in theory preserve the value of consumers' deposits, the longevity of these accounts is of no practical use to account holders if they are not aware that refunds are available.  And even in situations where account holders are aware of the availability of refunds, the rules we adopt today ensure that they have a mechanism enabling them

---

[1931] Worth Rises Comments, WC Docket No. 12-375, at 5 & n.9 (rec. Dec. 15, 2022); Public Interest Parties Dec. 15, 2022 Comments at 3 (explaining that rules relating to inactive accounts are "necessary to protect consumers"); Leadership Conference June 17, 2024 *Ex Parte* at 4 (asking that the Commission make sure consumers are able to recover funds in inactive accounts); *see 2022 ICS Order*, 37 FCC Rcd at 11930-31, para. 74 & n.208 ("The record . . . establishes that, collectively, the amounts [of unused funds] can represent a significant windfall to the providers, which have strong incentives to retain these funds for themselves.") (citing Prison Policy Initiative Comments, WC Docket No. 12-375, at 15-16 & n.27 (rec. Nov. 4, 2021) (PPI Nov. 4, 2021 Comments) (noting that ViaPath's 2019 and Securus's 2018 balance sheets reported tens of millions of dollars of deferred revenue, customer advances and unearned revenue which PPI asserted reflected customer prepayments)).  *See* Letter from Stephen Raher, General Counsel, PPI, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 2 (filed Aug. 31, 2022) ("For the entire period from April 2011 through August 2019, GTL's *monthly* revenue from account seizures averaged $1.2 million.").

[1932] *Infra* Appendix A, 47 CFR § 64.6000 (definition of "IPCS Account").

[1933] Securus Dec. 15, 2022 Comments at 24; Securus Mar. 5, 2023 Reply at 40-41.

[1934] *Id*. at 24-29 (proving a refund for an account held by an incarcerated person when Securus is notified that the incarcerated person has been released or transferred); ViaPath Dec. 15, 2022 Comments at 9 (explaining that it issues refunds for debit accounts upon release of the incarcerated person); Pay Tel Dec. 15, 2022 Comments at 11-12 (explaining that it provides information about requesting a refund upon release of the incarcerated person).

[1935] Securus Dec. 15, 2022 Comments at 26.

[1936] *See* Securus Dec. 15, 2022 Comments at 28-29.

[1937] *See* Public Interest Parties Mar. 3, 2023 Reply at 7-8 (suggesting consumer disclosures).

[1938] ViaPath Mar. 5, 2023 Reply at 10 (accounts held by incarcerated people "are never deemed inactive"); Securus Dec. 15, 2022 Comments at 24, 26-27 (accounts held by incarcerated people "never expire").

to have the amounts in those accounts returned to them.[1939]  Thus, regardless of how providers may characterize IPCS accounts, under the rules we make permanent today, an account that can be used to pay for IPCS rates and charges becomes inactive after 180 consecutive calendar days unless certain conditions are met.[1940]

547.    We conclude that, for purposes of the Commission's inactive account rules, regardless of whether an account remains open in perpetuity, the provider must take proactive steps to refund the entire balance of the account once it is deemed inactive within the meaning of our rules.  The amount refunded must include the entire balance of the account, and, consistent with our elimination of ancillary service charges generally, the provider shall not impose fees or charges in order to process the refund.[1941]  Additionally, in calculating the refund balance, the record supports requiring that the provider include in the refund any deductions it may have made in anticipation of taxes or other charges that it assessed when funds were deposited and that were not actually incurred.[1942]  This will prevent providers from profiting from practices such as assessing taxes or fees upfront on deposited funds, rather than at the time of the account holder's actual payment for service.

### (a)    Timing of Refunds

548.    In the *2022 ICS Notice*, the Commission invited comment on whether it should adopt a time frame for refunds to be issued and the length of time needed to process refunds.[1943]  The Commission also asked for comment on reasonable time frames to issue refunds in response to requests for refunds received before an account became inactive, and how much time was needed to process such requests.[1944]  Based on the record, we find that, as part of providers' duty to make reasonable efforts to refund balances in accounts deemed inactive, refunds must be issued within 30 calendar days of an account being deemed inactive or within 30 calendar days of a request from an account holder.[1945]  While one commenter urges us to leave this time period open ended,[1946] because we now require that refunds be issued automatically once an account becomes inactive and the provider has contacted the account holder to determine whether the account holder prefers to keep the account active or receive a refund in accordance with our rules, it is

---

[1939] *Cf. 2022 ICS Order*, 37 FCC Rcd at 11931, para. 75 (finding that "all funds deposited into any account that can be used to pay for interstate or international inmate calling services remain the property of the account holder").

[1940] *Supra* Section III.G.2.c.iii (Inactive Period).

[1941] *Supra* Section III.D.8 (Ancillary Service Charges).

[1942] NCIC Dec. 15, 2022 Comments at 8 ("The FCC also should train its discerning eyes on the practice of ICS providers front loading taxes on the amount deposited instead of taxing actual usage."); Raher Mar. 3, 2023 Reply at 11 (supporting NCIC and explaining that "[t]his practice clearly violates the Commission's existing rules and the Communication Act's prohibition on unreasonable practices"); NCIC July 15, 2022 *Ex Parte* at 7 ("[T]axes are imposed on ICS consumers *prior to* the inmate making a call; thus, without knowing whether the call will be interstate or intrastate.  NCIC believes that taxes on ICS calling should be calculated and applied at the time of the actual call, rather than at the time of the deposit . . . ICS providers cannot accurately calculate taxes at the time of the deposit.  This practice of collecting the anticipated taxes at the time of the deposit (rather than based upon each call), results in certain ICS providers 'over-collecting' taxes, because they are only obligated to remit taxes to the appropriate government entity for the amount of the actual funds used to place calls.").  NCIC explains that "when making a $50 deposit with ICSolutions, an interstate ICS consumer is charged more than $20 in taxes. . . .  A similar result occurs when making a deposit with City Tele-Coin."  NCIC July 15, 2022 *Ex Parte* at 7-8.

[1943] *2022 ICS Notice*, 37 FCC Rcd at 11944, para. 101.

[1944] *Id.*

[1945] We find suggestions in the record that requests for refunds should be issued within five to seven business days to likely be too short a time period for providers to process refunds.  Public Interest Parties Dec. 15, 2022 Comments at 2, 6; Raher Dec. 15, 2022 Comments at 2.  We therefore find it reasonable instead to allow 30 days for the completion of the refund process.

[1946] Securus Mar. 5, 2023 Reply at 44-45.

reasonable to expect that refund issuances will be completed within 30 calendar days. Likewise, we find that our new requirements that providers gather contact information and the means of issuing refunds when an account is opened will streamline the refund process such that a longer, or indeterminate, time period is not reasonable. We note that a provider's duty to conduct a timely refund process is not contingent on an affirmative request by the account holder for a refund. The provider must make reasonable efforts in the prescribed timeframe, as described below, to give account holders a reasonable opportunity to receive the refund or affirmatively request that the account be deemed active.

549.    Our rules require that "[a]fter 180 days of continuous account inactivity have passed, or at the end of any alternative period set by state law, the provider must make reasonable efforts to refund the balance in the account to the account holder.[1947] In response to several commenters' suggestions,[1948] we take the opportunity to clarify that "reasonable efforts" include, but are not limited to: (a) notification to the account holder that the account has been deemed inactive; (b) the collection of contact information needed to process the refund; and (c) timely responses to account holders' inquiries regarding the refund process.[1949]

550.    We agree with commenters that account balances should be automatically refunded once accounts have been deemed inactive.[1950] We find that requiring the account holder to affirmatively request a refund is inconsistent with the fact that the funds in the account are the account holder's property.[1951] As the Commission has recognized, providers "have strong incentives to retain these funds for themselves."[1952] Given these incentives, we find it appropriate to require providers to initiate and follow through on the refund process, including refunding all remaining money, once an account becomes inactive.[1953]

551.    We reject certain providers' suggestions that it is "impossible" or overly burdensome for providers to make automatic refunds.[1954] These arguments are based on assertions that some providers presently lack the information needed to generate automatic refunds or have not yet established procedures to process automatic refunds.[1955] Those arguments are unavailing. We strongly disagree that

---

[1947] 47 CFR § 64.6130(d).

[1948] Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 2; Raher Dec. 15, 2022 Comments at 3; Securus Dec. 15, 2022 Comments at 29; Raher Mar. 3, 2023 Reply at 5-6.

[1949] It is self-evident that taking no steps to effectuate refunds is not reasonable.

[1950] Securus Mar. 5, 2023 Reply at 36-37; *see* Raher Dec. 15, 2022 Comments at 3; Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 5.

[1951] *See* Public Interest Parties Dec. 15, 2022 Comments at 3-4 ("Once an inactive account is discovered, however, the consumer must affirmatively request that the account be reactivated, and the funds reinstated, or must jump through hoops to secure refunds of unused balances."); Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 2 ("[R]equiring the account holders to request the refund shifts the burden to the account holder, who may not know that they have an unused balance or the amount of the balance.").

[1952] *2022 ICS Order*, 37 FCC Rcd at 11931, para. 74; Public Interest Parties Dec. 15, 2022 Comments at 5 (noting that "providers have a financial incentive to retain unused account balances and therefore to make it difficult for account holders to request refunds"); DOJ Apr. 29, 2024 *Ex Parte* at 4 (asserting that "IPCS markets are characterized by . . . abusive provider practices such as the seizure of unused funds in incarcerated people's accounts without notice or refunds").

[1953] *See* Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 4; Public Interest Parties Dec. 15, 2022 Comments at 6; Public Interest Parties Mar. 3, 2023 Reply at 7-8; Securus Mar. 5, 2023 Reply at 36 (explaining that Securus has already implemented automatic refunds for prepaid accounts that have been inactive for 180 days).

[1954] ViaPath Mar. 5, 2023 Reply at 10-11; Securus Dec. 15, 2022 Comments at 27; Securus Mar. 5, 2023 Reply at 36. We are also unpersuaded by the notion that inactive accounts should not be automatically refunded due to the idea that providers "have no reason to track account activity." Securus Dec. 15, 2022 Comments at 27.

[1955] ViaPath Mar. 5, 2023 Reply at 10-11; Securus Mar. 5, 2023 Reply at 38-40.

"mandating routine inactivity refunds rather than refunds upon release or transfer will impose costs and burdens that far outweigh any demonstrated benefit."[1956] The record of the abuses by providers retaining account holders' funds for their own use is extensive.[1957] Retention of those funds has functioned as an additional charge on consumers that, if continued, would undermine our efforts to establish a compensation plan that ensures just and reasonable IPCS rates and charges for consumers. While the benefits of automatic refunds may seem slight to some providers, the record makes clear the importance consumers place on receiving this money.[1958] In contrast to that substantial evidence of the benefits of such a requirement, providers have failed to adequately quantify the claimed burdens of compliance, let alone demonstrate outright impossibility of complying. To the extent that providers already issue refunds upon release or transfer, nothing in our rules prevents this practice from continuing and we support any efforts taken by providers to ensure refunds are promptly issued.[1959] Indeed, the fact that providers have demonstrated the ability to promptly issue refunds based on certain triggering events—such as release or transfer—gives us confidence that it will be reasonably feasible for them to establish the processes (if not already in place) in order to promptly issue refunds based on the triggering event of an account's inactivity under our rules. We thus require providers to collect whatever information and establish any procedures they will need to process refunds expeditiously as required by our new rules.

552. We do, however, acknowledge commenters' concerns regarding the administrative burden of providing automatic refunds for inactive account balances that are below the cost of issuing the refund.[1960] As Securus explains, "[i]ssuing refunds on small account balances will result in the ICS provider incurring costs to administer those funds exceeding the value of the amount refunded."[1961] The

---

[1956] Securus Dec. 15, 2022 Comments at 27.

[1957] Raher Mar. 3, 2023 Reply at 2; Public Interest Parties Dec. 15, 2022 Comments at 2-3; Public Interest Parties Mar. 3, 2023 Reply at 2; PPI Aug. 31, 2022 *Ex Parte* Exh. 1 - Declaration of Ian Ratner, Plaintiff's Notice of Filing of Revised Public Version of the Declaration of Ian Ratner, Exh. B – Declaration of Ian Ratner at 7; PPI May 6, 2022 *Ex Parte* Exh. 1 at 1; *see also* PPI Dec. 17, 2021 Reply at 29 (noting that the plaintiffs in a 2014 class action, *Githieya v. GTL*, alleged that GTL had "seize[d] customer prepaid funds after 90 days of account inactivity"); PPI May 6, 2022 *Ex Parte* at 1-2; PPI Aug. 31, 2022 *Ex Parte* at 2; *2014 ICS Notice*, 29 FCC Rcd at 13206, para. 89 (observing that, at that time, if a GTL "account remain[ed] inactive for 180 days, the remaining funds [became] the property of GTL"); Drew Kukorowski, Peter Wagner, & Leah Sakala, *PPI, Please Deposit All of Your Money* (May 8, 2013), https://www.prisonpolicy.org/phones/pleasedeposit.html#sec5 (addressing providers' practice of seizing funds from inactive accounts, as evidenced by specific information from several providers' policies, terms, and conditions related to their prepaid accounts); *GTL Class Action Complaint* at 2, 8 (civil class action suit concerning GTL's collection of funds from prepaid account holders once a prepaid account was inactive for 90 days).

[1958] *See* PPI Nov. 4, 2021 Comments at 15-16 & n.27 (identifying the funds at issue as a material balance sheet item and noting GTL's 2019 and Securus's 2018 balance sheets, where the respective providers report tens of millions of unearned or deferred income from such sources); Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 3 (filed Sept. 21, 2022) (recognizing that the publicly released draft Order would result in a "substantial increase in the number of refunds" to inmate calling services account holders); *GTL Class Action Complaint* at 19-20 (seeking disgorgement and damages from GTL for seizing the customers' funds); Charleston Listening Session at 62:7-9 (Jada Cochran, formerly incarcerated, explaining that her "daughter put money on the phone, and then she got a new phone, and they never have refunded her money").

[1959] Securus Dec. 15, 2022 Comments at 26 & n.29; Securus Mar. 5, 2023 Reply at 41-42 (refunds of debit account balances triggered by the release or transfer of the account holder); ViaPath Dec. 15, 2022 Comments at 9.

[1960] Securus Mar. 5, 2023 Reply at 38 ("Setting the threshold for automated refunds appropriately balances the cost of administering the refund with the benefit to the account holder of receiving a refund of a *de minimis* amount."), 43; Pay Tel Dec. 15, 2022 Comments at 11; ("Pay Tel would like to highlight the fact that a significant number of remaining balances on inactive accounts are *de minimis*, often totaling less than $1. In that context, the amount of administrative time and resources required to proactively process refunds to each of these accounts would be significant to the point of being excessive.")

[1961] Securus Mar. 5, 2023 Reply at 38.

**Federal Communications Commission**  FCC 24-75

record contains relatively little quantitative data regarding the point at which issuing a refund would cost more than the balance in the account. Pay Tel suggests that an account balance of $1.00 might be a sufficient cutoff point,[1962] while Securus suggests that the Commission adopt a $1.50 *de minimis* threshold.[1963] Additionally, the record suggests that there may be circumstances in which providers might effectuate refunds through third parties such as Western Union and that "those third parties will charge for their role in issuing refunds."[1964] Given these choices, we adopt the more conservative of the two options provided to us in the record and therefore do not require automatic refunds where the balance in an inactive account is $1.50 or less. This *de minimis* threshold applies in the absence of "a consumer's specific request" for a refund.[1965] Thus, if an account holder requests a refund, providers must comply with such a request regardless of the amount of money remaining in the account. And, consistent with our rules, to the extent providers are unable to issue a refund, the provider shall treat such balances consistent with appliable state law, including applicable state unclaimed property law.[1966]

**(b)      Refund Mechanisms**

553.     The record suggests that there are a variety of methods available to providers to refund the balances in inactive accounts.[1967] Rather than prescribe a specific mechanism, we suggest several options which providers may offer to account holders that are supported by the record.[1968] As a general matter, Securus asserts that it "will tailor its refund method to the method used by the account holder to fund the account," which suggests that providers are able to offer different refund mechanisms.[1969] Indeed, Securus indicates that if an account is funded via a payment card, it will "initiate a refund using the payment card information on file."[1970] For accounts funded using a check or money order, Securus indicates that it "will issue a paper check that will be sent via postal mail using the address information on file."[1971] Other commenters similarly suggest that "[r]efunds should be issued either to the account holder's original form of payment or to a credit or debit card provided by the account holder at the time of the request" or through an electronic fund transfer to a bank account.[1972] Given record evidence of the availability of a variety of refund mechanisms, we find that providers must issue refunds in the original form of payment, an electronic transfer to a bank account, a check, or a debit card. We find that offering multiple refund mechanisms will ensure that barriers created by certain methods are avoided.[1973] While

---

[1962] Pay Tel Dec. 15, 2022 Comments at 11; *see also Alabama Inmate Phone Services Rules Further Order* at 10, § 3.13 (giving providers the option of foregoing the refund for an amount less than $1.00, and requiring such unrefunded amounts to be submitted to the state treasurer).

[1963] Securus Mar. 5, 2023 Reply at 43 ("In the context of refunds, Securus recommends that the Commission adopt a $1.50 *de minimis* threshold to issue a refund without a consumer's specific request.")

[1964] *Id.* at 37.

[1965] *Id.* at 38.

[1966] *Infra* III.G.2.c.vi (Controlling Judicial or Administrative Mandate).

[1967] Securus Mar. 5, 2023 Reply at 36; Pay Tel Dec. 15, 2022 Comments at 11-12 (explaining its use of a prepaid calling card system which facilitates refunds).

[1968] *See* Raher Dec. 15, 2022 Comments at 2 (suggesting check, electronic funds transfer to a bank account or "credit to the payment card that funded the prepaid account"); Public Interest Parties Dec. 15, 2022 Comments at 6 (suggesting several options); Securus Mar. 5, 2023 Reply at 36-37 (discussing a variety of options).

[1969] Securus Mar. 5, 2023 Reply at 36.

[1970] *Id.*

[1971] *Id.* at 37.

[1972] Public Interest Parties Dec. 15, 2022 Comments at 6; Raher Dec. 15, 2022 Comments at 2.

[1973] Securus Mar. 5, 2023 Reply at 41 ("[A]s a practical matter, an incarcerated person cannot cash a refund check, likely has no credit card, and usually has no electronic banking account."); Pay Tel Mar. 3, 2023 Reply at 7

(continued….)

**Federal Communications Commission**                    **FCC 24-75**

providers appear to use refund mechanisms that offer similar optionality to consumers,[1974] we emphasize that any refund mechanism that requires that an account holder affirmatively request a refund after the account has been inactive for 180 days would violate our rules.[1975]  Such requirements may be appropriate when an account holder seeks a refund while an account is active, but cannot be a barrier to receiving a refund once an account is deemed inactive.[1976]

### (v)    Required Notices

554.    We conclude that additional requirements are needed to ensure that account holders maintain control over IPCS accounts and receive refunds in a timely manner.[1977]  As discussed above, we impose certain disclosure requirements on providers, including requiring the posting of their terms and conditions of service on their publicly available websites, the posting of their obligation to refund unused balances upon request, and other more detailed disclosure requirements related to their inactive account balance procedures.[1978]  We now also require providers to provide account holders, through their billing statements and statements of account, notice of the status of IPCS accounts prior to their being deemed inactive.[1979]  This notice shall initially be provided at least 60 days prior to an account being deemed inactive.[1980]  It shall be included in each billing statement, or statement of account, the provider sends, or makes available to, the account holder until either some action by the account holder results in the inactivity period being restarted or the account is deemed inactive.[1981]  This notice must describe how the account holder can keep the account active, as well as how the account holder may update the refund

---

("[M]any customers choose to fund calling accounts with a prepaid card that is either inactive or unable to be loaded with new funds at the time at which a refund is due, making it impossible to simply automatically refund the original payment method that was used.").

[1974] Securus Mar. 5, 2023 Reply at 36-37; Pay Tel Dec. 15, 2022 Comments at 12 ("Pay Tel has found success through using a prepaid calling card system, which allows for the card to be exchanged for a refund of remaining account funds upon request at any time.").

[1975] *See* Pay Tel Dec. 15, 2022 Comments at 12.

[1976] *See id.* ("Pay Tel does not oppose providing refunds of inactive account balances to individuals at any point; however, it believes that its prepaid card system strikes an appropriate balance between providing service to the consumer and allocating vendor resources.").

[1977] Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 5 (calling on the Commission to take action against "half-hearted attempts to reach account holders to return unused account balances").

[1978] *Supra* Section III.G.1 (Consumer Disclosure Rules).

[1979] *See* Securus Dec. 15, 2022 Comments at 29 (suggesting notice be provided through a "reasonable frequency of periodic communications"); Securus Mar. 5, 2023 Reply at 36 ("Securus will alert [prepaid] account holders by email after 60 and 90 days of inactivity, notifying them that their account is available for use or refund.  Securus will also notify account holders upon 180 days of account inactivity that the account is being closed and any remaining balance will be refunded."); Public Interest Parties Dec. 15, 2022 Comments at 2 (requesting the Commission to require "providers to notify consumers if their accounts are at risk of being deemed inactive").

[1980] Pay Tel Mar. 3, 2023 Reply at 7 (explaining that it gives notice to consumers when their accounts have been inactive for 90 days); ViaPath Dec. 15, 2022 Comments at 9 (explaining that it provides notice after 150 days of inactivity); Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 4 (proposing that notice be given after 30, 60, 90, and 120 days of inactivity); Securus Mar. 5, 2023 Reply at 36 (explaining that it gives notice after 60 and 90 days of inactivity).  *But see* Securus Mar. 5, 2023 Reply at 44-45 (suggesting that the Commission leave notice requirements to the providers' discretion); ViaPath Dec. 15, 2022 Comments at 9 (proposing that providers establish their own notice and refund procedures).

[1981] *See* Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 4 (suggesting that with each attempt at contact with the customer, the provider should provide the unused balance amount); Securus Mar. 5, 2023 Reply at 36 (Securus's existing notices to account holders).  We agree with ViaPath that notices should be provided to the account holder only.  ViaPath Dec. 15, 2022 Comments at 9 n.27.

information associated with the account.[1982]  We emphasize that providers may supplement their compliance with these requirements with any additional measures they deem appropriate to keep account holders informed of the status of their accounts and how to update their account information.[1983]

#### (vi)    Controlling Judicial or Administrative Mandate

555.    We also adopt an exception to our permanent rules regarding the disposition of funds in inactive accounts that allows a provider to dispose of funds in inactive accounts in compliance with a controlling judicial or administrative mandate.  Our interim rules included an identical exception, which the Commission proposed to retain in the *2022 ICS Notice*,[1984] and was supported in the record.[1985]  We also update the definition of "controlling judicial or administrative mandate" from the interim rules[1986] to make clear that this exception to our rules regarding the disposition of funds in inactive accounts applies to all incarcerated people's communications services now subject to our authority.[1987]  This revised definition encompasses any final court order that requires an incarcerated person to pay restitution, any fine imposed as part of a criminal sentence, and any fee imposed in connection with a criminal conviction to the extent that these payments are required to be made from an account that could be used to pay IPCS rates or charges.  The revised definition also includes applicable state law requirements, including, but not limited to, requirements concerning unclaimed property in such accounts.[1988]  Finally, the definition excludes from the scope of our final rules acts taken pursuant to a final court or administrative agency order adjudicating a valid contract between an IPCS provider and an IPCS account holder, entered into prior to the release date of this Report and Order, that allows or requires the provider to act in a manner that would otherwise violate our rules regarding the disposition of funds in inactive accounts.

556.    In the *2022 ICS Notice*, we invited comment on "the ultimate disposition of unclaimed funds in a debit calling or prepaid calling account in circumstances where a provider's refund efforts fail and state law does not affirmatively require any particular disposition."[1989]  We conclude that the provider's inability to refund money remaining in an inactive account does not alter the account holder's entitlement to use their or ultimately have them refunded as a matter of our rules.  Consequently, the account holder's preexisting entitlement to those funds would be altered only where controlling judicial or administrative mandate or state law affirmatively requires otherwise.  Therefore, as advocated by some commenters, we find that if reasonable efforts by providers to refund the funds in inactive accounts fail,

---

[1982] *See* Public Interest Parties Dec. 15, 2022 Comments at 4-5 (observing that customers were not informed by GTL or Securus of procedures required to obtain refunds when New York facilities switched from GTL to Securus in 2017), 3-4 (explaining that consumers often discover that their accounts are inactive "at the moment that they are unable to answer a call from an incarcerated loved one" because providers regularly fail to inform account holders that their accounts have become inactive and how to request a refund).

[1983] Securus Mar. 5, 2023 Reply at 37 ("Securus will support its automatic refund process with email communications to account holders, disclosures on its website, updates to its Frequently Asked Questions, training for its customer support personnel, and updates to its terms and conditions.  The goal of these disclosures will be that account holders understand their options and are able to easily receive any desired refunds."); ViaPath Dec. 15, 2022 Comments at 9; ViaPath Mar. 5, 2023 Reply at 12; Pay Tel Dec. 15, 2022 Comments at 12 (explaining the uses of tablets and postcards).

[1984] *2022 ICS Order*, 37 FCC Rcd at 11933, para. 76; *2022 ICS Notice*, 37 FCC Rcd at 11946, para. 107.

[1985] ViaPath Dec. 15, 2022 Comments at 9 (agreeing that the Commission should retain the controlling judicial or administrative mandate exception to the inactive account rules).

[1986] 47 CFR § 64.6000(y).

[1987] *Infra* Appendix A, 47 CFR § 64.6000.

[1988] *See 2022 ICS Order*, 37 FCC Rcd at 11933-34, para. 76.

[1989] *Id.* at 11946, para. 109.

the "provider should be required to treat remaining funds consistent with applicable state law,"[1990] including applicable state unclaimed property laws.  While some commenters urge us to adopt specific unclaimed property requirements to be applied at the state level,[1991] we find compliance with state law to be presumptively reasonable.[1992]

### H.    Other Matters

#### 1.    Rule Revisions

557.    In this Report and Order, we revise our rules pursuant to the direction of the Martha Wright-Reed Act.[1993]  In particular, we amend our rules to make consistent use of the terms "incarcerated people's communications services," "IPCS," and "incarcerated people," as opposed to "inmate calling services," "ICS," and "inmates," terms previously used in this proceeding.  In the *2023 IPCS Notice*, the Commission proposed to revise its rules to use the term "incarcerated people's communications services" or "IPCS" instead of "inmate calling services" or "ICS" to refer to "the broader range of communications services subject to the Commission's jurisdiction as a result of the [Martha Wright-Reed] Act."[1994]  The Commission also proposed to "change[] references to 'inmates' to 'incarcerated people,'" as public interest advocates urge.[1995]  Nearly all commenters addressing the subject support these revisions.[1996]  Indeed, several commenters use the term "IPCS" in place of "ICS" in their comments, following the Commission's proposed approach.[1997]  Additionally, we note that these changes are consistent with and

---

[1990] Public Interest Parties Dec. 15, 2022 Comments at 6; Raher Dec. 15, 2022 Comments at 3 ("If a refund cannot be accomplished, the timing and process for revise its rules the inactive funds should be governed by applicable state law."); Securus Dec. 15, 2022 Comments at 33 ("[W]hen providers administer unspent account balances that have not been refunded despite reasonable efforts to do so, any further steps that comply with state law should be presumptively reasonable."); *see* ViaPath Dec. 15, 2022 Comments at 9-10 (supporting reliance on state unclaimed property laws for failed refund efforts).

[1991] Raher Dec. 15, 2022 Comments at 3-4; Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 3.

[1992] Securus Dec. 15, 2022 Comments at 33.  We note, however, concerns raised in the record that providers will forum shop for favorable unclaimed property laws outside of the location where the account holder resides. Minnesota Dept. of Commerce Dec. 15, 2022 Comments at 3.  We find instead that providers will be subject to the standards the courts have articulated for resolving choice-of-law questions generally and rely on courts to address abuse by providers regarding choice-of-law matters.  *See, e.g.*, *Delaware v. New York*, 507 U.S. 490, 498-500 (1993); *Texas v. New Jersey*, 379 U.S. 674, 680-82 (1965).

[1993] Martha Wright-Reed Act § 3(a).

[1994] *2023 IPCS Notice*, 38 FCC Rcd at 2700, para. 80 (citing the Act's "expansion of the Commission's authority beyond calling services to include all audio and video communications services used by incarcerated people"); *see id.* at 2674 n.37.

[1995] *Id.* at 2700, para. 80 (citing comments from the United Church of Christ "explaining that '[m]any incarcerated people and advocates view the term "inmate" as dehumanizing and disparaging'").

[1996] *See, e.g.*, Public Interest Parties May 8, 2023 Comments at 30 ("The Public Interest Parties support the Commission's proposal to revise its rules to refer to 'incarcerated people' instead of 'inmates,' and to more broadly use the terms 'incarcerated people's communications services' and 'IPCS' instead of 'inmate calling services' and 'ICS.'"); Securus May 8, 2023 Comments at 5 ("Securus appreciates the rationale behind the change in terminology from 'inmate' to 'incarcerated people.'"); Worth Rises May 8, 2023 Comments at 13 ("The Commission should codify the adoption of IPCS and person-centric terminology in reference to incarcerated people."); *see also* ViaPath May 8, 2023 Comments at 1 n.2 ("Consistent with the Commission's approach, ViaPath uses IPCS herein, but continues to use the term inmate calling service or 'ICS' when referring to historic Commission actions or current Commission rules."); Wood Aug. 21, 2023 Report at 3 n.6 ("I have updated the Commission's references in the cited text from Inmate Calling Services or ICS to the current term Incarcerated People's Communications Services, or IPCS.").

[1997] *See* ViaPath May 8, 2023 Comments at 1 n.2; Wood Aug. 21, 2023 Report at 3 n.6; *see generally* Public Interest Parties May 8, 2023 Comments; Pay Tel July 12, 2023 Reply.

advance the Commission's goal of digital equity for all.

558.    Securus argues that the "the replacement of 'calling services' with the broader, and [in Securus's view] somewhat ambiguous term 'communications services'" may "engender confusion."[1998] Securus's concern appears to focus on "retaining the distinction" between audio communications and video communications, "to avoid any suggestion that they may be subject to the same regulatory framework when in fact they are quite different services."[1999]  We are not convinced that incorporating the term "incarcerated people's communications services" into our rules would have this effect.  First, the Act explicitly contemplates a unified regulatory framework for these services by granting the Commission authority over "any audio or video communications service used by inmates."[2000]  The language of section 276, as modified by the Act, also refers to these types of services collectively.[2001]  Second, these respective services share, to a substantial extent, similar operating conditions as well as being commonly subject to critical aspects of our regulatory framework (consistent with the Act), which warrants the use of a single term that encompasses all services under our jurisdiction.  To the extent that the treatment of these two types of services differ under our regulatory framework, this distinction is effectively encapsulated by our use of the terms "audio IPCS" and "video IPCS."[2002]  Accordingly, we revise our rules to change all references to "inmate calling services" or "ICS" to instead refer to "incarcerated people's communications services" or "IPCS," respectively, and to change all references to "inmates" to "incarcerated people."[2003]  We encourage commenters and other participants in this proceeding to adopt these changes in their submissions going forward.

559.    We also revise our rules to incorporate terms used in the Martha Wright-Reed Act and to implement our actions in this Order.  These revisions include changes to certain definitions in section 64.6000 of our rules, and reflect the extension of the application of our rules to intrastate IPCS, the addition of new rules addressing alternate pricing plans, and changes to our disability access, rate cap, ancillary service charge, annual report and certification, inactive account, and consumer rules.[2004]

##    2.    Definitions of Prison and Jail

560.    In the *2022 ICS Notice*, the Commission sought comment on modifying the definitions of "Jail" and "Prison" in its rules "to ensure that they capture the full universe of confinement facilities"

---

[1998] Securus May 8, 2023 Comments at 5.

[1999] *Id.* at 6.  Securus therefore suggests that we adopt the terms "incarcerated calling services" and "incarcerated video services" to refer to these respective types of communications services.  *Id.* at 5-6.

[2000] *See* Martha Wright-Reed Act § 2(b)(3) (granting the Commission authority over "any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used").

[2001] *See* 47 USC §§ 276(b)(1)(A) (referring to communications using a "payphone or other calling device"), 276(d) (defining "payphone service" as including  "the provision of inmate telephone service and advanced communications services in correctional institutions").

[2002] *See, e.g.*, Appendix A, 47 CFR § 64.6010.

[2003] We will, however, continue to use the term "inmate calling services" or "ICS" to refer to historic Commission actions in WC Docket No. 12-375.  *See 2023 IPCS Notice*, 38 FCC Rcd at 2674 n.37 ("The Commission has historically used the term 'inmate calling services' or 'ICS' when referencing payphone service in the incarceration context.  We will now use the term 'incarcerated people's communications services' or 'IPCS' instead of 'inmate calling services' or 'ICS' to refer to the broader range of communications services subject to the Commission's jurisdiction as a result of the Act . . . To avoid confusion, however, when discussing the Commission's prior actions or current rules in this item, we may continue to use the terms "inmate calling services" or "ICS.").

[2004] Appendix A sets forth the rule changes.

such as civil commitment, residential, group and nursing facilities.[2005] In addition, the Commission sought comment on its authority to apply the inmate calling services rules, including those addressing communications access for people with disabilities, to these facilities.[2006] In the *2023 IPCS Notice*, the Commission again invited comment about whether to expand the definitions of "Jail" and "Prison" to include these facilities, or any additional facilities, as part of the definitions of "Jail," "Prison," or "Correctional Facility."[2007]

561.    Numerous commenters support expanding the definition of "Jail" to cover "civil commitment facilities, residential facilities, group facilities, and nursing facilities in which people with disabilities, substance abuse problems, or other conditions are routinely detained."[2008] One commenter urges the Commission to continue to "expand protections for vulnerable populations subject to various forms of detention."[2009] Another asserts that "[j]ust as incarcerated people with disabilities in prisons and jails, as currently defined in the Commission's rules, face inequitable access to communications services, so too do those confined to civil commitment facilities."[2010] Two commenters raise concerns that the definition of "Jail," as amended in the *2022 ICS Order*, "did not fully capture the Commission's intent to include every type of facility where individuals can be incarcerated or detained," in particular immigrations detention facilities.[2011] Specifically, they point out that, although the Commission incorporated into its definition of "Jail" "facilities used to detain individuals, operated directly by the Federal Bureau of Prisons or U.S. Immigration and Customs Enforcement, or pursuant to a contract with those agencies,"[2012] it failed to include similar facilities operated by Customs and Border Protection

---

[2005] *2022 ICS Notice*, 37 FCC Rcd at 11963, para. 161 (inviting comment on, among other things, whether to include in the definitions of "Jail" and "Prison" "civil commitment facilities, residential facilities, group facilities, and nursing facilities in which people with disabilities, substance abuse problems, or other conditions are routinely detained"). Two commenters, the Accessibility Coalition and UCC Media Justice, filed *ex partes* agreeing that the Commission should expand the definitions of "Prison" and "Jail" as suggested. Letter from Blacke E. Reid, Samuelson-Glushko Technology Law & Policy Clinic, Counsel to HEARD et. al, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 12-375, at 6-7 (Accessibility Coalition Sept. 21, 2022 *Ex Parte*); UCC Media Justice Sept. 21, 2022 *Ex Parte* at 3-4; *see 2022 ICS Notice*, 38 FCC Rcd at 11963, para. 161 n.398.

[2006] *2022 ICS Notice*, 37 FCC Rcd at 11964, para. 161. In addition, the Commission asked commenters to address whether residents of such facilities are able to access voice and other communications services through providers of their own choice, as opposed to being limited to the providers selected by third parties. *Id.*

[2007] *See 2023 IPCS Notice*, 38 FCC Rcd at 2683, para. 61 (citing Accessibility Coalition Sept. 21, 2022 *Ex Parte* at 6-7; UCC Media Justice Sept. 21, 2022 *Ex Parte* at 3-4).

[2008] *See, e.g.*, Accessibility Coalition Dec. 15, 2022 Comments at iv, 2, 5; Dillard Dec. 14, 2022 Comments at 1 (asserting that the Commission's rules should apply to places where disabled people are held and unable to leave freely); UCC Media Justice June 14, 2024 *Ex Parte* at 1. *But see* National Sheriffs' Association Comments, WC Docket No. 12-375, at 6-8 (rec. Dec. 15, 2022) (National Sheriffs' Association Dec. 15, 2022 Comments); National Sheriffs' Association Mar. 3, 2023 Reply at 5-6 (contending that the rules should not apply to the additional facilities).

[2009] Electronic Privacy Information Center Comments, WC Docket No. 12-375, at 2 (rec. Dec. 15, 2022) (EPIC Dec. 15, 2022 Comments); *see also* Letter from Eunice Cho, Senior Staff Attorney, ACLU National Prison Project, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket No. 12-375 (Feb. 8, 2023) (recommending that the Commission amend the definition of "Jail" to include detention facilities operated directly by or pursuant to a contract with Customs and Border Protection and the U.S. Marshals Service).

[2010] Accessibility Coalition Dec. 15, 2022 Comments at 6; Accessibility Coalition Mar. 3, 2023 Reply at 2.

[2011] American Civil Liberties Union Foundation Comments, WC Docket No. 12-375, at 1 (rec. Feb. 8, 2023) (ACLU Feb. 8, 2023 Comments); Letter from Eunice H. Cho, Sr. Staff Attorney, ACLU National Prison Project, to Jessical Rosenworcel, Chairwoman, FCC, WC Docket No. 23-62 and 12-375, at 2 (filed July 11, 2024) (ACLU July 11, 2024 *Ex Parte*); UCC Media Justice July 12, 2024 *Ex Parte* at 2-3.

[2012] 47 CFR § 64.6000(m); ACLU Feb. 8, 2023 Comments at 2.

(CBP) or the U.S. Marshals Service (USMS).[2013]  Given the similar nature of these agencies and their corresponding facilities, theses commenters urge us to add detention facilities operated by, or pursuant to a contract with, CBP or USMS to the definition of "Jail" in our rules.[2014]

562.    Other commenters oppose expanding our definition of "Jail" as proposed.  The National Sheriffs' Association questions whether the types of facilities the Commission sought comment on including in its definition of "Jail" fall within the scope of section 276 of the Act which applies to "the provision of inmate telephone service in correctional institutions."[2015]  One provider argues that our IPCS regulations "should apply only to facilities that contract with ICS providers to install and maintain secure, corrections-type communications systems."[2016]  The National Sheriffs' Association also contends that "it is unlikely that calling services in [civil commitment, residential, group, and nursing] facilities have the same cost characteristics of providing calling services in jails and prisons."[2017]

563.    Consistent with the Commission's intention in the *2022 ICS Order*,[2018] we modify the definition of "Jail" to cover all immigration detention facilities.  This definition therefore encompasses every immigration detention facility operated by, or pursuant to a contract with, ICE, CBP, USMS, or any other federal, state, city, county, or regional authority.[2019]  This modification to the definition of "Jail" addresses this unintended gap in our rules and also follows the Martha Wright-Reed Act's directive that we ensure "just and reasonable charges for telephone and advanced communications services in correctional and detention facilities."[2020]

564.    We decline at this time to make further modifications to the definitions of "Prison" and "Jail" in our rules.  While we agree with certain commenters that individuals in certain other facilities should benefit from the protections of the IPCS rate caps and other rules we adopt here, based on the current record, we find we lack sufficient information and data to address the issues raised in the record.  Given our lack of data, particularly on the costs providers incur in providing service in these types of facilities, we do not find we have sufficient confidence at this time that the rate caps we adopt herein would fairly compensate providers for providing service to such facilities.  We seek additional comment on these issues in the attached Notice.

### 3.    Annual Reporting and Certification Requirement

565.    Since 2013, the Commission has required providers of communications service to incarcerated people to file certain pricing and related data and information annually to promote transparency and heighten providers' accountability.  These annual reports enable the Commission and the public to monitor pricing practices and trends in the IPCS marketplace generally.  Pursuant to our

---

[2013] ACLU Feb. 8, 2023 Comments at 1-3; ACLU July 11, 2024 *Ex Parte* at 1; UCC Media Justice July 12, 2024 *Ex Parte* at 2-3.

[2014] ACLU Feb. 8, 2023 Comments at 1-3; ACLU July 11, 2024 *Ex Parte* at 1-2; UCC Media Justice July 12, 2024 *Ex Parte* at 2-3.

[2015] National Sheriffs' Association Dec. 15, 2022 Comments at 6-7 (claiming that "with the exception of civil commitment facilities," the other facilities "do not involve involuntary confinement" and "are not jails or prisons under the criminal justice system"); National Sheriffs' Association May 8, 2023 Comments at 11-12.

[2016] NCIC Dec. 15, 2022 Comments at 9.

[2017] National Sheriffs' Association Dec. 15, 2022 Comments at 7; *see also* Securus Dec. 15, 2022 Comments at 42 (contending that "[h]ealth care facilities, group facilities and the other types of facilities identified in the Notice have substantially different security requirements than typical jails, prisons or other types of detention facilities that results in different cost structures and different communications options and restrictions").

[2018] *2022 ICS Order*, 37 FCC Rcd at 11941, para. 89.

[2019] ACLU Feb. 8, 2023 Comments at 1-3; ACLU July 11, 2024 *Ex Parte* at 1-2.

[2020] ACLU Feb. 8, 2023 Comments at 1-3; ACLU July 11, 2024 *Ex Parte* at 1-2; UCC Media Justice July 12, 2024 *Ex Parte* at 2-3; Martha Wright-Reed Act pmbl.

**Federal Communications Commission**                    **FCC 24-75**

rules, ICS providers must file annual reports and certifications by April 1 of each year.[2021]  The reports contain information and data about the services provided for the preceding calendar year, and an officer or director of the provider must certify that the information and data are accurate and complete.[2022]  We now modify the scope and content of our annual reports to reflect the Martha Wright-Reed Act's expansion of Commission jurisdiction over other communications services in carceral facilities, including video IPCS and other advanced communications services, as well as intrastate IPCS, and the providers that offer these services.

### a.    Background

566.    The Commission's annual reporting requirements for providers of communications services to incarcerated people have changed over time reflecting the Commission's evolving perspective on the need for marketplace data.  The Commission first adopted annual reporting and certification requirements for providers in its *2013 ICS Order*.[2023]  The Commission subsequently included additional reporting requirements relevant to industry oversight in 2015,[2024] and further amended its rules in 2022 to require data concerning various services for individuals with disabilities.[2025]

567.    In the *2023 IPCS Order*, the Commission reaffirmed and updated its prior delegation of authority to WCB and Consumer and Governmental Affairs Bureau (CGB) "to modify, supplement, and update [the annual reporting] instructions and . . . template as appropriate to supplement the information

---

[2021] 47 CFR § 64.6060.

[2022] *See* ICS Annual Report Instructions at 9-22.

[2023] *2013 ICS Order*, 28 FCC Rcd at 14169-70, paras. 116-17.  The information and data required in the reports included interstate and intrastate ICS rates, ancillary service charges, and the number of disconnected calls.  An officer or director was required to certify to the accuracy of the data and information, "including the requirement that ICS providers may not levy or collect an additional charge for any form of TRS call, and the requirement that ancillary charges be cost-based." *Id.*  The Commission found that the certification requirement would facilitate enforcement and ensure that ICS providers' rates and practices were just, reasonable, and fair, and in compliance with that Order.  *See id.* at 14171-72, paras. 120-123.

[2024] *2015 ICS Order*, 30 FCC Rcd at 12891-92, para. 267 (47 CFR § 64.6060, as adopted).  The Commission added requirements to report data on: (a) site commissions; (b) the number of TTY-based ICS calls, the number of those calls that were dropped, and the number of complaints related to ICS made by TTY and TRS users; and (c) the usage, rates and ancillary service charges for video visitation services.  In 2017, the D.C. Circuit vacated the reporting requirement for video visitation services, considering the requirement "too attenuated to the Commission's statutory authority." *GTL v. FCC*, 866 F.3d 397, 415 (D.C. Cir. 2017).  In the *2020 ICS Order*, the Commission removed section 64.6060(a)(4)—the paragraph that had required ICS providers to submit data on video visitation services.  *2020 ICS Order*, 35 FCC Rcd at 8508, para. 63.

[2025] *2022 ICS Order*, 37 FCC Rcd at 11922-23, paras. 47-49.  The Commission required providers to report the number of calls and number of dropped calls for TTY-to-TTY ICS, for direct video calls placed or received by ASL users, and for each TRS available at a facility, as well as the number of complaints about dropped calls and poor call quality for these services.  Additionally, the Commission determined that it was no longer necessary to collect data on dropped calls, so it adopted the proposed section 64.6060(a)(5)-(6) without the requirement to report on dropped calls, and made a conforming modification to section 64.6060(a)(7) which requires reports about complaints from TTY and TRS users.  *Id.* at 11923, para. 50; *id.* at 11977 (adopting 47 CFR § 64.6060).  The changes to the three paragraphs, section 64.6060(a)(5)-(7), have not yet gone into effect.  *See* Inmate Calling Services (ICS) Provider Annual Reporting, Certification, and Other Requirements, OMB Control No. 3060-1022, Supporting Statement at 11 (submitted Nov. 2023) (from https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202311-3060-001, select the DOCX Supporting Statement file (explaining that the Commission will not seek Paperwork Reduction Act review by the Office of Management and Budget until an order is released adopting any changes to the annual report instructions, templates, and certification form); Federal Communications Commission, VRS and IP CTS—Commencement of Pending User Registration; Rates for Interstate Inmate Calling Services; Correction, 89 Fed. Reg. 8549, 8549 (Feb. 8, 2024) ("The amendments to § 64.6060(a)(5) through (7) . . . are delayed indefinitely").

[it would] be receiving in response to the Mandatory Data Collection."[2026]  In the accompanying *2023 IPCS Notice*, the Commission asked what rule changes or new rules would be necessary to effectuate the Martha Wright-Reed Act.[2027]  No commenter addresses possible changes to the annual reporting and certification requirement.

568.    In the *Aug. 3, 2023 IPCS Public Notice*, WCB and CGB proposed revisions to the instructions and templates for the annual reports and annual certifications to implement the Martha Wright-Reed Act and reflect the changes that were adopted in the *2022 ICS Order*.[2028]  Commenters generally supported the Commission's efforts to track trends in the IPCS marketplace as long as the reporting requirements were not unduly burdensome.[2029]  However, one commenter argued that it was premature to require reports on video and the expanded TRS obligations, because the Commission had not adopted video IPCS regulations, and the expanded TRS regulations had not yet gone into effect.[2030]  In response, the Commission refrained from adopting any changes to the annual reporting requirements prior to this Order.[2031]

### b.    Discussion

569.    We now modify our annual reporting and certification requirements, consistent with the Commission's expanded authority under the Martha Wright-Reed Act, to include the full scope of IPCS and all providers of IPCS.  These modifications will provide greater visibility into the IPCS marketplace and provide an objective foundation for future Commission action to ensure IPCS rates are just and reasonable and IPCS providers are fairly compensated.  We also provide WCB and CGB the flexibility to propose, seek comment on, and adopt further revised requirements in response to this Order and future IPCS marketplace developments in a timely fashion.  Collectively, these modifications to our annual reporting requirements and our delegation of authority to WCB and CGB to implement these changes will enable the Commission to better ensure it meets its statutory directives.[2032]

570.    First, we make several modifications to the annual reporting and certification rule.  Specifically, we revise section 64.6060(a) so the annual reporting requirement now applies to *IPCS*

---

[2026] *2023 IPCS Order*, 38 FCC Rcd at 2702, para. 86.  The Word and Excel templates are FCC Form 2301(a), and the certification is FCC Form 2301(b).  *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Order, 37 FCC Rcd 7558, 7558, para. 2 (WCB 2022).  The Commission also "delegate[d] to WCB and CGB the authority to conduct the requisite Paperwork Reduction Act analysis for any changes to the annual report requirements that were implemented pursuant to [the *2023 IPCS Order*]."  *2023 IPCS Order*, 38 FCC Rcd at 2702, para. 86.

[2027] *2023 IPCS Notice*, 38 FCC Rcd at 2697-98, para. 73.

[2028] *Wireline Competition Bureau and Consumer Governmental Affairs Bureau Seek Comment on Revisions to Providers' Annual Reporting and Certification Requirements*, WC Docket Nos. 23-62 and 12-375, Public Notice, DA 23-656, at 1 (WCB/CGB Aug. 3, 2023) (proposing revisions for the Apr. 1, 2024 Annual Report to include video IPCS, and the expanded TRS obligations).

[2029] *E.g.*, Pay Tel Communications, Inc. Reply to Proposed Revisions to the Annual Reporting Requirements, WC Docket Nos. 23-62 and 12-375, at 1 (rec. Sept. 26, 2023); Global Tel*Link Corp. d/b/a ViaPath on Revisions to Annual Reporting and Certification Requirements for IPCS Providers Comments, Docket Nos. 23-62 and 12-375, at 2 (rec. Sept. 10, 2023).

[2030] Securus Technologies, LLC Reply to Proposed Revisions to the Annual Reporting Requirements, WC Docket Nos. 23-62 and 12-375, at 1-2 (rec. Sept. 25, 2023).

[2031] The Apr. 1, 2024 annual reports and certifications used the same forms as were used previously.  *See* ICS Annual Report Instructions at 3; *Wireline Competition Bureau Reminds Providers of Inmate Calling Services of the April 1, 2024 Deadline for Annual Reports and Certifications*, WC Docket Nos. 23-62 and 12-375, Public Notice, DA 24-180, at 1 n.3 (WCB Feb. 28, 2024).  The public versions of providers' April 1, 2024 Annual Reports and Annual Certifications are available on ECFS.

[2032] Martha Wright-Reed Act § 2(a)(1)(A)-(C); *see supra* Section III.C (Interpreting the Martha Wright-Reed Act and the Commission's Authority Thereunder).

providers, rather than *ICS* providers. Consistent with the revised definition of IPCS, this change makes providers of video IPCS and advanced communications services not previously covered by our IPCS rules subject to the annual reporting and certification rule. We also remove section 64.6060(a)(2)-(3) which referred to ancillary service charges and site commissions to reflect the prohibition on those charges adopted in this Order.[2033] We retain the reporting requirements concerning TRS and related communications services in section 64.6060(a)(5)-(7), but renumber them as section 64.6060(2)-(4).[2034] These requirements were originally adopted in the *2022 ICS Order* but have not yet gone into effect.[2035] Finally, we modify the certification requirement in section 64.6060(b)[2036] to now include examples of several executives of the provider that may make the certification, and for consistency.[2037]

571. Next, we give WCB and CGB flexibility in revising and updating the annual reports, as necessary to provide useful transparency into industry practices and guide Commission efforts to regulate the industry. We direct that WCB pay particular attention to how best to capture developments in the rapidly changing, but nascent video IPCS marketplace in updating the requirements for the annual reports. We also direct CGB to pay attention to not only the availability of TRS, but growth of both the user base and the use of TRS, capturing data on the number of individuals with disabilities who are requesting access to the additional forms of TRS in carceral facilities, changes in the monthly minutes of use for each type of TRS, and other useful metrics.[2038] WCB and CGB therefore will be able to respond to regulatory and marketplace conditions more readily than if every specific annual report change needed to be adopted first by the Commission. We direct WCB and CGB to seek comment on and adopt all necessary revisions to annual report instructions, templates and certifications consistent with past practices.[2039]

---

[2033] *See supra* Section III.D.6 (Site Commissions); Section III.D.8 (Ancillary Service Charges); 47 CFR § 64.6060(a)(2)-(3).

[2034] 47 CFR § 64.6060(a)(5)-(7); Appendix A, 47 CFR § 64.6060(a)(2)-(4). Section 64.6060(a)(4) was previously "Reserved" and we make use of it here.

[2035] *2022 ICS Order*, 37 FCC Rcd at 11977 (revisions to 47 CFR § 64.6060(a)(5)-(7)). When these paragraphs were adopted, the Commission found that the annual reports would provide "valuable data showing to what extent the [TRS-related] rules adopted [in that order] are successfully implemented." *Id.*, 37 FCC Rcd at 11922-23, para. 48. These requirements will allow us to monitor incarcerated peoples' access to TRS and related communications services.

[2036] *Infra* Appendix A, 47 CFR § 64.6060(b).

[2037] ICS Annual Report Instructions at 11-45 (requiring the "Chief Executive Officer (CEO), Chief Financial Officer (CFO), or other senior executive with first-hand knowledge" certify to the "truthfulness, accuracy, and completeness of the information provided"). The current Annual Reporting and Certification Instructions, Word Template, Excel Template and Certification Form were adopted by WCB pursuant to authority delegated by the Commission and after public notice and comment.

[2038] *See* UCC Media Justice June 14, 2024 *Ex Parte* at 2.

[2039] For example, on December 15, 2021, WCB released a Public Notice proposing to revise the annual reports to reflect rule amendments adopted in the *2021 ICS Order. Wireline Competition Bureau Seeks Comment on Revisions to Annual Reporting and Certification Requirements for ICS Providers*, WC Docket No. 12-375, Public Notice, 36 FCC Rcd 17685 (WCB 2021). After considering the comments and replies submitted in response to the Public Notice, WCB adopted an order that revised the instructions, reporting templates, and certification. *2022 ICS Annual Report Order*, 37 FCC Rcd at 7558, para. 1. The instructions, reporting template, and certification were made available online. ICS Annual Reporting and Certification Instructions (Current), WC Docket No. 12-375, https://www.fcc.gov/general/ics-data-collections (last visited May 9, 2024); ICS Annual Reporting Form Word Template (Appendix A) (Current), WC Docket No. 12-375, https://www.fcc.gov/general/ics-data-collections (last visited May 9, 2024); ICS Annual Reporting Form Excel Template (Appendix B) (Current), WC Docket No. 12-375, https://www.fcc.gov/general/ics-data-collections (last visited May 9, 2024); ICS Annual Reporting Certification Form (Appendix C) (Current), WC Docket No. 12-375, https://www.fcc.gov/general/ics-data-collections (last visited May 9, 2024).

572.    We also reaffirm and update the Commission's prior delegation of authority to WCB and CGB to revise the annual reports.[2040]  Accordingly, WCB and CGB can modify, supplement, and update the required contents of the annual reports and the manner in which they are to be submitted, including all necessary instructions, templates and the required certification form, to ensure the reports reflect the Commission's expanded authority under the Martha Wright-Reed Act and the other actions taken in this Order.[2041]  We further delegate authority to WCB and CGB, independently or collectively, to require IPCS providers to submit information related to their IPCS offerings and practices upon request, to provide WCB and CGB flexibility to monitor compliance with our rules in a timely manner.[2042]  We find that this delegation is necessary because it is difficult in advance to determine what information will be needed on a case-by-case basis by the Commission to decide whether providers are in compliance with our rules.[2043]  Our delegations of authority to WCB and CGB will be effective upon publication of this Order in the Federal Register, enabling WCB and CGB to move expeditiously in modifying, supplementing, and updating the annual reports and certification for the next reporting period and thereafter, to facilitate the Commission's implementation of the Martha Wright-Reed Act and this Order.[2044]

### 4.    Reporting and Recordkeeping

573.    *Additional Data Collection*.  We adopt an additional data collection obligation to collect the data and other information we will need to set permanent rate caps for video IPCS, reevaluate our rate caps for audio IPCS if necessary, and learn more about service quality, particularly the prevalence of dropped calls or communications.  As the Commission explained in the *2023 IPCS Order*, the Martha Wright-Reed Act contemplates, among other things, the collection and analysis of advanced communications services' costs and related data, including for video communications, among other information.[2045]  The Commission therefore directed WCB and OEA to initiate an additional data collection—the 2023 Mandatory Data Collection—to obtain the data and other information needed to implement the statute.[2046]  Also, the record in this proceeding indicates that poor IPCS quality of service is a recurring issue.[2047]  Therefore, in the accompanying Notice, we seek comment on adopting IPCS quality

---

[2040] *2023 IPCS Order*, 38 FCC Rcd at 2702, para. 86; *see 2022 ICS Order*, 37 FCC Rcd at 11924, para. 52.

[2041] For example, this delegation includes authority to WCB and CGB to modify the annual reports to include data and information regarding the provision of TRS and related communications services to reflect the expanded requirements adopted in the *2022 ICS Order*, and our removal of section 64.6060(a)(5)-(7) in this Order.  *2022 ICS Order*, 37 FCC Rcd at 11907-29, 11977, paras. 19-68 (revisions to 47 CFR § 64.6060(a)(5)-(7)).

[2042] Such requests for information could result from complaints being filed by providers or by consumers, or on the Commission's or WCB's own motion.  47 CFR § 1.1.  In delegating authority to WCB and CGB in this regard, we do not directly or indirectly limit or modify the otherwise-existing authority delegated to the Enforcement Bureau.  47 CFR §§ 0.111, 0.311.

[2043] *See Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*; *Federal-State Joint Board on Universal Service*, CC Docket Nos. 97-21 and 96-45, Report and Order and Second Order on Reconsideration, 12 FCC Rcd 18400, 18442, para. 81 (1997) (delegating authority to the Common Carrier Bureau to require additional reporting requirements).

[2044] We also direct the Bureaus to conduct and submit the requisite Paperwork Reduction Act analysis for any changes to the annual report and certification requirements that are implemented pursuant to this Order.  *See* 44 U.S.C. § 3501 *et seq*.

[2045] *See 2023 IPCS Order*, 38 FCC Rcd at 2701, para. 83.

[2046] *See id.* at 2701-2702, paras. 84-85.

[2047] *E.g.*, California PUC May 8, 2023 Comments at 9 (dropped or interrupted calls); Worth Rises Jan. 7, 2022 Waiver Comments at 2-3; California PUC Sept. 27, 2021 Comments at 6 ("numerous . . . dropped or interrupted calls"); California PUC Sept. 27, 2021 Comments, Attach A, California PUC Decision 21-08-037, Decision Adopting Interim Rate Relief for Incarcerated Person's Calling Services at 13-14 (quoting commenters in a state

(continued….)

of service standards. Collecting more-detailed information about service quality, for example the frequency of dropped calls or communications, responds to concerns in the record and will help inform any future action the Commission may take regarding IPCS quality of service. We conclude that an additional data collection will be needed to set permanent rate caps for video IPCS and to update audio IPCS rate caps if necessary, including, as applicable, for the smallest size tier of jails.[2048] We therefore delegate to WCB and OEA the authority to conduct this data collection and direct them to structure an additional data collection as appropriate to enable us to accomplish these tasks.

574.     In designing and structuring this additional data collection, WCB and OEA should consider how best and when to collect data that demonstrate the evolving nature of the video IPCS marketplace. As our rate cap analysis recognizes, the video IPCS data from the 2023 Mandatory Data Collection reflect conditions typical of a nascent market, including relatively high initial investment costs and relatively low initial demand.[2049] We anticipate that, as the video IPCS marketplace evolves, per-unit costs of providing video IPCS will fall significantly—a factor that we take into account in setting our interim rate caps for video IPCS.[2050] Given the importance of ensuring that the rate caps for video IPCS are just and reasonable and fairly compensatory over the longer term, WCB and OEA should collect not just updated data on video IPCS costs and demand, but also (to the extent practicable) how those costs and demand might change over time. In the 2023 Mandatory Data Collection the Commission sought information on the "number of complaints regarding problems experienced with disability-related calls."[2051] We now give WCB and OEA the flexibility to add more generally applicable questions regarding IPCS quality of service to the next data collection.

575.     Consistent with the above, we reaffirm the Commission's prior delegation of data collection authority to WCB and OEA to conduct an additional data collection to collect detailed data and other information, at the provider, contract and facility level, on audio and video IPCS from all providers subject to our expanded authority under the Martha Wright-Reed Act and the Communications Act.[2052] To allow for consistent data reporting, we direct WCB and OEA to make any appropriate modifications to the template and instructions for the 2023 Mandatory Data Collection.[2053] We also grant WCB and OEA authority to determine the timing and scope of the data collection, provided that such collection shall be conducted as soon as practicable understanding the need to ensure that the Commission obtains data representative of a more mature video IPCS marketplace and an audio IPCS marketplace that has fully adapted to our actions in this Order. As part of their review of providers' submissions, WCB and OEA may require any provider to clarify and supplement its response to the data collection where appropriate to enable a full and meaningful evaluation of the providers' cost, demand, and revenue data and costing

---

proceeding who said that "calls get disconnected all the time because of the awful signal"); California PUC Public Participation Hearing, Vol. 2, Rulemaking 20-10-002, at 233, 240 (Apr. 29, 2021), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K478/382478114.PDF (statements of Liz Araiza that calls are cut off, and Teresa Rockwell explaining that Securus "drop[s] calls constantly"), cited by Securus May 13, 2021 *Ex Parte* at 2 n.2; California PUC Public Participation Hearing, Vol. 1, Rulemaking 20-10-002, at 73, 119 (Apr. 28, 2021), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M382/K604/382604073.PDF (statement of Anthony Salvatierra about calls being dropped) (California PUC Hearing Vol. 1), cited by Securus May 13, 2021 *Ex Parte* at 2 n.2.

[2048] *See* Wood June 7, 2024 Report at note 6 (suggesting that a Commission-led data collection would be sufficiently comprehensive); *see also infra* Section V.B (Further Disaggregating the Very Small Jail Tier).

[2049] *See supra* Section III.D.4.b (Determining Permanent Rate Caps for Audio IPCS and Interim Rate Caps for Video IPCS).

[2050] *Id*.

[2051] ICS Annual Reporting and Certification Instructions, https://www.fcc.gov/general/ics-data-collections.

[2052] As part of their review of the providers' submissions in response to the additional collection, WCB and OEA should evaluate whether our permanent rate caps for audio IPCS remain just and reasonable and fairly compensatory.

[2053] *See 2023 Mandatory Data Collection Order*, at 1, para. 1.

methodology.

576.     *No Recurring Data Collection*.  We decline, at this time, to adopt a recurring data submission obligation for IPCS providers, as suggested in the *2020* and *2021 ICS Notices*.[2054]  In those notices, the Commission invited comment on whether it should conduct data collections on a more routine, periodic basis, as opposed to relying on ad hoc data collections.[2055]  While we agree with several commenters that a recurring data collection would potentially aid us in ensuring that IPCS rates and charges remain just and reasonable and fairly compensatory,[2056] we find that the burdens of a recurring data collection on providers would exceed any potential benefits.[2057]  We also find that the information we will obtain from our additional data collection,[2058] coupled with the information to be provided in the IPCS Annual Reports as revised pursuant to this Order, will allow us to respond to any changes in the IPCS marketplace in a timely manner without unduly burdening IPCS providers.  We therefore conclude that, on balance, a recurring collection is not warranted at this time.

577.     *No Accounting Requirements*.  We also decline, at this time, to impose accounting requirements on IPCS providers, as suggested in the *2021 ICS Notice*.[2059]  In that Notice, the Commission sought comment on specific types of accounting requirements that may be useful if it were to adopt a recurring data collection.[2060]  Given that we decide not to adopt recurring data collections, we also conclude that we should refrain from imposing accounting requirements on IPCS providers at this time.

## 5.     Payphones Outside the Incarceration Context

578.     We decline, at this time, to adopt new rules applicable to the provision of payphones outside the incarceration context.  In the *2023 IPCS Notice*, the Commission observed that certain amendments that the Martha Wright-Reed Act made to section 276 of the Communications Act apply to payphones generally, including traditional payphones used outside the incarceration context.[2061]  The Commission invited comment on whether section 3(a) of the Martha Wright-Reed Act required the adoption of new regulations applicable to traditional payphone services.[2062]  In response, one commenter stated that the Commission did not need to address its traditional payphone compensation rules in this

---

[2054] *2021 ICS Notice*, 36 FCC Rcd at 9673-74, paras. 342-44; *2020 ICS Notice*, 35 FCC Rcd at 8532-33, para. 132.

[2055] *See 2021 ICS Notice*, 36 FCC Rcd at 9673-74, paras. 342-346; *2020 ICS Notice*, 35 FCC Rcd at 8532-33, para. 132.

[2056] *See, e.g*., Public Interest Parties Sept. 27, 2021 Comments at 15-16 (supporting a periodic data collection, on at least a triennial basis, that includes an assessment of the marketplace as a whole); California PUC Sept. 27, 2021 Comments at 3 (asserting that the Commission should conduct annual data collections and revise its rate caps based on the collected data); PPI Sept. 27, 2021 Comments at 22 (contending that a recurring data collection would provide the Commission with an "evergreen" record that would enable it to respond quickly to future developments); Public Interest Parties Dec. 17, 2021 Reply at 7-10 (arguing that it is necessary to establish an annual data collection and triennial reviews to ensure that ICS rates are just and reasonable in light of changes in the ICS marketplace).

[2057] *See* GTL Sept. 27, 2021 Comments at 11-13 (contending that the potential burden of a recurring collection would be significant).

[2058] *See supra* Section III.H.4 (Reporting and Recordkeeping).

[2059] *2021 ICS Notice*, 36 FCC Rcd at 9674, para. 345.

[2060] *See id.* at 9674, paras. 345-46.

[2061] *2023 IPCS Notice*, 38 FCC Rcd at 2699, para. 78.

[2062] *Id.*; *see* Martha Wright-Reed Act § 3(a) requiring that the Commission "shall promulgate any regulations necessary to implement [the Martha Wright-Reed Act] and this amendment made by this Act" within 18 to 24 months after the Martha Wright-Reed Act's enactment).

proceeding,[2063] but urged us to revisit our traditional payphone rules generally in a separate proceeding.[2064]  We find that no modifications to our traditional payphone rules are necessary to implement the Martha Wright-Reed Act and its amendments to the Communications Act, and therefore decline to address those regulations in this proceeding.

### 6.    Cost Benefit Analysis of Revised Interstate and Intrastate Rate Caps

579.    We perform an analysis of the relative costs and benefits of establishing revised, final rate caps for audio IPCS and new interim rate caps for video IPCS, and find that the benefits of our actions greatly exceed their cost.  As in the *2021 ICS Order*, we proceed by outlining the non-quantifiable but significant benefits to incarcerated persons and their families, the quantifiable benefits of expanded audio and video communications, and the likely implementation costs of our actions.

580.    *Expected Non-Quantifiable Benefits.*  In the *2021 ICS Order*, the Commission detailed the vast, but difficult-to-quantify, benefits of expanded incarcerated people's calling at lower IPCS rates, including maintaining incarcerated people's mental health, facilitating reentry, and improving the health and well-being of incarcerated people's families.[2065]  We enlarge and extend all of these benefits as we again lower rate caps for interstate calls[2066] and mandate new, lower rate caps for intrastate and international calls,[2067] as well as video calls across all jurisdictions.

581.    *Expected Quantitative Benefits of Expanded Call and Video Volumes.*  In the *2021 ICS Order*, staff used available empirical evidence to estimate the responsiveness of incarcerated people's calling volumes to changes in inmate calling services rates, known as the price elasticity of demand for calling services.[2068]  The available estimates led the Commission to conclude, conservatively, that inmate calling services have a demand elasticity of at least 0.3.[2069]  No commenter disputed our elasticity estimate or the methodology underlying it.  For the sake of consistency and simplicity, we continue to rely on this demand elasticity estimate and apply the same demand elasticity to audio and video incarcerated people's communications service.[2070]

---

[2063] USTelecom - Broadband Society Comments, WC Docket Nos. 23-62 and 12-375, at 1 (rec. May 8, 2023) ("As an initial matter, USTelecom agrees with the Commission that, for payphones outside the incarceration context, "no new regulations are 'necessary' to implement the Martha Wright-Reed Act and its amendments to the Communications Act[.]"); *id.* at 2 ("[T]he Commission need not – and should not – make any changes to its traditional payphone compensation rules specifically to implement the Act.").

[2064] *Id.* at 2 ("The Commission should, however, take a fresh look at its existing payphone compensation rules set forth in 64.1300 to 64.1340 of the Commission's rules in a new proceeding.").

[2065] *See 2021 ICS Order*, 36 FCC Rcd at 9604-05, paras. 194-95 & nn.584-91.

[2066] Although we do not alter the termination component that can be added to the interstate rate cap in the case of international calls, because we are lowering the interstate rate cap that serves as the foundation for international rates, we anticipate an effective reduction in international rates as a result.

[2067] Although we make no change to our rule allowing providers to add an amount to the rate caps to defray the costs of terminating international calls, because we are lowering the interstate rate caps that serve as the foundation for the international rate caps, we anticipate an effective reduction in international audio rates.

[2068] *See 2021 ICS Order*, 36 FCC Rcd at 9607, para.199 & n.604.

[2069] *See id.* at 9607-08, paras. 199-200 & nn.606-11.

[2070] By the same token, we continue to rely on the conclusion drawn in the *2021 ICS Order* that the incremental per-unit cost of audio IPCS is likely less than $0.01, and may be *de minimis*.  *2021 ICS Order*, 36 FCC Rcd at 9737, Appx. E, para. 78 n.114.  A similar principle applies to video IPCS, where many of its direct costs are also "independent of the need to carry additional call minutes," *id.*, especially given its proportionally greater share of capital expenses versus operating expenses.  *See* Appendix F at Table 12.  Thus, although video IPCS exhibits greater costs per minute than audio IPCS, the incremental per-unit costs of both services should be less than their

(continued….)

582.    The new, lower IPCS rate caps fall across two broad categories of call traffic—audio and video.[2071]  Our benefit estimation methodology for the new rate caps differs slightly from that used in the *2021 ICS Order*.  Previously, staff estimated welfare gains using the difference between the previous interim interstate rate caps and the then new, lower interim, interstate rate caps.  The current rate structure in the IPCS industry is more complex.  Some interstate IPCS traffic subject to the rate caps is priced below the caps, while the price of intrastate, international, and video IPCS call traffic that was previously beyond the reach of our rate caps can vary widely.  To capture this complexity, we measure the welfare gains from increased call volumes using the difference between existing weighted average revenue per unit (ARPU) for the different call-traffic categories and the new rate caps.[2072]  We divide 2022 billed revenues by billed minutes to determine the effective rate for IPCS, or ARPU.  We then compare this effective rate to the new rate cap for IPCS to determine the change in price, because going forward billed customers will be billed a rate equal to this rate cap (assuming the provider sets its rate at the cap).[2073]  With this methodological change, we estimate a total net welfare gain to incarcerated persons and their friends, families, and legal teams of about $386 million.  Of this, $362 million is a transfer from correctional facilities and providers, leaving  $24 million as a welfare gain from which implementation costs must be subtracted.[2074]  Unsurprisingly, the largest contribution of $12.5 million is from intrastate audio calls (5.6 billion minutes), not currently subject to rate caps, followed by: $7.8 million from interstate audio (4.8 billion minutes); $2.9 million from video (407 million minutes);[2075] and $0.5 million from international audio (54 million minutes).  The present value of a five-year stream of $24-million worth of benefits at a two percent discount rate exceeds $113 million.[2076]

583.    *Benefits Weighted By Income Strata.*  Weighting according to OMB guidelines greatly increases the welfare gain.  OMB Circular A-4 enables us to weight the benefits distributed to incarcerated persons by the ratio of median incarcerated people's income to the U.S. median income, raised to the negative power of the absolute value of the elasticity of income.[2077]  The impact of this could

---

average costs—such that the increased demand driven by a reduction in prices should, holding other factors equal, reduce providers' average costs for both audio and video IPCS.

[2071] The new rates for audio are: $0.06 per minute for prisons, $0.06 per minute for large jails, $0.07 per minute for medium-size jails, $0.09 per minute for small jails, and $0.12 per minute for very small jails.  The new rates for video are: $0.16 per minute for prisons, $0.11 per minute for large jails, $0.12 per minute for medium-size jails, $0.14 per minute for small jails, and $0.25 per minute for very small jails.

[2072] Staff computed the average revenues per unit (ARPUs) by dividing the total billed revenue for each type of traffic at each size facility by total billed minutes to yield average revenue per minute for intrastate audio calls for prisons, average revenue per minute for intrastate calls at large jails, and so on, enabling the compilation of a complete list of rate categories by traffic and facility type.  Staff then computed percentage changes in price and quantity for each rate category using the differences between the ARPUs and the rate caps and our price elasticity.  The net welfare gain (loss) is the gain (loss) in IPCS consumer surplus not captured by IPCS service providers.

[2073] We assume site commissions are only paid to the extent they do not result in rates that exceed our caps.

[2074] *See supra* Table 1 (presenting "Audio and Video Call Traffic").

[2075] We do not separately estimate welfare gains for video IPCS by jurisdiction because providers do not have a way to reliably record the jurisdiction associated with a video communication.  Further, nothing in the record suggests providers charge video IPCS rates that vary by jurisdiction.  As a matter of practice, providers charge a single rate without regard to the communication endpoint.

[2076] OMB Circular A-4, November 9, 2023, p. 77, https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf.  OMB stipulates a new, lower 2 percent discount rate.

[2077] *Id.*, p. 65-67 & nn.124-29.  To account for the diminishing marginal utility of goods and income, the revised circular suggests that agencies apply weights to the benefits and costs accruing to different groups when estimating aggregate net benefits.  To determine the weights, OMB recommends a constant elasticity for subgroups defined by income.  The weight for each group is: $CO_i = (I_i / I_{US})^{-\gamma}$ where $CO_i$ is the weight for subgroup i, $I_i$ is the median income for subgroup i, $I_{US}$ is the U.S. median income, and $\gamma$ is the absolute value of the elasticity of marginal utility.  Based

(continued....)

be large.  Analyzing Bureau of Justice Statistics 2014 survey data for the month just prior to incarceration, researchers for the Prison Policy Initiative estimated a 2014 median annual income of $19,185 for incarcerated persons.[2078]  U.S. median individual income for 2014 was $28,760.[2079]  The resulting weight for incarcerated people's welfare gains is 1.76 (= ($19,185/$28,760)$^{-1.4}$), meaning that every dollar in welfare gain directly attributable to incarcerated people was worth $1.76 in 2014.  If incarcerated people share equally in the total estimated net welfare gain, then about $12 million, or half, of the estimated $24 million is directly attributable to them, as opposed to friends and families.  At the same time, if the average income of families and friends of incarcerated persons was that of the average American, then, under these assumptions, the net welfare gain is effectively worth about $33 million (= ($12 million*1.76) + $12 million = $21 million + $12 million).  This is likely an underestimate, as the average income of the families and friends of incarcerated persons is likely below the national average, but we do not know what this average is.

584.    *Other Quantitative Benefits.*  In the *2021 ICS Order*, the Commission estimated that expanded inmate calling services call volumes at the lowered interstate rate caps would help curtail recidivism, saving the U.S. economy $23 million over ten years and reducing costly foster-child placements.[2080]  While we are certain that lowering IPCS rate caps further will increase these cost savings, we elect not to proffer precise estimates here, partly to avoid double-counting previous estimates.

585.    Costs of Reducing Rates for Interstate, Intrastate, and International Incarcerated People's Communications Services.  In the 2021 ICS Order, the Commission estimated that the cost of contract revisions needed to implement reduced interstate inmate calling services rates would total approximately $6 million.[2081]  Adjusting for inflation, the industry cost for the same set of contract revisions— simultaneously lowering interstate, intrastate, and international incarcerated people's communications services rates—would be about $7 million as of April 2024.[2082]  Lowering video calling rates, which we conservatively assume are contracted separately, would entail another $7 million in costs.  We, therefore, estimate total implementation costs of $14 million.

586.    *Comparison of Benefits and Costs.*  The benefits of lowering IPCS interstate rate caps and extending IPCS rate caps to intrastate and international audio and video call traffic far exceed the accompanying costs.  Without either weighting by income strata or summing and discounting future benefits, readily quantifiable benefits exceed costs by $10 million (= $24 - $14) in the inaugural year.  Weighting by income strata and summing and discounting future benefits further increase the value of benefits relative to costs.

**Table 1: Audio and Video Call Traffic**

Audio Call Traffic

| Rate Cap | Intrastate | | | Interstate | | | International | | |
|---|---|---|---|---|---|---|---|---|---|
| | Minutes | ARPU | Gain | Minutes | ARPU | Gain | Minutes | ARPU | Gain |
| Prisons, $0.06 | 3,095,089,972 | $0.060 | $884 | 3,179,735,362 | $0.070 | $704,910 | 34,290,298 | $0.147 | $266,659 |

on an average gleaned from the empirical literature, OMB recommends a constant elasticity of marginal utility of 1.4.

[2078] Bernadette Rabuy and Daniel Kopf, *Prisons of Poverty: Uncovering the pre-incarceration incomes of the imprisoned* (July 9, 2015), https://www.prisonpolicy.org/reports/income.html.

[2079] Federal Reserve Bank of St. Louis, *Median Personal Income in the United States*, https://fred.stlouisfed.org/series/MEPAINUSA646N (last visited June 17, 2024).

[2080] *See 2021 ICS Order*, 36 FCC Rcd at 9609, para. 201 & nn.612-18.

[2081] *See id.* para. 202 & nn.619-21.

[2082] US Bureau of Labor Statistics, *CPI Inflation Calculator*, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=6%2C000%2C000.00&year1=202105&year2=202404 (last visited June 25, 2024).

**Federal Communications Commission** **FCC 24-75**

| Large Jails, $0.06 | 878,094,584 | $0.099 | $1,990,573 | 686,852,024 | $0.102 | $1,761,431 | 4,767,832 | $0.174 | $53,188 |
| Medium Jails, $0.07 | 850,607,843 | $0.154 | $5,798,496 | 640,947,740 | $0.144 | $3,635,531 | 10,718,912 | $0.158 | $79,202 |
| Small Jails, $0.09 | 587,159,107 | $0.182 | $4,094,384 | 243,197,254 | $0.173 | $1,461,041 | 3,373,724 | $0.250 | $51,747 |
| Very Small Jails, $0.12 | 207,201,790 | $0.180 | $628,327 | 72,774,874 | $0.180 | $217,658 | 743,867 | $0.264 | $8,743 |
| Total | 5,618,153,296 | | $12,512,663 | 4,823,507,254 | | $7,780,571 | 53,894,633 | | $459,539 |

Video Call Traffic

| Rate Cap | Minutes | ARPU | Gain |
|---|---|---|---|
| Prisons, $0.16 | 85,787,195 | $0.257 | $471,462 |
| Large Jails, $0.11 | 60,592,954 | $0.230 | $567,352 |
| Medium Jails, $0.12 | 123,936,702 | $0.273 | $1,597,262 |
| Small Jails, $0.14 | 105,461,580 | $0.292 | $1,257,099 |
| Very Small Jails, $0.25 | 31,454,733 | $0.294 | $30,692 |
| Total | 407,233,163 | | $2,885,053 |

### 7. Effective Dates and Compliance Dates

587. Our reforms eliminating site commissions and our new permanent audio and interim video rate caps will take effect 60 days after notice of them is published in the Federal Register, but compliance with those reforms will be required on a staggered basis, as set forth below:

- **January 1, 2025** for all prisons and for jails with average daily populations of 1,000 or more incarcerated people, and **April 1, 2025** for jails with average daily populations of less than 1,000 incarcerated people, subject to the following special provisions:

  - Where a contract existing as of June 27, 2024[2083] includes terms and conditions that would require material alteration through renegotiation due to a conflict with our new rules involving rates, contractually prescribed site commissions, or passthrough charges included in the rates, and the contract expires[2084] on or after January 1, 2025 for prisons and for jails with average daily populations of 1,000 or more incarcerated people, or on or after April 1, 2025 for jails with average daily populations of less than 1,000 incarcerated people, the compliance dates will be **the earlier of the contract expiration date or January 1, 2026** for prisons and for jails with average daily populations of 1,000 or more incarcerated people, or **the earlier of the contract expiration date or April 1, 2026** for jails with average daily populations of less than 1,000 incarcerated people.

  - Where a contract existing as of June 27, 2024 includes terms and conditions that would require renegotiation due to a provision incorporating legally mandated site commission payments and the contract expires on or after July 1, 2025 for any size facility, the

---

[2083] We choose a date certain, which is the date of public draft of the Report and Order. *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC-CIRC2407-01 (June 27, 2024). The public draft version set forth the Commission's new IPCS rate caps and site commission reforms, none of which have changed since that time.

[2084] For purposes of this Report and Order, a contract expires after the expiration of its initial term in the contract without regard to any automatic extensions that might extend its validity.

compliance date will be **the earlier of the contract expiration date or April 1, 2026**.[2085]

588.    These timeframes recognize that, as a general matter, IPCS providers, governmental officials, and correctional officials may need additional time beyond January 1, 2025 or April 1, 2025 (depending on the type of facility and the terms of the contract) to renegotiate contracts in response to our actions today.[2086]  They also recognize that jails with average daily populations below 1,000 may need more time than prisons and larger jails to implement the Commission's new IPCS rate caps and to transition away from site commission payments,[2087] particularly since the smaller facilities were largely not impacted by the Commission's 2021 interim rate cap reforms.[2088]  In addition, by delaying the compliance date of our site commission and rate caps reforms at those correctional facilities where providers currently pay legally mandated site commissions, we recognize that more time may be needed to accommodate the legislative process to amend state or local laws and regulations that currently require site commission payments.

589.    We conclude that the compliance dates we adopt for our new audio and video rate caps and site commission reforms "strike[] a reasonable balance between [] competing interests."[2089]  On the one hand, we recognize the need to "help alleviate the burden of unreasonably high . . . rates on incarcerated people and those they [communicate with]."[2090]  On the other hand, and as the Commission has previously recognized, IPCS providers and correctional officials "will need more than 30 days to execute any contractual amendments necessary to implement the new . . . rate caps and otherwise adapt to those caps."[2091]  And smaller facilities likely need more time than larger facilities to implement rate cap and other changes.[2092]  Furthermore, we recognize that those facilities where IPCS providers currently pay legally mandated site commissions may likely need additional time to come into compliance with our reforms.  Thus, requiring compliance with the Commission's rate cap and site commission reforms on a staggered basis properly balances the need for expedited reform contemplated by the Martha Wright-Reed Act with the need to allow IPCS providers and correctional facilities sufficient time to adapt to our rules.

590.    Except for those facilities where IPCS providers pay legally mandated site commissions, for prisons and jails with ADPs of 1,000 or more, we find that there will be ample time between adoption of this Order and January 1, 2025 for such prisons and jails with existing contracts expiring before the end

---

[2085] To the extent any contract referenced here includes provisions that trigger automatic changes to contract terms in response to changes in the regulatory environment or, more specifically, changes in the Commission's rules such that renegotiation of contract terms would not be required, the compliance date extensions referenced in this paragraph do not apply.

[2086] *See, e.g.*, VARJ July 11, 2024 *Ex Parte* at 1 (noting that "many jails have entered into multi-year contracts that extend beyond the end of fiscal year 2025); National Sheriffs' Association July 11, 2024 *Ex Parte* at 2 (explaining that some contracts contain change-of-law provisions "that allow for renegotiation in the wake of regulatory action").

[2087] *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12887, para. 256 (recognizing that jails need "enough time to negotiate (or renegotiate) contracts to the extent necessary"); National Sheriffs' Association Jan. 15, 2021 Comments at 1 (supporting "the need for a longer transition period" for jails).

[2088] The reforms applicable to jails with average daily populations of less than 1,000 adopted in the *2021 ICS Order* were relatively modest, with "the only rate cap change" being a reduction of per-minute charges for collect calls from $0.25 to $0.21 per minute.  *2021 ICS Order*, 36 FCC Rcd at 9624, para. 231.

[2089] *Id.*

[2090] *Id.*

[2091] *Id.*

[2092] *See, e.g.*, *2015 ICS Order*, 30 FCC Rcd at 12889, para. 259 (adopting a 90-day transition period from Federal Register publication for prisons and a six-month transition period for jails); *see also* ViaPath June 13, 2024 *Ex Parte* at 13-14.

of this year to comply with today's reforms and that the possible extension of this compliance date to January 1, 2026 as outlined above will be more than sufficient to accommodate the contract renegotiation process.  In the *2021 ICS Order*, the Commission established a 90-day transition period following Federal Register publication for all facilities.[2093]  The Commission also adopted a 90-day transition period for prisons in connection with implementing the reforms in the *2015 ICS Order*.[2094]  Here, given the comprehensive nature of the reforms we adopt to rate caps and site commissions, we adopt a transition period of slightly more than five months from the adoption date of this Report and Order and we permit additional time based on the extent there are existing contracts as of June 27, 2024 that require renegotiation due to a conflict with our new rules.  This will allow providers and facilities significantly longer than the 30-day timeframe the Commission has previously recognized would be necessary to amend IPCS contracts.

591.    We also find that delaying the compliance date of our rate caps and site commission reforms for jails with ADPs below 1,000 except at those correctional facilities where IPCS providers pay legally mandated site commissions until April 1, 2025 or, in the alternative, until April 1, 2026 as described above, will afford IPCS providers and correctional officials sufficient extra time to adapt to these new rules.[2095]  Here, we delay the compliance date of our rate cap and site commission reforms for correctional facilities with average daily populations below 1,000 except at those correctional facilities where IPCS providers pay legally mandated site commissions by slightly more than eight months from the date of adoption of this Report and Order, which, to the extent there are existing contracts as of June 27, 2024 that require renegotiation due to a conflict with our new rules, can be extended.  These timeframes will be more than sufficient to ensure that IPCS providers and correctional facilities are able to amend their contracts to account for our reforms today.

592.    Recent experience at the state level suggests that IPCS providers and correctional facilities should be able to adapt to regulatory changes in the allotted timeframes.  For example, Massachusetts recently made IPCS free to consumers, and in doing so the state gave the industry and the state's prisons and jails less than five months to implement those changes—from July 31, 2023 to December 1, 2023—to account for budgetary impacts.[2096]  While one commenter advocates for a phase-

---

[2093] *2021 ICS Order*, 36 FCC Rcd at 9623, para. 230.

[2094] *2015 ICS Order*, 30 FCC Rcd at 12884-85, para. 251.  One provider supports adopting a 90-day transition period.  ViaPath June 13, 2024 *Ex Parte* at 13 (advocating that "[t]he Commission should adopt the same implementation period here" as the Commission adopted in the *2021 ICS Order*).

[2095] In the IPCS context, the Commission's use of the term "smaller" is focused on average daily population, and "is not meant to imply" that such facilities "are small in any absolute sense."  *2021 ICS Notice*, 36 FCC Rcd at 9659-60, para. 311 n.932.

[2096] On July 31, 2023, the Massachusetts legislature enacted a bill requiring unlimited free phone calls to incarcerated people retroactive to July 1, 2023, as part of the state's appropriations bill for Fiscal Year 2024.  *An Act Making Appropriations for The Fiscal Year 2024 for the Maintenance of the Departments, Boards, Commissions, Institutions, and Certain Activities of the Commonwealth, for Interest, Sinking Fund, and Serial Bond Requirements, and for Certain Permanent Improvements*, H.4040, https://malegislature.gov/Bills/193/H4040.  The free calling bill, H.4052, was enacted as sections 50, 85, and 111 of the appropriations bill, H.4040.  *See An Act Providing for Unlimited Free Phone Calls to Incarcerated Individuals*, H.4052, https://malegislature.gov/Bills/193/H4052/BillHistory.  The governor returned portions of the appropriations bill, including the portions relating to free calling for incarcerated people noting that making those provisions retroactive to July 1 "pos[ed] serious implementation challenges" and were also "underfunded by $20M in the budget."  *See So Much of the Message from Her Excellency the Governor Returning the General Appropriation Bill for Fiscal Year 2024*, Attach. E (Aug. 9, 2023), https://malegislature.gov/Bills/193/H4055.  The governor thereafter proposed that the effective date be delayed to December 1, 2023, which would avoid "the need for retroactive reimbursements, provide[] time for the Department of Corrections and the Sheriff's Departments to manage vendor contracts more effectively, and address[] fiscal challenges while also ensuring that families will be able to connect with their incarcerated loved ones during the holiday season."  *See id.*  The Massachusetts legislature eventually reenacted the free calling bill with a December 1,

(continued….)

out of site commission payments, partially in recognition of the fact many local governments continue to rely on site commission revenues,[2097] other commenters argue that implementing changes "should be a relatively easy and straightforward process" such that a more immediate compliance date might be appropriate.[2098]  We find, on balance, that the record supports a longer transition period for smaller jails.[2099]  Insofar as the transition we adopt for smaller jails today is longer than previous transitions the Commission has adopted, we are persuaded that this additional time is necessary but sufficient for both IPCS providers and correctional officials to adapt to our rules while also ensuring the most expeditious relief possible for incarcerated people and their loved ones, consistent with the Martha Wright-Reed Act.

593.    For all correctional facilities where IPCS providers currently pay legally mandated site commissions, we conclude that a longer transition period is justified such that compliance with our site commission reforms and our new rate caps will be required by July 1, 2025 unless a contract existing as of June 27, 2024 includes terms and conditions that would require renegotiation due to a provision incorporating legally mandated site commission payments and the contract expires on or after July 1, 2025, in which case the compliance date will be the earlier of the contract expiration date or April 1, 2026.  For such facilities, in addition to any additional time necessary to facilitate contract renegotiation where applicable, additional time is also necessary to accommodate states' and localities' legislative and budgetary processes to make the adjustments necessary to comply with this Report and Order, including by amending or repealing relevant laws pursuant to state or local statutes or other formal legal processes.  Because such processes may involve more than amending IPCS contracts, we expect that July 1, 2025 or, if applicable, April 1, 2026, will afford sufficient time for all parties involved to make the necessary legislative and contractual arrangements sufficient to implement our reforms.[2100]

594.    We disagree that we should delay our compliance dates for site commission reform, in particular, beyond the timeframes established herein.[2101]  IPCS providers and correctional authorities have

---

2023 effective date and the governor signed it on November 15, 2023.  *See An Act Providing for Unlimited Free Phone Calls to Incarcerated Individuals*, H.4052, https://malegislature.gov/Bills/193/H4052/BillHistory.

[2097] *See* Securus May 8, 2023 Comments at 24-25; Securus Sept. 27, 2021 Comments at 13-14 (advocating for "phasing out site commissions").

[2098] Public Interest Parties Nov. 23, 2020 Comments at 18.

[2099] *See, e.g.*, Wright Petitioners July 12, 2024 *Ex Parte* at 3 ("While we would encourage a faster transition, allowing approximately one year to amend certain contracts is more than sufficient.").  The timeframe we adopt for smaller facilities is more generous than the timeframes the Commission has adopted for such facilities previously. *See, e.g.*, *2021 ICS Order*, 36 FCC Rcd at 9623, para. 231 (adopting a 90-day transition period); *2015 ICS Order*, 30 FCC Rcd at 12884-85, para. 251 (adopting a six-month transition period).

[2100] This determination is distinct from the actions we take today in preempting state and local laws or regulations that require or allow site commission payments.  *Supra* Section III.D.6 (Site Commissions).  We provide this extra time for state and local authorities to comply with legal or administrative processes that may be required to repeal existing laws or regulations.  The lack of such a process does not negate our preemption actions in connection with site commission payments.

[2101] *See e.g.*, Securus May 8, 2023 Comments at 33 (noting the need to afford "state and local governments time to transition to alternative funding sources"); Securus Technologies, LLC Comments, WC Docket No. 12-375, at 18 (rec. Sept. 27, 2021) (stating that "[a]ny ban in site commissions should include a sufficient transition period"); VARJ July 11, 2024 *Ex Parte* at 2 (arguing that the "proposed order should be amended to delay the implementation of the new rule until current contracts have expired, but in no event sooner than July 1, 2025, for all correctional facilities"); Securus July 11, 2024 *Ex Parte* at 27 (requesting that the Commission provide "at least a year before implementing new rates that shift costs to local and state governments"); National Sheriffs' Association July 11, 2024 *Ex Parte* at 2 (arguing that "at least two budget cycles would be necessary"); PPI Sept. 27, 2021 Comments at 16 (expressing concern that "if the Commission prohibited contractual site commissions for interstate and international calling, one likely impact would be that site-commission agreements would simply focus on intrastate calls, thereby creating even greater incentives for regulatory arbitrage than exist currently").  We note that PPI's comments were made prior to the enactment of the Martha Wright-Reed Act, which gave the Commission authority

(continued….)

been on notice since at least the *2014 ICS Notice* that the Commission might eliminate site commissions.[2102] Against that regulatory backdrop, to the extent IPCS providers and correctional authorities have continued to rely on revenues from site commissions, they have done so at their own risk. In addition, as discussed above, a number of jurisdictions have eliminated site commissions, which presumably triggered state budgetary processes to account for the lost revenues.[2103] Our extended implementation deadlines here attempt to account for these state and local budgetary processes to the extent possible. Any further delays in requiring compliance with our rate cap and site commission reforms risks perpetuating unjust and unreasonable rates and charges for IPCS consumers or yielding unfair compensation for IPCS providers, contrary to the directives of the Martha Wright-Reed Act.[2104]

595.     *Other Deadlines.* Except for rules and requirements subject to OMB review under the Paperwork Reduction Act, all other rules and requirements adopted in this Order also will take effect 60 days after notice is published in the Federal Register, except the removal of section 64.6090, which will not take effect until other rules requiring OMB review take effect.[2105] With regard to reforms other than those related to our new rate caps and site commission prohibition that are not subject to the PRA, such as our rules pertaining to the seizing of balances in inactive accounts by providers, we find that making these changes effective 60 days after notice is published in the Federal Register best balances the need to bring these important, pro-consumer rules into effect expeditiously while affording IPCS providers sufficient time to implement any changes necessary to comply with our rules. Unlike our rate cap and site commission reforms, which may take longer to implement due to the need for contractual amendments or municipal budget adjustments, we do not view these other reforms as involving similar complexities such that a longer effective date period is necessary.

596.     Our delegations of authority to WCB and CGB to revise the annual reports will be effective upon publication of this Report and Order in the Federal Register, as will our delegations of authority to WCB and OEA to conduct an additional data collection.[2106]

### 8.    Enforcement

597.     We will be vigilant in monitoring compliance with the reforms we adopt today and will take action to vigorously enforce our rules where appropriate. Compliance with the Commission's IPCS rules is essential to ensuring that incarcerated people and their loved ones receive the full range of benefits resulting from today's reforms. As NCIC illustrates, certain providers took advantage of our prior regulatory regime to engage in practices or other behavior in contravention of our rules.[2107] Robust

---

over intrastate communications. Given that development and the fact that our reforms today sweep broadly to apply to all communications over which we now have jurisdiction, including intrastate communications, we conclude that the opportunities for the kind of arbitrage identified by PPI to be greatly reduced.

[2102] *See 2014 ICS Notice*, 29 FCC Rcd at 13187, para. 37; *2021 ICS Order*, 36 FCC Rcd at 9568, para. 113 n.345 (noting that "the Commission's proceeding on how to regulate rates for interstate inmate calling services has been underway for many years" and that "[t]hroughout this period, providers have understood that the Commission might seek to bar the recovery of some or all of site commissions through interstate rates").

[2103] *Supra* Section III.D.6 (Site Commissions).

[2104] Section 276(b)(1)(A) of the Communications Act, as amended by the Martha Wright-Reed Act, directs the Commission to establish a compensation plan to ensure IPCS providers are "fairly compensated" and that "all rates and charges are just and reasonable." 47 U.S.C. § 276(b)(1)(A); *see supra* Section III.D.6 (Site Commissions).

[2105] These timeframes are consistent with the terms of the Martha Wright-Reed Act, which requires the Commission to promulgate regulations necessary to implement the Act not earlier than 18 months and not later than 24 months after the date of enactment. Martha Wright-Reed Act § 3(a). Section 64.6090 prohibits flat-rate calling and will be removed to permit the offering of alternate pricing plans. *Supra* Section III.D.9.d.i (Flat-Rate Calling).

[2106] *See supra* Section III.H.3 (Annual Reporting and Certification Requirement).

[2107] *See* NCIC July 10, 2024 *Ex Parte* at 2 (discussing "several IPCS providers' exploitation of the FCC's rules, such as single-call ancillary fees and refusal to grant refunds").

enforcement is therefore necessary. To that end, we direct the Enforcement Bureau to work with CGB to develop a new IPCS complaint category, in addition to the existing informal consumer complaint process, within its existing intake system to ensure that IPCS industry providers, watchdogs, and other stakeholders have a mechanism for CGB to immediately bring any potential rule violations to the Enforcement Bureau's attention for investigation.[2108] Should the Commission observe or be made aware of practices, conduct, or other behavior that evades or is designed to evade our rules, we will not hesitate to take appropriate remedial action up to and including enforcement action, which may subject IPCS providers to, among other penalties, the imposition of monetary forfeitures.[2109] Thus, practices such as price gouging through, for example, charging rates above our rate caps, imposing ancillary service charges, or attempting to recover costs associated with the payment of site commissions, whether monetary or in-kind, through regulated rates may subject IPCS providers to investigation by the Commission's Enforcement Bureau and enforcement action. Similarly, practices that deprive consumers of funds in their IPCS accounts, circumvent the safeguards we adopt today governing alternate pricing plans or the Commission's disability access rules pertaining to IPCS may also subject IPCS providers to investigation and enforcement action by the Enforcement Bureau. At the same time, IPCS providers and other stakeholders are encouraged to provide the Commission with information at any time, whether through an informal complaint or otherwise, regarding attempts to skirt our rules or possible violations of our rules. In addition, the Commission will monitor providers' annual reports, which are due April 1 each year, for developments that may suggest noncompliance with our rules.[2110] Close scrutiny of these and other practices and behaviors, including through enforcement action where appropriate, will ensure that the reforms we adopt today are fully implemented.

      **I.**      **Severability**

      598.      The rules and policies adopted in this Order are designed to ensure that the rates and charges for IPCS are both just and reasonable for consumers and provide fair compensation for providers, in accordance with section 276, as amended by the Martha Wright-Reed Act, along with section 201(b) of the Communications Act.[2111] Other rules and policies seek to improve communications services for incarcerated people with disabilities. Each of the separate reforms we undertake here serves a particular function towards these goals. Therefore, it is our intent that each of the rules and policies adopted herein shall be severable. If any of the rules or policies is declared invalid or unenforceable for any reason, the unaffected rules shall remain in full force and effect.[2112]

## IV.    ORDER ON RECONSIDERATION, CLARIFICATION AND WAIVER

      599.      We address and resolve multiple pending petitions in this proceeding. We grant the Hamilton Relay, Inc. petition for reconsideration[2113] of certain aspects of the *2022 ICS Order*. We dismiss the United Church of Christ and Public Knowledge petition for reconsideration of the *2021 ICS*

---

[2108] We clarify that informal IPCS-related consumer inquiries and complaints should continue to be made to CGB, using established practices and procedures. Federal Communications Commission, Consumer Inquiries and Complaints Center, https://consumercomplaints.fcc.gov/hc/en-us (last visited July 15, 2024).

[2109] 47 U.S.C. § 503(b); 47 CFR § 1.80.

[2110] 47 CFR § 64.6060.

[2111] 47 U.S.C. § 276; Martha Wright-Reed Act § 2; 47 U.S.C. § 201(b).

[2112] We find premature ViaPath's request that we make clear that the rules and policies we adopt that are "related to IPCS rates and charges" are not severable from each other. *See* ViaPath July 11, 2024 *Ex Parte* at 5-6. In the unlikely event any of those rules or policies is declared invalid or unenforceable, interested parties are free to bring the matter to our attention or raise such arguments in court, as appropriate.

[2113] Petition for Partial Reconsideration of Hamilton Relay, Inc., WC Docket No. 12-375 (filed Jan. 9, 2023).

*Order*[2114] and dismiss the remainder of the NCIC petition for reconsideration[2115] not previously addressed. We also dismiss a petition filed by Securus seeking clarification of one aspect of the *2021 ICS Order*[2116] and dismiss in part and otherwise deny the Securus petition for waiver[2117] of certain Commission rules.

### A.    Hamilton Petition for Reconsideration

600.    Hamilton Relay, Inc., seeks partial reconsideration of the requirement that VRS and IP CTS providers update an incarcerated person's registration information within 30 days of the user being released from incarceration or transferred to a different correctional authority.[2118]  Hamilton asserts that TRS providers will learn that an incarcerated person has been released or transferred only when notified by the correctional authority or the incarcerated person.[2119]  Hamilton therefore asks us to modify section 64.611(k)(1)(iii) of our rules to require that VRS and IP CTS providers update an incarcerated person's registration information within 30 days "of receiving written notification from such person or the correctional authority of" an incarcerated person's release or transfer, rather than within 30 days "after" such release or transfer."[2120]  No party opposes this change.[2121]

601.    As some commenters anticipate, this concern may be less pressing as a result of our determination above to allow enterprise registration for IP CTS in carceral settings.[2122]  Nevertheless, to the extent that individual registration continues to be used, we agree that TRS providers are not expected to independently track the location status of incarcerated users who have individually registered for IP CTS or VRS.  The allowed thirty-day period for updating registration information should begin upon the provider's receipt of written notification of the incarcerated person's release or transfer.  Accordingly, we amend section 64.611(k)(1)(iii) to clarify the rule.  We modify Hamilton's proposed language to reflect that written notification may be received from the incarcerated person, the correctional authority, or the

---

[2114] Petition for Reconsideration of UCC, OC Inc. and Public Knowledge, WC Docket No. 12-375 (filed Dec. 15, 2022).  The petition seeks reconsideration of various aspects of the Commission's treatment of site commissions in the *2021 ICS Order*.  *E.g., 2021 ICS Order*, 36 FCC Rcd at 9530, para. 28.  Given the actions we take addressing site commissions in this Order, we dismiss the petition as moot.

[2115] Petition for Reconsideration of NCIC Inmate Communications, WC Docket No. 12-375, at 1 (filed Aug. 27, 2021) (NCIC Reconsideration Petition).  The Commission previously addressed the portions of the petition relating to the Commission's interim caps for certain ancillary service charges.  *2022 ICS Order*, 37 FCC Rcd at 11937, para. 82 & n.238.  We now dismiss as moot the remainder of the petition given our actions in this Order.

[2116] Securus Technologies, LLC Petition for Clarification, WC Docket No. 12-375 (filed Sept. 17, 2021) (Securus Petition for Clarification).

[2117] Securus Waiver Petition.

[2118] *2022 ICS Order*, 37 FCC Rcd at 11912, para. 26; 47 CFR § 64.611(k)(1)(iii) ("Upon release (or transfer to a different correctional authority) of an incarcerated person who has registered for VRS or IP CTS, the VRS or IP CTS provider with which such person has registered shall update the person's registration information within 30 days after such release or transfer.").

[2119] Hamilton Petition for Reconsideration at 2-3.

[2120] *Id.* at 2.

[2121] *See* Response to Petitions for Reconsideration by Accessibility Advocacy and Research Organizations, WC Docket No. 12-375, at 6-7 (filed Feb. 23, 2023) (Accessibility Coalition Feb. 23, 2023 Response) (supporting the petition); ClearCaptions, LLC Comments, WC Docket No. 12-375 (filed Feb. 23, 2023) (ClearCaptions Feb. 23, 2023 Comments) (supporting the petition); Global Tel*Link Corp. d/b/a ViaPath Comments, WC Docket No. 12-275, at 6 (rec. Feb. 23, 2023) (taking no position on the petition, while asserting that correctional authorities, not ICS providers, are in the best position to provide such information); Securus Technologies, LLC Reply, WC Docket No. 12-375, at 1-2 (rec. Mar. 6, 2023) (Securus Mar. 6, 2023 Reply) (supporting the petition).

[2122] *See supra* Section III.F.2 (Enterprise Registration for IP CTS); ClearCaptions Feb. 23, 2023 Comments at 2; Securus Mar. 6, 2023 Reply at 2; UCC Media Justice June 14, 2024 *Ex Parte* at 1-2.

Federal Communications Commission                                    FCC 24-75

IPCS provider.[2123]

602.    We also modify this provision to clarify the updated information that TRS providers must transmit to the TRS User Registration Database when an individual who registers for VRS or IP CTS while incarcerated is released.  In addition to the individual's residential address and Registered Location (if required), the update shall include any other required registration information not previously provided.

603.    We therefore grant Hamilton's Petition for Reconsideration with the modifications described herein.

### B.    Securus Petition for Clarification

604.    We dismiss as moot Securus's Petition for Clarification, which "addresses only contractually prescribed site commission payments."[2124]  With respect to such payments, Securus seeks clarification as to whether providers may use "revenues from ICS rates to pay site commission costs above the $0.02 rate cap," provided that the total charged to consumers does not exceed the applicable rate cap.[2125]  Securus's concern stems from the Commission's statement in the *2021 ICS Order* in which it confirmed that the $0.02 per minute allowance for contractually prescribed site commissions "does not prevent or prohibit the payment of additional site commission amounts to correctional facilities should the calling services providers and the facility enter into a contract resulting in the provider making per-minute payments to the facility higher than $0.02."[2126]  Securus contends that the Commission's language "creates ambiguity over whether providers may pay additional site commissions from end user revenues collected under the provider-related rate component."[2127]  In Securus's view, "[f]ailure to clarify the limits of site commission cost recovery from ICS rates . . . could result in some providers being competitively disadvantaged in the bidding process by which ICS service providers are selected to serve carceral facilities."[2128]

605.    Our actions today, which end the practice of paying site commissions, effectively moot Securus's request for clarification.[2129]  Our reforms eliminate site commission payments associated with IPCS.[2130]  Because IPCS providers will no longer be able to pay site commissions associated with their IPCS offerings, we need not clarify whether providers may use IPCS revenues to pay such site commissions.

### C.    Securus Waiver Petition

606.    We dismiss in part and otherwise deny the Securus Waiver Petition.[2131]  In its Waiver Petition, Securus seeks a waiver of sections 64.6030, 64.6080, and 64.6090 of the Commission's rules so that "Securus and other providers" can offer "alternative rate options that promote increased calling while reducing costs."[2132]  Because we adopt rules specifically allowing alternate pricing plans, including flat-

---

[2123] *See* 47 CFR § 64.6040(c)(4) (requiring inmate calling services providers to provide such notification to TRS providers).

[2124] *See* Securus Petition for Clarification at 1.

[2125] *Id.* at 2.

[2126] *2021 ICS Order*, 36 FCC Rcd at 9592, para. 168.

[2127] Securus Petition for Clarification at 3.

[2128] *Id.* at 4.

[2129] Because the rules we adopt today in connection with site commissions apply prospectively, there are no retroactive implications from these actions that we need to consider.

[2130] *See supra* Section III.J.7 (discussing effective and compliance dates).

[2131] *See generally* Securus Waiver Petition.

[2132] *Id.* at 1.

rate pricing, Securus's requests for a waiver of section 64.6030, which specifies the use of mandatory rate caps on a per-minute basis,[2133] and section 64.6090, which prohibits flat-rate calling,[2134] are moot and are therefore dismissed.

607.    We deny Securus's request for a waiver of section 64.6080, which prohibits per-call and per-connection charges, to the extent that request would permit a provider to impose such one-time charges in addition to any base rates for alternate pricing plans.[2135]  Section 64.6080 is a key consumer protection rule that we retain today, and Securus does not explain why a waiver of this section of the rules is necessary in light of the alternate pricing plan rules we adopt in the Order.

# V.    FURTHER NOTICE OF PROPOSED RULEMAKING

## A.    Establishing Permanent Rate Caps for Video Services

608.    In the accompanying Order, we determine that we do not have a sufficient record or sufficiently reliable data from the 2023 Mandatory Data Collection to set permanent rate caps for video IPCS.[2136]  The Commission identified anomalies in the video cost data (both industry-wide and for Securus in particular) that suggest that there is significant room for growth in this nascent market and that these data were unlikely to be representative of longer term trends in the video IPCS market.  For these reasons, we establish interim rates based on the best data available and delegate authority to WCB and OEA to conduct an additional mandatory data collection to obtain updated cost and other data and information from providers concerning their video IPCS offerings, among other things.[2137]  We now seek further comment on establishing permanent rate caps for video IPCS that are just and reasonable, and will fairly compensate IPCS providers.  We emphasize that we will keep a close eye on developments in the video IPCS marketplace, including how changes in it affect people with disabilities.  We anticipate receiving detailed information on those developments as part of the IPCS providers' annual reports once WCB and CGB revise the requirement for those reports in response to our Report and Order.[2138]  We also will be receiving detailed information regarding video IPCS costs and demand and (to the extent practicable) how those costs might change over time, once WCB and OEA implement the additional data collection we require today.[2139]  We ask interested parties to supplement the record in this proceeding with any information they have regarding the types of video communications services that providers offer incarcerated people, the demand for those services, the used and useful costs providers and facilities incur in the provision of those services, and other information that might help us set just and reasonable, and fairly compensatory, permanent rate caps for video IPCS.  While the course of this proceeding, including the Commission's efforts regarding inmate calling services prior to the enactment of the Martha Reed-Wright Act, make us acutely aware of all the steps involved in determining just and reasonable, and fairly compensatory, permanent rate caps, we intend to move quickly to complete that task with regard to video

---

[2133] *See supra* Section III.D.9.c.i (General Parameters of Alternate Pricing Plans); *infra* Appendix A, 47 CFR § 64.6140.

[2134] *See supra* Section III.D.9.d.i (Flat-Rate Calling); *infra* Appendix A (removing 47 CFR § 64.6090).

[2135] 47 CFR § 64.6080 (prohibiting providers from imposing a per-call or per-connection charge on a consumer); *see supra* Section III.D.9.c.i (General Parameters of Alternate Pricing Plans) (requiring IPCS providers that offer alternate pricing plans to comply with the rules specific to alternate pricing plans, as well as other rules applicable to all IPCS, to help ensure just and reasonable charges).  *See also 2015 ICS Order*, 30 FCC Rcd at 12810, para. 98 (explaining that "[p]er-call or per-connection charges are one-time fees often charged to ICS users at call initiation.").

[2136] *See supra* Section III.D.4.b (Determining Permanent Rate Caps for Audio and Interim Rate Caps for Video IPCS).

[2137] *See supra* Section III.H.4 (Reporting and Recordkeeping).

[2138] *See supra* Section III.H.3 (Annual Reporting and Certification Requirement).

[2139] *See supra* Section III.H.4 (Reporting and Recordkeeping).

IPCS once we have the requisite information.

609.     In the *2023 IPCS Notice*, the Commission sought comment on how we could best ensure that the rates and charges for video IPCS are just and reasonable.[2140]  We now invite further comment on the video IPCS marketplace, including the types of costs incurred by video IPCS providers and the pricing and other associated practices under which such providers presently offer video services to incarcerated people.  What types of video communications services are currently being offered to incarcerated people and what additional video services are likely to be offered in the near future?  Is there a difference between video communications depending on the technology used?  For example, are kiosks the primary means of video IPCS or are tablets more prevalent?  What role does application-based video IPCS play in the IPCS market and how is that role likely to change in the future with increased deployment of tablets?  Do providers use third-party applications, or develop applications internally?  Do providers that develop such applications internally offset their development costs by selling them to other providers?  Are there trends favoring the use of one technology over the other, for example, in costs, deployment, or usage?  Is there a cost difference between different types of technologies, whether hardware-based or software-based, or among different versions of the same types of technologies?  Are these technologies used in different ways?  For example, are kiosks used more commonly for on-site video visitation?  Do different hardware or software platforms entail differences in the manner in which video IPCS is offered, for example, as to quality of service or the variety of features offered with the service?  Within the categories of safety and security services that we identify as used and useful in the accompanying Order, are any such services or functions particular to video IPCS that—given the developing nature of the market—are still in the process of deployment or development?

610.     We also seek comment on trends that may characterize the video IPCS market.  What trends are there, if any, in the costs of providing video IPCS?  Are the substantial investments providers reported making in video equipment in the 2023 Mandatory Data Collection continuing or is investment in them trending to more stable, sustainable levels?  Under what circumstances would it be appropriate to determine that the market has reached a more mature stage, potentially warranting the adoption of permanent, rather than interim, rates?  What trends are there, if any, in demand for video IPCS?  To what extent are providers' investments in and deployment of video equipment and network architecture stimulating demand for video IPCS?  Are there trends in the costs of deploying these technologies as they become more widely available?  Are there trends in the relative usage of these technologies to access video IPCS, including video visitation, versus other services provided via the same technologies or platforms, such as educational or entertainment services?  How should we measure the relative use of these technologies among different services?  What proportion of equipment and platform costs are devoted to providing video IPCS as compared to providing other services?  Given the common usage of these equipment and platforms, what are appropriate methods for allocating costs among video IPCS, audio IPCS, and other non-IPCS that use the same equipment and platforms?  What trends are there, if any, in providers' investment in the platforms necessary to support the provision of video IPCS?

611.     *Additional Mandatory Data Collection.*  In the accompanying Order, we direct staff to conduct an additional mandatory data collection to obtain updated data on video IPCS and the IPCS industry in general.  We seek comment on the types of data that would be most helpful for the Commission to collect to support its efforts to adopt permanent video IPCS rate caps in the future.  We invite comment on any changes the Commission should consider making to the 2023 Mandatory Data Collection as it considers developing the additional data collection.  Are there any types of data that the Commission should consider adding to that collection to ensure it meets the Commission's needs?[2141]  We also seek comment on the relative benefits and burdens that collecting additional data would entail.

---

[2140] *2023 IPCS Notice*, 38 FCC Rcd at 2686-88, paras. 39-46.

[2141] *See, e.g.*, UCC Media Justice July 12, 2024 *Ex Parte* at 2 (supporting "regular re-evaluations of all rates, including very small or rural jails, but also focused on rates that should be declining because of increased efficiencies and cheaper modern technologies").

Finally, we seek comment on the appropriate timeframe in which to conduct this data collection to ensure that the data we receive reflect a sufficiently mature video IPCS market to be suitable as the basis for setting permanent video IPCS rate caps.

### B.    Further Disaggregating the Very Small Jail Tier

612.    In the accompanying Order, we establish five rate cap tiers based on facility type and size, based on the best evidence available, in both the record and the data provided in the 2023 Mandatory Data Collection, reflecting the factors driving providers' costs.[2142]  Of the four size tiers for jails, the smallest size tier (i.e., for those jails with an average daily population of less than 100) makes up approximately half of all jails for which we had available data.[2143]  Given the relative share of jail facilities comprising this tier, we recognize that there may be additional distinctions within this tier that are not effectively captured by the available data and that the number of facilities in this tier, of necessity, limits the granularity of the analysis for this smallest jail tier.[2144]  Accordingly, we seek comment on the types of cost or other data that would be most helpful for the Commission to collect from providers serving this tier of facilities to ascertain whether, and if so how, to further disaggregate this tier to capture any variability that may exist within segments of this tier.  Are there any particular types of data that the Commission should consider adding to our subsequent data collection to ensure that it meets the Commission's needs in this regard?  We also seek comment on, if the data suggests that this tier should be further disaggregated, how to do so in a manner that accurately reflects providers' costs, but also minimizes the burden on providers to administer or on consumers to understand.

### C.    Quality of Service

613.    Many commenters raise concerns regarding the quality of IPCS.[2145]  Dropped calls, lack

---

[2142] *See supra* Section III.D.1.c (Rate Cap Tiers).

[2143] *See* Appendix F; *see, e.g.*, Pay Tel July 11, 2024 *Ex Parte* at 2 (arguing that "[o]f the 2,779 jails in operation today, 1,523 have populations below 100").

[2144] For example, certain small providers that serve very small jails failed to submit data in response to the 2023 Mandatory Data Collection that we found to be reliable and therefore excluded from our analysis.  *See* Appendix D. Although we find that the available data are sufficiently robust for setting permanent audio rate caps at the tiers we adopt in the Report and Order, obtaining more reliable data from these providers may establish a better more comprehensive understanding of the costs of serving this smallest tier of jails.

[2144] Commenters suggest that the smallest facilities are subject to particularly high costs, due to, for example, more frequently being located in rural areas.  *See, e.g.*, *supra* note 513 (addressing the comment record attributing higher costs at smaller facilities to economies of scale and rurality); NCIC May 8, 2023 Comments at 9-10 (arguing that "there may be some necessary exceptions" to rate cap tiers "for smaller, rural facilities (including those with populations of 50 or fewer)," as "the costs of delivering services are higher" at rural facilities); Securus Dec. 15, 2022 Comments at 6 (noting the costs to deploy TRS as required at very small facilities are "not insubstantial" and "may not be recoverable in light of the revenue opportunity at the facility").  *But see* UCC Media Justice July 12, 2024 *Ex Parte* at 2 ("Advocates support regular re-evaluations of all rates, including very small or rural jails, but also focused on rates that should be declining because of increased efficiencies and cheaper modern technologies.").

[2145] California PUC May 8, 2023 Comments at 9 (urging the Commission to establish service quality standards); California PUC June 6, 2023 Reply at 5 ("The FCC should consider adopting quality of service standards and an enforcement mechanism to ensure IPCS providers provide functional and accessible equipment in all carceral facilities."); California PUC Sept. 27, 2021 Comments at 5-6 (explaining how consumers are charged multiple connection fees because of dropped calls); California PUC Sept. 27, 2021 Comments, Attach. A, California PUC Decision 21-08-037 Decision Adopting Interim Rate Relief for Incarcerated Person's Calling Services, at 14 (quoting commenters who explain how "[w]hen the inmates have access to the phones, it is often difficult to hear them because of the poor manner in which much of the equipment is lackadaisically 'maintained' with no concern exercised by the institutions or the service providers" and "[t]hese calls get disconnected all the time because of the awful signal. When a call is disconnected, that is a call spent"); Worth Rises May 8, 2023 Comments at 10 (explaining that per call pricing structures encourage "[shoddy] service with dropped calls" because they charge for

(continued….)

of enough communications devices at facilities, frozen video screens, and other technological shortcomings are ongoing challenges for incarcerated people and their loved ones.[2146]  As an initial matter, we seek comment on scope of the Commission's authority to address quality of service issues related to these communications services, including to establish and enforce service quality rules or standards for the provision of IPCS.  The Commission long has relied on its section 201(b) authority to address traffic delivery and call completion concerns.[2147]  In addition, the Commission has recognized that "[a]n inherent part of any rate setting process is not only the establishment of the rate level and rate structure, but the definition of the service or functionality to which the rate will apply."[2148]  We thus believe that quality of service considerations are within the purview of our establishment of a compensation plan to ensure just and reasonable rates for IPCS under section 276(b)(1)(A).[2149]  Do commenters agree that our traditional sources of statutory authority over these communications and providers—sections 276 and 201—convey jurisdiction for the regulation of service quality?[2150]  Are there alternative statutory provisions on which we could rely to regulate the service quality of IPCS?  Does the source of our authority differ depending on the type of communication, i.e., audio or video IPCS?[2151]

614.    Assuming the Commission has statutory bases to address service quality issues, we seek comment on whether the Commission should develop minimum federal quality of service standards.  If federal standards are warranted, how should such standards or rules be developed?  Should there be different standards or rules for different types of facilities or providers?  Should the Commission establish the same or different standards for audio and video IPCS?  Are there technical considerations that may warrant different standards for video services, or for different types of video services?  How would the Commission monitor and enforce such standards?  Similarly, are there service quality issues caused by factors beyond the control of the IPCS provider, such as broadband congestion or network failures?  If so, how would federal standards account for these factors?

615.    We also seek comment on the types of service quality issues that should be addressed by any federal standards.  Should the standards simply address the most common issues reported in the record or attempt to cover any issue that materially impacts the communication service?  If the

---

the entire block of time rather than the length of the communication); Public Interest Parties Apr. 15, 2024 *Ex Parte* at 4 (noting "that incarcerated people have difficulty connecting and may be charged for multiple calls if the call drops or quality is poor" and arguing that "requiring that a consumer pay for communication they did not receive, such as a call or video link where the parties on the line hear another call, or that is cut off repeatedly or is overwhelmed with static, would not result in just and reasonable rates").

[2146] *See, e.g.*, Chicago Listening Session at 245 (explaining how calls between incarcerated people and their loved ones would drop "three, four, five, six, ten times"); *id.* at 928-37 (describing a video call in which the caller was "stuck seeing a picture of an officer" rather than her incarcerated niece, with the call then being dropped and not refunded); Charleston Listening Session at 16:12-17:14 (agreeing that not only are calls dropped "daily," "[i]t happens all the time"); *id.* at 62:10-12 (explaining quality of service issues, including how "They also drop calls.  There's poor sound quality.  The service goes out frequently").  *But see* ViaPath June 13, 2024 *Ex Parte* at 15 (arguing that "'dropped calls' are not evidence of a service quality issue" because "[c]alls received on mobile devices also may be dropped due to service quality issues on the called party's mobile network" which "ViaPath has no control over.").

[2147] *See, e.g., USF/ICC Transformation Order,* 26 FCC Rcd at 17903, para. 734; *Establishing Just and Reasonable Rates for Local Exchange Carriers; Call Blocking by Carriers*, WC Docket No. 07-135, Declaratory Ruling and Order, 22 FCC Rcd 11629, 11631, paras. 5-6 (WCB 2007).

[2148] *USF/ICC Transformation Order*, 26 FCC Rcd at 17922-23, para. 776.

[2149] 47 U.S.C. § 276(b)(1)(A).

[2150] *See id*. §§ 201, 276.

[2151] *See* Letter to Marlene Dortch, Secretary, FCC, from Stephen Raher, Amalgamated Policy Research, WC Docket Nos. 23-62 and 12-375 (filed June 5, 2024) (describing the jurisdictional bases for the Commission to regulate practices and service quality in the context of IPCS video calling).

**Federal Communications Commission**                    **FCC 24-75**

Commission adopted service quality standards, how would such standards be monitored and enforced and through what procedures?  Under what circumstances, if any, should the standards require refunds to IPCS consumers?

616.    Finally, are there any existing service quality standards or regulations in the IPCS marketplace today?  To the extent that parties support adoption of federal service quality standards, we anticipate that existing standards or regulations might provide a model for federal efforts.  Do prison and jail facilities currently have rules or regulations in place to address the service quality of IPCS?  Do contracts between correctional institutions and providers include service quality standards, and, if so, what kinds of standards and what type of metrics for monitoring such standards are included?  Have states adopted any regulations designed to address service quality of communications in correctional facilities?  Parties should address these and any additional issues related to the service quality of IPCS.

### D.    Expanding the Definitions of Prisons and Jails

617.    In the accompanying Report and Order, we modify the definition of "Jail" to encompass all immigration detention facilities, but we decline, at this time, to further expand the definitions of "Prison" and "Jail" in our rules, as requested by some parties, to capture the full universe of confinement facilities such as civil commitment, residential, group and nursing facilities.[2152]  Although we agree that individuals in these facilities should benefit from the protections of just and reasonable rate caps and other consumer protection rules that we adopt here, we conclude that the Commission lacks sufficient information and data to address the requests.  For this reason, we seek further comment on the costs providers incur in providing service to confinement facilities that are not correctional institutions.

618.    Some parties contend that the definition of payphone service in section 276 of the Communications Act is, in pertinent part, limited to payphone service provided "in correctional institutions" and does not extend to confinement facilities that allegedly are not "correctional" in nature.[2153]  Others assert that the protections of our rules should be extended to benefit individuals in confinement facilities generally.[2154]  We seek comment on whether our statutory authority under section 276 can be interpreted to extend to confinement facilities.  Are there other sources of statutory authority that would allow us to extend our regulations to cover these facilities?

619.    Some parties contend that IPCS regulations should only apply to "corrections-type communications systems"[2155] because the various types of confinement facilities may not have the same cost characteristics as correctional facilities.[2156]  We seek comment on whether confinement facilities

---

[2152] *See supra* Section III.H.2 (Definitions of Prisons and Jails).  Several commenters support expanding the definition of "Jail" to cover civil commitment facilities, residential facilities, group facilities, and nursing facilities in which people with disabilities, substance abuse problems, or other conditions are routinely detained.  *See id*.  In both the *2022 ICS Notice* and *2023 IPCS Notice*, the Commission sought comment on modifying the definitions of "Jail" and "Prison" in its rules "to ensure that they capture the full universe of confinement facilities."  *See 2022 ICS Notice*, 37 FCC Rcd at 11963, para. 161; *2023 IPCS Notice*, 38 FCC Rcd at 2693, para. 61.  In addition, the Commission sought comment in 2022 on its authority to apply the inmate calling services rules, "including those addressing communication disabilities, to these facilities."  *2022 ICS Notice*, 37 FCC Rcd at 11964, para. 161.

[2153] National Sheriffs' Association Dec. 15, 2022 Comments at 6-7 (asserting that section 276 is limited to "the provision of inmate telephone service in correctional institutions" and that "with the exception of civil commitment facilities, it appears the other facilities identified by the Commission do not involve involuntary confinement" and "are not jails or prisons under the criminal justice system").

[2154] EPIC Dec. 15, 2022 Comments at 2 (urging the Commission to continue to expand protections for vulnerable populations subject to various forms of detention).

[2155] NCIC Dec. 15, 2022 Comments at 9.

[2156] National Sheriffs' Association Dec. 15, 2022 Comments at 7; *see also* Securus Dec. 15, 2022 Comments at 42 (contending that "[h]ealth care facilities, group facilities and the other types of facilities identified in the Notice have
(continued….)

outside the scope of facilities historically encompassed by our rules have cost characteristics that are substantially similar to the facilities our rules traditionally have addressed. Do confinement facilities make available communications services and impose similar types of usage restrictions as correctional facilities? Parties addressing these issues should detail any cost and service differences, and how such differences might result in different rate caps for non-correctional confinement facilities.

### E.      Treatment of Unused Balances in IPCS Accounts

620.      In the Report and Order, we adopt permanent rules designed to ensure that IPCS account holders receive refunds of any unused funds in their accounts once the accounts are deemed inactive.[2157] We invite comment on whether to incorporate into those rules a requirement that providers allow account holders to designate a family member or other individual as an additional person eligible to receive refunds. We ask that commenters address the relative benefits and burdens of such a measure. We also ask how we might tailor such a measure to facilitate timely refunds without unduly burdening providers.[2158] Should we, for example, require providers to give account holders the opportunity to provide their designees' contact information, including residential addresses, phone numbers, and email addresses? Should we specify, in addition, that a designee receive any inactivity and refund notices that would be provided to the account holder and be allowed to request refunds on the account holder's behalf?

### F.      Uniform Additive to Account for Correctional Facility Costs

621.      We seek comment on whether we should adopt a uniform additive to our IPCS rate caps to account for correctional facility costs. In the Report and Order, we permit IPCS providers to reimburse correctional facilities for the used and useful costs they may incur in allowing access to IPCS.[2159] Some commenters express concern that the reimbursement we permit may be difficult for IPCS providers to implement, particularly in determining which costs are used and useful for purposes of reimbursement.[2160] As an alternative, some commenters propose the use of an "explicit additive to the rate caps for audio and video IPCS."[2161] Under this proposal, rather than permit IPCS providers and correctional facilities to negotiate for reimbursement under our current audio and video IPCS rates caps, the Commission would adopt a uniform facility cost additive. One commenter suggests that this approach "would properly account for the security needs of facilities (and corresponding costs caused by making IPCS available)" and would "help to ensure the continued widespread availability of IPCS."[2162] We seek comment on this proposal, including the extent to which an additive would be a reasonable method to ensure that correctional facilities are able to recover the used and useful costs they incur in making IPCS available. Is such an additive preferable to the freely-negotiated reimbursement we allow in the accompanying

---

[2157] *See supra* Section III.G.2.

[2158] *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 29-30 (requesting a further notice exploring the use of a third-party designee).

[2159] *Supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[2160] *See, e.g.*, ViaPath July 11, 2024 *Ex Parte* at 4 (noting that the Commission's reimbursement mechanism may create "confusion and conflict for facilities and IPCS providers with respect to 'reimbursement' limits"); ICSolutions July 12, 2024 *Ex Parte* at 1 (seeking clarification about reasonable correctional facility costs); Securus July 11, 2024 *Ex Parte* Attach. A at 2 (asking how reimbursement payments should be structured "so as to avoid unjustified claims that allowable reimbursement payments are in fact prohibited site commissions").

[2161] *See, e.g.*, Wood June 7, 2024 Report at 2; Prison Policy Initiative June 25, 2024 *Ex Parte* at 7 (discussing a "maximum facility cost recovery fee").

[2162] Wood June 7, 2024 Report at 3.

substantially different security requirements than typical jails, prisons or other types of detention facilities that results in different cost structures and different communications options and restrictions").

Report and Order? Why or why not? Would a uniform additive allow correctional facilities to better adapt to the IPCS rate structure the Commission adopts today? Why or why not?

622.    We seek broad comment on the contours of any possible rate additive. In particular, we seek comment on the appropriate amount of a rate additive for used and useful correctional facility costs. One commenter suggests that $0.02 could be established as a maximum cost recovery amount.[2163] This would be consistent with the approach the Commission took for prisons and jails with average daily populations of 1,000 or more in the *2021 ICS Order*.[2164] Pay Tel's outside consultant, estimates, on the basis of an informal survey of 30 correctional facilities with average daily populations below 1,000 that the average used and useful costs may be $0.08 per minute.[2165] Which data should the Commission rely on in determining the appropriate additive and why? To the extent commenters believe more data are needed, should the Commission seek those data through an additional data collection? How can we ensure that we receive reliable data on correctional facilities' used and useful costs for purposes of establishing a rate additive?[2166] Finally, we invite comment on how the Commission should implement a rate additive within the zones of reasonableness determined in the Report and Order.

### G.    Effect on Small Entities

623.    We seek comment on the effect that our proposals to adopt permanent video IPCS rate caps, quality of service rules, and expanded definitions of "Prison" and "Jail" in our rules would have on small entities, and whether any rules that we adopt should apply differently to small entities. We seek input on the effect, if any, on small entities of any other issues upon which we inquire in this Notice. We also seek comment on how we should take into account the impact on small businesses and, in particular, any disproportionate impact or unique burdens that small businesses may face, in effectuating the questions and proposals in this Notice. Parties should also address any alternative proposals that would minimize the burdens on small businesses.

### H.    Digital Equity and Inclusion

624.    The Commission, as part of its continuing effort to advance digital equity for all,[2167] including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality, invites comment on any equity-related considerations[2168] and benefits (if any) that may be

---

[2163] Prison Policy Initiative June 25, 2024 *Ex Parte* at 7.

[2164] *2021 ICS Order*, 36 FCC Rcd at 9575, para. 134 (permitting IPCS providers to recover "no more than $0.02 per minute" to account for contractually prescribed site commissions).

[2165] Wood June 7, 2024 Report at 6.

[2166] Obtaining reliable correctional facility cost data has been a perennial problem in these proceedings. In the *2021 ICS Notice*, the Commission sought comment on how to obtain reliable correctional facility data. *2021 ICS Notice*, 37 FCC Rcd at 9565, para. 324. The Commission also sought facility cost data in the 2023 Mandatory Data Collection. As we explain above, however, commenters have not provided updated facility cost data. *Supra* Section III.D.3 (Accounting for Correctional Facility Costs).

[2167] Section 1 of the Communications Act provides that the Commission "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

[2168] The term "equity" is used here consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons

(continued….)

associated with the proposals and issues discussed in this Notice.  Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility, as well as the scope of the Commission's relevant legal authority.

### I.     OPEN Government Data Act

625.    We also seek comment on whether any of the information proposed to be collected in this would constitute "data assets" for purposes of the OPEN Government Data Act and, if so, whether such information should be published as "open Government data assets"?

## VI.    PROCEDURAL MATTERS

626.    *Final Regulatory Flexibility Analysis.*  As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[2169] the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) relating to this Report and Order and this Order on Reconsideration, Clarification and Waiver. The FRFA is set forth in Appendix B.

627.    *Initial Regulatory Flexibility Analysis.*  As required by the RFA,[2170] the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities by the policies and rules proposed in the *2024 IPCS Notice*.  The IRFA is set forth in Appendix C.  The Commission requests written public comments on the IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments provided in the *2024 IPCS Notice*.  The Commission will send a copy of the *2024 IPCS Notice*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2171]  In addition, the *2024 IPCS Notice* and the IRFA (or summaries thereof) will be published in the Federal Register.[2172]

628.    *Congressional Review Act.*  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs that this rule is "major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this *2024 IPCS Order* and *2024 IPCS Notice* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).[2173]

629.    *Paperwork Reduction Act Analysis.*  The *2024 IPCS Order* may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law No. 104-13.  All such requirements will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA.  OMB, the general public, and other federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. § 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

630.    In this present document, we have assessed the effects of the information collection burdens imposed on small businesses and, in particular, businesses with fewer than 25 employees as a result of this Report and Order.  Those requirements include consumer disclosure and inactive account requirements.  We find that those requirements, including the posting of certain information on publicly

---

otherwise adversely affected by persistent poverty or inequality.  *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

[2169] 5 U.S.C. § 601 *et seq*.

[2170] *Id.* § 603.

[2171] *See id.* § 603(a).

[2172] *Id.*

[2173] *Id.* § 801(a)(1)(A).

available websites, do not impose undue burdens on smaller businesses. We also find that obligations to collect and maintain consumer information in order to refund inactive account balances are commensurate with the number of customers served and therefore impose proportionate burdens on smaller businesses given the scale of their operations.

631.    *Initial Paperwork Reduction Act Analysis.*  The *2024 IPCS Notice* may contain new or modified information collection(s) subject to the PRA.[2174]  If the Commission adopts any new or modified information collection requirements, they will be submitted to the OMB for review under section 3507(d) of the PRA.  OMB, the general public, and other federal agencies are invited to comment on the new or modified information collection requirements contained in this proceeding.  In addition, pursuant to the Small Business Paperwork Relief Act of 2002,[2175] we seek specific comment on how we might "further reduce the information collection burden for small business concerns with fewer than 25 employees."[2176]

632.    *Providing Accountability Through Transparency Act.*  Consistent with the Providing Accountability Through Transparency Act, Public Law 118-9, a summary of the *2024 IPCS Order* will be available on https://www.fcc.gov/proposed-rulemakings.

633.    *OPEN Government Data Act.*  The OPEN Government Data Act,[2177] requires agencies to make "public data assets" available under an open license and as "open Government data assets," *i.e.*, in machine-readable, open format, unencumbered by use restrictions other than intellectual property rights, and based on an open standard that is maintained by a standards organization.[2178]  This requirement is to be implemented "in accordance with guidance by the Director of the OMB.[2179]  The term "public data asset" means "a data asset, or part thereof, maintained by the Federal Government that has been, or may be, released to the public, including any data asset, or part thereof, subject to disclosure under [the Freedom of Information Act (FOIA)]."[2180]  A "data asset" is "a collection of data elements or data sets that may be grouped together,"[2181] and "data" is "recorded information, regardless of form or the media on which the data is recorded."[2182]  We delegate authority to the Wireline Competition Bureau, in consultation with the agency's Chief Data and Analytics Officer and after seeking public comment to the extent it deems appropriate, to determine whether any data assets maintained or created by the Commission pursuant to the rules adopted in the *2024 IPCS Order* are "public data assets" and if so, to determine when and to what extent such information should be published as "open Government data assets."  In doing so, WCB shall take into account the extent to which such data assets should not be made publicly available because they are not subject to disclosure under the Freedom of Information Act. *See, e.g.*, 5 U.S.C. § 552(b)(4), (6)-(7) (exemptions concerning confidential commercial information, personal privacy, and information compiled for law enforcement purposes, respectively).  We also seek comment in the *2024 IPCS Notice* on whether any of the information proposed to be collected in the Notice would constitute "data assets" for purposes of the OPEN Government Data Act and, if so, whether such information should be published as "open Government data assets."

---

[2174] Pub. L. No. 104-13.

[2175] Pub. L. No. 107-198.

[2176] 44 U.S.C. § 3506(c)(4).

[2177] Congress enacted the OPEN Government Data Act as Title II of the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435 (2019), §§ 201-202.

[2178] 44 U.S.C. §§ 3502(20), (22) (definitions of "open Government data asset" and "public data asset"), 3506(b)(6)(B) (public availability).

[2179] OMB has not yet issued final guidance.

[2180] 44 U.S.C. § 3502(22).

[2181] *Id.* § 3502(17).

[2182] *Id.* § 3502(16).

634.     *Comment Period and Filing Procedures.*  Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  All filings must refer to WC Docket Nos. 23-62 and 12-375.

- Electronic filers: Comments may be filed electronically using the Internet by accessing the Commission's Electronic Comment Filing System (ECFS): https://www.fcc.gov/ecfs.  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

  - Filings can be sent by hand or messenger delivery, by commercial courier, or by the U.S. Postal Service.  **All filings must be addressed to the Secretary, Federal Communications Commission.**
  - Hand-delivered or messenger-delivered paper filings for the Commission's Secretary are accepted between 8:00 a.m. and 4:00 p.m. by the FCC's mailing contractor at 9050 Junction Drive, Annapolis Junction, MD 20701.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.
  - Commercial courier deliveries (any deliveries not by the U.S. Postal Service) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.
  - Filings sent by U.S. Postal Service First-Class Mail, Priority Mail, and Priority Mail Express must be sent to 45 L Street NE, Washington, DC 20554.

635.     Comments and reply comments must include a short and concise summary of the substantive arguments raised in the pleading.  Comments and reply comments must also comply with section 1.49 and all other applicable sections of the Commission's rules.  We direct all interested parties to include the name of the filing party and the date of the filing on each page of their comments and reply comments.  All parties are encouraged to use a table of contents, regardless of the length of their submission.  We also strongly encourage parties to track the organization set forth in the *2024 IPCS Notice* in order to facilitate our internal review process.

636.     *Ex Parte Rules.*  The proceeding that the *2024 IPCS Notice* initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[2183]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in the prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b).  In proceedings governed by section 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should

---

[2183] 47 CFR § 1.1200 *et seq.*

familiarize themselves with the Commission's *ex parte* rules.

637. *People with Disabilities*. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530.

638. *Availability of Documents.* Comments, reply comments, and *ex parte* submissions will be publicly available online via ECFS.

639. *Further Information*. For further information, contact Stephen Meil, at (202) 418-7233 or Stephen.Meil@fcc.gov or IPCS@fcc.gov.

# VII. ORDERING CLAUSES

640. Accordingly, IT IS ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), this Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking ARE ADOPTED.

641. IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), this Report and Order SHALL BE EFFECTIVE sixty (60) days after publication of a summary of it in the Federal Register, except as stated below. Amendments to sections 64.611(l)(2), (3), (5), (6); 64.6040(f); 64.6060; 64.6110; 64.6120; 64.6130(d), (e), (f), (h)-(k); 64.6140(c), (d), (e)(2)-(4), (f)(2), and (f)(4) will not become effective until the Office of Management and Budget (OMB) completes any review that the Wireline Competition Bureau or the Consumer and Governmental Affairs Bureau determine is required under the Paperwork Reduction Act (PRA). The removal of section 64.6090 will not become effective until after OMB completes any review of section 64.6140. The Commission directs the Wireline Competition Bureau and Consumer and Governmental Affairs Bureau to announce effective dates for these sections by publication in the Federal Register and by subsequent Public Notice.

642. IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), the delegations of authority to the Wireline Competition Bureau, Office of Economics and Analytics, and the Consumer and Governmental Affairs Bureau SHALL BE EFFECTIVE upon publication in the Federal Register.

643. IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), the Petition for Reconsideration, filed August 27, 2021 and amended December 14, 2022, by the United Church of Christ, OC Inc. and Public Knowledge IS DISMISSED as described herein.

644. IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), the Petition for Reconsideration, filed August 21, 2021, by NCIC Inmate Communications IS DISMISSED as described herein.

645. IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2,

**Federal Communications Commission** **FCC 24-75**

4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), the Petition for Partial Reconsideration, filed January 9, 2023, by Hamilton Relay, Inc. IS GRANTED as described herein.

646.    IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), the Petition for Clarification, filed September 17, 2021, by Securus Technologies, LLC IS DISMISSED as described herein.

647.    IT IS FURTHER ORDERED that, pursuant to the authority contained in sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022), the Petition for Waiver, filed August 30, 2021, by Securus Technologies, LLC IS DISMISSED IN PART AND OTHERWISE DENIED as described herein.

648.    IT IS FURTHER ORDERED that, pursuant to applicable procedures set forth in sections 1.415 and 1.419 of the Commission's Rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on this Further Notice of Proposed Rulemaking on or before 30 days after publication of a summary of this Further Notice of Proposed Rulemaking in the Federal Register and reply comments on or before 60 days after publication of a summary of this Further Notice of Proposed Rulemaking in the Federal Register.

649.    IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order and Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis and the Final Regulatory Flexibility Analyses, to the Chief Counsel for Advocacy of the Small Business Administration.

650.    IT IS FURTHER ORDERED that the Office of the Managing Director, Performance Evaluation and Records Management, SHALL SEND a copy of this Report and Order and Further Notice of Proposed Rulemaking in a report to be sent to Congress and the Government Accountability Officer pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

Federal Communications Commission                           FCC 24-75

## APPENDIX A

## Final Rules

For the reasons set forth above, the Federal Communications Commission amends parts 14 and 64 of Title 47 of the Code of Federal Regulations as follows:

## PART 14 – ACCESS TO ADVANCED COMMUNICATIONS SERVICES AND EQUIPMENT BY PEOPLE WITH DISABILITIES

    1. The authority citation for part 14 continues to read as follows:

**Authority:** 47 U.S.C. §§ 151-154, 255, 303, 403, 503, 617, 618, 619 unless otherwise noted.

    2. Amend § 14.10 by revising paragraph (c) to read as follows:

\* \* \* \* \*

  (c) The term *advanced communications services* shall mean:

    (1) Interconnected VoIP service, as that term is defined in this section;

    (2) Non-interconnected VoIP service, as that term is defined in this section;

    (3) Electronic messaging service, as that term is defined in this section;

    (4) Interoperable video conferencing service, as that term is defined in this section; and

    (5) Any audio or video communications services used by inmates for the purposes of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used.

\* \* \* \* \*

## PART 64 – MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

    3. The authority citation for part 64 is revised to read as follows:

**Authority:** 47 U.S.C. §§ 151, 152, 154, 201, 202, 217, 218, 220, 222, 225, 226, 227, 227b, 228, 251(a), 251(e), 254(k), 255, 262, 276, 403(b)(2)(B), (c), 616, 620, 716, 1401-1473, unless otherwise noted; Pub. L. 115-141, Div. P, sec. 503, 132 Stat. 348, 1091; Pub. L. No. 117-338, 136 Stat. 6156.

    4. The authority citation for subpart F is revised to read as follows:

**Authority:** 47 U.S.C. §§ 151-154, 225, 255, 303(r), 616, and 620; Pub. L. No. 117-338, 136 Stat. 6156

    5. Amend section 64.601 by redesignating paragraphs (a)(21) through (a)(56) as paragraphs (a)(23) through (a)(58) and adding paragraphs (a)(21) and (a)(22) to read as follows:

\* \* \* \* \*

(a) \* \* \*

    (21) *Incarcerated People's Communications Service or IPCS.* The term "Incarcerated People's Communications Service" or "IPCS" has the meaning given such term under § 64.6000 of this chapter, as such section may be amended from time to time.

    (22) *Incarcerated Person or Incarcerated People.* The term "Incarcerated Person" or "Incarcerated People" has the meaning given such term under § 64.6000 of this chapter, as such section may be amended from time to time.

    6. Amend section 64.611 by revising paragraph (k) and adding paragraph (l) to read as follows:

## § 64.611 Internet-based TRS registration.

* * * * *

(k) **Individual registration for use of TRS in correctional facilities**

(1) *Registration information and documentation.* If an individual eligible to use TRS registers with an Internet-based TRS provider while incarcerated, the provider shall collect and transmit to the TRS User Registration Database the information and documentation required by the applicable provisions of this section, except that:

(i) The residential address specified for such Incarcerated Person shall be the name of the correctional authority with custody of that person along with the main or administrative address of such authority;

(ii) A Registered Location need not be provided; and

(iii) If an Incarcerated Person has no Social Security number or Tribal Identification number, an identification number assigned by the correctional authority along with the facility identification number, if there is one, may be provided in lieu of the last four digits of a Social Security number or a Tribal Identification number.

(2) *Verification of VRS and IP CTS registration data.* An Incarcerated Person's identity and address may be verified pursuant to § 64.615(a)(6) of this chapter, for purposes of VRS or IP CTS registration, based on documentation, such as a letter or statement, provided by an official of a correctional authority that states the name of the person; the person's identification number assigned by the correctional authority; the name of the correctional authority; and the address of the correctional facility. The VRS or IP CTS provider shall transmit such documentation to the TRS User Registration Database administrator.

(3) *Release or transfer of an Incarcerated Person***.** Upon release (or transfer to a different correction authority) of an Incarcerated Person who has registered for VRS or IP CTS, the VRS or IP CTS provider with which such person has registered shall update the person's registration information within 30 days of receiving written notification from such person or the correctional authority of such release or transfer. Such updated information shall include, in the case of release, the individual's full residential address, Registered Location (if required by this section or part 9 of this chapter), and any other registration information required by this section and not previously provided, and in the case of transfer shall include the information required by paragraph (k)(2) of this section.

(4) *Dial-around calls for VRS***.** VRS providers shall not allow dial-around calls by Incarcerated People.

(l) **Enterprise registration for the use of TRS in correctional facilities.**

(1) Notwithstanding the other provisions of this section, a TRS provider may provide VRS, IP Relay, or IP CTS to an Incarcerated Person, without individual user registration, if the TRS provider has completed enterprise registration of the correctional facility or correctional authority for which service will be provided.

(2) *Signed certification.*

(i) *VRS and IP Relay.* For enterprise registration to use VRS or IP Relay, the TRS provider shall obtain a signed certification from the individual responsible for the devices used to access VRS or IP Relay (who may be an employee of the correctional authority or a provider of Incarcerated People's Communications Services), attesting that:

(A) The individual understands the functions of the devices used to access the service and that the cost of this relay service is financed by the federally regulated Interstate TRS Fund; and

**Federal Communications Commission**                    **FCC 24-75**

(B) The correctional authority (or the provider of Incarcerated People's Communications Services, if the individual is employed by such a provider) will make reasonable efforts to ensure that only persons with a hearing or speech disability are permitted to use the service.

(ii) *IP CTS*.  For enterprise registration to use IP CTS, the TRS provider shall obtain a signed certification from the individual responsible for the devices used to access IP CTS (who may be an employee of the correctional authority or of a provider of Incarcerated People's Communications Services), attesting that:

(A) The individual understands the functions of IP CTS and that the cost of IP CTS is supported by the federally regulated Interstate TRS Fund; and

(B) The correctional authority (or the provider of Incarcerated People's Communications Services, if the individual is employed by such a provider) will make reasonable efforts to ensure that only persons with hearing loss that necessitates the use of IP CTS to communicate by telephone are permitted to use IP CTS.

(iii) *Electronic signatures*.  The certification required by paragraph (l)(2) of this section shall be made on a form separate from any other agreement or form, and must include a separate signature specific to the certification.  For the purposes of this paragraph (l)(2)(iii), an electronic signature, defined by the Electronic Signatures in Global and National Commerce Act as an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record, has the same legal effect as a written signature.  For the purposes of this paragraph (l)(2)(iii), an electronic record, defined by the Electronic Signatures in Global and National Commerce Act as a contract or other record created, generated, sent, communicated, received, or stored by electronic means, constitutes a record.

(3) *Consent for transmission of registration information*.  A VRS or IP CTS provider shall obtain consent from the individual making the certification described in paragraph (l)(2) of this section to transmit the information required by this section to the TRS User Registration Database.  Before obtaining such consent, the TRS provider shall describe, using clear, easily understood language, the specific information being transmitted, that the information is being transmitted to the TRS User Registration Database to ensure proper administration of the TRS program, and that failure to provide consent will result in denial of service.  The TRS provider shall obtain and keep a record of affirmative acknowledgment of such consent.

(4) *Confidentiality*.  The TRS provider shall maintain the confidentiality of any registration and certification information obtained by the TRS provider, and shall not disclose such registration and certification information, or the content of such registration and certification information, except as required by law or regulation.

(5) *Registration data*.  To complete enterprise registration, a VRS or IP CTS provider shall collect and transmit to the TRS User Registration Database, in a format prescribed by the Database administrator:

(i) The TRS provider's name;

(ii) The telephone numbers or unique identifiers assigned to the relevant TRS device(s) at the correctional facility or correctional authority;

(iii) The name and address of the affected correctional facility or correctional authority;

(iv) The date of initiation of service and;

(v) The name of the individual executing the certification required by paragraph (l)(2) of this section, and the date the certification was obtained.

(6) When a VRS or IP CTS provider ceases providing relay service to a correctional authority via enterprise registration, the provider shall transmit the date of termination of such service to the TRS User Registration Database Administrator.

7. Revise the Title to subpart FF to read as follows:

**Subpart FF—Incarcerated People's Communications Services**

8. Revise § 64.6000 to read as follows:

### § 64.6000 Definitions.

As used in this subpart:

*Alternate Pricing Plan* or *Plan* means the offering of Incarcerated People's Communications Services to Consumers using a pricing structure other than per-minute pricing.

*Ancillary Service Charge* means any charge to Consumers associated with the provision or use of Incarcerated People's Communications Services that is not:

(1) Included in the per-minute charges assessed, in accordance with §§ 64.6010 and 64.6030 of this chapter, for individual Incarcerated People's Communications Services;

(2) Included in the charges assessed, in accordance with § 64.6140 of this chapter, in connection with an Alternate Pricing Plan; or

(3) An Authorized Fee, a Mandatory Fee, or a Mandatory Tax.

*Authorized Fee* means a government authorized, but discretionary, fee which a Provider must remit to a federal, state, or local government, and which a Provider is permitted, but not required, to pass through to Consumers for or in connection with intrastate, interstate, or international Incarcerated People's Communications Services. An Authorized Fee may not include a markup, unless the markup is specifically authorized by a federal, state, or local statute, rule, or regulation.

*Average Daily Population* or *ADP* means the sum of all Incarcerated People in a Correctional Facility for each day of the preceding calendar year divided by the number of days in that year, calculated each year on or before April 30.

*Billing Statement* or *Statement of Account* means the vehicle by which IPCS Account information is provided to the Consumer on a monthly basis, regardless of IPCS Account type, including: (a) the amount of any deposits in the IPCS Account; (b) the duration of any call(s) or communication(s) for which a charge is assessed; and (c) the balance remaining in the IPCS Account after deduction of those charges.

*Breakeven Point* means, for purposes of an Alternate Pricing Plan, the usage amount:

(1) Below which a Consumer would pay more under the Alternate Pricing Plan than the Consumer would have paid under the Provider's per-minute rates, and

(2) At or above which the cost of the Alternate Pricing Plan would be less than or equal to what the Consumer would pay under the Provider's per-minute rates.

*Collect Calling* means an arrangement whereby the called party takes affirmative action clearly indicating that it will pay the charges associated with a communication originating from an Incarcerated Person's Communications Device.

**Federal Communications Commission**                                    **FCC 24-75**

*Consumer* means the party paying a Provider of Incarcerated People's Communications Services.

*Controlling Judicial* or *Administrative Mandate* means:

>   (1) A final court order requiring an Incarcerated Person to pay restitution;

>   (2) A fine imposed as part of a criminal sentence;

>   (3) A fee imposed in connection with a criminal conviction; or

>   (4) A final court or administrative agency order adjudicating a valid contract between the Provider and the IPCS Account holder, entered into prior to July 22, 2024 that allows or requires that a Provider of Incarcerated People's Communications Services act in a manner that would otherwise violate § 64.6130 of this chapter.

*Correctional Facility*, *Facility,* or *Correctional Institution* means a Jail or a Prison.

*Debit Calling* means a presubscription or comparable service which allows an Incarcerated Person, or someone acting on an Incarcerated Person's behalf, to fund an IPCS Account set up through a Provider that can be used to pay for Incarcerated People's Communications Services originated by the Incarcerated Person.

*Facility-Related Rate Component* means either the Legally Mandated Facility Rate Component or the Contractually Prescribed Facility Rate Component identified in § 64.6030(d) of this chapter.

*Incarcerated Person* or *Incarcerated People* means a person or persons detained at a Jail or Prison, regardless of the duration of the detention.

*Incarcerated People's Communications Service* or *IPCS* means the provision of telephone service; interconnected VoIP service; non-interconnected VoIP service; interoperable video conferencing service; and any audio or video communications service used by Incarcerated People for the purpose of communicating with individuals outside the Facility where the Incarcerated Person is held, regardless of the technology used and regardless of interstate, intrastate or international jurisdiction.

*Incarcerated People's Communications Service Account* or *IPCS Account* means any type of account administered, or directly or indirectly controlled by a Provider or an affiliate of a Provider that can be used to pay IPCS rates and charges, including accounts where the Incarcerated Person is the account holder.

*Incarcerated Person's Communications Device* means a telephone instrument or other device capable of initiating communications, set aside by authorities of a Correctional Facility for use by one or more Incarcerated People.

*Interconnected Voice over Internet Protocol or Interconnected VoIP* means a service that: (i) enables real-time, two-way voice communications; (ii) requires a broadband connection from the user's location; (iii) requires Internet protocol-compatible customer premises equipment; and (iv) permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network.

*Interoperable Video Conferencing Service* means a service that provides real-time video communications, including audio, to enable users to share information of the user's choosing.

*International Communications* means communications that originate in the United States and terminate outside the United States.

*International Destination* means the rate zone in which an International Communication terminates. For countries that have a single rate zone, International Destination means the country in which an International Communication terminates.

*Inmate* means a person detained at a Jail or Prison, regardless of the duration of the detention;

*Inmate Calling Service* means a service that allows Inmates to make calls to individuals outside the Correctional Facility where the Inmate is being held, regardless of the technology used to deliver the service;

*Inmate Telephone* means a telephone instrument, or other device capable of initiating calls, set aside by authorities of a Correctional Facility for use by Inmates;

*Jail* means a Facility of a local, state, or federal law enforcement agency that is used to primarily hold individuals who are:

    (1) Awaiting adjudication of criminal charges;

    (2) Post-conviction and committed to confinement sentences of one year or less; or

    (3) Post-conviction and awaiting transfer to another Facility. The term also includes city, county, or regional facilities that have contracted with a private company to manage day-to-day operations; privately owned and operated Facilities primarily engaged in housing city, county or regional Incarcerated People; immigration detention facilities operated by, or pursuant to contracts with, federal, state, city, county, or regional agencies; juvenile detention centers; and secure mental health facilities.

*Jurisdiction* means:

    (1) The state, city, county, or territory where a law enforcement authority is operating or contracting for the operation of a Correctional Facility; or

    (2) The United States for a Correctional Facility operated by or under the contracting authority of a Federal law enforcement agency.

*Jurisdictionally Mixed Charge* means any charge Consumers may be assessed for use of Incarcerated People's Communications Services that is not included in the per-minute charges assessed for individual communications and that are assessed for, or in connection with, uses of Incarcerated People's Communications Service to make such communications that have interstate or international and intrastate components that are unable to be segregated at the time the charge is incurred.

*Mandatory Tax* or *Mandatory Fee* means a fee that a Provider is required to collect directly from Consumers, and remit to federal, state, or local governments. A Mandatory Tax or Mandatory Fee that is passed through to a Consumer for, or in connection with, Incarcerated People's Communications Services may not include a markup, unless the markup is specifically authorized by a federal, state, or local statute, rule, or regulation.

*Non-interconnected VoIP* means a service, other than an Interconnected VoIP service, that enables real-time voice communications that originate from, or terminate to, the end-user's location using Internet Protocol or any successor protocol and that requires Internet Protocol compatible customer premises equipment.

*Per-Call, Per-Connection,* or *Per-Communication Charge* means a one-time fee charged to a Consumer of IPCS at call or communication initiation.

*Prepaid Calling* means a presubscription or comparable service in which a Consumer, other than an Incarcerated Person, funds an account set up through a Provider of Incarcerated People's Communications Services. Funds from the account can then be used to pay for Incarcerated People's Communications Services that originate with the same Incarcerated Person.

*Prepaid Collect Calling* means a calling arrangement that allows an Incarcerated Person to initiate an Incarcerated People's Communications Services communication without having a pre-established billing arrangement and also provides a means, within that communication, for the called party to establish an arrangement to be billed directly by the Provider of Incarcerated People's Communications Services for future communications from the same Incarcerated Person.

*Prison* means a Facility operated by a territorial, state, or Federal agency that is used primarily to confine individuals convicted of felonies and sentenced to terms in excess of one year. The term also includes public and private facilities that provide outsource housing to other agencies such as the State Departments of Correction and the Federal Bureau of Prisons; and facilities that would otherwise fall under the definition of a Jail but in which the majority of Incarcerated People are post-conviction and are committed to confinement for sentences of longer than one year.

*Provider of Incarcerated People's Communications Services* or *Provider* means any communications service provider that provides Incarcerated People's Communications Services, regardless of the technology used.

*Provider-Related Rate Component* means the interim per-minute rate specified in either § 64.6030(b) or (c) of this chapter that Providers at Jails with Average Daily Populations of 1,000 or more Incarcerated People and all Prisons may charge for interstate Collect Calling, Debit Calling, Prepaid Calling, or Prepaid Collect Calling.

*Site Commission* means any form of monetary payment, in-kind payment, gift, exchange of services or goods, fee, technology allowance, or product that a Provider of Incarcerated People's Communications Services or affiliate of a Provider of Incarcerated People's Communications Services may pay, give, donate, or otherwise provide to an entity that operates a Correctional Institution, an entity with which the Provider of Incarcerated People's Communications Services enter into an agreement to provide Incarcerated People's Communications Services, a governmental agency that oversees a Correctional Facility, the city, county, or state where a Facility is located, or an agent of any such Facility.

9. Revise § 64.6010 to read as follows:

**§ 64.6010 Incarcerated People's Communications Services rate caps.**

(a) A Provider must offer each Incarcerated People's Communications Service it provides at a per-minute rate. A Provider may also offer an Incarcerated People's Communications Service under one or more Alternate Pricing Plans, pursuant to § 64.6140 of this chapter.

(b) A Provider must not charge a per-minute rate for intrastate or interstate audio Incarcerated People's Communications Services in excess of the following rate caps on or after the dates specified below:

(1) $0.06 per minute for each Prison;

(2) $0.06 per minute for each Jail having an Average Daily Population of 1,000 or more Incarcerated People;

(3) $0.07 per minute for each Jail having an Average Daily Population of between and including 350 and 999 Incarcerated People;

(4) $0.09 per minute for each Jail having an Average Daily Population of between and including 100 and 349 Incarcerated People; and

(5) $0.12 per minute for each Jail having an Average Daily Population of below 100 Incarcerated People.

(c) A Provider must not charge a per-minute rate for video Incarcerated People's Communications Services in excess of the following interim rate caps except as set forth in paragraph (d) of this section:

(1) $0.16 per minute for each Prison;

(2) $0.11 per minute for each Jail having an Average Daily Population of 1,000 or more Incarcerated People;

(3) $0.12 per minute for each Jail having an Average Daily Population of between and including 350 and 999 Incarcerated People;

(4) $0.14 per minute for each Jail having an Average Daily Population of between and including 100 and 349 Incarcerated People; and

(5) $0.25 per minute for each Jail having an Average Daily Population of below 100 Incarcerated People.

(d) A Provider must not charge a per-minute rate in excess of the rate caps described in paragraphs (b) and (c) of this section beginning January 1, 2025 for all Prisons and for Jails with Average Daily Populations of 1,000 or more Incarcerated People, and April 1, 2025 for Jails with Average Daily Populations of less than 1,000 Incarcerated People, subject to the following special provisions.

(1) Where a contract existing as of June 27, 2024 includes terms and conditions that would require material alteration through renegotiation due to a conflict with our new rules involving rates, contractually-negotiated Site Commission payments or passthrough charges included in the rates, and the contract expires on or after January 1, 2025 for Prisons and for Jails with Average Daily Populations of 1,000 or more Incarcerated People, or on or after April 1, 2025 for Jails with Average Daily Populations of less than 1,000 Incarcerated People, the compliance dates for the rate caps set forth in paragraphs (b) and (c) of this section and the Site Commission rules set forth in § 64.6015 will be the earlier of the contract expiration date or January 1, 2026 for Prisons and for Jails with Average Daily Populations of 1,000 or more Incarcerated People, or the earlier of the contract expiration date or April 1, 2026 for Jails with Average Daily Populations of less than 1,000 Incarcerated People.

(2) Where a contract existing as of June 27, 2024 includes terms and conditions that would require renegotiation due to a provision incorporating legally-mandated Site Commission payments and the contract expires on or after July 1, 2025 for any size Facility, the compliance date for paragraphs (b) and (c) of this section and the Site Commission rules set forth in § 64.6015 will be the earlier of the contract expiration date or April 1, 2026.

(e) A Provider must not charge a per-minute rate for international audio Incarcerated People's Communications Services in each Prison or Jail it serves in excess of the applicable interstate and intrastate cap set forth in paragraph (b) of this section plus the average amount that the Provider paid its underlying international service providers for audio communications to the International Destination of that communication, on a per-minute basis.  A Provider shall determine the average amount paid for communications to each International Destination for each calendar quarter and shall adjust its maximum rates based on such determination within one month of the end of each calendar quarter.

10.  Add § 64.6015 to read as follows:

**Federal Communications Commission**  FCC 24-75

**§ 64.6015 Prohibition against Site Commissions.**

(a)  A Provider must not pay any Site Commissions associated with its provision of Incarcerated People's Communications Services on or after the dates specified below:

(1)  Providers must comply with this section beginning January 1, 2025 for all Prisons and for Jails with Average Daily Populations of 1,000 or more Incarcerated People, and April 1, 2025 for Jails with Average Daily Populations of less than 1,000 Incarcerated People, subject to the special provisions in subparagraphs (2) and (3) of this section.

(2) Where a contract existing as of June 27, 2024 includes terms and conditions that would require material alteration through renegotiation due to a conflict with our new rules involving rates, contractually-negotiated Site Commission payments or pass-through charges included in the rates, and the contract expires on or after January 1, 2025 for Prisons and for Jails with Average Daily Populations of 1,000 or more Incarcerated People, or on or after April 1, 2025 for Jails with Average Daily Populations of less than 1,000 Incarcerated People, the compliance dates for this section will be the earlier of the contract expiration date or January 1, 2026 for Prisons and for Jails with Average Daily Populations of 1,000 or more Incarcerated People, or the earlier of the contract expiration date or April 1, 2026 for Jails with Average Daily Populations of less than 1,000 Incarcerated People.

(3) Where a contract existing as of June 27, 2024 includes terms and conditions that would require renegotiation due to a provision incorporating legally-mandated Site Commission payments and the contract expires on or after July 1, 2025 for any size Facility, the compliance date for this section will be the earlier of the contract expiration date or April 1, 2026.

11.  Revise § 64.6020 to read as follows:

**§ 64.6020 Ancillary Service Charges.**

(a) A Provider of Incarcerated People's Communications Services must not charge any Ancillary Service Charge, as defined in § 64.6000 of this chapter.

12.  Revise § 64.6030 by adding paragraph (f) to read as follows:

**§ 64.6030 Inmate Calling Services interim rate caps.**

* * * * *

(f) Paragraphs (a) through (e) of this section shall cease to be effective upon the individual compliance dates prescribed in the revisions to § 64.6010 of this chapter and the addition of § 64.6015 of this chapter for the Providers serving the Facilities subject to each such date.

13.  Amend § 64.6040 by revising paragraph (b)(1) and adding paragraphs (e) and (f) to read as follows:

**§ 64.6040 Communications access for Incarcerated People with disabilities.**

* * * * *

(b)

(1) A Provider shall provide access for Incarcerated People with hearing or speech disabilities to Traditional (TTY-Based) TRS and STS.  As an alternative to supporting transmissions from a TTY device, where broadband Internet access service is available, an IPCS Provider may provide access to Traditional TRS via real-time text, in accordance with 47 CFR part 67, if real-time text is supported by the available devices and reliable access to a provider of traditional TRS service can be provided by this method.

* * * * *

(e) Alternate Pricing Plans

**Federal Communications Commission**                                    **FCC 24-75**

(1) Paragraphs (a) through (c) of this section apply to services offered pursuant to an Alternate Pricing Plan, as defined in § 64.6000of this chapter.

(2) Except as provided in this paragraph (e) of this section, in the context of a Provider offering an Alternate Pricing Plan, the Provider shall not levy or collect any charge or fee, or count any minute(s) of use, or call(s) or communication(s), toward the amount included in an Alternate Pricing Plan, on or from any party to a TRS call to or from an Incarcerated Person, or any charge for the use of a device or transmission service when used to access TRS from a Correctional Facility, or any charge for the Internet or other connections needed for services covered by this section.

(3) When providing access to IP CTS or CTS within the context of a Provider offering an Alternate Pricing Plan:

(i) If the Alternate Pricing Plan consists of a fixed number of calls or communications, the IP CTS or CTS call shall count as one call or communication.

(ii) If the Alternate Pricing Plan offers a fixed number of minutes, the IP CTS or CTS call shall count as the number of minutes used for the voice portion of the IP CTS or CTS call.

(iii) If the Alternate Pricing Plan offers an unlimited number of minutes, calls or communications, the IP CTS or CTS call shall be counted as part of the unlimited number of minutes, calls or communications.

(iv) There shall be no charge or fee for any Internet or data portion of an IP CTS or CTS call.

(4) When providing access to a point-to-point video service, as defined in § 64.601(a) of this chapter, within the context of a Provider offering an Alternate Pricing Plan for Incarcerated People with hearing or speech disabilities who can use ASL:

(i) If the Alternate Pricing Plan consists of a fixed number of calls or communications, the point-to-point call shall be counted as one video communication (if only video is included in the Alternate Pricing Plan), or one audio call (if audio is included in the Alternate Pricing Plan).

(ii) If the Alternate Pricing Plan offers a fixed number of minutes, then the point-to-point call shall count as the number of minutes used and shall apply to the minutes provided for video, if only video is including in the Alternate Pricing Plan, or shall apply to the minutes provided for audio, if audio is included in the Alternate Pricing Plan.

(iii) If the Alternate Pricing Plan offers an unlimited number of minutes, calls or communications, the point-to-point call shall count as a video communication (if only video is provided as part of the Alternate Pricing Plan) or as an audio call (if audio is provided as part of the Alternate Pricing Plan).

(iv) Regardless of the format of the Alternate Pricing Plan, there shall be no charge or fee for the use of the equipment.

(5) When providing access for TTY-to-TTY use within the context of a Provider offering an Alternate Pricing Plan that includes audio service:

(i) If the Plan consists of a fixed number of calls, the TTY-to-TTY call shall count as one call;

(ii) If the Plan offers a fixed number of minutes, then the TTY-to-TTY call shall count as no more than one-fourth of the minutes used; and

(iii) If the Plan offers an unlimited number of minutes, or calls, the TTY-to-TTY call

shall count as an audio call.

(f) Accessible formats

(1) A Provider shall ensure that the information and documentation that it provides to current or potential Consumers of Incarcerated People's Communications Services is accessible. Such information and documentation includes, but is not limited to, disclosures of charges, user guides, bills, installation guides for end user devices, and product support communications.

(2) The term "accessible" has the same meaning given such term under § 14.10 of this chapter, as such section may be amended from time to time.

(3) The requirement to ensure the information is accessible also includes ensuring access, at no extra cost, to call centers and customer support regarding the products and services for current or potential Consumers of Incarcerated People's Communications Services.

14.  Revise § 64.6050 to read as follows:

**§ 64.6050 Billing-related call blocking.**

No Provider shall prohibit or prevent completion of a Collect Calling IPCS communication or decline to establish or otherwise degrade any Collect Calling IPCS communication solely for the reason that it lacks a billing relationship with the called party's communications service provider unless the Provider offers Debit Calling, Prepaid Calling, or Prepaid Collect Calling for IPCS communications.

15.  Revise § 64.6060 to read as follows:

**§ 64.6060 Annual reporting and certification requirement.**

(a) Each Provider must submit a report to the Commission, by April 1 of each year, regarding intrastate, interstate and international audio and video IPCS for the prior calendar year.  The report shall be categorized both by service type and Facility type and size and shall contain:

(1) Current intrastate, interstate, and international rates for Incarcerated People's Communications Services.

(2) For each Facility served, the kinds of TRS that may be accessed from the Facility.

(3) For each Facility served, the number of calls completed during the reporting period in each of the following categories:

(i) TTY-to-TTY calls;

(ii) Point-to-point video calls placed or received by ASL users as those terms are defined in § 64.601(a) of this chapter; and

(iii) TRS calls, broken down by each form of TRS that can be accessed from the Facility.

(4) For each Facility served, the number of complaints that the reporting Provider received in each of the categories set forth in paragraph (a)(3) of this section.

(5) Such other information as the Consumer and Governmental Affairs Bureau or the Wireline Competition Bureau may require.

(b) The Chief Executive Officer, Chief Financial Officer, or other senior executive of the reporting Provider, with first-hand knowledge of the truthfulness, accuracy, and completeness of the information provided pursuant to paragraph (a) of this section, must certify that the reported information and data are true, accurate and complete to the best of his or her knowledge, information, and belief.

16.  Revise § 64.6070 to read as follows:

**§ 64.6070  Taxes and fees.**

(a) A Provider must not charge a Consumer any tax or fee associated with Incarcerated People's Communications Services other than a Mandatory Tax, a Mandatory Fee, or an Authorized Fee, as defined in § 64.6000 of this chapter.

    17.  Revise § 64.6080 to read as follows:

**§ 64.6080  Per-Call, Per-Connection or Per-Communication Charges.**

A Provider must not impose a Per-Call, Per-Connection, or Per-Communication Charge on a Consumer for any Incarcerated People's Communications Services communication.

    18.  Remove and reserve § 64.6090.

**§ 64.6090**  [Reserved].

    19.  Revise § 64.6100 to read as follows:

**§ 64.6100 Minimum and maximum Prepaid Calling and Debit Calling account balances.**

    (a) No Provider shall institute a minimum balance requirement for a Consumer to use Debit or Prepaid Calling for Incarcerated People's Communications Services.

    (b) No Provider shall prohibit a Consumer from depositing at least $50 per transaction to fund a Debit or Prepaid Calling account that can be used for Incarcerated People's Communications Services.

    20.  Amend § 64.6110 by revising paragraphs (a), (c), and adding paragraphs (d), (e), (f), and (g) to read as follows:

**§ 64.6110 Consumer Disclosure of Incarcerated People's Communications Services Rates.**

    (a) Providers must clearly, accurately, and conspicuously disclose their intrastate, interstate, and international Incarcerated People's Communications Services rates, charges and associated practices on their publicly available websites.  In connection with international rates, Providers shall also separately disclose the rate component for terminating calls to each International Destination where that Provider terminates International Communications.

    (1) In addition to the information required in paragraph (a) of this section, the Provider must disclose information on:

        (i) How to manage an IPCS Account;

        (ii) How to fund an IPCS Account;

        (iii) How to close an IPCS Account and how to obtain a refund of any unused balance in that account; and

        (iv) How to obtain a refund of any unused balance in inactive accounts pursuant to § 64.6130 of this chapter.

* * * * *

    (c) Providers must clearly label all charges for International Communications in § 64.6010(e) of this chapter as a separate line item on Consumer Billing Statements and Statements of Account.  To be clearly labeled, Providers must identify the amount charged to the Consumer for the International Communication, including the costs paid by the provider to its underlying international providers to terminate the International Communication to the International Destination of the call.

    (d) Providers shall make disclosures pursuant to this section available:

    (1) Via the Provider's website in a form generally accessible to the public without needing to have an IPCS Account with the Provider;

(2) Via the Provider's online or mobile application, if Consumers use that application to create an IPCS Account with the Provider; and

(3) On paper, upon request of the Consumer.

(e) Billing Statements and Statements of Account

(1) Providers must make available Billing Statements and Statements of Account to all IPCS Account holders on a monthly basis via:

(i) The Provider's website;

(ii) The Provider's online or mobile application; or

(iii) On paper, upon request of the Consumer.

(2) Billing Statements and Statements of Account shall include:

(i) The amount of any deposits to the account;

(ii) The duration of any calls and communications for which a charge is assessed; and

(iii) The balance remaining in the IPCS Account after the deduction of those charges.

(f) All disclosures made pursuant to this section, and §§ 64.6130 and 64.6140 of this chapter shall be clear, accurate, and conspicuous, and shall be available in accessible formats for people with disabilities.

(g) Paragraph (b) of this section shall cease to be effective upon the individual compliance dates prescribed in the revisions to § 64.6010 of this chapter and the addition of § 64.6015 of this chapter.

21.  Revise § 64.6120 to read as follows:

**§ 64.6120 Waiver process.**

(a) A Provider may seek a waiver of the rate caps established in § 64.6010 of this chapter on a Correctional Facility or contract basis if the applicable rate caps prevent the Provider from recovering the costs of providing Incarcerated People's Communications Services at a Correctional Facility or at the Correctional Facilities covered by a contract.

(b) At a minimum, a Provider seeking such a waiver must submit:

(1) The Provider's total company costs, including the nonrecurring costs of the assets it uses to provide Incarcerated People's Communications Services, and its recurring operating expenses for these services at the Correctional Facility or under the contract;

(2) The methods the Provider used to identify its direct costs of providing Incarcerated People's Communications Services, to allocate its indirect costs between its Incarcerated People's Communications Services and other operations, and to assign its direct costs to and allocate its indirect costs among its Incarcerated People's Communications Services contracts and Correctional Facilities;

(3) The Provider's demand for Incarcerated People's Communications Services at the Correctional Facility or at each Correctional Facility covered by the contract;

(4) The revenue or other compensation the Provider receives from the provision of Incarcerated People's Communications Services at the Correctional Facility or at each Correctional Facility covered by the contract;

(5) A complete and unredacted copy of the contract for the Correctional Facility or Correctional Facilities, and any amendments to such contract;

*Federal Communications Commission* **FCC 24-75**

(6) Copies of the initial request for proposals and any amendments thereto, the Provider's bid in response to that request, and responses to any amendments (or a statement that the Provider no longer has access to those documents because they were executed prior to the effective date of this rule);

(7) A written explanation of how and why the circumstances associated with that Correctional Facility or contract differ from the circumstances at similar Correctional Facilities the Provider serves, and from other Correctional Facilities covered by the same contract, if applicable; and

(8) An attestation from a company officer with knowledge of the underlying information that all of the information the Provider submits in support of its waiver request is complete and correct.

(c) A Provider seeking a waiver pursuant to section 64.6120(a) must provide any additional information requested by the Commission during the course of its review.

22. Revise § 64.6130 to read as follows:

**§ 64.6130 Protection of consumer funds in inactive accounts.**

(a) All funds deposited into an IPCS Account shall remain the property of the account holder unless or until the funds are either:

(1) Used to pay for products or services purchased by the account holder or the Incarcerated Person for whose benefit the account was established;

(2) Disposed of in accordance with a Controlling Judicial or Administrative Mandate; or

(3) Disposed of in accordance with applicable state law, including, but not limited to, laws governing unclaimed property.

(b) No Provider may dispose of unused funds in an IPCS Account until at least 180 calendar days of continuous account inactivity have passed, or at the end of any longer, alternative period set by state law, except as provided in paragraphs (a) and (d) of this section or through a refund to the IPCS Account holder or such other individual as the account holder may have designated to receive a refund.

(c) The 180-day period, or any longer alternative period set by state law, must be continuous. Any of the following actions by the IPCS Account holder or the Incarcerated Person for whose benefit the account was established ends the period of inactivity and restarts the 180-day period:

(1) Depositing, crediting, or otherwise adding funds to an IPCS Account;

(2) Withdrawing, spending, debiting, transferring, or otherwise removing funds from an IPCS Account; or

(3) Expressing an interest in retaining, receiving, or transferring the funds in an IPCS Account, or otherwise attempting to exert or exerting ownership or control over the account or the funds held within the IPCS Account.

(d) After 180 days of continuous account inactivity have passed, or at the end of any longer alternative period set by state law, the Provider must:

(1) Contact the account holder prior to closing the account and refunding the remaining balance to determine whether the account holder wishes to continue using the IPCS Account, or to close it and obtain a refund; and

Federal Communications Commission                     FCC 24-75

    (2) Make reasonable efforts to refund the balance in the IPCS Account to the account holder or such other person as the account holder has specified.  Reasonable efforts include, but are not limited to:

        (i) Notification to the account holder that the account has been deemed inactive;

        (ii) The collection of contact information needed to process the refund; and

        (iii) Timely responses to inquiries from an account holder.

(e) If a Provider's reasonable efforts to refund the balance of the IPCS Account fail, the Provider must dispose of remaining funds in accordance with applicable state consumer protection law concerning unclaimed funds or the disposition of such accounts.

(f) If a Provider becomes aware that an Incarcerated Person has been released or transferred, the 180-day inactivity period shall be deemed to have run and the Provider shall begin processing a refund in accordance with this section.  The Provider shall contact the account holder prior to closing the IPCS Account and refunding the remaining balance in the IPCS Account, to determine whether the account holder wishes to continue using the IPCS Account, or to close it and obtain a refund from the Provider.

(g) Any refund made pursuant to this section must include the entire balance of the IPCS Account, including any deductions the Provider may have made in anticipation of taxes or other charges that it assessed when funds were deposited and that were not actually incurred.  The Provider shall not impose any fees or charges for processing the refund.

(h) Any refund made pursuant to this section shall be issued within 30 calendar days of the IPCS Account being deemed inactive or within 30 calendar days of a request for a refund from an account holder or other such individual as the account holder may have specified to receive a refund.

(i) In the absence of a Consumer's request for a refund, the requirement to provide a refund in accordance with this section shall not apply where the balance in an inactive IPCS Account is $1.50 or less.  To the extent a Provider is unable to issue a refund requested by a Consumer, the Provider shall treat such balances consistent with applicable state consumer protection law concerning unclaimed funds or the disposition of such accounts.

(j) Providers shall issue refunds required pursuant to this section through:

    (1) The IPCS Account holder's original form of payment;

    (2) An electronic transfer to a bank account;

    (3) A check; or

    (4) A debit card.

(k) Providers shall clearly, accurately, and conspicuously disclose to IPCS Account holders, through their Billing Statements or Statements of Account, notice of the status of IPCS Accounts prior to their being deemed inactive.

    (1) This notice shall initially be provided at least 60 calendar days prior to an IPCS Account being deemed inactive.

    (2) The notice shall be included in each Billing Statement or Statement of Account the Provider sends, or makes available to, the account holder until the IPCS Account holder takes one of the actions sufficient to restart the 180-day period in paragraph (c) of this section or the IPCS Account becomes inactive pursuant to this section.

(3) All notices provided pursuant to this paragraph shall describe how the IPCS Account holder can keep the IPCS Account active and how the IPCS Account holder may update the refund information associated with the IPCS Account.

23.   Add § 64.6140 to read as follows:

**§ 64.6140 Alternate Pricing Plans.**

(a) *General Parameters.*

(1) A Provider offering IPCS via an Alternate Pricing Plan must comply with this section as well as § 64.710 of this chapter and this subpart.

(2) Enrollment in an Alternate Pricing Plan must be optional for the Consumer.

(3) A service period for an Alternate Pricing Plan shall be no longer than one month.

(4) When determining the format of an Alternate Pricing Plan, Providers must consider:

(i) any limits on the number of and length of calls or communications imposed by the Correctional Facility;

(ii) the availability of correctional staff to manage the use of IPCS at the Correctional Facility; and

(iii) equipment availability for the calls or communications at the Correctional Facility.

(b) *Alternate Pricing Plan Rates.*

(1) An Alternate Pricing Plan must be offered at a rate such that the Breakeven Point is at or below the applicable rate cap(s).

(i) A consumer complaint about an IPCS Provider's Alternate Pricing Plan rates will not be entertained under the rules in this section unless the consumer's usage meets or exceeds the Breakeven Point(s) for the Alternate Pricing Plan.

(2) If a Consumer believes that the rates under an Alternate Pricing Plan exceed the applicable per-minute rates for that Correctional Facility, the Consumer must show that their usage meets or exceeds the Breakeven Point for the Alternate Pricing Plan.  It is the Provider's burden to demonstrate that the rate charged to that Consumer under its Alternate Pricing Plan is less than or equal to the applicable rate cap.

(3) After a Consumer uses all of the minutes, calls, or communications available during a service period of an Alternate Pricing Plan, the charge for subsequent minutes, calls, or communications during the remaining part of the service period shall not exceed the Provider's per-minute rate for the corresponding service.

(c) *Consumer Disclosures.*

(1) A Provider offering an Alternate Pricing Plan must comply with the consumer disclosure requirements in § 64.6110 of this chapter as well as the requirements in this section.

(2) Before a Consumer enrolls in an Alternate Pricing Plan; upon request, at any time after Alternate Pricing Plan enrollment; with a Billing Statement or Statement of Account, and any related communications; and at the beginning of each call or communication, the Provider also must make disclosures that include the following information for each Alternate Pricing Plan offered by the Provider:

(i) The rates and any added Mandatory Taxes or Mandatory Fees, a detailed explanation of the Mandatory Taxes and Mandatory Fees, total charge, quantity of minutes, calls or communications included in the Plan, the service period, and the beginning and end dates of the service period;

**Federal Communications Commission**                    **FCC 24-75**

(ii) Terms and conditions, including those concerning dropped calls and communications in paragraph (d) of this section, automatic renewals in paragraph (e) of this section and cancellations in paragraph (f) of this section;

(iii) An explanation that per-minute rates are always available as an option to an Alternate Pricing Plan and that per-minute rates apply if the Consumer exceeds the calls/communications allotted in the Plan;

(iv) The Breakeven Point indicating at the amount of Alternate Pricing Plan usage above which the Consumer will save money compared to the Provider's applicable per-minute rate for the same type and amount of service at the Correctional Facility; and

(v) The ability to obtain prior usage and billing data, upon request, for each of the most recent three service periods (where feasible), including total usage and total charges including taxes and fees.

(3) The Provider must make the disclosures for Alternate Pricing Plans pursuant to this paragraph (c) of this section available: to the public on the Provider's website; on the Provider's online or mobile application, if Consumers use the application to enroll in the Plan; via paper upon request; and via the methods for general IPCS disclosures pursuant to § 64.6110 of this chapter before, during, and after a Consumer's enrollment in a Plan.

(4) In every communication between the Provider and a Consumer (or the Incarcerated Person, if they are not the Consumer) concerning the Alternate Pricing Plan, the Provider must either include the disclosures for Alternate Pricing Plans pursuant to paragraph (c) of this section, or provide clear, easy to follow, instructions for how the consumer (or Incarcerated Person, if not the Consumer) may immediately obtain access to those disclosures.

(5) Before a Consumer enrolls in a Plan, and at any time upon Consumer request, the Provider must also provide to the Consumer:

(i) The rates, Breakeven Point, and total cost including any Mandatory Taxes or Mandatory Fees associated with the Plan; and

(ii) An explanation that the Consumer's prior usage and billing data is available upon request through a readily accessible means and must include:

(A) For the Provider's most recent three service periods (where feasible): the minutes of use for each of the calls or communications made by the Consumer and the applicable per-minute rate that was charged; the total number of minutes; and the totals charged for each service period including the details of any Mandatory Taxes and Mandatory Fees; and

(B) This prior usage and billing data must be made available to the Consumer via the Provider's website or online or mobile application or via paper upon request of the Consumer.

(6) After the Consumer enrolls in a Plan, the Provider must provide Billing Statements and Statements of Account for the Plan via the same method the Consumer used to sign up for the Plan, and via paper upon Consumer request. The Billing Statements and Statements of Account must include information specific to the Alternate Pricing Plan for the service period but the Consumer must be able to receive, upon request, information for the past three service periods (where feasible). The Billing Statement or Statement of Account must include for each service period:

(i) Call details, including the duration of each call made, and the total minutes used for that service period, and the total charge including Mandatory Taxes and Mandatory Fees, with explanations of each Mandatory Tax or Mandatory Fee;

**Federal Communications Commission**                    **FCC 24-75**

(ii) The charges that would have been assessed for each call using the Provider's per-minute rate, and the total of those charges;

(iii) The calculated per-minute rate for the service period under the Alternate Pricing Plan, calculated as the charge for the service period divided by the total minutes used by that Consumer, with an explanation of that rate;

(iv) The Breakeven Point with an explanation of the Breakeven Point; and

(v) Information about deposits made to the Consumer's IPCS Account and the IPCS Account balance.

(7) The Provider must make available the number of minutes, calls, or communications remaining under a Consumer's Alternate Pricing Plan for the service period without the Consumer having to initiate a call or communication that would count toward a fixed allotment of minutes, calls, or communications in an Alternate Pricing Plan.

(d) *Dropped Calls or Communications and Related Consumer Disclosures.*

(1) A Provider offering an Alternate Pricing Plan must explain its policies regarding dropped calls or communications in plain language in its consumer disclosures.

(2) The consumer disclosures must include:

(i) The types of dropped calls and communications that a Consumer can seek a credit or refund for;

(ii) How the Provider will calculate a credit or refund for a dropped call or communication; and

(iii) The method the Consumer must use to request a credit or refund for a dropped call or communication, and that method must be easy for the Consumer to complete.

(e) *Automatic Renewals and Related Consumer Disclosures.*

(1) If a Provider of an Alternate Pricing Plan offers automatic renewals, the automatic renewals must be optional to the Consumer.

(2) A Provider offering an Alternate Pricing Plan must explain the terms and conditions of the automatic renewal in plain language in its consumer disclosures when it initially offers the automatic renewal option and before any automatic renewal is about to occur by whatever method the Provider has established for consumer notifications to the Consumer.

(3) The consumer disclosures must include an explanation that if a Consumer who requested automatic renewals does not later want the Alternate Pricing Plan to be renewed, the Consumer may cancel their participation in the Alternate Pricing Plan.

(4) The Provider must give notice of an upcoming renewal for an Alternative Pricing Plan directly to the Consumer no later than three business days prior to the renewal date. Along with providing the notice, the Provider must explain, in plain language, the terms and conditions of the automatic renewal using, at a minimum, the method of communication the Consumer agreed to at the time they enrolled in the Alternate Pricing Plan.

(f) *Cancellation by the Consumer and Related Consumer Disclosures.*

(1) A Provider must allow a Consumer using an Alternate Pricing Plan to cancel their participation in the Alternate Pricing Plan at any time during the relevant service period and revert to per-minute pricing. The Consumer may end their participation in the Alternate Pricing Plan on the date of their choosing. The process for cancelling an Alternate Pricing

Plan must be readily accessible to the Consumer and must include the method that the Consumer used to enroll in the Alternate Pricing Plan.

(2) A Provider must issue a refund for the remaining balance on an Alternate Pricing Plan if:

(i) The Incarcerated Person is released;

(ii) The Incarcerated Person is transferred to another Correctional Facility; or

(iii) The Incarcerated Person is not permitted to make calls or communications for a substantial portion of the subscription period.

(3) The refund amount provided to the Consumer upon the Consumer's cancellation of an Alternate Pricing Plan for the special circumstances provided in paragraph (f)(2) of this section must be at least the pro-rated amount that corresponds to the unused portion of the service period.

(4) Consumer disclosures related to Consumer cancellation of an Alternate Pricing Plan must include:

(i) An explanation that a Consumer enrolled in an Alternate Pricing Plan may cancel at any time and where applicable, the Provider will begin billing the Consumer at the Provider's per-minute rates by the first day after the termination date;

(ii) An explanation of the process for requesting cancellation of the Alternate Pricing Plan;

(iii) An explanation that the Consumer can end the Alternate Pricing Plan on a specific termination date of their choosing; and

(iv) The special circumstances for which a Consumer who has cancelled their enrollment shall receive a refund and how that refund will be calculated.

(g) *Application to Telecommunications Relay Service (TRS) and Related Communications Services.* A Provider that offers an Alternate Pricing Plan shall make TRS and related communications services available via the Alternate Pricing Plan, pursuant to § 64.6040 of this chapter.

## APPENDIX B

## Final Regulatory Flexibility Act Analysis

1.       As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] Initial Regulatory Flexibility Analyses (IRFAs) were incorporated in the *Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking (Notice) in WC Docket Nos. 23-62 and 12-375 (released in March 2023), in the Sixth Further Notice of Proposed Rulemaking in WC Docket No. 12-375 (released in September 2022), and in the Fifth Further Notice of Proposed Rulemaking in WC Docket No. 12-375 (released in May 2021).[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in those Notices, including comment on the IRFAs.  No comments were filed addressing the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) relating to the Report and Order and the Order on Reconsideration, Clarification and Waiver (collectively, Report and Order) conforms to the RFA.[3]

### A.       Need for, and Objectives of, the Report and Order

2.       The Report and Order implements the expanded authority granted to the Commission by the Martha Wright-Reed Act[4] to establish a compensation plan that ensures both just and reasonable rates and charges for incarcerated people's audio and video communications services and fair compensation for incarcerated people's communication services (IPCS) providers.  The Report and Order fundamentally reforms the regulation of IPCS in all correctional facilities, regardless of the technology used to deliver these services, and significantly lowers the IPCS rates that incarcerated people and their loved ones will pay.

3.       The reforms adopted by the Report and Order: (1) utilize the expanded authority granted the Commission, in conjunction with the Commission's preexisting statutory authority, to adopt just and reasonable IPCS rates and charges for all intrastate, interstate, and international audio and video IPCS, including video visitation services, that ensure fair compensation for providers; (2) lower existing per-minute rate caps for audio IPCS, based on industry-wide cost data submitted by IPCS providers, while permitting states to maintain IPCS rates lower than the Commission's rate caps; (3) lower the overall prices consumers pay for IPCS and simplify the pricing structure by incorporating the costs of ancillary services in the rate caps and prohibiting providers from imposing any separate ancillary service charges on IPCS consumers; (4) prohibit IPCS providers from making site commission payments for IPCS and preempt state and local laws and regulations requiring such commissions; (5) limit the costs associated with safety and security measures that can be recovered in the per-minute rates to only those costs that the Commission finds used and useful  in the provision of IPCS; (6) allow, subject to conditions, IPCS providers to offer alternate pricing plans for IPCS that comply with the rate caps we establish; (7) revise and strengthen accessibility requirements for IPCS for incarcerated people with disabilities; (8) revise and strengthen existing consumer disclosure and inactive account requirements; and (9) revise the existing

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-602, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Notice of Proposed Rulemaking and Order, 38 FCC Rcd 2669, 2706, Appx. A (2023).  This item continues ongoing efforts to reform providers' rates, charges, and practices in connection with interstate and international inmate calling services.  *See, e.g., Rates for Interstate Inmate Calling Services, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking*, 37 FCC Rcd 11900, 11991, Appx. D (2022); *Rates for Interstate Inmate Calling Services, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking*, 36 FCC Rcd 9519, 9697, Appx. D (2021).

[3] *See* 5 U.S.C. § 604.

[4] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156.

annual reporting and certification requirements.  The Report and Order also addresses petitions for reconsideration, clarification and waiver pending in this proceeding.

**B.       Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

4.        There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

**C.       Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

5.        Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[5]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

**D.       Description and Estimate of the Number of Small Entities to Which Rules Will Apply**

6.        The RFA directs agencies to provide a description of, and, where feasible, an estimate of, the number of small entities that may be affected by the rules they adopt.[6]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[7]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[8]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[9]

7.        *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[10]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[11]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[12]

8.        Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[13]  The

---

[5] 5 U.S.C. § 604 (a)(3).

[6] *Id.* § 604(a)(3).

[7] 5 U.S.C. § 601(6).

[8] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[9] 15 U.S.C. § 632.

[10] 5 U.S.C. § 601(3)-(6).

[11] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf (Mar. 2023).

[12] *Id*.

[13] 5 U.S.C. § 601(4).

Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[14] Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[15]

9.    Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[16] U.S. Census Bureau data from the 2022 Census of Governments[17] indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[18] Of this number, there were 36,845 general purpose governments (county,[19] municipal, and town or township[20]) with populations of less than 50,000 and 11,879 special purpose governments—independent school districts[21] with enrollment populations of less than 50,000.[22] Accordingly, based on the 2022 U.S. Census of Governments data, we

---

[14] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description. See Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data do not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[15] See Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2022 with revenue less than or equal to $50,000 for Region 1-Northeast Area (71,897), Region 2-Mid-Atlantic and Great Lakes Areas (197,296), and Region 3-Gulf Coast and Pacific Coast Areas (260,447) that includes the continental U.S., Alaska, and Hawaii. These data include information for Puerto Rico (469).

[16] See 5 U.S.C. § 601(5).

[17] See 13 U.S.C. § 161. The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7". See also Census of Governments, , https://www.census.gov/programs-surveys/economic-census/year/2022/about.html.

[18] See U.S. Census Bureau, 2022 Census of Governments – Organization Table 2. Local Governments by Type and State: 2022 [CG1700ORG02], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html. Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts). See also tbl.2. CG2200ORG02 Table Notes_Local Governments by Type and State_2022.

[19] See id. at tbl.5. County Governments by Population-Size Group and State: 2022 [CG2200ORG05], https://www.census.gov/data/tables/2022/econ/gus/2017-governments.html. There were 2,097 county governments with populations less than 50,000. This category does not include subcounty (municipal and township) governments.

[20] See id. at tbl.6. Subcounty General-Purpose Governments by Population-Size Group and State: 2022 [CG2200ORG06], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html. There were 18,693 municipal and 16,055 town and township governments with populations less than 50,000.

[21] See id. at tbl.10. Elementary and Secondary School Systems by Enrollment-Size Group and State: 2022 [CG2200ORG10], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html. There were 11,879 independent school districts with enrollment populations less than 50,000. See also tbl.4. Special-Purpose Local Governments by State Census Years 1942 to 2022 [CG2200ORG04], CG2200ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2022.

[22] While the special purpose governments category also includes local special district governments, the 2022 Census of Governments data does not provide data aggregated based on population size for the special purpose governments

(continued….)

estimate that at least 48,724 entities fall into the category of "small governmental jurisdictions."[23]

10.    *Wired Telecommunications Carriers.*  The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[24]  Transmission facilities may be based on a single technology or a combination of technologies.  Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband Internet services.[25]  By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[26]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[27]

11.    The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[28]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[29]  Of this number, 2,964 firms operated with fewer than 250 employees.[30]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[31]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[32]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

12.    *Local Exchange Carriers (LECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services.  Providers of these services include both incumbent and competitive local exchange service providers.  Wired

---

category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[23] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,845) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (11,879), from the 2022 Census of Governments - Organizations tbls.5, 6 & 10.

[24] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www. census.gov/naics/?input=517311&year=2017&details=517311.

[25] *Id.*

[26] *Id.*

[27] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers are not included in this industry.

[28] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[29] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/ table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[30] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[31] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022),https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[32] *Id.*

Telecommunications Carriers[33] is the closest industry with an SBA small business size standard.[34] Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[35] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[36] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[37] Of this number, 2,964 firms operated with fewer than 250 employees.[38] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were fixed local exchange service providers.[39] Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[40] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

13.     *Incumbent Local Exchange Carriers (Incumbent LECs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers[41] is the closest industry with an SBA small business size standard.[42] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[43] U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[44] Of this number, 2,964 firms operated with fewer than 250 employees.[45] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 1,212 providers that reported they were incumbent local

---

[33] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[34] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[35] Fixed Local Exchange Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

[36] *Id.*

[37] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[38] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[39] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[40] *Id.*

[41] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[42] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[43] *Id.*

[44] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[45] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

exchange service providers.[46]  Of these providers, the Commission estimates that 916 providers have 1,500 or fewer employees.[47]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

14.     *Competitive Local Exchange Carriers (CLECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers.[48] Wired Telecommunications Carriers[49] is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[50]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[51]  Of this number, 2,964 firms operated with fewer than 250 employees.[52]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 3,378 providers that reported they were competitive local service providers.[53]  Of these providers, the Commission estimates that 3,230 providers have 1,500 or fewer employees.[54]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

15.     *Interexchange Carriers (IXCs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for Interexchange Carriers.  Wired Telecommunications Carriers[55] is the closest industry with a SBA small business size standard.[56]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[57]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry

---

[46] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[47] *Id.*

[48] Competitive Local Exchange Service Providers include the following types of providers: Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

[49] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[50] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[51] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[52] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[53] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[54] *Id.*

[55] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[56] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[57] *Id.*

for the entire year.[58]  Of this number, 2,964 firms operated with fewer than 250 employees.[59]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of interexchange services.  Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees.[60]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

16.     *Local Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers.  Telecommunications Resellers is the closest industry with a SBA small business size standard.[61]  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[62]  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[63]  Mobile virtual network operators (MVNOs) are included in this industry.[64]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[65]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[66]  Of that number, 1,375 firms operated with fewer than 250 employees.[67]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 207 providers that reported they were engaged in the provision of local resale services.[68]  Of these providers, the Commission estimates that 202 providers have 1,500 or fewer employees.[69]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

17.     *Toll Resellers*.  Neither the Commission nor the SBA have developed a small business

---

[58] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[59] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[60] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[61] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[66] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[67] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[68] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[69] *Id.*

size standard specifically for Toll Resellers. Telecommunications Resellers[70] is the closest industry with a SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[71] Mobile virtual network operators (MVNOs) are included in this industry.[72] The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[73] U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[74] Of that number, 1,375 firms operated with fewer than 250 employees.[75] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 457 providers that reported they were engaged in the provision of toll services.[76] Of these providers, the Commission estimates that 438 providers have 1,500 or fewer employees.[77] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

18.     *Other Toll Carriers*. Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers. This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers. Wired Telecommunications Carriers[78] is the closest industry with a SBA small business size standard.[79] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[80] U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[81] Of this number, 2,964 firms operated with fewer than 250 employees.[82] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were

---

[70] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www. census.gov/naics/?input=517911&year=2017&details=517911.

[71] *Id.*

[72] *Id.*

[73] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[74] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/ cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false. At this time, the 2022 Economic Census data are not available.

[75] *Id.* The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[76] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[77] *Id.*

[78] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www. census.gov/naics/?input=517311&year=2017&details=517311.

[79] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[80] *Id.*

[81] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/ table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false. At this time, the 2022 Economic Census data are not available.

[82] *Id.* The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

90 providers that reported they were engaged in the provision of other toll services.[83]  Of these providers, the Commission estimates that 87 providers have 1,500 or fewer employees.[84]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

19.    *Payphone Service Providers (PSPs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for payphone service providers, a group that includes incarcerated people's services providers.  Telecommunications Resellers[85] is the closest industry with a SBA small business size standard.  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[86]  Mobile virtual network operators (MVNOs) are included in this industry.[87]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[88]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[89]  Of that number, 1,375 firms operated with fewer than 250 employees.[90]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 36 providers that reported they were engaged in the provision of payphone services.[91]  Of these providers, the Commission estimates that 32 providers have 1,500 or fewer employees.[92]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

20.    *Telecommunications Relay Service (TRS) Providers.*  Telecommunications relay services enable individuals who are deaf, hard of hearing, deafblind, or who have a speech disability to communicate by telephone in a manner that is functionally equivalent to using voice communication services.[93]  Internet-based TRS connects an individual with a hearing or a speech disability to a TRS communications assistant using an Internet Protocol-enabled device via the Internet, rather than the public switched telephone network.[94]  Video Relay Service (VRS) one form of Internet-based TRS, enables

---

[83] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[84] *Id.*

[85] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[86] *Id.*

[87] *Id.*

[88] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[89] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[90] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[91] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[92] *Id.*

[93] 47 U.S.C. § 225(a)(3).

[94] 47 CFR § 64.601(a)(22). IP CTS can also be provided with an Automatic Speech Recognition programs producing the captions.  Except as authorized or required by the Commission, Internet-based TRS does not include the use of a text telephone (TTY) or RTT over an interconnected Voice over Internet Protocol service.

people with hearing or speech disabilities who use sign language to communicate with voice telephone users over a broadband connection using a video communication device.[95]  Internet Protocol Captioned Telephone Service (IP CTS) another form of Internet-based TRS, permits a person with hearing loss to have a telephone conversation while reading captions of what the other party is saying on an Internet-connected device.[96]  A third form of Internet-based TRS, Internet Protocol Relay Service (IP Relay), permits an individual with a hearing or a speech disability to communicate in text using an internet Protocol-enabled device via the internet, rather than using a text telephone (TTY) and the public switched telephone network.[97]  Providers must be certified by the Commission to provide VRS and IP CTS[98] and to receive compensation from the TRS Fund for TRS provided in accordance with applicable rules.[99]  Analog forms of TRS, text telephone (TTY),[100] Speech-to-Speech Relay Service,[101] and Captioned Telephone Service,[102] are provided through state TRS programs, which also must be certified by the Commission.[103]

21.      Neither the Commission nor the SBA have developed a small business size standard specifically for TRS Providers.  All Other Telecommunications is the closest industry with a SBA small business size standard.[104]  Internet Service Providers (ISPs) and Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are included in this industry.[105]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[106]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[107]  Of those firms, 1,039 had revenue of less than $25 million.[108]  Based on Commission data there are 14 certified Internet-based TRS providers and two analog forms of TRS providers.[109]  The Commission however does not compile financial information for these providers.

---

[95] *Id.* § 64.601(a)(51).

[96] *Id.* § 64.601(a)(23).

[97] *Id.* § 64.601(24).

[98] *Id.* § 64.606(a)(2).

[99] *Id.* § 64.604(c)(5)(iii)(F).

[100] *Id.* § 64.601(a)(44) ("A machine that employs graphic communication in the transmission of coded signals through a wire or radio communication system.").

[101] *Id.* § 64.601(a)(41) ("A telecommunications relay service that allows individuals with speech disabilities to communicate with voice telephone users through the use of specially trained CAs who understand the speech patterns of persons with speech disabilities and can repeat the words spoken by that person.").

[102] A telephone captioning service provided over the public switched telephone network.

[103] *Id.* § 64.606(a)(1).

[104] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[105] *Id.*

[106] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[107] See U.S. Census Bureau, 2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017, Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[108] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[109] See Internet-Based TRS Providers | Federal Communications Commission (fcc.gov), https://www.fcc.gov/general/internet-based-trs-providers (last visited May 13, 2024); TRS by State and Territories, Federal

(continued....)

Nevertheless, based on available information, the Commission estimates that most providers in this industry are small entities.

22.     *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[110]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[111]  Providers of Internet services (e.g., dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[112]  The SBA small business size standard for this industry classifies firms with annual receipts of $40 million or less as small.[113]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[114]  Of those firms, 1,039 had revenue of less than $25 million.[115]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

### E.     Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

23.     IPCS providers, including any that may be small entities, will need to change their operations, recordkeeping, and reporting to comply with the requirements of the Report and Order.  These requirements include compliance with the rate caps the Report and Order establishes for IPCS.  While the new rate cap structure is lower than the preexisting per-minute rate caps, given that the rate caps are based on cost data provided by IPCS providers, including smaller providers, small entities are likely to be able to recover their costs in the same manner as larger providers.  Additionally, because the rate caps apply to both interstate and intrastate IPCS, the new rate cap structure reduces the recordkeeping and reporting burdens of complying with the Commission's rules with regards to audio IPCS because providers will no longer need to determine the jurisdictional nature of each call.  The Report and Order's requirements also include a prohibition on the assessment of ancillary service charges associated with IPCS, which will greatly reduce the recordkeeping burdens on providers and simplify their billing operations.

24.     The Report and Order prohibits IPCS providers from paying site commissions of any kind associated with IPCS and eliminates the requirement under the Commission's rules for providers to label, and disclose the source of, those payments on consumers' bills.  The Report and Order requires that, where facilities claim to incur costs related to IPCS, providers are to determine whether those costs are in fact used and useful in the provision of IPCS and are, therefore, reimbursable under the

---

Communications Commission (fcc.gov), https://www.fcc.gov/general/trs-state-and-territories (last visited May 13, 2024).

[110] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[111] *Id.*

[112] *Id.*

[113] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[114] See U.S. Census Bureau, 2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017, Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false. At this time, the 2022 Economic Census data are not available.

[115] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

Commission's rules.  These changes will reduce the burdens of the Commission's billing rules, while requiring that IPCS providers make determinations regarding whether cost claims submitted to them by facilities are consistent with Commission requirements.

25.    The Report and Order allows providers the option to offer alternate pricing plans in addition to providing IPCS at per-minute rates.  IPCS providers may elect whether to offer such plans, and should they elect to do so, they may determine the format of such plans, provided that these plans comply with the Commission's generally applicable IPCS rules, certain specified limitations, and other safeguards adopted in the Report and Order.  The Report and Order establishes additional requirements for alternative pricing plans regarding dropped communications, automatic renewals, and consumer cancellation.

26.    The Report and Order adopts consumer disclosure requirements applicable to all IPCS, including requirements that providers disclose their IPCS rates, charges, and associated practices on their publicly available websites in a manner that is easily accessible and available to all members of the public.  Providers must also make these disclosures available via their online and mobile applications, if consumers use such applications to enroll, and on paper, upon a consumer's request.  The Report and Order further requires providers to make available billing statements and statements of account to account holders on a monthly basis, and details regarding the timing, manner, and content requirements for these and other disclosure documents for alternate pricing plans.  The Report and Order also ensures that the consumer disclosure rules, as amended, apply to all IPCS providers subject to the Commission's expanded jurisdiction under the Martha Wright-Reed Act.

27.    The Report and Order extends the Commission's rules regarding inactive accounts to apply to all accounts that can be used to pay an IPCS-related rate or charge, to the extent they are controlled by IPCS providers or their affiliates.  The Report and Order reaffirms that providers are barred from improperly disposing of unused funds in inactive accounts (which includes disposing of such funds before 180 calendar days of continuous account inactivity has passed), and are required to undertake reasonable efforts to refund unused funds.  The Report and Order expands upon these rules, including by requiring providers to (1) contact the relevant account holder if and when they become aware that an incarcerated person has been released or transferred or upon the expiration of the 180-day inactivity period, (2) issue refunds within 30 calendar days of a request from an account holder, or of an account being deemed inactive (even in the absence of such a request), and (3) notify account holders of the status of IPCS accounts prior to their being deemed inactive.  However, the Report and Order limits the requirement for automatic refunds (i.e., in the absence of a consumer's specific request) to account balances of greater than $1.50.  The Report and Order also clarifies what "reasonable efforts" entail, the procedures to follow if "reasonable efforts" to refund inactive accounts fail, and which refund mechanisms providers may use.  Additionally, the Report and Order reaffirms and clarifies the exception to these rules that allows a provider to dispose of funds in inactive accounts in compliance with a controlling judicial or administrative mandate.

28.    The Report and Order modifies the scope and content of the annual reporting requirements, to reflect the Commission's expanded jurisdiction under the Martha Wright-Reed Act, to include the full scope of IPCS and all providers of IPCS, and to reflect the changes to the Commission's rules adopted in the Report and Order.  The Report and Order also amends the Commission's Part 14 rules as appropriate to reflect the Martha Wright-Reed Act's expansion of the Communications Act's definition of "advanced communication service."  It also modifies the Commission's rules to allow a form of enterprise registration for the use of Internet Protocol Captioned Telephone Service (IP CTS) in carceral facilities and clarifies that Internet-based IPCS providers may provide access to traditional (TTY-based) TRS via real-time text.  The Report and Order on Reconsideration also amends the Commission's rules to require that VRS and IP CTS providers update an incarcerated person's registration information within 30 days of receiving written notification from such person, the correctional authority, or IPCS provider of an incarcerated person's release or transfer.

**F.    Steps Taken to Minimize the Significant Economic Impact on Small Entities, and**

**Significant Alternatives Considered**

29.     The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[116]

30.     In the Report and Order, the Commission adopts a new, more comprehensive set of rate caps that differentiate between prisons and jails, and between four different sizes of jails—large, medium, small and very small—based on average daily population (ADP).  The use of four different size tiers is supported in the record and accounts for differences in costs incurred by providers serving these different facility sizes.  The Commission conducts a cost analysis specific to each size tier using data submitted by IPCS providers and adopts new rate caps for each of these facility size and type categories for both audio and video IPCS.  The Commission believes that these actions properly recognize that some jails may be more costly for providers to serve than prisons, and similarly that jails with smaller ADPs may be more costly for providers to serve than those with larger ADPs.

31.     Compliance with the Commission's new audio and video rate caps and its rules eliminating site commission payments will be required by January 1, 2025 for prisons and for jails with ADPs of 1,000 or above incarcerated persons where no site commissions mandated by law are currently paid; by April 1, 2025 for jails with ADPs less than 1,000 where no site commissions mandated by law are currently paid; and by July 1, 2025 for all size facilities where site commissions mandated by law are currently paid.  The Commission extended the compliance deadline for providers serving smaller jails to account for the additional time that these facilities, and the providers that serve them, may need to adapt to the changes adopted in the Report and Order.

32.     The Commission recognizes that it cannot foreclose the possibility that in certain limited instances, certain providers, possibly smaller providers with less ability to spread their costs over a larger number of facilities or minutes of use, may not be able to recover their costs of providing IPCS under the rate caps adopted in the Report and Order.  To minimize the burden on such providers, the Commission retains, with modifications, its waiver process, which allows providers to seek relief from its rules at the facility or contract level if they can demonstrate that they are unable to recover their used and useful IPCS-related costs at that facility or for that contract.  The Commission modifies this process to reflect the provisions of the Martha Wright-Reed Act, including its new authority thereunder.  The waiver process will allow the Commission to review individual providers' data and potentially allow these providers to charge rates that enable them to recover their costs of providing IPCS at that facility or under that contract.  This waiver process should benefit any IPCS providers that may be small businesses unable to recover their costs under the new rate caps.

33.     In the Report and Order, the Commission prohibits providers from assessing ancillary service charges in addition to per-minute rates for IPCS.  The Commission incorporates the costs of providing ancillary services in its rate caps to allow providers the opportunity to recover their average costs of providing these ancillary services, while eliminating the burden of administering independent billing processes for each of these services.  At the same time, eliminating all separately assessed ancillary service charges prevents providers from engaging in rent-seeking activity in their application of these charges, helping to ensure that IPCS rates and charges are just and reasonable.

34.     The Commission revises its rules to make clear that IPCS providers may meet the requirement to provide access to traditional TRS via real-time text, as an alternative to TTY transmissions, if real-time text transmission is supported by the available devices and reliable service can be provided by this method.  Permitting this alternative affords providers further flexibility in conducting their operations, and accommodates the needs of smaller providers that may have insufficient resources to

---

[116] 5 U.S.C. § 604(a)(6).

**Federal Communications Commission** FCC 24-75

expand or otherwise adjust their service format and infrastructure to enable TTY transmission.

35.     The Commission revises its rules to permit providers to implement alternate pricing plans, other than per-minute pricing, subject to rules and conditions to protect IPCS consumers.  Any provider that adopts these plans must offer them as a voluntary alternative to per-minute pricing.  Providers are not required to offer such plans, but should they elect to do so, they will have the flexibility to determine the format of the plans they offer.  Permitting this additional means of providing IPCS affords providers, including smaller providers, further flexibility in conducting their operations.

36.     The Commission's rate caps incorporate the costs of only a subset of the safety and security measures reported by providers.  The rate caps incorporate the costs of the two categories that the Commission finds to be both used and useful in the provision of IPCS: Communications Assistance for Law Enforcement Act (CALEA) compliance measures and communications security services.  Because cost recovery through the rate caps is only accommodated for a more limited set of such measures, providers, particularly smaller providers, may not need to be capable of offering more sophisticated safety and security services in order to successfully compete for IPCS contracts.

> **G.     Report to Congress**

37.     The Commission will send a copy of the Report and Order, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[117]  In addition, the Commission will send a copy of the Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  A copy of the Report and Order and FRFA (or summaries thereof) will also be published in the Federal Register.[118]

---

[117] 5 U.S.C. § 801(a)(1)(A).

[118] *See id.* § 604(b).

Federal Communications Commission                    FCC 24-75

APPENDIX C

Initial Regulatory Flexibility Act Analysis

1.       As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Federal Communications Commission (Commission) has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities by the policies and rules proposed in this *2024 IPCS Further Notice of Proposed Rulemaking* (Notice). Written public comments are requested on this IRFA. Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments the Notice. The Commission will send a copy of the Notice, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2] In addition, the Notice and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

A.       **Need for, and Objectives of, the Proposed Rules**

2.       In the Notice, the Commission seeks additional comment on establishing permanent rate caps for video incarcerated people's communications services (IPCS) that are just and reasonable, and will fairly compensate IPCS providers. Specifically, the Commission requests that parties supplement the record with additional information on the video IPCS marketplace, including the types of video communications services that providers offer incarcerated people, the demand for those services, the used and useful costs providers and facilities incur in the provision of those services, and other information that might help us set just and reasonable, and fairly compensatory, permanent rate caps for video IPCS. It also requests comment on the types of data that would be most helpful for the Commission to collect to support its efforts to adopt permanent video IPCS rate caps.

3.       The Notice also seeks comment on quality of service issues that have been raised in this proceeding. This includes comment on the Commission's legal authority to address quality of service issues and whether it should develop minimal quality of service standards. It seeks comment on the types of service quality issues that should be addressed and whether there should be different standards or rules for different types of facilities or providers.

4.       The Commission again seeks comment on revisions to its definitions of "Prison" and "Jail," and specifically, the costs providers incur in providing service to confinement facilities that are not correctional institutions. The Notice also seeks comment on whether the Commission's statutory authority under Section 276 can be interpreted to extend to confinement facilities. Finally, the Commission seeks comment on possibly obtaining additional data about serving very small jails, the possible designation of a third party to receive refunds from IPCS accounts and possibly adopting a uniform additive to the IPCS rate caps to account for correctional facility costs.

B.       **Legal Basis**

5.       The proposed action is authorized pursuant to sections 1, 2, 4(i)-(j), 201(b), 218, 220, 225, 255, 276, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 201(b), 218, 220, 225, 255, 276, 403, and 617 and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat 6156 (2022).

C.       **Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

6.       The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rule revisions, if adopted. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business,"

---

[1] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See* 5 U.S.C. § 603(a).

[3] *Id.*

"small organization," and "small governmental jurisdiction."[4]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[5]  A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[6]

7.	*Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[7]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[8]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[9]

8.	Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[10]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[11]  Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[12]

9.	Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special

---

[4] *See* 5 U.S.C. § 601(6).

[5] *See* 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[6] *See* 15 U.S.C. § 632.

[7] 5 U.S.C. § 601(3)-(6).

[8] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf (Mar. 2023).

[9] *Id*.

[10] 5 U.S.C. § 601(4).

[11] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[12] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2022 with revenue less than or equal to $50,000 for Region 1-Northeast Area (71,897), Region 2-Mid-Atlantic and Great Lakes Areas (197,296), and Region 3-Gulf Coast and Pacific Coast Areas (260,447) that includes the continental U.S., Alaska, and Hawaii.  These data include information for Puerto Rico (469).

districts, with a population of less than fifty thousand."[13]  U.S. Census Bureau data from the 2022 Census of Governments[14] indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[15]  Of this number, there were 36,845 general purpose governments (county,[16] municipal, and town or township[17]) with populations of less than 50,000 and 11,879 special purpose governments (independent school districts[18]) with enrollment populations of less than 50,000.[19]  Accordingly, based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 entities fall into the category of "small governmental jurisdictions."[20]

10.     *Wired Telecommunications Carriers.*  The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[21]  Transmission facilities may be based on a single technology or a combination of technologies.  Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband Internet services.[22]  By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[23]  Wired Telecommunications Carriers

---

[13] 5 U.S.C. § 601(5).

[14] 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/economic-census/year/2022/about.html.

[15] *See* U.S. Census Bureau, 2022 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2022 [CG2200ORG02], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* Tbl. 2.  CG2200ORG02 Table Notes_Local Governments by Type and State_2022.

[16] *See id.* at Tbl. 5.  County Governments by Population-Size Group and State: 2022 [CG2200ORG05], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 2,097 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[17] *See id.* at Tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2022 [CG2200ORG06], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 18,693 municipal and 16,055 town and township governments with populations less than 50,000.

[18] *See id.* at Tbl. 10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2022 [CG2200ORG10], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 11,879 independent school districts with enrollment populations less than 50,000.  *See also* Tbl. 4.  Special-Purpose Local Governments by State Census Years 1942 to 2022 [CG2200ORG04], CG2200ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2022.

[19] While the special purpose governments category also includes local special district governments, the 2022 Census of Governments data do not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts are included in the special purpose governments category.

[20] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,845) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (11,879), from the 2022 Census of Governments - Organizations tbls. 5, 6 & 10.

[21] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[22] *Id.*

[23] *Id.*

are also referred to as wireline carriers or fixed local service providers.[24]

11.        The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[25]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[26]  Of this number, 2,964 firms operated with fewer than 250 employees.[27]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[28]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[29]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

12.        The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[30]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[31]  Of this number, 2,964 firms operated with fewer than 250 employees.[32]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[33]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[34]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

13.        *Local Exchange Carriers (LECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services.  Providers of these services include both incumbent and competitive local exchange service providers.  Wired

---

[24] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers are not included in this industry.

[25] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[26] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/ table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[27] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[28] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[29] *Id.*

[30] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[31] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/ table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[32] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[33] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[34] *Id.*

Telecommunications Carriers[35] is the closest industry with an SBA small business size standard.[36]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[37]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[38]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[39]  Of this number, 2,964 firms operated with fewer than 250 employees.[40]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were fixed local exchange service providers.[41]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[42]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

14.    *Incumbent Local Exchange Carriers (Incumbent LECs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers[43] is the closest industry with an SBA small business size standard.[44]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[45]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[46]  Of this number, 2,964 firms operated with fewer than 250 employees.[47]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 1,212 providers that reported they were incumbent local

---

[35] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www. census.gov/naics/?input=517311&year=2017&details=517311.

[36] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[37] Fixed Local Exchange Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

[38] *Id.*

[39] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/ table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[40] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[41] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[42] *Id.*

[43] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www. census.gov/naics/?input=517311&year=2017&details=517311.

[44] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[45] *Id.*

[46] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/ table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[47] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

exchange service providers.[48]  Of these providers, the Commission estimates that 916 providers have 1,500 or fewer employees.[49]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

15.    *Competitive Local Exchange Carriers (CLECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers.[50] Wired Telecommunications Carriers[51] is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[52]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[53]  Of this number, 2,964 firms operated with fewer than 250 employees.[54]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 3,378 providers that reported they were competitive local service providers.[55]  Of these providers, the Commission estimates that 3,230 providers have 1,500 or fewer employees.[56]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

16.    *Interexchange Carriers (IXCs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for Interexchange Carriers.  Wired Telecommunications Carriers[57] is the closest industry with a SBA small business size standard.[58]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[59]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry

---

[48] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[49] *Id.*

[50] Competitive Local Exchange Service Providers include the following types of providers: Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

[51] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[52] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[53] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[54] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[55] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[56] *Id.*

[57] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[58] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[59] *Id.*

for the entire year.[60]  Of this number, 2,964 firms operated with fewer than 250 employees.[61]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of interexchange services.  Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees.[62]  Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

17.    *Local Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers.  Telecommunications Resellers is the closest industry with a SBA small business size standard.[63]  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[64]  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[65]  Mobile virtual network operators (MVNOs) are included in this industry.[66]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[67]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[68]  Of that number, 1,375 firms operated with fewer than 250 employees.[69]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 207 providers that reported they were engaged in the provision of local resale services.[70]  Of these providers, the Commission estimates that 202 providers have 1,500 or fewer employees.[71]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

---

[60] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[61] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[62] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[63] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[68] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[69] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[70] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[71] *Id.*

**Federal Communications Commission**    **FCC 24-75**

18.    *Toll Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Toll Resellers.  Telecommunications Resellers[72] is the closest industry with a SBA small business size standard.  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[73]  Mobile virtual network operators (MVNOs) are included in this industry.[74]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[75]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[76]  Of that number, 1,375 firms operated with fewer than 250 employees.[77]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 457 providers that reported they were engaged in the provision of toll services.[78]  Of these providers, the Commission estimates that 438 providers have 1,500 or fewer employees.[79]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

19.    *Other Toll Carriers*.  Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers.  This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers.  Wired Telecommunications Carriers[80] is the closest industry with a SBA small business size standard.[81]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[82]  U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[83]  Of this number, 2,964 firms operated with fewer than 250 employees.[84]  Additionally, based on

---

[72] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[73] *Id.*

[74] *Id.*

[75] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[76] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[77] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[78] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[79] *Id.*

[80] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[81] *See* 13 CFR § 121.201, NAICS Code 517311 (as of 10/1/22, NAICS Code 517111).

[82] *Id.*

[83] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[84] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 90 providers that reported they were engaged in the provision of other toll services.[85]  Of these providers, the Commission estimates that 87 providers have 1,500 or fewer employees.[86]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

20.    *Payphone Service Providers (PSPs).*  Neither the Commission nor the SBA have developed a small business size standard specifically for payphone service providers.  Telecommunications Resellers[87] is the closest industry with a SBA small business size standard.  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[88]  Mobile virtual network operators (MVNOs) are included in this industry.[89]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[90]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[91]  Of that number, 1,375 firms operated with fewer than 250 employees.[92]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 36 providers that reported they were engaged in the provision of payphone services.[93]  Of these providers, the Commission estimates that 32 providers have 1,500 or fewer employees.[94]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

21.    *Telecommunications Relay Service (TRS) Providers.*  Telecommunications relay services enable individuals who are deaf, hard of hearing, deafblind, or who have a speech disability to communicate by telephone in a manner that is functionally equivalent to using voice communication services.[95]  Internet-based TRS connects an individual with a hearing or a speech disability to a TRS communications assistant using an Internet Protocol-enabled device via the Internet, rather than the public switched telephone network.[96]  Video Relay Service (VRS), one form of Internet-based TRS, enables

---

[85] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[86] *Id.*

[87] *See* U.S. Census Bureau, *2017 NAICS Definition,* "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[88] *Id.*

[89] *Id.*

[90] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[91] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[92] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.

[93] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[94] *Id.*

[95] 47 U.S.C. § 225(a)(3).

[96] 47 CFR § 64.601(a)(22).  IP CTS can also be provided with an Automatic Speech Recognition programs producing the captions.  Except as authorized or required by the Commission, Internet-based TRS does not include the use of a text telephone (TTY) or RTT over an interconnected Voice over Internet Protocol service.

people with hearing or speech disabilities who use sign language to communicate with voice telephone users over a broadband connection using a video communication device.[97]  Internet Protocol Captioned Telephone Service (IP CTS) another form of Internet-based TRS, permits a person with hearing loss to have a telephone conversation while reading captions of what the other party is saying on an Internet-connected device.[98]  A third form of Internet-based TRS, Internet Protocol Relay Service (IP Relay), permits an individual with a hearing or a speech disability to communicate in text using an internet Protocol-enabled device via the internet, rather than using a text telephone (TTY) and the public switched telephone network.[99]  Providers must be certified by the Commission to provide VRS and IP CTS[100] and to receive compensation from the TRS Fund for TRS provided in accordance with applicable rules.[101]  Analog forms of TRS, text telephone (TTY),[102] Speech-to-Speech Relay Service,[103] and Captioned Telephone Service,[104] are provided through state TRS programs, which also must be certified by the Commission.[105]

22.  Neither the Commission nor the SBA have developed a small business size standard specifically for TRS Providers.  All Other Telecommunications is the closest industry with a SBA small business size standard.[106]  Internet Service Providers (ISPs) and Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are included in this industry.[107]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[108]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[109]  Of those firms, 1,039 had revenue of less than $25 million.[110]  Based on Commission data there are 14 certified Internet-based TRS providers and two analog forms of TRS providers.[111]  The Commission however does not compile financial information for these providers.

---

[97] *Id.* § 64.601(a)(51).

[98] *Id.* § 64.601(a)(23).

[99] *Id.* § 64.601(24).

[100] *Id.* § 64.606(a)(2).

[101] *Id.* § 64.604(c)(5)(iii)(F).

[102] *Id.* § 64.601(a)(44) ("A machine that employs graphic communication in the transmission of coded signals through a wire or radio communication system.").

[103] *Id.* § 64.601(a)(41) ("A telecommunications relay service that allows individuals with speech disabilities to communicate with voice telephone users through the use of specially trained CAs who understand the speech patterns of persons with speech disabilities and can repeat the words spoken by that person.").

[104] A telephone captioning service provided over the public switched telephone network.

[105] *Id.* § 64.606(a)(1).

[106] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[107] *Id.*

[108] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[109] See U.S. Census Bureau, 2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017, Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.  At this time, the 2022 Economic Census data are not available.

[110] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[111] *See* Internet-Based TRS Providers | Federal Communications Commission (fcc.gov), https://www.fcc.gov/general/internet-based-trs-providers (last visited May 13, 2024); TRS by State and Territories,

(continued….)

Nevertheless, based on available information, the Commission estimates that most providers in this industry are small entities.

23.    *All Other Telecommunications.*    This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[112]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[113]  Providers of Internet services (e.g., dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[114]  The SBA small business size standard for this industry classifies firms with annual receipts of $40 million or less as small.[115]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[116]  Of those firms, 1,039 had revenue of less than $25 million.[117]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

D.    **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

24.    *Establishing Permanent Rate Caps for Video IPCS.*    In the Notice, the Commission seeks comments on establishing  permanent video IPCS rates, including updated marketplace and cost data.  To the extent that permanent video IPCS rate caps are lower than the interim rate caps and apply to all types of facilities (including jails with average daily populations below 1,000) as detailed in the Report and Order,[118] IPCS video providers (including any smaller entities) must comply with the new rate caps.

25.    *Compliance with Quality of Service Rules.*    In the Notice, the Commission seeks comment on adopting quality of service rules for IPCS.  It also seeks comment on whether there should be different standards or rules for different types of facilities or providers.  Thus, IPCS providers that are small entities may be subject to any quality of service rules ultimately adopted by the Commission.

26.    *Recordkeeping, Reporting, and Certification*.    The Report and Order directs staff to conduct an additional mandatory data collection to obtain updated data on video IPCS and the IPCS industry in general.  The Notice seeks comment on the types of data that would be most helpful for the Commission to collect to support its efforts to adopt permanent video IPCS rate caps that are just and reasonable to consumers, as well as ensuring fair compensation to providers.  To the extent the Commission imposes a new mandatory data collection, providers of all sizes must maintain and report their cost data in accordance with the Commission's rules.  The Notice also seeks comments on revising

---

Federal Communications Commission (fcc.gov), https://www.fcc.gov/general/trs-state-and-territories (last visited May 13, 2024).

[112] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[113] *Id.*

[114] *Id.*

[115] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[116] See U.S. Census Bureau, 2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017, Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false. At this time, the 2022 Economic Census data are not available.

[117] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[118] *Supra* Section III.D.4 (Adopting Interim Video IPCS Rate Caps).

the Commission's definitions of "Prisons" and "Jail" to capture the full universe of confinement facilities. To the extent the Commission expands these definitions as proposed, providers of communication services to these facilities may be subject to the Commission's regulations. We anticipate the information we receive in comments including where requested, cost and benefit analyses, will help the Commission identify and evaluate relevant compliance matters for small entities, including compliance costs and other burdens that may result from the proposals and inquiries we make in the Notice.

### E.    Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered

27.    The RFA requires an agency to describe any significant, alternatives that could minimize impacts to small entities that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rules for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[119]

28.    In the Notice, the Commission seeks comments on establishing permanent rate caps for video IPCS. Data are sought from providers servicing different facility types and sizes, and information on how small providers serving jails, which may be smaller, higher-cost facilities, and larger prisons, which often benefit from economies of scale, can recover their legitimate IPCS costs related to video communications services.

29.    The Commission seeks comment on adopting quality of service standards for IPCS including whether there should be different standards or rules for different types of facilities or providers. The Commission seeks information on the impact such rules may have on IPCS providers for smaller facilities. The Commission seeks comment on the costs providers incur in providing service to confinement facilities of all sizes that are not correctional institutions. Specifically, whether non-correctional confinement facilities have cost characteristics that are substantially similar to correctional facilities.

30.    The Commission seeks comment on whether any of the burdens associated the filing, recordkeeping and reporting requirements described above can be minimized for small entities and whether any of the costs associated with the proposals in the Notice can be alleviated for small entities. The Commission will consider the economic impact on small entities, as identified in comments filed in response to the Notice and this IRFA, in reaching its final conclusions and promulgating rules in this proceeding.

### F.    Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules

31.    None.

---

[119] 5 U.S.C. § 603(c)(1)-(4).

**APPENDIX D: DATA COLLECTION**

1.    This appendix and the other technical appendices that follow outline the data compilation and analysis that the Commission staff (staff) conducted using the 2023 Mandatory Data Collection as part of the Commission's efforts to determine just and reasonable and fairly compensatory rate caps for incarcerated people's communications services (IPCS). Collectively, the appendices provide: a description of the database compilation (Appendix D); a description of methods (Appendix E); summary statistics (Appendix F); a least absolute shrinkage and selection operator (Lasso) analysis to determine what characteristics of IPCS provision have a meaningful association with providers' reported per-minute expenses (Appendix G); our upper bound analysis (Appendix H); our lower bound analysis, including validation analyses (Appendix I); and a validation analysis of the rate caps adopted in the Order (Appendix J).

2.    *Description of Data Collection.* On July 26, 2023, the Wireline Competition Bureau and the Office of Economics and Analytics released an Order implementing the 2023 Mandatory Data Collection regarding IPCS.[1]  All providers of IPCS were required to respond to the data request by October 31, 2023.[2]  The aim of this collection was to acquire IPCS providers financial and operating data as part of the Commission's efforts to set just and reasonable and fairly compensatory rate caps. Generally, the data collection required IPCS providers to report, for 2022, billed and unbilled demand (minutes and communications) and billed revenues for audio and video IPCS and ancillary services;[3] monetary and in-kind site commission payments, both legally mandated and contractually prescribed; and investments and expenses for audio and video IPCS, safety and security measure services, ancillary services, and all other products and services.[4]  To minimize the burden of the collection, we required providers to supply information based on their internal accounts, while remaining consistent with their financial reports and GAAP.

3.    The data collection requested information from providers at company-wide and facility levels, as well as by various categories of investments and expenses. We required reports at the company level for two reasons: such reports may be compared with company financial statements and doing so constrains the investments and expenses to be allocated among IPCS and IPCS-related services and non-

---

[1] *Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 23-638 (WCB/OEA July 26, 2023) (*2023 Mandatory Data Collection Order*).

[2] *Id.* at 21, para. 56. For the purposes of the 2023 Mandatory Data Collection, a provider is defined as any contractor or subcontractor that provides IPCS, regardless of whether that entity has a contract directly with the facility or with another provider. *Id.* at 16, para. 41.

[3] Throughout Appendices D through J, we use terms defined in the 2023 Mandatory Data Collection. Unless otherwise specified, we observe the following conventions: "minutes" refers to Billed and Unbilled Minutes sometimes also written "billed and unbilled minutes"; "IPCS minutes" refers to the sum of Audio IPCS Billed and Unbilled Minutes and Video IPCS Billed and Unbilled Minutes; "audio IPCS services" is typically shortened to "audio services"; "video IPCS services" is typically shortened to "video services"; "audio minutes" refer to Audio IPCS Billed and Unbilled Minutes; "video minutes" refer to Video IPCS Billed and Unbilled Minutes; the same conventions for minutes apply to communications, which generally can be thought of as calls; "revenues" refer to Billed Revenues; "safety and security measure services" are typically shortened to "safety and security services"; and ancillary services refer to the five types of services defined in the data collection as "Permissible Ancillary Services," for which the Commission's rules allowed providers to assess charges: (i) automated payment services, (ii) live agent services, (iii) paper bill/statement services, (iv) single-call and related services, and (v) third-party financial transaction services (all other ancillary services are defined as "Other Ancillary Services"). *See Incarcerated People's Communications Services*, 2023 Mandatory Data Collection Instructions, WC Docket Nos. 23-62 and 12-375, at 10, https://www.fcc.gov/files/2023-ipcs-mandatory-data-collection-instructions (last visited July 5, 2024).

[4] *2023 Mandatory Data Collection Order* at 3-4, 7, 13, paras. 8 (generally), 11 (year of coverage), 17 (expenses and allocation), 35 (site commissions).

IPCS. We required reports at the facility level to give us insight into how costs might vary with facility size and type. Staff also prepared a detailed set of instructions for providers, which required providers to allocate their reported investments and expenses among IPCS and IPCS-related services and other products and services and to further allocate the IPCS investments and expenses among facilities. Specifically, we required providers to allocate their investments and expenses, to the extent possible, in the following order: direct assignment; direct attribution based on factors that cause a particular business activity and thus investments or expenses to increase or decrease; indirect attribution in proportion to related categories of investments or expenses that are directly assigned or directly attributed; or allocation based on the share of the total of all investments or expenses already directly assigned or attributed.

4.    *Structure of the Collection.* To collect these financial and operating data, and to help the Commission understand the data at different levels and across different categories, staff developed an Excel template and a Word template, which we required providers to populate. Providers were required to report information at the company-wide level (worksheets C1-C2), including total company investments,[5] capital expenses,[6] operating expenses,[7] and revenues. Providers were also required to allocate their data across ten (10) categories of services: audio IPCS, video IPCS, safety and security measures, permissible ancillary services (automated payment services, live agent services, paper bill/statement services, single-call and related services, and third-party financial transaction services), other ancillary services, and other products and services.[8] Providers also were required to report their revenues from each of the 10 service categories.[9]

---

[5] Investments (capital assets) categories include: tangible assets; capitalized research and development; purchased software; internally developed software; trademarks; capitalized site commissions; other identifiable intangible assets; and goodwill. Gross investment, accumulated depreciation or amortization, and net investment are reported separately for each of these categories of assets. The remaining investment categories are: accumulated deferred federal income taxes, accumulated deferred state income taxes, customer prepayments or deposits, cash working capital, and net capital stock. None of these categories is specific to any category of capital assets. The Excel template calculates net capital stock—gross investment in assets, net of accumulated depreciation and amortization, accumulated deferred federal and state income taxes, and customer prepayments or deposits, plus an allowance for cash working capital.

[6] Capital expenses categories include: depreciation - tangible assets; amortization - capitalized research and development; amortization - purchased software; amortization - internally developed software; amortization – trademarks; amortization - capitalized site commissions (includes amortization recognized as an offset against gross revenues); amortization - other identifiable intangible assets; amortization - goodwill; return; interest other than interest paid on customer prepayments or deposits; interest paid on customer prepayments or deposits; federal income tax; state income tax. The Excel template calculates return by multiplying net capital stock by the provider's claimed weighted average cost of capital or the default after-tax rate of return of 9.75%. Federal and state income taxes are not allocated. The Excel template uses the provider's reported federal and state income tax rates and tax-deductible interest expense to calculate the federal and state income tax income taxes that correspond to the taxable fraction of the return.

[7] Operating expenses categories are: maintenance, repair, and engineering of site plant, equipment, and facilities; payments to telecommunications carriers or other entities for interstate, international, or intrastate communications other than extra payments to telecommunications carriers or other entities for international communications; extra payments to telecommunications carriers or other entities for international communications; field services; network operations; call center; data center and storage; payment of site commissions recognized as an expense or an offset against gross revenues when paid or when the commissions-related transaction occurred; billing, collection, client management, and customer care; sales and marketing; general and administrative; other overhead; taxes other than income taxes; transactions related to mergers and acquisitions; and bad debt.

[8] Site commissions are reported only for the entire company; they are not allocated among services or facilities. Ancillary service reports are not split out as between audio and video.

[9] Annual total expenses is the sum of annual operating expenses and annual capital expenses (including a return on net capital stock to cover the cost of capital).

**Federal Communications Commission** **FCC 24-75**

5.　　　Providers were further required to allocate their company-wide investments and expenses to the facility level for audio and video IPCS costs, respectively (worksheet D1). These data are providers' allocations of the annual expenses they incurred to supply IPCS to each facility. Providers were also required to report revenues and demand for audio IPCS, video IPCS, and ancillary services at the facility level, by reporting billed revenues and total billed and unbilled minutes of use for each facility.[10] Providers were required to report company-wide annual safety and security expenses among seven different safety and security categories: (i) the Communications Assistance for Law Enforcement Act (CALEA) compliance measures;[11] (ii) law enforcement support services; (iii) communication security services; (iv) communication recording services; (v) communication monitoring services; (vi) voice biometrics services; and (vii) other safety and security measures (worksheet C3).[12] The company-wide safety and security expenses for audio and video IPCS were then allocated among facilities as well (worksheet D2.c).[13]

6.　　　Providers also were required to report site commissions attributable to all company products and services. They were further required to report company-wide "IPCS and associated ancillary services," to report site commissions as either legally-mandated or contractually-prescribed, and were further required to sub-categorize these commissions as monetary, in-kind, fixed, upfront, and variable site commissions (worksheet C3).[14] These company-wide site commission figures were also required to be allocated among facilities (worksheet D2.b). There was no requirement to allocate site commissions between audio IPCS, and video IPCS and associated ancillary services separately.

7.　　　Providers were required to identify any affiliates or third parties they used to provide ancillary services, to report any payments to third parties for ancillary services, and to quantify any third-party fees they paid for ancillary services that they passed through to their customers (worksheet C3). Providers were also required to report any IPCS or ancillary services revenues passed through to their affiliates and any payments made to their affiliates to complete international communications. Similarly, providers were required to supply these responses at a facility level (worksheet D2.e).

8.　　　*Breadth of the Collection.* Twenty-one providers submitted responses to the 2023 Mandatory Data Collection.[15] Of this group, twelve provided data, or revisions to their data, before May

---

[10] For audio and video IPCS, providers reported billed, unbilled, and the total of billed and unbilled communications and minutes and billed revenues for each facility. In addition to the billed totals, billed communications, minutes, and revenues are reported separately for interstate, international, and intrastate communications for each facility. For ancillary services, providers reported billed demand separately for automated payment service (number of uses), live agent service (uses), paper bill/statement service (uses), single-call and related services (number of transactions), and third-party financial transaction service (transactions), and billed revenues separately for each these services for each facility.

[11] 47 U.S.C. § 1001 *et seq.*; 47 CFR § 1.20000 *et seq.*

[12] Safety and security expenses were allocated across four different service categories: (a) audio IPCS; (b) video IPCS; (c) ancillary services; and (d) other products and services. Statistics for these expenses are provided below in Appendix F, Tbls. 18 and 19.

[13] Providers were directed simply to use estimates to allocate their safety and security expenses.

[14] Throughout Appendices D-J, the term "site commissions" without further modification means all site commissions of all forms.

[15] The list of filers with associated short names or acronyms used for these providers in appendices D through J: Ameelio, Inc. (Ameelio); ATN, Inc. (ATN); City Tele-Coin Co. (City Tele-Coin); Correct Solutions, LLC (Correct); Combined Public Communications (CPC); Crown Correctional Telephone, Inc. (Crown); Consolidated Telecom, Inc. (Consolidated); Custom Teleconnect (Custom); Encartele, Inc. (Encartele); Global Tel*Link Corporation d/b/a ViaPath (ViaPath); HomeWAV, LLC (HomeWAV); ICSolutions, LLC (ICSolutions); iWebVisit.com, LLC (iWeb); NCIC Inmate Communications (NCIC); Pay Tel Communications, Inc. (Pay Tel); Prodigy Solutions, Inc. (Prodigy); Reliance Telephone of Grand Forks, Incorporated (Reliance); Securus Technologies, LLC (Securus); Smart Communications (Smart); Talton Communications, Inc. (Talton); and TKC Telecom, LLC (TKC).

**Federal Communications Commission**                    **FCC 24-75**

1, 2024, which, as explained below, we were able to process and include in our provider database: ATN, City Tele-Coin, CPC, ICSolutions, HomeWAV, NCIC, Pay Tel, Prodigy, Securus, Smart, TKC, and ViaPath.[16]  The resulting IPCS database covers 2,750 contracts and 4,537 facilities, accounting for an average daily population of 2,112,042 incarcerated people and 11.3 billion billed and unbilled minutes of audio and 563 million billed and unbilled minutes of video.  Unless otherwise indicated, our analyses and tables that follow are derived from this database.

9.        The IPCS database provides a helpful depiction of the IPCS industry.  The database's twelve providers represent the vast majority of the IPCS industry, and their worksheets, though not audited, are broadly consistent with their submitted financial accounts.  For seven providers beyond these twelve, staff were able to capture data such as minutes and/or revenues, though not the same data from each.[17]  For the remaining two providers, {[

            ]}  Incorporating these data shows that the database of twelve providers covers approximately 84% of reported facilities, and approximately 87% of incarcerated persons.  Table 1 reports shares of minutes, communications (the number of audio or video calls), and revenues covered by the twelve providers included in the database alongside the shares of the seven providers we excluded to the extent those seven providers provided processable data (the data from {[                                    ]} were either missing or unreliable).

**Table 1:  Relative Percentage of Minutes, Communications, and Revenue in Database**[18]

|  | **Audio** | | | **Video** | | |
|---|---|---|---|---|---|---|
|  | **Percent Billed and Unbilled Minutes** | **Percent Billed and Unbilled Communications** | **Percent Revenue** | **Percent Billed and Unbilled Minutes** | **Percent Billed and Unbilled Communications** | **Percent Revenue** |
| **Providers in Database (12)** | 99.03% | 99.27% | 96.89% | 99.95% | 99.97% | 99.98% |
| **Providers Excluded from Database (7)** | 0.97% | 0.73% | 3.11% | 0.05% | 0.03% | 0.02% |

Note: Based on providers' submitted worksheets aggregated up from the facility-level with minimal processing.

---

[16] Staff made the IPCS database available to Reviewing Parties in accordance with the relevant *Protective Orders* and *Public Notice*.  *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Protective Order, DA 23-298 (WCB Apr. 5, 2023); *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Protective Order, 28 FCC Rcd 16954 (WCB 2013); *Wireline Competition Bureau and Office of Economics and Analytics Make Incarcerated People's Communications Services 2023 Mandatory Data Collection Database Available to Eligible Individuals Pursuant to Protective Order*, WC Docket Nos. 23-62 and 12-375, Public Notice, DA 24-267 (WCB/OEA Mar. 18, 2024).

[17] The additional seven are from Ameelio, Correct, Crown, Consolidated, Custom, iWeb, and Talton.

[18] As described above, our database includes twelve providers: ATN, CPC, City Tele-Coin, HomeWAV, ICSolutions, NCIC, Pay Tel, Prodigy, Securus, Smart, TKC, and ViaPath.  There are another seven providers reflected in this table's second row whose data we could process in part, but who were ultimately excluded from the database for the reasons discussed below: Ameelio, Correct, Crown, Consolidated, Custom, iWeb, and Talton.  Finally, staff could not process the submissions of Encartele and Reliance.

The table marginally overstates the relative marketplace significance of the providers included in the database, though the impact is *de minimis*.  The overstatement arises for several reasons: some of {[

            ]}; and some very small providers did not file.  It is staff's view that if data were available for all these providers, the impact on our conclusions would amount to no more than a rounding error.

### G.    Description of Initial Data Processing, Data Cleaning, and Database Compilation

10.    This subsection reviews the steps we took to process, clean, and combine the collected 2023 Mandatory Data Collection data into a database.

11.    *Data Combination*.  Staff created variable names for each row of data in the Excel templates.  Staff combined the processed twelve provider submissions into a database, segmented by tabs organized by worksheet from the submissions.[19]  Since the same facilities appear in multiple worksheets, staff took care to ensure the database linked the same facilities across all worksheets.

12.    *Data Review*.  Staff reviewed each submission, including the narratives supplied in the Word template, and checked for errors to evaluate whether the submitted data complied with the Excel template parameters.  To minimize data submission errors, the Excel template included formulas to check for consistency between provider's company-wide and facility-specific entries.  In all cases, staff communicated issues identified in our review, and allowed providers to resubmit corrected data.  This resulted in some form of extended interaction between staff and providers in all cases except Consolidated, Custom, and Talton.  In these communications, staff answered provider questions about the data collection requirements and/or explained the data collection process to aid submission.  We received 14 refilings as a result of our error check process.[20]

13.    *Removing Invalid or Incomplete Data.*  Despite these efforts, staff concluded that we could not incorporate into the database worksheets submitted by nine providers: Ameelio, Correct, Crown, Consolidated, Custom, Encartele, iWeb, Reliance, and Talton.[21]  Most commonly, filings could not be incorporated because providers' reports of expense, revenue, or demand data were wholly or partially omitted.[22]  In other cases, the provider failed to fully allocate investments or expenses, failed to identify the relevant subcontractor, or failed to report video expenses at a facility level, among other problems.[23]

---

[19] Throughout Appendices D through J, the term "worksheet" refers to Excel sheets in the original Excel template filled out by providers and 'tab' refers to Excel sheets in the database.

[20] The following providers refiled: Ameelio, CPC, Correct, City Tele-Coin, HomeWAV, ICSolutions, NCIC, Prodigy, Securus, Smart, TKC, ViaPath, and Pay Tel on two occasions.  The conversations which staff had with these providers to prompt their refiling illustrates that the Commission "made inquiries to providers during the data-collection process regarding "questionable" cost data."  *See* Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 18 (filed July 11, 2024).

[21] Staff would have removed {[

                                                                        ]}.

[22] For example, among other problems, {[                                                        ]} did not provide costs at the facility level.  Thus, their data could not be used to analyze how per-minute expenses vary by facility type, a matter which is central to the analysis.  Similarly, among other problems, {[                                        ]} did not provide IPCS minutes, making analysis of per-minute expenses, which is the basis for capping rates, impossible.

[23] For example, {[            ]} did not allocate investments or expenses to the other products and services category (though it supplies other services, e.g., electronic incarcerated person messaging services and management services) overstating {[                ]} IPCS expenses.  {[            ]} also did not identify the name of the subcontractor, address, and facility geographic coordinates for all facilities making it impossible to match {[                ]} expense reports with those of its subcontractors, making analysis of {[                ]} facilities impossible.  {[            ]} did not allocate IPCS costs between audio IPCS and video IPCS (though it provides both services).  {[                        ]} provided no financial statements, providing no means of cross-checking their expense reports.  Without such cross checks staff and outside parties cannot even determine whether {[                            ]} reports are internally consistent.  {[                    ]} also left the company-wide investment and expenses and facility video worksheets blank (though it sells video), making analysis of its expenses, and of video services impossible.  In contrast to claims in the record, no provider was excluded from the database based on the provider's costs relative to industry costs.

(continued….)

**Federal Communications Commission**                    **FCC 24-75**

14.    *Excluding an Anomalous Provider*.  {[




]}

15.    *Excluding Federally Managed Facilities*.  Staff also excluded from the database facilities subject to the Immigration and Customs Enforcement (ICE) and the Bureau of Prisons (BOP) contracts because these facilities are not comparable to other correctional facilities.  Significant portions of incarcerated people's communications services in these institutions are managed by a federal incarceration authority rather than the reporting provider.[24]  As was the case in the *2021 ICS Order*, {[
]}.[25]  Staff removed all BOP contracts they were able to identify.[26]

16.    *Data Corrections*.  For the 12 filings reflected in the database, staff made corrections where necessary and feasible.  In cases where unique facility identifiers were not identical across worksheets due to misspellings, abbreviations, or other mistakes (e.g., "Couny" versus "County"), staff corrected these.  In cases where the provider did not identify the facility as a jail or prison, and staff was able to do so, staff inserted the relevant facility type.  Twenty-four entries could not be identified as a jail or prison, and were removed.[27]  ViaPath submitted average daily population (ADP) and site commissions data at the contract level, so staff allocated ADP from contracts to facilities in proportion to ViaPath's total audio and video IPCS communications.  Communications were chosen as the allocator variable as it correlates strongly with ADP in ViaPath's single-facility contracts.[28]  Additionally, for some facilities reported total (billed + unbilled) minutes of use did not match the sum of billed and unbilled minutes of

---

Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed July 11, 2024).

[24] *See* {[



]}

[25] *See, e.g.*, *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9711, Appx. E, para. 14. (2021) (*2021 ICS Order*).  {[                                                                                                    ]} under those subcontracts from the database.

[26] In *2021 ICS Order*, staff allocated the shared costs to the BOP contract before dropping it, but that is not necessary for this data collection as it required providers to allocate all their costs down to the facility, {[
]} *Id.*

[27] Of these 24 facilities, {[                        ]} entries given at the contract level that could not be matched to a facility.  Two more entries do not correspond to a specific facility, and are instead attributed to 'No Specific Contract' and 'Other Non IPCS Facility Sites.'  The last is an {[
]}

[28] Communications was chosen over minutes as the allocator as the Pearson correlation coefficient was higher between ADP and communications than ADP and minutes.  However, the impact of this choice is small.  The difference in methodologies influences the industry per-minute IPCS expenses by no more than $0.0046 and by no more than 2.22% in any size-bracket, audio or video.  This largest difference can be found in video IPCS per-minute expenses for very small jails, where the minutes-weighted methodology is $0.0046 lower than the calls-weighted methodology.

Federal Communications Commission                                     FCC 24-75

use.  To fix these discrepancies, for both audio and video, total minutes of use were recalculated by summing billed and unbilled minutes of use.

17.       *Treatment of Subcontractors*.  At certain facilities, IPCS is provided by a contractor and a subcontractor.  In some cases, both the contractor and subcontractor submitted cost or demand data for a single facility, because each incurred some part of costs or bills for service.  To account for this, staff matched or removed facilities across contractor/subcontractor pairs to avoid double counting the same facility.  As facility IDs are not consistent among providers, staff performed many matches by examining information on address, counterparty, building, type, latitude, and longitude.  Table 2 below depicts the attempted and successful matches:

**Table 2: Subcontractor to Contractor Matching Results**

| Subcontractor | Contractor | Facilities with Contractor | Successfully Matched |
|---|---|---|---|
| {[ | | | |
| | | | |
| | | | |
| | | | ]} |

18.       In cases where the contractor and subcontractor both submitted data that could be incorporated into the dataset, multiple entries for a single facility were merged into one.  For non-numeric descriptive data and numeric data that could not easily aggregate across entries, such as max call duration, average daily population, or tax rates, staff used the values given by the contractor for the merged entry if available.  Staff summed numeric data that would not be duplicated across entries, such as revenue, cost, and minute information.  In total, staff merged 82 subcontractor entries with 81 contractor entries.[29]  In the three instances where a match was attempted but could not be made, staff removed the facilities, as identified.  Additionally, {[

} remain in the dataset, but staff removed the video information.  In other cases, where the subcontractor was not incorporated into the dataset, either because it never filed or was excluded, staff removed those facility entries.  This accounts for the removal of 354 facility entries, which, in addition to the other steps, leaves 4,537 facility entries in the dataset.

19.       *Geocoding*.  The providers were asked to provide address and coordinate information for each facility.  However, many facilities lacked coordinate information.  Staff used address information, where given, to geocode the dataset to generate coordinate information.[30]  As many providers' coordinates were incomplete, inaccurate, had low precision, or were different from staff-geocoded coordinates by a large distance, staff-geocoded coordinates were used where possible.  To identify facilities as urban or rural, staff used Census-block data published by the US Census Bureau.[31]  The US Census identifies urban census tracts with five-digit UACE codes.  Using UACE codes provided in the 2020 Census, staff identified 2,474 urban and 1,975 rural facilities, for a total of 4,449 identified

---

[29] In one case, a facility is reported by three providers, with  {[
]} both acting as subcontractors.

[30] Geocoding was performed using ArcGIS Pro using the ArcGIS StreetMap Premium (Q3 2023 North American/HERE) street database.

[31] United States Census Bureau, *Record Layout for 2020 Census Tabulation Blocks Shapefile with 2020 Census Population and Housing Unit Counts*, https://www.census.gov/programs-surveys/geography/technical-documentation/complete-technical-documentation/tiger-geo-line/2020.html (last visited July 5, 2024) (containing information.  on the 2020 US Census data and TIGER/Line shape).

**Federal Communications Commission**                    **FCC 24-75**

facilities.[32]  This is used in the Lasso Analysis in Appendix G.

---

[32] {[

]}  98% of included facilities across all providers could be identified as urban or rural using provider coordinates or geocoded addresses.

## APPENDIX E: RATE CAP METHODOLOGY

1.      This appendix describes the method staff used to analyze the 2023 Mandatory Data Collection data and estimate the upper and lower bounds of our zones of reasonableness for incarcerated people's communications services (IPCS) per-minute expenses.  The structure of the data collection allows staff to determine the fully distributed cost of providing IPCS for each provider and the entire industry.  Providers were required to directly assign, attribute, or allocate all of their investments and expenses among audio IPCS, video IPCS, safety and security measures, ancillary services, and other products and services.  Our measure of the fully distributed cost of providing a service, annual total expenses, sums the provider's operating expenses and capital expenses, including an allowance for recovery of its cost of capital.[1]  Annual total expenses were reported for audio IPCS, video IPCS, safety and security measures, and ancillary services at the company level and separately for audio IPCS and video IPCS at each facility.  Company-wide annual total expenses of providing safety and security were allocated among seven different safety and security categories separately for audio IPCS, video IPCS, ancillary services, and other products and services.  Audio IPCS and video IPCS safety and security expenses were further allocated by category among facilities.  We determine our lower and upper bounds described in this Order by dividing allowable amounts of the reported expenses for various IPCS components by billed and unbilled minutes separately for prisons and different jail sizes.  In this appendix, we outline the critical components of this analysis necessary to set just and reasonable rate caps for the provision of IPCS.

2.      *Unit of Analysis.*  As discussed in the data collection description section, the 2023 Mandatory Data Collection required providers to report audio IPCS and video IPCS investments and expenses at two levels: that of the provider (company-wide) and that of individual facilities the provider serves.  Our analysis of providers' costs is performed primarily at the level of the individual facility.  This is in contrast to the *2021 ICS Order* where staff analyzed provider data at the level of the contract, which was necessary because, in the ordinary course of business, many filers did not maintain requested cost data at the facility level.[2]  The structure of the 2023 Mandatory Data Collection, delineated by a detailed set of instructions requiring providers to assign, attribute, or allocate reported audio IPCS and video IPCS investments and expenses among facilities, allows for a more granular facility-level analysis.  This ensures that the analysis is fully consistent with our rate-setting approach, which establishes rate caps for facilities rather than for contracts.[3]

3.      *Separation into Tiers.*  Staff separate facility observations into prisons versus jails and into jail size tiers based on average daily population (ADP), analyzing provider IPCS investments and expenses separately within each tier.  Staff establish the following tiers for the purposes of rate setting: prisons; large jails (ADP ≥ 1,000); medium jails (350 ≤ ADP < 1,000); small jails (100 ≤ ADP < 350); and very small jails (ADP < 100).  This approach is largely consistent with the approach taken in the *2021 ICS Order* and is similarly consistent with record evidence of the cost differences among facilities of

---

[1] As described in Appendix D above, annual total expenses accounts for all of a provider's expenses, including maintenance, repair, and engineering and 14 other categories of operating expenses, depreciation and amortization expenses, federal and state income taxes, and the provider's cost of capital.

[2] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9712, Appx. E, para. 18. (2021) (*2021 ICS Order*).

[3] Relying on multi-facility contracts encompassing facilities of varying sizes, and in particular contracts that included facilities with less than 1,000 ADP, likely led to an overestimate of interim rate caps.  *Id.* at 9554, para. 84 n.254.  The rate-setting methodology staff employ in this rulemaking relies on reported facility-level data, and thus avoids this problem.

different sizes.[4]  However, whereas the *2021 ICS Order* did not adopt rate caps for jails with ADP less than 1,000, the 2023 Mandatory Data Collection enables us to address IPCS facilities of all sizes.  As such, staff must establish additional jail size tiers for the purposes of rate setting.  Staff analysis of the variation in IPCS costs across jails of different sizes showed that significant cost differences exist among facilities served.  These cost differences reflect progressively greater costs for jails with smaller ADPs,[5] which warrants a more granular tiering structure for jails than that adopted in previous orders, comprising four tiers based on jail size.[6]  Grouping facilities into the tiers outlined above is necessary to ensure that our rate caps reflect underlying differences in the cost of IPCS provision across different types and sizes of facilities.

4.    *Unit of Sale.*  Our rate setting methodology relies on the sum of billed and unbilled minutes of audio or video IPCS as the unit of sale.  That is, we divide annual total expenses by billed and unbilled minutes to determine separate per-minute rate caps for audio and video IPCS for each facility tier.  Use of a per-minute rate structure is consistent with past Commission action, reflects the predominant industry pricing strategy for IPCS, and is consistent with existing Commission rules covering interstate and international audio IPCS, which require providers to charge for service on a per-minute basis.[7]  The use of both billed and unbilled minutes is an improvement from the *2021 ICS Order*, which divided expenses by paid minutes, and better reflects the cost of actual minutes.[8]  This approach helps ensure all incarcerated persons are charged no more than the cost of their calls, and treats all

---

[4] *Id.* at 9713, Appx. E, paras. 19-20.  *See* Securus Technologies, LLC Reply, WC Docket Nos. 12-375, at 13-14 (rec. Mar. 5, 2023) (arguing that costs increase sharply at ADP of less than 100); National Sheriffs' Association Comments, WC Docket Nos. 23-62 and 12-375, at 7 (rec. May 8, 2023) (arguing that costs vary at ADP thresholds of 350 and 1,000).

[5] *See* Appendix F, Tbls. 4 and 7 (respectively addressing providers' reported calling and safety and security expenses per minute at each facility tier).  Prisons and jails are distinguished under our rules largely by their respective confinement periods, with prisons used to confine individuals "sentenced to terms in excess of one year" and jails used to confine those with shorter sentences.  47 CFR § 64.6000(m), (r).  This definitional difference entails a meaningful difference in average confinement periods and turnover rates, which drives part of the difference in costs between the two types of facilities.  Thus, by accounting for facility type, our rate caps account for the impact of turnover on costs.  We examine the impact of other factors in the Lasso analysis below.  *See infra* Appendix G.

[6] Staff examined per-minute costs both graphically and using simple regressions.  While there were no sharply obvious break points, per-minute costs increased at an increasingly steep rate as facility ADP fell.  This suggested use of the tiers was adopted in the *Rates for Inmate Calling Services*, WC Docket No. 12-375, Second Report and Order and Third Further Notice of Proposed Rulemaking, 30 FCC Rcd 12763 (2015) with the small jails tier split into two tiers, now called small jails and very small jails.

[7] While this rulemaking allows alternate pricing plans, such as monthly plans for a set number of calls or minutes, subject to certain specified conditions, all providers still must offer per-minute pricing for audio and video IPCS.

[8] We disagree with commenters who argue that, similar to the *2021 ICS Order*, we should have calculated per-minute costs on the basis of billed minutes rather than the sum of billed and unbilled minutes.  *See* Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, FCC, WC Docket Nos. 23-62 and 12-375, at 6, 16-18 (filed July 9, 2024) (Pay Tel July 9, 2024 *Ex Parte*); Letter from Lee. G. Petro and Glenn S. Richards, Dickinson Wright PLLC, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 3 (filed July 10, 2024); Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 8, 22 (filed July 11, 2024) (Securus July 11, 2024 *Ex Parte*).  The ratio of billed minutes to unbilled minutes varies across facilities, and rate caps based on the average cost of a billed minute would allow over recovery of costs, and therefore unreasonably high rates, in facilities that had a lower ratio than the average facility in 2022, while allowing under-recovery in other facilities.  As a result, such an approach would also mean the Commission was effectively requiring incarcerated people who receive relatively few free minutes to subsidize other users.  Further, if the relative proportions of billed to unbilled minutes were to shift in the future, a rate cap based on the amount of billed minutes would become outdated.

minutes equally, regardless of a facility's or a provider's policy decisions on whether and how to provide free minutes.[9]  We further note that there is no strict parallel between "Paid Minutes," as used in the *2021 ICS Order*, and "Billed Minutes" as used in the 2023 Mandatory Data Collection.[10]

5.    *Industry Average Costs.*  The Martha Wright-Reed Act expressly granted the Commission authority to use industry-wide average costs to set IPCS rate caps.  Our rate-setting approach relies on this new statutory authority.  As such, our analysis of provider investments and expenses calculates the minute-weighted average expense of IPCS provision, separately for audio and video IPCS and within each rate tier.  If staff were confident of three things: (1) that the providers' cost allocations reasonably reflect cost-causation; (2) there was no underlying cost variation within each of our five facility categories when looking at audio and video separately;[11] and (3) there was no overstatement of costs—then rate caps based on the industry average would be far too high from an efficiency perspective.  However, it is unlikely that any of these three things are true, so instead staff use the minute-weighted industry average to account for potential variation in costs within our categories, and discount certain costs using a zone of reasonableness analysis,[12] to account for potentially misallocated or cost variation otherwise not controlled for.[13]  Specifically, our analysis calculates the minute-weighted average expense

---

[9] It is true that many "IPCS providers—particularly those serving jails—are required to provide certain calls (e.g., calls for booking and calls to public defenders) free of charge."  *See* Pay Tel July 9, 2024 *Ex Parte* at 6.  Today's Report and Order does not prevent or in any way discourage this.  Just as correctional authorities may pay providers to offer calling plans that (from the incarcerated person's perspective) are free, correctional authorities may enter into arrangements with providers that allow incarcerated people to make  certain types, or a certain number, of free calls.  Correctional authorities remain free to decide whether and how providers should offer unbilled minutes.

[10] Billed minutes do not equal paid minutes to the extent minutes are billed for, but not paid.  The instructions for the 2023 Mandatory Data Collection define billed minutes as the number of audio or video IPCS minutes supplied for which payment is demanded, and define unbilled minutes as the number of audio or video IPCS minutes supplied for which payment is not demanded.  Thus, billed minutes reported in response to the 2023 Mandatory Data Collection are intended to *include* minutes billed to the caller, called party, incarcerated authority, or any other third party whether or not these bills were actually paid.  By contrast, paid minutes reported in response to the Second Mandatory Data Collection were intended to *exclude* minutes which were billed, but for which the bills were not actually paid.  (Our measure of expenses reflected in the rate caps includes an allowance for bad debt expense to recognize unpaid bills that are no longer expected to be collected due to customer default.)

[11] For example, our analysis showed no material variation from facility to facility in local market conditions.

[12] *See* Appendix E.

[13] Staff reliance on industry average costs is further supported by the Brattle Group's analysis of the 2023 Mandatory Data Collection data.  Brattle finds considerable variation in costs among IPCS providers and the facilities they serve, particularly in the provision of video IPCS, and ultimately drop all facility observations with costs above $0.25 per minute in their analysis of per-minute expenses.  We have concerns with such an approach, as dropping observations creates a delta between company-wide expenses and those reported across providers' facilities.  In addition, any threshold relied upon for pruning outliers must either be untenably high or would potentially drop valid data points.  However, given that Brattle relies on simple, rather than weighted, averages of facility-level per-minute expenses, pruning of outliers needs to take place to obtain meaningful results.  Staff's use of weighted industry average expenses per minute avoids this concern, allowing even significant outlier observations to be included in the calculation of rate caps while ensuring that such observations do not have a disproportionate impact on the results.  *See* Wright Petitioners et al. Comments, WC Docket Nos. 23-62 and 12-375, at 51-54 (rec. May 8, 2023).  We disagree with commenters who argue that the use of the industry average to develop our caps is "confiscatory."  *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 8.  *But see* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 4-5 (Wright Petitioners July 12, 2024 *Ex Parte*) (arguing that "[a]ny suggestion that the new rate caps would be unduly restrictive—or potentially 'confiscatory'—[is] wholly without merit"); *see also* Appendix J; *supra Report and Order* at III.D.4.b (Determining Permanent Rate Caps for Audio IPCS and Interim Rate Caps for Video IPCS); *infra* note 21.

**Federal Communications Commission** FCC 24-75

of providing IPCS, separately for audio and video IPCS for each facility tier (prisons, and jails of differing sizes).[14]

6.      Staff consider that the industry minute-weighted averages, controlling for audio or video service, and whether the facility is a prison or a jail of a particular size, are good, if high, estimates of efficient costs for the following reasons.  First, providers differ in their cost accounting practices, and use different and necessarily imperfect cost allocators.  These cost allocation variations create cost differences across facilities that are not related to the efficient cost of service delivery.  However, by definition, these cost allocation problems cancel out across each provider—that is, if costs are overallocated to one facility, they must be under allocated to another.[15]  If these inappropriate cost allocations are relatively random across all facilities, there is no evidence to the contrary, then the use of the per-minute weighted mean would, as a good approximation, net these differences out.[16]  Second, given providers' incentives, costs are likely overstated,[17] biasing the industry mean toward overstating efficient costs.  Third, to the extent that providers' cost reports are not overstated in the sense that they reflect actual costs, many providers appear to be inefficient, implying that the industry mean is further biased toward overstating efficient costs.[18]  Fourth, while there may be some variation in efficient costs, after controlling for audio or video service, and whether the facility is a prison or a jail of a particular size, the cost variation that can be attributed to any given factor is relatively small compared with the preceding two sources of difference.[19]  In summary, when taking the industry mean, the variation due to the first of these points likely cancels out; the variation due to the second and third points likely results in substantial overstatement of efficient per-minute expenses; and the true cost variation of the fourth point is small.  Thus, the industry minute-

---

[14] Staff calculate minute-weighted average costs as annual total expense divided by total billed and unbilled minutes, separately for audio and video IPCS and within each rate tier.

[15] This conclusion does not apply, of course, to costs that are improperly allocated to IPCS rather than to nonregulated services.

[16] The Commission could only take a different action if there was a known correctable cost allocation bias.

[17] That {[                                        ]} reported company-wide IPCS revenues that were respectively about 15%, 15%, and 25% below their reported IPCS costs plus site commissions is evidence of cost overstatement, *see* Appendix F, Tbl. 9 and associated discussion.  There are many ways that costs could be overstated which we cannot audit on the record before us and, to the extent additional information would help us resolve the matter, within the timeframe the Martha Wright-Reed Act sets for Commission action.  Securus argues that "the assumption that costs must be inflated is contrary to the draft's conclusion that the cost information is reliable."  Securus July 11, 2024 *Ex Parte* at 18.  We disagree.  *See* Appendix I.

[18] For example, there is substantial variation in provider costs that quality or scale differences do not readily explain.  While the largest providers, {[




]} These disparities are not likely explained by quality differences, since, for example, the large providers tend to offer more features than smaller ones, suggesting they should have higher per-minute costs.  *See* Appendix F, Tbl. 1.

[19] The record suggests the key drivers of audio cost are facility-type and size, which are already controlled for in our rate-setting approach.  *See* Securus Technologies, LLC Reply, WC Docket Nos. 23-62 and 12-375, at 15 (rec. July 12, 2023) ("[L]arge facilities show lower costs per minute; exactly what you would expect in an industry that offers some economies of scale.  FTI's previous detailed analysis of the Third Mandatory Data Collection cost data showed strong correlations between cost drivers such as facility type and size. . . .  These strong relationships between overall costs with ADP, provider, facility size, and facility type also translate to [cost per minute] as well, with these factors being significantly predictive of CPM.").  The Lasso analysis shows the relationship between costs and other variables, apart from provider identity and state, to be largely statistically insignificant.  Although our Lasso analysis points to provider identity and state as the dominant predictors of costs, we find that these variables are not appropriate for incorporation into our rate caps.  *See* Appendix G; *cf. 2021 ICS Order*, 36 FCC Rcd at Appx. F, 9739, para. 3, Appx. G, 9748, para. 14.

weighted mean likely lies above efficient costs.  This is further supported by analysis of facility per-minute revenues.[20]

7.    *Overview of Our Zones of Reasonableness*.  Staff establish zones of reasonableness, separately for audio and video IPCS and for each facility tier, and determine final audio and interim video IPCS rate caps from within these zones.  A zone of reasonableness approach helps avoid giving undue weight to imprecise and likely overstated provider cost data, as well as to data assumptions and adjustments that could lead to unduly high or low per-minute rate caps.

8.    Staff begin by using data that providers submitted in response to the 2023 Mandatory Data Collection to establish upper bounds.  Staff make no adjustments to provider reported expenses beyond the data cleaning, processing, and corrections discussed in the data collection appendix, and supplement these data with estimates of the costs incurred by facilities to provide access to IPCS and by providers to provide TRS.[21]  Staff then make reasonable, conservative adjustments to the reported data and use those data to establish the lower bounds of our zones of reasonableness.  Finally, we select rates from within each zone of reasonableness to establish final audio and interim video IPCS rate caps for each facility rate tier.

9.    *Components of Our Upper Bounds.*  Our upper bounds incorporate five distinct components of expenses for audio and video IPCS: (1) audio/video IPCS expenses; (2) audio/video IPCS safety and security expenses; (3) ancillary service expenses; (4) correctional facility expense component; and (5) TRS allowance.  Staff discuss and explain each of these components in the upper bounds appendix.

10.    *Components of Our Lower Bounds.*  As indicated, staff establish our lower bounds by making reasoned disallowances and adjustments to reported provider cost data.  The lower bounds appendix explains the need for these steps.  After the disallowances and adjustments, the lower bounds incorporates the following components of industry average costs: (1) audio/video IPCS expenses after adjustments to certain expense categories; (2) audio/video IPCS safety and security expenses after certain disallowances and adjustments to expense categories; (3) ancillary service expenses after adjustments to certain expense categories;[22] and (4) unadjusted TRS allowance.

---

[20] *See* Appendix J.

[21] As discussed above, we find that, in light of the Martha Wright-Reed Act's elimination of the requirement that "each and every" completed communication be fairly compensated, it is appropriate to set our upper and lower bounds based on industry-wide average costs at each tier of facilities, without the need to consider one standard deviation or any other measure of deviance from the average.  *See supra Report and Order* at III.D.1 (Rate Cap Structure); Securus July 11, 2024 *Ex Parte* at 5 n.9 (arguing against the use of industry average costs "without any extension through standard deviations or other means").

[22] The impact of the expense adjustments on ancillary service expenses is trivial, shaving $0.001 off the lower bounds.

Federal Communications Commission                    FCC 24-75

## APPENDIX F: SUMMARY STATISTICS

1.      The database, developed as described in Appendix D, is the primary data source for our analysis.  This appendix provides summary statistics and associated analysis for that database.  The database used in our analyses contains data for 4,537 facilities supplied by 12 providers, referred to throughout as the industry.  The following discussion summarizes key aspects of audio and video incarcerated people's communications services (IPCS) provision, including industry demand, revenue, and expenses as reported in the database.

2.      As mentioned in previous sections, the data used for this analysis comes from two levels of data: company-wide and facility-specific.  It is important to note that the estimates from company-wide and facility-specific do not always perfectly match one another.  Therefore, estimates using company-wide data may vary slightly from facility-specific data.

### A.  Industry Fundamentals

3.      Table 1 provides an overview of the size and composition of audio and video supply and of the nature of audio and video expenses.  In 2022, IPCS audio was the predominate form of communication, and IPCS audio usage outweighed IPCS video.  There were 11,266 million audio IPCS minutes, and 558 million video IPCS minutes.  Thus, audio minutes comprised approximately 95% of industry minutes—see Table 1.[1]  This suggests that in 2022 video had barely taken off as a service, and it is highly likely that video share today is much higher than in 2022, and likely will continue to grow.  It is best to first focus on audio given the lopsided share of audio data and, as evidenced below, the odd results for video, which are likely attributable to the nascent nature of video supply in 2022.  Either in terms of minutes or average daily population (ADP)  the two largest IPCS providers by far were {[


]}

4.      {[



]}  Video is also different from audio in other ways.  {[


]}

---

[1] Similarly, audio communications comprised approximately 97% (1.82 billion / 1.878 billion) of industry communications.  *See infra* Tbl. 15.  This difference was less marked in terms of facilities: 2,092 facilities had video calls, or about half as many 2,092, was about half as many as had audio, 4,151.  *See infra* Tbl. 16.

[2] While providers' rankings according to facility shares are similar, the differences between providers is less marked.  For example, in audio, {[
]}

[3] Providers report different facility and ADP numbers as between audio and video IPCS because they do not always offer both services at all facilities.

Federal Communications Commission    FCC 24-75

**Table 1: Summary Statistics for Audio and Video IPCS, By Provider and Industry**

| | Number of Facilities Where Audio is Supplied | ADP Where Audio is Supplied | ADP (Percent of Industry ADP) | Billed and Unbilled Audio Minutes | Audio Minutes (Percent of Industry Audio Minutes) | Audio IPCS Expenses Per Audio Minute | Audio IPCS and Safety & Security Expenses Per Minute |
|---|---|---|---|---|---|---|---|
| {[ | | | | | | | ]} |
| Industry | 4,151 | 1,817,786 | 100% | 11,266,271,215 | 100% | $0.029 | $0.075 |

| | Number of Facilities Where Video is Supplied | ADP Where Video is Supplied | ADP (Percent of Industry ADP) | Billed and Unbilled Video Minutes | Video Minutes (Percent of Industry Video Minutes) | Video IPCS Expenses Per Video Minute | Video IPCS and Safety & Security Expenses Per Minute |
|---|---|---|---|---|---|---|---|
| {[ | | | | | | | ]} |
| Industry | 2,234 | 1,102,165 | 100% | 558,129,967 | 100% | $0.118 | $0.209 |

Source: Data from facility-specific Excel tabs. There are 4,537 facilities in our dataset. Of these, 4,235 facilities have entries for both audio minutes and expenses, and, of these 4,235 facilities, 4,151 have entries for ADP. Of the original 4,537 facilities in the dataset, 2,266 facilities have entries for both video minutes and expenses, and, of these 2,266 facilities, 2,234 have entries for ADP. Minute(s) refer to the sum of billed and unbilled minute(s).

 5. Table 1 also illustrates that per-minute audio expenses vary significantly across carriers. Focusing first on audio, while {[

]}

6.     Per-minute video expenses vary much more than audio.[6]  And again there are surprises. For example, despite being a relatively low-cost audio provider, {[

]}  This wide variation could arise from accounting differences, including choices on how to depreciate assets over time, quality differences, and providers being at different points in their video deployment.  For example, some providers may be further down the "learning by doing" cost curve, and/or have incurred costs without yet achieving the sales volumes they are capable of.

7.     Finally, Table 2 shows providers' shares of audio minutes can be quite different from their share of audio communications, implying that the average length of an audio communication varies across providers.  This is directly shown in Table 2, and is also true for video.  Table 2 also shows that the average video communication lasts about 18.3 minutes, more than double the average audio communication length of 7.3 minutes.  Yet, {[

]}  Video communication lengths are also considerably more varied than those of audio.  Audio communications lengths vary by about nine minutes, from 4.3 to 12.9, while video communications lengths vary by about twenty-one minutes, from 3.6 to 25.1 minutes.[8]

---

[4] *See Incarcerated People's Communications Services*; *Implementation of the Martha Wright-Reed Act*; *Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 and 12-375, Order, DA 23-638 at 14-15, paras. 38-40 (WCB/OEA July 26, 2023) (defining audio IPCS and audio safety and security).  Similar definitions apply respectively to video IPCS and video safety and security expenses.

[5] {[

]}

[6] The industry standard deviation across providers is 210.7 for audio and 1,187.5 for video.

[7] For more detail on per-minute expenses, *see infra* Tbls. 17 and 18.

[8] The industry standard deviation across providers is 2.3 for audio and 6.8 for video.

Federal Communications Commission    FCC 24-75

**Table 2: The Ratio of Audio Minutes to Audio Communications and Video Minutes to Video Communications**

| | Audio Minutes / Communications | Video Minutes / Communications |
|---|---|---|
| {[ | | ]} |
| Industry | 7.3 | 18.3 |
| Obs (#) | 4,244 | 2,287 |

### B.    Expenses, Revenues, and Margins

8.    *Expenses*.  Table 3 shows provider-reported expenses, as allocated between five categories: audio, video, safety and security services, site commissions, and ancillary services.[9]  As expected, {[

]}  Safety and security expenses are the largest source of industry expenses, accounting for more than a third of the sum of reports for the five listed expenses.  Yet, there is a sharp difference between {[

]}, a matter we will turn to when discussing Table 4.

---

[9] Throughout Appendices D through J, the term "site commissions" refers to the sum of all forms of monetary payment, in-kind payment, gift, exchange of services or goods, fee, technology allowance, or product that a provider or affiliate of a provider may pay, give, donate, or otherwise provide to an entity that operates a facility, an entity with which the provider enters into an agreement to provide IPCS, a governmental agency that oversees a facility, the city, the county, or state where a facility is located, or an agent of any such facility.  In-kind site commissions amount to less than one percent of all site commissions.  Site commissions are not IPCS costs.  Ancillary services refer to the five types of services defined in the data collection as "Permissible Ancillary Services," which our rules allowed providers to charge: (i) automated payment services, (ii) live agent services, (iii) paper bill/statement services, (iv) single-call and related services, and (v) third-party financial transaction services (all other ancillary services are defined as "Other Ancillary Services").  Incarcerated People's Communications Services 2023 Mandatory Data Collection Instructions, WC Docket Nos. 23-62 and 12-375, at 8, 10, and 13, https://www.fcc.gov/files/2023-ipcs-mandatory-data-collection-instructions.

**Federal Communications Commission**        **FCC 24-75**

9.        After safety and security, site commissions account for the second largest fraction of industry expenses—over one fourth.[10]  By comparison, audio expenses account for about one fifth of industry expenses, and ancillary services for about one tenth.  A distant last place, video expenses only account for less than five percent of this total, again likely reflecting that video was a new service in 2022.

**Table 3: Industry Expenses and Site Commissions, By Provider and Category**

| | Audio Expenses | Video Expenses | Safety & Security Expenses | Site Commissions | Ancillary Service Expenses | Sum of Expenses and Site Commissions |
|---|---|---|---|---|---|---|
| {[ | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | ]} |
| **Industry** | $346,353,404 | $71,350,523 | $569,889,222 | $432,594,611 | $135,040,474 | $1,555,228,234 |

Source: Data from Company-Wide Information, Safety & Security Measures, and Commissions and Rev Sharing Excel tabs.

10.        Using facility-specific data from providers, we also analyze expenses and revenues separately for prisons and jails, and for different jail sizes.[11]  As demonstrated in the tables below, a large majority of facilities are jails as opposed to prisons and, of all jails, about half classify as very small, with ADPs of less than 100.

11.        Table 4 reports first audio expenses, excluding safety and security expenses, per billed and unbilled audio minute by facility type for each provider and the industry average, and then the same thing for video.  Focusing first on audio, it shows that audio expenses per billed and unbilled minute tend to be lower for prisons compared to jails for the entire industry, with an industry average of about $0.02 for prisons and between $0.02 and $0.09 across the different jail sizes.  However, for the three providers that serve prisons, the difference between prisons and jails is minimal.  Similarly, smaller jails tend to have higher per-minute expenses for audio compared to larger jails.  Industry audio expenses per billed and unbilled minute are about $0.02, $0.04, $0.06, and $0.09 for large, medium, small, and very small jails, respectively.  Again, the data for video contain anomalies.  Video per-minute expenses for prisons were $0.156, greater than that for jails of all sizes except very small jails, reversing the same comparison for audio.  And the per-minute expenses of the three providers of prisons are very different, with an order of magnitude range of {[

---

[10] Percent of Site Commissions of All Related Expenses = (Legally Mandated Site Commissions + Contractually Prescribed Site Commissions) / Total Expenses = ($29,017,010 + $403,577,600) / $1,555,228,234 = 27.8%.

[11] We categorize jails based on average daily population (ADP).  A large jail is defined as a jail with an ADP equal to or greater than 1,000.  A medium jail is a jail with an ADP of or greater than 350 and less than 1,000.  A small jail has an ADP of or greater than 100 and less than 350.  Lastly, a very small jail has an ADP of less than 100.

**Federal Communications Commission**                    **FCC 24-75**

                    ]}  With only ten providers reporting video expenses, industry video expenses per billed and unbilled minute are about $0.09, $0.09, $0.12, and $0.21 for large, medium, small, and very small jails, respectively.  Table 4 also shows the outsized impact of {[

                    ]}

Federal Communications Commission    FCC 24-75

**Table 4: IPCS Expenses Per Billed and Unbilled Minutes, By Facility Type and Provider**

| | All Facilities ($ / Min) | Prisons ($ / Min) | Large Jails ($ / Min) | Medium Jails ($ / Min) | Small Jails ($ / Min) | Very Small Jails ($ / Min) |
|---|---|---|---|---|---|---|
| {[ | | | | | | ]} |
| Industry | 0.029 | 0.023 | 0.023 | 0.037 | 0.059 | 0.087 |
| Obs (#) | 4,184 | 1,361 | 120 | 415 | 873 | 1,415 |
| {[ | | | | | | ]} |
| Industry | 0.121 | 0.156 | 0.094 | 0.094 | 0.116 | 0.208 |
| Obs (#) | 2,740 | 968 | 88 | 343 | 667 | 674 |
| {[ | | | | | | ]} |

Source: Data from facility-specific Excel tabs.

12.     *Safety and Security Expenses*.  Table 5 presents per-minute audio and per-minute video IPCS safety and security expenses for facility types.  It shows that {[

**Federal Communications Commission**                    **FCC 24-75**

]}

---

[12] Provider shares of IPCS billed and unbilled minutes with safety and security expenses are reported in Tbl. 19 below.

**Federal Communications Commission**                    **FCC 24-75**

**Table 5: Audio and Video Safety & Security Expenses Per Billed and Unbilled Audio and Video Minute, By Facility Type and Provider**

| | | All Facilities | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails |
|---|---|---|---|---|---|---|---|
| **Audio** | {[ | | | | | | ]} |
| | Industry | 0.046 | 0.051 | 0.042 | 0.040 | 0.029 | 0.030 |
| | Obs (#) | 4,159 | 1,330 | 120 | 414 | 873 | 1,422 |
| **Video** | {[ | | | | | | ]} |
| | Industry | 0.092 | 0.137 | 0.097 | 0.089 | 0.058 | 0.047 |
| | Obs (#) | 2,255 | 633 | 83 | 326 | 625 | 588 |

Source: Data from facility-specific Excel tabs.

{[

]}

13.    *International Audio Termination Expenses*.  Staff examine the providers' reported international termination expenses to determine the feasibility of establishing a separate rate cap to recover those expenses.  Under the Commission's current rules, a provider can charge a per-minute rate for international audio communications that does not exceed the applicable interstate rate cap plus the average per-minute amount the provider paid its international service providers for communications to a

**Federal Communications Commission**                    **FCC 24-75**

particular international destination.[13]  Providers were required to report extra payments to telecommunications carriers or other entities for international communications as an operating expense on row 75 on the C1-C2. Company-Wide Information worksheet.  {[

]}  As these extra payments are for termination of audio communications to international destinations[15] and providers can impose a separate charge on international minutes to recover these expenses under our rules, staff divide {[

]}  Table 6 below details this calculation.

**Table 6: {[**



14.

]}  In addition, nothing in the record suggests a need to create a separate charge for video analogous to the separate charge for termination of international audio communications.

15.    Staff note that annual total expenses, as developed on the Excel template, excludes extra payments to telecommunications carriers or other entities for international communications.  {[

]} other providers make payments for termination of international communications. They likely report these as expenses on a different row than the row designated for reporting these extra payments in the Excel template.[16]  To the extent that these other providers report these extra payments as expenses on any other row, these expenses are reflected in annual total expenses and thus in the upper and lower bounds of our audio rate caps.  Consequently, the upper and lower bounds for our audio rate caps are likely overstated because providers can still impose a separate charge for termination of international audio communications, consistent with the Commission's existing rules.

16.    *Revenues*.  Turning to the other side of the ledger, Table 7 depicts IPCS billed revenues, inclusive of the portion of those revenues used to pay monetary site commissions (revenues hereafter), by category for each provider and the overall industry.  Table 7 shows that the overwhelming majority of

---

[13] Under these rules, a provider is also required to determine the average amount paid for communications to each international destination for each calendar quarter and to adjust its maximum rates based on this determination within one month of the end of each calendar quarter.  *See* 47 CFR § 64.6030(e).

[14] Providers were also required to report extra payments to telecommunications carriers or other entities for international communications as an operating expense on row 86 on the D1. Facility Audio IPCS Costs and D1. Facility Video IPCS Costs worksheets.

[15] Logically, if none of the extra payments to telecommunications carriers or other entities for international communications were allocated to video IPCS, then the portion of the extra payments allocated to safety and security measures would be attributed to audio IPCS provision.

[16] For example, providers may have reported the extra payments for international communications not as extra payments but instead as part of payments to telecommunications carriers or other entities for interstate, international, or intrastate communications other than extra payments to telecommunications carriers or other entities for international communications.  In other words, they may have reported the extra payments on row 74 on the C1-C2. Company-Wide Information worksheet and row 85 on the D1. Facility Audio IPCS Costs and D1. Facility Video IPCS Costs worksheets.

IPCS revenue is audio revenue, roughly 77%.  {[

]}  We conclude that generally safety and security measures are not priced separately.[17]

**Table 7: IPCS Billed Revenues, By Provider and Industry**

| | Audio Revenue (1) | Video Revenue (2) | Safety & Security Revenue (3) | IPCS Ancillary Revenue (4) | Total Revenue (1) + (2) + (3) + (4) |
|---|---|---|---|---|---|
| {[ | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | ]} |
| **Industry** | $1,025,851,747 | $115,802,730 | $5,820,502 | $188,778,151 | $1,336,253,130 |

Source: Using data drawn from the company-wide Excel tab.  Revenue includes site commission payments passed on to the correctional facility.

17.    The top of Table 8 shows the audio revenues per billed and unbilled audio minutes among the different facility types for each provider and for the industry average.  Looking at the industry; revenues, per billed and unbilled minutes, are lowest for prisons, increasing by about 50% for large jails, by 50% again for medium jails, and finally by about 20% for small jails, with no change for very small jails.  However, this pattern is largely driven by {[
            Many of the smaller providers' per-minute revenues fall for some jail size declines, and often their per-minute revenues are quite close across the jail types they serve.  The latter half of Table 8 reveals less variation across facility types for video than for audio revenues per billed and unbilled minutes, but directionally the effects are similar.

---

[17] Our instructions specified that only revenues derived from safety and security measures that are priced separately were to be reported separately.

[18] {[
            ]}

**Federal Communications Commission**                              **FCC 24-75**

**Table 8: IPCS Revenues Per Billed and Unbilled Minutes, By Facility Type and Provider**

|  | | All Facilities (Rev / Min) | Prisons (Rev / Min) | Large Jails (Rev / Min) | Medium Jails (Rev / Min) | Small Jails (Rev / Min) | Very Small Jails (Rev / Min) |
|---|---|---|---|---|---|---|---|
| **Audio** | {[ | | | | | | ]} |
| | **Industry** | 0.088 | 0.061 | 0.092 | 0.139 | 0.169 | 0.167 |
| | **Obs (#)** | 4,184 | 1,361 | 120 | 415 | 873 | 1,415 |
| **Video** | {[ | | | | | | ]} |
| | **Industry** | 0.196 | 0.158 | 0.140 | 0.206 | 0.238 | 0.176 |
| | **Obs (#)** | 2,740 | 968 | 88 | 343 | 667 | 674 |
| | { | | | | | | ]} |

Source: Data from facility-specific Excel tabs. Revenue includes site commission payments passed on to the correctional facility.

18.     *Margins*.  Provider's reported margins, the difference between their reported revenues and expenses, including site commission payments, are remarkable—see Table 9.  Half of the 12

**Federal Communications Commission**                    **FCC 24-75**

companies in the database, including the largest three, {[                              ]}  And five of these companies {[

                                                          ]}  The reported losses are so large that they result in an industry loss of about $219 million, more than 16% of industry revenue.  {[

                                                                              ]}

**Table 9: Industry Revenues, Expenses, and Margins**

|  | Calling + Safety & Security + IPCS Ancillary Service Revenues (1) | Calling + Safety & Security + IPCS Ancillary Service Expenses +  Site Commissions (2) | Difference between Industry Revenues and Industry Expenses (1) - (2) | Percent Margin [(1) - (2)]/(1) |
|---|---|---|---|---|
| {[ |  |  |  |  |
|  |  |  |  | ]} |
| **Industry** | $1,336,253,130 | $1,555,228,234 | ($218,975,104) | -16.4% |

Source: Using data drawn from the company-wide Excel tab.

19.    A firm's revenues from the sale of services over the long run must cover the expenses it incurs to provide these services, including its cost of capital.  Otherwise, a firm will cease to operate as it will be unable to pay its employees, suppliers, or creditors, or compensate its owners with a normal rate of return for use of their money.[19]  There is no evidence that a current IPCS provider is failing to recover enough to justify long-run ongoing service.[20]  As such, a useful benchmark to gauge the suitability of the providers' reported expenses for setting rate caps is whether their revenues cover their expenses.[21]

20.    Thus, the reported losses of at least the six companies, {[
                    ]} are difficult to reconcile with a reasonable expectation of these providers' economic profits—their capacity to recover the least cost of their operations, including a return on capital commensurate with efficient risk bearing—rather than accounting losses relevant for tax

---

[19] A normal rate of return is a rate of return equal to what the firm's owners could expect to earn if they invested in their next best alternative, holding other things, most notably risk, constant.

[20] While recent press reports suggest Securus may be considering filing for bankruptcy, {[
                                            ]}  *See, e.g.*, Dana Floberg, and Morgan Duckett, *The Slow Death of a Prison Profiteer: How Activism Brought Securus to the Brink* (April 4, 2024) https://theappeal.org/securus-bankruptcy-prison-telecom-industry/.

[21] Some providers produce services other than and in addition to IPCS.  IPCS is a key business segment for all providers and this segment would be expected to operate as a profit center.  Thus, a narrower comparison between IPCS revenues and expenses is a useful benchmark for the business segment.

purposes, or to investors who may have overpaid for the company or debtors who may have underappreciated the risks associated with their loans.  {[

        ]} are large and sophisticated, with many years of experience in the provision of IPCS.  Indeed, the smaller companies reporting losses also have many years of experience in this industry.[22]  All these companies routinely and voluntarily bid on contracts in an environment they understand.  They know what services correctional authorities are interested in and what is necessary to offer them.  They have a deep knowledge of the characteristics of their customers and the regulatory and political environment, and thus of what protections are needed in their contracts.  There is nothing in the record that suggests 2022 was a year in which any of these providers faced unusual economic difficulties,[23] or to suggest that these providers' operations are not going concerns.

        21.     It is therefore implausible that {[


                                        ]}  Such deficits call into question the suitability of these four providers' reported expenses for setting rate caps.  In sum, these figures suggest that, at a high level, reported costs are overstated.  In either case, use of the providers' reported expenses without adjustment to set rate caps or without considering other record evidence or recognizing that this deficit is simply a snapshot in time that does not reflect long run expectations may produce rate caps that are too high, thereby enabling even an inefficient provider to earn more than a normal rate of return.

        **C.     Video Versus Audio IPCS Investment and Expense Data**

        22.     We compare key net investment and expense categories reported industry-wide for video IPCS, a relatively new service, with the same categories reported for audio IPCS, a service that has been provided for many years.  Staff observe large differences between the video IPCS and audio IPCS net investment and expense data across the various categories.[25]  Table 10 below shows each of these categories of net investment and expense and billed revenues, depicted in absolute dollar amounts, and billed and unbilled minutes.[26]

---

[22] {[


                                        ]}

[23] 2022 was unusual due to the ongoing impacts of COVID, which led correctional facilities to request changes in contract terms, for example, so as to provide more free calling.  However, these were voluntary, and subject to the original terms of the existing contracts.  There is no evidence that these changes created financial hardship for any providers.

[24] The share of these three firms measured by facilities covered was approximately {[

                        ]}.  *See* Appendix F, Tbl. 15.

[25] This analysis excludes consideration of safety and security investments and expenses as providers were not required to further allocate the various investment and expense categories for safety and security measures between audio and video.  Rather, providers more simply allocated annual total expenses, our measure of the fully distributed costs of providing IPCS, between audio and video.

[26] Investment and expense data are from the C1-C2. Company-Wide Information worksheet.  Revenue and minutes data are from the D1. Facility Demand and Revenue worksheet.

**Federal Communications Commission**    **FCC 24-75**

**Table 10: Video versus Audio Industry-Wide Financial Data**

| | Audio | | Video | | Video versus Audio | |
|---|---|---|---|---|---|---|
| | Totals | $ / Min | Totals | $ / Min | Ratio of Video to Audio Totals | Ratio of Video to Audio per Min |
| Net Investment in Tangible Assets | 103,350,224 | 0.009 | 50,202,172 | 0.085 | 0.49 | 9.62 |
| Net Investment in Intangible Assets | 205,719,708 | 0.018 | 29,249,902 | 0.050 | 0.14 | 2.82 |
| Net Investment in Goodwill | 297,443,629 | 0.025 | 29,860,041 | 0.051 | 0.10 | 1.99 |
| Total Net Investment | 606,513,561 | 0.052 | 109,312,115 | 0.185 | 0.18 | 3.57 |
| Depreciation and Amortization Expenses | 56,432,644 | 0.005 | 20,983,000 | 0.036 | 0.37 | 7.37 |
| Total Operating Expenses | 215,336,567 | 0.018 | 35,633,412 | 0.060 | 0.17 | 3.28 |
| Billed Revenues | 1,025,851,747 | 0.088 | 115,802,730 | 0.196 | 0.11 | 2.24 |
| Billed and Unbilled Minutes | 11,687,826,443 | | 589,888,581 | | 0.05 | |

23.     Table 10 shows that the dollar amount for each of these categories is much smaller for video relative to audio.  For example, the ratios of video to audio dollars for net investment in tangible assets, total net investment, depreciation and amortization expenses, total operating expenses, billed revenues, and billed and unbilled minutes are respectively about 0.49, 0.18, 0.37, 0.17, 0.11, and 0.05.  In short, video has yet to achieve anywhere near the scale of operations as audio.  This is not surprising, given that audio is an established industry, while video is still emerging.  These facts demonstrate relative size but not relative efficiency between video and audio operations.

24.     One current difficulty in establishing permanent video rate caps stems from relative cost inefficiencies reflected in the video net investment and expense data.  To enable a comparison between the provision of audio and video, staff must provide a measure of efficiency and adjust for scale.  Staff first divide the absolute dollar amount reported for each of the net investment and expense categories by billed and unbilled minutes separately for video and audio.  A service is provided more efficiently if it requires fewer dollars of investments or expenses to produce a unit of output (e.g., a minute of audio or video).  We then divide the resulting per-minute video net investment and expense numbers by the analogous audio numbers to compare the efficiency of providing video and audio.  The last column of Table 10 shows that the resulting video to audio ratios for all of the net investment and expense categories are well above one, and as high as ten.[27]  Overall, these results demonstrate that provision of video is far less efficient than that of audio.[28]

25.     Most notably, the highest ratios of video to audio per-minute net investments and expenses are for tangible assets net investment (about 10) and depreciation and amortization expenses

---

[27] As video and audio are different services, we would expect the video to audio per-minute ratios for the various net investment and expense categories to differ somewhat from one, even after video matures, though not nearly to this same extent.

[28] We note that the ratio of video to audio billed revenue per billed and unbilled minute is also set out in the last column of Tbl. 10.  This ratio is greater than two, meaning that average revenue per minute for video is more than twice that average for audio.

**Federal Communications Commission**                FCC 24-75

(about 7).[29]  These high ratios may reflect providers' large capital outlays for purchasing and installing long-term assets necessary for the roll out and delivery of video, as would be expected for a new service that requires significant investment in fixed assets during its early phases.[30]  At the same time, limited customer awareness of and experience with a new service such as video may limit initial customer demand over which the capital outlays for these assets may be spread.[31]  We can reasonably expect video to experience considerable growth in the future.  As this growth occurs, we can expect video to be provided far more efficiently and therefore at a much lower cost per-minute than the current video investment and expense data suggest.  Consequently, we hesitate to establish permanent cost-based rate caps for video at this time given the likelihood that these caps will soon be considerably above cost.

> **D.     Ancillary Services**

26.     Table 13 shows expenses, by provider and for the industry, per billed and unbilled audio and video minutes for each of the ancillary services for which providers may assess separate interstate charges under the Commission's rules.  Per-minute expenses for these ancillary services collectively range from less than {[

]}, with an industry average of $0.011.  Eight providers reported automated payment services expenses, and these expenses account for most of the ancillary services expenses.  Automated payment services per-minute expenses range from {[                                        ]}, with an industry average of about $0.01.  Industry expenses per minute for the other ancillary services are no higher than one tenth of a cent.  Seven providers reported live agent expenses; of these providers, these per-minute expenses are as large as {[

]}.  Only four, three, and two providers reported expenses for third-party financial services, paper bill/statement services, and single-call and related services, respectively.  As Table 11 demonstrates, providers failed to reliably or consistently allocate their costs among the various ancillary services.

---

[29] While video may have greater capital requirements than audio, we would not expect the ratios of video to audio per minute for tangible assets net investment and depreciation and amortization expenses to be nearly as high as video usage grows significantly over time.

[30] {[

]}

[31] Depreciation and amortization allocate the initial capital outlay for a long-term asset over its useful life as a periodic expense for accounting or tax purposes.  (While depreciation and amortization are conceptually the same, tangible assets are said to be depreciated over time whereas definite-life intangible assets are said to be amortized over time.)

Federal Communications Commission    FCC 24-75

**Table 11: Ancillary Expenses Per All Billed and Unbilled Audio and Video Minutes, By Provider**

| | APS Expenses Per Minute | LA Expenses Per Minute | PBS Expenses Per Minute | SC Expenses Per Minute | TPFT Expenses Per Minute | Total Ancillary Expenses Per Minute |
|---|---|---|---|---|---|---|
| {[ | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | |
| ' | | | | | | ]} |
| **Industry*** | 0.010 | 0.001 | 0.00004 | 0.001 | 0.0007 | 0.011 |

Source: Data drawn from the Commissions and Revenue Sharing Excel tab with the exception of minutes.
Notes:  Excludes all providers that report zero or nothing for each cost category.  Three providers, {[            ]}, reported no ancillary expenses.  Expense per minute for each ancillary service and for all ancillary services collectively set out on the bottom row are calculated by excluding the minutes reported by providers that did not report expenses for a particular service, or in the last column, reported no expenses for any service.  For example, {[            ]} reported expenses for each ancillary service, except single-call and related services expenses.  Therefore, {[                  ]} expenses and minutes are included in the calculation of industry per-minute expense for each service except for single-call and related services.

### E.    Site Commissions

27.    Table 12 shows site commissions, by provider and industry.  Site commissions are equal to the sum of legally mandated and contractually prescribed site commissions, and are only attributable to audio, video, safety and security measures, and ancillary services, not other products and services.  Over 93% ($403.6 million / $432.6 million) of site commissions are contractually prescribed as opposed to legally mandated.  Only two providers, {[                  ]}, reported legally mandated site commissions.

Federal Communications Commission                    FCC 24-75

**Table 12: Site Commissions by Site Commission Type and in Total, By Provider and Industry**

| | Legally Mandated Site Commissions | Contractually Prescribed Site Commissions | Site Commissions |
|---|---|---|---|
| {[ | | | |
| ' | | | |
| ' | | | |
| ' | | | |
| ' | | | |
| ' | | | |
| ' | | | |
| ' | | | |
| ' | | | ]} |
| **Industry** | $29,017,010 | $403,577,601 | $432,594,611 |

Notes: Data drawn from the company-wide Excel tab.[32]

    28.    Table 13 shows that legally mandated and contractually prescribed site commissions, expressed per billed and unbilled minute, range from {[                    ]} with an industry average of $0.036.  {[
                    ]}

---

[32] This total site commissions figure understates the overall industry cost for site commissions, as it omits the excluded providers, whose collective submissions comprise less than 1% of reported billed and unbilled minutes in the 2023 Mandatory Data Collection, and total an additional $13,433,691 in reported site commissions, or 3% of the industry total of $446,038,302.  *See* Tbl. 1.

**Federal Communications Commission**                    **FCC 24-75**

**Table 13: Site Commissions Per Total Audio and Video Billed and Unbilled Minutes, By Provider and Industry**

| Providers/Industry | Site Commissions Per Minute |
|---|---|
| {[ | |
| , | |
| , | |
| , | |
| , | |
| , | |
| , | |
| , | |
| , | |
| , | ]} |
| Industry | 0.036 |

Source: Site Commission data from the company-wide tab and minutes, being billed and unbilled minutes, from the facility tab.

29.    Table 14 presents site commissions per billed and unbilled minute, by facility type for each provider and the overall industry.  Similar to other expenses and revenues, site commissions per minute are typically lower among prisons and higher among medium and smaller-sized jails.

Federal Communications Commission    FCC 24-75

**Table 14: Site Commissions Per Billed and Unbilled Audio and Video Minutes, By Facility Type and Provider**

| | Site Commissions Per Minute - All Facilities | Site Commissions Per Minute - Prisons | Site Commissions Per Minute - Large Jails | Site Commissions Per Minute - Medium Jails | Site Commissions Per Minute - Small Jails | Site Commissions Per Minute - Very Small Jails |
|---|---|---|---|---|---|---|
| {[ | | | | | | ]} |
| Industry | 0.045 | 0.023 | 0.045 | 0.082 | 0.083 | 0.074 |
| Obs (#) | 3634 | 1075 | 109 | 395 | 851 | 1204 |

Source: Data from facility-specific Excel tabs. Only facilities with site commissions greater than zero listed.

### F.    Supplemental Data Tables

30.    *Detailed Tables Showing Industry Shares for Minutes, Communications, and Facilities.* Tables 15 and 16 provide detailed breakdowns of provider shares, first by minutes and communications, and then by facilities and ADP.

**Table 15: Minute and Communications and Shares of Industry for Audio and Video, By Provider**

| | Audio | | | | Video | | | |
| | Minutes | | Communications | | Minutes | | Communications | |
| Provider | *Count* | *Percent* | *Count* | *Percent* | *Count* | *Percent* | *Count* | *Percent* |
|---|---|---|---|---|---|---|---|---|
| {[ | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | ]} |
| **Total** | 11,276,212,436 | 100.0% | 1,836,047,657 | 100.0% | 562,743,071 | 100.0% | 62,258,030 | 100.0% |
| **Obs.** | 4,244 | 4,244 | 4,244 | 4,244 | 2,287 | 2,287 | 2,294 | 2,294 |

Source: Data from facility-specific Excel tabs.

**Table 16: Facility and ADP Counts and Share of Industry, By Facility Type and Provider**

| | Facilities | | Prisons | | Jails | | ADP | |
| Provider | *Count* | *Percent* | *Count* | *Percent* | *Count* | *Percent* | *Count* | *Percent* |
|---|---|---|---|---|---|---|---|---|
| {[ | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | ]} |
| **Industry** | 4,441 | 100% | 1,542 | 100% | 2,899 | 100% | 2,112,042 | 100% |

Source: Data from facility-specific Excel tabs.

31.     *Safety and Security Expenses—Detailed Tables*.  Tables 17- through 19 provide detailed breakdowns of safety and security expenses.

**Federal Communications Commission**      **FCC 24-75**

**Table 17: Audio, Video and Safety and Security Expenses Per Billed and Unbilled Audio and Video Minute Respectively, By Provider and Industry**

| | Audio and Video Expenses Per Billed and Unbilled Minute | Safety & Security Expenses Per Billed and Unbilled Minute | Audio, Video and Safety & Security Expenses Per Billed and Unbilled Minute |
|---|---|---|---|
| **Audio** {[ | | | ]} |
| **Industry** | 0.030 | 0.045 | 0.075 |
| **Video** {[ | | | ]} |
| **Industry** | 0.122 | 0.092 | 0.213 |
| {[ | | | ]} |

Source: Data drawn from the company-wide Excel tab with the exception of minutes. Company-wide safety and security expenses are separated between audio and video. {[                           ]}

**Federal Communications Commission**     **FCC 24-75**

**Table 18: Safety & Security Expenses Per Billed and Unbilled Audio and Video Minute, By Provider**

|  | Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 = sum (Col 1 to Col 7) |
|---|---|---|---|---|---|---|---|---|
|  | **CALEA[33] Complianc e Measures ($ / min)** | **Law Enforceme nt Support Services ($ / min)** | **Communica tion Security Services ($ / min)** | **Communica tion Recording Services ($ / min)** | **Communica tion Monitoring Services ($ / min)** | **Voice Biometrics Services ($ / min)** | **Other Safety & Security ($ / min)** | **Total Safety & Security ($ / min)** |
| {[ |  |  |  |  |  |  |  |  |
| ' |  |  |  |  |  |  |  |  |
| ' |  |  |  |  |  |  |  |  |
| ' |  |  |  |  |  |  |  |  |
| ' |  |  |  |  |  |  |  |  |
| ' |  |  |  |  |  |  |  |  |
| ' |  |  |  |  |  |  |  |  |
| ' |  |  |  |  |  |  |  | ]} |
| **Industry** | **0.0000005** | **0.002** | **0.016** | **0.012** | **0.008** | **0.004** | **0.005** | **0.047** |
| **Industry (no 0s)** | **0.00001** | **0.002** | **0.010** | **0.013** | **0.009** | **0.004** | **0.005** | **0.047** |

Note: This table uses data provided at the company-wide level with the exception of the calculation for the sum of total audio minutes and total video minutes.  {[                                                       ]}

---

[33] The Communications Assistance for Law Enforcement Act (CALEA), 47 U.S.C. § 1001 *et seq.*; 47 CFR § 1.20000 *et seq.*

**Federal Communications Commission**                    **FCC 24-75**

**Table 21: Share of Billed and Unbilled Audio and Video Minutes with Safety & Security Costs, By Provider (% of Minutes)**

| | Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 = sum(Col 1 to Col 7) |
|---|---|---|---|---|---|---|---|---|
| **Provider** | **CALEA Compliance Measures** | **Law Enforcemt. Support Services** | **Comm. Security Services** | **Comm. Recording Services** | **Comm. Monitoring Services** | **Voice Biometrics Services** | **Other Safety & Security** | **Total IPCS Safety & Security** |
| {[ | | | | | | | | |
| ' | | | | | | | | |
| ' | | | | | | | | |
| ' | | | | | | | | |
| ' | | | | | | | | |
| ' | | | | | | | | |
| ' | | | | | | | | ]} |
| **Industry** | **2.3%** | **87.1%** | **88.6%** | **90.4%** | **88.6%** | **93.3%** | **87.9%** | **96.3%** |
| **Industry (no zeroes)** | **98.9%** | **90.7%** | **90.9%** | **91.0%** | **90.9%** | **93.3%** | **90.9%** | **96.3%** |

Note: This table uses data provided at the facility level.  {[                                        ]}
*{[
      ]}

### APPENDIX G: LASSO ANALYSIS

1.        In this appendix, staff analyze incarcerated people's communications services (IPCS) providers' responses to the 2023 Mandatory Data Collection to determine what characteristics of IPCS provision have a meaningful association with providers' reported per-minute expenses.  The Commission performed a similar analysis in Appendix F of the *2021 ICS Order*,[1] Appendix F of the *2020 ICS Order on Remand*,[2] and in the *2020 ICS Notice*.[3]  Those analyses found that provider identity and the state a facility is in to be the most important predictors of a contract's per-minute audio costs.  Staff update that analysis here, using the 2023 Mandatory Data Collection data and looking at both audio and video facility-level costs.  Staff consider characteristics such as the average daily population (ADP) of the facility, the type of facility served (prison or jail), and the rurality of the facility.  If these variables are associated with statistically significant variation in provider costs, then our analysis would support a rate-setting approach that has audio and video rate caps that vary along these dimensions.

2.        As before, staff use the statistical method called Lasso (least absolute shrinkage and selection operator).[4]  This method identifies predictors of an outcome variable—in our case, the logarithm of either audio or video costs per minute—by trading off goodness of fit against the complexity of the model, as measured by the number of predictors.  Lasso is especially useful in situations where many variables, and interactions among those variables, can predict an outcome of interest.[5]  The results of our Lasso analysis indicate that the main predictors of provider costs per minute at the facilities they serve, for both audio and video, are provider identity and the state where the facility is located.  We also find that whether the facility is a prison or jail is a predictor of costs per minute, although the effect is weaker than provider identity and state.  A wide range of other variables have less or essentially no predictive power for either audio or video expenses.

3.        We use the upper bound processed dataset with the facility operated by a provider as the unit of observation for our analysis.  For both audio and video communications, we use the logarithm of per-minute costs as the dependent variable.[6]  Among the variables that we are interested in are monetary and in-kind site commission payments by providers at facilities they serve.  Providers, however, did not allocate site commissions between audio and video.  Therefore, for some of our models we will rely on the logarithm of the sum of audio and video per-minute costs as the dependent variable.  To avoid having the Lasso biased by misreported and outlier data, we conservatively drop facilities with per-minute audio costs above $1, per-minute video costs above $5, or for which per-minute audio or video costs are

---

[1] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd 9519, 9738, Appx. F (2021).

[2] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Report and Order on Remand and Fourth Further Notice of Proposed Rulemaking, 35 FCC Rcd 8485, 8566, Appx. F (2020) (*2020 ICS Order on Remand* or *2020 ICS Notice*).

[3] *2020 ICS Notice*, 35 FCC Rcd at 8514, para. 84 (referring to the appendix describing the Lasso analysis).

[4] *See* Robert Tibshirani, *Regression Shrinkage and Selection via the Lasso*, 58 J. Royal Stat. Soc'y, Series B (methodological) 267 (1996), https://www.jstor.org/stable/2346178.

[5] Given that we are interested in determining the potential cost effects of many categorical variables as well as their interactions with one another, the overall number of potential variables is extremely large: our baseline Lasso specifications consider 490 variables for audio, and 381 for video.  Estimating the effects all these variables have on costs via more traditional methods (such as linear regression) is infeasible.  For more, *see id*. at n.87.

[6] Log transformation of the dependent variable has two benefits: (1) it can reduce the impact of outliers; and (2) it can reduce skewness of the underlying per-minute cost data and make the distribution of the dependent variable more normal, which can improve model fit and help to ensure that residuals are normally distributed.

**Federal Communications Commission**                                    **FCC 24-75**

reported as negative.[7]  We also drop facilities for which negative commission payments were reported.  The predictor variables that we considered in our analysis are as follows:

- The identity of the incarcerated people's communications service provider;
- The state(s) in which the correctional facilities are located;
- The type of facility (prison or jail);
- An indicator for joint contracts (i.e., contracts for which an IPCS service provider subcontracts with another incarcerated people's communications service provider);
- An indicator for whether the facility receives a site commission;
- Contract average daily population (ADP);
- Five indicators for whether a facility meets one of the five following criteria:  it is a jail with average daily population ≤ 100; it is a jail with average daily population between 100 and 350; it is a jail with average daily population between 350 and 1,000; it is a jail with average daily population > 1,000; or it is a prison;
- Log of safety and security expenses;
- Rurality of the facilities covered by the contract (urban if the facility is located in an area designated by the Urban Area Census (UACE20) as urban);
- Various combinations (i.e., multiplicative interactions) among the above variables.

4.      *Lasso and Costs per Minute.*  The Lasso results indicate significant differences in costs per minute across different providers and states.  The baseline Lasso models, when all variables, including multiplicative interactions, are included, explain approximately 62% of the variation in audio costs across facilities, and 67% of the variation in video costs across facilities.  In addition to provider and state variables, these baseline models also select variables for facility type (*i.e.,* prison versus jail), and whether or not a site commission was collected.[8]  However, the explanatory power of variables other than provider and state is small.

5.      To establish the incremental explanatory power of state and provider, staff consider audio and video Lasso models where only provider and state variables are included and compare them with models that included all variables except for provider and state.  Staff find the provider and state variables explain far more than what all the other variables are able to explain.  When only provider and state variables are included, the Lasso models explain approximately 52% of the variation in audio costs across contracts, and 56% of the variation in video costs.  This is a difference of about 10% as compared with the full model.  By contrast, for models that include all variables except for provider and state, Lasso explains just 23% of variation in audio costs across contracts, and 20% of the variation in video costs, a difference of about 40% as compared with the full model.

6.      The differences in costs across providers identified by the Lasso may reflect systematic differences in underlying costs of IPCS provision but may also point to differences in the way providers allocated their company-wide investment and expenses to the facility-level.  The cost variation attributed to the state variable may reflect state-level differences in costs arising from different regulatory

---

[7] Standard regression analysis is vulnerable to distortion from outliers.  The simplest regression of the dependent variable on an independent variable fits a line by minimizing the sum of the squared differences between each observation and that line.  Points on the line are the model's "prediction," and can be thought of as the expected values of the dependent variable for the values of the independent variable.  Outlier observations are farther from the prediction line and squaring those differences has a disproportionate effect on the sum of squared differences, pulling the prediction line towards those outliers.  The same logic applies for a multivariate regression except that the prediction line is a "hyperplane" across the multidimensional space of all the independent variables.  The Lasso model, like standard linear regression, minimizes the sum of squared differences and is therefore also sensitive to outliers.  In the case of the 2023 Mandatory Data Collection, there are some extreme outliers, e.g., per-minute expense reports in excess of $1,000 for audio and $100,000 for video.

[8] For both our audio and video baseline models, facility type is selected by the Lasso almost exclusively for its interaction effect with state dummy variables.

frameworks, including state-specific price caps that may be correlated with provider decisions to bid on contracts (allowing only the most efficient providers to operate in certain states), or to underlying cost differences due to other state-specific factors.  Given concerns that the Lasso model may be placing undue weight on the provider and state variables due to cost allocation approaches that are unrelated to the underlying cost of IPCS provision, and given that we have substantial record evidence indicating that facility type and size are important dimensions along which costs of IPCS vary, it would not be appropriate to consider the Lasso model results as suggesting that rate caps be established by directly taking into account the IPCS provider or location of a facility.  Rather, the Lasso results confirm that there are certain data deficiencies at the facility-level, likely due to differences in cost allocation approaches across providers as well as instances of cost misallocation, and provide additional support for the industry average cost approach to rate-setting, as such an approach is less impacted by individual provider decisions on cost allocation and cost-allocation anomalies that create outlier facility cost observations.

7.    While the provider and state variables were most significant in explaining the variation in audio and video costs in our Lasso models, facility type was also selected by the Lasso as an important predictor of per-minute costs.  Given the results from the Lasso models, and the strong record support for jails being more costly to service than prisons and smaller jails being more costly to serve than larger ones, we explored whether a cost difference between jails and prisons, and between jails of different sizes, existed using a double-selection Lasso model.[9]  Unlike regular Lasso, which selects predictors but does not allow for standard statistical inference (e.g., confidence intervals, t-statistics),[10] double-selection Lasso allows for statistical inference to be performed on a subset of variables of interest.  In double-selection Lasso, the researcher selects a subset of predictor variables as the variables of interest.  Two Lasso models are then run.  In the first, a Lasso is run regressing the variables of interest on all other predictor variables.  In the second, a Lasso is run regressing the dependent variable (in our case, the per-minute cost of service) on all the predictor variables except for the variables of interest.  The researcher then takes all of the predictor variables that were selected by the two Lasso models and runs a regression of the dependent variable on that subset of predictor variables *and* the variables of interest.  This process allows for statistical inference on the variables of interest.

8.    For audio communications, the results of the double selection Lasso model indicated that—all other things equal—the costs of providing audio services are approximately 113% greater in jails than in prisons, and the costs of providing video services were approximately nine percent greater in jails than in prisons.  The audio result was statistically significant at the 99% confidence level, whereas the video result was not significant (z-score of 0.31).  The lack of statistical significance in the difference between video costs in jails and prisons may be further evidence that the 2022 video data is unreliable; for example, it could be the result of certain providers in the data making significant upfront capital expenditures in video provision, without yet realizing high video usage.  When audio and video costs were combined, the per-minute costs of providing audio *and* video service were approximately 33% higher in jails than in prisons, with the cost difference between jails and prisons statistically significant at the 90% level, but not 95% confidence level (z-score of 1.90).

9.    Lastly, we test whether providers that pay legally mandated or contractually prescribed site commissions at their facilities have significantly lower per-minute expenses than providers who do not pay site commissions.  If our results showed this, it would be consistent with there being cost shifting between the provider and the correctional facility (*i.e.,* the facility is receiving a commission in exchange

---

[9] *See generally* Alexandre Belloni, Victor Chernozhukov, & Christian Hansen, *Inference on Treatment Effects After Selection Among High-Dimensional Controls*, 81 Rev. Econ. Stud. 608 (2014) (Belloni, Chernozhukov, and Hansen), https://www.jstor.org/stable/43551575.

[10] For an explanation for why standard Lasso fails to allow for statistical inference methods, *see* Bruce E. Hansen, *Econometrics 946* (2022) (unpublished manuscript) (discussing in Chapter 29, Section 20, how Lasso models, as an example of post-model-selection estimators, can have confidence interval coverage probabilities that are far from the nominal level); *see also* Belloni, Chernozhukov, and Hansen, at 608, n.9 (providing Monte Carlo simulation examples in Section 6, in which standard statistical inference fails.).

**Federal Communications Commission**                    **FCC 24-75**

for covering some costs of IPCS provision).  With respect to audio communications, however, we find that facilities for which providers pay site commissions—all else equal—have *higher* per-minute costs, with the result being significant at the 99% confidence level.  This is not consistent with cost-shifting between the provider and the incarceration authority receiving the site commission.  Instead, it may reflect how different providers allocated their costs and site commissions, or something else.  For video communications, we find no statistically significant difference in costs between facilities that do and do not collect a site commission.  Recognizing the aforementioned issues with our per-minute video cost data, we also consider the sum of per-minute video and audio costs.  We find no statistically significant difference between costs in facilities that do and do not pay site commissions.  Altogether, our double-selection Lasso results do not support the premise that site commissions represent cost-shifting between the provider and the correctional facility.

**Federal Communications Commission**                    **FCC 24-75**

### APPENDIX H: UPPER BOUND ANALYSIS

1.    The following appendix explains how staff determined the upper bounds of our zones of reasonableness for incarcerated people's communications services (IPCS) per-minute expenses (hereafter "upper bound(s)"), using the providers' reported expenses and billed and unbilled minutes without adjustment.[1]  These upper bounds reflect the allocation methods that providers chose following our instructions.[2]  Staff calculated ten upper bounds—five for audio IPCS and five for video IPCS, for prisons, large jails, medium-size jails, small jails, and very small jails.  Staff did this to control, albeit imperfectly, for the effect of facility type and size on expense per minute.  The average per-minute expense for each category measures the central tendency of the data for similar facilities.[3]

2.    The respective upper bounds for audio and video services for the five facility types are the sum of five per-minute expense components: (1) audio IPCS or video IPCS; (2) audio or video IPCS safety and security measures (hereafter "safety and security measures"); (3) ancillary services; (4) Telecommunications Relay Services (TRS) compliance; and (5) correctional facilities' expenses.  We discuss these in turn.

3.    *Audio and Video Expenses*.  Audio and video IPCS,[4] safety and security,[5] and ancillary services[6] expenses per minute are calculated in the same way as per-minute expenses in the summary statistics section above.  Staff calculated safety and security expenses per minute for all seven safety and security measure categories combined.[7]  This ensures our upper bounds reflect all safety and security expenses reported by providers without consideration as to whether they are used and useful in the provision of audio or video IPCS.

---

[1] The data used consist of the database as described in Appendix D.  Staff reviewed providers' data for compliance with the basic parameters of the Incarcerated People's Communications Services 2023 Mandatory Data Collection Instructions, WC Docket Nos. 23-62 and 12-375, at 29, https://www.fcc.gov/files/2023-ipcs-mandatory-data-collection-instructions, including a comparison with their financial statements, and shared that review with providers.  In response, providers revised and resubmitted their data, also providing a narrative to address these compliance issues.  *See* Appendix D.  The expenses of the unadjusted dataset are likely too high.  *See* Appendix E. *But see* Appendix I.

[2] Providers allocated their reported company-wide investment and expenses among audio IPCS, video IPCS, safety and security measures, automated payment services, live agent services, paper bill/statement services, single-call and related services, third-party financial transaction services, other ancillary services, and other products and services.  Providers further allocated audio IPCS, video IPCS, and safety and security investments and expenses among individual facilities.  The providers chose the basis for allocation, or allocators, as necessary to allocate their investments and expenses among the above services and facilities.

[3] *See* Appendix D and Appendix E.

[4] Audio IPCS and video IPCS expenses per minute, respectively, are calculated by taking the sum of, respectively, the reported audio IPCS and video IPCS expenses and audio IPCS and video IPCS billed and unbilled minutes across all providers, and dividing the expenses by the minutes.

[5] Safety and security expenses per minute, respectively, sum the reported safety and security expenses and audio IPCS and video IPCS billed and unbilled minutes across all providers and divides the expenses by the minutes.

[6] Ancillary services expenses per minute sums the reported ancillary services expenses and billed and unbilled audio and video minutes across all providers that reported ancillary services expenses and divides the expenses by the minutes.  The ancillary services are automated payment services, live agent services, paper bill/statement services, single-call and related services, and third-party financial transaction services.

[7] The seven safety and security measures are: (1) the Communications Assistance for Law Enforcement Act (CALEA), 47 U.S.C. § 1001 *et seq.*, 47 CFR § 1.20000 *et seq.*, Compliance Measures; (2) law enforcement support services; (3) communication security services; (4) communication recording services; (5) communication monitoring services; (6) voice biometrics services; and (7) other safety and security measures.

**Federal Communications Commission**                    **FCC 24-75**

4.        *Ancillary Services*.  Prior to this Order, ancillary services were billed separately, but going forward will be recovered under our caps.[8]  To incorporate ancillary service expenses into the upper bounds, staff divide the sum of ancillary expenses by the sum of audio and video minutes for providers reporting said expenses and add this quotient, $0.011, to each of our ten caps.  Staff do this because ancillary service expenses are not reported separately for audio and video.  This also is a reasonable way to allocate these costs for three reasons: billing and collection services cover both audio and video IPCS; both sets of charges would generally appear on the same bill; and it is not obvious billing and collection services for audio would be more expensive than for video or *vice versa*.[9]

5.        *TRS Expenses*.  The 2023 Mandatory Data Collection invited providers to estimate the incremental expense of complying with the TRS requirements adopted in the *2022 ICS Order*, to the extent those expenses are not reflected in their data for 2022.[10]  One provider, {[          ]} submitted an incremental expense estimate, providing the only data from which we extrapolated these costs for the industry.  The upper-bound TRS compliance expense per minute component divides {[

]}[11]  The resulting figure, rounded to $0.002, is used as an estimate for the industry, as no other provider submitted an incremental TRS expense estimate.  It is added to each of the ten upper bound calculations.

6.        *Correctional Facilities' Expenses*.  The 2023 Mandatory Data Collection recognized that, in some cases, the authorities that operate prisons or jails may incur costs attributable to providing IPCS.  Specifically, the 2023 Mandatory Data Collection directed providers to report any verifiable, reliable, and accurate information about the costs incurred by facilities that the providers served in 2022 to offer safety and security measures or other functions regarding the provision of IPCS.  None of the providers submitted these cost data.  Hence, staff develop the facilities component of the upper bounds by again relying on the $0.02 expense additive adopted as part of the interim rate caps in the *2021 ICS Order*.  Staff add this amount to each upper bound rate cap tier for both audio and video IPCS.  Including this amount likely overstates facilities' IPCS costs.

7.        Table 22 shows the upper bound industry average components for prisons and the four jail sizes, depicting audio and video IPCS and IPCS safety and security, excepting the ancillary services, TRS, and facility components, and the sum of these components plus $0.011 for ancillary services, $0.002 for TRS, and $0.02 for facility expenses.  Columns (1A) and (2A) summarize the industry average

---

[8] *See supra Report and Order* at III.D.1.a (Rate Caps Based on Total Costs).

[9] Indeed, commenters asserted that the costs of ancillary services were not distinguishable for audio versus video IPCS.  *See, e.g.*, Securus Technologies, LLC, Comments, WC Docket Nos. 23-62 and 12-375, at 21 (rec. May 8, 2023).

[10] *Rates for Interstate Inmate Calling Services*, WC Docket No. 12-375, Fourth Report and Order and Sixth Further Notice of Proposed Rulemaking, 37 FCC Rcd 11900, 11907-28, paras. 8-28 (2022) (*2022 ICS Order*).  Those rules require that IPCS providers must provide access for incarcerated people with communications disabilities to all relay services eligible for TRS Fund support in any correctional facility where broadband is available and where the average daily population incarcerated in that jurisdiction totals 50 or more persons.  47 CFR § 64.6040(b)(2).  They also require that where incarcerated people's communication services providers are required to provide access to all forms of TRS, they also must allow American Sign Language direct, or point-to-point, video communication.  *Id.* § 64.6040(b)(2)(ii).  The Commission clarified and expanded the scope of the restrictions on incarcerated people's communications service providers assessing charges for TRS calls, expanded the scope of the required Annual Reports to reflect the above changes, and modified TRS user registration requirements to facilitate the use of TRS by eligible incarcerated persons.  *2022 ICS Order*, Appx. B, at 11974, 11978.

[11] *See* {[

]}.

**Federal Communications Commission**                    **FCC 24-75**

components of the upper bounds of our zones of reasonableness for audio IPCS and safety and security expenses, separately for each rate tier. Staff adds a flat per-minute allowance for ancillary services ($0.011), TRS ($0.002), and facility expenses ($0.02) to calculate the upper bounds for audio IPCS rate caps in the third column.

**Table 1: Upper Bound IPCS Expenses Per Billed and Unbilled Minutes, By Facility Type ($/minute)**

|  | Audio | | | Video | | |
|---|---|---|---|---|---|---|
|  | IPCS Expenses Per Minute (1A) | Safety & Security Expenses Per Minute (2A) | Upper Bound (1A) + (2A) + $0.011 + $0.002 + $0.020 | IPCS Expenses Per Minute (1B) | Safety & Security Expenses Per Minute (2B) | Upper Bound (1B) + (2B) + $0.011 + $0.002 + $0.020 |
| Prisons | 0.023 | 0.051 | 0.107 | 0.156 | 0.137 | 0.326 |
| Large Jails | 0.023 | 0.042 | 0.098 | 0.094 | 0.097 | 0.223 |
| Medium Jails | 0.037 | 0.040 | 0.110 | 0.094 | 0.089 | 0.216 |
| Small Jails | 0.059 | 0.029 | 0.121 | 0.116 | 0.058 | 0.208 |
| Very Small Jails | 0.087 | 0.030 | 0.151 | 0.208 | 0.047 | 0.288 |

Source: Data from facility-specific Excel tabs.

8.      Columns (1B) and (2B) show the industry average components of the upper bounds of our zones of reasonableness for video IPCS and safety and security expenses. Staff adds a flat per-minute allowance for ancillary services ($0.011), TRS ($0.002), and facility expenses ($0.02) to calculate the upper bounds for video IPCS rate caps in the final column of Table 1.

9.      The upper bound results for audio IPCS and video IPCS are driven by the two largest providers, {[                    ]} which supply a majority of video IPCS minutes. As a result, {[                    ]}, discussed in the summary statistics above, likely distort our video upper bounds. Tables 2 and 3 present the upper bound results, for audio and video respectively, for each individual provider to permit comparisons across and between providers' per-minute expenses and the industry average per-minute expense. The fixed add-ons for ancillary services, TRS, and facility expenses are excluded.

10.      Table 23 suggests that the upper bounds for audio IPCS rate caps do not disadvantage smaller providers that appear to operate efficiently in their provision of audio IPCS compared to the industry average. Setting an audio IPCS zone of reasonableness upper bounds at the industry average implies four carriers, {[                    ]}, have average per-minute expenses that are either less than the upper bounds or within five percent of them for all facility types. This is also true for {[                    ]}. That leaves five providers with average per-minute expenses that are more than five percent above the cap for a majority, but not always for all of the facility types: {[                    ]}. While, to some degree, these results support the view that larger providers have lower unit costs, {[                    ]} are small providers who report costs largely or entirely under, or close to, the upper bounds. In fact, for small and very small jails, {[                    ]}[12] Thus, though {[                    ]} appear to benefit from scale economies, there is no clear indication that the rest of the industry is systematically disadvantaged in its ability to provide audio IPCS at rates below our upper bounds. That being said,

---

[12] {[                    ]}

**Federal Communications Commission**                     **FCC 24-75**

efficient costs are the least costs of provision, and there is no onus on the Commission to set rate caps that support inefficient business models, even if a provider is inefficient due to its scale.[13]

**Table 2: Upper Bound Audio Expenses, Per Billed and Unbilled Audio Minutes, By Provider ($/minute)**

|  | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails |
|---|---|---|---|---|---|
| {[ | | | | | |
| . | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | |
| | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | |
| , | | | | | ]} |
| **Industry** | 0.107 | 0.098 | 0.110 | 0.121 | 0.151 |

Source: Data from facility-specific Excel tabs.
Notes: <u>Single-underlined</u> cell indicates that provider's industry average exceeds the industry average by more than five percent but less than 10 percent.  <u>Double-underlined</u> cells indicate a provider's upper bound per-minute audio expenses exceed the industry average by more than ten percent.

11.    Table 24 shows that using the industry average to determine the five upper bounds for video IPCS expenses leaves only {[                                                                      ]} with per-minute expenses that exceed the industry average by more than five percent for a majority of facility types.  However, this result is largely driven by one provider.  {[          ]} per-minute expenses substantially raise the average, ranging from nearly twice to more than seven times as high as the next highest provider.  It is also not clear that reported per-minute video expenses represent long run expenses, because video calling is a nascent market.[14]  Thus, providers may still be making large expenditures to improve their platforms, while supply may be constrained and demand is still growing.  These effects would overstate per-minute video expenses relative to a future steady state, as current expenses are higher than those in a future steady state, while demand is lower.

---

[13] *See, e.g.*, Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Group, Response to the FCC's Implementation of the Martha Wright-Reed Act, at 8 (filed July 12, 2024) ({[

                          ]})

[14] *See supra Report and Order*, Section III.C. (Video Versus Audio IPCS Investment and Expense Data).

**Federal Communications Commission**                    **FCC 24-75**

**Table 3: Upper Bound Video Expenses, Per Billed and Unbilled Video Minutes, By Provider ($/minute)**

|  | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails |
|---|---|---|---|---|---|
| {[ |  |  |  |  |  |
| , |  |  |  |  |  |
| , |  |  |  |  |  |
| , |  |  |  |  |  |
| , |  |  |  |  |  |
| , |  |  |  |  |  |
| , |  |  |  |  |  |
| , |  |  |  |  |  |
| , |  |  |  |  | ]} |
| **Industry** | 0.326 | 0.223 | 0.216 | 0.208 | 0.288 |

Source: Data from facility-specific Excel tabs.

Notes: <u>Double-underlined</u> cells indicate a provider's upper bound per-minute video expenses exceed the industry average by more than ten percent.  No provider's upper bound per video minute expenses exceed the industry average by more than five percent but less than ten percent.

{[                                          ]}

## APPENDIX I: LOWER BOUND ANALYSIS

1. The following appendix explains how staff estimated the lower bounds of our zones of reasonableness for incarcerated people's communications services (IPCS) per-minute expenses (hereafter "lower bounds"). The first section explains a range of adjustments made to the upper bounds, to produce our lower bounds, while the second section brings these together, producing ten lower bounds, being the five for each facility type for both audio and video. The final section uses three independent sources to validate our lower bounds.

### G. Lower Bound Analysis and Adjustments

2. This section develops the lower bounds for audio and video IPCS per-minute rate caps for each rate cap tier by making the following adjustments to the upper bounds: bringing the WACCs reported by {[                    ]} down to 9.75%; removing the allowances for expenses incurred by correctional facilities; removing categories of safety and security expenses that are not generally used and useful in the provision of IPCS; adjusting the ancillary service expenses to reflect the WACC changes; and adjusting for anomalies in {[                                                      ]} The section also explains our concerns with providers' reports of goodwill, but that we decline to make goodwill adjustments due to a lack of data.[1] In making these adjustments, staff rely on the providers' data reports, financials, and Word templates.

#### 1. WACC Analysis and Adjustments

3. The weighted average cost of capital, or WACC, is the sum of a company's cost of equity, cost of preferred stock, and cost of debt, each expressed as an annual percentage rate and weighted by its proportion in the capital structure. It represents the average rate-of-return that debt, preferred stock, and equity investors require to provide a company with the capital it uses to finance its assets and operations.[2] Staff programmed the Excel template to multiply the WACC by net capital stock[3] to determine the return component of the provider's annual total expenses.[4]

4. The instructions directed providers to use either a default WACC of 9.75% or an alternative WACC. {[
]} All other providers used the default WACC. If the provider claimed a WACC greater than 9.75%, the instructions for the 2023 Mandatory Data Collection required the provider to fully document, explain, and

---

[1] While at least one commenter has argued that the lower bounds are "unreasonably low," we disagree. *See* Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 6-9 (filed July 11, 2024) (Securus July 11, 2024 *Ex Parte*). As set out herein, we reach those bounds based on a reasonable, logical analysis of the collected data.

[2] Mathematically,

WACC = [(Equity / (Debt + Equity + Preferred Stock)) * Cost of Equity] + [(Debt / (Debt + Equity + Preferred Stock)) * Cost of Debt] + [(Preferred Stock / (Debt + Equity + Preferred Stock)) * Cost of Preferred Stock].

*Connect America Fund et al.*, WC Docket Nos. 10-90, 14-58, CC Docket No. 01-92, Report and Order, Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 31 FCC Rcd 3087, 3189, para. 268 (2016) (*Rate-of-Return Reform Order*).

[3] Net capital stock means gross investment in assets, net of accumulated depreciation and amortization, accumulated deferred federal and state income taxes, and customer prepayments or deposits, plus an allowance for cash working capital.

[4] Annual total expenses is the sum of annual operating expenses and annual capital expenses. Return is the allowance for recovery of the cost of capital and is therefore a component of capital expenses.

justify how it developed that alternative WACC.[5]  The instructions warned providers that a failure to do so may result in reversion to the default WACC.[6]

5.      The default 9.75% WACC is equal to the Commission's currently authorized rate of return for local exchange carrier services subject to rate of return on rate base regulation.  The Commission adopted this rate of return as part of a formal rulemaking proceeding and it reflects rigorous analyses of the costs of debt and equity, capital structure, and the WACC, as the authorized rate of return is designed to compensate these carriers for their cost of capital.  The Commission's determination was informed by comments, data and other information entered into the record by interested parties and the analyses reflected in this prescription underwent peer review.[7]

6.      While we accept the claimed WACC of both Securus and ViaPath to establish the upper bounds, we decline to do so for the purpose of establishing the lower bounds.  As explained below, neither Securus nor ViaPath sufficiently justifies its claimed WACC.  Given this lack of justification and the limited information otherwise available to the Commission to develop its own estimate, we also decline to develop an alternative WACC for either of these two providers.  Estimates of the true WACC can vary over a wide range under different sets of reasonable assumptions.  A firm's cost of equity, in particular, must be estimated because it reflects both current and future investors' constantly changing expectations of that firm's future profits.  Cost of equity estimates are necessarily developed from imperfect models such as the Capital Asset Pricing Model or Discounted Cash Flow Model.  Where a firm does not issue publicly traded stock, as is the case for Securus and ViaPath, one must apply these (or other) models to a sufficiently comparable proxy group of firms that issue publicly traded stock.  Identifying a proxy group of comparable and publicly traded firms can be a difficult and imprecise exercise and using different proxies can produce significantly different estimates.  Consequently, cost of equity estimates developed from models and using proxy groups are often susceptible to large errors and the cost of equity is often impossible to measure precisely.  Given this, if the Commission were to attempt to estimate Securus's or ViaPath's costs of capital, the estimates would come with wide error ranges that would encompass the 9.75% default.  We therefore find that adopting our default WACC provides a reasonable lower bound assumption.

7.      *Cost of Debt*.  Of the three estimates needed to estimate the WACC (i.e., cost of debt, cost of equity, and capital structure estimates), the cost of debt estimate typically is the least complicated.  Yet, both Securus and ViaPath make mistakes in how they estimate their costs of debt.[8]

8.      {[

---

[5] Incarcerated People's Communications Services 2023 Mandatory Data Collection Instructions, WC Docket Nos. 23-62 and 12-375, at 29, https://www.fcc.gov/files/2023-ipcs-mandatory-data-collection-instructions (2023 Mandatory Data Collection Instructions).  Specifically, the instructions required that the provider "fully document . . . by submitting data, formulas, cost of equity analyses[,] . . . calculations, and worksheets, and explain and justify the development of" its claimed cost of capital, as well as its claimed cost of debt, its claimed cost of equity, and the other components of its claimed capital structure.  *Id.*

[6] *Id.*  We note that, despite an opportunity for comment, neither Securus nor ViaPath (nor any other party) objected to the use of 9.75% as the default WACC during the pleading cycle leading to its adoption.  *Id.*, Appx. A, Word Template, at 14, 28-29, https://docs.fcc.gov/public/attachments/DOC-395510A1.docx.

[7] *Rate-of-Return Reform Order*, 31 FCC Rcd at 3171-12, paras. 226-326.

[8] {[

]}

[9] {[

]}

**Federal Communications Commission**                    **FCC 24-75**

]}

10.    *Capital Structure*.  Capital structure refers to the shares of equity, preferred stock, and debt capital that a firm uses to finance its operations and assets.[14]  Each share is used to weight its respective capital cost to estimate the weighted average cost of capital.  Financial theory requires use of market value weights to estimate the WACC.[15]  Regulators, including the Commission, typically use book value weights to estimate the WACC, though under the Commission's represcription rules, market value weights can be used if use of book value weights would produce unreasonable results.[16]

11.    {[

---

[10] {[

]}

[11] {[                          ]}

[12] {[                                    ]}

[13] {[

]}

[14] Each capital structure component is equal to: value of a capital component / (value of debt + value of preferred stock + value of equity).  *Rate-of-Return Reform Order*, 31 FCC Rcd at 3189, para. 268.

[15] Financial theory also specifies that a firm's target capital structure should be used to estimate the WACC.  Haim Levy & Marshall Sarnat, Capital Investment and Financial Decisions 476-478 (3d ed. 1986).

[16] Under the Commission's rules for represcribing the authorized rate of return for local exchange carriers regulated on a rate-of-return basis, the results of book value capital structure calculations are to be used unless their use would be unreasonable.  *See* 47 CFR §§ 65.300(a), 65.305(b).  In fact, the Commission's current authorized rate of return for local exchange carriers regulated on a rate-of-return basis, 9.75%, reflects the use of market value weights. *Rate-of-Return Reform Order*, 31 FCC Rcd at 3189-90, paras. 68-70.

[17] {[                                                                              ]}

**Federal Communications Commission**                    **FCC 24-75**



---

[23] {[



]}
[24] {[



]}
[25] {[                                ]}
[26] {[                    ]}
[27] {[                                                        ]}

**Federal Communications Commission**       **FCC 24-75**

---

[28] {[



]}

[29] {[



]}

[30] {[
]}

[31] {[

]}

[32] {[
]}

[33] {[

]}

---

[34] {[



                                                                          ]}
[35] {[

                                                        ]}
[36] {[
                                                                      ]}
[37] {[




                                                                    ]}
[38] {[
                          ]}

---

[39] {[



]}

[40] {[                                                                                    ]}

[41] {[                          ]}

[42] {[                                                                      ]}

[43] Total beta is equal to the standard deviation of a security's expected returns divided by the market's expected return.  Alternatively, total beta equals the CAPM beta estimate divided by the square root of the coefficient of determination for the regression equation used to estimate beta.  Pratt & Grabowski at 304-305.

**Federal Communications Commission**                    **FCC 24-75**

]}

25.     The use of total beta to develop cost of equity estimates for a private business is not broadly accepted.  For example, Pratt and Grabowski argue: "This interpretation of beta as the risk measure in estimating total returns is based on the premise that most owners of private businesses are completely undiversified and, therefore, the cost of equity capital of the private business should include that extra amount due to the owner being undiversified.  This leads to the unreasonable position that there are at least two costs of capital for a business – the cost of capital for investors who are the pool of likely buyers who are likely to be diversified (for whom in theory only market or beta risk matters) and the cost of equity capital to the current owner who is completely undiversified (for whom both market risk and unsystematic risk matter)."[44]

26.     Moreover, Securus is not an undiversified investor.  Securus is a subsidiary of Aventiv Technologies, which in turn is owned by the private equity firm Platinum Equity.  On its website, Platinum Equity explains that it has been in business for more than 28 years, made more than 450 acquisitions, and manages over \$48 billion in assets.  It further explains that it "generate[s] returns by investing in companies across a wide range of industries that need financial and operational support."  Securus cannot credibly argue that its owner, Platinum Equity (or Platinum Equity's investors collectively), is an undiversified owner, and it therefore fails to justify its company specific risk premium adjustment.[45]

27.     {[

---

[44] *Id.* at 306-307.

[45] *See Platinum Equity*,  https://www.platinumequity.com/ (last visited May 30, 2024).

[46] {[

]}

[47] {[                                                                                     ]}

**Federal Communications Commission**                    **FCC 24-75**

33.

]}  While CAPM is widely used among practitioners and is featured prominently in most finance textbooks, CAPM is not perfect, as no model can be.  For this reason, in addition to reasons we set out above, we are reluctant to rely on the results of a single model, adjusted or not.  When the Commission last prescribed the rate of return for local exchange carriers, for example, it relied on CAPM and the Discounted Cash Flow Model, recognizing that neither model is perfect.[52]  That would have been our preferred approach here as well.  However, we do not have access to data that would allow us to develop a Discounted Cash Flow Model for either provider.

34.     In summary, a substantial range of Securus's and ViaPath's assumptions in developing their WACCs are not fully documented and/or appear inappropriate.  Consequently, we cannot rely on their estimates.  Given there is insufficient evidence in the record to allow the Commission to develop robust estimates of our own, we revert to our default WACC of 9.75%.

35.     *WACC Adjustment Mechanics*.  Staff replace Securus's and ViaPath's claimed WACC figures with the default WACC of 9.75% on their Excel templates to adjust their reported annual total expenses.  Staff also replace the tax-deductible interest expense {[

---

[48] {[          ]}

[49] {[                                                                          ]}

[50] {[                        ]}

[51] {[                                                                          ]}

[52] *Rate-of-Return Reform Order*, 31 FCC Rcd at 3194-204, paras. 281-309.

**Federal Communications Commission**                    **FCC 24-75**

]}  Section 163(j) limits the interest expense deduction to the sum of (1) the taxpayer's business interest income; (2) 30% of the taxpayer's adjusted taxable income; and (3) the taxpayer's floor plan financing interest expense for the taxable year.[54] Staff add this formula even though {[                    ]} approach likely understates tax-deductible interest expense, leading to a larger income tax allowance and larger annual total expenses than otherwise.  Under section 163(j), adjusted taxable income aligns with earnings before (subtracting) interest expense and taxes.  Return on the Excel template is generally a smaller number than adjusted taxable income under section 163(j) because return is equivalent to earnings after interest expense and taxes with the interest expense added back to this calculation of earnings.[55]  {[



]}  Lastly, staff reduce the safety and security expenses these providers report at the facility level by the same percentage as these expenses are reduced by at the company-wide level as a result of the WACC and tax-deductible interest expense adjustments.[57]

36.     We reject the argument that the Commission's default 9.75% WACC "bears no resemblance to rate of return for companies like Securus that are primarily technology and IT service providers."[58]  We recognize that IPCS is a communication service, yet not necessarily the same as local exchange carrier service.[59]  This distinction is why the 2023 Mandatory Data Collection instructions directed providers to use either the default WACC of 9.75% or an alternative WACC, with providers

---

[53] {[




]}

[54] *See* 26 CFR §§ 163(j)(1) (setting out the maximum amount allowed as a deduction for any taxable year for business interest), and (8)(A) (defining the term adjusted taxable income of the taxpayer).  Business interest income is not a cost of providing IPCS and is not reported on the Excel template or relevant to the development of rate caps.  Under section 163(j), floor plan financing interest expense is interest on debt used to finance the acquisition of motor vehicles held for sale or lease where the debt is secured by the acquired inventory.  Floor plan financing interest expense is not reported separately on the Excel template and neither {[          ]} nor any other IPCS provider is likely to incur this type of expense.

[55] The portion of return subject to taxes must be "grossed up" by dividing it by one minus the tax rate, and then added to the portion of the return that is not subject to taxes to calculate the pre-tax return (including interest expense).

[56] {[




]}

[57] Securus argues against this adjustment by noting that by reducing Securus's and ViaPath's costs of capital, "the draft cut {[          ]} for [sic] the industries' total safety and security expenses." Securus July 11, 2024 *Ex Parte* at 21.  We find this effect is a natural consequence of the adjustment, given the fact that capital expenses constitute a significant portion of safety and security measure costs, and do not find this a compelling reason to avoid making said adjustment.

[58] Securus July 11, 2024 *Ex Parte* at 21.

[59] *See*, *e.g.*, Securus Oct. 31, 2023 Response to 2023 Mandatory Data Collection Word Template at 2-4.

**Federal Communications Commission**                                          **FCC 24-75**

bearing the burden to fully document, explain, and justify how they developed any alternative WACC. [60] Neither Securus nor any other party objected to the use of 9.75% as the default WACC during the pleading cycle leading to its adoption. [61]

37.     As discussed elsewhere in Appendix I, Securus relies on a number of aggressive and insufficiently justified assumptions to develop its WACC estimate.  For example, CAPM assumes that investors are able to diversify away exposure to non-systematic risk such as company-specific risk. Securus, however, adds a company-specific risk premium {[          ]} to its CAPM cost of equity estimate, even though its owner, Platinum Equity (or Platinum Equity's investors collectively), is able to diversify away exposure to non-systematic risk such as company-specific risk.  For these and the other reasons discussed, we therefore find it reasonable to use the default WACC for Securus to develop lower bounds for our rate caps.

### 2.     Aggressive Assumptions on Facilities Additive

38.     *Expenses Incurred by Correctional Facilities*.  To the extent correctional facilities bear some IPCS expenses and recover these through site commissions, our rate caps should allow for the reimbursement of the legitimately recoverable expenses facilities incur.  In our upper bound analysis, relying on record claims, we add $0.02 for such expenses.  We do not make this addition in our lower bound analysis because our dataset provides no evidence that site commissions lower providers' expenses.

39.     If site commissions were in some instances associated with facilities bearing some of the expenses of IPCS provision, then we would expect to see that providers' expenses in facilities where site commissions are paid would, on average, be lower than in facilities where they are not.  In fact, the presence of site commissions tends to raise, rather than lower, providers' audio and video IPCS and safety and security expenses—see Table 2.  For four of the five facility types, the average expenses per minute rise by between $0.021 and $0.012 per minute, only declining by $0.006 for small jails. [62]

---

[60] While the Commission's 9.75% rate-of-return prescription dates back to 2016, that prescription was conservative. The Commission found that an overall range for reasonable WACC estimates for rate-of-return-regulated local exchange carriers is 7.12% to 9.01%, based on WACC estimates derived from CAPM and a discounted cash flow model.  It expanded the upper end of the rate of return zone of reasonableness beyond these WACC estimates based on policy considerations and adopted the rate of return from the upper end of this zone.  Specifically, the Commission expanded the zone of reasonableness to provide an additional cushion for rate-of-return incumbent LECs that may have relatively high costs of capital.  It also added a cushion to account for regulatory lag between recognition of the need to prescribe a different rate of return, as capital markets change significantly over time, and actually prescribing a new rate of return.  It therefore added about three-quarters of a percentage point to the top of the WACC range developed from the cost of equity models, expanding the overall zone of reasonableness for rate of return estimates to 7.12% to 9.75%, and then prescribed a 9.75% rate of return.  *See* Connect America Fund et al., WC Docket Nos. 10-90, 14-58, CC Docket No. 01-92, Report and Order, Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 31 FCC Rcd 3087, 3208-10 (2016) (*Rate-of-Return Reform Order*).

[61] *See, e.g.*, 2023 Mandatory Data Collection Instructions, Appx. A Word Template, at 14, 28-29, https://docs.fcc.gov/public/attachments/DOC-395510A1.docx.

[62] We therefore disagree with those commenters that urge the Commission to include a $0.02 additive to account for facility costs in the lower bounds.  *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 22.  Commenters have not provided sufficient data on either the costs or type of facility costs to contradict the analysis we perform here.  Nor have they provided any data or other information that might independently justify a $0.02 additive, or indeed any other additive, to the lower bounds.

**Federal Communications Commission**                    **FCC 24-75**

**Table 2: Audio and Video IPCS Expenses per Minute at Facilities where Site Commissions (SC) are Paid or Not Paid**

| IPCS and Safety and Security Expenses per Minute | Prison | Large Jail | Medium Jail | Small Jail | Very Small Jail | All |
|---|---|---|---|---|---|---|
| SC = 0 | $0.069 | $0.059 | $0.075 | $0.104 | $0.103 | $0.070 |
| SC > 0 | $0.081 | $0.076 | $0.089 | $0.098 | $0.124 | $0.085 |
| Change between SC = 0 and SC > 0 | $0.012 | $0.017 | $0.014 | -$0.006 | $0.021 | $0.015 |

Notes: SC = site commissions; minutes are billed and unbilled minutes.

40.    To the extent that a correctional facility incurs IPCS expenses (e.g., a broadband connection or safety and security measure), its corresponding provider would face fewer expenses than otherwise.  Further, one would expect this to be reflected in higher site commission payments, holding other things constant.  However, the payment of site commissions is not associated with a reduction of providers' audio and video IPCS and safety and security expenses.  Providers' mean per billed and unbilled minute IPCS expenses at facilities with no site commissions is $0.070, which is less than the $0.085 IPCS per-minute expenses where site commissions are paid.  This difference is not statistically significant:  there is an approximately 50% chance of the observed difference randomly occurring if the means were in fact identical.[63]  Finally, the results of our Lasso analysis are also consistent with the conclusion that provider expenses are not offset by the payment of site commissions to the correctional facilities they serve.[64]

### 3.    Lower Bound TRS Additive

41.    We add to the lower bounds of our zones of reasonableness the same per-minute estimate of TRS expenses, $0.002, that we added to the upper bound zones.  This estimate, as explained above in the upper bound analysis, is derived from {[        ]}study of the incremental expense of TRS compliance.  {[        ]} study reasonably adheres to our instructions for developing the incremental expense of TRS compliance.  At the same time, no other provider submitted an estimate of these expenses.  As there is nothing in the record to support a lower estimate, we use the same estimate for both the upper and the lower bounds of our zones of reasonableness.

### 4.    Goodwill Analysis

42.    Four providers report goodwill as an investment, and this section discusses these investments and their implication for the development of rate caps.  In particular, we find that we lack the necessary information to determine the appropriate amount of goodwill assigned to regulated services and whether the resulting amount should be reflected in the development of our rate caps.  We conclude that the best way forward is to accept goodwill as reported in the development of our upper and lower bounds, but to take account of this uncertainty in choosing how we set our rate caps within those bounds.

43.    The section begins by defining goodwill.  Next, it provides information on each of the four providers' reported goodwill, including a description of the relative importance of goodwill as reflected in their overall investment and expenses.  It then discusses regulatory approaches to goodwill and describes our concerns with these providers' reported goodwill.  Finally, it explains our approach to goodwill in this proceeding.

---

[63] Based on a linear regression of expenses per minute on an indicator variable for when site commissions are zero versus when site commissions are greater than zero, the p-value for the coefficient of the indicator variable is 0.488.  (The regression model is of the form: *Expense Per Minute = A + B \* Site Commission Dummy (0,1)*).  In contrast, the conventional default for statistical significance requires a p-value of less than 0.05, that is, less than a one in twenty chance that the observed difference occurred by chance.

[64] *See* Appendix G.  In fact, the Lasso model finds that facilities at which site commissions are paid have higher per-minute expenses than facilities at which site commissions are not paid.

**Federal Communications Commission** **FCC 24-75**

44.    Goodwill is a balance sheet item that is recorded when one company acquires another company, being the difference between the purchase price and the sum of the fair value of the assets acquired, net of the sum of the fair value of the liabilities assumed.[65]  Goodwill recognizes that the present value of the expected future return of the going concern is greater than what would be necessary to compensate the original owners for the value of their assets net of their debts.  Like other long-lived assets measured at carrying value on a company's financial statements, goodwill is impaired if the carrying value is not recoverable.  The goodwill impairment test is a test of whether the aggregate carrying value of the assets of a business including the value of the goodwill is recoverable.  Goodwill impairment testing assesses whether a business acquisition is successful and holds management accountable for the acquisition.  For example, if after an acquisition the hoped for synergies fail to materialize, then this should be recognized through impairment testing.  If the impairment testing so indicates, the carrying value of the goodwill is written down or reduced on the balance sheet, and the amount of the reduction is recorded as a loss on the income statement.

45.    Four IPCS providers, {[                                        ]}, report goodwill on the Excel template.[66]  Table 3 below shows the dollar amount of each provider's reported goodwill net investment (or more simply goodwill) and the percentage of the accounting entity total each provider reported for regulated services and nonregulated services.[67]

**Table 3: Reported Goodwill Net Investment by Provider**

| Provider | Regulated Services | | Nonregulated Services | |
|---|---|---|---|---|
| | $ | % of Accounting Entity Total | $ | % of Accounting Entity Total |
| {[ | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | ]} |

46.    These four providers collectively report goodwill of approximately $1.2 billion for regulated services, about 94% of the accounting entity total, as compared to approximately $79 million for nonregulated services, about six percent of that total.

47.    A provider's reported annual total expenses increase as the amount of reported goodwill increases.  Goodwill reported on the Excel template is a component of net capital stock.  The Excel template multiplies each provider's net capital stock by its claimed WACC or the default WACC of 9.75% to calculate return.  The Excel template also calculates the federal and state income taxes on this

---

[65] Pratt & Grabowski at 503.

[66] Providers were required to report goodwill gross investment, accumulated amortization, net investment, and amortization expense on rows 36, 37, 38, and 55 on the C1-C2. Company-Wide Information worksheet and on rows 47, 48, 49, and 66 on the D1. Facility Audio IPCS Costs and D1. Facility Video IPCS Costs worksheets, respectively.  The goodwill data reported on the Company-Wide Information worksheet are used for the analysis in this section.

[67] For purposes of our discussion of goodwill, regulated services are audio IPCS, video IPCS, safety and security measures, automated payment services, live agent services, paper bill/statement services, single-call and related services, and third-party financial transaction services.  Nonregulated services are other ancillary services and other products and services.  These four providers attribute 100% of their safety and security investments and expenses to audio IPCS and video IPCS and thus none to ancillary services or other products and services on the C3. Safety & Security Measures worksheet.

**Federal Communications Commission**                    **FCC 24-75**

return, net of tax-deductible interest expense, using the provider's reported federal and state tax income tax rates. The return and income taxes are components of annual total expenses, and these expenses are reflected in our rate cap calculations.[68]

48.    Net investment is the building block for net capital stock.[69]  To get a sense of the relative magnitude of each of these providers' reported goodwill, Table 4 below shows their reported goodwill net investment, total net investment including goodwill, and goodwill's share of total net investment separately for regulated and nonregulated services.[70]

49.    The four providers collectively report total net investment of {[
]} for regulated services, and of this total goodwill accounts for about {[
]}  Thus, for these four providers, goodwill accounts for over half the return and related income tax allowances that are reflected in our rate caps for the industry.  In contrast, the four providers collectively report total net investment of approximately {[                ]} for nonregulated services, and of this total, goodwill accounts for only about {[        ]}  There is no "net capital stock" for these nonregulated services upon which a return is "allowed" to be earned or reflected in rate caps.

**Table 4: Reported Goodwill Net Investment versus Reported Total Net Investment By Provider**

| | Regulated Services | | | Nonregulated Services | | |
|---|---|---|---|---|---|---|
| Provider | Goodwill Net Investment | Total Net Investment | Goodwill Net Investment as a Percent of Total Net Investment | Goodwill Net Investment | Total Net Investment | Goodwill Net Investment as a Percent of Total Net Investment |
| {[ | | | | | | |
| | ___ | ___ | ___ | ___ | ___ | ___ |
| | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ]} |

50.    Table 29 shows the impact of removing goodwill on each provider's annual total expenses. Annual total expenses are the sum of reported capital expenses, including a return on net capital stock, and operating expenses and is the key component to the upper and lower bounds of our zones of reasonableness. Removing goodwill from each provider's reported annual total expenses

---

[68] A private firm under GAAP may elect to amortize goodwill on a straight-line basis over a period of 10 years or less.  {[

]} Federal Accounting Standards Board accounting standards update Nos. 2014-02, issued January 16, 2014.

[69] Net capital stock equals net investment in assets minus accumulated deferred federal income taxes, minus accumulated deferred state income taxes, minus customer prepayments or deposits, plus cash working capital.  Net capital stock is not developed on the Excel template for nonregulated services.

[70] Total net investment includes net investment in tangible assets, capitalized research and development, purchased software, internally developed software, trademarks, other identifiable intangible assets, and goodwill.  It excludes capitalized site commissions.

**Federal Communications Commission**                    **FCC 24-75**

reduces the four providers' expenses collectively by approximately $141 million, or about 15%.[71]

**Table 5: Annual Total Expenses for Regulated Services With and Without Goodwill by Provider**

| Provider | Annual Total Expenses With Goodwill | Annual Total Expenses Without Goodwill | Percent Difference |
|---|---|---|---|
| {[ | | | |
| | | | |
| | | | |
| | | | |
| | | | ]} |

51.     Regulators often exclude goodwill from the base on which a return is allowed, absent a showing by the regulated firm that its rate payers stand to benefit from the sale that gives rise to the goodwill.  Otherwise, a firm that is sold for more than the original cost, fair value, or other regulator-specified valuation of its assets would be able to earn a return that exceeds what that same firm was entitled to earn immediately prior to the sale for no reason other than the exchange of ownership for money.[72]  The burden typically is on the acquiring firm to demonstrate to the satisfaction of the regulator that the acquisition will, for example, create efficiencies that lower the firm's operating expenses or lead to superior service quality or more innovative services, and thus benefit rate payers.  Otherwise, the regulator may exclude the goodwill arising from the acquisition from the base upon which the regulator allows a return to be earned.

52.     For the reasons stated above, regulators are skeptical of allowing goodwill to be included in net capital stock.[73]  While these four firms assign large dollar amounts of goodwill to regulated services relative to nonregulated services, they do not explain the basis for these assignments.  We looked for justification of these providers' goodwill claims in their financial statements and in their Word templates. What we found only further increased our skepticism.  For example, {[

---

[71] Staff assume a 9.75% return on net capital stock to determine this impact.  For {[      ]}, the reduction to annual total expenses reflects removal of the remaining unamortized value of capitalized goodwill from net capital stock and removal of amortization expense.

[72] Methods of asset valuation imposed on regulated firms vary among regulators.  The 2023 Mandatory Data Collection simply requires that IPCS providers report values for the components of net capital stock consistent with GAAP.  *See* 2023 Mandatory Data Collection Instructions at 21.

[73] James C. Bonbright, Albert L. Danielson, David R. Kamerschen, Principles of Public Utility Rates 238-241 (2d ed. 1988).

[74] {[

]}

[75] {[

}

]}

53.    We are also skeptical of {[                    ]} reported goodwill.  {[

]}  Finally, we have no information that would allow us to determine whether the four providers' reported goodwill reflects value to the incarcerated persons that the prior owner was unable to deliver.  Absent a demonstration of that value, goodwill typically would not be allowed to earn a return or recovered as an expense.

54.    In summary, the four providers that report goodwill have not justified the amount of their claimed goodwill, nor the assignments they make to regulated and nonregulated services.  A proper assignment of goodwill to regulated services and nonregulated services would reflect a comparison between the fair values of these services to the fair value of their assets, net of liabilities.  Among other complexities, determining the fair value of these services would require an estimate of the present worth of their future cash flows.  Staff lack the type of detailed and comprehensive financial information and the insight into the operations of these services that would be needed to develop our own present worth estimates and thus have no accurate and feasible way to re-assign or make targeted disallowances to the goodwill these providers' report on their Excel templates.  Further, we lack sufficient information to

---

[76] {[

]}

[77] {[

]}

[78] {[
]}

**Federal Communications Commission**                                    **FCC 24-75**

estimate the goodwill recorded on the balance sheet at time of the acquisition, to conduct impairment tests, or to determine the source of the goodwill, and hence to determine whether it should be allowed to earn a return or recovered as an expense. We therefore make no reassignment of or disallowance to the providers' claimed goodwill. Instead, we consider the possibility of misassignment or overstatement of goodwill when choosing rate caps from within our zones of reasonableness.

### 5. Safety and Security Expenses

55. Safety and security expenses as reported in the data collection are divided into seven categories: the Communications Assistance for Law Enforcement Act (CALEA)[79] compliance measures and communication security services, law enforcement support, communication recording services, communication monitoring services, voice biometric services, and other safety and security measures. Of the providers included in our dataset, 11 providers reported expense data and additional information regarding their delivery of safety and security measures.[80] Of those 11 providers, all reported offering some mix of safety and security measures and allocated their expenses by category. Table 6 shows these expenses by category and facility type, after the WACC and tax-deductible interest expense adjustments.

**Table 6: Audio and Video Safety and Security Measures Expenses by Category and Facility Type**

| | | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails | All |
|---|---|---|---|---|---|---|---|
| **Audio Safety and Security Expenses ($)** | CALEA Compliance | - | 1,775 | 2,184 | 1,026 | 321 | 5,306 |
| | Law Enforcement | 15,496,861 | 2,500,354 | 2,010,475 | 674,735 | 261,580 | 20,944,006 |
| | Communication Security | 105,671,155 | 23,640,795 | 21,162,701 | 8,358,914 | 3,105,390 | 161,938,954 |
| | Communication Recording | 76,853,881 | 17,150,363 | 15,399,531 | 6,108,059 | 2,272,789 | 117,784,624 |
| | Communication Monitoring | 60,722,633 | 10,374,258 | 9,076,623 | 3,525,398 | 1,255,842 | 84,954,753 |
| | Voice Biometrics | 25,055,363 | 5,264,356 | 6,028,900 | 2,948,166 | 997,187 | 40,293,972 |
| | Other Safety and Security | 32,947,510 | 7,727,510 | 6,188,009 | 2,061,319 | 743,464 | 49,667,811 |
| | All Categories | 316,747,403 | 66,659,410 | 59,868,423 | 23,677,616 | 8,636,573 | 475,589,426 |
| | CALEA + Security Services | 105,671,155 | 23,642,570 | 21,164,885 | 8,359,940 | 3,105,711 | 161,944,261 |
| **Video Safety and Security Expenses** | CALEA Compliance | - | - | 26 | 36 | 22 | 84 |
| | Law Enforcement | 487,103 | 240,241 | 450,459 | 255,901 | 66,723 | 1,500,426 |
| | Communication Security | 6,374,137 | 3,344,311 | 4,981,924 | 2,479,923 | 540,365 | 17,720,659 |
| | Communication Recording | 5,615,118 | 2,973,351 | 4,243,216 | 2,078,946 | 466,170 | 15,376,802 |

---

[79] 47 U.S.C. § 1001 *et seq.*; 47 CFR § 1.20000 *et seq.*

[80] {[                                                                              ]}

**Federal Communications Commission**                    **FCC 24-75**

| | | | | | | |
|---|---|---|---|---|---|---|
| Communication Monitoring | 2,601,918 | 1,410,152 | 2,018,519 | 1,014,162 | 222,998 | 7,267,749 |
| Voice Biometrics | 379,510 | 202,909 | 431,787 | 334,646 | 79,618 | 1,428,469 |
| Other Safety and Security | 1,516,377 | 767,952 | 1,409,925 | 868,099 | 183,328 | 4,745,683 |
| All Categories | 16,974,163 | 8,938,916 | 13,535,856 | 7,031,714 | 1,559,223 | 48,039,872 |
| CALEA + Security Services | 6,374,137 | 3,344,311 | 4,981,949 | 2,479,959 | 540,387 | 17,720,743 |

Note: Does not include jails with zero or missing ADP. Expenses reflect WACC and tax-deductible interest expense adjustments.

56.     Because these expenses were exclusively reported at the level of these seven categories and each category contains more than one safety and security measure, it is not possible to isolate the expenses incurred to provide each individual safety and security measure within each category, much less the portion of the expenses within each category that are used and useful in the provision of IPCS.[81] While our upper bounds include all expenses reported for each of the seven categories, the lower bounds include only the expenses reported for the two of these categories that consist of safety and security measures that we find are generally used and useful in the provision of IPCS: CALEA compliance measures and communication security services.[82] Together, CALEA compliance measures and communication security services capture 34.1% of reported audio and 36.9% of reported video safety and security measure expenses after the WACC and tax-deductible interest expense adjustments.

57.     Table 7 compares per-minute audio and video IPCS safety and security expenses after the WACC and tax-deductible interest expense adjustments, with and without the category adjustment. Across the industry, the adjustment for the lower bounds decreases audio safety and security expenses by $0.028 per billed audio minute and video safety and security expenses by $0.054 per billed video minute. The percent decrease from the unadjusted to adjusted total is similar across all facility types within audio and video.

---

[81] The instructions for the 2023 Mandatory Data Collection required providers to allocate safety and security expenses among *the* seven categories at the facility level, and gave providers the option to further allocate these expenses among individual services within each category, notwithstanding NCIC's claim to the contrary. 2023 Mandatory Data Collection Instructions at 36-37 ("Once you have sorted each of the Company's discrete Safety and Security Measures into a specific category, the Company may elect to divide measures within any particular category into subcategories and report percentages for each of the measures within each subcategory. Note that this option to create additional subcategories for Safety and Security Measures operates as a supplement, not an alternative, to the procedures detailed below."); Letter from Lee. G. Petro and Glenn S. Richards, Dickinson Wright PLLC, Counsel to NCIC Correctional Services, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 3 & n.3 (filed July 10, 2024). Providers, including NCIC, declined to allocate costs among individual services, precluding the Commission from identifying those expenses on a more granular basis.

[82] Providers' narrative responses also indicate that the suite of safety and security measures they provide are often offered as a *default* package at the time of contract, however some providers also offer optional add-on services. The fact that these services are optional belies the claim that they are necessary for the provision of IPCS. *See supra Report and Order*, Part III.D.8 (Ancillary Service Charges) (discussing services offered as an elective to facilities). For example, {[                                                              ]}

Federal Communications Commission                    FCC 24-75

**Table 7: Safety and Security Expenses per Total Minute**

| | Audio Safety and Security Expenses Per Total Minute | | | Video Safety and Security Expenses Per Total Minute | | |
|---|---|---|---|---|---|---|
| | No Adjustment | After Adjustment | Percent Decrease | No Adjustment | After Adjustment | Percent Decrease |
| Prisons | 0.0469 | 0.0157 | 66.6% | 0.1276 | 0.0479 | 62.4% |
| Large Jails | 0.0389 | 0.0138 | 64.5% | 0.0901 | 0.0337 | 62.6% |
| Medium Jails | 0.0371 | 0.0131 | 64.6% | 0.0822 | 0.0302 | 63.2% |
| Small Jails | 0.0267 | 0.0094 | 64.7% | 0.0543 | 0.0191 | 64.7% |
| Very Small Jails | 0.0285 | 0.0103 | 64.0% | 0.0442 | 0.0153 | 65.3% |
| Total | 0.0422 | 0.0144 | 65.9% | 0.0855 | 0.0315 | 63.1% |

Note: Does not include jails with zero or missing ADP. The safety and security adjustment was made after the WACC and interest expense adjustments.

### 6.    Ancillary Services Cost Analysis

58.    Ancillary services are billing and collection services for both audio and video IPCS, and consequently are not reported separately. The reported expenses for these services are included in the upper bounds of our zones of reasonableness for audio and video IPCS by dividing them by the sum of audio and video minutes and adding this quotient to the separate audio and video caps. This upper bound adjustment adds a flat per-minute allowance, $0.011, for ancillary services, for all five size-type facilities.[83]

59.    The lower bounds reflect reductions in ancillary services expenses for {[    ]} due to restatements (lowering) of their WACCs, with an accompanying adjustment to {[    ]} reported tax-deductible interest expense. The result is an industry ancillary service expense of $0.010 per minute.[84] Like the $0.011 ancillary expense added to the upper bounds, this lower figure is added to the lower bounds as a flat per-minute allowance for all five size-type facilities.

### 7.    Video Expense Adjustment(s)

60.    *{[    ]} Video IPCS Adjustment.* {[    ]} reports extremely high costs for the provision of video IPCS. Their video IPCS per-minute expenses are a substantial outlier vis-a-vis their closest competitors and the industry as a whole, and their resulting reported per-minute video IPCS expenses significantly skew the industry average. They are three times higher than the industry average and about {[    ]}[85] Staff did not adjust {[    ]} per-minute expenses in establishing the upper bounds of our zones of reasonableness but

---

[83] *See* Appendix H. This is computed as industry ancillary services expenses, $125.2 million, divided by the sum of the audio and video IPCS minutes of the providers that reported ancillary services expenses, 11,585.9 million (a smaller number than the industry total number of minutes).

[84] Industry ancillary services expense for the five services, $125.2 million, is reduced by WACC and interest expense adjustments for {[    ]}. The minutes for providers who report these expenses are 11,585.9 million.

[85] *See* Tbl. 8 {[    ]} *See* Appendix F, Tbls. 3 and 15.

**Federal Communications Commission** **FCC 24-75**

find it appropriate to adjust these expenses in establishing the lower bounds. While staff cannot fully determine why {[           ]} reported expenses are so different to everyone else's, they are not indicative of efficient operations. For example, it is likely {[           ]} future demand will rise to at least proportionately match that of {[           ]}, and that may result in spreading {[           ]} capital expenditures over significantly more video minutes.[86]

61.     Staff make a conservative adjustment to {[           ]} video IPCS expenses to align them more closely with the rest of the industry by recalculating their expenses based on the industry average costs per minute. More specifically, we calculate the weighted average video IPCS cost per minute of all providers, excluding {[           ]}. This estimate is multiplied by {[           ]} total billed and unbilled video IPCS minutes to estimate {[           ]} video expenses as if they were equivalent to the rest of the industry. {[           ]} adjusted expenses are then divided by their original expenses and subtracted from one to calculate the percent reduction to {[           ]} video expenses. With an industry cost per minute for video IPCS of 0.076 when {[           ]} is excluded, the reduction to {[           ]} expenses is 78.5%. We apply this reduction to video IPCS expenses separately to each of {[           ]} facility tiers and divide by total minutes for each tier to arrive at per-minute estimates. This approach is conservative as a more appropriate adjustment of {[           ]} video expenses would weigh more heavily towards {[           ]} video expenses, given their comparable sizes and market positions. Such a reduction would bring {[           ]} video per-minute costs even lower, as {[           ]} is a relatively low-cost provider of video IPCS.

62.     Table 8 shows the unadjusted and adjusted video IPCS expenses for {[           ]} as well as the industry average, which includes {[           ]}, for each facility type.[87] All other adjustments made to the lower bounds are applied to both scenarios presented in the table. When compared to the industry average, which includes {[           ]}, {[           ]} cost per minute across each facility type is roughly three or more times higher, with the exception of small jails, which are still twice that of the industry average. Once the adjustment is made to {[           ]} video IPCS expenses, {[           ]} video cost per minute for each facility type is much more comparable to the industry average for each corresponding facility type. However, when including safety and security we find that {[           ]} total IPCS video expenses are still substantially above the industry average, both overall and for each corresponding facility type. Despite what is likely a similar overinvestment in video safety and security relative to competitors, we do not adjust {[           ]} safety and security expenses for video IPCS provision.

---

[86] {[



]}

[87] The adjusted video IPCS expense per minute for {[           ]} across all facilities does not equal that of the industry average because the reduction applied to the video expenses for {[           ]} is calculated using all observations while the industry average expense per minute estimates presented in Tbl. 8 must exclude facilities that do not report ADP so that facilities can be grouped by tier.

**Federal Communications Commission**          **FCC 24-75**

**Table 8: Non-Adjusted\* and Adjusted\*\* Video IPCS and Safety & Security Costs Related to Video IPCS Per Billed and Unbilled Video Minute, For {[          ]} and Industry**



Source: Data from facility-specific Excel tabs.
{[

]}

63.     *{[          ]} Tablet Deployment.* We examine {[          ]} deployment of tablets relative to its competitors to determine whether {[          ]} has over-invested in tablets, and whether tablet deployment costs have an outsized impact on {[          ]} video IPCS expenses. Table 9 shows tablet deployment per ADP across providers and facility tiers. {[          ]} deployed the most tablets per ADP for each jail tier, and has the same per-ADP deployment as {[          ]} in prisons. For medium jails, {[          ]} tablets exceed the incarcerated person population by 21%. In total, as seen further down in Table 10 below, {[          ]} has deployed nearly twice as many tablets as {[          ]}.

**Table 9: Tablets per ADP**

| Provider | Prison | Large Jail | Medium Jail | Small Jail | Very Small Jail | Total |
|---|---|---|---|---|---|---|
| {[ | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | ]} |
| **Minute Weighted Average** | 0.33 | 0.42 | 0.59 | 0.48 | 0.38 | 0.38 |

Source: Tab D1. Facility Demand and Revenue.

**Federal Communications Commission**                    **FCC 24-75**

64.    {[          ]} reports a \$400 million gross investment in tablets.  {[          ]} tablet deployment should be reflected in higher investment in tangible assets in the 2023 Mandatory Data Collection data.  Table 10 shows industry net tangible asset attribution between regulated and nonregulated business segments.  While {[          ]} has a significant investment in net tangible assets, possibly due to its investment in tablets, it attributes the lowest percentage of net tangible assets to regulated services among all providers {[  (          ]}.  As such, despite {[          ]} tablet deployment being out of line with {[          ]} and the rest of the industry, the large majority of {[          ]} tangible asset net investment is not reflected in its net capital stock for regulated IPCS services.  As such, we refrain from making any adjustments with respect to {[          ]} video investments or expenses on the basis of tablet deployment.

**Table 10: Attribution of Net Tangible Assets**

| Provider | Tablets | Net Tangible Regulated | Net Tangible Nonregulated | Percentage Regulated |
|---|---|---|---|---|
| {[ | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | ]} |

Source: Tab D1. Facility Demand and Revenue; Tab C1-C2. Company-Wide Information.

### H.    Audio and Video IPCS Lower Bounds

65.    Incorporating the adjustments discussed above, staff have calculated ten lower bounds – five for audio IPCS and five for video IPCS, in each case for prisons, large jails, medium-size jails, small jails, and very small jails.  As with the upper bounds, our rate-setting approach controls for the effect of facility type and size on expense per minute.

66.    The respective lower bounds for audio and video services for the five facility types are the sum of four per-minute expense components: (1) audio IPCS or video IPCS; (2) audio or video IPCS safety and security measures; (3) ancillary services; and (4) the TRS additive.

67.    Table 11 summarizes the industry average components of the lower bounds of our zones of reasonableness for audio and video IPCS expenses, separately for audio and video, and for each rate tier.  Column (1) shows the industry average for per-minute audio IPCS expenses by facility type, column (2) shows the industry average for per-minute safety and security expenses by facility type, and column (3) shows the final lower bound estimates for audio IPCS, including the ancillary service and TRS additives.  Columns (4), (5), and (6) report the corresponding estimates for video IPCS expenses per minute.

Federal Communications Commission    FCC 24-75

**Table 11: Lower Bound Audio and Video IPCS and IPCS-Related Expenses Per Billed and Unbilled Audio and Video Minutes, By Facility Type ($/minute)**

| | Audio | | | Video | | |
|---|---|---|---|---|---|---|
| | IPCS Per Minute (1) | Safety & Security Per Minute (2) | Lower Bound (1) + (2) + $0.01 + $0.002 | IPCS Per Minute (3) | Safety & Security Per Minute (4) | Lower Bound (3) + (4) + $0.01 + $0.002 |
| All Facilities | 0.028 | 0.014 | 0.054 | 0.073 | 0.032 | 0.117 |
| Prisons | 0.021 | 0.016 | 0.049 | 0.062 | 0.048 | 0.122 |
| Large Jails | 0.022 | 0.014 | 0.047 | 0.042 | 0.034 | 0.087 |
| Medium Jails | 0.035 | 0.013 | 0.061 | 0.060 | 0.030 | 0.102 |
| Small Jails | 0.058 | 0.009 | 0.080 | 0.094 | 0.019 | 0.126 |
| Very Small Jails | 0.086 | 0.010 | 0.109 | 0.187 | 0.015 | 0.214 |

Source: Data from facility-specific Excel tabs.

### I.    Validation of Lower Bounds

68.    This section uses three different sources to validate our lower bounds. The first examines evidence submitted by the Brattle Group as to reasonable per-minute audio and video expenses and find that to be consistent with, if somewhat lower, than our lower bounds for audio. The second shows that large fractions of facilities in all likelihood would be viable at rates that are less than our lower bounds, validating that our lower bounds are not set too low. Staff demonstrate this for many facilities—presumably those with the most efficient operations after controlling for facility type. The third compares counties in the region of Dallas and Denton in Texas and finds that per-minute audio rates of {[                                         ]} Because we set each of our rate caps somewhat above the respective lower bounds, but in each case closer to the lower bounds than the upper bounds, these sources also offer support for the rate caps that we adopt.

#### 1.    Brattle Analysis

69.    In reviewing the record, we find the Brattle Group's model carrier analysis provides external validation for our lower bounds. The Brattle Group's analysis estimates per-minute costs for audio and video calls in small, medium, and large facilities, drawing on market data and data from the 2023 Mandatory Data Collection. The initial model was filed on July 12, 2023,[88] and a revised model was filed on February 9, 2024.[89] Comments were filed on the Brattle model carrier analysis.[90]

---

[88] Wright Petitioners et al. Reply, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Report (rec. July 12, 2023) (Brattle July 12, 2023 Report).

[89] Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Report (filed Feb. 11, 2024) (Brattle Feb. 11, 2024 Report); *see also* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375 (filed May 7, 2024).

[90] *See* Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach., Report of Don J. Wood (filed Aug. 21, 2023) (Wood Aug. 21, 2023 Report); Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach., Report of Don J. Wood (filed Apr. 24, 2024) (Wood Apr. 24, 2024 Report); Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach., Report of FTI Consulting (filed Apr. 30, 2024) (FTI Consulting Apr. 30, 2024 Report); *see also* Letter from Michael H. Pryor,

(continued….)

70.    The Commission finds the model carrier approach useful to evaluate the analysis of reported industry investments and expenses undertaken by staff to establish the lower bounds of our zones of reasonableness.  Brattle's model carrier analysis aggregates estimates of the costs of the various components that comprise IPCS, including a markup on expenses to cover overhead.  Its aim is to estimate IPCS costs based on publicly available prices that are constrained by market forces capturing industry standards for efficiency, cost, and performance.[91]  As explained below, we find that, by and large, Brattle has produced a credible and transparent model of industry costs.

71.    The advantages of Brattle's model carrier approach include its transparency and that market forces "audit" the relied-upon price data, in contrast to the inability of the Commission and other stakeholders to audit providers' expense reports.  The disadvantages are that there are aspects of IPCS for which there are limited market data, notably many safety and security measures (which the Brattle Group does not model), that it is not clear how to add up piece parts from different wholesale markets to ensure the sum of the parts is a good estimate of the whole,[92] and that it may be difficult for a model carrier approach to capture cost variation along relevant cost-causative dimensions,[93] notably the distinction between prisons and jails, and across jail sizes.[94]

72.    Brattle filed an initial model carrier approach, and then in the light of comments, a revised approach.  We focus on the latter.  Brattle created its model carrier by identifying five modules of costs, populating the modules with data taken from, where available, publicly available prices, the sources for which they document in their report; the Commission's data collection from IPCS providers; and other market estimates.  The five cost modules are described in Table 12.

**Table 12: Model Carrier – Five Cost Modules**

| | Module | Audio | Video |
|---|---|---|---|
| 1. | Telecom | (a)  Voice over Internet Protocol (VoIP) call<br>(b)  Broadband cost (leased line) | (a)  Video call<br>(b)  Broadband cost (leased line) |
| 2. | Facilities | (a)  Phone handset<br>(b)  Enclosures, etc.<br>(c)  Installation | (a)  Kiosk<br>(b)  Enclosure, etc.<br>(c)  Installation |
| 3. | Security | None additional, for purposes of the model | None additional, for purposes of the model |
| 4. | Overhead | {[        ]} based on available industry data | {[        ]} based on available industry data |
| 5. | Allowable margin | {[        ]} based on industry benchmarks | {[        ]} based on industry benchmarks |

73.    Brattle's revised model carrier analysis makes several adjustments to the Telecom and

---

Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, and Marcus W. Trathen and Christopher B. Dodd, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Attach. B, Joint Report by FTI Consultants and Wood and Wood, at 8, 11 (filed June 10, 2024) (commenting on the Brattle Group's analysis of audio IPCS data as compared to Brattle Group's model carrier analysis); Securus July 11, 2024 *Ex Parte* at 22-23 (arguing that Brattle's model carrier approach is not a reasonable validator for the lower bound figures).

[91] Brattle July 12, 2023 Report at 2.

[92] The Brattle Group address this difficulty by using wholesale prices, which already include markups for overheads, and then apply further markups for overheads to the sum of these component estimates.  Arguably, economies of scope and scale in IPCS supply may be missed by such an approach, resulting in cost overestimation.

[93] *See* Wood Aug. 21, 2023 Report at 13, 20.

[94] The Brattle Group seek to capture these differences by choosing component cost models that, in their analysis, likely overstate costs.

**Federal Communications Commission**                    **FCC 24-75**

Facilities cost modules in response to critiques in the record. These adjustments include the following four responsive adjustments. First, Brattle made an upward revision in VoIP call cost by eliminating zero-cost providers from the set used to calculate an average price.[95] This revision responded to Mr. Wood's critique that the model picked the lowest prices.[96] FTI argues even this high rate is too low, but offers no alternative.[97] Second, Brattle made an upward adjustment to the price of a video call with a rate from Microsoft Azure at $0.0004 per minute.[98] This revision responded to Mr. Wood's critique that the model picked the lowest prices.[99] FTI argues even this higher rate is too low but offers no alternative.[100] Third, Brattle made an upward adjustment to the number of necessary T-1 lines based on high-definition video call quality for 60 minutes.[101] Fourth, Brattle shortened the useful life of equipment and relied on a wider array of equipment pricing to respond to Mr. Wood's critique that providers make tradeoffs between maintenance and replacement of assets.[102]

74.    The model carrier analysis assumes all video calls are made over kiosks, which Brattle explains are more expensive than tablets.[103] Brattle does not use tablets because tablets can be used for nonregulated services like books and movies, which creates a cost allocation issue.[104] FTI's comments argue that in fact tablets are widely used, sometimes in conjunction with kiosks.[105] This may be so, but may reflect a transition from kiosks to tablets, with such duplication being inherently inefficient. Without record evidence, staff do not consider it appropriate to add both kiosk and tablet costs together for the purposes of the model carrier model. Further, even a partial transition from kiosks to tablets would imply that Brattle's revised model may overestimate the number of kiosks but underestimate the cost of tablets, with the net impact on recoverable expenses arguably being an over, rather than an underestimate.

75.    In its revised model carrier analysis, Brattle also lowers the video to audio minutes ratio from 1:2 to 1:4, which raises video per-minute costs.[106] The more video minutes in the model, the lower the per-minute cost would be, because a large fraction of costs are fixed. Video IPCS is still developing, and the Commission's data collection does not provide a robust basis for establishing a ratio based on long-run relative demand for audio vs. video IPCS. In developing our lower bounds, the Commission implicitly assumes an audio to video ratio as given by the industry average, excluding Securus. {[

                                                          ]} If, as is likely, the ratio of video to audio calls were to increase substantially, then our per video minute lower bounds would be much too high.

---

[95] Brattle Feb. 11, 2024 Report at 14-20.

[96] Wood Aug. 21, 2023 Report at 20-21.

[97] FTI Consulting Apr. 30, 2024 Report at 11.

[98] Brattle Feb. 11, 2024 Report at 10.

[99] Wood Aug. 21, 2023 Report at 20-21.

[100] FTI Consulting Apr. 30, 2024 Report at 15.

[101] Brattle Feb. 11, 2024 Report at 11.

[102] Wood Aug. 21, 2023 Report at 21-22.

[103] Brattle Feb. 11, 2024 Report at 7.

[104] *Id.* at 8 & n.23.

[105] FTI Consulting Apr. 30, 2024 Report at 23.

[106] Brattle Feb. 11, 2024 Report at 5-8.

[107] {[

                                                          ]}

Outside of the IPCS context, video calls are increasingly popular,[108] and it is likely we will see a similar trajectory for the provision of video IPCS going forward.  To the degree that happens, the Brattle model and our own projections would overstate long-run video expenses.  It is uncertainty about long run video expenses that leads us to set interim, rather than permanent, rate caps for video IPCS.

76.      Site commissions are not included the model carrier, something Wood criticizes.[109]  However, the exclusion of site commissions as an expense is consistent with the used and useful analysis in our Order.  Consequently, excluding those costs from the data analysis accords with the legal determinations we make.

77.      Table 13 shows costs for audio and video calls when applying the model carrier for small, medium, and large facilities in Brattle's revised model.  {[

]}

### Table 13: Model Carrier Cost per Minute

|  | {[ |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Audio |  |  |  |  |  |  |
| Video |  |  |  |  |  | ]} |

78.      *The Model Carrier Analysis Is Largely Consistent with Our Lower Bounds for Audio IPCS.*  Brattle Group's revised model carrier analysis makes several reasoned adjustments in response to record criticism of its original submission, resulting in the per-minute estimates in Table 13 above.  For audio, these estimates generally align with the lower bound audio IPCS component of expenses that staff derived through an examination of industry average costs based on provider 2023 Mandatory Data Collection data ($0.021 per minute for prisons and $0.022 for large jails).  While the model's estimated video IPCS expenses, excluding safety and security, are about {[            ]} than those established in our lower bounds, this disparity can be, at least in part, attributed to the market for video being less established than audio, as reflected by {[

]}

79.      Staff acknowledge that the model carrier is not a substitute for a fully distributed cost analysis of provider investments and expenses because it is unable to capture all sources of cost variation in the provision of IPCS, most notably cost differences between facilities of different types and sizes, and because a model that aggregates piece-parts of service provision to create an efficient provider by definition does not reflect the real world investment, operating, and other decisions of IPCS providers.  However, staff are encouraged that the benchmark audio IPCS rates estimated by the revised model align closely with the lower bounds we have established, which helps to validate both our lower bound estimates and the rate caps that we ultimately adopt.

### 2.      Reported Facilities Earning Per-Minute Revenues Below our Lower Bounds

80.      *Comparing Per-Minute Audio Revenues with Our Lower Bounds*.  This section examines the facilities in which the per-minute audio revenue, less site commissions, that is, the per-minute

---

[108] For example, Juniper Research predicts a continued decline in revenues from voice service for mobile network operators, despite investments in 5G and growing subscriber numbers, because the quality of over-the-top services like video conferencing applications are improving.  Alex Webb, *How Operators Will Monetise Voice in 2023* (July 24, 2023), https://www.juniperresearch.com/resources/whitepapers/how-operators-will-monetise-voice-in-2023.

[109] Wood Apr. 24, 2024 Report at 9, 11.

[110] {[                                                    ]}

**Federal Communications Commission**                    **FCC 24-75**

revenues providers keep at a given facility, is less than our lower bounds for that facility type.[111]  {[
]}
These facilities demonstrate that our lower bounds may be too high (and so provide further validation for setting our rate caps closer to the lower bounds).  Such facilities are *prima facie* profitable at prices that approximate their per-minute audio revenue rates, otherwise providers would be seeking to exit these contracts, thus showing their per-minute audio costs, net of site commissions, to be below our lower bounds.  This result applies most strongly for prisons and large jails, where nearly two thirds and nearly one half of facilities, respectively, have per-minute audio revenues net of site commissions that lie below their respective lower bounds.  For medium, small and very small jails this share is between more than a fifth and more than a third of facilities.  We also find that the share of providers with per-minute audio revenues less site commissions that are less than our lower bounds is not significantly impacted by whether the provider is in a rural or urban area.

81.    In undertaking the analysis, staff's first step is to calculate, for each facility, the sum of IPCS audio, safety and security and ancillary service revenues net of site commissions and divide this amount by the sum of the facility's billed and unbilled minutes.[112]  To make an apples-to-apples comparison between the resulting revenue per minute for a facility and its corresponding lower bound, staff subtract from the lower bound the $0.002 allowance for TRS costs and add back in the safety and security expenses removed from the lower bounds.[113]  The TRS allowance is subtracted because in 2022 TRS was largely not provided, and so TRS costs did not need to be recovered.  Staff add back in the safety and security expenses that were removed to create the lower bounds, because revenue reported in 2022 was for services that included these safety and security expenses.  The last row of Table 14 shows the net impact of these two adjustments on the lower bound.  Thus, staff compare the revenue per-minute calculation for each facility with the lower bound appropriate to that facility, thereby identifying facilities for which the per-minute revenue is less than the lower bound.

---

[111] We do not perform a similar analysis for video because the video data is unreliable and likely reflects a nascent market with significant up-front expenses and low demand.  This means that both per-minute video revenues and per-minute video expenses (relied upon to establish the lower bounds) are distorted, and a comparison of the two would not yield meaningful results in terms of validating our interim video lower bounds.

[112] Safety and security revenues are allocated to facilities using safety and security expenses, as the two are likely correlated.  {[

]}  Site commissions at the facility level are allocated between audio video using revenue weights, since site commissions are in many cases proportional to revenues.

[113] The safety and security expenses added back in are: law enforcement support, communication recording services, communication monitoring services, voice biometric services, and other safety and security measures.  CALEA compliance measures and communication security services are included in the lower bounds.

Federal Communications Commission    FCC 24-75

**Table 14: Number and Industry Share of Facilities For Which Per-Minute Audio IPCS Revenues, Net of Site Commissions, Is Less Than Its Adjusted Lower Bound, By Provider and Facility Type**

| Provider | Prison | Large Jail | Medium Jail | Small Jail | Very Small Jail | All Facilities | All Facilities with Audio | Percent of All Facilities with Audio |
|---|---|---|---|---|---|---|---|---|
| {[ | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | ]} |
| **Industry with Audio** | 1,330 | 120 | 414 | 873 | 1,413 | 4,150 | | |
| **Share of Industry (%)** | 65.4% | 49.2% | 37.4% | 22.9% | 31.6% | 41.7% | | |
| **Lower bound ($)** | $0.046 | $0.045 | $0.058 | $0.077 | $0.106 | | | |
| **Adjusted Lower Bound ($)** | $0.075 | $0.068 | $0.080 | $0.092 | $0.122 | | | |

Notes: Lower bounds are adjusted by removing the TRS addon of $0.002, and by adding in the safety and security costs removed in constructing the lower bounds. The facilities included in these counts reported positive numbers for audio revenues, audio minutes and ADP.

82.    Table 15 shows the facilities depicted in Table 14 categorized by whether they are located in an urban area, as classified by the Census (locations that we could not geocode were unassigned). It suggests that geography does not have a material impact on whether facilities have per-minute revenues less than their lower bounds as calculated. The last row shows that non-urban facilities are 75% less common than urban facilities.[114] This ratio is also true for facilities that could be identified as urban or rural with the per-minute revenues as described being less than the adjusted lower bounds,[115] suggesting geography has no impact on the likelihood that a facility's per-minute rates being lower than the lower bounds as calculated here.[116]

---

[114] {[

]}

[115] {[

]}

[116] {[

(continued….)

Federal Communications Commission                                        FCC 24-75

**Table 15: Facilities for which Per-Minute Audio IPCS Revenues, Net of Site Commissions, Is Less Than their Adjusted Lower Bound, By Whether Categorized as Urban[117]**

| Provider | Urban | Non-Urban | Unassigned | Total | Percent Urban | Percent Non-Urban | Percent Unassigned |
|---|---|---|---|---|---|---|---|
| {[ | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | ]} |
| All < Adjusted Lower Bound | 621 | 480 | 629 | 1,730 | 35.9% | 27.7% | 36.4% |
| All ≥ Adjusted Lower Bound | 1,083 | 764 | 573 | 2,420 | 44.8% | 31.6% | 23.7% |
| Industry with Audio | 1,704 | 1,244 | 1,202 | 4,150 | 41.1% | 30.0% | 29.0% |

Notes: Lower bounds are adjusted by removing the TRS addon of $0.002, and by adding in the safety and security costs removed in constructing the lower bounds. A facility is unassigned if it had an address that could not be geocoded. Rows with percent sum horizontally to 100 percent.

83.     In summary, our lower bounds do not appear too low. Nearly 42% of facilities operate at imputed per-minute rates, after netting of site commissions, that lie below our caps, yet there are no signs that these contracts are not viable. Thus, it is likely per-minute costs for at least the vast bulk of these contracts are less than our lower bounds.

### 3.     Low-Priced Contracts Analysis

84.     *A Comparison Across 13 Contiguous Texas Counties*. This section shows two things. First, that our lower bounds may be excessive for the region of Dallas-Fort Worth and surrounding counties, which provide a broad range of conditions, from urban to rural. And staff have no reason to think there is something special about this region. Second, that despite there being no obvious reasons why costs would vary significantly across comparable counties within this region, the per-minute revenues kept by providers, that is, per-minute revenues net of site commissions, vary widely. This suggests in most instances where one sees high per-minute revenues, net of site commissions, these do not reflect costs.

85.     {[

]} We then reviewed the publicly available contracts we were able to find to better determine if these low prices were driven by unusual factors (aside from having limited site commissions). {[

]}

---

[117] *See* Michael Ratcliffe, *Redefining Urban Areas following the 2020 Census* (December 22, 2022), https://www.census.gov/newsroom/blogs/random-samplings/2022/12/redefining-urban-areas-following-2020-census.html.

Federal Communications Commission     FCC 24-75

]}  Consequently, staff examined the cluster of 13 counties contiguous to Dallas, Tarrant (Fort Worth), and Denton in Texas—Figure 1, {[

]}.  The twin cities of Dallas and Fort Worth (Tarrant) are natural comparators.  Collin and Denton are also natural comparators.  They are neighbors of similar geographic size, each lies above a major urban agglomeration, and has a population of about one million people.[120]  Ellis, Hunt, Grayson, Johnson, Parker are all of geographically similar sizes with populations ranging from about 100,000 to about 200,000.[121]  Rockwall's population is 107,819, very similar to Hunt's, but Rockwall is geographically much smaller than all the counties considered here.[122]  That leaves Cooke and Wise, which are of similar geographic size to all the other counties, except Rockwall.  Cooke and Wise have the two smallest populations, respectively of 41,668 and 8,632.[123]

---

[118] Coincidentally, based on demographic criteria, the *Washington Post* found Denton County to be among those counties which are closest to representing the U.S. as a whole.  *See* Andrew Van Dam, *What state best represents America?* (May 10, 2024), https://www.washingtonpost.com/business/2024/05/10/most-representative-most-unique-places-america/.

[119] The counties are Collin, Cooke, Ellis, Dallas, Denton, Grayson, Hunt, Johnson, Kaufman, Parker, Rockwall, Tarrant (Fort Worth), and Wise.  Hunt County is included because it is close to Dallas, even if it not contiguous with it.

[120] Collin had a population of 1,064,465, and Denton of 906,422. The Population Estimates and Projections Program, The Texas Demographic Center, The University of Texas at San Antonio, *Estimates of the Total Populations of Counties and Places in Texas for July 1, 2022 and January 1, 2023* (November 2023), https://demographics.texas.gov/Resources/TDC/Estimates/2022/2022_txpopest_county.pdf?v=20231101 (*Texas County Population*).

[121] Their respective 2020 Census population estimates were: Ellis: 192,455; Grayson: 135,543; Hunt: 99,956; Johnson: 179,927; Kaufman: 145,310; and Parker: 148,222.  *Id.*

[122] *Id.*

[123] *Id.*

**Figure 1: The Counties of, and Surrounding, Dallas-Fort Worth and Denton, Texas, sorted according to their Reported IPCS Audio Rates**



{[                                                                        ]}

Source: Rates are as found in the providers' 2022 Annual Reports (covering 2021).

86.     Of the 13 counties just outlined, staff were able to identify all but {[        ]} in the 2023 Mandatory Data Collection—*see* Table 16.  {[

]}

Federal Communications Commission    FCC 24-75

**Table 16: Audio Revenues Per Minute, Net of Site Commissions, for the Texas Counties Surrounding Dallas and Denton, Texas (from 2023 Mandatory Data Collection)**

| County | Site Commissions Per Minute | Revenues Less Site Commissions Per Minute | Revenues (Including Site Commissions) Per Minute |
|---|---|---|---|
| Collin | {[ | | |
| Cooke | | | |
| Dallas | | | |
| Denton | | | |
| Ellis | | | |
| Grayson | | | |
| Hunt | | | |
| Kaufman | | | |
| Parker | | | |
| Rockwall | | | |
| Tarrant | | | |
| Wise | | | ]} |

Notes: IPCS site commissions, which are reported for audio and video together, are allocated to audio using IPCS revenue shares. Staff were unable to find Johnson County in the 2023 Mandatory Data Collection. Source: 2023 Mandatory Data Collection.

87.    {[







]}

88.    Given the disparity in reported per-minute revenues, net of site commissions, staff sought further information on each of these counties. Staff could identify no factors that would justify cost differences substantially above the implied costs for the counties with low prices.

89.    Staff first checked providers' 2023 Annual Reports for 2022 for consistency with their 2023 Mandatory Data Collection reports. Each county's IPCS audio rates are listed in Table 17, along with whether the county receives any site commissions. This data was largely consistent with the reports in the 2023 Mandatory Data Collection.

---

[125] {[                    ]}

[126] {[                      ]}

[127] {[



]}

Federal Communications Commission    FCC 24-75

**Table 17: Per-Minute Audio Rates, and Whether a Site Commission is Paid, for the Counties Surrounding Dallas and Denton, Texas (from Annual Reports)**

| County | Provider | Audio Rate ($) | Site Commission Paid? |
|---|---|---|---|
| Cooke | {[ | | |
| Collin | | | |
| Ellis | | | |
| Dallas | | | |
| Denton | | | |
| Grayson | | | |
| Hunt | | | |
| Johnson | | | |
| Kaufman | | | |
| Parker | | | |
| Rockwall | | | |
| Tarrant (Fort Worth) | | | |
| Wise | | | ]} |

Source: Rates are from 2023 Reports (covering 2022).

90.    *Summary of Contract Analysis*.  Commission staff then analyzed the five contracts they were able to find for these 13 counties, those of Dallas, Denton, Grayson, Tarrant and Wise.  Comparing the twin cities of Dallas and Fort Worth (Tarrant) shows that Securus's per minute revenues, net of site commissions, were about $0.015 per audio minute in Dallas, much less than in Tarrant, which were $0.133 per audio minute, for no reasons staff could identify.  Thus, staff concludes the costs of supplying populated suburban counties like Dallas and Tarrant are around or less than $0.016 per minute.  This is well below our lower bound.

91.    {[

]}

92.    Staff examination of the Grayson contract showed it only provides fairly basic features.

{[

]}  In turn, this suggests that our rate caps should be set closer to our lower bounds.

**Federal Communications Commission**     **FCC 24-75**

93.    *Dallas and Tarrant Contracts*.  The Dallas contract shows nothing that would suggest it is for facilities with unusually low costs.[128]  {[                                                                        ]} the Dallas contract was with Securus, involved no site commissions, and included free community tablets and included hosted video visitation services.[129]  Per-minute domestic audio and video visitation rates were respectively $0.0119 and $0.13, with the only other charges being $0.24 to send an email, and $5 per month for a personal tablet and charges for games, video and audio content.[130]

94.    Given their proximity, and extent of interaction, Dallas and Tarrant likely face similar cost conditions.  {[

]}  They showed audio rates were s of site commissions: Tarrant received $0.02 per minute, and $59,420 per month, which previously came from per-minute site commissions.[133]  Staff could not calculate Tarrant's effective per-minute site commission from the contract.  In comparison, Securus received $0.0119 per IPCS minute in the Dallas contract.  There is nothing in the contracts to suggest that IPCS provision in Tarrant is more expensive than IPCS provision in Dallas.

95.    *Denton contract*.  Staff next compared the "sister" counties Denton and Collin.  {[

]}  Staff only had the Denton contract to examine.  It specifies call prices of $0.02 per minute with a 95% site commission payment.[134]  {[

]}

96.    *Grayson and Wise Contracts*.  The only other contracts staff were able to find were for the relatively small and rural Grayson and Wise Counties.[135]  Both contracts are with Correct.  In Grayson, Correct sets the following per-minute rates: interstate prepaid and debit, $0.21, interstate collect, $0.25, international, $1.00, intrastate, $0.30, and video visitation $0.50.[136]  There is a $3.00 credit card

---

[128] Dallas County, Texas, Commissioners Court, Court Order 2020-0168, Attach. Contract between Dallas County, Texas and Securus Technologies, LLC, at 2-3, 25-26 (Feb. 18, 2020), https://www.prisonpolicy.org/contracts/file.php?document_id=428&name=Dallas_contract_Order_2020-0168.pdf (Dallas Contract).

[129] *Id.*, Appx. A, at 2-3, 5, 25.

[130] *Id.* at 25-26.

[131] Contract between Tarrant County Texas, Commissioners Court Communication, and Securus Technologies, LLC (Dec. 19, 2023) https://tarrantcounty.primegov.com/meetings/ItemWithTemplateType?id=324090&meetingTemplateType=2&compiledMeetingDocumentId=28834 (Tarrant 2023 Contract); Contract between Tarrant County Texas, Commissioners Court Communication, and Securus Technologies, LLC (Nov. 16, 2021), https://tarrantcounty.primegov.com/meetings/ItemWithTemplateType?id=255594&meetingTemplateType=2 (Tarrant 2021 Contract).

[132] Tarrant 2023 Contract at 2.

[133] Tarrant 2021 Contract at 2.

[134] Denton County, Texas, Commissions Court, Agenda, Attach. Contract between Denton County Sheriff's Office and Smart Communications, at 364-72 (Oct. 26, 2021), https://dentoncounty.granicus.com/MetaViewer.php?view_id=26&clip_id=1840&meta_id=214955.

[135] Contract between Grayson County, Commissioners Court, and Correct Solutions Group, LLC, at 59-74 (May 5, 2020) at 59-74, https://grayson.novusagenda.com/agendapublic/AttachmentViewer.ashx?AttachmentID=8634&ItemID=7744, *see* "Legal Minutes (Grayson Contract).

[136] *Id.* at 66.  The contract's domestic rates are consistent with the 2022 annual report Correct made to the Commission for calendar year 2001.

**Federal Communications Commission**    **FCC 24-75**

transaction fee, a $1 for debit calling moving fee, a $5.95 live operator fee, a $0.50 message or email fee, and $0.99 per hour for tablet use, though prisoners are allowed 15 minutes of free tablet use every four hours.[137]  Correct installs and maintains equipment, including kiosks and tablets, and undertakes certain services, such as contraband and remote mail scanning.[138]  Under the contract, Correct pays an 82% site commission on all but interstate calls and 10% on video visitation,[139] suggesting Correct collects $0.21 per minute on interstate calls, and $0.06 (= (1 - 0.82) * $0.30) on intrastate calls.  {[

]}

97.     Wise County contracted with Correct effective October 1, 2018, to provide audio IPCS setting the following rates: interstate prepaid, $0.21, interstate collect, $0.25, international, $0.50, intrastate, $0.50, kiosk transactions, $3.00, and live operator transactions, $5.95.[140]  {[

]}  Under the contract, Correct was to provide what appear to be relatively basic services: the equipment and platform required for IPCS and voicemail services.[141]  Wise County was also to receive 75% of calling revenue "with the exception of interstate calls with regard to the FCC rule," and 100% of voicemail revenues.[142]  Staff understand the exception to be the same as for Grayson, that no commission is paid on interstate calls.  The contract was amended three times, numbered one through three,[143] and still appears to be in place.  One of those amendments is relevant here.  In that, Correct agrees to increase the services it requires, in particular to provide 100 tablets, two correctional grade kiosks, chargers and similar and certain services such as electronic messaging, law library, and medical scheduling.[144]  There was also a memorandum of understanding which states that due to an "excessive increase in cost of business" Correct will now "impose a five percent reduction in the number of minutes on which the commission is calculated."[145]

98.     {[

]}

---

[137] *Id.*

[138] *Id.* at 68-70.

[139] *Id.* at 71.

[140] Contract between Wise County, Sheriff's Office, and Correct Solutions Group, LLC, at 5 (Aug. 16, 2018) https://www.co.wise.tx.us/DocumentCenter/View/597/Correct-Solutions-Group---Inmate-Phones-PDF.

[141] *Id.* at 6.

[142] *Id.* at 7.

[143] Correct Solutions Group, Third Amendment to Contract and Agreement at 1 (June 1, 2023) https://www.co.wise.tx.us/DocumentCenter/View/4273/Correct-Solutions-Group---Inmate-Phones-Third-Amendment-PDF (extending term of contract).

[144] Correct Solutions Group, Second Amendment to Contract and Agreement at 1 (Sept. 30, 2023) https://www.co.wise.tx.us/DocumentCenter/View/2410/Correct-Solutions-Group---Inmate-Phones-Second-Amendment-PDF.

[145] Memorandum of Understanding between Wise County, Sheriff's Office, and Correct Solutions, LLC, at 1 (June 1, 2023) https://www.co.wise.tx.us/DocumentCenter/View/4266/Correct-Solutions-Group---Inmate-Phones-MOU-PDF (reducing site commission payments by five percent).

## APPENDIX J: RATE CAP VALIDATION

1. *Selection of Rate Caps from Within Zones of Reasonableness.* We establish our final audio IPCS and our interim video IPCS rate caps from within our zones of reasonableness. Table 1 presents the rate caps for audio and video IPCS.

**Table 1: Audio and Video Rate Caps ($/Min)**

|  | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails |
|---|---|---|---|---|---|
| **Audio** | 0.06 | 0.06 | 0.07 | 0.09 | 0.12 |
| **Video** | 0.16 | 0.11 | 0.12 | 0.14 | 0.25 |

2. *Validity Check on the Audio Rate Caps.* This appendix counts the facilities where the per-minute audio revenue, less site commissions, is less than our rate cap for that facility type.[1] About half of facilities meet this condition, as shown in Table 2. It is likely that our audio caps will have little impact on these facilities, for those facilities which collect revenues per minute which lie below our caps will not need to adjust their pricing, things otherwise constant. This result applies most strongly for prisons and large jails, where about three quarters and more than half of facilities, respectively, collected per-minute audio revenues below their respective rate caps. Shares of medium, small, and very small jails facilities with per-minute revenues below the rate caps are about 42%, 29%, and 39% respectively.

---

[1] On the revenue side, for each facility, we calculate the sum of IPCS audio, safety and security, and ancillary service revenues, net of site commissions, and divide this amount by the sum of the facility's billed and unbilled minutes. Safety and security revenues are allocated to facilities using safety and security expenses, as the two are likely correlated. {[

]} Site commissions at the facility are allocated between audio and video using revenue weights, since site commissions are in many cases proportional to revenues. To ensure apples-to-apples comparisons, staff subtracts the TRS addon of $0.002 from our rate cap and adds back those safety and security expenses which were removed from the lower bounds. *See supra* Appendix I.

We do not perform a similar analysis for video because the video data is comparatively unreliable and likely reflects a nascent market with significant up-front expenses and low demand. *See, e.g.*, Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, Appx. A, Brattle Group, Response to the FCC's Implementation of the Martha Wright-Reed Act, at 12 (filed July 12, 2024) (Brattle July 12, 2024 Report) (noting that " {[

]} "). We agree that "[v]ideo calling is a relatively new service compared to audio calling" and that providers "will gradually enhance their efficiency in providing this service over time." *Id.* In sum, a comparison of per-minute video revenues and per-minute video expenses using data from the 2023 Mandatory Data Collection, which are for calendar year 2022, would not meaningfully validate our interim video rate caps.

Federal Communications Commission                                    FCC 24-75

**Table 2: Number and Industry Share of Facilities for Which Per-Minute Audio IPCS Revenues, Net of Site Commissions, is Less Than their Adjusted Rate Caps, By Provider and Facility Type**

| Provider | Prison | Large Jail | Medium Jail | Small Jail | Very Small Jail | All Facilities Below Adjusted Cap | All Facilities with Audio | Percent Below Adjusted Cap |
|---|---|---|---|---|---|---|---|---|
| {[ | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | ]} |
| **Total** | 976 | 66 | 172 | 251 | 553 | 2,018 | 4,150 | 48.6% |
| **Industry with Audio** | 1330 | 120 | 414 | 873 | 1,413 | 4,150 | | |
| **Share of Industry (%)** | 73.4% | 55.0% | 41.5% | 28.8% | 39.1% | 48.6% | | |
| **Rate Cap ($)** | $0.060 | $0.060 | $0.070 | $0.090 | $0.120 | | | |
| **Adjusted Rate Cap** | $0.089 | $0.083 | $0.092 | $0.105 | $0.136 | | | |

Notes: Rate caps are adjusted by removing the TRS addon of $0.002, and by adding in the safety and security costs removed in constructing the lower bounds. The facilities included in these counts reported positive numbers for audio revenues, audio minutes, and ADP.

3.    A large fraction of facilities of all types demonstrate profitability at rates consistent with our rate caps.[2] Many facilities appear to have per-minute revenues net of site commissions that exceed plausible estimates of costs. For example, 1,294, or over 30% of facilities, report per-minute audio revenue, less site commissions, that exceed our highest upper bound, $0.152, which is for very small jails.[3] Our upper bound analysis suggests it is unlikely that these per-minute revenues are cost-reflective. Per-minute expenses, net of site commissions, also vary widely within the same facility tier. Given there

---

[2] While certain providers claim otherwise and argue that our rate caps will prevent many providers from recovering costs, we reject these claims as explained herein. *See, e.g.,* Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, FCC, WC Docket Nos. 23-62 and 12-375, at 3-5 (filed July 9, 2024) (Pay Tel July 9, 2024 *Ex Parte*); Letter from Michael H. Pryor, Brownstein Hyatt Farber Schreck, LLP, Counsel to Securus Technologies, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 1, 4-9 (filed July 11, 2024) (Securus July 11, 2024 *Ex Parte*) (claiming that, under the rate caps, a third of providers will not recover their costs and that half of audio providers will not recover their audio costs).

[3] Of these, 627, or 15% of, facilities have reported per-minute audio revenues, net of site commissions, that exceed $0.21, our highest interim cap, but there are no credible claims that per-minute costs come close to this level. In fact, the highest per-minute average cost for audio, including safety and security costs, any provider reported in the current collection, was {[                    ]}. *See supra* Appendix D, Tbl. 3.

were facilities where providers' per-minute revenues less site commissions exceeded our rate caps, this suggests that their revenues per-minute either exceed costs per-minute, or some providers' costs are inefficiently high.

4.  In an efficient market for the same service, all providers' per-minute revenues (net of site commissions) would be similar, as would providers' per-minute expenses net of site commissions. After controlling for facility type, we do not see this similarity.[4] In fact, our Lasso analysis shows providers' identities are more correlated with costs than any other variable, reinforcing the conclusion that reported per-minute revenues do not reflect efficient costs.[5] Consequently, our caps will put market pressure on providers with inefficient per-minute costs.[6]

5.  Comparing revenues under our rate caps to reported expenses shows that a range of providers, both big and small, are expected to recover their costs, again supporting our finding that our rate caps will allow efficient providers to meet demand for IPCS.[7] Table 3 shows the revenues a provider would receive if their reported respective audio minutes and video minutes for each facility were multiplied by the respective audio and video rate caps. It also shows the sum of audio IPCS, video IPCS, and CALEA and Communication Security expenses.[8] The difference between these understates the expected margin since call volumes would rise with lower prices, but, due to economies of scale, costs would rise less quickly.[9] Of the 4,441 facilities, 3,202 have revenues at the rate caps that match or exceed their costs, accounting for 72% of facilities. Eight of the twelve providers in our database have implied revenues under the caps that exceed their reported costs.[10] These providers, {[

---

[4] There is no suggestion in the record that we are missing key sources of cost variation that could explain the substantial differences we observe.

[5] The Lasso analysis shows that provider identity and state are primarily correlated with per-minute expenses. Facility type and whether or not a site commission is collected also matter, but far less than provider identity and state. *See supra* Appendix G.

[6] Because so many facilities, after controlling for facility type, have per-minute revenues below our rate caps, we find it likely that efficient per-minute costs are below our caps as well. *See* Brattle July 12, 2024 Report at 8 (explaining that " {[

]}"); *see also* Appendix D (discussing reasons our cost estimates are overstated). Thus, our caps incentivize firms with particularly inefficient costs to reduce their costs through increased efficiencies.

[7] Inefficient firms may well face market pressure as a result, but we are not persuaded by such claims. *See, e.g.*, Pay Tel July 9, 2024 *Ex Parte* at 5 ("If the Commission forces Pay Tel and other smaller providers out of the market, who will pick up the facilities they currently serve?").

[8] *See supra* Appendix I (providing further discussion of which categories of safety and security costs are included in the lower bound).

[9] We likewise reiterate that we believe reported costs are inflated, particularly given that total industry reported costs exceed total industry reported revenues by such a wide margin. *See supra* Appendix D; *see also* Letter from Gregory R. Capobianco, Jenner & Block, LLP, Counsel to the Wright Petitioners, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 and 12-375, at 3 (filed July 12, 2024) (Wright Petitioners July 12, 2024 *Ex Parte*) (recognizing that "several reported costs that are either overstated or ultimately not recoverable, or both, including goodwill (for both the lower and upper bounds) and certain safety and security costs and site commissions (for the upper bound)").

[10] The eight providers are {[                                                                                          .]} This is also true for revenues calculated as the product of reported minutes and the lower of our rate caps and existing prices. We do not find that the other four providers would not recover their costs, only that they would not recover revenues as calculated here. *Cf.* Letter from Marcus W. Trathen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Counsel to Pay Tel Communications, Inc., to Marlene H. Dortch, FCC, WC Docket Nos. 23-62 and 12-375, at 2 (filed July 11, 2024). We therefore disagree that many providers would not be "fairly compensated." *See* Securus July 11, 2024 *Ex Parte* at 8.

Federal Communications Commission    FCC 24-75

]}, cover about 85% of all facilities.[11]  {[

]}

**Table 3: Revenues at Rate Caps and Expenses, by Provider**

| Provider | Facilities | Facilities with Capped Revenue >= Expenses | Audio and Video IPCS | | Percent of Facilities where Capped Revenue >= Expenses | Provider Capped Revenue >= Expenses |
|---|---|---|---|---|---|---|
| | | | Potential Revenue at Caps | Expenses | | |
| {[ | | | | | | |
| | | | | | | ]} |
| **Total** | 4,441 | 3,202 | 820,764,940 | 593,111,871 | 72% | |

Notes: Excludes jails where ADP is missing or zero.  Capped revenue is calculated on the facility-level by multiplying the relevant rate cap by the total number minutes.  Audio, video, and safety and security Categories I and III (CALEA and Communication Security) expense are included as expenses.

6.      Contrary to some claims, which argue that our rate caps impact smaller providers and thus smaller facilities, provider size is no predictor of the choice to serve very small jails.[14]  As illustrated in Table 4, all eight of the providers discussed above serve very small jails.  {[

---

[11] {[                                                                                  ]}

[12] *See supra* Appendix D, Tbl. 3.

[13] *Id*.

[14] *See* Pay Tel July 9, 2024 *Ex Parte* at 2 (arguing that our rate caps "actively shrinks the IPCS market by pricing out one-third of the providers—providers who are predominantly serving the smallest, most difficult-to-serve facilities"), 6 (contending that "if adopted, the Draft Order will make IPCS less available, not more, particularly in smaller, more difficult to serve facilities"); Securus July 11, 2024 Ex Parte at 1, 4 (arguing that our rate caps "may drive smaller providers out of the market, thus reducing overall competition").  We disagree with such claims.  As we explain, the eight providers which already have revenues less site commissions beneath our caps serve an overwhelming number of small and very small facilities, as well as medium and large facilities.

**Federal Communications Commission**                                    **FCC 24-75**

]} Thus, it is implausible that our caps will prevent supply in small jails. Even if we take all providers' reported costs at face value, which we do not,[16] we would not be setting just and reasonable rates if we allowed any provider to recover its reported costs-of-service where these exceed those of an efficient provider. Equally, we must ensure providers are fairly compensated. To that end, we have chosen to set rate caps that likely exceed efficient costs, even if they are lower than some providers' reported costs.

**Table 4: Facility Counts for Providers and Industry, by Facility Type**

|  | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails |
|---|---|---|---|---|---|
| ATN | {[ |  |  |  |  |
| CPC |  |  |  |  |  |
| City Tele-Coin |  |  |  |  |  |
| HomeWAV |  |  |  |  |  |
| ICSolutions |  |  |  |  |  |
| NCIC |  |  |  |  |  |
| Pay Tel |  |  |  |  |  |
| Prodigy |  |  |  |  |  |
| Securus |  |  |  |  |  |
| Smart |  |  |  |  |  |
| TKC |  |  |  |  |  |
| ViaPath |  |  |  |  | ]} |
| **Industry** | 1542 | 124 | 433 | 904 | 1438 |

7.        We reject claims that our actions could harm competition. Competition should not be mistaken for the number of competitors.[17] Competition delivers lower prices, adjusted for quality, and competition may sometimes drive out inefficient competitors. Competition also leads inefficient competitors to become more efficient. Setting rate caps to enable inefficient competitors to survive would not be pro-competitive, and would not result in just and reasonable prices. It would also allow providers to be overcompensated, rather than to receive fair compensation. Nor would an inefficient provider's exit from the market indicate a reduction of competition as some commenters allege.[18] We agree with those

---

[15] {[

]}

[16] *See supra* Appendix D, paragraphs 24-25. As articulated therein, we find the reasons that reported costs are overstated to be compelling, and disagree that such a finding is "erroneous[]." *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 7, 18-19.

[17] *See, e.g.,* Pay Tel July 9, 2024 *Ex Parte* at 2.

[18] *See* Securus July 11, 2024 *Ex Parte* at 9 ("It is axiomatic that one cannot increase competition by driving competitors out of the marketplace."). This commenter would do well to mind the age-old antitrust maxim: the law protects competition, not competitors. *E.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for 'the protection of competition not competitors.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

commenters that observe that "the Commission is not obligated to set rates to cover an inefficient business model."[19]

8.      We also disagree with claims that inflation and concomitant regulatory obligations are "plausible explanations" for why industry reported costs are exceeding IPCS revenues.[20]  Commercial contracts commonly include clauses addressing inflation and changes of law, and here, contract renegotiation seems common; in any year, a material fraction of contracts are won, renewed and renegotiated.[21]  Without any evidence in the record, we decline to assume that half of providers, including Securus, would broadly renew unviable contracts, place bids at non-viable prices, or would not seek to renegotiate contracts in the face of unanticipated inflation.  Neither Securus nor any other party has shown that IPCS expenses have grown sufficiently fast since 2022, after accounting for industry productivity, to render 2022 expenses too low for the purpose of setting our rate caps.  In fact, over the past decade, telecommunications industry inflation has been significantly lower than broader measures of inflation.[22]  Likewise, we are unconvinced that regulation compliance costs made IPCS unviable in 2022.[23]  In sum, we do not find it credible that inflation could have caused the apparent losses providers reported in 2022, nor is it the Commission's responsibility to cure contracts that fail to anticipate common exigencies.

9.      We are likewise unpersuaded that the difference between industry contract revenues and IPCS expenses is explained by providers use of profits from other non-IPCS services to cross-subsidize the price of IPCS.[24]  The record presents no substantive evidence of cross-subsidization, or of its extent, let alone establish that the practice was widespread and led to material reductions of IPCS revenues below costs.[25]

10.      In validating our caps, we do not place significant weight on analysis of facility-level per-minute audio expenses as that would be misleading for at least the following reasons: different providers allocate costs differently, no provider's cost allocations are likely to be particularly accurate at the level of the facility, and the likelihood of reporting errors at the facility.  There are also corner cases, for example,

---

[19] *See* Wright Petitioners July 12, 2024 *Ex Parte* at 6 & n.25.

[20] *See* Securus July 11, 2024 *Ex Parte* at 19.

[21] *See, e.g.,* Tarrant 2023 Contract at 2, a contract held by Securus; *see also* Wise County, Sheriff's Office, and Correct Solutions Group, LLC, at 1 (June 1, 2023) https://www.co.wise.tx.us/DocumentCenter/View/4273/Correct-Solutions-Group---Inmate-Phones-Third-Amendment-PDF).

[22] The Telecommunications PPI over the last ten years averaged 0.7% annually, as opposed to 2.6% average annual increases in the GDP deflator over the same period.

[23] In 2022, roughly half of all audio call minutes were for intrastate calls, which were not subject to Commission pricing regulation at that time.  Further, our 2022 rate caps were set substantially above our current upper bounds, which take providers' 2022 reported costs at face value, so they cannot have held rates below costs.  Nor are we convinced that regulation at the state level adequately explains the disparity between industry-wide costs and revenues.  For example, Securus points to Pay Tel's exit from California, but IPCS continued to be supplied at the correctional facility in question, just by a different, and presumably more efficient provider.  *See* Pay Tel July 12, 2023 Reply at 17, n.46 (noting that even though it could not continue to operate in California due to California's IPCS rate regulation efforts, Pay Tel was "able to assign its unprofitable contract to a [provider] serving a neighboring county").

[24] *See* Securus July 11, 2024 *Ex Parte* at 23.

[25] Cross-subsidization, while potentially making an otherwise unprofitable business segment profitable for the overall contract, can also obscure inefficiencies within the regulated business and misalign incentives.  For example, providers may be disincentivized to reduce costs and efficiently provide IPCS if they only use it to generate other business within the same contract.  In Securus' own words, "regulated rates must enable companies to earn a positive return specifically from the service being regulated." Securus July 11, 2024 *Ex Parte* at 19.  Given the distortionary effects of cross-subsidization, we find the most direct way to assess viability of IPCS provision at a facility is to compare IPCS revenues with IPCS costs.

where costs are incurred at the start of a contract, but few or no minutes are supplied.[26]  Tables 5 and 6 illustrate the difficulties with facility-level data.  These tables show provider-reported per-minute expenses vary widely within a single provider's data, often over implausible ranges.  However, because providers allocate all their costs down to their facilities, a focus at the level of the provider avoids cost allocation problems.  Similarly, viewing an aggregation of facilities, including at the level of the provider, or across providers, tends to smooth out reporting errors and corner cases.  This is not the case when considering a provider's higher cost facilities, since, by definition, one is choosing the facilities to which more costs were allocated and ignoring those to which fewer costs were allocated.[27]

**Table 5: Minimum Per-Minute Audio Expense, Inclusive of CALEA and Communication Security Expenses, at a Facility by Facility Type**

| Provider | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails |
|---|---|---|---|---|---|
| ATN | {[ | | | | |
| CPC | | | | | |
| City Tele-Coin | | | | | |
| HomeWAV | | | | | |
| ICSolutions | | | | | |
| NCIC | | | | | |
| Pay Tel | | | | | |
| Prodigy | | | | | |
| Securus | | | | | |
| Smart | | | | | |
| TKC | | | | | |
| ViaPath | | | | | ]} |

---

[26] *See, e.g.*, Pay Tel July 9, 2024 *Ex Parte* at 3.

[27] *See* Tables 5 and 6.  Thus, Pay Tel's argument that one third of its facilities will be loss-making under our rate caps requires belief that its cost allocations accurately reflect underlying costs.  *See* Pay Tel July 9, 2024 *Ex Parte* at 3.  That seems improbable for at least some of its facilities given its per-minute cost estimates for very small jails range from {[                    ]}.  If it is true that Pay Tel overall could not operate profitably under our rate caps, we find that to be because Pay Tel's costs exceed efficient costs.  We reject, for the same reasons, a similar claim made by Securus. *See* Securus July 11, 2024 *Ex Parte* at 9.  Securus argues that a substantial number of facilities will be "underwater at the lower bound cost level given the proposed rate caps," and that certain "providers' lower bound costs exceed the rate cap[s]." *Id.*  We find this analysis implausible, unsupported, and, given the fact that Securus did not submit the calculations in the record, we are unable to analyze or otherwise replicate their results.  *Id.*  As an initial matter, Securus fails to separately identify audio and video profitability, leaving the differences between these services obscure.  Further, we find Securus's analysis misleading.  By "excluding {[                    ]}" from the analysis, Securus removes the substantial majority of facilities and cost data from its analysis, and uses a sample size of less than 20% of the industry to support its conclusions.  *Id.*  Such a limited picture is particularly inappropriate for developing rate caps based on industry average costs, an approach which is expressly permitted by the statute.  For example, given that our upper bounds reflect all costs as submitted, we find it unlikely that certain providers have "lower bound costs [that] exceed rate caps by {[          ]}" as Securus claims, because costs which lie {[      ]} above the rate caps would also lie above the upper bounds for all jail size tiers.  *See, e.g.*, Securus July 11, 2024 *Ex Parte* at 8-9.

Federal Communications Commission    FCC 24-75

**Table 6: Maximum Per-Minute Audio Expense, Inclusive of CALEA and Communication Security Expenses, at a Facility by Facility Type**

| Provider | Prisons | Large Jails | Medium Jails | Small Jails | Very Small Jails |
|---|---|---|---|---|---|
| ATN | {[ | | | | |
| CPC | | | | | |
| City Tele-Coin | | | | | |
| HomeWAV | | | | | |
| ICSolutions | | | | | |
| NCIC | | | | | |
| Pay Tel | | | | | |
| Prodigy | | | | | |
| Securus | | | | | |
| Smart | | | | | |
| TKC | | | | | |
| ViaPath | | | | | ]} |

**STATEMENT OF**
**CHAIRWOMAN JESSICA ROSENWORCEL**

Re:     *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act,* WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking (July 18, 2024).

It is never too late to do the right thing.

The action we take today at the Federal Communications Commission is a tribute to this principle. It is also a testament to the love of a grandmother. Two decades ago, Martha Wright filed a petition calling on this agency to do something about the unconscionable rates families of the incarcerated pay for communications. There was something wrong about being asked to pay through the roof just to stay in touch with her grandson Ulandis, who is here with us today. It was better for all of us, she believed, if while he was incarcerated, he could stay in touch with family and hear about what was happening at home and in church.

She was right. For those who are incarcerated and their loved ones, talk does not come cheap. People in prison are often separated from their families by hundreds of miles, and families may lack the time and means to make regular visits. So calls from payphones are often the only way to stay connected. But the price of an individual call can be as much as many of us pay for an unlimited monthly plan. This is not just a strain on the household budget. It harms all of us because regular contact with family can reduce recidivism.

This agency took far too long to pick up the petition from Martha Wright. But my friend and former colleague Mignon Clyburn was the first at this agency to demand that we do it. She was right.

In the years that followed, we cut rates for calls. We limited ancillary service fees. We put restrictions on site commissions. But our work was not always embraced by the courts. We were told—over and over again—that the Commission did not have the authority to address every aspect of these rates, because while interstate calls fell within our jurisdiction, intrastate calls did not. This limited our ability to provide families relief and meaningfully address what Martha Wright called on us to do in her petition.

Senator Tammy Duckworth saw what was happening and decided we needed a new law. She was right. Working with former Representative Bobby Rush and others in Congress, Senator Duckworth championed the Martha Wright-Reed Just and Reasonable Communications Act. It honored the trailblazing work of its namesake and gave us new authority to address this problem.

Today, using this new law, we fix what has been wrong for too long. We reduce calling rates by more than half. We stop tacked-on costs like ancillary fees and prohibit special fees for site commissions. We make clear these policies apply to both interstate and intrastate rates. We also set rates for video calls for the first time. On top of that, we strengthen accessibility requirements for incarcerated people with disabilities and improve consumer disclosures.

This is meaningful change. We did not get here on our own. In addition to Martha Wright, champions at the Commission, champions in Congress, and public interest advocates, let me thank the people I met during the last year at the public hearings we held to discuss implementation of this new law. They told stories I will never forget. There was the father in South Carolina who was crushed by the expense of calls, the costly hang-ups, and disconnects that kept him from staying in touch with his family. There was the mother in Illinois, who described how she took jobs cleaning the bathrooms while

**Federal Communications Commission**                    **FCC 24-75**

incarcerated—something nobody wanted to do—because she could find bits of soap that were left behind, and form them into a small bar, saving her what she would otherwise spend on hygiene at the commissary, just to afford a call with her children.

Martha Wright passed away nine years ago.  Today, we honor her as we implement this new law.  Her legacy reminds us that it is never too late for justice and it is never too late to do the right thing.

Thank you to the staff who have worked long and hard on this proceeding, including Irina Asoskov, Susan Bahr, Ahuva Battams, Peter Bean, Deb Clemens, Callie Coker, Madison Decker, Lynne Engledow, Athula Gunaratne, Victoria Goldberg, Amy Goodman, Trent Harkrader, William Kehoe, Isabelle Kristick, Al Lewis, Shannon McCracken, Stephen Meil, Terri Natoli, Christopher Niccolini, Kiara Ortiz, Erik Raven-Hansen, Marvin Sacks, Gunjan Shah, Simon Solemani, Gil Strobel, and David Zesiger from the Wireline Competition Bureau; Mark Azic, Amanda Betag, Paula Cech, Liesl Himmelberger, Stacy Jordan, Eugene Kiselev, Richard Kwiatkowski, Giulia McHenry, Mark Montano, Eric Ralph, Lester Roberts, Michelle Schaefer, Geoff Waldau, George Williams, and Irene Wu from the Office of Economics and Analytics; Robert Aldrich, Bridgette Gomez, and Michael Scott from the Consumer and Governmental Affairs Bureau; Sarah Citrin, Valerie Hill, Wade Lindsay, Richard Mallen, Marcus Maher, Erika Olsen, Joel Rabinovitz, Royce Sherlock, Elliot Tarloff, and Chin Yoo from the Office of General Counsel; and Michael Gussow, Joycelyn James, and Chana Wilkerson from the Office of Communications Business Opportunities.

### STATEMENT OF COMMISSIONER BRENDAN CARR
### APPROVING IN PART AND CONCURRING IN PART

Re:     *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act,* WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking (July 18, 2024).

I want to offer my thanks and appreciation to Ulandis Forte for joining us this morning at the Commission. Your grandmother, Martha Wright-Reed, is the epitome of the old adage that one person with courage can make a majority. And I might add determination to that line in this case.

Martha Wright-Reed started out twenty years ago to fix a system that had long been broken. Her cause was ensuring that the families of incarcerated individuals do not pay unjust and excessive rates for what we call incarcerated people's communications services or IPCS. As a blind elderly woman who could neither write letters nor travel for in-person visits, Martha Wright-Reed often spent hundreds of dollars a month in long-distance calls to stay in touch with her incarcerated grandson. In her tireless effort to make this system more fair, she made some good allies along the way—including former FCC Chair Mignon Clyburn.

The excessive rates Martha Wright-Reed sought to reform flowed from a market failure. The market for inmate calling services does not benefit from the same type of competitive forces that we see in other segments of the telecom ecosystem. As a result, the FCC has had a critical role to play in regulating certain aspects of this marketplace, and it has taken actions to address providers' practices over the years. A big part of enabling this is ensuring that IPCS providers are limited to charging just and reasonable rates for inmate calling services.

For years, however, the FCC was unable to alter the status quo, despite broad consensus on the types of reforms that are necessary. A string of decisions at the D.C. Circuit turned aside several well intentioned FCC actions that the court determined exceeded the agency's statutory authority. For this reason, I welcomed Congress' passage of the Martha Wright-Reed Act, which provides the FCC with the authority necessary to establish rules for intrastate and international inmate calls.

Turning to the FCC's implementation of that law, I support the FCC's decision in this proceeding to address the worst abuses and ensure that IPCS rates are just and reasonable. Over the years, I have heard from families who experienced firsthand the difficulties of maintaining contact with their incarcerated loved ones. I also heard from formerly incarcerated individuals who underscored the decline in mental and emotional health that can result from a lack of external communications. Beyond that, studies have repeatedly shown that increased communication between incarcerated people and their families, friends, and other outside resources helps reduce recidivism rates.

With respect to the specifics, a ratemaking like this one must balance two competing objectives, as the relevant statutory provisions make clear. The FCC must not only ensure that charges are just and reasonable, but the agency must also preserve the incentives to invest and serve inmates by taking into consideration the unique costs of providing IPCS.

When I first read the draft of today's FCC decision, I had concerns that the item went too far in one direction and overcorrected in ways that could ultimately work against the interests of inmates, their families, IPCS providers, state correctional facilities, and the public-safety officials who operate them.

For one, with respect to the rates the FCC sets—particularly for smaller jails—it was not clear to me that they would offset the costs that some IPCS providers bear. For another, the FCC's decision

excludes certain safety and security costs—like monitoring tools designed to protect inmates from violence—from the rates it set. These costs distinguish IPCS from traditional voice telephone service offered at homes and businesses. And it is why the FCC, in its previous decisions, has long considered these safety and security costs as part and parcel of the overall rate.

As a result, I was concerned that this item could lead to negative unintended consequences, particularly for public safety. As the item itself acknowledges, at least some IPCS providers will likely lose money for every call made under the new rules. It is in nobody's interest for these providers to exit the market, or for smaller facilities to go unserved because the economics no longer make sense. And undermining the investment-backed expectations of correctional facilities for their safety and security costs may create acute state budgetary pressures that could ultimately lead to a reduction in IPCS access or the loss of essential law-enforcement tools. These are outcomes that none of us want to see.

For these reasons, I am grateful that the Chairwoman's office worked with my team to mitigate some of the potential harms that might otherwise have flowed from today's decision. First, the item now extends the transition deadlines to help accommodate IPCS providers whose contracts will need to be renegotiated following this item. This change will help ease the disruptive impact of flash-cut changes that state governments, correctional facilities, and IPCS providers would have borne. Second, the item now includes in the *Further Notice* a section that seeks comment on a uniform fee-recovery additive. I am pleased that we are now seeking comment on this idea because it could help correctional facilities and IPCS providers recoup various costs that are otherwise excluded from this item. Finally, and with thanks to Commissioner Simington for his work to develop this idea, the *Further Notice* asks about the unique challenges and variable costs of providing IPCS at very small jails, for which our existing data may be incomplete.

While I still have some concerns about the item's rate structure, I am grateful to my colleagues for working in good faith to address my feedback. And I will be voting to approve in part and concur in part.

To that point, I want to recognize the staff of the Wireline Competition Bureau and the Office of Economics and Analytics in particular for their hard work on these important issues. And I want thank you again, Ulandis, for joining us and for sharing your story today.

**Federal Communications Commission** **FCC 24-75**

**STATEMENT OF**
**COMMISSIONER GEOFFREY STARKS**

Re:     *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act,* WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking (July 18, 2024).

For more than a decade, this Commission has endeavored to lower the cost of communication services for incarcerated persons. Rightfully so. For far too long, our efforts have been stymied by incomplete authority. Congress recognized the need to correct this oversight on a bipartisan, unanimous basis, and passed the Martha Wright-Reed Just and Reasonable Communications Act. Signed into law last year, this historic legislation empowered the Commission to continue its work in setting just and reasonable rates for incarcerated people's communication services.

Today's Order completes this task. In the rates set forth, we ensure that incarcerated persons and their loved ones will pay no more than 12 cents a minute to make a phone call, and far less in many cases. But we know connection doesn't just happen over the phone, which is why we also set interim rates for video communication services. These audio and video rates apply regardless if you are calling an incarcerated loved one in the town over or across state lines. Importantly, we end the practice of provider kickbacks to correctional facilities and payments for costs irrelevant to providing services so callers will no longer be forced to bear the financial burden of these costs.

We also take important steps to strengthen access to communication services for incarcerated persons with disabilities. The Order requires that providers make services accessible to people with disabilities and extends rate protections to all such communication services and technologies used now or in the future.

The rules we adopt today not only cap the rate for communication services for incarcerated individuals, they also establish important consumer protections for users of these services. Consumers will now be able to easily access information on the rates and charges of services, as well as information on accounts, billing, and refunds on a service providers' public website. By increasing transparency and requiring these disclosures from IPCS providers, we enable consumers to make informed decisions when seeking to communicate with their incarcerated loved ones.

It is no secret that the market for communication services for incarcerated people has long been plagued by predatory fees and practices. Today's actions put an end to these abuses. This Order goes a step further and puts another tool in our enforcement toolbox by establishing a complaint pathway for whistleblowers to report suspected violations. Doing so will enable our Enforcement Bureau to swiftly identify, investigate, and address potential violations. I want to thank the Chairwoman for incorporating my edits on this matter.

Mrs. Martha Wright-Reed led the fight to make communication services affordable for incarcerated persons as a result of her struggles to afford to communicate with her incarcerated grandson. She carried the torch for this cause until her passing in 2015. This Order honors her years of work and the struggles faced by millions of incarcerated persons to stay connected. Her spirit guided the legislation and our rules today.  Today, we must also honor the hard work of former Commissioner Mignon Clyburn who carried on this fight.

I know years of hard work has gone into this proceeding to bring today's item into fruition. For that, I want to thank the Wireline Competition Bureau and all staff involved for their good work. This item has my full support.

## STATEMENT OF
## COMMISSIONER ANNA M. GOMEZ

Re:  *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act,* WC Docket No. 23-62; *Rates for Interstate Inmate Calling Services,* WC Docket No. 12-375, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking (July 18, 2024).

As of 2021, the average cost of a 15-minute phone call from prison was $5.74—more than nine times the cost of a 15-minute phone call anywhere else in the United States. Families of incarcerated individuals pay the price… literally. One in three families enter debt to pay for phone calls and visits to incarcerated family members. This is unacceptable.

We know that keeping incarcerated people connected with their family helps them stay connected to their communities and rebuild their lives. It also helps reduce the risk of recidivism. Yet, the high cost of communications services makes it difficult to stay connected. These high costs hurt not just incarcerated persons and their families, but society as well.

I recently had the opportunity to host a listening session on the implementation of the Martha Wright-Reed Act in Phoenix, Arizona, organized by the FCC. There, I heard the story of Brione, a junior in high-school who is very close to her father, who is currently incarcerated in Louisiana. Brione's only connection to her father is through Incarcerated Persons Calling Services (IPCS), which costs her mother over $200 a month. Brione and her father try to talk as much as possible—but their communication is often disconnected unexpectedly.

Brione tearfully shared that her father called the day after a good friend passed away, but the call dropped and she could not get in touch with him for a week. This was at a time when Brione needed her father's support the most. The disruption communication has affected her dad's relationship with her siblings as well, as they think that their dad just does not want to communicate with them. But that is not the case.

And Brione's story makes me think of another—a father I met during a visit to a Colorado correctional facility. During his first two years of being incarcerated, he could not afford to call his young children. Now that they are older and that video calls are possible, he can only imagine what it would have been like to see and speak with them during their initial formative years.

These are the families that are affected by IPCS. These families know that "communication is key to connection." With a just and reasonable rate, we can help families try their best to stay connected.

Today, we take a critical step toward eliminating exorbitant phone and video call rates and ensuring just and reasonable rates for incarcerated people and their loved ones to communicate. The rates and reforms we adopt here apply to all correctional and detention facilities, including immigration detention facilities.

I am proud of the Commission's continued efforts for more than a decade to make communications services more accessible for all incarcerated people and their families. Today, we honor the incredible advocacy of one grandmother from D.C. to stay in touch with her grandson in an Arizona prison, and we implement what Congress instructed us to do in the legislation honoring her name— Martha Wright-Reed. These long-awaited reforms would not be possible without the tireless advocacy of Mrs. Wright-Reed, as well as the leadership of Senator Tammy Duckworth and former FCC Acting Chairwoman Mignon Clyburn. Thank you to the staff of the Wireline Competition Bureau and staff throughout the FCC for its hard work on this monumental item.

# Exhibit B

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 64

[WC Docket Nos. 12–375, 23–62; FCC 24–75; FR ID 237667]

### Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule; dismissal, partial grant and partial denial of petitions for reconsideration, clarification and waiver.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) addresses and resolves multiple pending petitions in the incarcerated people's communications services (IPCS) proceeding. The Commission grants the Hamilton Relay, Inc. petition for reconsideration of certain aspects of the *2022 ICS Order* released on September 30, 2022. The Commission dismisses the United Church of Christ and Public Knowledge petition for reconsideration of the *2021 ICS Order* released on May 24, 2021. The Commission dismisses the portion of the NCIC Inmate Communications petition for reconsideration of the *2021 ICS Order* that it had not previously addressed. The Commission dismisses a petition filed by Securus Technologies, LLC seeking clarification of one aspect of the *2021 ICS Order* and dismiss in part and otherwise denies the Securus petition for waiver of certain Commission rules.

**DATES:** August 26, 2024.

**ADDRESSES:** Federal Communications Commission, 45 L Street NE, Washington, DC 20554.

*People with Disabilities:* To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov,* or call the Consumer and Governmental Affairs Bureau at (202) 418–0530 (voice) or (202) 418–0432 (TTY).

**FOR FURTHER INFORMATION CONTACT:** Stephen Meil, Pricing Policy Division of the Wireline Competition Bureau, at (202) 418–7233 or via email at *stephen.meil@fcc.gov,* regarding the portions of this document relating to matters other than communications services for incarcerated people with disabilities, and Michael Scott, Disability Rights Office of the Consumer and Governmental Affairs Bureau, at

(202) 418–1264 or via email at *michael.scott@fcc.gov,* regarding the portions of this document relating to communications services for incarcerated people with disabilities.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Order on Reconsideration, Clarification and Waiver, document FCC 24–75, adopted on July 18, 2024 and released on July 22, 2024, in WC Docket Nos. 12–375 and 23–62. This summary is based on the public redacted version of the document. The full text of the document FCC 24–75 can be accessed electronically via the FCC's Electronic Document Management System (EDOCS) website at *www.fcc.gov/edocs* or via the FCC's Electronic Comment Filing System (ECFS) website at *www.fcc.gov/ecfs,* or is available at the following internet address: *https://www.fcc.gov/document/fcc-caps-exorbitant-phone-video-call-rates-incarcerated-persons-their-families.*

### Synopsis

### I. Order on Reconsideration, Clarification and Waiver

1. We address and resolve multiple pending petitions in this proceeding. We grant the Hamilton Relay, Inc. petition for reconsideration of certain aspects of the *2022 ICS Order,* published at 87 FR 75496 (Dec. 9, 2022). We dismiss the United Church of Christ and Public Knowledge petition for reconsideration of the *2021 ICS Order,* published at 86 FR 40682 (July 28, 2021). We also dismiss the remainder of the NCIC petition for reconsideration not previously addressed. The NCIC petition seeks reconsideration of various aspects of the Commission's treatment of site commissions in the *2021 ICS Order,* published at 86 FR 40682. The Commission previously addressed the portions of the petition relating to its interim caps for certain ancillary service charges in the *2022 ICS Order.* Given the actions we take addressing site commissions in this Order, we now dismiss as moot the remainder of the petition. We also dismiss a petition filed by Securus seeking clarification of one aspect of the *2021 ICS Order* and dismiss in part and otherwise deny the Securus petition for waiver of certain Commission rules.

### A. Hamilton Petition for Reconsideration

2. Hamilton Relay, Inc., seeks partial reconsideration of the requirement that Video Relay Service (VRS) and internet Protocol Captioned Telephone Service (IP CTS) providers update an incarcerated person's registration

information within 30 days of the user being released from incarceration or transferred to a different correctional authority. Hamilton asserts that TRS providers will learn that an incarcerated person has been released or transferred only when notified by the correctional authority or the incarcerated person. Hamilton therefore asks us to modify § 64.611(k)(1)(iii) of our rules to require that VRS and IP CTS providers update an incarcerated person's registration information within 30 days ''of receiving written notification from such person or the correctional authority of'' an incarcerated person's release or transfer, rather than within 30 days ''after'' such release or transfer.'' No party opposes this change.

3. As some commenters anticipate, this concern may be less pressing as a result of our determination above to allow enterprise registration for IP CTS in carceral settings. Nevertheless, to the extent that individual registration continues to be used, we agree that TRS providers are not expected to independently track the location status of incarcerated users who have individually registered for IP CTS or VRS. The allowed thirty-day period for updating registration information should begin upon the provider's receipt of written notification of the incarcerated person's release or transfer. Accordingly, we amend § 64.611(k)(1)(iii) to clarify the rule. We modify Hamilton's proposed language to reflect that written notification may be received from the incarcerated person, the correctional authority, or the IPCS provider.

4. We also modify this provision to clarify the updated information that TRS providers must transmit to the TRS User Registration Database when an individual who registers for VRS or IP CTS while incarcerated is released. In addition to the individual's residential address and Registered Location (if required), the update shall include any other required registration information not previously provided.

5. We therefore grant Hamilton's Petition for Reconsideration with the modifications described herein.

### B. Securus Petition for Clarification

6. We dismiss as moot Securus's Petition for Clarification, which ''addresses only contractually prescribed site commission payments.'' With respect to such payments, Securus seeks clarification as to whether providers may use ''revenues from ICS rates to pay site commission costs above the $0.02 rate cap,'' provided that the total charged to consumers does not exceed the applicable rate cap.

Securus's concern stems from the Commission's statement in the *2021 ICS Order* in which it confirmed that the $0.02 per minute allowance for contractually prescribed site commissions "does not prevent or prohibit the payment of additional site commission amounts to correctional facilities should the calling services providers and the facility enter into a contract resulting in the provider making per-minute payments to the facility higher than $0.02." Securus contends that the Commission's language "creates ambiguity over whether providers may pay additional site commissions from end user revenues collected under the provider-related rate component." In Securus's view, "[f]ailure to clarify the limits of site commission cost recovery from ICS rates . . . could result in some providers being competitively disadvantaged in the bidding process by which ICS service providers are selected to serve carceral facilities."

7. Our actions in the *2024 IPCS Report and Order,* which end the practice of paying site commissions, effectively moot Securus's request for clarification. Because the rules we adopt in connection with site commissions apply prospectively, there are no retroactive implications from these actions that we need to consider. Our reforms eliminate site commission payments associated with IPCS. Because IPCS providers will no longer be able to pay site commissions associated with their IPCS offerings, we need not clarify whether providers may use IPCS revenues to pay such site commissions.

*C. Securus Waiver Petition*

8. We dismiss in part and otherwise deny the Securus Waiver Petition. In its Waiver Petition, Securus seeks a waiver of §§ 64.6030, 64.6080, and 64.6090 of the Commission's rules so that "Securus and other providers" can offer "alternative rate options that promote increased calling while reducing costs." Because we adopt rules, in the *2024 IPCS Report and Order,* specifically allowing alternate pricing plans, including flat-rate pricing, Securus's requests for a waiver of § 64.6030, which specifies the use of mandatory rate caps on a per-minute basis, and § 64.6090, which prohibits flat-rate calling, are moot and are therefore dismissed.

9. We deny Securus's request for a waiver of § 64.6080, which prohibits per-call and per-connection charges, to the extent that request would permit a provider to impose such one-time charges in addition to any base rates for alternate pricing plans. We retain today

a key consumer protection rule at § 64.6080, and Securus does not explain why a waiver of this section of the rules is necessary in light of the alternate pricing plan rules we adopt in the Order.

**II. Procedural Matters**

10. *Final Regulatory Flexibility Analysis.* As required by the Regulatory Flexibility Act of 1980, as amended (RFA), the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) relating to this Report and Order and this Order on Reconsideration, Clarification, and Waiver. The FRFA is set forth in below.

11. *Congressional Review Act.* The Commission will not send a copy of this Order on Reconsideration, Clarification, and Waiver to Congress and the Government Accountability Office pursuant to the Congressional Review Act (CRA), see 5 U.S.C. 801(a)(1)(A), because it does not adopt any rule as defined in the CRA, 5 U.S.C. 804(3).

12. *Paperwork Reduction Act Analysis.* The Order on Reconsideration, Clarification, and Waiver does not contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104–13. Therefore, it does not contain any new or modified information collection burdens for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4).

13. *People with Disabilities.* To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the Consumer and Governmental Affairs Bureau at 202–418–0530.

**III. Final Regulatory Flexibility Act Analysis**

14. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), Initial Regulatory Flexibility Analyses (IRFAs) were incorporated in the *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services,* Notice of Proposed Rulemaking (NPRM) in WC Docket Nos. 23–62 and 12–375 (released in March 2023), in the Sixth Further Notice of Proposed Rulemaking in WC Docket No. 12–375 (released in September 2022), and in the Fifth Further Notice of Proposed Rulemaking in WC Docket No. 12–375 (released in May 2021). The Federal Communications Commission (Commission) sought written public

comment on the proposals in those documents, including comment on the IRFAs. No comments were filed addressing the IRFA. This present Final Regulatory Flexibility Analysis (FRFA), relating to the Report and Order and the Order on Reconsideration, Clarification and Waiver (collectively, Report and Order), conforms to the RFA.

*A. Need for, and Objectives of, the Report and Order*

15. The Report and Order implements the expanded authority granted to the Commission by the Martha Wright-Reed Act to establish a compensation plan that ensures both just and reasonable rates and charges for incarcerated people's audio and video communications services and fair compensation for incarcerated people's communication services (IPCS) providers. The Report and Order fundamentally reforms the regulation of IPCS in all correctional facilities, regardless of the technology used to deliver these services, and significantly lowers the IPCS rates that incarcerated people and their loved ones will pay.

16. The reforms adopted by the Report and Order: (1) utilize the expanded authority granted the Commission, in conjunction with the Commission's preexisting statutory authority, to adopt just and reasonable IPCS rates and charges for all intrastate, interstate, and international audio and video IPCS, including video visitation services, that ensure fair compensation for providers; (2) lower existing per-minute rate caps for audio IPCS, based on industry-wide cost data submitted by IPCS providers, while permitting states to maintain IPCS rates lower than the Commission's rate caps; (3) lower the overall prices consumers pay for IPCS and simplify the pricing structure by incorporating the costs of ancillary services in the rate caps and prohibiting providers from imposing any separate ancillary service charges on IPCS consumers; (4) prohibit IPCS providers from making site commission payments for IPCS and preempt state and local laws and regulations requiring such commissions; (5) limit the costs associated with safety and security measures that can be recovered in the per-minute rates to only those costs that the Commission finds used and useful in the provision of IPCS; (6) allow, subject to conditions, IPCS providers to offer alternate pricing plans for IPCS that comply with the rate caps we establish; (7) revise and strengthen accessibility requirements for IPCS for incarcerated people with disabilities; (8) revise and strengthen existing consumer disclosure and inactive account requirements; and (9)

revise the existing annual reporting and certification requirements. The Report and Order also addresses petitions for reconsideration, clarification and waiver pending in this proceeding.

*B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA*

17. There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

*C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration*

18. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

*D. Description and Estimate of the Number of Small Entities to Which Rules Will Apply*

19. The RFA directs agencies to provide a description of, and, where feasible, an estimate of, the number of small entities that may be affected by the rules they adopt. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).

20. *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein. First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees. These types of small businesses represent

99.9% of all businesses in the United States, which translates to 33.2 million businesses.

21. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field." The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations. Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.

22. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." U.S. Census Bureau data from the 2022 Census of Governments indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States. Of this number, there were 36,845 general purpose governments (county, municipal, and town or township) with populations of less than 50,000 and 11,879 special purpose governments (independent school districts) with enrollment populations of less than 50,000. Accordingly, based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 entities fall into the category of "small governmental jurisdictions."

23. *Wired Telecommunications Carriers.* The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband internet services. By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry. Wired Telecommunications Carriers are

also referred to as wireline carriers or fixed local service providers.

24. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

25. *Local Exchange Carriers (LECs).* Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include both incumbent and competitive local exchange service providers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were fixed local exchange service providers. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

26. *Incumbent Local Exchange Carriers (Incumbent LECs).* Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies

firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 1,212 providers that reported they were incumbent local exchange service providers. Of these providers, the Commission estimates that 916 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

27. *Competitive Local Exchange Carriers (CLECs).* Neither the Commission nor the SBA have developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers. Wired Telecommunications Carriers is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 3,378 providers that reported they were competitive local service providers. Of these providers, the Commission estimates that 3,230 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

28. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA have developed a small business size standard specifically for Interexchange Carriers. Wired Telecommunications Carriers is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal

Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of interexchange services. Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

29. *Local Resellers.* Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers. Telecommunications Resellers is the closest industry with a SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year. Of that number, 1,375 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 207 providers that reported they were engaged in the provision of local resale services. Of these providers, the Commission estimates that 202 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

30. *Toll Resellers.* Neither the Commission nor the SBA have developed a small business size standard specifically for Toll Resellers. Telecommunications Resellers is the closest industry with a SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell

telecommunications; they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year. Of that number, 1,375 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 457 providers that reported they were engaged in the provision of toll services. Of these providers, the Commission estimates that 438 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

31. *Other Toll Carriers.* Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers. This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers. Wired Telecommunications Carriers is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 90 providers that reported they were engaged in the provision of other toll services. Of these providers, the Commission estimates that 87 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

32. *Payphone Service Providers (PSPs).* Neither the Commission nor the SBA have developed a small business size standard specifically for payphone service providers, a group that includes incarcerated people's services providers. Telecommunications Resellers is the closest industry with a SBA small business size standard. The Telecommunications Resellers industry

comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year. Of that number, 1,375 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 36 providers that reported they were engaged in the provision of payphone services. Of these providers, the Commission estimates that 32 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

33. *Telecommunications Relay Service (TRS) Providers.* Telecommunications relay services enable individuals who are deaf, hard of hearing, deafblind, or who have a speech disability to communicate by telephone in a manner that is functionally equivalent to using voice communication services. Internet-based TRS connects an individual with a hearing or a speech disability to a TRS communications assistant using an internet Protocol-enabled device via the internet, rather than the public switched telephone network. Video Relay Service (VRS) one form of internet-based TRS, enables people with hearing or speech disabilities who use sign language to communicate with voice telephone users over a broadband connection using a video communication device. Internet Protocol Captioned Telephone Service (IP CTS) another form of internet-based TRS, permits a person with hearing loss to have a telephone conversation while reading captions of what the other party is saying on an internet-connected device. A third form of internet-based TRS, internet Protocol Relay Service (IP Relay), permits an individual with a hearing or a speech disability to communicate in text using an internet Protocol-enabled device via the internet, rather than using a text telephone (TTY) and the public switched telephone network. Providers must be certified by the Commission to provide VRS and IP CTS and to receive compensation from the TRS Fund for TRS provided in accordance with applicable rules. Analog forms of TRS, text telephone (TTY), Speech-to-Speech Relay Service, and Captioned Telephone Service, are provided through state TRS programs, which also must be certified by the Commission.

34. Neither the Commission nor the SBA have developed a small business size standard specifically for TRS Providers. All Other Telecommunications is the closest industry with a SBA small business size standard. Internet Service Providers (ISPs) and Voice over internet Protocol (VoIP) services, via client-supplied telecommunications connections are included in this industry. The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small. U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year. Of those firms, 1,039 had revenue of less than $25 million. Based on Commission data there are 14 certified internet-based TRS providers and two analog forms of TRS providers. The Commission however does not compile financial information for these providers. Nevertheless, based on available information, the Commission estimates that most providers in this industry are small entities.

35. *All Other Telecommunications.* This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Providers of internet services (*e.g.,* dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry. The SBA small business size standard for this industry classifies firms with annual receipts of $40 million or less as small. U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year. Of those firms, 1,039 had revenue of less than $25 million. Based on this data, the Commission estimates that the majority of ''All Other Telecommunications'' firms can be considered small.

*E. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities*

36. IPCS providers, including any that may be small entities, will need to change their operations, recordkeeping, and reporting to comply with the requirements of the Report and Order. These requirements include compliance with the rate caps the Report and Order establishes for IPCS. While the new rate cap structure is lower than the preexisting per-minute rate caps, given that the rate caps are based on cost data provided by IPCS providers, including smaller providers, small entities are likely to be able to recover their costs in the same manner as larger providers. Additionally, because the rate caps apply to both interstate and intrastate IPCS, the new rate cap structure reduces the recordkeeping and reporting burdens of complying with the Commission's rules with regards to audio IPCS because providers will no longer need to determine the jurisdictional nature of each call. The Report and Order's requirements also include a prohibition on the assessment of ancillary service charges associated with IPCS, which will greatly reduce the recordkeeping burdens on providers and simplify their billing operations.

37. The Report and Order prohibits IPCS providers from paying site commissions of any kind associated with IPCS and eliminates the requirement under the Commission's rules for providers to label, and disclose the source of, those payments on consumers' bills. The Report and Order requires that, where facilities claim to incur costs related to IPCS, providers are to determine whether those costs are in fact used and useful in the provision of IPCS and are, therefore, reimbursable under the Commission's rules. These changes will reduce the burdens of the Commission's billing rules, while requiring that IPCS providers make determinations regarding whether cost claims submitted to them by facilities are consistent with Commission requirements.

38. The Report and Order allows providers the option to offer alternate pricing plans in addition to providing IPCS at per-minute rates. IPCS providers may elect whether to offer such plans, and should they elect to do so, they may determine the format of such plans, provided that these plans comply with the Commission's generally applicable IPCS rules, certain specified limitations, and other safeguards adopted in the Report and Order. The Report and Order

establishes additional requirements for alternative pricing plans regarding dropped communications, automatic renewals, and consumer cancellation.

39. The Report and Order adopts consumer disclosure requirements applicable to all IPCS, including requirements that providers disclose their IPCS rates, charges, and associated practices on their publicly available websites in a manner that is easily accessible and available to all members of the public. Providers must also make these disclosures available via their online and mobile applications, if consumers use such applications to enroll, and on paper, upon a consumer's request. The Report and Order further requires providers to make available billing statements and statements of account to account holders on a monthly basis, and details regarding the timing, manner, and content requirements for these and other disclosure documents for alternate pricing plans. The Report and Order also ensures that the consumer disclosure rules, as amended, apply to all IPCS providers subject to the Commission's expanded jurisdiction under the Martha Wright-Reed Act.

40. The Report and Order extends the Commission's rules regarding inactive accounts to apply to all accounts that can be used to pay an IPCS-related rate or charge, to the extent they are controlled by IPCS providers or their affiliates. The Report and Order reaffirms that providers are barred from improperly disposing of unused funds in inactive accounts (which includes disposing of such funds before 180 calendar days of continuous account inactivity has passed), and are required to undertake reasonable efforts to refund unused funds. The Report and Order expands upon these rules, including by requiring providers to (1) contact the relevant account holder if and when they become aware that an incarcerated person has been released or transferred or upon the expiration of the 180-day inactivity period, (2) issue refunds within 30 calendar days of a request from an account holder, or of an account being deemed inactive (even in the absence of such a request), and (3) notify account holders of the status of IPCS accounts prior to their being deemed inactive. However, the Report and Order limits the requirement for automatic refunds (*i.e.,* in the absence of a consumer's specific request) to account balances of greater than $1.50. The Report and Order also clarifies what "reasonable efforts" entail, the procedures to follow if "reasonable efforts" to refund inactive accounts fail, and which refund mechanisms

providers may use. Additionally, the Report and Order reaffirms and clarifies the exception to these rules that allows a provider to dispose of funds in inactive accounts in compliance with a controlling judicial or administrative mandate.

41. The Report and Order modifies the scope and content of the annual reporting requirements, to reflect the Commission's expanded jurisdiction under the Martha Wright-Reed Act, to include the full scope of IPCS and all providers of IPCS, and to reflect the changes to the Commission's rules adopted in the Report and Order. The Report and Order also amends the Commission's part 14 rules as appropriate to reflect the Martha Wright-Reed Act's expansion of the Communications Act's definition of "advanced communication service." It also modifies the Commission's rules to allow a form of enterprise registration for the use of Internet Protocol Captioned Telephone Service (IP CTS) in carceral facilities and clarifies that internet-based IPCS providers may provide access to traditional (TTY-based) TRS via real-time text. The Report and Order on Reconsideration also amends the Commission's rules to require that VRS and IP CTS providers update an incarcerated person's registration information within 30 days of receiving written notification from such person, the correctional authority, or IPCS provider of an incarcerated person's release or transfer.

*F. Steps Taken To Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered*

42. The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."

43. In the Report and Order, the Commission adopts a new, more comprehensive set of rate caps that differentiate between prisons and jails, and between four different sizes of jails—large, medium, small and very small—based on average daily population (ADP). The use of four different size tiers is supported in the record and accounts for differences in costs incurred by providers serving these different facility sizes. The Commission conducts a cost analysis

specific to each size tier using data submitted by IPCS providers and adopts new rate caps for each of these facility size and type categories for both audio and video IPCS. The Commission believes that these actions properly recognize that some jails may be more costly for providers to serve than prisons, and similarly that jails with smaller ADPs may be more costly to serve than those with larger ADPs.

44. Compliance with the Commission's new audio and video rate caps and its rules eliminating site commission payments will be required by January 1, 2025 for prisons and for jails with ADPs of 1,000 or above incarcerated persons where no site commissions mandated by law are currently paid; by April 1, 2025 for jails with ADPs less than 1,000 where no site commissions mandated by law are currently paid; and by July 1, 2025 for all size facilities where site commissions mandated by law are currently paid. The Commission extended the compliance deadline for providers serving smaller jails to account for the additional time that these facilities, and the providers that serve them, may need to adapt to the changes adopted in the Report and Order.

45. The Commission recognizes that it cannot foreclose the possibility that in certain limited instances, certain providers, possibly smaller providers with less ability to spread their costs over a larger number of facilities or minutes of use, may not be able to recover their costs of providing IPCS under the rate caps adopted in the Report and Order. To minimize the burden on such providers, the Commission retains, with modifications, its waiver process, which allows providers to seek relief from its rules at the facility or contract level if they can demonstrate that they are unable to recover their used and useful IPCS-related costs at that facility or for that contract. The Commission modifies this process to reflect the provisions of the Martha Wright-Reed Act, including its new authority thereunder. The waiver process will allow the Commission to review individual providers' data and potentially allow these providers to charge rates that enable them to recover their costs of providing IPCS at that facility or under that contract. This waiver process should benefit any IPCS providers that may be small businesses unable to recover their costs under the new rate caps.

46. In the Report and Order, the Commission prohibits providers from assessing ancillary service charges in

addition to per-minute rates for IPCS. The Commission incorporates the costs of providing ancillary services in its rate caps to allow providers the opportunity to recover their average costs of providing these ancillary services, while eliminating the burden of administering independent billing processes for each of these services. At the same time, eliminating all separately assessed ancillary service charges prevents providers from engaging in rent-seeking activity in their application of these charges, helping to ensure that IPCS rates and charges are just and reasonable.

47. The Commission revises its rules to make clear that IPCS providers may meet the requirement to provide access to traditional TRS via real-time text, as an alternative to TTY transmissions, if real-time text transmission is supported by the available devices and reliable service can be provided by this method. Permitting this alternative affords providers further flexibility in conducting their operations, and accommodates the needs of smaller providers that may have insufficient resources to expand or otherwise adjust their service format and infrastructure to enable TTY transmission.

48. The Commission revises its rules to permit providers to implement alternate pricing plans, other than per-minute pricing, subject to rules and conditions to protect IPCS consumers. Any provider that adopts these plans must offer them as a voluntary alternative to per-minute pricing. Providers are not required to offer such plans, but should they elect to do so, they will have the flexibility to determine the format of the plans they offer. Permitting this additional means of providing IPCS affords providers, including smaller providers, further flexibility in conducting their operations.

49. The Commission's rate caps incorporate the costs of only a subset of the safety and security measures reported by providers. The rate caps incorporate the costs of the two categories that the Commission finds to be both used and useful in the provision of IPCS: Communications Assistance for Law Enforcement Act (CALEA) compliance measures and communications security services. Because cost recovery through the rate caps is only accommodated for a more limited set of such measures, providers, particularly smaller providers, may not

need to be capable of offering more sophisticated safety and security services in order to successfully compete for IPCS contracts.

*G. Report to Congress*

50. The Commission will send a copy of the Report and Order, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act. In addition, the Commission will send a copy of the Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the Report and Order and FRFA (or summaries thereof) will also be published in the **Federal Register**.

## IV. Ordering Clauses

51. Accordingly, *it is ordered* that, pursuant to the authority contained in §§ 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat 6156 (2022), this Order on Reconsideration, Clarification and Waiver *is adopted*.

52. *It is further ordered* that, pursuant to the authority contained in §§ 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat 6156 (2022), the Petition for Reconsideration, filed August 27, 2021 and amended December 14, 2022, by the United Church of Christ, OC Inc. and Public Knowledge *is dismissed* as described herein.

53. *It is further ordered* that, pursuant to the authority contained in §§ 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat 6156 (2022), the Petition for Reconsideration, filed August 21, 2021, by NCIC Inmate Communications *is dismissed* as described herein.

54. *It is further ordered* that, pursuant to the authority contained in §§ 1, 2,

4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat 6156 (2022), the Petition for Partial Reconsideration, filed January 9, 2023, by Hamilton Relay, Inc. *is granted* as described herein.

55. *It is further ordered* that, pursuant to the authority contained in §§ 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat 6156 (2022), the Petition for Clarification, filed September 17, 2021, by Securus Technologies, LLC *is dismissed* as described herein.

56. *It is further ordered* that, pursuant to the authority contained in §§ 1, 2, 4(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 716, of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 201(b), 218, 220, 225, 255, 276, 403, and 617, and the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Public Law 117–338, 136 Stat 6156 (2022), the Petition for Waiver, filed August 30, 2021, by Securus Technologies, LLC *is dismissed in part and otherwise denied* as described herein.

57. *It is further ordered* that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, *shall send* a copy of this Order on Reconsideration, Clarification, and Waiver, including the Final Regulatory Flexibility Analyses, to the Chief Counsel for Advocacy of the Small Business Administration.

58. *It is further ordered* that the Office of the Managing Director, Performance Evaluation and Records Management, *shall send* a copy of this Order on Reconsideration, Clarification, and Waiver in a report to be sent to Congress and the Government Accountability Officer pursuant to the Congressional Review Act, 5 U.S.C. 801(a)(1)(A).

Federal Communications Commission.

**Marlene Dortch,**

*Secretary.*

[FR Doc. 2024–18605 Filed 8–23–24; 8:45 am]

**BILLING CODE 6712–01–P**

# United States Court of Appeals
## For the First Circuit

---

No. 24-1814
Agency No. 24-75; WC 23-62, WC 12-375

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION,

Respondent.

---

**CASE OPENING NOTICE**

Issued: September 5, 2024

A petition for review was received and docketed today by the clerk of the court of appeals in compliance with Fed. R. App. P. 15. A copy of the petition is being transmitted to counsel for the respondent with this notice.

The administrative record, or certified list of all documents, must be filed by **October 16, 2024**. Fed. R. App. P. 17.

A notice advising you of the due date for filing your brief, and, if necessary, an appendix, will be sent upon the filing of the administrative record, or certified list, in this court.

An appearance form should be completed and returned immediately by any attorney who wishes to file pleadings in this court. 1st Cir. R. 12.0(a) and 46.0(a)(2). Petitioner must file an appearance form by **September 20, 2024** in order for it to be deemed timely filed. Any attorney who has not been admitted to practice before the First Circuit Court of Appeals must submit an application and fee for admission using the court's Case Management/Electronic Case Files ("CM/ECF") system prior to filing an appearance form. 1st Cir. R. 46.0(a). *Pro se* parties are not required to file an appearance form.

Dockets, opinions, rules, forms, attorney admission applications, the court calendar and general notices can be obtained from the court's website at www.ca1.uscourts.gov. Your attention is called specifically to the notice(s) listed below:

- Notice to Counsel and Pro Se Litigants

If you wish to inquire about your case by telephone, please contact the case manager at the direct extension listed below.

Maria R. Hamilton, Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210
Case Manager:  Jennifer - (617) 748-9885

# United States Court of Appeals
## For the First Circuit

———————————

### NOTICE OF ELECTRONIC AVAILABILITY OF CASE INFORMATION

The First Circuit has implemented the Federal Judiciary's Case Management/Electronic Case Files System ("CM/ECF") which permits documents to be filed electronically. In addition, most documents filed in paper are scanned and attached to the docket. In social security and immigration cases, members of the general public have remote electronic access through PACER only to opinions, orders, judgments or other dispositions of the court. Otherwise, public filings on the court's docket are remotely available to the general public through PACER. Accordingly, parties should not include in their public filings (including attachments or appendices) information that is too private or sensitive to be posted on the internet.

Specifically, Fed. R. App. P. 25(a)(5), Fed. R. Bank. P. 9037, Fed. R. Civ. P. 5.2 and Fed. R. Cr. P. 49.1 require that parties not include, or partially redact where inclusion is necessary, the following personal data identifiers from documents filed with the court <u>unless an exemption applies</u>:

- **Social Security or Taxpayer Identification Numbers.** If an individual's social security or taxpayer identification number must be included, only the last four digits of that number should be used.
- **Names of Minor Children.** If the involvement of a minor child must be mentioned, only the initials of that child should be used.
- **Dates of Birth.** If an individual's date of birth must be included, only the year should be used.
- **Financial Account Numbers.** If financial account numbers are relevant, only the last four digits of these numbers should be used.
- **Home Addresses in Criminal Cases.** If a home address must be included, only the city and state should be listed.

<u>See also</u> 1st Cir. R. 25.0(m).

If the caption of the case contains any of the personal data identifiers listed above, the parties should file a motion to amend caption to redact the identifier.

Parties should exercise caution in including other sensitive personal data in their filings, such as personal identifying numbers, medical records, employment history, individual financial information, proprietary or trade secret information, information regarding an individual's cooperation with the government, information regarding the victim of any criminal activity, national security information, and sensitive security information as described in 49 U.S.C. § 114.

Attorneys are urged to share this notice with their clients so that an informed decision can be made about inclusion of sensitive information. The clerk will not review filings for redaction.

Filers are advised that it is the experience of this court that failure to comply with redaction requirements is most apt to occur in attachments, addenda, or appendices, and, thus, special attention should be given to them. For further information, including a list of exemptions from the redaction requirement, see http://www.privacy.uscourts.gov/.

# United States Court of Appeals
## For the First Circuit

---

### NOTICE TO COUNSEL REGARDING
### MANDATORY REGISTRATION AND TRAINING
### FOR ELECTRONIC FILING (CM/ECF)

On August 21, 2017, the U.S. Court of Appeals for the First Circuit upgraded its CM/ECF system to NextGen CM/ECF, the latest iteration of the electronic case filing system. Use of the electronic filing system is mandatory for attorneys. If you intend to file documents and/or receive notice of docket activity in this case, please ensure you have completed the following steps:

- **Obtain a NextGen account.** Attorneys who had an e-filing account in this court prior to August 21, 2017 are required to update their legacy account in order to file documents in the NextGen system. Attorneys who have never had an e-filing account in this court must register for an account at www.pacer.gov. For information on updating your legacy account or registering for a new account, go to the court's website at www.ca1.uscourts.gov and select *E-Filing (Information)*.

- **Apply for admission to the bar of this court.** Attorneys who wish to e-file must be a member of the bar of this court. For information on attorney admissions, go to the court's website at www.ca1.uscourts.gov and select *Attorney Admissions* under the *Attorney & Litigants* tab. Bar admission is not required for attorneys who wish to receive notice of docket activity, but do not intend to e-file.

- **Review Local Rule 25.** For information on Loc. R. 25.0, which sets forth the rules governing electronic filing, go to the court's website at www.ca1.uscourts.gov and select *First Circuit Rulebook* under the *Rules & Procedures* tab.

# United States Court of Appeals
## For the First Circuit

_____

### ORDER OF COURT

Entered: February 9, 2021

    In response to recent disclosures of wide-spread breaches of both private sector and government computer systems, the Court has adopted new security procedures to protect any highly sensitive document (HSD) filed with the Court that, if improperly disclosed, could cause harm to the United States, the Federal Judiciary, litigants, or others.

    HSDs are documents containing information that is likely to be of interest to the intelligence service of a foreign government and the use or disclosure of such information by a hostile foreign government would likely cause significant harm to the United States or its interests. Examples of HSDs include unclassified sealed documents involving national security, foreign sovereign interests, criminal activity related to cybersecurity or terrorism, investigation of public officials, and extremely sensitive commercial information likely to be of interest to foreign powers.

    The following types of sealed documents, if they do not fall into one of the categories above, typically will <u>not</u> qualify as HSDs: (1) presentence reports and related documents; (2) pleadings related to cooperation in criminal cases; (3) Social Security records; (4) administrative immigration records; and (5) most sealed documents in civil cases.

    The designation of a document as highly sensitive is typically made by the district court or originating agency. Documents that have previously been designated by the district court or an agency as highly sensitive will ordinarily be treated in the same manner by this court. <u>See</u> 1st Cir. R. 11.0(c)(1).

    If a document qualifies as an HSD as that term is described above, a filer is required to file a motion to treat that document as an HSD. The movant must serve the motion and the proposed HSD on all other parties by mail with proof of service under Fed. R. App. P. 25(d)(1). The motion and each proposed HSD should be conspicuously marked as a "HIGHLY SENSITIVE DOCUMENT" and placed inside an envelope marked "HIGHLY SENSITIVE." The motion to treat a document as an HSD should be filed contemporaneously with the filing of a motion to seal the document and should be filed in paper format only under the procedures and requirements of 1st Cir. R. 11.0(c). The motion must set forth in detail why the proposed document constitutes a highly sensitive document under the criteria set out in this order, including the specific grounds for asserting that the document contains information that is likely to be of interest to the intelligence service of a foreign government and the use or disclosure of such information by a hostile foreign government would likely cause significant harm to the United States or its interests. Conclusory assertions will not be deemed a sufficient basis for filing a motion to treat a sealed document as an HSD. If a filer believes that a previously filed document in an ongoing case before

the court qualifies as an HSD, a motion to treat the sealed document as an HSD may be filed. There is no need to file such a motion in a closed case.

/s/ Jeffrey R. Howard
Jeffrey R. Howard
Chief Judge

cc:
Jessica Ring Amunson
P. Michele Ellison
Merrick B. Garland

# United States Court of Appeals
## For the First Circuit

_____

**NOTICE TO ALL CM/ECF USERS REGARDING
"NATIVE" PDF REQUIREMENT**

All documents filed electronically with the court must be submitted as "native" Portable Document ("PDF") files. <u>See</u> 1st Cir R. 25.0. A **native PDF file** is created by electronically converting a word processing document to PDF using Adobe Acrobat or similar software. A **scanned PDF file** is created by putting a paper document through an optical scanner. Use a scanner ONLY if you do not have access to an electronic version of the document that would enable you to prepare a native PDF file. If you fail to file a document in the correct format, you will be asked to resubmit it.