# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

| | |
|---|---|
| IN RE: MCP 191 | Nos. 24-8028 and 24-1860 |

## RESPONDENT FEDERAL COMMUNICATIONS COMMISSION'S OPPOSITION TO MOTION OF SECURUS TECHNOLOGIES TO TRANSFER TO THE FIFTH CIRCUIT

For more than two decades, "egregiously high" rates for communications services provided in prisons and jails have "imped[ed] incarcerated people's ability to stay connected with their families and friends" despite the well-documented benefits to society of fostering such connections. *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, FCC No. 24-75 ¶ 1 (rel. July 22, 2024) (*Order*); *see id.* ¶¶ 26–30. The *Order* on review is the culmination of the Federal Communications Commission's longstanding efforts to address this persistent problem.

In the *Order* on review, the Commission adopted a comprehensive set of rules to govern all forms of "incarcerated people's communications services" (IPCS), whether audio or video, intrastate, interstate, or international. The *Order* has been challenged by a variety of parties: a

leading IPCS provider, fourteen states, and public interest organizations from across the country.

The first four petitions for review of the *Order* were consolidated and transferred to this Circuit by the U.S. Judicial Panel on Multidistrict Litigation after it conducted the judicial lottery provided by 28 U.S.C. § 2112(a)(3). In the time since, two other petitions have been transferred from the U.S. Courts of Appeals for the Third and Ninth Circuits to this Court, pursuant to 28 U.S.C. § 2112(a)(5). Four additional petitions—in the Second, Fourth, Fifth, and Eighth Circuits—are awaiting transfer.

Petitioner Securus Technologies, LLC now asks this Court to transfer all the consolidated cases, "in the interest of justice," to the Fifth Circuit. Mot. 1, 9. Securus bases this request on a quirk of timing with the *Order*'s publication in the Federal Register. Consistent with past practice in this proceeding, the FCC prepared separate Federal Register summaries of the main portion of the *Order*, in which the Commission adopted its revised rules, and a separate, much shorter portion of the *Order* in which it resolved petitions that Securus had filed for clarification and waiver of the old rules. The Office of the Federal Register processed those summaries separately, and the shorter summary—just paragraphs long—was approved and published several

weeks before the other. Securus now claims to have been the only "party aggrieved" by the first-published portion of the *Order*, Mot. 4 (quoting 28 U.S.C. § 2344), and contends that, as a result, this Court should transfer its case and the other consolidated cases to the Fifth Circuit, *see id.* at 8–9.

As we explain, contrary to what Securus claims, it was not substantially aggrieved by the FCC's dismissal of its clarification and waiver petitions. The interest of justice thus does not require transfer to Securus' preferred forum.

## BACKGROUND

### A.    Statutory And Regulatory Background

Historically, the Communications Act directed the FCC to ensure that providers of "inmate telephone service in correctional institutions, and any ancillary services," 47 U.S.C. § 276(d) (1996), would (with specified exceptions) be "fairly compensated for each and every completed intrastate and interstate call using their payphone," *id.* § 276(b)(1)(A). The Act has also long authorized the Commission to ensure, more generally, that "[a]ll charges" for interstate communications services are "just and reasonable." 47 U.S.C. § 201(b).

In January 2023, Congress enacted the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act), Pub. L. 117-338, 136 Stat. 6156 (2023) (codified at 47 U.S.C. §§ 152–53, 276), which expanded and clarified the scope of the Commission's authority over what has become known as "IPCS." *Order* ¶ 5. Among other things, the Martha Wright-Reed Act authorized the Commission to regulate "any audio or video communications service used by inmates . . . regardless of technology used." *Id.* (alteration in original; quotation marks omitted). The Act also directed the Commission to ensure that rates for IPCS "be just and reasonable," and eliminated the requirement that "fair[] compensat[ion]" for IPCS providers be determined for "each and every" call. *Id* (citing Martha Wright-Reed Act § 2(a)(1)).

