REDACTED FOR PUBLIC FILING

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

Nos. 24-8028, 24-1927

IN RE: MCP 191

On Petition for Review of an Order of the Federal Communications Commission

**REPLY IN SUPPORT OF SECURUS TECHNOLOGIES, LLC'S MOTION FOR STAY PENDING JUDICIAL REVIEW**

Michael H. Pryor
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
1155 F Street, N.W. Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

Scott H. Angstreich
Justin B. Berg
Jordan R.G. González
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
jberg@kellogghansen.com
jgonzalez@kellogghansen.com

*Counsel for Securus Technologies, LLC*

October 25, 2024

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................. ii

I. SECURUS IS LIKELY TO PREVAIL ON THE MERITS ............................2

    A. The Order Reads "Fairly Compensated" Out of the Statute .................2

    B. The Order Sets an Unlawfully Low Zone of Reasonableness ..............5

    C. The Order's 60-Day Compliance Deadline Is Arbitrary.......................7

II. SECURUS WILL SUFFER IRREPARABLE HARM ....................................8

III. THE REMAINING FACTORS FAVOR A STAY ......................................11

CONCLUSION ........................................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

*ACLU v. FCC*, 823 F.2d 1554 (D.C. Cir. 1987) .................................................. 8

*Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36 (1st Cir. 2012) .................................... 4

*Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245
   (2d Cir. 1999) .................................................................................... 11

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220
   (5th Cir. 2024) ..................................................................................... 9

*Fed. Power Comm'n v. Conway Corp.*, 426 U.S. 271 (1976) .................................. 7

*Glob. Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ............................................ 5

*K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989) ......................... 9

*Marie O. v. Edgar*, 131 F.3d 610 (7th Cir. 1997) ..................................................... 3

*Rest. Law Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593 (5th Cir. 2023) ........................... 8

*Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212 (2020) ..................................... 3

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ............................................ 9

*United States v. Pelullo*, 14 F.3d 881 (3d Cir. 1994) ................................................ 3

**STATUTES AND REGULATIONS**

Martha Wright-Reed Just and Reasonable Communications Act of
   2022, Pub. L. No. 117-338, § 3(b), 136 Stat. 6157 ....................................... 3

47 U.S.C. § 276(b) ............................................................................................... 2

47 U.S.C. § 276(b)(1)(A) ..................................................................................... 3

47 U.S.C. § 276(b)(1)(A) (2022) .......................................................................... 3

47 C.F.R. § 64.6020 ........................................................................................... 10

## ADMINISTRATIVE DECISIONS

Third Report and Order, Order on Reconsideration, and Fifth
    Further Notice of Proposed Rulemaking, *Rates for Interstate
    Inmate Calling Services*, 36 FCC Rcd 9519 (2021) ..................................... 11

## OTHER AUTHORITIES

*Webster's Third New International Dictionary* (1993) ............................................ 3

The Court should stay the FCC's Final Rules pending appeal, as the D.C. Circuit did with two prior IPCS rate-setting orders. Securus showed it is likely to succeed on the merits. The FCC's response confirms that it misinterpreted the statutory command that "all . . . providers [be] fairly compensated" by equating it with the separate statutory command to set just and reasonable rates. The FCC also concedes the inconsistencies in its choices of which safety and security measures to include and exclude in the rate base, while also confirming the agency's refusal to abide by the statute's directive to identify which measures are, in fact, "necessary." The FCC's use of unbilled minutes to set rate caps was at least a $50 million annual error — hardly *de minimis*. And its attempt to rehabilitate the Order's sparse justification for not phasing in the ancillary charge prohibition or delaying operational changes fails.

The FCC also does not rebut Securus' showing that it will likely suffer several irreparable harms if the Order is not stayed — including ▇▇▇▇▇▇▇ ▇▇▇▇▇▇ unrecoverable revenue losses and ▇▇▇▇▇▇▇ unrecoverable compliance costs, as well as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

A stay also serves the public interest, because the Order fails to achieve — and, indeed, will undermine — the MWR Act's laudable goals, which Securus supports. The Order will reduce the availability of IPCS services, both by driving

smaller providers out of the marketplace and leading prisons and jails to curtail the availability of IPCS services given the reduced funds for critical safety and security measures. The FCC ignores all this and that many incarcerated persons will not pay the Order's lower rates until mid-2025 or April 2026, even without a stay. And while the Order is stayed, the FCC's 2021 interim rules (which it found ensure just and reasonable rates) remain in effect.

## I. SECURUS IS LIKELY TO PREVAIL ON THE MERITS

### A. The Order Reads "Fairly Compensated" Out of the Statute

Securus showed (at 11-14) that the FCC misread the statutory command that "all payphone service providers" be "fairly compensated." 47 U.S.C. § 276(b)(1)(A). The FCC's response confirms it.

