PUBLIC COPY

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

| | |
|---|---|
| IN RE: MCP 191 | No. 24-8028 |
| PAY TEL COMMUNICATIONS, INC., *Petitioner*, v. FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, *Respondents*. | No. 24-1969 |

On Petition for Review of an Order of
the Federal Communications Commission

## RESPONDENTS' OPPOSITION TO THE MOTION OF
## PAY TEL COMMUNICATIONS, INC. FOR STAY
## PENDING JUDICIAL REVIEW

### INTRODUCTION

The Federal Communications Commission and the United States of America oppose the motion of Pay Tel Communications, Inc. for a stay pending judicial review of the FCC order on review. *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, FCC No. 24-75 (rel. July 22, 2024) (*Order*) (Mot. Ex. A). As we explained in opposing the earlier-filed motion of Securus

PUBLIC COPY

Technologies, LLC, Entry ID 667554, the rules adopted in the *Order* are both lawful and beneficial, and a stay would be counter to the public interest. The Court should deny the requested stay.

## BACKGROUND

### A.    Early IPCS Reform Efforts

"[E]gregiously high" rates for communications services provided in prisons and jails—known as "incarcerated people's communications services" (IPCS)—have been a problem for more than two decades. *Order* ¶ 1. The problem arises from a well-acknowledged "market failure." *Id.* ¶ 23. Providers of IPCS compete for exclusive contracts to serve correctional facilities, then operate as monopoly providers within each facility to the end users there. *Id.* Incarcerated people "have no choice but to pay the rates and charges imposed if they wish to call their family or other loved ones." *Id.* No market force keeps rates in check. On the contrary, providers and correctional facilities have often freely negotiated "site commissions"—"payments…from [IPCS] providers to correctional facilities," *id.* n.30—and passed the cost of these payments on to end users through higher rates. *See id.* ¶ 23.

High rates for IPCS impose a "substantial burden" on "the ability of incarcerated people to stay connected" with family and friends. *Order*

PUBLIC COPY

¶ 26; *see id.* ¶ 28. "[R]egular contact" between incarcerated people and their families "lower[s] rates of recidivism and increase[s] [the] likelihood of successful reentry into society after release." *Id.* ¶ 29 & n.116. Allowing incarcerated people access to IPCS also "provides valuable non-monetary benefits to correctional facilities." *Id.* n.1114 (quotation marks omitted). Among other things, facilities use IPCS access as an "incentive[]" for incarcerated people to "exhibit good behavior." *Id.* (quotation marks omitted).

The FCC first addressed the problem of excessive IPCS rates in 2013, when it set interim rate caps for interstate calls and directed providers to submit cost data. *Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013). In 2015, it adopted revised caps on rates for interstate and intrastate calls, derived from industry-wide average costs reported in the earlier data collection. *Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015) (*2015 Order*).

**B.    *Global Tel\*Link***

IPCS providers and state authorities challenged the *2015 Order*. *See Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017). Although the court acknowledged the "serious[]" problem of "extraordinarily high" end-user charges arising from the IPCS "market failure," *id.* at 404 (quotation

PUBLIC COPY

marks omitted), it nonetheless invalidated several portions of the *2015 Order*. First, the court held that the FCC lacked authority to adopt intrastate rate caps. *See id.* at 408–12. Second, it concluded that the FCC's reliance on industry-wide cost averaging "ma[de] calls with above-average costs…unprofitable," contrary to the Communications Act's requirement, as then in force, "that 'each and every' inter- and intrastate call be fairly compensated." *See id.* at 414.

## C.    Martha Wright-Reed Act

Congress responded to the *Global Tel*Link* decision by passing the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (MWRA or Act), Pub. L. No. 117-338, 136 Stat. 6156 § 2(a)(1)(B) (2023). The Act provided jurisdiction over intrastate rates and required the agency to ensure that rates for IPCS are "just and reasonable." *Id.* § 2. It also removed the requirement that "each and every" call provide fair compensation to providers.[1] *Id.* Congress provided, moreover, that "[i]n

---

[1] Section 276(b)1)(A) was thus amended as follows:

> [The FCC shall] establish a ~~per call~~ compensation plan to ensure that all payphone service providers are fairly compensated ~~for each and every~~ **, and all rates and charges are just and reasonable, for** completed intrastate and interstate ~~call~~ **communications** using their payphone **or other calling device**…[.]

