REDACTED FOR PUBLIC INSPECTION

No. 24-8028, No. 24-1969

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

PAY TEL COMMUNICATIONS, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of the Federal Communications Commission
in WC Docket Nos. 23-62 and 12-375

**PAY TEL'S REPLY TO FCC AND UNITED STATES IN SUPPORT OF
MOTION FOR STAY PENDING JUDICIAL REVIEW**

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC  27602
Telephone: (919) 839-0300

November 14, 2024

*Counsel for Petitioner*

REDACTED FOR PUBLIC INSPECTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................... i

INTRODUCTION ............................................................ 1

I.      PAY TEL IS LIKELY TO SUCCEED ON THE MERITS ....... 2

      A.     The Order Does Not Ensure Fair Compensation for All IPCS Providers ........................................................ 2

      B.     The Order Unlawfully Excludes Safety and Security Features ............................................................... 4

      C.     Treatment of Ancillary Fees ........................... 5

II.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT A STAY ............................. 6

      A.     Pay Tel Will Suffer Irreparable Harm Without a Stay ................................................................ 6

      B.     The Remaining Factors Support a Stay ......................... 11

CONCLUSION ................................................................ 11

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DECLARATION OF M. SUZANNE HAFFNER

COMMENTS OF GLOBAL TEL*LINK CORPORATION, Docket Nos. 23-62, 12-375 (Oct. 28, 2024)

REDACTED FOR PUBLIC INSPECTION

## INTRODUCTION

Pay Tel Communications, Inc. ("Pay Tel") respectfully submits this Reply to the Opposition of Respondents Federal Communications Communication and United States to Pay Tel's Motion for Stay Pending Judicial Review ("Motion").[1]

Respondents assert that the IPCS industry suffers from "egregiously high" rates (at 2).  But the existing rates were set by the FCC just three years ago, based on actual cost data[2] submitted by IPCS providers.  *See 2021 IPCS Order,* 36 FCC Rcd 9519, at ¶ 28 (rel. May 24, 2021) (the "reforms adopted here will enable consumers . . . to obtain essential communications capability at just and reasonable rates"). The rates in the Order under review are an average of 57% lower than (i.e. less than half of) the "just and reasonable" rates approved by the FCC in 2021. There is nothing in the record remotely suggesting industry cost declines of this magnitude in the last three years.

---

[1] Pay Tel believes that the Court has the jurisdiction to rule on Pay Tel's Motion regardless of whether the Court ultimately retains jurisdiction and venue over the consolidated appeal. *See* 28 U.S.C. § 2112(a)(4).  Pay Tel reserves the right to seek transfer of this appeal at the appropriate time. *See* Order of Court, Nos. 24-8028, 24-1860, 24-1927 (Oct. 21, 2024) (denying Securus motion to transfer "without prejudice to later revisitation of all issues bearing on venue and potential transfer").

[2] These rates were based on costs excluding site commissions, consistent with the Order.

Pay Tel supports regulation of the industry. But IPCS is already one of the (probably *the*) most highly regulated industries under the FCC's jurisdiction. *See, e.g.*, 47 C.F.R. §§ 64.6000–64.6130. The insinuation that the Order is the only restraint on IPCS rates is inaccurate.

## I. PAY TEL IS LIKELY TO SUCCEED ON THE MERITS

### A. The Order Does Not Ensure Fair Compensation for All IPCS Providers

As regards the proper analysis of the "fair compensation" requirement of Section 276(b)(1)(A), Respondents repeat arguments fully debunked by Securus in its reply supporting its stay request, *see* Securus reply, at 2-4 (Oct. 25, 2024), which Pay Tel incorporates by reference.

As regards the Order's impact on the industry, Respondents concede that the FCC's Order fails to provide cost recovery for one-third of the control group used to establish rates,[3] including Pay Tel. Respondents' Opposition implies that elimination of one-third of competitors is fine because the remaining providers serve the vast majority of total industry minutes—ignoring that Pay Tel serves 100% of the minutes for the nearly 24,000 people in its 151 facilities, many of them small, higher-cost jails. Respondents offer no plausible explanation for how the Order's apparent intention to eliminate one-third of the market competitors can

---

[3] The likely impact is understated, as this control group excludes other providers whose data were deemed unreliable.

2

REDACTED FOR PUBLIC INSPECTION

be consistent with the Congressional directive to afford "fair compensation" or to promote competition and the widespread availability of the service. 47 U.S.C. § 276(b)(1).

Similarly, Respondents fail to explain why the remaining industry participants would serve the small, high-cost facilities previously served by the companies driven out of business. Respondents do not dispute Pay Tel's showing (Motion, at 11) that the Order results in up to 50% of the nation's jails being unable to recover their costs. Rather, they argue (at 11) that facility-by-facility cost data is unreliable because of the large variation in reported costs—claiming that Pay Tel's reported range of costs for very small jails ranged from ███████ ████████████. Setting aside that there are real differences between jails that impact costs (e.g., population turnover, calling restrictions imposed by Sheriffs), Respondents' assertion about Pay Tel's data is incorrect. Their calculations appear nowhere in Pay Tel's cost filings. Pay Tel's actual reported range for its smallest jails is █████████████████████████████████ and a relatively low standard deviation of 0.12—all suggestive of a reliable dataset.

