Nos. 24-8028, 24-1814, 24-1859, 24-1861, 24-1884, 24-1886, 24-1922

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

## IN RE MCP 191

DIRECT ACTION FOR RIGHTS AND EQUALITY; CRIMINAL JUSTICE
REFORM CLINIC; PENNSYLVANIA PRISON SOCIETY, *et al.*

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

*Respondents.*

---

On Petitions for Review of a Final Order of the
Federal Communications Commission

---

## JOINT OPENING BRIEF OF PETITIONERS DIRECT ACTION FOR RIGHTS AND EQUALITY, CRIMINAL JUSTICE REFORM CLINIC, AND PENNSYLVANIA PRISON SOCIETY

---

Andrew Jay Schwartzman
525 Ninth Street, NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelilaw.com

*Counsel for Criminal Justice Reform Clinic*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights and
Equality*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners submit the following corporate disclosure statements:

**Direct Action for Rights and Equality** is a non-profit organization. Direct Action for Rights and Equality has no parent corporation and no publicly held corporation holds 10% or more of its stock.

**Criminal Justice Reform Clinic** is a non-profit organization. Criminal Justice Reform Clinic has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**Pennsylvania Prison Society** is a non-profit organization. Pennsylvania Prison Society has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS.................................................i

TABLE OF AUTHORITIES.........................................................iv

GLOSSARY ....................................................................x

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT....................................................5

STATUTES AND REGULATIONS ...................................................5

ISSUES PRESENTED ...........................................................6

STATEMENT OF THE CASE ......................................................6

I.      STATUTORY AND REGULATORY BACKGROUND .........................6

    A.      Pre-Act Efforts to Address Excessive IPCS Rates and Charges. ....................................................................6

    B.      The Martha Wright-Reed Act ........................................9

    C.      The Order .........................................................11

II.     PROCEDURAL HISTORY ..............................................16

STANDARD OF REVIEW.........................................................21

SUMMARY OF ARGUMENT .....................................................22

ARGUMENT....................................................................24

I.      THE COMMISSION'S INCLUSION OF CERTAIN REPORTED COSTS IN THE RATE-CAP CALCULATION WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.............................24

    A.      The Commission's Inclusion of Communications Security Services Costs in the Lower Bounds Was Contrary to Law and Arbitrary and Capricious.............................................26

    B.      The Commission's Inclusion of Correctional Facility Costs in the Upper Bounds Was Arbitrary and Capricious. .........................32

II.  THE COMMISSION'S FAILURE TO ADOPT CERTAIN CONSUMER PROTECTION MEASURES WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. .................................... 37

    A.  The Commission's Decision to Permit Alternate Pricing Plans Without Adequate Consumer Safeguards Was Contrary to Law and Arbitrary and Capricious. ............................................... 37

    B.  The Commission's Failure to Adopt a Consumer Protection Label Was Arbitrary and Capricious. ........................................... 43

III.  THE PROVIDERS' JURISDICTIONAL AND VENUE ARGUMENTS REMAIN MERITLESS. ............................................. 46

    A.  This Court Has Jurisdiction. ....................................................... 46

    B.  Venue Is Proper in this Court. ..................................................... 50

        1.  Resolution in this Court Best Serves the Convenience of the Parties and the Interest of Justice. ............................. 51

        2.  The Commission's Release of the Order on July 22, 2024, Does Not Dictate the Lottery Timing. ........................ 56

CONCLUSION ........................................................................................ 58

# TABLE OF AUTHORITIES

CASES

*ACLU v. FCC*, 486 F.2d 411 (D.C. Cir. 1973) ................................................. 51

*Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ................................................................... 25

*Animal Legal Defense Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir.
2017) .......................................................................................................... 44

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018) ........................... 25

*AT&T Services, Inc. v. FCC*, 21 F.4th 841 (D.C. Cir. 2021) ........................... 30

*BASF Wyandotte Corp. v. Costle*, 582 F.2d 108 (1st Cir. 1978) ...................... 51

*Brotherhood of Locomotive Engineers & Trainmen v. Federal Railroad
Administration*, 972 F.3d 83 (D.C. Cir. 2020) .......................................... 16

*CBS v. United States*, 316 U.S. 407 (1942) ..................................................... 56

*Council Tree Communications, Inc. v. FCC*, 503 F.3d 284 (3d Cir.
2007) .......................................................................................................... 48

*Craker v. DEA*, 714 F.3d 17 (1st Cir. 2013) .............................................. 48, 49

*District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir.
2015) .......................................................................................................... 36

*Environmental Defense Fund v. United States EPA*, 124 F.4th 1 (D.C.
Cir. 2024) ................................................................................................... 21

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ................................ 21

*Fibertower Spectrum Holdings, LLC v. FCC*, 782 F.3d 692 (D.C. Cir.
2015) .......................................................................................................... 32

*FirsTier Mortgage Co. v. Investment Mortgage Insurance Co.*, 498
U.S. 269 (1991) .......................................................................................... 47

*Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) .............................. 1, 8

*Grosso v. Surface Transportation Board*, 804 F.3d 110 (1st Cir. 2015) ............. 29

*Herrera-Molina v. Holder*, 597 F.3d 128 (2d Cir. 2010) .................................. 47

*Hounmenou v. Holder*, 691 F.3d 967 (8th Cir. 2012) ..................................... 47

*Jimenez-Morales v. United States Attorney General*, 821 F.3d 1307 (11th Cir. 2016) ...................................................................... 47

*Khan v. Attorney General of the United States*, 691 F.3d 488 (3d Cir. 2012) ............................................................................... 47

*In re MCP No. 185*, No. 24-7000, 2024 WL 3517673 (6th Cir. June 28, 2024) ............................................................................... 55

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ........................ 22, 39

*National Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000) ............................ 26

*New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine*, 742 F.2d 1 (1st Cir. 1984) ....................................... 57

*NLRB v. Bayside Enterprises, Inc.*, 514 F.2d 475 (1st Cir. 1975) ...................... 52

*North America Telecommunications Ass'n v. FCC*, 751 F.2d 207 (7th Cir. 1984) ............................................................................... 54

*North Carolina v. EPA*, 550 F.3d 1176 (D.C. Cir. 2008) ................................. 26

*Remington Lodging & Hospitality, LLC v. NLRB*, 747 F.3d 903 (D.C. Cir. 2014) ............................................................................... 17, 52

*Sierra Club v. West Virginia Department of Environmental Protection*, 64 F.4th 487 (4th Cir. 2023) .................................................................. 44

*Snohomish County v. Surface Transportation Board*, 954 F.3d 290 (D.C. Cir. 2020) ................................................................. 48

*TeleSTAR, Inc. v. FCC*, 888 F.2d 132 (D.C. Cir. 1989) (per curiam) ................. 47

*Triangle Cayman Asset Co. v. LG & AC, Corp.*, 52 F.4th 24 (1st Cir. 2022) ............................................................................... 46

*United Steelworkers of America, AFL-CIO CLC v. Marshall*, 592 F.2d 693 (3d Cir. 1979) ..................................................... 52

*United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ................. 50

*Western Union Telegraph Co. v. FCC*, 773 F.2d 375 (D.C. Cir. 1985) ................................................................ 46, 47, 48, 49

*Wade v. FCC*, 986 F.2d 1433 (D.C. Cir. 1993) (per curiam) ............................ 48

*Waterway Communications Systems, Inc. v. FCC*, 851 F.2d 401 (D.C. Cir. 1988) ............................................................... 46

*Westinghouse Electric Corp. v. United States Nuclear Regulatory Commission*, 598 F.2d 759 (3d Cir. 1979) ................................... 17

## STATUTES

5 U.S.C. § 706(2)(A) ....................................................... 21

28 U.S.C. § 2112(a) ................................................... 17, 49

28 U.S.C. § 2112(a)(1) .............................................. 51, 56

28 U.S.C. § 2112(a)(5) ................................. 50, 52, 54, 56

28 U.S.C. § 2342(1) ........................................................ 5

28 U.S.C. § 2343 ..................................................... 16, 55

28 U.S.C. § 2344 ................................................. 5, 16, 50

47 U.S.C. § 201 .............................................................. 6

47 U.S.C. § 201(b) .......................................................... 7

47 U.S.C. § 276 .............................................................. 6

47 U.S.C. § 276(b)(1)(A) ......................................... 10, 42

47 U.S.C. § 276(b)(1)(A) (2022) .................................... 7

47 U.S.C. § 402(a) .......................................................... 5

47 U.S.C. § 405(a) ................................................... 16, 55

47 U.S.C. § 1002(a) ............................................................ 14

Martha Wright-Reed Just and Reasonable Communications Act of
2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) ................... 2, 3, 10, 11, 26

LEGISLATIVE MATERIALS

168 Cong. Rec. H10027-28 (daily ed. Dec. 22, 2022) (statement of Rep.
Rush) ............................................................................... 10

ADMINISTRATIVE RULINGS

*Empowering Broadband Consumers Through Transparency*, 37 FCC
Rcd 13686 (2022) .............................................................. 43

*In re Incarcerated People's Communications Services; Implementation
of the Martha Wright-Reed Act*, 38 FCC Rcd 2669 (2023) ........... 11

*In re Rates for Inmate Calling Services*, 28 FCC Rcd 14107 (2013) ..... 8

*In re Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763
(2015), *vacated in part Global Tel*Link v. FCC*, 866 F.3d 397 (D.C.
Cir. 2017) ....................................................................... 1, 8

*In re Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519
(2021) ............................................................................. 9

OTHER AUTHORITIES

47 C.F.R. § 1.4(b) ............................................................... 16

47 C.F.R. § 1.4(b)(1) ........................................................... 16

47 C.F.R. § 1.4(b)(1) note .................................................. 55, 56

47 C.F.R. § 1.4(b)(2) ........................................................... 56

47 C.F.R. § 1.13(a)(1) .......................................................... 17

89 Fed. Reg. 68,369 (Aug. 26, 2024) ...................................... 17

89 Fed. Reg. 77,244 (Sept. 20, 2024) ..................................... 17

Consolidation Order, *In re FCC, Incarcerated People's Commc'ns Servs., Implementation of the Martha Wright-Reed Act, FCC 24-75, Released July 22, 2024, 89 Fed. Reg. 68,369, Published on Aug. 26, 2024*, MCP No. 191 (J.P.M.L. Sept. 18, 2024) ..................................... 18-19

FCC Response to Renewed Transfer Motion, *In re MCP 191*, No. 24-8028 (1st Cir. Dec. 4, 2024) ....................................................... 57

Motion of Securus Technologies, LLC to Transfer to the Fifth Circuit, *In re MCP 191*, No. 24-8028 (1st Cir. Sept. 27, 2024)...........20, 50, 51, 53, 57

Order of Court, *In re MCP 191*, No. 24-8028 (1st Cir. Oct. 3, 2024)................. 46

Order of Court, *In re MCP 191*, No. 24-8028 (1st Cir. Oct. 21, 2024)............... 20

Order of Court, *In re MCP* 191, No. 24-8028 (1st Cir. Nov. 13, 2024)............... 20

Order of Court, *In re MCP* 191, No. 24-8028 (1st Cir. Dec. 9, 2024)........... 20, 21

Order of Court, *U.S. Telecom Ass'n v. FCC*, No. 15-1063 (D.C. Cir. June 11, 2015) (per curiam)............................................... 49-50

Pay Tel Communications, Inc.'s Motion To Transfer, *In re MCP 191*, No. 24-8028 (1st Cir. Nov. 20, 2024)...................................... 56

Petition for Review, *Criminal Justice Reform Clinic v. FCC*, No. 24-5438 (9th Cir. filed Sept. 5, 2024) ...................................3, 18, 54

Petition for Review, *Criminal Justice Reform Clinic v. FCC*, No. 24-5895 (9th Cir. filed Sept. 26, 2024) ...................................... 19

Petition for Review, *DARE v. FCC*, No. 24-1814 (1st Cir. Sept. 5, 2024)............................................................. 18, 54

Petition for Review, *DARE v. FCC*, No. 24-1884 (1st Cir. filed Sept. 25, 2024)................................................................. 19

Petition for Review, *Fines & Fees Justice Center, Inc. v. FCC*, No. 24-2611 (2d Cir. filed Sept. 27, 2024)........................................... 19

Petition for Review, *Pay Tel Communications, Inc. v. FCC*, No. 24-1984 (4th Cir. filed Oct. 7, 2024)........................................... 19

Petition for Review, *Pennsylvania Prison Society v. FCC*, No. 24-2647
(3d Cir. filed Sept. 4, 2024) ...........................................................3, 18, 54

Petition for Review, *Pennsylvania Prison Society v. FCC*, No. 24-2798
(3d Cir. filed Sept. 25, 2024)............................................................... 19

Petition for Review, *Securus Technologies, LLC v. FCC*, No. 24-60454
(5th Cir. Sept. 4, 2024).............................................................18, 51, 54

