Nos. 24-8028, 24-1927, 24-1969, 24-2013, 24-2061

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

IN RE: MCP 191

SECURUS TECHONOLOGIES, LLC,

Petitioner,

V.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

PAY TEL COMMUNICATIONS, INC.

Petitioner,

V.

FEDERAL COMMUNICATIONS COMMISSION; UNITIED STATES,

Respondents.

(For Continuation of Caption See Inside Cover)

On Petitions for Review of an Order of the Federal Communications Commission

BRIEF FOR INTERVENOR NATIONAL SHERIFFS' ASSOCIATION

Salvatore Taillefer, Jr.
Blooston, Mordkofsky, Dickens
  & Prendergast, LLP
2120 L Street, NW Suite 825
Washington, DC 20037
(202) 828-5562
sta@bloostonlaw.com
Counsel for the National
  Sheriffs' Association

February 3, 2025

---

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA

Petitioners,

V.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

---

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS; SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION

Petitioners,

V.

FEDERAL COMMUNICATIONS COMMISSION; UNITIED STATES,

Respondents.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the National Sheriffs' Association ("NSA") makes the following disclosures:

1. NSA is a nonstock corporation organized under the laws of Virginia, and is headquartered in Alexandria, Virginia.

2. There is no publicly held company that owns 10% or more of NSA's stock.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................ iii

TABLE OF CONTENTS............................................................. iv

TABLE OF AUTHORITIES .........................................................v

STATEMENT OF JURISDICTION ..............................................1

STATEMENT OF THE ISSUES ..................................................1

STATEMENT OF THE CASE .....................................................1

SUMMARY OF ARGUMENT ....................................................3

ARGUMENT............................................................................4

I.      The FCC Failed to Amply Consider the Cost of Safety and Security Measures ..................................................................................4

II.     The FCC's Application of the Used and Useful Framework is Arbitrary and Capricious .................................................................6

    A.      The Used and Useful Framework Does Not Fit the IPCS Market .....7

    B.      The FCC Failed to Consider the "Necessity" of Safey and Security Measures ..............................................................................8

    C.      The FCC Erred in its Consideration of the Benefits of Safety and Security Measures..................................................................10

    D.      The FCC Failed to Address Evidence that Excluding Safety and Security Measures from Recovery May Reduce IPCS Availability..........12

CONCLUSION.........................................................................14

**TABLE OF AUTHORITIES**

**Cases**

*Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)......7, 13

*Baker v. Smith & Wesson, Inc.*, 40 F.4th 43 (1st Cir. 2022).......................................4

*Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502 (2003).......................9

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ...........................................5

*Gen. Chem. Corp. v. United States*, 817 F.2d 844 (D.C. Cir. 1987). ....................7, 8

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .........................................4

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983). ............................................................................ 6, 7, 10

**Statutes**

28 U.S.C § 2342(1) .....................................................................................................1

28 U.S.C. § 2344 ........................................................................................................1

47 U.S.C. § 276(b) ......................................................................................................1

47 U.S.C. § 402(a) ......................................................................................................1

5 U.S.C. § 706(2)(A).....................................................................................................1

47 U.S.C. § 405(a) ......................................................................................................1

**Other Authorities**

*Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services,* Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375, FCC 24-75 (rel. July 22, 2024) .......................................................................................................2

Martha Wright-Reed Just and Reasonable Communications Act of 2022, P.L. 117-338 (117th Cong.) ......................................................................... passim

San Francisco, Cal., Administrative Code, Ordinance 123-20 ...............................13

Statement of Sens. Duckworth, Portman, Booker, Schatz, King, Markey, Gillibrand, Warren, Blackburn, Casey, Udall, Blumenthal, Wyden, and Klobuchar...........................................................................................6

**Rules**

47 C.F.R. § 1.4(b)(l) ...................................................................................1

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 47 U.S.C. § 402(a) and 28 U.S.C § 2342(1). The petitions are timely filed, 28 U.S.C. § 2344; *see* 47 U.S.C. § 405(a); 47 C.F.R. § 1.4(b)(l), and NSA has been granted intervenor status in support of the Petitioners.

