Nos. 24-8028, 24-1860, 24-1927, 24-1969

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

No. 24-8028

IN RE: MCP 191

Nos. 24-1860, 24-1927

SECURUS TECHNOLOGIES, LLC,
*Petitioner*,

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,
*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,
*Respondents*,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA PRISON SOCIETY; CRIMINAL JUSTICE REFORM CLINIC; OFFICE OF COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,
*Intervenors*.

*(caption continued on next page)*

On Petitions for Review of an Order of the Federal Communications Commission

## CORRECTED [PROOF] OPENING BRIEF FOR SECURUS TECHNOLOGIES, LLC AND PAY TEL COMMUNICATIONS, INC.

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
  HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com

*Counsel for Pay Tel
Communications, Inc.*

February 13, 2025

Scott H. Angstreich
Justin B. Berg
Jordan R.G. González
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

*Counsel for Securus
Technologies, LLC*

*(additional counsel listed on inside cover)*

Michael H. Pryor
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus
Technologies, LLC*

*(caption, cont'd)*

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,
*Petitioner*,

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,
*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,
*Respondents*,

PENNSYLVANIA PRISON SOCIETY; DIRECT ACTION FOR RIGHTS AND
EQUALITY, INC.; OFFICE OF COMMUNICATION OF
THE UNITED CHURCH OF CHRIST, INC.,
*Intervenors*.

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners Securus Technologies, LLC ("Securus") and Pay Tel Communications, Inc. ("Pay Tel") submit the following corporate disclosure statements:

**Securus:** Securus is wholly owned by SCRS Holding Corporation ("SCRS"). SCRS does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of SCRS. Platinum Equity Capital Partners IV, L.P. ("Platinum") is the principal investor of SCRS. Platinum does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of Platinum.

**Pay Tel:** Pay Tel does not have any parent corporations. Pay Tel does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of Pay Tel's stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS ....................................................... i

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF THE ISSUES..............................................................................2

INTRODUCTION .................................................................................................3

STATEMENT OF THE CASE...............................................................................7

    A.    The IPCS Industry ................................................................7

    B.    Legal Background ............................................................10

    C.    The Order ........................................................................13

    D.    Procedural History...........................................................20

SUMMARY OF ARGUMENT ..............................................................................23

STANDARD OF REVIEW ...................................................................................26

ARGUMENT ......................................................................................................27

I.    THE COURT SHOULD TRANSFER THESE CASES TO THE
FIFTH CIRCUIT ......................................................................................27

II.    THE FCC VIOLATED THE COMMUNICATIONS ACT AND
MWR ACT ...............................................................................................31

    A.    The FCC Violated the Requirement To Ensure That All IPCS
Providers Are Fairly Compensated ...................................31

    B.    The FCC's Treatment of Safety and Security Measures and
Facility Costs Violated the Statutes ..................................37

III.  THE ORDER IS ARBITRARY AND CAPRICIOUS IN
      MULTIPLE RESPECTS .................................................................41

      A.   The FCC Arbitrarily and Capriciously Excluded Safety and
           Security and Facility Costs....................................................41

      B.   The FCC Arbitrarily Used Unpaid Minutes When
           Calculating Rate Caps ..........................................................46

      C.   The FCC's Treatment of Ancillary Services Is Arbitrary and
           Capricious.............................................................................49

IV.   THE FCC'S PREEMPTION RULINGS ARE UNLAWFUL ......................54

V.    THE FCC ERRONEOUSLY DISMISSED SECURUS' WAIVER
      AND CLARIFICATION PETITIONS...........................................................58

CONCLUSION ..................................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

Page

## CASES

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018) ......................42, 47, 49

*Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024
    (9th Cir. 2024) .................................................................................55

*AT&T Co. v. FCC*, 836 F.2d 1386 (D.C. Cir. 1988)..........................................55

*Blanca Tel. Co. v. FCC*, 743 F.3d 860 (D.C. Cir. 2014) ........................................29

*Boldt v. N. States Power Co.*, 904 F.3d 586 (8th Cir. 2018) ..................................31

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) .........................................31

*Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284 (3d Cir. 2007) ............2, 28, 30

*Coskery v. Berryhill*, 892 F.3d 1 (1st Cir. 2018) .....................................................57

*DeRoy v. Carnival Corp.*, 963 F.3d 1302 (11th Cir. 2020) ....................................32

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .............................26, 44

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000).............................................56

*Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*,
    550 U.S. 45 (2007)................................................................................10

*Glob. Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ........ 3, 10 11, 23, 32, 36, 37

*Gulluni v. Levy*, 85 F.4th 76 (1st Cir. 2023) ...........................................................26

*Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167
    (1st Cir. 2011)......................................................................................26

*Housatonic River Initiative v. EPA*, 75 F.4th 248 (1st Cir. 2023)...........................27

*Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018 (D.C. Cir. 2014) .....................10

*Indus. Union Dep't, AFL-CIO v. Bingham*, 570 F.2d 965 (D.C. Cir. 1977) ...................................................................30

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................26

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ..........................................53

*Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001) ...................................31

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019).........................................56, 57

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601 (2019) ....................38

*Riley, In re*, 923 F.3d 433 (5th Cir. 2019) ................................................32

*Seavey v. Barnhart*, 276 F.3d 1 (1st Cir. 2001) ........................................53

*Southland Mower Co. v. U.S. Consumer Prod. Safety Comm'n*, 600 F.2d 12 (5th Cir. 1979) .............................................................30

*Time Warner Ent. Co. v. FCC*, 56 F.3d 151 (D.C. Cir. 1995)...........................38, 39

*Trs. of Iron Workers Loc. 473 Pension Tr. v. Allied Prods. Corp.*, 872 F.2d 208 (7th Cir. 1989) ...............................................................32

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)...................................54

*Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467 (2002) ...............................31, 33, 39

*W. Union Tel. Co. v. FCC*, 773 F.2d 375 (D.C. Cir. 1985) ..........................2, 28, 30

*Whitman v. Am Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001)...................................35

## STATUTES AND REGULATIONS

Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ............................................32, 37

§ 2....................................................................................................12

§ 2(a)(1)(A)............................................................................................12

§ 2(a)(1)(B)............................................................................................12

§ 2(a)(1)(C)............................................................................................12

§ 3(a)....................................................................................................54

§ 3(b)(1).....................................................................................13, 35, 38

§ 3(b)(2)...............................................................................5, 13, 38, 39

5 U.S.C. § 706(2)(A)..............................................................................2

28 U.S.C.:

§ 2112...................................................................................................27

§ 2112(a).............................................................................4, 23, 28, 30, 31

§ 2112(a)(1)....................................................................2, 4, 22, 28, 29, 30

§ 2112(a)(3)...........................................................................................28

§ 2112(a)(5)......................................................................................4, 28

§ 2342(1)..................................................................................................1

§ 2344.................................................................................................1, 28

§ 2346...................................................................................................27

47 U.S.C.:

§ 152(b)................................................................................................12

§ 276 ..........................................................................................4, 12, 58

§ 276(b)...................................................... 2, 12, 16, 24, 31, 33, 37

§ 276(b)(1).............................................................................................36

§ 276(b)(1)(A) ..................................................5, 13, 31, 33, 47, 54

§ 276(b)(1)(A) (2015) ...........................................................32

§ 276(b)(1)(A) (1996) ...........................................................10

§ 276(d) (1996) .....................................................................10

§ 276(c) ..........................................................................55, 57

§ 402(a) .................................................................................1

47 C.F.R.:

§ 1.4(b) .................................................................................29

§ 1.4(b)(1) note ....................................................................28

§ 1.4(b)(1)-(2) ......................................................................28

§ 64.6140 ..............................................................................58

## ADMINISTRATIVE DECISIONS

Memorandum Opinion and Order, *Iowa Network Access Division, Tariff F.C.C. No. 1*, 33 FCC Rcd 7517 (2018) ...............................46

Notice of Proposed Rulemaking and Order, *Incarcerated People's Communications Services*, 38 FCC Rcd 2669 (2023) .......................13

Order, *Incarcerated People's Communications Services*, 38 FCC Rcd 6625 (Wireline Comp. Bur. & Off. of Econ. & Analytics 2023) ...........................................................................13

Order on Reconsideration, *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 11 FCC Rcd 21233 (1996) ......................10

Order on Reconsideration, *Rates for Interstate Inmate Calling Services*, 31 FCC Rcd 9300 (2016) .................................................9

Order on Remand and Notice of Proposed Rulemaking, *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 17 FCC Rcd 3248 (2002) ...................................................9

Report and Order and Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) .........................................................9, 10, 38, 41, 43

Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communications Services*, WC Docket Nos. 23-62, 12-375, FCC 24-75 (rel. July 22, 2024; modif. Aug. 26, 2024 and Oct. 2, 2024) ........................................1

Second Report and Order and Third Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015) .................................................11, 50

Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519 (2021) .............12, 18, 19, 46, 47

## OTHER AUTHORITIES

FCC Mot., *Securus Techs., Inc. v. FCC*, No. 13-1280 (D.C. Cir. Dec. 10, 2014) .................................................................11

FCC Mot. To Dismiss, *Ins. Mktg. Coal. Ltd. v. FCC*, No. 23-14125 (11th Cir. Jan. 19, 2024) .................................................30

89 Fed. Reg.:

   p. 68,369 (Aug. 26, 2024) ...........................................................19

   (Sept. 20, 2024):

      p. 77,065 .................................................................20

p. 77,244 ...............................................................................20

**STATEMENT OF JURISDICTION**

Although the Fifth Circuit is the proper venue for these challenges, *see infra* Part I, this Court has jurisdiction over the petitions for review Securus (Nos. 24-1860 and 24-1927) and Pay Tel (No. 24-1969) filed.  *See* 47 U.S.C. § 402(a); 28 U.S.C. §§ 2342(1), 2344.  The Order[1] is "an[] order of the Commission under" the Communications Act that is not among "those appealable under subsection [402](b)."  47 U.S.C. § 402(a).  Therefore, a "proceeding to enjoin, set aside, annul, or suspend" the Order "shall be brought as provided by . . . chapter 158 of title 28."  *Id.*  That chapter provides the courts of appeals with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a)."  28 U.S.C. § 2342(1).  Securus and Pay Tel are "part[ies] aggrieved" by the Order — each participated in the FCC's rulemaking proceeding, and the challenged decisions regulate their activities — and each petitioned for review "within 60 days after its entry."  *Id.* § 2344.

---

[1] Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communications Services*, WC Docket Nos. 23-62, 12-375, FCC 24-75 (rel. July 22, 2024; modif. Aug. 26, 2024 and Oct. 2, 2024) ("Order") (JA___-__ (public); JA___-__ (sealed); JA___ (second errata)).

The Court also has jurisdiction under those provisions over all the other petitions for review filed *except for* the three so-called "protective" petitions that Direct Action for Rights and Equality, Inc. (No. 24-1814), Criminal Justice Reform Clinic (No. 24-1859), and Pennsylvania Prison Society (No. 24-1861) filed. As explained in Part I, all were filed before entry of the only portion of the Order those entities challenge. Thus, the petitions are incurably premature and must be dismissed for lack of jurisdiction. *See Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 291, 293 (3d Cir. 2007) (dismissing prematurely filed petitions for review); *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 381 (D.C. Cir. 1985) (same).

## STATEMENT OF THE ISSUES

1.      Whether this case should be transferred to the Fifth Circuit under 28 U.S.C. § 2112(a)(1).

2.      Whether the Order's new rate regulations for intrastate and interstate phone and video calls by incarcerated persons violate the Communications Act, 47 U.S.C. § 276(b).

3.      Whether the Order's new rate regulations for intrastate and interstate phone and video calls by incarcerated persons are arbitrary and capricious and violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

4.     Whether the FCC's failure to preempt states and localities from setting lower rate caps for intrastate calls, while preempting states and localities from setting higher rate caps, is unlawful.

5.     Whether the FCC erroneously dismissed as moot Securus' waiver and clarification petitions.

## INTRODUCTION

Securus and Pay Tel provide audio and video communications services used in prisons and jails, known as Incarcerated People's Communication Services ("IPCS").  Over the past 12 years, the FCC has regulated the rates providers could charge for those services.  In 2014 and again in 2016, the D.C. Circuit stayed earlier FCC IPCS rate regulations, eventually vacating them.  *See Glob. Tel\*Link v. FCC*, 866 F.3d 397, 405-06, 416-17 (D.C. Cir. 2017).  After that vacatur, the FCC adopted interim rate caps in 2021 (which no one challenged), and Congress enacted the Martha Wright-Reed Just and Reasonable Communications Act of 2022 ("MWR Act"), giving the FCC additional authority over IPCS.

