Nos. 24-8028, 24-1884, 24-1886, 24-1922

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

No. 24-8028

IN RE: MCP 191

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

*Respondents*,

SECURUS TECHNOLOGIES, LLC,

*Intervenor*.

*(caption continued on next page)*

On Petitions for Review of an Order of the
Federal Communications Commission

## [PROOF] BRIEF FOR INTERVENOR
## SECURUS TECHNOLOGIES, LLC

Michael H. Pryor
BROWNSTEIN HYATT FARBER
   SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

*Counsel for Intervenor Securus Technologies, LLC*

April 21, 2025

*(caption, cont'd)*

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,
*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,
*Respondents*,

SECURUS TECHNOLOGIES, LLC,
*Intervenor*.

_____

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,
*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,
*Respondents*,

SECURUS TECHNOLOGIES, LLC,
*Intervenor*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenor Securus Technologies, LLC ("Securus") submits the following corporate disclosure statement:

Securus is wholly owned by SCRS Holding Corporation ("SCRS"). SCRS does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of SCRS. Platinum Equity Capital Partners IV, L.P. ("Platinum") is the principal investor of SCRS. Platinum does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of Platinum.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .......................................................... i

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ..................................................................................... 4

I.    The Public Interest Organizations' Protective Petitions Should Be Dismissed for Lack of Jurisdiction .................................................... 4

II.   The FCC Reasonably Included Communications Security Services Costs in the Rate Caps ...................................................................... 8

III.  The Public Interest Organizations' Proposed Consumer Protection Measures for Alternative Pricing Plans Would Eliminate Those Plans from the Marketplace ........................................................... 12

CONCLUSION ................................................................................. 16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

**CASES**

*Banner Health v. Price*, 867 F.3d 1323 (D.C. Cir. 2017)..........................................15

*Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291 (D.C. Cir. 2003) ...............................6

*Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284 (3d Cir. 2007) .......................6

*Craker v. DEA*, 714 F.3d 17 (1st Cir. 2013) ................................................................7

*FirsTier Mortg. Co. v. Inv. Mortg. Ins. Co.*, 498 U.S. 269 (1991) ........................ 7-8

*Herrera-Molina v. Holder*, 597 F.3d 128 (2d Cir. 2010) .........................................8

*Hounmenou v. Holder*, 691 F.3d 967 (8th Cir. 2012)...............................................8

*Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307 (11th Cir. 2016) .....................8

*Khan v. Att'y Gen.*, 691 F.3d 488 (3d Cir. 2012) .......................................................8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*
   *Ins. Co.*, 463 U.S. 29 (1983)............................................................................15

*Sacks v. Rothberg*, 845 F.2d 1098 (D.C. Cir. 1988) ..................................................7

*TeleSTAR, Inc. v. FCC*, 888 F.2d 132 (D.C. Cir. 1989) .............................................7

*Triangle Cayman Asset Co. v. LG & AC, Corp.*, 52 F.4th 24
   (1st Cir. 2022) ...................................................................................................7

*U.S. Satellite Broad. Co. v. FCC*, 740 F.2d 1177 (D.C. Cir. 1984) .................15, 16

*U.S. Telecom Ass'n v. FCC*, 227 F.3d 450 (D.C. Cir. 2000)....................................11

*Van Hollen, Jr. v. FEC*, 811 F.3d 486 (D.C. Cir. 2016)...........................................15

*W. Union Tel. Co. v. FCC*, 773 F.2d 375 (D.C. Cir. 1985) ....................................6, 7

*Waterway Commc'ns Sys., Inc. v. FCC*, 851 F.2d 401
(D.C. Cir. 1988) ............................................................................6, 7


**STATUTES, REGULATIONS, AND RULES**

Communications Assistance for Law Enforcement Act, Pub. L.
No. 103-414, 108 Stat. 4279 (1994) .......................................3, 9, 11

Martha Wright-Reed Just and Reasonable Communications Act of
2022, Pub. L. No. 117-338, 136 Stat. 6156 .................................1, 9

