No. 24-8028 (and consolidated cases)

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 24-8028,

IN RE: MCP 191

(CAPTION CONTINUED ON INSIDE COVER)

ON PETITIONS FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

**BRIEF OF THE DISTRICT OF COLUMBIA, NEW YORK, CALIFORNIA, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, AND RHODE ISLAND AS AMICI CURIAE IN SUPPORT OF RESPONDENT THE FEDERAL COMMUNICATIONS COMMISSION**

LETITIA JAMES
Attorney General
State of New York

BARBARA D. UNDERWOOD
Solicitor General

JUDITH N. VALE
Deputy Solicitor General

DANIEL S. MAGY
Assistant Solicitor General

28 Liberty Street
New York, NY 10005
(212) 416-6073
daniel.magy@ag.ny.gov

BRIAN L. SCHWALB
Attorney General
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CHLOE Q. PAN
Assistant Attorney General

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

(CAPTION CONTINUED FROM FRONT COVER)

———————————

No. 24-1814,

DIRECT ACTION FOR RIGHTS AND EQUALITY,
PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS.

———————————

No. 24-1859,

CRIMINAL JUSTICE REFORM CLINIC,
PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS.

———————————

No. 24-1860,

SECURUS TECHNOLOGIES, LLC,
PETITIONER,

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,
INTERVENOR FOR PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC., *et al.*,
INTERVENORS FOR RESPONDENTS.

———————————

(CAPTION CONTINUED FROM PREVIOUS PAGE)

———————

No. 24-1861,

PENNSYLVANIA PRISON SOCIETY,
PETITIONER,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS.

———————

No. 24-1884,

DIRECT ACTION FOR RIGHTS AND EQUALITY,
PETITIONER,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

SECURUS TECHNOLOGIES, LLC,
INTERVENOR FOR RESPONDENTS.

———————

No. 24-1886,

PENNSYLVANIA PRISON SOCIETY,
PETITIONER,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

SECURUS TECHNOLOGIES, LLC,
INTERVENOR FOR RESPONDENTS.

———————

(CAPTION CONTINUED FROM PREVIOUS PAGE)

———————————

No. 24-1922,

CRIMINAL JUSTICE REFORM CLINIC,
PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

SECURUS TECHNOLOGIES, LLC,
INTERVENOR FOR RESPONDENTS.

———————————

No. 24-1927,

SECURUS TECHNOLOGIES, LLC,
PETITIONER,

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,
INTERVENOR FOR PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC., *et al.*,
INTERVENORS FOR RESPONDENTS.

———————————

(CAPTION CONTINUED FROM PREVIOUS PAGE)

———————————

No. 24-1969,

PAY TEL COMMUNICATIONS, INC.,
PETITIONER,

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,
INTERVENOR FOR PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

PENNSYLVANIA PRISON SOCIETY, *et al.*,
INTERVENORS FOR RESPONDENTS.

———————————

No. 24-2013,

STATE OF INDIANA, *et al.*,
PETITIONER,

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,
INTERVENOR FOR PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

OFFICE OF COMMUNICATION OF THE UNITED CHURCH
OF CHRIST, INC., *et al.*,
INTERVENORS FOR RESPONDENTS.

———————————

v

(CAPTION CONTINUED FROM PREVIOUS PAGE)

————————————

No. 24-2061,

STATE OF LOUISIANA, *et al.*,
PETITIONER,

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES
AND NATIONAL SHERIFFS' ASSOCIATION,
INTERVENORS FOR PETITIONER,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC., *et al.*,
INTERVENORS FOR RESPONDENTS.

————————————

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF *AMICI CURIAE* .......................................1

SUMMARY OF ARGUMENT ...................................................................................3

ARGUMENT .............................................................................................................5

    I.    The FCC's Order Promotes Positive Family And Societal Relationships, Which Help Incarcerated Individuals Successfully Rehabilitate. ..................................................................5

        A.    The cost of calling for incarcerated individuals is often prohibitively high and inhibits their ability to maintain strong ties to community support structures. ...........................5

        B.    Maintaining incarcerated individuals' social support promotes public safety by helping offenders transition back into their communities upon release and reducing long-term recidivism. ...............................................................10

        C.    Frequent communication between incarcerated individuals and their families promotes improved outcomes for offenders' families and children. ........................12

    II.    Amici States' Experience Confirms That Implementing Affordable IPCS Rates Is Feasible Without Sacrificing Facility or Public Safety. ..................................................................14

CONCLUSION ........................................................................................................19

# TABLE OF AUTHORITIES

*Cases*

*Carpenter v. Pallito*,
  No. 531-9-13 WNCV, 2014 WL 5795286 (Vt. Super. Ct. Aug. 13, 2014) ........ 5

*Samson v. California*,
  547 U.S. 843 (2006) ..................................................................................... 10

*Statutes*

Cal. Pen. Code § 2084.5 (West 2023) ....................................................... 16

