Nos. 24-8028, 24-1860, 24-1927, 24-1969

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

No. 24-8028

IN RE: MCP 191

Nos. 24-1860, 24-1927

SECURUS TECHNOLOGIES, LLC,
*Petitioner*,

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,
*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,
*Respondents*,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA
PRISON SOCIETY; CRIMINAL JUSTICE REFORM CLINIC; OFFICE OF
COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,
*Intervenors*.

*(caption continued on next page)*

On Petitions for Review of an Order of the Federal Communications Commission

## [PROOF] REPLY BRIEF FOR SECURUS TECHNOLOGIES, LLC
## AND PAY TEL COMMUNICATIONS, INC.

Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
  HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com

*Counsel for Pay Tel
Communications, Inc.*

Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

*Counsel for Securus
Technologies, LLC*

May 12, 2025

*(additional counsel listed on inside cover)*

Michael H. Pryor
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus*
*Technologies, LLC*

*(caption, cont'd)*

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,
*Petitioner*,

GLOBAL TEL*LINK, d/b/a ViaPath Technologies,
*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,
*Respondents*,

PENNSYLVANIA PRISON SOCIETY; DIRECT ACTION FOR RIGHTS AND
EQUALITY, INC.; OFFICE OF COMMUNICATION OF
THE UNITED CHURCH OF CHRIST, INC.,
*Intervenors*.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ........................................................................................ 4

I.  THE COURT SHOULD TRANSFER THESE CASES TO THE
    FIFTH CIRCUIT .......................................................................... 4

II. THE FCC VIOLATED THE COMMUNICATIONS ACT AND
    THE MWR ACT ......................................................................... 7

    A.  The FCC Violated the Requirement To Ensure That All IPCS
        Providers Are Fairly Compensated ......................................... 7

    B.  The FCC's Treatment of Safety and Security Measures and
        Facility Costs Violated the Statutes ..................................... 14

III. THE ORDER IS ARBITRARY AND CAPRICIOUS IN
     MULTIPLE RESPECTS ............................................................... 16

    A.  The FCC Arbitrarily and Capriciously Excluded Safety and
        Security and Facility Costs .................................................. 16

    B.  The FCC Arbitrarily Used Unpaid Minutes When
        Calculating Rate Caps ........................................................ 20

    C.  The FCC's Treatment of Ancillary Services Is Arbitrary and
        Capricious ........................................................................ 22

IV. THE FCC'S PREEMPTION RULINGS ARE UNLAWFUL ...................... 26

V.  THE FCC ERRONEOUSLY DISMISSED SECURUS' WAIVER
    AND CLARIFICATION PETITIONS ................................................ 28

CONCLUSION ..................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000) ................................9

*ALLTEL Corp. v. FCC*, 838 F.2d 551 (D.C. Cir. 1988) ..........................................9

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018) .................................18

*Apple, Inc.*, *In re*, 602 F.3d 909 (8th Cir. 2010) ........................................................7

*Blanca Tel. Co. v. FCC*, 743 F.3d 860 (D.C. Cir. 2014) ..........................................5

*Brooks-Scanlon Co. v. R.R. Comm'n of La.*, 251 U.S. 396 (1920) ..........................9

*Centennial P.R. License Corp. v. Telecomms. Regul. Bd. of P.R.*,
    634 F.3d 17 (1st Cir. 2011)................................................................................14

*Glob. NAPs, Inc. v. Verizon New England Inc.*, 444 F.3d 59
    (1st Cir. 2006) ...........................................................................................14, 22

*Glob. Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ..............................10, 11, 14

*Indus. Union Dep't, AFL-CIO v. Bingham*, 570 F.2d 965
    (D.C. Cir. 1977) ...................................................................................................4

*Liquor Salesmen's Union Loc. 2 of N.Y. v. NLRB*, 664 F.2d 1200
    (D.C. Cir. 1981) ...................................................................................................6

*Me. Med. Ctr. v. Burwell*, 775 F.3d 470 (1st Cir. 2015)..........................................24

*Me. Pub. Utils. Comm'n v. FERC*, 520 F.3d 464 (D.C. Cir. 2008)........................12

*Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001) ....................................9

*Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246
    (1951)..................................................................................................................12

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019)..........................................26, 27

*PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1 (D.C. Cir. 2020) ...............................6

*Southland Mower Co. v. U.S. Consumer Prod. Safety Comm'n*,
    600 F.2d 12 (5th Cir. 1979) .............................................................................4

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ................................27

*Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467 (2002) ......................................7, 15


**STATUTES AND REGULATIONS**

Martha Wright-Reed Just and Reasonable Communications
    Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 ......................1, 11, 12, 13,
                                                                                                  15, 27, 29

    § 3(b)(1) ...........................................................................................11, 15

    § 3(b)(2) ...........................................................................................15, 16

28 U.S.C.:

    § 2112(a) .................................................................................................1, 4

    § 2112(a)(5) ................................................................................................6

47 U.S.C.:

    § 201(b) ....................................................................................................10

    § 276 .........................................................................................................13

    § 276(b) .........................................................................................2, 3, 7, 10

    § 276(b)(1) ..................................................................................................8

    § 276(b)(1)(A) .......................................................................................8, 26

47 C.F.R. § 1.4(b)(1) note .....................................................................................5, 6

2023 Mont. Laws ch. 11 (S.B. 7) § 1(2) ................................................................22

**ADMINISTRATIVE DECISIONS**

Report and Order and Further Notice of Proposed Rulemaking,
*Rates for Interstate Inmate Calling Services*, 28 FCC Rcd
14107 (2013) ................................................................................10

Report and Order and Order on Remand and Further Notice of
Proposed Rulemaking, *Review of the Section 251
Unbundling Obligations of Incumbent Local Exchange
Carriers*, 18 FCC Rcd 16978 (2003) ...........................................25

Second Report and Order and Third Further Notice of Proposed
Rulemaking, *Rates for Interstate Inmate Calling Services*,
30 FCC Rcd 12763 (2015) .............................................................10

