# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

No. 24-8028

IN RE: MCP 191

(CAPTION CONTINUED ON INSIDE COVER)

On Petitions for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

Abigail A. Slater
　*Assistant Attorney General*

Robert B. Nicholson
Robert J. Wiggers
　*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

D. Adam Candeub
　*General Counsel*

Bradley Craigmyle
　*Deputy General Counsel*

Sarah E. Citrin
　*Deputy Associate General Counsel*

Matthew J. Dunne
　*Counsel*

FEDERAL COMMUNICATIONS
　COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*[Caption Continued from Front Cover]*

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

*[Caption Continued from Previous Page]*

---

No. 24-1860

SECURUS TECHNOLOGIES, LLC,

*Petitioner,*

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,

*Intervenor for Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents,*

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA
PRISON SOCIETY; CRIMINAL JUSTICE REFORM CLINIC; OFFICE OF
COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,

*Intervenors for Respondents.*

---

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

---

*[Caption Continued from Previous Page]*

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents,*

SECURUS TECHNOLOGIES, LLC.,

*Intervenor for Respondents.*

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents,*

SECURUS TECHNOLOGIES, LLC.,

*Intervenor for Respondents.*

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents,*

SECURUS TECHNOLOGIES, LLC.,

*Intervenor for Respondents.*

No. 24-1927

SECURUS TECHNOLOGIES, LLC,

*Petitioner,*

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,

*Intervenor for Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents,*

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA
PRISON SOCIETY; CRIMINAL JUSTICE REFORM CLINIC; OFFICE OF
COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,

*Intervenors for Respondents.*

No. 24-1969

PAY TEL COMMUNICATIONS, INC.,

*Petitioner,*

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,

*Intervenors for Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents,*

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA
PRISON SOCIETY; OFFICE OF COMMUNICATION OF THE UNITED CHURCH
OF CHRIST, INC.,

*Intervenors for Respondents.*

No. 24-2013

STATE OF INDIANA; STATE OF ARKANSAS; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF IOWA; STATE OF MISSOURI; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF VIRGINIA,

*Petitioners*,

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES,

*Intervenor for Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA PRISON SOCIETY; OFFICE OF COMMUNICATION OF THE UNITED CHURCH OF CHRIST, INC.,

*Intervenors for Respondents.*

*[Caption Continued from Previous Page]*

_____

No. 24-2061

STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF TEXAS;
SHERIFF SID GAUTREAUX; SHERIFF BOBBY WEBRE; SHERIFF MARK
WOOD; SHERIFF KEVIN COBB; LOUISIANA SHERIFFS' ASSOCIATION,

*Petitioner*,

GLOBAL TEL*LINK, D/B/A VIAPATH TECHNOLOGIES; NATIONAL
SHERIFF'S ASSOCIATION,

*Intervenor for Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*,

DIRECT ACTION FOR RIGHTS AND EQUALITY, INC.; PENNSYLVANIA
PRISON SOCIETY; OFFICE OF COMMUNICATION OF THE UNITED CHURCH
OF CHRIST, INC.,

*Intervenors for Respondents.*

_____

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................... xiii

INTRODUCTION ...................................................................... 1

JURISDICTIONAL STATEMENT ........................................... 4

STATEMENT OF THE ISSUES ............................................... 4

STATEMENT OF THE CASE .................................................... 7

    A.    History Of Excessive Rates And Charges For IPCS .............. 7

    B.    Early Efforts To Constrain IPCS Rates ................................. 8

    C.    The *Global Tel\*Link* Decision ................................................. 9

    D.    The Martha Wright-Reed Act ............................................... 11

    E.    *Order* On Review ................................................................. 12

        1.    New and revised rate caps ............................................. 13

        2.    Ratemaking methodology ............................................... 14

        3.    Safety and security costs ............................................... 16

        4.    Facility costs .................................................................. 19

        5.    Site commissions ........................................................... 21

        6.    Other matters ................................................................. 24

            a.    Ancillary service charges ....................................... 24

            b.    Differing state rate caps ......................................... 25

            c.    Alternate pricing plans ........................................... 26

            d.    Petitions for clarification and waiver .................. 26

    F.    Procedural History ............................................................... 27

STANDARD OF REVIEW ......................................................... 31

SUMMARY OF THE ARGUMENT ........................................... 32

ARGUMENT .............................................................................. 37

I.  THE RATEMAKING METHODOLOGY ADOPTED IN THE *ORDER* FALLS EASILY WITHIN THE COMMISSION'S CLARIFIED AND EXPANDED STATUTORY AUTHORITY ........................................................ 37

   A.  In Directing The FCC To Ensure "Just And Reasonable" Rates And "Fair" Compensation, The Statute Provides Ample Flexibility To Support The Used-And-Useful Standard ................................................. 37

      1.  In determining what costs to include in the IPCS rate caps, the Commission lawfully applied the used-and-useful standard to consider "necessary" safety and security measures ...................................... 39

      2.  Congress directed the Commission, not correctional facilities, to consider the safety and security measures necessary to provide IPCS ............. 42

      3.  The used-and-useful standard is consistent with the requirement that providers be "fairly compensated" ............................................................. 44

   B.  Using Industry-Wide Average Cost Data To Formulate The Rate Caps Was Fully Consistent With The Statute ..... 45

      1.  The Commission's approach allows fair compensation for "all" providers .................................. 47

      2.  The Martha Wright-Reed Act expressly allows the Commission to rely on industry-wide average costs ...................................................................... 49

      3.  The Commission's reading of section 276 gives meaning to both "just and reasonable" and "fairly compensated" ............................................................. 50

II. THE COMMISSION REASONABLY EXERCISED ITS DISCRETION IN ASSESSING WHICH SAFETY AND SECURITY COSTS ARE COMPENSABLE IN IPCS RATES ...................................................................................... 52

A. The Commission Fully Considered And Explained Its Approach To Safety And Security Costs ....................... 53

B. The Commission Did Not Ignore The Need To Offer IPCS "Safely" ........................................................ 56

C. The Commission's Approach To Each Safety And Security Cost Category Was Consistent And Reasonable .................................................................... 58

D. The Commission Reasonably Explained Any Departure From Its Precedent ................................................... 60

E. Ample Evidence Supported The Commission's Determinations ......................................................... 61

F. The Commission Reasonably Treated Communications Security Costs As Used And Useful ....................... 62

III. THE COMMISSION HAD AUTHORITY TO BAN SITE COMMISSIONS, WHICH IT REASONABLY CONCLUDED ARE INCOMPATIBLE WITH THE DUAL MANDATES OF SECTION 276(B)(1)(A) AND WITH SECTION 201(B) ......................................................... 65

A. The Commission Has Authority To Prohibit Providers From Paying Site Commissions ............................ 68

1. Section 276 supplies authority ..................... 68

2. Section 201(b) supplies an independent source of authority ................................................... 72

B. The Commission Has Authority To Preempt State And Local Laws That Require Or Permit Site Commissions ...... 75

IV. THE COMMISSION REASONABLY ACCOUNTED FOR THE POSSIBILITY THAT CORRECTIONAL FACILITIES MAY INCUR USED-AND-USEFUL COSTS IN ALLOWING ACCESS TO IPCS ........................... 80

A. The States Fail To Show That The Commission's Approach Was Arbitrary And Capricious ............. 82

B. The Public Interest Petitioners Fail To Show That The Commission's Approach Was Arbitrary And Capricious ..... 86

V. THE PETITIONERS' REMAINING OBJECTIONS ARE UNPERSUASIVE ........................................................................ 87

 A. The Commission Reasonably Derived The Rate Caps Using Total Minutes Of Use ................................................ 87

 B. The Commission's Approach To Ancillary Service Charges Is Reasonable ............................................................ 90

  1. The agency reasonably incorporated the cost of ancillary services directly into IPCS rates ................. 90

  2. The agency reasonably declined to delay the ban on ancillary service charges ......................................... 93

 C. Section 276 Does Not Require The Commission To Preempt Lower State-Imposed Rate Caps ........................... 96

 D. The Commission Lawfully And Reasonably Allowed Alternate Pricing Plans And Declined To Require A Consumer Protection Label .................................................... 97

  1. In allowing alternate pricing plans, the Commission fulfilled its duty to ensure "just and reasonable" rates and adequately accounted for objections to flat-rate calling ......................................... 97

  2. The Commission reasonably did not require an IPCS consumer protection label ................................ 101

 E. The States' Constitutional Challenge To The Structure Of The FCC Is Procedurally Barred And, In Any Event, Unsubstantiated .................................................................... 102

VI. VENUE IS PROPER IN THIS COURT ................................. 106

CONCLUSION ........................................................................................ 110

CERTIFICATE OF COMPLIANCE ....................................................... 111

# TABLE OF AUTHORITIES

**Cases**

*Astra USA, Inc. v. Santa Clara Cnty., Cal.*,
563 U.S. 110 (2011) .............................................................. 65

*Bhatti v. FHFA*,
97 F.4th 556 (8th Cir. 2024) ............................................. 105

*Boston Edison Co. v. FERC*,
885 F.2d 962 (1st Cir. 1989) ........................................ *passim*

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ............................................................ 100

*CFPB v. CashCall, Inc.*,
35 F.4th 734 (9th Cir. 2022) ............................................. 105

*CFPB v. Law Offs. of Crystal Moroney, P.C.*,
63 F.4th 174 (2d Cir. 2023) ............................................... 105

*CFPB v. Nat'l Collegiate Master Student Loan Tr.*,
96 F.4th 599 (3d Cir. 2024) ............................................... 105

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) .............................................................. 79

*City of Houston v. Sw. Bell Tel. Co.*,
259 U.S. 318 (1922) .............................................................. 38

*Collins v. Yellin*,
594 U.S. 220 (2021) ................................................... 104, 105

*Del. Riverkeeper Network v. FERC*,
45 F.4th 104 (D.C. Cir. 2022) ........................................... 103

*Edd Potter Coal Co., Inc. v. Dir., Off. of Workers' Comp. Progs.*,
39 F.4th 202 (4th Cir. 2022) ............................................. 102

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..................................................... 60, 83

# TABLE OF AUTHORITIES

## (continued)

Page(s)

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................ 31, 62, 87

*FDA v. Wages & White Lion Invs., L.L.C.,* No. 23-1038,
  2025 WL 978101 (U.S. Apr. 2, 2025) ........................................ 13, 60

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
  320 U.S. 591 (1944) .................................................................... 2

*Fines and Fees Justice Center Inc. v. FCC*, No. 24-2611
  (2d Cir.) (dismissed Feb. 11, 2025) ........................................ 29

*Fleming v. USDA*,
  987 F.3d 1093 (D.C. Cir. 2021) ............................................. 102, 103

*Forest Grove Sch. Dist. v. T.A.*,
  557 U.S. 230 (2009) .................................................................. 71

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ................................................................ 104

*Frontier Fishing Corp. v. Pritzker*,
  770 F.3d 58 (1st Cir. 2014) ...................................................... 84

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2001) .................................................................. 77

*Global Tel\* Link v. FCC*,
  866 F.3d 397 (D.C. Cir. 2017) ........................................... *passim*

*Hikvision USA v. FCC*,
  97 F.4th 938 (D.C. Cir. 2024) .................................................. 71

*Housatonic River Initiative v. EPA*,
  75 F.4th 248 (1st Cir. 2023) .................................................... 60

*Ill. Bell Tel. Co. v. FCC*,
  883 F.2d 104 (D.C. Cir. 1989) .................................................. 72

# TABLE OF AUTHORITIES

## (continued)

Page(s)

*In re FBI Distrib. Corp.*,
330 F.3d 36 (1st Cir. 2003) .............................................................. 105

*Integrity Adv., LLC v. CFPB*,
48 F.4th 1161 (10th Cir. 2022) ...................................................... 105

*K & R Contractors, LLC v. Keene*,
86 F.4th 135 (4th Cir. 2023) .......................................................... 105

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ............................................................................ 79

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................ 31, 39, 72

*Medtronic v. Lohr*,
518 U.S. 470 (1996) ............................................................................ 75

*Minn. Pub. Utils. Comm'n v. FCC*,
483 F.3d 570 (8th Cir. 2007) ........................................................... 72

*NLRB v. Starbucks Corp.*,
125 F.4th 78 (3d Cir. 2024) ............................................. 102, 103, 105

*Parsons v. United States*,
167 U.S. 324 (1897) .......................................................................... 104

*Presque Isle TV Co. v. United States*,
387 F.2d 502 (1st Cir. 1967) .......................................................... 102

*Press Commc'ns LLC v. FCC*,
875 F.3d 1117 (D.C. Cir. 2017) ...................................................... 100

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
579 U.S. 115 (2016) ............................................................................ 75

*Rieth-Riley Constr. Co. v. NLRB*,
114 F.4th 519 (6th Cir. 2024), *cert denied* No. 24-767
(U.S. Mar. 24, 2025) ......................................................................... 104

# TABLE OF AUTHORITIES

## (continued)

Page(s)

*Ross v. Blake,*
578 U.S. 632 (2016) ............................................................ 103

*Rural Cellular Ass'n v. FCC,*
588 F.3d 1095 (D.C. Cir. 2009) ........................................... 92

*S. Shore Hosp., Inc. v. Thompson,*
308 F.3d 91 (1st Cir. 2002) ................................................. 60

*Severino v. Biden,*
71 F.4th 1038 (D.C. Cir. 2023) .......................................... 104

*State v. Dir., U.S. Fish & Wildlife Serv.,*
262 F.3d 13 (1st Cir. 2001) ........................................... 3, 74

*Sutherland v. Peterson's Oil Serv., Inc.,*
126 F.4th 728 (1st Cir. 2025) .............................................. 31

*Sw. Bell Tel. Co. v. FCC,*
168 F.3d 1344 (D.C. Cir. 1999) ...................................... 32, 89

*Time Warner Entm't Co. v. FCC,*
144 F.3d 75 (D.C. Cir. 1998) ............................................. 102

*Time Warner Entm't Co. v. FCC,*
56 F.3d 151 (D.C. Cir. 1995) ................................................ 3

*United States v. Morales-de-Jesus,*
372 F.3d 6 (1st Cir. 2004) .................................................. 32

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951) ............................................................ 84

*Verizon Commc'ns, Inc. v. FCC,*
535 U.S. 467 (2002) .............................................................. 2

## Constitution

U.S. Const. art. II, § 1, cl. 1 .......................................... 6, 36

# TABLE OF AUTHORITIES

## (continued)

Page(s)

**Statutes**

5 U.S.C. § 706 .................................................................... 31

28 U.S.C. § 2112(a) ........................................................... 36

28 U.S.C. § 2112(a)(1)............................................ 106, 108

28 U.S.C. § 2112(a)(3)............................................... 28, 106

28 U.S.C. § 2112(a)(5)............................................... 29, 106

28 U.S.C. § 2342(1) .............................................................. 4

28 U.S.C. § 2344.............................................................. 108

47 U.S.C. § 152...................................................... 11, 12

47 U.S.C. § 152(b) ................................................. 76, 79

47 U.S.C. § 153(1) .......................................................... 11

47 U.S.C. § 154(c) ........................................................ 103

47 U.S.C. § 201(b) ............................................... *passim*

47 U.S.C. § 276 (2012) ..................................................... 9

47 U.S.C. § 276(b)(1)(A) ...................................... *passim*

47 U.S.C. § 276(c)....................................... 75, 77, 78

47 U.S.C. § 276(d) ......................................................... 41

47 U.S.C. § 276(d) (2015)............................................... 9

47 U.S.C. § 402(a) ............................................................ 4

47 U.S.C. § 405(a) ................................................. 36, 102

# TABLE OF AUTHORITIES

## (continued)

Page(s)

Communications Assistance for Law Enforcement Act (CALEA),
47 U.S.C. § 1001 et seq. (1994) .......................................................... 18

Martha Wright-Reed Just and Reasonable Communications Act of
2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) ..................... *passim*

**Regulations**

47 C.F.R. § 1.4(b) ................................................................. 36, 108

47 C.F.R. § 1.4(b)(1) ....................................................... 108, 109

**Administrative Materials**

*Incarcerated People's Communication Services,*
89 Fed. Reg. 77,244 (Sept. 20, 2024) ................................ 4, 27

*Incarcerated People's Communications Services,*
89 Fed. Reg. 68,369 (Aug. 26, 2024) ................................ 4, 27

*McClenning v. Dep't of the Army,*
2022 MSPB 3 (Mar. 31, 2022) .......................................... 102

*Pay Tel Commc'ns, Inc.'s Petition for Waiver of Interim Interstate
ICS Rates,*
29 FCC Rcd 1302 (Wireline Comp. Bur. 2014) .................. 49

*Rates for Interstate Inmate Calling Services,*
28 FCC Rcd 14107 (2013) .................................................... 8

*Rates for Interstate Inmate Calling Services,*
30 FCC Rcd 12763 (2015) ...................................... 8, 10, 85

*Rates for Interstate Inmate Calling Services,*
35 FCC Rcd 8485 (2020) .................................................... 74

**Legislative Materials**

168 Cong. Rec. H10027–28 (daily ed. Dec. 22, 2022) ................. 11, 51, 79

# TABLE OF AUTHORITIES

## (continued)

Page(s)

**Other Materials**

Black's Law Dictionary (12th ed. 2024)....................................................69

Merriam-Webster Dictionary...................................................................69

Webster's New Universal Unabridged Dictionary (1st ed. 1996)...........69

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

IN RE: MCP 191

On Petitions for Review of an Order of
the Federal Communications Commission

**BRIEF FOR RESPONDENTS**

## INTRODUCTION

This case is about agency ratemaking, a tool that Congress has used for more than a century to address monopolistic power. The monopolists here are companies that provide calling services in prisons and jails. These providers have a monopoly in each facility they serve, and they often exploit that economic position by charging rates and fees that greatly exceed the cost of providing calling services. Many prisons and jails, in turn, exploit their role in awarding monopoly contracts to providers. Rather than choosing providers that offer low costs or effective service to consumers (incarcerated people and those they communicate with), prisons and jails often select providers based on the benefits providers offer to *them*. The cost of those benefits is then bundled into

rates and passed onto consumers, which makes it harder for incarcerated people to keep in touch with family and friends. This is a problem, because regular contact between incarcerated people and their loved ones lowers the chance that incarcerated persons will commit future crimes, while increasing their odds of successfully rejoining their communities.

To address this problem, Congress recently expanded the Federal Communications Commission's authority to regulate incarcerated people's communications services, or IPCS. That authority now includes a duty to ensure that rates are "just and reasonable," as well as that providers are "fairly compensated." 47 U.S.C. § 276(b)(1)(A).

Agency ratemaking, of course, is not an exact science. It involves "pragmatic adjustments" and "a balancing of . . . interests" on the agency's part: the agency must weigh the interests of "investor[s]" who contribute capital to provide a service against the interests of "consumer[s]" who purchase the service. *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 602–03 (1944) (internal quotation marks omitted).

The FCC has been balancing these competing interests and setting rates for communications services, in a variety of contexts, for decades. *See Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 477–89 (2002). It thus has "acknowledged . . . expertise" to which courts in ratemaking cases

are "particularly deferential." *Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 163 (D.C. Cir. 1995); *accord Boston Edison Co. v. FERC*, 885 F.2d 962, 964 (1st Cir. 1989).

Here, the Commission set rate caps for IPCS using a familiar framework (called "used and useful") that it has long used in other ratemaking contexts. In doing so, the agency set caps that account for the actual costs of providing calling services (like security costs unique to IPCS). But it excluded costs that providers need not incur to offer calling services (like payments that prisons and jails at times demand when awarding monopoly contracts). The Commission faithfully exercised its statutory authority and, based on the record before it, reasonably balanced the interests of service providers, ratepaying consumers, and correctional facilities.

Representatives of all three of those groups challenge the balance the Commission struck.[1] But especially given the "leeway" that courts afford to agency judgments in ratemaking proceedings, *Boston Edison*

---

[1] Consistent with the Administrative Procedure Act (APA), should the current framework have unintended consequences down the road, the Commission may revisit this balance. Any unintended consequences would not affect this Court's review, however, which is limited to the record that was before the agency when it adopted the *Order*. *See State v. Dir., U.S. Fish & Wildlife Serv.*, 262 F.3d 13, 20 (1st Cir. 2001).

