# United States Court of Appeals
# For the First Circuit

---

No. 24-8028

In re: MCP 191

*(Caption Continued on Inside Cover)*

---

On Petitions for Review of a Final Order of the
Federal Communications Commission

---

## JOINT REPLY BRIEF OF PETITIONERS DIRECT ACTION FOR RIGHTS AND EQUALITY, CRIMINAL JUSTICE REFORM CLINIC, AND PENNSYLVANIA PRISON SOCIETY

---

Andrew Jay Schwartzman
525 Ninth Street NW, Seventh Floor
Washington, DC 20004
Telephone: (202) 241-2408
andyschwartzman@gmail.com

*Counsel for Pennsylvania Prison Society*

Jessica Ring Amunson
Arjun R. Ramamurti
Andrew C. DeGuglielmo
Ruby C. Giaquinto
JENNER & BLOCK LLP
1099 New York Avenue NW, #900
Washington, DC, 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Direct Action for Rights
and Equality*

Amy E. Potter
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform
Clinic*

No. 24-1814

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1859

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1861

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents.

_____

No. 24-1884

DIRECT ACTION FOR RIGHTS AND EQUALITY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1886

PENNSYLVANIA PRISON SOCIETY,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

_____

No. 24-1922

CRIMINAL JUSTICE REFORM CLINIC,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES,

Respondents,

SECURUS TECHNOLOGIES, LLC,

Intervenor.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................ii

INTRODUCTION ......................................................................................1

ARGUMENT..............................................................................................4

I.  THE COMMISSION'S INCLUSION OF CERTAIN REPORTED COSTS IN THE RATE-CAP CALCULATION WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.................................4

    A.  The Commission's Inclusion of Communications Security Services Costs in the Lower Bounds Was Contrary to Law and Arbitrary and Capricious................................................4

    B.  The Commission's Inclusion of Correctional Facility Costs in the Upper Bounds Was Arbitrary and Capricious. .......................10

II.  THE COMMISSION'S FAILURE TO ADOPT CERTAIN CONSUMER PROTECTION MEASURES WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS...................................13

    A.  The Commission's Decision to Permit Alternate Pricing Plans Without Adequate Consumer Safeguards Was Contrary to Law and Arbitrary and Capricious...............................................13

    B.  The Commission's Failure to Adopt a Consumer Protection Label Was Arbitrary and Capricious...........................................17

III.  THE PROVIDERS' JURISDICTIONAL AND VENUE ARGUMENTS REMAIN MERITLESS. .............................................19

    A.  This Court Has Jurisdiction Over Public Interest Petitioners' Initial Petitions. ........................................................................19

    B.  Venue is Still Proper in this Court..............................................26

CONCLUSION.........................................................................................29

i

# TABLE OF AUTHORITIES

CASES

*ACLU v. FCC*, 486 F.2d 411 (D.C. Cir. 1973) ................................................. 27

*Animal Legal Defense Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir. 2017).......................................................................................................... 18

*Ball v. NLRB*, 299 F.2d 683 (4th Cir. 1962)...................................................... 28

*BASF Wyandotte Corp. v. Costle*, 582 F.2d 108 (1st Cir. 1978).................. 26, 27

*Boston Edison Co. v. FERC*, 885 F.2d 962 (1st Cir. 1989)................................ 12

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011).................................................. 7

*City & County of San Francisco v. EPA*, 145 S. Ct. 704 (2025)........................ 27

*Council Tree Communications, Inc. v. FCC*, 503 F.3d 284 (3d Cir. 2007)...................................................................................................... 22, 26

*Craker v. DEA*, 714 F.3d 17 (1st Cir. 2013)................................................ 22, 23

*District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015)......................................................................................................... 13

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021).................................. 12

*FirsTier Mortgage Co. v. Investors Mortgage Insurance Co.*, 498 U.S. 269 (1991)........................................................................................... 21

*Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 559 U.S. 280 (2010) ............................................................... 7

*Jimenez-Morales v. United States Attorney General*, 821 F.3d 1307 (11th Cir. 2016) ..................................................................................... 20

*Khan v. Attorney General of the United States*, 691 F.3d 488 (3d Cir. 2012)........................................................................................................ 20

*In re MCP No. 185*, 2024 WL 3517673 (6th Cir. June 28, 2024)...................... 29

*Newsweek, Inc. v. United States Postal Service*, 652 F.2d 239 (2d Cir. 1981).................................................................................. 28

*NLRB v. Bayside Enterprises, Inc.*, 514 F.2d 475 (1st Cir. 1975) (per curiam), *aff'd*, 429 U.S. 298 (1977) .......................................... 29

*North American Telecommunications Ass'n v. FCC*, 751 F.2d 207 (7th Cir. 1984) (per curiam) ............................................................. 23

*Remington Lodging & Hospitality, LLC v. NLRB*, 747 F.3d 903 (D.C. Cir. 2014).................................................................................. 24

*Sierra Club v. West Virginia Department of Environmental Protection*, 64 F.4th 487 (4th Cir. 2023) ...................................................... 18

*Snohomish County v. Surface Transportation Board*, 954 F.3d 290 (D.C. Cir. 2020).............................................................................. 22

*Southland Mower Co. v. United States Consumer Product Safety Commission*, 600 F.2d 12 (D.C. Cir. 2020) ................................... 25

*Stone v. INS*, 514 U.S. 386 (1995).................................................... 20

*T Mobile Northeast LLC v. City of Wilmington*, 913 F.3d 311 (3d Cir. 2019).................................................................................. 26

*United Steelworkers of America, AFL-CIO CLC v. Marshall*, 592 F.2d 693 (3d Cir. 1979) ..................................................................... 28

*United States Telecom Ass'n v. FCC*, 824 F.3d 674 (D.C Cir. 2016) ................. 19

*Wade v. FCC*, 986 F.2d 1433 (D.C. Cir. 1993) (per curiam) ............................ 22