## B.    Factual Background

"[T]he IPCS market is a prime example of market failure." *Order* ¶ 23 (quotation marks and alteration omitted). Because correctional facilities typically contract with a single IPCS provider to serve an entire facility, each IPCS provider has a monopoly within a given facility. *See id.* ¶ 24. IPCS providers do not compete for end users—the incarcerated people, and their families and friends, who pay for calls—and market

forces fail to constrain IPCS rates. *See id.* On the contrary, historically many correctional facilities have granted the monopoly franchise based partly on what monetary or in-kind payments providers agree to make them—payments known as "site commissions." *See id.* ¶ 25. Providers thus have often competed, when bidding for new contracts, to offer the highest commission payments, leading to correspondingly *higher* charges for end users. *See id.*

Martha Wright-Reed—a grandmother who paid "hundreds of dollars a month" to keep "in touch with her incarcerated grandson"—first petitioned the FCC to address excessive rates for phone calls from carceral facilities in 2003. *Order* ¶ 1; *see id.* ¶ 9 & n.22. A decade later, the Commission adopted "interim interstate rate caps" intended to curb the problem of excessive rates while the agency developed a more comprehensive regulatory framework. *Id.* ¶ 9; *see Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) (*2013 Order*).

In 2015, the FCC adopted a new regulatory framework for audio IPCS. *See Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (*2015 Order*). The 2015 rules included revised rate caps for interstate and intrastate calls, as well as a prohibition on "flat-rate" calling. *Order* ¶ 10. IPCS providers and state attorneys general again petitioned for review

- 5 -

of the rate caps and certain other provisions of the *2015 Order*. *See Global Tel\*Link v. FCC*, Nos. 15-1461 et al. (D.C. Cir.).

A divided panel of the D.C. Circuit vacated the challenged rate caps. *See generally Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) (*Global Tel*). The court held, among other things, that the Commission lacked authority to cap intrastate rates, and that the agency had erred by categorically excluding site commissions from providers' costs used to set the revised rate caps. *Id.* at 408–14. The court did not address or disturb the *2015 Order*'s prohibition on flat-rate calling. *See generally id.*

Following the D.C. Circuit's decision, the Commission took further steps to combat excessive rates for audio IPCS within the strictures of *Global Tel. See Order* ¶¶ 16–17, 19; *see Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519 (2021) (*2021 Order*). In May 2021, the Commission "lowered the interstate interim rate caps"—which had remained in place from the *2013 Order*—"to $0.12 per minute for prisons and $0.14 per minute for [large] jails." *Id.* ¶ 17. In the same order, the Commission provided that site commission payments not "mandated by federal, state, or local law" would be "capped," for prisons and large jails, at "no more than $0.02 per minute" above the otherwise applicable rate caps. *Id.*

Shortly after release of the *2021 Order*, Securus submitted two petitions to the FCC concerning the application of the IPCS rules as revised or maintained in that order. First, Securus petitioned the FCC for a waiver of the revised audio rate caps and of the corresponding prohibition on flat-rate calling. *See generally* Waiver Pet. (cited at Mot. n.2). Second, Securus petitioned for clarification "regarding the limitations on the ability of providers . . . to recover site commission costs from . . . rates as established in the [*2021 Order*]." *See* Clarification Pet. 1 (cited at Mot. n.3). In particular, Securus asked that the Commission clarify "whether providers [could] pay additional site commissions"—over and above $0.02 per minute—"from end user revenues collected under the" established rate caps of "$0.14 for larger jails or $0.12 for prisons." *Id.* at 3; *see id.* at 4–5.

## C. *Order* On Review

In early 2023, the Commission began the process of implementing the Martha Wright-Reed Act through a notice of proposed rulemaking. *Order* ¶ 21; *see id.* n.60. After receiving and considering extensive data and comment provided in response—as well as data and comments collected at earlier stages of the IPCS proceeding—the Commission adopted a revised, comprehensive framework to govern the provision of

IPCS. Among other things, the Commission determined that, going forward, IPCS providers will be "prohibit[ed] . . . from paying site commissions," now defined as "payments from IPCS providers to correctional facilities that are not used and useful in the provision of IPCS." *Id.* ¶¶ 244–245. The Commission also determined that it will no longer limit IPCS providers to charging per-minute rates for their communications services. *See id.* ¶¶ 427–471. Instead, providers may now "offer alternate pricing plans," *id.* ¶ 428, including "subscription plans" that "charge[] a flat rate for a fixed number of calls for a [specified time] period," *id.* ¶ 430.