*First*, the FCC contends (at 14) that "all" providers receive "fair compensation" when they "charge rates that compensate them for 'used and useful' costs of providing IPCS." But "used and useful" is how the FCC identified "just and reasonable" rates. Order ¶ 42. If "just and reasonable" rates suffice to satisfy the separate requirement that "all" providers are "fairly compensated," the latter requirement does no independent work. Notably, the FCC and its intervenors identify no independent role for that separate statutory command, which Congress retained when it amended § 276(b).

*Second*, without citing a dictionary or a case, the FCC asserts (at 13-15) that "all . . . providers" means only efficient or prudent providers. But that ignores the plain meaning of "all," which means "each and every." Mot. 12 (collecting cases); *see also Webster's Third New International Dictionary* 54 (1993) (when used to describe a group, "all" means "every member . . . of" or "each one of"); *Marie O. v. Edgar*, 131 F.3d 610, 620 (7th Cir. 1997) ("'All' is unambiguous; it means every eligible child."); *United States v. Pelullo*, 14 F.3d 881, 894 (3d Cir. 1994) ("The use of 'all'" "necessarily means 'every,'" "and rules out any exceptions"). The FCC also "read[s] into [the] statute[] words" — like efficient and prudent — "that aren't there." *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020).

Contrary to the FCC's contention (at 14-15), nothing in the MWR Act authorized the agency to depart from the ordinary meaning of "all." Congress deleted "each and every," as the FCC notes, but that phrase had modified "completed intrastate and interstate call," not "providers." 47 U.S.C. § 276(b)(1)(A) (2022). And while Congress allowed the FCC to consider "industry-wide average" costs, MWR Act § 3(b), it did not say that considering them necessarily satisfies the "fairly compensated" requirement. The MWR Act amendments the FCC highlights permit rates that are below cost for some calls, but

3

above cost for others. They do not — as the FCC argues — swallow the "all . . . providers are fairly compensated" requirement, rendering it a nullity.

*Third*, the FCC concedes (at 15) that, even under its own calculations, one-third of all IPCS providers will be unable to recover costs under the new caps. The agency contends that this does not matter because the providers who cannot recover are small. But "all means all," not two thirds. *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 43 (1st Cir. 2012) (cleaned up).

The FCC's identification of "profitable" providers also depends on accepting its blinkered view of IPCS providers' costs. Accounting for only a few of the actual costs that IPCS providers incur, but the FCC pretends do not exist, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[1] And the FCC's counsel's suggestion (at 10) that the agency — which rejected Securus' ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* Order App. I ¶¶ 4-6 — adopted just-and-reasonable rate caps that allow a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is laughable. Instead, unrebutted evidence shows Securus is likely to face ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* Dougherty Decl. ¶¶ 10-16, if the rules take effect.

---

[1] Securus incurred ▮▮▮▮▮▮▮▮▮ in ancillary service, TRS, and voice biometrics costs, *see* Order App. F tbls. 1, 3 & 18; *id.* App. H ¶ 5; *id.* App. J tbl. 3 & note, for a total of ▮▮▮▮▮▮▮▮▮ in costs — more than the ▮▮▮▮▮▮▮▮▮ the Order projects, *id.* App. J tbl. 3.

4

### B. The Order Sets an Unlawfully Low Zone of Reasonableness

**1.** ***Exclusion of Necessary Safety and Security Costs.*** Securus showed (at 14) that the FCC also violated the fairly compensated requirement by excluding safety and security costs prison officials impose as a mandatory precondition of doing business. *See Glob. Tel*Link v. FCC*, 866 F.3d 397, 413 (D.C. Cir. 2017) (holding that such costs must be included to meet the "fairly compensated" standard). The FCC and its intervenors say nothing in response.

Securus then showed (at 15-16) that the FCC arbitrarily and capriciously misapplied its own "used and useful" standard, excluding some safety and security measures it conceded benefit users while permitting recovery for features it found do not. The FCC admits (at 19) it did so. And the agency's shifting description of its own standard confirms that it was not imprecision in cost categories, but rather a results-oriented desire to select categories with the lowest costs (to yield the lowest rates) that drove the agency's choices. First, the test asks if a feature "directly . . . benefit[s]" incarcerated persons, Stay Denial ¶ 14; then, it shifts to ask whether a category is "predominant[ly]" "used and useful," *id.* ¶ 15; then, the FCC says categories can be "used and useful" despite "no direct benefit" to users, *id.* ¶ 16.