PUBLIC COPY

implementing [the] Act and the amendments made by [the] Act," the FCC could "use industry-wide average costs of…service." *Id.* § 3(b)(1) (codified at 47 U.S.C. § 152 (Supp. V 2023) (Statutory Notes and Related Subsidiaries)).

The MWRA also directed the FCC to "consider costs associated with any safety and security measures necessary to provide" service. *Id.* § 3(b)(2). The Act further directed the agency to "consider…differences in the [average costs of service]" reported "by small, medium, or large facilities." *Id.* Congress required the agency to issue any regulations needed to effectuate the Act "not later than 24 months after" January 5, 2023, "the date of enactment of [the] Act." *Id.* § 3(a); *see Order* ¶ 5.

### D.  *Order*

On July 22, 2024, the FCC released the *Order*, implementing the MWRA. *Order* ¶ 1. To ensure "just and reasonable" "rates and charges" for all IPCS, the Commission set rate caps based on industry-wide data about providers' costs. *Id.* ¶¶ 72, 120. In doing so, the Commission employed its longstanding "used and useful" ratemaking framework

---

Language that the Act deleted from Section 276(b)(1)(A) is ~~struck through~~; language added is **<u>bolded and underlined</u>**.

PUBLIC COPY

under which it "exclude[s]…any costs that do not benefit [end] users." *Id.* ¶ 43.

The FCC used this framework to establish a "zone of reasonableness" for each IPCS rate tier based on type (prison or jail) and size of facility. *Order* ¶ 146. The Commission set the upper limit by including all costs providers reported—even costs not "used and useful"; it established the lower limit by excluding costs not used and useful. *See id.* ¶¶ 161, 189–206. The FCC then set caps for per-minute rates within those bounds. *Id.* ¶ 207.

The Commission also prohibited separately assessed "ancillary service charges," such as fees for credit card payments, live-agent interactions, paper billing statements, and third-party financial transactions. *Order* nn.25 & 27; *see id.* ¶ 414. Instead, to ensure providers receive fair compensation for such costs, the Commission "include[d] providers' reported ancillary service costs…in the used and useful IPCS costs" from which it derived the new rate caps. *Id.*

The FCC explained that "a provider will be fairly compensated if it is afforded an opportunity to recover the industry average…costs," including costs for ancillary services, "on a company-wide basis." *Order* ¶ 219; *see id.* ¶ 414. By this measure, even if not every provider is

PUBLIC COPY

"profitable" according to its own reported costs, the *Order* nonetheless ensures fair compensation for all providers, as required by Section 276. *Id.* ¶ 219 (quotation marks omitted). The Commission calculated that eight of the twelve IPCS providers in its data set—representing 90 percent of revenue and 96 percent of minutes—will, under the new rules, collect revenue exceeding their reported allowable costs. *Id.* ¶ 216.

The Commission "decline[d] to set rate caps [calculated to] ensure cost recovery for providers with unusually high costs," reasoning that "to let unusual cases determine rates generally would result in unjust and unreasonable rates." *Order* n.234. But providers with used and useful costs unrecoverable within the revised rate caps may seek a waiver. *See id.* ¶¶ 475–481; *see also Pay Tel Commc'ns, Inc.'s Petition for Waiver of Interim Interstate ICS Rates*, 29 FCC Rcd 1302 (Wireline Competition Bureau 2014) (granting Pay Tel a temporary waiver of the 2013 interim rate caps).