Regardless, even accepting some variances in how providers allocate costs, whether the percentage of the nation's jails where costs exceed revenues is 25% or 50%, Respondents have no explanation for why providers would offer service in money-losing facilities when they are under no requirement to do so.

**B.    The Order Unlawfully Excludes Safety and Security Features**

Respondents' opposition illustrates the arbitrary and results-driven nature of its exclusion of safety and security costs—accounting for 84% of the reduction in audio rates.    Order ¶ 209.    Respondents state that the FCC permitted costs associated with "preventing unpermitted three-way calls" (at 13)—yet its Order excludes such costs. Pay Tel repeatedly explained that voice biometrics and recording are essential tools to detecting and preventing three-way calls (*see, e.g.*, Motion at Ex. C, Townsend Decl. ¶¶ 21-24), but the Order excludes recovery of these costs.    Order at ¶ 339.    Making matters worse, the Order holds that the provision of these excluded safety and security services constitutes prohibited "in kind" site commission which, if provided to the facility, would expose the provider to enforcement action, including fines. *Id.* ¶¶ 222, 597.

The FCC's shifting explanations of its standard (i.e., directly benefits; predominantly used and useful; no direct benefit but used and useful), and its inconsistent application of the same, constitutes arbitrary and capricious decision-making. *See Okuno v. Reliance Standard Life Ins. Co.,* 836 F.3d 600, 612 (6th Cir. 2016) (shifting explanations are indicative of arbitrary and capricious determination).    To be clear, Pay Tel agrees that costs unrelated to IPCS (e.g., mail scanning, ankle bracelets) should not be included in the rate, but the Order excludes costs which are directly related to, caused by, and necessary for the

4

REDACTED FOR PUBLIC INSPECTION

provision of IPCS. And the Order fails to perform the statutorily required task of determining which measures are "necessary." *Compare* MWRA at Section 3(b)(2) ("shall consider costs associated with any safety and security measures necessary to provide [IPCS]") *with* Order ¶ 162 n.576 (no need to define the term "necessary").

The Order's hair-splitting of IPCS technology has real-world consequences for public safety and will cause Sheriffs, who have a duty to ensure public safety, to curtail service availability. *See* Motion, Ex. D, Sheriff Johnson Decl., at 8.

## C.    Treatment of Ancillary Fees

As regards the Order's total elimination of ancillary fees, Respondents state (at 16) that the FCC's prior rules created "confusion" over charging multiple fees for the same transaction and the opportunity for gamesmanship. As an initial matter, the Order's implementation of the ancillary fee prohibition does nothing to clear up any "confusion" and, absent a stay, in fact creates far more. *See e.g.*, Comments of Global Tel*Link Corporation, Docket Nos. 23-62, 12-375 (Oct. 28, 2024) (Ex. 2). Further, a simpler path would have been to prohibit charging multiple fees for the same transaction or otherwise clarifying its rules, rather than prohibit recovery of costs directly associated with the method by which consumers choose to fund calling accounts.

Respondents' characterization of payment fees as "intrinsic" (at 17) has no

REDACTED FOR PUBLIC INSPECTION

bearing on the fact that not all users utilize payment methods which create payment costs for providers. And Respondents' dismissal (*id.*) of Pay Tel's argument that pricing payment fees at zero will incent user behavior which will further increase costs disregards clear economic incentive—when elsewhere Respondents argue that lower IPCS prices will incent demand.

## II.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT A STAY

### A.     Pay Tel Will Suffer Irreparable Harm Without a Stay

Respondents' response to Pay Tel's showing of irreparable harm dwells on quibbles while seeking to minimize the obvious catastrophic impact the Order would have on Pay Tel. Pay Tel demonstrated in its Motion that the Order will cause it to swing from a modest ███████████████████████████ ███████████. Respondents' response is to say (at 20) that ████████████ ████████████████████████████████████████████████████████ ███████—but Respondents' calculations rely on the disallowance of the vast majority of industry's reported safety and security costs which is being challenged in this appeal.

Respondents' argument overlooks that the purpose of the stay remedy is to prevent irreparable harm while the court is adjudicating the merits of an appellant's claims. A party

REDACTED FOR PUBLIC INSPECTION

> need not demonstrate that the denial of injunctive relief will be fatal to its business. It is usually enough if the plaintiff shows that its legal remedies are inadequate. If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18–19 (1st Cir. 1996) (cleaned up). Here, Pay Tel has demonstrated substantial injury in that implementation of the Order will cause ████████████████████████████ ████████████████████████ If permitted to go into effect, Pay Tel will be forced to ██████████████████████████████—any of which is irreparable harm by any definition.

Respondents' remaining arguments do nothing to alter the fact that, by design, the Order will ████████████████.