*In re Securus Technologies LLC*, No. 24-658 (U.S. filed Dec. 13,
2024)............................................................................................ 21

*Securus Technologies, LLC v. FCC*, No. 24-60492 (5th Cir. filed Sept.
25, 2024)....................................................................................... 19

Securus Renewed Motion to Transfer, *In re MCP 191*, No. 24-8028 (1st
Cir. Nov. 20, 2024)........................................................................ 57

Securus Technologies, LLC's Reply in Support of Motion to Transfer,
*In re MCP 191*, No. 24-8028 (1st Cir. Oct. 11, 2024)................................ 52

16 Charles Alan Wright & Arthur R. Miller, *Federal Practice &
Procedure* § 3944 (3d ed. updated June 2024)............................................. 55

# GLOSSARY

| | |
|---|---|
| **CALEA** | Communications Assistance for Law Enforcement Act |
| **CJCR** | Criminal Justice Reform Clinic |
| **DARE** | Direct Action for Rights and Equality |
| **FCC** | Federal Communications Commission |
| **IPCS** | Incarcerated People's Communications Services |
| **MWRA** | The Martha Wright-Reed Act |
| **NSA** | National Sheriffs' Association |
| **Order** | *In the Matter of Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act, Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking*, WC Docket Nos. 23-62 & 12-375, FCC 24-75 (rel. July 22, 2024) |
| **PPS** | Pennsylvania Prison Society |

# INTRODUCTION

Incarcerated people need affordable, transparent access to communications services to maintain vital connections with their family and loved ones, their counsel, and other support systems. Yet, for decades, providers of incarcerated people's communications services ("IPCS") have charged egregiously high rates and engaged in other deceptive practices.[1] IPCS providers have done so because they face no competitive forces or other incentives to consider the interests of IPCS consumers, who are a captive market. Instead, IPCS providers paid "site commissions" to prisons and jails in exchange for contracts to operate at their facilities, and then passed along the cost of these "site commissions" (and other costs that are not themselves useful in the provision of IPCS) to incarcerated people and their families. The Federal Communications Commission ("Commission") attempted to address these market failures with rate regulation, but that effort was thwarted by the D.C. Circuit's narrow construction of the Commission's statutory authority and resistance from IPCS providers to needed reforms. *See generally Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).

---

[1] *See, e.g.*, *In re Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763, 12765 ¶ 1 (2015) ("2015 Order") (noting that "[f]amily members report paying egregious amounts … just to stay connected to incarcerated spouses, parents and children" and that "[f]or over a decade, they have pleaded with this agency for help fighting these excessive and unaffordable phone charges"), *vacated in part Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).

The Order under review represents a significant step forward.[2] The Order draws on expanded statutory authority Congress conferred under the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) (the "Act" or "MWRA"), which responded to the D.C. Circuit's decision and directed the Commission to set "just and reasonable" IPCS rates. Pursuant to that authority, the Commission promulgated permanent rate caps for audio communications services that halved the per-minute rates that IPCS consumers will pay. The Commission also adopted interim video rate caps for the first time; limited the "safety and security" costs that could be included in the calculation of the new rate caps; prohibited IPCS providers from making site commission payments; strengthened the Commission's existing consumer disclosures; and required additional consumer disclosures to ensure that consumers are informed about their rates. *See, e.g.*, Order ¶ 4 (JA__).

Petitioners Direct Action for Rights and Equality ("DARE"), Criminal Justice Reform Clinic ("CJCR"), and Pennsylvania Prison Society ("PPS"; collectively, the "Public Interest Petitioners") work and communicate with incarcerated people and

---

[2] *See In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, WC Docket Nos. 23-62 & 12-375, FCC 24-75 (rel. July 22, 2024) ("Order") (JA__).

their families to improve conditions in incarcerated facilities.[3]  Public Interest Petitioners participated in the Commission's rulemaking and welcome the progress reflected in the Commission's Order.  In particular, Public Interest Petitioners agree that the Act's mandate to ensure "just and reasonable" rates should be effectuated through the well-established "used and useful" ratemaking framework and that, pursuant to that framework, the Commission correctly excluded site commissions and many categories of safety and security costs that do not benefit IPCS consumers. Nonetheless, the Commission's Order should have gone further to protect consumers in two primary respects:

*First*, the Commission's inclusion of certain costs in both the lower bounds and upper bounds of the zones of reasonableness used to set the new rate caps was contrary to law and arbitrary and capricious.  In determining the lower bounds, the Commission unlawfully and unreasonably included safety and security costs in the form of "communications security services," but those costs predominantly serve law enforcement and surveillance purposes, and are therefore not "necessary" to the provision of IPCS nor used and useful to IPCS consumers.  *See* MWRA § 3(b)(2).

---

[3] *See, e.g.*, Letter from Melonie Perez, Aliza Kaplan, Jennifer Scaife, & Leigh Owens, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (July 10, 2024) ("Public Interest Petitioners Letter") (JA__); Pet. for Review at 3-4, *Crim. Just. Reform Clinic v. FCC*, No. 24-5438 (9th Cir. filed Sept. 5, 2024); Pet. for Review at 4, *Pa. Prison Soc'y v. FCC*, No. 24-2647 (3d Cir. filed Sept. 4, 2024).

Moreover, in determining the zones' upper bounds, the Commission arbitrarily included a two-cent "additive" to account for "correctional facility costs" that facilities incur in providing communications services that are "used and useful" for consumers. The Commission did so even though the existence of any such costs is entirely speculative. And the Commission estimated the additive at two cents based on decade-old data that it has repeatedly recognized—including in the Order itself—to be unreliable and inaccurate.

*Second*, the Commission should have gone further with respect to its consumer-protection provisions governing alternate pricing plans and consumer disclosures. Though the Commission took significant steps to protect consumers who choose an alternate pricing plan, the Commission accorded IPCS providers tremendous flexibility to design such plans so long as they are formally structured to have a "breakeven" point equal to or less than the otherwise applicable per-minute provider rate. By focusing only on the theoretical structure of such plans, the Commission left open the possibility that incarcerated people and their loved ones will pay more than the otherwise applicable rate caps in situations where their usage is low, and it unreasonably placed the burden on consumers to complain about any such issues.

Additionally, with respect to consumer disclosures, the Commission failed to engage in reasoned decisionmaking in declining to adopt an "IPCS label" that would

provide information about rates and charges to incarcerated people in a standard and clear format. In finding that reform unnecessary, the agency arbitrarily disregarded record evidence of providers' historical noncompliance with disclosure requirements.

In light of these errors, and because there is no jurisdictional or venue bar to the Court rendering a decision on the merits, *see* Part III *infra*, the Court should grant these petitions for review and remand without vacatur to permit the Commission to address these errors while leaving the Order's rate caps in place during the pendency of the remand.

## JURISDICTIONAL STATEMENT

This Court has subject-matter jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). The Commission released the Order on July 22, 2024, and it was published in two parts in the Federal Register on August 26, 2024, and September 20, 2024. The Public Interest Organizations timely petitioned for review of the Order on September 4 and 5, 2024, and again on September 24, 25, and 26, 2024. *See* 28 U.S.C. § 2344.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum.

**ISSUES PRESENTED**

1.     Whether the Commission's decision to include providers' reported communications security services costs in the lower bounds of its zones of reasonableness was contrary to law and arbitrary and capricious.

2.     Whether the Commission's decision to include a two-cent additive for correctional facility costs in the upper bounds of its zones of reasonableness was arbitrary and capricious.

3.     Whether the Commission's decision to authorize alternate pricing plans that could result in higher effective rates in some circumstances was contrary to law and arbitrary and capricious.

4.     Whether the Commission's decision to decline to adopt a standard "IPCS label" for consumer disclosures was arbitrary and capricious.

5.     Whether jurisdiction and venue are proper in this Court.

**STATEMENT OF THE CASE**

**I.     STATUTORY AND REGULATORY BACKGROUND**

**A.     Pre-Act Efforts to Address Excessive IPCS Rates and Charges.**

Prior to Congress' enactment of the Martha Wright-Reed Act in January 2023, the Commission sought to regulate IPCS under § 276 and § 201 of the Communications Act.  47 U.S.C. §§ 276, 201.  In relevant part, those provisions required IPCS providers (with some exceptions) to be "fairly compensated for each

and every completed intrastate and interstate call using their payphone," *id.* § 276(b)(1)(A) (2022), and separately required that "[a]ll charges" for interstate communications services be "just and reasonable," *id.* § 201(b).

These provisions proved to be insufficient to address the fundamental distortions in the IPCS market. *See* Order ¶ 23 (JA___) ("The history of this proceeding makes crystal clear that the IPCS marketplace is not a well functioning market with competitive forces that would drive prices toward costs." (quotation marks omitted)). Because IPCS providers receive a monopoly over communications services upon contracting with an incarcerated facility, IPCS providers often agreed to pay "site commissions" to these facilities to win such contracts, with the costs of those commissions passed on to incarcerated people and their families. Similarly, incarcerated people and their families were often required to bear the costs of safety and security measures that did not benefit them but instead served law enforcement purposes. Other exploitative behaviors to increase profits were also common, such as obfuscating information about IPCS rates and charges to mislead consumers and seizing unused funds in incarcerated people's accounts without notice or refund.[4] These barriers have made regular communication between incarcerated people and

---

[4] *See, e.g.*, Ex Parte Submission of the U.S. Department of Justice, Antitrust Division at 4, WC Docket Nos. 23-62 & 12-375 (Apr. 29, 2024) (JA___).

their loved ones more difficult, even as such communication has been shown to reduce recidivism and facilitate successful reentry. *See, e.g.*, *id.* ¶ 29 (JA__).

In 2013, the Commission concluded that IPCS voice calling rates "greatly exceeded the reasonable costs of providing those services and adopted interim interstate rate caps of $0.21 per minute for debit and prepaid calls, and $0.25 per minute for collect calls." *Id.* ¶ 9 (JA__); *see In re Rates for Inmate Calling Services*, 28 FCC Rcd 14107, 14111 ¶ 5 (2013). Then, in 2015, the Commission adopted permanent rate caps for interstate and intrastate calling services and explicitly excluded the recovery of site commissions. *See* 2015 Order ¶¶ 7, 9, 106-116; *see also* Order ¶ 10 (JA__).

The 2015 reforms were vacated in significant part by a divided panel of the D.C. Circuit. *Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017). That court held that the Commission lacked statutory authority to regulate intrastate rates, could not categorically exclude site commissions because some commissions were required by state law, and failed to provide adequate justification for its use of industry-wide average costs to set its per-minute interstate rate caps. *Id.* at 412. The D.C. Circuit also concluded that the Commission unreasonably relied on the "just and reasonable" standard of § 201(b) to implement § 276, the text of which did not explicitly adopt this standard. *Id.* at 408-12.

In 2021, the Commission adopted new interim rate caps of $0.12 per minute for prisons and $0.14 per minute for jails with average daily populations of 1,000 or more. *See In re Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519, 9530, 9563-64 ¶¶ 28, 103 (2021) ("2021 Order"). But in light of the D.C. Circuit's construction of the Commission's statutory authority, the Commission's interim rate caps were limited to interstate IPCS, and although they included a cap for site commissions, they nevertheless permitted providers to pass portions of these payments onto consumers. *See, e.g.*, Order ¶ 17 (JA__). In short, "[d]espite Commission actions over the years to constrain rates and charges in the audio IPCS marketplace, the monopolistic nature of the marketplace has not changed, and remains characterized by increasing rates, with no competitive pressures to reduce rates." *Id.* ¶ 24 (JA__) (quotation marks omitted); *see id.* ¶¶ 26-30 (JA__-__) (describing the significant impacts on incarcerated people and their loved ones).

## B. The Martha Wright-Reed Act

In January 2023, "[I]n the face of years of litigation frustrating the Commission's reform efforts in this area, Congress passed the Martha Wright-Reed Act." *Id.* ¶ 1 (JA__). The Act was a direct response to the *Global Tel*Link* decision,

enacted by unanimous consent in the Senate and by voice vote in the House.[5] The Act "significantly expand[ed] the Commission's jurisdiction over [IPCS]." *Id.*

As relevant here, Congress expressly empowered the Commission to regulate "any [inmate] audio or video communications service," and it expressly amended § 276 to provide that the Commission must ensure "just and reasonable" rates for these services. MWRA § 2(a), (b). By importing the § 201(b) "just and reasonable" requirement into § 276(b)(1)(A), Congress also eliminated the prior requirement under § 276(b)(1)(A) that providers be "fairly compensated" on a "per call" basis for "each and every [call]." MWRA § 2(a)(1).[6] Thus, the new § 276(b)(1)(A) directs the Commission to set "just and reasonable" rates and charges for IPCS, and to ensure that all providers of such services are "fairly compensated." 47 U.S.C. § 276(b)(1)(A); *see generally* Order ¶¶ 38-40 (JA__-__).