## STATEMENT OF THE ISSUES

1. Whether the Order's regulations for incarcerated people's communications services ("IPCS") violate the Communications Act of 1934, as amended, 47 U.S.C. § 276(b), and Martha Wright-Reed Just and Reasonable Communications Act of 2022, P.L. 117-338 (117th Cong.) (the "MWRA").

2. Whether the Order's regulations for IPCS are arbitrary and capricious and violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## STATEMENT OF THE CASE

NSA represents over 3,000 Sheriffs nationwide who operate approximately 80% of the jails in the nation. The Sheriffs are a diverse group, with vastly different populations, jurisdictional sizes and challenges, including budget constraints. Sheriffs that operate jails are required by oath and by law to maintain security in all aspects of the jail's operation, including when incarcerated people use IPCS. Thus, safety and security measures are a necessary and integral part of the operation of IPCS systems. Without them, the ability of correctional facilities to allow access to IPCS is compromised.

1

For decades, the cost of safety and security measures – whether integrated by the IPCS provider or separately obtained by the correctional institution – were typically recovered from IPCS rates. In 2023 the MWRA was signed into law, amending the Communications Act to require the FCC to ensure "just and reasonable" IPCS rates in addition to existing requirements to ensure "fair compensation" for IPCS providers. In carrying out this obligation, the MWRA explicitly required the FCC to consider the costs of safety and security measures necessary for the provision of IPCS. MWRA § 3(b)(2). The MWRA also made clear that it did not prohibit the implementation of any safety and security measure or require IPCS be made available in any correctional institution. MWRA § 4. Recognizing that access to IPCS – which is not legally mandated in most jurisdictions – would likely be *reduced* if cost recovery for safety and security measures was limited, NSA supported the MWRA with reliance that cost recovery for safety and security be maintained.

In 2024, the FCC issued the challenged Order which, among other things, established rate caps for IPCS and severely limited cost recovery for safety and security measures. *See Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services,* Report and Order, Order on Reconsideration, Clarification and

2

Waiver, and Further Notice of Proposed Rulemaking, WC Docket Nos. 23-62, 12-375, FCC 24-75 (rel. July 22, 2024) ("Order").

Four petitions for review were filed and consolidated in this Court. This Court granted NSA's motion to intervene in support of the above-captioned Petitioners.

## SUMMARY OF ARGUMENT

The Order is unlawful and must be vacated for two principal reasons. First, the FCC violated MWRA's explicit requirement that it "shall consider" the costs of necessary safety and security measures. The FCC improperly concluded that this statutory mandate did not require giving any "specific weight" to such costs, effectively rendering Congress's directive superfluous. This interpretation contravenes both the canon against surplusage and clear congressional intent, as evidenced by statements from the MWRA's sponsors emphasizing the preservation of correctional facilities' ability to recover security costs.

Second, the FCC's application of the "used and useful" framework to evaluate safety and security measures is arbitrary and capricious in several respects. The framework, which balances the equitable principles of compensation for public utilities and payment by ratepayers for only beneficial investments, provides that an agency must balance recovery of carriers' investments with the equitable principle that rate payers should not be required to pay the costs for

investments that do not benefit them, was designed for traditional two-party telecommunications markets and fails to account for the unique three-party structure of the IPCS market, which includes correctional facilities as essential stakeholders. The FCC's approach is particularly flawed because it: (1) refused to meaningfully analyze what constitutes a "necessary" security measure while simultaneously adopting an impermissibly restrictive definition of necessity; (2) failed to recognize that safety measures primarily benefit incarcerated persons by enabling IPCS access in the first place; and (3) dismissed substantial record evidence that limiting cost recovery for security measures could reduce IPCS availability. The FCC's responses to these critical issues fall short of the reasoned decision-making required by the Administrative Procedure Act.

## ARGUMENT

### I.     The FCC Failed to Amply Consider the Cost of Safety and Security Measures

On appeal, this Court reviews questions of statutory interpretation "de novo." *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 47 (1st Cir. 2022) "[A]gency interpretations of statutes … are not entitled to deference" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (emphasis omitted). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412.