Securus and Pay Tel support the MWR Act.  If implemented appropriately, the Act promises to make IPCS more accessible, affordable, and sustainable, while also funding safety and security measures necessary when incarcerated persons use communications services and fairly compensating the companies that provide those services.  But the Order does none of those things.  As then-Commissioner (now-

Chairman) Carr recognized, the FCC went "too far in one direction" and "overcorrected in ways that" will "ultimately work against the interests of inmates, their families, IPCS providers, state correctional facilities, and the public-safety officials who operate them." Order at 486 (JA___). The Order violates the plain text of the MWR Act and § 276 of the Communications Act and is arbitrary and capricious in multiple respects. The Order should be vacated and remanded for the FCC to implement the MWR Act faithfully.

To begin with, though, 28 U.S.C. § 2112(a) selects the Fifth Circuit, not this Court, to hear these challenges. A portion of the Order was entered on July 22, 2024, and the first petition for review (Securus', in the Fifth Circuit) was filed more than ten days later. In addition, the three petitions filed right after Securus' (in this Court and the Third and Ninth Circuits) were incurably premature; courts of appeals lack jurisdiction over them. For both reasons, § 2112(a)(1) required the FCC to file the record in the Fifth Circuit, with § 2112(a)(5) requiring all other challenges to the same order transferred to that court. The FCC instead sent Securus' petition and the three others to the Judicial Panel on Multidistrict Litigation, which randomly selected this Court. That was an error this Court should cure by transferring these cases to the Fifth Circuit without reaching the merits.

But whichever court reviews the Order, the FCC's many legal errors require vacatur and remand. To start, Congress required the FCC to adopt a compensation plan that not only sets "just and reasonable" rates, but also "ensure[s] that all" IPCS providers are "fairly compensated." 47 U.S.C. § 276(b)(1)(A). The FCC, however, misinterpreted "all" to mean "efficient," and conflated the two distinct statutory requirements. As a result, the FCC set rate caps that its own calculations say will fail to recover costs for one-third of the dozen IPCS providers the FCC considered; in reality, they fail to do so for more than half of them. That is not fair compensation.

The FCC also flouted Congress's instruction that the agency "shall consider" the "safety and security measures necessary to provide" IPCS. MWR Act § 3(b)(2). The FCC refused to decide which safety and security measures are "necessary" and, instead, inconsistently assessed those measures under an inapt "used and useful" test. In combination, those errors enabled the FCC to exclude more than two-thirds of IPCS providers' safety and security costs (hundreds of millions of dollars) as part of its rate-setting. Providers had incurred those costs in reliance on prior FCC orders allowing recovery of them through IPCS rates. The FCC does not adequately explain its changed approach, so the Order is arbitrary and capricious for this reason as well.

The FCC then translated the limited costs it allowed providers to recover into per-minute rates by dividing those costs by *all* minutes of use, including minutes that generate no revenue. Using non-revenue-generating minutes not only departs from the FCC's prior orders without sufficient explanation but also results in rate caps that will fail to fairly compensate all IPCS providers by design.

Nor are these the only errors. The FCC also excluded "facility costs" — the safety, security, and administrative costs correctional facilities incur in offering IPCS that providers reimburse — despite recognizing that those costs can be "used and useful" for incarcerated persons. Order ¶ 166 (JA___). The FCC prohibited IPCS providers from billing for ancillary services on a per-use basis — and implemented that prohibition before the rest of its new rate regulations take effect — without reasoned explanation. And the FCC erroneously read the Act not to preempt all state IPCS rate-setting for intrastate calls, instead inviting states to set rate caps for intrastate calls below the FCC's already too low levels. All the errors share a common feature: they all cause the FCC's zone of reasonableness, and thus its rate caps, to be lower than a faithful application of the MWR Act would yield.

No matter how well intentioned, the Order will ultimately harm the incarcerated persons and their friends and families who are its intended beneficiaries. As now-Chairman Carr explained, the unrecoverable costs the Order

imposes on IPCS providers will cause significant "negative unintended consequences" "for public safety," competition in the market, and "IPCS access" for incarcerated persons more broadly. Order at 487 (JA___). It will likely "lead to a reduction in IPCS access or the loss of essential law-enforcement tools," *id.*, leading to increases in crime, fraud, and violence within prisons and jails. The new rates are also so low that they will likely drive smaller providers out of the market and leave "smaller facilities . . . unserved because the economics no longer make sense." *Id.*

For all these reasons, the petition should be granted and the Order vacated and remanded.

## STATEMENT OF THE CASE

### A. The IPCS Industry

IPCS providers compete for the opportunity to provide audio and video calling services in individual jails and prisons. *See*, *e.g.*, Securus Comments at 3 (JA___); Pay Tel Comments at 17-18 (JA___-__). Once selected, they negotiate contracts with state and local government agencies to provide service in the jails and prisons those agencies operate. The contracts set out the services IPCS providers must offer — including safety and security measures they must build into their communications offerings — as well as the rates they may charge for use of those communications services and for ancillary services (such as fees for

funding the accounts that pay for IPCS calls). *See*, *e.g.*, Securus Comments at 35-36 (JA___-__); ViaPath Comments at 5-6 (JA___-__); Securus & Pay Tel Ex Parte Letter at 13-20 (June 10, 2024) (JA___-__). To fulfill those obligations, IPCS providers incur significant up-front costs to equip each jail or prison with the infrastructure and technology needed to meet the local government's requirements, which the provider recovers through the rates charged over the life of a contract. *See* Securus Comments at iii (JA___).

Offering audio and video calling services in jails and prisons creates unique security challenges to ensure the safety of the callers, who are at risk of theft or violence by other incarcerated persons, and public safety, as audio and video calls could be used to facilitate criminal activity. *See* Pay Tel Ex Parte Letter at 1-3 & Ex. 1 (June 18, 2024) (JA___-__, ___-__). These challenges lead jails and prisons to require IPCS providers to incorporate into their offerings costly safety and security measures that are necessary to ensure proper use and protect public safety. Moreover, safety and security measures must constantly evolve to defeat efforts to evade prior measures. *See* Pay Tel Ex Parte Letter at 9-10 & Ex. A (July 9, 2024) (JA___-__, ___-__).

These measures include recording capabilities for all calls; blocking capabilities to prevent unauthorized calls; monitoring calls for possible criminal uses; and reimbursing facilities for safety and security costs they incur in

connection with IPCS. *See* Order ¶¶ 164, 364 (JA___, ___). The FCC has, for more than two decades, recognized that these are costs necessary for the provision of IPCS. *See 2002 IPCS Order*[2] ¶ 9 (observing that call recording, monitoring, and blocking are necessary for IPCS); *2013 IPCS Order*[3] ¶¶ 2, 58 (same). The FCC has similarly found that the costs facilities bear to administer IPCS are necessary and so should be included in rates providers charge. *See 2016 IPCS Order*[4] ¶ 1 (increasing rate caps to account for facility costs).

Historically, some state and local correctional authorities required IPCS providers to pay "site commissions," which are fees that jails and prisons charge IPCS providers and that facilities use to fund various programs that aid the incarcerated population, provide safety and security measures, and offset authorities' costs of providing communications services. *See* Order ¶ 181 (JA___). Such site commissions are "a condition of doing business" for IPCS providers, as they are either "mandated by state statute" or "required by state correctional

---

[2] Order on Remand and Notice of Proposed Rulemaking, *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 17 FCC Rcd 3248 (2002) ("*2002 IPCS Order*").

[3] Report and Order and Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) ("*2013 IPCS Order*").

[4] Order on Reconsideration, *Rates for Interstate Inmate Calling Services*, 31 FCC Rcd 9300 (2016) ("*2016 IPCS Order*").

institutions" by contract. *Glob. Tel\*Link*, 866 F.3d at 413. IPCS providers would recover the cost of the site commissions through the prices they charge for their services.

### B.    Legal Background

In the Telecommunications Act of 1996, Congress directed the FCC "to ensure that all payphone service providers" — a category that includes IPCS providers — "are fairly compensated for each and every" completed call. 47 U.S.C. § 276(b)(1)(A), (d) (1996).

While the FCC issued a series of orders addressing compensation for public payphone operators,[5] the FCC left IPCS rates unregulated. For nearly two decades, the FCC concluded that the rates an IPCS provider was "able to negotiate" with prisons and jails satisfied the "statutory obligation" of fair compensation.[6] But in 2013, the FCC changed course. Based on its finding that rates for certain IPCS calls were "very high," the FCC established maximum per-minute rates and put limits on charges for ancillary services. *2013 IPCS Order* ¶¶ 12, 35, 48. The D.C. Circuit stayed portions of that order. *See* Order, *Securus*

---

[5] *See, e.g.*, *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 51-52 (2007); *Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018, 1020-22 (D.C. Cir. 2014).

[6] *E.g.*, Order on Reconsideration, *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 11 FCC Rcd 21233, ¶ 72 (1996).

*Techs., Inc. v. FCC*, No. 13-1280 (D.C. Cir. Jan. 13, 2014). In response, the FCC sought abeyance while it drafted new rules.[7] The resulting order set rate caps for both interstate and intrastate IPCS calls, as well as on charges for ancillary services. *See 2015 IPCS Order*[8] ¶ 9.

That effort fared little better. The D.C. Circuit stayed much of the *2015 IPCS Order* pending appeal.[9] When it reached the merits, the D.C. Circuit vacated the FCC's interstate and intrastate rate caps, while remanding the caps on ancillary charges in light of the vacatur. *See Glob. Tel\*Link*, 866 F.3d at 402. The D.C. Circuit held that the FCC lacked statutory authority to regulate intrastate rates, *see id.* at 412; arbitrarily and capriciously relied on industry-wide average costs, which meant that the rate caps did not ensure that "all" IPCS providers were "fairly compensated" for "each and every" call, *id.* at 414-15; and unlawfully prohibited IPCS providers from recovering through their rates a "condition of doing business" — the site commissions that state and local government agencies required IPCS providers to pay, *id.* at 413.

---

[7] *See* FCC Mot., *Securus Techs., Inc. v. FCC*, No. 13-1280 (D.C. Cir. Dec. 10, 2014).

[8] *See* Second Report and Order and Third Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015) ("*2015 IPCS Order*").

[9] *See* Order, *Glob. Tel\*Link v. FCC*, No. 15-1461 (D.C. Cir. Mar. 7, 2016); Order, *Glob. Tel\*Link v. FCC*, No. 15-1461 (D.C. Cir. Mar. 23, 2016).

In 2021, the FCC responded to the vacatur by setting new interim rate caps
— ranging from $0.12 to $0.21 per minute depending on the size and type of
facility — for interstate telephone calls. *See 2021 IPCS Order*[10] ¶¶ 3, 40. It also
capped rates for separately assessed ancillary-service charges. *See id.* ¶ 209. The
FCC found that the various "reforms adopted" in that order "will enable consumers
— incarcerated people and their families — to obtain essential communications
capability at just and reasonable rates." *Id.* ¶ 28. No one petitioned for review of
the *2021 IPCS Order*.

In early 2023, Congress enacted the MWR Act, which responded to *Global
Tel*Link* in a number of ways. Congress amended both 47 U.S.C. § 276 and 47
U.S.C. § 152(b) to give the FCC express authority to regulate rates for intrastate
calls, including IPCS calls. *See* MWR Act § 2. Congress also deleted the
requirement that the FCC's rules ensure that payphone service providers are fairly
compensated for "each and every" call, *id.* § 2(a)(1)(A), (C), and added a
requirement that "all [payphone] rates and charges are just and reasonable," *id.*
§ 2(a)(1)(B). But Congress's edits to § 276(b) retained the requirement that the

---

[10] Third Report and Order, Order on Reconsideration, and Fifth Further
Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*,
36 FCC Rcd 9519 (2021) ("*2021 IPCS Order*"). Functionally, these rate caps
applied to intrastate calls as well, given providers' inability to determine whether
individual calls, on an end-to-end basis, are interstate or intrastate. *See id.* ¶¶ 250-
254.

FCC "prescribe regulations that . . . establish a compensation plan to ensure that all payphone service providers are fairly compensated." 47 U.S.C. § 276(b)(1)(A).

Congress also allowed the FCC to use both "industry-wide average costs . . . and the average costs of service of a communications provider" in setting just and reasonable rates. MWR Act § 3(b)(1) ("may use"). But Congress required the FCC to "consider costs associated with any safety and security measures necessary to provide" IPCS in determining just and reasonable rates. *Id.* § 3(b)(2) ("shall consider").

### C. The Order

In response to the MWR Act, the FCC issued a notice of proposed rulemaking,[11] and its staff issued a mandatory data collection order requiring providers to submit detailed information on their costs of providing IPCS.[12] The notice of proposed rulemaking posed numerous questions to the industry, but did not contain proposed rules or set forth the FCC's views on the legal issues the MWR Act's amendments raised. The staff's data collection order contained more

---

[11] *See* Notice of Proposed Rulemaking and Order, *Incarcerated People's Communications Services*, 38 FCC Rcd 2669 (2023) (JA___-__).