§ 3(b)(1) ........................................................................................10

§ 3(b)(2) ....................................................................................3, 10

28 U.S.C. § 2112(a)(1) ...............................................................................2

5th Cir. L.R. 15.1(b) ...................................................................................5


**ADMINISTRATIVE DECISIONS**

Second Report and Order, *Communications Assistance for Law
Enforcement Act*, 15 FCC Rcd 7105 (1999) ....................................11


**OTHER AUTHORITIES**

Letter from Rep. Hudson & Sen. Budd to Chairman Carr
(Apr. 2, 2025) ................................................................................10

## INTRODUCTION AND SUMMARY OF ARGUMENT

Intervenor Securus Technologies, LLC ("Securus") supports the goals of the MWR Act,[1] which if implemented properly will make incarcerated people's communications services ("IPCS") more accessible, affordable, and sustainable, while also funding safety and security measures necessary when incarcerated persons use communications services and fairly compensating the companies that provide IPCS. As Securus explained in its petitioner brief — and as then-Commissioner (now-Chairman) Carr recognized at the time — the FCC's Order went "too far." Order at 486 (JA___). As he explained, the Order's rate caps and rules will "ultimately work against the interests of inmates, their families, IPCS providers, state correctional facilities, and the public-safety officials who operate them." *Id.*

But three public interest organizations — Direct Action for Rights and Equality ("DARE"), Pennsylvania Prison Society ("PPS"), and Criminal Justice Reform Clinic ("CJRC") (collectively, "Public Interest Organizations") — argue that the Order did not go far enough. They contend that the FCC should have adopted even lower rate caps, by excluding from the rates the one major category of safety and security measures the FCC included. And they argue, among other

---

[1] Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ("MWR Act").

things, that the FCC's rules for alternative pricing plans should have included an automatic refund mechanism that would make it economically irrational for IPCS providers to offer such plans. We agree with the FCC that the Public Interest Organizations' petitions for review should be denied. We write separately to make the following points.

To begin, the petitions for review that the Public Interest Organizations filed after the Federal Register published the FCC's new IPCS rules did not cure the jurisdictional defect in the earlier, so-called "protective" petitions they filed to trigger a venue lottery. As every court of appeals to confront the question has concluded, a prematurely filed Hobbs Act petition for review is *incurably* premature. No court of appeals has ever adopted the novel curing rule the Public Interest Organizations urge on this Court. The Court should dismiss for lack of jurisdiction those initial petitions for review.[2]

Turning to the merits, the FCC properly included in IPCS rates the communications security services costs that IPCS providers incur. The Public Interest Organizations would have the FCC exclude *all* safety and security costs from IPCS rates, other than the negligible amount IPCS providers reported as the

---

[2] Once dismissed for lack of jurisdiction, the Court should transfer these cases to the Fifth Circuit, which is the court of appeals with venue over the remaining petitions for review under 28 U.S.C. § 2112(a)(1). *See* Securus-Pay Tel Br. 27-31.

costs of complying with the Communications Assistance for Law Enforcement Act ("CALEA"). Yet IPCS providers spent nearly $570 million in 2022 on safety and security measures, making it "the single largest category of reported costs." Order ¶ 352 (JA___); *id.* App. F tbl. 3 (JA___). And Congress made it mandatory for the FCC to consider those costs in setting IPCS rates. *See* MWR Act § 3(b)(2). The Public Interest Organizations' suggestion that excluding more than 99.99% of those costs complies with Congress's directive shows the error in their argument.

The FCC also reasonably rejected the Public Interest Organizations' proposed additional rules governing alternative plans that offer unlimited calling or a set amount of usage for a flat rate. The record showed that Securus' pilot program offering discounted alternative pricing was a huge success. Incarcerated persons and their families and friends urged its reinstatement when the pilot program ended due to FCC rule changes. Under the Order, alternative plans must have a monthly break-even point equal to, or less than, the per-minute rate cap — with per-minute pricing remaining as an option — and consumers can cancel their alternative pricing plan and revert to per-minute pricing at any time. The Public Interest Organizations' proposed mandatory "true down" rule would make alternative plans economically irrational for providers. The FCC wisely did not adopt that self-defeating rule.