Cal. Welf. & Inst. Code § 208.1 (West 2023) ......................................... 16

N.Y. Corr. Law § 623(3) ........................................................................... 17

*Administrative Materials*

Incarcerated People's Communication Services; Implementation of the
  Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services,
  89 Fed. Reg. 77,244 (Sept. 20, 2024) ............................................... 1, 2

*Rates for Interstate Inmate Calling Services*, Report and Order and Further
  Notice of Proposed Rulemaking, 28 FCC Rcd. 14107
  (released Sept. 26, 2013) ................................................................ 17, 18

Report and Order, Order on Reconsideration, Clarification and Waiver, and
  Further Notice of Proposed Rulemaking, *Incarcerated People's
  Communications Services; Implementation of the Martha Wright-Reed
  Act: Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62
  & 12-375, FCC 24-75 (released July 22, 2024) ........................................ *passim*

*Legislative Materials*

S. 1541, 117th Cong. (2022) ....................................................................... 2

S.B. 1008, Reg. Sess. (Ca. 2022) .............................................................. 16

*Other Authorities*

Aaron Littman, *Free-World Law Behind Bars*,
113 Yale L.J. 1385 (2022) ................................................................ 11

Aleks Kajstura, *Most incarcerated people will return home; the Census Bureau should count them there*, Prison Pol'y Initiative (May 14, 2024), https://tinyurl.com/5ahnjjpa ............................................................. 10

Amy B. Cyphert, *Prisoners of Fate: The Challenges of Creating Change for Children of Incarcerated Parents*, 77 Md. L. Rev. 385 (2018) .................. 12, 13

Beatrix Lockwood & Nicole Lewis, *The Long Journey to Visit a Family Member in Prison*, The Marshall Project (Dec. 18, 2019), https://tinyurl.com/ycjemev2 .............................................................. 6

Bonita Tenneriello & Elizabeth Matos, *The Telephone Is A Lifeline For Prison Families And Calls Are Outrageously Expensive*, WBUR (Jan. 27, 2020), https://tinyurl.com/yefnrr2j ................................... 5, 7

Bryce Peterson et al., Model Practices for Parents in Prisons and Jails: Reducing Barriers to Family Connections (Urb. Inst. et al., July 2019) ........... 13

Candice Norwood, *A mother's calling: Inside the fight to make prison phone calls free in Connecticut*, Conn. Pub. Radio (May 31, 2024), https://tinyurl.com/yjk8cyh4 .................................................................. 9

Danielle L. Haverkate & Kevin A. Wright, *The differential effects of prison contact on parent–child relationship quality and child behavioral changes* 26 (Corr.: Pol'y, Prac. & Rsch., 2020) ....................................... 13, 14

Emilia Calma & Yesim Sayin, *Map of the week: Where are D.C. Code offenders housed today?*, D.C. Pol'y Ctr. (Mar. 10, 2023), https://tinyurl.com/4bsjsttw .......................................................... 5, 6

Fed. Bureau of Prisons, U.S. Dep't of Just., *Program Statement No. 5264.07* (Jan. 31, 2002), https://tinyurl.com/5n7xfaa4 ................................... 12

Jocelyn Fontaine et al., The Urban Institute, Families and Reentry: Unpacking How Social Support Matters (Ill. Crim. Just. Info. Auth., Jul. 27, 2012), https://tinyurl.com/4pmxwkjm .................................................................. 10, 11

Johanna B. Folk et al., *Behind Bars but Connected to Family: Evidence for the Benefits of Family Contact During Incarceration* (J. Fam. Psych., June 2019) ................................................................. 6

Julie Poehlmann et al., *Children's Contact With Their Incarcerated Parents* (Am. Psych., Sept. 2010) ............................................................. 13, 14

Kelle Barrick et al., *Reentering Women: The Impact of Social Ties on Long-Term Recidivism*, 94 Prison J. 279 (2014)........................................... 11

Kyle C. Ward et al., *Identifying the Impact of Incarceration on Parenting: An Examination of Incarcerated Parents' Perceptions in the "Reading for a Change" Program in Colorado*, 102 Prison J. 626 (2022) .............................. 13

Letter from Anthony J. Annucci, Acting Comm'r, N.Y. Dept. of Corr. & Comm. Supervision, to Gregory V. Haledjian, Att'y-Advisor, Fed. Commc'ns Comm'n (July 8, 2013) .................................................... 17

Letter from Bianca Tylek, Exec. Dir., Worth Rises, to Marlene H. Dortch, Sec'y, Fed. Commc'ns Comm'n (Nov. 23, 2020)........................................... 16

Letter from Stefen R. Short, Chief Couns., Worth Rises, to Marlene H. Dortch, Sec'y, Fed. Commc'ns Comm'n (May 17, 2024) ............................................ 15