Third Report and Order, Order on Reconsideration, and Fifth
Further Notice of Proposed Rulemaking, *Rates for Interstate
Inmate Calling Services*, 36 FCC Rcd 9519 (2021) ...................11, 12, 13, 25

**OTHER AUTHORITIES**

89 Fed. Reg. 68,369 (Aug. 26, 2024) .......................................................5

Order, *U.S. Telecom Ass'n v. FCC*, No. 15-1063
(D.C. Cir. June 11, 2015), https://bit.ly/4jrBxjZ .............................7

## INTRODUCTION AND SUMMARY OF ARGUMENT

The FCC's brief confirms that the Order does not properly implement the MWR Act. The FCC's rate caps and rules do not fulfill the Act's promise to make IPCS more accessible, affordable, and sustainable, while also funding safety and security measures necessary when incarcerated persons use communications services and fairly compensating the companies that provide those services. Instead, in the words of now-Chairman Carr, the FCC went "too far in one direction," and the Order will "ultimately" harm incarcerated persons, their families, IPCS providers, and public safety. Order at 486 (JA___). The Order should be vacated and remanded, so the FCC can try again.

But the Fifth Circuit, not this Court, should issue that ruling. As the FCC agrees, three of the four petitions that triggered the lottery that brought these cases to this Court were incurably premature; the Court should dismiss them for lack of jurisdiction. Cases applying 28 U.S.C. § 2112(a) — which the FCC and its intervenors ignore — compel the transfer of the remaining cases to the Fifth Circuit, where Securus' petition would have stayed, and the others would have gone, but for the jurisdictionally defective petitions. Alternatively, transfer is mandatory because no lottery should have occurred. The time for review started with the release of the Order, which contained an adjudicatory decision as to specific parties. Securus' first-filed petition thus controls the venue.

On the merits, the FCC's defenses of the Order's many errors fail. The FCC's brief confirms that the agency treated the two mandates in § 276(b) — fair compensation for all providers and just and reasonable rates — as a single, just and reasonable requirement. Congress's addition of the phrase "just and reasonable" to § 276(b) could not justify the FCC's disregard of the separate fair compensation mandate. The FCC had for more than a decade been assessing IPCS rates against the statutory just and reasonable standard. And the FCC's own (flawed) math shows that the rate caps it adopted do not fairly compensate all providers. The FCC could have selected different rates within the zones of reasonableness it established that also would have fairly compensated all IPCS providers, as the plain language of § 276(b) continues to require.

The FCC's treatment of safety and security measures is doubly unlawful. The FCC both flouted the statutory command to identify "necessary" measures — asking instead whether measures are used and useful — and then arbitrarily applied its improper test. Nor can the FCC brush aside these errors and its failure to account for facilities costs because it set rate caps marginally above the lower bound of its zones of reasonableness. The FCC repeatedly looks to that same small gap (generally one penny) to address more than a half-dozen decisions it made to drive down the lower bound, without ever showing that the gap adequately covers any one of them, much less all of them.

The FCC also deprived providers of tens of millions of dollars in annual revenues — which can turn losses into profitability — by departing from its historical practice of dividing allowed costs by *paid* minutes and instead using *all* minutes. The FCC's defenses of the switch are inconsistent with the text of the Order.

The same is true of the FCC's defense of eliminating separate ancillary service charges, which misstates the Order's findings and reasoning in multiple respects. As for the decision to apply that rule ahead of the rest of the Order's rate structure changes, the FCC's lawyers offer only post-hoc rationalizations, because the Order contained no explanation at all. And those new reasons have no basis in the record and ignore the agency's own finding that its pre-Order rate caps and ancillary service charge rules yielded just and reasonable rates.

The FCC barely defends its preemption rulings, which are unlawful because Congress tasked the FCC alone — not the FCC and the states together — to ensure that the compensation rules comply with § 276(b) and because conflict preemption cannot apply categorically. The FCC says nothing in response to either point.

The FCC also says nothing to defend its erroneous conclusion that rules taking effect months or years in the future mooted requests for relief in the present. And Securus remains harmed by the dismissals of its waiver and clarification petitions. Grants of those petitions would have given Securus here and now relief

3

that, instead, will only come at some future point, if the Order's rules take full effect.

For all these reasons, the petition should be granted and the Order vacated and remanded.

## ARGUMENT

## I.   THE COURT SHOULD TRANSFER THESE CASES TO THE FIFTH CIRCUIT

The FCC agrees that the Public Interest Organizations' initial petitions for review were incurably premature and should be dismissed for lack of jurisdiction. FCC Br. 29, 106; Securus-Pay Tel Br. 30-31.[1]  But it is wrong to assert (at 106) that the dismissals do not affect venue.

Once a court dismisses for lack of jurisdiction petitions that triggered the venue rules in 28 U.S.C. § 2112(a), the Court must "retransfer all remaining proceedings transferred to it" to "the next circuit" that § 2112(a) selects. *Indus. Union Dep't, AFL-CIO v. Bingham*, 570 F.2d 965, 974 n.8 (D.C. Cir. 1977) (Wilkey, J., concurring) (per curiam); *see Southland Mower Co. v. U.S. Consumer Prod. Safety Comm'n*, 600 F.2d 12, 13 (5th Cir. 1979) (per curiam) (following *Industrial Union* in ignoring "premature" petitions under § 2112(a)).  That is the Fifth Circuit, given Securus' first-filed petition for review.  *See* Securus-Pay Tel

---

[1] While the Public Interest Organizations dispute that (Opening Br. 46-50), they are wrong for reasons Securus has explained.  *See* Securus Intervenor Br. 4-8.

Br. 20, 31.  The FCC and the Public Interest Organizations say nothing about these decisions.  This Court should follow them.