*Co.*, 885 F.2d at 964, the petitioners face a steep climb. The Court should deny their petitions for review.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). Notice of the *Order* was published in the Federal Register on August 26, 2024, 89 Fed. Reg. 68,369, and September 20, 2024, 89 Fed. Reg. 77,244. Securus Technologies, LLC, Direct Action for Rights and Equality, Inc. (DARE), Pennsylvania Prison Society, and Criminal Justice Reform Clinic petitioned for review within 10 days of the August 26 notice. All four of these petitioners, as well as the remaining petitioners in these consolidated cases, filed additional petitions within 60 days of the September 20 notice.

## STATEMENT OF THE ISSUES

1.  Did the Commission satisfy its statutory obligations—including its dual mandates to ensure that IPCS rates are "just and reasonable" and that IPCS providers are "fairly compensated," 47 U.S.C. § 276(b)(1)(A)—by establishing IPCS rate caps using the "used-and-useful" framework familiar from other ratemaking contexts, and by using industry-wide average cost data collected from IPCS providers?

2. Did the Commission, based on the record before it, properly consider safety and security costs in calculating the IPCS rate caps?

3. Did the Commission, based on the record before it, properly bar IPCS providers from making "site commission" payments to correctional facilities and properly preempt state and local laws that require or permit such payments?

4. Did the Commission, based on the record before it, reasonably account for any costs that facilities incur in allowing access to IPCS that should be compensable through end-user rates?

5. Should the *Order* be upheld against arguments that

(a) the Commission should have used only billed, not unbilled, IPCS minutes in calculating the *Order*'s rate caps;

(b) it was unreasonable to bar IPCS providers from imposing separate "ancillary service charges," beginning immediately upon the *Order*'s effective date, and instead (based on the record) to account for the costs of ancillary services by enabling their recovery through the *Order*'s rate caps;

(c) the Commission was required to preempt state-imposed rate caps that are lower than the rate caps adopted in the *Order*;

(d) the Commission's decision to allow alternate pricing plans was unlawful and unreasonable, and the agency unreasonably declined to require an IPCS consumer protection label; and

(e) the structure of the Commission is unconstitutional under the Take Care Clause of the U.S. Constitution, U.S. Const. art. II, § 1, cl. 1?

6.   Is venue proper in this Court?

## STATEMENT OF THE CASE

### A.    History Of Excessive Rates And Charges For IPCS

As the FCC has long recognized, "the IPCS market is a prime example of market failure." *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, 39 FCC Rcd __ ¶ 23 (JA1497) (rel. July 22, 2024, amended Aug. 26, 2024) (alteration omitted) (*Order*). "Once a provider successfully competes for a contract to serve a facility, it has a monopoly over the provision of IPCS at that facility." *Id.* Incarcerated people then "have no choice but to pay the rates and charges imposed if they wish to call their family or other loved ones." *Id.* No market force keeps rates in check, and providers have historically charged rates that "far exceed" their costs. *Id.* Furthermore, providers and correctional facilities have often freely negotiated "site commissions"—"payments . . . from [IPCS] providers to correctional facilities" that can take many forms, such as "a percentage of gross revenue, a signing bonus, . . . or in-kind contributions." *Id.* n.30 (JA1492). (In other cases, site commissions have been required under state or local law. *Id.* ¶ 249 (JA1620)). Providers have historically recovered the cost of site commissions from consumers of their services through higher rates. *See id.* ¶ 23 (JA1497).

High rates for IPCS impose a "substantial burden" on "the ability of incarcerated people to stay connected" with family and friends. *Order* ¶ 26 (JA1500); *see id.* ¶ 28 (JA1503) (IPCS users' comments describing, for example, a family's choice between "communication or rent, food, or school supplies"). Yet, regular contact between incarcerated people and their families leads to lower rates of recidivism and more successful reentry into society. *Id.* ¶ 29 & n.116 (JA1504) (collecting studies).

## B. Early Efforts To Constrain IPCS Rates

Martha Wright-Reed, who paid "hundreds of dollars a month" to keep "in touch with her incarcerated grandson," first asked the FCC to address the problem of excessive rates for IPCS in 2003. *Order* ¶ 1 (JA1488); *see id.* n.22 (JA1491). In 2013, the FCC set interim rate caps for interstate calls and directed providers to submit cost data. *Rates for Interstate Inmate Calling Services*, 28 FCC Rcd 14107 (2013) (*2013 Order*). In 2015, the FCC adopted a broader set of reforms, including revised caps on rates for interstate calls and new caps on intrastate calls. *Rates for Interstate Inmate Calling Services*, 30 FCC Rcd 12763 (2015) (*2015 Order*). The agency derived those rate caps using industry-wide average costs as reported in the earlier data collection. *See id.* at 12792–96 ¶¶ 58–64. The Commission also found that site commissions (such as

signing bonuses) were not "a legitimate cost" of providing IPCS, and so it excluded those costs in setting rate caps. *Id.* at 12819 ¶ 118. Although site commissions were thus no longer included in the rate caps themselves, facilities remained free to demand these benefits (which they did), and providers remained able to pay them (and they did).

In adopting these reforms, the FCC invoked its authority under sections 276 and 201(b) of the Communications Act. 47 U.S.C. §§ 201(b), 276 (2012); *see 2013 Order* at 14113 ¶ 12; *2015 Order* at 12813–14 ¶ 107. Under section 276, as then in force, the Commission was required to ensure that providers of "inmate telephone service in correctional institutions," 47 U.S.C. § 276(d) (2015), would (with specified exceptions) be "fairly compensated for each and every completed intrastate and interstate call using their payphone," *id.* § 276(b)(1)(A). And under section 201(b) of the Act, the Commission was required to ensure that "[a]ll charges" for interstate and international communications services were "just and reasonable." *Id.* § 201(b).

## C.    The *Global Tel\*Link* Decision

IPCS providers and state authorities challenged the *2015 Order* before the D.C. Circuit. *See Global Tel\* Link v. FCC*, 866 F.3d 397, 403 (D.C. Cir. 2017). In reviewing those challenges, the court acknowledged

the "seriousness of the situation" caused by the IPCS "market failure," which generated "extraordinarily high" charges to end users. *Id.* at 404 (internal quotation marks omitted).

The court nonetheless held invalid and vacated several portions of the *2015 Order*. First, it concluded that the FCC did not have authority to cap intrastate (as opposed to interstate) rates. *See Global Tel\*Link*, 866 F.3d at 408–12.

Second, the court concluded that the FCC's rate caps, which relied on industry-wide cost averaging, "ma[de] calls with above-average costs . . . unprofitable, . . . and thus [did] not fulfill the mandate of § 276 [as it then existed] that 'each and every' inter- and intrastate call be fairly compensated." *Global Tel\*Link*, 866 F.3d at 414.

Third, the court invalidated the Commission's decision to exclude the cost of site commissions when deriving the rate caps, rejecting the FCC's contention that the cost of site commissions had "nothing to do with the provision of [service]." *Global Tel\*Link*, 866 F.3d at 413. It found that, in at least some instances, providers were required under state law or "as a condition of doing business" to pay site commissions. *Id*. The court remanded to the agency to "assess . . . which portions of site

commissions might be directly related to the provision of [IPCS] and therefore legitimate." *Id.* at 414.

### D. The Martha Wright-Reed Act

Congress responded to the *Global Tel\*Link* decision by passing the Martha Wright-Reed Just and Reasonable Communications Act of 2022 (Martha Wright-Reed Act, MWR Act, or Act), Pub. L. No. 117-338, 136 Stat. 6156 (2023). The law's sponsors described the Act as granting the FCC the authority that the court in *Global Tel\*Link* had found the agency lacked. *See* 168 Cong. Rec. H10027–28 (daily ed. Dec. 22, 2022) (statements of Reps. Pallone and Rush referencing *Global Tel\*Link*).

The Act granted the FCC explicit authority over "any audio or video communications service"—whether interstate or intrastate—"used by inmates for the purpose of communicating with individuals outside the correctional institution." MWR Act § 2 (amending 47 U.S.C. §§ 152, 153(1)).

The Act also amended section 276(b)(1)(A) to require "just and reasonable" rates for IPCS callers—not merely "fair compensat[ion]" for providers. And it deleted that section's former reference to fair compensation for "each and every" call. The statute, as amended, now reads as follows:

> [The FCC shall] establish a ~~per call~~ compensation plan to ensure that all payphone service providers are fairly compensated ~~for each and every~~**, and all rates and charges are just and reasonable, for** completed intrastate and interstate ~~call~~ **communications** using their payphone **or other calling device** . . . [.]

47 U.S.C. § 276(b)(1)(A).[2]

Congress also expressly authorized the Commission, "[i]n implementing [the] Act and the amendments made by [the] Act," to "use industry-wide average costs of . . . service . . . and the average costs of service of a communications service provider." MWR Act § 3(b)(1) (codified at 47 U.S.C. § 152 (Supp. V 2023) (Statutory Notes and Related Subsidiaries)). The Act also directs the agency to "consider costs associated with any safety and security measures necessary to provide" IPCS, MWR Act § 3(b)(2), and specifies that it does not "prohibit the implementation of any safety and security measures related to" IPCS, *id.* § 4.

### E. *Order* On Review

Following the enactment of the Martha Wright-Reed Act, the Commission solicited additional comments and collected more data to

---

[2] Language that the Act deleted from Section 276(b)(1)(A) is ~~struck through~~; language added is **bolded and underlined**.

inform its implementation of the Act. *See Order* ¶¶ 21–22 (JA1497). In particular, the Commission's "2023 Data Collection" elicited more robust data on IPCS providers' services, rates and charges, site commissions, and costs than the Commission had previously obtained. *See generally Order* App. D ¶¶ 2–9 (JA1854–1857). Upon careful review and analysis of this extensive record,[3] the Commission adopted its *Order* implementing the Act. We highlight the most relevant features below.

### 1. New and revised rate caps

The Commission adopted new rate caps for intrastate audio IPCS, lower rate caps for interstate audio IPCS, and new (interim) rate caps for video IPCS. *See Order* ¶ 4 (JA1489). The rate caps vary by type and size of the served facility, in recognition that some types of facilities may be costlier to serve. *See id.* ¶¶ 147–150 (JA1565–1567). Table One of the *Order* summarizes the rate caps:

---

[3] The Commission's decision was based on the record before it at the time. If that decision creates unintended consequences, the Commission may, consistent with the APA, revisit that decision. *See, e.g.*, *FDA v. Wages & White Lion Invs., L.L.C.*, No. 23-1038, 2025 WL 978101, at *13–14 (U.S. Apr. 2, 2025) (describing "[t]he change-in-position doctrine").

| Tier ([Average Daily Population]) | Audio (Permanent) (Per minute) | | Video (Interim) (Per minute) | |
|---|---|---|---|---|
| | Current Caps | New Caps | Current Caps | New Caps |
| **Prisons** (any pop.) | $0.14* | $0.06 | N/A | $0.16 |
| **Large Jails** (1000+) | $0.16* | $0.06 | N/A | $0.11 |
| **Med. Jails** (350-999) | $0.21 | $0.07 | N/A | $0.12 |
| **Small Jails** (100-349) | $0.21 | $0.09 | N/A | $0.14 |
| **Very Small Jails** (0-99) | $0.21 | $0.12 | N/A | $0.25 |

*Order* ¶ 4 (JA1489) (the rates marked with an asterisk included a $0.02 per-minute markup then in place for facility costs).

## 2. Ratemaking methodology

The Commission derived these rate caps based in part on two key methodological determinations. First, recognizing that "Congress has imported section 201(b)'s 'just and reasonable' standard into section 276(b)(1)(A)," the Commission concluded that it would determine what costs are compensable in IPCS rates by applying the "used-and-useful" ratemaking framework, which the FCC and other agencies have long and widely used to determine just and reasonable rates. *Order* ¶ 41 (JA1510); *see id.* ¶¶ 41–48 (JA1510–1514). Under this standard, the agency "exclude[s] . . . any costs that do not benefit [end] users," whether because those costs were incurred imprudently or because they do not support the regulated service. *Id.* ¶ 43 (JA1511). Second, citing its new "explicit authority to use 'industry-wide average costs'" in implementing

section 276, *Order* ¶ 68 (JA1521) (citing MWR Act § 3(b)(1)), the Commission elected to "adopt rate caps based on industry-wide cost data submitted by IPCS providers in response to the Commission's 2023 . . . Data Collection," *id.*; *see id.* ¶¶ 71, 120 (JA1523, 1545).

Using these data, the Commission first determined the bounds of a "zone of reasonableness" for each IPCS rate tier. *Order* ¶ 128 (JA1551); *see id.* ¶¶ 189–206 (JA1591–1600). It set the upper limit of each zone of reasonableness by considering all costs that providers reported—even costs not "used and useful" to the provision of IPCS. *Id.* ¶ 161 (JA1575); *see id.* ¶¶ 190–197 (JA1592–1595).[4] To establish each lower limit, it excluded costs that it found were not used and useful. *See Order* ¶ 160 (JA1575).

The FCC then set caps for per-minute rates at each facility tier within those bounds. *See Order* ¶ 207 (JA1600). In choosing where within the zone of reasonableness for a given tier to set the rate caps, the agency explained that the lower bound "operate[d] as a more accurate reference" for providers' used-and-useful costs. *Id.* ¶ 209 (JA1600). This was in large

---

[4] The Commission added an additional $0.02 per minute to that total to account for any used-and-useful costs incurred directly by correctional facilities. *Order* ¶ 179 (JA1584); *see also below* pp. 19–21 (discussing facility-incurred costs).

part because "providers' reported costs [were] likely inflated." *Id.* ¶ 210 (JA1601). For example, industry-reported costs exceeded reported revenues by $219 million (over 16 percent of revenue), meaning that, if those costs were accurate, the IPCS industry was unprofitable. *See id.* ¶ 210 (JA1601); *id.* App. F ¶ 18 (JA2507). The Commission doubted that could be true when IPCS providers operate as monopolists at the facilities they serve. *Id.* ¶ 210 (JA1601); *see id.* App. F. ¶¶ 19–21 (JA2507–2508). The agency nevertheless chose a rate cap above the lower bounds of the zones of reasonableness "to minimize reliance on . . . imperfect data." *Id.* ¶ 213 (JA1603).

The Commission also made clear that in any "exceptional" instance in which a provider "cannot recover [its] cost of service," the provider may seek a waiver of the rate caps under a process set out in the *Order. Id.* ¶ 479 (JA1737); *see id.* ¶¶ 475–481 (JA1735–1738).

### 3. Safety and security costs

In applying the used-and-useful framework to derive the rate caps, the Commission recognized that IPCS differs from other communications services in part because "certain safety and security measures [are] needed to adapt communications services to the carceral context." *Order* ¶ 339 (JA1664). For that reason—and pursuant to Congress's directive to

"consider costs associated with any safety and security measures necessary to provide" IPCS, MWR Act § 3(b)(2)—the FCC considered extensive comments on safety and security measures implemented by IPCS providers, and it thoroughly analyzed the data collected from providers on the costs of those measures. *See Order* ¶¶ 347–407 (JA1669–1705).

The most recent data gave the Commission, "for the first time[,] a comprehensive picture of the dominant role that the costs of safety and security measures now play in the IPCS industry's cost structure." *Order* ¶ 352 (JA1670). The Commission observed that "the purposes and scope" of IPCS safety and security measures have "evolved" over several decades. *Id.* ¶ 373 (JA1681). Whereas such measures once "simply facilitat[ed] the provision of voice communications in correctional institutions," they now include, for example, services to "assist law enforcement in investigating potential criminal activity and building cases, [to] create reports for facilities and law enforcement, [to] analyze data, and [to] store records for use in court." *Id.*

On this record, the Commission concluded that "[s]afety and security measures that do not facilitate the provision of underlying communications services . . . are not used and useful." *Order* ¶ 374

(JA1683). And under the used-and-useful framework, the Commission concluded that allowing recovery through rates of "the costs of measures . . . not used and useful in the provision of IPCS . . . would be inconsistent" with its mandate to "ensure just and reasonable . . . rates for incarcerated people and their loved ones." *Id.*; *see id.* ¶ 390 (JA1693). The cost of services for law enforcement, the Commission explained, "would more appropriately be paid for directly by [correctional facilities]." *Id.* ¶ 346 (JA1668); *see id.* ¶ 374 (JA1683).

By applying the used-and-useful framework, the agency ensured that the costs included in IPCS rate caps for safety and security measures are limited to costs for measures "necessary" to the provision of IPCS. *See Order* ¶¶ 369–370 (JA1679–1680). The Commission considered each of the seven categories of data submitted in the 2003 Data Collection: (1) CALEA compliance measures,[5] (2) law enforcement support services, (3) communications security services, (4) communication recording services, (5) communication monitoring services, (6) voice biometrics

---

[5] Under the Communications Assistance for Law Enforcement Act (CALEA), 47 U.S.C. § 1001 et seq., all telecommunications providers must be able to accommodate certain authorized requests from law enforcement to monitor communications. *See Order* n.1387 (JA1692).

services, and (7) other safety and security measures. *See Order* ¶¶ 348–349, 384–407 (JA1669–1670, 1690–1705). Through this review, it identified security measures that are "inherent" in providing communications for incarcerated people—like restricting the telephone numbers they may call, or preventing unpermitted three-way communications. *See id.* ¶¶ 395–397 (JA1698–1699). It determined, however, that other measures—like those associated with processing search warrants, or with recording and monitoring communications to gather information for prosecutors—serve purposes unconnected to the actual provision of communications services. *E.g.*, *id.* ¶¶ 394, 398, 401 (JA1696, 1700, 1702) (JA2313 (sealed version)). Accordingly, in setting the lower bounds of the zones of reasonableness for the IPCS rate caps, the Commission excluded costs for these other measures. *See id.* ¶ 385 (JA1690).

### 4. Facility costs

Commenters primarily representing correctional institutions argued that facilities incur costs in enabling incarcerated people's access to IPCS that should be considered in ratesetting (and, presumably, reimbursed to facilities by providers). *Order* ¶ 165 (JA1576). But the

available record data did not allow the FCC to quantify these asserted costs "with any level of exactitude." *Id.*

This "issue [was] not new." *See Order* ¶ 165 (JA1576). The agency had asked in 2020 and 2021, and again in 2023, for data on costs incurred by facilities in connection with the provision of ICPS. *Id.* However, facilities and providers failed to provide such data, or even to propose a methodology that might accurately estimate used-and-useful costs that correctional facilities purportedly incur. *Id.* Instead, the National Sheriffs' Association resubmitted a 2015 cost survey that the FCC had already found problematic, and which reflected costs that, in the agency's view, are "for the most part cost[s] of operating prisons and jails, not [of] providing communication service." *Id.* ¶ 174 (JA1581) (cleaned up).

This state of the record, the Commission found, "warrant[ed] an adverse inference that actual information" on facility costs "would not support" allowing the recovery of those costs through regulated rates. *Order* ¶ 166 (JA1577). The Commission accordingly did not include any estimate of such costs in calculating the lower bounds of the zones of reasonableness for the rate caps. *See id.* However, "out of an abundance of caution," the Commission took several steps to "account" for any used-and-useful costs that correctional facilities "may incur . . . in allowing

access to IPCS." *Id.* It included a $0.02 per-minute allowance for such costs in calculating the upper bounds of the zones of reasonableness (deriving that figure from the National Sheriffs' Association 2015 cost survey), *id.* ¶¶ 166–169 (JA1577–1579), and it chose rate caps above the lower bounds, *id.* ¶¶ 180–182 (JA1585). Finally, it allowed providers to reimburse facilities for any used-and-useful costs that facilities actually incur in the provision of IPCS. *Id.* ¶ 181 (JA1585); *see id.* ¶ 268 (JA1631).

### 5. Site commissions

The Commission found that, despite the FCC's earlier attempted reforms, site commissions "continue to exert 'upward pressure' on [IPCS] rates," sometimes accounting for "more than 70 percent" of what consumers pay. *Order* ¶¶ 252–253 (JA1622–1623). As explained above (at pp. 19–21), the *Order* allows providers to reimburse correctional facilities for any used-and-useful costs that facilities incur in enabling IPCS. *See id.* ¶ 268 (JA1631). With that exception, however, the Commission for the first time disallowed all other forms of payment from providers to facilities. *Id.* ¶ 242 (JA1616).

To that end, the Commission adjusted its use of the term "site commission." Traditionally, the term referred to "any form of monetary payment, in-kind payment requirement, gift, exchange of services or

goods, fee, technology allowance, product or the like" that facilities received from IPCS providers. *Order* ¶ 248 (JA1619). In the *Order*, the Commission "separate[d] out from [the] definition of 'site commissions' the reimbursement IPCS providers make to correctional facilities for [used-and-useful] costs [that] facilities incur." *Id.* ¶ 278 (JA1635).