*Waterway Communication Systems, Inc. v. FCC*, 851 F.2d 401 (D.C. Cir. 1988).................................................................................. 20

*Western Union Telegraph Co. v. FCC*, 773 F.2d 375 (D.C. Cir. 1985) ............... 26

STATUTES

8 U.S.C. § 1252(a)(1)....................................................................... 20

28 U.S.C. § 2112(a) ................................................................. 19, 24

28 U.S.C. § 2112(a)(1) .................................................................... 26

28 U.S.C. § 2112(a)(3) .................................................................... 26

28 U.S.C. § 2112(a)(5) ................................................................. 3, 27

47 U.S.C. § 276(b)(1)(A) ................................................................ 16

Martha Wright-Reed Just and Reasonable Communications Act of
    2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) .................................... 1, 6

**OTHER AUTHORITIES**

Order of Court, No. 24-8028 (1st Cir. Oct. 21, 2024)........................................ 28

Petition for Review, *Securus Technologies, LLC v. FCC*, No. 24-60454
    (5th Cir. Sept. 4, 2024), Dkt. No. 1 ............................................................ 23

# INTRODUCTION

The Order under review makes significant progress in reforming rates and charges for incarcerated people's communications services ("IPCS") pursuant to the Martha Wright-Reed Just and Reasonable Communications Act of 2022, Pub. L. No. 117-338, 136 Stat. 6156 (2023) ("Act" or "MWRA"). [1]  But the Federal Communications Commission ("Commission") should have excluded certain costs from its rate-cap calculations and should have included additional consumer-protection measures.  This Court should therefore order a limited remand without vacatur to permit the Commission to address these errors while leaving the Order's rate caps in place.

First, the Commission erred in including certain costs in the lower and upper bounds of its zones of reasonableness for its rate caps.  With respect to the lower bounds, the Commission correctly excluded most categories of safety and security costs, but it unlawfully and unreasonably included communications security services costs despite those costs primarily serving law-enforcement purposes rather than benefitting IPCS consumers.  The Commission and Securus Technologies, LLC ("Securus") cannot explain how the Act's text mandates inclusion of any safety and security costs in rates given that the Act merely directs the Commission to "consider"

---

[1] *See In re Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act*, 39 FCC Rcd 7647 (2024) ("Order") (JA1486).

whether any such costs are "necessary to provide" IPCS.  And the "used and useful" framework—which the Commission otherwise correctly applied—does not permit inclusion of any safety and security measures that do not benefit IPCS consumers. With respect to the upper bounds, the Commission improperly included a two-cent "additive" for "correctional facility costs" despite the conceded absence of any reliable data supporting that figure.  The Commission defends that decision based on the deference owed to it on questions of data, but that deference does not extend to crediting a wholly unsupported estimate that influenced the final rate caps.

Second, the Commission should have included additional consumer protections when it allowed alternate pricing plans—particularly for flat-rate plans that permit providers to charge rates higher than the "just and reasonable" rate caps the Commission imposed.  The Commission argues that incarcerated people are unlikely to sign up for plans that they will underutilize, but the Order itself contains evidence to the contrary, and the Commission arbitrarily and capriciously failed to even acknowledge commenters' proposal to "true up" consumers' accounts when they do end up paying higher rates.  The Commission also unreasonably rejected a much-needed proposal for a standard "consumer label" format in an industry known for using flexibility regarding disclosure formats to confuse consumers.  The Commission points to its other consumer disclosure reforms to justify this omission,

but those reforms, while laudable, do not go to the format of providers' disclosures and therefore cannot justify the Commission's failure to adopt a standardized label.

Finally, the Court should reject the jurisdictional and venue arguments offered by Securus and Pay Tel Communications, Inc. (collectively, the "Providers"). Public Interest Petitioners have repeatedly explained why this Court has jurisdiction over their initial petitions, and no one disputes that the Court has jurisdiction over Public Interest Petitioners' supplemental petitions. *See, e.g.*, Providers Opening Br. 2. As for venue, as Securus has previously conceded, the only statutory mechanism by which these cases could now be transferred to the Fifth Circuit requires this Court to assess the "convenience of the parties in the interest of justice." 28 U.S.C. § 2112(a)(5). Yet Securus' merits briefing nowhere makes the case that this standard is satisfied, and it plainly is not: it does not serve the parties' convenience to transfer this fully briefed matter to the Fifth Circuit at this late stage, and it is not in the interest of justice to permit Securus to impose its chosen forum on the numerous stakeholders affected by this important Order based on a quirk in the timing of its publication in the Federal Register. This Court and the Supreme Court have already denied Securus' previous attempts to immediately compel transfer to the Fifth Circuit. The Court should continue to reject those arguments and decide these cases on the merits.

3

**ARGUMENT**

## I.    THE COMMISSION'S INCLUSION OF CERTAIN REPORTED COSTS IN THE RATE-CAP CALCULATION WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A.    The Commission's Inclusion of Communications Security Services Costs in the Lower Bounds Was Contrary to Law and Arbitrary and Capricious.

The Commission should not have included providers' reported communications security services costs in its lower bounds.  *See* Opening Br. 27-28, 30-31.  The Commission correctly determined that the "used and useful" framework was the appropriate approach to determine "just and reasonable" rates under the Act. *See id.* at 24-25; Public Interest Intervenors Br. 25-26.  But communications security services costs are not "used and useful" to IPCS consumers because they are associated with safety and security measures that restrict or surveil IPCS consumers rather than benefit them.  These measures include calling features that "limit the individuals or numbers an incarcerated person may call"; "provid[e] personal identification numbers (PINs) to incarcerated people"; "track[] frequently called numbers"; and "implement[] incoming communication restrictions."  Order ¶ 395 n.1418 (JA1698).   In defending the Commission's inclusion of communications security services costs in the lower bounds, the Commission and Securus primarily press two points: (1) Public Interest Petitioners' exclusion of communications security services costs "leaves no room" for the Act's requirement that the

4

Commission "consider" safety and security costs "necessary to provide" IPCS because nearly all safety and security costs would then be excluded from the rates, Commission Br. 62-63; *see also* Securus Intervenor Br. 9-10; and (2) the Commission reasonably included communications security services costs because these services appear to be "universally offered by IPCS providers and are a standard part of all IPCS offerings," Commission Br. 62 (quoting Order ¶ 396 (JA1699)). Each response lacks merit.