In a portion of the *Order* addressing party-specific petitions, the Commission "dismiss[ed] as moot Securus's Petition for Clarification" of the agency's existing rule governing payments to correctional facilities. *Order* ¶ 604. Clarification of the existing rule was no longer necessary, the Commission explained, now that, under the *Order*, "IPCS providers will no longer be able to pay site commissions associated with their IPCS offerings." *Id.* ¶ 605. In view of that prohibition, the Commission saw no reason to "clarify whether" the existing rules allowed providers to "use IPCS revenues to pay such site commissions." *Id.* The Commission also dismissed the portion of Securus's petition for waiver of the existing rules

- 8 -

that required per-minute and prohibited flat-rate pricing. *See id.* ¶ 606. That request was moot, the Commission determined, because the new rules adopted in the *Order* "specifically allow[] alternate pricing plans, including flat-rate pricing." *Id.*

The Commission determined that its "reforms eliminating site commissions," as well as the *Order*'s new rate caps, would "take effect 60 days after notice of them [was] published in the Federal Register." *Order* ¶ 587. But the Commission allowed a staggered period for providers to come into "compliance with those reforms." *Id.* Unless special circumstances apply, providers must comply by either January 1, 2025, or April 1, 2025 (depending on the size and type of correctional facility). *Id.* For certain contracts in place as of June 27, 2024, however, the Commission allowed an additional year for providers to come into compliance. *See id.* Providers will be able to implement alternate pricing plans once the Office of Management and Budget completes its review of designated portions of the rule allowing for those plans, 47 C.F.R. § 64.6140. *See Order* ¶ 641.

### D.   Federal Register Publication

The Office of the Federal Register reviews summaries of all FCC orders before publishing them in the Federal Register. On occasion, the

FCC releases a single order—e.g., in this case, "FCC 24-75"—that contains within it certain subsections that the agency identifies, through headings in the document, as discrete "orders" or "notices" concerning matters related to the main issues in the order. In these circumstances, staff at the FCC have understood the Office of the Federal Register to require the agency to prepare separate summaries of each discrete portion of the order.

In this proceeding, FCC staff prepared separate Federal Register summaries for the portion of the *Order* adopting revised rules governing IPCS and for the portion of the order addressing Securus's petitions for clarification and waiver. The much shorter section addressing Securus's petitions received approval for publication first; it was published in the Federal Register on August 26, 2024. 89 Fed. Reg. 68,369. The remaining portions of the *Order*, including the principal rulemaking and a further notice of proposed rulemaking, were published in the Federal Register on September 20, 2024. *See* 89 Fed. Reg. 77,244 (Rules and Regulations); 89 Fed. Reg. 77,065 (Proposed Rulemaking).

### E.    Judicial Challenges

Between August 26, 2024, when the first portion of the *Order* was published in the Federal Register, and September 5, 2024, the tenth day

thereafter, the FCC received four petitions for review filed in four different circuits. Notice of Multicircuit Petitions for Review (Sept. 16, 2024) (attached hereto, with the schedule of petitions, as Exhibit A). On September 16, the FCC provided notice of these petitions to the Judicial Panel pursuant to 28 U.S.C. § 2112(a)(3). *See id.* On September 18, the Judicial Panel announced that it had randomly selected this Circuit in which to consolidate the four petitions for review. *See* Consolidation Order, MCP No. 191 (Sept. 18, 2024), *available at* https://perma.cc/26BU-EQ7W.