Securus does not argue, as the FCC contends (at 18), that the FCC must accept as necessary whatever costs a correctional facility says are safety-and-

5

security related. Rather, Securus' complaint is that the FCC failed to perform what the FCC now agrees (at 18) (but the Order denied) was a mandatory task: "'consider' what measures are 'necessary to the provision' of IPCS." *But see* Order ¶ 162 n.576 ("we . . . have no need to" "define" "the term 'necessary'"); *id.* ¶ 369 ("we need not resolve" what features are "necessary").

2. ***Using Unbilled Minutes.*** The FCC repeats (at 19) the Order's rationale for using non-revenue-generating minutes to calculate the per-minute rate caps — that it avoids cross-subsidies — ignoring that the Order's central premise is using industry-wide average costs, which necessarily creates cross-subsidies. *See* Mot. 17.

The FCC (at 20) and DARE (at 12) also assert that the effect is "*de minimis*," because uncompensated minutes account for ▇ of total minutes. But the record shows that incarcerated persons placed *11.2 billion minutes* of audio calls in 2022. Order App. F tbl. 1. Even a half-cent rate increase yields more than $50 million in additional annual industry revenues.[2] That is not "de minimis."

3. ***Other Methodological Flaws.*** Securus explained (at 18) that the FCC (among other flaws) failed to include facility and compliance costs when

---

[2] Had the FCC excluded unbilled minutes, the rate caps would have been ranging from ▇▇▇. A ▇ increase would result in audio rate caps ▇▇▇ rather than $0.06 to $0.12.

calculating the zone of reasonableness. The FCC responds (at 20) that the Order mentioned these costs when setting rates slightly above the lower bound. But that misses the point: that the FCC's omission of these costs drove down the *outer bounds* of the zone of reasonableness. No matter the method for choosing a rate *within* the zone, the failure to set accurate outer bounds is error when it places the chosen rates outside the zone. *See Fed. Power Comm'n v. Conway Corp.*, 426 U.S. 271, 278 (1976). And, here, even a small upward shift of the lower bound moves the rate caps outside of that zone.

### C. The Order's 60-Day Compliance Deadline Is Arbitrary

Securus showed (at 18-19) that the Order did not adequately explain why the FCC required compliance with the ancillary-charge prohibition and all operational requirements within 60 days of Federal Register publication.

As to the ancillary-charge prohibition, the FCC defends (at 22) the Order's assertion that they do not require contract amendments.  ▮▮▮▮▮▮▮  *See* Dougherty Decl. ¶ 10. And the FCC offers no explanation — and the Order contained none — why a rule barring one aspect of providers' cost recovery should take effect everywhere, immediately, while caps on rates (another cost-recovery mechanism) are phased in over a lengthy period ending on April 1, 2026.

As to the new operational rules, the FCC misreads (at 22) Securus' declaration, which explains that, even with extraordinary (and uncompensated)

7

expenditures, ███████████████████████████████████████ *See*
Dougherty Decl. ¶¶ 11, 21.  The possibility of obtaining a waiver, *see* FCC Opp. 23; DARE Opp. 13, is no cure for the Order's insufficient explanation:  "waiver provisions cannot do service for reasoned decisionmaking." *ACLU v. FCC*, 823 F.2d 1554, 1573 n.38 (D.C. Cir. 1987) (per curiam).

## II.   SECURUS WILL SUFFER IRREPARABLE HARM

Securus showed it would likely suffer ███████████████ in unrecoverable harm.  *See* Mot. 20-23; Dougherty Decl. ¶¶ 10-25.  And absent a stay, Securus will ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ lose the ability to challenge that deadline.  Mot. 20-23.  The FCC never addresses the last two points.  Its other responses lack merit.

**1.** The FCC contends (at 23) that Securus' description of monetary harm is "not credible" or "substantiated."  To the contrary, "[s]tringent[ ] insist[ence] on a precise dollar figure reflects an exactitude" the "law does not require." *Rest. Law Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023).  In any event, Securus submitted a sworn declaration from its chief operating officer substantiating those harms in detail and providing specific dollar figures.  *See* Dougherty Decl. ¶¶ 10-16.  Nor does the FCC's prediction (at 25 n.5) of higher future call volumes —

even if it comes true — cure those short-term losses, which Securus cannot recover if it prevails.

Similarly, the FCC is wrong to suggest (at 23) that Securus has not "substantiated" its ███████████████████████████████████████ ███████ It said so in a sworn declaration, in unequivocal terms, and the FCC offers no contrary evidence. That is more than adequate. *Compare* Dougherty Decl. ¶¶ 18-20 █████████████████████████████████████████ ██████████████████), *with Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024) (affidavit describing similar steps sufficient, and "it was error" to "discount" the affidavit).

2.   The FCC next responds (at 24) that Securus' compliance costs ████ ██████ are too small to be irreparable. But in "determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." *Career Colls.*, 98 F.4th at 238; *see also K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989) ("irreparability . . . is [the] paramount concern").