PUBLIC COPY

### E.     Procedural Background

On October 7, 2024, Pay Tel asked the FCC to stay the *Order*. The FCC denied that request on October 15, 2024. *See* Mot. Ex. D-2  (*Stay Denial Order*). Pay Tel filed this motion for stay on October 25, 2024.[2]

## ARGUMENT

A stay pending appeal is "an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotation marks and citations omitted). Courts assess whether to grant a stay based on four factors: "(1) [W]hether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Boston Parent Coal. for Academic Excellence Corp. v. Sch. Comm. of Boston*, 996 F.3d 37, 44 (1st Cir. 2021) (quoting *Nken*, 556 U.S. at 434). Pay Tel fails to justify a stay under those factors.

---

[2] Pay Tel did not serve Respondents with a complete electronic copy of its motion that day. Thus, time to respond extended to November 7, 2024, under Rule 26(c) of the Federal Rules of Appellate Procedure.

## I. PAY TEL IS UNLIKELY TO PREVAIL ON THE MERITS

Because "agency ratemaking is far from an exact science and involves policy determinations in which the agency is acknowledged to have expertise[,]…[t]he FCC is accorded broad discretion in selecting methods...to make and oversee rates." *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999) (citations and quotation marks omitted); *see Boston Edison Co. v. FERC*, 885 F.2d 962, 964 (1st Cir. 1989). The FCC exercised that discretion reasonably and lawfully here.

### A. The *Order* ensures fair compensation.

In developing its revised compensation plan for IPCS, the FCC acknowledged the need to "give full effect to both the 'just and reasonable' and the 'fairly compensated' clauses in section 276(b)(1)(A)." *Order* ¶ 60; *accord id.* ¶ 65. For each clause to have independent meaning, the FCC explained, the "just and reasonable" mandate should not be subordinated to the "fairly compensated" mandate. *Id.* ¶ 66. In addition, a valid interpretation of those clauses must take into account the MWRA's deletion of "per call" and "each and every [call]" from the compensation clause, and its allowance of "industry-wide average costs" in rate setting. *Id.* ¶¶ 67–68.

PUBLIC COPY

With these principles in mind, the Commission concluded that the requirement for "fair compensation" does not mean that every provider—including those with "unusually high costs," *id.* n.234—must necessarily be "profitable," *see id.* ¶ 219. Indeed, requiring consumers to pay supra-competitive rates would not be "just and reasonable." *See id.* Rather, providers are "fairly compensated" if they have the "opportunity to recover the industry average of…costs on a company-wide basis." *Id.*

Pay Tel argues (Mot. 9–12) that the Commission's approach fails the requirement that "all [IPCS] service providers [be] fairly compensated." 47 U.S.C. § 276(b)(1)(A). Not so. The Commission's new rate caps ensure that "all" providers will be "fairly compensated" for the "used and useful" costs of providing IPCS, *Order* ¶¶ 219 & nn.777, 778, including providing ancillary services, *id.* ¶ 414. But the FCC is *not* required to guarantee every IPCS provider a profit, regardless whether it operates inefficiently or adds to its costs expenses that generate no value for end users of IPCS. Such a requirement would thwart the MWRA's allowance for rate-setting based on industry-wide costs, and its deletion of the former requirement of fair compensation for "each and every" call.

PUBLIC COPY

Pay Tel highlights (Mot. 10) the Commission's calculation that eight of twelve IPCS providers in the data set would see revenues that exceeded their reported used and useful costs under the relevant rate caps, *Order* ¶ 216, arguing that this shows not all providers will be fairly compensated. But these eight providers account for 96 percent of billed and unbilled minutes in the data set, thus supporting the agency's finding that the "rate caps will allow efficient providers to meet demand for IPCS." *Id.* App. J ¶ 5, p. 478.