First, Respondents speculate that lower rates will increase demand which will result in ██████████████████████████████████ ██████████████████████████████████████. Further, that claim assumes a price elasticity of demand of 0.3 (i.e., each 1% reduction in rates will result in a 0.3% increase in demand), an assumption not supported by any evidence in the record and calculated based on what the FCC characterized as insufficient data and an unverifiable analysis. *See* 2021 IPCS Order, 36 FCC Rcd 9519, at n.606. Further Respondents' speculation about increased usage conflicts with its own conclusion that the IPCS market is not a properly functioning market;

i.e., it does not respond to normal demand and supply signals because access to IPCS is dictated by the facilities themselves—not by the wishes of users.  *See, e.g.,* Motion, Ex. D, Sheriff Johnson Decl., at 8.  Respondents' speculation about "what could happen" does not provide a competent basis for disregarding the irreparable harm to Pay Tel flowing from implementation of the Order.

Second, Respondents seek (at 19-20) to trivialize Pay Tel's projected ████ ████████████████████████████ by claiming its costs are "likely overstated" but the agency fails to demonstrate, or even allege, that any particular costs are overstated.  Pay Tel's cost filings have been prepared with great care and attention by experienced staff from the company's financial records, supervised by Pay Tel's outside regulatory consultant, and tied to financial statements which are audited yearly.  Pay Tel has made its personnel available to the Commission staff to address questions and at no point has staff asserted that Pay Tel's costs are "overstated."   Indeed, heretofore, the agency noted the integrity of the data provided by Pay Tel, even relying on Pay Tel to set the rate cap on payment processing fees.  *See* 2015 IPCS Order, 30 FCC Rcd 12763, at ¶ 167 (Nov. 5, 2015).

Respondents' specific claims in this regard are misleading.  First, they claim that ███████████████████████████████████████████████ ███████████████████████████████████████████████

REDACTED FOR PUBLIC INSPECTION

████████████████████████████████████████████████████████████

███████████████████████████████████████.  Second, Respondents assert

that ███████████████████████████████████████████████████████ —

again, a misleading claim.  What Respondents mean by this is that—after

(wrongly) rejecting large portions of other providers' costs—Pay Tel's costs are

higher than those adjusted costs.  *See* Motion, Ex. B-2, Wood Decl. ¶¶ 22-24.

Variations in how providers reported safety and security costs, and the

Commission's subsequent use of only expenses exclusive of these costs, means

that no conclusions can be drawn about relative efficiency among providers.  *See,*

*e.g.*, Order ¶ 184. Rather than buckets of "efficient" and "inefficient," what they

have is a "reported a high percentage of total costs as safety and security" bucket

and "reported a low percentage of total cost as safety and security" bucket.  The

FCC cannot use the very cost manipulations which are being challenged in this

litigation to claim that Pay Tel's "reported costs" substantially exceed other

providers' costs.

Third, Respondents chide Pay Tel for not specifying which of its contract

rates it must reduce in 2025—saying that it has failed assert imminent harm (at 19).

But Respondents do not even claim that "imminent" harm is a component of the

legal standard (at 8). Irreparable harm is sufficient, which Pay Tel has clearly

shown through verified pleading.  Nonetheless, in the absence of stay, ██████████

REDACTED FOR PUBLIC INSPECTION

███████████████████████████████████████████████████

█████████████████████████████████. *See* Ex. 1, Haffner Decl.  So

not only will the harm shown by Pay Tel be irreparable, it will also be imminent.

Fourth, Respondents dismiss Pay Tel's claim of compliance costs as

unsubstantiated (at 19).  It is not clear what Respondents would have Pay Tel do.

The Order will require the re-negotiation of all of the contracts for Pay Tel's 151

facilities, a massive undertaking.  These negotiations will be arduous, as Pay Tel

will explain to each Sheriff and their procurement officers how (a) Pay Tel can no

longer pay site commissions; (b) how the facilities will not be permitted to receive

compensation for their own costs in administering IPCS; and (c) how Pay Tel can

no longer provide safety and security features that Sheriffs have, for years,

requested and demanded.  These discussions will be undertaken in a competitive

environment where all providers are struggling to interpret the Commission's 500-

page order which upends what had been accepted business practices—all of which

will undoubtedly lead to contractual and competitive disputes, and likely the loss

of some contracts.

Finally, disputing Pay Tel's claim of stranded costs due to the Order's

disallowance of the majority of safety and security costs and their related

functionality, Respondents claim (at 19) that Pay Tel is free to offer any and all

safety and security measures so long as end users are not charged or costs not

REDACTED FOR PUBLIC INSPECTION

classified as used and useful. This is a misstatement.  As stated above, the Order prohibits the provision of any service not deemed "used and useful" as a prohibited in-kind site commission payment.   Order ¶ 222. Respondents' presumption that jails have untapped funds to pay for features and function which have, to date, been provided as part of IPCS is unsupported by record evidence.

### B.     The Remaining Factors Support a Stay

Since 1996, the FCC has had jurisdiction over IPCS rates.  Existing rates charged by IPCS providers are compliant with the rate caps established by the FCC based on an extensive evidentiary record only three years ago.  The Commission cannot now complain that its new rates must immediately when the existing rates were recently implemented reflecting the agency's reasoned judgment. The "public's true interest lies in the correct application of the law." *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). Neither the agency nor the public has a compelling interest in the immediate implementation of new rates which may be reversed after judicial review.