In addition, Congress expressly limited which safety and security costs could be included in the Commission's calculation of new rate caps. Thus, Congress

---

[5] *See, e.g.*, 168 Cong. Rec. H10027-28 (daily ed. Dec. 22, 2022) (statement of Rep. Rush) (explaining that the *GTL* decision was "why [Rep. Rush] took up this issue" and sponsored the Act); *id.* ("The bill ends the practice of phone companies charging families astronomically high rates to call incarcerated loved ones in prison. These rates are unjust and unreasonable[.]").

[6] Congress also explicitly authorized the Commission to "use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider" in setting such rates. MWRA § 3(b)(1).

specified that the Commission need only "*consider* costs associated with any safety and security measures" that were "*necessary* to provide" IPCS.  MWRA § 3(b)(2) (emphases added).  In so doing, Congress made clear that, while the Commission should reach a reasoned conclusion as to whether such costs should be included, the Commission need only include those costs that were in fact "necessary" to provide IPCS—rather than costs incurred for other, unrelated safety and security purposes.

Finally, recognizing the urgency of the problem faced by incarcerated people and their families, Congress directed the Commission to promulgate rules necessary to implement the Act within 24 months.  MWRA § 3(a).

### C.    The Order

The Commission promptly initiated a rulemaking proceeding in March 2023. *See In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, 38 FCC Rcd 2669 (2023) (JA___).  Public interest groups participated in the rulemaking, urging the Commission, inter alia, to bar most or all recovery of safety and security costs, to ensure adequate consumer protection provisions in any alternate pricing plans, and to require greater transparency in IPCS billing by adopting an IPCS consumer disclosure label similar to consumer labels required in the broadband context.[7]  Several IPCS providers and the National

---

[7] *See, e.g.*, Public Interest Petitioners Letter at 2-4 (JA___); Comments of the Wright Petitioners et al., WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA___) ("Wright Petitioners May 8, 2023 Comments"); Comments of Worth Rises, WC Docket Nos.

Sheriffs' Association ("NSA") also participated in the proceeding to advocate for preserving higher rate caps.[8]  To aid in its development of the new rate caps, the Commission also incorporated providers' responses to its mandatory data collection regarding provider costs for calendar year 2022.  *See* Order ¶ 17 & n.60 (JA__).

On July 22, 2024, the Commission released the Order.  The Commission first concluded that because "Congress has imported section 201(b)'s 'just and reasonable' standard into section 276(b)(1)(A)," the Commission should incorporate the "used and useful" framework that has been used for decades to set just and reasonable rates.  Order ¶ 41 (JA__).  That framework "focuses on affording regulated entities an opportunity to recover their 'prudently incurred investments and expenses that are "used and useful" in the provision of the regulated service for which rates are being set.'"  *Id.* ¶ 42 (JA__) (quoting 2021 Order ¶ 126).  As applied to the IPCS context, the "used and useful" framework "allows [the Commission] to recognize all IPCS costs *that benefit IPCS users*, including any such costs incurred by correctional

23-62 & 12-375 (May 8, 2024) (JA__) ("Worth Rises May 8, 2023 Comments"); Opening Comments of United Church of Christ Media Justice Ministry and Public Knowledge, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA__); Joint Letter of 90+ Organizations Supporting Low Rates, to Jessica Rosenworcel, Chairwoman, FCC, WC Docket Nos. 23-62 & 12-375 (June 17, 2024) (JA__); *Ex Parte* Letter from UCC Media Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 23-62 & 12-375 (June 14, 2024) (JA__).

[8] *See, e.g.*, Comments of the National Sheriffs' Association WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA__); Comments of Securus Technologies, LLC at 25-34, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA__).

facilities, as costs that should be recovered through IPCS rates and charges." *Id.* ¶ 43 (JA__) (emphasis added). This approach produces a "zone of reasonableness" within which rates are considered just and reasonable. *Id.* ¶ 62 & n.211 (JA__) (citation omitted).

The Commission determined the costs to be included in the zones of reasonableness for different types of services and facilities in the following way. First, the Commission set the upper bounds of the zones of reasonableness based on all of the IPCS providers' reported costs. *Id.* ¶¶ 190–197 & Appendix H (JA__, __). Then, to determine the lower bounds, the Commission deducted from those upper bounds all costs that the Commission could not determine were "used and useful" to consumers in the provision of IPCS. *Id.* ¶¶ 160-161 & Appendix I (JA__, __). From there, the Commission adopted per-minute permanent audio and interim video rate caps by selecting a rate between the lower bound and the midpoint between the lower and upper bounds. *Id.* ¶ 209 (JA__).

Applying the well-established "used and useful" standard, the Commission determined that site commissions should be excluded from the calculation of the rate caps because they do not benefit incarcerated people and therefore are not "used and useful" in the provision of IPCS. *See id.* ¶¶ 270–288 (JA__). The Commission also excluded most categories of reported costs associated with safety and security measures from the lower bounds because such costs serve law enforcement purposes

and do not benefit the IPCS users. *See id*. ¶¶ 339–407 (JA__-__). However, the Commission included safety and security costs in the form of "communications security services" costs, which are costs associated with developing pre-approved "allow" call lists, preventing three-way communications, and managing fraud. *Id.* ¶ 395 (JA__).[9] And the Commission adopted a two-cent "additive" in the upper bounds of its zones of reasonableness for "correctional facility costs" that are used and useful to IPCS consumers. *Id.* ¶¶ 163-182 (JA__). It did so based on scant evidence that facilities actually incur any such costs and based on concededly outdated and unreliable data supplied by NSA. *Id.* ¶¶ 164-167 (JA__).

The overall result of the Commission's approach was significantly lower rate caps for audio communications services and new, interim rate caps for video communications services. For instance, the new per-minute audio rate caps for prisons and large jails was $0.06, down from $0.14 for prisons and $0.16 for large jails. Order ¶ 4 (JA__). Nonetheless, rates were higher than they would have been without the inclusion of communications security services costs and correctional facility costs.

---

[9] The Commission also chose to include CALEA compliance costs, which are costs associated with maintaining providers' capability to intercept communications on behalf of law enforcement. *See* 47 U.S.C. § 1002(a).

The Order made other changes as well.  The Commission allowed providers to offer "alternate pricing plans" for the first time.  *Id.* ¶ 427 (JA__).  Rather than charging per minute of use, such plans could adopt different pricing structures, including charging a flat rate per month (something the Commission had previously prohibited).  *Id.* ¶¶ 424, 440 (JA__, __).  The Commission required various consumer protection measures concerning these plans, including that providers make robust disclosures about their pricing structures, make such plans optional, and limit contract terms to one month in length.  *Id.* ¶¶ 435, 438, 442 (JA__, __, __).  However, the Commission did not require that providers ensure that consumers actually pay effective rates below the rate caps.  Instead, it required merely that "any IPCS alternate pricing plan be offered at a rate that has a breakeven point equal to or less than the applicable rate cap," *id.* ¶ 448 (JA__), and it otherwise left it to consumers to complain about higher effective rates under any such plans, *id.* ¶ 449 (JA__).

Finally, to further ensure "just and reasonable" rates in practice, the Commission revised and expanded its existing IPCS consumer disclosure rules.  The prior rules required IPCS providers to "clearly, accurately, and conspicuously" disclose their rates and other charge information to consumers "on their websites or in another reasonable manner readily available to consumers."  Order ¶ 503 (JA__) (quotation marks omitted).  Providers had consistently violated that requirement by making information about their rates unreasonably opaque.  *See* Order ¶¶ 514–515

(JA__-__).  In response, the Commission prescribed specific information that providers must disclose in billing statements.  *See id*. ¶¶ 502–529 (JA__-__). Stopping where it should have gone further, however, the Commission declined to adopt commenters' suggestion that it adopt a standard format for such disclosures, as it has done in the broadband context.  *See id*. ¶¶ 503, 507, 514–515 (JA__, __, __-__).

## II.    PROCEDURAL HISTORY

Judicial review of Commission orders is governed by the Communications Act, 47 U.S.C. § 405, and the Hobbs Act, 28 U.S.C. § 2344.  The Communications Act provides that the 60-day period for seeking judicial review runs "from the date upon which the Commission gives public notice of the order, decision, report, or action complained of."  47 U.S.C. § 405(a).  The Hobbs Act likewise provides that the 60-day period begins "[o]n the entry of a final order," for which the agency "shall promptly give notice thereof by service or publication."  28 U.S.C. § 2344; *see Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 101–02 (D.C. Cir. 2020).  By rule, the Commission has provided that the 60-day period for review of agency action begins to run "the day after the day on which public notice of that action is given," and defined what constitutes "public notice" in various situations. 47 C.F.R. § 1.4(b).  As relevant here, public notice occurs for "documents

in … rulemaking proceedings" upon their "publication in the Federal Register." *Id.* § 1.4(b)(1).

Under the Hobbs Act, venue lies "in the judicial circuit in which the petitioner resides or has its principal office," or in the D.C. Circuit. 28 U.S.C. § 2343. When Hobbs Act proceedings are "instituted in two or more courts of appeals with respect to the same order," Congress has provided for a judicial lottery to randomly select a single venue in which all such proceedings will be consolidated. 28 U.S.C. § 2112(a); *see also* 47 C.F.R. § 1.13(a)(1). The purpose of this provision is to avoid a race to the courthouse and ensure that any party aggrieved by an order has access to a "procedure for preserving its choice of forum." *Remington Lodging & Hosp., LLC v. NLRB*, 747 F.3d 903, 905 (D.C. Cir. 2014). Section § 2112(a) "is not jurisdictional in nature, but rather, is a somewhat unusual venue statute." *Westinghouse Elec. Corp. v. U.S. Nuclear Regul. Comm'n*, 598 F.2d 759, 766 (3d Cir. 1979).

Here, the Commission released the Order on July 22, 2024. The Order was published in the Federal Register in two parts, on August 26, 2024, and September 20, 2024. *See* 89 Fed. Reg. 68,369 (Aug. 26, 2024); 89 Fed. Reg. 77,244 (Sept. 20, 2024). The first part, comprising only six pages, included a small portion of the Order in which the Commission dismissed as moot in part and denied in part petitions for clarification and waiver that Securus Technologies, LLC ("Securus")

had filed in 2021 relating to site commissions and alternate pricing plans. *See* Order ¶¶ 604–606 (JA___); *see also* Securus Techs., LLC Pet. for Clarification, WC Docket No. 12-375 (Sept. 17, 2021) ("Securus Pet. for Clarification") (JA___); Securus Techs., LLC Petition for Waiver of the Per Minute Rate Requirement, WC Docket No. 12-375 (Aug. 30, 2021) ("Securus Pet. for Waiver") (JA___).

On August 30, 2024—four days after the first part of the Order was published—Securus filed a petition for review in its home circuit, the Fifth Circuit, purporting to challenge the entire Order. Pet. for Review at 1–2 & n.1, *Securus Techs., LLC v. FCC*, No. 24-60454 (5th Cir. Sept. 4, 2024) ("Securus Pet. for Review"). Given Securus' representation that it was challenging the entire Order— and seeking to protect their statutory right to a judicial lottery—Public Interest Petitioners filed petitions for review in their home circuits (the First, Third, and Ninth Circuits), also within the ten-day period after August 26. Public Interest Petitioners explained that "in the event that the Order is deemed [already] reviewable," they sought to challenge its "key substantive provisions." Pet. for Review at 1–2, *DARE v. FCC*, No. 24-1814 (1st Cir. Sept. 5, 2024) ("DARE Pet. for Review"); *see also CJCR v. FCC*, No. 24-5438 (9th Cir. filed Sept. 5, 2024); *PPS v. FCC*, No. 24-2647 (3d Cir. Sept. 4, 2024).

The Commission sent all four petitions to the Judicial Panel on Multidistrict Litigation ("JPML") to conduct the lottery. On September 18, 2024, the JPML

randomly selected this Court to hear consolidated challenges to the Order. Consolidation Order, *In re FCC, Incarcerated People's Commc'ns Servs., Implementation of the Martha Wright-Reed Act, FCC 24-75, Released July 22, 2024, 89 Fed. Reg. 68,369, Published on Aug. 26, 2024*, MCP No. 191 (J.P.M.L. Sept. 18, 2024). As a result, all four petitions were transferred to this Court, including Securus' petition in the Fifth Circuit.