The FCC violated the MWRA's mandate that it "shall consider" the cost of necessary safety and security measures. *See*, MWRA § 3(b)(2). In the Order, the FCC wrote, "… we do not read section 3(b)(2) … as inherently requiring the Commission 'to give any specific weight' to such costs as a statutory matter." Order ¶356 (JA-___). By interpreting the MWRA in this way, the FCC violated the canon against surplusage, which requires statutes be read "to give effect to every word and phrase." *City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020) (internal citation omitted). As a corollary, statutes must not be interpreted "in a way that renders words or phrases either meaningless or superfluous." *Id.* (internal citation omitted).

In Section 3(b)(2) of the MWRA, Congress specifically enumerated safety and security measures as an important and mandatory consideration, distinct and apart from other cost factors. In fact, these measures are the *only* cost factor Congress specifically singled out for consideration. This deliberate statutory emphasis signals Congress's intent for these particular costs to receive special attention in the ratemaking process. As the FCC itself acknowledges, it has been "considering" safety and security measures for over 20 years. Order ¶371 (JA-___) (stating that "[s]ince 2002, the Commission has recognized the need to "balance the laudable goal of making calling services available to inmates at reasonable rates … with necessary security measures and costs related to those measures"). To

conclude that Congress' specific direction here means that the FCC may simply continue doing what it has been doing, with no "specific weight," effectively renders this statutory provision superfluous.

The FCC's error is plain considering the Congressional intent behind the MWRA. In a statement on a previous version of the MWRA, the bill's co-sponsors said "[n]othing in the bill undermines law enforcements' ability to recoup safety and security costs. In fact, applying the just and reasonable standard *preserves* sheriffs' ability to recoup those costs." Statement of Sens. Duckworth, Portman, Booker, Schatz, King, Markey, Gillibrand, Warren, Blackburn, Casey, Udall, Blumenthal, Wyden, and Klobuchar, *available at* http://bit.ly/3Cyp8KB (last visited February 3, 2025) (emphasis in original). This policy was codified when Congress included specific language (i) requiring the FCC to consider safety and security costs and (ii) clarifying that the MWRA may not be read to require IPCS or prohibit any safety and security measures to the version of the MWRA that ultimately was enacted. *See,* MWRA §§ 3(b)(2), 4.

## II. The FCC's Application of the Used and Useful Framework is Arbitrary and Capricious

Administrative law demands that an agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). The

requisite explanation must describe what justifies the agency's determination with more than just a "conclusory statement." *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993). An agency action is also arbitrary if it fails to address an important aspect of the problem, *Motor Vehicle Mfrs. Assn,* 463 U.S. at 43, or its analysis is "internally inconsistent and inadequately explained." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987).

## A. The Used and Useful Framework Does Not Fit the IPCS Market

The FCC's reliance upon the used and useful framework, to the exclusion of other principles of rate regulation such as cost causation fails to take into account an important aspect of the issue at hand. *Motor Vehicle Mfrs. Assn,* 463 U.S. at 43. The framework balances the equitable principles that "that public utilities must be compensated for the use of their property in providing service to the public" and that ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them." Order ¶42 (JA-___) (internal citations omitted). It was developed in the context of traditional communications markets, which involve two parties: the customer and the service provider. Reply Comments of NSA at 12-13 (July 12, 2023) (JA-___). The IPCS market, on the other hand, has three parties: the customer, the service provider, and the location provider (i.e., the correctional facility). *Id.* In order to allow access in a correctional institution,

the IPCS provider must meet the safety and security requirements of that institution. *Id.*

The used and useful framework does not take into account this critical and unique distinction. Nor is its application mandatory, as courts have recognized that the framework is only one of many tools for the regulation of rates. Comments of Securus Technologies, LLC at 30-31(May 8, 2023) (JA-___). Nevertheless, the FCC declined to rely upon any other principle of ratemaking, such as cost causation. Order fn. 846. Accordingly, the FCC's decision is arbitrary and capricious.