[12] *See* Order, *Incarcerated People's Communications Services*, 38 FCC Rcd 6625 (Wireline Comp. Bur. & Off. of Econ. & Analytics 2023) ("*2023 Data Collection Order*") (JA___-__).

than 60 pages of detailed instructions,[13] as well as lengthy Word and Excel templates for providers to complete.[14]  Securus and Pay Tel not only submitted the extensive cost and other data related that the data collection order required but also responded to numerous FCC inquiries about their submissions.

On July 22, 2024, the FCC released the Order, which imposed a number of dramatic changes for the IPCS industry and the correctional agencies it serves. The FCC made three major changes to the rates and rate structure for IPCS providers' offerings.

*First*, the FCC adopted new rate caps for interstate and intrastate calls.  For audio calls, the FCC's rate caps were as much as two-thirds lower than the 2021 interim rate caps it found just and reasonable.  For video calls, the FCC adopted rate caps for the first time and set them, in many cases, lower than the 2021 interim caps on audio calls:

---

[13] *See 2023 Data Collection Order* App. A (JA___); *see also* 2023 Mandatory Data Collection Instructions (JA___-__).

[14] *See* 2023 Mandatory Data Collection Word Template (JA___-__); 2023 Mandatory Data Collection Excel Template (JA___-__).

**Table One: New Rate Caps by Tier**

| Tier (ADP) | Audio (Permanent) (Per minute) | | Video (Interim) (Per minute) | |
|---|---|---|---|---|
| | Current Caps | New Caps | Current Caps | New Caps |
| **Prisons** (any ADP) | $0.14* | *$0.06* | N/A | *$0.16* |
| **Large Jails** (1,000+) | $0.16* | *$0.06* | N/A | *$0.11* |
| **Med. Jails** (350-999) | $0.21 | *$0.07* | N/A | *$0.12* |
| **Small Jails** (100-349) | $0.21 | *$0.09* | N/A | *$0.14* |
| **Very Small Jails** (0-99) | $0.21 | *$0.12* | N/A | *$0.25* |

Order ¶ 3 (JA___).  The FCC also made its new caps a ceiling (preempting higher state or local rates for intrastate calls) but not a floor, so states remain free to set lower rate caps for such calls, subject only to case-by-case review.  *See id.* ¶¶ 223-241 (JA___-__).  *Second*, the FCC banned all separate charges for ancillary services, requiring IPCS providers instead to recover the costs of those services through their per-minute rates.  *See id.* ¶¶ 408-426 (JA___-__).  *Third*, the FCC prohibited site commissions.  *See id.* ¶¶ 242-338 (JA___-__).

The FCC delayed implementation of the rate caps and the site commission ban so they take effect from January 1, 2025, through April 1, 2026.  *See id.* ¶ 587 (JA___).  The Order did not expressly address the effective date for the elimination of separate charges for ancillary services.  But the FCC's staff has interpreted the Order and the rules the FCC promulgated to make that prohibition effective November 19, 2024.  *See* Securus Stay Denial ¶ 28 (JA___); Pay Tel Stay Denial ¶ 30 (JA___).

The FCC found that because its new rate caps are "just and reasonable," they also satisfy the requirement in § 276(b) that its "compensation plan . . . ensure[s] that all payphone service providers are fairly compensated." *Id.* ¶ 219 (JA____); *see id.* ¶ 71 (JA____). The FCC concluded that "fair compensation need not be evaluated on a provider-by-provider basis," *id.* ¶ 69 (JA____), and rejected the argument that the statute's "term 'all payphone service providers' . . . mean[s] 'each payphone service provider," *id.* ¶ 219 n.778 (JA____). Based on this interpretation of § 276(b), the FCC found that rates caps that — on its own calculations — leave one-third of all IPCS providers unable to recover costs, *see id.* App. J. tbl. 3 (JA____), satisfy the statute's fair compensation requirement.

To conclude that its rate caps are just and reasonable, the FCC first identified the upper and lower bounds of a "zone of reasonableness." *Id.* ¶ 189 (JA____). In setting the upper bound, the FCC said it would include "all reported provider costs." *Id.* ¶ 161 (JA____); *see id.* ¶¶ 190-196 (JA____-__). But in calculating that upper bound, the FCC excluded several costs, including inflation and compliance with the new rules. *Id.* ¶¶ 129, 214 (JA____, ____). In contrast, in setting the lower bound, the FCC excluded numerous reported safety and security costs, and all facility costs; disregarded some providers' reported costs; and adjusted downward providers' reported weighted average cost of capital. *See id.* ¶¶ 198-205 (JA____-__).

Most notably, the FCC excluded the vast majority of IPCS providers' safety and security costs — the largest category of the industry's reported costs. *See id.* App. F tbl. 3 (JA___). Of the seven cost categories the FCC required providers to use when reporting data, *see 2023 Data Collection Order* ¶ 20 n.44 (JA___), the FCC included only two, *see* Order ¶¶ 391, 396 (JA___, ___). The FCC excluded the other five altogether, on the ground that the safety and security measures those costs funded primarily served law enforcement purposes, and therefore did not primarily benefit incarcerated people. *See id.* ¶¶ 394, 398, 401, 404, 407 (JA___, ___, ___, ___, ___). The FCC did so despite recognizing that some of those safety and security measures "may provide a benefit to incarcerated people." *Id.* ¶ 394 (JA___); *see also id.* ¶ 406 (JA___) (describing how voice biometrics can "supplement fraud prevention"). Yet the FCC had included one category in the lower bound despite being "not persuaded" that the measure "would directly benefit IPCS users." *Id.* ¶ 391 (JA___).

The result was that the FCC excluded *two-thirds* of all reported safety and security costs (more than $340 million) from the lower bound of the zone of reasonableness. *Id.* App. I tbl. 6 (JA___). The FCC also excluded from the lower bound all facility costs — costs prisons and jails incur to facilitate IPCS, for which providers reimburse them — despite recognizing that such costs are "used and useful in the provision of IPCS." *Id.* ¶¶ 138, 180, 201 (JA___, ___, ___).

Having calculated total costs (including return on capital) for its upper and lower bounds, the FCC then translated those totals into per-minute figures. To do so, the FCC divided the total costs by *all* minutes of use in 2022, including minutes that generated no revenue — such as free (or unbilled) minutes and minutes that providers billed to users, but for which they were never paid. *See id.* ¶ 189 (JA___); *id.* App. E ¶¶ 1, 4 (JA___, ___). The record showed that IPCS providers are often required by law or contract to provide certain calls for free, including "calls to public defenders." *Id*. App. E ¶ 4 n.9 (JA___). In 2022, unbilled minutes accounted for ███████ of all audio minutes. *See* Securus Stay Denial ¶ 20 n.82 (JA___). In contrast, in setting the interim rate caps, the FCC used only revenue-producing minutes (billed and paid) in its denominator. *See 2021 IPCS Order* App. E ¶ 38. The FCC justified the change by asserting that using all minutes "helps ensure all incarcerated persons are charged no more than the cost of their calls." Order App. E ¶ 4 (JA___).

Having calculated the upper and lower bounds of its zone of reasonableness, the FCC then selected rate caps located just above the lower bound.

| Tier (ADP) | Audio (Per minute) | | | Video (Per minute) | | |
|---|---|---|---|---|---|---|
| | Lower Bound | Audio Rate Caps | Upper Bound | Lower Bound | Interim Video Rate Caps | Upper Bound |
| Prisons (any ADP) | $0.049 | $0.06 | $0.107 | $0.122 | $0.16 | $0.326 |
| Large Jails (1,000+) | $0.047 | $0.06 | $0.098 | $0.087 | $0.11 | $0.223 |
| Med. Jails (350-999) | $0.061 | $0.07 | $0.110 | $0.102 | $0.12 | $0.216 |
| Small Jails (100-349) | $0.080 | $0.09 | $0.121 | $0.126 | $0.14 | $0.208 |
| Very Small Jails (0-99) | $0.109 | $0.12 | $0.151 | $0.214 | $0.25 | $0.288 |

*Id.* ¶ 207 (JA___).  The FCC claimed that the small gap between the lower bound and the caps would address multiple potential errors in its analysis, including:  the possibility that its "evaluation of used and useful costs to provide IPCS may be inaccurate" or its adjustments "to providers' reported costs . . . were too aggressive," *id.* ¶ 213 (JA___), as well as any improperly excluded safety and security costs, facility costs, compliance costs, and inflation, *see id.* ¶¶ 209 n.741, 214 (JA___, ___).

Finally, relying on its new rules, the FCC dismissed as moot Securus' petitions for waiver and clarification relating to the *2021 IPCS Order*.  *Id.* ¶¶ 599-607 (JA___-___).  Securus' waiver petition asked the FCC to waive rules so Securus could offer consumer-friendly alternative pricing plans (rather than only per-minute pricing) to IPCS users.[15]  The FCC dismissed the waiver request as "moot" because the Order adopted new rules "allowing alternat[ive] pricing plans." Order ¶ 606 (JA___).  Securus' clarification petition asked the FCC to clarify

---

[15] *See* Securus Waiver Pet. (JA___-__).

existing limitations on site-commission payments under the *2021 IPCS Order*.[16]
The Order deemed this request "moot" and dismissed the petition because the
Order's new rules "end[ed] the practice of paying site commissions." Order ¶ 605
(JA___).

### D.    Procedural History

While the FCC released the final Order on July 22, 2024, the first portion of
it was published in the Federal Register on August 26, 2024. But this portion of
the Order included only the dismissals of Securus' petitions for waiver and
clarification and denials of reconsideration petitions. *See* 89 Fed. Reg. 68,369
(Aug. 26, 2024). Securus petitioned for review of the dismissals in the Fifth
Circuit. *See* Securus Pet. for Review, *Securus Techs., LLC v. FCC*, No. 24-60454
(5th Cir. Aug. 30, 2024). Within days, three others petitioned for review in
different circuits. Each admitted that the published portion of the Order did not
aggrieve it and that, despite largely supporting the Order, they planned to challenge
one aspect of the Order's rules, which had not yet been published.[17] The FCC sent

---

[16] Securus Clarification Pet. (JA___-__).

[17] *See* DARE Pet. for Review at 2, *Direct Action for Rights & Equality v.
FCC*, No. 24-1814 (1st Cir. Sept. 5, 2024) (noting that DARE "does not claim to
be separately aggrieved by the limited portion of the Order published on August
26, 2024"); PPS Pet. for Review at 2, 4, *Pa. Prison Soc'y v. FCC*, No. 24-2647 (3d
Cir. Sept. 5, 2024) (redocketed in this Court as No. 24-1861) (the "one portion of
the *Order* as to which PPS seeks review" — the FCC's "determination allow[ing]
IPCS providers to recover certain safety and security costs in their rates" — "ha[d]

all four petitions to the Judicial Panel on Multidistrict Litigation, which selected

this Circuit by lottery.  *See* Consolidation Order, No. 24-1814 (1st Cir. Sept. 19,

2024).  The other three petitions were then transferred to this Court.

On September 20, 2024, the Federal Register published the remainder of the

Order, including the rules the FCC adopted.[18]  Twenty-eight parties, including the

four that filed petitions after the Federal Register publication of the first portion of

the Order, petitioned for review of the rules in various courts of appeals.  All but

one of those petitions has been transferred to this Court.[19]

Securus, Pay Tel, and intervenor National Sheriffs Association each moved

for a stay pending appeal, all of which the FCC staff denied.[20]  Securus and Pay

Tel then sought stays pending appeal from this Court, which a motions panel

denied in brief orders that stated in relevant part:

> Having carefully reviewed the specific arguments [Securus and Pay
> Tel] offer[] in favor of a stay, the motion is hereby *denied*, without

---

not been published in the Federal Register"); Crim. Just. Reform Clinic Pet. for
Review at 2-3, *Crim. Just. Reform Clinic v. FCC*, No. 24-5438 (9th Cir. Sept. 5,
2024) (redocketed in this Court as No. 24-1859) (same).

[18] *See* 89 Fed. Reg. 77,244 (Sept. 20, 2024); 89 Fed. Reg. 77,065 (Sept. 20,
2024).

[19] The Second Circuit has not yet acted on the FCC's October 2024
unopposed transfer motion, recently calendaring it for a February 4, 2025 motions
panel.  *See* Notice, *Fines & Fees Just. Ctr., Inc. v. FCC*, No. 24-2611 (2d Cir. Jan.
22, 2025).