# ARGUMENT

## I.     The Public Interest Organizations' Protective Petitions Should Be Dismissed for Lack of Jurisdiction

Securus agrees with the FCC that the Public Interest Organizations' "protective" petitions that caused the venue lottery were incurably premature and should be dismissed for lack of jurisdiction.  *See* FCC Br. 29, 106.

Each of the Public Interest Organizations' initial petitions for review said the filer would be aggrieved by a portion of the FCC's Order that had not yet been published in the Federal Register.[3]  The Public Interest Organizations say (at 52) that they filed these "protective petitions" because Securus' initial petition for review — filed after the Federal Register published the dismissals of Securus' petitions for waiver and clarification — "stat[ed] that it was seeking review of the entire Order, including the as-yet unpublished provisions."  That is false.

Securus expressly sought review of only the "portion of the *Order* resolving petitions for reconsideration, clarification, and waiver" that had been "published in

---

[3] *See* DARE Pet. for Review at 2, *Direct Action for Rights & Equality v. FCC*, No. 24-1814 (1st Cir. Sept. 5, 2024) (noting that DARE "does not claim to be separately aggrieved by the limited portion of the Order published on August 26, 2024"); PPS Pet. for Review at 2, 4, *Pa. Prison Soc'y v. FCC*, No. 24-2647 (3d Cir. Sept. 5, 2024) (redocketed in this Court as No. 24-1861) (the "one portion of the Order as to which PPS seeks review" — the FCC's "determination allow[ing] IPCS providers to recover certain safety and security costs in their rates" — "ha[d] not been published in the Federal Register"); CJRC Pet. for Review at 2-3, *Crim. Just. Reform Clinic v. FCC*, No. 24-5438 (9th Cir. Sept. 5, 2024) (redocketed in this Court as No. 24-1859) (same).

the Federal Register."  Pet. for Review at 1, *Securus Techs., LLC v. FCC*, No. 24-
60454 (5th Cir. Aug. 30, 2024) (redocketed in this Court as No. 24-1860).  Securus
limited its request for relief to a ruling that the FCC's "denials of [Securus']
clarification and waiver petitions" were unlawful.  *Id.* at 2.  Securus attached to its
petition for review the Federal Register publication of that limited portion of the
Order, while noting that the "remaining portions of the *Order . . .* ha[d] not yet
been published."  *Id.* at 2 n.1.  Securus also attached the full FCC Order, which
included the then-unpublished portions, but did so because Fifth Circuit local rules
require petitioners to "[a]ttach a copy of the order . . . to be reviewed."  5th Cir.
L.R. 15.1(b).  Nowhere does Securus' petition state — or even imply — that
Securus filed that petition for review to challenge then-unpublished portions of the
Order.  The FCC was never confused about the limited scope of Securus' initial
petition for review.  *See* FCC Br. 27 (correctly describing the limited scope of
Securus' petition).[4]  And though the Public Interest Organizations continue to feign
confusion, the only thing their premature petitions "protected" was their ability to
forum shop and deny Securus its home circuit and chosen forum.

---

[4] But the agency is wrong to suggest that the dismissals of its waiver and
clarification petitions did not aggrieve Securus.  *Compare* FCC Br. 106 n.28 *with*
Securus-Pay Tel Br. 58-59.