Nazish Dholakia, *The FCC Is Capping Outrageous Prison Phone Rates, but Companies Are Still Price Gouging*, Vera Inst. (Sept. 4, 2024), https://tinyurl.com/4krst2zt.............................................................. 6, 7

*New Prepaid Phone Plans Without the Gotcha*, Metro by T-Mobile, https://tinyurl.com/42u7w9kx.............................................................. 7

Parajita Charles et al., Parenting and Incarceration: Perspectives on Father-Child Involvement during Reentry from Prison, 93 Soc. Serv. Rev. 218 (2019) ............................................................................. 14

Peter Wagner & Wanda Bertram, *State of Phone Justice 2022: The problem, the progress, and what's next*, Prison Pol'y Initiative (Dec. 2022), https://tinyurl.com/yc23n59b ................................................................. 7

*Premium Wireless Plans Starting at $15/Mo*, Mint Mobile, https://tinyurl.com/bddfuyfh .......................................................... 7

Press Release, Fed. Commc'ns Comm'n, *FCC Caps Exorbitant Phone & Video Call Rates for Incarcerated Persons & Their Families* (July 18, 2024), https://tinyurl.com/mvttvmpk ................................... 2

Press Release, Worth Rises, *FCC Votes Unanimously to Significantly Lower Phone and Video Communication Costs After Decades of Exploitation by Prison Telecoms* (July 18, 2024), https://tinyurl.com/3rzmj8vb ....................... 2

Rebecca L. Naser & Nancy G. La Vigne, *Family Support in the Prisoner Reentry Process: Expectations and Realities*, 43 J. Offender Rehabilitation 93 (2006) ......................................................................... 11

Roby Chavez, *Incarcerated people face heightened costs to communicate with families*, PBS (Apr. 7, 2023), https://tinyurl.com/34m57rcw ........................... 6

Roby Chavez, *The high cost of staying in touch while incarcerated can linger long after release*, PBS (Apr. 3, 2023), https://tinyurl.com/ycy68fjs ............... 8

Saneta deVuono-powell et al., Who Pays? The True Cost of Incarceration on Families 30 (Ella Baker Ctr. for Human Rts. et al., Sept. 2015) ....................... 7

Sarah Betancourt, *Massachusetts prison and jail calls doubled in first year of free calls*, WGBH (Nov. 17, 2023), https://tinyurl.com/bdbbkeee .................. 16

*Securus Phone System*, N.Y. Dept. of Corr. & Comm. Supervision, https://tinyurl.com/4t7jx45v ............................................................ 17

The Council of State Gov'ts Just. Ctr., 50 States, 1 Goal: Examining State-Level Recidivism Trends in the Second Chance Act Era (Apr. 2024), https://tinyurl.com/n6j83vb9 .......................................................... 10

Emma Kaufman, *The Prisoner Trade*, 133 Harv. L. Rev. 1815 (2020) ....................................................... 5, 9

The Sent'g Project, Parents in Prison (Feb. 2021),
    https://tinyurl.com/3drw3f9f...........................................................................5, 12

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*

The District of Columbia, New York, California, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, and Rhode Island (collectively, "*Amici* States") file this brief as *amici curiae* in support of respondent the Federal Communications Commission (FCC) and its rule capping the cost of phone and video call rates for incarcerated people and their families. *See* Report and Order, Order on Reconsideration, Clarification and Waiver, and Further Notice of Proposed Rulemaking, *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act: Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62 & 12-375, FCC 24-75 (released July 22, 2024) (hereinafter 2024 Order).

In 2022, Congress passed the Martha Wright-Reed Just and Reasonable Communications Act (MWRA) with bipartisan support, significantly expanding the FCC's jurisdiction over incarcerated people's communications services (IPCS). Incarcerated People's Communication Services; Implementation of the Martha Wright-Reed Act; Rates for Interstate Inmate Calling Services, 89 Fed. Reg. 77,244 (Sept. 20, 2024). Congress passed the MWRA in recognition of the work of Martha Wright-Reed, a grandmother who spent decades advocating to reduce prohibitively high IPCS costs after she was forced to pay hundreds of dollars each month to stay in contact with her incarcerated grandson. *Id.* at 77,244. The MWRA was also a

direct response to years of litigation by IPCS providers seeking to thwart FCC efforts to reform correctional facility telecommunications costs. *Id.* The MWRA amended the Communications Act of 1934 to direct the FCC to "ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities." S. 1541, 117th Cong. (2022).