Alternatively, the Court should transfer the cases to the Fifth Circuit because the time to petition for review began with the Order's release; no petitions for review were filed within 10 days of release; and Securus' initial petition for review was the first filed.  *See* Securus-Pay Tel Br. 29-30.  The FCC's only response is to assert (at 108) that a passing reference in Securus' waiver petition to "other providers" means the FCC's dismissal of that petition was not an "adjudicatory decision[] with respect to specific parties."  47 C.F.R. § 1.4(b) note.  But as we explained (at 30 n.24), and the FCC ignores, the evidence Securus presented and the relief Securus sought were specific to Securus' pilot subscription program.  *See* Securus Waiver Pet. 3-4, 7-9 (JA___-__, ___-__).[2]

Even if Securus' waiver petition sought industry-wide relief, the Court should reach the same result.  The IPCS industry is tiny, with fewer than two dozen IPCS providers.  *See* Order App. D ¶ 8 (JA___).  The FCC has previously claimed that an industry-wide adjudication that modified "thousands of . . . licenses" was an

---

[2] The Public Interest Organizations — but not the FCC — assert that the waiver dismissal was a rulemaking, not an adjudication.  *See* Pub. Int. Intervenor Br. 57.  They are wrong.  Decisions on waiver petitions are adjudications.  *See*, *e.g.*, *Blanca Tel. Co. v. FCC*, 743 F.3d 860, 866-67 (D.C. Cir. 2014).  And the Federal Register publication of the dismissal states that it "does not adopt any rule."  89 Fed. Reg. 68,369, 68,370 (Aug. 26, 2024).

adjudication as to specific parties under the note in § 1.4(b), starting the appellate review clock. *PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 7 (D.C. Cir. 2020). While the D.C. Circuit correctly rejected that overreach, an order that affects only a score of easily identified parties is "reasonably . . . described as a decision 'with respect to specific parties.'" *Id.* (quoting 47 C.F.R. §1.4(b)(1) note).

The FCC's remaining arguments lack merit. First, Securus never "agreed that venue here is proper." FCC Br. 105. In the transfer motion the FCC cites, Securus sought a discretionary transfer "in the interest of justice," 28 U.S.C. § 2112(a)(5), because it presented the simplest basis for transfer: other courts of appeals had granted transfers under § 2112(a)(5) when facing similarly "egregious example[s] of filing solely to forum-shop." *E.g.*, *Liquor Salesmen's Union Loc. 2 of N.Y. v. NLRB*, 664 F.2d 1200, 1206 (D.C. Cir. 1981). And Pay Tel never agreed that venue is proper here — nor does the FCC claim otherwise.

Second, the FCC asserts in a footnote (at 106 n.28) that the agency's dismissals of Securus' waiver and clarification petitions did not aggrieve it, so Securus' initial petition for review was also improper. But Securus was (and is) aggrieved for the same reasons the FCC erred in dismissing its petitions as moot — reasons the FCC ignores in its brief. *See* Securus-Pay Tel Br. 58-59; *infra* Part V.

Finally, the Court should rule on the transfer motion in a separate order issued before any ruling on the merits. That is what the only other court of appeals

to refer a transfer motion to a merits panel did.  *See* Securus-Pay Tel Br. 28 n.23.[3]

And it is the only way to ensure that Securus and Pay Tel can meaningfully seek

review via mandamus of a transfer denial, as "appeal . . . is not an adequate remedy

for an improper failure to transfer."  *E.g.*, *In re Apple, Inc.*, 602 F.3d 909, 912 (8th

Cir. 2010) (per curiam).

## II.    THE FCC VIOLATED THE COMMUNICATIONS ACT AND THE MWR ACT

### A.    The FCC Violated the Requirement To Ensure That All IPCS Providers Are Fairly Compensated

**1.**    The FCC agrees (at 4) that, as amended, § 276(b) imposes "dual

mandates."  But its brief confirms that the agency improperly reads the two

mandates to impose a single duty: to establish just and reasonable rates.  The FCC

says (at 47) that providers are fairly compensated when they recover "the used-

and-useful costs of service."  But as the Supreme Court has explained, rates are

just and reasonable when they allow providers to "recover prudently invested

capital that is being 'used and useful' in providing the public a good or service."

*Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 483-84 & n.6 (2002); *see* Securus-

Pay Tel Br. 33-34.  The FCC thus identifies no way in which the fair compensation

---

[3] The Public Interest Organizations (Opening Br. 50) claim to have found another example, but that court referred a "motion *to dismiss* . . . to the merits panel."  Order at 2, *U.S. Telecom Ass'n v. FCC*, No. 15-1063 (D.C. Cir. June 11, 2015) (emphasis added), https://bit.ly/4jrBxjZ.  No party in that case filed a transfer motion.

requirement operates independently of the just and reasonable rate requirement. And the result is that its Order ignores one of the statute's dual mandates: that the FCC's compensation plan "ensure that *all* payphone service providers are fairly compensated." 47 U.S.C. § 276(b)(1)(A) (emphasis added).

Indeed, the FCC admits its compensation plan — on its own flawed math — sets rates below cost and thus does not compensate some providers. *See* FCC Br. 47. The FCC's efforts to downplay that admission fail.

The FCC first says that those providers are too small to matter, *see id.*, but Pay Tel is one of them, *see* Order App. J tbl. 3 (JA___). The FCC's disregard for smaller providers is inconsistent with Congress's directive that the FCC "promote competition" and the "widespread deployment" of service. 47 U.S.C. § 276(b)(1).[4] The FCC also has no response to our showing (at 34-35) that the agency's math both overstates revenues and understates costs — and that fixing those errors means the rate caps put *more than half* of providers underwater, including Securus.