The term "site commission" now means only other payments from providers to facilities, *id.*—payments that the Commission explained "primarily compensate correctional facilities for the transfer of their market power over IPCS at a given facility," *id.* ¶ 281 (JA1636). The record showed that these site commissions often fund "a wide and disparate range of activities" unrelated to the provision of IPCS, including funding a state's general treasury or even contributing to "influential sheriff-led associations." *Id.* ¶ 251 (JA1621) (internal quotation marks omitted).

Because site commissions are not used-and-useful costs, *e.g.*, *Order* ¶ 287 (JA1639), the Commission excluded them from the calculation of its rate caps, *id.* ¶ 269 (JA1631). But it determined for two reasons that simply excluding site commissions from rate caps was not, alone, sufficient to meet the dual mandates of section 276(b)(1)(A) that rates be

"just and reasonable" and that providers be "fairly compensated." 47 U.S.C. § 276(b)(1)(A); *see Order* ¶¶ 295–335 (JA1643–1662).

First, so long as facilities are able to demand site commissions and IPCS providers are required or permitted to pay them—whether with excess revenue from IPCS rates or otherwise—site commissions will continue to introduce "competitive distortions in the bidding market for IPCS," *Order* ¶ 296 (JA1643), and "exert[] 'upward pressure' on IPCS rates," to the detriment of "IPCS consumers," *id.* ¶ 297 (JA1643). Second, if state and local authorities by law, or correctional facilities by contract, are able to require IPCS providers to pay site commissions as a condition precedent to doing business, while providers are unable to recover the cost of those payments through IPCS rates, IPCS providers would likely assert that the Commission has not complied with the statutory "fair compensation" mandate as interpreted in *Global Tel*Link. See id.* ¶ 315 (JA1654).

Thus, the Commission "preempt[ed] state and local laws and regulations requiring [site] commissions," pursuant to the express preemption provision of section 276(c) and principles of conflict preemption. *Order* ¶ 3 (JA1488); *see id.* ¶¶ 313–329 (JA1652–1659). It also "prohibit[ed] providers from entering into contracts allowing or

requiring them to pay site commissions associated with IPCS." *Id.* ¶ 330 (JA1659); *see id.* ¶¶ 330–338 (JA1659–1664).

### 6. Other matters

#### a. Ancillary service charges

The FCC prohibited separately assessed "ancillary service charges," such as fees for credit card payments, live-agent interactions, paper billing statements, and third-party financial transactions. *Order* nn.25 & 27 (JA1492); *see id.* ¶¶ 408–426 (JA1705–1714). Ancillary service charges "have been a continuous source of confusion and gamesmanship," "significantly increasing the costs of IPCS" by as much as 40 percent. *Id.* ¶ 409 (JA1706); *see also Global Tel*Link*, 866 F.3d at 415 (ancillary service charges can serve as a "loophole" to rate caps). However, the Commission recognized that some types of ancillary services are "an inherent part of providing [IPCS]." *Order* ¶ 415 (JA1708) (internal quotation marks omitted). It therefore included the reported costs of such ancillary services in setting the rate caps. *Id.* ¶ 414 (JA1708).

The Commission prohibited assessing separate fees for ancillary services, however, which providers had often done previously. This prohibition, the Commission explained, would prevent providers from continuing to engage in "rent-seeking activity," *Order* ¶ 419 (JA1711),

such as "charg[ing] multiple fees for the same transaction"—"a problem . . . well-documented in the record," *id.* ¶ 418 (JA1709). In addition, the Commission found that including the cost of ancillary services within the rate caps would be easier for consumers to understand and providers to administer. *Id.* ¶ 421 (JA1712).

### b. Differing state rate caps

The Commission preempted state and local laws or regulations that require IPCS rates above the new and revised federal rate caps. *Order* ¶ 223 (JA1609); *see id.* ¶¶ 223–241 (JA1609–1616). The agency declined, however, to preempt state or local requirements for IPCS rates lower than the federal caps. *Id.* ¶ 235 (JA1613). The Commission reasoned that lower rates do not conflict with federal caps that establish "ceilings, rather than floors" for IPCS rates, and that were derived using a "zone of reasonableness" approach. *Id.* ¶ 237 (JA1615). Furthermore, the Commission explained, state or local laws that require lower rates may reflect local cost data and conditions not captured, on a "disaggregated basis," in the FCC's nationwide analysis. *Id.* ¶ 236 (JA1614). The Commission made clear, however, that if a provider can demonstrate that a lower state rate leads to unfair compensation, it may seek "relief in the

relevant state or locality" or "submit[] a petition for preemption" to the FCC. *Id.* ¶ 239 (JA1615).

### c.  Alternate pricing plans

"[T]o safeguard consumers from potentially unreasonable rates and practices," the Commission's rules for interstate and international audio IPCS have "traditionally required IPCS providers to charge" consumers "on a per-minute basis," and have "prohibited providers from using 'flat-rate calling' that would require consumers to pay a flat rate per call regardless of the length of the call." *Order* ¶ 427 (JA1714). Recognizing "marketplace developments" in recent years, however, the Commission "permit[ted] IPCS providers to offer . . . IPCS via optional 'alternate pricing plans,' subject to clearly defined safeguards." *Id.*; *see id.* ¶¶ 432–471 (JA1718–1734). Accordingly, it also rescinded its former rule prohibiting flat-rate calling. *Id.* ¶ 465 (JA1731).

### d.  Petitions for clarification and waiver

In a brief portion of the *Order*, the Commission resolved two petitions from provider Securus Technologies, LLC, concerning the agency's then-existing IPCS rules. *See Order* ¶¶ 604–607 (JA1796–1797). The Commission dismissed as moot in light of its ban on site commissions Securus's petition for clarification on whether providers may pay some

site commissions under certain conditions. *Order* ¶ 604 (JA1796); *see* Securus Clarification Pet. at 1 (JA212). The Commission likewise dismissed as moot and otherwise denied a petition for waiver of the former ban on alternate pricing plans, in light of the new allowance for such plans. *Order* ¶ 606 (JA1796); *see* Securus Waiver Pet. at 1 (JA203); *see above* p. 26.

## F.    Procedural History

The FCC released the *Order* on its website on July 22, 2024. Notice of the paragraphs of the *Order* addressing Securus's petitions for clarification and waiver was published in the Federal Register on August 26, 2024. 89 Fed. Reg. 68,369. By happenstance, notice of the remainder of the *Order* was not published in the Federal Register until September 20. 89 Fed. Reg. 77,244.

Within 10 days from Federal Register publication of the first portion of the *Order*, four parties filed petitions for review. Securus first petitioned for review in the Fifth Circuit, arguing that the "denials of its clarification and waiver petitions" were unlawful. 8/30/2024 Pet. for Review of Securus at 2 (Entry ID 6670737). Three more parties—DARE, the Pennsylvania Prison Society, and the Criminal Justice Reform Clinic (collectively, the Public Interest Petitioners or Advocates)—then filed

petitions for review in the First, Third, and Ninth Circuits. *See* JPML Notice (Entry ID 6670727) (schedule). The Public Interest Petitioners said that, "in the event that the Order [was] deemed [already] reviewable," they wished to challenge its "key substantive provisions." 9/5/2024 Pet. for Review of DARE at 1–2 (Entry ID 6665820); *see* 9/5/2024 Pet. for Review of the Criminal Justice Reform Clinic at 2 (Entry ID 6670733); 9/4/2024 Pet. for Review of the Pennsylvania Prison Society (Entry ID 6670740). Pursuant to 28 U.S.C. § 2112(a)(3), the FCC forwarded all four petitions to the Judicial Panel on Multidistrict Litigation (Judicial Panel). *See* JPML Notice.

On September 18, 2024, the Judicial Panel by random lottery selected this Court to hear challenges to the *Order*. *See* JPML Notice (attachment) (containing the consolidation order for MCP No. 191). Accordingly, the three petitions filed elsewhere were transferred to this Court, and all four cases were consolidated as case No. 24-8028.

Meanwhile, after the remainder of the *Order* was published in the Federal Register on September 20, 2024, the original petitioners and others filed additional petitions for review in seven different circuits. All of these cases have been consolidated in this Court, apart from one case

that was voluntarily dismissed. *See Fines and Fees Justice Center Inc. v. FCC*, No. 24-2611 (2d Cir.) (dismissed Feb. 11, 2025).

On September 27, 2024, Securus asked this Court to transfer all the consolidated cases to the Fifth Circuit. 9/27/2024 Securus Transfer Mot. (Entry ID 6670732). Arguing that it was the only party aggrieved by the first-published portion of the *Order*, Securus urged this Court to "exercise its discretion" under 28 U.S.C. § 2112(a)(5) "to transfer [the] consolidated petitions" to the Fifth Circuit "in the interest of justice." *Id.* at 8. After full briefing, this Court denied the requested transfer without prejudice. *See Transfer Denial Order* (Entry ID 6675812).

The Court on October 3, 2024, ordered the Public Interest Petitioners in cases 24-1814, 24-1859, and 24-1861—all filed before Federal Register publication of the large substantive portion of the *Order*—to show cause why those cases should not be dismissed for lack of jurisdiction. *E.g.*, *October 4 Order to Show Cause* (Entry ID 6672177). In response, the government stated that, because these petitioners did not claim to be aggrieved by the first-published portion of the *Order*, their initial petitions were incurably premature and should be dismissed. *See* Gov't Resp. to Show Cause Orders at 6 (Entry ID 6675294). The government stated, however, that the Court had jurisdiction to review

their later petitions, which addressed the later-published remainder of the *Order*. *Id.* On November 13, 2024, the Court ruled that "this matter [would] proceed, with the issues flagged in the order[s] to show cause reserved to the ultimate merits panel." *November 13 Order to Proceed* (Entry ID 6681156).

Meanwhile, Securus and Pay Tel each moved for a stay pending judicial review of the FCC's *Order*. On November 18, 2024, after full briefing, the Court denied them both. *Securus Stay Denial Order* (Entry ID 6682036); *Pay Tel Stay Denial Order* (Entry ID 6682034).

Two days later, Securus renewed its motion for transfer to the Fifth Circuit, and Pay Tel filed a separate motion seeking the same relief. The Court denied those motions without prejudice on December 9, 2024, directing the parties to "address all relevant gating matters, including the venue issues," in briefing to the merits panel. *December 9 Second Transfer Denial Order* (Entry ID 6686253).

On December 13, 2024, Securus and Pay Tel sought a Supreme Court writ of mandamus ordering this Court to transfer these cases to the Fifth Circuit. The Supreme Court denied that petition on February 24, 2025.

# STANDARD OF REVIEW

In deciding whether agencies have acted within their statutory authority, "[c]ourts must exercise their independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits," however, "courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413. This Court "fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (cleaned up); *see Sutherland v. Peterson's Oil Serv., Inc.*, 126 F.4th 728, 738 n.5 (1st Cir. 2025).

The APA's arbitrary and capricious standard, 5 U.S.C. § 706, "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). With respect to the parties' APA challenges here, the *Order* is entitled to an even greater level of deference than most agency orders. This is because ratemaking decisions are normally granted "considerable legal leeway," *Boston Edison Co.*, 885 F.2d at 964, in recognition that "ratemaking is far from an exact science and involves policy determinations in which the

agency is acknowledged to have expertise," *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999) (internal quotation marks omitted).

Constitutional challenges are reviewed *de novo. E.g.*, *United States v. Morales-de-Jesus*, 372 F.3d 6, 8 (1st Cir. 2004).

## SUMMARY OF THE ARGUMENT

**I.A.** In the Martha Wright-Reed Act, Congress required the Commission to ensure not only that IPCS providers are "fairly compensated," but also that IPCS rates are "just and reasonable." 47 U.S.C. § 276(b)(1)(A). By using these very general terms, Congress gave the Commission flexible ratemaking authority, which easily supports the agency's use of the "used-and-useful" framework to determine compensable costs. And in applying this framework, the Commission fulfilled its duty to consider the safety and security costs "necessary" to the provision of IPCS. MWR Act § 3(b)(2). Considering those costs is a task that Congress delegated to the agency, not to correctional authorities, which have no experience or role in regulating communications services.

**I.B.** In the Martha Wright-Reed Act, moreover, Congress expressly invited the Commission to "use industry-wide average costs" in setting rates. MWR Act § 3(b)(1). Congress also struck the "per call" and "each

and every [call]" requirements of the former version of section 276(b)(1)(A), which the D.C. Circuit in *Global Tel*Link* had interpreted as preventing the Commission from using "industry-wide" cost averaging. 866 F.3d at 414. Thus, the Commission permissibly used industry-wide average cost data to formulate rate caps, which provide both "fair[] compensat[ion]" and "just and reasonable" rates.

**II.** The Commission reasonably applied the used-and-useful framework to determine which categories of IPCS safety and security costs to include in the lower bounds of the zones of reasonableness for its IPCS rate caps. The agency carefully considered an extensive record and reasonably explained why it considered only two categories of reported safety and security costs predominantly used and useful in providing IPCS: those associated with "communications security services" and with "CALEA compliance." *Order* ¶¶ 383–407 (JA1690–1705). In doing so, the Commission expressly accounted for the need to provide IPCS safely. And although the cost data in the record were imperfect, the Commission had ample evidence supporting its decisions.

**III.** The Commission persuasively explained why site commissions, which "primarily compensate correctional facilities for the transfer of their market power over IPCS," *Order* ¶ 281 (JA1636), are

"fundamentally incompatible" with the dual mandates of section 276(b)(1)(A) to ensure just and reasonable rates and fair compensation, *Order* ¶244 (JA1617). (After all, provider payments to facilities that reimburse for used-and-useful costs are no longer considered site commissions.) The Commission therefore banned IPCS providers from contracting to pay site commissions. It also preempted state and local laws and regulations requiring or permitting site commissions, invoking the express preemption provision of section 276(c) and principles of conflict preemption. All of these actions were within the agency's statutory authority.

**IV.** In the FCC's IPCS proceedings, correctional authorities have long claimed that some portion of the payments they have historically received from IPCS providers reimburse for actual costs incurred in allowing access to IPCS. Although the Commission has repeatedly asked for supporting data, the record here did not conclusively demonstrate the level of such costs. To account for any used-and-useful costs that facilities do incur, the Commission incorporated a $0.02 per-minute allowance into the upper bounds of the zones of reasonableness. It also chose rate caps above the lower bounds, and it permitted providers to reimburse facilities for used-and-useful costs that the facilities actually incur. The

Commission's approach, based on the record, was reasonable, and neither the States nor the Public Interest Petitioners have shown otherwise.

**V.** The petitioners' other arguments are unpersuasive:

**A.** In an exercise of its expert ratemaking judgment, the Commission reasonably elected to calculate the *Order*'s per-minute rate caps by dividing the providers' annual total expenses by total minutes of use, both billed and unbilled, to more accurately represent the cost of service.

**B.** In another reasonable judgment based on the record before it, the Commission incorporated the reported costs of ancillary services—such as credit-payment or live-agent services—directly into the IPCS rate caps and banned IPCS providers from charging separate fees for those services. The agency thus ensured compensation for measures that are an intrinsic part of providing IPCS, while guarding against practices that circumvent the Commission's rate caps.

**C.** Contrary to the contention of Petitioners Pay Tel Communications, Inc. and Securus Technologies, LLC (Providers), the Commission was not statutorily required, on this record, to preempt state laws that set IPCS rates below the *Order*'s rate caps. Lower rates, by definition, do not conflict with the Commission's "caps" on rates.

**D.** The Commission reasonably concluded that alternate pricing plans benefit IPCS consumers and adopted measures that will adequately protect those consumers.

**E.** The Court should not reach the merits of the constitutional claim—raised by the petitioning states and related parties (States)—that "the structure of the FCC" is unconstitutional under the Take Care Clause, U.S. Const. art. II, § 1, cl. 1. Neither the States nor any other party gave the FCC an "opportunity to pass" on that claim. 47 U.S.C. § 405(a). In any event, the States have made no showing to prove their claim.

**VI.** Venue in this Court is proper. There is no dispute that, after the FCC received four petitions for review of the *Order* within 10 days from Federal Register publication of the first portion of the *Order*, the agency and the Judicial Panel complied with the statutory process. *See* 28 U.S.C. § 2112(a) (setting out the lottery selection process). The Providers' recently developed theory that no lottery was required because public notice purportedly occurred upon the *Order*'s release on the FCC's website misinterprets the FCC rule governing public notice. *See* 47 C.F.R. § 1.4(b).

## ARGUMENT

## I. THE RATEMAKING METHODOLOGY ADOPTED IN THE *ORDER* FALLS EASILY WITHIN THE COMMISSION'S CLARIFIED AND EXPANDED STATUTORY AUTHORITY

The States and the Providers contend that the Commission's reliance on the used-and-useful standard exceeded its statutory authority. *See* Providers Br. 40–41; States Br. 21–23; *see also* Br. for Intervenor National Sheriffs' Association (Sheriffs) 7–8. In addition, the Providers argue that the Commission's reliance on industry-wide average costs violated the "fair[] compensat[ion]" requirement of the statute. *See* Providers Br. 31. These challenges to the Commission's ratemaking methodology are unavailing, particularly given the clarified and expanded authority that Congress delegated to the Commission in the Martha Wright-Reed Act.

### A. In Directing The FCC To Ensure "Just And Reasonable" Rates And "Fair" Compensation, The Statute Provides Ample Flexibility To Support The Used-And-Useful Standard

To formulate the IPCS rate caps adopted in the *Order*, the Commission relied on its experience setting rates for interstate and foreign telecommunications. Section 201(b) of the Communications Act authorizes the FCC to ensure that charges for interstate and international telecommunications are "just and reasonable." 47 U.S.C.

§ 201(b). The Commission has for decades implemented section 201(b)'s standard with the used-and-useful framework, which it uses to set rates based on providers' costs. *Order* ¶¶ 41–43, 275 (JA1510–1511, 1633). This "balances the equitable principle that public utilities must be compensated for the use of their property in providing service to the public with the [equally] central . . . equitable principle that . . . ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them." *Id.* ¶ 42 (JA1510) (alterations in original; internal quotation marks omitted); *see id.* ¶ 48 (JA1514); *see also City of Houston v. Sw. Bell Tel. Co.*, 259 U.S. 318, 324 (1922) ("the proper base for rate-making . . . is the fair value of the property, useful and used by the Company").

In the Martha Wright-Reed Act, Congress borrowed language from section 201(b) and amended section 276 to include the requirement that IPCS "rates and charges" be "just and reasonable." MWR Act § 3(b)(2). Given the well-recognized historical link between the used-and-useful framework and the Commission's implementation of the "just and reasonable" standard under section 201(b), *e.g.*, Providers Br. 34, the Commission determined in the *Order* that it would likewise apply the

used-and-useful framework to set rate caps for IPCS. *Order* ¶ 41 (JA1510).

The Commission found that the used-and-useful framework, which accounts for costs that benefit consumers by facilitating service, fulfills the agency's obligation to "consider costs associated with any safety and security measures necessary to provide" IPCS. *Order* ¶ 370 (JA1680) (quoting MWR Act § 3(b)(2)); *see id.* ¶ 46 (JA1513). At the same time, the framework "ensure[s] that IPCS consumers do not bear the costs of those safety and security measures . . . not necessary to provide IPCS." *Id.* ¶ 47 (JA1514).

The Commission's conclusion that the used-and-useful standard fulfills section 276's dual mandates of "just and reasonable" IPCS rates and "fair[]" compensation is well within the scope of the "discretion" that Congress granted the agency by using those "flexib[le]" phrases. *Loper Bright*, 603 U.S. at 394–95; *see id.* at 404, 413.

> **1. In determining what costs to include in the IPCS rate caps, the Commission lawfully applied the used-and-useful standard to consider "necessary" safety and security measures**

Both the Providers and the States contend that the Commission's reliance on the used-and-useful standard in the *Order* did not satisfy its

obligation to "consider costs associated with safety and security measures necessary to provide" IPCS. MWR Act § 3(b)(2). The Providers contend that "[w]hether a safety and security measure is 'used and useful' does not answer whether it is 'necessary' to provide IPCS, which is the question Congress directed the FCC to answer." Providers Br. 40. They and the States make a related argument that relying on the used-and-useful standard, without specifically "opin[ing] on the necessity of safety and security measures," *id.* at 39, fails to comply with section 3(b)(2) of the Act, *see id.* at 38–40; *see* States Br. 22. These claims are meritless.