*First*, the Commission is incorrect to suggest that because Congress "directed the FCC to consider which safety and security costs are necessary to provide IPCS," communications security services costs necessarily must be included. Commission Br. 62-63. The statutory command to "*consider*" safety and security costs in no way constitutes a requirement to *include* any particular costs. *See* Public Interest Intervenors Br. 24-25. The Order itself agrees that the requirement to "consider" safety and security costs amounts only to a command to "reach … express and reasoned conclusion[s]" regarding those costs. Order ¶ 356 (JA1671); *see also* Comments of the Wright Petitioners et al. at 23, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) ("Wright Petitioners May 8, 2023 Comments") (JA761) ("Congress did not say that the Commission 'must include' or 'shall allow for the recovery of' the safety and security costs claimed by IPCS providers."); Opening Comments of Stephen A. Raher at 14–15, WC Docket Nos. 23-62 & 12-375 (May 8, 2023)

(JA621-22) (similar).  It is therefore no answer to say that communications security services costs must be included simply because otherwise no significant category of costs would be included in rates.

Along similar lines, the Commission asserts that courts are "'not ... equipped' to second-guess" the Commission's "'balance [of] competing interests'" in choosing to include communications security services costs while excluding other costs that serve other functions.  Commission Br. 63-64 (citation omitted).  But here, too, the relevant statutory language makes this rationale unpersuasive.  As noted, Congress carefully specified that the Commission was to "consider costs associated with any safety and security measures necessary to provide" IPCS.  MWRA § 3(b)(2).  This language plainly does not contemplate that the Commission would simply survey the universe of self-reported costs incurred on safety and security measures and strike a reasonable middle ground.  Rather, costs associated with safety and security measures should be included in rates only if those measures are truly "necessary to provide" IPCS.

For its part, Securus emphasizes that "Congress made it *mandatory* for the FCC" to consider costs associated with safety and security measures through its use of the word "shall."  Securus Intervenor Br. 3, 9-10 (emphasis added).  But again, the mandatory obligation is merely to "consider" these costs, not to include them in rates.  If Congress meant to require the Commission to include these costs, it easily

could have said so.  Securus therefore pivots to inferring that "Congress would not have imposed that mandatory duty if it intended for IPCS rates to cover *none* of those costs."  *Id.* at 10.  But in fact, the statutory language—as well as the broader purpose of the Act to make IPCS *more* affordable by ensuring "just and reasonable" rates—is perfectly consistent with that result.  Indeed, the Order recognized that "the Commission has never concluded" that "even a substantial portion" of safety and security measures should be recovered.  Order ¶ 376 (JA1684).  In short, the Act requires appropriate *consideration*, and rates excluding *all* safety and security costs would be permissible if none were shown to be "necessary to provide" IPCS.[2]

*Second*, the Commission contends that communications security services are "necessary to provide" IPCS because they are basic services that are "inherent" or "require[d]" in the provision of IPCS.  Commission Br. 63.  As an initial matter, Public Interest Petitioners agree that the Commission correctly chose the "used and useful" framework to determine, as a substantive matter, which safety and security

---

[2] Securus also cites the post-enactment statement of two members of Congress to the effect that excluding safety and security costs "contradicts Congressional intent in the Martha Wright-Reed Act."  Securus Intervenor Br. 10.  This carries very little weight.  *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 298 (2010) (holding that a post-enactment letter by a bill's sponsors "does not qualify as legislative 'history,'" and is of "scant or no value"); *see also Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").

costs are "necessary." The problem is that the communications security services costs that the Commission included do not meet that substantive test.

For example, even assuming that communications security services are "a standard part of all IPCS offerings," Commission Br. 62 (quoting Order ¶ 396 (JA1699)), that fact would still not justify the recovery of communications security services costs under the Commission's "used and useful" framework. To be sure, safety and security services that are *not* offered and provided universally are *not* necessary services. *See* Order ¶ 381 (JA1688) ("Safety and security measures cannot be both required to provide IPCS and elective."). But the converse—that any service that *is* offered by all providers *is* necessary to facilitate the provision of IPCS, regardless of any benefit to IPCS consumers—need not be true. If it were, then providers would have the ultimate say as to recoverable costs: they could always simply augment their "default packages." *See* Order App. I ¶ 56 n.82 (JA1918) (explaining that providers typically offer a default set of services to facilities at the time of contract). That system would improperly "place th[e] role" of "determining just and reasonable rates" in "the hands of the providers" rather than the agency, Order ¶ 362 (JA1675), and the Commission relies on this very same logic to *reject* the Providers' arguments elsewhere in its brief, *see* Commission Br. 42.