In the time since the remainder of the *Order* was published in the Federal Register on September 20, 2024, the FCC has received an additional seven petitions for review. Each of the original four petitioners—Securus and three public interest organizations—filed a second petition in the same forum as their first.[1] Three new groups of petitioners also challenged the *Order*: a public interest organization in the Second Circuit, another IPCS provider in the Fourth Circuit, and a

---

[1] *See Direct Action for Rights and Equality v. FCC*, No. 24-1884 (1st Cir.); *Penn. Prison Soc'y v. FCC*, No. 24-1886 (3d Cir.); *Securus Techs., LLC v. FCC*, No. 24-60492 (5th Cir.); *Criminal Justice Reform Clinic v. FCC*, No. 24-1859 (9th Cir.).

coalition of fourteen states in the Eighth Circuit.[2] The Third and Ninth Circuits have since transferred the second petitions filed in those jurisdictions to this Court as required by 28 U.S.C. § 2112(a)(5).[3] The Fifth Circuit has not yet acted on a pending transfer petition there (which Securus did not oppose).[4] The FCC has not yet moved to transfer the remaining three petitions but plans to do so shortly if the cases are not first transferred on the courts' own motion.

On October 3, 2024, this Court directed Petitioners Direct Action for Rights and Equality, Pennsylvania Prison Society, Criminal Justice Reform Clinic, as well as respondents, "to show cause, in writing filed by October 17, 2024, why" the initial petitions filed by those petitioners "should not be dismissed in whole or in part." *E.g.*, *Direct Action for Rights and Equality*, No. 24-1814 (1st Cir.), Entry ID 6672175.

---

[2] *See Fines & Fees Justice Center v. FCC*, No. 24-2611 (2d Cir.); *Pay Tel Commc'ns, Inc. v. FCC*, No. 24-____ (4th Cir.) (filed Oct. 7, 2024) (not yet docketed); *Indiana v. FCC*, No. 24-2983 (8th Cir.).

[3] *See* Entry ID No. 6671151 (case opening notice for the *Pennsylvania Prison Society* case transferred from the Third Circuit). This Court has not yet docketed the *Criminal Justice Reform Clinic* case transferred from the Ninth Circuit (9th Cir. No. 24-5895).

[4] *See* Unopposed Mot. to Transfer, *Securus Techs., LLC v. FCC*, No. 24-60492 (5th Cir.) (filed Sept. 30, 2024).

## ARGUMENT

Securus does not challenge the validity of the lottery that selected this Court to review the *Order*. *See generally* Mot. Securus also does not deny that multiple parties are aggrieved by the rulemaking portion of the *Order* and have sought to have the *Order* reviewed in their home circuits. *See generally id.* Instead, Securus argues that transferring the consolidated cases to the Fifth Circuit would serve the interest of justice. Mot. 1, 9.

The underlying premise of Securus's request is that, at the time the window for lottery petitions under 28 U.S.C. § 2112(a) closed, the only judicially reviewable portion of the *Order* was the portion addressing Securus's petitions for clarification and waiver. *See* Mot. 3. Securus claims to be the only petitioner "aggrieved" by that portion of the *Order*. *Id.* at 8. On that basis, Securus asks this Court to exercise its discretion to transfer all consolidated cases challenging the *Order* to Securus's preferred forum. *Id.*

Contrary to what Securus claims, it was not significantly, if at all, aggrieved by the first-published portion of the *Order*. And in any event, a transfer to the Fifth Circuit would not serve the interest of justice when—as is undisputed—all four participants in the recent judicial

lottery are aggrieved by the later-published, rulemaking portion of the *Order*.

## I. Dismissal Of The Petitions For Clarification And Waiver Caused Securus No Meaningful Harm

The Commission "dismissed as moot Securus's Petition for Clarification and Petition for Waiver because the *Order* effectively provide[s]" the relief Securus "had requested." *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, DA 24-1031 n.15 (Wireline Competition Bureau 2024) (*Stay Denial Order*), https://docs.fcc.gov/public/attachments/DA-24-1031A1.pdf. Accordingly, as we explain, Securus is not substantially aggrieved by either aspect of the Commission's decision, and the interest of justice does not provide a basis for transfer of these cases under 28 U.S.C. § 2112(a)(5).