The FCC also asserts (at 24) that Securus can recover compliance costs because the rate caps are (barely) above the lower-bound of its zone of reasonableness. But that is no answer to the irreparable harm: if the court vacates the Order, Securus will suffer harms it cannot later recover. *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and

9

concurring in the judgment) ("complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs"). The rate caps are also too low for Securus to recover its existing operating costs — let alone these new compliance costs.

3. The FCC similarly contends (at 24) that Securus can recover losses from the ancillary-charge prohibition through its per-minute rates. That ignores that the FCC is simultaneously lowering the per-minute rates Securus can charge at most of the facilities it serves and prohibiting ancillary charges, while Securus' costs are going up, due to the need to comply with the new rules. The FCC's decision to require IPCS providers to recover ancillary service charges through per-minute rates, *see* 47 C.F.R. § 64.6020, does not make those rates sufficient to cover Securus' costs. ▮▮▮▮ *See* Dougherty Decl. ¶¶ 10, 15-16.

4. Finally, the FCC improperly discounts (at 25) Securus' declaration stating it will be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ if the rate caps go into effect. Securus' declarant made clear that, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Dougherty Decl. ¶ 25 (emphasis added). That would harm Securus and harm the incarcerated persons who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That shows irreparable harm, notwithstanding the FCC's emphasis on the word "likely."

10

*See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) ("substantial chance" status quo will be altered presents "irreparable harm").

## III. THE REMAINING FACTORS FAVOR A STAY

The FCC's claim (at 25-26) that the status quo is harmful ignores that its key reforms — the elimination of site commissions and rate-cap changes — will not take full effect, even without a stay, until April 1, 2026. *See* Order ¶ 587. And a stay would not, as the FCC claims (at 26), "perpetuate" a "broken system." Instead, the FCC's 2021 interim rules — which functionally cap both interstate and intrastate calling rates and ancillary charges — remain in place. The FCC found that the "reforms adopted" in that 2021 order "will enable consumers . . . to obtain essential communications capability at just and reasonable rates."[3]

If the Order takes effect, as Commissioner Carr observed, it will likely drive smaller providers out of business, create the risk that some facilities go under-served, and reduce the availability of IPCS services. *See* Order at 462 (statement of Commissioner Carr). The FCC ignores all these likely harms to the people the Order is meant to benefit.

---

[3] Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519, ¶ 28 (2021).

11

## CONCLUSION

Securus supports the MWR Act's goals, but the Order will not achieve them. The Court should stay the Order's Final Rules pending judicial review. If it does not, it should order expedited briefing and schedule oral argument at the earliest possible opportunity.

Respectfully submitted,

 /s/ *Scott H. Angstreich*

| | |
|---|---|
| Michael H. Pryor | Scott H. Angstreich |
| BROWNSTEIN HYATT FARBER SCHRECK, LLP | Justin B. Berg |
| | Jordan R.G. González |
| 1155 F Street, N.W. Suite 1200 | KELLOGG, HANSEN, TODD, |
| Washington, D.C. 20004 |  FIGEL & FREDERICK, P.L.L.C. |
| (202) 389-4706 | 1615 M Street, N.W., Suite 400 |
| mpryor@bhfs.com | Washington, D.C. 20036 |
| | (202) 326-7900 |
| | sangstreich@kellogghansen.com |
| | jberg@kellogghansen.com |
| | jgonzalez@kellogghansen.com |

*Counsel for Securus Technologies, LLC*

October 25, 2024

# CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this reply complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the portions of the reply exempted by Federal Rules of Appellate Procedure 27(d)(2) and 32(f), the reply contains 2,598 words.

I further certify that this reply complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

 /s/ *Scott H. Angstreich*
Scott H. Angstreich

*Counsel for Securus Technologies, LLC*

October 25, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on October 25, 2024, I caused a redacted copy of this reply to be filed electronically with the Clerk of the Court through the Court's CM/ECF system and that a copy of the same will be served on all counsel of record through the Court's CM/ECF system.

I further certify that, on October 25, 2024, I caused a physical copy of the reply (under-seal, unredacted) to be delivered via courier to the Clerk's Office for the United States Court of Appeals for the First Circuit, John Joseph Moakley U.S. Courthouse, 1 Courthouse Way, Suite 2500, Boston, MA 02210.

I further certify that, on October 25, 2024, I emailed copies of the unredacted and under-seal reply to counsel of record for Respondents and counsel of record for parties that have filed motions for leave to intervene who have signed the Protective Order Acknowledgement *2023 IPCS Protective Order*.

 /s/ *Scott H. Angstreich*
Scott H. Angstreich

*Counsel for Securus Technologies, LLC*