Pay Tel also argues (Mot. 10) that this finding ignores the impact on individual facilities where reported costs may exceed projected revenues, speculating that providers will cease service in some 31 percent of prisons and jails, and up to 50 percent of jails. But as the *Order* explained, comparing allocated costs to revenues on a facility-by-facility basis "would be misleading" because it would be highly dependent on providers' individual cost allocations, which "vary widely within a single provider's data, often over implausible ranges." *Order* App. J ¶ 10, p. 482. For example, Pay Tel's reported per-minute costs for very small jails ranged from ███████████████. *Id.* n.27. The FCC found those estimates "improbable," and declined to set industry-wide rate caps so as

PUBLIC COPY

to ensure revenues above reported costs at even the highest-outlier facilities. *Id.*

Pay Tel also speculates that "[s]maller providers…who focus on service in jails" will be hardest hit by the rate caps. Mot. 11. But the FCC found that "provider size is no predictor of the choice to serve very small jails." *Order* App. J ¶ 6, p. 480. Indeed, "███████████████████ ████████████████████████████████████████ ████████." *Id.* The Commission therefore found it "implausible that [the rate] caps will prevent supply in small jails." *Id.*

### B. The Commission reasonably accounted for safety and security costs.

#### 1. The Commission appropriately applied its longstanding "used and useful" framework.

When setting "just and reasonable" IPCS rates, the FCC must "consider costs associated with any safety and security measures necessary to provide" the service. MWRA § 3(b)(2). The agency did that by setting rates that include the costs of safety and security measures that are "used and useful" in the provision of IPCS. *See Order* ¶¶ 365–382.

After closely analyzing providers' cost data, the FCC found that certain security costs—e.g., costs for blocking calls to specified numbers,

PUBLIC COPY

or preventing unpermitted three-way calls—are inherent to providing IPCS. *E.g.*, *Order* n.1423. It included such costs in setting the lower bounds of the zones of reasonableness. *See id.* ¶¶ 395–397. By contrast, the Commission found that other activities—e.g., processing search warrants and monitoring communications for information gathering—while valuable to correctional institutions, "do not facilitate the provision of IPCS," and so are not used and useful costs that should be bundled into "just and reasonable" IPCS rates. *Id.* ¶¶ 394, 398, 401.

Pay Tel contends (Mot. 13) that the FCC was not permitted to employ the "used and useful" framework in establishing IPCS rate caps. But the Commission has applied this approach for decades to set just and reasonable rates in other contexts. Doing so "prevents ratepayers from having to pay for costs that are primarily incurred for the benefit of the provider, while allowing regulated entities to be compensated for providing service." *Id.* ¶ 384 & n.1382. It thus appropriately implements Congress's directive that the Commission "consider costs associated with any safety and security measures necessary to provide [IPCS] service" while also assuring "just and reasonable rates" for users. MWRA § 3(a), (b)(2).

- 13 -

PUBLIC COPY

Pay Tel further argues (Mot. 13–14) that the FCC erred in excluding several categories of safety and security costs from the lower bound of reasonableness because, Pay Tel contends, those measures are essential to protecting the public. As the Commission explained, however, "[c]orrectional facilities remain free to implement any safety and security measures of their choosing; they just cannot expect the IPCS consumer to bear the cost of all of those choices." *Order* ¶ 379.

Finally, Pay Tel argues the "used and useful" framework is inapt in "the unique IPCS context," where correctional officials and IPCS users will not take the same view of which safety and security measures are beneficial. Mot. 14. The Commission considered this issue fully, concluding that "incarcerated people or their loved ones are the ones paying for and using IPCS," and so must be the users benefited by any provider costs. *Order* ¶ 380. To instead evaluate safety and security costs under a framework that characterized correctional institutions as customers would be incompatible with the FCC's obligation to ensure just and reasonable rates and charges. *Id.*

PUBLIC COPY

### 2.  The FCC reasonably determined which security costs are "used and useful."

Contrary to Pay Tel's claim of arbitrariness (Mot. 14–15), the FCC carefully analyzed which safety and security functions are necessary to the provision of IPCS, and which are not. *See Order* ¶¶ 339–407. Thus, it allowed recovery for costs related to compliance with the Communications Assistance for Law Enforcement Act, even though that statute does not directly benefit users, because compliance is a legal prerequisite to providing telecommunications in any area, even outside of correctional facilities. *Id.* ¶ 391; *see id.* ¶¶ 391–393. By contrast, the Commission reasonably excluded costs related to law enforcement support system services—such as anonymous tip lines—which may benefit incarcerated people in a general sense, but which are not necessary to the provision of ICPS. *Id.* ¶ 394.