### CONCLUSION

The Court should stay the FCC's Final Rules pending judicial review.

REDACTED FOR PUBLIC INSPECTION

Dated:  November 14, 2024

Respectfully submitted,

*/s/ Marcus W. Trathen*
Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC  27602
Telephone:  (919) 839-0300
mtrathen@brookspierce.com
ahawkins@brookspierce.com
cdodd@brookspierce.com

*Counsel for Petitioner*
 *Pay Tel Communications, Inc.*

REDACTED FOR PUBLIC INSPECTION

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 27(d) and 32(g), the undersigned hereby certifies that this Reply complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

1.     Exclusive of the accompanying documents as authorized by Fed. R. App. P. 27(a)(2)(B) and the exempted portions of the Reply as provided by Fed. R. App. P. 27(d)(2) and 32(f), the Reply contains 2,569 words.

2.     The Reply has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font as provided by Fed. R. App. P. 32(a)(5)-(6). As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ *Amanda S. Hawkins*
Amanda S. Hawkins

November 14, 2024

REDACTED FOR PUBLIC INSPECTION

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 14, 2024, I caused a redacted copy of this Reply to be filed electronically through the Court's CM/ECF system, a copy of which will be served on all counsel of record through the Court's CM/ECF system.

I further certify that on November 14, 2024, I provided an electronic copy of the unredacted and under-seal Reply to the Clerk's Office for the United States Court of Appeals for the First Circuit.

I further certify that on November 14, 2024 I emailed copies of the unredacted and under-seal Reply to counsel of record as follows:

Robert Wiggers
robert.wiggers@usdoj.gov
Robert Nicholson
robert.nicholson@usdoj.gov
*Counsel for Respondent*
 *United States of America*

Matthew Dunne
Matthew.Dunne@fcc.gov
Sarah Citrin
Sarah.Citrin@fcc.gov
*Counsel for Respondent FCC*

Elizabeth Deutsch
EDeutsch@jenner.com
*Counsel for DARE*

/s/ *Amanda S. Hawkins*
Amanda S. Hawkins

November 14, 2024

REDACTED FOR PUBLIC INSPECTION

# EXHIBIT 1

REDACTED FOR PUBLIC INSPECTION

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
No. 24-8028, No. 24-1969

| | |
|---|---|
| PAY TEL COMMUNICATIONS, INC., <br><br> *Petitioner*, <br><br> v. <br><br> FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, <br><br> *Respondents*. | **DECLARATION OF M. SUZANNE HAFFNER** |

1.      My name is M. Suzanne Haffner.  I am the Vice President of Business Development for Pay Tel Communications, Inc. ("Pay Tel").  In this capacity, I oversee and implement Pay Tel's contracts with confinement facilities.  This Declaration is submitted based on my own personal knowledge.

2.      I have reviewed Pay Tel's Reply to the FCC Opposition to Motion for Stay Pending Judicial Review.  I can confirm, as stated on page 9 of the Reply, that in the absence of stay, ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████.

REDACTED FOR PUBLIC INSPECTION

I declare under penalty of perjury under the laws of the United States of America that the foregoing information and materials are true and correct to the best of my knowledge, information and belief.

Executed on the 13th day of November, 2024.

M. Suzanne Haffner

REDACTED FOR PUBLIC INSPECTION

# EXHIBIT 2

REDACTED FOR PUBLIC INSPECTION

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Incarcerated People's Communications Services; | ) | WC Docket No. 23-62 |
| Implementation of the Martha Wright-Reed Act | ) | |
| | ) | |
| Rates for Interstate Inmate Calling Services | ) | WC Docket No. 12-375 |
| | ) | |
| _____ | ) | |

**COMMENTS OF**
**GLOBAL TEL\*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES**

Global Tel*Link Corporation d/b/a ViaPath Technologies ("ViaPath"),[1] by its undersigned counsel, respectfully submits these comments regarding the effective date for implementation of the prohibition on incarcerated people's communications service ("IPCS") ancillary service charges adopted by the Federal Communications Commission ("Commission") in the *2024 IPCS Order*[2] as discussed in the Petition for Partial Stay and Petition for Reconsideration and/or Clarification filed in the above-referenced dockets.[3]

---

[1]      These comments are filed by ViaPath on behalf of itself and its wholly owned subsidiaries that also provide incarcerated people's communications services: DSI-ITI, Inc. d/b/a ViaPath Technologies, Public Communications Services, Inc. d/b/a ViaPath Technologies, Telmate, LLC d/b/a ViaPath Technologies, and Value-Added Communications, Inc. d/b/a ViaPath Technologies.

[2]      WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, FCC 24-75 (rel. July 22, 2024) ("*2024 IPCS Order*") (subsequent history omitted).