Following Federal Register publication of the remaining hundreds of pages of the Order on September 20, 2024, all four of the original petitioners promptly filed supplemental petitions for review, and other petitions were filed in three additional circuits. *DARE v. FCC*, No. 24-1884 (1st Cir. filed Sept. 25, 2024); *PPS v. FCC*, No. 24-2798 (3d Cir. filed Sept. 25, 2024); *Securus Techs., LLC v. FCC*, No. 24-60492 (5th Cir. filed Sept. 25, 2024); *CJCR v. FCC*, No. 24-5895 (9th Cir. filed Sept. 26, 2024). The other petitions included a petition from provider Pay Tel Communications, Inc. ("Pay Tel") in the Fourth Circuit. *Pay Tel Commc'ns, Inc. v. FCC*, No. 24-1984 (4th Cir. filed Oct. 7, 2024). All of these petitions have now been transferred to this Court, with one exception where transfer remains pending.[10]

---

[10] Fines and Fees Justice Center, Inc. filed a petition for review in the Second Circuit on September 27, 2024. *Fines & Fees Just. Ctr., Inc. v. FCC*, No. 24-2611 (2d Cir. filed Sept. 27, 2024).

Only *after* Securus acquiesced to the JPML's random selection of the First Circuit and acquiesced to transfer to this Court did Securus begin to contend that something had gone awry in the venue-selection process. On September 27, 2024, Securus moved to transfer all the consolidated cases to the Fifth Circuit. Notably, Securus recognized in its initial transfer motion that transfer was not mandatory, instead arguing that this Court should "exercise its discretion to transfer" the cases "in the interest of justice." Mot. of Securus Techs., LLC to Transfer to the Fifth Circuit at 8, *In re MCP 191*, No. 24-8028 (1st Cir. Sept. 27, 2024) ("Securus Mot. to Transfer") (citing 28 U.S.C. § 2112(a)(5)). After "carefully review[ing]" Securus' arguments, the Court denied that motion "without prejudice to later revisitation of all issues bearing on venue and potential transfer." Order of Court, *In re MCP 191*, No. 24-8028 (1st Cir. Oct. 21, 2024).

On October 3, 2024, this Court *sua sponte* issued orders to show cause why the original petitions filed by the Public Interest Petitioners should not be dismissed as premature. After receiving briefing on that question, the Court concluded on November 13, 2024, that the "matter may proceed," with the "issues flagged in the order[s] to show cause reserved to the ultimate merits panel." Order of Court, *In re MCP 191*, No. 24-8028 (1st Cir. Nov. 13, 2024).

Following that ruling, Securus subsequently renewed its motion for transfer—and Pay Tel filed its first such motion—on November 20, 2024, which the First

Circuit denied without prejudice on December 9, 2024. Order of Court, *In re MCP 191*, No. 24-8028 (1st Cir. Dec. 9, 2024) ("Dec. 9 Order"). The First Circuit then ordered the parties to brief "all relevant gating matters, including the venue issues discussed in the current motions to transfer." *Id.*[11]

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), a petition for review of agency action should be granted where agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining whether an "agency's interpretation of its governing statute is contrary to law," the Court "must exercise [its] 'independent judgment' and 'apply[] all relevant interpretive tools' to reach 'the best reading of the statute." *Env't. Def. Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)).

The "APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action does not survive arbitrary and capricious review where the agency "entirely failed to consider an important aspect of the problem" or

---

[11] On December 13, 2024, Securus and Pay Tel sought a writ of mandamus in the United States Supreme Court to compel this Court to transfer this case to the Fifth Circuit. *See In re Securus Technologies LLC*, No. 24-658 (U.S. filed Dec. 13, 2024). The Public Interest Petitioners and the Commission filed oppositions on January 17, 2025, and the petition remains pending.

"offered an explanation for its decision that runs counter to the evidence before [it]." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## SUMMARY OF ARGUMENT

I.  First, though the Commission correctly relied on the "used and useful" framework to examine which costs should be incorporated into its rate caps, the Commission's application of that framework to incorporate certain costs in its lower and upper bounds was contrary to law and arbitrary and capricious.

I.A.  With respect to the lower bounds, the Commission improperly included reported communications security services costs.  The Act requires the Commission to include only those safety and security costs that are "necessary to provide" IPCS, but communications security services costs are not "necessary" because they predominantly benefit law enforcement and not IPCS consumers.  Furthermore, the Commission arbitrarily distinguished this category of costs from other similar categories of costs that were properly excluded.

I.B.  With respect to the upper bounds, the Commission arbitrarily included a two-cent additive for costs incurred by incarcerated facilities that are exceedingly rare, if not nonexistent.  And it further erred in estimating the required additive to be two cents based on data it expressly recognized was outdated and inflated.

II.  Second, the Commission also erred in declining to adopt certain consumer protection measures relating to alternate pricing plans and consumer disclosures.

II.A.  With respect to alternate pricing plans, the Act requires the Commission to ensure "just and reasonable" rates and address practices that would allow providers to circumvent its rate caps and overcharge incarcerated people and their loved ones.  Yet instead of ensuring that IPCS consumers do not pay an effective rate under an alternate pricing plan that is higher than the otherwise applicable rate, the Commission merely required that IPCS providers show a theoretical *possibility* that consumers could obtain some marginal benefit from an alternate pricing plan, and it largely placed the burden on IPCS consumers to object if that benefit did not materialize in practice.

II.B.  With respect to consumer disclosures, the Commission arbitrarily declined to adopt a standardized "IPCS label," which would have remedied IPCS users' lack of clear, easily accessible information about what they pay for communications services and why.  The agency's explanation for this determination unreasonably discounted record evidence of providers' historical noncompliance with disclosure requirements.

III.  Finally, as the Commission agrees, jurisdiction and venue are proper in this Court.  Public Interest Petitioners are indisputably aggrieved by the Order as a whole and filed timely supplemental petitions.  Securus has sought to leverage a

quirk in the Federal Register publication of the Order to avoid a statutorily required multi-circuit lottery, but Securus' own petition was premature, and the best reading of the relevant statutory and regulatory requirements is that this Court retains discretion to keep this matter—as Securus itself has previously recognized. Given that the petitions challenging the Order have already been consolidated here and the parties have already briefed the merits, it would best serve the convenience of the parties and the interest of justice if this Court declined to transfer the case to the Fifth Circuit.

## ARGUMENT

### I. THE COMMISSION'S INCLUSION OF CERTAIN REPORTED COSTS IN THE RATE-CAP CALCULATION WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

The Commission erred by incorporating certain costs in both the lower and upper bounds of the zone of reasonableness. In advancing this challenge, Public Interest Petitioners do not contest the Commission's conclusions (1) that the Act's express adoption of a "just and reasonable" standard into § 276(b)(1)(A) confers the same meaning as the "just and reasonable" standard set forth in § 201(b); and (2) that the consequence of this amendment is that the Commission should employ the longstanding "used and useful" framework from § 201(b) and other ratemaking contexts to set just and reasonable IPCS rates, *see, e.g.*, Order ¶¶ 41–44, 118–119, 159 (JA__-__, __-___, __).

Moreover, Public Interest Petitioners agree that, under the longstanding "used and useful" framework, the Commission must set rates that allow "regulated entities an opportunity to recover their 'prudently incurred investments and expenses that are 'used and useful' in the provision of the regulated service for which rates are being set,'" *id.* ¶ 42 (JA__), and that application of these standards allows the regulated entities to recover costs that "directly benefit the ratepayer" while "exclud[ing] any imprudent, fraudulent, or extravagant outlays,'" *id.* (quotation marks omitted). Finally, Public Interest Petitioners further accept that in undertaking this task, the Commission is free to adopt a "zone of reasonableness" within which a rate may be said to be "just and reasonable" while "fairly compensat[ing]" providers. *See, e.g.*, *id.* ¶ 62 & n.211 (JA__) (citing *Farmers Union Cent. Exch. v. FERC*, 734 F.2d 1486, 1502 (D.C. Cir. 1984)), *id.* ¶¶ 119, 186–206 (JA__, __-__) (citing, *inter alia*, *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968)).

Public Interest Petitioners argue only that the Commission's *application* of the "used and useful" framework was contrary to law and arbitrary and capricious in two respects that the Commission can cure with a limited remand. Because the "consequences of vacating may be quite disruptive"—by depriving incarcerated people of the Order's lower rate caps during the time of the remand—remand without vacatur of the Order's new rate caps is therefore the proper remedy here. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir.

1993); *see also, e.g.*, *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 853-54 (D.C. Cir. 2021) (remand without vacatur appropriate where implementation of the Order has already started); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 635 (D.C. Cir. 2000) (remanding without vacating where vacating "would at least temporarily defeat [Petitioner's] purpose"); *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (similar).

## A.    The Commission's Inclusion of Communications Security Services Costs in the Lower Bounds Was Contrary to Law and Arbitrary and Capricious.

The Commission's determination that communications security services costs should be included in the lower bounds of the zone of reasonableness was contrary to law and arbitrary and capricious.  Section 3(b)(2) of the Act requires only that the Commission "*consider*" safety and security costs that are "*necessary* to provide" IPCS in the course of rate-setting.  MWRA § 3(b)(2); *see* Order ¶¶ 46–48 (JA__) (emphases added).  But communications security services costs primarily serve law enforcement purposes and are not "necessary to provide" IPCS.  What's more, the Commission's bases for distinguishing this category of costs from other safety and security costs that it properly excluded was arbitrary and capricious.

Communications security services costs are not "necessary to provide" IPCS and must be excluded.  The Commission properly defined "necessary" to mean "'that which is required to achieve a desired goal,'" Order ¶ 365 (JA__) (quoting *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000)), meaning that "for a safety and

security measure to be necessary, it must be required for the provision of communications services in correctional institutions." *Id.* ¶ 366 (JA__). Applying the "used and useful" framework to answer that question, the Commission examined "whether a cost 'promotes customer benefits, or is primarily for the benefit of the carrier,' as well as whether that cost was prudently incurred." *Id.* ¶ 370 (JA__).

Communications security services costs do not satisfy this statutory standard. As an initial matter, as commenters explained, it is not obvious that *any* safety and security costs are truly "necessary" for IPCS provision under this interpretation. *See, e.g.*, Coleman Bazelon & Paroma Sanyal, *Brattle Report* at 23 (May 8, 2023), attached to Wright Petitioners May 8, 2023 Comments (JA__) ("It is unclear if any safety and security measures are necessary components of providing IPCS, and, if so, the [Commission] should exclude such costs from the rate for the services."); Comments of Worth Rises at 1–2, WC Docket Nos. 23-62 & 12-375 (June 3, 2024) (JA__-__) ("[T]he overwhelming majority of safety and security measures are neither required for nor indispensable to the provision of IPCS—and are thus not necessary[.]"). After all, the customers of these services are corrections administrators, and services and costs vary from jurisdiction to jurisdiction. *See* Public Interest Petitioners Letter at 2-3 (JA__). Given such considerations, it can hardly be said that these costs are "necessary," in the sense of "required" or "indispensable," to the provision of IPCS.

That is especially so for communications security services costs. These costs include costs associated with the development of pre-approved "allow" call lists, preventing three-way communications, and fraud management, which the Commission explains "prevent witness tampering and violations of no-contact orders, and protect consumer accounts from being used unlawfully." Order ¶ 395 n.1422 (JA__). But such costs, at least as amorphously defined by the Commission in its mandatory data collection, are not "necessary" under the "used and useful" framework. That definition explains that these "services include ... implementing measures that allow an Incarcerated Person to call only certain individuals or numbers; implementing measures that limit the individuals or numbers an incarcerated person may call; [and] providing personal identification numbers (PINs) to incarcerated people." Order ¶ 395 n.1418 (JA__). As this definition makes plain, the "primary function of communication security services is to *restrict* the access that incarcerated people and their loved ones have to communications"—not facilitate such access. Public Interest Petitioners Letter at 2-3 (JA__) (emphasis added). And because the Commission "evaluate[d] categories based on the nature of the preponderance of tasks or functions within each category," the Commission certainly cannot show that limiting communication in these various ways is *predominantly* used and useful to incarcerated people. *Id.* ¶ 385 (JA__). As a result, these services are not "necessary to provide" IPCS under the Act.

Nor can it be said that communications security services are "necessary" because they advance the safety of IPCS consumers in some general sense. The Order rejects logic along these lines when it comes to other categories of safety and security costs. *See id.* ¶ 394 (JA___) ("We recognize that some functions within [law enforcement support services] may provide a benefit to incarcerated people, such as the administration of tiplines to anonymously report crimes and connect incarcerated people with Prison Rape Elimination Act (PREA) report centers; however, they do not facilitate the provision of IPCS and are therefore not used and useful in the provision of IPCS." (footnote omitted)); *see also id.* ¶ 287 (JA___) (same, with respect to site commissions). In short, these "services are not for the benefit of incarcerated people and do not belong in the rate." Public Interest Petitioners Letter at 2 (JA___).