## B. The FCC Failed to Consider the "Necessity" of Safey and Security Measures

The FCC's application of the used and useful framework is the product of inconsistent reasoning regarding the necessity of safety and security measures. *See, Gen. Chem. Corp.* 817 F.2d at 846. In the Order, the FCC expressly refused to "opine on the necessity of safety and security measures that correctional facilities may implement." Order at fn. 1316 (JA-___). Instead, the FCC stated that:

> .. the cost of any safety and security measure that even arguably could be viewed as necessary to the provision of IPCS—under any understanding of "necessary"—is a cost that we evaluate, and reach a reasoned decision about, under the used and useful framework that we employ to determine just and reasonable IPCS rates in this Report and Order.

Order at ¶369 (JA-___). This reasoning enabled the FCC to claim that it has discharged its duty to "consider" the cost of "necessary" safety and security

measures and proceed to applying the used and useful framework without any substantive regard for necessity. But this approach is logically irreconcilable with the FCC's own admission that, under the used and useful framework, it must evaluate "whether the expense was necessary to the provision of the regulated service." Order ¶159 (JA-___). The FCC cannot coherently claim to consider necessity while simultaneously declining to analyze it.

In addition to this flaw, the FCC adopted an impermissibly restrictive definition of what constitutes a "necessary" safety and security measure. Specifically, the FCC found that "for a safety and security measure to be necessary, it must be required for the provision of communications services in correctional institutions." Order ¶366 (JA-___). In coming to this conclusion, the FCC relies on comments which argue that a "necessary" safety and security measure "must be required or indispensable for the provision of telephone service and advanced communications services to incarcerated people." Order ¶366, fn. 1307 (JA-___). This definition, however, is overly strict:

> 'Courts have frequently interpreted the word 'necessary' to mean less than absolutely essential and have explicitly found that a measure may be 'necessary' even though acceptable alternatives have not been exhausted.' Context is relevant to the interpretation of the term 'necessary.' The 'meaning varies with context,' and a dictionary definition by no means tells us what 'necessary' means in every statutory context.

*Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 512 (2003) (internal citation omitted). The context here is particularly significant: the FCC itself

recognizes that IPCS is unique precisely because of the "safety and security measures needed to adapt communications services to the carceral context." Order ¶339 (JA-___).

These errors are not merely procedural. By refusing to meaningfully analyze necessity while simultaneously imposing an unreasonably strict definition of what qualifies as "necessary," the FCC created a framework that systematically undervalues critical safety and security measures. This approach not only misreads the statute and the Congressional intent behind it but also threatens the practical ability of correctional facilities to maintain secure communication systems.

## C. The FCC Erred in its Consideration of the Benefits of Safety and Security Measures

Another important aspect of the problem the FCC failed to take into account is the fact that access to IPCS, in the first instance, is the primary benefit of safety and security measures. *Motor Vehicle Mfrs. Assn,* 463 U.S. at 43. In other words, without safety and security measures, IPCS may not be made accessible to incarcerated people in the first place. This reality undermines the entirety of the FCC's analysis.

Correctional facilities are not required to allow IPCS in most places, and the MWRA does not change that. *See,* MWRA § 4. Correctional facilities make IPCS available *because* it benefits incarcerated people, even as they safeguard that benefit by also protecting and benefiting their loved ones and the public at large.

10

Unlike the traditional telecommunications marketplace, where access to communications is a matter of a customer purchasing a service from a provider, access to IPCS for incarcerated people is not a given. It is available in correctional facilities to the extent it meets the safety and security requirements of the correctional officers who operate the facility, the families and friends of the incarcerated persons, and the public. The FCC's analysis fails to recognize this intrinsic connection between security and access.

The FCC's illogical approach is exemplified in its conclusion that five out of seven categories of safety and security measures "primarily" benefit the law enforcement, *including truly critical measures like call recording and monitoring*. Order ¶¶394 (JA-___), 400 (JA-___), 401 (JA-___), 404 (JA-___), and 407(JA-___) (emphasis supplied). These 'benefits' that inure to law enforcement inure only to its ability to safely allow IPCS for the benefit of all in the first place. If IPCS were not allowed in the correctional institution, there would be no IPCS safety and security measures costs to be borne.