[20] *See generally* Securus Stay Denial (JA___-__); Pay Tel Stay Denial
(JA___-__); NSA Stay Denial (JA___-__).

prejudice to later revisitation of relevant points in briefing and during merits review.

Order Denying Securus Stay Mot. at 2 (1st Cir. Nov. 18, 2024); Order Denying

Pay Tel Stay Mot. at 2 (1st Cir. Nov. 18, 2024).

The Court also issued orders directing petitioners DARE, CJRC, and PPS to show why their initial petitions for review — the ones filed before Federal Register publication of the new rules — should not be dismissed for lack of jurisdiction. *See* Orders To Show Cause (1st Cir. Oct. 3, 2024).  In response, the FCC explained that, "[b]ecause [DARE, CJRC, and PPS] filed these petitions for review before September 20, the petitions are incurably premature and should be dismissed for lack of jurisdiction."[21]  A motions panel, however, issued orders "reserv[ing] to the ultimate merits panel" "the issues flagged in the order[s] to show cause."  Orders (1st Cir. Nov. 13, 2024).

The motions panel also denied without prejudice Securus' and Pay Tel's motions to transfer to the Fifth Circuit, reserving that issue to the merits panel as well.  Securus filed an initial transfer motion — immediately after the first four petitions for review were consolidated in this Circuit — and the motions panel "den[ied] the motion, without prejudice to later revisitation of all issues bearing on

---

[21] FCC Resp. to Show Cause Orders at 6 (1st Cir. Oct. 17, 2024) (FCC Resp.").

venue and potential transfer." Order (1st Cir. Oct. 21, 2024). After the deadline expired to seek review of any part of the FCC's Order, Securus renewed its motion to transfer, and Pay Tel also filed a transfer motion. Before replies were due, the motions panel denied them "without prejudice to revisitation" "by the ultimate merits panel." Order (1st Cir. Dec. 9, 2024).[22]

## SUMMARY OF ARGUMENT

**I.** The Court should transfer this case to the Fifth Circuit. Under 28 U.S.C. § 2112(a)(1), the FCC was required to file the record in the Fifth Circuit, making it the court of appeals to hear all challenges to the Order. First, a portion of the Order was entered for purposes of the Hobbs Act in July 2024 and the first petition for review was filed more than ten days later. Second, even if that portion of the Order was entered in August 2024, the courts of appeals had jurisdiction over only one of the four petitions for review filed within the first ten days. In either event, § 2112(a) selects the court that received the first-filed petition for review (the Fifth) as the one that must receive the administrative record and hear all petitions for review of the same agency order. Transfer to the Fifth Circuit is

---

[22] On December 13, 2024, Securus and Pay Tel filed a mandamus petition in the Supreme Court (No. 24-658) seeking an order directing this Court to transfer these cases to the Fifth Circuit. That petition remains pending.

mandatory. That court, not this one, should resolve the merits of the parties' challenges to the Order.

**II.A.** The FCC violated Congress's command that the agency's compensation plan ensure that "all" IPCS providers are "fairly compensated." The FCC interpreted "all" to mean "efficient" and erased the "fairly compensated" requirement from the statute by concluding that just and reasonable rates necessarily provide fair compensation. These two legal errors led the FCC to select rate caps so low that — even on its own flawed estimates — one-third of all IPCS providers will be unable to recover their costs.

**B.** The FCC also flouted § 276(b) and the MWR Act in its treatment of the costs of safety and security measures. The FCC violated the "fairly compensated" requirement by omitting safety and security costs that providers incur as a "condition of doing business" — the same mistake the D.C. Circuit identified when vacating an earlier IPCS order. *Glob. Tel\*Link*, 866 F.3d at 413. The FCC also refused to determine what safety and security measures are "necessary," despite an explicit statutory command that it do so. Instead, it employed a "used and useful" test that has no place in the IPCS context to eliminate cost recovery for many safety and security measures.

**III.A.** The FCC arbitrarily and capriciously applied its "used and useful" test by excluding many safety and security measures that it had recognized — in

previous orders and the current Order — benefit IPCS users.  The FCC also reversed decades of contrary practice on safety and security measures without a coherent explanation for the changed approach, instead pretending there was no change.

**B.**     The FCC arbitrarily and capriciously turned its calculations of providers' costs into per-minute rates by using all minutes of use — including non-revenue-generating minutes — as the divisor.  That ignores that only paid minutes can allow a provider to recover its costs and departs from the FCC's prior practice of without sufficient explanation.

**C.**     The FCC arbitrarily and capriciously eliminated the ability to charge separate fees for ancillary services, instead requiring providers to recover those costs — incurred on an as-used basis — in their per-minute rates.  The FCC failed to acknowledge that doing so will increase providers' costs, as incarcerated persons and their friends and families use ancillary services more often at no added cost.  And the FCC failed to offer an adequate explanation for adopting rules implementing this prohibition immediately, while it phased in other aspects of its rate reforms over a period ending April 1, 2026.

**IV.**     The FCC's decision not to preempt states and localities from adopting lower rate caps is unlawful.  First, that decision improperly shirks a task Congress gave the FCC:  adopting a compensation plan that *ensures* both fair compensation

to all IPCS providers and just and reasonable rates. The FCC's rate caps reflect a national, unified rate-regulation framework; permitting some states to set lower rate caps will disrupt this framework as it disregards the impact on cost recovery in higher-cost states. The FCC, therefore, should have found that federal law preempts *all* state and local rate-setting for IPCS. But if some state and local rate-setting were permitted, the FCC had to apply the same case-by-case approach to conflict preemption to higher and lower intrastate rates. The same reasons the FCC gave for why lower rate caps might not conflict with federal law apply equally to higher ones.

**V.**     Finally, the FCC incorrectly dismissed Securus' clarification and waiver petitions as moot. Securus sought relief from (or relating to) regulations that continued to apply at the time of the Order and that will continue to apply until the Order's new rules take full effect in the future. Securus' requests were not — and are not — moot.

## STANDARD OF REVIEW

This Court reviews "[q]uestions of statutory interpretation" "de novo." *Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167, 170 (1st Cir. 2011). "[A]gency interpretations of statutes . . . are not entitled to deference." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (emphasis omitted).

Rather, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412.

"An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded an important aspect of the problem, offered an explanation that runs counter to the evidence, or when a reasonable explanation for the agency's decision cannot be discerned." *Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023). When an agency "depart[s] from a prior policy," it must "provide reasoned explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And when an agency's proposed policy "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," the agency must provide a "more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* "[A]n about-face . . . owing to facts changed from those underlying the prior view requires that the new facts be addressed explicitly by reasoned explanation for the change of direction." *Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023).

## ARGUMENT

## I. THE COURT SHOULD TRANSFER THESE CASES TO THE FIFTH CIRCUIT

The lottery selecting this Court should not have occurred. Instead, the FCC should have filed the record on appeal in the Fifth Circuit — where Securus filed

the first petition for review — and all other petitions for review should have been transferred to that court. Alternatively, the courts of appeals lacked jurisdiction over three of the four petitions for review included in that lottery. That renders those petitions a nullity, leaving the Fifth Circuit as the required venue for these challenges. For either reason, before reaching the merits, this Court should transfer these cases to the Fifth Circuit.[23]

A. Congress has enacted rules selecting the appellate venue when "proceedings are instituted in two or more courts of appeals with respect to the same [agency] order." 28 U.S.C. § 2112(a); *see id.* § 2346 (applying § 2112 to Hobbs Act appeals). In only one circumstance does § 2112(a) call for a venue lottery: when, "within ten days" after the order can be appealed, petitions for review are filed "in at least two courts of appeals." *Id.* § 2112(a)(1), (3). In all other cases, the agency must file the record in the first court of appeals in which the first petition is filed. *See id.* § 2112(a)(1). Thereafter, other courts of appeals that receive petitions for review of "the same order . . . shall transfer those proceedings to the court in which the record is . . . filed." *Id.* § 2112(a)(5).

---

[23] We are aware of only one case in which another court of appeals deferred ruling on a transfer motion to a merits panel. There, the D.C. Circuit granted the transfer motion before the scheduled oral argument. *See* Order, *Howard Stirk Holdings, LLC v. FCC*, No. 14-1090 (D.C. Cir. Nov. 24, 2015).

Under the Hobbs Act, the time to petition for review begins "[o]n the entry of a final order." *Id.* § 2344. "Entry" occurs when "the agency" "give[s] notice thereof . . . in accordance with its rules." *Id.* Agency rules therefore determine when an order is entered and the time to petition for review starts, including the ten-day period in § 2112(a)(1). *See Council Tree*, 503 F.3d at 287; *W. Union Tel.*, 773 F.2d at 376.

The FCC's rules distinguish between rulemaking and adjudications. Rulemaking orders are entered when published in the Federal Register, while adjudicatory decisions are entered when released. 47 C.F.R. § 1.4(b)(1)-(2). But the FCC has a specific rule that governs when an "adjudicatory decision[] with respect to specific parties" is "contained in [a] rulemaking document[]": the adjudicatory decision is entered once the FCC releases the order containing it, while entry of the rules awaits Federal Register publication. *Id.* § 1.4(b)(1) note.

**B.** The FCC's dismissal of Securus' waiver petition was an adjudicatory decision as to a specific party. Rulings on waivers are adjudicatory decisions. *See Blanca Tel. Co. v. FCC*, 743 F.3d 860, 866-67 (D.C. Cir. 2014). And Securus sought a waiver of the FCC's rules "to allow continuation of the company's pilot

subscription programs," Securus Waiver Pet. 9 (JA___), so the dismissal was an adjudication as to a specific party.[24]

Therefore, under the note in 47 C.F.R. § 1.4(b), the time to seek judicial review of that part of the Order began with the Order's release. The first petition for review — Securus' petition in the Fifth Circuit — was filed more than ten days later. The FCC was therefore required to file the administrative record in the Fifth Circuit, because it is "the court in which proceedings with respect to the order were first instituted." 28 U.S.C. § 2112(a)(1). The FCC violated § 2112(a) by sending Securus' petition, along with three later-filed petitions, for a venue lottery.

**C.** But even if the note in § 1.4(b) does not apply to Securus' waiver petition, only one party (Securus) filed a valid petition "within ten days after" publication of the first part of the Order in the Federal Register. *Id.* Each of the other three petitions filed in that window conceded that the petitioner did not challenge the then-published portion of the Order; instead, each sought to challenge part of the Order that had not yet been published. *See supra* note 17. As the FCC correctly explained to this Court, those "petitions are incurably premature

---

[24] While Securus noted that granting a waiver to it would also provide a precedent that would enable "other providers" to obtain similar waivers, Securus Waiver Pet. at 1 (JA___), the relief Securus sought — and the evidence Securus submitted supporting that relief — was limited to its own subscription offering, *see id.* at 3-4, 7-9 (JA___-__, ___-__).

and should be dismissed for lack of jurisdiction."  FCC Resp. at 6; *see also Council Tree*, 503 F.3d at 291, 293; *W. Union Tel.*, 773 F.2d at 380.[25]  Once those petitions are dismissed, they are excluded from the § 2112(a) calculus.  *See Southland Mower Co. v. U.S. Consumer Prod. Safety Comm'n*, 600 F.2d 12, 13 (5th Cir. 1979) (per curiam); *see also Indus. Union Dep't, AFL-CIO v. Bingham*, 570 F.2d 965, 974 (D.C. Cir. 1977) (Wilkey, J., concurring) (per curiam) (explaining that § 2112(a) "is designed to solve forum disputes as between courts having jurisdiction over the order").  So the result is the same:  § 2112(a)(1) selects the Fifth Circuit to hear these cases.

## II.  THE FCC VIOLATED THE COMMUNICATIONS ACT AND MWR ACT

### A.  The FCC Violated the Requirement To Ensure That All IPCS Providers Are Fairly Compensated

**1.**  As amended by the MWR Act, § 276(b) imposes two separate duties on the FCC:  its compensation plan for IPCS must "ensure that all payphone service providers are fairly compensated" and also "ensure that . . . all rates and charges are just and reasonable."  47 U.S.C. § 276(b)(1)(A).  While Congress

---

[25] The FCC recently told the Eleventh Circuit that, "[s]o far as [it is] aware, every . . . court to reach this issue" — whether a "petition filed before publication in the Federal Register is 'incurably premature' and must be dismissed for lack of jurisdiction" — "has come to the same conclusion."  FCC Mot. To Dismiss at 3-4, *Ins. Mktg. Coal. Ltd. v. FCC*, No. 23-14125 (11th Cir. Jan. 19, 2024).  That petitioner voluntarily dismissed its case shortly afterward.

added the requirement that rates be "just and reasonable" and removed the requirement for fair compensation on a per-call basis, Congress retained the existing language requiring the FCC to ensure that "all" IPCS providers are "fairly compensated."