As the FCC has explained, the Public Interest Organizations' initial petitions — filed before the Federal Register published the portion of the *Order* that they claim aggrieved them — are *incurably* premature. *See* FCC Br. 29; FCC Resp. to Show Cause Orders at 6, *In re MCP 191*, No. 24-8028 (1st Cir. Oct. 17, 2024) ("Because [the Public Interest Petitioners] filed these petitions for review before September 20, the petitions are incurably premature and should be dismissed for lack of jurisdiction."). Case after case agrees. Petitions for review of a rulemaking filed before publication in the Federal Register are incurably premature. *See Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 288 (3d Cir. 2007) (holding that petition for review filed "before . . . publi[cation] in the Federal Register" is "incurably premature"); *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 296-97 (D.C. Cir. 2003) (same); *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 378 (D.C. Cir. 1985) (same).

The Public Interest Organizations, however, assert (at 46-50) that their second petitions for review — filed after the Federal Register published the rest of the Order — cured the prematurity of their initial petitions. Wrong. None of the Hobbs Act cases they cite reaches that result. *Waterway Communications Systems, Inc. v. FCC*, 851 F.2d 401 (D.C. Cir. 1988), *dismissed* a premature petition for review, *see id.* at 406. And what they quote (at 47) from that case as though it were a holding — "an appeal taken prematurely effectively ripens and secures

6

appellate jurisdiction when the [underlying] judgment becomes final" — is drawn

from a parenthetical that describes the rule in non-Hobbs Act cases.  851 F.2d at

406 (quoting *Sacks v. Rothberg*, 845 F.2d 1098, 1099 (D.C. Cir. 1988)).  The D.C.

Circuit suggested in *Waterway* that Congress's enactment of the lottery process

might "argue[] for some relaxation" of the *Western Union* rule that challenges filed

before a rulemaking is published in the Federal Register are incurably premature.

*Id.*  But the *Waterway* court recognized that "*Western Union* remains the law of

this circuit."  *Id.*  And it remains the law in Hobbs Act cases in the D.C. Circuit —

and every other circuit that has addressed the question — today.[5]

That is why the Public Interest Organizations rely (at 47-49) on non-Hobbs

Act cases, such as *Craker v. DEA*, 714 F.3d 17 (1st Cir. 2013).  But in *Craker*, this

Court recognized that the Hobbs Act differs from other judicial review statutes, so

those other statutes' treatment of premature petitions can differ as well.  *See id.* at

24-26.  Non-Hobbs Act cases thus offer no support for the Public Interest

Organizations' novel cure rule for Hobbs Act cases.[6]

---

[5] The only other Hobbs Act case the Public Interest Organizations cite also rejects their position.  In *TeleSTAR, Inc. v. FCC*, 888 F.2d 132 (D.C. Cir. 1989) (per curiam), the D.C. Circuit noted that, while "final agency action can ripen an *issue* for appellate review," a "*challenge* to agency action" filed before finality "is incurably premature," and "subsequent action" will not "secure appellate jurisdiction" over the prematurely filed petition, *id.* at 134 (emphases added).

[6] The Public Interest Organizations also cite (at 47-48) non-Hobbs Act cases involving appeals from a district court (*Triangle Cayman Asset Co.* and *FirsTier*

Of the 28 parties to petition for review of the FCC's Order, only these three Public Interest Organizations violated the Hobbs Act's requirements and filed incurably premature petitions challenging portions of the Order before they were published in the Federal Register. Their later-filed petitions for review did not cure that prematurity. The Court should dismiss the initial petitions for review for lack of jurisdiction.[7]

## II.  The FCC Reasonably Included Communications Security Services Costs in the Rate Caps

To prevent incarcerated persons from using calling services for improper purposes, such as intimidating witnesses, ordering the murder of other incarcerated individuals, or running drug operations, correctional agencies have long mandated that IPCS providers include safety and security protections as part of their communications services. IPCS providers thus built these measures into their communications platforms, such as allowing calls only to certain numbers, ensuring the identity of the person making the call, and enabling monitoring and recording of calls for illicit behavior. Until the Order, the FCC authorized IPCS providers to recover their costs of these measures through the rates they charge.

---

*Mortgage Co.*) and others involving the Immigration and Nationality Act's judicial review provision (*Jimenez-Morales*, *Khan*, *Hounmenou*, and *Herrera-Molina*). All are inapposite.