In 2024, to implement the MWRA's requirements, the FCC voted unanimously to enact the Order under review in this case. To ensure "just and reasonable rates for IPCS consumers and fair compensation for IPCS providers," 2024 Order at 22, the Order: (1) lowered per-minute rate caps for phone calls, excluding most security costs from the rate; (2) established interim caps for video communications; (3) eliminated ancillary fees; and (4) prohibited site commissions between correctional facilities and IPCS providers. Under the 2024 Order, the cost of a 15-minute phone call drops from as much as $11.35 in large jails to $0.90, and from $12.10 in small jails to $1.35. Press Release, Fed. Commc'ns Comm'n, *FCC Caps Exorbitant Phone & Video Call Rates for Incarcerated Persons & Their Families* (July 18, 2024), https://tinyurl.com/mvttvmpk. By one estimate, the 2024 Order will affect 83% of incarcerated people and save families at least $500 million annually. Press Release, Worth Rises, *FCC Votes Unanimously to Significantly Lower Phone and Video Communication Costs After Decades of Exploitation by Prison Telecoms* (July 18, 2024), https://tinyurl.com/3rzmj8vb.

*Amici* States have strong interests in this Court upholding the 2024 Order. *Amici* States operate correctional facilities covered by the Order and seek to maintain security within those facilities while enhancing broader public safety. Providing affordable IPCS serves both goals. Phone and video call services are often the primary lifeline between incarcerated people and the outside world and are critical for facilitating greater connections with loved ones. These deepened community connections promote successful rehabilitation, reduce recidivism, and even improve outcomes for the children and family members of incarcerated people. Moreover, reasonable IPCS rates achieve these critical public safety enhancements without undermining security at correctional facilities. *Amici* States therefore have an interest in ensuring that low-cost correctional facility phone and video call services are available where feasible.

## SUMMARY OF ARGUMENT

I.  The 2024 Order promotes public safety by addressing the exorbitant costs of making calls for incarcerated individuals. These prohibitive rates are driven by predatory practices that often have little relation to the actual cost of providing IPCS. Instead, IPCS providers leverage the fact that incarcerated individuals have no choice but to pay calling rates—no matter how high—if they want to stay in touch with loved ones. And maintaining regular contact with family and community is crucial for helping incarcerated individuals successfully reenter society and reducing

3

recidivism. Frequent communication also promotes family stability and improves developmental outcomes for children with incarcerated parents.

II. *Amici* States' extensive experience demonstrates that implementing reasonable IPCS rates is feasible without sacrificing facility or public safety. *Amici* States operate correctional facilities covered by the 2024 Order and negotiate with providers over IPCS rates charged in those facilities. Several States have made IPCS free. Other States have lowered their IPCS rates to levels that are far below the rate caps set in the 2024 Order. These States have all seen significant benefits from the elimination or reduction of rates, including increased family reunification for incarcerated individuals upon release. Rate reductions have also led to facility safety benefits, like curtailing illicit cell phone use by incarcerated people and keeping incarcerated individuals meaningfully engaged with their communities. Thus, contrary to State Petitioners' contentions, there is no reason to believe that the 2024 Order's rate caps will jeopardize public or correctional-facility safety or lead to a reduction in the availability of calling services for incarcerated individuals.

# ARGUMENT

I. **The FCC's Order Promotes Positive Family And Societal Relationships, Which Help Incarcerated Individuals Successfully Rehabilitate.**

A. **The cost of calling for incarcerated individuals is often prohibitively high and inhibits their ability to maintain strong ties to community support structures.**

When people are incarcerated, their connection to loved ones becomes both precious and precarious.  Telephone and video calls serve as vital lifelines for sustaining family and community connection.  *See, e.g.*, Bonita Tenneriello & Elizabeth Matos, *The Telephone Is A Lifeline For Prison Families And Calls Are Outrageously Expensive*, WBUR (Jan. 27, 2020), https://tinyurl.com/yefnrr2j.  In the United States, people in prison are incarcerated, on average, more than 100 miles from their homes.  The Sent'g Project, Parents in Prison 2 (Feb. 2021), https://tinyurl.com/3drw3f9f.  These statistics are even starker for some incarcerated communities.  For example, since 1998, the Vermont Department of Corrections has sent incarcerated individuals out of state due to lack of correctional facility capacity. *See Carpenter v. Pallito*, No. 531-9-13 WNCV, 2014 WL 5795286 (Vt. Super. Ct. Aug. 13, 2014).  Hawaii houses nearly half of its incarcerated individuals on the mainland.  *See* Emma Kaufman, *The Prisoner Trade*, 133 Harv. L. Rev. 1815, 1818 (2020).  And District of Columbia offenders are routinely incarcerated hundreds of miles away from home, including in California and Puerto Rico.  Emilia Calma & Yesim Sayin, *Map of the week: Where are D.C. Code offenders housed today?*, D.C.

5

Pol'y Ctr. (Mar. 10, 2023), https://tinyurl.com/4bsjsttw.  Correctional facilities are also often located in isolated locations that are not readily accessible by public transportation.  Beatrix Lockwood & Nicole Lewis, *The Long Journey to Visit a Family Member in Prison*, The Marshall Project (Dec. 18, 2019), https://tinyurl.com/ycjemev2.  Such barriers can make it difficult for family and friends to visit incarcerated loved ones.  Johanna B. Folk et al., *Behind Bars but Connected to Family: Evidence for the Benefits of Family Contact During Incarceration* 15 (J. Fam. Psych., June 2019) (noting that "distance, lack of transportation, and the cost of traveling to correctional facilities are often prohibitive" for in-person visitation).