The FCC next retorts (at 47-48) that providers' reported costs are likely inflated because, for many, reported revenues are lower than reported costs. But record evidence shows this results from some extremely low state rate caps — such

---

[4] *See also* Pay Tel Ex Parte Letter at 3-5 (July 9, 2024) (JA___-__) (describing Pay Tel's 35-year history of serving jails, including many small and mid-size facilities).

as a $0.05 per-minute cap in California — and the fact that regulated IPCS are not providers' only offerings, so companies can be profitable overall, even if they suffer losses on their regulated lines of business. *See* Securus Ex Parte Letter at 18-19 (July 15, 2024 ) (JA___-__).[5] But while providers may voluntarily use revenue from unregulated offerings to ensure their overall profitability, regulators cannot "compel[] [them] to carry on even a branch of business at a loss." *Brooks-Scanlon Co. v. R.R. Comm'n of La.*, 251 U.S. 396, 399 (1920). The FCC, therefore, acts unlawfully when it requires IPCS providers "to subsidize their [rate] regulated services . . . with revenues generated from unregulated services." *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 594 (6th Cir. 2001).[6]

Finally, the FCC notes (at 48) that individual IPCS providers can seek waivers of the rate caps. But the "FCC cannot save an irrational rule by tacking on a waiver procedure." *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988); *see Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 622 (5th Cir. 2000).

**2.** The FCC also does not grapple with the cases holding that "all" means "all," *see* Securus-Pay Tel Br. 32-33, instead complaining (at 47) that reading "all

_____

[5] *See also* Wood Decl. ¶ 13 & n.8 (Oct. 25, 2024) (explaining errors in the FCC's comparison of reported revenues and costs) (Ex. B to Pay Tel Mot. for Stay Pending Appeal (1st Cir. filed Oct. 25, 2024)).

[6] The State amici point (at 17) to Securus' contract with the New York prison system, which is a voluntarily negotiated contract — not one compelled by federal or state rate regulation.

payphone service providers" literally would allow providers that incurred unnecessary or imprudent costs to still profit. But the D.C. Circuit already rejected a similar FCC effort to defend IPCS rate caps on the ground that "providers can become profitable under the[m] . . . if they operate more efficiently." *Glob. Tel\*Link v. FCC*, 866 F.3d 397, 415 (D.C. Cir. 2017). While Congress amended § 276(b) in several respects to address the D.C. Circuit's decision, it preserved the requirement that the FCC's compensation plan "ensure that all payphone service providers are fairly compensated." *Compare* Securus-Pay Tel Br. Add. 3 *with id.* Add. 5. Even as amended, "all" means "all."

The FCC, however, repeatedly points to Congress's addition of the phrase "just and reasonable" to § 276(b), implying that it changed the meaning of the "all providers" language Congress retained. *See* FCC Br. 2, 14, 32, 38, 44, 50-51. As the FCC acknowledges elsewhere in its brief, *see id.* at 9, that addition was not a sea change for IPCS rate-setting. The FCC has long viewed 47 U.S.C. § 201(b) to require it to set just and reasonable IPCS rates. *See 2013 IPCS Order*[7] ¶ 13 & n.40 (citing precedent dating to 1998); *see also 2015 IPCS Order*[8] ¶ 107 (citing § 201(b)

---

[7] Report and Order and Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) ("*2013 IPCS Order*").

[8] Second Report and Order and Third Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015) ("*2015 IPCS Order*").

for the proposition that the FCC's "authority to ensure the reasonableness of rates . . . for interstate I[P]CS is not in dispute"); *2021 IPCS Order*[9] ¶ 113 (referring to the FCC's "statutory duty to ensure . . . 'just and reasonable' rates for inmate calling services"). And while the D.C. Circuit rejected the FCC's conclusion that Congress had given the agency authority to ensure that *intra*state rates are just and reasonable, it did not dispute the FCC's long-standing application of § 201(b) to *inter*state IPCS rates. *See Glob. Tel\*Link* 866 F.3d at 408-14. The MWR Act thus extended the FCC's obligation to ensure just and reasonable rates to intrastate calls. Congress did not thereby alter the meaning of the unchanged text: "all payphone service providers are fairly compensated."

The FCC (at 48-49) and its intervenors (at 20) also suggest that two other changes Congress made in response to *Global Tel\*Link* — allowing the FCC to consider industry average costs and deleting "each and every" — alter the meaning of "all payphone service providers." Wrong. Congress did not *require* the FCC to use industry average costs, *see* MWR Act § 3(b)(1) ("may use"), much less say that any use of industry averages will always result in both just and reasonable rates and fair compensation for all providers. And Congress's deletion of "each and

---

[9] Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519 (2021) ("*2021 IPCS Order*").

every" changed *how* providers must be fairly compensated (overall, not for each individual call). Congress did not change *which* providers must be fairly compensated — as before the MWR Act, "all" of them must be.

    **3.** Finally, the FCC claims (at 50-51) that we are arguing that the MWR Act was meant to increase rates. Our argument is instead that Congress required the FCC to select rate caps that *both* are within the zone of reasonableness *and* fairly compensate all providers. That should be easy to accomplish, because there is "not a single 'just and reasonable rate' but rather a zone of rates that are just and reasonable." *Me. Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 470-71 (D.C. Cir. 2008) (per curiam). And there can be "a substantial spread between what is unreasonable because too low and what is unreasonable because too high." *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951). The FCC identified "zones of reasonableness for each tier of facilities." Order ¶ 207 (JA___). But then, for all ten of the zones of reasonableness, it chose rate caps at the very bottom of those ranges, *see id.*, which even on its own flawed math will not fairly compensate all providers, *see id.* App. J tbl. 3 (JA___). The FCC instead, as it has done before, could have chosen rate caps closer to the top of the ranges. *See 2021 IPCS Order* ¶ 94 (choosing rate caps "above the midpoint . . . of the zone of reasonableness"). That would have yielded rate caps that *both* are just and reasonable *and* fairly compensate all providers.

Nor would that have raised rates. Every rate within the FCC's zones of reasonableness was already far below the 2021 rate caps, which the FCC held set "just and reasonable rates." *2021 IPCS Order* ¶ 28; *compare* Order ¶ 4 (JA___) (showing the 2021 audio rate caps, which ranged from $0.14 to $0.21 per minute), *with id.* ¶ 207 (JA___) (audio upper bound ranging from $0.098 to $0.151 per minute). The FCC says nothing in its brief about the *2021 IPCS Order*, which no one — not IPCS providers, states, sheriffs, or public interest organizations — challenged. Thus, as of the Order, the industry had three years of experience under those just and reasonable rates, which the FCC had functionally extended to most intrastate calls as well. *See 2021 IPCS Order* ¶ 254.[10] Any "exorbitant" rates, FCC Br. 96, were a distant memory.