At the outset, the Commission made clear that the used-and-useful framework would account for its obligation to consider necessary safety and security measures. *See, e.g., Order* ¶ 48 (JA1514) ("In applying that [used-and-useful] framework, along with the 'necessary' standard that section 3(b)(2) of the Martha Wright-Reed Act specifies . . . , we discharge our statutory duties . . . .").

Beyond that, the agency explicitly defined the term "necessary" to mean "'that which is required to achieve a desired goal.'" *Order* ¶ 365 (JA1676). Here, that "desired goal" is providing IPCS, *i.e.*, "telephone service and advanced communications services to incarcerated people." *Id.* ¶ 366 (JA1677) (internal quotation marks omitted); *see* 47 U.S.C.

§ 276(d) (defining regulated "payphone service" to include "inmate telephone service and advanced communications services"). In sum, "for a safety and security measure to be necessary, it must be required for the provision of communications services in correctional institutions." *Id.* ¶ 366 (JA1677).

The Commission further explained that the function of the used-and-useful standard is to "separate the costs that captive ratepayers should pay for regulated services from those that are either properly attributable to other products or services or [are] excessive." *Order* ¶ 48 (JA1514). In other words, the framework operates to weed out costs not necessary to the provision of the regulated service. By the same token, it includes all costs, including safety and security costs, that are necessary to that function.

Finally, the Commission's thorough examination of safety and security costs, *see Order* ¶¶ 339–407 (JA1664–1705), including each individual category of providers' cost data, *id.* ¶¶ 391–407 (JA1694–1705), shows that the Commission carefully evaluated the extent to which each cost category is required to provide IPCS, *see below* pp. 53–55. The Providers' and States' attempt to manufacture a discrepancy between the requirement to "consider costs" "necessary" to service and

the used-and-useful framework ignores the Commission's analysis. By employing the useful-and-useful framework, the Commission fully considered the costs "necessary" to providing IPCS.[6]

### 2. Congress directed the Commission, not correctional facilities, to consider the safety and security measures necessary to provide IPCS

The Providers further claim that the used-and-useful standard "cannot be exported from its historical public utility context . . . to the IPCS context" because "there are two customers in the IPCS context," end users and correctional officials. Providers Br. 40–41. "[I]t is those officials," the Providers contend, "who determine the safety and security measures that providers must implement in their services." *Id.* at 41. But the Martha Wright-Reed Act directs the FCC, not correctional officials, to "consider" the costs of safety and security measures "necessary" to providing IPCS, a role well-suited to the agency's expertise in communications. *See Order* ¶ 362 (JA1674); MWR Act § 3(b)(2).

---

[6] In the statement from footnote 1316 of the *Order* on which the Providers rely (at 39) for their assertion that the Commission did not "opine on the necessity of safety and security measures that correctional facilities may implement," the Commission was merely making clear that correctional facilities are free to implement any safety and security measures they like, as long as they do so at their own cost.

The Providers' reading—which would include in IPCS rates all safety and security costs that correctional officials assert are needed to provide IPCS—would be "an anomalous approach to ratemaking," "effectively eliminat[ing]" the FCC's role in determining just and reasonable rates and "instead[] plac[ing] that role in the hands of the providers and facilities." *Order* ¶ 362 (JA1674). Indeed, such an approach might well raise constitutional private delegation concerns. *See id.* n.1291 (JA1675).

The Commission's straightforward reading of section 276, which raises no such concerns, is consistent with the broader statutory context. Section 4 of the Martha Wright-Reed Act states that nothing in the Act "shall be construed to . . . prohibit the implementation of any safety and security measures related to" IPCS. MWR Act § 4. If the FCC were required to include in rates the costs of every "safety and security" measure sought by correctional officials or implemented by providers, that guidance would be unnecessary. Section 4 only makes sense if the FCC has discretion to exclude some such costs in ratesetting, while leaving correctional officials free to implement, at their own expense, any

safety and security measures they deem appropriate. *Order* ¶¶ 54–55 (JA1516–1517).[7]

### 3. The used-and-useful standard is consistent with the requirement that providers be "fairly compensated"

The Providers contend that the Commission violated the statutory requirement to "fairly compensate[]" providers, as interpreted by the D.C. Circuit in *Global Tel*Link*, *see* 866 F.3d at 413, by "excluding from the lower bound of [the *Order*'s] zone of reasonableness safety and security and facility costs that jails and prisons require IPCS providers to incur." Providers Br. 37–38. The cost of any such services, the Providers argue, "obviously are costs of doing business incurred by I[P]CS providers" that the Commission is required to treat as compensable in IPCS rates. *Id.* at 37 (quoting *Global Tel*Link*, 866 F.3d at 413).

Whatever the correctness of the court's interpretation of section 276 in *Global Tel*Link* before the Martha Wright-Reed Act's amendments, it plainly does not reflect the best reading of the statute now. As amended,

---

[7] For these same reasons, contrary to an assertion of the National Sheriffs' Association, nothing in the Martha Wright-Reed Act required the Commission to give safety and security costs "special attention in the ratemaking process." Sheriffs Br. 5. Rather, the Act requires the agency only to "consider" the costs of such measures "necessary to provide" IPCS. MWR Act § 3(b)(2).

Section 276 requires the Commission not only to ensure that providers are "fairly compensated," but also to ensure that rates for consumers are "just and reasonable." 47 U.S.C. § 276(b)(1)(A). And Congress directed the Commission to "consider" the safety and security costs "necessary to provide" IPCS. MWR Act § 3(b)(2).

Moreover, the concern of the majority in *Global Tel*Link* that facilities could force IPCS providers to implement gold-plated security services, or make site commission payments, as a "condition precedent" to doing business, 866 F.3d at 413—a concern the Providers echo (at 37)— is now obsolete. The Commission has barred providers from paying site commissions and preempted state and local laws allowing or requiring site commissions. *See below* Part III. This ban includes "in kind" payments, such as offering services for free. *Order* ¶ 201 (JA1597). Facilities thus cannot require, and providers may not implement, services for free as a condition of providing IPCS.

## B. Using Industry-Wide Average Cost Data To Formulate The Rate Caps Was Fully Consistent With The Statute

In developing its revised compensation plan for IPCS, the Commission acknowledged the need to "give full effect to both the 'just and reasonable' and the 'fairly compensated' clauses in section

- 45 -

276(b)(1)(A)." *Order* ¶ 60 (JA1518); *accord id.* ¶ 65 (JA1520). The used-and-useful framework is well suited to doing so, balancing the "principle that . . . ratepayers may not fairly be forced to pay a return except on investment which can be shown directly to benefit them" with the corresponding need to compensate "public utilities" "for the use of their property in providing service to the public." *Id.* ¶ 42 (JA1510) (internal quotation marks omitted).

To give both mandates meaning, the Commission explained, one cannot be subordinated to the other. *See Order* ¶ 66 (JA1521). Moreover, proper interpretation should take into consideration the Martha Wright-Reed Act's deletion of the "per call" and "each and every [call]" language of the former version of section 276(b)(1)(A), as well as the express grant of authority for the Commission to use "industry-wide average costs" in ratesetting. *Id.* ¶¶ 67–68 (JA1521).

With these principles in mind, the Commission concluded that the requirement for "fair compensation" does not mean that every provider—including those with "unusually high costs," *Order* n.234 (JA1523), those that make imprudent investments, or those that treat expenses related to other aspects of their businesses as "IPCS" costs, *see id.* ¶¶ 219–220 (JA1607)—must necessarily be "profitable," *see id.* ¶ 219 (JA1607).

Indeed, requiring consumers to pay supra-competitive rates would not be "just and reasonable." *See id.* Rather, the Commission determined, providers are "fairly compensated" if they have the "opportunity to recover the industry average of . . . costs on a company-wide basis." *Id.*; *accord id.* ¶ 71 (JA1523).

Consistent with this understanding, the Commission established its new rate caps using industry-wide data about providers' costs. *Order* ¶¶ 72, 120 (JA1523, 1545). Because the new rate caps "reflect . . . the industry average costs incurred to provide IPCS," the FCC determined that the caps provide "fair compensation" to all providers. *Id.* ¶ 220 (JA1607).

### 1. The Commission's approach allows fair compensation for "all" providers

The Providers argue that the Commission's approach improperly "reads . . . out of the statute" the requirement that "all" IPCS providers be fairly compensated. Provider Br. 34. Not so. The Commission's new rate caps *do* ensure that "all" providers will be "fairly compensated" by including the used-and-useful costs of service, i.e., the actual costs incurred in providing service. "Fair compensation" should not instead be read to include other, extraneous costs of no benefit to ratepayers. *See*

*Order* ¶ 219 & nn.777, 778 (JA1607); *cf.* MWR Act § 3(b)(2) (requiring consideration of safety and security costs "necessary to provide" IPCS). Put differently, it is the Providers who read the word "fairly" out of the statute, rewriting it to require "profitable" compensation, even when a provider has incurred unnecessary or imprudent costs.

The Providers assert that the FCC's approach is inadequate because rate caps are "below cost for one-third of IPCS providers." Provider Br. 34. But those four of twelve providers account for only 4 percent of all IPCS minutes, while the remaining providers, accounting for 96 percent of IPCS minutes, will accrue revenue above their reported allowable costs. *See Order* ¶ 216 (JA1605). And as the *Order* points out, there is good reason to think that those reported costs are inflated. *See id.* ¶¶ 210–212, 217, App. F. ¶ 18 (JA1601–1602, 1605, 2507) (describing such evidence, including total reported costs that exceeded reported revenues by $219 million).

Finally, should there be "exceptional" circumstances in which a particular provider cannot recover its used-and-useful costs within the rate caps, the provider can seek a waiver. *Order* ¶ 479 (JA1737); *see also Pay Tel Commc'ns, Inc.'s Petition for Waiver of Interim Interstate ICS*

*Rates*, 29 FCC Rcd 1302 (Wireline Comp. Bur. 2014) (granting provider a temporary waiver of previous IPCS rate caps based on cost showing).

> **2. The Martha Wright-Reed Act expressly allows the Commission to rely on industry-wide average costs**

The *Order*'s approach to ensuring "fair[] compensat[ion]" for providers is bolstered by the Martha Wright-Reed Act's express allowance of using "industry-wide average costs" in implementing the Act and its amendments to section 276. MWR Act § 3(b)(1). The Providers argue that Congress simply provided this as an option for "establishing rates," but "did not thereby prejudge" whether using that option—or an alternative option to use "the average costs . . . of a . . . provider," *id.*— "would discharge the fair-compensation requirement." Provider Br. 36.

But the invitation to use industry-average costs is not limited to "determining just and reasonable rates." MWR Act § (3)(b). Congress gave the Commission authority to use industry-average costs in "determining just and reasonable rates" *and* in otherwise "implementing [the Martha Wright-Reed] Act and the amendments [it] made." *Id.* That implementation necessarily includes the requirement to ensure that providers are "fairly compensated." 47 U.S.C. § 276(b)(1)(A). And

allowing the use of industry-average costs necessarily recognizes that some providers may have costs above average. *See Order* ¶ 68 (JA1521).

The Providers' reading of the statute also runs counter to Congress's deletion, from section 276(b)(1)(A), of the phrase "each and every." The phrase was at the heart of the court's conclusion in *Global Tel*Link* that the Commission could not rely on industry averages that failed to cover an individual provider's costs. *See* 866 F.3d at 414. By deleting that phrase (and by expressly allowing the agency to rely on industry averages), Congress made clear that it was moving away from an assessment tailored to each provider's costs.

### 3. The Commission's reading of section 276 gives meaning to both "just and reasonable" and "fairly compensated"

The Providers also argue (at 32–33) that, because the requirement of "just and reasonable" rates by itself guarantees a "fair return" under existing law, the provision that all providers be "fairly compensated" must mean something more. This argument is puzzling: its theory is that, by adding the "just and reasonable" requirement to the existing, standalone directive to ensure "fair[] compensation," Congress ordered the Commission to *increase* rates. That is not the best reading of the

statute, particularly in light of its history and in the context of the *Global Tel\*Link* decision.

Section 276 was originally enacted to ensure that incumbent payphone providers did not engage in anti-competitive behavior against new entrants in the newly deregulated payphone market. *See Global Tel\*Link*, 866 F.3d at 410. The court in *Global Tel\*Link* thus interpreted the requirement that providers be "fairly compensated" as a one-way ratchet, designed to prevent under-compensation for providers, not to guard against excessive rates for consumers. *See id.* at 409; *id.* at 424 (Pillard, J., dissenting). In the Martha Wright-Reed Act, Congress then explicitly granted the FCC authority to ensure "just and reasonable" IPCS rates, which the court in *Global Tel\*Link* had found lacking. *See* 168 Cong. Rec. H10027–28 (daily ed. Dec. 22, 2022) (statements of Reps. Pallone and Rush). In this light, the Providers' surplusage argument makes little sense. They assert that by adding authority to ensure "just and reasonable" rates, Congress converted the existing requirement of "fair[] compensat[ion]" into a more powerful one-way ratchet favoring providers. A better reading, given *Global Tel\*Link* and the history of the

statute, is that the "just and reasonable" requirement was added to protect consumers, not providers.[8]

## II. THE COMMISSION REASONABLY EXERCISED ITS DISCRETION IN ASSESSING WHICH SAFETY AND SECURITY COSTS ARE COMPENSABLE IN IPCS RATES

"Independent of" their statutory challenges to the Commission's decision to set IPCS rate caps using the used-and-useful framework and industry-wide average costs, the Providers and the States contend that the agency's specific application of that framework to exclude the costs of many safety and security measures was "arbitrary and capricious." Providers Br. 41; *see id.* at 41–45; States Br. 29–35. By contrast, the Public Interest Petitioners support the Commission's use of the used-and-useful framework, but argue that aspects of the *Order* are "contrary to law and arbitrary and capricious" because the Commission included *too many* safety and security costs when deriving the rate caps. Advocates Br. 22. Both sets of claims are unavailing, particularly given the

---

[8] Notably, too, the Providers nowhere specify what "extra" payment is required under their reading of "fair compensation." Presumably they envision a profitable return even for imprudent and inefficient providers. But as already explained, that reading is incompatible with "just and reasonable" rates.

considerable deference that courts afford to agency judgments in ratemaking proceedings. *E.g.*, *Boston Edison Co.¸* 885 F.2d at 964.

## A. The Commission Fully Considered And Explained Its Approach To Safety And Security Costs

The 2023 Data Collection, which yielded the most detailed cost reports the FCC had yet received on IPCS, provided, "for the first time," "a comprehensive picture of the dominant role" that safety and security measures play in IPCS providers' costs. *Order* ¶ 352 (JA1671) (JA2287 (sealed)). Indeed, these costs "significantly exceed the total costs of providing" the actual communications services. *Id.*

The 2023 Data Collection also provided details of these services. The record was "replete with examples of costly services," described by providers as "safety and security measures," "that are unrelated (or only marginally related) to providing IPCS." *Order* ¶ 374 (JA1683). For example, providers reported services to "assist law enforcement in investigating potential criminal activity and building cases, create reports for facilities and law enforcement, analyze data, and store records for use in court." *Id.* ¶ 373 (JA1681).

At the Commission's direction, providers participating in the 2023 Data Collection grouped their "safety and security" costs into seven

categories. *Order* ¶ 349 (JA1670). The agency found that the costs in two of these categories were predominantly used-and-useful costs "inherent" in proving IPCS. *See id.* ¶ 395 (JA1698). The first of those categories, "communications security services," includes, for example, "measures that allow an Incarcerated Person to call only certain individuals or numbers," features "that limit the individuals or numbers an incarcerated person may call," and measures to "prevent[] three-way communications." *Id.* n.1418 (JA1698).[9] The second category, "CALEA compliance measures," includes functions that allow IPCS providers to meet their obligations under that federal statute. *See Order* n.1387 (JA1692); *above* note 5. The FCC therefore included the costs of these measures in calculating the lower bounds of its zones of reasonableness.

By contrast, the agency found that the other five categories of measures primarily serve "law enforcement" purposes unrelated to the

---

[9] *See also Order* n.1418 (JA1698) (JA2315 (sealed)) (listing, in addition, features "providing personal identification numbers (PINs) to incarcerated people; providing disclaimers to called parties regarding communication origination; implementing communication-acceptance procedures; . . . preventing chain communications; dual-tone multifrequency detection; [allowing] manual call control for the Facility; tracking frequently called numbers; implementing incoming communication restrictions; and [assisting with] fraud management").

provision of communications services. For example, the category of "law enforcement support services" includes tasks such as "search warrant processing," "FOIA request processing," and "call transcription services, which are primarily used to create databases for law enforcement to conduct investigations and assist with case building." *Order* ¶ 394 (JA1696). Similarly, the category of "communications recording services" includes measures such as storing and transcribing communications "to support investigation and litigation activities," *id.* ¶ 398 (JA1700). And "communications monitoring services," such as automatic word detection and keyword searches, are "predominantly 'used to aid investigations related to detention facilities'" and similar investigative purposes, *id.* ¶ 403 (JA1703) (quoting comments from Securus).

If such measures were unavailable, "incarcerated people would still be able to place telephone calls or use advanced communications" because these measures "serve almost exclusively law enforcement functions," as opposed to facilitating communications. *Order* ¶ 378 (JA1685). The agency therefore excluded the costs of these measures from the lower bounds of the zones of reasonableness in deriving rate caps. *Id.*

## B. The Commission Did Not Ignore The Need To Offer IPCS "Safely"

The States argue that, because the application of the used-and-useful standard in the *Order* is focused on identifying services that benefit end users of IPCS, the Commission "ignore[d]" that IPCS must be provided "safely." States Br. 24; *see id.* at 22–25.

On the contrary, the Commission acknowledged that "communications services for incarcerated people are different [from] communications services offered to the general public due, in part, to [the need for] certain safety and security measures." *Order* ¶ 339 (JA1664). And in calculating the lower bound for each tier of rate caps using the used-and-useful standard, the Commission included the costs of "communications security services" in recognition that such costs are necessary to "ensure[] that communications services can be safely and securely offered in an incarceration setting." *Id.* ¶ 395 (JA1698); *see id.* (these costs are used and useful because they either "enable or appropriately limit the customer's use" of IPCS).[10]

---

[10] The cost of these services made up approximately 34 percent of providers' reported safety and security costs, illustrating that the FCC is willing to include large costs, so long as they are used and useful. *See Order* App. I, table 6 (JA1917) (communications security costs for audio

(cont'd)

By contrast, the Commission determined that other safety and security functions—such as recording and monitoring communications (States Br. 24), to the extent not required under CALEA—are "elective" "nice-to-haves" that "vary from [corrections] agency to [corrections] agency," undermining the contention that they are "necessary" or "used and useful." *Order* ¶¶ 381–382 (JA1688–1689). Although some commenters asserted that these functions helped, for example, ensure that IPCS was not being used "to intimidate judges and witnesses," the Commission found no record evidence that such purported functions were not simply "redundant" of the communications security costs that the agency had already included. *Id.* ¶ 400 (JA1701); *see id.* ¶ 403 (JA1703) (purported use of communication monitoring was also redundant).

In these assessments, moreover, the Commission did not ignore warnings that correctional facilities might "deny [access to] IPCS" if "forced to choose between providing IPCS in an insecure manner or withholding it altogether." States Br. 24. The *Order* does not put facilities to that choice: the rate caps include the cost of measures that the Commission determined from the record were needed to provide IPCS

and video service represented approximately $179.6 million of $523.6 million total safety and security costs).

safely, and the *Order* explains that facilities remain free to purchase any other features they might wish to have. *Order* ¶ 362 & n.1291 (JA1674–1675).

Moreover, the Commission found it unlikely (based on the record before it) that correctional authorities would eliminate IPCS, given the well-recognized benefits that communications services provide to incarcerated people, facilities, and communities. *See Order* ¶ 312 (JA1652).