In any case, the factual basis for the conclusion that these costs are "inherent" is unsupported by the record. The Commission merely cites to its pre-MWRA orders

and a handful of comments from providers and carceral institutions, all of which are either irrelevant in light of the Act's new statutory standard or are plainly self-serving statements that do not provide the needed factual support. *See, e.g.*, Order ¶ 396 n.1426 (JA1699) (citing Comments of NCIC Inmate Communications at 15, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA574) (stating without supporting facts that various safety and security measures are "necessary for the safety of incarcerated people, victims, witnesses, judges, lawyers, facility staff and others")); *id.* ¶ 397 n.1428 (JA1699) (citing Comments of Pay Tel Communications, Inc. in Response to Notice of Proposed Rulemaking at 16-17, WC Docket Nos. 23-62 & 12-375 (May 8, 2023) (JA595-96) (addressing who, between facilities and providers, incurs various safety and security costs and contending only that call recording is necessary to ensure safety)). This meager basis cannot support the Commission's inclusion of these significant costs in the lower bounds.[3]

Finally, the Commission further argues, in response to Public Interest Petitioners' argument that the Commission arbitrarily included communications security services costs while excluding other redundant costs, that it was precisely

---

[3] Securus also suggests that public safety is already suffering under the current rate caps because facilities have had to cut services. Securus Intervenor Br. 10 n.8. But Securus points to no actual safety effects, and the Commission itself has recognized that facilities are "unlikely to make good on their implicit threats to curtail access." Commission Br. 84 (citing Order ¶ 312 (JA1651)).

because the Commission chose to include these "basic" costs that it could "exclude other add-ons that in part duplicated these functions." Commission Br. 63 n.12. But as Public Interest Petitioners have explained, in recognizing that these sets of costs serve equivalent ends, the Commission implicitly recognizes that communications security services "primarily serve law enforcement purposes." Order ¶ 394 (JA1696). That being the case, they cannot benefit IPCS consumers and should not be included in the lower bounds. *See* Opening Br. 30-31.

### B. The Commission's Inclusion of Correctional Facility Costs in the Upper Bounds Was Arbitrary and Capricious.

The Commission's inclusion of a two-cent "additive" for alleged "correctional facility costs" in its upper bounds was also wholly without foundation and thus arbitrary and capricious. Opening Br. 32-37. There is very little in the record to establish the existence of such costs, even though the Commission repeatedly requested supportive data. *Id.* 32-34. And any information that was provided to the Commission had "infirmities" that rendered it of "severely limit[ed] … value." Order ¶ 167 (JA1578). Nonetheless, the Commission defends its inclusion of the two-cent additive on the grounds that the additive did not necessarily affect the ultimate rates and that, in any event, the Commission did the best it could with the record before it. *See* Commission Br. 85-86. Neither response is persuasive.

*First*, the Commission briefly suggests that Public Interest Petitioners have not "demonstrate[d] that the agency would have chosen lower rate caps if the upper

10

bounds had been $0.02 lower." *Id.* at 85.  But that suggestion is inconsistent with various statements in the Order regarding the Commission's zone-of-reasonableness approach, including specific statements indicating that the additive did play a role in rate-setting.  For example, the Order explained that while poor data "preclude[d] any adjustment to the lower bounds" based on facility costs, the Commission "account[ed] for" any understatement in the lower bounds by "choosing rate caps at levels that exceed the lower bounds."  Order ¶ 180 (JA1585).  And the Commission directly stated that it "consider[ed] facility costs in choosing rate caps from within the zones of reasonableness." *Id.* ¶ 166 n.591 (JA1577).  In light of such statements, Public Interest Petitioners have plausibly raised the possibility that the ultimate rate caps were affected by the additive.

*Second*, the Commission's substantive response that it is owed deference on the questions of data at issue here is also flawed.  The Commission acted reasonably, it says, to include a two-cent additive in the upper bounds even though the data did not allow any "exactitude" in quantifying facility costs, because that was the best approach available given the limited evidence at hand.  Commission Br. 85.  But the circumstances in this case differ significantly from the circumstances at issue in the

primary case on which the Commission relies.[4]  In *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021), the Commission repeatedly requested data supporting certain commenters' position that the agency's proposed action would harm minority and female ownership, but did not agree with the predictions in the data.  *Id.* at 426-27. Therefore, the Court ruled that the Commission reasonably concluded that possible harm to minority and female ownership was *not* a reason to change course.  *Id.* at 427.

That is the opposite of what occurred here.  For years, the Commission had asked providers and facilities for data supporting the existence of facility costs to no avail.  Order ¶ 166 (JA1577).  But unlike in *Prometheus*, the data the Commission received here was self-serving and had no statistical validity, and therefore should have played no role in ratemaking.  Unlike in *Prometheus*, where the Commission acknowledged but rejected data because it disagreed with the data's predictive value, here the Commission *relied upon* commenters' unsupported data to specifically quantify costs based on data it had repeatedly recognized was flawed and unreliable. *Id.* ¶¶ 167, 170 & n.606 (JA1577-79).  That decision and calculation had no basis in any facts in the record and cannot be deemed the "best approach" in a limited-

---

[4] The Commission (at 86) also cites *Boston Edison Co. v. FERC*, 885 F.2d 962, 964 (1st Cir. 1989).  But *Boston Edison* is of limited relevance because it does not involve a situation where the agency was confronted with insufficient or invalid data.

information situation.  *Contra* Commission Br. 86 (quoting Order ¶ 166 (JA1577)).

Rather, it amounts to the improper "use [of] inaccurate data."  *See, e.g.*, *Dist. Hosp.*

*Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015).

## II. THE COMMISSION'S FAILURE TO ADOPT CERTAIN CONSUMER PROTECTION MEASURES WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A. The Commission's Decision to Permit Alternate Pricing Plans Without Adequate Consumer Safeguards Was Contrary to Law and Arbitrary and Capricious.

As commenters explained before the agency, while alternate pricing plans have promise, they "risk[] opening the door to abuse and higher prices."  Wright Petitioners May 8, 2023 Comments at 29 (JA767).  Thus, the "purpose of allowing alternative rate structures should be to benefit IPCS customers, not allow IPCS providers additional ways to profit from IPCS."  *Id.*  With respect to flat-rate plans, the Order is inadequately protective of consumers because it adopts a breakeven point requirement that merely obligates flat-rate plans to have *some* point at which a consumer's level of use is high enough that they are paying an effective rate equal to or less than the rate caps.  Order ¶ 448 (JA1724-25).  As Public Interest Petitioners explained, that is no guardrail because it allows providers to offer flat-rate plans with a high breakeven point that could be worse for low-usage consumers than the per-minute rates, with such consumers left either to file their own complaints or wait for the Commission to investigate.  *Id.* ¶¶ 444, 449 (JA1723-25).