### A. Petition For Clarification

In its petition for clarification, filed in 2021, Securus asked the Commission to clarify whether, under the existing rules for audio IPCS, "providers [could] pay additional site commissions from end user revenues," over and above the $0.02 per-minute allowance for contractually prescribed site commissions under those rules.

Clarification Pet. 3; *accord Stay Denial Order* n.15. "Clarification on this point was necessary, Securus argued, because without it 'some providers [could be] competitively disadvantaged in the bidding process' for new IPCS contracts." *Id.* (quoting Clarification Pet. 4). The *Order* "eliminates any such risk by clarifying that, once the new rules take effect, IPCS providers will no longer be able to bid for new contracts under the terms of the old rules." *Id.* (quoting *Order* ¶ 587).

In its motion here, Securus's theory of injury is that "[t]he new rule eliminating site commissions takes effect on a 'staggered basis,' not fully phasing in at all prisons and jails until as late as April 1, 2026." Mot. 5. That misapprehends the Commission's *Order*. The prohibition against site commissions takes effect 60 days from publication of the rulemaking portion of the *Order* in the Federal Register—i.e., on November 19, 2024. *See Order* ¶ 587. Parties generally must comply by January 1, 2025 (prisons and large jails), or April 1, 2025 (smaller jails). *See id.* ¶ 587. In certain circumstances, the *Order* allows additional time—until as late as April 1, 2026—for parties to come into compliance. *Id.* But that additional time is only available with respect to "contract[s] existing as of June 27, 2024." *Id.* The grace period does not apply to more recently negotiated

contracts, which must come into compliance by either January 1 or April 1, 2025.

With this understanding, Securus's alleged injury from the dismissal of its petition for clarification is vanishingly small, if it exists at all. The premise of Securus's request for clarification of the Commission's existing site commission rule was that Securus (or other providers) could be "competitively disadvantaged in the bidding process" for new IPCS contracts if the Commission did not explain whether the existing rule allowed providers to pay more than $0.02 per minute to carceral facilities using profits from the provision of IPCS. Clarification Pet. 4. Now, as of November 19, 2024, IPCS providers may no longer bid for new contracts under the 2015 rule at all. This leaves roughly five weeks during which a competing provider could even theoretically put Securus at a disadvantage in the bidding process for new contracts by adopting a more aggressive reading of the Commission's 2015 rule than Securus adheres to. And any new contracts executed during that period could only pay site commissions until January 1, 2025 (for prisons and large jails) or April 1, 2025 (for smaller jails).

For these reasons, the Commission correctly concluded that Securus's petition for clarification was "effectively moot." *Order* ¶ 605. To

whatever extent Securus is conceivably "aggrieved" by the dismissal of its petition, there will not be any "effectual relief" that any court can grant Securus concerning this portion of the *Order* after November 19, 2024, at which point no new contracts under the old rules can be formed. *Contra* Mot. 5 (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016)). Securus's claim based on the petition for clarification will then be not just "effectively" but legally moot. *See id.*

As the Seventh Circuit has recognized in a case on which Securus relies, "[w]here a party to an administrative proceeding has received substantially all the relief contemplated, . . . any shortfall is inconsequential[,] even [if] it does not eliminate the technical status of 'aggrievement.'" *J.L. Simmons Co. v. NLRB*, 425 F.2d 52, 55 (7th Cir. 1970) (per curiam) (quotation marks omitted). Whatever short-term, technical "aggrievement" Securus might claim from the dismissal of its petition for clarification, that injury is not "substantial[]" and does not warrant transfer of these consolidated cases. *Id.*

**B.    Petition For Waiver**

Securus's petition for waiver concerned Sections 64.6030 and 64.6090 of the Commission's existing rules.[5] 47 C.F.R. §§ 64.6030, 64.6090 (2021); *see* Waiver Pet. 1. Section 64.6030 requires IPCS providers to "adhere to per-minute rate caps for interstate and international calls." *Stay Denial Order* n.15. Section 64.6090 "prohibits providers from offering flat-rate calling for such calls." *Id.*

"Securus sought a waiver of those rules so that it could offer subscription calling plans as an alternative to assessing only per-minute rates for interstate calls." *Stay Denial Order* n.15; *see* Waiver Pet. 9. "In the [*Order*], the Commission expressly acknowledged the benefits of Securus's alternative pricing plans and . . . decided to permit such plans under the new rules . . . ." *Stay Denial Order* n.15 (citing *Order* ¶¶ 432, 435, 437–471). For that reason, "the Commission correctly recognized that Securus's waiver request was moot under the new rules." *Id.* (citing *Order* ¶ 606).