More generally, because the categories of safety and security costs in the data collection were necessarily "imprecise," and because "providers' allocations of their safety and security costs [were] at times inexact among these categories," the agency evaluated those categories based on "the preponderance of tasks or functions within each category." *Order* ¶ 385. Such "[im]perfect empirical or statistical data" is not

PUBLIC COPY

"unusual in day-to-day agency decisionmaking," and the FCC properly "made a reasonable predictive judgment based on the evidence it had." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021).

### C.    The Commission treated ancillary service charges reasonably.

Ancillary service charges "have been a continuous source of confusion and gamesmanship, significantly increasing the costs of IPCS," by as much as 40%. *Order* ¶ 409 (quotation marks and citations omitted); *see Global Tel*Link*, 866 F.3d at 415 (ancillary charges can serve as a "loophole" to rate caps). The Commission recognized that some types of ancillary services are "an inherent part of providing inmate calling services," and their costs should be recoverable. *Order* ¶ 415 (quotation marks omitted). The Commission therefore included the costs of those ancillary services in setting rates. *Id.* ¶ 414. However, the Commission prohibited assessing separate fees, as providers had often done previously, so that providers cannot continue to "charge multiple fees for the same transaction"—"a problem…well-documented in the record," *id.* ¶ 418—and also to create a cost recovery framework that is easier for users to understand and for providers to administer, *id.* ¶ 421.

PUBLIC COPY

Pay Tel argues this approach will unfairly force "those who do not cause the costs" to pay for them. Mot. 15. But the Commission found that these services are an "intrinsic part of providing IPCS," rather than voluntary add-ons. *Order* ¶ 425 (quotation marks omitted) (many services are "either universally or near universally incurred by" all end users).

Pay Tel also argues that prohibiting separate fees for ancillary services "will encourage user behavior that increases those costs…such as high volumes of small deposits." Mot. 15–16. Pay Tel offers no support for this contention, and we are aware of none. Moreover, Pay Tel does not suggest why the Commission should have treated IPCS providers differently from non-IPCS communications providers, which do not charge for routine business functions separate from their rates. In these circumstances, the Commission reasonably declined to "set minimum funding amounts," while also stating it will "continue to monitor…concerns" that IPCS providers need additional protections "to better manage costs." *Order* n.280.

PUBLIC COPY

## II.    THE REMAINING FACTORS WEIGH AGAINST A STAY

### A.    Pay Tel's allegations of irreparable harm are inadequately substantiated and not credible.

Pay Tel asserts (Mot. 17-18) that it will incur losses from the ban on separate charges for ancillary services, which takes effect November 19, 2024. But as the Wireline Competition Bureau explained in denying Pay Tel's agency stay petition, that claim is "misleading." *Stay Denial Order* ¶ 36. The rate caps, once they go into effect, "include recovery of all costs of providing ancillary services," because the agency incorporated those costs in setting rates. *Id.* And before those caps go into effect, Pay Tel is permitted to charge even higher, above-cost rates, "allow[ing] it to recover its costs of providing both IPCS and ancillary services, plus an additional margin of profit." *Id.* █████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████ ███████████ ████████████

Pay Tel alleges further losses "[o]nce the rate caps are fully in effect." Mot. 18. As Pay Tel acknowledges, those caps will "phas[e] in" gradually. *Id.* For contracts that conflict with the Commission's "new

rules involving rates,…site commissions, or passthrough charges," but formed before June 27, 2024, compliance is not required until January 1, 2026 (for prisons and large jails), or April 1, 2026 (for all other jails). *Order* ¶ 587. Pay Tel does not specify which, if any, of its contract rates it must reduce before 2026, and it thus fails to show imminent harm from the Commission's new rate caps.