[3]      WC Docket Nos. 23-62, 12-375, Petition for Partial Stay (dated Oct. 21, 2024); WC Docket Nos. 23-62, 12-375, Petition for Reconsideration and/or Clarification (dated Oct 21, 2024). Pursuant to Rule 1.45(d), responses to a request for stay shall be filed within 7 days after the request is filed, or by October 28, 2024. *See* 47 C.F.R. § 1.45(d).

REDACTED FOR PUBLIC INSPECTION

In the *2024 IPCS Order*, the Commission adopted "comprehensive reforms"[4] to implement the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWR Act"),[5] which the Commission concluded represented an "effort to comprehensively address unreasonably high rates and charges that incarcerated people and their families pay for communications services."[6] There are three main components of the Commission's "comprehensive plan"[7] to ensure just and reasonable rates:  (1) "Lower existing per-minute rate caps for audio IPCS and establish initial interim per-minute rates for video IPCS;" (2) "Lower the overall prices consumers pay for IPCS and simplify the pricing structure by incorporating the costs of ancillary services in the rate caps and prohibiting providers from imposing any separate ancillary service charges on IPCS consumers;" and (3) "Prohibit IPCS providers from making site commission payments for IPCS and preempt state and local laws and regulations requiring such commissions."[8]

While other rule changes are scheduled to take effect 60 days after Federal Register publication, the Commission unequivocally determined that implementation of its new comprehensive compensation plan would require additional time.[9]  The Commission understood and explained that IPCS providers and their correctional facility customers would require "additional time . . . to renegotiate contracts in response to [the Commission's] actions" and to "accommodate the legislative process to amend state or local laws and regulations" that conflicted with the FCC's new compensation plan.[10]  Accordingly, the Commission adopted a "staggered"

---

[4]     *2024 IPCS Order* ¶¶ 2, 3, 242, 590.

[5]     S. 1541 (2022), https://www.congress.gov/bill/117th-congress/senate-bill/1541/text.

[6]     *2024 IPCS Order* ¶ 5.

[7]     *2024 IPCS Order* ¶ 82.

[8]     *2024 IPCS Order* ¶ 3.

[9]     *2024 IPCS Order* ¶ 588

[10]    *2024 IPCS Order* ¶ 588.

REDACTED FOR PUBLIC INSPECTION

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

implementation process for those contracts that "would require material alteration through renegotiation due to a conflict with [the Commission's] new rules involving rates, contractually prescribed site commissions, or passthrough charges included in the rates."[11]   The Commission determined such additional time was necessary "given the comprehensive nature of the reforms" adopted in the *2024 IPCS Order*.[12]

There is no question the *2024 IPCS Order* intended for all of the Commission's rate reforms – the prohibition on separate ancillary service charges, the new rate caps now incorporating the costs of ancillary service charges, and the prohibition on site commissions contained in contracts or state laws – to be subject to the staggered implementation process designed by the Commission.[13]   Any other interpretation[14] conflicts with the Commission's treatment of ancillary service charges as "rates," the Commission's rationale for adopting a staggered transition for contract amendments and state law changes, and the operational difficulties associated with changing one of the comprehensive reform measures on a different schedule than the others,[15] as supported by the attached Declaration.[16]

---

[11]     *2024 IPCS Order* ¶ 587.

[12]     *2024 IPCS Order* ¶ 590.

[13]     *2024 IPCS Order* ¶ 587.

[14]     *See, e.g.*, WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Order Denying Stay Petition, DA 24-1031, ¶¶ 28-29 (rel. Oct. 2, 2024) ("*Securus Stay Order*"); WC Docket Nos. 23-62, 12-375, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services*, Order Denying Stay Petition, DA 24-1074, ¶¶ 29-32 (rel. Oct. 15, 2024) ("*Pay Tel Stay Order*").

[15]     47 C.F.R. § 0.5(c) (delegating authority to staff "to act on matters which are minor or routine or settled in nature"); 47 C.F.R. § 0.291 ("The Chief, Wireline Competition Bureau shall not have authority to act on any applications or requests which present novel questions of fact, law or policy which cannot be resolved under outstanding precedents and guidelines.").

[16]     Declaration of John C. Pitsenberger on behalf of Global Tel\*Link Corporation d/b/a ViaPath Technologies ("Declaration").

REDACTED FOR PUBLIC INSPECTION

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

<u>Ancillary service charges are "rates."</u>  The *2024 IPCS Order* is clear that the "new rules involving rates" are to be implemented using the staggered timeline established by the Commission.[17]  The Commission has determined that ancillary service charges "are inherent in the provision of IPCS."[18]  The FCC's authority to regulate ancillary service charges stems from its authority to regulate "rates" under Section 201(b) and Section 276(b).[19]

Considering ancillary service charges outside of "rates" also is inconsistent with the Commission's "total cost" approach to IPCS rates.[20]  Under that approach, the Commission incorporated the costs associated with ancillary service charges into its new rate caps, and eliminated the pass-through of separate ancillary service charges by IPCS providers.[21]  Ancillary service charges have been and continue to be intertwined and interdependent with IPCS rate caps.[22]

---

[17]     *2024 IPCS Order* ¶ 587.