At minimum, the Commission's rationales for including communications security services costs are arbitrary and capricious. An agency action is arbitrary and capricious where the agency fails to "articulate a satisfactory explanation." *Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 116 (1st Cir. 2015) (quoting *State Farm*, 463 U.S. at 43). Here, the Commission primarily relied on the fact that communications security services costs have been "traditionally found to be 'inherent' in communications services for incarcerated people," pointing to prior orders relating to IPCS. Order ¶ 395 (JA___); *see also id.* ¶ 397 (JA___) (asserting

that communications security services "measures are *required* to facilitate the provision of communications services in the carceral setting." *Id.* ¶ 397 (JA__) (emphasis added)); *see also id.* ¶ 395 & n.1422 (JA__). But the Commission recognized that the Act worked a sea change in the regime governing IPCS, including by specifically directing how "safety and security" measures are to be addressed by the Commission. *See, e.g., id.* ¶ 5 (JA__). In light of Congress' acknowledged aim to remake IPCS rates for the benefit of incarcerated people and to reform traditional predatory practices by providers, the Order's reliance on the past treatment of this category of costs was arbitrary and capricious.

Similarly, the Commission failed to adequately explain why communications security services costs should be treated as required while other categories of safety and security costs should be excluded. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) (where agency "decision is internally inconsistent, it is arbitrary and capricious"). For example, the Commission correctly excluded law enforcement support services, which includes the "administration of subpoenas, the administration of crime tip lines, the administration of informant lines, and the maintenance of data repositories for use by law enforcement personnel." Order ¶ 394 n.1410 (JA__) (quotation marks omitted). In response to providers' claims that these functions "assist in minimizing crime and identifying potential violators," the agency explained that such aims "do not facilitate or enable the provision of

IPCS" but rather "primarily serve law enforcement purposes." *Id.* ¶ 394 (JA__). Similarly, the Commission correctly excluded the recording services category because it is "primarily used to police the contents of all communications or to gather information for law enforcement purposes." *Id.* ¶ 398 (JA__). And it excluded the monitoring services categories because they operate to "identify potential criminal activity." *Id.* ¶ 401 (JA__) (quotation marks omitted).

The Commission nowhere explained why these other costs should be excluded but communications security services costs should be included. And the Commission in fact acknowledged that at least some of the other services were "redundant" of communications security services. *Id.* ¶ 400 (JA__). For instance, some providers use their recording services "to verify that the incarcerated person participating in a communication was the person whose PIN was used to originate the communication," which is another way to prevent incarcerated people from "intimidat[ing] judges and witnesses." *Id.* Communications security services cannot be both redundant of other safety and security functions that were excluded and, at the same time, meaningfully distinct from them. In light of the statutory obligation to include only "necessary" safety and security costs, the rational course was therefore to exclude communications security services costs, too.

Correctional institutions remain free to implement and pay for whatever safety and security measures they would like. *Cf. id.* ¶ 57 (JA__). But it was contrary to

law and arbitrary and capricious for the Commission to conclude that incarcerated people and their loved ones should be required to bear the cost of communications security services that are not predominantly for their benefit.

**B.    The Commission's Inclusion of Correctional Facility Costs in the Upper Bounds Was Arbitrary and Capricious.**

The Commission's decision to include an across-the-board two-cent additive for "correctional facility costs" in its upper bounds was also arbitrary and capricious. *See Fibertower Spectrum Holdings, LLC v. FCC*, 782 F.3d 692, 700 (D.C. Cir. 2015) ("An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence." (quotation marks omitted)).  In determining the upper bound of its zones of reasonableness, the Commission decided "[t]o account for the possibility that some correctional facilities may incur—and IPCS providers may reimburse—used and useful costs in allowing access to IPCS" by "incorporat[ing] into [its] zones of reasonableness the Commission's best estimate of IPCS costs that correctional facilities may incur."  Order ¶ 163 (JA__).  But the basis for including any such costs was exceptionally thin.

*First*, it is not at all clear that there are *any* facility costs that are used and useful to consumers warranting a major increase to the upper bounds.  The record supporting such costs is essentially nonexistent.  The Commission itself recognized that, while some commentators wanted these costs to be included, they did so "largely without support or current data," and that the "nature and extent of such

32

costs is unclear on the current record." *Id.* ¶ 164 (JA__). The only other basis the Commission offers for including such costs is a general statement from Worth Rises suggesting the possibility that "correctional facilities *may* incur used and useful costs which the Commission *could* include within rates," *id.* (quoting Worth Rises May 8, 2023 Comments at 8), but those comments asserted in the same sentence that any such costs would be "exceedingly rare." *Id.* (emphases added); *see also* Comments of UCC & Public Knowledge at 11, WC Docket Nos. 23-62 & 12-375 (June 3, 2024) (JA__).

Moreover, the one concrete example the Commission provides of facility costs that are used and useful to consumers—a correctional facility paying for internet installation and maintenance to enable IPCS—is something Worth Rises identified as an "extreme rarity in the IPCS industry." Order ¶ 182 & n.649 (JA__) (quoting Worth Rises May 8, 2023, Comments at 8)). Otherwise, the Commission simply asserts that its inclusion of facility costs in the upper bounds reflects its "recognition that correctional facilities *may well* incur used and useful costs in allowing access to IPCS." *Id.* ¶ 179 (JA__) (emphasis added). Because the record provides no support for including this cost, the Commission's decision to include this adjustment was arbitrary and capricious. And that is especially so given that the Commission decided to include this additive for all of its rate caps, and for both audio and video

services, without any indication that such an additive actually accounts for any real-world costs across all of these tiers.

Indeed, the Commission's reasoning makes clear that the inclusion of the facility cost additive was a solution in search of a problem. The Commission explained that it wanted to incorporate these costs into the rate caps to ensure providers had room to reimburse facilities for their used and useful costs. *See, e.g.*, Order ¶ 182 (JA__) (explaining that the "IPCS provider could reimburse the correctional facility for its costs from the revenue collected by the IPCS provider since the cost of Internet installation is included in our rate caps"). But the Commission first should have determined whether any such costs are even incurred before adopting an across-the-board additive to account for that possibility.

*Second*, the Commission's decision to estimate this additive at two cents was still more unreasonable. *See* Order ¶ 166 (JA__). The Commission said as much, explaining that the "available cost data … do not allow us to quantify what those costs are with any level of exactitude." *Id.* ¶ 165 (JA__). The Commission also recognized that this lack of data was entirely the fault of facilities and providers, who supplied no reliable data in the face of the agency's repeated calls for more information. Indeed, the Commission even suggested this silence likely meant such costs were miniscule, drawing the "adverse inference that actual information would not support the case for recovery." *Id.* ¶ 166 (JA__).

Despite all this, and out of an "abundance of caution," the agency nonetheless concluded that it should include "some allowance" for facilities costs in the upper bounds. *Id.* But because "neither the record nor providers' cost data … adequately or consistently support the inclusion of *any specific level of cost*," the agency opted to include two cents, which represented its "*best estimate* of IPCS costs that correctional facilities may incur." *Id.* ¶¶ 163, 166 (JA__, __) (emphases added). That figure came from 2015 survey data provided by the National Sheriff's Association. Though the Commission previously relied on that data in the 2021 Order for prisons and jails with an average daily population of 1,000 or more, it did so with the recognition—even at that time—that the data was not reliable. *See id.* ¶ 170 & n.606 (JA___); *see also* 2021 Order ¶¶ 141, 148-149). And in the present Order, the Commission agreed with a commenter who undertook a detailed examination of the 2015 survey data and found it infirm because it "overstated correctional facility costs" by employing "'inappropriately expansive descriptions' of IPCS-related tasks." *Id.* ¶ 167 (JA___) (citation omitted). Indeed, the Commission itself found that the costs identified in the survey generally relate to the "'cost[s] of operating prisons and jails, not providing communication service' and, as such, do

not benefit IPCS consumers sufficiently to render them used and useful in the provision of IPCS." *Id.* ¶ 174 (JA__) (citation omitted).[12]

Nonetheless, the Commission incorporated the two-cent figure from the 2015 NSA study on the grounds that it had relied on it before, and because an agency may rely on the best data available. *Id.* ¶ 167 & n.598 (JA__) (citing *Am. Pub. Gas Ass'n v. FPC*, 567 F.2d 1016 (D.C. Cir. 1977)). But the agency cannot continue to rely on data that the agency recognizes measures the wrong thing (or nothing) and is therefore actually inaccurate. *See, e.g.*, *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) (recognizing that "agencies do not have free rein to use inaccurate data"; instead, each agency must "'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made'" (quoting *State Farm*, 463 U.S. at 43)).

Otherwise, the Commission's primary response is that it included the two-cent additive only in the upper bound, did not add it directly to the ultimate rate caps, and

---

[12] The Commission also considered and rejected two additional data sources in estimating the additive. First, the Commission found that the 2022 data from the mandatory data collection provided "no basis to identify an amount of correctional facility costs that should be recoverable through regulated IPCS rates." *Id.* ¶ 168 (JA__). Second, the Commission correctly "decline[d] to give any weight" to a Pay Tel-commissioned survey, finding it was "unreliable," "unrepresentative," and "does not attempt to account for the nuances of how safety and security measures are administered," among other flaws. *Id.* ¶ 175 (JA__).

did not include it in the lower bounds—decisions that it framed as accounting for the poor quality of the underlying data. Order ¶¶ 168-169, 174, 178 (JA__-__, __, __). But that is no answer. The fact that it would have been even more arbitrary and capricious to include these costs in the actual rate caps or the lower bounds does not give the agency carte blanche to arbitrarily include them in the upper bounds. And the Commission made clear that it ultimately did "consider facility costs in choosing rate caps from within the zones of reasonableness" *id.* ¶ 166 n.591 (JA__); *see also id.* ¶ 180 (JA__), so inclusion of the additive in the upper bounds still affected the ultimate rate caps.

## II.    THE COMMISSION'S FAILURE TO ADOPT CERTAIN CONSUMER PROTECTION MEASURES WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

The Commission further erred in declining to adopt certain consumer protection measures applicable to alternate pricing plans and consumer disclosures.

### A.    The Commission's Decision to Permit Alternate Pricing Plans Without Adequate Consumer Safeguards Was Contrary to Law and Arbitrary and Capricious.

In permitting IPCS providers to offer "alternate pricing plans" for the first time, the Commission failed to take adequate steps to ensure that consumers do not pay more than the applicable rate caps in the event that they choose to sign up for

such a plan.[13] As commenters explained, introducing alternate rate plans for the first time "risks opening the door to abuse and higher prices," and the "purpose of allowing alternative rate structures should be to benefit IPCS customers, not allow IPCS providers additional ways to profit from IPCS." Wright Petitioners May 8, 2023 Comments at 29 (JA__). Though the Order adopted several consumer-protection measures, its failure to take additional steps to prevent consumer overpayment in the context of flat-rate plans was contrary to law and arbitrary and capricious.

The Order did not do enough to ensure "just and reasonable" rates because it allows IPCS providers to offer plans that comply with the Commission's otherwise applicable rate caps in theory while appearing to allow providers to charge IPCS customers higher effective rates in practice. In particular, the Order repealed the Commission's prior prohibition on flat-rate plans, Order ¶ 427 (JA__), and then accorded the Commission tremendous flexibility to design alternate pricing plans as long as the plan is "offered at a rate that has a breakeven point equal to or less than the applicable rate cap," *id.* ¶ 448 (JA__). Breakeven point refers to the usage

---

[13] An "alternate pricing plan" refers to the "offering of IPCS to consumers using a pricing structure other than per-minute pricing." Order ¶ 437 (JA__). The Public Interest Petitioners have no quarrel with alternate pricing plans as a whole, only with the agency's failure to adopt guardrails ensuring that any such pricing plan truly promises pro-consumer benefits and is therefore just and reasonable.

amount required for the consumer to realize a rate that equals the provider's per-minute rate. *See id*. App. A, 47 C.F.R. § 64.6000 (JA___). In other words, a provider whose per-minute rate meets the applicable rate cap need only ensure that it is *possible* for a consumer to realize that per-minute rate in a flat-rate plan, even if such realization is only possible upon total (or an unrealistic) utilization of the alternate plan. According to the Commission, alternate pricing plans that "satisfy this requirement will be presumed lawful." *Id.* ¶ 448 (JA___).

This result is insufficiently protective of consumers, does not ensure "just and reasonable" rates, and is arbitrary and capricious. For one, insofar as providers are offering per-minute rates at the Commission's rate caps, they will have every incentive to create flat-rate plans for which the breakeven points are as close to the maximum monthly usage allowed as possible. Consider an example. Suppose a provider in a large jail offers audio calling a per-minute rate that is at the rate cap for its jail size, namely 6 cents. Therefore, an alternate, flat-rate plan offering 500 minutes for $30 a month would be "presumed lawful," *id.*, because the consumer realizes 6 cents per-minute if the consumer uses all 500 minutes. But in the likely scenario that the consumer does not use the full pre-purchased 500 minutes, she

would pay more than the rate cap of 6 cents per minute.[14] That result does not accord with the Commission's obligation to ensure "just and reasonable" rates.