Despite highlighting the purported flexibility of its used and useful framework, the FCC nevertheless "decline[d] to expand that framework to include non-ratepayers." Order ¶380 (JA-___). This rigid adherence to traditional ratemaking principles again ignores the unique context of correctional communications, where safety and security requirements necessarily serve multiple

stakeholders. Thus, the FCC's conclusions are arbitrary and capricious and must be reversed.

The issue is further compounded by the fact that the FCC's used a new "preponderance" standard. In the Order, the FCC explained that:

> … to account for the facts that the categories of safety and security costs in the 2023 Mandatory Data Collection are imprecise, and that providers' allocations of their safety and security costs are at times inexact among these categories, we evaluate categories based on the nature of the preponderance of tasks or functions within each category.

Order ¶385 (JA-___). Under the preponderance standard, a safety and security measure may in fact benefit the incarcerated but nevertheless fail to qualify for cost recovery. The FCC does not provide a reasoned explanation beyond its conclusory statement here to address the logical inconsistency between the preponderance standard and the "equitable principle that the ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them" that the FCC purports to apply. *See*, Order ¶380 (JA-___). This allowed the FCC to arbitrarily eliminate cost recovery with demonstrated benefits to incarcerated people. *See,* Letter from Salvatore Taillefer, Jr., Counsel to NSA (June 20, 2024) (JA-___).

### D. The FCC Failed to Address Evidence that Excluding Safety and Security Measures from Recovery May Reduce IPCS Availability

The FCC's treatment of evidence regarding potential reductions in IPCS access in response to its rules demonstrates its failure to engage the record and to

provide more than just a conclusory statement. *See, Allied-Signal, Inc.* 988 F.2d at

152. Even though substantial record evidence indicates that the dramatic reduction

in cost recovery for safety and security measures occasioned by the FCC's action

would likely curtail IPCS access, the FCC dismissed these concerns without the

reasoned analysis the Administrative Procedure Act requires.

In the record, NSA explained how budget constraints would force difficult

choices between security and access. *See* Comments of NSA at 9 (May 8, 2023)

(JA-___). Regional jail administrators and service providers offered similar

warnings. *See* Letter from Michelle Lewis, Northern Neck Regional Jail (May 29,

2024) (JA-___); Reply Comments of Pay Tel Communications, Inc. (July 12,

2023) (JA-___).

The FCC's response to these concerns is terse and conclusory: it simply

declared that facilities would maintain IPCS access because such access benefits

incarcerated people, and because eliminating it would likely elicit "intense

negative backlash." Order ¶312 (JA-___). Its reliance on isolated local statutes that

eliminate site commissions is misplaced. For example, San Francisco's "People

Over Profits Ordinance," specifically cited to funds used for "programs and

services in the jails" like legal services and rehabilitation programs - not safety and

security measures. San Francisco, Cal., Administrative Code, Ordinance 123-20 §

1(g) (2020).

## CONCLUSION

For the forgoing reasons, the Court should vacate and remand the FCC's

Order for further proceedings.


Dated: February 3, 2025

Respectfully submitted,

Salvatore Taillefer, Jr.
Blooston, Mordkofsky, Dickens &
    Prendergast, LLP
2120 L Street NW STE 825
Washington, DC 20037
202-659-0830
sta@bloostonlaw.com

Attorney for the National Sheriffs'
    Association

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit approved by the Court in its December 18, 2024, Order (3,000 words) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2966 words, as counted by Microsoft Word.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

_____

Salvatore Taillefer, Jr.

Attorney for the National
Sheriffs' Association

**CERTIFICATE OF SERVICE**

I, Salvatore Taillefer, Jr., hereby certify that, on February 3, 2025, I caused a

copy of the foregoing Brief for Intervenor National Sheriffs' Association to be filed

electronically with the Clerk of the Court through the Court's CM/ECF system and

that a copy of the same will be served on all counsel of record through the Court's

CM/ECF system.

_____

Salvatore Taillefer, Jr.

Attorney for the National
Sheriffs' Association