Fair compensation and just and reasonable rates are distinct requirements. "Just and reasonable" — a well-known standard, *see Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 477-81 (2002) — bars rates that are so low that they prevent a regulated entity from "maintain[ing] its financial integrity" or "compensat[ing] its investors for the risk assumed." *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 593 (6th Cir. 2001). Because just and reasonable rates necessarily afford regulated entities "a 'fair' return," *Verizon*, 535 U.S. at 486, the *additional* statutory requirement that "all" IPCS providers be "fairly compensated" must go beyond that baseline. *See City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020) (courts read statutes to "give effect to every word and phrase").

That not only ensures that "fairly compensated" is not rendered surplusage but also accords with the ordinary meaning of the words Congress used. "All," "[w]hen used as an adjective," "means 'each and every.'" *Boldt v. N. States Power Co.*, 904 F.3d 586, 592 (8th Cir. 2018); *see also*, *e.g.*, *DeRoy v. Carnival Corp.*, 963 F.3d 1302, 1316 (11th Cir. 2020) ("'all' means 'every'"); *Trs. of Iron Workers Loc. 473 Pension Tr. v. Allied Prods. Corp.*, 872 F.2d 208, 213 (7th Cir. 1989)

("The common meaning of 'all' is 100 percent.").  And "compensated" means

"'ma[de] whole.'"  *In re Riley*, 923 F.3d 433, 442 (5th Cir. 2019).  So § 276(b)

requires that the FCC's compensation plan give all providers the ability to charge

rates that allow them to recover their costs.

Before the MWR Act, the D.C. Circuit had interpreted Congress's use of

"all" and "fairly compensated" the same way we do.  While § 276(b) at that time

required the agency to "establish a per call compensation plan to ensure that all

[IPCS] providers are fairly compensated for each and every . . . call," 47 U.S.C.

§ 276(b)(1)(A) (2015), the D.C. Circuit understood that "all," modifying

"providers," meant all — not average, prudent, or efficient.  It rejected the FCC's

argument that "providers can become profitable under the rate caps if they operate

more efficiently." *Glob. Tel\*Link*, 866 F.3d at 415.  That court also rejected the

FCC's decision to "exclud[e]" amounts that "obviously are costs of doing business

incurred by I[P]CS providers" when setting rates, holding that the exclusion

"cannot be easily squared with the requirements of § 276" because it meant the

agency "set the rate caps below cost." *Id.* at 413.

**2.**     The FCC, in contrast, claimed "fair compensation need not be

evaluated on a provider-by-provider basis." Order ¶ 69 (JA___).  As a result, the

FCC concluded that "all . . . providers," 47 U.S.C. § 276(b)(1)(A), instead means

"efficient providers," Order ¶ 71 (JA___).  In addition, the FCC conflated "fairly

compensated" and "just and reasonable," treating them as a single standard.  The

FCC asserted that, under its "approach,"

> a provider will be fairly compensated if the rates and fees it is
> permitted to charge will afford it an opportunity to recover industry-
> average costs associated with prudent investments used and useful in
> providing IPCS and associated ancillary services at the facilities the
> provider serves.

*Id.* (JA___-__).  But, as the Supreme Court has noted, allowing a provider to

"recover prudently invested capital that is being 'used and useful' in providing the

public a good or service" *is* the just and reasonable standard.  *Verizon*, 535 U.S. at

483-84 & n.6.  The FCC's "approach" thus reduces to the assertion that a provider

will be fairly compensated if its rates are just and reasonable.  The FCC thus reads

"all' out of the statute — replacing it with "efficient" — and treats the fairly

compensated requirement as surplusage.

These basic errors of statutory interpretation led the FCC to conclude that

rate caps that — by its own estimation — are below cost for one-third of IPCS

providers, ███████████, nonetheless "fairly compensate" all IPCS providers.

*See* Order ¶ 216 (JA___); *id.* App. J tbl. 3 (JA___).  And the FCC's estimation of

both revenues and costs understates the problem substantially.

First, the FCC estimates providers' revenues by assuming they will charge

rates equal to the rate caps and are paid for 100 percent of their minutes of use.  *Id.*

App. J ¶ 5 (JA___).  But that overstates revenues.  IPCS providers may negotiate

34

below-cap rates as part of the competitive bidding process to win a contract at a prison or jail, *see* ViaPath Comments at 3 & n.7 (JA___); the FCC refused to preempt states from setting lower rate caps for intrastate calls, *see* Order ¶¶ 223-241 (JA___-__); and the record showed that a sizeable fraction of audio minutes of use generate no revenues, *see* Securus Stay Denial ¶ 20 n.82 (JA___).

Second, the FCC dramatically understates IPCS providers' costs. The FCC's cost estimates exclude two categories that the agency allowed IPCS providers to recover through their rates,[26] as well as hundreds of millions of dollars in safety and security costs. *See infra* Part III.A. The FCC's conclusion that IPCS rates should not pay for those safety and security measures does not make those costs disappear. A more accurate calculation would show that the rate caps place more than half of all providers underwater, █████████████.[27]

The FCC's justifications for its misreading of the statute lack merit.

*First*, the FCC asserts that Congress's grant to the FCC of permission to "use industry-wide average costs" when setting rates also, "of necessity, evaluates provider compensation on a more aggregated — rather than provider-by-provider

---

[26] *Compare* Order App. E ¶¶ 9-10 (JA___) (allowing providers to recover TRS and ancillary service expenses through per-minute rates), *with id.* App. J tbl. 3 note (JA___) (omitting both costs when assessing whether providers can break even under the rate caps).

[27] *See* Securus Ex Parte Letter at 6 & n.12 (July 15, 2024) (JA___).

— basis." Order ¶ 68 (JA___). The latter does not follow from the former. In § 3(b)(1), Congress granted the FCC permission to employ *two* more tools in establishing rates, one of which is provider specific. *See* MWR Act § 3(b)(1) (FCC "may use industry-wide average costs . . . and the average costs . . . of a . . . provider"). Congress did not thereby prejudge whether the FCC's use of either tool would discharge the fair-compensation requirement. And if Congress wanted to change the meaning of "all . . . providers" or equate "just and reasonable" and "fairly compensated," it would have done so explicitly. "Congress . . . does not alter the fundamental details of a regulatory scheme in . . . ancillary provisions." *Whitman v. Am Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

*Second*, the FCC relies on Congress's deletion of "per call" and "each and every" from § 276(b)(1). *See* Order ¶ 69 (JA___). But all this change means (as the FCC observes) is that "compensation need not be evaluated on a per-call basis." *Id.* It does not mean (as the FCC also contends) that "fair compensation need not be evaluated on a provider-by-provider basis." *Id.* If Congress wanted to alter the requirement that "all . . . providers" be fairly compensated, it would have replaced "all" with some other word. Indeed, Congress's deletion of "each and every" shows that it knows how to speak clearly when deleting a modifier like "all."

## B. The FCC's Treatment of Safety and Security Measures and Facility Costs Violated the Statutes

*First*, the FCC violated the "fairly compensated" requirement in § 276(b) by excluding from the lower bound of its zone of reasonableness safety and security and facility costs that jails and prisons require IPCS providers to incur. The D.C. Circuit previously held that preventing IPCS providers from recovering what "obviously are costs of doing business incurred by I[P]CS providers" because they are "a condition of doing business" "cannot be . . . squared with the requirements of § 276." *Glob. Tel*Link*, 866 F.3d at 413. The court reasoned that, "[i]f agreeing to pay" a cost "is a condition precedent to [IPCS] providers offering their services" in a particular jail or prison, "[i]gnoring [such] costs" when setting rates "defies reasoned decisionmaking." *Id.* The same reasoning applies with equal force here.

The record showed that jails and prisons require IPCS providers to implement a host of safety and security measures as a condition of providing IPCS services. For example, correctional authorities require IPCS providers to perform automatic call transcription, *see* Securus Comments at 22 (JA___), to "[r]ecord the content of all" calls and "store recordings for at least 2 years," and to implement "[v]oice biometrics to prevent unauthorized use" of IPCS, *id.* at 39 (JA___); *see also* Order ¶ 382 n.1373 (JA___) (citing record evidence explaining that "demand for security features has largely been driven by facilities," which "define[] the

tools they need" "through RFPs with detailed security requirements"). Yet, in setting the lower bound of its zone of reasonableness, the FCC excluded the costs of these required measures. *See* Order ¶ 394 (JA___) (call transcription services); *id.* ¶¶ 398-400 (JA___-__) (call recording measures); *id.* ¶ 404 (JA___) (voice biometrics).

The FCC contends that "safety and security features offered solely or chiefly to win contracts do not warrant recovery through regulated IPCS rates." *Id.* ¶ 382 (JA___). Yet that is the same reasoning the D.C. Circuit rejected, explaining that it "ma[de] no sense in light of the undisputed record" evidence that "correctional institutions" require them "as a condition of doing business." *Glob. Tel\*Link*, 866 F.3d at 413. The FCC then asserts that it is "not uncommon for providers responding to requests for proposals to offer" measures "not specifically demanded by the correctional authority." Order ¶ 382 (JA___). But the FCC cites no record support for that assertion. *See generally id.* Instead, the record showed that IPCS providers include safety and security measures in their bids because those that "do not meet [facilities'] security requirements risk losing contracts or being disqualified from the bidding process." Securus Reply Comments at 28 (JA___).

*Second*, the FCC failed to perform a mandatory task Congress assigned in the MWR Act: to identify which safety and security measures are "necessary" to provide IPCS. Congress used mandatory language ("shall consider") — rather

than permissive language ("may use") — to describe the FCC's obligation to incorporate into its compensation plan the "costs associated with any safety and security measures necessary to provide" IPCS. *Compare* MWR Act § 3(b)(2) *with id.* § 3(b)(1). Despite that mandatory language, the FCC asserts that it need "not opine on the necessity of safety and security measures" "[b]ecause [it] evaluate[s]" all such measures under the used-and-useful framework. Order ¶ 369 n.1316 (JA___). Quoting *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151 (D.C. Cir. 1995), the FCC contends that its obligation to "consider" safety and security measures means only that it "must 'reach . . . express and reasoned conclusion[s]' regarding such costs." Order ¶ 356 & n.1269 (JA___).

But that skips a key step. Congress's directive that the FCC "shall consider" "necessary" safety and security requires the FCC to identify which measures are "necessary." That directive also made sense. "Congress legislates against the backdrop of existing law." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019). And existing law included prior FCC orders holding that IPCS providers could be compensated through their rates for necessary safety and security measures. *See*, *e.g.*, *2013 IPCS Order* ¶ 53 n.196 (security features "inherent in [IPCS] providers' network" are "recoverable costs"). Skipping this step allowed the FCC to exclude recovery for many measures without having to confront the necessity of those measures.

Nor does *Time Warner* help the FCC.  There, the D.C. Circuit found that, by "gathering data for both non-competitive and competitive systems" and "performing multiple regression analyses," the FCC had performed the "comparison of similarly situated cable systems" that Congress required.  56 F.3d at 176.  And the court noted that the FCC had "expressly consider[ed] the potential role of [another] factor," before "conclud[ing] it should not be given any weight." *Id.* at 175.  Here, in contrast, the FCC asserts that it can "consider costs associated with . . . necessary" safety and security measures, MWR Act § 3(b)(2), without ever identifying which ones those are.

*Third*, the FCC asserts that it satisfied § 3(b)(2) because it has considered whether every safety and security measure, necessary or unnecessary, is "used and useful."  Order ¶ 396 (JA___).  But, as shown above, "used and useful" is part of the just-and-reasonable standard historically applied to public utilities.  *See Verizon*, 535 U.S. at 484-85 & n.6.  Whether a safety and security measure is "used and useful" does not answer whether it is "necessary" to provide IPCS, which is the question Congress directed the FCC to answer.

In addition, "used and useful" cannot be exported from its historical public utility context — which involved monopoly, common-carrier providers on the one hand and rate payers on the other — to the IPCS context.  *See* Securus Comments at 25-32 (JA___-__).  First, IPCS providers are not monopoly, common-carrier

providers.  They compete with each other to win the business of correctional facilities.  Second, there are two customers in the IPCS context:  the officials who contract with an IPCS provider and the incarcerated persons who use the services the officials select.  And it is those officials who determine the safety and security measures that providers must implement in their services.  Asking whether safety and security measures are "used and useful" thus ignores the dual customers in the IPCS context.  It asks only whether a measure benefits one customer — the incarcerated person placing the call — and gives no weight to the conclusions of prison and jail officials that the measure is needed to prevent IPCS from being used to facilitate criminal activity, including harm to other incarcerated people.