[7] That dismissal supports transfer of these cases to the Fifth Circuit for the reasons stated in our opening brief. *See* Securus-Pay Tel Br. 27-31.

The record shows that safety and security measures are the single largest driver of the cost of IPCS offerings (nearly $570 million), and cost substantially more than the underlying communications services (about $418 million). *See* Order ¶ 352 (JA___); *id.* App. F tbl. 3 (JA___). Securus agrees with the FCC that costs of communication security services should be included in the providers' rates. *See* FCC Br. 61-64. Indeed, as Securus and Pay Tel (at 37-45) and the States and sheriffs (at 21-36) explain, the FCC should have included the costs of other safety and security measures in setting its rate caps.

Yet the Order excludes from the rates about two-thirds of providers' reported safety and security costs and only included communications security costs and de minimis CALEA costs. *See* Order App. I tbl. 6 (JA___-__). And of the two included cost categories, communications security service costs account for 99.997 percent of the total amount, with CALEA compliance accounting for the tiny remainder. *See id.* But the Public Interest Organizations are not satisfied: they now seek to effectively exclude from the regulated rates the costs of *all* safety and security measures, which is the opposite of Congress's intent.

Including safety and security measures like communications security services is fully consistent with the MWR Act. Congress made it mandatory for the FCC, when "determining just and reasonable rates," to "consider costs associated with any safety and security measures necessary to provide" IPCS

9

services.  MWR Act § 3(b)(2).  The mandatory language in § 3(b)(2) — "shall

consider" — contrasts with the permissive language — "may use" — in § 3(b)(1),

confirming Congress's intent that IPCS rates pay for safety and security measures.

Congress would not have imposed that mandatory duty if it intended for IPCS rates

to cover *none* of those costs.  The FCC agreed that § 3(b)(2) is evidence that

Congress "envision[ed]" that IPCS rates would pay for the costs of "features that

ensure that [IPCS] are available to incarcerated people and can be used safely."

Order ¶ 367 (JA___).

Thus, accepting the Public Interest Organizations' argument would mean

that the lower bound of just and reasonable IPCS rate would functionally exclude

*100 percent* of IPCS providers' incurred costs of providing safety and security

measures.  That cannot be the result Congress intended when it enacted § 3(b)(2),

as members of Congress have since noted.  *See* Letter from Rep. Hudson & Sen.

Budd to Chairman Carr at 1 (Apr. 2, 2025) (stating that the Order's exclusion of

safety and security costs "contradicts Congressional intent in the Martha Wright-

Reed Act").[8]

---

[8] The Order is already having a negative effect on correctional facilities' ability to pay for critical safety and security tools necessary to the safe provision of IPCS.  *See* Securus-Pay Tel Ex Parte Letter at 4-5, WC Docket No. 23-62 (Apr. 3, 2025), https://www.fcc.gov/ecfs/document/1040387339205/1.  Eliminating *all* safety and security costs from the rates would exacerbate these harms, endangering facility and public safety.

Finally, the Public Interest Organizations do not explain why they accept the FCC's explanation for including CALEA compliance costs. But surely the de minimis amount — less than $5,400 — that IPCS providers reported as CALEA compliance costs explains it. *See* Order App. I tbl. 6 (JA___-__). CALEA requires providers of telecommunications services and makers of telecommunications equipment to ensure that law enforcement agencies can, pursuant to a court order or other lawful authorization, intercept phone calls. *See generally U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 453-55 (D.C. Cir. 2000). IPCS communications — with rare exceptions (such as calls between an incarcerated person and counsel) — are all already available to law enforcement. The costs of ensuring that law enforcement can listen in to, or listen to recordings of, IPCS calls are thus part of the ordinary operations that prison and jail officials require from IPCS providers. That is why providers included those costs in other categories — which the FCC excluded — in responding to the FCC's request for data. *See* Order ¶ 387 & nn.1388, 1390 (JA___-__).[9]

---

[9] On top of that, in 1999, the FCC excluded all payphone providers — a category that includes IPCS providers — from its CALEA rules. *See* Second Report and Order, *Communications Assistance for Law Enforcement Act*, 15 FCC Rcd 7105, ¶ 25 (1999).