Telephone and video calls are critical for helping incarcerated individuals stay connected to family and friends, but exorbitant rates have long been a substantial barrier to maintaining community bonds while in correctional facilities.  2024 Order at 17.  For incarcerated individuals, the average cost of a single 15-minute phone call is $3.  Roby Chavez, *Incarcerated people face heightened costs to communicate with families*, PBS (Apr. 7, 2023), https://tinyurl.com/34m57 rcw.  Some family members spend as much as $500 per month for such calls and must work multiple jobs to afford to stay in touch with incarcerated loved ones.  Nazish Dholakia, *The FCC Is Capping Outrageous Prison Phone Rates, but Companies Are Still Price Gouging*, Vera Inst. (Sept. 4, 2024), https://tinyurl.com/

4krst2zt.  As one survey found, the most frequent barrier to maintaining contact with incarcerated family members is the cost of calls.  *See* Saneta deVuono-powell et al., Who Pays? The True Cost of Incarceration on Families 30 (Ella Baker Ctr. for Human Rts. et al., Sept. 2015).  And the FCC's administrative record here contains "overwhelming evidence of the substantial burden excessive communications rates have on the ability of incarcerated people to stay connected" with their support systems.[1]  2024 Order at 16.

Beyond per-minute calling costs, incarcerated individuals and their families are also subject to ancillary service charges that have "inflated the effective price paid for inmate calling services."  *Id.* at 7 n.27.  These fees, which may be charged for reasons as mundane as opening, funding, or closing a prepaid phone account, can add up to nearly 40% of the amounts that incarcerated individuals and their families spend on calls.  Peter Wagner & Wanda Bertram, *State of Phone Justice 2022: The problem, the progress, and what's next*, Prison Pol'y Initiative (Dec. 2022), https://tinyurl.com/yc23n59b.  For example, simply depositing $50 into an

---

[1]    Generally, calling rates charged in prisons far exceed calling costs outside of those facilities.  Standard telecommunications carriers now offer phone customers unlimited calling in the United States for just $15 to $25 a month.  *See, e.g.*, *Premium Wireless Plans Starting at $15/Mo*, Mint Mobile, https://tinyurl.com/bddfuyfh; *New Prepaid Phone Plans Without the Gotcha*, Metro by T-Mobile, https://tinyurl.com/42u7w9kx.  "While the free world barely notices cheap, flat-rate phone calls, prison families pay sky-high rates."  Tenneriello & Matos, *supra*.

incarcerated person's phone account can trigger $18 in extra fees. Roby Chavez, *The high cost of staying in touch while incarcerated can linger long after release*, PBS (Apr. 3, 2023), https://tinyurl.com/ycy68fjs.

Moreover, IPCS providers are known to impose "multiple fees for the same transaction, as a way of exacting revenue from consumers." 2024 Order at 70. For instance, some providers charge "both an automated payment fee and a fee for the card processor costs for the same transactions," causing incarcerated individuals to pay, on average, 21% more than they otherwise would. *Id.* at 70 n.445 & 225 n.1506. Providers will also charge multiple "single call" fees when calls are disconnected and reconnected, which can more than *triple* the cost of a call. *Id.* at 71 n.448. These fees bear little to no relation to the actual costs of providing IPCS and primarily serve as a mechanism for increasing provider profits.[2] *See id.* at 70 & 224 n.1505. This double-dipping is an "endemic feature" of the IPCS provider market and comes at the expense of incarcerated people and their families. *Id.* at 74.

Site commissions to correctional facilities have also inflated the cost of calls. Correctional authorities sometimes award contracts to IPCS providers based on the amount of revenue that the provider is willing to share with the facility. *Id.* at 133-

---

[2]  *Amici* States recognize that important fiscal considerations must be balanced when establishing IPCS rates. But excessively high rates are not necessary to recoup operational costs and undermine broader public interest in supporting community connection and rehabilitation for incarcerated people.

35.  This practice can create "reverse competition" because correctional institutions and IPCS providers share the same financial interest in generating the highest payments possible.  *Id*. at 138-39.  The cost of these site commissions ultimately get passed on to incarcerated people and their loved ones.  *Id.* at 138.

These multi-layered costs are prohibitively expensive for many incarcerated individuals, who are disproportionately low-income.  *See* Kaufman, *supra*, at 1857.  The median annual income of an individual prior to incarceration is just $19,185.  *Id.*  On average, incarcerated individuals earn fourteen to sixty-three cents per hour for their labor in correctional facilities.  *Id.* at 1858 n.246.  Consequently, the costs for telephone and video calls often fall on incarcerated individuals' family members, who are also disproportionately likely to have lower incomes.  *See id.* at 1857.