For each of these reasons, the FCC violated the Communications Act by reducing the rate caps so far that they deprive all providers of the fair compensation that § 276 — even after the MWR Act — continues to guarantee.

---

[10] The FCC held that, if an IPCS provider was not certain that both parties to an IPCS call are in the same state — which the record showed IPCS providers could not be for wireless calls and nomadic VoIP (e.g., Vonage) calls — the provider "must charge a rate at or below the applicable interstate cap." *2021 IPCS Order* ¶ 254; *see id.* ¶¶ 246-247, 251.

**B.      The FCC's Treatment of Safety and Security Measures and Facility Costs Violated the Statutes**

*First*, the FCC does not dispute that it violates the "fairly compensated" requirement when it prohibits IPCS providers from recovering through their regulated rates the costs of safety and security measures that prisons and jails require them to offer as "a condition of doing business." *Glob. Tel\*Link*, 866 F.3d at 413; *see* Securus-Pay Tel Br. 37-38. Instead, the FCC asserts (at 44-45) that the Order's ban on site commissions is so broad that it preempts state and local requirements that IPCS providers include safety and security measures that the FCC concluded are not used and useful, unless the jail or prison pays the IPCS provider the full cost of those measures. *See* FCC Br. 41 n.6, 44-45.

The FCC does not quote any language in the Order — and there is none — unambiguously preempting states from requiring even ordinary (not "gold-plated," *id.* at 44) safety and security measures that the FCC concluded are not used and useful. Yet this Court has recognized the need for a "clear indication of the [FCC's] intent to preempt" and that "ambiguity is not enough to preempt state regulation." *Glob. NAPs, Inc. v. Verizon New England Inc.*, 444 F.3d 59, 72 (1st Cir. 2006); *see Centennial P.R. License Corp. v. Telecomms. Regul. Bd. of P.R.*, 634 F.3d 17, 34-36 (1st Cir. 2011) (same). The Order does not contain the unambiguous preemptive language needed for the site commission ban to cure this violation of the fair compensation requirement.

Even if the site commission ban unambiguously preempted uncompensated safety and security requirements, the Order is still unlawful. IPCS providers built existing safety and security measures because jail and prison officials demanded them and now will be stuck with stranded — and unrecoverable — costs if those officials decide to forgo those measures when the Order's rate caps take effect. *See* Securus-Pay Tel Br. 43-44. The FCC says nothing in the Order or its brief about those reliance interests.

*Second*, the FCC's brief confirms (at 40-41) that the agency treated "used and useful" as equivalent to "necessary." It thus failed to perform a mandatory, statutory task: the FCC "shall consider costs" of "necessary" safety and security measures. MWR Act § 3(b)(2).[11] "Used and useful" is not the same as "necessary." The agency has historically applied the used and useful standard in the public utility, monopoly setting for determining just and reasonable rates. *Verizon*, 535 U.S. at 484-85 & n.6. But as the FCC acknowledges (at 7), IPCS providers compete to win business at specific jails and prisons. And there are *two* customers in the IPCS context — the officials who choose the service provider and

---

[11] The FCC asserts in a footnote (at 43 n.7) that "nothing in the" MWR Act required it to "give safety and security costs 'special attention.'" The MWR Act used mandatory language ("shall consider") for safety and security measures, but permissive language ("may use") in an adjacent section. *Compare* MWR Act § 3(b)(2) *with id.* § 3(b)(1). That difference in language warranted special attention to this mandatory task.

the incarcerated persons who use the chosen service.  Used and useful thus cannot

be imported, unchanged, to the non-monopoly, three-party IPCS context, much

less be treated as synonymous with the very different word "necessary."

The FCC's only response to this argument is to twist it into something very

different.  We do not argue that the FCC must "include in IPCS rates all safety and

security costs that correctional officials assert are needed."  FCC Br. 42.  Our

position instead is that the FCC should have considered "correctional

authorities['] . . . expertise on safety and security," Order ¶ 362 (JA___), treating it

as persuasive, though not dispositive, evidence when identifying necessary safety

and security measures.  But the FCC's used and useful approach caused it to

disregard that expertise entirely, deeming measures that "serve only a law

enforcement function" categorically *not* necessary to providing audio and

communications services in correctional facilities.  *Id.* ¶ 383 (JA___).  "Used and

useful" cannot answer whether a "safety and security measure[] [is] necessary to

provide" IPCS.  MWR Act § 3(b)(2).

## III.  THE ORDER IS ARBITRARY AND CAPRICIOUS IN MULTIPLE RESPECTS

### A.  The FCC Arbitrarily and Capriciously Excluded Safety and Security and Facility Costs

Even under the FCC's "used and useful" framework, its decision about

which safety and security measures to include in — and its decision to exclude

16

facility costs from — the lower bound of its zone of reasonableness were arbitrary and capricious. The FCC inconsistently applied its "used and useful" standard; reversed decades of contrary rate-setting practice regarding safety and security measures, with no reasoned explanation for the departure; and acknowledged that its exclusion of all facility costs "understate[s] . . . used and useful costs of providing IPCS." Order ¶ 180 (JA___); *see* Securus-Pay Tel Br. 41-45. In doing so, the FCC arbitrarily excluded two-thirds of providers' reported safety and security costs, which is "the single largest category of reported costs." Order ¶ 352 (JA___); *id.* App. F tbl. 3 (JA___).