## C. The Commission's Approach To Each Safety And Security Cost Category Was Consistent And Reasonable

The Providers' complaint (at 41–43) that the Commission's treatment of safety and security costs was inconsistent is belied by the *Order*. The Commission explained that some functions in the "law enforcement support services" category, such as "administration of tiplines to anonymously report crimes," may "provide a benefit to incarcerated people" in a general sense, *Order* ¶ 394 (JA1696), because incarcerated people benefit from the prevention of crime in the facilities where they reside. But such measures nonetheless "do not facilitate the provision of IPCS," and so are not used and useful in the provision of that service. *Id.*; *see id.* ¶ 366 (JA1677) (defining "necessary"). Contrary to the

Providers' argument (at 42), the Commission's determination on this point is consistent with the *Order*'s overall approach: not all measures that in some way redound to the benefit of incarcerated people are "necessary" costs "in the provision" of IPCS to be recovered through rates, as the statute specifies.[11]

The Providers also assert (at 42–43) that it was arbitrary to include costs for compliance with the federal CALEA statute but not for call monitoring and recording. All communications providers must comply with CALEA, however, whether they are providing IPCS or otherwise. *Order* ¶¶ 391–393 (JA1694–1695). CALEA compliance is thus intrinsic to offering communications service generally. Call monitoring and recording services, by contrast, are "elective" services that are not required even in all correctional facilities, and thus are not "necessary" to providing IPCS. *Id.* ¶¶ 381–382 (JA1688–1689). The agency's line-drawing, based on the record before it, was reasonable and reasonably explained. *See S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 102 (1st

---

[11] The Providers assert (at 42 & n.28) that call recording and monitoring likewise benefit users by preventing misuse, such as witness tampering. As explained above, the FCC found, based on the record before it, that any such function was duplicative of already allowed costs. *See above* p. 57.

Cir. 2002) (courts uphold reasonable line-drawing, even if "there are other possible places at which the line could be drawn").

## D. The Commission Reasonably Explained Any Departure From Its Precedent

The FCC has consistently maintained that "the costs of safety and security measures should be limited to 'costs that are reasonably and directly related to the provision of [IPCS].'" *Order* ¶ 375 (JA1683) (quoting *2013 Order*). The Providers (at 43–44) and States (at 31) nevertheless argue that the agency irrationally departed from precedent by excluding costs for measures that it had previously included when calculating IPCS rate caps, such as for voice-identification-related services known as "voice biometrics."

The APA allows an agency to change its position, so long as it "display[s] awareness that it *is* changing position," and "show[s] that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord Wages & White Lion Invs.*, 2025 WL 978101 at *13; *see also Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (agency "need not demonstrate that the reasons for the new policy are better"). Here, the FCC did just that, explaining that its previous inclusion of certain safety and security costs

was "based on the record at the time . . . and [did] not reflect the evolution of the industry and the proliferation of such services during the course of [the agency's] proceeding." *Order* ¶ 402 (JA1702) (communications monitoring); *see id.* ¶ 399 (JA1700) (citing "significant evolution" regarding communications recording); *id.* ¶¶ 405–406 (JA1704) (describing changes "over time" in marketing and use of voice biometrics). In any case, the Commission stated that its new directives, under the Martha Wright-Reed Act, to ensure "just and reasonable" rates and to consider costs "necessary" to the provision of IPCS "require[d] that [the FCC] reevaluate this precedent." *Id.* ¶ 375 (JA1683).

## E. Ample Evidence Supported The Commission's Determinations

The States also assert (at 36) that the evidentiary record "was woefully inadequate" to make determinations about which safety and security costs should be included. But the agency's efforts to gather data were extensive, the resulting record was large, and the agency was required to issue new rules by a date certain. *See Order* App. D (JA1854) (describing data collection); MWR Act § 3(a) (requiring FCC action "not later than 24 months after the date of enactment of [the] Act").

To be sure, the categories of safety and security costs in the 2023 Data Collection were necessarily "imprecise," given the variety of services offered by providers, and provider cost allocations that were "at times inexact." *Order* ¶ 385 (JA1690). The agency therefore reasonably "evaluate[d] categories based on the nature of the preponderance of tasks or functions within each category." *Id.* But it "is not unusual" for agencies to lack "perfect empirical or statistical data," and the "APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Prometheus*, 592 U.S. at 427. Instead, agencies need only make "a reasonable predictive judgment based on the evidence" available, *id.*, as the FCC did here.

## F. The Commission Reasonably Treated Communications Security Costs As Used And Useful

Unlike the States and Providers, the Public Interest Petitioners contend that the FCC unreasonably treated *too many* safety and security costs as used and useful. Specifically, they challenge the Commission's inclusion of communications security services, such as blocking calls to unapproved numbers and three-way calls. Advocates Br. 26–32; *see* above p. 54 (describing these services). These arguments are unpersuasive.

The Public Interest Petitioners first express doubt that "*any* safety and security costs are truly 'necessary'" for IPCS under the used-and-useful framework, in part because such services "vary from jurisdiction to jurisdiction." Advocates Br. 27. But the FCC included communications security services in the lower bound of the zones of reasonableness in part because these measures "appear to be universally offered by IPCS providers and are a standard part of all IPCS offerings," unlike most other safety and security costs. *Order* ¶ 396 (JA1699).

The Public Interest Petitioners next argue that these measures, which primarily serve to "*restrict* the access [of] incarcerated people and their loved ones" to communication services, cannot be used and useful to users. Advocates Br. 28 (internal quotation marks omitted). But the agency found that some forms of restriction are "required to facilitate the provision of communications services in the carceral setting." *Order* ¶ 397 (JA1699). Indeed, these measures "are the key factors distinguishing IPCS communications from those communications of the general public, which do not require such services." *Id.* ¶ 396 (JA1699). Congress clearly agreed that IPCS is different from other forms of communication and directed the FCC to consider which safety and security costs are necessary to provide IPCS. MWR Act § 3(b)(2). The Public Interest

Petitioners' argument that no form of restriction can be included in rates leaves no room for this requirement.

Contrary to what the Public Interest Petitioners contend (at 29), the FCC relied not on history but on "the record before [it]" to conclude that communications security services are "inherent" in providing IPCS. *Order* ¶ 396 (JA1699). And far from ignoring the "sea change" of the Martha Wright-Reed Act, Advocates Br. 30, the FCC took account of both the requirement for "just and reasonable rates" and the agency's statutory duty to consider necessary safety and security costs. The Commission found that including the costs of these "basic" safety and security measures, *Order* ¶ 395 (JA1698), while excluding the costs of other measures that primarily serve other functions, "appropriately balanc[es] the need to protect public safety against ensuring that incarcerated people can stay connected with their loved ones," *id.* ¶ 397 (JA1699).[12] The "balance [of] competing interests" that the Commission struck was reasonable and well within its discretion as the expert

---

[12] The Public Interest Petitioners argue (at 31) that it was irrational for the Commission to include communications security costs while excluding other costs that are in some respects redundant in function. In fact, as explained above, *see* p. 57, it was because the agency included basic communications security services that it was able to exclude other add-ons that in part duplicated these functions.

agency—a balance of the kind that courts are "not . . . equipped" to second-guess. *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 120, n.6 (2011).

## III. THE COMMISSION HAD AUTHORITY TO BAN SITE COMMISSIONS, WHICH IT REASONABLY CONCLUDED ARE INCOMPATIBLE WITH THE DUAL MANDATES OF SECTION 276(B)(1)(A) AND WITH SECTION 201(B)

The Commission reviewed the extensive record evidence it gathered and concluded that site commissions "are fundamentally incompatible" with its statutory mandates to ensure both just and reasonable rates and charges for IPCS and fair compensation for IPCS providers. *Order* ¶ 244 (JA1617). Payments from providers to facilities have funded a "wide and disparate range of activities"—many unrelated to enabling communication—including funding "inmate welfare programs[,] . . . salaries and benefits of correctional facilities, states' general revenue funds, and personnel training." *Id.* ¶¶ 251–252 (JA1621–1622) (second alteration in original). Some of these payments have even directly "benefit[ed] . . . correctional officials, through, for example, campaign contributions or 'payments to influential sheriff-led associations.'" *Id.* ¶ 251 (JA1621). One provider offered a sheriff's office, "among other inducements," an annual Caribbean cruise. *Id.* ¶ 286 (JA1638).

The problems with site commissions are two-fold. First, they drive up rates, and historically have accounted, on average, for over 33 percent of out-of-pocket consumer call charges, rising "to more than 70 percent in some jurisdictions." *Order* ¶ 253 (JA1623) (quoting Securus comments). Second, they "have distorted the IPCS marketplace," as providers "compete to offer the highest site commission payments," rather than "competing on service-based, competitive market factors" like price or quality. *Id.* ¶ 254 (JA1623) (internal quotation marks omitted). Petitioner Pay Tel, for example, documented a request for proposal in which it was ranked highest in each scoring category except for site commissions, but still lost the bid. *Id.* ¶ 284 (JA1637).

The Commission acknowledged, however, that facilities may incur some used-and-useful costs from measures necessary to facilitate IPCS. *Order* ¶ 308 (JA1650). It therefore "decoupl[ed]" payments for any used-and-useful costs borne by facilities—which may still be reimbursed by providers to facilities, *see below* Part IV—from all other provider payments to facilities. *Id.* ¶ 267 (JA1630). The term "site commission" in the *Order* refers only to the latter category of payments unrelated to used-and-useful IPCS costs. *Id.* ¶ 242 (JA1616). So characterized, site commissions "primarily compensate correctional facilities for the

transfer of their market power over IPCS at a given facility." *Id.* ¶ 281 (JA1636).

Because site commissions do not serve to "recover costs or expenses used and useful in the provision of IPCS," they "create a conflict between the dual statutory requirements of ensuring fair compensation for providers and just and reasonable IPCS rates and charges for consumers and providers." *Order* ¶ 294 (JA1642). After all, someone must pay for site commissions. If the costs, unrelated to the provision of IPCS, are passed on to end users through inflated rates, those rates are not just and reasonable. If instead providers are required to bear those costs, the providers will not be fairly compensated. Thus, to ensure both "just and reasonable" rates and "fair[] compensat[ion]" as required by section 276(b)(1)(A), it is necessary to prohibit site commission payments associated with IPCS. *Id.* ¶¶ 296, 302 (JA1643, 1647).

The Commission took two actions to accomplish this goal. It prohibited providers from entering into contracts that require or permit site commission payments, and it preempted state and local laws that require or permit such payments. *Order* ¶ 302 (JA1647). As described below, both actions were within the agency's authority.

## A. The Commission Has Authority To Prohibit Providers From Paying Site Commissions

### 1. Section 276 supplies authority

Section 276 directs the agency to establish an IPCS "compensation plan" to "ensure that . . . all rates and charges are just and reasonable" and that providers are "fairly compensated." 47 U.S.C. § 276(b)(1)(A). Because site commission payments are "fundamentally incompatible" with that mandate, *Order* ¶ 244 (JA1617), the Commission precluded providers from entering into contracts that require or allow those payments, *id.* ¶ 332 (JA1660).

The States (but not the Providers) argue that site commission payments are "practices," and that the FCC has authority only over "rates and charges" for IPCS, not provider practices. States Br. 12–16. In support, they point to section 201(b), which grants the FCC jurisdiction over interstate communications providers' "charges, practices, classifications, and regulations." 47 U.S.C. § 201(b). When Congress amended section 276 in the Martha Wright-Reed Act, it added a requirement of just and reasonable "rates and charges," without also including "practices." This shows, the States argue (at 13), that Congress intended to withhold jurisdiction over IPCS providers' practices.

The argument fails on multiple grounds. To start, the statutory text tasks the FCC not merely with regulating rates and charges, but with establishing a "compensation plan to ensure" just and reasonable rates and charges. 47 U.S.C. § 276(b)(1)(A). Provider payments made to facilities to secure a contract are "compensation." *See Compensation*, Black's Law Dictionary (12th ed. 2024) (defining compensation as "[r]emuneration and other benefits received in return for services rendered"); *Compensation*, Webster's New Universal Unabridged Dictionary (1st ed. 1996) (compensation is "something given or received as an equivalent for services"). Section 276 therefore authorizes the agency to form a "compensation plan" that governs those payments to the extent necessary to "ensure" "just and reasonable rates and charges." As the agency stated, the requirement to "establish a compensation plan" "requires more of the Commission than the simple act of setting rates and charges."[13] *Order* ¶ 80 (JA1528). The States' proffered reading, which

---

[13] This conclusion flows from the plain meaning of "plan," which contemplates something beyond the rate itself. *See Plan*, Merriam-Webster, https://www.merriam-webster.com/dictionary/plan (last visited Apr. 9, 2025) (defining "plan" as "a detailed program (as for payment or the provision of some service)").

would allow only direct regulation of rates, ignores the words that Congress used.

The history of section 276, too, supports the Commission's authority to regulate more than just consumer rates. Before the Martha Wright-Reed Act, section 276 required the Commission to "establish a compensation plan to ensure" that payphone providers were "fairly compensated." The "compensation" at issue there was not payments from consumers to providers, but compensation among providers as the payphone industry transitioned from monopoly to competition. *See Global Tel*Link*, 866 F.3d 410. Thus, from the beginning, the FCC's authority under section 276 has been understood to reach not only consumer payments to providers, but also payments by providers.

Consistent with that historical context, the Commission has for years implemented the "fair compensation" mandate of section 276 through requirements that are not direct rate regulation, but instead concern practices "associated with charging for, and receiving payment for, payphone services." *Order* ¶ 81 (JA1528). "Such requirements have included, among other things, . . . requiring the transmission of information" related to calls, "allocating responsibility for paying compensation for payphone calls," and "defining the permissible

arrangements between payphone providers and the carriers paying them compensation for payphone calls." *Id.*

Thus, when Congress in the Martha Wright-Reed Act left unchanged the directive to establish "a compensation plan to ensure" the goals of section 276, and added the goal of "just and reasonable" rates, it empowered the Commission to regulate provider practices when necessary to achieve those rates. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *Hikvision USA v. FCC*, 97 F.4th 938, 946 (D.C. Cir. 2024).[14]

The States' theory, by contrast, ignores this textual and historical grounding. Rather, under their reading, Congress (1) knew that the Commission regulated IPCS practices through its compensation-plan authority; (2) left in place the agency's existing authority and tasked it with ensuring just and reasonable rates; but (3) in requiring the agency

---

[14] To be clear, the Commission has not claimed authority to regulate all intrastate IPCS "practices" without regard to ensuring "just and reasonable" rates and "fair" compensation. *Order* ¶ 84 (JA1530). For example, nothing in the *Order* seeks to regulate contractual agreements between providers and facilities that do not directly affect rates for end users of IPCS.

to ensure such rates, silently stripped its historical ability to regulate practices that affect rates. That is highly unlikely. At a minimum, it is not the best or required reading of the "flexib[le]" terminology that Congress used in establishing the bounds of the Commission's authority to regulate IPCS. *Loper Bright*, 603 U.S. at 395.

### 2. Section 201(b) supplies an independent source of authority

Section 201(b) separately allows the agency to prohibit providers from paying site commissions. It grants the Commission jurisdiction over "charges, *practices*, classifications, and regulations" of carriers "for and in connection with" interstate and international communications services. 47 U.S.C. § 201(b) (emphasis added). Courts and the Commission have consistently recognized that this authority extends to intrastate communications as well, when "(1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective." *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007); *see Order* ¶ 86 (JA1530); *Ill. Bell Tel. Co. v. FCC*, 883 F.2d 104, 113 (D.C. Cir. 1989). Under this doctrine—known as the "impossibility" exception—the FCC may regulate the practices associated with

intrastate IPCS to the extent they cannot practically be separated from practices applicable to interstate IPCS. *Order* ¶ 337 (JA1664).

Here, the Commission found that "[t]he record contains no evidence that IPCS providers can practically separate the practice of paying site commissions in connection with . . . interstate and international payphone services . . . from the practice of paying site commissions for or in connection with the other payphone services within the Commission's section 276(d) authority." *Order* ¶ 338 (JA1664). After all, when providers agree to provide IPCS, they do so in a single contract. *See id.* ¶¶ 283, 298 (JA1637, 1644). Moreover, even if those two categories of payments could be separated, the Commission found that "enough aggregate revenues are potentially at stake" for intrastate IPCS "that even allowing carriers' continued payments of site commissions only associated with those services is likely to lead to marketplace distortions that undermine [the agency's] ability to ensure just and reasonable interstate and international IPCS rates." *Id.* ¶ 338 (JA1664). And because the providers enter into a single contract, the Commission cannot separate the market distortions that flow from intrastate IPCS. *See id.* (pointing to this "inseverability"). It is thus impossible for the

Commission to address the harms that flow only from site commissions in connection with interstate or international IPCS.

The States dispute that the impossibility rule applies, speculating that providers "can presumably" use the recipient's address to make the determinations necessary to separate which calls are interstate and which intrastate. States Br. 17. But they do not point to any record evidence that providers do, or even could, practically separate the payment of site commissions for intrastate versus interstate and international calls.[15] *See Order* ¶ 338 (JA1664); *U.S. Fish & Wildlife Serv.*, 262 F.3d at 20 (review of agency action "usually confined to the record before the agency"). And even if separation were possible, that would not negate the FCC's finding that market distortions from site commissions paid in connection with intrastate IPCS are "inseverab[le]" from intrastate and international distortions, which allows the Commission to regulate this practice. *Id.* ¶ 338 (JA1664).

---

[15] For example, a recipient using a mobile phone might be in a different state at the time of the call. *See Rates for Interstate Inmate Calling Services*, 35 FCC Rcd 8485, 8498 ¶ 36 (2020).

## B. The Commission Has Authority To Preempt State And Local Laws That Require Or Permit Site Commissions

Just as the FCC has authority to prohibit providers from contracting to pay site commissions, it also has authority to preempt state and local laws requiring site commissions. Section 276 contains an express preemption clause. After requiring the FCC to "prescribe regulations" to establish a compensation plan to ensure just and reasonable rates and fair compensation for IPCS, 47 U.S.C. § 276(b)(1)(A), the statute provides that, "[t]o the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements," *id.* § 276(c). Where, as here, a federal law "contains an express preemption clause," courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (internal quotation marks omitted); *see generally Medtronic v. Lohr*, 518 U.S. 470, 485 (1996) (no presumption against preemption for statutes with express preemption clauses).

In the Martha Wright-Reed Act, Congress did not disturb this express preemption provision. To the contrary, Congress amended the

Communications Act to clarify that the FCC has jurisdiction over intrastate, as well as interstate, IPCS,[16] making clear that the express preemption clause of section 276 reaches conflicting state IPCS regulations. *Order* ¶ 319 (JA1656).

The FCC found, based on an extensive record and thorough analysis, that site commission payments conflict with its regulations, as adopted and revised in the *Order*, to ensure just and reasonable rates and fair compensation. *Order* ¶ 314 (JA1653); *see generally id.* ¶¶ 295–306 (JA1643–1649). This is because they "lead to unjust and unreasonable rates and charges insofar as consumers are being charged for non-IPCS costs where providers pay site commissions," *id.* ¶ 314 (JA1653), or, if they were not passed on to consumers, would prevent providers from being fairly compensated, *id.* ¶ 315 (JA1654). And of course, any state or local laws requiring or allowing site commissions are facially inconsistent with the agency's regulations forbidding such payments by providers. *Id.*

---

[16] Section 2 of the Communications Act provides that the Act shall not be construed to give the FCC jurisdiction over "charges, classifications, practice, services, facilities, or regulations for, or in connection with intrastate communication service," *except* for enumerated exceptions. 47 U.S.C. § 152(b). The Martha Wright-Reed Act added section 276 to those exceptions, thus making clear that the agency's jurisdiction *does* extend to intrastate IPCS. *See* MWR Act § 2(c).

¶ 317 & n.1138 (JA1655).[17] Because such laws are "State requirements . . . inconsistent with the Commission's [IPCS] regulations," 47 U.S.C. § 276(c), the agency recognized them as preempted, *Order* ¶ 314 (JA1653).

As a separate source of preemption authority, the FCC cited its section 201(b) duty to ensure just and reasonable rates for interstate and international communications. 47 U.S.C. § 201(b). The FCC explained that state laws requiring site commission payments are an "obstacle" to the FCC's regulations because those payments conflict with the agency's mandate to ensure that IPCS rates are "just and reasonable." *Order* ¶ 322 (JA1657) (citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2001)). They are thus preempted under principles of conflict preemption.