13

In response, the Commission primarily resists the premise of Public Interest Petitioners' objection. The Commission suggests that no plan with a high breakeven point would realistically be attractive to consumers. Commission Br. 96-97. But the record makes clear that consumers underutilizing an alternate rate plan is a likely scenario. In Securus' pilot program, between "10% to 34% of the consumers" had "low usage and as a result, paid more using the subscription plans than they would have paid under per-minute rates." Order ¶ 434 (JA1719). When up to a third of consumers demonstrate a behavior that could result in their paying unjust and unreasonable rates, the Commission should address that possibility.

The Commission further responds that it "required that providers offering alternate pricing plans consider factors such as facility limits on the number or length of calls and the equipment available," Commission Br. 97-98, in order to help ensure that "consumers are reasonably able to make enough calls to reach the breakeven point," Order ¶ 441 & n.1591 (JA1722). But, as just discussed, a requirement to "consider" certain things is not a requirement to reach an end result that actually accounts for those things. And the fact that the Commission believed it necessary to direct providers to consider such factors only reinforces that providers will be looking to structure plans to benefit their revenue streams and harm consumers. *Cf. id.* ¶ 441 n.1591 (JA1722) (explaining that the Commission "want[s] to avoid IPCS providers, offering alternate pricing plans of, for example, 200 calls per month

when ... the incarcerated individual could not possibly make 200 calls a month at their facility").

Otherwise, the Commission falls back to the point that any individual consumer who ends up paying more than the rate caps for a given month can "switch back to per-minute rates" if they prefer.  Commission Br. 98 (citing Order ¶ 461 (JA1730)).  But even assuming that such consumers are able to promptly switch back in this manner, the Commission's argument amounts to the view that providers can structure plans to take advantage of different pools of IPCS consumers from month to month, all of whom risk paying rates that are unjust and unreasonable until they recognize the problem. [5]

The Commission also ignored commenters' proposal that providers "true up" accounts by issuing refunds for users that did not reach their breakeven points.  *See* Opening Br. 42.  In response, the Commission and Securus both assert that such a system would deprive providers of the "benefit of the bargain," Order ¶ 462 (JA1730), and eliminate their incentive to offer these plans.  *See generally* Commission Br. 98–99; Securus Intervenor Br. 14.  Apparently this point is so

---

[5] The Commission also argues that consumers are not overly burdened by the complaint process because the Commission can also initiate an investigation. Commission Br. 98 n.24.  But the mere possibility of an investigation is little reassurance, and the Commission has not explained why consumer complaints can apparently only be brought by those consumers who meet their breakeven point. *See* Order ¶ 449 (JA1725).

obvious that it need not have been said in the Order at all.  In reality, this assertion is far from straightforward: even in situations where providers are not permitted to collect effective rates higher than the rate caps, providers could still benefit from lower variable rates, and their plans could incentivize greater use of IPCS (and therefore higher revenues).  Thus, the Commission should have at least responded to this proposal.

That is especially so because, without a "true up" rule, the Commission appears to have blessed—without explanation—effective rates that exceed the "just and reasonable" rate caps that it has otherwise adopted.  Opening Br. 42-43.  The statute specifies that "*all* rates and charges" be just and reasonable, without an exception for alternate rate plans that take advantage of low usage.  47 U.S.C. § 276(b)(1)(A); *see also* Order ¶ 76 (JA1526).  In response, the Commission itself concedes that its explanation may not have been a "model of clarity."  Commission Br. 99 (quoting *Press Commc'ns LLC v. FCC*, 875 F.3d 1117, 1122 (D.C. Cir. 2017)).  But it argues that the Order "expressly acknowledged that alternate pricing plans must provide just and reasonable rates."  Commission Br. 99.  That is no answer: the thrust of Public Interest Petitioners' argument is precisely that, despite that assertion,

the flat-rate alternate pricing structure without true-up that the Commission has approved allows providers to avoid that obligation.[6]

### B. The Commission's Failure to Adopt a Consumer Protection Label Was Arbitrary and Capricious.

Finally, the Commission fails to explain its decision not to adopt a consumer protection label specifying not just *what* providers must disclose to IPCS consumers and *where* they must do so, but *how* they must disclose the relevant information. *See* Opening Br. 43-45. According to the Commission, its other reforms will "adequately inform consumers," and a standardized label "would deprive providers of useful flexibility." Commission Br. 100; *see also* Order ¶ 515 (JA1754-55).

The Public Interest Petitioners agree that the Commission's other consumer-disclosure reforms are salutary, but those reforms do not address the specific issue that a label would solve. The Commission does not contend with the fact that its other reforms have nothing to do with the *format* of disclosures, which is a known mechanism by which providers have repeatedly skirted disclosure obligations. *See, e.g.*, Order ¶ 514 (JA1754) (noting that one provider prices its products in dollars per megabyte, rather than dollars per minute); *id.* ¶ 515 (JA1754-55) (another

---

[6] As for Securus, its defense of alternate rate plans primarily relies on expressions of consumer support for its previous pilot program. *See* Securus Intervenor Br. 13-14. But it is unsurprising that there was "demand for alternative pricing plans," *id.* at 14, at a time when the applicable rate caps were twice what they are now.

provider's disclosures are 18,000 words long, a format not conducive to consumer understanding). Nothing about the Order's new requirements to disclose certain additional information at specific locations, *see id.* ¶¶ 506–508 (JA1749-51), addresses these practices. That information, too, could apparently still be buried in a mountain of other disclosures, leaving consumers without recourse. Without more targeted changes that would ensure consumer understanding in the way that a standardized label would, it was "arbitrary and capricious for [the FCC] to predict compliance" given providers' past practices. *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 502 (4th Cir. 2023); *see also Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619-20 (D.C. Cir. 2017).