---

[5] Securus also requested a waiver of Section 64.6080, which prohibits per-call and per-connection charges. 47 C.F.R. § 64.6080 (2021). The Commission's denial of that portion of Securus's waiver request, *see Order* ¶ 607, is not at issue in this case, *see* Mot. 2–3 n.4.

In its motion here, Securus claims injury from the dismissal of its petition for waiver because, until the Office of Management and Budget completes its Paperwork Reduction Act review of the Commission's new rule allowing alternate pricing plans, Securus will not be able to offer subscription plans for interstate calls (or calls that cannot be identified as purely intrastate). *See* Mot. 5 & n.7. But to whatever extent that theory might—with the right factual showing—be sufficient to establish injury for purposes of Article III standing and "aggrieve[ment]" under the 28 U.S.C. § 2344, it does not establish the kind of "substantial" harm that might favor a discretionary transfer. *Contra* Mot. 7–8.

Because Securus has not offered subscription pricing plans for audio IPCS since at least March 2022, the Commission's dismissal of its waiver request does not require Securus to change any current business practice. *See Stay Denial Order* n.15 (citing *Order* ¶ 430 & n.1552). At most, then, the *Order* deprives Securus of the opportunity to resume subscription pricing for audio calls immediately—which Securus has not demonstrated it would be prepared to do.[6] As with the petition for

---

[6] If Securus were prepared to resume its subscription pricing plans immediately, pending approval of the new rule governing alternate pricing plans from the Office of Management and Budget, Securus would be free to petition the FCC again for a waiver. *See Order* ¶¶ 475–481

clarification, Securus "received substantially all the relief contemplated," and "any shortfall is inconsequential" and does not support its request for transfer. *J.L. Simmons Co.*, 425 F.2d at 55 (quotation marks omitted).

## CONCLUSION

The Motion of Securus Technologies, LLC to Transfer to the Fifth Circuit should be denied.

Dated:  October 7, 2024                  Respectfully submitted,

                                        /s/  Jacob M. Lewis

                                        P. Michele Ellison
                                            *General Counsel*

                                        Jacob M. Lewis
                                            *Deputy General Counsel*

                                        Sarah E. Citrin
                                            *Deputy Associate General Counsel*

                                        Matthew J. Dunne
                                            *Counsel*

                                        FEDERAL COMMUNICATIONS
                                            COMMISSION
                                        45 L Street NE
                                        Washington, DC 20554
                                        (202) 418-1740
                                        fcclitigation@fcc.gov

---

(waiver procedure). It could thus obtain, without judicial intervention, the only relief it could hope to receive from a court, which at most could remand the *Order* for the Commission to reconsider the dismissal of Securus's earlier waiver petition (not grant the waiver itself).

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This document complies with the type-volume limit of Fed. R. App.
P. 27(d)(2) because, excluding the parts of the document exempted
by Fed. R. App. P. 32(f):

☒    this document contains <u>3,929</u> words, *or*

☐    this document uses a monospaced typeface and contains <u>    </u>
lines of text.

2.    This document complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) because:

☒    this document has been prepared in a proportionally spaced
typeface using <u>Microsoft Word for Office 365</u> in <u>14-point
Century Schoolbook</u>, *or*

☐    this document has been prepared in a monospaced spaced
typeface using <u>     </u> with <u>     </u>.


<u>/s/  *Jacob M. Lewis*     </u>
Jacob M. Lewis
*Counsel for Respondent*
*Federal Communications Commission*