Pay Tel's other, passing claims of irreparable harm are also insufficient. Pay Tel mentions "regulatory compliance costs," Mot. 18, but without attempting to substantiate them. Pay Tel also claims it will "incur…stranded costs of investment for nascent safety and security features" and costs "to de-integrate existing safety and security features." *Id.* There is no reason to credit those bare assertions when the *Order* emphasizes that IPCS providers are free to offer any and all security measures that a correctional facility may request, so long as end users are not charged for the costs of measures not "used and useful" to IPCS. *E.g.*, *Order* ¶¶ 378–379.

There is also reason to doubt Pay Tel's projection of ███████ ██████ once the rate caps take full effect in 2026. *See* Mot. 18; *Stay Denial Order* ¶ 35. The Commission found, in general, that IPCS providers' reported costs were likely "overstated," *Order* ¶ 188, especially

because they exceeded reported revenues by $219 million (over 16 percent of industry revenue), *id.* ¶ 210 & App. F ¶ 18, p. 417. And there was particular reason to believe Pay Tel's reported IPCS costs were inflated, because ███████████████, the company's reported IPCS expenses including site commissions ███████████████████ ██████████." *Stay Denial Order* ¶ 35.[3]

Even using Pay Tel's "likely…overstated" reported IPCS costs, the Commission in the *Order* estimated ████████████████████████ than Pay Tel now projects from the new rules. *Id.* ¶ 35 & n.135. The FCC's estimate, moreover, did not account for the increase in demand for IPCS—and corresponding increase in IPCS revenues—likely to arise from lower rates. *See Stay Denial Order* ¶ 35 & n.136. Taking that factor

---

[3] Pay Tel suggests (Mot. 19) that the FCC's doubts about Pay Tel's reported costs are in tension with the *Order*'s characterization of providers' data submissions as "broadly consistent with their submitted financial accounts." *Order* App. D ¶ 9, p. 395. There is no contradiction. The submitted financial reports provided company-level data, and provided no insight into cost allocations to particular facilities or lines of business. It is the latter cost allocations that providers have an incentive to inflate, and about which the Commission expressed doubt. *See Order* ¶¶ 210–212 (industry-reported costs exceeded revenues by $219 million); *id.* App. F ¶ 18, p. 417 (██████████████████████████); *id.* App. J ¶ 10 n.27, p. 482 (doubting that Pay Tel's cost allocations accurately reflect costs).

PUBLIC COPY

into account, the Wireline Competition Bureau has estimated a ███

████████████████████████████████████████████████

████████████, which will offset the *Order*'s estimate of

████████████ under the new rules. *Id.* ¶ 35. With that offset, the

Bureau found "the new rate caps will ██████████████████

███████████████████████████████████."

*Id.*[4] In addition, the Bureau observed that ████████████████

████████████████████████████████████████████

██████████████████ ███████ ████ Thus,

there is reason to think "Pay Tel may well be able to ████████████

██████████" *id.*, and that the ████████████████ of the *Order* for

Pay Tel's business will not be ████████████, as Pay Tel claims, Mot. 16.

## B.    A stay would harm the public interest.

In enacting the MWRA, Congress recognized that excessive rates

for IPCS present a significant societal problem. *See Order* ¶¶ 26, 29, 31

& n.123, 584. Pay Tel contends (Mot. 20–23), counterintuitively, that a

---

[4] Pay Tel's declarant seems to allege that the Commission's calculation failed to account for additional IPCS costs and revenues that the company did not report as such because of the company's interpretation of the data collection instructions. Wood Decl., Mot. Ex. B-2, at 7 n.8. Pay Tel does not explain what these products or services are, or how they would be affected by the rules in the *Order*.

stay of the *Order* designed to end those excessive rates would benefit the public interest.