[18]     *2024 IPCS Order* ¶ 415; *see also Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763, ¶ 146 (2015) ("*2015 ICS Order*") (subsequent history omitted).

[19]     47 U.S.C. §§ 201(b), 276(b)(1)(A); *see also Global Tel\*Link v. FCC*, 866 F.3d 397, 415 (D.C. Cir. 2017) (finding the FCC has authority to regulate ancillary service charges based on its authority to regulate rates under Section 201(b), which includes practices for and in connection with calls) ("*GTL*").

[20]     *2024 IPCS Order* ¶ 129.

[21]     *2024 IPCS Order* ¶ 130.

[22]     *2024 IPCS Order* ¶ 131 ("As the record shows, all of these fees 'relate to payment and billing,' and other than the paper bill fee, all of these fees address consumers' means of paying for the service they rely upon. . . . While alternative methods of funding an account remain available (e.g., by check or money order), we find that automated payment or money transmitter services are 'an intrinsic part' of accessing the service, like most other services in the 21st-century economy.").  The Commission's conclusions are consistent with the legal framework that permits it to extend its Section 201(b) jurisdiction to these ancillary service charges.  *See GTL*, 866 F.3d at 415 ("The Commission has plenary authority to regulate interstate rates under § 201(b), including 'practices . . . for and in connection with' interstate calls. . . . Furthermore, ancillary fees for *interstate* [and now intrastate IPCS per the MWR Act] calls satisfy the test of the Commission's authority under § 201(b) as they are 'in connection with' interstate calls."); *2015 ICS Order* ¶ 194 ("billing and collection services provided by a common carrier for its own customers are subject to section 201, and are therefore, subject to Commission regulation . . . . because such billing is an integral part of that carrier's communication service"); *see also* FCC-FTC Consumer Protection Memorandum of Understanding (2015) (noting "FCC authority over activities engaged in by common carriers and by non-common carriers for and in connection with common carrier activities"); *Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges ("Cramming")*, 27 FCC Rcd 4436, ¶ 120 (2012) ("Our jurisdiction extends to carrier practices 'for and in connection' with telecommunications services,

REDACTED FOR PUBLIC INSPECTION

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

The Wireline Competition Bureau also confirmed the "reforms are designed to work in concert."[23] The Commission's comprehensive compensation plan, including the prohibition on ancillary service charges, cannot "function sensibly" and fairly without all components of the plan taking effect at the same time.[24]

  <u>Ancillary service charges are set forth in contracts or in state laws</u>.  The Commission recognized that certain of its reforms "may take longer to implement due to the need for contractual amendments"[25] or "to accommodate the legislative process to amend state or local laws and regulations."[26]  Based on that recognition, the Commission established a staggered implementation process to "execute any contractual amendments necessary" or otherwise "come into compliance with [the Commission's] reforms."[27]

  The majority of ViaPath's correctional facility contracts contain provisions setting forth ancillary service charges to be assessed to complete IPCS calls, the per-minute rates for those calls,

---

not just to carrier practices "for" telecommunications services.").  Ancillary service charges cannot be disassociated from the telecommunications service rates or the contracts under which IPCS rates and ancillary services charges are defined and applied for implementation purposes.  It is unworkable and inappropriate.

[23] *Pay Tel Stay Order* ¶ 31.

[24] *MD/DC/DE Broadcasters Association v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) ("Whether the offending portion of a regulation is severable depends on the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision.") (emphasis in original); *see also Board of County Commissioners of Weld County, Colorado v. Environmental Protection Agency*, 72 F.4th 284 (D.C. Cir. 2023) ("If parts of a regulation are invalid and other parts are not, we set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together."); *Nasdaq Stock Market LLC v. Securities and Exchange Commission*, 38 F.4th 1126 (D.C. Cir. 2022) ("Severability turns on agency intent, meaning that where there is substantial doubt the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted, partial affirmance is improper.").

[25] *2024 IPCS Order* ¶ 595.

[26] *2024 IPCS Order* ¶ 588.

[27] *2024 IPCS Order* ¶ 589.

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

and the site commissions to be paid to the correctional facility.[28]  The ancillary service charges to be assessed for communications originating from a correctional facility are part and parcel of the competitive bidding and Request for Proposal ("RFP") process.[29]  Ancillary service charges cannot be divorced from the context of the contract as a whole.[30]  As the FCC has observed, the competitive bidding process for IPCS is "focused on contracts as a whole and not elements of the contracts."[31]  Requiring changes to ancillary service charges to be implemented separate and apart from the other necessary contractual changes is inconsistent with the intent of the staggered implementation process adopted in the *2024 IPCS Order* to allow more time for contractual renegotiations and amendments.[32]

The Commission also recognized that additional implementation time was necessary to "accommodate the legislative process" needed to change state laws that conflict with the *2024 IPCS Order*.[33]  Numerous states have adopted legislation and/or rules governing ancillary service charges for IPCS.[34]  Requiring a different implementation process for ancillary service charges

---

[28]     Declaration ¶ 4.  In most cases, the ancillary service charges to be assessed by ViaPath are included in ViaPath's best-and-final-offer made during the competitive bidding process.  *See* Declaration ¶ 4.