Moreover, in failing to address this possibility, the Commission ignored an important part of the problem. *State Farm*, 463 U.S. at 43. According to the Commission, simply by requiring a breakeven point in alternate pricing plans that theoretically benefits consumers, the Commission has "ensure[d] that providers cannot use alternate pricing plans to circumvent our rate caps, as commenters have cautioned." Order ¶ 448 (JA__). But it has done nothing of the sort. Commentators' concern about low usage is not hypothetical. For example, during a pilot program run by Securus, "from 10% to 34% of the consumers … had low usage and as a result, paid more using the subscription plans than they would have paid under per-minute rates." *Id.* ¶ 434 (JA__). And the Commission itself recognized that "[p]er minute pricing structures ... protect ratepayers who may only make a few calls and do not want to be locked into paying for extended time periods." *Cf. id.* ¶ 439 (JA__) (quoting Worth Rises May 8, 2023, Comments at 9).

And though the Commission took several important steps to require disclosures to consumers regarding the terms of their alternate pricing plans and how

---

[14] Alternatively, providers may lure IPCS consumers by developing alternate pricing plans that have a breakeven point well below full utilization—*e.g.*, a 1000-minute or unlimited plan under which the consumer would break even at "only" 500 minutes— yet consumers may end up paying higher effective rates (and rates above the rate caps) if their usage is below 500 minutes.

they compared to the rate caps, *see, e.g.*, *id.* ¶¶ 518-529 (JA__), those disclosures only reinforce that the Commission ultimately placed the burden on IPCS consumers to object when paying effective rates that are higher than the rate caps. For example, while the IPCS provider nominally "bears the burden of demonstrating compliance with this [breakeven] condition" with respect to any alternate pricing plan, that burden is triggered only "*if its alternate pricing plan is the subject of a complaint or an investigation by the Commission*." *Id.* ¶ 449 (JA__) (emphasis added); *see also id.* ("For purposes of demonstrating compliance with our rules *in the event of a consumer complaint or investigation*, an alternate pricing plan … must have a breakeven point that, when calculated on a per-minute basis, is less than or equal to the applicable rate caps.").

Similarly, incarcerated people bear the burden of showing that they pay a higher effective rate due to their usage, at least in some circumstances. Thus, "[t]o the extent a *consumer* purchasing services under an alternate pricing plan believes that the charge assessed for the bundled services resulted in the effective rate exceeding the applicable rate caps established in this Report and Order, the *consumer* would first need to show that their usage of each service in the bundle meets or exceeds the usage required to meet the specified breakeven point(s)," and only "then the IPCS provider would bear the burden of demonstrating that the rate charged to that consumer under its alternate pricing plan is less than or equal to the applicable

ICS per-minute rate cap." *Id.* ¶ 444 (JA__).  And the Commission further *barred* consumers from raising low-usage objections that, in practice, their per-minute rate is higher than the applicable rate cap by providing that a "consumer complaint about the provider's alternate pricing plan rates will not be entertained … unless the consumer's usage meets or exceeds the breakeven point(s) for the alternate pricing plan." *Id.* ¶ 449 (JA__).

Finally, the Commission arbitrarily ignored commenters' suggestion that the only way to ensure that consumers do not pay more than the rate caps in practice would be to require that any underuse resulting in a greater-than-rate-cap price be remedied by a mechanism for "truing up" a consumer's account. *See* Comments of the Wright Petitioners et al. at 10, WC Docket No. 12-375 (Dec. 15, 2022) ("Wright Petitioners Dec. 15, 2022 Comments") (JA__).  The agency nowhere addressed the possibility of a truing up or refunding mechanism in this context, nor explain why it would be unreasonable.

The Commission primarily responds by noting that the alternate pricing plans are in any case "optional."  Order ¶¶ 436, 438 (JA__, __); *see also id.* ¶ 435 n.1573 (JA__).  But the fact that a consumer may optionally sign up for a plan that results in rates that contravene the Act does not permit the Commission to make such options available.  And the Commission's five-sentence explanation as to why alternate pricing plans are "consistent with the Martha Wright-Reed Act," *see id.*

¶ 469 (JA___), fails entirely to discuss how permitting providers to offer plans that could charge effective rates that exceed the applicable rate caps is consistent with the Act's "just and reasonable" mandate. That is especially so given that section 276(b)(1)(A) specifies that "*all* rates and charges" be just and reasonable. 47 U.S.C. § 276(b)(1)(A); *see also* Order ¶ 76 (JA___) (emphasizing this language in setting forth the Commission's general statutory obligations).

### B. The Commission's Failure to Adopt a Consumer Protection Label Was Arbitrary and Capricious.

Finally, the Order failed to adequately explain why it declined to adopt the IPCS consumer protection label requested by commenters. *See, e.g.*, Wright Petitioners Dec. 15, 2022 Comments at 7-8; Public Interest Petitioners Letter at 2 (JA___). As these commenters explained, the Commission had adopted a similar "consumer broadband label" to clearly inform consumers of broadband prices.[15] Yet the Commission found that adopting the label proposal here would be "overly prescriptive and unnecessary," because it "expect[ed]" that its longstanding requirement that disclosures be "clear, accurate, and conspicuous," combined with the new disclosure requirements adopted in the Order itself, "will ensure IPCS users and the public will timely receive clear and transparent information about providers'

---

[15] *In re Empowering Broadband Consumers Through Transparency*, 37 FCC Rcd 13686 (2022).

rates, charges, and practices." Order ¶ 515 (JA__). The Commission therefore "decline[d] to prescribe a particular format for disclosures" because it wanted to "minimize unnecessary burdens on providers and to allow flexibility." *Id.*

That reasoning was arbitrary and capricious. Most significantly, the Commission failed to accord due weight to providers' history of non-compliance in the face of the Commission's requirement that disclosures be "clear, accurate, and conspicuous." *Id.* ¶ 503 (JA__) (quoting 2015 Order ¶ 278). The Commission has applied that standard to its disclosures since 2015. *Id.* Yet that requirement did not stop providers from adopting disclosure practices that confused consumers—as the Commission itself documents. *Id.* ¶¶ 514-515 (JA__). For example, one provider prices its products in dollars per megabyte, rather than dollars per minute, which the Commission admits "would be confusing to consumers." *Id.* ¶ 514 (JA__). Another's terms and conditions and privacy policy totaled 18,000 words, leaving consumers with an unhelpful, unwieldy disclosure, not a clear and conspicuous one. *Id.* ¶ 515 (JA__). Still another provider's rates, the Commission observed, "are included in a page labelled 'Legal and Privacy,' giving no indication to consumers that this is the location of such information." *Id.*

In the face of "historic noncompliance," it is "arbitrary and capricious for an agency to predict compliance without a rational explanation." *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 502 (4th Cir. 2023) (quotation marks omitted); *see*

*also Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619-20 (D.C. Cir. 2017). Nonetheless, the Commission simply "*expect*[*ed*] that the requirement that disclosures be 'clear, accurate, and conspicuous'" would provide adequate consumer protection. Order ¶ 515 (JA__) (emphasis added). That was arbitrary and capricious. And it is especially arbitrary to "allow flexibility" to IPCS providers and seek to "minimize unnecessary burdens" on providers, when there is every reason to believe they will use this flexibility to skirt the Commission's disclosure rules. *Id.*

Nor can the Commission point to the expanded consumer disclosure rules it adopted elsewhere in the Order as a reason not to adopt the IPCS label. To be sure, the Order adopted several significant reforms that the Public Interest Petitioners strongly support. For instance, the Commission required providers to disclose rates, charges, and associated practices (including information about how to manage, fund, and close accounts, and obtain refunds) in an easily accessible manner on their public websites, *id.* ¶¶ 506-507 (JA__-__)), as well as on the providers' online and mobile applications (if used to enroll), and on paper (if requested), *id.* ¶ 508 (JA__). But those changes primarily go to *what* must be disclosed and *where*, not to the question of whether a standardized format would be beneficial. As noted, with respect to *how* this information must be disclosed, the Commission again simply extended its prior requirement that disclosures be "clear, accurate, and conspicuous." *Id.* ¶ 514 (JA__). The Commission's decision not to adopt an IPCS label was arbitrary and capricious.

## III. THE PROVIDERS' JURISDICTIONAL AND VENUE ARGUMENTS REMAIN MERITLESS.

Finally, in response to this Court's directive to brief all "relevant gating matters" in the merits briefs, *see* Dec. 9 Order, Public Interest Petitioners reiterate that this Court has jurisdiction over their petitions for review and that this Court is the proper venue for the consolidated challenges to the Order. The providers' two arguments to the contrary lack merit.

### A. This Court Has Jurisdiction.

This Court previously issued show-cause orders regarding the protective petitions for review filed by Public Interest Petitioners, raising the concern that the Court "may not have jurisdiction over a petition challenging an agency order before the publication date" under the "incurably premature" doctrine. Order of Court, *In re MCP 191*, No. 24-8028 (1st Cir. Oct. 3, 2024) (citing *W. Union Tel. Co. v. FCC*, 773 F.2d 375 (D.C. Cir. 1985); *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 291 (3d Cir. 2007)). The Court ultimately deferred resolution of that question to the merits panel. Jurisdiction is proper here twice over: the Court has jurisdiction to review Public Interest Petitioners' initial petitions because they were not incurably premature and have ripened following full publication in the Federal Register, and, as the Commission agrees, the Court has jurisdiction to review Public Interest Petitioners' supplemental petitions.

First, there is no dispute that Public Interest Petitioners are "parties aggrieved" by the Commission's final Order within the meaning of 28 U.S.C. § 2344 due to the Order's failure to exclude certain costs and adopt certain consumer-protection measures. Jurisdiction over the initial petitions is thus grounded in the longstanding principle that "an appeal taken prematurely effectively ripens and secures appellate jurisdiction when the [underlying] judgment becomes final." *Waterway Commc'ns Sys., Inc. v. FCC*, 851 F.2d 401, 406 (D.C. Cir. 1988) (quotation marks omitted); *accord Triangle Cayman Asset Co. v. LG & AC, Corp.*, 52 F.4th 24, 31 (1st Cir. 2022). That principle is underpinned by the recognition that "permitting the notice of appeal to become effective when judgment is entered" prejudices no one; it "does not catch the appellee by surprise," and "[l]ittle would be accomplished by prohibiting the court of appeals from reaching the merits of such an appeal." *FirsTier Mortg. Co. v. Invs. Mortg. Ins. Co.*, 498 U.S. 269, 276 (1991).

The Court's show-cause orders referenced the "incurably premature" doctrine, but dismissal of the initial petitions on that basis would be inappropriate. Courts have repeatedly exercised jurisdiction over prematurely filed petitions in analogous circumstances after agency action has become final. *See, e.g.*, *Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1309 (11th Cir. 2016); *Khan v. Att'y Gen. of the U.S.*, 691 F.3d 488, 493 (3d Cir. 2012); *see also Hounmenou v. Holder*, 691 F.3d 967, 970 n.1 (8th Cir. 2012) (concluding the court had jurisdiction because "the finality of

[the agency action] is no longer in question"); *Herrera-Molina v. Holder*, 597 F.3d 128, 132 (2d Cir. 2010) ("A premature petition for review of a not-yet final order … can become a reviewable final order upon the adjudication of [the remaining issues]."); *TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 134 (D.C. Cir. 1989) (per curiam) ("[F]inal agency action can ripen an issue for appellate review."). This Court should do the same.

Moreover, the two cases cited by the Court in the show-cause orders do not compel dismissal of the protective petitions. First, in *Western Union Telegraph Co. v. FCC*, the D.C. Circuit dismissed a petition filed after the agency's order had been released but prior to its publication in the Federal Register. 773 F.2d 375, 376, 378 (D.C. Cir. 1985). The case did not, however, address the situation here, where part of the order was published followed by the remainder, and the petitioner filed a supplemental petition to cure any prematurity issue. To the contrary, the D.C. Circuit expressly *admonished* the petitioner there for failing to do what Public Interest Petitioners have done here, emphasizing that "nothing prevented [the petitioner] from *supplementing* its premature petition with a later protective petition—as [another petitioner] did and as we have repeatedly urged petitioners to do in analogous situations." *Id.* at 380 (emphasis added).

Nor should *Council Tree Communications, Inc. v. FCC* given this Court pause. The "incurably premature" doctrine articulated there was applied in the context of

parties' petitioning for review while a motion for reconsideration remained pending before the agency. *See Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 291 (3d Cir. 2007); *see also Snohomish Cnty. v. Surface Transp. Bd.*, 954 F.3d 290, 298 (D.C. Cir. 2020) (same). The doctrine is accordingly grounded in "[t]he danger of wasted judicial effort that attends the simultaneous exercise of judicial and agency jurisdiction." *Wade v. FCC*, 986 F.2d 1433, 1434 (D.C. Cir. 1993) (per curiam). But here, in contrast, when the Commission released the Order on July 22, it had completed its action and addressed all then-pending petitions for reconsideration, thus eliminating the doctrine's rationale.