## III.  THE ORDER IS ARBITRARY AND CAPRICIOUS IN MULTIPLE RESPECTS

### A.  The FCC Arbitrarily and Capriciously Excluded Safety and Security and Facility Costs

Independent of the legal errors detailed above, the FCC's decisions about which safety and security measures to include in the lower bound of its zone of reasonableness — and its decision to exclude facility costs from the lower bound — were arbitrary and capricious.

*First*, while the FCC said that "safety and security measures that primarily benefit consumers" "appropriately are included in regulated rates" and "[m]easures that serve only a law enforcement function or provide no benefit to IPCS

41

consumers are not," Order ¶ 383 (JA___), that is not how the FCC decided which measures to include and exclude. The FCC excluded all safety and security measures in the category of "Law Enforcement Support Services," despite conceding that "some functions within this category may provide a benefit to incarcerated people, such as the administration of tiplines to anonymously report crimes and connect people with Prison Rape Elimination Act (PREA) report centers." *Id.* ¶ 394 (JA___). And the FCC had recognized that two categories of measures it excluded (call recording and call monitoring), *see id.* ¶¶ 400, 403 (JA___, ___), benefit incarcerated people because they "advance the safety and security of . . . inmates[ and] their loved ones." *2013 IPCS Order* ¶ 2.[28] At the same time, the FCC included the nominal costs providers identified as associated with complying with CALEA — a federal law requiring all communications providers to enable call-monitoring and recording capabilities to assist law enforcement — even though it was "not persuaded that [those] functionalities . . . generally would directly benefit IPCS users." Order ¶ 391 (JA___).

---

[28] The record demonstrates that such features are necessary to provide basic protections (such as preventing witness tampering and violations of no-contact orders and protecting consumer accounts) the FCC admits are essential to the service. *Compare* Pay Tel Ex Parte Letter Ex. 1 at 5-6 (June 18, 2024) (JA___-__), *with* Order ¶ 395 n.1422 (JA___).

The FCC's treatment of the costs of CALEA compliance, call monitoring, and call recording is especially arbitrary. All involve call monitoring and recording to assist law enforcement officials. And all are legal requirements, the first in a federal statute, the latter two required by government officials. The FCC's inclusion of the former and exclusion of the latter two can only be explained by the massive difference in reported costs: less than $6,000 for the one the FCC included but more than $225 million for the ones the FCC excluded. *See id.* App. I tbl. 6 (JA___-__). Such a results-oriented approach designed to yield the lowest possible rates is arbitrary and capricious — and it is not the standard the FCC claimed to be applying.

In sum, the FCC inconsistently applied its "used and useful" standard to safety and security measures and did not faithfully include all measures that benefit incarcerated persons and their families and friends. Such internal inconsistencies are the hallmark of arbitrary and capricious decisionmaking. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

*Second*, the FCC's exclusion of these safety and security measures reversed decades of contrary practice with no reasoned explanation for the departure. As now-Chairman Carr noted, the Order "excludes certain safety and security costs . . . the FCC, in its previous decisions, has long considered . . . as part and parcel of the overall rate." Order at 487 (JA___). In reliance on those prior orders,

IPCS providers invested heavily in those features.  In 2022 alone those investments

exceeded $500 million.  *See id.* App. F tbl. 3 (JA___).  The FCC, however, blithely

asserts that it had not previously "made a determination of which safety and

security measure costs should be recoverable in IPCS rates." *Id.* ¶ 375 (JA___).

But that is exactly what its previous orders did.  *See 2013 IPCS Order* ¶ 58 ("Our

interim rate caps . . . include the cost of advanced security features such as

continuous voice biometric identification.").[29]  The FCC's unexplained change in

position is arbitrary and capricious — particularly in light of the "serious reliance

interests" "its prior policy has engendered." *Fox Television Stations*, 556 U.S. at

515.

*Third*, the FCC excludes all facility costs when setting the lower bound of its

zone of reasonableness, despite recognizing that doing so "understate[s] . . . used

and useful costs of providing IPCS." Order ¶ 180 (JA___).  This exclusion is more

---

[29] *Compare also* Order ¶ 375 (JA___) ("reject[ing]" the "suggestion" that the
FCC previously treated costs related to "recording, monitoring, biometrics, and
related services" as "inherent in the provision of" IPCS), *with 2013 IPCS Order*
¶ 53 n.196 ("[C]osts that the Commission would likely find appropriate for
inclusion in interstate I[P]CS rates include . . . [s]ecurity features inherent in the
I[P]CS providers' network [that] would also likely constitute recoverable costs.
Examples of such costs include the costs of recording and screening calls, as well
as the blocking mechanisms the I[P]CS provider must employ to ensure that
inmates cannot call prohibited parties.").

evidence that the FCC did not faithfully apply its purported standard, suggesting that the FCC's true standard was a different, unannounced one.

The FCC, however, claims that this exclusion is irrelevant because facility costs are one reason it selected rate caps marginally higher than the absolute bottom of its zone of reasonableness. *See id.* ¶ 214 (JA___-__); Securus Stay Denial ¶ 25 (JA___). But the rate caps the FCC selected are just barely above the lower bound, *see* Order ¶ 207 (JA___), and the agency repeatedly resorts to those slim differences — about one cent per minute for audio calls — to justify a host of things: excluding industry-wide compliance costs, *id.* ¶ 214 (JA___), and the costs of inflation from the rates, *id.* ¶ 213 (JA___); the potential that the FCC improperly excluded some safety and security measures because the FCC's data collection categories were imprecise, *see id.* ¶¶ 209 n.741, 214 (JA___, ___); the possibility that its "evaluation of used and useful costs may be inaccurate to some degree," *id.* ¶ 213 (JA___); and the possibility that "adjustments we applied to providers' reported costs to obtain the lower bound estimates were too aggressive," *id.* The FCC never performed any analysis to confirm that the small gaps between the chosen rate caps and the lower bounds could address any of these issues, let alone simultaneously care for all of them.

### B. The FCC Arbitrarily Used Unpaid Minutes When Calculating Rate Caps

To create a zone of reasonableness in terms of per-minute rates, the FCC divided the total costs it included in its upper and lower bounds by *total* minutes of use in 2022 — including non-revenue generating minutes (free or billed but uncollected).  *See* Order App. E ¶¶ 1, 4 (JA___, ___).  IPCS providers offer certain minutes for free, like calls to public defenders.  *See* Pay Tel Ex Parte Letter at 6 (July 9, 2024) (JA___).  And even "[b]illed minutes do not equal paid minutes to the extent minutes are billed for, but not paid."  Order App. E ¶ 5 n.10 (JA___).  In 2022, unbilled minutes accounted for ███████ of all audio minutes.[30]  Securus Stay Denial ¶ 20 n.82 (JA___).  If the FCC had used only billed minutes, the resulting per-minute rates would have been ███████ higher.[31]  When multiplied by the billions of minutes of IPCS usage, this small change adds up to tens of millions of dollars annually.

Once the rate caps take effect, providers will collect revenues only on minutes that are billed and collected.  It is those minutes — not all minutes — that

---

[30] While the FCC recognized that "[b]illed minutes do not equal paid minutes," the FCC's data collection directed providers to report billed but unpaid minutes of use as billed minutes.  Order App. E ¶ 4 n.10 (JA___).

[31] The math is straightforward.  $100/1000 minutes = 10 cents-per-minute. But if the denominator is reduced ███████, the result increases ███████ ████████████████████████████████.

must cover their costs. That is why the FCC has historically used projected revenue-generating demand for translating allowed costs into per-minute rates.[32] And it is why the FCC used only paid minutes in calculating the interim rate caps in 2021. *See 2021 IPCS Order* App. E ¶ 38 ("Paid minutes are used as the divisor because those are the minutes that providers rely on to recover their costs."). Rate caps that ignore the existence of free and other non-revenue-generating minutes in the marketplace cannot fairly compensate providers and are not just and reasonable.

The FCC's defenses of its change of position lack merit. *First*, the FCC asserts that using all minutes (even those that generate no revenue) "more accurately reflects providers' average costs." Order ¶ 189 (JA___). But that misunderstands the task Congress assigned to the agency. Congress did not direct the FCC to engage in a math exercise to determine cost per minute. Instead, Congress directed the FCC to "establish a compensation plan" that must both "ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable." 47 U.S.C. § 276(b)(1)(A). Establishing a compensation plan that ignores that only revenue-generating minutes recover providers' costs fails that assignment.

---

[32] *See*, *e.g.*, Memorandum Opinion and Order, *Iowa Network Access Division, Tariff F.C.C. No. 1*, 33 FCC Rcd 7517, ¶ 93 (2018).

*Second*, the FCC claims that using all minutes "is an improvement" from its *2021 IPCS Order*, as it "better reflects the cost of actual minutes" and "helps ensure all incarcerated persons are charged no more than the cost of their calls." Order App. E ¶ 4 (JA___). But the premise of the FCC's rate-setting approach is that it can use industry-wide average costs and total industry-wide minutes to set rate caps that apply at all prisons or all jails of a certain size, even though the actual cost of providing service at an individual prison or jail within a category differs. That approach necessarily means that the rate an incarcerated person is charged may be higher (or lower) than the actual cost of her call. A uniform rate cap will, for example, lead incarcerated persons at less-expensive-to-serve small jails to subsidize service at more-expensive-to-serve small jails. The FCC cannot defend its departure from its *2021 IPCS Order* — and from basic rate-setting practice — with an argument that is inconsistent with the remainder of the Order. That internal inconsistency is arbitrary and capricious. *See ANR Storage*, 904 F.3d at 1028.

*Third*, the FCC says that, "if the proportion of billed to unbilled minutes were to shift in the future, a rate cap based on the amount of billed minutes would become outdated." Order App. E ¶ 4 n.8 (JA___). But that is true of every aspect of the Order. The FCC decided that using cost data and reported minutes from 2022 could create just and reasonable rate caps that provide fair compensation in

2025 and beyond.  Changes in costs (e.g., increases in equipment costs) or in usage (e.g., a shift from audio minutes to video minutes) will change providers' costs and revenues.  That things might change cannot be a justification for arbitrarily using non-revenue generating minutes to set the rate caps.

### C.    The FCC's Treatment of Ancillary Services Is Arbitrary and Capricious

The FCC prohibited IPCS providers from recovering the costs of ancillary services through separate charges, instead requiring providers to recover those costs through per-minute rates.  *See* Order ¶¶ 408-426 (JA___-__).  And while the FCC delayed the implementation of two other aspects of its rate rules at many prisons and jails — the rate caps and the ban on site commissions, *see id.* ¶ 587 (JA___) — the FCC's staff has stated that the prohibition on separate charges for ancillary services took effect on November 19, 2024, *see* Securus Stay Denial ¶ 28 (JA___-__); Pay Tel Stay Denial ¶ 30 (JA___).  Both decisions were arbitrary and capricious.

1.    IPCS providers incur the costs of providing ancillary services as incarcerated persons and their family and friends use *those* services — not when they make audio or video calls.  *See* Securus Reply Comments at 19 (JA___).  Requiring incarcerated persons and their family and friends to pay for the ancillary services they use provides them with proper economic incentives to make efficient use of those services.  As the FCC recognized, removing those economic signals

will increase usage of ancillary services. *See* Order ¶ 423 (JA___). That increased use will increase providers' costs in ways that the FCC did not capture in its rate caps.

Even if providers could recover those increased costs through per-minute rates that will require those who make less use of ancillary services to subsidize those who use them more. Yet the FCC cited preventing such cross-subsidization as a reason to include non-revenue generating minutes when calculating per-minute rates. *See id.* App. E ¶ 4 (JA___). Either "ensur[ing] all incarcerated persons are charged no more than the cost of their calls," *id.*, is important or it is not. The FCC's inconsistent application of that goal renders the Order arbitrary and capricious. *See ANR Storage*, 904 F.3d at 1028.

The FCC's defenses of its decision to prohibit separate charges for ancillary services also lack merit. First, the FCC asserts that ancillary services are "inherent in the provision of IPCS." Order ¶ 415 (JA___). But the FCC acknowledges that not all incarcerated persons (or their friends and family) will use all ancillary services or use them all equally. *See id.* ¶¶ 417, 425 (JA___, ___). Declaring the ancillary services "inherent" thus does not change the increased usage and costs from eliminating the separate fees, *see id.* ¶ 423 (JA___), or the cross-subsidization that will result and that the FCC sometimes treats as problematic, *id.* App. E ¶ 4 (JA___).

Second, the FCC asserts that eliminating separate charges will eliminate abuses. *See id.* ¶ 418 (JA___). But curbing abuses should be addressed through rules targeting that behavior, *see*, *e.g.*, *2015 IPCS Order* ¶¶ 144-181 (adopting rules), not spreading the costs of ancillary services across all IPCS consumers. The FCC does not explain why it could not address any abusive practices directly through such rules.