### III. The Public Interest Organizations' Proposed Consumer Protection Measures for Alternative Pricing Plans Would Eliminate Those Plans from the Marketplace

The Order adopts rules that both require IPCS providers to always offer per-minute pricing while also allowing them to offer alternative, flat-rated pricing plans. Order ¶¶ 437-438 (JA___-__). Those rules require that the alternative plans offer realistic calling options in light of the calling restrictions imposed by correctional facilities, *id.* ¶ 441 & n.1591 (JA___); cannot have a commitment period longer than one month, *id.* ¶ 442 (JA___); and cannot be combined with non-regulated, non-IPCS services, *id.* ¶ 445 (JA___). In addition, the rules require that IPCS providers let consumers cancel their alternative pricing plan and revert to per-minute pricing at any time. *Id.* ¶¶ 460-461 (JA___-__). And to ensure that alternative pricing plans do not circumvent the FCC's rate caps, the FCC requires the plans to have a monthly break-even point that does not exceed what would be paid at per-minute rates. *Id.* ¶¶ 448-449 (JA___-__).

The Order allowed providers to offer alternative pricing plans because of record evidence of Securus' successful alternative pricing pilot programs. In December 2020, Securus started offering several pilot alternative pricing plans, which it developed through "consultations between Securus leadership and justice-involved families." Securus Ex Parte Letter at 2 (May 13, 2021) (JA___); *see* Order ¶ 432 & n.1561 (JA___). Securus' programs offered a set number of calls at

a discounted flat rate because focus groups indicated that consumers preferred this option over buckets of minutes. *See* Securus Reply Comments at 8 (Mar. 3, 2023) (JA___). Users raved about the pilot program plans, and the initial results were highly encouraging: a program survey found that "80 percent of participants said the program was important to them and 70 percent would recommend the plan to others." Securus Ex Parte Letter at 2 (May 13, 2021) (JA___). The plans provided meaningful benefits to incarcerated persons and their friends and family, including "significant savings," "increased calling time," and "budget predictability." Securus Ex Parte Letter, Attach. at 30 (Dec. 21, 2023) (JA___).

But Securus had to stop offering these plans when the FCC altered some rules and effectively prohibited the plans' continuation.[10] After the plans were terminated, however, consumers overwhelmingly asked Securus to reinstate the plans, emphasizing their benefits. *See* Order ¶ 432 & n.1562 (JA___) (citing record evidence). For example, subscribers and their friends and family wrote that the plans "help to keep the costs down," "made communication significantly more cost effective," and allowed for "longer . . . conversations about meaningful

---

[10] *See* Securus Comments at 7 (Dec. 15, 2022) (JA___). In 2021, Securus sought a waiver to continue offering those alternative plans. *See* Securus Waiver Pet. (Aug. 30, 2021) (JA___-__). This is the same waiver petition that the FCC in 2024 dismissed as moot, *see* Order ¶¶ 604-607 (JA___-__), and that Securus challenged in its initial petition for review, discussed above.

topics." Securus Waiver Pet. Comments at 5-8 (Jan. 7, 2022) (JA___-__); Securus

Comments at 8 (Dec. 15, 2022) (JA___).  The new rules will allow Securus to

meet that demand for alternative pricing plans.

The Public Interest Organizations complain (at 37-43) that the FCC did not

also adopt a rule requiring IPCS providers to automatically refund a portion of the

flat-rate payment in months when an incarcerated person did not use all the

minutes necessary to reach the break-even point.  That is, they argue that

incarcerated persons purchasing alternative plans should never pay more for

calling in a month than if they had chosen to pay for IPCS on a per-minute basis.