As an example, one mother reported spending more than 20% of her $2,000 monthly paycheck to stay in contact with her incarcerated 17-year-old son.  Candice Norwood, *A mother's calling: Inside the fight to make prison phone calls free in Connecticut*, Conn. Pub. Radio (May 31, 2024), https://tinyurl.com/yjk8cyh4.  This sometimes caused her to be late on bills and to have her utilities cut off, and she "would often work all day and skip eating lunch to save money."  *Id.*  Indeed, as the FCC found here, the "high costs of keeping in contact drive more than 1 in 3 families, who are already financially burdened, into debt for phone calls and visits with their loved ones."  2024 Order at 16.

**B.    Maintaining incarcerated individuals' social support promotes public safety by helping offenders transition back into their communities upon release and reducing long-term recidivism.**

As the FCC recognized, the 2024 Order will help incarcerated individuals successfully reenter society and reduce recidivism rates by making telephone and video calling more affordable. 2024 Order at 19. Recidivism is a serious public safety concern throughout the country, and States have a significant interest in reducing recidivism rates in their communities. *See Samson v. California*, 547 U.S. 843, 854 (2006). Reduced recidivism means fewer crime victims and reduced public expenses from incarceration. For instance, the Council of State Governments estimates that States "will collectively spend an estimated $8 billion to reincarcerate people who were released from prison in 2022." The Council of State Gov'ts Just. Ctr., 50 States, 1 Goal: Examining State-Level Recidivism Trends in the Second Chance Act Era 5 (Apr. 2024), https://tinyurl.com/n6j83vb9.

After their release, incarcerated people usually return to their home communities. Aleks Kajstura, *Most incarcerated people will return home; the Census Bureau should count them there*, Prison Pol'y Initiative (May 14, 2024), https://tinyurl.com/5ahnjjpa. And families and social support play a critical role in helping formerly incarcerated individuals successfully transition back into society and avoid reoffending. *See* Jocelyn Fontaine et al., The Urban Institute, Families and Reentry: Unpacking How Social Support Matters 1 (Ill. Crim.

10

Just. Info. Auth., Jul. 27, 2012) (listing studies), https://tinyurl.com/4pmxwkjm.

For example, formerly incarcerated individuals often rely "very heavily on their families for support in navigating virtually every aspect of the reentry experience, from assistance with housing and employment to financial support and overall encouragement." Rebecca L. Naser & Nancy G. La Vigne, *Family Support in the Prisoner Reentry Process: Expectations and Realities*, 43 J. Offender Rehabilitation 93, 102 (2006).

Strong statistical evidence, including data collected by state departments of corrections, demonstrates that maintaining family contact during incarceration can substantially reduce rates of disciplinary infractions and post-release recidivism. Aaron Littman, *Free-World Law Behind Bars*, 113 Yale L.J. 1385, 1440 (2022). As the FCC explained, research has repeatedly "linked regular contact with family with lowering rates of recidivism and increasing likelihood of successful reentry into society after release." 2024 Order at 19. For example, a 2014 study of high-risk incarcerated women found that those with more frequent family contact through phone calls during incarceration were less likely to be reincarcerated in the first five years after their release. Kelle Barrick et al., *Reentering Women: The Impact of Social Ties on Long-Term Recidivism*, 94 Prison J. 279, 293 (2014). "Furthermore, when separately examining types of contact, familial telephone contact was most consistently associated with reductions in recidivism." *Id.* at 298. And the federal

Bureau of Prisons has similarly recognized that telephone contact is an important "means of maintaining community and family ties that will contribute to an inmate's personal development." Fed. Bureau of Prisons, U.S. Dep't of Just., *Program Statement No. 5264.07*, at 1 (Jan. 31, 2002), https://tinyurl.com/5n7xfaa4.

In short, one way to reduce recidivism is to create meaningful opportunities for incarcerated people to remain engaged with their communities, including reducing the costs of communications between them. From a fiscal perspective, implementing low-cost IPCS translates to significant taxpayer savings in criminal justice costs incurred due to recidivism, re-prosecution, and reincarceration.

## C.   Frequent communication between incarcerated individuals and their families promotes improved outcomes for offenders' families and children.

The affordable telephone and video calling rates implemented under the 2024 Order will also improve outcomes for the children and families of incarcerated individuals. Approximately 2.7 million children in the United States have a parent who is incarcerated. Parents in Prison, *supra*, at 1. In some States, the percentage of children with parents who are incarcerated is as high as 13%. *Id.* Having an incarcerated parent can negatively affect aspects of a child's emotional, psychological, and educational development. Amy B. Cyphert, *Prisoners of Fate: The Challenges of Creating Change for Children of Incarcerated Parents*, 77 Md.