The FCC's primary answer (at 58) — that "not all measures that in some way redound to the benefit of incarcerated people" count — just highlights the arbitrariness of the agency's approach. The line the FCC purported to draw in the Order was to exclude measures that "serve *only* a law enforcement function or provide *no* benefit to IPCS consumers." Order ¶ 383 (JA___) (emphases added). The FCC thus should have included safety and security measures that redound to the benefit of incarcerated people, such as recording, monitoring, and voice biometrics, which prevent other incarcerated people from stealing their debited funds for calls.[12] In other words, these measures ensure that incarcerated persons

---

[12] *See* Pay Tel Ex Parte Letter Ex. 1 at 3-6 (June 18, 2024) (JA___-__).

cannot circumvent measures the FCC found used and useful, like PIN numbers, *see id.* ¶ 395 n.1423 (JA___), by stealing them from others, including by force. Yet the FCC excluded those protective measures, despite the obvious benefits they provide to incarcerated people, because the agency found this investment in keeping incarcerated people safe "excessive" and "imprudent." *Id.* ¶ 406 (JA___). Announcing a standard and then failing to apply it is arbitrary and capricious. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

The FCC's defense of its inclusion of CALEA costs also fails to grapple with the arbitrariness of its approach. Providers reported less than $5,400 in costs for CALEA compliance. *See* Order App. I tbl. 6 (JA___). The FCC recognized that providers instead reported the costs of CALEA-related functions under other categories ("communications recording services" and "communications monitoring services") that the FCC found not used and useful. *See id.* ¶ 387 (JA___). Yet having belatedly decided that providers miscategorized their costs,[13] the FCC made no effort to identify — and then to include in its rate caps — the portion of the $225 million in recording and monitoring costs that providers would have

---

[13] Securus had argued that the FCC should have excluded a CALEA category from its data collection because "IPCS already enables electronic surveillance as a basic component," so "it is unclear what specific categories of costs [the FCC] expect[s] to be allocated" to the CALEA category. Securus Data Collection Comments at 4-5 (JA___-__).

identified as CALEA costs had the FCC's data collection order directed them to do so.  *See* Order App. I tbl. 6 (JA___); *id.* ¶ 387 (noting the FCC was "unable to disaggregate the [CALEA] costs reported to these other categories").

The imprecision of the FCC's data collection categories also undermines the Order's assertion, which the FCC repeats (at 56), that the excluded safety and security measures are "elective" or "nice-to-haves."  The FCC excluded the costs of broad categories of safety and security measures, not individual measures themselves.  *See* Order ¶ 385 (JA___).  And the FCC's categories were "arbitrary buckets" that did not align with IPCS providers' recordkeeping practices and lumped "essential and non-essential costs into a single category."  Pay Tel Data Collection Comments at 4-5 (JA___); *see also* ViaPath Data Collection Comments at 5 (JA___) (noting difficulties in "allocat[ing] and report[ing] costs in each of the Commission-established categories").  As a result of the FCC's categorical approach, it threw out the baby with the bathwater, tossing whole categories despite the presence within them of non-optional, necessary, and essential safety and security measures like recording, monitoring, and biometrics.

Finally, the FCC repeats (at 79-80) the Order's claim that, by picking rate caps marginally higher than the absolute bottom of its zone of reasonableness, the FCC adequately accounted for facility costs.  Yet as we showed (at 45), the FCC

relies on that tiny amount — about one cent per minute for audio calls — to take care of a host of issues, in addition to the properly recoverable facility costs:

- inaccuracies in its evaluation of used and useful costs, Order ¶ 213 (JA___);

- overly aggressive adjustments to providers' reported costs in setting the lower bounds, *id.*;

- under-reported CALEA costs, *id.* ¶ 387 (JA___);

- the potential that it improperly excluded the costs of some used and useful safety and security measures because the FCC's data collection categories were broad, *see id.* ¶¶ 209 n.741, 214 (JA___, ___);

- industry-wide cost of compliance with the new rules, *id.* ¶ 214 (JA___); and

- the costs of inflation, *id.* ¶ 213 (JA___).

The Order contains no analysis supporting the assertion that this small gap, like Mary Poppins' carpet bag, can expand to encompass all these things at once. And the FCC's brief ignores the point, effectively conceding that the Order arbitrarily and capriciously stuffed them all in that gap.

## B. The FCC Arbitrarily Used Unpaid Minutes When Calculating Rate Caps

The FCC cost providers tens of millions of dollars annually when it switched from its historical use of paid minutes to calculate rate caps to using all minutes, including those that generate no revenue. *See* Securus-Pay Tel Br. 46-47. The FCC's defenses of that arbitrary and capricious about-face fail.

First, contrary to the FCC's claim (at 87), Securus and Pay Tel do dispute that the agency's changed approach "more accurately reflects the costs of service." Changing the divisor may more accurately identify the cost of an average call, by an average provider, at an average prison or jail. But the FCC's justification for the switch was not that it yielded a better average, but that it "helps ensure all incarcerated persons are charged no more than the cost of *their calls*." Order App. E ¶ 4 (JA___) (emphasis added). An average cost — no matter how calculated — does not identify any individual provider's cost of providing service to an incarcerated person at a specific facility. *See* Securus-Pay Tel Br. 48. Therefore, the FCC's switch from paid minutes to all minutes does nothing to improve accuracy as to an individual incarcerated person's calls. Yet it materially reduces IPCS providers' revenue.[14]

Second, the FCC points (at 87-88) to its ban on site commissions, claiming that it also preempts states and localities from requiring IPCS providers to offer free calls to incarcerated persons unless the jails or prisons pay the full cost of those calls. But, again, the FCC does not identify a "clear indication of [its] intent to preempt" state and local mandates for free calls, such as to public defenders.

---

[14] The FCC suggests (at 88 n.20) that "tens of millions of dollars" is immaterial given the total revenues of the industry. The FCC's cavalier attitude toward what can be the difference between profitability (and fair compensation) and losses is striking.

*Glob. NAPs*, 444 F.3d at 72. The footnote the FCC cites (at 88) says only that "correctional authorities may" — not, as the brief asserts, must — "pay providers to offer calling plans that (from the incarcerated person's perspective) are free." Order App. E ¶ 4 n.9 (JA___). At best, that is an ambiguous statement of preemptive intent, and "ambiguity is not enough to preempt state regulation," *Glob. NAPs*, 444 F.3d at 72, such as Montana's recently enacted law requiring one free phone call and one free video call weekly for each incarcerated person. *See* 2023 Mont. Laws ch. 11 (S.B. 7) § 1(2).