In challenging the preemption announced in the *Order*, the States (at 18–20) do not dispute the FCC's conclusion that site commissions are "fundamentally incompatible" with section 276's mandate that the agency ensure just and reasonable IPCS rates and charges and fair compensation for IPCS providers. *Order* ¶ 244 (JA1617). They argue

---

[17] Section 276(c) explicitly preempts "state" laws, but not local laws. While no party raises arguments predicated on this distinction, the *Order* explains that the conflict preemption analysis that applies to state laws applies with equal force to local laws. *Order* ¶¶ 325–327 (JA1658).

instead that the FCC can do nothing about it because Congress, in enacting the Martha Wright-Reed Act, purportedly stripped the Commission of its authority to regulate IPCS "practices," as opposed to rates and charges. States Br. 18. The States' preemption theory thus recycles its argument that the Martha Wright-Reed Act does not give the agency authority to regulate practices.

The argument fails for several reasons. First, it is incorrect, as we explained above, *see* p. 69–71. Second, it is facially incompatible with the statute's express provision for preemption of state "requirements" that are "inconsistent" with the FCC's regulations. 47 U.S.C. § 276(c); *Order* ¶ 318 (JA1655) ("Consistent with [Supreme Court] precedent [interpreting express preemption requirements], we find that the reference to 'state requirements' in section 276(c) is broad enough to reach state laws and regulations requiring or allowing the payment of site commissions associated with IPCS."). The States argue that, by amending section 276, Congress implicitly limited the "requirements" subject to preemption to "rates and charges," not other forms of state requirements. That would be a very odd way for Congress to amend the statute's express preemption clause. The Court should instead look to the "plain wording," which "contains the best evidence of Congress'

preemptive intent." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011).

Third, the States ignore the statute's history. They urge (at 19) that any preemption authority must be read narrowly under 47 U.S.C. § 152(b), citing *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 373 (1986). But *Louisiana Public Service Commission* considered a different section of the Communications Act and did not analyze an express preemption provision like section 276(c). Again, too, the Martha Wright-Reed Act specifically amended section 152(b) to make clear that the ordinary presumption against preemption does *not* apply to section 276. Indeed, Congress made this amendment precisely to provide the explicit preemptive authority that the court in *Global Tel\*Link* had found the Commission to lack. *See Global Tel\*Link*, 866 F.3d at 409 (citing *La. Pub. Serv. Comm'n* and section 152(b)); 168 Cong. Rec. H10027–28 (law would "give the FCC . . . authority" over intrastate calls that "a court found [the agency] cannot regulate"). The Act is thus best read as giving the FCC authority over intrastate communications as needed to accomplish the statute's goals, including by preempting state requirements that require or allow site commissions.

## IV. THE COMMISSION REASONABLY ACCOUNTED FOR THE POSSIBILITY THAT CORRECTIONAL FACILITIES MAY INCUR USED-AND-USEFUL COSTS IN ALLOWING ACCESS TO IPCS

Correctional facilities have long claimed that some portion of their payments from IPCS providers reimburses them for actual costs that they incur in allowing access to IPCS. *Order* ¶ 164 (JA1576). The States make that claim here (at 37). But the Commission found, based on the record before it, that these payments primarily fund expenses unrelated to the provision of IPCS. *Id.* ¶ 281 (JA1636).

The Commission also found that facilities may incur *some* expenses in allowing IPCS, but that reliable quantification was impossible on the available record. *Order* ¶ 165 (JA1576). This was largely because, despite repeated and recent requests, facilities and providers failed to submit "verifiable, reliable, and accurate information" on costs that facilities incur from allowing IPCS. *Id.* (quoting instructions to the 2023 Data Collection (JA376)).

Given that failure, the FCC inferred "that actual information would not support the case for recovery." *Order* ¶ 166 (JA1577). It therefore included no facility costs in the lower bound of the zone of reasonableness for each rate tier. *Id.* ¶¶ 178–180 (JA1583–1585). Recognizing, however,

that facilities may incur some costs, the agency incorporated $0.02 into the upper bounds of the zones of reasonableness, *id.* ¶¶ 170–177 (JA1579–1583), and chose rate caps above the lower bounds, *id.* ¶¶ 182, 214 (JA1585, 1604).

The Commission also permitted providers to reimburse facilities for "used and useful costs" that the agency had included in computing the rate caps' lower bounds. *Order* ¶¶ 181–182 (JA1585). That is, the rate caps account for costs that IPCS providers incur in providing service, as demonstrated by the record, and indeed are higher than the lower bounds based on those costs. Where a facility should incur used-and-useful costs instead, a provider may reimburse the facility for those costs. (This allowance is necessary because providers are otherwise prohibited from making payments to facilities under the ban on site commissions.) For example, if "it is apparent that" a facility incurs internet installation and maintenance costs to provide access to IPCS, which an IPCS provider would otherwise have needed to incur directly, the provider may reimburse the facility for those costs. *Id.* ¶ 181 (JA1585). However, any such reimbursement may not result in charges to IPCS consumers above the rate caps adopted in the *Order*. *Id.* ¶ 182 (JA1585).

## A. The States Fail To Show That The Commission's Approach Was Arbitrary And Capricious

The States claim (at 37–41) that the Commission's approach was arbitrary and capricious. Their arguments in support of this claim are uniformly unconvincing.

They argue that the Commission's approach "depart[ed] from its historical approach" and "skirt[ed]" its obligation to "provide an adequate explanation" for doing so. States Br. 33 (internal quotation marks omitted). But, as in previous IPCS orders, the FCC acknowledged that facilities may incur at least some costs from measures that enable IPCS—despite facilities' repeated failure to submit reliable data. *Order* ¶ 181 (JA1585). The Commission likewise continued to allow for compensation of any such costs. *See id.* It did, however, decide and fully explain a change: that it was now more appropriate to account for these costs with a rate above the lower bound of the zones of reasonableness, and with provider reimbursement, rather than with a $0.02 additive above the generally applicable rate caps.[18] The agency thus acknowledged that this

---

[18] The States argue (at 39) that this approach is "internally contradictory," but the FCC fully explained that it allowed for reimbursement despite excluding facility costs in the lower bounds to account for the paucity of evidence in the record. *Order* ¶¶ 179–180 (JA1584–1585).

was a new approach and explained its reasoning, as required by the APA. *See Fox*, 556 U.S. at 515.

The States also assert (at 38) that the agency's approach is inconsistent with the requirement to consider safety and security costs necessary for the provision of IPCS. But the agency carefully reviewed all record evidence regarding such costs. *See above* pp. 52–55. To the extent that facilities incur used-and-useful safety and security costs directly, those costs are included in the rate caps, and facilities can be reimbursed for them. *Order* ¶ 181 (JA1585).

The States next assert that the agency's approach is inconsistent with the D.C. Circuit's finding that site commissions "are costs of doing business incurred by I[P]CS providers." Br. 38 (citing *Global Tel*Link*, 866 F.3d at 413). That finding does not demonstrate, however, that facilities themselves incur particular costs, only that providers formerly were required to pay site commissions. *See also Order* ¶ 307 (JA1650) (discussing *Global Tel*Link*). Indeed, the court in *Global Tel*Link* remanded the Commission's order for the agency to "assess . . . which portions of site commissions might be directly related to the provision of I[P]CS and therefore legitimate, and which are not." 866 F.3d at 414.

The States also contend (at 38) that the agency failed to fully consider the National Sheriffs' Association's 2015 cost survey and Pay Tel's submission. But the Commission reasonably explained why it deemed the "self-reported" data in the Sheriffs' 2015 survey to "very likely . . . overstate[] correctional facility costs at the time of the survey, . . . severely limit[ing] the data's value as a proxy for current facility costs." *Order* ¶ 167 (JA1577). It also reasonably explained why it found the Pay Tel submission "unreliable." *Id.* ¶ 175 (JA1582). That submission concerned an "unrepresentative" sample of only 30 smaller facilities, including no prisons or large jails, covering less than 1 percent of facilities in the data collection. *Id.* The sample also failed to distinguish which activities are performed by facilities and which by providers. *Id.*

Under the APA, agency findings are set aside only when the record "clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951); *see Frontier Fishing Corp. v. Pritzker*, 770 F.3d 58, 62–63 (1st Cir. 2014). The FCC's treatment of the record here easily surpasses that low bar.

Finally, as noted already with respect to security costs more generally, *see above* p. 57, the Commission reasonably concluded that its approach to facility costs—and its decision to eliminate site commissions, which are not for costs used and useful in providing IPCS—would not result in "decreased access to IPCS services." States Br. 39 (quoting Montana comments). And contrary to the States' assertion (at 40), this finding was not conclusory.

The Commission observed that IPCS provides widely recognized benefits to incarcerated people, facilities, and communities. *Order* ¶ 312 (JA1652); *see id.* ¶¶ 26–30 (JA1500–1505). In part for this reason, the Commission predicted that any "denial or reduction of access to IPCS" would "likely . . . elicit an 'intensely negative backlash,'" and that facilities would thus be unlikely to make good on their implicit threats to curtail access. *Id.* ¶ 312 (JA1652) (quoting *2015 Order* at 12835 ¶ 140).[19] Moreover, in the many states that have banned site commissions, there has not been a decrease in access to IPCS. *See id.*; *see also id.* ¶ 266 (JA1629). As the Commission emphasized, it is tasked by Congress to

---

[19] And if access to IPCS services turns out differently than the Commission expects, the agency will of course be free to revisit the rate caps if it concludes it is necessary to do so.

ensure just and reasonable rates and so cannot allow consumers to shoulder costs that are "for the most part, 'cost[s] of operating prisons and jails, not providing communication service.'" *Id.* ¶ 174 (JA1581).

## B. The Public Interest Petitioners Fail To Show That The Commission's Approach Was Arbitrary And Capricious

Challenging the *Order*'s approach to facility costs from the opposite direction, the Public Interest Petitioners contend (at 32–37) that the FCC was too liberal in including a $0.02 per-minute allowance for potential facility costs when calculating the upper bound of each rate tier's zone of reasonableness. But the Public Interest Petitioners do not demonstrate that the agency would have chosen lower rate caps if the upper bounds had been $0.02 lower. *See Order* ¶ 209 (JA1600) (lower boundary "operate[d] as a more accurate reference").

In any case, the agency's approach was reasonable, "balancing [the] two competing factors" of commenters' continued assertions that facilities incur such costs and the lack of data permitting the agency to quantify those costs "with any level of exactitude." *Id.* ¶¶ 164–165 (JA1576). That balancing led the Commission to exclude the asserted $0.02 per-minute costs from the lower bound of each rate tier's zone of reasonableness, and instead to incorporate it into the upper bound. *Id.* Although the Public

Interest Petitioners disagree with this decision, this Court should not second-guess what the Commission regarded as "the best approach given the [available] record." *Id.* ¶ 168 (JA1578); *see Prometheus*, 592 U.S. at 427; *Boston Edison Co.*¸ 885 F.2d at 964.

## V.  THE PETITIONERS' REMAINING OBJECTIONS ARE UNPERSUASIVE

### A.  The Commission Reasonably Derived The Rate Caps Using Total Minutes Of Use

The FCC calculated its per-minute rate caps by dividing the providers' annual total used-and-useful expenses by total minutes of use—both billed and unbilled. *Order* App. E ¶ 4 (JA1862). Unbilled minutes arise when correctional institutions negotiate for IPCS providers to provide some calls, such as those to public defenders, free of charge to consumers. *Id.* App. E ¶ 4 & n.9 (JA1863 & 1864). Although the agency had previously performed its rate calculations using only paid minutes, it explained that using total minutes of use was an "improvement," because doing so "better reflects the cost of actual minutes." *Id.*; *see id.* ¶ 189 (JA1591) (method "more accurately reflects providers' average costs").

The Providers argue (at 46–48) that the Commission should have used only billed minutes in its calculations, and that the agency's

inclusion of unbilled minutes will lead to under-recovery. But as the Commission explained, it adopted this revised approach because "[t]he ratio of billed minutes to unbilled minutes varies across facilities." *Order* App. E n.8 (JA1863). Therefore, rate caps set based only on billed minutes would allow over-recovery of costs (and unreasonably high rates) in places with few unbilled minutes, and under-recovery in places with many. *Id.* This would "effectively requir[e] incarcerated people who receive relatively few free minutes to subsidize other users." *Id.* Moreover, the Commission explained, if in the future the proportion of billed and unbilled minutes were to change, including as the result of changes in facilities' policies, the rate caps pegged to current assumptions would become outdated. *Id.*

The Providers do not dispute that the Commission's approach more accurately reflects the costs of service. However, they argue (at 47) that the resulting rate caps will not ensure fair compensation and just and reasonable rates. But the Commission reasonably decided, based on the record before it, not to force consumers to shoulder the burden of the facilities' voluntary decisions, especially when those consumers may not reap any benefit. Correctional authorities "may enter into arrangements with providers that allow incarcerated people to make . . . free calls" and,

when they do, providers are assured of compensation because the *Order*'s ban on site commissions means facilities must pay them for those services. *Id.* App. E n.9 (JA1864). A methodology that incorporated the varying requirements of facilities for incarcerated people to make free calls, by contrast, would lead to excessive rates for at least some consumers at some facilities. *See id.* App. E n.8 (JA1863).

The Providers respond that all ratesetting based on average costs "necessarily means" that some users may be charged rates "higher (or lower) than the actual cost of [their] call[s]." Providers Br. 48. That does not mean, however, that the agency erred by making its cost calculations as accurate as possible. Once again, "[t]he FCC is accorded broad discretion in selecting methods to make and oversee rates." *Southwestern Bell*, 168 F.3d at 1352 (cleaned up). It was within the bounds of that discretion for the Commission to prefer a method that "treats all minutes equally, regardless of a facility's or a provider's policy decisions on whether and how to provide free minutes." *Id.* App. E ¶ 4 (JA1863).[20]

---

[20] The Providers assert (at 46) that the difference in calculation methods "adds up to tens of millions of dollars annually" across the entire IPCS industry. But that figure must be measured against projected revenues of over $820 million under the new caps. *Order* App. J Table 3 (JA1939) (JA2569 (sealed)). As the Wireline Competition Bureau stated in denying (cont'd)

### B. The Commission's Approach To Ancillary Service Charges Is Reasonable

#### 1. The agency reasonably incorporated the cost of ancillary services directly into IPCS rates

Historically, IPCS providers have often charged separate "ancillary service charges"—additional fees for services like credit card payments, live-agent interactions, paper billing statements, and third-party financial transactions—in addition to their per-minute rates. *Order* nn.25 & 27 (JA1492); *see id.* ¶¶ 408–426 (JA1705–1714). These charges have been a "continuous source of confusion and gamesmanship," and they have increased the costs of IPCS by as much as 40 percent. *Order* ¶ 409 (JA1706).

In the *Order*, the Commission eliminated all separate ancillary service charges and, because these services are part of providing IPCS, included them directly in its new rate caps. *Order* ¶ 414 (JA1708); *see id.* ¶¶ 415–416 (JA1708–1709). In support of this approach, the Commission

---

Securus's request for an administrative stay, the number of unbilled minutes is sufficiently small that "excluding unbilled minutes in the calculation of the rates is unlikely to materially impact the actual rate caps." *Incarcerated People's Communications Services*, DA 24-1031, at n.82 (Wireline Comp. Bur. Oct. 2, 2024) (JA2591) (*Securus Agency Stay Denial*). Moreover, any impact is likely further blunted, if not offset, by the demand stimulated by lower prices. *See Order* ¶ 581 (JA1786).

found that eliminating separate charges will remove "an incentive . . . to engage in practices that unreasonably burden consumers and effectively raise the cost of IPCS," such as charging multiple fees for the same transaction, "a problem that is well-documented in the record." *Order* ¶ 418 (JA1709). In the Commission's judgment, eliminating separate fees will also create a rate structure that is easier for consumers to understand. *Id.* ¶ 421 (JA1712).

The Providers argue that the Commission's approach is arbitrary and capricious because it will lead to increased consumer use of ancillary services and correspondingly higher costs for providers not captured in the rate caps. Providers Br. 49–50. But the Commission found that incentives to "avoid[] a live agent" or to "transfer[] funds . . . less frequently" were "barriers to communication," not beneficial economic signals as the Providers imply. *Order* ¶ 423 (JA1712). These services are "inherent" in modern communications, *id.* ¶ 415 (JA1708), and including their costs in rates "better align[s]" with their treatment "in non-carceral contexts," *id.* ¶ 423 (JA1712). After all, outside of IPCS, "[m]ost telephone corporations and other utilities provide customer services for free, including services such as speaking with a live agent to set up an account, adding money to an account, or assisting with making a call," *id.* (quoting

comments of the California Public Utilities Commission), and there is no evidence that customers overuse these services.

The Providers argue, further, that this action will unfairly cause consumers who do not use ancillary services to subsidize those who do. Providers Br. 50. But the record does not show that a significant number of consumers actually forgo ancillary services. As the Commission explained, "consumers typically 'must either incur [these charges] when making a call or forego contact with their loved ones.'" *Order* ¶ 425 (JA1713). And even if not all consumers use all of these services, the agency found that the other benefits of its approach, including discouraging abusive provider practices and making billing clearer and more uniform, outweigh any such marginal differences. *Id.*[21] "The Commission enjoys broad discretion when conducting exactly this type of balancing." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009).

---

[21] According to the Providers (at 50 (citing *Order* ¶¶ 417, 425 (JA1709, 1713))), the FCC acknowledged that not all IPCS users will use ancillary services equally. In fact, the agency simply explained that any such difference is no more of a problem for IPCS than for "products and services provided outside the IPCS context." *Order* ¶ 417 (JA1709). Some customers will use a company's helpline more than others, but companies generally do not charge for helpline services separately.

Finally, the Providers argue that the agency should have dealt with abuses through "rules targeting that behavior." Providers Br. 51. But the agency had already attempted to do so, and providers were "still 'motivated to exploit every available opportunity to continue deriving unreasonable profits from such fees.'" *Order* ¶ 418 & n.1505 (JA1709) (quoting comments of the Prison Policy Initiative). It was reasonable to remove that incentive altogether.[22]

### 2. The agency reasonably declined to delay the ban on ancillary service charges

The FCC made most rules in the *Order*—including the ban on separate ancillary service charges—effective 60 days after publication in the Federal Register. *Order* ¶ 595 (JA1793). The agency established a staggered schedule, however, for compliance with the new rate caps and the elimination of site commissions. *See id.* ¶ 587 (JA1789). It did so because providers and facilities might "need additional time . . . to

---

[22] The FCC also incorporated ancillary services directly into rate caps, rather than setting caps for each ancillary service, in part because in the 2023 Data Collection "providers failed to reliably or consistently allocate their costs among the various ancillary services." *Order* ¶ 420 (JA1711). The agency here mistakenly referenced "Appendix H" of the *Order*, when it should have referenced "Appendix F." *See id.* App. F ¶ 26 (JA1882) (JA2510 (sealed)). The mistaken cross-reference in no way undermines the Commission's point.

renegotiate [existing] contracts" to comply with those aspects of the *Order*, and also to ensure sufficient time to "accommodate the legislative process to amend state or local laws" that, at the time of the *Order*, required site commissions. *Id.* ¶ 588 (JA1790).

The Providers (at 52–54)—joined by Intervenor Global Tel*Link, another IPCS provider (at 7–12)—argue that they deserve this same additional time to comply with the *Order*'s ban on separate ancillary service charges, which they assert are likewise contract terms that require renegotiation. Providers Br. 53; Global Tel*Link Br. 7–9.

This argument conflates a permissive contractual term with a mandatory one. While existing contracts may *permit* providers to assess separate ancillary service charges, neither the petitioning Providers nor Global Tel*Link claims to have contracts that *require* them to do so, and they fail to show that they cannot stop charging separate ancillary service fees without violating existing contractual provisions.[23] And the Providers do not dispute that even if there were contractual provisions that required them to charge separate ancillary service fees, change-of-

---

[23] Similarly, Global Tel*Link cites state laws "governing ancillary service charges," Global Tel*Link Br. n.5, but it does not allege that these laws *require* separate ancillary service fees.

law provisions would generally account for such situations. *See Securus Agency Stay Denial* ¶ 29 n.127 (JA2595) (cited above at note 20); Providers Br. n.33.

The petitioning Providers and Global Tel*Link also argue that ancillary service charges are "related" to rates and so should be implemented at the same time as rate changes. *See* Providers Br. 52–53; Global Tel*Link Br. 8. But they do not explain why that relation would justify delaying the effective date for the ban on separate fees for ancillary services. To be sure, that ban is part of the Commission's overall effort to ensure just and reasonable rates. *Order* ¶ 408 (JA1705). But that is not a reason to delay the prohibition until the new, lower rate caps go into effect. The rate caps now in effect are *higher* than the new rate caps. While those rate caps remain in effect, providers may recoup costs of providing ancillary services through their supra-competitive rates. *See Securus Agency Stay Denial* ¶ 32 (JA2596). The Commission reasonably decided not to allow providers to charge additional ancillary service fees, on top of supra-competitive rates, during the interim period before its new, lower rate caps take effect.