Nor can a general appeal to "provider flexibility" justify the failure to adopt a consumer protection label. Whatever value provider flexibility might have in the abstract, that value is absent here given the incentives for providers to ensnare consumers in plans that may not be financially beneficial—as has occurred in the past. In such circumstances, the Commission's decision not to require a consumer protection label was arbitrary and capricious.

III.   **THE     PROVIDERS'     JURISDICTIONAL     AND     VENUE
        ARGUMENTS REMAIN MERITLESS.**

Finally, this Court should reject the Providers' threshold arguments seeking to
justify a transfer of these consolidated cases to the Fifth Circuit.[7] *See* Opening Br.
46-58 (refuting these arguments).   A transfer would deprive Public Interest
Petitioners of their statutory right to a judicial lottery and cannot be squared with
Congress' scheme.  *See* 28 U.S.C. § 2112(a).  At bottom, the Providers have not
shown that it would serve the convenience of the parties nor the interest of justice to
transfer these cases at this stage.  The Court should now reject these arguments once
and for all.

A.   **This Court Has Jurisdiction Over Public Interest Petitioners'
        Initial Petitions.**

Public Interest Petitioners have already demonstrated that courts may exercise
jurisdiction over prematurely filed petitions once agency action has become final.
Securus responds that Public Interest Petitioners' cases are "non-Hobbs Act cases,"
Securus Intervenor Br. 6-7, but all but one of the cases that Public Interest Petitioners
cited *are* Hobbs Act cases.  They arose in the context of judicial review of orders of
removal by the Board of Immigration Appeals.  *See* Opening Br. 47–48 (citing

---

[7] The Providers suggest (citing a single case) that the Court should issue a separate
order ruling on the transfer motion.  Providers Opening Br. 28 n.23.  But Public
Interest Petitioners have identified another case where a court deferred adjudication
of the very same prematurity issue to the merits panel, which simply ruled on the
merits.  *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).

*Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1309 (11th Cir. 2016); *Khan v. Att'y Gen. of the U.S.*, 691 F.3d 488, 493 (3d Cir. 2012); *Hounmenou v. Holder*, 691 F.3d 967, 970 n.1 (8th Cir. 2012); and *Herrera-Molina v. Holder*, 597 F.3d 128, 132 (2d Cir. 2010)).  Judicial review in that context is set forth in the Immigration and Nationality Act, which provides in relevant part that "[j]udicial review of a final order of removal … is governed only by chapter 158 of [t]itle 28."  8 U.S.C. § 1252(a)(1).  And the Supreme Court has confirmed that the "reference to chapter 158 of Title 28 is a reference to the Hobbs Act" such that "Congress directed that the Hobbs Act procedures would govern review of deportation orders."  *Stone v. INS*, 514 U.S. 386, 392, 393 (1995).  Those cases are thus particularly apposite for the case at hand.

Securus also fails to justify why the Court should deviate from the longstanding principle underlying those cases, namely, that "an appeal taken prematurely effectively ripens and secures appellate jurisdiction when the [underlying] judgment becomes final."  *Waterway Commc'ns Sys., Inc. v. FCC*, 851 F.2d 401, 406 (D.C. Cir. 1988) (quotation marks omitted).  As the Third Circuit concluded, there is "no reason to treat premature petitions for review from final orders [governed by the Hobbs Act] differently than we have treated premature notices of appeal in other types of cases."  *Khan*, 691 F.3d at 494; *accord Jimenez Morales*, 821 F.3d at 1309 (adopting the rule in the Hobbs Act context because the

"approach is consistent with how we have addressed premature appeals in other contexts"). Securus accuses Public Interest Petitioners of quoting this language from *Waterway* "as though it were the holding," Securus Intervenor Br. 6, while largely ignoring that Public Interest Petitioners quoted *Waterway* for this general "principle" and cited First Circuit case law applying that same principle, Opening Br. 47 (citing *Triangle Cayman Asset Co. v. LG & AC, Corp.*, 52 F.4th 24, 31 (1st Cir. 2022)). It continues to be the case that permitting a protective petition "to become effective when" the Order was fully published "does not catch" the government by surprise, and "little would be accomplished by prohibiting the court of appeals from reaching the merits of such an appeal." *FirsTier Mortg. Co. v. Invs. Mortg. Ins. Co.*, 498 U.S. 269, 276 (1991).

Devoid of any discussion of the Hobbs Act, Securus' argument leaves the Court to guess both as to the language and logic that compel a different rule in this context. There is no First Circuit Hobbs Act case that supports Securus' position. And Securus' unsupported proclamation as to the "the law in Hobbs Act cases in the D.C. Circuit[] and every other circuit that has addressed the question" is otherwise refuted by the cases on which Public Interest Petitioners have relied. Securus Intervenor Br. 7.

Securus otherwise continues to invoke the "incurably premature" doctrine based on cases where a petitioner's pending motion for reconsideration remained

pending before the agency. *See Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 291 (3d Cir. 2007); *Snohomish Cnty. v. Surface Transp. Bd.*, 954 F.3d 290, 297–98 (D.C. Cir. 2020). In that specific context (but not here), there exists a "danger of wasted judicial effort that attends the simultaneous exercise of judicial and agency jurisdiction." *Wade v. FCC*, 986 F.2d 1433, 1434 (D.C. Cir. 1993) (per curiam). Here, the Commission had resolved all outstanding matters in connection with the Order by the time it published the first portion of the Order in the Federal Register on August 26, 2024, and no party petitioned for review prior to August 26.