Pay Tel's central claim is that the *Order* could make IPCS services "unavailable or less available" by either pricing certain providers out of the IPCS jail market, *id.* at 20–21, or by leaving correctional facilities unwilling or unable to pay for "safety and security features" that have until now been funded through site commissions, *id.* at 22. Both theories are speculative, and the Commission reasonably expected IPCS to remain available—and grow more accessible—under the new rules.

The Commission sensibly found that the rate caps are unlikely to reduce service because providers representing 96 percent of minutes were projected to have revenues above reported costs, ██████████████████
██████████████████████████. *Stay Denial Order* ¶ 40 & n.150. Thus providers with higher reported costs may well "become more efficient" and remain in the market. *Order* App. J ¶ 7, p. 481; *see above* Part II.A. But even if not (and assuming such providers do not obtain a waiver, *see Order* ¶¶ 475–81), true competition "may sometimes drive out inefficient competitors." *Id.* App. J. ¶ 7 & n.18, p. 481. A stay, by contrast, would prolong the well-recognized lack of competition among providers in the "retail" (i.e., end-user) market. *See Order* ¶ 44.

PUBLIC COPY

Pay Tel's suggestion that correctional facilities will elect to curtail access to IPCS because they are unwilling or unable to pay for safety and security features (Mot. 20) is similarly speculative. The Commission found it highly unlikely that "facilities [will] limit or deny access to IPCS as a result of the elimination of site commission payments." *Order* ¶ 312. That is because there are "well-documented benefits" for "correctional institutions," and for society more generally, "in allowing incarcerated people access to IPCS," and "the record contains no indication that IPCS deployment has decreased or been eliminated in states that have eliminated site commissions." *Id.* (quotation marks omitted). Furthermore, it is doubtful that correctional facilities would risk incurring the "intensely negative backlash" likely to follow from the elimination of IPCS. *Id.* (quotation marks omitted).

Pay Tel's declaration from the sheriff of Alamance Country, North Carolina (Mot. Ex. E) is not to the contrary. The sheriff acknowledges that if, because of the *Order*, more money is needed for IPCS services at the county's detention facility, he can "ask for new funding in the next [local government] budget cycle"; he merely claims "not [to] know whether such a request would be honored." *Id.* ¶ 7. That does not

PUBLIC COPY

demonstrate that the *Order* "will result in a loss of service" (*id.* ¶ 8) for incarcerated people.

In truth, a stay would run decidedly counter to the public interest. Congress directed the FCC to change a "broken system" under which incarcerated people and their families have for too long paid "exorbitant rates" for the benefit of IPCS providers and correctional facilities. 168 Cong. Rec. H10027-28 (daily ed. Dec. 22, 2022). There is no cause to maintain that system pending judicial review.

## CONCLUSION

The motion for stay should be denied.

PUBLIC COPY

Dated:  November 7, 2024

Respectfully submitted,

/s/  Robert J. Wiggers

/s/  Matthew J. Dunne

 Jonathan S. Kanter
   *Assistant  Attorney General*

Robert B. Nicholson
Robert J. Wiggers
   *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
   *General Counsel*

Jacob M. Lewis
   *Deputy General Counsel*

Sarah E. Citrin
   *Deputy Associate General Counsel*

Matthew J. Dunne
   *Counsel*

FEDERAL COMMUNICATIONS
   COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

PUBLIC COPY

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.   This document complies with the type-volume limit of Fed. R. App.
P. 27(d)(2) because, excluding the parts of the document exempted
by Fed. R. App. P. 32(f):

☒   this document contains <u>4629</u> words, *or*

☐   this document uses a monospaced typeface and contains <u>    </u>
lines of text.

2.   This document complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) because:

☒   this document has been prepared in a proportionally spaced
typeface using <u>Microsoft Word for Office 365</u> in <u>14-point
Century Schoolbook</u>, *or*

☐   this document has been prepared in a monospaced spaced
typeface using <u>        </u> with <u>        </u>.

<u>/s/  *Matthew J. Dunne*      </u>
Matthew J. Dunne
      *Counsel*
*Federal Communications Commission*