[29]     Declaration ¶¶ 3-4.

[30]     *See, e.g.*, *Express Scripts, Inc., Complainant v. AT&T Corp., Defendant*, 33 FCC Rcd 930, ¶ 13 (2018) ("selective citation of the Agreement's terms is unpersuasive because it ignores the principle that a contract must be read as a whole"); *BellSouth Telecommunications, LLC d/b/a AT&T Florida, Complainant v. Florida Power & Light Company, Defendant*, 36 FCC Rcd 12602, ¶ 31(2021) ("construction of the Abandonment Clause is incorrect because it reads the clause in isolation"); *see also KiSKA Construction Corp. v. Washington Metropolitan Area Transit Authority*, 321 F.3d 1151, 1163 (D.C. Cir. 2003) ("The law requires contracts to be read as a whole, with meaning given to every provision contained therein.").

[31]     *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519, Appendix E ¶ 18 (2021) ("*2021 ICS Order*").

[32]     *2024 IPCS Order* ¶ 588.

[33]     *2024 IPCS Order* ¶ 588; *see also Securus Stay Order* ¶ 29 (discussing whether any state or local law mandates ancillary service charges).

[34]     *See, e.g.*, Oregon Senate Bill 498 (2019); New Mexico Public Regulation Commission, 17.11.28 NMAC, Inmate Calling Service Providers Rule (last amended Nov. 7, 2023); Louisiana Public Service

REDACTED FOR PUBLIC INSPECTION

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

ignores the Commission's clear understanding that additional time is needed to amend contracts and state laws to reflect the Commission's reforms.

<u>Operational complexities exist</u>.  ViaPath has begun the process to renegotiate its correctional facility contracts as necessary to comply with the new rate cap, ancillary service charge, and site commission rules pursuant to the staggered schedule adopted in the *2024 IPCS Order*.[35]  Implementing contract changes to ancillary service charges separately from the other necessary contractual changes imposes significant "operational difficulties" for ViaPath.[36]

Ancillary service charges are contained in contracts (or in state laws), and cannot be unilaterally changed by ViaPath.[37]  ViaPath must engage in active renegotiations with the counterparties to such agreements, and any agreement reached pursuant to such discussions must then be approved by the governmental body overseeing the correctional facility.[38] This is precisely the reason the Commission adopted the staggered implementation process – "to renegotiate contracts in response to [the] actions today."[39]  Taking action to "end[] ancillary service charges would require material alteration of IPCS contracts,"[40] and introduces the same "complexities" as implementation of the new rate caps and site commission changes.[41]

---

Commission Docket No. R-32777, *Rulemaking to Establish Rules and Regulations Specific to the Regulation of Prison Telephone Communication Systems* (April 20, 2016).

[35]     Declaration ¶ 5.

[36]     Declaration ¶ 5; *see also Securus Stay Order* ¶ 29 (inquiring about whether Securus "would experience any specific operational difficulties eliminating ancillary service charges").

[37]     Declaration ¶ 6.

[38]     Declaration ¶ 6.  This process can take many months, especially if the governmental body only meets on a monthly basis.  *See* Declaration ¶ 7.

[39]     *2024 IPCS Order* ¶ 588.

[40]     *Cf. Pay Tel Stay Order* ¶ 32; *see also 2024 IPCS Order* ¶ 587 (allowing for a staggered implementation process when contracts require "material alteration" due to rule changes).

[41]     *2024 IPCS Order* ¶ 595.

REDACTED FOR PUBLIC INSPECTION

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

There is a "practical necessity"[42] to have a uniform implementation process for all of the changes required to IPCS contracts due to the rate reforms adopted in the *2024 IPCS Order*. ViaPath cannot simply flip a switch and turn off all ancillary service charges at all of its correctional facility customers with contracts that permit such charges across the nation.[43]  Rates and charges are programmed into ViaPath's billing, accounting, and operational systems by contract, and ViaPath updates those records when contract amendments are executed and approved by correctional authorities.[44]  As such, each rate and charge in ViaPath's systems corresponds to the terms of the applicable contract.[45]  Implementing changes to ancillary service charges outside of the staggered implementation process would require ViaPath to renegotiate and make these system changes twice for each of its correctional facility customers with ancillary service charges in place – first by November 19th and then pursuant to the staggered implementation deadlines.[46]

Further, ViaPath cannot renegotiate all applicable contracts to eliminate ancillary service charges alone or in concert with other rule changes to rates and site commissions prior to November 19th.[47]  If ViaPath attempts to comply with the ancillary service charge rule by November 19th without a corresponding contract amendment, it will be in violation of its correctional facility contracts.[48]  Legal and "technology and operational limitations"[49] further

---

[42]      *Cf. Pay Tel Stay Order* ¶ 31.

[43]      Declaration ¶ 8.

[44]      Declaration ¶ 8.

[45]      Declaration ¶ 8.

[46]      Declaration ¶ 9.

[47]      Declaration ¶ 10.