And, in any case, this Court has squarely rejected the "incurably premature" doctrine. Specifically, in *Craker v. DEA*, this Court rejected the argument that a "premature petition for review" filed prior to publication was "incurably premature" such that it "did not ripen so as to vest [this Court] with jurisdiction once the agency issued its final decision." 714 F.3d 17, 24 (1st Cir. 2013). This Court stated it was "not persuaded that [it] should impose a bright line test requiring dismissal" where it had held a petition in abeyance while the agency resolved a petition for reconsideration; to the contrary, the Court explained, exercising jurisdiction over the petition "served . . . the interests of judicial economy." *Id.* at 25–26. Before proceeding to evaluate the petitioner's challenge on the merits, the Court emphasized that any "jurisdictional concerns" were "alleviated" after the agency's

reconsideration concluded. *Id.* at 25. That logic fully accords with the principle that final agency action can ripen a petition for review.

Finally, in all events, even if the Court were to dismiss Public Interest Petitioners' initial petitions, such dismissal has no impact on their supplemental petitions for review, which were indisputably proper. Indeed, as noted, courts have "repeatedly urged petitioners" to file supplemental petitions in such situations to protect their rights. *W. Union Tel. Co.*, 773 F.2d at 380. And any such dismissal of the initial petitions also would not alter the conclusion that this Court is the proper venue to hear the consolidated petitions under Congress' scheme set forth in the judicial lottery statute—even when, as here, the prematurely filed petition is the basis for the selection of venue. *See* 28 U.S.C. § 2112(a); *see also, e.g.*, Order of Court, *U.S. Telecom Ass'n v. FCC*, No. 15-1063 (D.C. Cir. June 11, 2015) (per curiam) (declining to dismiss based on venue issue and instead "referr[ing] to the merits panel" that issue); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) (deciding the case on the merits).

## B.     Venue Is Proper in this Court.

The providers have also repeatedly argued that this Court should transfer this case to the Fifth Circuit. But neither argument they have advanced supports the conclusion that transfer would be "for the convenience of the parties in the interest of justice." 28 U.S.C. § 2112(a)(5). Given that the petitions have been consolidated

in this Court, the parties have all agreed to a joint briefing schedule, and the Court has now received briefs on the merits, the most convenient and just course is for this Court simply to decide the case before it.

### 1. Resolution in this Court Best Serves the Convenience of the Parties and the Interest of Justice.

Securus has argued that this Court should transfer this case to the Fifth Circuit because only Securus was "aggrieved" under the Hobbs Act by the six pages of the Order published on August 26, 2024. *See, e.g.*, Securus Mot. to Transfer at 1, 4; *see generally* 28 U.S.C. § 2344. The basis for that contention is that the August 26 publication included denials of Securus' 2021 petitions for clarification and waiver. Securus Mot. to Transfer at 5. Because Public Interest Petitioners were not "aggrieved" specifically by that portion of the Order, Securus argues, their three petitions for review filed within 10 days of August 26 were incurably premature. *Id.* at 6. And because, in Securus' view, a valid petition by an aggrieved party was filed "in only one court of appeals," Securus argues that all appeals of the same order must be heard there "notwithstanding the institution in any other court of appeals of proceedings for review of that order." 28 U.S.C. § 2112(a)(1). This argument suffers from numerous flaws:

*First*, the judicial lottery and transfer provisions of § 2112(a) are concerned with the "same *order*," not the same *publication*, and they contemplate a single judicial lottery with respect to the same order. The August 26 and September 20

publications are clearly part of the same order because they "arise from the 'same or interrelated proceedings,'" *BASF Wyandotte Corp. v. Costle*, 582 F.2d 108, 112 (1st Cir. 1978) (quoting *Pub. Serv. Comm'n v. FPC*, 472 F.2d 1270, 1272 (D.C. Cir. 1972)), and otherwise "represent the staggered implementation of a single, multi-faceted agency undertaking," *ACLU v. FCC*, 486 F.2d 411, 414 (D.C. Cir. 1973). Because Section 2112(a) provides just one lottery with respect to an Order, the Public Interest Petitioners' only opportunity to participate was through their protective petitions, which were triggered by Securus's petition stating that it was seeking review of the entire Order, including the as-yet unpublished provisions. *See* Securus Pet. for Review at 1–2 & n.1 ("Securus Technologies, LLC ('Securus') hereby petitions this Court for review of an order of the [Commission]" (citing and attaching full Order)). *Cf. Remington Lodging & Hosp.*, 747 F.3d at 905 (recognizing Congress' intent to provide a "procedure for preserving [aggrieved parties'] choice of forum"). The consequence of Securus' position is that *all* other parties aggrieved by the Commission's nearly 500-page Order should be deprived of their statutory right to a judicial lottery due to a quirk in the Federal Register's publication schedule.

*Second*, Securus concedes that the Commission had no obligation to inquire into the validity of petitions filed within the 10-day period before sending them to the JPML. As Securus explained, "[e]ven facially invalid petitions for review

52

'institut[e]' 'proceedings' [under § 2112(a)], and it would be improper for the agency to make pre-lottery determinations of the validity of petitions that challenge its orders." Securus Techs., LLC Reply in Support of Initial Transfer Mot. 3 n.2, *In re MCP 191*, No. 24-8028 (1st Cir. Oct. 11, 2024). Securus is correct. Any other approach would turn a "mechanical rule easy of application" into an amorphous and ambiguous inquiry. *NLRB v. Bayside Enters., Inc.*, 514 F.2d 475, 476 (1st Cir. 1975); *see also United Steelworkers of Am., AFL-CIO CLC v. Marshall*, 592 F.2d 693 697 3d Cir. 1979) But if that is so, then the only statutory basis for transfer after-the-fact is § 2112(a)(5) discretionary standard providing that courts "may" transfer proceedings "[f]or the convenience of the parties in the interest of justice." 28 U.S.C. § 2112(a)(5). Indeed, Securus has conceded in this Court that the venue question is left to this Court's discretion under that standard. *See* Securus Mot. to Transfer at 8 ("The Court should therefore exercise its discretion to transfer these consolidated petitions 'in the interest of justice' to the Fifth Circuit" (citation omitted)). But Securus cannot show that this standard is satisfied here.

*Third*, even on the assumption that some such inquiry into the validity of the initial petitions should have occurred, Securus *itself* was not aggrieved by the August 26th publication. As the Commission has explained, Securus received all of the relief it sought in its 2021 petitions for clarification and waiver. *See, e.g.*, Order ¶¶ 599, 604–607 (JA__, __-__). Securus sought clarification regarding providers'

ability to pay site commission fees from their profits, confusion about which could competitively disadvantage providers who read the Commission's previous rules conservatively. Securus Pet. for Clarification at 4 (JA__). But the Order "end[ed] the practice of paying site commissions," thereby "effectively moot[ing]" Securus' request for clarification. Order ¶ 605 (JA__); *see also id.* ¶ 242 (JA__). Securus also sought a waiver of then-extant rules banning alternate pricing plans, Securus Pet. for Waiver at 1 (JA__), but that request, too, was mooted by the Commission allowing such plans in the Order, *see* Order ¶¶ 427, 606 (JA__, __). Thus, Securus cannot claim to be a party "aggrieved" within the meaning of the Hobbs Act by the Commission's dismissal of its petitions as moot in light of the new rules.

*Fourth*, and most fundamentally, transfer plainly would not serve the "interest of justice" nor the "convenience of the parties." 28 U.S.C. § 2112(a)(5). Securus should not be rewarded for filing prematurely and setting off a race to the courthouse in this proceeding—an outcome that § 2112(a) was expressly designed to avoid. Public Interest Petitioners only filed their protective petitions in response to *Securus*' representation that it was challenging the entire Order. *See* Securus Pet. for Review at 1–2 & n.1; *see also N. Am. Telecomms. Ass'n v. FCC*, 751 F.2d 207, 208–09 (7th Cir. 1984) (declining to dismiss petition where litigation activity "may have lulled [the petitioner] into thinking that it had not filed . . . prematurely"). And the Public Interest Petitioners were completely transparent that they filed their petitions not

necessarily because they were separately aggrieved by the six pages published on August 26, but rather to protect their statutory right to a judicial lottery "in the event that the Order is deemed [already] reviewable." DARE Pet. for Review at 2; *see also Crim. Just. Reform Clinic v. FCC*, No. 24-5438 (9th Cir. filed Sept. 5, 2024); *Pa. Prison Soc'y v. FCC*, No. 24-2647 (3d Cir. filed Sept. 4, 2024).

In short, it would not be in the "interest of justice" to permit the providers to undo the results of a concededly valid judicial lottery by leveraging a quirk in the timing of the Federal Register's publication. Though the providers insinuate that Public Interest Petitioners are forum-shopping, Public Interest Petitioners have simply acted to protect their statutory right to a judicial lottery by filling petitions for review in their home circuits, as Congress expressly provided. 28 U.S.C. § 2343. It is the providers who have made multiple attempts to undo the results of that lottery and transfer this case to *their* preferred forum. But "[w]hen considering a motion to transfer a multi-circuit petition, [courts] give considerable weight to [the] selection in the lottery." *In re MCP No. 185*, No. 24-7000, 2024 WL 3517673, at *1 (6th Cir. June 28, 2024).

Nor, finally, would transfer serve the "convenience of the parties." 28 U.S.C. § 2112(a)(5). This Court is perfectly capable of resolving these challenges. That is especially so when the challenges have already been consolidated here and briefing on the merits is well underway. And the providers cannot credibly claim they are

inconvenienced by filing their appellate briefs here rather than in the Fifth Circuit;
they face none of the "fundamental burdens that arise from the place
of ... proceedings in the district court" in this "administrative review proceeding[]."
16 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3944
(3d ed. June 2024 Update). In these circumstances, the most just and convenient
course is for this Court to resolve the case before it.

### 2. The Commission's Release of the Order on July 22, 2024, Does Not Dictate the Lottery Timing.

Pay Tel has also argued that transfer to the Fifth Circuit is required under
Section 2112(a) because the time for seeking judicial review began on July 22, 2024,
with the Commission's release of the Order under 47 U.S.C. § 405(a); 47 C.F.R.
§ 1.4(b)(1) note. *See* Pay Tel Mot. to Transfer at 7-12, *In re MCP 191*, No. 24-8028
(1st Cir. Nov. 20, 2024). According to Pay Tel, because no party filed within ten
days of July 22, 2024, all petitions for review must be heard "in the court in which
proceedings with respect to the order were first instituted," which is the Fifth Circuit.
28 U.S.C. § 2112(a)(1). On this view, all subsequent petitions must be transferred
to the Fifth Circuit as well. *See Id.* § 2112(a)(5). This argument is also wrong.

*First*, the argument proceeds from the incorrect assumption that the portion of
the Order published on August 26 constituted an "adjudicatory decision[] with
respect to specific parties … contained in [a] rulemaking document[]," 47 C.F.R.
§ 1.4(b)(1) note, such that the triggering date for the clock to enter the judicial lottery

was the "release date," *id.* § 1.4(b)(2), rather than Federal Register publication. But the Commission's denials of Securus' petitions in the August 26 publication were plainly rulemaking, not adjudication. The Commission's reasoning dealt with the rights of all providers and users, and it relied on its newly issued, generally applicable rules regarding site commissions and alternate pricing plans. *See* Order ¶¶ 604, 606 (JA___). Thus, unlike adjudication, "which is binding *only* on the parties to the particular proceeding," the August 26th publication embodies "a valid exercise of the rule-making power" because it "is addressed to and sets a standard of conduct for all to whom its terms apply." *CBS v. United States*, 316 U.S. 407, 418 (1942); *see also, e.g.*, *New England Tel. & Tel. Co. v. Pub. Utils. Comm'n of Me.*, 742 F.2d 1, 6 (1st Cir. 1984) (collecting cases).

Indeed, Securus even acknowledged in filing its petition for clarification that the nature of its clarification went to "ensur[ing] uniform implementation across the industry," and sought "industry-wide clarification" on whether the Commission had decided to "absolutely bar[] providers" as a whole—not just Securus—from paying site commissions from their IPCS profits. Securus Pet. for Clarification at 1–2 (JA___-___). Similarly, the waiver request asked that "Securus *and other providers*" be allowed to offer alternate rate plans. Securus Pet. for Waiver, at 6-7 (JA___-___) (emphasis added). And, as the Commission has explained, the narrow exception for "licensing and other adjudicatory decisions with respect to specific parties" in

rulemaking documents "applies in much more limited circumstances" than those present here.  FCC Resp. to Renewed Transfer Mot. at 17–19, *In re MCP 191*, No. 24-8028 (1st Cir. Dec. 4, 2024).