Third, the FCC asserts that limitations in the cost data providers submitted required recovering ancillary costs through per-minute rates. *See* Order ¶ 420 (JA___-__). But while the FCC says it "made clear in Appendix H" that "providers failed to reliably or consistently allocate their costs among the various ancillary services," *id.*, Appendix H says no such thing. Instead, it notes only that "ancillary service expenses are not reported separately for audio and video." *Id.* App. H ¶ 4 (JA___). That is because providers incur ancillary service costs as incarcerated persons use *those* services, not when they place audio or video calls. *See* Securus Comments at 21 (JA___).

Finally, the FCC asserts that eliminating separate ancillary service charges benefits both providers and incarcerated persons. *See* Order ¶¶ 421-422 (JA___-__). But the FCC makes no claim that "easing the administrative burdens on providers" in terms of "record keeping and billing," *id.* ¶ 421 (JA___), will offset the losses providers will face from the increased costs eliminating the separate

charges will cause. And the benefit to incarcerated persons the FCC cites —

"spread[ing ancillary service] costs across all calls and communications," *id.* ¶ 422

(JA___) — is the very cross-subsidization the FCC condemns elsewhere in the

Order, *id.* App. E ¶ 4 (JA___).

     **2.**     The FCC offered a detailed explanation for phasing in its rate caps

and prohibition on site commissions over a period ranging from January 1, 2025,

through April 1, 2026. *See id.* ¶¶ 587-594 (JA___-__). The FCC noted that

providers and government officials "may need additional time . . . to renegotiate

contracts" and to "adapt to [the] rules." *Id.* ¶¶ 587, 589 (JA___, ___). But the

FCC offered only a cursory paragraph addressing the effective date for its other

rules. *See id.* ¶ 595 (JA___-__). That paragraph does not specifically mention the

prohibition on separate ancillary charges. Instead, the FCC offers only generic

assertions that, for other rules, 60 days after Federal Register publication "afford[s]

IPCS providers sufficient time to implement any changes necessary to comply."

*Id.*

     That generic assertion is arbitrary and capricious as applied to the

prohibition on separate ancillary service charges. Indeed, the first half of the

sentence containing that assertion distinguishes rules "*related to* our new rate caps

and site commission" rules — for which the FCC delayed implementation — from

"other rules" such as those "pertaining to the seizing of balances in inactive

accounts" that the FCC would not delay. *Id.* (emphasis added). As the FCC recognizes throughout the Order, the prohibition on ancillary service charges is "related to" the rate caps. *See id.* ¶¶ 117-118 (JA___-__) (listing the "decision to eliminate separate charges for ancillary services" among the "series of actions to establish just and reasonable rates"); *id.* ¶¶ 130-137 (JA___-__) (summarizing its later justification for eliminating separate ancillary service charges as part of the "Rate Cap Structure" section of the Order). The prohibition is therefore unlike the inactive account balance rule the FCC cites as the kind of rule that should take effect shortly after Federal Register publication.

Ancillary service charges are a contract term, so eliminating them requires renegotiation. The FCC recognized that, where existing contracts include "terms and conditions that would require material alteration through renegotiation due to a conflict with our new rules involving rates," delay in the implementation is required. *Id.* ¶ 587 (JA___). Indeed, when justifying the earlier implementation date for other rules, the FCC distinguished those rules from ones "which may take longer to implement due to the need for contractual amendments." *Id.* ¶ 595 (JA___). Yet the same need for contract amendments exists for the separate ancillary service charge prohibition as well.[33]

---

[33] In denying Securus' stay motion, the FCC's staff asserted in a footnote that the "Commission did not consider ceasing to assess ancillary service charges on consumers to fall outside of the normal scope of a change of law provision."

For both reasons, the FCC's adoption of rules that implement its prohibition on separate ancillary service charges ahead of its new rate caps and ban on site commissions is insufficiently explained and, therefore, arbitrary and capricious. *See Seavey v. Barnhart*, 276 F.3d 1, 12 (1st Cir. 2001) ("When an agency . . . has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency.").

## IV. THE FCC'S PREEMPTION RULINGS ARE UNLAWFUL

The FCC preempted all state and local laws that would allow IPCS providers to charge rates above the Order's caps for intrastate calls but refused to similarly preempt state and local laws setting lower rate caps for those calls. *See* Order ¶¶ 223-241 (JA___-__). That decision is unlawful for two reasons.

A. In amending the Communications Act to give the FCC authority over rates for intrastate IPCS, Congress directed the FCC to "promulgate any regulations necessary" to "establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications."

---

Securus Stay Denial ¶ 29 n.127 (JA___). The staff cites nothing in the Order to support that assertion. *See Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) ("It is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale.").

MWR Act § 3(a); 47 U.S.C. § 276(b)(1)(A). Because Congress placed that responsibility on the FCC, the agency cannot shirk that task or share it with state officials. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565-66, 568 (D.C. Cir. 2004) ("vacat[ing]" an FCC decision to share with states the agency's obligation "to establish regulations" that "determin[e] which network elements shall be made available").

Nor can the FCC carry out its obligation to "ensure" that its "compensation plan" achieves the fair compensation and just and reasonable goals if it permits states and localities to modify critical terms of the plan. As shown above, the Order adopts a regime of implicit cross-subsidies, by setting nationwide rate caps that apply uniformly to all facilities that fit within one of five broad categories. Those rate caps apply even if the costs of serving some facilities within a category — or even all facilities with that category in a particular state — are higher or lower than the category's average. If some states set lower rate caps based on "cost data . . . targeted to only certain state specific facilities," Order ¶ 236 (JA___) — but other states cannot set higher rate caps based on cost data specific to their facilities — the FCC's regime of cross-subsidization comes undone.

The D.C. Circuit long ago recognized that a regime that required a "carrier to refund any [over-]earnings," while prohibiting "recoup[ing] any shortfall in its earnings," would "guarantee the regulated company an economic loss" and not

"produce a just and reasonable 'total effect' on the regulated business." *AT&T Co.*
*v. FCC*, 836 F.2d 1386, 1390-92 (D.C. Cir. 1988). Allowing states to apply a one-
way, downward ratchet to the FCC's nationwide, uniform rate caps will have the
same effect. For the FCC to carry out the task Congress assigned it, the FCC's
compensation plan must serve both as a ceiling and a floor, preempting *all*
inconsistent state and local regulations.

**B.** Even if the FCC were not required to preempt all state and local
regulation of intrastate IPCS rates, the FCC violated basic conflict preemption
principles that apply to IPCS through 47 U.S.C. § 276(c).[34] Conflict preemption
applies when, "under the circumstances of the particular case," state law "prevents
or frustrates the accomplishment of a federal objective." *Geier v. Am. Honda*
*Motor Co.*, 529 U.S. 861, 873 (2000) (cleaned up). That is why the question
"whether a state regulation unavoidably conflicts with national interests is an issue
incapable of resolution in the abstract, let alone in gross." *Mozilla Corp. v. FCC*,
940 F.3d 1, 81 (D.C. Cir. 2019) (per curiam).

---

[34] Section 276(c) has long "contain[ed] an express preemption clause,"
Order ¶ 317 (JA___), which Congress did not modify in the MWR Act. Yet that
long-standing provision "merely codifies what would otherwise be implied conflict
preemption." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1033
(9th Cir. 2024).

Yet here, the FCC categorically found all current and future state and local laws and regulations that permit IPCS providers to charge rates above the FCC's rate caps conflict preempted. *See* Order ¶ 223 (JA___). In contrast, the FCC concluded that state and local laws setting lower rate caps would likely not conflict. *See id.* ¶¶ 235-238 (JA___-__). The FCC noted that a lower cap "might fall within th[e] zone" of reasonableness and that IPCS providers could "submit[] a petition for preemption" to the FCC if "a state or local requirement leads to unfair compensation." *Id.* ¶¶ 237, 239 (JA___).

Yet the same factors that led the FCC to take a case-by-case approach to conflict preemption of lower rate caps apply equally to higher ones. As the FCC states, "rates can be lawful if they fall *within a zone* of reasonableness." *Id.* ¶ 237 (JA___) (emphasis added). Because the FCC's chosen rate caps are near the bottom of the zone it set, states could set higher rate caps while remaining within that zone. The FCC also "agree[d]" with commenters that "states and local governments are in a better position to assess what a reasonable rate would be . . . in their geographic locations." *Id.* ¶ 236 (JA___). That is also true when states and localities conclude, based on "cost data . . . targeted to only certain state specific facilities," that higher rates are necessary to "yield fair compensation for providers operating in that state at those facilities." *Id.*

The D.C. Circuit recently vacated a sweeping FCC attempt to preempt state laws, in part because "a conflict-preemption analysis involves fact-intensive inquiries" and cannot be conducted "in gross." *Mozilla*, 940 F.3d at 81-82. Therefore, if the FCC were correct that § 276, as amended by the MWR Act, still only preempts conflicting state and local laws under § 276(c), all state and local actions — whether they set rate caps higher or lower than the FCC's choices — must be assessed for conflict preemption case-by-case.

## V. THE FCC ERRONEOUSLY DISMISSED SECURUS' WAIVER AND CLARIFICATION PETITIONS

The FCC's only basis for dismissing Securus' petitions for waiver and clarification was its view that the agency's new rules mooted the relief requested. Order ¶¶ 604-607 (JA___-__). The FCC was wrong.

First, the FCC's new rules cannot have mooted Securus' waiver and clarification requests *before* they took effect. Like nearly all agency rules, the Order's new rules do not apply retroactively. *See Coskery v. Berryhill*, 892 F.3d 1, 4 (1st Cir. 2018). Therefore, when the FCC released the Order, the rules that the FCC cites could not have mooted Securus' petitions. Those rules were not slated to take effect until some much later time. *See* Order ¶ 641 (JA___).

Second, those rules still have not fully taken effect, so the relief Securus sought still is not moot. Even now, the new rule governing calling plans with an alternative to per-minute billing remains only partially effective. Portions of that

rule (47 C.F.R. § 64.6140) took effect on November 19, 2024, but other portions will not take effect until completion of the Paperwork Reduction Act review by the Office of Management and Budget at some unknown future date. *See* Order ¶ 641 (JA___). Therefore, Securus' waiver petition is not moot. In addition, as discussed above, the FCC's prohibition on site commissions will not take effect at all prisons and jails until April 1, 2026. *See id.* ¶ 587 (JA___). Securus' clarification petition sought clarity on site-commission-payment obligations under "current contract[s]," Securus Clarification Pet. 5 (JA___), many of which will (along with the pre-Order rules) remain effective until April 1, 2026. That clarification request also is not moot.

The Court should remand the FCC's dismissals of both petitions.

## CONCLUSION

The Court should transfer these consolidated petitions for review to the Fifth Circuit. But regardless of which court of appeals addresses the merits, the court should vacate the Order and remand for further proceedings so the FCC can faithfully implement the MWR Act and achieve Congress's goals of making IPCS more accessible, affordable, and sustainable, while also funding necessary safety and security measures and fairly compensating the companies that provide those services.

Respectfully submitted,

/s/ *Marcus W. Trathen*
Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
    HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com
ahawkins@brookspierce.com
cdodd@brookspierce.com

*Counsel for Pay Tel Communications, Inc.*

/s/ *Scott H. Angstreich*
Scott H. Angstreich
Justin B. Berg
Jordan R.G. González
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
jberg@kellogghansen.com
jgonzalez@kellogghansen.com

Michael H. Pryor
BROWNSTEIN HYATT FARBER
    SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus Technologies, LLC*

February 13, 2025

## Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

    1.  This document complies with the word limit approved by the Court in its 12/18/24 Order (14,000) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains   13,375   words, **or**

☐ this brief uses a monospaced typeface and contains       lines of text.

    2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Microsoft Word_____ in Times New Roman, 14 point_____ , **or**

☐ this document has been prepared in a monospaced typeface using _____ with _____.

(s) Scott H. Angstreich_____

Attorney for Securus Techs. LLC

Dated: 02/13/2025_____

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 13, 2025, I caused this brief to be filed

electronically with the Clerk of the Court through the Court's CM/ECF system and

that a copy of the same will be served on all counsel of record through the Court's

CM/ECF system.

          /s/ *Scott H. Angstreich*
          Scott H. Angstreich
          *Counsel for Securus*
          *Technologies, LLC*

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

Page

Martha Wright-Reed Just and Reasonable Communications Act of 2022,
Pub. L. No. 117-338, 136 Stat. 6156 .................................................................Add. 1

Communications Act of 1934, 47 U.S.C. § 151 *et seq.*:

    47 U.S.C. § 276 (1996)...........................................................................Add. 3

    47 U.S.C. § 276 (2024)...........................................................................Add. 5

    47 U.S.C. § 402.......................................................................................Add. 7

Hobbs Act, 28 U.S.C. § 2341 *et seq.*:

    28 U.S.C. § 2342...................................................................................Add. 10

    28 U.S.C. § 2344...................................................................................Add. 10

    28 U.S.C. § 2346...................................................................................Add. 11

28 U.S.C. § 2112(a) ...................................................................................Add. 11

1. The Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156, provides:

Public Law 117-338
117th Congress

### An Act

To amend the Communications Act of 1934 to require the Federal Communications Commission to ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Martha Wright-Reed Just and Reasonable Communications Act of 2022".