Adopting such a rule would make it economically irrational for Securus and

other IPCS providers to offer alternative plans.  While payment of a flat rate for a

set number of calls per month offers IPCS providers administrative cost savings —

which they can pass through to incarcerated persons in the form of lower costs —

an automatic refund rule would eliminate those administrative cost savings.  And

the IPCS provider would also need to factor the economic risk an automated refund

rules creates into the price of the plans.  *See* Securus Comments at 13 (Dec. 15,

2022) (JA___).  The rule the Public Interest Organizations urged would deprive

providers of the benefit of the bargain alternative pricing plans offer — lower rates

in exchange for a predictable revenue stream.  *See id.*

14

The FCC was not required to respond expressly to this self-defeating proposal.  *See* Public Interest Organizations Br. 42.  An agency does not have to respond to "every comment so long as it responds in a reasoned manner to significant comments received."  *U.S. Satellite Broad. Co. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984).  The FCC did so here, giving a lengthy explanation of its decision to permit alternative pricing plans and of the rules it adopted to ensure that such plans benefited both IPCS providers and incarcerated persons.  *See* Order ¶¶ 427-471 (JA___-__).  The FCC also explained that the many rules it imposed on alternative pricing plans "sufficiently address the fundamental concerns raised in the record," including concerns that the plans will "circumvent" rate caps.  *Id.* ¶¶ 448, 469 (JA___, ___).

Even if the FCC were required to respond expressly to the automatic refund proposal, courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Banner Health v. Price*, 867 F.3d 1323, 1356 (D.C. Cir. 2017) (per curiam) (court was "able to discern HHS's path" even though HHS "declined to explain the complexity of its chosen formula relative to available alternatives"); *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 497 (D.C. Cir. 2016) (although explanation "was *not* one of 'ideal clarity,'" the court "can reasonably discern the FEC's analytical path").  The FCC

found that alternative pricing plans "provide meaningful benefits to IPCS consumers including, but not limited to, increased utilization of IPCS, with all of its attendant benefits for reducing recidivism, and greater budgetary certainty for IPCS consumers."  Order ¶¶ 428, 432-433 (JA___, ___-___).  The FCC also emphasized that consumers asked Securus to reinstate the plans after the pilot program ended, confirming their benefits.  *Id.* ¶ 432 (JA___).  Those statements provide a "clear implicit rejection" of a self-defeating automatic refund rule that would have prevented IPCS providers from offering alternative pricing plans.  *U.S. Satellite Broad. Co.*, 740 F.2d at 1188; *see* FCC Br. 99.

## CONCLUSION

The Court should dismiss the Public Interest Organizations' initial petitions for review for lack of jurisdiction.  If the Court does not transfer these cases to the Fifth Circuit, it should deny the Public Interest Organizations' supplemental petitions for review.

Respectfully submitted,

/s/ *Scott H. Angstreich*

Michael H. Pryor
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
jberg@kellogghansen.com
dzhang@kellogghansen.com
jgonzalez@kellogghansen.com

*Counsel for Intervenor Securus Technologies, LLC*

April 21, 2025

17

# Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

    1.  This document complies with the word limit approved by the Court in its 12/18/24 Order (4,500) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains ___3,755___ words, **or**

☐ this brief uses a monospaced typeface and contains _____ lines of text.

    2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using
Microsoft Word_____ in
Times New Roman, 14 point____, **or**

☐ this document has been prepared in a monospaced typeface using
_____ with
_____.

(s) _Scott H. Angstreich_____

Attorney for _Securus Techs. LLC_

Dated: _04/21/2025_____

## CERTIFICATE OF SERVICE

I hereby certify that, on April 21, 2025, I caused the foregoing brief to be filed electronically with the Clerk of the Court through the Court's CM/ECF system and that a copy of the same will be served on all counsel of record through the Court's CM/ECF system.

 /s/ *Scott H. Angstreich*
Scott H. Angstreich
*Counsel for Intervenor Securus*
*Technologies, LLC*