L. Rev. 385, 290 (2018).  The disruption of parental attachment increases rates of childhood depression and anxiety and can disrupt academic performance.  *Id.* at 391.

Decades of research demonstrates that maintaining contact between a child and their incarcerated parent is an important way to mitigate these harms to children. *See id.* at 395; Kyle C. Ward et al., *Identifying the Impact of Incarceration on Parenting: An Examination of Incarcerated Parents' Perceptions in the "Reading for a Change" Program in Colorado*, 102 Prison J. 626, 627 (2022).  Phone calls serve as a particularly crucial medium of parent-child contact because they remove negative stressors associated with in-person visits, such as undergoing strip searches and seeing parents behind Plexiglas barriers.  *See* Bryce Peterson et al., Model Practices for Parents in Prisons and Jails: Reducing Barriers to Family Connections 50, 52, 59 (Urb. Inst. et al., July 2019).

For instance, a 2020 study found that children developed better relationships with their incarcerated parents when they communicated weekly through phone calls.  Danielle L. Haverkate & Kevin A. Wright, *The differential effects of prison contact on parent–child relationship quality and child behavioral changes* 26 (Corr.: Pol'y, Prac. & Rsch., 2020).  Other studies from the last two decades have repeatedly found positive associations between contact and relationship perceptions for children and incarcerated parents.  *See* Julie Poehlmann et al., *Children's Contact With Their Incarcerated Parents* 7, 31-35 (Am. Psych., Sept. 2010).  "[G]reater

levels of contact between incarcerated fathers and their children is associated with higher rates" of success in parent-child relationship building during reentry.  Parajita Charles et al., *Parenting and Incarceration: Perspectives on Father-Child Involvement during Reentry from Prison*, 93 Soc. Serv. Rev. 218, 223 (2019). Increased mother-child contact is associated with fewer instances of school dropout and suspension.  Poehlmann et al., *supra*, at 9.  Overall, "the strengthening of these caring, committed parenting behaviors has been linked to better child and family outcomes" post-release.  Charles et al., *supra*, at 223.

These same studies acknowledge the prohibitively expensive nature of correctional facility calls and the need to decrease costs to remove "barriers to effective communication and relationship building among incarcerated parents and their children."  Haverkate & Wright, *supra*, at 26.  Expanding affordable IPCS access would therefore help "ameliorate the harmful consequences of parental incarceration within prisons and in the community."  Charles et al., *supra*, at 253.

## II.    Amici States' Experience Confirms That Implementing Affordable IPCS Rates Is Feasible Without Sacrificing Facility or Public Safety.

Under the MWRA, Congress directed the FCC to "consider costs associated with any safety and security measures necessary to provide" IPCS in setting reasonable rate caps.  2024 Order at 180 (citing Martha Wright-Reed Act § 3(b)(2)). The 2024 Order properly followed this statutory directive.  Specifically, the agency reasonably determined that certain safety and security measures are necessary for

14

providing IPCS and factored those costs into calculating rate caps, while other costs—such as those related to law enforcement activities—are not necessary and therefore should be excluded from rate caps. *Id.* at 201 & 202 n.1359.

The State Petitioners speculate, *see* State Pet'rs Br. at 25-36, that the FCC's exclusion of unnecessary law enforcement costs means that the rate caps will jeopardize public or correctional-facility safety or lead to a reduction in the IPCS provided. But *Amici* States' extensive experience demonstrates that this speculation is unfounded and incorrect. Many States have implemented IPCS rates that are lower than the caps set in the 2024 Order, and States have successfully done so without sacrificing safety or service availability.

Several States have eliminated rates altogether, absorbing the costs of calling in the same way facilities absorb the cost of other utilities like water or heat. For example, Massachusetts, Connecticut, California, Minnesota, and Colorado provide free IPCS. 2024 Order at 145. California offers free voice calls to incarcerated individuals in state prisons and juvenile detention facilities for the express purposes of keeping incarcerated individuals connected to their support systems and reducing the economic burden of staying connected. S.B. 1008, Reg. Sess. (Ca. 2022); Cal. Pen. Code § 2084.5 (West 2023); Cal. Welf. & Inst. Code § 208.1 (West 2023). Since 2023, Massachusetts has provided free calling services in state and county correctional facilities and the impacts of this reform have been dramatic: calls more

than doubled in the first year of implementation. *See* Sarah Betancourt, *Massachusetts prison and jail calls doubled in first year of free calls*, WGBH (Nov. 17, 2023), https://tinyurl.com/bdbbkeee. Massachusetts has also issued tablets to incarcerated individuals that are equipped with phone access. *Id.* In addition to strengthening family bonds, described above, calls on these devices are also used for educational purposes like trade certifications, which directly support rehabilitation and successful reentry. *See id.* Meanwhile, Pennsylvania offers free video calls over the Zoom platform to incarcerated individuals, which facilitated nearly 800,000 calls in 2022. Letter from Stefen R. Short, Chief Couns., Worth Rises, to Marlene H. Dortch, Sec'y, Fed. Commc'ns Comm'n (May 17, 2024). Pennsylvania has been able to safely provide these cost-free video calls even without added security features on Zoom. *See id.*