### C. The FCC's Treatment of Ancillary Services Is Arbitrary and Capricious

The FCC's decisions to prohibit IPCS providers from recovering the costs of ancillary services through separate charges and to enforce that prohibition before the rest of its rate restructuring were arbitrary and capricious. First, rolling ancillary services costs into per-minute rates will increase the use of those services, raising providers' costs in ways the FCC did not capture in its rate caps, and lead to more cross-subsidization (while elsewhere the FCC claimed incarcerated persons should pay only for their own costs). *See* Securus-Pay Tel Br. 49-52. Second, the FCC insufficiently explained — indeed, it did not explain at all — why this one aspect of its rate restructuring should take effect before the rest of it. *Id.* at 52-54. As to each, the FCC's responses lack merit.

In defending its elimination of separate ancillary service charges, the FCC says (at 90) that doing so will not increase their usage. But the Order recognized that basic economics says the opposite: the separate ancillary service charges create "incentives for customer behavior," including "avoiding" ancillary services or using them "less frequently." Order ¶ 423 (JA__). The FCC also asserts (at 91) that the "record does not show that a significant number of consumers actually forgo ancillary services." But the FCC cites no record evidence for that statement. The Order identified one ancillary service, automated payment services, that "are either universally or near universally" used. Order ¶ 425 (JA___).[15] As to the rest, the Order claims it is irrelevant whether they are currently "used by *all* consumers," *id.*, so including them in the per-minute rates creates the very cross-subsidization the FCC elsewhere said is improper, *see id.* App. E ¶ 4 (JA___). Finally, in defense of its refusal to adopt further reforms targeted to address specific abuses, the FCC cites (at 92) one commenter's assertion about IPCS providers' motivations. But that commenter recommended specific, targeted rule changes, not the wholesale elimination of separate ancillary service charges. *See* PPI Comments at 6-12 (Sept. 27, 2021) (JA___-__).

---

[15] The Order cites no record support for this assertion, which appears in the only sentence of paragraph 425 to lack a supporting footnote.

As to the FCC's refusal to align the implementation date of the separate ancillary service charge ban with the rest of the rate structure reforms, the FCC points to nothing in the Order explaining the refusal. Because there is nothing. The FCC devoted a single paragraph to the effective date for all rules other than the new rate caps and site commission ban, and that paragraph says nothing about ancillary service charges. *See* Order ¶ 595 (JA___). The Court should disregard the FCC's lawyers' post-hoc rationalizations for the decision. *See Me. Med. Ctr. v. Burwell*, 775 F.3d 470, 478 (1st Cir. 2015) (reviewing court is "limited to the rationale advanced by the agency in the administrative proceeding").

But the FCC's lawyers' novel rationales fail on the merits. The FCC asserts (at 93) that contract provisions governing ancillary services are "permissive," while the terms governing per minute rates and site commissions are "mandatory." But the FCC cites nothing in the record to support its distinction. And the FCC is wrong. IPCS providers' contracts with providers dictate the ancillary services they will provide and the rates they will charge for them. Those terms are no more permissive than per-minute rate and site commission provisions.

The FCC next asserts (at 93-94) that change-of-law provisions in the contracts will account for the new ancillary service. But the way change-of-law provisions accommodate new FCC rules is by requiring the parties to negotiate an amendment to the contract — exactly what the FCC explained warranted delaying

the effective date of the rate caps and site commission rules.  *See* Order ¶¶ 588, 589 (JA___, ___) (noting that providers and government officials "may need additional time . . . to renegotiate contracts" and to "adapt to [the] rules").  The FCC used to understand that this is how change-of-law provisions work.  They "allow for negotiation and some mechanism to resolve disputes about new agreement language implementing new [FCC] rules."  Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCC Rcd 16978, ¶ 700 (2003).  Its current misunderstanding of those provisions offers no defense for its decision here.

Finally, the FCC claims (at 94) that earlier implementation of the ancillary service charge prohibition will not harm IPCS providers because they can still charge "supra-competitive" rates until the new rate caps take effect.  Yet until the new rates caps and site commission ban take effect, providers remain subject to the 2021 rate caps.  The FCC held in adopting those rate caps (and ancillary service charge rules) that they "will enable consumers — incarcerated people and their families — to obtain essential communications capability *at just and reasonable rates*."  *2021 IPCS Order* ¶ 28 (emphasis added); *see id.* ¶¶ 209-216 (adopting ancillary service charge reforms).  The post-hoc, unsupported assertion that those

2021 rates are supra-competitive thus fails to justify the FCC's refusal to implement all aspects of its new rate structure simultaneously.

## IV. THE FCC'S PREEMPTION RULINGS ARE UNLAWFUL

The FCC's preemption rulings are unlawful in two ways — neither of which the FCC squarely addresses in its brief. First, by ceding authority to states to set even lower rate caps, the FCC did not fulfill the task Congress placed squarely on its shoulders: "establish[ing] a compensation plan to *ensure*" both fair compensation for all providers and just and reasonable rates. 47 U.S.C. § 276(b)(1)(A) (emphasis added); Securus-Pay Tel Br. 54-56. Second, the FCC's application of categorical conflict preemption to higher intrastate rate caps conflicts with *Mozilla Corp. v. FCC*, 940 F.3d 1, 81 (D.C. Cir. 2019) (per curiam), and the FCC's own rationale for using a case-by-case approach for lower intrastate rate caps. *See* Securus-Pay Tel Br. 56-58.

As to the first failing, the FCC suggests (at 95) that because it set rate caps — which "provide pricing 'flexibility'" — the Order does not adopt a regime of implicit cross-subsidies. Yet on the FCC's own (flawed) math, 38% of jails and prisons are *unprofitable* to serve at the rate caps. *See* Order App. J tbl. 3 (JA___). And each of the eight providers the FCC concludes is profitable overall at the rate caps serves unprofitable facilities. *See id.* Thus, the FCC is relying on providers' profits from the less costly to serve facilities to make up for losses at the more

costly to serve facilities. That *is* a regime of implicit cross-subsidies. And it is one the FCC allows states to destabilize by setting lower rate caps based on "cost data . . . [at] certain state specific facilities" — that is, the ones less costly to serve. Order ¶ 236 (JA___). The FCC's compensation plan cannot "ensure" both fair compensation and just and reasonable rates when the FCC gives states authority to modify its terms.[16]

As to the second failing, the FCC asserts (at 96) only that categorically preempting higher rates, while applying a case-by-case standard to lower ones, is consistent with the MWR Act's purpose. But the FCC does not deny that the Order applies conflict preemption. Nor could it. *See* Order ¶¶ 232-234 (JA___-__) (repeatedly invoking "conflict preemption"). Because conflict preemption involves "fact-intensive inquiries," it cannot be handed out "in gross" as the FCC does here. *Mozilla*, 940 F.3d at 81. In addition, higher state rates, no different from lower ones, "might fall within th[e] zone" of reasonableness the FCC set and be justified based on "cost data . . . [at] certain state specific facilities" — that is,

---

[16] The Public Interest Organizations note (Intervenor Br. 34-36) that some federal laws operate only as ceilings. True enough. But when Congress directs the FCC to "ensure" that something occurs, the FCC cannot cede part of that task to the states, any more than the FCC could share with states its statutory obligation to make a "determin[ation]" about which network elements incumbent local telephone companies must unbundle. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565-66, 568 (D.C. Cir. 2004) (vacating FCC rules that shared with states that task, which Congress assigned to the agency).

the ones more costly to serve. Order ¶¶ 236-237 (JA___-__). For both reasons, the FCC acted unlawfully when it categorically concluded that all future state laws setting rates above the caps it chose conflict with federal law.

## V.    THE FCC ERRONEOUSLY DISMISSED SECURUS' WAIVER AND CLARIFICATION PETITIONS

The FCC erred in concluding that the Order's new rules could moot Securus' waiver and clarification petitions before those rules took effect. *See* Securus-Pay Tel Br. 58. The FCC, its intervenors, and amici say nothing in response.

The FCC, instead, briefly asserts (at 106 n.28) that Securus has not established that the dismissals of its petitions aggrieved it. Nonsense. Securus showed why the relief it sought is not moot even now, because it remains harmed (that is, aggrieved) by the dismissals of its waiver petition. *See* Securus-Pay Tel Br. 58-59. Had the FCC granted Securus' waiver petition, it could have resumed offering its popular alternative pricing plans shortly after the Order issued.[17] Instead, Securus must now wait for the new rules to take full effect — OMB review remains ongoing — so it can ensure that any plans it develops are compliant. Similarly, Securus would still benefit from the clarification it sought,

---

[17] *See* Securus Intervenor Br. 12-14 (describing those plans, which Securus had to abandon because of rule changes, leading to its waiver petition).

because the FCC's new rate caps and site commission prohibition do not take full effect until April 1, 2026. *See* Order ¶ 587 (JA___). IPCS providers thus have been operating, and will continue to operate, under the contracts and rules that existed at the time of the Order, without the clarification that would have resolved disagreements in the industry about how the prior rules applied to the site commissions in those contracts. *See* Securus Clarification Pet. 4-5 (JA___-__).

In sum, the Order did not grant Securus the relief it sought in its petitions. And Securus still does not have that relief. Securus is aggrieved, and its waiver and clarification petitions were not and are not moot.

## CONCLUSION

The Court should transfer these consolidated petitions for review to the Fifth Circuit. But regardless of which court of appeals addresses the merits, the court should vacate the Order and remand for further proceedings so the FCC can faithfully implement the MWR Act and achieve Congress's goals of making IPCS more accessible, affordable, and sustainable, while also funding necessary safety and security measures and fairly compensating the companies that provide those services.

Respectfully submitted,

/s/ *Marcus W. Trathen*
Marcus W. Trathen
Amanda S. Hawkins
Christopher B. Dodd
BROOKS, PIERCE, MCLENDON
  HUMPHREY & LEONARD L.L.P.
1700 Wells Fargo Capitol Center
150 Fayetteville Street (27601)
Post Office Box 1800
Raleigh, NC 27602
(919) 839-0300
mtrathen@brookspierce.com
ahawkins@brookspierce.com
cdodd@brookspierce.com

*Counsel for Pay Tel*
*Communications, Inc.*

 /s/ *Scott H. Angstreich*
Scott H. Angstreich
Justin B. Berg
Daren G. Zhang
Jordan R.G. González
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
jberg@kellogghansen.com
dzhang@kellogghansen.com
jgonzalez@kellogghansen.com

Michael H. Pryor
BROWNSTEIN HYATT FARBER
  SCHRECK, LLP
1155 F Street, N.W., Suite 1200
Washington, D.C. 20004
(202) 389-4706
mpryor@bhfs.com

*Counsel for Securus*
*Technologies, LLC*

May 12, 2025

# Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

    1.   This document complies with the word limit approved by the Court in its 12/18/24 Order (7,000) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains __6,986__ words, **or**

☐ this brief uses a monospaced typeface and contains _____ lines of text.

    2.   This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Microsoft Word_____ in Times New Roman, 14 point___, **or**

☐ this document has been prepared in a monospaced typeface using _____ with _____.

(s) Scott H. Angstreich_____

Attorney for _Securus Techs. LLC_

Dated: _05/12/2025_____

## CERTIFICATE OF SERVICE

I hereby certify that, on May 12, 2025, I caused this brief to be filed electronically with the Clerk of the Court through the Court's CM/ECF system and that a copy of the same will be served on all counsel of record through the Court's CM/ECF system.

       /s/ *Scott H. Angstreich*
Scott H. Angstreich
*Counsel for Securus*
*Technologies, LLC*