## C. Section 276 Does Not Require The Commission To Preempt Lower State-Imposed Rate Caps

The Commission declined to preempt state laws that set IPCS rates below the *Order*'s caps. *Order* ¶ 235 (JA1613). As the Commission explained, lower rate requirements by definition do not conflict with rate "caps," which establish only a ceiling, not a floor. *Id.* ¶ 237 (JA1615). The Commission also recognized that state requirements for lower rates— which arise from "[s]tate IPCS proceedings . . . designed to look at cost data and market conditions unique to [a] particular state," on a "more disaggregated basis" than the FCC's nationwide approach—may yield fair compensation for individual states' providers. *Id.* ¶ 236 (JA1614). And if not, the Commission made clear, a provider may seek relief from state authorities or preemption from the Commission on a state-specific basis. *Id.* ¶ 239 (JA1615).

The Providers argue that lower state IPCS rate requirements will necessarily undermine the FCC's "regime of implicit cross-subsidies." Providers Br. 55. But this misconceives the agency's approach, which is to set rate caps, not to mandate specific rates. *Order* ¶ 237 (JA1615). Rate caps provide pricing "flexibility" and allow rates below caps where appropriate, while still protecting consumers from unreasonably high

rates. *Id.* ¶ 120 (JA1545). The FCC has consistently set rate caps for IPCS, rather than specific rates, and commenters widely supported the continuation of this approach. *Id.* Moreover, preempting higher state rates but not lower ones was "consistent with the 'underlying purpose of the [Martha Wright-Reed Act]' to fundamentally reform the IPCS marketplace and eliminate, to the greatest extent possible, decades of exorbitant rates." *Id.* ¶ 238 (JA1615).

### D. The Commission Lawfully And Reasonably Allowed Alternate Pricing Plans And Declined To Require A Consumer Protection Label

#### 1. In allowing alternate pricing plans, the Commission fulfilled its duty to ensure "just and reasonable" rates and adequately accounted for objections to flat-rate calling

Under the *Order*, IPCS providers may for the first time offer alternate pricing plans, such as a monthly flat rate for a set number of minutes, or unlimited minutes, similar to plans now prevalent in non-carceral settings. *Order* ¶ 427 (JA1714). The Commission explained that these plans would promote more IPCS usage, often at lower costs, and would allow IPCS users to better budget for calls in a given period by knowing their cost in advance. *Id.* ¶¶ 432–433 (JA1718). At the same time, the agency instituted "guardrails" to protect against potential

abuse and higher prices, *id.* ¶ 428 (JA1715), including by requiring that such plans be optional, cancelable at will, and no longer than one month in duration, *id.* ¶¶ 438–443 (JA1720–1722).

The FCC also required that any such plan have a "breakeven" point equal to or less than the applicable rate caps. *Order* ¶ 444 (JA1723). That is, any plan offered must have an amount of usage at which the average or effective rate paid by the user is less than or equal to the governing rate cap. *Id.* n.1603 & ¶ 448 (JA1723 & 1724). "[I]n the event of a consumer complaint or [an FCC] investigation," providers must be able to demonstrate that the plan in question has such a breakeven point. *Id.* ¶ 449 (JA1725).

The Public Interest Petitioners argue that the FCC's requirements are "insufficiently protective of consumers," positing a plan with a breakeven point that requires so many minutes a customer "likely" would not use them all. Advocates Br. 39. This argument is not persuasive. First, it seems unlikely that such a plan would be attractive to most consumers, who presumably best understand how many minutes they are likely to use in a month, especially because providers must clearly disclose a plan's breakeven point. *See Order* ¶ 519 (JA1756). Second, the agency required that providers offering alternate pricing plans consider

factors such as facility limits on the number or length of calls and the equipment available, to help ensure that "consumers are reasonably able to make enough calls to reach the breakeven point." *Id.* ¶ 441 & n.1591 (JA1722). Third, in a previous FCC-approved pilot of alternate pricing by Securus, between 66 and 90 percent of consumers saw effective rates below the rate caps. *See Order* ¶ 434 (JA1719); Advocates Br. 40. And the remaining users would be free to switch back to per-minute rates for the next month if they preferred. *Id.* ¶ 461 (JA1730).[24]

The Public Interest Petitioners fault the agency for not requiring providers to "tru[e] up" accounts—by issuing refunds—for any users who do not reach a breakeven point. Advocates Br. 42. But as the FCC explained in the analogous context of cancellations during a subscription period, requiring refunds would undermine providers' incentive to offer these plans by depriving them "of the benefit of the bargain—low rates

---

[24] The Public Interest Petitioners argue (at 41–42) that the FCC's rules would place too great a burden on consumers in enforcement proceedings. But the Commission made clear that the agency can initiate its own investigations. *See Order* ¶ 449 (JA1725). And even when a user brings a complaint, "[t]he IPCS provider bears the burden of demonstrating compliance." *Id.*

in exchange for a predictable revenue stream." *Order* ¶ 462 (JA1730) (internal quotation marks omitted); *see id.* ¶ 464 (JA1731).[25]

Finally, although the Public Interest Petitioners contend (at 42–43) that the FCC did not adequately explain why alternate pricing plans are compatible with the statutory requirement of "just and reasonable" rates, the above discussion of the *Order* belies that claim. An agency's explanation need not be lengthy, or "a model of clarity," to survive APA review, so long as the agency's reasoning "may reasonably be discerned." *Press Commc'ns LLC v. FCC*, 875 F.3d 1117, 1122 (D.C. Cir. 2017) (quoting, in part, *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). The discussion of alternate pricing plans in the *Order* easily clears that low bar, particularly when—contrary to the Public Interest Petitioners' assertion (at 43)—the Commission expressly acknowledged that alternate pricing plans must provide just and reasonable rates and explained that the "guardrails" it adopted were designed with that mandate in mind. *See Order* ¶ 428 & n.1537 (JA1715).

---

[25] Providers *are* required to issue refunds where an incarcerated person can no longer use the service because he or she is released, transferred, or not permitted to make calls. *Id.* ¶¶ 462–463 (JA1730–1731).

## 2. The Commission reasonably did not require an IPCS consumer protection label

To increase consumer protection, the *Order* requires disclosures to be "clear, accurate, and conspicuous," and includes new requirements for website and app disclosures, billing statements, and special rules for alternate pricing plans. *Order* ¶¶ 506–515 (JA1749–1754). The Public Interest Petitioners argue (at 43) that the Commission should have adopted an "ICPS consumer protection label," that is, required certain disclosures in a standardized format. But the agency fully considered and rejected that proposal. *Order* ¶ 515 (JA1754). It found that the reforms it adopted would adequately inform consumers, and a further IPCS label requirement would deprive providers of useful flexibility. *See id.*

The Public Interest Petitioners argue that providing this flexibility was arbitrary and capricious, given providers' "history of non-compliance." Advocates Br. 44 (citing *Order* ¶ 503 (JA1748)). But unlike the cases on which the Public Interest Petitioners rely (at 44–45), the FCC did not simply trust providers and hope for the best. Instead, as the Public Interest Petitioners describe (at 45), the agency added considerable detail about what providers must now disclose and where they must disclose it. The Commission reasonably concluded that these

new requirements would sufficiently inform consumers without need for separate disclosures in a specified format.

### E. The States' Constitutional Challenge To The Structure Of The FCC Is Procedurally Barred And, In Any Event, Unsubstantiated

The States contend that "the structure of the FCC" is unconstitutional because "[t]he FCC and its Commissioners aren't sufficiently accountable to the President." Br. 43–46.

This argument is procedurally barred, because neither the States nor any other party raised it before the Commission. The Communications Act precludes judicial review of any "questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass." 47 U.S.C. § 405(a); *see Presque Isle TV Co. v. United States*, 387 F.2d 502, 504–06 (1st Cir. 1967); *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998) (collecting cases).[26] Section 405(a)'s exhaustion requirement is

---

[26] Courts have routinely treated constitutional challenges to agency officials as procedurally barred when the challengers failed to comply with similar exhaustion requirements. *E.g.*, *Fleming v. USDA*, 987 F.3d 1093, 1097–99 (D.C. Cir. 2021); *Edd Potter Coal Co., Inc. v. Dir., Off. of Workers' Comp. Progs.*, 39 F.4th 202, 206–12 (4th Cir. 2022); *NLRB v. Starbucks Corp.*, 125 F.4th 78, 87–88 (3d Cir. 2024); *see McClenning v. Dep't of the Army*, 2022 MSPB 3 ¶ 7 (Mar. 31, 2022) (collecting decisions from the Second, Third, Sixth, Ninth, and Tenth Circuits).

mandatory, and courts have no discretion to excuse a forfeiture. *See Ross v. Blake*, 578 U.S. 632, 639 (2016) (although "judge-made exhaustion doctrines" may be "amenable to judge-made exceptions," "a statutory exhaustion provision stands on a different footing," and courts must "take[] such statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements").

"Petitioners are required to exhaust even constitutional claims before the agency," and that is so "even if the agency does not have the authority to rule on them in the first instance." *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 115 (D.C. Cir. 2022) (internal quotation marks and citations omitted); *see Fleming*, 987 F.3d at 1099 (no futility exception); *id.* at 1101–02 (no exception for "structural constitutional issue[s]"); *Starbucks*, 125 F.4th at 87–88 (same).

Even if section 405(a) did not foreclose the States from bringing their removal challenge, the argument is meritless on the facts here. First, it rests on the premise that the FCC's Commissioners are protected from at-will removal by the President, but the States have failed to substantiate that premise. The States cite (at 44) 47 U.S.C. § 154(c), which provides that Commissioners are appointed to five-year terms, but that text simply sets the *maximum* period that a Commissioner may

serve before reappointment is required, without purporting to limit removal before then. *See Severino v. Biden*, 71 F.4th 1038, 1045 (D.C. Cir. 2023) (term of service is "a ceiling, not a floor"); *Rieth-Riley Constr. Co. v. NLRB*, 114 F.4th 519, 530 (6th Cir. 2024) ("The Supreme Court has long held that a fixed term of office, without any additional limitation, does not impact the President's discretionary removal power." (citing *Parsons v. United States*, 167 U.S. 324, 338–39 (1897))), *cert. denied* No. 24-767 (U.S. Mar. 24, 2025). Nor does any other provision of the Communications Act purport to grant FCC Commissioners protection from removal.

Finally, the Court need not resolve the States' structural challenge because—even assuming that FCC Commissioners are protected from at-will removal—the States have not shown any material effect on the *Order* that would entitle them to relief.[27] Unlike when an officer is improperly *appointed*, an "unconstitutional[] limit[] [on] the President's authority to *remove*" an officer, by itself, supplies "no reason to regard any of the actions taken by [the officer] as void." *Collins v. Yellin*, 594 U.S. 220, 257–58 (2021). Instead, to be entitled to relief from the *Order*, the States

---

[27] *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 487 (2010) (assuming *arguendo* that SEC Commissioners enjoy removal protection).

would need to show that removal protections "might have altered [Commissioners'] behavior in a way" that "inflict[ed] compensable harm" on them. *Id.* at 259–60.

The States make no such showing here. They do not show that the President sought or wished to remove any Commissioner, or that the Commissioners would have voted differently on the *Order* depending whether they believed they were protected from removal. *See id.* at 260. Absent such a showing, courts have universally held under *Collins* that litigants are not entitled to relief from otherwise-valid agency orders. *E.g.*, *Starbucks*, 125 F.4th at 88–89; *Bhatti v. FHFA*, 97 F.4th 556, 559–62 (8th Cir. 2024); *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 96 F.4th 599, 613–16 (3d Cir. 2024); *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 179–81 (2d Cir. 2023); *Integrity Adv., LLC v. CFPB*, 48 F.4th 1161, 1169–71 (10th Cir. 2022); *CFPB v. CashCall, Inc.*, 35 F.4th 734, 742–43 (9th Cir. 2022).

Having failed to develop any such argument in their opening brief (let alone before the agency), the States have now waived it. *See In re FBI Distrib. Corp.*, 330 F.3d 36, 41 n.6 (1st Cir. 2003).

## VI. VENUE IS PROPER IN THIS COURT

When an agency "receives two or more petitions for review" "within ten days" of when an "order" is issued, it "shall" notify the Judicial Panel, which "shall" by random selection "designate one court of appeals . . . in which the record is to be filed." 28 U.S.C. § 2112(a)(1) & (3). Then, "[a]ll courts in which proceedings are instituted with respect to the same order" "shall transfer those proceedings to the court in which the record is so filed." *Id.* § 2112(a)(5). It is then within the discretion of the court where the record is filed to transfer the matter to another court "[f]or the convenience of the parties in the interest of justice." *Id.*

The FCC and the Judicial Panel followed that procedure here: four parties filed petitions for review within ten days after the first-published portion of the order (which denied Securus's petitions for clarification and waiver) appeared in the Federal Register, the FCC gave notice to the Judicial Panel, and the consolidated cases were randomly assigned to this Court. Venue in this Court is therefore proper.

Although Securus initially agreed that venue here is proper, and moved for a discretionary transfer "in the interest of justice," Securus First Transfer Mot. at 8 (Entry ID 6670732), the Providers now offer two theories as to why transfer to the Fifth Circuit (where Securus filed its

petition challenging the first-published portion of the order) is mandatory. Both arguments fail.

First, the Providers argue that the initial (but not the second) set of petitions from the Public Interest Petitioners was incurably premature and thus should be "excluded from the § 2112(a)" calculus, which they argue means no lottery should have occurred. Providers Br. 30–31. Respondents do not dispute that those initial petitions were premature. *E.g.*, Gov't Resp. to Show Cause Orders at 6 (Entry ID 6675294). But that is beside the point, because the Providers do not deny that the FCC and the Judicial Panel complied with the process required by statute. Indeed, Securus has previously asserted that it would have been "improper for the agency to make pre-lottery determinations of the validity of petitions that challenge its order." Transfer Reply at 3 n.2 (Entry ID 6674018).[28]

---

[28] In addition, for reasons we have discussed in earlier pleadings, Securus "was not meaningfully aggrieved, if it was aggrieved at all, by the agency's dismissal of [the clarification and waiver] petitions"—the portion of the *Order* at issue in Securus's first petition for judicial review—because Securus obtained the relief it sought. Gov't Opp. to Mandamus 12; *see* Gov't Opp. to Transfer Mot. 14–20 (Entry ID 6672945); Gov't Opp. to Renewed Transfer Mot. 9–13 (Entry ID 6685604). Tellingly, the Providers make no showing in their opening brief here to substantiate Securus's purported aggrievement. *See* Providers Br. 58–59 (arguing only that "the FCC's new rules cannot have mooted" Securus's petitions before the new rules took effect).

Second, the Providers contend that the statutory lottery was never triggered because no petition was filed during the lottery-triggering window. *See* Providers Br. 28–30. The window for any lottery petitions, they argue, began when the Commission released the *Order* on its website, not when it published the *Order* in the Federal Register, and no party petitioned for review within 10 days of the *Order*'s website-release date. Providers Br. 30. Because Securus's petition was the first filed, they assert that venue is only proper in the Fifth Circuit. *Id.* (citing 28 U.S.C. § 2112(a)(1)).

This theory relies on a misreading of section 1.4(b) of the FCC's rules, which governs the date of public notice for Commission orders. 47 C.F.R. § 1.4(b); *see* 28 U.S.C. § 2344 (window to petition for review occurs upon "notice . . . or publication in accordance with [agency] rules"). As the Providers agree, public notice of "documents in notice and comment . . . rulemaking proceedings required by the [APA] to be published in the Federal Register" is ordinarily "the date of publication in the Federal Register." 47 C.F.R. § 1.4(b)(1) (citations omitted); *see* Providers Br. 29. They invoke (at 30) a limited exception to that general rule, codified in a note to section 1.4(b)(1), which provides that "adjudicatory decisions with respect to specific parties that may be

. . . contained in rulemaking documents are governed by the" public notice provisions for non-rulemaking documents. 47 C.F.R. § 1.4(b)(1) note. But that exception does not apply here. Securus's petitions for clarification and waiver did not seek relief limited to "specific parties," but rather relief for the IPCS industry at large. *See* Securus Clarification Pet. at 1 (JA212) (seeking clarification "to ensure uniform implementation across the industry"); Securus Waiver Pet. at 1 (JA203) (seeking a waiver for "Securus and other providers").

## CONCLUSION

There is no cause for this Court to transfer these cases to the Fifth Circuit, and the petitions for review should be denied.

Dated: April 14, 2025

Respectfully submitted,

/s/ *Matthew J. Dunne*

Abigail A. Slater
  *Assistant Attorney General*

Robert B. Nicholson
Robert J. Wiggers
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
  *United States of America*

D. Adam Candeub
  *General Counsel*

Bradley Craigmyle
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Matthew J. Dunne
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
  *Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the word limit approved by the Court in its December 18, 2024 Order (31,500) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒   this document contains <u>22,005</u> words, *or*

    ☐   this document uses a monospaced typeface and contains <u>    </u> lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using <u>        </u> with <u>        </u>.

*/s/  Matthew J. Dunne*
Matthew J. Dunne
*Counsel for Respondent Federal*
*Communications Commission*

# Statutory Addendum

Martha Wright-Reed Just and Reasonable Communications Act......... 1

28 U.S.C. § 2112. ........................................................................... 4

47 U.S.C. § 201. ............................................................................. 8

47 U.S.C. § 276. ............................................................................. 9

47 U.S.C. § 405. ........................................................................... 12

47 C.F.R. § 1.4 ............................................................................. 14

# MARTHA WRIGHT-REED JUST AND REASONABLE COMMUNICATIONS ACT OF 2022

Public Law 117-338
117th Congress

An Act

To amend the Communications Act of 1934 to require the Federal Communications Commission to ensure just and reasonable charges for telephone and advanced communications services in correctional and detention facilities.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.
   This Act may be cited as the "Martha Wright-Reed Just and Reasonable Communications Act of 2022".

SEC. 2. TECHNICAL AMENDMENTS.
   (a) In General.--Section 276 of the Communications Act of 1934 (47 U.S.C. 276) is amended--
      (1) in subsection (b)(1)(A)--
         (A) by striking "per call";
         (B) by inserting ", and all rates and charges are just and reasonable," after "fairly compensated";
         (C) by striking "each and every";
         (D) by striking "call using" and inserting "communications using"; and
         (E) by inserting "or other calling device" after "payphone"; and
      (2) in subsection (d), by inserting "and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 3(1)" after "inmate telephone Service".

(b) Definition of Advanced Communications Services.--Section 3(1) of the Communications Act of 1934 (47 U.S.C. 153(1)) is amended--

(1) in subparagraph (C), by striking "and" at the end;

(2) in subparagraph (D), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(E) any audio or video communications service used by inmates for the purpose of communicating with individuals outside the correctional institution where the inmate is held, regardless of technology used.".

(c) Application of the Act.--Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by inserting "section 276," after "sections 223 through 227, inclusive,".

## SEC. 3. IMPLEMENTATION.

(a) Rulemaking. --Not earlier than 18 months and not later than 24 months after the date of enactment of this Act, the Federal Communications Commission shall promulgate any regulations necessary to implement this Act and the amendments made by this Act.

(b) Use of Data.--In implementing this Act and the amendments made by this Act, including by promulgating regulations under subsection (a) and determining just and reasonable rates, the Federal Communications Commission--

(1) may use industry-wide average costs of telephone service and advanced communications services and the average costs of service of a communications service provider; and

(2) shall consider costs associated with any safety and security measures necessary to provide a service described in paragraph (1) and differences in the costs described in paragraph (1) by small, medium, or large facilities or other characteristics.

SEC. 4.  EFFECT ON OTHER LAWS.

Nothing in this Act shall be construed to modify or affect any Federal, State, or local law to require telephone service or advanced communications services at a State or local prison, jail, or detention facility or prohibit the implementation of any safety and security measures related to such services at such facilities.

Approved January 5, 2023.

# 28 U.S.C. § 2112

## § 2112. Record on review and enforcement of agency orders

**(a)** The rules prescribed under the authority of section 2072 of this title may provide for the time and manner of filing and the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers. Such rules may authorize the agency, board, commission, or officer to file in the court a certified list of the materials comprising the record and retain and hold for the court all such materials and transmit the same or any part thereof to the court, when and as required by it, at any time prior to the final determination of the proceeding, and such filing of such certified list of the materials comprising the record and such subsequent transmittal of any such materials when and as required shall be deemed full compliance with any provision of law requiring the filing of the record in the court. The record in such proceedings shall be certified and filed in or held for and transmitted to the court of appeals by the agency, board, commission, or officer concerned within the time and in the manner prescribed by such rules. If proceedings are instituted in two or more courts of appeals with respect to the same order, the following shall apply:

**(1)** If within ten days after issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in at least two courts of appeals, the agency, board, commission, or officer shall proceed in accordance with paragraph (3) of this subsection. If within ten days after the issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in only one court of appeals, the agency, board, commission, or officer shall file the record in that court notwithstanding the institution in any other court of appeals of proceedings for review of that order. In all other cases in which proceedings have been instituted in two or more courts of appeals with respect to the same order, the agency, board, commission, or

officer concerned shall file the record in the court in which proceedings with respect to the order were first instituted.

**(2)** For purposes of paragraph (1) of this subsection, a copy of the petition or other pleading which institutes proceedings in a court of appeals and which is stamped by the court with the date of filing shall constitute the petition for review. Each agency, board, commission, or officer, as the case may be, shall designate by rule the office and the officer who must receive petitions for review under paragraph (1).

**(3)** If an agency, board, commission, or officer receives two or more petitions for review of an order in accordance with the first sentence of paragraph (1) of this subsection, the agency, board, commission, or officer shall, promptly after the expiration of the ten-day period specified in that sentence, so notify the judicial panel on multidistrict litigation authorized by section 1407 of this title, in such form as that panel shall prescribe. The judicial panel on multidistrict litigation shall, by means of random selection, designate one court of appeals, from among the courts of appeals in which petitions for review have been filed and received within the ten-day period specified in the first sentence of paragraph (1), in which the record is to be filed, and shall issue an order consolidating the petitions for review in that court of appeals. The judicial panel on multidistrict litigation shall, after providing notice to the public and an opportunity for the submission of comments, prescribe rules with respect to the consolidation of proceedings under this paragraph. The agency, board, commission, or officer concerned shall file the record in the court of appeals designated pursuant to this paragraph.

**(4)** Any court of appeals in which proceedings with respect to an order of an agency, board, commission, or officer have been instituted may, to the extent authorized by law, stay the effective date of the order. Any such stay may thereafter be modified, revoked, or extended by a court of appeals designated pursuant to paragraph (3) with respect to that order or by any other court of appeals to which the proceedings are transferred.

**(5)** All courts in which proceedings are instituted with respect to the same order, other than the court in which the record is filed pursuant to this subsection, shall transfer those proceedings to the court in which the record is so filed. For the convenience of the parties in the interest of justice, the court in which the record is filed may thereafter transfer all the proceedings with respect to that order to any other court of appeals.

**(b)** The record to be filed in the court of appeals in such a proceeding shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency, board, commission, or officer concerned, or such portions thereof (1) as the rules prescribed under the authority of section 2072 of this title may require to be included therein, or (2) as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court in any such proceeding may consistently with the rules prescribed under the authority of section 2072 of this title designate to be included therein, or (3) as the court upon motion of a party or, after a prehearing conference, upon its own motion may by order in any such proceeding designate to be included therein. Such a stipulation or order may provide in an appropriate case that no record need be filed in the court of appeals. If, however, the correctness of a finding of fact by the agency, board, commission, or officer is in question all of the evidence before the agency, board, commission, or officer shall be included in the record except such as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court agree to omit as wholly immaterial to the questioned finding. If there is omitted from the record any portion of the proceedings before the agency, board, commission, or officer which the court subsequently determines to be proper for it to consider to enable it to review or enforce the order in question the court may direct that such additional portion of the proceedings be filed as a supplement to the record. The agency, board, commission, or officer concerned may, at its option and

without regard to the foregoing provisions of this subsection, and if so requested by the petitioner for review or respondent in enforcement shall, file in the court the entire record of the proceedings before it without abbreviation.

**(c)** The agency, board, commission, or officer concerned may transmit to the court of appeals the original papers comprising the whole or any part of the record or any supplemental record, otherwise true copies of such papers certified by an authorized officer or deputy of the agency, board, commission, or officer concerned shall be transmitted. Any original papers thus transmitted to the court of appeals shall be returned to the agency, board, commission, or officer concerned upon the final determination of the review or enforcement proceeding. Pending such final determination any such papers may be returned by the court temporarily to the custody of the agency, board, commission, or officer concerned if needed for the transaction of the public business. Certified copies of any papers included in the record or any supplemental record may also be returned to the agency, board, commission, or officer concerned upon the final determination of review or enforcement proceedings.

**(d)** The provisions of this section are not applicable to proceedings to review decisions of the Tax Court of the United States or to proceedings to review or enforce those orders of administrative agencies, boards, commissions, or officers which are by law reviewable or enforceable by the district courts.

# 47 U.S.C. § 201

## § 201. Service and charges

**(a)** It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

**(b)** All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided*, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

# 47 U.S.C. § 276

## § 276. Provision of payphone service

## (a) Nondiscrimination safeguards

After the effective date of the rules prescribed pursuant to subsection (b), any Bell operating company that provides payphone service--

**(1)** shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and

**(2)** shall not prefer or discriminate in favor of its payphone service.

## (b) Regulations

### (1) Contents of regulations

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that--

**(A)** establish a compensation plan to ensure that all payphone service providers are fairly compensated, and all rates and charges are just and reasonable, for completed intrastate and interstate communications using their payphone or other calling device, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation;

**(B)** discontinue the intrastate and interstate carrier access charge payphone service elements and payments in effect on February 8, 1996, and all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues, in favor of a compensation plan as specified in subparagraph (A);

**(C)** prescribe a set of nonstructural safeguards for Bell operating company payphone service to implement the provisions of paragraphs (1) and (2) of subsection (a), which safeguards shall, at a minimum, include the nonstructural safeguards equal to those adopted in the Computer Inquiry-III (CC Docket No. 90-623) proceeding;

**(D)** provide for Bell operating company payphone service providers to have the same right that independent payphone providers have to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry interLATA calls from their payphones, unless the Commission determines in the rulemaking pursuant to this section that it is not in the public interest; and

**(E)** provide for all payphone service providers to have the right to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry intraLATA calls from their payphones.

## (2) Public interest telephones

In the rulemaking conducted pursuant to paragraph (1), the Commission shall determine whether public interest payphones, which are provided in the interest of public health, safety, and welfare, in locations where there would otherwise not be a payphone, should be maintained, and if so, ensure that such public interest payphones are supported fairly and equitably.

## (3) Existing contracts

Nothing in this section shall affect any existing contracts between location providers and payphone service providers or interLATA or intraLATA carriers that are in force and effect as of February 8, 1996.

**(c) State preemption**

To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements.

**(d) "Payphone service" defined**

As used in this section, the term "payphone service" means the provision of public or semi-public pay telephones, the provision of inmate telephone service and advanced communications services described in subparagraphs (A), (B), (D), and (E) of section 153(1) of this title in correctional institutions, and any ancillary services.

## § 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order

**(a)** After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the

Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

**(b)(1)** Within 90 days after receiving a petition for reconsideration of an order concluding a hearing under section 204(a) of this title or concluding an investigation under section 208(b) of this title, the Commission shall issue an order granting or denying such petition.

   **(2)** Any order issued under paragraph (1) shall be a final order and may be appealed under section 402(a) of this title.

# 47 C.F.R. § 1.4

## § 1.4 Computation of time.

(a) Purpose. The purpose of this rule section is to detail the method for computing the amount of time within which persons or entities must act in response to deadlines established by the Commission. It also applies to computation of time for seeking both reconsideration and judicial review of Commission decisions. In addition, this rule section prescribes the method for computing the amount of time within which the Commission must act in response to deadlines established by statute, a Commission rule, or Commission order.

(b) General Rule—Computation of Beginning Date When Action is Initiated by Commission or Staff. Unless otherwise provided, the first day to be counted when a period of time begins with an action taken by the Commission, an Administrative Law Judge or by members of the Commission or its staff pursuant to delegated authority is the day after the day on which public notice of that action is given. See § 1.4(b)(1)–(5) of this section. Unless otherwise provided, all Rules measuring time from the date of the issuance of a Commission document entitled "Public Notice" shall be calculated in accordance with this section. See § 1.4(b)(4) of this section for a description of the "Public Notice" document. Unless otherwise provided in § 1.4(g) and (h) of this section, it is immaterial whether the first day is a "holiday." For purposes of this section, the term public notice means the date of any of the following events: See § 1.4(e)(1) of this section for definition of "holiday."

> (1) For all documents in notice and comment and non-notice and comment rulemaking proceedings required by the Administrative Procedure Act, 5 U.S.C. 552, 553, to be published in the Federal Register, including summaries thereof, the date of publication in the Federal Register.

Note to paragraph (b)(1): Licensing and other adjudicatory decisions with respect to specific parties that may be associated with or contained in rulemaking documents are governed by the provisions of § 1.4(b)(2).

Example 1: A document in a Commission rule making proceeding is published in the Federal Register on Wednesday, May 6, 1987. Public notice commences on Wednesday, May 6, 1987. The first day to be counted in computing the beginning date of a period of time for action in response to the document is Thursday, May 7, 1987, the "day after the day" of public notice.

Example 2: Section 1.429(e) provides that when a petition for reconsideration is timely filed in proper form, public notice of its filing is published in the Federal Register. Section 1.429(f) provides that oppositions to a petition for reconsideration shall be filed within 15 days after public notice of the petition's filing in the Federal Register. Public notice of the filing of a petition for reconsideration is published in the Federal Register on Wednesday, June 10, 1987. For purposes of computing the filing period for an opposition, the first day to be counted is Thursday, June 11, 1987, which is the day after the date of public notice. Therefore, oppositions to the reconsideration petition must be filed by Thursday, June 25, 1987, 15 days later.

(2) For non-rulemaking documents released by the Commission or staff, including the Commission's section 271 determinations, 47 U.S.C. 271, the release date.

Example 3: The Chief, Mass Media Bureau, adopts an order on Thursday, April 2, 1987. The text of that order is not released to the public until Friday, April 3, 1987. Public notice of this decision is given on Friday, April 3, 1987. Saturday, April 4, 1987, is the first day to be counted in computing filing periods.

(3) For rule makings of particular applicability, if the rule making document is to be published in the Federal Register and the Commission so states in its decision, the date of public notice will commence on the day of the Federal Register publication date. If the decision fails to specify Federal Register publication, the date of public notice will commence on the release date, even if the document is subsequently published in the Federal Register. See Declaratory Ruling, 51 FR 23059 (June 25, 1986).

Example 4: An order establishing an investigation of a tariff, and designating issues to be resolved in the investigation, is released on Wednesday, April 1, 1987, and is published in the Federal Register on Friday, April 10, 1987. If the decision itself specifies Federal Register publication, the date of public notice is Friday, April 10, 1987. If this decision does not specify Federal Register publication, public notice occurs on Wednesday, April 1, 1987, and the first day to be counted in computing filing periods is Thursday, April 2, 1987.

(4) If the full text of an action document is not to be released by the Commission, but a descriptive document entitled "Public Notice" describing the action is released, the date on which the descriptive "Public Notice" is released.

Example 5: At a public meeting the Commission considers an uncontested application to transfer control of a broadcast station. The Commission grants the application and does not plan to issue a full text of its decision on the uncontested matter. Five days after the meeting, a descriptive "Public Notice" announcing the action is publicly released. The date of public notice commences on the day of the release date. Example 6: A Public Notice of petitions for rule making filed with the Commission is released on Wednesday, September 2, 1987; public notice of these petitions is given on September 2, 1987. The first day to be counted in computing filing times is Thursday, September 3, 1987.

(5) If a document is neither published in the Federal Register nor released, and if a descriptive document entitled "Public Notice" is not released, the date appearing on the document sent (e.g., mailed, telegraphed, etc.) to persons affected by the action.

Example 7: A Bureau grants a license to an applicant, or issues a waiver for non-conforming operation to an existing licensee, and no "Public Notice" announcing the action is released. The date of public notice commences on the day appearing on the license mailed to the applicant or appearing on the face of the letter granting the waiver mailed to the licensee.

(c) General Rule—Computation of Beginning Date When Action is Initiated by Act, Event or Default. Commission procedures frequently require the computation of a period of time where the period begins with the occurrence of an act, event or default and terminates a specific number of days thereafter. Unless otherwise provided, the first day to be counted when a period of time begins with the occurrence of an act, event or default is the day after the day on which the act, event or default occurs.

Example 8: Commission Rule § 21.39(d) requires the filing of an application requesting consent to involuntary assignment or control of the permit or license within thirty days after the occurrence of the death or legal disability of the licensee or permittee. If a licensee passes away on Sunday, March 1, 1987, the first day to be counted pursuant to § 1.4(c) is the day after the act or event. Therefore, Monday, March 2, 1987, is the first day of the thirty day period specified in § 21.39(d).

(d) General Rule—Computation of Terminal Date. Unless otherwise provided, when computing a period of time the last day of such period of time is included in the computation, and any action required must be taken on or before that day.

Example 9: Paragraph 1.4(b)(1) of this section provides that "public notice" in a notice and comment rule making proceeding begins on the day of Federal Register publication. Paragraph 1.4(b) of this section provides that the first day to be counted in computing a terminal date is the "day after the day" on which public notice occurs. Therefore, if the commission allows or requires an action to be taken 20 days after public notice in the Federal Register, the first day to be counted is the day after the date of the Federal Register publication. Accordingly, if the Federal Register document is published on Thursday, July 23, 1987, public notice is given on Thursday, July 23, and the first day to be counted in computing a 20 day period is Friday, July 24, 1987. The 20th day or terminal date upon which action must be taken is Wednesday, August 12, 1987.

(e) Definitions for purposes of this section:

(1) The term holiday means Saturday, Sunday, officially recognized Federal legal holidays and any other day on which the Commission's Headquarters are closed and not reopened prior to 5:30 p.m., or on which a Commission office aside from Headquarters is closed (but, in that situation, the holiday will apply only to filings with that particular office). For example, a regularly scheduled Commission business day may become a holiday with respect to the entire Commission if Headquarters is closed prior to 5:30 p.m. due to adverse weather, emergency or other closing. Additionally, a regularly scheduled Commission business day may become a holiday with respect to a particular Commission office aside from Headquarters if that office is closed prior to 5:30 p.m. due to similar circumstances.

Note to paragraph (e)(1): As of August 1987, officially recognized Federal legal holidays are New Year's Day, January 1; Martin Luther King's Birthday, third Monday in January; Washington's Birthday, third Monday in February; Memorial Day, last Monday in May; Independence Day, July 4; Labor Day, first Monday in September; Columbus Day, second Monday in October; Veterans Day, November 11; Thanksgiving Day, fourth Thursday in November; Christmas Day, December 25. If a legal holiday falls on Saturday or Sunday, the holiday is taken, respectively, on the preceding Friday or the following Monday. In addition, January 20, (Inauguration Day) following a Presidential election year is a legal holiday in the metropolitan Washington, DC area. If Inauguration Day falls on Sunday, the next succeeding day is a legal holiday. See 5 U.S.C. 6103; Executive Order No. 11582, 36 FR 2957 (Feb. 11, 1971). The determination of a "holiday" will apply only to the specific Commission location(s) designated as on "holiday" on that particular day.

(2) The term business day means all days, including days when the Commission opens later than the time specified in Rule § 0.403, which are not "holidays" as defined above.

(3) The term filing period means the number of days allowed or prescribed by statute, rule, order, notice or other Commission action for filing any document with the Commission. It does not include

any additional days allowed for filing any document pursuant to paragraphs (g), (h) and (j) of this section.

(4) The term filing date means the date upon which a document must be filed after all computations of time authorized by this section have been made.

(f) Except as provided in § 0.401(b) of this chapter, all petitions, pleadings, tariffs or other documents not required to be accompanied by a fee and which are hand-carried must be tendered for filing in complete form, as directed by the Commission's rules, with the Office of the Secretary before 4 p.m., at the address indicated in 47 CFR 0.401(a). The Secretary will determine whether a tendered document meets the pre–7:00 p.m. deadline. Documents filed electronically pursuant to § 1.49(f) must be received by the Commission's electronic filing system before midnight. Applications, attachments and pleadings filed electronically in the Universal Licensing System (ULS) pursuant to § 1.939(b) must be received before midnight on the filing date. Media Bureau applications and reports filed electronically pursuant to § 73.3500 of this chapter must be received by the electronic filing system before midnight on the filing date.

(g) Unless otherwise provided (e.g., §§ 1.773 and 76.1502(e)(1) of this chapter), if the filing period is less than 7 days, intermediate holidays shall not be counted in determining the filing date.
Example 10: A reply is required to be filed within 5 days after the filing of an opposition in a license application proceeding. The opposition is filed on Wednesday, June 10, 1987. The first day to be counted in computing the 5 day time period is Thursday, June 11, 1987. Saturday and Sunday are not counted because they are holidays. The document must be filed with the Commission on or before the following Wednesday, June 17, 1987.

(h) If a document is required to be served upon other parties by statute or Commission regulation and the document is in fact served by mail (see § 1.47(f)), and the filing period for a response is 10 days or less, an additional 3 days (excluding holidays) will be allowed to all parties in the proceeding for filing a response. This paragraph (h) shall not apply

to documents filed pursuant to § 1.89, § 1.315(b) or § 1.316. For purposes of this paragraph (h) service by facsimile or by electronic means shall be deemed equivalent to hand delivery.

Example 11: A reply to an opposition for a petition for reconsideration must be filed within 7 days after the opposition is filed. 47 CFR 1.106(h). The rules require that the opposition be served on the person seeking reconsideration. 47 CFR 1.106(g). If the opposition is served on the party seeking reconsideration by mail and the opposition is filed with the Commission on Monday, November 9, 1987, the first day to be counted is Tuesday, November 10, 1987 (the day after the day on which the event occurred, § 1.4(c)), and the seventh day is Monday, November 16. An additional 3 days (excluding holidays) is then added at the end of the 7 day period, and the reply must be filed no later than Thursday, November 19, 1987.

Example 12: Assume that oppositions to a petition in a particular proceeding are due 10 days after the petition is filed and must be served on the parties to the proceeding. If the petition is filed on October 28, 1993, the last day of the filing period for oppositions is Sunday, November 7. If service is made by mail, the opposition is due three days after November 7, or Wednesday, November 10.

(i) If both paragraphs (g) and (h) of this section are applicable, make the paragraph (g) computation before the paragraph (h) computation. Example 13: Section 1.45(b) requires the filing of replies to oppositions within five days after the time for filing oppositions has expired. If an opposition has been filed on the last day of the filing period (Friday, July 10, 1987), and was served on the replying party by mail, § 1.4(i) of this section specifies that the paragraph (g) computation should be made before the paragraph (h) computation. Therefore, since the specified filing period is less than seven days, paragraph (g) is applied first. The first day of the filing period is Monday, July 13, 1987, and Friday, July 17, 1987 is the fifth day (the intervening weekend was not counted). Paragraph (h) is then applied to add three days for mailing (excluding holidays). That period begins on Monday, July 20, 1987. Therefore, Wednesday, July 22, 1987, is the date by which replies must be filed, since the intervening weekend is again not counted.

(j) Unless otherwise provided (e.g. § 76.1502(e) of this chapter) if, after making all the computations provided for in this section, the filing date falls on a holiday, the document shall be filed on the next business day. See paragraph (e)(1) of this section. If a rule or order of the Commission specifies that the Commission must act by a certain date and that date falls on a holiday, the Commission action must be taken by the next business day.

Example 14: The filing date falls on Friday, December 25, 1987. The document is required to be filed on the next business day, which is Monday, December 28, 1987.

(k) Where specific provisions of part 1 conflict with this section, those specific provisions of part 1 are controlling. See, e.g.,§§ 1.45(d), 1.773(a)(3) and 1.773(b)(2). Additionally, where § 76.1502(e) of this chapter conflicts with this section, those specific provisions of § 76.1502 are controlling. See e.g. 47 CFR 76.1502(e).

(l) When Commission action is required by statute to be taken by a date that falls on a holiday, such action may be taken by the next business day (unless the statute provides otherwise).