In any case, as Public Interest Petitioners have previously argued, Opening Br. 49, this Court has outright rejected the "incurably premature" doctrine. *See Craker v. DEA*, 714 F.3d 17 (1st Cir. 2013). Securus attempts to distinguish *Craker* on the ground that judicial review of the petitioner's claim there was not governed by the Hobbs Act. But this Court squarely rejected the categorical application of the "incurably premature" doctrine that the Providers favor; there, the Court was "not persuaded that [it] should impose a bright line test requiring dismissal" where it had held a petition in abeyance while the agency resolved a petition for reconsideration. *Id.* at 25-26. Instead, the Court explained, exercising jurisdiction over the petition "served … the interests of judicial economy." *Id.* The same is true here, where the case has now been briefed on the merits and the parties have fully developed their arguments based on this Court's precedents. Moreover, the *Craker* Court further

concluded that any "jurisdictional concerns" were "alleviated" after the agency's reconsideration concluded. *Id.* at 25. And it emphasized that "[i]t is not clear that even those courts that have adopted the ['incurably premature' doctrine] would apply it here, where … broader reconsideration of the factual and legal bases for the agency's final order remained only, at the time of filing of the petition for review, a mere possibility." *Id.* The absence of any pending proceedings before the Commission in connection with the Order at the time Public Interest Petitioners filed their initial petitions is yet another reason why this Court should reject Securus' argument outright.

Further, the Public Interest Petitioners' filing of its initial petitions was especially appropriate given that Securus' first petition represented that it was challenging the entire Order, including the as-yet unpublished provisions. *See* Pet. for Review at 1-2 & n.1, *Securus Techs., LLC v. FCC*, No. 24-60454 (5th Cir. Sept. 4, 2024), Dkt. No. 1 ("Securus Technologies, LLC ('Securus') hereby petitions this Court for review of an order of the Federal Communications Commission ('Commission')." (citing and attaching full Order)). While Securus contests this characterization of its petition, Securus Intervenor Br. 4, Public Interest Petitioners took Securus at its word and reasonably proceeded on the assumption that the whole Order was being challenged. *See N. Am. Telecomms. Ass'n v. FCC*, 751 F.2d 207, 208–09 (7th Cir. 1984) (per curiam) (declining to dismiss petition where litigation

activity "may have lulled [the petitioner] into thinking that it had not filed . . . prematurely"). Indeed, despite the Providers' repeated accusations of forum-shopping, it is Securus who started the race to the courthouse in this matter. And it is Securus that has relentlessly sought to impose its preferred forum on the parties by inventing various rationales to preclude the numerous stakeholders affected by this Order from exercising their statutory right to a judicial lottery. *Cf.* Providers' Opening Br. 27 ("The lottery selecting this Court should not have occurred.").

Indeed, Securus' challenge to Public Interest Petitioners' interpretation of Securus' initial petition is ultimately self-defeating. Securus claims that it attached the entire Order because it was required to "[a]ttach a copy of the order … to be reviewed" under Fifth Circuit Rules. Securus Intervenor Br. at 5 (quoting 5th Cir. L.R. 15.1(b)). But that explanation establishes that Securus itself understood the August 26th and September 20th publications to be part of the same order for purposes of the judicial lottery statute. Accordingly, Public Interest Petitioners' filing of their initial petitions within ten days of the August 26th publication was the only means by which they could participate in the judicial lottery. *See* 28 U.S.C. § 2112(a). Securus' argument would thus foreclose Public Interest Petitioners' ability to participate in the lottery altogether—a result antithetical to Congress' intent in enacting the lottery statute to provide a party aggrieved by an agency order a

"procedure for preserving its choice of forum." *Remington Lodging & Hosp., LLC v. NLRB*, 747 F.3d 903, 905 (D.C. Cir. 2014).

Moreover, the Providers' jurisdictional argument, if accepted, would create jurisdictional problems for Securus as well. As Public Interest Petitioners and the Commission have argued, Securus itself was not aggrieved by the Commission's denial of its requests for waiver and clarification. *See* Opening Br. 53-54; Commission Br. 106 n.28. The Providers do not meaningfully attempt to argue otherwise, devoting two cursory paragraphs at the end of their opening brief to this issue. Providers Opening Br. 58-59. As a result, Providers' interpretation would doom Securus' initial petition, too.[8]

Finally, at minimum, it is undisputed that this Court has jurisdiction over Public Interest Petitioners' supplemental petitions. Public Interest Petitioners have done exactly what courts have "repeatedly urged petitioners to do in analogous

---

[8] Dicta from a 50-year-old concurrence pre-dating the lottery provision is not to the contrary. *See* Providers Opening Br. 31 (citing *Industrial Union Department, AFL-CIO v. Bingham*, 570 F.2d 965, 974 (D.C. Cir. 1977) (Wilkey, J., concurring)). There, the fractured D.C. Circuit expressly held that it had jurisdiction over the premature petitions, but nonetheless transferred the case in an unusual situation where the agency appeared to have facilitated certain parties' filing first. *Id.* at 966-67 (per curiam). And *Southland Mower Co. v. U.S. Consumer Product Safety Commission*, 600 F.2d 12, 13 (5th Cir. 1979), did not even order a transfer and expressly referenced the discretionary standard in 28 U.S.C. § 2112(a)(5) that Public Interest Petitioners defend. Moreover, because Securus' initial petition was also premature, this Court remains the proper venue as DARE was the first party to file a supplemental petition.

situations" as a means of safeguarding their rights. *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 380 (D.C. Cir. 1985) ("[N]othing prevented [the petitioner] from supplementing its premature petition with a later protective petition…."); *Council Tree Commc'ns*, 503 F.3d at 291 ("[W]e note that 'nothing prevented [the petitioners] from supplementing [their] premature petition with a later protective petition." (second and third alteration in original) (quotation marks omitted)). Indeed, for this very reason, the Third Circuit has expressly distinguished and declined to apply the *Council Tree Communications* case on which Securus relies. *See T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 331 (3d Cir. 2019). Just so here.

### B.    Venue is Still Proper in this Court.

Both the Public Interest Petitioners and the Commission agree that venue is proper in this Court. *See* Opening Br. 50-58; Commission Br. at 105-08. The judicial lottery statute contemplates an easy-to-administer rule in which a single judicial lottery—and a single consolidated proceeding—occur when "proceedings are instituted in two or more courts of appeals with respect to the *same order*" within 10 days. 28 U.S.C. § 2112(a)(1), (3); *see* Opening Br. 52-53. Both of the publications at issue here are part of the same order because they arise from the "same or interrelated proceedings," *BASF Wyandotte Corp. v. Costle*, 582 F.2d 108, 112 (1st Cir. 1978) (citation omitted), and otherwise "represent the staggered implementation

26

of a single, multi-faceted agency undertaking," *ACLU v. FCC*, 486 F.2d 411, 414 (D.C. Cir. 1973).

Proceeding on the incorrect assumption that only its initial petition was proper, *see, e.g.*, Securus Intervenor Br. 2 n.2, Securus cites Section 2112(a)(1) as the basis for transferring these cases to the Fifth Circuit. But Section 2112(a)(1) does not articulate a transfer mechanism; only Section 2112(a)(5) does. *See City & Cnty. of San Francisco v. EPA*, 145 S. Ct. 704, 713-14 (2025) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). And Section 2112(a)(5) permits transfer *only* "[f]or the convenience of the parties in the interest of justice." 28 U.S.C. § 2112(a)(5). Congress thus provided for transfer in extremely limited circumstances: only "to compensate for any harshness [that] may result" from the random selection process; and to "enable th[e] court to take whatever steps are necessary to [e]nsure judicial economy and fairness for all concerned." *Costle*, 582 F.2d at 111-12.

Securus previously conceded—as it must—that Section 2112(a)(5)'s discretionary standard governs whether transfer is appropriate. *See, e.g.*, Commission Br. 105 (noting this concession). Yet in their opening brief, the Providers did not make any showing with respect to either of Section 2112(a)(5)'s

27

considerations. Nor could they. Transfer plainly does not serve the "convenience of the parties." The "convenience" inquiry "balanc[es] . . . competing claims of convenience in the prompt disposition of the petitions." *United Steelworkers of Am., AFL-CIO CLC v. Marshall*, 592 F.2d 693, 696 (3d Cir. 1979). This factor militates in favor of transfer only if "a hearing in [the assigned] court would impose an undue burden." *Ball v. NLRB*, 299 F.2d 683, 689 (4th Cir. 1962). Securus does not explain how convenience would be served by transfer at this late stage. To an even greater extent than when this Court considered Securus' first transfer motion more than six months ago, *see* Order of Court, No. 24-8028 (1st Cir. Oct. 21, 2024), transfer at this juncture would tremendously burden every party to this litigation, who have now fully briefed the merits of their respective petitions in reliance on this Circuit's case law and already litigated numerous threshold issues.

Nor would a transfer be "in the interest of justice." To the contrary, courts have long recognized that "[t]he interest of justice favors retention of jurisdiction in the forum chosen by an aggrieved party where, as here, Congress has given him a choice." *Newsweek, Inc. v. U.S. Postal Serv.*, 652 F.2d 239, 243 (2d Cir. 1981). Consistent with 28 U.S.C. § 2344, DARE, an aggrieved party, exercised its right to file its petition in the First Circuit, where DARE is located, and that forum was selected through the judicial lottery conducted pursuant to Section 2112(a)(5) as the venue in which the record was to be filed.

In short, both of Section 2112(a)(5)'s considerations weigh more heavily against transfer now than they did when this Court previously rejected Securus' arguments, and there is no compelling reason to require the parties to start again from scratch. The Court should continue to reject Securus' attempts to transform a "mechanical rule easy of application" designed "to avoid confusion" into an amorphous and ambiguous inquiry. *NLRB v. Bayside Enters., Inc.*, 514 F.2d 475, 476 (1st Cir. 1975) (per curiam), *aff'd*, 429 U.S. 298 (1977); *see also In re MCP No. 185*, 2024 WL 3517673, at *1 (6th Cir. June 28, 2024) ("Th[e] lottery system would not mean much if a party disappointed by the luck of the draw could transfer the case to its preferred forum.").[9]

## CONCLUSION

The Court should grant Public Interest Petitioners' petitions for review and remand without vacatur to permit the Commission to address the cost and consumer protection issues raised herein.

---

[9] The Providers also argue in the alternative that the Commission's dismissal of Securus' waiver petition was an adjudicatory decision, meaning the time to seek judicial review ran from the Order's release. Providers Opening Br. 29-30 (citing 47 C.F.R. § 1.4(b)(1) and 28 U.S.C. § 2112(a)(1)). Securus does not even allude to that argument in its intervention brief, and the argument in any case fails for the reasons Public Interest Petitioners and the Commission have already extensively explained. *See* Opening Br. 56-58; Commission Br. 107-08.

Dated: June 16, 2025                    Respectfully submitted,

/s/ *Andrew Jay Schwartzman*              /s/ *Jessica Ring Amunson*

Andrew Jay Schwartzman                   Jessica Ring Amunson
525 Ninth Street NW, Seventh Floor       Arjun R. Ramamurti
Washington, DC 20004                     Andrew C. DeGuglielmo
Telephone: (202) 241-2408                Ruby C. Giaquinto
andyschwartzman@gmail.com                JENNER & BLOCK LLP
                                         1099 New York Avenue NW, Suite
*Counsel for Pennsylvania Prison*        900
*Society*                                Washington, DC 20001
                                         Telephone: (202) 639-6000
                                         jamunson@jenner.com

                                         *Counsel for Direct Action for Rights*
                                         *and Equality*

/s/ *Amy E. Potter*

Amy E. Potter
Angeli & Calfo LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
amy@angelicalfo.com

*Counsel for Criminal Justice Reform*
*Clinic*

**CERTIFICATE OF COMPLIANCE**

Under Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure, I certify that this brief complies with the length limits set forth in this Court's Order of December 18, 2024, because it contains 6,990 words, as counted by Microsoft Word, excluding the items that may be exempted under Federal Rule of Appellate Procedure 27(a)(2)(B).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

*/s/ Jessica Ring Amunson*
Jessica Ring Amunson

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jessica Ring Amunson*
Jessica Ring Amunson