[48]      Declaration ¶ 10.

[49]      *See, e.g., Telephone Number Portability*, 19 FCC Rcd 875, ¶ 8 (2004) (finding special circumstances exist because of "technology and operational limitations" requiring the acquisition of hardware and software, network upgrades, and reliability and accuracy testing to meet Commission number portability requirements); *see also Rules and Policies Regarding Calling Number Identification Service*, 11

REDACTED FOR PUBLIC INSPECTION
*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

support uniform implementation of all of the Commission's interrelated and interdependent rate reforms to be subject to the staggered timeline for contracts adopted by the Commission.

## **CONCLUSION**

For the foregoing reasons, ViaPath submits the *2024 IPCS Order* provides for the uniform implementation of the Commission's comprehensive rate reforms, which include ancillary service charge changes, pursuant to the staggered schedule adopted by the Commission to accommodate necessary contract amendments and changes to state law.

Respectfully submitted,

**GLOBAL TEL\*LINK CORPORATION
D/B/A VIAPATH TECHNOLOGIES**

*/s/ Cherie R. Kiser*

Chérie R. Kiser
Angela F. Collins
CAHILL GORDON & REINDEL LLP
1990 K Street, NW, Suite 950
Washington, DC 20006
202-862-8900
ckiser@cahill.com
acollins@cahill.com

Dated:  October 28, 2024

Its Attorneys

---

FCC Rcd 11437, ¶ 7 (1996) (recognizing "that unique technical problems constitute a special circumstance").

REDACTED FOR PUBLIC INSPECTION

**DECLARATION ON BEHALF OF**
**GLOBAL TEL*LINK CORPORATION D/B/A VIAPATH TECHNOLOGIES**

I, John C. Pitsenberger, state as follows on behalf of Global Tel*Link Corporation d/b/a ViaPath Technologies ("ViaPath"):

1.      I am the Chief Financial Officer for ViaPath.  I am responsible for overseeing all financial activities of the company, including accounting, financial reporting, planning and analysis, pricing, treasury, and tax as well as the contract and procurement functions.

2.      I am making this Declaration in support of ViaPath's Comments relating to the effective date for implementation of the prohibition on incarcerated people's communications service ("IPCS") ancillary service charges adopted by the Federal Communications Commission ("Commission") in the *2024 IPCS Order*.

3.      ViaPath provides IPCS to nearly 2,000 correctional facilities across the United States pursuant to contracts entered into via competitive bidding and the Request for Proposal ("RFP") process.

4.      The majority of ViaPath's correctional facility contracts contain provisions setting forth the ancillary service charges to be assessed to complete IPCS calls, the per-minute rates for those calls, and the site commissions to be paid to the correctional facility.  The determination of which ancillary service charges will be assessed for communications originating from the facility are part and parcel of the competitive bidding and RFP process.  In most cases, the ancillary service charges to be assessed by ViaPath are included in ViaPath's best-and-final-offer made during the competitive bidding process.

5.      ViaPath has begun the process to renegotiate its correctional facility contracts as necessary to comply with the new rate cap, ancillary service charge, and site commission rules pursuant to the staggered schedule adopted in the *2024 IPCS Order*.  Implementing contract

REDACTED FOR PUBLIC INSPECTION

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

changes to ancillary service charges separately from the other necessary contractual changes raises significant operational difficulties for ViaPath.

6.      Most of ViaPath's correctional facility contracts prevent it from unilaterally changing the terms of the contract without renegotiation of or amendment to the contract. Eliminating ancillary service charges from a contract would be a material alteration of the contract triggering renegotiation and requiring a contract amendment.

7.      Once a contract amendment (or new contract) is reached, the contract must be approved by the governmental body overseeing the correctional facility.  This process can take many months, especially if the governmental body only meets on a monthly basis.

8.      ViaPath cannot flip a switch and turn off all ancillary service charges for all of its correctional facility customers with contracts that permit such charges across the nation.  Rates and charges are programmed into ViaPath's billing, accounting, and operational systems by contract, and ViaPath updates those records when contract amendments are executed and approved by the relevant governmental body.  Each rate and charge in ViaPath's systems corresponds to the terms of the applicable contract or contract amendment.

9.      Implementing changes to ancillary service charges outside of the staggered implementation process would require ViaPath to renegotiate and make system changes twice for each of its correctional facility customers with ancillary service charges in place – first by November 19th and then pursuant to the staggered implementation deadlines.

10.      ViaPath also could not renegotiate contracts to eliminate ancillary service charges alone or in concert with changes to rates and site commissions prior to November 19th.  If ViaPath attempts to comply with the ancillary service charge rule by November 19th without a corresponding contract amendment, it will be in violation of its correctional facility contracts.

REDACTED FOR PUBLIC INSPECTION

*Comments of Global Tel\*Link Corporation d/b/a ViaPath Technologies*
*October 28, 2024*

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.

Executed on October 28, 2024

*/s/ John C. Pitsenberger*

John C. Pitsenberger
Chief Financial Officer
Global Tel\*Link Corporation d/b/a ViaPath
    Technologies