*Second*, Securus previously departed from Pay Tel's position twice before this Court, instead expressly taking the position that the triggering date for the review period under the Hobbs Act occurred with the August 26 publication in the Federal Register.  *See* Securus Mot. to Transfer at 6 (JA__) (arguing instead that the parties were "required to wait for the Federal Register publication of those rules" that aggrieved them "to petition for review"); Securus Renewed Mot. to Transfer at 7, *In re MCP 191*, No. 24-8028 (1st Cir. Nov. 20, 2024) (JA__) (contending that "Securus' petition was the only valid one filed within 10 days after Federal Register publication of the FCC's actions resolving reconsideration, clarification, and waiver petitions"). Because the providers have not established that the Order's July release date is the proper triggering event—and have themselves taken conflicting positions on this question in this litigation—the Court should decline to transfer this case to the Fifth Circuit.

## CONCLUSION

The Court should grant Public Interest Petitioners' petitions for review and remand without vacatur to permit the Commission to address the cost and consumer protection issues raised herein.

Dated: January 27, 2025

Respectfully submitted,

/s/ *Andrew Jay Schwartzman*

Andrew Jay Schwartzman
525 Ninth Street, NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

/s/ *Jessica Ring Amunson*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights and Equality*

/s/ *Amy E. Potter*

Amy E. Potter
Angeli & Calfo LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelilaw.com

*Counsel for Criminal Justice Reform Clinic*

## CERTIFICATE OF COMPLIANCE

Under Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure, I certify that this brief complies with the length limits set forth in this Court's Order of December 18, 2024, because it contains 13,953 words, as counted by Microsoft Word, excluding the items that may be exempted under Federal Rule of Appellate Procedure 27(a)(2)(B).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

*/s/ Jessica Ring Amunson*

Jessica Ring Amunson

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jessica Ring Amunson*

Jessica Ring Amunson

# ADDENDUM

# TABLE OF CONTENTS

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156.....................................................................................1

28 U.S.C. § 2112(a) .................................................................................3

28 U.S.C. § 2342(1) .................................................................................5

28 U.S.C. § 2343 .....................................................................................6

28 U.S.C. § 2344 .....................................................................................7

47 U.S.C. § 201(b) ...................................................................................8

47 U.S.C. § 276(b)(1)(A)..........................................................................9

47 U.S.C. § 402(a) .................................................................................10

47 U.S.C. § 405(a) .................................................................................11

47 C.F.R. § 1.4(b) ..................................................................................13

47 C.F.R. § 1.13(a)(1) ............................................................................15

Public Law 117–338
117th Congress

An Act

Jan. 5, 2023
[S. 1541]

To amend the Communications Act of 1934 to require the Federal Communications Commission to ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Martha Wright-Reed Just and Reasonable Communications Act of 2022.
47 USC 609 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Martha Wright-Reed Just and Reasonable Communications Act of 2022".

**SEC. 2. TECHNICAL AMENDMENTS.**

(a) IN GENERAL.—Section 276 of the Communications Act of 1934 (47 U.S.C. 276) is amended—

(1) in subsection (b)(1)(A)—

(A) by striking "per call";

(B) by inserting ", and all rates and charges are just and reasonable," after "fairly compensated";

(C) by striking "each and every";

(D) by striking "call using" and inserting "communications using"; and

(E) by inserting "or other calling device" after "payphone"; and

(2) in subsection (d), by inserting "and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 3(1)" after "inmate telephone service".

(b) DEFINITION OF ADVANCED COMMUNICATIONS SERVICES.—Section 3(1) of the Communications Act of 1934 (47 U.S.C. 153(1)) is amended—

(1) in subparagraph (C), by striking "and" at the end;

(2) in subparagraph (D), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used.".

(c) APPLICATION OF THE ACT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by inserting "section 276," after "sections 223 through 227, inclusive,".

47 USC 152 note.

Deadlines.

**SEC. 3. IMPLEMENTATION.**

(a) RULEMAKING.—Not earlier than 18 months and not later than 24 months after the date of enactment of this Act, the Federal

Communications Commission shall promulgate any regulations necessary to implement this Act and the amendments made by this Act.

(b) USE OF DATA.—In implementing this Act and the amendments made by this Act, including by promulgating regulations under subsection (a) and determining just and reasonable rates, the Federal Communications Commission—

(1) may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider; and

(2) shall consider costs associated with any safety and security measures necessary to provide a service described in paragraph (1) and differences in the costs described in paragraph (1) by small, medium, or large facilities or other characteristics.

**SEC. 4. EFFECT ON OTHER LAWS.**                                              47 USC 152 note.

Nothing in this Act shall be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities.

Approved January 5, 2023.

LEGISLATIVE HISTORY—S. 1541:

CONGRESSIONAL RECORD, Vol. 168 (2022):
    Dec. 21, considered and passed Senate.
    Dec. 22, considered and passed House.

○

**28 U.S.C. § 2112(a)**

**Record on Review and Enforcement of Agency Orders.**

(a) The rules prescribed under the authority of section 2072 of this title may provide for the time and manner of filing and the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers. Such rules may authorize the agency, board, commission, or officer to file in the court a certified list of the materials comprising the record and retain and hold for the court all such materials and transmit the same or any part thereof to the court, when and as required by it, at any time prior to the final determination of the proceeding, and such filing of such certified list of the materials comprising the record and such subsequent transmittal of any such materials when and as required shall be deemed full compliance with any provision of law requiring the filing of the record in the court. The record in such proceedings shall be certified and filed in or held for and transmitted to the court of appeals by the agency, board, commission, or officer concerned within the time and in the manner prescribed by such rules. If proceedings are instituted in two or more courts of appeals with respect to the same order, the following shall apply:

(1) If within ten days after issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in at least two courts of appeals, the agency, board, commission, or officer shall proceed in accordance with paragraph (3) of this subsection. If within ten days after the issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in only one court of appeals, the agency, board, commission, or officer shall file the record in that court notwithstanding the institution in any other court of appeals of proceedings for review of that order. In all other cases in which proceedings have been instituted in two or more courts of appeals with respect to the same order, the agency, board, commission, or officer concerned shall file the record in the court in which proceedings with respect to the order were first instituted.

(2) For purposes of paragraph (1) of this subsection, a copy of the petition or other pleading which institutes proceedings in a court of appeals and which is stamped by the court with the date of filing shall constitute the petition for

review. Each agency, board, commission, or officer, as the case may be, shall designate by rule the office and the officer who must receive petitions for review under paragraph (1).

(3) If an agency, board, commission, or officer receives two or more petitions for review of an order in accordance with the first sentence of paragraph (1) of this subsection, the agency, board, commission, or officer shall, promptly after the expiration of the ten-day period specified in that sentence, so notify the judicial panel on multidistrict litigation authorized by section 1407 of this title, in such form as that panel shall prescribe. The judicial panel on multidistrict litigation shall, by means of random selection, designate one court of appeals, from among the courts of appeals in which petitions for review have been filed and received within the ten-day period specified in the first sentence of paragraph (1), in which the record is to be filed, and shall issue an order consolidating the petitions for review in that court of appeals. The judicial panel on multidistrict litigation shall, after providing notice to the public and an opportunity for the submission of comments, prescribe rules with respect to the consolidation of proceedings under this paragraph. The agency, board, commission, or officer concerned shall file the record in the court of appeals designated pursuant to this paragraph.

(4) Any court of appeals in which proceedings with respect to an order of an agency, board, commission, or officer have been instituted may, to the extent authorized by law, stay the effective date of the order. Any such stay may thereafter be modified, revoked, or extended by a court of appeals designated pursuant to paragraph (3) with respect to that order or by any other court of appeals to which the proceedings are transferred.

(5) All courts in which proceedings are instituted with respect to the same order, other than the court in which the record is filed pursuant to this subsection, shall transfer those proceedings to the court in which the record is so filed. For the convenience of the parties in the interest of justice, the court in which the record is filed may thereafter transfer all the proceedings with respect to that order to any other court of appeals.

**28 U.S.C. § 2342(1)**

**Jurisdiction of Court of Appeals**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

> (1) all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47

**28 U.S.C. § 2343**

**Venue.**

The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

**28 U.S.C. § 2344 (portion)**

**Review of Orders; Time; Notice; Contents of Petition; Service.**

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States.

**47 U.S.C. § 201(b)**

**Service and Charges.**

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

**47 U.S.C. § 276(b)(1)(A)**

**Provision of Payphone Service.**

**(b) Regulations**

(1) Contents of regulations

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that—

(A) establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications using their payphone or other calling device, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation

**47 U.S.C. § 402(a)**

**Judicial Review of Commission's Orders and Decisions.**

**(a) Procedure**

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.

**47 U.S.C. § 405(a)**

**Petition for Reconsideration; Procedure; Disposition; Time of Filing; Additional Evidence; Time for Disposition of Petition for Reconsideration of Order Concluding Hearing or Investigation; Appeal of Order.**

(a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: Provided, That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from

the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

**47 C.F.R. § 1.4(b)(1)–(2)**

**Computation of Time.**

**(b) General Rule—Computation of Beginning Date When Action is Initiated by Commission or Staff.** Unless otherwise provided, the first day to be counted when a period of time begins with an action taken by the Commission, an Administrative Law Judge or by members of the Commission or its staff pursuant to delegated authority is the day after the day on which public notice of that action is given. See § 1.4(b)(1)-(5) of this section. Unless otherwise provided, all Rules measuring time from the date of the issuance of a Commission document entitled "Public Notice" shall be calculated in accordance with this section. See § 1.4(b)(4) of this section for a description of the "Public Notice" document. Unless otherwise provided in § 1.4 (g) and (h) of this section, it is immaterial whether the first day is a "holiday." For purposes of this section, the term public notice means the date of any of the following events: See § 1.4(e)(1) of this section for definition of "holiday."

(1) For all documents in notice and comment and non-notice and comment rulemaking proceedings required by the Administrative Procedure Act, 5 U.S.C. 552, 553, to be published in the Federal Register, including summaries thereof, the date of publication in the Federal Register.

Note to paragraph (b)(1):
Licensing and other adjudicatory decisions with respect to specific parties that may be associated with or contained in rulemaking documents are governed by the provisions of § 1.4(b)(2).

Example 1:
A document in a Commission rule making proceeding is published in the Federal Register on Wednesday, May 6, 1987. Public notice commences on Wednesday, May 6, 1987. The first day to be counted in computing the beginning date of a period of time for action in response to the document is Thursday, May 7, 1987, the "day after the day" of public notice.

Example 2:
Section 1.429(e) provides that when a petition for reconsideration is timely filed in proper form, public notice of its filing is published in the Federal Register. Section 1.429(f) provides that oppositions to a

petition for reconsideration shall be filed within 15 days after public notice of the petition's filing in the Federal Register. Public notice of the filing of a petition for reconsideration is published in the Federal Register on Wednesday, June 10, 1987. For purposes of computing the filing period for an opposition, the first day to be counted is Thursday, June 11, 1987, which is the day after the date of public notice. Therefore, oppositions to the reconsideration petition must be filed by Thursday, June 25, 1987, 15 days later.

(2) For non-rulemaking documents released by the Commission or staff, including the Commission's section 271 determinations, 47 U.S.C. 271, the release date.

> Example 3:
> The Chief, Mass Media Bureau, adopts an order on Thursday, April 2, 1987. The text of that order is not released to the public until Friday, April 3, 1987. Public notice of this decision is given on Friday, April 3, 1987. Saturday, April 4, 1987, is the first day to be counted in computing filing periods.

**47 C.F.R. § 1.13(a)(1)**

**Filing of petitions for review and notices of appeals of Commission orders.**

**(a) Petitions for review involving a judicial lottery pursuant to 28 U.S.C. 2112(a).**

(1) This paragraph pertains to each party filing a petition for review in any United States court of appeals of a Commission Order pursuant to 47 U.S.C. 402(a) and 28 U.S.C. 2342(1), that wishes to avail itself of procedures established for selection of a court in the case of multiple petitions for review of the same Commission action, pursuant to 28 U.S.C. 2112(a). Each such party shall, within ten days after the issuance of that order, serve on the Office of General Counsel, by email to the address LitigationNotice@fcc.gov, a copy of its petition for review as filed and date-stamped by the court of appeals within which it was filed. Such copies of petitions for review must be received by the Office of General Counsel by 5:30 p.m. Eastern Time on the tenth day of the filing period. A return email from the Office of General Counsel acknowledging receipt of the petition for review will constitute proof of filing. Upon receipt of any copies of petitions for review according to these procedures, the Commission shall follow the procedures established in section 28 U.S.C. 2112(a) to determine the court in which to file the record in that case.