## SEC. 2. TECHNICAL AMENDMENTS.

(a) IN GENERAL.—Section 276 of the Communications Act of 1934 (47 U.S.C. 276) is amended—

(1) in subsection (b)(1)(A)—

(A) by striking "per call";

(B) by inserting ", and all rates and charges are just and reasonable," after "fairly compensated";

(C) by striking "each and every";

(D) by striking "call using" and inserting "communications using"; and

(E) by inserting "or other calling device" after "payphone"; and

(2) in subsection (d), by inserting "and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 3(1)" after "inmate telephone service".

(b) DEFINITION OF ADVANCED COMMUNICATIONS SERVICES.—Section 3(1) of the Communications Act of 1934 (47 U.S.C. 153(1)) is amended—

(1) in subparagraph (C), by striking "and" at the end;

(2) in subparagraph (D), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used.".

(c) APPLICATION OF THE ACT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by inserting "section 276," after "sections 223 through 227, inclusive,".

## SEC. 3. IMPLEMENTATION.

(a) RULEMAKING.—Not earlier than 18 months and not later than 24 months after the date of enactment of this Act, the Federal Communications Commission shall promulgate any regulations necessary to implement this Act and the amendments made by this Act.

(b) USE OF DATA.—In implementing this Act and the amendments made by this Act, including by promulgating regulations under subsection (a) and determining just and reasonable rates, the Federal Communications Commission—

(1) may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider; and

(2) shall consider costs associated with any safety and security measures necessary to provide a service described in paragraph (1) and differences in the costs described in paragraph (1) by small, medium, or large facilities or other characteristics.

## SEC. 4. EFFECT ON OTHER LAWS.

Nothing in this Act shall be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities.

Approved January 5, 2023

2.      Section 276 of the Communications Act of 1934, 47 U.S.C. § 276 (1996), provided:

## § 276.  Provision of payphone service

### (a) Nondiscrimination safeguards

After the effective date of the rules prescribed pursuant to subsection (b), any Bell operating company that provides payphone service—

> **(1)** shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and

> **(2)** shall not prefer or discriminate in favor of its payphone service.

### (b) Regulations

#### (1) Contents of regulations

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that—

> **(A)** establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation;

> **(B)** discontinue the intrastate and interstate carrier access charge payphone service elements and payments in effect on February 8, 1996, and all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues, in favor of a compensation plan as specified in subparagraph (A);

> **(C)** prescribe a set of nonstructural safeguards for Bell operating company payphone service to implement the provisions of paragraphs (1) and (2) of subsection (a), which safeguards shall, at a minimum, include the nonstructural safeguards equal to those adopted in the Computer Inquiry-III (CC Docket No. 90-623) proceeding;

> **(D)** provide for Bell operating company payphone service providers to have the same right that independent payphone providers have to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider,

to select and contract with, the carriers that carry interLATA calls from their payphones, unless the Commission determines in the rulemaking pursuant to this section that it is not in the public interest; and

**(E)** provide for all payphone service providers to have the right to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry intraLATA calls from their payphones.

### (2) Public interest telephones

In the rulemaking conducted pursuant to paragraph (1), the Commission shall determine whether public interest payphones, which are provided in the interest of public health, safety, and welfare, in locations where there would otherwise not be a payphone, should be maintained, and if so, ensure that such public interest payphones are supported fairly and equitably.

### (3) Existing contracts

Nothing in this section shall affect any existing contracts between location providers and payphone service providers or interLATA or intraLATA carriers that are in force and effect as of February 8, 1996.

## (c) State preemption

To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements.

## (d) "Payphone service" defined

As used in this section, the term "payphone service" means the provision of public or semi-public pay telephones, the provision of inmate telephone service in correctional institutions, and any ancillary services.

3.      Section 276 of the Communications Act of 1934, 47 U.S.C. § 276 (2024), provides:

**§ 276. Provision of payphone service**

**(a) Nondiscrimination safeguards**

After the effective date of the rules prescribed pursuant to subsection (b), any Bell operating company that provides payphone service—

(1) shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and

(2) shall not prefer or discriminate in favor of its payphone service.

**(b) Regulations**

**(1) Contents of regulations**

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that—

(A) establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications using their payphone or other calling device, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation;

(B) discontinue the intrastate and interstate carrier access charge payphone service elements and payments in effect on February 8, 1996, and all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues, in favor of a compensation plan as specified in subparagraph (A);

(C) prescribe a set of nonstructural safeguards for Bell operating company payphone service to implement the provisions of paragraphs (1) and (2) of subsection (a), which safeguards shall, at a minimum, include the nonstructural safeguards equal to those adopted in the Computer Inquiry-III (CC Docket No. 90-623) proceeding;

(D) provide for Bell operating company payphone service providers to have the same right that independent payphone providers have to negotiate with the location provider on the location provider's selecting and contracting

with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry interLATA calls from their payphones, unless the Commission determines in the rulemaking pursuant to this section that it is not in the public interest; and

**(E)** provide for all payphone service providers to have the right to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry intraLATA calls from their payphones.

### (2) Public interest telephones

In the rulemaking conducted pursuant to paragraph (1), the Commission shall determine whether public interest payphones, which are provided in the interest of public health, safety, and welfare, in locations where there would otherwise not be a payphone, should be maintained, and if so, ensure that such public interest payphones are supported fairly and equitably.

### (3) Existing contracts

Nothing in this section shall affect any existing contracts between location providers and payphone service providers or interLATA or intraLATA carriers that are in force and effect as of February 8, 1996.

## (c) State preemption

To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements.

## (d) "Payphone service" defined

As used in this section, the term "payphone service" means the provision of public or semi-public pay telephones, the provision of inmate telephone service and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 153(1) of this title in correctional institutions, and any ancillary services.

4.    Section 402 of the Communications Act of 1934, 47 U.S.C. § 402 (2024), provides:

## § 402.  Judicial review of Commission's orders and decisions

**(a) Procedure**

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.

**(b) Right to appeal**

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

**(1)** By any applicant for a construction permit or station license, whose application is denied by the Commission.

**(2)** By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

**(3)** By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

**(4)** By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

**(5)** By the holder of any construction permit or station license which has been modified or revoked by the Commission.

**(6)** By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

**(7)** By any person upon whom an order to cease and desist has been served under section 312 of this title.

**(8)** By any radio operator whose license has been suspended by the Commission.

**(9)** By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

**(10)** By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

## (c) Filing notice of appeal; contents; jurisdiction; temporary orders

Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of.  Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission.  Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper.  Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

## (d) Notice to interested parties; filing of record

Upon the filing of any such notice of appeal the appellant shall, not later than five days after the filing of such notice, notify each person shown by the records of the Commission to be interested in said appeal of the filing and pendency of the same.  The Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28.

## (e) Intervention

Within thirty days after the filing of any such appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission.  Any person who would be aggrieved or whose interest would be adversely affected by a reversal or modification of the order of the Commission complained of shall be considered an interested party.

**(f) Records and briefs**

The record and briefs upon which any such appeal shall be heard and determined by the court shall contain such information and material, and shall be prepared within such time and in such manner as the court may by rule prescribe.

**(g) Time of hearing; procedure**

The court shall hear and determine the appeal upon the record before it in the manner prescribed by section 706 of title 5.

**(h) Remand**

In the event that the court shall render a decision and enter an order reversing the order of the Commission, it shall remand the case to the Commission to carry out the judgment of the court and it shall be the duty of the Commission, in the absence of the proceedings to review such judgment, to forthwith give effect thereto, and unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record upon which said appeal was heard and determined.

**(i) Judgment for costs**

The court may, in its discretion, enter judgment for costs in favor of or against an appellant, or other interested parties intervening in said appeal, but not against the Commission, depending upon the nature of the issues involved upon said appeal and the outcome thereof.

**(j) Finality of decision; review by Supreme Court**

The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 1254 of title 28, by the appellant, by the Commission, or by any interested party intervening in the appeal, or by certification by the court pursuant to the provisions of that section.

5.     The Hobbs Act, 28 U.S.C. § 2341 *et seq.*, provides in relevant part:

## § 2342.  Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

**(1)** all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47;

**(2)** all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

**(3)** all rules, regulations, or final orders of—

**(A)** the Secretary of Transportation issued pursuant to section 50501, 50502, 56101–56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

**(B)** the Federal Maritime Commission issued pursuant to section 305,1 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

**(4)** all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

**(5)** all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

**(6)** all final orders under section 812 of the Fair Housing Act; and

**(7)** all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

## § 2344.  Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies.  The action shall be against the United States.  The petition shall contain a concise statement of—

**(1)** the nature of the proceedings as to which review is sought;

**(2)** the facts on which venue is based;

**(3)** the grounds on which relief is sought; and

**(4)** the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency.  The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

### § 2346.  Certification of record on review

Unless the proceeding has been terminated on a motion to dismiss the petition, the agency shall file in the office of the clerk the record on review as provided by section 2112 of this title.

6.      28 U.S.C. § 2112 provides in relevant part:

### § 2112.  Record on review and enforcement of agency orders

**(a)** The rules prescribed under the authority of section 2072 of this title may provide for the time and manner of filing and the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers.  Such rules may authorize the agency, board, commission, or officer to file in the court a certified list of the materials comprising the record and retain and hold for the court all such materials and transmit the same or any part thereof to the court, when and as required by it, at any time prior to the final determination of the proceeding, and such filing of such certified list of the materials comprising the record and such subsequent transmittal of any such materials when and as required shall be deemed full compliance with any provision of law requiring the filing of the record in the court.  The record in such proceedings shall be certified and filed in or held for and transmitted to the court of appeals by the agency, board, commission, or officer concerned within the time and in the manner prescribed by such rules.  If proceedings are instituted in two or more courts of appeals with respect to the same order, the following shall apply:

**(1)** If within ten days after issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the

proceedings, the petition for review with respect to proceedings in at least two courts of appeals, the agency, board, commission, or officer shall proceed in accordance with paragraph (3) of this subsection.  If within ten days after the issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in only one court of appeals, the agency, board, commission, or officer shall file the record in that court notwithstanding the institution in any other court of appeals of proceedings for review of that order.  In all other cases in which proceedings have been instituted in two or more courts of appeals with respect to the same order, the agency, board, commission, or officer concerned shall file the record in the court in which proceedings with respect to the order were first instituted.

**(2)** For purposes of paragraph (1) of this subsection, a copy of the petition or other pleading which institutes proceedings in a court of appeals and which is stamped by the court with the date of filing shall constitute the petition for review.  Each agency, board, commission, or officer, as the case may be, shall designate by rule the office and the officer who must receive petitions for review under paragraph (1).

**(3)** If an agency, board, commission, or officer receives two or more petitions for review of an order in accordance with the first sentence of paragraph (1) of this subsection, the agency, board, commission, or officer shall, promptly after the expiration of the ten-day period specified in that sentence, so notify the judicial panel on multidistrict litigation authorized by section 1407 of this title, in such form as that panel shall prescribe.  The judicial panel on multidistrict litigation shall, by means of random selection, designate one court of appeals, from among the courts of appeals in which petitions for review have been filed and received within the ten-day period specified in the first sentence of paragraph (1), in which the record is to be filed, and shall issue an order consolidating the petitions for review in that court of appeals.  The judicial panel on multidistrict litigation shall, after providing notice to the public and an opportunity for the submission of comments, prescribe rules with respect to the consolidation of proceedings under this paragraph.  The agency, board, commission, or officer concerned shall file the record in the court of appeals designated pursuant to this paragraph.

**(4)** Any court of appeals in which proceedings with respect to an order of an agency, board, commission, or officer have been instituted may, to the extent authorized by law, stay the effective date of the order.  Any such stay may thereafter be modified, revoked, or extended by a court of appeals

designated pursuant to paragraph (3) with respect to that order or by any other court of appeals to which the proceedings are transferred.

    **(5)** All courts in which proceedings are instituted with respect to the same order, other than the court in which the record is filed pursuant to this subsection, shall transfer those proceedings to the court in which the record is so filed.  For the convenience of the parties in the interest of justice, the court in which the record is filed may thereafter transfer all the proceedings with respect to that order to any other court of appeals.

* * *