Other States, including several State Petitioners, have reduced their IPCS rates to well below the caps set in the 2024 Order.[3] As the FCC has recognized, these state laws reducing IPCS rates demonstrate that rates can be affordable "without jeopardizing the security needs of correctional facilities and law enforcement or the

---

[3]    States that have set rates at or below the caps set in the 2024 Order include Nebraska, Texas, Wisconsin, Pennsylvania, South Carolina, Ohio, Missouri, Alabama, New Jersey, New York, Virginia, Florida, Mississippi, Delaware, Vermont, Maryland, West Virginia, Rhode Island, New Hampshire, and Illinois. *See* Letter from Bianca Tylek, Exec. Dir., Worth Rises, to Marlene H. Dortch, Sec'y, Fed. Commc'ns Comm'n (Nov. 23, 2020).

quality of service." *Rates for Interstate Inmate Calling Services*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107, 14110 (released Sept. 26, 2013).

For example, in 2007, New York passed a law prohibiting the New York Department of Corrections and Community Supervision (DOCCS) from collecting "revenue in excess of its reasonable operating cost for establishing and administering" IPCS. N.Y. Corr. Law § 623(3). DOCCS currently has an agreement with Securus Technology with a calling rate of $0.035 per minute, *Securus Phone System*, N.Y. Dept. of Corr. & Comm. Supervision, https://tinyurl.com/4t7jx45v, well under the $0.06 per minute cap in the 2024 Order. *See* 2024 Order at 4. In a letter to the FCC, DOCCS's then-Acting Commissioner explained that lower rates led to more incarcerated individuals making telephone calls, which "helped contribute to family reunification" and curbed "illicit cell phone use by inmates." Letter from Anthony J. Annucci, Acting Comm'r, N.Y. Dept. of Corr. & Comm. Supervision, to Gregory V. Haledjian, Att'y-Advisor, Fed. Commc'ns Comm'n (July 8, 2013). Ultimately, for New York, the "significant benefits" of reducing inmate calling rates have outweighed any operational challenges involved in reducing the rates. *Id.* at 3. And New York's positive experience is not unique. For example, after New Mexico lowered rates, one official testified that "there are no

17

security problems in New Mexico." 28 FCC Rcd. at 14110 n.16 (citing Tr. of Reforming IPCS Rates Workshop at 186-87).

The encouraging experiences of *Amici* States in reducing rates belie the State Petitioners' speculative argument that the 2024 Order's IPCS rate caps will jeopardize public or correctional-facility safety. *See* State Pet'rs Br. at 25-36. Moreover, States have been able to continuously provide IPCS at lowered costs without decreasing or limiting access to calls. Thus, there is no reason to think that the 2024 Order would require reducing the availability of IPCS, let alone eliminating IPCS altogether, as State Petitioners incorrectly suggest. *See id.* at 24, 39-40.

Lastly, the experience of States that have banned site commissions refutes State Petitioners' contention, *see id.* at 39-40, that the 2024 Order's prohibition of site commissions will cause correctional facilities to stop providing IPCS. At least nine States have banned site commissions, including California, Massachusetts, Michigan, Missouri, Nebraska, New Mexico, New York, Rhode Island, and South Carolina. *See* 2024 Order at 144-45. Indeed, among the States that have banned site commissions are two of the State Petitioners, Missouri and South Carolina. *See id.* State Petitioners do not point to any evidence suggesting that eliminating site commissions in Missouri or South Carolina, or any other States, has impeded States' abilities to safely provide IPCS or have led to any reduction in available services.

## CONCLUSION

This Court should uphold the FCC's 2024 Order.

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York

BARBARA UNDERWOOD
Solicitor General

JUDITH N. VALE
Deputy Solicitor General

DANIEL S. MAGY
Assistant Solicitor General

Office of the Attorney General for
   New York
28 Liberty Street
New York, NY 10005
(212) 416-6073
daniel.magy@ag.ny.gov

April 2025

BRIAN L. SCHWALB
Attorney General
District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CHLOE Q. PAN
Assistant Attorney General

Office of the Attorney General for
   the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

19

On behalf of:

ROB BONTA
*Attorney General*
*State of California*
1515 Clay Street
Oakland, CA 94612

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations set forth in

Fed. R. App. P. 29(a)(5).  This brief contains 4,103 words, including all headings,

footnotes, and quotations, and excluding the parts of the response exempted under

Fed. R. App. P. 32(f).  I certify that this brief complies with the typeface and type

style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared

in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point

Times New Roman font.

/s/ Caroline S. Van Zile

CAROLINE S. VAN ZILE

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on April 21, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE